6/17/2020 10:54 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 43838219
By: Adiliani Solis
Filed: 6/17/2020 10:54 PM

**CAUSE NO.**

| | | |
|---|---|---|
| **SCOTT SULLIVAN,** | § | **IN THE DISTRICT COURT** |
| **FRANK DELLACROCE,** | § | |
| **ST. CHARLES SURGICAL** | § | |
| **HOSPITAL, L.L.C.,** | § | **_____ JUDICIAL DISTRICT** |
| **ST. CHARLES HOLDINGS, L.L.C.,** | § | |
| **CENTER FOR RESTORATIVE** | § | |
| **BREAST SURGERY, LLC,** | § | |
| **SIGMA DELTA BILLING, LLC,** | § | **HARRIS COUNTY, TEXAS** |
| **CERBERUS INSURANCE CORP.,** | § | |
| **JANUS INSURANCE CORP., AND** | § | |
| **ORION INSURANCE CORP.** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **STEWART A. FELDMAN,** | § | |
| **THE FELDMAN LAW FIRM LLP,** | § | |
| **CAPSTONE ASSOCIATED** | § | |
| **SERVICES (WYOMING), LIMITED** | § | |
| **PARTNERSHIP, CAPSTONE** | § | |
| **ASSOCIATED SERVICES, LTD.,** | § | |
| **JEFF CARLSON, and** | § | |
| **CAPSTONE INSURANCE** | § | |
| **MANAGEMENT, LTD** | § | |
| **Defendants.** | § | |

---

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs, Scott K. Sullivan, M.D., Frank J. DellaCroce, M.D., St. Charles Surgical Hospital, L.L.C., St. Charles Holdings, L.L.C., Center for Restorative Breast Surgery, L.L.C., Sigma Delta Billing, L.L.C., Cerberus Insurance Corp., Janus Insurance Corp., and Orion Insurance Corp. (collectively, the "Plaintiffs") respectfully petition the Court and aver as follows:

Exhibit A

## DISCOVERY CONTROL PLAN

### 1.

Plaintiffs intend that discovery be conducted under Level Three of Rule 190 of the Texas Rules of Civil Procedure and affirmatively plead that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169.

## CLAIM FOR RELIEF

### 2.

Pursuant to Texas Rule of Civil Procedure 47, Plaintiffs seek monetary relief over $1,000,000, and to compel arbitration to the extent that any claim is arbitrable, pursuant to the Federal Arbitration Act.

## PARTIES AND VENUE

### Plaintiffs

### 3.

Plaintiff, Scott K. Sullivan, M.D., is an individual residing in St. Tammany Parish, Louisiana at 106 Fontainbleu Dr., Mandeville, LA 70471. The last three digits of plaintiff Scott K. Sullivan, M.D.'s driver's license number are 548. The last three digits of plaintiff's Social Security number are 247.

### 4.

Plaintiff, Frank J. DellaCroce, M.D., is an individual residing in Jefferson Parish, Louisiana at 303 Sena Dr., Metairie, LA 70005. The last three digits of plaintiff Frank J. DellaCroce, M.D.'s driver's license number are 524. The last three digits of plaintiff's Social Security number are 796.

5.

Plaintiff, St. Charles Holdings, L.L.C., is a limited liability corporation doing business in Orleans Parish, Louisiana at 1717 St. Charles Ave., New Orleans, LA 70130.

6.

Plaintiff, Center for Restorative Breast Surgery, L.L.C., is a limited liability corporation doing business in Orleans Parish, Louisiana at 1717 St. Charles Ave., New Orleans, LA 70130.

7.

Sigma Delta Billing, L.L.C. is a limited liability corporation doing business in Orleans Parish, Louisiana at 1717 St. Charles Ave., New Orleans, LA 70130.

8.

Cerberus Insurance Corp. is a corporation doing business in Orleans Parish, Louisiana at 1717 St. Charles Ave., New Orleans, LA 70130.

9.

Janus Insurance Corp., is a corporation doing business in Orleans Parish, Louisiana at 1717 St. Charles Ave., New Orleans, LA 70130.

10.

Orion Insurance Corp., is a corporation doing business in Orleans Parish, Louisiana at 1717 St. Charles Ave., New Orleans, LA 70130.

**Defendants**

11.

Defendant, Stewart A. Feldman, an individual, may be served with process at defendant's usual place of business in Harris County at Two Post Oak Central, 1980 Post Oak Blvd., Suite 1900, Houston, TX 77056-3877 or wherever defendant may be found.

12.

Defendant, The Feldman Law Firm, LLP, a Texas Limited Liability Partnership whose registered office is located in Harris County at 1980 Post Oak Blvd., Suite 1900, Houston, TX 77056-3877, may be served with process by serving its Managing Partner, Stewart Feldman, at that address.

13.

Capstone Associate Services (Wyoming), Limited Partnership, a Wyoming Limited Partnership, whose registered office is located in Harris County at P.O. Box 460203, Houston, TX 77056, may be served through the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because defendant is required by Texas Business Organizations Code section 5.201 to appoint and maintain a registered agent in Texas, but defendant's registered agent cannot be found with reasonable diligence.

14.

Defendant, Capstone Associated Services, Ltd., a Texas Limited Partnership whose registered office is located in Harris County at 1980 Post Oak Blvd., Suite 1900, Houston, TX USA 77056-3877, may be served with process by serving its registered agent for service of process, Stewart A. Feldman, at that address.

15.

Defendant, Jeff Carlson, an individual, may be served with process at defendant's usual place of business in Harris County at Two Post Oak Central, 1980 Post Oak Blvd., Suite 1900, Houston, TX 77056-3877 or wherever defendant may be found.

16.

Capstone Insurance Management, LLC, a Delaware Limited Liability Company whose registered office is located in Harris County at 1980 Post Oak Blvd., Suite 1900, Houston, TX 77056-3877, may be served though the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because defendant is required by Texas Business Organizations Code section 5.201 to appoint and maintain a registered agent in Texas, but defendant's registered agent cannot be found with reasonable diligence.

17.

This litigation involves breach of contract, breach of fiduciary duty, tort, legal malpractice, and breach of professional obligations against Defendants Stewart A. Feldman, The Feldman Law Firm LLP, Capstone Associated Services (Wyoming), Limited Partnership, and Capstone Associated Services, Ltd., and Jeff Carlson (collectively, the "Defendants").[1] Venue is proper in Harris County because all or most of the defendants maintain their principal offices in Harris County Texas under Texas Civil Practice and Remedies Code § 15.002.

## SUMMARY

18.

Defendants agreed to design, implement, operate, manage, and administer an alternative risk planning program to protect Plaintiffs, Scott K. Sullivan, M.D., Frank J. DellaCroce, M.D.

---

[1] Feldman is an owner and founder of Capstone.

(the "Doctors"), and their business entities. Upon learning that the program designed by Defendants presents substantial risks to Plaintiffs due to a U.S. Tax Court ruling against another of Defendants' clients, the Doctors contacted Defendants to wind down their participation in the program in accordance with the parties' contract. Defendants refused to wind down the program, mispresenting that it could not be wound down.

## FACTS AND CLAIMS

### 19.

The Doctors are surgeons who perform restorative breast surgeries for women with breast cancer at the Center for Restorative Breast Surgery in New Orleans, Louisiana.

### 20.

Defendants proposed to the Doctors a turnkey arrangement to design, implement, operate, manage, and administer an alternative risk planning program for the Doctors and their business entities (the remaining Plaintiffs). Defendants represented that the program would protect Plaintiffs against a multitude of loss exposures and also provide tax benefits.

### 21.

Based on Defendants' representations, the Doctors entered into an Agreement dated October 22, 2015 and revised November 15, 2015, a copy of which is attached as Exhibit "A." Only the Doctors are signatories to that 2015 Engagement Letter. Additionally, Carlson and certain other defendants are not signatories to that 2015 Engagement Letter; however, Carlson was one of the primary individuals at Capstone responsible for managing and administering the captive insurance policies on the Doctors' behalf. The Agreement describes the services to be performed on a turnkey basis jointly by the Defendants, including Capstone and the Feldman Law Firm,

listing the following services:  underwriting, risk management, day-to-day administration and operations of an insurance enterprise, designing insurance coverages, pricing insurance coverages, and administering insurance coverages.[2] The Agreement further described the turnkey services to be performed by Defendants:

> [O]ur Firm and Capstone (and persons acting on behalf of these entities) will handle the design, formation and all aspects of the insurance operations on behalf of the captives, including operating the captives, designing and maintaining the risk coverages, complying with the domicile's investment diversification requirements and maintaining the captive's accounting records.  We will also endeavor to make available to you an insurance pooling arrangement through PoolRe (see Exhibit E) which Capstone administers on behalf of many joint clients of Capstone and the Firm (and their affiliated insureds) as well as the owners of PoolRe.[3]

The Agreement provided that Defendants would not interfere with investments:  "Neither Capstone nor our Firm will handle the checkbook or the brokerage investment accounts, nor will we advise on the specific investments being made by the captives."[4]

22.

The Agreement provided that Plaintiffs would have all managerial and decision making control.  The Agreement provides for Plaintiffs having "ultimate managerial control" on PDF page 18 of the Agreement:

> WHEREAS, Capstone offers the Firm's clients the option of having it (Capstone) take on administrative responsibility on a turnkey basis for the captives under a multi-year contract, with Capstone drawing on a variety of outside professionals, including professionals in the Firm, to assist it, with the Firm exercising oversight over Capstone's activities, with **the Client[, Plaintiffs and their companies,] having ultimate managerial control**.[5]

---

[2] See Agreement (Exhibit "A"), PDF p. 43.
[3] Id. at PDF p. 44 (footnote omitted).  PoolRe is a risk pooling arrangement controlled by Defendants, described in greater detail in paragraph 25.
[4] Id. at PDF pp. 43-44.
[5] Id. at PDF p. 18 (emphasis added).

7

Similar provisions for managerial and decision making control are provided throughout the Agreement, as seen in this example on the following page: "With the **Client exercising ultimate decision making and managerial control**, and with direction from **the Firm (which also is acting at the direction of the Client**), Capstone shall provide services in accordance with terms conditions set forth herein."[6]  The Agreement recognizes that the Doctors and their companies are "retaining **ultimate decision making authority over the totality of the Companies' operations**."[7]

23.

As part of the turnkey services, Defendants agreed "to commit to keep you informed as to the status of your representation and to provide you, where possible, with available alternative courses of action" and "to use reasonable care and to put forth a diligent effort."[8]

24.

The Agreement provides that Plaintiffs shall have access to files maintained by the Feldman Law Firm LLP: "The Firm's files of your matters are available for your inspection."[9] The Agreement also provides that Plaintiffs shall have access to all books and records maintained by Capstone: "The Companies shall have the right at all reasonable times during normal business hours to audit, examine, and make copies of its books and accounts maintained by Capstone pursuant to this Agreement.  Capstone shall cause to be maintained such financial records for a period of six (6) years."[10]

---

[6] Id. at PDF p. 19 (emphasis added).
[7] Id. (emphasis added)
[8] Id. at PDF p. 13
[9] Id.
[10] Id. at PDF p. 23.

25.

As part of the turnkey services, Defendants offered participation in third party insurance through Defendants' PoolRe, which the Agreement describes as a "risk pooling arrangement involving sets of generally similar policies covering generally similar risks of closely-held businesses, wherein each captive assumes reinsurance on policies covering other client of Capstone."[11]

26.

Participation in Defendants' PoolRe arrangement was the key to obtaining the tax benefits of the program designed, implemented, and administered by Defendants.

27.

To obtain the tax benefits from the insurance program designed, implemented, and administered by Defendants, Plaintiffs participated in the Defendants' PoolRe arrangement as directed by Defendants.

28.

In the latter part of 2019, Plaintiffs became aware that a decision by the Tax Court in the case of <u>Reserve Mech. Corp. v. Comm'r of Internal Revenue</u>, 115 T.C.M. (CCH) 1475 (T.C. 2018), could have very negative consequences for Plaintiffs.  In <u>Reserve Mechanical</u>, the United States Tax Court concluded that "that PoolRe was not a bona fide insurance company."[12]  In addition, the Tax Court determined Reserve Mechanical "was not operated as a bona fide insurance company, and there was no legitimate business purpose for the policies that Reserve issued for the

---

[11] <u>Id.</u> at PDF p. 38.
[12] <u>Reserve Mech. Corp. v. Comm'r of Internal Revenue</u>, 115 T.C.M. (CCH) 1475 (T.C. 2018).  A copy of the Tax Court Opinion is attached as Exhibit "B."

insureds."[13]  The Tax Court found "that Reserve's transactions were not insurance transactions in the commonly accepted sense."[14]

29.

The Reserve Mechanical program was also set up by Defendants.  In particular, the PoolRe arrangement that the Tax Court found "not [to be] a bona fide insurance company" was the same PoolRe involved in Plaintiffs' insurance program.

30.

Accordingly, the Doctors requested in late 2019 that Defendants liquidate and wind down Plaintiffs' program that the Defendants had designed, implemented, and administered.  For example, on October 15, 2019, the Doctors sent an email to Feldman asking Defendants to initiate the wind down:  "Not sure if Dave Sherman [the Doctors' attorney] told you, but I want to start the wind down of this captive.  What is the process?"[15]  Feldman replied with his acknowledgement, stating:S "We have heard this from David and we'll follow up."[16]

31.

On October 21, 2019, the Doctors reiterated to Defendants their request for wind down and liquidation, stating:

> I realize we have of complete our contractual obligation for you to assist in management of our captives.  However, **as owner of the captive I am directing its closure by the end of this year at the latest**.  We can negotiate terms of remaining payments.  **I do not care to be in this space anymore**.[17]

---

[13] Id.
[14] Id.
[15] See October 15, 2019 email exchange between Sullivan and Feldman, a copy of which is attached as Exhibit "C."
[16] Id.
[17] See October 21, 2019 email exchange between Sullivan and Feldman, a copy of which is attached as Exhibit "D" (emphasis added).

32.

On October 30, 2019, another email was sent on behalf of the Doctors to Defendants reiterating the wind down request and providing notice of termination of the Agreement per the terms of the Agreement in advance of the December 31, 2019 deadline in the Agreement:

> As we discussed last evening, [the Doctors] have decided to activate the notification provision in the engagement agreement that they wish to terminate. This is done well before the December 31, 2019 deadline. They also no longer wish to purchase additional insurance coverage for future years. **They want the 3 entities wound down and liquidated**.[18]

33.

Defendants obfuscated and failed to wind down and liquidate the program that Defendants had designed, implemented, and administered for Plaintiffs.

34.

Plaintiffs continue to pay all amounts owed under the Agreement.

35.

On March 20, 2020, the Internal Revenue Service sent correspondence to Plaintiffs regarding their insurance program administered by Defendants.[19] The IRS correspondence advised of potential adverse consequences, including disallowance of deductions taken pursuant to Plaintiffs' insurance program that was designed, implemented, and administered by Defendants.[20]

---

[18] See October 30, 2019 email on behalf of Plaintiffs to Defendants, a copy of which is attached as Exhibit "E" (emphasis added).
[19] See March 20, 2020 Letter from IRS, a copy of which is attached as Exhibit "F."
[20] Id.

36.

Due to Defendants' failure and refusal to wind down the program that Defendants designed, implemented, and administered, Plaintiffs engaged a third-party, Peter Strauss and his firm, to accomplish the wind down and liquidation.

37.

To accomplish the wind down and liquidation, Plaintiffs requested that Defendants provide Plaintiffs and Mr. Strauss with documents and information.  Defendants have refused and failed to provide the documents and information.  As of the time of this Demand, Defendants' failure to provide the documents and information has prevented the wind down and liquidation of the program designed, implemented, and administered by Defendants.

38.

By virtue of their position of trust with respect to the Doctors and their companies, Defendants owed fiduciary duties to Plaintiffs.

39.

Defendants have breached the Agreement and breached their fiduciary, tort, and professional obligations owed to Plaintiffs independent from the Agreement in the following non-exclusive particulars:

A.  Failing to provide the documents and information, as required by the Agreement and as required by independent professional, fiduciary, and tort obligations;

B.  Failing and refusing to liquidate and wind down the program that was designed, implemented, and administered by Defendants;

C.  Failing to provide complete control and decision-making authority, as required by the express provisions of the Agreement;

D.  Breaching the obligation owed to Plaintiffs under the Agreement regarding decision making and managerial control, which should have allowed Plaintiffs ultimate decision making and managerial control, including the ability to direct liquidation and wind down of the program that was designed, implemented, and administered by Defendants;

E.  Negligently misrepresenting to Plaintiffs the ability to wind down and liquidate the program that was designed, implemented, and administered by Defendants. Defendants failed to exercise reasonable care and competence in obtaining or communicating said information. Plaintiffs' reliance on Defendants' representations was justifiable. Defendants' negligent misrepresentations proximately caused Plaintiffs' injuries;

F.  Breaching the fiduciary duties and professional obligations owed by Defendants, including obligations owed by Feldman as the Doctors' lawyer, by occupying a conflict of interest position in which Defendants owed an obligation to Plaintiffs that conflicted (who wanted to leave PoolRe and the program) with the position of Defendants (who stood to gain from continuing to administer PoolRe and their other clients' captives) and acting on that conflict by failing to execute the Doctors' directives, including the liquidation and wind down of the program that was designed, implemented, and administered by Defendants;

G.  Failing to offer alternatives to accomplish the goals of the program, particularly when PoolRe and similar programs were declared a failure by the Tax Court in <u>Reserve Mechanical</u>, in breach of the professional and tort obligations to Plaintiffs and in breach of the express terms of the Agreement that required Defendants to provide "alternative courses of action" and "to use reasonable care and to put forth a diligent effort;"

H.  Defendants violated the Texas Business & Commerce Code — Texas Deceptive Trade Practices Act by engaging in false, misleading or deceptive acts toward Plaintiffs in (1) making, or directly or indirectly causing to be made, an assertion, representation, or statement with respect to the winding down of the captive insurance program that was untrue, deceptive, or misleading; (2) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion; (3) a failure to disclose information in violation of Section 17.46(b)(24); and (4) an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion. Defendants acted knowingly and/or intentionally, and Defendants' wrongful conduct was a producing cause of Plaintiffs' injuries;

I.  Legal malpractice, breach of fiduciary duty, and professional negligence by Stewart Feldman, the Feldman Law Firm, and other Defendants' professionals.

J.  Defendants breached the standard of care that arose from the attorney-client relationship by the aforementioned acts. Defendants' breach of the standard of care proximately cased injury to Plaintiffs;

K.  Breach of fiduciary duties which proximately caused injury to Plaintiffs;

L.  Breach of the Agreement;

M.  Negligence in failure to adhere to the applicable standards of care;

N.  All other breaches and failures implicit in the circumstances described in this Statement of Claims; and

O.  All other breaches and failures to be shown at the trial of this matter.

40.

All of aforementioned breaches proximately caused the following damages incurred by Plaintiffs:

(a) all taxes, penalties, and interest paid and/or owed and/or may subsequently be held to be owed to the Internal Revenue Service;

(b) all taxes, penalties, and interest paid and/or owed, or which may be found to be owed, to the Internal Revenue Service;

(c) a refund, return, and/or disgorgement of all amounts paid under the Agreement to the Defendants;

(d) all amounts paid to wind down and liquidate after the requests to liquidate and wind down were not honored by Defendants;

(e) the loss in value between the time liquidation and wind down were requested and the time the liquidation and wind down are accomplished (e.g., drop in value of investments); and

(f) mental anguish.

41.

By statute, claims for breach of fiduciary duty under Texas law are subject to the discovery rule. With respect to any assertion of statute of limitations by Defendants, Plaintiffs plead application of the discovery rule. Plaintiffs did not receive information or documentation from Defendants concerning the conduct described in this Original Petition. Plaintiffs did not learn of the facts giving rise to their claims and described in this Original Petition until the fall of 2019.

42.

Plaintiffs plead, without limitation, all claims, causes of action, damages, and remedies supported by the circumstances described in this Petition.

43.

The Doctors have filed a valid arbitration demand presenting their claims before Hon. Stanwood Duval (retired) to occur in Houston, Texas. Such arbitration was properly constituted pursuant to the Agreement, which the Doctors filed on May 28, 2020. This lawsuit was necessitated because the Defendants are wrongfully challenging the validity of that arbitration before Judge Duval. To the extent that the claims pleaded herein are subject to arbitration, the Doctors respectfully request an order compelling arbitration of such claims before Hon. Stanwood Duval, in accordance with the U.S. Federal Arbitration Act.

## **PRAYER**

**WHEREFORE**, Plaintiffs respectfully request that a judgment be issued in their favor and against Defendants for all relief, remedies, and damages supported by the circumstances presented in this Complaint, including without limitation the following:

(a) A declaratory judgment that Defendants are liable for all taxes, penalties, and interest paid and/or owed and/or may subsequently be held to be owed to the Internal Revenue Service;

(b) An award of all taxes, penalties, and interest paid and/or owed, or which may be found to be owed, to the Internal Revenue Service;

(c) A refund, return, and/or disgorgement of all amounts paid under the Agreement to the Defendants;

16

(d) An award of all amounts paid to wind down and liquidate after the requests to liquidate and wind down were not honored by Defendants;

(e) An award of the loss in value between the time liquidation and wind down were requested and the time the liquidation and wind down are accomplished (e.g., drop in value of investments);

(f) An award of treble damages under the Texas Business & Commerce Code;

(g) Mental anguish.

(h) A declaratory judgment that Defendants breached the Agreement;

(i) A declaratory judgment that Plaintiffs have the right to wind down and liquidate the program;

(j) An order compelling the production of the documents, books, records, and information related to the program, including without limitation the documents and information needed to wind down and liquidate the program.

(k) An award of attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 38.001 and costs;

(l) An order directing that, to the extent that the claims pleaded herein are subject to arbitration, arbitration of such claims shall be arbitrated before Hon. Stanwood Duval, in accordance with the U.S. Federal Arbitration Act; and

(m) All other relief, damages, and remedies available.

Dated: June 17, 2020

Respectfully submitted,

/s/ *James M. Garner*

JAMES M. GARNER (#79312)
PETER L. HILBERT, JR. (*pro hac vice* to be submitted)
THOMAS J. MADIGAN, II (*pro hac vice* to be submitted)
JEFFREY D. KESSLER (*pro hac vice* to be submitted)
**SHER GARNER CAHILL RICHTER**
**KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 2800
New Orleans, Louisiana 70112-4046
Telephone:      (504) 299-2100
Facsimile:      (504) 299-2300
E-Mail:         jgarner@shergarner.com

**McDowell Law Group LLP**
Kacy J. Shindler
State Bar No. 24088407
ks@houstontrialattorneys.com
603 Avondale Street
Houston, Texas 77006
Telephone      (713) 655-9595
Facsimile      (713) 655-7868



# THE FELDMAN LAW FIRM LLP
TWO POST OAK CENTRAL
1980 POST OAK BLVD., SUITE 1900
HOUSTON, TEXAS 77056-3877

TELEPHONE (713) 850-0700
www.feldlaw.com

TELECOPIER (713) 850-8530
TELECOPIER (713) 623-6636

October 22, 2015 (Revised November 10, 2015)

Scott K. Sullivan, M.D.
Frank J. DellaCroce, M.D.
c/o St. Charles Surgical Hospital
1717 St. Charles Avenue
New Orleans, LA 70130

*By email: scottsullivanmd@gmail.com*
*By email: drd@brestcenter.com*

Re: *Joint Engagement Letter For Captive Formation/Administration*

Dear Dr. Sullivan and Dr. DellaCroce:

This is the joint engagement letter regarding the formation and operation of an alternative risk planning arrangement. This engagement proposes that the Firm and Capstone jointly serve as the "captain of the ship" with regards to your three cell arrangements, all as discussed below.

This letter supplements our agreement with each of the Firm and Capstone for administering your alternative risk planning program as such now exists and sets forth the roles and responsibilities of the various parties with respect to such. As well, various options (e.g., secured lending, the above discussed reorganization, etc.) are made available to you.

*SCOPE OF SERVICES.* Note that there are three basic types of property & casualty insurers, being formed and operated under Internal Revenue Code ("IRC") §501(c)(15), §831(b) or §831(a). In your case, the entities formed and operated under IRC §831(b) ("intermediate" captives), which has a practical annual premium limitation of $1,000,000± , are applicable to the Clinic given the scope of its business. See Exhibit D.

As explained, the purpose of the existing three cell arrangements (as may be continued in Cerberus CC, Janus CC, and Orion CC) is to protect the Clinic against a multitude of loss exposures beyond those economically covered by commercial insurance based upon ISO-form policies commercially available through, for example, Liberty Mutual, Zurich, The Hartford or Travelers.

We note that the nature of your business presents good examples as to why property & casualty insurance companies are formed in the first instance. That is, there exists otherwise uninsured but insurable risks (that is, "coverage gaps") associated with owning and operating a speciality hospital, with over 90 physicians having privileges and having hundreds of support staff across several businesses, your dependence on key employees (e.g., the Clinic's CEO Cheri Saltaformaggio, and CFO Sarah Underwood, CPA), the loss of whose services would result in lost business/added costs, all in addition to billing operations for multiple entities, along with the operations of at least three medical practices. Additionally, there exists the multitude of risk factors beyond your control (e.g. changes in medical reimbursement rates, contracts with third party payors, legislative and regulatory restrictions on physician owned hospitals, the ever changing regulatory environment, etc.).

# EXHIBIT A

# THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 2

Our clients (that is, clients of Capstone and the Firm) involved with evaluating captive insurance planning commonly have expressed an interest in being free of: (i) the ongoing underwriting, risk management, and day-to-day administration and operations of an insurance enterprise; and (ii) the ongoing involvement of designing, pricing, and administering insurance coverages, and interfacing with regulatory authorities. For these reasons, we usually are asked jointly to handle these matters on a turnkey basis, as was done by you in this instance.

To help accomplish these tasks, the Firm has associated itself with Capstone Associated Services (Wyoming), Limited Partnership and its affiliate, Capstone Associated Services, Ltd., a Texas limited partnership (collectively "Capstone"), which is owned by certain of the Firm's lawyers and related parties, to provide many of the needed insurance, underwriting, accounting and other non-legal support services.

Our Firm's work and Capstone's activities, as described below, will be performed in our collective multiple capacities on behalf of, as appropriate: (i) the owners of the captives insurer in connection with the formation of the captives; (ii) the Clinic and certain of its affiliates as the insureds; and (iii) the captives, Cerberus CC, Janus CC, and Orion CC, as the insurers. At all times you (whether directly or indirectly through the captives) will have exclusive control over the monies in the captives and its various investments, subject to the captives' compliance with insurance regulatory requirements calling for either a given level of reserves or a particular form of securities in which they must be held[1]. Neither Capstone nor our Firm will handle the checkbook or the brokerage investment accounts, nor will we advise on the specific investments being made by the captives. However, our Firm and Capstone (and persons acting on behalf of these entities[2]) will handle the design, formation and all aspects of the insurance operations on behalf of the captives, including operating the captives, designing and maintaining the risk coverages, complying with the domicile's investment diversification requirements and maintaining the captives' accounting records. We will also endeavor to make available to you an insurance pooling arrangement through PoolRe (see Exhibit E) which Capstone administers on behalf of many joint clients of Capstone and the Firm (and their affiliated insureds) as well as the owners of PoolRe.

As explained above, our work is generally on behalf of the captives but also at times on behalf

---

[1] At a minimum you should expect that the captives must maintain its initial capitalization (which, assuming the formation is in Delaware, would be $250,000 for the Section 831(b)-type captive) in first class, non-volatile, marketable securities, usually in the form of income producing, high quality liquid debt instruments. By way of comparison, Anguilla's capitalization would be $200,000, assuming $1,00,000 in first year premiums. These requirements can be met by contributing existing qualifying securities to the captives. The preferred investment would be in bank certificates of deposit or U.S. Treasuries. An amount equal to the year end liabilities will need to be maintained in similar investments.

[2] Note that the Firm and Capstone in turn draw upon the resources of various other service providers (e.g., auditors, risk managers, commercial insurance brokers, outside underwriters, lawyers, Capstone's Texas affiliates, etc.) in providing their services called for under this agreement.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 3

of the captives' shareholders and of the captives' various insureds[3]. In doing so, both our Firm and Capstone additionally will draw upon the skills and expertise of persons outside of both organizations, at our expense, as part of our overall turnkey fee arrangement unless otherwise noted. These other persons may include local co-counsel, a resident manager (which is a Capstone subsidiary), a resident director in the domicile of choice (e.g., Delaware), actuaries (where applicable), risk managers, the captives' auditors, a company manager (U.K. territories) and registered agent, and other U.S. based professionals, who can be changed only with your concurrence upon our recommendations. Not included in the turnkey package are any fees due to your CPA to review and sign captive related state and federal tax returns as their preparer and any other work requested by you.

More specifically, the Firm's role as your lawyers and the cooperative role of Capstone (and persons working under both) is to provide the following services included in our turnkey fee arrangement:

1.  Providing comprehensive tax, legal, accounting, risk, insurance, re-insurance and regulatory planning services designed to address the structuring of the captives arrangement, and conducting the captives insurance company operations beginning with the formation of the new captives.[4]

2.  Preparing and filing all tax, legal, and regulatory reports for the captives in all jurisdictions, including formation filings, except the various state premium tax filings (as such may exist) and the federal Form 990 (or Form 1120 PC, as appropriate) will be drafted by us for review and revision and ultimate completion, signature and filing by your CPA who will serve as the preparer of all tax returns (see footnote 4). Your CPA's compensation is your sole obligation.

3.  Coordinating - and together with the rest of our team, performing - the structure functions of an ongoing insurance business, including structuring insurance coverages, drafting insurance policies, obtaining independent quotations and premium reviews, obtaining audits by an independent CPA firm qualified to practice before the regulatory authorities of the chosen domicile and preparing statutory reports to the captives' regulators.

4.  To the extent you decide to do so as part of meeting the generally recognized

---

[3] We note that in order for Capstone to properly maintain the accounting records for Cerberus CC, Janus CC, and Orion CC, your bank/broker must send the original bank/brokerage statements to the captives' Delaware or Anguilla office address which is the primary address of Cerberus CC, Janus CC, and Orion CC, with a copy of all bank/broker statements (including copies of cancelled checks, deposit slips, etc.) to Capstone, with of course another copy being directed to you, as an officer of the captives.

[4] Given that the insurance policies, the third party risk pool and captive management was done by the previous captive manager for 2015, we think the previous manager should be responsible for the 2015 financials, reporting and tax returns. Given the difficulty in receiving the information so far, we think this is a practical necessity. We understand that the previous captive manager has been paid for 2015 work, so this is not an issue.

TWO POST OAK CENTRAL • 1980 POST OAK BLVD. • SUITE 1900 • HOUSTON, TX 77056-3877 • 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 4

criteria set forth in applicable case law on this issue, endeavoring to procure for your consideration and evaluation, unrelated insurance business (reinsurance assumed) for the captives at a prudent level for fiscal policy periods beginning 12/31/15.[5] As part of this program other third parties will consider underwriting your insured's coverages. See Exhibit E.

5.      Administering the entire operation of the captives in a prudent and cohesive manner to ensure compliance with laws and regulations in the captives' domicile as we understand them currently.

6.      In this regard, please note the division of responsibilities between Capstone and the Firm. Advice and counsel as to the legal, tax and regulatory issues will come from the attorneys of the Firm. Neither Capstone nor its employees and representatives provide any legal, tax or regulatory advice, and although Charles Earls is a CPA, he provides no public accounting services through Capstone or to the clients of either Capstone or of the Firm. Also, because the officers and directors of the captives retain the ultimate decision whether to underwrite a particular risk, Capstone does not perform underwriting in the traditional sense, although it does make recommendations on risk coverages and policy pricing. The function of Capstone is to execute the numerous oversight and administrative responsibilities required by the captives in accordance with the guidance provided by the captives' resident manager, legal and other advisors, and you as the officers and directors of the captives. To be clear, however, Capstone is a significant client of the Firm and the intellectual property which comprises the captives insurance planning being undertaken is exclusively the property of Capstone.

7.      We will work with the current banking and captive management providers to re-establish the bank account's ownership as that of the separate Delaware captives. Neither Capstone nor our firm ever holds authority to sign on clients' accounts or make investment decisions on their behalf.[6]

Services such as the following are not included in the scope of this turnkey agreement (whether from the Firm or from Capstone): (i) providing risk management services to any person or assisting in the acquisition of conventionally available insurance; and (ii) engaging in the promotion, negotiation, sale or contract finalization of any agreements of insurance in

---

[5] We recommend a limited amount of unrelated insurance coverage (i.e., to cover insureds which are not a part of your affiliated group to the extent of 30%-50% of net written premiums). Historically, we have recommended 30% but are more recently suggesting the 50% level. For more on this issue, see Exhibit C. If you elect to do so, we will assist you in this regard as part of our turnkey package of services. See Exhibit E. Note that pooling and other third party insurance is offered in conjunction with PoolRe Insurance Corp., which is independently owned by a third party but is administered by Capstone under the direction of PoolRe's officers and directors. The Feldman Law Firm LLP also does occasional legal work for PoolRe.

[6] Note that there is pool money being held that continues on at least through March 1, 2016 and subjects the three cells to losses.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

## THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 5

the State of Louisiana.[7]  The Firm's and Capstone's role relates to the various aspects of the cells captives' operations and their ongoing operation and may extend to the optional Delaware captives as well.

***Term of Agreement.***  Our services under this engagement letter are for an initial five plus year term, during which our fees will remain fixed as set forth herein.  Drawing on the Firm, Capstone will design and write for review and binding by your captives, 12-month insurance contracts (that is, fiscal year contracts) for the twelve months beginning December 31, 2015.  It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement, subject to satisfying PoolRe's criteria which it sets from time-to-time.  See Exhibit E.

As discussed above, this is a five plus year agreement ending August 31, 2021.  Following appropriate notice as set forth herein, you may cancel these ongoing services (which ends Capstone's ongoing responsibilities as of August 31, 2021 under the "Service Agreement", a copy of which is enclosed as Exhibit B) and in conjunction with doing so, also end Capstone's and our Firm's our ongoing responsibilities.  Because of: (i) our need to commit personnel to the operations of the captives, (ii) our commitments to our associates, (iii) the tail on certain coverages being underwritten by your captives, and (iv) the significant up front work, should the nature of our relationship change at the end of the initial term, written notice to us must be received prior to December 31, 2019.  In all cases of termination, the effectiveness of the cancellation notice is predicated upon all payments due Capstone and the Firm being current as of the time that written notice is given.  If terminated by you in this fashion, no further payments will be due for work done after August 31, 2021, at which point our services will cease and our obligations under this agreement will terminate.  If not terminated by you in this fashion, i.e., by advance written notice given by December 31, 2019, this agreement will automatically renew for a three year term under the same financial arrangements, the first such renewal period being September 1, 2021 - August 31, 2024; furthermore, every three (3) years, this agreement will renew (i.e., absent our timely and qualifying receipt of notice to terminate), so as to always provide Capstone and the Law Firm at least twenty (20) months notice of any change in our relationship.

***Reorganization of the Cell Captives into Standalone U.S. Captives.***  We understand that you have concluded, after seeking inputs from your outside counsel and CPA, to have our Firm (and Capstone) move forward with a tax free reorganization of The Bahamian cell captives into three standalone U.S.-domesticated captives, done on a tax free basis.

The reorganization will include the formation of new Delaware captives, and the production of a full insurance application, business plan and financial pro formas.  That is, we are starting from scratch by forming three, U.S. captives and organizing the three cells into these newly formed entities on a tax free basis.  Assuming that we will be doing the reorganization from all of tax, legal, financial, and insurance standpoint, our fee will be included in the overall fees paid to Capstone (and then paid by Capstone to the Firm for the Firm's services) that will begin

---

[7]If your captives are domiciled outside the U.S., your captives will be taking the reporting position that it does not engage in the insurance business in the United States.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 6

on December 31, 2015 and continue through at least August 31, 2021. Note that this project encompasses, in addition to the design, formation, organization and assistance with funding of these three new captives, the tax free acquisition of the cell assets (or the entities) and the tax filings associated with same.

***Ownership of Reorganized Cerberus CC, Janus CC, and Orion CC; Officers and Directors.*** We have preliminarily discussed that Cerberus CC, Janus CC, and Orion CC will continue to be directly owned by Dr. Scott K. Sullivan and Dr. Frank J. DellaCroce, all as currently existing.

Delaware requires a resident director, and in this regard we propose Dana Moore, who currently serves as the resident director and local agent for our other Delaware entities. Ms. Moore is not intended to be an officer, and you will appoint two directors, giving you a majority on the board. Fees for the resident director (if the decision is made to form in Delaware) are included as part of our turnkey fee.

***Capstone.*** The Captives will engage Capstone which will serve as the resident manager, or it will engage a resident insurance manager on behalf of each captive in Delaware to assist in the ongoing services needed to properly implement and administer this planning. The responsibilities of Capstone (relative to those of the Firm) are set forth in Exhibit A and with the Services Agreement (with Capstone) for the captives attached as Exhibit B. Our Firm will work with the designated team of professionals and related service providers (that is, we will quarterback the overall planning for your captives and coordinate our work with your CPA and with the domicile manager, etc.[8]) although our Firm reserves its rights to upwardly adjust its fees in the event a team other than that of Capstone and the Firm is chosen by you. The respective responsibilities of Capstone and the Firm (and subsumed within such, the work of the resident manager) and other third parties working under Capstone's administration and with the Firm's direction have been set out in a manner so that, as between these organizations, all aspects of the initial set-up and ongoing administrative or regulatory work will be conducted either by the Firm or Capstone, each acting from time-to-time as circumstances warrant on behalf of either (i) the captives, (ii) the insured(s), (iii) the captives' owners, or (iv) the resident manager. This is intended to ensure that all of the many moving parts of the captives' planning are professionally and timely handled. This is also in furtherance of the responsibilities of the Firm in the case of a state or federal tax inquiry (see pages 11-12) or a domicile audit.

Unless otherwise expressly set forth herein, you agree to engage our Firm, Capstone, and the designated resident manager to carry out their called-for duties and responsibilities. Recognizing that the fees quoted below are based upon a Delaware incorporation and domicile, and the term agreement specified with the pattern of fees set forth herein, as opposed to being

---

[8] We note that changing the members of the team, for example, by having our Firm work with other auditors or resident managers, will result in duplicate work, redundant costs and likely extra fees on our part related to the increased complexity and administrative burden. As noted above, an affiliate of Capstone, CIMA, will also provide services to Cerberus CC, Janus CC, and Orion CC, all of whose fees are included in the overall turnkey fee. The voluntary of involuntary termination of the Firm will nonetheless obligate Capstone and Capstone obligates you to this agreement for the contract term provided herein in all situations.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

## THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2016)
Page 7

front weighted in recognition of large amount of up-front transition work being undertaken. Capstone's affiliate, Capstone Insurance Management, Ltd. ("CIMA"), which is also an affiliate of the Firm and under common ownership, is the anticipated insurance manager.

*Fees.* In the captives' initial years, there is a substantial amount of legal design and drafting, technical insurance planning, regulatory approval, financial and administrative work, all of which is reflected in the amount and timing of our fees. The purpose of our assignment is to continue to assist you in operating the existing cell arrangement and likely transitioning such into U.S. domiciled, standalone captive insurers.

We understand that you are directing us to undertake the reorganization portion of the assignment. Additionally, our work includes in addition to the ongoing management of the captives, preparing the application for the captives, obtaining the necessary approval from Delaware's Director of Insurance to form and operate your insurance companies, actually forming, organizing and capitalizing the insurance companies, and assisting you in identifying the risks to be insured (with you retaining all decision making on coverages and policy pricing) and preparing the necessary policies to evidence those risks being borne by the captive insurance companies along with obtaining third party quotations for the costs of such coverages in the marketplace. At least two conferences or in-person meetings are expected to be held by the resident manager yearly with the Delaware Insurance Commissioner or the Commissioner's staff. We will make available to the three cells (as may evolve into Cerberus CC, Janus CC, and Orion CC), as an option, the ability to participate (subject to satisfying the pool criteria) in unrelated insurance risks, in which the captives may (or may not) participate, subject to compliance with the program's terms. We will provide up-front and ongoing legal and tax support for the overall alternative risk planning structure.

In addition we will prepare documents to facilitate the exit of the three cells from the overall cell arrangement and oversee the return of assets to your cells. In this regard, we understand that monies are on deposit with the core or with an existing pooling arrangement.

We understand that at some point you will want assistance in handling the investment of the captives' excess reserves (that is, what remains after the captives' expenses and losses) whether those be investments in bonds, certificates of deposit, stocks, loans to affiliates, or participation in other planning for your captives' hoped for residual retained profits. While we are not investment managers, we will assist in the legal and, through Capstone, the regulatory, accounting and reporting aspects of such investment activities. See below. Note, however, that a captive is a regulated insurance company, and in this regard, its investment and operations are subject to the regulatory oversight in the chosen domicile. To be sure, the captives cannot be operated as a personal checking account.[9]

---

[9] By way of example, you should not expect that in Delaware any more than 40% - 50% of the captives' "excess" reserves (generally being the amount in excess of the captives' initial $250,000 capitalization plus all liabilities plus perhaps a margin) can be loaned back to your operating entity, which itself is a special concession made to Capstone-administered captives in, for example, Delaware because of our recognized experience in administering captive and history of performing as directed by insurance regulators. For federal tax purposes, however, we recommend that clients keep these affiliated loans in the usual case at less than 50%. The lower the better. Nonetheless, the types of investments and the amount able to be put into each category are governed

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 8

Our workload, which is very substantial in the early years of the captives' formation and organization, may level off somewhat thereafter, which is generally more than offset by what we find are more active captives as their capital builds and as other planning opportunities therefore become more available. At some point you may ask the Firm to assist in distributing the captives' profits and even shutting down the captives; we stand ready to assist in that regard as part of our regular, quarterly retainer, without further charge.

As is true of any business enterprise, there is some uncertainty in the amount of costs and expenses which we will incur in providing this service. In complex endeavors such as this, there is an extra level of unpredictability in quantifying such costs, recognizing that you desire as much certainty as possible in committing to this project. To this end, we have assembled a turnkey service package[10] and fee structure which only *excludes*:

> (i) any taxes or related payments which any State government, any other country or the Internal Revenue Service (IRS) assesses or is due on or with respect to: (a) the captives; (b) the insured companies; or (c) the parent-owners[11].

> (ii) any financing activities involving the captives and other legal work (e.g., a real estate transaction) beyond our preparing general secured loan agreements (i.e., standard secured lending where accounts receivables are the primary security) (subject to the fee set forth below) which we will endeavor to dovetail with your existing lines of credit.  More tailored factoring plan design and implementation, legal document drafting and related work will be billed at the Firm's and Capstone's standard billing rates; and

> (iii) other expanded captives planning opportunities beyond that outlined herein, such as having the captives acquire, finance or participate in real estate investments or estate planning or trust work.

In general, Capstone's turnkey fee (which is inclusive of fees then paid by Capstone to the Firm) is inclusive of such significant matters as compensating the statutory captives manager (one of our affiliates), all Delaware insurance licensing and Delaware corporation fees and all

---

by numerous Delaware regulations, which change from time-to-time.

   [10] Of course, any underwriting or investment losses are the responsibility of your insurer (and similarly any such gains accrue to its benefit) and are not the responsibility of either Capstone or the Firm.

   [11] Under current law, the proposed structure of Cerberus CC, Janus CC, and Orion CC as intermediate captives would result in the captives being: (i) free of local income taxes (but not the myriad of fees for licenses and filing fees which is part of Capstone's fixed fee arrangement in the chosen domicile; and (ii) free of U.S. income and excise taxes on the captives' underwriting profits.  Investment income is taxed as in a C corporation. Federal, state and local taxes may be due upon the captives' wind up and liquidation or upon dividends being paid.

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 9

financial audit fees, statutory triennial audit, annual independent CPA audit[12] and other
"standard services" (as set out in Exhibit A) being provided by Capstone and by our Firm.
However, fees for services requested that are beyond those specified as standard services or
for work beyond the services contemplated by this Agreement, will be charged at standard
rates of the Firm or Capstone, as the case may be. By way of example, if you decide to seek
regulatory approval to have your captives make a mortgage loan to an affiliate to finance a
building, we would separately charge to make application to the Delaware Department of
Insurance for such a use of the captives' assets as a permitted investment and to perform (if
you so request) the legal work related to the financing. Additionally, should you ask our Firm
to represent you in a real estate acquisition, we also would separately charge for such
services. Generally, however, we seek and usually obtain up-front permission from the
domicile's regulator for certain types of corporate lending such as loans to operating
businesses, which are nonetheless subject to additional regulatory limitations.

The overall fees, which are paid to Capstone (which in turn pays the Firm for legal work
undertaken whether or not in excess of the total fees paid) for their respective services, total
as follows:

* **Calendar Years 1 - 5 (December 31, 2015 - August 31, 2021):** Given a broad
range of coverages with premiums for each captive being no more than
$1,000,000± .each, with coverages spread among your operating entities:

- installments of $11,875 per quarter per captive for calendar year 2016
(($160,000-$17,500)/[4 quarters x 3 captives]);

- installments of $13,334 per quarter per captive for the first half of 2017
($160,000/[4X3]); and

- installments of $16,000 per quarter per captive for the second half of
2017 through August 31, 2021 ($192,000/[4X3]).

Payments are due January 1st, April 1st, July 1st and October 1st of each year
(2021 being prorated), such inclusive of both Capstone's and the Firm's efforts.
See footnote 6. If you elect to engage in secured corporate lending to affiliates,
our ongoing fees increase by $2500 per captive per quarter due for the whole
of any calendar year in which a loan is outstanding. If there are similarities in
the secured lending arrangements there will be some economies of scale which
we will pass onto you. Note that the existing unsecured lending arrangement
should cease. Please see enclosed Guidelines on Administration and Billing.

***RISKS AND RESPONSIBILITIES.*** It is our intention under this planning to elect special tax
treatment as to the insurance and investment operations of Cerberus CC, Janus CC, and Orion

---

[12] The audit will be performed on a scheduled turnkey basis by a domicile-licensed independent auditor,
at Capstone's choice, or by another accounting firm recommended by Capstone, subject to your prior approval.
In all cases, the auditing firm must be licensed and approved by the regulators. The first audit will likely be for the
combined period of formation through December 31, 2016.

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 10

CC under relevant provisions of the Internal Revenue Code and to obtain tax deductibility for the premiums paid to the captives by the affiliated insureds. This planning assumes that the captives' aggregate direct and pooled net written premiums are no more than $1,000,000.00± per calendar year, which seems reasonable based upon the preliminary information from the feasibility study, and that other legal, regulatory, and judicial requirements of the planning (e.g., premiums do not exceed $1.2 million/year, the captives conduct themselves as insurance companies, etc.) are respected. See Exhibit C attached.

Should the IRS challenge the planning being done herein as to its IRC Section 831(b) status, subject to the timely payment by you of the fees due us from time-to-time, such fees being in all ways current, and the uninterrupted and continued retention of the Firm and Capstone for the scope of services described in this agreement, the Firm agrees to represent you without further payment of legal fees in any IRS audit (either field, office or by mail), before IRS Appeals, in an IRS mediation, and then, if appropriate, file on your behalf a petition and an opening legal brief in the U.S. Tax Court regarding the issues related to the planning being done herein under IRC Section 831(b) (and no other issues but those specified herein). Note that our obligations under this paragraph run only for federal or state tax challenges which relate to the captives' operations post-December 31, 2015 (the beginning of Capstone's and the Firm's role) and not for prior work done by your existing service providers. To be clear, legacy work is not covered, but the Firm is likely willing to take on any challenge under a separate fee agreement.

In the history of Capstone and our Firm with respect to alternative risk planning dating back to our beginnings in 1998, we have never gone beyond this point (that is, the point covered by our fixed fee arrangement) and have been able to resolve issues satisfactorily (that is, with "no change") well short of even basic discovery in the U.S. Tax Court, which (as noted) is outside of the scope of the fixed fee portion of this agreement. Of course, in connection therewith, we cannot guarantee any particular result, and several others are still in process.

As we have discussed previously, this planning technique – as well as other types of advanced business and tax planning – involves inherent risks and should only be undertaken by those who understand and can evaluate and bear such risks. A non-exhaustive but lengthy discussion of the risks plus other pertinent issues (e.g., a detailed summary of our experience with the IRS in these planning areas) are set forth in the attached Exhibit C. See also the materials listed on www.CapstoneAssociated.com. In connection with our work, it is additionally important that you commit to retain the services of a highly competent and diligent CPA, whose involvement is critical to maintain the interface of the Clinic and your captives, and to review and file the various state and federal tax returns which will be presented in draft form for signature.

*ADDITIONAL PLANNING.* Captive insurance planning opens up the opportunity for related business, financial and tax planning. This and other opportunities will be brought to your attention for your consideration. As discussed previously, these additional planning matters are not included in the turnkey fee arrangement discussed above, and for such work we would separately invoice you if requested to perform such.

## THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 11

Please sign below and return a copy of this agreement to us to that Capstone and our Firm can
continue our joint work on this project. We look forward to working with you.

Very truly yours,

Stewart A. Feldman on behalf of
Capstone and the Firm

enclosures:    ■Engagement Retainer Invoice

            ■Guidelines on Administration and Billing (applicable to both the Firm
            and Capstone)

            ■Exhibit A - Duties and Responsibilities: (i) of Capstone Associated Services,
            Ltd.; and (ii) of THE FELDMAN LAW FIRM LLP

            ■Exhibit B - Services Agreement

            ■Exhibit C - Tax Risks Inherent in §831(b) planning

            ■Exhibit D – Brief Description of Types of Captives

            ■Exhibit E - Supplement on Third Party Insurance

***CIRCULAR 230.*** I may ask the Attorney's advice regarding federal tax issues. The Internal
Revenue Service (IRS) does not allow me to rely on informal tax advice rendered before I file
my tax return to avoid tax penalties. If I want to rely on the Attorney's federal tax advice to
avoid tax penalties, the IRS requires the Attorney to issue formal written tax opinions
regarding the tax issue(s). Formal written tax opinions are not within the scope of this
engagement. The IRS rules also prohibit someone else from using the advice the
Attorney provides to me. All communications from the Attorney are intended for my
use only and include, and are intended to reflect, in substance, the following notice:

> ***Treasury Circular 230 Disclosure:*** To the extent this communication
> contains any statement of tax advice, such statement is not intended or
> written to be sued, and cannot be used, by any person for the purpose
> of, or as the basis for, avoiding tax penalties that may be imposed on
> that person. This communication is not intended to be used, and cannot

Shown from Office of Marilyn Burgess District Clerk

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 10, 2015)
Page 12

     be used for the purpose of promoting, marketing, or recommending to
     another party any matter addressed in this communication.

This legend is attached pursuant to U.S. Treasury Regulations governing tax practice,
to comply with requirements imposed by the Internal Revenue Service. I will let the
Attorney know if I want a formal, legal opinion regarding tax issues. I agree to sign
a separate engagement letter with the Attorney to show I want such an opinion. I
understand that the cost of such an opinion will be substantial given the IRS
requirements.

APPROVAL TO PROCEED AS DESCRIBED ABOVE:

_____
Scott K. Sullivan, M.D.

_____
Date

_____
Frank J. DellaCroce, M.D.

_____
Date

copy:    Capstone Associated Services, Ltd. *(w/encl.)*
       att: Charles B. Earls III, President
       Two Post Oak Central
       1980 Post Oak Blvd., Suite 1950
       Houston, TX 77056-3877

       David Kushner, CPA *By email*

       David Sherman, Esq. *By email*

S:\client\sullivan\frank\engagement agmt 11.10.15 std agt.wpd

CLIENT INFORMATION: GUIDELINES ON ADMINISTRATION & BILLING

As with any type of legal representation, advanced financial structuring or sophisticated business planning, no one can provide guaranties regarding the outcome of any matter. We do commit, however, to use reasonable care and put forth a diligent effort on your behalf. We also commit to keep you informed as to the status of your representation and to provide you, where possible, with available alternative courses of action.

The Feldman Law Firm LLP (the "Firm") provides open communication regarding the status of your legal affairs. Access to persons knowledgeable about your legal affairs will always be available. Your phone calls will be returned promptly. Every attempt will be made to respond to emergency situations. Throughout our engagement, copies of all significant documentation relating to your legal affairs will be provided to you on a timely basis. The Firm's files of your matters are available for your inspection.

You have agreed that attorney Stewart Feldman, or another attorney in the Firm, has primary responsibility for the supervision of your legal affairs under the parameters of the engagement letter, and recognize that other attorneys in the Firm will provide services to you from time-to-time. Should you have any problem communicating with anyone, or should you have any concerns regarding attention to your legal affairs, please contact Mr. Feldman immediately.

For any additional work beyond that described in a fixed fee engagement letter with either Capstone or the Firm, you will receive a regular statement for such attorney's fees and expenses incurred in your representation. Each invoice will be itemized setting forth specific work performed and expenses incurred. The Firm bases its billing on hourly rates (customary hourly rates range from $195 - $495 for attorneys with paralegal staff at $100 - $195 per hour. Capstone rates range from $125 - $225 per hour. Although hourly rates are the basis for billings, we review each bill and the actual amount billed may be greater or less than that derived from the hourly rates, such adjustment based upon the novelty and complexity of the issues involved, the skill required to provide proper legal representation, the magnitude of the matter, the results achieved, the time frame required for handling the matter and any other circumstances which have a material and direct impact on the reasonable value of the legal services performed. From time-to-time, billing rates are modified to reflect a particular expertise and the changing cost of providing legal services. We will provide you, at any time upon your request, a current list of hourly rates. Note that all retainers, deposits and payments are deemed fully earned when paid and are for the reservation of the organization's time to do the called for work, in addition to the obligation to do such work.

Expenses advanced will be billed with the monthly invoice for matters such as photocopy charges, fax charges, delivery fees, filing fees, certified mail charges, travel expenses, court costs, deposition costs, electronic research services, secretarial overtime (when necessary to comply with your time requirements) and other expenses. You authorize us to retain and direct such other persons and companies to render services on your behalf as may be necessary and you further agree to reimburse us at the time of our invoice for any expenses thereby incurred. Of course, we will confer with you before incurring material expenses on your behalf.

All invoices are due upon receipt. If an invoice is not paid within twenty (20) days from the invoice date, the amount due shall accrue interest at the rate of 18% per annum from the invoice date until paid (unless that rate exceeds the maximum legal rate, in which case the maximum legal rate of interest shall be charged). Should Capstone or the Firm be required to take formal action to recover any amounts owed it under your engagement letter agreement or any invoice, you agree that the Firm will be entitled to recover reasonable attorneys' fees and costs. Although we may provide services to your trusts, corporations, partnerships, and/or other entities, we look as well to the owners of our clients to personally insure payment of all legal fees for work undertaken and each of the owners of our clients agree to assume personal liability for these sums.

You understand and acknowledge that although we will endeavor to provide you with recommendations and alternatives based on our best judgment, there can be no guarantee of successful consummation of any transaction, that each decision must be your own, and that the ultimate responsibility of each decision must necessarily be yours. Accordingly, you may incur substantial fees and other expenses in connection with matters we will handle on your behalf, even though you may not achieve your desired result. Unless expressly stated otherwise in writing, any U.S. federal tax advice provided by this Firm or its lawyers, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service.

GUIDELINES ON ADMINISTRATION & BILLING
    CAPSTONE AND THE FIRM

Page 2

Additionally, please note that The Patient Protection and Affordable Care Act (H.R. 3590), signed into law on March 23, 2010, codifies a federal income tax doctrine known as the "economic substance doctrine." Under this new legislation, a transaction has economic substance only if the taxpayer's economic position (other than its federal tax position) changed in a meaningful way and the taxpayer had a substantial purpose (other than a federal tax purpose) for engaging in the transaction. The new law states that profit potential may be taken into account only if the present value of the reasonably expected profit from the transaction is substantial in relation to the present value of expected net tax benefits that would be allowed if the transaction were respected. Furthermore, financial accounting benefits arising out of a reduction in federal income tax are disregarded in determining whether the taxpayer has a substantial purpose for entering into the transaction.

Failure to demonstrate the economic substance of a transaction will be subject to an automatically-applied penalty equal to 20% of the underpayment (40% if the transaction is not adequately disclosed on the tax return). The new law imposes virtual strict liability for these penalties by eliminating the reasonable cause and good faith defenses otherwise available under existing law.

You may terminate our legal representation at any time upon written request. The Firm may withdraw from your legal representation should: (i) it believe such continuation is prohibited by the Code of Professional Responsibility; (ii) you fail to comply with our agreements as reflected in your engagement letter or any subsequent agreements or commitments to the Firm; or (iii) the Firm believes, for any reason, the attorney/client relationship is compromised or has been detrimentally affected. In the event the Firm withdraws, you agree to promptly retain other legal counsel. Upon termination or withdrawal, you agree immediately to pay all accrued and outstanding attorneys' fees and expenses including through the conclusion of any fixed price assignment or for a given term, plus subsequent fees incurred by the Firm to facilitate the transfer of representation to any subsequent law firm and/or for the Firm to fully and completely withdraw. If you have contracted with Capstone, the withdrawal of the Firm will not affect Capstone's obligations to you or your obligations to Capstone, which as to called for non-legal services and fees shall be undiminished.

*POTENTIAL CONFLICTS.* When we are asked to provide legal services for more than one person (e.g., multiple owners of a business or a husband and a wife in an estate planning assignment or a business matter), conflicts may arise. If we are to act as attorneys for multiple persons, we must balance the interests of all persons involved. Therefore, we cannot be an advocate for any one person against another in the case of multiple representation. The process could favor one to the detriment of the other. By way of further example, a substantial conflict could arise in the determination of what constitutes community property versus separate property. That determination may be more beneficial for one spouse than the other. Further, while divorce may not be contemplated, it is important to realize that estate planning, and especially estate planning that incorporates declarations of gift, could have consequences that either spouse may find adverse in the event of divorce. As an additional example, because the Firm represents and Capstone administers many insurers (captive and otherwise), including for those of affiliates of the Firm and Capstone, the Firm will not take on representation adverse to or to the detriment of or against those persons within the scope of the Firm's representation. Similarly, our recommendations could affect the income, property, and support provisions in any divorce or after the death of one of the spouses or that of one business partner versus another. For these and other reasons, each person or entity is advised to and welcome to have separate counsel.

*    *    *

Should any dispute arise out of or in conjunction with the attorneys' fees and/or costs and/or expenses of the legal work previously performed for you or your affiliates by THE FELDMAN LAW FIRM LLP or its lawyers, agents or principals that cannot be settled by good faith negotiation between the parties, either party may submit the legal fee dispute to the Houston Bar Association's Fee Dispute Committee for binding and nonappealable resolution, which shall be the sole and exclusive forum to resolve disputes regarding legal fees but not otherwise. Note that while we hope that any dispute will be amiably resolved directly between us, the State Bar of Texas investigates and prosecutes professional misconduct of Texas attorneys. Should you have any questions, the Office of the General Counsel of the State Bar will provide you with information regarding the Bar's procedures.

GUIDELINES ON ADMINISTRATION & BILLING
CAPSTONE AND THE FIRM

Page 3

With respect to any and all other controversies, disputes or claims whatsoever between (x) the Firm (including its lawyers) and/or its affiliates (including Capstone Associated Services, Ltd., Capstone Insurance Management (Anguilla), Ltd., and/or Export Assurance) (including their employees, officers and directors) and (y) any client of the Firm and/or its affiliates related to or arising out of the Firm's or its affiliates' services or arising under or in connection with or related to any of the parties' agreements (but in no event for attorneys' fees for services previously rendered, see preceding paragraph), either party may submit the dispute to any recognized, neutral (x) arbitral association or (y) arbitrator for final resolution in an arbitration proceeding to be concluded within four months, except that the American Arbitration Association (AAA) shall not administer the arbitration. Submission of the dispute to arbitration under this agreement shall be the sole and exclusive forum for resolving any and all disputes between the parties, except for attorneys' fees for services previously rendered which are before the HBA's FDC.

Except as to the HBA's FDC which shall apply its own rules, all arbitrations – regardless of the arbitral organization or arbitrator actually hearing the dispute – shall be conducted in Houston, Texas applying Texas substantive law pursuant to the Commercial Arbitration Rules (and not the rules for Large, Complex Commercial Cases) of the American Arbitration Association (AAA) then in effect, whose Expedited Procedures shall apply regardless of the monetary size of the dispute or the number of parties to the proceeding, with only a single arbitrator hearing the dispute, again all regardless of the organization sponsoring the arbitration in question. All parties acknowledge and agree that this arbitration agreement modifies the AAA arbitration rules regarding, inter alia, the selection of the arbitrator and the administration of the arbitration in that: (1) either party may directly appoint the single arbitrator or the arbitral association who/which shall proceed to resolve the dispute, provided that the arbitrator is recognized and neutral; (2) the AAA is not required to administer and shall not administer the arbitration; and (3) any recognized and neutral arbitrator himself/herself or arbitral association may administer the arbitration. The arbitrator or arbitral association appointed to resolve the dispute shall have the sole and exclusive ability to rule on all aspects of the arbitrator's appointment, including, but not limited to, disputes or challenges of bias and neutrality.

In all cases, the parties shall be deemed to have adopted the Optional Rules of the AAA For Emergency Measures of Protection (regarding injunctive or equitable relief, which requests for relief shall exclusively be submitted to the arbitrator). In all events, the parties waive the right to trial by jury in any action or proceeding. This arbitration provision shall be effective notwithstanding any actions that may later take place. The parties agree that the issue of arbitrability shall likewise be decided by the arbitrator, and not by any other person. That is, the question of whether a dispute itself is arbitrable shall be decided solely by the arbitrator and not, for example, by any court. The parties agree that the arbitrator has exclusive authority to resolve all disputes and challenges to the formation and enforceability of this arbitration agreement, and decide all disputes or challenges to the enforceability of the parties' agreements as a whole. The parties agree that their intent is to divest the courts of all powers in disputes involving the parties, except to compel arbitration, and to confirm, vacate or enforce award. The courts shall have no jurisdiction over legal or equitable (including injunctive) matters. The arbitration decision shall be final and binding in all respects. Any person may have a U.S. District Court or another court of competent jurisdiction enter the findings of the arbitrator for all purposes, including for the confirmation and enforcement of any award.

If the first arbitrator or arbitral organization which receives a written demand for arbitration of the dispute from either of us does not complete the arbitration to finality within four months of receiving the written demand, any party then may file another written demand for arbitration of the dispute with another recognized, neutral, arbitrator or arbitral association, with the prior arbitrator or arbitral association then being immediately divested of jurisdiction, and the replacement arbitrator or arbitral association being required to render a final award within four months of the new, written demand being filed with the replacement arbitrator or arbitral organization. The replacement arbitrator shall not be the original arbitrator. Additionally, the parties agree that the dispute resolution process set forth above concerning the first (non-HBA FDC) arbitration demand, shall apply to every subsequent arbitration. We look forward to working with you.

September 18, 2015

S:\clients\st charles brarlang agmt\client guidelines 9.15.wpd

## Exhibit A
### Respective Duties and Responsibilities of
### Forming and Operating Captive Insurer by the Firm and Capstone

The following duties and responsibilities are the standard services to be independently provided for under the joint engagement agreement by the persons shown below.

**Duties and responsibilities to be performed by The Feldman Law Firm LLP:**

▪ Research and design of the overall business and financial plan so as to help ensure that the federal tax and legal definitions of what constitutes insurance are met.

▪ In the instance of a Section 501(c)(15) captive, prosecuting the application on behalf of the captive with the Internal Revenue Service to provide for tax exempt treatment under the Internal Revenue Code.

▪ Preparation, filing and prosecution of an election with the IRS to be taxed as a domestic U.S. corporation, assuming that the captive is foreign domiciled.

▪ Research and design of the various corporate and business entities available and relationships to help ensure compliance with appropriate tax, legal and regulatory requirements.

▪ Research and design of the tax structure to help ensure among other things that controlled foreign corporation status is avoided.

▪ Research and design of the plan for repatriating the surpluses.

▪ Feasibility analysis and selection of the operating domicile.

▪ Preparation and submission of the licensing application and other duties attendant to obtaining an insurance license.

**Duties and responsibilities to be performed by Capstone Associated Services, Ltd.:**

▪ Coordinating administrative and regulatory activities with the resident insurance manager in the operating domicile.

▪ Provide administrative support in prosecuting the application on behalf of the captive to the Internal Revenue Service to provide for tax exempt treatment under the Internal Revenue Code.

▪ Coordinating with representatives of the captive the control and management of the cash, investments and other liquid assets of the captive.

▪ Assist Firm in the preparation, filing and prosecution of an election with the IRS to be taxed as a domestic U.S. corporation, assuming that the captive is foreign domiciled.

▪ Assisting representatives of the captive in establishing and overseeing the bank account and the brokerage account wherein the captive's cash and investment securities are held.

▪ Arranging the performance of limited risk management reviews of the insured's loss exposures but only for the purpose of performing the underwriting duties for the captive, which is the process of selecting which of those exposures (the "selected exposures") will be underwritten by the captive insurer.

▪ Arranging to have insurance policies written for use by the captive to cover the aforementioned selected exposures.

TWO POST OAK CENTRAL▪ 1980 POST OAK BLVD., 19ᵀᴴ FLOOR ☐ HOUSTON, TX 77056-5604

RESPECTIVE DUTIES AND RESPONSIBILITIES
OF THE LAW FIRM AND CAPSTONE

Page 2 (cont'd)

■ Arranging the incorporation of the captive in the operating domicile.

■ Filing forms with the Internal Revenue Service regarding the initial qualification of the captive.

■ Other actions and executive oversight of Capstone necessary to complete the process of forming the captive insurance company and monitor its operation to ensure proper implementation of the captive planning.

■ Legal services in conjunction with preparing insurance polices and putting insurance polices in force

■ Legal support services of assisting the insured and the insurer in negotiating, in reaching agreement on terms and in putting the insurance policies into force, with such services to be conducted wholly outside of the state of Florida.

■ Legal services associated with the recurring activities of negotiating and settling claims for the insured affiliate.

■ Drafting the factoring documentation and related assistance in the operations of the factoring activities.

*Services beyond those enumerated above as standard services are not included in the services to be provided under this fee agreement.*

■ Obtaining unrelated (third-party) insurance business of a kind that carries with it prudent financial risk parameters.

■ Arranging the performance of claims adjusting and settlement duties. Arranging all loss reserve and admitted asset evaluations to ensure proper regulatory requirements are met.

■ Keeping the internal financial records and providing periodic reports to management. Arranging the required annual audit by an independent CPA firm. Note that Capstone is not a CPA firm and does not itself provide public accounting services.

■ Arranging and recording annual shareholders meetings and preparing annual shareholder reports.

■ Maintaining a Florida office for the captive for purposes of domesticating the captive as a U.S. taxpayer.

■ Arranging for the preparation and filing of appropriate regulatory reports for the captive in the chosen domicile.

■ Arranging for the drafting of annual IRS tax reporting for review, signature and filing by your outside CPA.  Monitoring and arranging for preparation, through the Firm, for filing by the insured of quarterly or annual state premium tax reports.

*Services beyond those enumerated above as standard services are not included in the services to be provided under this fee agreement. Capstone's obligation to provide these services are independent of the continuing representation of the Firm to a client.*

## Exhibit B
### CAPSTONE SERVICES AGREEMENT

This Services Agreement (this "Agreement") is entered into at Wilmington, Delaware or at The Valley, Anguilla, British West Indies, by and among: (i) CERBERUS CASUALTY CORP[1].; (ii) JANUS CASUALTY CORP., (iii) ORION CASUALTY CORP. (collectively, the "Companies"), Delaware corporations; DR. SCOTT K. SULLIVAN; DR. FRANK J. DELLACROCE; ST. CHARLES SURGICAL HOSPITAL, and their respective "Affiliates" (as such term is defined herein) including, but not limited to, the Companies (all of the aforementioned collectively referred to herein as the "Client"); and (ii) CAPSTONE ASSOCIATED SERVICES (WYOMING), LIMITED PARTNERSHIP ("Capstone"), a Wyoming limited partnership (which is owned by certain of the Firm's lawyers or their affiliates), and joined in for the limited purposes set forth herein by THE FELDMAN LAW FIRM LLP (the "Firm"), effective as of December 31, 2015. Capstone and Client are sometimes individually referred to as a "Party" and collectively referred to as the "Parties."

#### DEFINITIONS

"Affiliates" means any person directly or indirectly controlled by or under common control with another person (whether such be an individual or an entity of any sort) and, in the case of partnerships, shall specifically include all partners, owners and beneficial holders of a person, and additionally includes their signatories, agents, employees, independent contractors, transferees, assigns, officers, members, directors, those with an interest in and all those in privity therewith. For purposes of this Agreement, in the case of Capstone alone, references to Capstone's Affiliates shall not include the Firm (and its successors and assigns), unless the context expressly so states.

#### W I T N E S S E T H

WHEREAS, the Companies conduct property and casualty insurance business domiciled in Delaware;

WHEREAS, the Client is interested in having certain of its operating entities purchase property & casualty insurance from the Companies;

WHEREAS, Capstone is a service provider which provides turnkey administrative services (as described further below) to small property & casualty insurance companies; and

WHEREAS, Capstone offers the Firm's clients the option of having it (Capstone) take on administrative responsibility on a turnkey basis for the captives under a multi-year contract, with Capstone drawing on a variety of outside professionals, including professionals in the Firm, to assist it, with the Firm exercising oversight over Capstone's activities, with the Client having ultimate managerial control.

NOW THEREFORE IN CONSIDERATION OF THE FOREGOING and in connection with the mutual representations, warranties, covenants, and agreements herein contained, and such other due and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, the Client and Capstone hereby agree as follows:

### ARTICLE I
### REPRESENTATIONS AND DECLARATIONS OF THE COMPANIES

The Companies represent that they are duly qualified and licensed insurance companies in good standing as Delaware corporations, operating as insurance companies or otherwise solely in Delaware. The Companies wish to continue to confine their operations to that legal domicile and regulatory jurisdiction. The

---

[1]Assuming the reorganized cells into three standalone Delaware captives. If this option is not elected, the names of the three Bahamian cells will be substituted.

Companies hereby covenant not to undertake any actions in any foreign jurisdiction, and shall both negotiate and issue their insurance policies within the United States.

# ARTICLE II
# COVENANTS OF CAPSTONE

For the benefit of the Companies, Capstone shall use reasonable efforts to obtain the following for the Companies' evaluation and approval: (i) independently procured risks directly written to Affiliates of the Companies' beneficial owners, but only where the procurement of such is outside of the State of Texas; (ii) as to reinsurance assumed (being direct written insurance policies underwritten by other insurance companies which directly or indirectly cede such policies or risks thereunder in whole or in part to the Companies), reinsurance procured outside of the State of Texas; (iii) as to pooled risks of policies directly underwritten by other insurance companies and assumed by the Companies on a quota share basis (hereafter "pooling arrangements"), only to the extent such pooling arrangements are procured outside of the State of Texas; and (iv) from time-to-time such other insurance opportunities as Capstone may identify outside of the State of Texas.

# ARTICLE III
# RELATED AGREEMENTS

This Agreement relates to the joint contractual agreement with the Firm and Capstone set forth in an engagement letter (including all attachments, exhibits and addendums) dated October 22, 2015 (revised October 30, 2015); the "Engagement Letter". Any conflict between this Agreement and the Engagement Letter shall be construed in a manner giving precedence to the Engagement Letter. Further, by execution of this Agreement, the Companies, which were formed after the execution of the Engagement Letter, agree to be bound by the Engagement Letter's terms and conditions as modified hereby, as if made a party to it in the first instance.

# ARTICLE IV
# SERVICES TO BE PROVIDED

The Companies wish to minimize their staffing and to better the quality of their services by contracting with Capstone for the performance of administrative duties for the operation of the Companies, while retaining ultimate decision making authority over the totality of the Companies' operations. Services conducted by Capstone and by persons retained by it are subject to the Companies' ratification of such. With the Client exercising ultimate decision making and managerial control, and with direction from the Firm (which also is acting at the direction of the Client), Capstone shall provide services in accordance with the terms and conditions set forth herein. Accordingly, the Companies hereby contract with Capstone, and Capstone hereby agrees to cause such services to be provided as set forth below.

**4.1    Administrative Services.**  The Companies hereby engage Capstone (acting on its own behalf and in connection with its service providers) to contract with third parties, to perform, and Capstone hereby agrees to perform, or to contract with third parties with competence in needed specialties to perform, the designated administrative and/or consultancy services for the Companies as set forth in this Agreement ("Administrative Services"), subject to the terms and conditions herein. In all instances where actions or judgments of Capstone are called for under this Article, such shall be made in the reasonable judgment of Capstone, subject to the Companies reserving the sole and absolute discretion to direct Capstone otherwise by a written notice within thirty (30) days of Companies having actual notice of any such action having been taken which the Companies wish to contradict. Any actions taken by Capstone which are not contradicted by the Companies in this manner shall be deemed to be actions of the Companies for all purposes.

**(a)    Authority.**  Consistent with the provisions of this Agreement, Capstone shall have the responsibility and commensurate authority to contract with third parties in Delaware (and other locations) to provide Administrative Services. Capstone is hereby expressly authorized to provide Administrative Services

in a manner as Capstone considers reasonable and appropriate (such to be determined in the sole and absolute discretion of Capstone - subject to the Companies' reserved sole and absolute discretion to direct Capstone otherwise) to fulfill its obligations under this Agreement. For example, Capstone has the authority to terminate and replace the independent auditor, the resident insurance manager and other service providers to the Companies, provided Capstone shall give written notification to the Companies' appropriate officer or director, and Capstone's decision can be countermanded by the Companies' notification to Capstone within thirty (30) days of such notice.

In addition to the Capstone services identified in Exhibit "A" to the Engagement Letter and subject in all cases to the obligations of the Companies to timely furnish all information as described in Section 4.1(n) below, a non-exhaustive list of Capstone's duties and responsibilities, subject to the Companies' reserved sole and absolute discretion to direct Capstone otherwise, under this Agreement follows:

> ▪ The maintenance in Delaware of a business office for use on a non-exclusive basis by the Companies.

> ▪ Hiring and overseeing the actions of the resident insurance manager in the operating domicile.

> ▪ Coordinating with the Companies' officers regarding control and their management of the Companies' cash, investments and other liquid assets, which shall remain within the exclusive control of the Companies' officers and directors.

> ▪ Assisting the Companies' personnel, if requested, in establishing the bank account and the brokerage account wherein the Companies' cash and investment securities are held.

> ▪ Arranging or causing to be performed, a limited risk management review of the insured's loss exposures but only for the purpose of analyzing and identifying exposures (the "selected exposures") to be underwritten by the Companies.

> ▪ Arranging to have insurance policies manuscripted, with Capstone making recommendations (for evaluation and decision by the Client) as to policy premium pricing, the terms and conditions of policy coverages, and the level of coverages, all remaining in the sole control of the Client; and licensing documents (subject to Article V hereof) for use by the Companies.

> ▪ Identifying as practical for the Companies' consideration, unrelated (third-party) insurance business.

> ▪ Arranging or causing to be performed outside the State of Texas claims' adjustment for the selected exposures.

> ▪ Arranging for non-actuarial reviews of the Companies' loss reserves sufficient to meet Delaware's insurance regulatory requirements and the ongoing review of such loss reserves.

> ▪ Interfacing with the Companies' regulators, being Delaware Department of Insurance ("Delaware DOI") or the Anguilla Financial Services Commission ("Anguilla FSC").

> ▪ Arranging for the required annual audit by an independent CPA firm licensed by the insurance regulators in the Companies' domicile, and, subject to the Companies' ongoing cooperation and timely assistance, maintaining the books and records of the Companies.

> ▪ Maintaining the financial records for the Companies based upon information provided by the Companies' management and issuing periodic reports to management based

upon such information.

■ Coordinating annual shareholders' and directors' meetings or written consents in lieu thereof.

■ Preparing or causing to be prepared reports from time-to-time for the Companies and its officers, directors and shareholders covering reserve status, policies written, and the results of the Companies' financial performance.

■ Preparing and filing all regulatory reports in Delaware.

■ Arranging for and assisting in the preparation of drafts of IRS Form 1120-PC or Form 990, as appropriate, for review, edit and signature by a CPA or other tax preparer who is compensated directly for such work by the Companies (and not by Capstone), it being acknowledged by the Companies that the Companies have the ultimate obligation for filing any U.S. tax return or extension thereof.

■ Performing services in coordination with and under the oversight of the Firm and in Capstone's so doing, performing the services specified in Exhibit "A" to the Engagement Letter, further subject to the Sections 4.1(f) and (n) below. Capstone (with the Firm acting as disbursing agent on behalf of Capstone) will compensate the Firm for its services. The undersigned expressly acknowledge and understand that the Firm represents Capstone as well as the Companies and that as such the signatories hereto waive any conflict that may exist, with each signatory hereto retaining the right to separately retain at its expense separate counsel.

■ Causing to be prepared, in coordination with the Firm, periodic reports and updates on legal, financial, tax and regulatory issues pertaining to captive insurance companies operating in the chosen domicile.

■ Overseeing and conducting the dissolution and orderly liquidation of the Companies as their irrevocably appointed liquidator hereunder under Delaware law.

Except as otherwise provided in this Agreement, all expenses incurred by Capstone in providing services pursuant to this Agreement shall be borne by Capstone.

(b) **Financial Services.** Capstone shall make available to the Companies' treasury, control and planning services, or the equivalent thereof, to assist the Companies with respect to accounting, risk control, and other financial matters as Capstone determines to be necessary and appropriate. Such services shall include assistance and advice in support of the Companies' CPA's or other financial advisors on bank relations, cash management, financial reporting, accounting, and such other matters as Capstone determines to be necessary; but in no event shall Capstone provide "personal services", or services for "credit", "debt collection", "insurance", "information", "real property", "data processing", and "security", as those terms are defined by statute or regulations for Florida or Texas sales and use tax purposes. Provided, however, as explained further under subparagraph (e) below, Capstone does not serve in a custodial or investment function with regard to the Companies' assets.

(c) **Tax and Audit.** Subject to the Companies' obligations to provide continuing cooperation as set forth in subpara. (n) below, Capstone shall arrange for, coordinate and pay for the annual independent audit of the Companies' books and reports as part of and contemporaneously with Capstone's work for other clients generally, all as mandated by Delaware DOI. Capstone shall also have responsibility for causing to be prepared and submitted to the Companies for input, assistance and execution all required tax and regulatory filings for the Companies in Delaware. As to all required tax and regulatory filings due elsewhere, principally in the United States, Capstone's responsibility shall only be to arrange for the drafting of such filings, for review and signature by others, with any taxes then due remitted by the Companies from their own funds. Capstone does not and shall not provide as part of this or any other service, professional accounting, tax or legal services, such as, by way of example and not by way of limitation, any legal, tax or regulatory advice. By way of

further example, while Capstone shall be obligated to pay for the financial audit when timely performed as set forth above, Capstone is not the Companies' independent auditor. The Companies' failure to timely fulfill their responsibilities as set forth under subpara. (n) below will result in additional costs and expenses borne by the Companies for both the ongoing work of Capstone and the separate completion of the audit of the Companies distinct from Capstone's other clients.

(d)      **Fiscal Budgeting Matters**. In addition to arranging for general bookkeeping services throughout the year, Capstone from time-to-time shall assist the Companies in their preparation of their operational budgets.

(e)      **Bookkeeping, Accounting, and Financial Records**. Capstone shall arrange for the maintenance in Delaware of the bookkeeping records of the Companies and otherwise establish procedures, controls, and systems for the maintenance, and safekeeping of records and books of account reflecting the Companies' operations, all of which shall be prepared and maintained in accordance with appropriate accounting principles accepted by Delaware DOI. However, Capstone does not have and shall not have any control or custody over the nature or type of the Companies' investments or procedures relating to the Companies' cash, securities and other valuables. Capstone will, however, advise the Companies on the regulatory parameters on the Companies' investments as set forth by Delaware DOI.

Within approximately one hundred seventy (170) days after the end of the calendar year, Capstone shall arrange for the preparation and delivery to the Companies of the Companies' balance sheets and income statements reflecting the financial status as of and for the year then ending, all of which shall be prepared in accordance with appropriate accounting principles accepted by Delaware DOI. Capstone shall also arrange for the preparation and delivery from time-to-time to the Companies of unaudited financial statements to be used for management purposes only, as frequently as reasonably requested in writing by the Companies.

An objective of Capstone is efficiently and responsively providing high quality services in support of the Companies insurance operations. To meet this objective, Capstone will endeavor to group its requests for information necessary to document loans, support corporate housekeeping functions, support the Companies' insurance operations, etc.; however, to facilitate this goal, the Companies recognizes that it must be timely and responsive in providing information. The Companies recognize that additional costs (including legal fees) as a consequence of the Companies' failure to provide information in a timely fashion will be the responsibility of the Companies pursuant to Section 4.1(n).

(f)      **Legal**. Capstone shall coordinate its services to the Companies with the Firm and such additional legal advisors as Capstone or the Firm determines to be necessary. The Companies may hire whatever additional legal counsel the Companies wish to supplement or replace those of the Firm at the Companies' sole expense and without reduction of the fees due under the Engagement Letter, which are due nonetheless to Capstone. Generally speaking, the legal services being provided by the Firm in coordination with Capstone, for which Capstone compensates the Firm, include the standard legal support services for the day-to-day operation of the companies such as monitoring and responding to regulatory changes, manuscripting insurance policies for licensing by Capstone, drafting standardized line of credit agreements and updating corporate records, along with the other legal services specified in Exhibit "A" to the Engagement Letter. Additionally, Capstone stands ready to compensate the Firm for the legal and tax defense set forth in the Engagement Letter. However, from time-to-time opportunities or issues may arise outside of the scope of standard legal services provided by the Firm, for which the companies may require legal and/or other professional services. For example, if the Companies wish to make an investment in other than Delaware Department of Insurance approved securities or a loan secured by collateral other than accounts receivable, equipment, or inventory, the qualification of that investment with Delaware DOI and the documentation of that investment would be outside the scope of the standard legal services provided by the Firm in coordination with Capstone and the Firm's and Capstone's related services shall be separately charged to and borne by the Companies. Additionally, the Companies at their own expense may request the Firm to supplement such standard legal services by separate arrangements with the Firm.

(g)      **Supplies**. Capstone shall arrange to obtain and provide all reasonable office supplies, and shall ensure that the Companies' office(s) is at all times adequately stocked with the supplies that are reasonably necessary and appropriate for the operation of their offices and the business therein.

(h)   **Office and Support Services.**  Capstone shall arrange for printing, stationery, forms, postage, duplication or photocopying services, and other support services that are reasonably necessary and appropriate for the operation of the Companies' office and the business in the office.

(i)   **Regulatory Licenses and Permits.**  Capstone shall use reasonable efforts to arrange for the application and maintenance in the name of the Companies of all U.S. federal and Bahamian or Delaware (as the case may be) regulatory licenses and permits required for and in connection with the operation of the Companies. The Companies understand and acknowledge that they take the regulatory position that the Companies are not subject to state insurance regulations outside the state of the Companies' domicile.

(j)   **Contract Negotiations.**  Capstone shall arrange to advise the Companies with respect to and shall arrange to negotiate, either directly or on the Companies' behalf, as Capstone determines to be necessary and appropriate, all contractual arrangements with third parties for the Companies' business, including, without limitation, negotiating agreements with third parties.  Agreements on behalf of the Companies shall be entered into as provided for in this Section 4.1.

(k)   **Access.**  The Companies shall have the right at all reasonable times during normal business hours to audit, examine, and make copies of its books and accounts maintained by Capstone pursuant to this Agreement. Capstone shall cause to be maintained such financial records for a period of six (6) years.

(l)   **Office Support, Reports, and Records.**  Capstone shall arrange to establish, monitor, and maintain appropriate office procedures and policies for the timely creation, preparation, filing and retrieval of all business records in connection with the Companies' business, and of all other proprietary information of the Companies.  Capstone shall maintain the confidentiality of all customer records in accordance with all applicable state and federal laws and shall establish written policies and procedures for such.  Capstone will cause its third party service providers to also maintain the confidentiality of all customer records.

(m)   **Additional Reports.**  Capstone will arrange for the preparation, analysis and filing of any other reports and records as are reasonably necessary for the Companies' business.

(n)   **Companies' Obligation to Furnish Information.**  In connection with the accounting, legal and bookkeeping services described above and elsewhere in this Agreement and the Engagement Letter, the Companies hereby undertake to regularly provide to Capstone:

(i) promptly each month and without further follow-up by Capstone, copies of all account information of the Companies (whether such be one or more bank or brokerage account(s) or accounts with other types of financial institutions), including but not limited to copies of all deposits, withdrawals, transfers, and copies of all checks written and cleared, along with an explanation of each such transaction, in order to enable Capstone to timely and accurately maintain the books and records of the Companies and in order to ensure that certain statutory obligations of persons servicing the Companies and/or Capstone are timely met;

(ii) in connection with any authorized line of credit between the Companies and any borrower, Companies shall timely deliver copies of the fully executed loan documents (as well as any applicable amendments and modifications) and cause all borrowers to timely prepare and deliver to Capstone needed advance requests, borrowing base reports, and other periodic reports and information in connection with such loan as well as any other information required by Delaware DOI or by the Companies' resident insurance manager, registered agent or independent auditors; and

(iii) in connection with third party risk management consultants and annual auditors, updated financial statements, tax returns, and conventional insurance policies and related underwriting documents.

Should Capstone not regularly receive such information to enable it to efficiently and timely perform its functions, then Capstone may charge additional fees to the Companies (i) to compensate Capstone in identifying, locating, obtaining or creating information reasonably needed by Capstone in the performance of its obligations hereunder or (ii) in paying third party consultants or the Firm for their additional fees due to the

Companies' delay.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall Administrative Services include "personal services", "credit reporting services", "debt collection services", "insurance services", "information services", "real property services", "data processing services", "security services", or any other "taxable services" as those terms are defined by statute or regulations for Florida or Texas sales and use tax purposes. Furthermore, since it is not a law firm or a CPA firm, under no circumstances will Capstone itself provide any legal or CPA services.

    4.2    **Service Providers.**  In performing their obligations under this Agreement, the Companies acknowledge that Capstone will be retaining at Capstone's expense the services of third party service providers, all as and to the extent Capstone deems reasonable and appropriate.

    4.3    **Personnel.** Except as specifically provided in this Agreement, Capstone from time-to-time shall retain at its expense and shall be responsible for training, supervising, and terminating administrative and other nonprofessional personnel for the benefit of the Companies as Capstone deems reasonably necessary and appropriate for Capstone's performance of its duties and obligations under this Agreement. Capstone shall have sole responsibility for determining salaries and providing fringe benefits for personnel and for remunerating independent contractors, and for withholding income tax, unemployment insurance, social security, or any other withholding or filing information reports, as required by all applicable laws. Capstone shall appropriately prepare, maintain, and file all requisite reports and statements regarding income tax withholdings, unemployment insurance, social security, workers' compensation, equal employment opportunity, or other reports and statements required with respect to personnel employed or retained by Capstone and provided to the Companies pursuant to this Agreement.

    4.4    **Place of Assistance.** Administrative Services to be rendered pursuant to this Agreement may be performed for the Companies in Florida, Delaware, or Anguilla or at other locations, including Texas where Capstone Associated Services, Ltd., a Texas limited partnership, a subsidiary of Capstone is located.

    4.5    **Time to be Devoted to Contractual Duties.** Capstone shall devote reasonable efforts to the discharge of its duties hereunder as appropriate.

    4.6    **Term of Assistance.** Capstone's Administrative Services to the Companies due under this Agreement and in connection with the Engagement Letter shall commence on the effective date first above written being December 31, 2015 and shall continue for a term of five (5) plus years ending August 31, 2021, with such term being automatically renewed for successive three (3) year periods ("Successive Terms") beginning on each successive third (3rd) anniversary date thereafter until terminated by the Companies or by Capstone by either party giving written notice of termination of services in accordance with the provisions of this Section 4.6. Given Capstone's need to commit its personnel to the Companies' operations and because of Capstone's commitments to service providers in Delaware and elsewhere so as to economically provide services under this Agreement, coupled with the need to allow time for an orderly liquidation of the Companies as required by the regulatory authorities of the Companies' domicile, settlement of claims, withdrawal from the pooling agreement, etc., substantial advance notice is necessary to terminate this Agreement (and the services due hereunder) and the Engagement Letter. If the Companies wish to terminate services at the end of the initial three plus year term, written notice of termination must be received by Capstone on or before December 31, 2019 (as further specified in the Engagement Letter) with the requirement that all fees due Capstone or the Firm be current as of such date of notice for such notice to be effective. If terminated by the Companies in this fashion, no further payments will be due for work done after the end of the initial contract terms, being after August 31, 2021, at which point Capstone's services (including access to any pooling arrangement and third party insurance) will cease and Capstone's (and PoolRe's) obligations under this Agreement will terminate. If *not* terminated in this fashion, i.e., by advance written notice being given on or before December 31, 2019 (as further specified in the Engagement Letter), this Agreement will automatically renew for a three year term under the same financial arrangements, the first such renewal period being September 1, 2021 - August 31, 2024; furthermore, every three (3) years thereafter this Agreement will automatically renew unless terminated by the Companies or by Capstone by giving written notice of termination at least twenty months prior to any third anniversary date (i.e. by December 31, 2019 for the first automatic renewal), in which case the services portion of this Agreement shall terminate as of such third (3rd) anniversary

date, so as to always provide Capstone at least twenty months advance notice of any change in the Parties' relationship. Provided, however, anything to the contrary in any agreement notwithstanding, under no circumstances shall the Year End Termination Date be prior to August 31, 2021.

As used herein, the term "Year End Termination Date" means August 31, 2021 for the initial term of this Agreement and for each Successive Term, the last day of each such Successive Term.

Upon the termination of this Agreement for any reason whatsoever, Capstone shall have the obligation (for no additional fees due it) and the right to arrange for and cause the dissolution and liquidation of the Companies under U.S. and domicile law, with such dissolution effective on or about the Year End Termination Date. In order to effect such dissolution and liquidation, the undersigned, comprising all of the owners of the Companies, hereby agree to cause and to continue to cause the Companies' owners to revoke all inconsistent proxies and hereby grant to and appoint Capstone's Chief Executive Officer and/or any Vice President an exclusive proxy to vote and represent all of the Companies' outstanding stock and equity as follows: (i) to call an election of and to elect the Companies' board of directors for the purposes of presenting and approving a Plan of Liquidation calling for the liquidation of the Companies on or about the Year End Termination Date; (ii) to vote the Companies' stock in favor of such Plan of Liquidation; and (iii) to vote on and take such other actions as Capstone deems appropriate or necessary to facilitate the dissolution and liquidation of the Companies as of the Year End Termination Date. This proxy, which is irrevocable and coupled with an interest, is granted in part to ensure that no insurance companies continue its corporate existence without comprehensive professional management, which otherwise creates a burden on the domicile's regulators (and reflects on Capstone) and further ensures that the Companies comply with applicable U.S. laws. Additionally, this provision is in place in connection with the ongoing tax obligations of the Firm to provide ongoing tax controversy support as outlined in the Engagement Letter.

All fees under the Engagement Letter, as amended from time-to-time, shall be due and payable to Capstone through the later to occur of the dissolution of the Companies or the Year End Termination Date.

Notwithstanding anything to the contrary, in the event that the Companies default in its obligations to pay its invoices to Capstone or breaches Companies' agreement under this Agreement and the Engagement Letter, and such defaults are continuing for one hundred twenty (120) days after Capstone's written notice to the Companies, Capstone at its option may terminate or suspend its obligations in whole or part under this Agreement or the Engagement Letter and pursue any other remedies available to it.

4.7   **Services Fee.** In consideration of services to be provided by Capstone to the Companies under this Article, the Companies and/or the Client agree to pay Capstone a fee in accordance with and on a time schedule as agreed to from time-to-time between Capstone and the Client in the aforementioned Engagement Letter, as amended in writing from time-to-time.

4.8   **Relationship of Parties.** Nothing in this Article shall be construed as (a) the guarantee by Capstone of the success of the Companies' insurance or investment activities; (b) an assumption by Capstone of any financial obligation of the Companies; (c) the creation of any employment relationship between (x) the Companies and (y) employees or consultants of Capstone and its affiliated entities; (d) an assumption by Capstone of any responsibility for the work performed by outside suppliers or consultants employed by the Companies, except where such work is performed at the suggestion or recommendation of Capstone; or (e) the delegation of any managerial authority over the Companies to Capstone. The Companies acknowledge that Capstone will make recommendations and offer advice pursuant to this Agreement but that all decisions with respect thereto shall remain those of the Companies' officers and directors.

# ARTICLE V
# INFORMATION DISCLOSURE AND LICENSE

5.1   **Intellectual Property.** The Client and the Companies acknowledge that they have received or will be receiving Intellectual Property from Capstone that is confidential, proprietary, copyrighted or kept as a trade secret in connection with the receipt of services provided under this Agreement and through its ongoing relationship with Capstone including the value and advantage of special information and expert knowledge

about, and expertise in captive insurance services. Such "Intellectual Property" means any confidential, proprietary, copyrighted, trademarked, or trade secret information provided by Capstone. Such information includes, but is not limited to the value and advantage of special information and expert knowledge about, and expertise in captive insurance services, and Documents as described herein. Additionally, such confidential information includes, but is not limited to Documents, such "Document(s)" being of any item, whether written or oral, tangible or intangible, prepared by or at the direction of Capstone for the Companies, including but not limited to insurance policies, insurance contracts, insurance coverage agreements, reinsurance agreements, treaties, and loan agreements, additionally including any other item, document, agreement, or any form of expression made by Capstone at any time before, during or after the term of this Agreement if the person receiving such expression is notified by Capstone or one of its Affiliates, either orally or in writing, that such expression is confidential, secret, or the Intellectual Property of Capstone. Provided, however, as used in this Article V, the terms "confidential", "proprietary," "exclusive" or "trade secret" do not apply to those specific portions of any Documents or materials provided by Capstone, its Affiliates or the Firm in connection with this Agreement or the Engagement Letter that address tax treatment for or tax structure of the Client, it being the express intention of the Parties and the Firm to not create a "Reportable Transaction" under Section 1.6011-4 of the United States Treasury Regulations.

Further, the Client and the Companies hereby acknowledge that the Intellectual Property provided is considerably valuable in nature, was created, produced, and developed by Capstone at great expense, and the dissemination, replication or theft of such information will cause Capstone a considerable amount of monetary damages. Further, due to the confidential nature of the Intellectual Property provided through receipt of Capstone's services, the Client hereby enters into the following limited license as described below.

5.2    **Grant of a Limited License to Use.**    Capstone hereby grants a limited, non-exclusive, non-transferable by any Party other than Capstone, non-assignable by any Party other than Capstone, license to "Use" the Intellectual Property received from Capstone by the Client for the full duration of the Parties' rolling three year terms as described in Section 4.6 of this Agreement and such rights and duties described herein are fully enforceable against the Client, their Affiliates, or others who later become bound by this Agreement or Article V even beyond the termination of this Agreement until every right, duty and obligation is fully satisfied by each Client, their respective Affiliates, or those other who later become bound by this Agreement or Article V. "Use" is defined to mean, for the purposes of Article V, the right for the Companies to use Intellectual Property delivered by Capstone or the Firm in connection with the operation of the Companies during the term of the Engagement Letter. Such Use grants the Client only the ability to receive, read, and make decisions concerning insurance operations under this Agreement and the Engagement Letter based on the Intellectual Property provided hereunder. Use does not include a right to copy, distribute, forward, share, sell, or assign. Use by Client does not extend beyond the Companies and actual parties to the Documents without the express prior written consent from Capstone as described below. Use does not constitute a granting of ownership, interest in, or right to the Intellectual Property. Capstone, at all times prior to, during, and after the expiration of this Agreement and Article V, remains sole owner of all Intellectual Property prepared by or at the direction of Capstone for the Companies, including any Intellectual Property created prior to, during, and after this Agreement terminates.

5.3    **Ownership Retained by Capstone.**    The Parties hereby acknowledge that all Documents and Intellectual Property shall remain the sole property of Capstone. Upon the termination of this Agreement, either by mutual termination by the parties, the formation of a dispute, the failure to pay for the services Capstone provides, leading to the expiration of the Term of Assistance as set forth in Section 4.6, the end of services being provided by Capstone under this Agreement, or for any reason whatsoever, the Client, the Companies, and their Affiliates, including any person who has received any Document or Intellectual Property as described herein or been granted an extension of the right to Use, must immediately return all Documents and Intellectual Property to Capstone or destroy the Documents or Intellectual Property and provide written, verified, and sworn proof of said destruction within five (5) business days to Capstone. Failure to either return or destroy all Intellectual Property or Documents, with proof thereof, as described herein shall constitute a material breach of this Agreement. Except as expressly provided in this Article V, no rights, licenses, trademarks, inventions, copyrights, patents or other intellectual property rights are implied, transferred or granted from Capstone to the Client or any other Party by execution of this Agreement or by delivery of the Intellectual Property or Documents to the Client or any other Party. The obligations of the Parties under this Article V shall survive termination of this Agreement for whatever reason.

**5.4    Right to Use.** This limited license conveys only a right to Use, as described above, to the Companies and does not extend to any other person or entity beyond the Client except as granted as described in the following section.

**5.5    Requests for Extensions of the Right to Use.** Should the Client require additional assistance in reviewing Documents or Intellectual Property under this Agreement by a third party advisor or consultant, the Client must make a written request to Capstone by United States Postal Service mail with a return receipt or by emailing both the President and General Counsel of Capstone, whereupon Capstone, in its sole discretion, will determine if such right to Use may be extended to the person named in the Client's request. Capstone shall attempt to respond to each request from a Client within a reasonable time, such being at least twenty (20) business days. However, if Capstone fails to respond to such request, Capstone's failure to respond shall be deemed a denial of the request and shall never constitute a grant of the right to Use to any other person or entity. Failure to request an extension of the right to Use and receipt of Capstone's required granting thereof, prior to the Client delivering, conveying, forwarding, or in any other way showing another person or entity the Intellectual Property, shall constitute a material breach. If Capstone allows a third party request for Use of the Intellectual Property or Documents, they must sign an agreement in form an substance acceptable to Capstone concerning the access to such Intellectual Property or Documents.

# ARTICLE VI
# MISCELLANEOUS

**6.1    Effect of This Agreement.** Subject to the Engagement Letter having precedence as to any conflicts, the Parties hereto stipulate and agree that this Agreement amends the Engagement Letter (including its attachments and prior amendments) and agree to be bound by the terms and provisions of this Agreement as if incorporated into the Engagement Letter. To the extent of any conflict between the terms and provisions of this Agreement and the Engagement Letter, the Engagement Letter controls.

**6.2    Waiver of Compliance; Consents.** Any failure of a party to comply with any obligation, covenant, agreement, or condition herein may be waived by the other party; provided, however, that any such waiver may be made only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement, or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Agreement requires or permits consent by or on behalf of any party hereto, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set worth in this section, with appropriate notice in accordance with section 6.6 of this Agreement.

**6.3    Assignment.** This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. This Agreement may not be assigned in whole or in part by any Party except with the prior written consent of all Parties hereto; provided, however, the Parties hereto acknowledge that Capstone will be retaining various third parties to assist in the performance of its services hereunder. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any person other than the parties, any successors and permitted assigns, any rights, remedy, or claim under or by reason of this Agreement or any provisions herein contained.

**6.4    Severability; Governing Law; Dispute Resolution.** The covenants set forth in this Section of this Capstone Services Agreement are independent and severable from every other provision of this Agreement. If any one or more provisions contained in this Article shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, or unenforceability shall not affect any other provision of this Article, but this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. For purposes of any disputes arising under this Agreement, the sole venue and jurisdiction for resolution of such disputes shall be in Houston, Texas. The arbitration provisions of the Engagement Letter with Capstone and The Feldman Law Firm LLP are incorporated herein for all purposes.

**6.5    Counterparts.** This Agreement may be executed in two or more counterparts in original form

or by fax, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    6.6    **Notices.** Any notice, demand, request or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been given upon delivery, if hand delivered, and upon mailing, if mailed by U. S. mail, registered or certified, return receipt requested, adequate postage prepaid, to the following address, unless the parties are subsequently notified of any change of address as shall be specified by like notice:

*If to the Companies:*

Janus Casualty Corp.
Orion Casualty Corp.
Cerberus Casualty Corp.
c/o Capstone Insurance Management, Ltd..
2207 Concord Pike, Suite 585
Wilmington, Delaware 19803-2908

*With a copy to:*

St. Charles Surgical Hospital
att: Dr. Scott K. Sullivan and
Dr. Frank J. DellaCroce
1717 St. Charles Avenue
New Orleans, LA 70130

*With a copy to:*

David Kushner, CPA
Kushner LaGraize
David Kushner
3330 W. Esplanade Ave. S, Suite 100
Metairie, LA 70002

*With a copy to:*

David R. Sherman
Chehardy Sherman L.L.P.
One Galleria Blvd., Suite 1100
Metairie, LA 70001

*If to Capstone:*

Capstone Associated Services (Wyoming), Limited Partnership
att: President
6725 Woodbridge Drive
Boca Raton, FL 33434
Fax: 561/208-1458

with a copy to:

Capstone Associated Services, Ltd.
att: President
1980 Post Oak Blvd., Suite 1950
Houston, TX 77056
Fax: 713/623-0329

*With a copy to:*

Capstone Associated Services, Ltd.
att: Michael T. Kelly
1980 Post Oak Blvd., Suite 1950
Houston, TX 77056
Fax: 713/850-8530

*with a copy in all instances to:*
THE FELDMAN LAW FIRM LLP
att: Stewart A. Feldman
Two Post Oak Central
1980 Post Oak Blvd., Suite 1900
Houston, TX 77056-3877
Fax: 713/850-8530

    6.7    **Headings.** The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

    6.8    **Entire Agreement.** This Agreement, including the exhibits, schedules, and other documents and instruments referred to herein, together with the Engagement Letter, embodies the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein. With respect to the subject matter of this Agreement, this Agreement supersedes all prior agreements and understandings between the parties.

6.9    Amendment and Modification.    This Agreement may be amended, modified, or supplemented only by written agreement executed by the parties hereto with specific, written reference to this Agreement. Except as set forth in the preceding, no part of this Agreement may be excluded, waived, objected to, modified or superseded by any contemporaneous or subsequent written or oral agreement by and between the Parties. The Parties hereby agree that should any provision of this Agreement be declared or be determined by any court, arbitrator, or tribunal to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be deemed not be a part of this Agreement.    The Parties mutually agree that this Agreement shall not be construed against any Party as the author or drafter thereof and hereby waive all defenses to such.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the day and year first above written.

"CLIENT"

_____
Dr. Scott K. Sullivan individually and as: (i) autho-
rized signatory as an owner, either directly or
through a holding company, of Cerberus Casualty
Corp.; Janus Casualty Corp.; and Orion Casualty
Corp. (or the existing Bahamian cells) and (ii) autho-
rized signatory for St. Charles Surgical Hospital
including all respective Affiliates

_____
Dr. Frank J. DellaCroce individually and as: (i) autho-
rized signatory as an owner, either directly or
through a holding company, of Cerberus Casualty
Corp.; Janus Casualty Corp.; and Orion Casualty
Corp. (or the existing Bahamian cells) and (ii) autho-
rized signatory for St. Charles Surgical Hospital
including all respective Affiliates

"CAPSTONE"

CAPSTONE ASSOCIATED SERVICES (WYOMING),
LIMITED PARTNERSHIP, a Wyoming limited partner-
ship

By: Capstone Associated Services, LLC, a Wyoming
limited liability company, its General Partner

By: _____
Authorized Representative

The Feldman Law Firm LLP joins in the execution
of this Agreement for the limited purposes of
agreeing to certain rights and responsibilities with
respect to Section 4.6 and Article V.

THE FELDMAN LAW FIRM LLP

By: _____
Stewart A. Feldman, Partner

Unofficial Copy Official Records Harris County District Clerk

## Exhibit C
### TAX RISKS AND RESPONSIBILITIES UNDER IRC §831(b)

Tax and business planning, even without the overlay of alternative risk management planning, has its own inherent risks. This planning, as other types of business and tax planning, involves inherent risks and should only be undertaken by those who can identify and evaluate such risks and understand and accept them.

The intention is to structure and operate the captive insurer so as to qualify for partial tax exempt status as a small non-life (casualty) insurance company under Internal Revenue Code (IRC) §831(b) wherein underwriting income is exempt (but investment income is fully taxable as in any other C corporation) from U.S. income taxes, provided, among other criteria, that annual premium revenue is limited to no more than $1,200,000. To summarize on a non-exhaustive basis, the risks include that the Internal Revenue Service ("IRS" or the "Service") will challenge the tax deductibility of the insurance premiums paid by the insureds and also disallow the tax exempt status of the captive and assess back taxes, interest and penalties. The tax deductibility of the insurance premiums and tax exempt status of the captive insurer is an issue of fact that turns on, among other issues: (i) whether the captive is in fact acting as an "insurance company" (see discussion below); and (ii) whether or not the coverage provided by the captive is truly an act of insuring a risk (and not merely an act of reserving for a risk). The final determination of these issues could ultimately depend on an assessment of all the relevant facts and circumstances by a court. Tax exempt status, of course, does not extend to the captive's liquidation or sale although tax planning to minimize such tax effect does exist in this regard as well.

There are a number of court cases and IRS rulings that have dealt with these issues which can be distilled down to an inquiry in the following three areas:

(i) Having a corporate structure wherein the captive insures the risks of brother-sister entities, and not the risks of persons higher in the ownership chain (including parent-owners), in order to satisfy the criterion that there must be "risk-shifting" for insurance to exist. The Service has argued that there is no risk shifting where a parent or any entity higher in the direct chain of ownership is paid money on a claim, since the payment for a claim that the parent receives from the captive is offset on the parent's books by a reduction in the value of the captive subsidiary on the parent's books. For this reason, we recommend that a person other than the primary insured, that also is higher in the chain of ownership than the insured, be the owner of your captive insurer so as to create a brother-sister relationship between the captive and the insured, and thereby assist in achieving risk-shifting.

(ii) Having a certain percentage of unrelated (third-party) insurance business in order to satisfy the criterion that there be "risk distribution" for insurance to exist. Opinions as to the minimum outside business required varies from 0% to 50%, and should decrease in the instances of the structure described in subparagraph (i) immediately above. The Service has previously advised that 50% outside business is sufficient, but that 10% is not. Based on our research and experience in obtaining rulings from the Service in this area, we advise at least 30% in unrelated insurance business (measured in terms of premium dollars) with unrelated business being recommended at the 50% level. Under the Firm's supervision, Capstone will be responsible for attempting to make available the third party insurance at this level for your evaluation and consideration for possible underwriting to the extent that you concur with our recommendation. However, there are no guaranties being offered that this third party underwriting will be available to your captive insurer or the exposures and risks related thereto.

In this regard, the Service released Rev. Rul. 2005-40 which concerns a single insured and an insurer insuring only that insured. Although the arrangement may shift the risks to the insurer, the Service concluded in this revenue ruling that those risks are not, in turn, sufficiently distributed among other insureds or policyholders. Therefore, such arrangement did not constitute insurance for federal income tax purposes. As an aside, we note that the Service's example of non-compliant planning is more aggressive than that typically undertaken for the Firm's clients.

THE FELDMAN LAW FIRM LLP

Additionally, the Service stated in Rev. Rul. 2005-40 that to be an insurable risk the transferred risk must contemplate "the fortuitous occurrence of a stated contingency," and must "not be merely an investment or business risk." This was consistent with prior case law. However, a broader and more favorable pro-taxpayer view was adopted in September 2015 by the U.S. Tax Court in R.V.I. Guaranty Co., Ltd. In that case, the court held that the taxpayer, which issued residual value insurance contracts, was an insurance company for federal income tax purposes. This decision of the U.S. Tax Court is contrary to the position taken by the IRS in administrative rulings and published materials stating that the risks involved in residual value insurance was an "investment risk" and not an insurable risk. The distinction of insurance risk versus investment or business risk in light of the R.V.I. decision and its application to captive insurance companies is unclear. If it is determined that a policy is not for "insurance," the captive's status as an insurance company could be in jeopardy if such determination caused the captive's investment income to exceed its underwriting income for the year.

The IRS has also ruled that risk distribution incorporates the statistical phenomenon known as the law of large numbers. In prior years, there was no case law or other tax authority that illustrated the application of this principle; however, in 2014 the U.S. Tax Court ruled in favor of two captive insurance arrangements (discussed below) based upon risk distribution through discrete risks rather than number of insureds. Distributing risk allows the insurer to reduce the possibility that a single costly claim will exceed the amount taken in as premiums and set aside for the payment of such a claim. By assuming numerous relatively small, independent risks that occur randomly over time, the insurer smooths out losses to match more closely its receipt of premiums.

In 2014, the U.S. Tax Court again ruled in favor of the taxpayers in the Securitas and Rent-A-Center, Inc. cases. In each case, the taxpayer had formed a captive insurance company to insure its operations. The IRS claimed, among other things, that the insurance arrangement lacked risk distribution. The primary argument advanced by the IRS in these cases was that the risk was too heavily concentrated in one insured. The U.S. Tax Court held in both cases that risk distribution had been achieved due to the large number of independent risks that the captives insured. In Rent-A-Center, the court noted the existence of thousands of stores and trucks in addition to tens of thousands of employees insured by the captive insurance program, in concluding that the captive insured a sufficient number of statistically independent risks. Likewise, in Securitas, the court noted that the captive was exposed to a large pool of statistically independent risk exposures in ruling that risk distribution had been achieved by the captive without unrelated insurance underwriting.

It remains unclear what minimum number of risks are required to meet the law of large numbers. Further, it is unclear whether meeting these criteria is indispensable to achieve the requisite level of risk diversification for closely-held captive insurance companies. Nevertheless, through the PoolRe risk pool -- should you decide to participate in such and should the pool accept your participation -- our clients cross insure 500+ distinct companies on over 800 distinct policies in order to achieve a measure of risk diversification on that segment of the captive's exposures.

(iii) Having a legitimate business purpose for forming and operating the captive insurer beyond that of merely gaining a tax benefit in order to satisfy the criterion that the business structure and the transactions connected to it not be a mere sham designed solely to gain tax advantages.

Another possible area of IRS challenge concerns the capitalization of the captive. While most captives are capitalized with the statutory minimum capital in the form of cash, the Service could make the argument that the captive is too thinly capitalized, notwithstanding its having met the domicile's statutory minimum capitalization requirement. Notwithstanding such, we have never seen the Service make this argument where the capitalization complies with that of a recognized insurance domicile.

THE FELDMAN LAW FIRM LLP

TAX RISKS AND RESPONSIBILITIES UNDER IRC §831(b)
Page 3

Additionally, the IRS imposes a 4% excise tax under IRC §4371 on premiums paid by U.S. persons which will be assessed if the captive is domiciled outside the U.S. and has not made an election to be taxed as a domestic corporation. Such election, if made, must be approved by the IRS and maintained by the captive. A closing agreement with the IRS is required if the captive does not maintain a "U.S. office" with a minimum percentage of its assets in the U.S. However, if this requirement were not met, there would likely be required a letter of credit placed with the IRS as a condition to this election.[1]

In December 2002, the Service issued Rev. Proc. 2002-75 stating that the Service will consider ruling requests regarding the proper tax treatment of a captive insurance company generally. The practical import of this advance ruling procedure remains unclear. Because the filing fee due the IRS is alone generally at least $6,000, in addition to the uncertainty as to the Service actually ruling, this planning is based on no ruling request being made. Nonetheless, under an election allowed pursuant to IRC section 831(b), provided that the entity is properly operated, tax exempt status exists in the case of underwriting profits. Further, in order to meet the partial tax exempt provisions of IRC §831(b), the captive must be operated in a manner consistent with relevant provisions of the Internal Revenue Code. Such exempt status, of course, does not extend to the captive's liquidation or sale, which generally results in a long term capital gain tax being assessed on the gain as well as, in the case of a liquidation, an income tax internal to the captive on its appreciated assets.

In the event that a determination is made that the captive is not an "insurance company," it would not be entitled to the benefits of IRC §831(b), with the resulting flow of adverse consequences. The term "insurance company" generally means any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. Whether more than half of the business activity is related to the issuing of insurance or annuity contracts will depend on facts and circumstances. Factors to be considered in evaluating this "more than half of the business" test may include the relative distribution of the number of employees assigned to, the amount of space allocated to, and the net income derived from, the various business activities. A company whose investment activities "outweigh" its insurance activities is not considered to be an insurance company for this purpose. Additionally, the captive needs to conduct its business, including its investment activities, like an insurance company. In this regard, while the Service has not yet addressed the issue of secured loans, tax practitioners differ in their opinion on the prudent level, but they generally agree that secured loans must be on a commercial and arm's length basis and that the higher the relative amount of secured loans, the less the captive looks like an insurance company. Nonetheless, some tax practitioners believe that a higher percentage of secured loans may be supported by their being well secured and profitable and therefore prudent investments of the captive.

If a foreign domiciled captive is determined not to be an insurance company for tax purposes, any election made under IRC §953(d) to domesticate the foreign company for U.S. tax purposes is invalid and the captive may be treated as a controlled foreign corporation as defined in IRC §957, from which still other adverse consequences flow.

---

[1] The letter of credit secures the IRS for payment of the 4% excise tax in the event that the tax exempt election, following its grant by the Service, is later determined to be invalid. To be clear, the §953(d) election, which has the effect of making the foreign domiciled captive a domestic corporation for federal tax purposes, may require an ongoing $75,000 letter of credit (calculated annually as 10% of the captive's total revenue, with a $75,000 minimum) with the IRS as the beneficiary, to guaranty the payment of federal taxes should such ever be assessed; although, as set forth herein, this requirement should be avoided through the maintenance of a U.S. office with sufficient U.S. assets.

THE FELDMAN LAW FIRM LLP

TAX RISKS AND RESPONSIBILITIES UNDER IRC §831(b)
Page 4

In addition to the above risks, there are legislative and regulatory risks that could change or reduce or eliminate the benefits under IRC §831(b). To this end, the IRS issued final regulations in 2003 requiring tax return disclosure of transactions involving tax shelters. While we believe (and our peers in the captive industry appear to agree) that the captive planning described herein and in the related engagement letter is not a "tax shelter," as defined by the regulations, the area is very technical and others may reach a different conclusion. To be sure, the Service has been active with pronouncements in this area which are available for your review in complete form at www.CapstoneAssociated.com. Because we are not your tax return preparer, the final decision of whether to separately disclose this transaction is between you and your tax return preparer. Our view is that this disclosure is not required by the Service's pronouncements.

In February 2015, the IRS added abusive captive insurance arrangements to its annual list of tax scams known as the "Dirty Dozen" for the 2015 filing season. The IRS stated that an otherwise legitimate tax structure involving small or "micro" captives was subject to abuse by unscrupulous promoters. The result of this IRS announcement will most likely be a notable increase in IRS scrutiny and audits of captive insurance companies and their captive managers, whether such arrangements are legitimate or abusive.

The timing of the planning in the initial year may be an issue. No doubt undertaking the planning earlier in a calendar year is preferable to an end of the year formed insurer, although we have identified no specific case law or regulations on point. However, the contracts entered into each year by the insured with the insurer must be "insurance policies" appropriately priced. In this regard, a year-end formed captive presents particular issues.

At the state level, the State of Texas as well as other states assesses a premium tax on an insured for risks borne in such state(s) by a non-admitted carrier even where the coverage is independently procured outside of such state(s). For example, under §1.14-1 of the Texas Insurance Code, the amount of this tax is 4.85% of the premiums paid on insurance contracts that are independently procured and attributable to Texas risks.

The following discussion addresses Texas risk, but is equally applicable to the state of your operations. We will act on behalf of the insureds and the captive to independently procure all coverages outside of Texas, but these non-Texas acts may still subject your operating entities to the Texas independently procured premium ("IPP") tax. We recommend that your operating entity (that is, the insured) file and pay tax on the premiums on "Texas risks" covered by the independently procured policies, which could amount to several thousand dollars per year. Such recommendation is notwithstanding the uncertain basis for imposing and collecting this tax under the Todd Shipyard case decided by the U.S. Supreme Court in 1962 (suggesting that the IPP tax may not be constitutional in the absence of minimum contacts with a state). See also (i) Dow, decided in 2001, which, following Todd Shipyard, declared unconstitutional the IPP tax as such applies to Dow Chemical; and (ii) STNP where in 2006, an Austin trial court ruled in a summary judgment that the state's IPP tax is invalid as it violates the McCarran Ferguson Act. However, please note that the Third Court of Appeals in Austin reversed the trial court's decision in 2007, and the Texas Supreme Court subsequently denied taxpayer's petition for review. STNP operates the South Texas Nuclear Power Project, a major utility-owned electrical generating facility. The full version of these cases are available at the web address provided above. Although we will take responsibility for assisting your CPA in completing the filings based on the information you provide us, our fees exclude, in all cases, taxes and other amounts due the IRS and other taxing authorities.

More recently, the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act included a provision giving the home state of the insureds the exclusive right to collect premium taxes on non-admitted insurance. The impact of such provision on captive insurance arrangements is unclear and is

THE FELDMAN LAW FIRM LLP

TAX RISKS AND RESPONSIBILITIES UNDER IRC §831(b)
Page 5

currently the subject of debate by commentators. See www.feldlaw.com/articles.html under "Nonadmitted and Reinsurance Reform Act."

The stated intent of the relevant portion of the Dodd-Frank Act was to unify premium tax reporting on surplus lines insurance; that is, the use of licensed brokers to place certain lines of insurance with approved but unlicensed insurance companies. However, certain states have taken the position that the exclusive authority to tax premiums on all types of independently procured insurance was granted to them under the Dodd-Frank Act when implementing their respective changes to surplus lines insurance tax law.

While not a tax risk per se, most of the Firm's and Capstone's clients are looking for bundled or turnkey services from a reputable law firm with the depth and experience to handle the corporate, tax and potential tax controversy work and from a fully staffed captive administration, management and insurance based group. Capstone and the Firm offer clients unbundled services, if they wish, recognizing that doing such interjects a wide range of operational risks that the Firm and Capstone believe that this joint undertaking minimizes.

Finally, on April 10, 2004, President Bush signed the Pension Funding Equity Act of 2004 (Public Law No. 108-218). Under both the new law and the prior law, an "insurance company," other than a life insurance company, qualifies as an IRC §831(b) company if (a) its net written premiums (or, if greater, direct written premiums) for the taxable year do not exceed $1,200,000 (when aggregated with such amounts received in the taxable year by all other companies in the same controlled group), and (b) the company elects to be taxed under IRC §831(b). Once an IRC §831(b) election is made, it basically becomes irrevocable if the captive continues to operate as an intermediate size captive. Under the new law, the $350,000 floor for net written premiums (or, if greater, direct written premiums) which existed under prior law is removed. Under prior law, an IRC §831(b) company would automatically revert by operation of law to a IRC §501(c)(15) company if premiums fell below $350,000 in any given year. Still, under the new law, if an IRC §831(b) insurance company meets the requirements of both IRC §831(b) and IRC §501(c)(15), it is not clear whether the company continues as an IRC §831(b) company or reverts to an IRC §501(c)(15) company. In this regard, the Service has indicated informally that where both provisions apply, that IRC §501(c)(15) trumps IRC §831(b) with the result that the captive is wholly tax exempt.

## Summary of The Feldman Law Firm LLP's IRS Experience With Capstone-Administered Captive/Alternative Risk Planning

The provisions of the Internal Revenue Code (the "Code") providing favorable treatment of small insurance companies have been traced by the Firm back prior to 1920. Of course, during this period of time, the tax provisions for small captives have changed on multiple occasions. For example, the Revenue Act of 1913 provided for small mutual insurance companies as being tax exempt up to $75,000 in insurance premiums ($1.8 million in 2015 dollars) under the ancestral provision of Code section 501(c)(15). To be sure, recently proposed legislation for section 831(b) insurance companies would nearly double the maximum premium revenue to $2.2 million per year, with further indexing for inflation. Whether this proposed legislation ultimately will pass is unclear. Over the years, some changes in legislation have expanded the use of these provisions; others have restricted the flexibility of the planning.

Our experience discussed below centers on property & casualty insurance companies operating under Code sections 501(c)(15), 831(b) and 831(a). Capstone operates the former two Code-based captives in a similar manner such that the tax issues should be the same. The following summarizes our tax experience with IRS reviews of the planning in some form since the formation of our first captive in 1998. We've now surpassed 175 formations in which the Firm was the lead counsel and where Capstone has operated the captives. This is exclusive of other projects in which either Capstone or our Firm were involved as advisors.

THE FELDMAN LAW FIRM LLP

A. Thirty-nine (39) favorable rulings by the IRS which issued favorable Form 1024 tax exemption determination letters after exhaustive submissions to the Service. Each of these submissions comprised hundreds of pages of documents, such prepared by the Firm on behalf of clients, with significant input from Capstone. These captives were originally all section 501(c)(15) captives, most of which (to the extent still in operation) now have migrated to operate under Code section 831(b); although some of which continue to operate under Code section 501(c)(15). As originally filed, this planning was based upon the Harper decision in which 30% outside (unaffiliated) business was considered sufficient for risk distribution. Beginning in 2012, because of the Service's then unexplained actions of its tax exempt division regarding section 501(c)(15) captives, the Firm recommended and Capstone made available a 50% outside (unaffiliated) business program in an effort to meet the 50% safe harbor test set forth in Rev. Rul. 2002-89. We have since continued this enhanced risk sharing program. The 50% pool is available to both section 501(c)(15) and 831(b) captives.

These tax exemption determination letters were obtained usually in each instance after extensive follow-up inquiry by the Service (often multiple inquiries) and review of the responses before the Service issued its affirmative tax exempt rulings.

B. Twelve (12) audits of captives where the Service examined a broad range of issues at length. These were all section 501(c)(15) captives under audit. Except for one of the audits described in Section C. below, these audits were closed out at the audit level. Each case was closed with no change in tax due and no interest or penalties due.

C. Three statutory notices of deficiency (known as "90-day" letters) issued by the Service that resulted in filed tax court petitions jointly prepared by the Firm and other counsel hired and paid for by the Firm. Two of the tax court petitions followed adverse Form 1024 determination letters issued by the IRS National Office and the other filed petition resulted from one of the 12 audits described in Section B above. All three Tax Court cases were subsequently transferred to IRS Appeals for an administrative hearing. In 2014, after multiple conferences and subsequent re-reviews of the captives' work product by the Service extending for more than a year, IRS Appeals conceded all the issues in these three cases, with no taxes, interest or penalties due. As a result, the U.S. Tax Court entered decisions in favor of the three captives consistent with the decision of IRS Appeals.

Please note that the IRS agent in these three cases was the same one who audited the nine captives referenced in Section D. below. IRS Appeals declined to follow the IRS National Office's determination in the two cases in which the National Office had originally issued adverse rulings. That is, IRS Appeals disagreed with the IRS National Office, which was reflected in a decision by the U.S. Tax Court in favor of Capstone's clients.

D. Nine audits (exclusive of the one recent (June 2015) audit - see paragraph E below) remain, which are now in IRS Appeals. All nine audits, which were conducted by the same IRS agent referenced in Section C. above, are before IRS Appeals which is considering the taxpayer's request for reversal of the IRS agent's adverse exam reports. All cases are factually similar to the cases ruled upon by IRS Appeals referenced in Section C. above and in the 39 favorable Form 1024 tax exemption letters and the 12 completed audits. That is, a single IRS auditor issued adverse audit rulings on 12 captives, despite the prior decade plus-long Capstone/Firm experience to the contrary by other IRS auditors and without regard to the 39 favorable tax exempt rulings.

THE FELDMAN LAW FIRM LLP

TAX RISKS AND RESPONSIBILITIES UNDER IRC §831(b)
Page 7

The IRS Appeals officer who ruled upon the concession leading to the U.S. Tax Court entry of judgment in the taxpayers' favor referenced in Section C. above is now the group manager over the team handling these matters in IRS Appeals. A decision is expected over the next six months. Should IRS Appeals not concede the cases, the cases will likely proceed to the U.S. Tax Court.

E. One audit of a captive that was initiated in June 2015 through an audit of a client's operating business. This matter is in its early stages.

F. An estimated four to six audits of clients' operating businesses which included some examination of insurance premiums. These audits resulted in "no change" to the insurance deduction. Our involvement in these audits varies.

G. In June 2015, the IRS notified either Stewart A. Feldman or the Firm or Capstone (the addressee of the inquiry is unclear) that the captive insurance/alternative risk planning program is the subject of a review by the IRS and issued an information document request (IDR). The Firm is unclear whether this IDR is unconnected with the audits of any particular captive client, but is likely connected to the IRS's examination of captive insurance programs generally. The Firm believes that the inquiring IRS agent was unaware of the dozens of completed IRS reviews of the planning resulting in its agreeing with the taxpayers' positions. After a three day review by the IRS agent and after providing him evidence of the more than 50 prior successful rulings by the IRS, this matter has been dormant.

The Firm has retained outside counsel or co-counsel to assist both (i) in response to the Service's IDR discussed in paragraph G above; and (ii) in connection with the nine pending audits now before IRS Appeals which are discussed in paragraph D above (the other 55+ matters described above having been successfully concluded).

The Firm does not believe that there is any conflict created by the inquiries in paragraph G above and the nine remaining audits of the captive insurance companies which are now in IRS Appeals. Similarly, the Firm does not believe that there is a conflict between the Service's IDR and the position of any one or more clients.

In accordance with the terms of the engagement letter, the Firm is handling the above matters. However, any client is welcome to evaluate the facts and conclude if it wishes to hire its own CPA or counsel to participate in or take over the work in these matters independently of the Firm and its co-counsel.

We are available to discuss or further explain these issues in more detail as needed to enable you to make an informed decision on these matters.

SEPTEMBER 29, 2015

## Exhibit D

### St. Charles Surgical Hospital and
### The Center for Restorative Surgery

#### Brief Comparison of Types of Captives

| | Small Captive | Intermediate Size Captive |
|---|---|---|
| *Expected Maximum Practical Premium Per Year (Maximum Legal Premium Limit)* | ▪ | $1,000,000.00 (up to a maximum of $1,200,000.00) in premiums. While investment income is generally unlimited, it receives no special tax treatment. Underwriting income is not taxed. |
| *Type of entity; year end* | ▪ | C corporation. December 31st. |
| *Tax consequences from the standpoint of the captive insurer* | ▪ | Underwriting income is tax exempt. Investment income is taxable like any other C corporation. |
| *Insurance activities* | ▪ | During any given taxable year, more than half of the revenues for a captive must be the derived from insurance contracts or from reinsuring the risks of other insurance companies |

▪ *Note: Because the St. Charles Surgical Hospital and The Center for Restorative Surgery family of companies include risks far exceeding the limited capabilities of one or more small captives, the small captive is inapplicable to your situation.*

S:\client\st charles bret\eng agmt\type comp.wpd

## Exhibit E
### Third Party Insurance

Capstone encourages participation in two separate third-party reinsurance programs:

> a. PoolRe - a risk pooling arrangement involving sets of generally similar policies covering generally similar risks of closely-held businesses, wherein each captive assumes reinsurance on policies covering other clients of Capstone; and

> b. CreditRe - a reinsurance program wherein Capstone-sponsored captives assume reinsurance on contractual liability policies written to persons wholly unaffiliated with Capstone.

Clients may participate in either or both of these programs; however the final inclusion/exclusion decision is in the sole and absolute judgment of PoolRe, recognizing that PoolRe, which is owned by non-affiliates, is administered by Capstone which in turn from time-to-time draws upon the services of The Feldman Law Firm LLP. Typically pooled are 800± distinct policies on 400± distinct insureds. Only clients of both the Firm and Capstone that continue to be in good standing may participate in these reinsurance programs.

### PoolRe (Capstone-administered Risk Pool)

This risk pool is conducted by PoolRe Insurance Corp. ("PoolRe") which is domiciled in and licensed by the Financial Services Commission of Anguilla, British West Indies, a British overseas territory. PoolRe is an insurance and re-insurance company owned by an individual that is not affiliated with either the Firm or Capstone. PoolRe conducts the pooling program for a fee (that is, on a contract basis) paid by Capstone but is independently carried out by PoolRe. There should be no incremental operating cost to the pool participants; however, participants are responsible for insurance losses (claims).

This reinsurance facility is available to qualifying clients of Capstone subject to any captive participant or policy deemed inappropriate by PoolRe for any reason and thereby excluded (i.e., particular insurance policies and/or particular clients and/or policy pricing may be deemed unsuitable for or "non-homogeneous" with the risk pool). The risk pool conducted by PoolRe enables participating captive insurance companies to diversify their underwriting risks, furthering the insurance aspects (that is, the "law of large numbers") of the planning. Note that among the several hundred policies in the pool are policies issued to Capstone or the Firm (or their affiliates) and that their affiliated captives may participate in the pool.

Insurance involves the sharing of risk among insureds, which in turn furthers the predictability of losses through the law of a large numbers of covered risks. Through the pooling mechanism, participants "pool" their losses by accepting other participants' risks, which increases the diversification of each captive's underwriting by covering a larger number of risks. Thus, the basic concept behind the risk pool is for multiple insurers to share risks of multiple insureds. Limiting pool participants to Capstone-administered companies raises the confidence level as to the prudence of the risks being underwritten and as to the pricing of such. The result is a higher level of risk diversification for each of the individual client insurance companies.

Utilizing the risk pooling arrangement helps client captive insurance companies gain greater risk distribution. To achieve this, the pooling provides critical stop-loss protection for direct written policies, which is a type of catastrophic coverage. These catastrophic loss coverages are spread

among the participating captive insurers, which reduces the impact of losses on the individual captives. Furthermore, the reduction in loss variability (produced by the stop-loss coverage and by the sharing of risks through the pooling mechanism) is designed to stabilize cash expenditures for losses by the individual captive participants.

Client captives and their affiliated insureds are not required by Capstone to participate in the risk pool; Capstone and the Firm make this opportunity available to their joint clients but do not require their participation. It is ultimately the clients' sole decision (the clients being the captive insurer, its owners and officers, and the related insureds) as to whether or not to participate in the pooling arrangement. And, as mentioned above, once a client has decided to participate in the risk pool, it is within PoolRe's discretion as to which policies and insureds are included/excluded from the pool.

### CreditRe (Third Party Reinsurance, Retroceded through PoolRe Insurance Corp.)

Capstone's other third party reinsurance program enables Capstone-administered captives to more fully diversify their portfolio of risks underwritten, while enabling the captive to underwrite, in total (that is, including the PoolRe program above) either 30% or 50% of risks unaffiliated with the insureds or their beneficial owners. Captives at the 50% threshold of third party coverage may meet the IRS Safe Harbor risk distribution requirement for captive insurers. The 30% threshold is well established in tax law and in IRS rulings over the last twenty years but is not at the so-called safe harbor level.

The structure of this third party reinsurance program for 2014, which is expected to carry forward in some modified form for 2015, is as follows: Reinsurance for contractual liability coverage underwritten by Lyndon Property Insurance Company is assumed by Credit Reassurance Ltd. (CReLtd) from multiple cells of ARIA (SAC). These risks are then retroceded to PoolRe as part of a Reinsurance Contract which is updated and amended annually. PoolRe in turn retrocedes a portion of the risk exposure to participating captive insurers. There is no assurance that this program will continue into the future and the nature of this program has changed over the years.

The reinsurance agreement historically includes an experience refund formula, which provides for a refund to the ceding company if the experience is favorable. Based on the formula, each reinsurer can realize an underwriting profit of up to 10.25% of the earned premium with favorable experience. If loss experience is unfavorable, the reinsurer is subject to the possibility (albeit low) of unlimited losses. Even though the risk is not capped, the risk of catastrophic losses to the reinsurer is believed to be manageable based on historical data and loss projections, the diversification derived from the law of large numbers, and other policy provisions. Loss ratios for this program have ranged between 88% and 92% over the last seven years (2008 - 2014) which may or may not be indicative of future results.

\*                      \*                      \*

The particulars of both insurance programs for any given year are described in the insurance contracts which are the definitive documents that control the respective insurance programs. The above provides only a summary as of the date and for the year set out below.

JANUARY 2015



# THE FELDMAN LAW FIRM LLP
TWO POST OAK CENTRAL
1980 POST OAK BLVD., SUITE 1900
HOUSTON, TEXAS 77056-3877

TELEPHONE (713) 850-0700                                        TELECOPIER (713) 850-8530
www.feldlaw.com                                                TELECOPIER (713) 623-6636

*Attorney/Client Privilege*

October 22, 2015 (Revised November 11, 2015)

Scott K. Sullivan, M.D.                    **By email:** *scottsullivanmd@gmail.com*
Frank J. DellaCroce, M.D.                  **By email:** *drd@brestcenter.com*
c/o St. Charles Surgical Hospital
1717 St. Charles Avenue
New Orleans, LA 70130

Re: *Supplement to Joint Engagement Letter For Captive Formation/Administration*

Dear Dr. Sullivan and Dr. DellaCroce:

Please consider this as a supplement to the November 10, 2015 joint engagement letter. *This communication is intended to be attorney/client privilege.* This supplement is intended to be read in connection with the Joint Engagement Letter of November 10, 2015 and includes sensitive client communications which we have agreed should be separately communicated.

Based on our assessment following the "Health Check-up", which included multiple on-site visits and the review of the existing captive insurance documentation provided, along with multiple conferences with your advisors, we included in our findings the following;

> The primary areas of concern relate to the lack of an overall "captain of the ship" that takes responsibility for the planning's design, implementation and operation; (ii) the lack of documentation and unusual arrangements in several areas; and (iii) the unnecessary risks associated with operating in a fringe domicile like The Bahamas and with such compounded with a cell captive structure; and (iv) the questions as to risk distribution achieved through the policy grouping and pooling arrangement and the insurance operations issuance of duplicate coverages.

This engagement proposes that the Firm and Capstone jointly serve as the "captain of the ship" with regards to your three cell arrangements;

In our recent discussions we suggested that there are multiple advantages of having the "cell captives," which are under the control of your former attorney/captive manager and his affiliates, evolve into stand alone, U.S. captive insurance companies under your sole control. However, this is not a requisite of your engaging us. This simply remains an option on your part. That is, for the several reasons discussed among ourselves, it makes sense to be in control of your own destiny and that such be through a U.S.-domiciled, captive insurance arrangement. While in general an offshore captive insurance arrangement is as good – or sometimes better than a domestic arrangement – The Bahamas is not a well recognized insurance domicile, it has few captives and most appear to be sponsored by your former

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 2

attorney/captive manager. Most importantly, the consequences of gaffes in the administration of the captive planning are magnified in the case of an offshore captive. Given the state of the documentation, we are especially concerned with multiple gaffes.

More specifically, the Clinic and the captives' owners will benefit by having the current three "intermediate" IRS Section 831(b) captive cells, Cerberus Insurance, Janus Insurance, and Orion Insurance, enter into a tax free reorganization whereby the resulting entities are domestically domiciled (e.g., Delaware) property & casualty insurance companies, tentatively named Cerberus Casualty Corp. (Cerberus CC), Janus Casualty Corp. (Janus CC) and Orion Casualty Corp. (Orion CC) which will continue to operate to serve the needs of the Clinic and third parties. It is intended that the reorganization be tax free. Note that we have not yet designed or structured this planning.

This letter supplements our agreement with each of the Firm and Capstone for administering your alternative risk planning program as such now exists and sets forth the roles and responsibilities of the various parties with respect to such. As well, various options (e.g., secured lending, the above discussed reorganization, etc.) are made available to you.

**SCOPE OF SERVICES.** The purpose of our initial assignment was to analyze your current captive insurance program and to make recommendations for improvement and thereafter, if you so decide, to assist in the formation and management of three, domestically licensed and incorporated, single parent captive insurance companies under your sole control.

Note that there are three basic types of property & casualty insurers, being formed and operated under Internal Revenue Code ("IRC") §501(c)(15), §831(b) or §831(a). In your case, the entities formed and operated under IRC §831(b) ("intermediate" captives), which has a practical annual premium limitation of $1,000,000± , are applicable to the Clinic given the scope of its business. See Exhibit D. Based upon our analysis following our Health Check-Up, which we have already shared with you, we have jointly concluded that three "intermediate" captives continue to be an appropriate choice for the Clinic. We have not yet evaluated that any further expansion of the planning is warranted.

As explained, the purpose of the existing three cell arrangements (as may be continued in Cerberus CC, Janus CC, and Orion CC) is to protect the Clinic against a multitude of loss exposures beyond those economically covered by commercial insurance based upon ISO-form policies commercially available through, for example, Liberty Mutual, Zurich, The Hartford or Travelers.

We foresee issues with continuing the current structure. Firstly, it appears that these cell captives have ceded much of the control to the core, Worldwide Property and Casualty, Ltd. SAC, under the operating agreement. Ongoing management will be burdened by having to seek the core's permission for routine operations. Also, the exposure of the assets in your three cells separate and apart from the rest of the corporate structure under the core, of which both you and we have little understanding, is far from insulated. The success of the financial separation of the cells is largely dependent upon the administration of your former captive manager and his associates. As these captives become an increasingly important part of your

## THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 3

financial structure, the discomfort from this arrangement usually increases.  To be starkly frank, this is not an acceptable arrangement where millions of your dollars are housed.  While we have several captives holding ten million dollar plus in assets, none of these arrangements are under the signature control of anyone but the captives' owners.

We note that the nature of your business presents good examples as to why property & casualty insurance companies are formed in the first instance.  That is, there exists otherwise uninsured but insurable risks (that is, "coverage gaps") associated with owning and operating a speciality hospital, with over 90 physicians having privileges and having hundreds of support staff across several businesses, your dependence on key employees (e.g., the Clinic's CEO Cheri Saltaformaggio, and CFO Sarah Underwood, CPA), the loss of whose services would result in lost business/added costs, all in addition to billing operations for multiple entities, along with the operations of at least three medical practices.  Additionally, there exists the multitude of risk factors beyond your control (e.g. changes in medical reimbursement rates, contracts with third party payors, legislative and regulatory restrictions on physician owned hospitals, the ever changing regulatory environment, etc.).

Our clients (that is, clients of Capstone and the Firm) involved with evaluating captive insurance planning commonly have expressed an interest in being free of: (i) the ongoing underwriting, risk management, and day-to-day administration and operations of an insurance enterprise; and (ii) the ongoing involvement of designing, pricing, and administering insurance coverages, and interfacing with regulatory authorities.  For these reasons, we usually are asked jointly to handle these matters on a turnkey basis, as was done by you in this instance.

To help accomplish these tasks, the Firm has associated itself with Capstone Associated Services (Wyoming), Limited Partnership and its affiliate, Capstone Associated Services, Ltd., a Texas limited partnership (collectively "Capstone"), which is owned by certain of the Firm's lawyers and related parties, to provide many of the needed insurance, underwriting, accounting and other non-legal support services.

Our Firm's work and Capstone's activities, as described below, will be performed in our collective multiple capacities on behalf of, as appropriate: (i) the owners of the captives insurer in connection with the formation of the captives; (ii) the Clinic and certain of its affiliates as the insureds; and (iii) the captives, Cerberus CC, Janus CC, and Orion CC, as the insurers.  At all times you (whether directly or indirectly through the captives) will have exclusive control over the monies in the captives and its various investments, subject to the captives' compliance with insurance regulatory requirements calling for either a given level of reserves or a particular form of securities in which they must be held[1].  Neither Capstone nor our Firm will handle the checkbook or the brokerage investment accounts, nor will we advise on the

---

[1] At a minimum you should expect that the captives must maintain its initial capitalization (which, assuming the formation is in Delaware, would be $250,000 for the Section 831(b)-type captive) in first class, non-volatile, marketable securities, usually in the form of income producing, high quality liquid debt instruments.  By way of comparison, Anguilla's capitalization would be $200,000, assuming $1,000,000 in first year premiums. These requirements can be met by contributing existing qualifying securities to the captives.  The preferred investment would be in bank certificates of deposit or U.S. Treasuries.  An amount equal to the year end liabilities will need to be maintained in similar investments.

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 4

specific investments being made by the captives. However, our Firm and Capstone (and persons acting on behalf of these entities[2]) will handle the design, formation and all aspects of the insurance operations on behalf of the captives, including operating the captives, designing and maintaining the risk coverages, complying with the domicile's investment diversification requirements and maintaining the captives' accounting records. We will also endeavor to make available to you an insurance pooling arrangement through PoolRe (see Exhibit E) which Capstone administers on behalf of many joint clients of Capstone and the Firm (and their affiliated insureds) as well as the owners of PoolRe.

As explained above, our work is generally on behalf of the captives but also at times on behalf of the captives' shareholders and of the captives' various insureds[3]. In doing so, both our Firm and Capstone additionally will draw upon the skills and expertise of persons outside of both organizations, at our expense, as part of our overall turnkey fee arrangement unless otherwise noted. These other persons may include local co-counsel, a resident manager (which is a Capstone subsidiary), a resident director in the domicile of choice (e.g., Delaware), actuaries (where applicable), risk managers, the captives' auditors, a company manager (U.K. territories) and registered agent, and other U.S. based professionals, who can be changed only with your concurrence upon our recommendations. Not included in the turnkey package are any fees due to your CPA to review and sign captive related state and federal tax returns as their preparer and any other work requested by you.

More specifically, the Firm's role as your lawyers and the cooperative role of Capstone (and persons working under both) is to provide the following services included in our turnkey fee arrangement:

1.    Providing comprehensive tax, legal, accounting, risk, insurance, re-insurance and regulatory planning services designed to address the structuring of the captives arrangement, and conducting the captives insurance company operations beginning with the formation of the new captives.[4]

2.    Preparing and filing all tax, legal, and regulatory reports for the captives in all jurisdictions, including formation filings, except the various state premium tax filings (as such may exist) and the federal Form 990 (or Form 1120 PC, as

---

[2] Note that the Firm and Capstone in turn draw upon the resources of various other service providers (e.g., auditors, risk managers, commercial insurance brokers, outside underwriters, lawyers, Capstone's Texas affiliates, etc.) in providing their services called for under this agreement.

[3] We note that in order for Capstone to properly maintain the accounting records for Cerberus CC, Janus CC, and Orion CC, your bank/broker must send the original bank/brokerage statements to the captives' Delaware or Anguilla office address which is the primary address of Cerberus CC, Janus CC, and Orion CC, with a copy of all bank/broker statements (including copies of cancelled checks, deposit slips, etc.) to Capstone, with of course another copy being directed to you, as an officer of the captives.

[4] Given that the insurance policies, the third party risk pool and captive management was done by the previous captive manager for 2015, we think the previous manager should be responsible for the 2015 financials, reporting and tax returns. Given the difficulty in receiving the information so far, we think this is a practical necessity. We understand that the previous captive manager has been paid for 2015 work, so this is not an issue.

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 5

appropriate) will be drafted by us for review and revision and ultimate completion, signature and filing by your CPA who will serve as the preparer of all tax returns (see footnote 4). Your CPA's compensation is your sole obligation.

3.   Coordinating - and together with the rest of our team, performing - the structure functions of an ongoing insurance business, including structuring insurance coverages, drafting insurance policies, obtaining independent quotations and premium reviews, obtaining audits by an independent CPA firm qualified to practice before the regulatory authorities of the chosen domicile and preparing statutory reports to the captives' regulators.

4.   To the extent you decide to do so as part of meeting the generally recognized criteria set forth in applicable case law on this issue, endeavoring to procure for your consideration and evaluation, unrelated insurance business (reinsurance assumed) for the captives at a prudent level for fiscal policy periods beginning 12/31/15.[6] As part of this program other third parties will consider underwriting your insured's coverages. See Exhibit E.

5.   Administering the entire operation of the captives in a prudent and cohesive manner to ensure compliance with laws and regulations in the captives' domicile as we understand them currently.

6.   In this regard, please note the division of responsibilities between Capstone and the Firm. Advice and counsel as to the legal, tax and regulatory issues will come from the attorneys of the Firm. Neither Capstone nor its employees and representatives provide any legal, tax or regulatory advice, and although Charles Earls is a CPA, he provides no public accounting services through Capstone or to the clients of either Capstone or of the Firm. Also, because the officers and directors of the captives retain the ultimate decision whether to underwrite a particular risk, Capstone does not perform underwriting in the traditional sense, although it does make recommendations on risk coverages and policy pricing. The function of Capstone is to execute the numerous oversight and administrative responsibilities required by the captives in accordance with the guidance provided by the captives' resident manager, legal and other advisors, and you as the officers and directors of the captives. To be clear, however, Capstone is a significant client of the Firm and the intellectual property which comprises the captives insurance planning being undertaken is exclusively the property of Capstone.

------

[6] We recommend a limited amount of unrelated insurance coverage (i.e., to cover insureds which are not a part of your affiliated group to the extent of 30%-50% of net written premiums). Historically, we have recommended 30% but are more recently suggesting the 50% level. For more on this issue, see Exhibit C. If you elect to do so, we will assist you in this regard as part of our turnkey package of services. See Exhibit E. Note that pooling and other third party insurance is offered in conjunction with PoolRe Insurance Corp., which is independently owned by a third party but is administered by Capstone under the direction of PoolRe's officers and directors. The Feldman Law Firm LLP also does occasional legal work for PoolRe.

## THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 6

7.    We will work with the current banking and captive management providers to re-establish the bank account's ownership as that of the separate Delaware captives.  It appears that some of the accounts are under the partial or full signature control of the previous captive manager.  Neither Capstone nor our firm ever holds authority to sign on clients' accounts or make investment decisions on their behalf.[6]

Services such as the following are not included in the scope of this turnkey agreement (whether from the Firm or from Capstone): (i) providing risk management services to any person or assisting in the acquisition of conventionally available insurance; and (ii) engaging in the promotion, negotiation, sale or contract finalization of any agreements of insurance in the State of Louisiana.[7]  The Firm's and Capstone's role relates to the various aspects of the cells captives' operations and their ongoing operation and may extend to the optional Delaware captives as well.

***Term of Agreement.***   Given our preliminary conclusions from the Health Check-Up, the feasability analysis and your decision to proceed, our services under this engagement letter are for an initial <u>five</u> plus year term, during which our fees will remain fixed as set forth herein. Drawing on the Firm, Capstone will design and write for review and binding by your captives, 12-month insurance contracts (that is, fiscal year contracts) for the twelve months beginning December 31, 2015.  It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement, subject to satisfying PoolRe's criteria which it sets from time-to-time.  See Exhibit E.

Our "transition fees" are <u>included</u> in this our fixed fee.  See below.  In this regard, we recognize the extraordinary efforts that we've gone through over the past several months leading to the documents obtained thus far.  We have identified documents that are missing and have little success in obtaining such.  In general, documents have been hard to come by. In this regard, we will work with what we have obtained thus far; if additional documents appear, so much the better.  As requested, we will provide an updated list of key documents that appear to be missing.

The consequences of the uncertain state of the captives is that we (Capstone and the Firm) cannot take responsibility for the bona fides of the insurance arrangement for past years or to defend its tax status as part of our fixed fee.  However, we will stand behind the captives (as set forth herein) on a prospective basis (that is from December 31, 2015 onward) involving transactions guided by Capstone and which take place from this December date forward (but not for legacy transactions).   Note that we must have definitive information as to all the underwriting done through your prior captive manager affecting in any way calendar year 2015

---

[6] Note that there is pool money being held that continues on at least through March 1, 2016 and subjects the three cells to losses.

[7] If your captives are domiciled outside the U.S., your captives will be taking the reporting position that it does not engage in the insurance business in the United States.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 7

for all three captives in order to properly limit the premium levels to meet the tax requirements going forward.

As discussed above, this is a five plus year agreement ending August 31, 2021. Following appropriate notice as set forth herein, you may cancel these ongoing services (which ends Capstone's ongoing responsibilities as of August 31, 2021 under the "Service Agreement", a copy of which is enclosed as Exhibit B) and in conjunction with doing so, also end Capstone's and our Firm's our ongoing responsibilities. Because of: (i) our need to commit personnel to the operations of the captives, (ii) our commitments to our associates, (iii) the tail on certain coverages being underwritten by your captives, and (iv) the significant up front work, should the nature of our relationship change at the end of the initial term, written notice to us must be received prior to December 31, 2019. In all cases of termination, the effectiveness of the cancellation notice is predicated upon all payments due Capstone and the Firm being current as of the time that written notice is given. If terminated by you in this fashion, no further payments will be due for work done after August 31, 2021, at which point our services will cease and our obligations under this agreement will terminate. If not terminated by you in this fashion, i.e., by advance written notice given by December 31, 2019, this agreement will automatically renew for a three year term under the same financial arrangements, the first such renewal period being September 1, 2021 - August 31, 2024; furthermore, every three (3) years, this agreement will renew (i.e., absent our timely and qualifying receipt of notice to terminate), so as to always provide Capstone and the Law Firm at least twenty (20) months notice of any change in our relationship.

*Reorganization of the Cell Captives into Standalone U.S. Captives.* We understand that you have concluded, after seeking inputs from your outside counsel and CPA, to have our Firm (and Capstone) move forward with a tax free reorganization of The Bahamian cell captives into three standalone U.S.-domesticated captives, done on a tax free basis. We think this arrangement will minimize ongoing involvement with Mr. Strauss and his associates, recognizing that at some level the core's approval of the reorganization will be necessary. While we are hopeful that these approvals by the core will be forthcoming or a work around found, we are less clear as to Mr. Strauss' reaction and what affirmative actions he may take to either allow or hinder the reorganization.

The reorganization will include the formation of new Delaware captives, and the production of a full insurance application, business plan and financial pro formas. That is, we are starting from scratch by forming three, U.S. captives and organizing the three cells into these newly formed entities on a tax free basis. Assuming that we will be doing the reorganization from all of tax, legal, financial, and insurance standpoint, our fee will be included in the overall fees paid to Capstone (and then paid by Capstone to the Firm for the Firm's services) that will begin in December 2015 and continue through August 2021. Note that this project encompasses, in addition to the design, formation, organization and assistance with funding of these three new captives, the tax free acquisition of the cell assets (or the entities) and the tax filings associated with same.

*Ownership of Reorganized Cerberus CC, Janus CC, and Orion CC; Officers and Directors.* We have preliminarily discussed that Cerberus CC, Janus CC, and Orion CC will continue to be

TWO POST OAK CENTRAL • 1980 POST OAK BLVD. • SUITE 1900 • HOUSTON, TX 77056-3877 • 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 8

directly owned by Dr. Scott K. Sullivan and Dr. Frank J. DellaCroce, all as currently existing.
There will be no holding company structure or estate planning overlay.

Delaware requires a resident director, and in this regard we propose Dana Moore, who
currently serves as the resident director and local agent for our other Delaware entities. Ms.
Moore is not intended to be an officer, and you will appoint two directors, giving you a
majority on the board. Fees for the resident director (if the decision is made to form in
Delaware) are included as part of our turnkey fee.

**Capstone.** The Captives will engage Capstone which will serve as the resident manager, or
it will engage a resident insurance manager on behalf of each captive in Delaware to assist in
the ongoing services needed to properly implement and administer this planning. The
responsibilities of Capstone (relative to those of the Firm) are set forth in Exhibit A and with
the Services Agreement (with Capstone) for the captives attached as Exhibit B. Our Firm will
work with the designated team of professionals and related service providers (that is, we will
quarterback the overall planning for your captives and coordinate our work with your CPA and
with the domicile manager, etc.[8]) although our Firm reserves its rights to upwardly adjust its
fees in the event a team other than that of Capstone and the Firm is chosen by you. The
respective responsibilities of Capstone and the Firm (and subsumed within such, the work of
the resident manager) and other third parties working under Capstone's administration and
with the Firm's direction have been set out in a manner so that, as between these organiza-
tions, all aspects of the initial set-up and ongoing administrative or regulatory work will be
conducted either by the Firm or Capstone, each acting from time-to-time as circumstances
warrant on behalf of either (i) the captives, (ii) the insured(s), (iii) the captives' owners, or (iv)
the resident manager. This is intended to ensure that all of the many moving parts of the
captives' planning are professionally and timely handled. This is also in furtherance of the
responsibilities of the Firm in the case of a state or federal tax inquiry (see pages 11-12) or a
domicile audit.

Unless otherwise expressly set forth herein, you agree to engage our Firm, Capstone, and the
designated resident manager to carry out their called-for duties and responsibilities.
Recognizing that the fees quoted below are based upon a Delaware incorporation and domicile,
and the term agreement specified with the pattern of fees set forth herein, as opposed to being
front weighted in recognition of large amount of up-front transition work being undertaken.
Capstone's affiliate, Capstone Insurance Management, Ltd. ("CIMA"), which is also an affiliate
of the Firm and under common ownership, is the anticipated insurance manager.

**Fees.** In the captives' initial years, there is a substantial amount of legal design and drafting,
technical insurance planning, regulatory approval, financial and administrative work, all of
which is reflected in the amount and timing of our fees. The purpose of our assignment is to

---

[8]We note that changing the members of the team, for example, by having our Firm work with other
auditors or resident managers, will result in duplicate work, redundant costs and likely extra fees on our part related
to the increased complexity and administrative burden. As noted above, an affiliate of Capstone, CIMA, will also
provide services to Cerberus CC, Janus CC, and Orion CC, all of whose fees are included in the overall turnkey fee.
The voluntary of involuntary termination of the Firm will nonetheless obligate Capstone and Capstone obligates
you to this agreement for the contract term provided herein in all situations.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 9

continue to assist you in operating the existing cell arrangement and likely transitioning such into U.S. domiciled, standalone captive insurers.

We understand that you are directing us to undertake the reorganization portion of the assignment. Additionally, our work includes in addition to the ongoing management of the captives, preparing the application for the captives, obtaining the necessary approval from Delaware's Director of Insurance to form and operate your insurance companies, actually forming, organizing and capitalizing the insurance companies, and assisting you in identifying the risks to be insured (with you retaining all decision making on coverages and policy pricing) and preparing the necessary policies to evidence those risks being borne by the captive insurance companies along with obtaining third party quotations for the costs of such coverages in the marketplace. At least two conferences or in-person meetings are expected to be held by the resident manager yearly with the Delaware Insurance Commissioner or the Commissioner's staff. We will make available to the three cells (as may evolve into Cerberus CC, Janus CC, and Orion CC), as an option, the ability to participate (subject to satisfying the pool criteria) in unrelated insurance risks, in which the captives may (or may not) participate, subject to compliance with the program's terms. We will provide up-front and ongoing legal and tax support for the overall alternative risk planning structure.

In addition we will prepare documents to facilitate the exit of the three cells from the overall cell arrangement and oversee the return of assets to your cells. In this regard, we understand that monies are on deposit with the core or with an existing pooling arrangement.

We understand that at some point you will want assistance in handling the investment of the captives' excess reserves (that is, what remains after the captives' expenses and losses) whether those are investments in bonds, certificates of deposit, stocks, loans to affiliates, or participation in other planning for your captives' hoped for residual retained profits. While we are not investment managers, we will assist in the legal and, through Capstone, the regulatory, accounting and reporting aspects of such investment activities. See below. Note, however, that a captive is a regulated insurance company, and in this regard, its investment and operations are subject to the regulatory oversight in the chosen domicile. To be sure, the captives cannot be operated as a personal checking account.[9]

Our workload, which is very substantial in the early years of the captives' formation and organization, may level off somewhat thereafter, which is generally more than offset by what we find are more active captives as their capital builds and as other planning opportunities therefore become more available. At some point you may ask the Firm to assist in distributing the captives' profits and even shutting down the captives; we stand ready to assist in that

[9] By way of example, you should not expect that in Delaware any more than 40% - 50% of the captives' "excess" reserves (generally being the amount in excess of the captives' initial $250,000 capitalization plus all liabilities plus perhaps a margin) can be loaned back to your operating entity, which itself is a special concession made to Capstone-administered captives in, for example, Delaware because of our recognized experience in administering captive and history of performing as directed by insurance regulators. For federal tax purposes, however, we recommend that clients keep these affiliated loans in the usual case at less than 50%. The lower the better. Nonetheless, the types of investments and the amount able to be put into each category are governed by numerous Delaware regulations, which change from time-to-time,

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 10

regard as part of our regular, quarterly retainer, without further charge.

As is true of any business enterprise, there is some uncertainty in the amount of costs and expenses which we will incur in providing this service. In complex endeavors such as this, there is an extra level of unpredictability in quantifying such costs, recognizing that you desire as much certainty as possible in committing to this project. To this end, we have assembled a turnkey service package[10] and fee structure which only *excludes*:

> (i) any taxes or related payments which any State government, any other country or the Internal Revenue Service (IRS) assesses or is due on or with respect to: (a) the captives; (b) the insured companies; or (c) the parent-owners[11].

> (ii) any financing activities involving the captives and other legal work (e.g., a real estate transaction) beyond our preparing general secured loan agreements (i.e., standard secured lending where accounts receivables are the primary security) (subject to the fee set forth below) which we will endeavor to dovetail with your existing lines of credit. More tailored factoring plan design and implementation, legal document drafting and related work will be billed at the Firm's and Capstone's standard billing rates; and

> (iii) other expanded captives planning opportunities beyond that outlined herein, such as having the captives acquire, finance or participate in real estate investments or estate planning or trust work.

In general, Capstone's turnkey fee (which is inclusive of fees then paid by Capstone to the Firm) is inclusive of such significant matters as compensating the statutory captives manager (one of our affiliates), all Delaware insurance licensing and Delaware corporation fees and all financial audit fees, statutory triennial audit, annual independent CPA audit[12] and other "standard services" (as set out in Exhibit A) being provided by Capstone and by our Firm. However, fees for services requested that are beyond those specified as standard services or for work beyond the services contemplated by this Agreement, will be charged at standard rates of the Firm or Capstone, as the case may be. By way of example, if you decide to seek regulatory approval to have your captives make a mortgage loan to an affiliate to finance a

---

[10] Of course, any underwriting or investment losses are the responsibility of your insurer (and similarly any such gains accrue to its benefit) and are not the responsibility of either Capstone or the Firm.

[11] Under current law, the proposed structure of Cerberus CC, Janus CC, and Orion CC as intermediate captives would result in the captives being: (i) free of local income taxes (but not the myriad of fees for licenses and filing fees which is part of Capstone's fixed fee arrangement) in the chosen domicile; and (ii) free of U.S. income and excise taxes on the captives' underwriting profits. Investment income is taxed as in a C corporation. Federal, state and local taxes may be due upon the captives' wind up and liquidation or upon dividends being paid.

[12] The audit will be performed on a scheduled turnkey basis by a domicile-licensed independent auditor, at Capstone's choice, or by another accounting firm recommended by Capstone, subject to your prior approval. In all cases, the auditing firm must be licensed and approved by the regulators. The first audit will likely be for the combined period of formation through December 31, 2016.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2016)
Page 11

building, we would separately charge to make application to the Delaware Department of
Insurance for such a use of the captives' assets as a permitted investment and to perform (if
you so request) the legal work related to the financing. Additionally, should you ask our Firm
to represent you in a real estate acquisition, we also would separately charge for such
services. Generally, however, we seek and usually obtain up-front permission from the
domicile's regulator for certain types of corporate lending such as loans to operating
businesses, which are nonetheless subject to additional regulatory limitations.

The overall fees, which are paid to Capstone (which in turn pays the Firm for legal work
undertaken whether or not in excess of the total fees paid) for their respective services, total
as follows:

■ *Calendar Years 1 - 5 (December 31, 2015 - August 31, 2021):* Given a broad
range of coverages with premiums for each captive being no more than
$1,000,000± each, with coverages spread among your operating entities:

•       Installments of $11,875 per quarter per captive for calendar year 2016
        (($160,000-$17,500)/[4 quarters x 3 captives]);

•       Installments of $13,334 per quarter per captive for the first half of 2017
        ($160,000/[4X3]); and

•       installments of $16,000 per quarter per captive for the second half of
        2017 through August 31, 2021 ($192,000/[4X3]).

Payments are due January 1st, April 1st, July 1st and October 1st of each year
(2021 being prorated), such inclusive of both Capstone's and the Firm's efforts.
See footnote 6. If you elect to engage in secured corporate lending to affiliates,
our ongoing fees increase by $2500 per captive per quarter due for the whole
of any calendar year in which a loan is outstanding. If there are similarities in
the secured lending arrangements there will be some economies of scale which
we will pass onto you. (Note that the existing unsecured lending arrangement
should cease.

*RISKS AND RESPONSIBILITIES.* It is our intention under this planning to elect special tax
treatment as to the insurance and investment operations of Cerberus CC, Janus CC, and Orion
CC under relevant provisions of the Internal Revenue Code and to obtain tax deductibility for
the premiums paid to the captives by the affiliated insureds. This planning assumes that the
captives' aggregate direct and pooled net written premiums are no more than
$1,000,000.00± per calendar year, which seems reasonable based upon the preliminary
information from the feasibility study, and that other legal, regulatory, and judicial requirements
of the planning (e.g., premiums do not exceed $1.2 million/year, the captives conduct
themselves as insurance companies, etc.) are respected. See Exhibit C attached.

Should the IRS challenge the planning being done herein as to its IRC Section 831(b) status,
subject to the timely payment by you of the fees due us from time-to-time, such fees being
in all ways current, and the uninterrupted and continued retention of the Firm and Capstone

## THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 12

for the scope of services described in this agreement, the Firm agrees to represent you without further payment of legal fees in any IRS audit (either field, office or by mail), before IRS Appeals, in an IRS mediation, and then, if appropriate, file on your behalf a petition and an opening legal brief in the U.S. Tax Court regarding the issues related to the planning being done herein under IRC Section 831(b) (and no other issues but those specified herein). Note that our obligations under this paragraph run only for federal or state tax challenges which relate to the captives' operations post-December 31, 2015 (the beginning of Capstone's and the Firm's role) and not for prior work done by your existing service providers. To be clear, legacy work is not covered, but the Firm is likely willing to take on any challenge under a separate fee agreement.

In the history of Capstone and our Firm with respect to alternative risk planning dating back to our beginnings in 1998, we have never gone beyond this point (that is, the point covered by our fixed fee arrangement) and have been able to resolve issues satisfactorily (that is, with "no change") well short of even basic discovery in the U.S. Tax Court, which (as noted) is outside of the scope of the fixed fee portion of this agreement. Of course, in connection therewith, we cannot guarantee any particular result, and several others are still in process.

As we have discussed previously, this planning technique – as well as other types of advanced business and tax planning – involves inherent risks and should only be undertaken by those who understand and can evaluate and bear such risks. A non-exhaustive but lengthy discussion of the risks plus other pertinent issues (e.g., a detailed summary of our experience with the IRS in these planning areas) are set forth in the attached Exhibit C. See also the materials listed on www.CapstoneAssociated.com. In connection with our work, it is additionally important that you commit to retain the services of a highly competent and diligent CPA, whose involvement is critical to maintain the interface of the Clinic and your captives, and to review and file the various state and federal tax returns which will be presented in draft form for signature.

***ADDITIONAL PLANNING.*** Captive insurance planning opens up the opportunity for related business, financial and tax planning. This and other opportunities will be brought to your attention for your consideration. As discussed previously, these additional planning matters are not included in the turnkey fee arrangement discussed above, and for such work we would separately invoice you if requested to perform such.

Please sign below and return a copy of this agreement to us to that Capstone and our Firm can continue our joint work on this project. We look forward to working with you.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX 77056-3877 ● 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 13

Very truly yours,

Stewart A. Feldman

enclosures (all previously provided):

- Engagement Retainer Invoice

- Guidelines on Administration and Billing (applicable to both the Firm and Capstone)

- Exhibit A - Duties and Responsibilities: (i) of Capstone Associated Services, Ltd.; and (ii) of THE FELDMAN LAW FIRM LLP

- Exhibit B - Services Agreement

- Exhibit C - Tax Risks Inherent in §831(b) planning

- Exhibit D - Brief Description of Types of Captives

- Exhibit E - Supplement on Third Party Insurance

**CIRCULAR 230.** I may ask the Attorney's advice regarding federal tax issues. The Internal Revenue Service (IRS) does not allow me to rely on informal tax advice rendered before I file my tax return to avoid tax penalties. If I want to rely on the Attorney's federal tax advice to avoid tax penalties, the IRS requires the Attorney to issue formal written tax opinions regarding the tax issue(s). Formal written tax opinions are not within the scope of this engagement. The IRS rules also prohibit someone else from using the advice the Attorney provides to me. All communications from the Attorney are intended for my use only and include, and are intended to reflect, in substance, the following notice:

*Treasury Circular 230 Disclosure:* To the extent this communication contains any statement of tax advice, such statement is not intended or written to be used, and cannot be used, by any person for the purpose of, or as the basis for, avoiding tax penalties that may be imposed on that person. This communication is not intended to be used, and cannot be used for the purpose of promoting, marketing, or recommending to another party any matter addressed in this communication.

TWO POST OAK CENTRAL ● 1980 POST OAK BLVD. ● SUITE 1900 ● HOUSTON, TX. 77056-3877 ● 713/850-0700

THE FELDMAN LAW FIRM LLP

October 22, 2015 (revised November 11, 2015)
Page 14

This legend is attached pursuant to U.S. Treasury Regulations governing tax practice, to comply with requirements imposed by the Internal Revenue Service. I will let the Attorney know if I want a formal, legal opinion regarding tax issues. I agree to sign a separate engagement letter with the Attorney to show I want such an opinion. I understand that the cost of such an opinion will be substantial given the IRS requirements.

APPROVAL TO PROCEED AS DESCRIBED ABOVE:

Scott K. Sullivan, M.D.                          12/7/15
                                                 Date

Frank J. DellaCroce, M.D.                        12/7/15
                                                 Date

copy:    Capstone Associated Services, Ltd. *(w/encl.)*
         att: Charles B. Earls III, President
         Two Post Oak Central
         1980 Post Oak Blvd., Suite 1950
         Houston, TX 77056-3877

         David Sherman, Esq. *By email*

Unofficial Copy Office of Marilyn Burgess District Clerk

T.C. Memo. 2018-86

UNITED STATES TAX COURT

RESERVE MECHANICAL CORP., f.k.a. RESERVE CASUALTY CORP.,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14545-16.                    Filed June 18, 2018.

<u>Val J. Albright</u> and <u>Michelle Y. Ku</u>, for petitioner.

<u>Thomas F. Harriman</u>, <u>Naseem Jehan Khan</u>, <u>Grubert Roger Markley</u>, and
<u>Justin D. Scheid</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined the following deficiencies in
petitioner's Federal income tax for tax years 2008-10 (tax years in issue):

**EXHIBIT B**

- 2 -

[*2]

| Year | Deficiency |
|------|------------|
| 2008 | $144,538 |
| 2009 | 164,418 |
| 2010 | 168,305 |

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

The issues for consideration are:  (1) whether transactions that petitioner executed during the tax years in issue constituted insurance contracts for Federal income tax purposes, and therefore, whether petitioner was exempt from tax as an "insurance company" described in section 501(c)(15); (2) whether petitioner was eligible to make an election under section 953(d) to be treated as a domestic corporation; and (3) if petitioner was not an insurance company and was not eligible to make an election under section 953(d), whether payments that it received for the tax years in issue are subject to the 30% tax imposed by section 881(a).

- 3 -

[*3]                          FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and the

attached exhibits are incorporated herein by this reference.  When petitioner filed

its petition, it was a corporation organized under the laws of Anguilla, British

West Indies.  In our findings of fact we use the terms "insurance", "risk",

"coverage", and similar terms to describe the form of the transactions, but our use

of those terms does not reflect any ruling as a matter of fact or law with respect to

insurance or insurance companies within the meaning of subchapter L of the Code.

I.      Overview of Reserve Mechanical Corp.

Reserve Mechanical Corp. f.k.a. Reserve Casualty Corp. (hereinafter,

Reserve) was incorporated in Anguilla in 2008 under the provisions of section 9 of

the Companies Act.  Anguilla is an overseas territory of the United Kingdom.

During the tax years in issue Reserve held a Class B General Insurance License

(Class B insurance license) issued by the Financial Services Commission of

Anguilla.  The Financial Services Commission is the Anguillan governmental

entity authorized to license, regulate, and oversee the financial services industry in

Anguilla, including insurance companies.

During the tax years in issue Peak Casualty Holdings, LLC (Peak Casualty),

a Nevada limited liability company, owned 100% of  Reserve's stock.  Norman L.

- 4 -

[*4] Zumbaum and Cory Weikel each owned 50% of Peak Casualty.  Zumbaum and Weikel were U.S. citizens who resided in Idaho during the tax years in issue.

Zumbaum and Weikel served as directors for Reserve.  Zumbaum was its chief executive officer, president, treasurer, and assistant secretary.  Weikel was its vice president, secretary, and assistant treasurer.

A.     Peak's Operations

Peak Mechanical & Components, Inc. (Peak) was incorporated in 1997, and its principal place of business was in Osburn, Idaho.  Zumbaum and Weikel each owned 50% of Peak's outstanding stock, and Peak elected to be treated as an S corporation for Federal income tax purposes.  Peak engaged in the business of distributing, servicing, repairing, and manufacturing equipment used for underground mining and construction.  By 2008 Peak had grown significantly.  In 2008 and 2009 it had 17 employees, including management personnel, shop managers and staff, and outside salespersons.  In 2010 it had 13 employees.

Peak's facilities were in Idaho's Silver Valley, an active mining district, and were within the Bunker Hill Mining & Metallurgical Complex, a "Superfund Site" designated by the U.S. Environmental Protection Agency (EPA) (Bunker Hill Superfund Site).  See Bunker Hill Mining & Metallurgical Complex, Smelterville, ID, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=

- 5 -

[*5] second.Cleanup&id=1000195#bkground (last visited June 13, 2018).  The

Bunker Hill Superfund Site was polluted with heavy metals, including zinc and

lead, as a result of historic mining practices.  The site was subject to EPA

oversight and regulation.  As part of its business Peak cleaned equipment used in

polluted mines, and it took measures to protect its employees and to control fluid

runoff containing pollutants and other hazardous materials.

During the tax years in issue Peak's equipment was used in approximately

12 mines in Idaho, Nevada, and Washington, and it sold some products outside the

United States.  It manufactured and serviced a line of submersible pumps used to

remove groundwater from working areas, and it supplied and serviced large

ventilation fans and air barrier doors, which are used to improve air quality and

control air flow in underground mines.  It rebuilt and customized trucks to be used

as support vehicles in mining operations, and it manufactured and repaired guide

wheels for hoist conveyances, which are used in mine shaft elevators.

B.    Peak's Commercial Insurance Coverage

During all of the tax years in issue Peak maintained insurance coverage with

third-party commercial insurers.  It held policies with third-party insurers that

covered general liability, worker's compensation, commercial property, inland

- 6 -

[*6] marine, and international risk.  It maintained the following policies with the following insurance companies:

| Insurance provider | Policy type & limit categories | Policy limits |
|---|---|---|
| Employers Mutual Casualty Co. (EMC) | General liability | |
| | Each occurrence | $1,000,000 |
| | Damage to rent premises | 100,000 |
| | Medical expense | 5,000 |
| | Personal & advertising injury | 1,000,000 |
| | General aggregate limit | 2,000,000 |
| | Products/completed operations aggregate limit | 2,000,000 |
| EMC | Commercial property | |
| | Blanket policy limit | 914,940 |
| EMC | Commercial inland marine (covering electronic data processing equipment) | |
| | Limit for hardware | 8,000 |
| Idaho State Insurance Fund | Worker's compensation employer's liability | |
| | Each accident | 100,000 |
| | Disease, each employee | 100,000 |
| | Disease, policy limit | 500,000 |
| Ace American Insurance Co. | International risk policy | |
| | Foreign general liability, automobile liability, employers liability | 1,000,000 |
| | Foreign accidental death & dismemberment | 5,000 |
| | Kidnap & extortion | 50,000 |

Peak also maintained auto insurance policies with State Farm for several vehicles that its employees drove.

Unofficial Copy Office of Marilyn Burgess District Clerk

- 7 -

[*7]   For tax year 2006 Peak claimed a deduction on its Form 1120S, U.S.

Income Tax Return for an S Corporation, for insurance expenses of $38,810.  For

tax year 2007 it claimed a deduction for insurance expenses of $95,828.  Peak's

income statement reflects that for the first six months of 2008 it incurred insurance

expenses of $57,300.

C.     Peak's History of Losses and Insurance Claims and Potential Losses

Sometime before the tax years in issue Peak engaged a large accounting

firm to review returns it had filed for previous years.  Peak was advised that its

income had been underreported and that it needed to restate its income for three

tax years.  It contacted the Internal Revenue Service (IRS) about restating its

income, and it paid additional tax as a result.  The IRS waived penalties.

In years prior to the tax years in issue Peak had filed insurance claims under

its auto insurance policies for losses associated with company vehicles.  In

February 2008 a snowstorm damaged the roof of one of Peak's buildings, and it

filed a claim with EMC.  EMC conducted an examination and concluded that the

repair would cost $2,000.  Peak had a separate examination of the roof which

concluded that $2,000 would be insufficient to repair the roof.  It tried to negotiate

with EMC for a larger payout, but after negotiations EMC agreed to pay only

$2,000.  Peak paid $25,000 out of pocket to have the roof replaced.

- 8 -

[*8]    D.    <u>RocQuest and ZW Enterprises</u>

During the tax years in issue Zumbaum and Weikel equally co-owned 100%
of the membership interests in two other entities:  RocQuest, LLC (RocQuest), and
ZW Enterprises, LLC (ZW).  RocQuest and ZW were Idaho limited liability
companies that were treated as partnerships for Federal income tax purposes.
RocQuest owned real estate in Osburn and Hayden Lake, Idaho, and Elko,
Nevada.  It leased the properties in Osburn and Elko to Peak for Peak's business
operations.  It leased the property in Hayden Lake to Premier Electric Motor, Inc.
(Premier), an entity that Zumbaum and Weikel partially owned.  Premier
conducted repair work on electrical motors and received most of its business from
Peak.

ZW was an entity that Zumbaum and Weikel organized to facilitate a loan to
an ex-employee.  After leaving Peak the ex-employee wanted to purchase a bar in
Osburn, and Zumbaum and Weikel, through ZW, helped finance the purchase.
ZW held a 10% ownership interest in the bar.  Zumbaum and Weikel organized
ZW so that Peak would not have any liability vis-a-vis the bar.

II.    <u>Formation of Reserve</u>

Before forming Peak Zumbaum and Weikel worked for Mining Equipment,
Ltd. (MEL), based in Colorado.  Robert Pope was the president and owner of

- 9 -

[*9] MEL.  Zumbaum and Weikel viewed Pope as a mentor.  Pope recommended

that Peak should obtain more insurance, and he suggested forming a captive

insurance company.  He advised Zumbaum and Weikel to contact Capstone

Associated Services, Ltd. (Capstone).

    A.   <u>Overview of Capstone</u>

In 1998 Stewart Feldman formed Capstone, a Texas limited partnership with

an office in Houston, Texas.[1]  Capstone offered insurance-related services,

including captive feasibility studies, assistance with regulatory filings, accounting,

and other services related to forming a captive insurance company.  It offered a

"turnkey" administrative program to help small and intermediate size captives

overcome transaction costs.

Capstone employed insurance and accounting professionals, and it was

closely affiliated with the Feldman Law Firm, LLP (Feldman firm), which

provided legal services to Capstone clients.  Feldman was the Feldman firm's

managing partner and chief executive officer of Capstone's corporate general

partner.

---

[1] Feldman testified that Capstone was a Texas limited partnership.  Exhibit 9-J includes a reference to "Capstone Associated Services, Ltd., a Florida limited partnership".

- 10 -

[*10] Capstone would perform a feasability study for a client, which provided an opinion as to the advisability of establishing a captive insurance company. Generally, a feasibility study identified factors that would make a captive insurance arrangement desirable for a particular client, including a discussion of the client's business operations and risks, insurance coverage that the client held through third-party insurers, and potential coverage gaps ("exposures") that might be relevant to the client's business. For clients that proceeded with the formation of a captive insurance company, Capstone performed a comprehensive set of captive management and administrative services.

Capstone provided the services of its insurance professionals, and it assisted clients in selecting and administering policies that the captive entities issued. It advised clients in selecting policies, drafted policies, and provided services to handle claims adjustment and settlement. Capstone advised clients as to the premiums that should be charged for policies. It charged Reserve approximately $15,000 a quarter for services, including disbursements on Reserve's behalf.

B.    Onsite Visit of Peak's Operations

Zumbaum and Weikel contacted Capstone to discuss forming a captive insurance company. Peak provided documents relating to its business operations, which Capstone compiled as "Client Background Documents" for a feasibility

- 11 -

[*11] study.  Peak provided financial and income statements, tax returns, and documentation of insurance policies that it held with third-party insurers.  A copy of Rocquest's partnership tax return for 2007 was included with the background documents.

On August 13, 2008, Feldman and Lance McNeel, director of Capstone's insurance department, visited Peak's facilities.  Feldman and McNeel met with Zumbaum and Weikel, and they toured locations where Peak conducted operations in Osburn and the facility in Hayden Lake.  McNeel took pictures of Peak's operations and inventory.  Feldman and McNeel discussed with Zumbaum and Weikel documents that Peak had provided and discussed products that Peak sold and its repair and manufacturing operations.  They discussed possible gaps in Peak's existing insurance coverage.  The onsite visit of Peak's facilities lasted six to eight hours.

C.    Feasibility Study for Peak

In August 2009 the finalized feasibility study for Peak was issued, about nine months after the start of Reserve's operations.  The background documents compiled to support the feasibility study included documents that reflected Peak's financial information through August 31, 2009, and the background file was updated as late as December 14, 2009.  Capstone's feasibility study for Peak

- 12 -

[*12] concluded that "as of the date of this report, the viability of a small captive

insurer * * * to address the insurance and risk management issues discussed herein

is feasible, reasonable, and practical, and is the best alternative risk mechanism

option for the proposed insured ".

The feasibility study included an explanation of tax benefits for small and

intermediate-size captives under sections 831(b) and 501(c)(15).  It included a

summary of Peak's business operations, a table reflecting Peak's commercial

insurance policies, and a list of "other risk management issues".  The study did not

provide detailed information regarding the other risks that conventional insurance

might not cover.  The study provided brief descriptions of these risks, but it

included no information on the probability that these risks might occur.  The study

did not include information about Rocquest and ZW.  The study identified specific

policies that Peak could consider handling through a captive insurer.  It identified

potential domiciles for Peak's small captive and concluded:  "Anguilla is the

preferred choice."

Capstone and Willis HRH of Houston (Willis), an insurance broker and risk

management consulting firm that collaborated regularly with Capstone during the

tax years in issue, jointly issued the feasibility study.  Robert Snyder signed the

study as senior vice president of Willis.  McNeel was principal author of the study,

- 13 -

**[\*13]** and Snyder's role was to review it.  Snyder did not perform any independent

investigation of Peak's business operations, and he based his review on the

background documents that Capstone compiled and an oral briefing from McNeel.

      D.    <u>License Application & Organization</u>

      On October 10, 2008, Feldman wrote a letter to the Financial Services

Commission of Anguilla notifying the commission that Capstone would be

providing its "usual comprehensive set of captive administrative services" to

Reserve.  On October 21, 2008, Zumbaum, Weikel, and Feldman endorsed and

submitted Reserve's Application For a Class B Insurer's License in Anguilla.  The

application contained a business plan for Reserve.  The business plan stated that in

its early years Reserve "is expected to be operated under section 501(c)(15) of the

U.S. Federal Tax Code which limits gross receipts to $600,000".

      On December 3, 2008, Reserve was incorporated in Anguilla, and on the

same date the Financial Services Commission granted it a Class B insurance

license valid through December 31, 2008.  Reserve's insurance license application

identified Capstone and Atlas Insurance Management (Anguilla) Limited (Atlas)

as key service providers.  On December 10, 2008, Reserve received an initial

capitalization of $100,000, the minimum amount required for a Class B insurer

under Anguillan law.

- 14 -

[*14] Capstone engaged Atlas to serve as the authorized representative and

resident insurance manager for Capstone clients in Anguilla.  Atlas transmitted

documents that Capstone prepared for Reserve's license application to the

Anguillan regulatory authorities.  After Atlas submitted the license application, its

principal role was to provide a local business address for Reserve.

III.   Reserve's Direct Written Policies

During the tax years in issue Reserve issued direct written insurance

policies, with Peak, Rocquest, and ZW as the named insureds on each policy.  All

of the policies that Reserve issued the insureds showed one premium price and did

not specify amounts to be paid by each insured.  All of the policies contained the

following provision:

> THE COVERAGES AFFORDED BY THIS POLICY ARE EXCESS
> OVER ANY OTHER VALID AND COLLECTIBLE INSURANCE
> POLICY ISSUED BY ANY OTHER INSURER * * *.  THE LIMITS
> AND DEDUCTIBLES STATED HEREIN ONLY APPLY AFTER
> COVERAGE IS EXHAUSTED FROM ANY AND ALL OTHER
> VALID INSURANCE POLICIES ISSUED BY ANY OTHER
> INSURER.

During the tax years in issue Peak maintained its insurance coverage with third-

party insurers.

For the tax years in issue Capstone selected and drafted the policies that

Reserve issued for Peak and the other insureds.  Zumbaum scanned the policies

- 15 -

**[*15]** but did not review them in detail, and he was unaware of specific terms in the policies.  Capstone employees, including McNeel, determined the premiums that Reserve charged for the policies.  For each of the tax years in issue McNeel prepared a rating worksheet that calculated the premiums for Reserve's direct written policies.  Zumbaum and Weikel had ultimate authority to determine the premiums, and they always approved the amounts that Capstone advised.

McNeel calculated the premiums using ratings bases specific to Peak's business; for most policies the ratings base was Peak's annual projected sales.  He applied to the ratings base for each policy a base rate that varied according to the type of insurance being provided, which yielded a base premium price for the first $250,000 of coverage.  Capstone maintained a spreadsheet of base rates for "common policies" that it administered on behalf of its clients' captive insurance companies (Capstone entities).  McNeel prepared the spreadsheet by reviewing the premiums that all Capstone entities had charged in previous years, and the spreadsheet provided both an average and a range of rates from which he could choose for each type of policy.  On Reserve's rating worksheets McNeel adjusted the base premium amounts using increased limit factors, which accounted for the increased coverage limits in its policies.

- 16 -

**[*16]** Capstone engaged persons employed by an outside firm, Mid-Continent General Agency, Inc. (Mid-Continent), to develop premium quotations.  A Mid-Continent employee generated pricing indications using information that Capstone compiled about its clients.  McNeel relied on the Mid-Continent indications in setting the premiums that Reserve and other Capstone entities charged for their direct written policies.

In 2009 Mid-Continent wrote Capstone a letter which stated that "many of the insurance coverages written by the [Capstone] captives are nonstandard lines of insurance for which there is no 'manual rating'".  The letter stated further that "[u]nderwriting judgment, while 'subjective,' is a key component of evaluating and pricing risk" in the methodology that Mid-Continent employees used to generate pricing indications.  Peak and the other insureds under Reserve's policies had insufficient histories of insurance claims and losses to use as bases for determining premiums, and McNeel did not rely on loss data in calculating the premiums for Reserve's direct written policies.

A.   2008 Direct Written Policies

For 2008 Reserve issued 13 direct written insurance policies, with Peak, RocQuest, and ZW as the named insureds.  Each policy listed PoolRe Insurance Corp. (PoolRe) as the stop loss insurer.  These policies were effective from

- 17 -

[*17] December 4, 2008, through January 1, 2009.  The aggregate amount of insurance was $13 million, and the premiums were $412,089.  Reserve issued the following direct written policies for 2008:

| Name of policy | Combined premium[1] | Aggregate policy limit |
| --- | --- | --- |
| Excess Directors & Officers Liability | $17,122 | $1,000,000 |
| Special Risk--Loss of Major Customer | 7,268 | 1,000,000 |
| Special Risk--Expense Reimbursement | 31,312 | 1,000,000 |
| Special Risk--Loss of Services | 4,874 | 1,000,000 |
| Special Risk--Weather Related Business Interruption | 7,268 | 1,000,000 |
| Excess Pollution Liability | 82,850 | 1,000,000 |
| Special Risk--Tax Liability | 65,408 | 1,000,000 |
| Excess Intellectual Property Package | 18,169 | 1,000,000 |
| Special Risk--Regulatory Changes | 64,899 | 1,000,000 |
| Special Risk--Punitive Wrap Liability | 55,233 | 1,000,000 |
| Excess Employment Practices Liability | 24,256 | 1,000,000 |
| Excess Cyber Risk | 28,343 | 1,000,000 |
| Special Risk--Product Recall | 5,087 | 1,000,000 |
| Total | 412,089 | 13,000,000 |

[1]As noted, each of the direct written policies that Reserve issued showed only one premium price for coverage to be provided to all three named insureds.  According to additional agreements executed by the parties, which are described in more detail below, a portion of the premiums due for the direct written policies were to be paid to a stop loss insurer.  It is unclear from the record which of the insureds paid premiums under the direct written policies, in what amounts they paid, and to whom.  Accordingly, the table reflects only the combined premium price shown on each of the policies.

- 18 -

**[*18]** Seven of the 2008 policies had retroactive dates or look-back provisions. The policies for excess directors and officers liability, excess pollution liability, excess intellectual property, punitive wrap liability, excess employment practices liability, and excess cyber risk provided that the policies would cover claims occurring after January 1, 2005. The tax liability policy provided that it would cover all tax periods for tax returns whose due dates (without extensions) were during the 2008 calendar year. The remaining six policies for loss of major customer, expense reimbursement, loss of services, weather-related business interruption, intellectual property package, regulatory changes, and product recall had no retroactive dates.

     B.    <u>2009 Direct Written Policies</u>

For 2009 Reserve issued 11 direct written insurance policies. Peak, RocQuest, and ZW were the named insureds, and the policies were effective for January 1, 2009, through January 1, 2010. Each policy listed PoolRe as the stop loss insurer. The total premiums were $448,127. The direct written policies for 2009 did not include insurance for weather-related business interruption and excess cyber risk as included in the 2008 direct written policies. Reserve issued the following policies for 2009:

- 19 -

[*19]

| Name of policy | Combined premium | Aggregate policy limit |
|---|---|---|
| Excess Directors & Officers Liability | $17,075 | $1,000,000 |
| Special Risk--Loss of Major Customer | 50,625 | 500,000 |
| Special Risk--Expense Reimbursement | 26,686 | 1,000,000 |
| Special Risk--Loss of Services | 62,791 | 1,000,000 |
| Excess Pollution Liability | 60,750 | 500,000 |
| Special Risk--Tax Liability | 45,562 | 500,000 |
| Excess Intellectual Property Package | 34,425 | 1,000,000 |
| Special Risk--Regulatory Changes | 47,588 | 500,000 |
| Special Risk--Punitive Wrap Liability | 40,500 | 500,000 |
| Legal Expense Reimbursement | 26,687 | 1,000,000 |
| Special risk--Product Recall | 35,438 | 500,000 |
| Total | 448,127 | 8,000,000 |

On January 1, 2009, an Atlas employee executed the 2009 policies on

Reserve's behalf.  During 2009 Capstone formed its own licensed insurance

management company in Anguilla, and Capstone replaced Atlas with its own

employee to serve as Reserve's resident insurance manager and authorized

representative.

C.    2010 Direct Written Policies

For 2010 Reserve issued 11 direct written policies.  Peak, RocQuest, and

ZW were the named insureds.  Each policy listed PoolRe as the stop loss insurer.

On January 1, 2010, a Capstone employee executed the policies as Reserve's

- 20 -

[*20] authorized representative.  The effective policy period for the 2010 policies

was January 1, 2010, through January 1, 2011, and the total premiums were

$445,314.  Reserve issued the following policies for 2010:

| Name of policy | Combined premium | Aggregate policy limit |
|---|---|---|
| Excess Directors & Officers Liability | $17,075 | $1,000,000 |
| Special Risk--Loss of Major Customer | 47,812 | 500,000 |
| Special Risk--Expense Reimbursement | 23,024 | 1,000,000 |
| Special Risk--Loss of Services | 62,791 | 1,000,000 |
| Excess Pollution Liability | 60,750 | 500,000 |
| Special Risk--Tax Liability | 45,562 | 500,000 |
| Excess Intellectual Property Package | 34,425 | 1,000,000 |
| Special Risk--Regulatory Changes | 47,588 | 500,000 |
| Special Risk--Punitive Wrap Liability | 40,500 | 500,000 |
| Legal Expense Reimbursement | 30,349 | 1,000,000 |
| Special Risk--Product Recall | 35,438 | 500,000 |
| Total | 445,314 | 8,000,000 |

D.     Claims Under Direct Written Policies

The only claim made under one of Reserve's direct written policies was

made in 2009.  Peak made a claim under the policy for loss of a major customer.

The date of occurrence for the claim was January 5, 2009, according to a notice of

claim filed on April 6, 2009.  The claim notice reported a reduction of orders from

- 21 -

[*21] Stillwater Mining Co. that reportedly resulted in a 16% reduction in Peak's

sales for that period.  The claim as reflected on the claim notice was for $164,820.

On April 21, 2009, Reserve issued Peak a check for $150,000.  The check

was drawn on Reserve's bank account at AmericanWest Bank in Wallace, Idaho.

Jill Howard (Howard), a Peak employee, signed the check.  On May 27, 2009,

Reserve and Peak executed a settlement and release agreement in which Reserve

agreed to pay the calculated value of $164,820 for Peak's loss of customer claim.

On that date Reserve issued a second check, which Howard signed, from its

AmericanWest bank account to Peak for $14,820.  The claim notice indicates that

on June 29, 2009, Reserve closed the claim for the Stillwater loss.

The claim notice states that Reserve reopened the claim for the Stillwater

loss on account of extended losses on August 25, 2009.  On September 10, 2009, a

third check that Howard signed for $175,000 was issued from the AmericanWest

bank account to Peak.  After the tax years in issue, on January 30, 2012, Reserve

and Peak executed an addendum to the settlement and release agreement, which

stated that the amount to be paid in connection with the Stillwater loss was

$339,820 and that the amount had been paid already.  Reserve paid all amounts to

Peak for the Stillwater loss out of its own funds.

- 22 -

[*22] IV.    PoolRe, the Quota Share Arrangement, and the CreditRe Reinsurance Arrangement

A.    PoolRe's Stop Loss Endorsements

In 2008 PoolRe was domiciled in the British Virgin Islands. Stephen Friedman was the owner of PoolRe. In 2009 PoolRe redomiciled in Anguilla, and starting on April 15, 2009, and through 2010 it held a Class B insurance license in Anguilla. PoolRe had no employees in Anguilla or in the United States. Capstone administered PoolRe's operations and maintained the books and records for PoolRe. Zumbaum was unaware of what Reserve did in Anguilla during the tax years in issue.

For each of the tax years in issue Reserve and PoolRe executed a Joint Underwriting Stop Loss Endorsement (stop loss endorsement), which by its terms applied to all of the direct written policies that Reserve issued. Pursuant to the stop loss endorsements, PoolRe agreed to serve as a joint underwriter and stop loss insurer for the direct written policies. Reserve was the lead insurer with respect to the policies, and PoolRe assumed an amount of excess risk.

According to the terms of the stop loss endorsement for each of the tax years in issue, PoolRe would receive a percentage of the total combined premiums due from the insureds under Reserve's direct written policies. Pursuant to the

- 23 -

[*23] 2008 and 2009 stop loss endorsements, 81.5% of the premiums charged for the direct written policies was to be paid to Reserve as lead insurer, and the remaining 18.5% was to be paid to PoolRe as stop loss insurer.  The terms of the 2010 stop loss endorsement were modified and provided that Reserve would receive 80.1% of the combined premiums under the direct written polices and PoolRe would receive 19.9%.

Under the terms of the stop loss endorsements for all tax years in issue, PoolRe's obligation to pay on claims made against Reserve's direct written policies arose only if a total claims threshold was exceeded, and according to the endorsements PoolRe was obligated to cover a certain amount of payments in excess of that threshold.  The 2008 and 2009 stop loss endorsements provided that PoolRe would have no liability until claims reported under the direct written policies exceeded 100% of the total combined premiums due under the policies and one of four attachment points occurred.

Under the 2008 and 2009 stop loss endorsements attachment points were triggered when a certain number of losses reached a set amount.  For example, the first attachment point described in the stop loss endorsements was reached when the lead insurer received two original loss claims for events of $100,000 or more, and the fourth attachment point was reached when the lead insurer received five

- 24 -

[*24] claims of $20,000 or more for separate events. PoolRe's participation level under the 2008 and 2009 stop loss endorsements, i.e., the total amount it might have to pay, was expressly limited to the lesser of: (1) the amount of the claim that exceeded the appropriate attachment point, (2) 150% of the combined direct written premiums, or (3) the named insureds' pro rata share of the total current year loss funding pool up to a maximum of 125% of the stop loss insurer's combined premium revenue from all current year stop loss coverage.

Under the modified 2010 stop loss endorsement PoolRe's liability to pay on claims made against Reserve's direct written policies arose when all reported claims exceeded 35% of total combined premiums. For reported claims above the 35% threshold the 2010 stop loss endorsement provided that PoolRe was liable to pay 50%, and PoolRe's participation level was limited to 100% of total combined premiums.

PoolRe entered into stop loss endorsements for insurance policies that other Capstone entities issued. During the tax years in issue PoolRe entered into endorsements for around 400 policies that between 51 and 56 Capstone clients issued and that covered in the aggregate around 150 insureds. The terms of the stop loss endorsements that PoolRe executed with Reserve and with the other Capstone entities were similar.

- 25 -

[*25] B.     Quota Share Policies

PoolRe pooled the premiums that it was entitled to receive under the stop

loss endorsements, and it executed reinsurance agreements designed to redistribute

them to the Capstone entities.  For each of the tax years in issue Reserve and the

other Capstone entities each executed with PoolRe a Quota Share Reinsurance

Policy (quota share policy).  Pursuant to their respective quota share policies

Reserve and each of the other Capstone entities agreed to assume coverage for a

specified portion (quota share) of the risks that PoolRe had assumed according to

the terms of the stop loss endorsements (stop loss pool).

The quota share that Reserve assumed under the quota share policy for each

tax year in issue was calculated so that Reserve was entitled to receive payments

from PoolRe equal to the premiums that PoolRe was entitled to receive from Peak

and the other insureds pursuant to the stop loss endorsement.  Pursuant to the stop

loss endorsement for 2008 PoolRe was to receive premiums of $76,236,

representing 18.5% of the total combined premiums that Peak and the other

insureds were charged under the direct written policies.  Under the 2008 quota

share policy PoolRe agreed to pay Reserve reinsurance premiums of $76,236 for

assuming approximately 1.35% of PoolRe's stop loss pool.  Reserve's general

ledger reflects that Reserve bore no losses under the quota share policy for 2008.

- 26 -

[*26] It reflects that Reserve received payments from PoolRe for the 2008 quota share policy that totaled $76,236, which were designated in the ledger as reinsurance premiums.

For 2009 and 2010 Reserve recorded no losses in connection with the quota share policies.  Reserve's general ledger reflects that it received payments pursuant to the 2009 quota share policy of $82,903, which equaled the percentage of premiums that PoolRe was entitled to receive for the 2009 stop loss endorsement (i.e., 18.5% of $448,127) from Peak and the other insureds.  PoolRe was due to receive premiums of $88,617 under the 2010 stop loss endorsement (i.e., 19.9% of $445,314) from Peak and the other insureds, and pursuant to the 2010 quota share policy PoolRe agreed to pay Reserve $88,617 for assuming about 1.44% of the stop loss pool.

C.    CreditRe Reinsurance Arrangement

For the tax years in issue Reserve executed with PoolRe a Credit Insurance Coinsurance Contract (coinsurance contract), under which Reserve agreed to assume a small portion of risk that PoolRe had agreed to assume from an unrelated company, CreditRe Reassurance Corp., Ltd. (CreditRe).  Gary Fagg owned CreditRe, which had no employees.  CreditRe had no knowledge of Reserve's formation or operations.

- 27 -

**[*27]**  The coinsurance contracts recited that, pursuant to a preexisting reinsurance treaty, CreditRe ceded to PoolRe for the tax years in issue a pro rata share of the liability and premiums associated with a large pool of vehicle service contracts. According to statements in the coinsurance contracts, the vehicle service contracts in the pool originated from Lyndon Property Insurance Co. (Lyndon), a large U.S.-based direct writer of insurance.  An exhibit prepared in connection with Reserve's Form 1024, Application for Recognition of Exemption Under Section 501(a), represents that Lyndon ceded the alleged vehicle contracts to ARIA (SAC), Ltd. (ARIA), a Bermuda-domiciled insurance company.

According to Fagg ARIA then ceded a portion of the liability for the vehicle service contracts to CreditRe, which ceded a small portion to PoolRe.  The coinsurance contracts provided that PoolRe would cede shares of its portion of the liability for the vehicle service contracts to Reserve.  The terms of the coinsurance contracts required Reserve to reinsure 0.9946%, 1.1576%, and 0.9100% of the annualized liability of PoolRe for the tax years in issue, respectively.  PoolRe executed similar coinsurance contracts involving the vehicle services contracts with other Capstone entities during the tax years in issue.

- 28 -

[*28] V.    Reserve's Tax Returns

On its tax returns filed for the tax years in issue Reserve reported that it
used the accrual method of accounting.  For each of the tax years in issue Reserve
elected to be treated as a domestic insurance company pursuant to section 953(d).
For tax year 2008 it filed Form 990-EZ, Short Form Return of Organization
Exempt From Income Tax, and for tax years 2009 and 2010 it filed Forms 990,
Return of Organization Exempt From Income Tax.

On the Form 990-EZ for 2008 Reserve reported program service revenue of
$481,589 and total expenses of $179,811.  It reported a small amount of revenue
attributable to investment income.  All expenses reported for 2008 were "other
expenses" and were detailed on an attached schedule.  The attached schedule
identified expenses for management and legal fees, office expenses, depreciation,
travel, reinsurance commissions, and loss expenses.

On its 2009 Form 990 Reserve reported program service revenue of
$524,627.  It also reported revenue from investment income and "other revenue".
For 2009 it reported total expenses of $517,514.  Part IX, Statement of Functional
Expenses, of the 2009 Form 990 listed expenses for management and legal fees,
office expenses, depreciation, conferences, conventions, and meetings, reinsurance
commissions, loss expenses, licenses and Government fees, and "other expenses".

- 29 -

[**29**] On its 2010 Form 990 Reserve reported program service revenue of

$511,314, and reported investment income and "other revenue".  For 2010 it

reported total expenses of $164,768.  Part IX of the 2010 Form 990 listed

expenses for management and legal fees, office expenses, depreciation,

conferences, conventions, and meetings, reinsurance commissions, loss expenses,

licenses and government fees, and "other expenses".

On August 31, 2009, Zumbaum submitted on behalf of Reserve a Form

1024, requesting recognition as a tax-exempt organization.  At a later date Reserve

withdrew its application.

VI.    Reserve's Financial Statements

For tax years 2009 and 2010 statutory financial statements required by and

in compliance with Anguillan law were filed with the Financial Services

Commission on Reserve's behalf.[2]  Liptz & Associates (Liptz) prepared and filed

these financial statements.  David Liptz, a licensed certified public accountant,

was head of Liptz, and he and his firm performed audits of Reserve for the tax

years in issue.  During the tax years in issue Reserve met the minimum solvency

margin requirements under Anguillan law.

---

[2]The Anguilla Financial Services Commission waived the requirement to
file an audited financial statement for 2008 because Reserve was not incorporated
until the fourth quarter of that year.

- 30 -

**[\*30]** VII.    <u>Notice of Deficiency</u>

On March 29, 2016, respondent issued Reserve a notice of deficiency for the tax years in issue (notice).  In the notice respondent determined that Reserve was not a tax-exempt insurance company within the meaning of section 501(c)(15).  Respondent determined that Reserve's insurance and reinsurance transactions lacked economic substance and in the alternative that it was not an insurance company within the meaning of subchapter L of the Code because its predominant activity was not insurance.

Respondent determined that Reserve was not eligible to make an election under section 953(d) to be treated as a domestic corporation and that Reserve was required to file Forms 1120-F, U.S. Income Tax Return of a Foreign Corporation, for the tax years in issue.  The notice stated that substitutes for returns had been prepared for Reserve for the tax years in issue.  The notice determined that the amounts that Reserve reported as program service revenue for the tax years in issue constituted taxable income.

The proposed tax liabilities in the notice were based on respondent's determination that the 30% withholding tax imposed by section 881(a) applied to income that Reserve received for the tax years in issue.  Respondent determined that because Reserve had failed to file Forms 1120-F for the tax years in issue

- 31 -

**[\*31]** within 18 months of their respective due dates (as provided in section 6072)

it was barred from claiming all deductions and credits in computing its taxable

income.

OPINION

Generally, the taxpayer bears the burden of proving that the Commissioner's

determinations set forth in the notice of deficiency are incorrect.  Rule 142(a);

Welch v. Helvering, 290 U.S. 111, 115 (1933).  Under section 7491(a) in certain

circumstances the burden of proof may shift from the taxpayer to the

Commissioner.  Reserve does not contend that the burden of proof shifts to

respondent under section 7491(a) as to an issue of fact.

Both parties presented experts to support their respective positions.  We

focus on the degree to which experts' opinions are supported by the evidence.  We

do not use titles because we do not wish to imply a greater deference to academic

experts than to industry experts.  We do not discuss the opinion of any expert

which does not pertain to our factual conclusions.

I.    Applicable Statutes

Section 501(a) and (c)(15) provides for the tax-exempt treatment of income

received by insurance companies that meet certain criteria.  An insurance company

as defined in section 816(a) (other than a life insurance company) shall be exempt

- 32 -

[*32] from tax if (1) its gross receipts for the taxable year do not exceed $600,000 and (2) more than 50% of its receipts consist of premiums.  Sec. 501(a), (c)(15)(A).  Section 816(a) defines an insurance company as any company "more than half of the business of which during the taxable year is the issuing of insurance * * * or the reinsuring of risks underwritten by insurance companies."

Pursuant to section 953(d) a foreign insurance company that is a controlled foreign corporation, and which would qualify as an insurance company under subchapter L of the Code if it were a domestic corporation, may make an election to be treated as a domestic corporation for Federal income tax purposes.  Reserve made an election under section 953(d) for the tax years in issue.  It filed returns taking the position that it qualified as a tax-exempt insurance company under section 501(c)(15).

Generally, section 881(a) imposes a 30% tax on amounts received from sources within the United States by a foreign corporation as interest, dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other fixed or determinable annual or periodical gains, profits, or income.  This withholding tax is limited to the amount not effectively connected with the conduct of a trade or business within the United States.  Sec. 881(a).

- 33 -

[*33] II.   <u>Insurance Requirements</u>

Reserve contends that it was engaged in the business of issuing insurance

and that it was a bona fide insurance company.   Respondent contends that Reserve

was not an insurance company because its arrangement with Peak and the other

insureds was not insurance.

Neither the Code nor the regulations define insurance, and we are guided by

caselaw in determining whether a particular transaction constitutes insurance for

Federal income tax purposes.   <u>Avrahami v. Commissioner</u>, 149 T.C. __, __ (slip

op. at 49) (Aug. 21, 2017).   Courts have looked to four criteria in deciding whether

an arrangement constitutes insurance:   (1) the arrangement involves insurable

risks; (2) the arrangement shifts the risk of loss to the insurer; (3) the insurer

distributes the risk among its policy holders; and (4) the arrangement is insurance

in the commonly accepted sense.   <u>Harper Grp. v. Commissioner</u>, 96 T.C. 45, 58

(1991), <u>aff'd</u>, 979 F.2d 1341 (9th Cir. 1992); <u>AMERCO & Subs. v. Commissioner</u>,

96 T.C. 18, 38 (1991), <u>aff'd</u>, 979 F.2d 162 (9th Cir. 1992).   These four

nonexclusive criteria establish a framework for determining the existence of

insurance for Federal income tax purposes.   <u>AMERCO & Subs. v. Commissioner</u>,

96 T.C. at 38.   We consider all of the facts and circumstances in the light of the

- 34 -

[**34**] criteria outlined above.  See Rent-A-Center, Inc. v. Commissioner, 142 T.C.

1, 13-14 (2014).  We will first look at the criterion of risk distribution.

A.    Risk Distribution

Generally, risk distribution occurs when the insurer pools a sufficiently

large number of unrelated risks.  Id. at 24.  From the insurer's perspective

insurance is a risk-distribution device, a mechanism by which the insurer pools

multiple risks of multiple insureds in order to take advantage of the "law of large

numbers".  R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. 209, 228 (2015).

Insuring many independent risks for numerous premiums serves to distribute risk.

Clougherty Packing Co. v. Commissioner, 811 F.2d 1297, 1300 (9th Cir. 1987),

aff'g 84 T.C. 948 (1985).  Risk distribution allows the insurer to reduce the

possibility that a single claim will exceed the amount taken in as premiums and set

aside for the payment of such a claim.  Id.

In past cases we have focused on both the number of insureds and the total

number of independent risk exposures to determine whether an insurer distributed

risk.  See Avrahami v. Commissioner, 149 T.C. at __ (slip op. at 64).  We have

held that a captive insurer may effectively distribute risk even though it insures

only the risks of its commonly owned brother-sister entities.  See Rent-A-Center,

- 35 -

**[\*35]** <u>Inc. v. Commissioner</u>, 142 T.C. at 24; <u>Securitas Holdings, Inc. v. Commissioner</u>, T.C. Memo. 2014-225, at \*26-\*27.

In <u>Rent-A-Center, Inc. v. Commissioner</u>, 142 T.C. at 24, we concluded that the captive assumed and pooled premiums for "a sufficient number of statistically independent risks" and achieved risk distribution because it issued policies for its affiliates that covered more than 14,000 employees, 7,100 vehicles, and 2,600 stores in all 50 States. We found that the captive in <u>Securitas Holdings v. Commissioner</u>, at \*26-\*27, distributed risk effectively where it provided worker's compensation coverage for more than 300,000 employees, automobile coverage for more than 2,200 vehicles, and other coverages for more than 25 separate entities. By contrast, in <u>Avrahami v. Commissioner</u>, 149 T.C. at __ (slip op. at 65), we found that the captive's issuance of seven types of direct policies covering exposures for four related entities was insufficient to distribute risk.

      1.    <u>Direct Written Policies</u>

During the tax years in issue Reserve issued between 11 and 13 direct written policies for three insureds. According to Reserve, one company, Peak, was the primary insured under all of the policies, even though the policies listed Peak, Rocquest, and ZW. Peak operated two facilities in Osburn, had a maximum of 17 employees, and maintained some machinery used to repair and fabricate

- 36 -

[*36] mining equipment.  It sold or serviced equipment used in 12 mines, and it sold some equipment outside the United States.

The record establishes that the operations of the other two insureds were insignificant.  Only one document relating to either of these entities was included with the background documents that Capstone used to produce the feasability study.  Rocquest owned real estate in three locations, all of which it leased to Peak or another entity partly owned by Zumbaum and Weikel, and it had no employees. ZW had no employees and owned no assets other than a small interest in a local bar.

Reserve issued direct written policies for the tax years in issue that covered between $8 and $13 million in potential losses, and most or all of the risk of loss was associated with the business operations of just one insured.  We conclude that the number of insureds and the total number of independent exposures were too few to distribute the risk that Reserve assumed under the direct written policies. Like the taxpayer in Avrahami, Reserve in this case failed to achieve risk distribution through the policies that it issued for its affiliated entities.  See id.

2.     The Reinsurance Agreements

Reserve contends that it distributed risk through the stop loss endorsements and the quota share policies with PoolRe.  During the tax years in issue around 55

- 37 -

[*37] Capstone entities executed these same contracts with PoolRe, and these contracts were referred to as the quota share arrangement.  Under the quota share arrangement PoolRe gave stop loss endorsements for the captives' direct written policies and agreed to assume an excess portion of the risks associated with those policies.  Simultaneously, the captives agreed to reinsure, and to receive premiums for reinsuring, a share of blended risk from PoolRe's stop loss pool.  Reserve contends that pursuant to the quota share arrangement it "insured hundreds of unaffiliated insureds under hundreds of unaffiliated insurance policies."

Reserve contends that it distributed risk through the coinsurance contracts. According to the terms of these contracts it assumed liability for a fraction of the pool of vehicle service contracts that CreditRe ceded to PoolRe for the tax years in issue.  Reserve contends that through the coinsurance contracts it earned premiums for assuming risks "related to a large pool of many thousands of risks".

Because of the payments that PoolRe agreed to make pursuant to the quota share arrangement and the payments called for under the coinsurance contracts, Reserve contends that over 30% of its gross premiums for each of the tax years in issue was from providing insurance to unrelated parties.  Reserve cites Harper Grp. in support of its argument that its percentage of nonaffiliated premium income is sufficient to satisfy the requirements of risk distribution.  In Harper Grp.

- 38 -

**[\*38]** <u>v. Commissioner</u>, 96 T.C. at 59-60, we determined that the captive insurer distributed risk because, in addition to insuring affiliated entities, the captive provided coverage to and collected premiums from a "relatively large number of unrelated insureds". We considered the percentage of the captive's gross premiums that was derived from unrelated insurance business and we found that approximately 30% of the captive's business came from insuring unrelated parties. <u>Id.</u> We concluded that this fact demonstrated that the captive had "a sufficient pool of insureds to provide risk distribution." <u>Id.</u> at 60.

In cases where we held that the captive insurer achieved risk distribution by insuring a sufficient number of unrelated parties, we also determined that the transactions with the unrelated parties were insurance transactions for Federal income tax purposes. <u>Avrahami v. Commissioner</u>, 149 T.C. at __ (slip op. at 66); <u>see also</u> <u>Harper Grp. v. Commissioner</u>, 96 T.C. at 59-60; <u>AMERCO & Subs. v. Commissioner</u>, 96 T.C. at 39-42. Before we can determine whether Reserve effectively distributed risk through these agreements, we must determine whether PoolRe was a bona fide insurance company. <u>See</u> <u>Avrahami v. Commissioner</u>, 149 T.C. at __ (slip op. at 66-67). In determining whether an entity is a bona fide insurance company we have considered a number of factors, including:

(1)    whether it was created for legitimate nontax reasons;

- 39 -

[*39] (2)   whether there was a circular flow of funds;

(3)   whether the entity faced actual and insurable risk;

(4)   whether the policies were arm's-length contracts;

(5)   whether the entity charged actuarially determined premiums;

(6)   whether comparable coverage was more expensive or even available;

(7)   whether it was subject to regulatory control and met minimum statutory requirements;

(8)   whether it was adequately capitalized; and

(9)   whether it paid claims from a separately maintained account.

Id.; Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 10-13.  We address the most relevant factors in our analysis below.

PoolRe engaged in two sets of transactions during the tax years in issue:  the quota share arrangement and the coinsurance contracts.  We will consider the facts surrounding both in determining whether PoolRe was a bona fide insurance company.

a.    Quota Share Arrangement

Capstone managed PoolRe, and only Capstone entities participated in the quota share arrangement.  PoolRe had no employees.  Reserve contends that PoolRe's stop loss pool was a mechanism whereby risks associated with the stop

- 40 -

[*40] loss endorsements were pooled and blended and that blended risk was ceded back to the Capstone entities. Reserve's expert Neil Doherty concluded that "virtually all the exposure assumed by any captive under the quota share reinsurance is entirely unrelated to the captive's affiliate".

Doherty explained that the pooled insurance risk of PoolRe is reinsured back to the Capstone captives on a proportional basis, which has the effect that the captives, such as Reserve, insure the smaller losses of their affiliates, but pool the larger losses so that each captive ends up bearing less than one-fiftieth of the larger loss. He concluded that this arrangement enabled Reserve to spread its risks across a large pool of unrelated parties, providing a wide distribution of risk.

Respondent contends that the quota share arrangement provided the appearance of risk distribution without actually distributing any risk. Respondent argues that PoolRe is not a bona fide insurance company because Reserve's arrangement with PoolRe did not distribute risk. Respondent argues that Reserve's arrangement with PoolRe did not distribute risk because PoolRe was not a bona fide insurance company.

i.    Circular Flow of Funds

Under its quota share policies Reserve was to receive reinsurance premiums equal to the direct written premiums that its affiliated insureds owed PoolRe under

- 41 -

**[*41]** the stop loss endorsements.  Reserve never recorded and it does not contend

that it had any losses or expenses in connection with its purported quota share

liabilities.  Accordingly, the end result for each tax year under the quota share

arrangement was that Reserve would receive payments from PoolRe in exactly the

same amount as the payments that PoolRe was entitled to receive from Peak and

the other insureds for the stop loss coverage.  In considering a very similar set of

circumstances in <u>Avrahami v. Commissioner</u>, 149 T.C. at __ (slip op. at 68), we

concluded that "[w]hile not quite a complete loop, this arrangement looks

suspiciously like a circular flow of funds."

ii.    <u>Arm's-Length Contracts</u>

The perfect matching of payments under the corresponding stop loss

endorsements and quota share policies (from insureds to PoolRe, and from PoolRe

to captives) indicates that the quota share arrangement was not the product of

arm's-length considerations.  Peak's risks that were insured through PoolRe were

different from the risks that PoolRe ceded to Reserve under the quota share

policies.  The risks that PoolRe purported to assume under the stop loss

endorsements related to various unrelated business activities and to policies

covering various unrelated lines of insurance.  Reserve has not shown that the

risks were comparable in scale.

- 42 -

[*42] The same amount that Peak and the other insureds were obligated to pay PoolRe for the stop loss coverage was to be paid to Reserve pursuant to the quota share arrangement. Reserve has not explained why these amounts were the same. It has not explained how all Capstone clients in the quota share arrangement would be able to transfer a particular set of risks (i.e., those associated with their affiliated insureds) and assume in exchange a blended portion of completely different risks for exactly the same premium price.

Reserve did not produce evidence which shows the risks of other Capstone entities. It did not provide evidence regarding their industries, locations, operations, types of risks, and exposure to risk. The evidence shows that the stop loss pool was divided among the captives so that reinsurance premiums equaled the portion of direct premiums paid by each captive's affiliated insureds. We conclude that the amounts that PoolRe was to pay Reserve under the quota share arrangement were not determined at arm's length or using objective criteria.

iii.    Actuarially Determined Premiums

According to a letter from Glicksman Consulting, LLC, to Capstone, PoolRe charges premiums that are a flat percentage of the gross direct written premiums. Reserve produced no evidence to support the calculation of the premiums. There is no evidence regarding the other Capstone entities that

- 43 -

[*43] participated in the quota share arrangement which shows the industries and the risks involved and the specific amounts of exposure.

According to the evidence, all participants in the quota share arrangement agreed to direct their affiliated insureds to pay the same percentage of direct written premiums to PoolRe. As in <u>Avrahami v. Commissioner</u>, 149 T.C. at __ (slip op. at 69), we are concerned with a one-size-fits-all rate for all the participants in the quota share arrangement.

iv.    <u>Faced Actual and Insurable Risk</u>

Under the terms of the direct written policies Reserve was liable for claims not covered by "any other valid and collectible insurance policy issued by any other insurer". Peak maintained extensive commercial insurance coverage with third-party insurers. Under the stop loss endorsements PoolRe was liable on claims made under the direct written policies only after a substantial claims threshold was exceeded.

Coverage under the stop loss endorsements was not triggered until claims reached 100% of total combined premiums in 2008 and 2009 and 35% of total combined premiums in 2010 (after which PoolRe would be obligated to pay 50% of claims made). The total combined premium amounts for the tax years in issue were $412,089, $448,127, and $445,314, respectively. Reserve could identify

- 44 -

[*44] only one occurrence before the tax years in issue when Peak tried to collect

on an insurance claim with its third-party commercial insurers.  EMC agreed to

pay only $2,000 and Peak had to pay $25,000 for repairs to the damaged roof.

This amount was significantly below the combined total premiums to be paid by

the insureds for each tax year in issue and significantly below the claims threshold

that would trigger PoolRe's liability under the stop loss endorsements.

Reserve cited the additional taxes that Peak paid after its returns were

reviewed by an accounting firm, and it contends that this was a loss that the direct

written policies and stop loss endorsements were designed to cover.  However,

Reserve provided no evidence of the amount of that purported loss or the

likelihood that something like it would happen again.  The available history of

losses for Peak and the other insureds shows that before the tax years in issue they

never suffered any losses that would even come close to triggering the stop loss

coverage provided for in the stop loss endorsements.  PoolRe was removed far

from any actual risk associated with the business or operations of Reserve's

insureds.

v.    Licensed and Regulated as an Insurance Company

Reserve provided evidence that PoolRe obtained a Class B insurance license

after it redomiciled in Anguilla, starting April 15, 2009.  However, it did not

- 45 -

**[\*45]** provide evidence that PoolRe was a licensed and regulated insurer before

that time.  The record establishes only that PoolRe was a corporation in good

standing in the British Virgin Islands before it reincorporated in Anguilla.

Reserve executed both its 2008 and 2009 reinsurance agreements with PoolRe

before it obtained an insurance license in Anguilla.

vi.    <u>Created for Legitimate Nontax Reasons</u>

Reserve contends that PoolRe, through the quota share arrangement,

operated for the purpose of distributing risk for the Capstone entities.  All the facts

and circumstances in this case indicate that Reserve did not enter into the quota

share arrangement with the intention of distributing its risk.  For each of the tax

years in issue the arrangement cycled a portion of the premiums that Peak paid

under the direct written policies from one controlled entity to another, Reserve,

and Reserve was not taxed on the income pursuant to section 501(c)(15).  The

only purpose PoolRe served through the quota share arrangement was to shift

income from Peak to Reserve.  Reserve has not established that PoolRe was

created or operated for legitimate nontax reasons.

vii.    <u>Conclusion</u>

We conclude that the facts surrounding Reserve's quota share policies with

PoolRe establish that those agreements were not bona fide insurance agreements.

- 46 -

[*46] The quota share arrangement involved a circular flow of funds.  The premiums were not negotiated at arm's length.  All the insureds of the participants in the quota share arrangement were obligated to pay the same percentage of premiums to PoolRe.  There is no evidence that the premiums Peak and the other insureds were obligated to pay PoolRe and the premiums that PoolRe was obligated to pay Reserve were actuarially determined.  PoolRe's activities as they relate to those policies were not those of a bona fide insurance company.

b.    Coinsurance Contracts

The risks associated with the coinsurance contracts purportedly related to a large pool of vehicle service contracts that a large insurance provider had originally underwritten.  According to documents that Reserve provided and testimony of its witnesses, the liabilities for these vehicle service contracts were pooled and ceded down a chain of entities, and ultimately CreditRe ceded a portion of the pooled risk to PoolRe.  The coinsurance contracts provided that PoolRe ceded portions of its liability for the vehicle service contracts to Reserve.

Reserve contends that liability for the pool of vehicle service contracts generated losses that offset premiums received during the tax years in issue.  It failed to provide evidence that the vehicle service contracts, which formed the basis for the reinsurance that PoolRe re-ceded in the coinsurance contracts,

- 47 -

[*47] actually existed.  Fagg described a series of ceding transactions (i.e., from Lyndon to ARIA, from ARIA to CreditRe, and from CreditRe to PoolRe).  Even if we agree with Reserve about the validity of the coinsurance contracts, any actual risk that PoolRe had in connection with the vehicle service contracts was de minimis, because PoolRe assumed liability for a small, blended portion of the overall pool of vehicle service contracts, and it re-ceded most or all of that liability to the Capstone entities.  The amount ceded to Reserve was also de minimis.

On the basis of the relevant facts and circumstances we conclude that the coinsurance contracts were not bona fide reinsurance agreements.  Reserve has not established that the contracts underlying the purported reinsurance transactions existed or that the transactions involved actual risk.

c.    Conclusion

We conclude that PoolRe was not a bona fide insurance company.  The purported reinsurance agreements between it and Reserve did not allow Reserve to effectively distribute risk.  Neither through the policies it issued for its affiliated entities nor through its agreements with PoolRe did Reserve achieve risk distribution.  Risk distribution is a necessary component of insurance, and its absence in this case is sufficient for us to conclude that Reserve's transactions during the tax years in issue were not insurance transactions.  See Avrahami v.

- 48 -

[*48] <u>Commissioner</u>, 149 T.C. at __ (slip op. at 76); <u>see also</u> <u>AMERCO & Subs. v.</u>

<u>Commissioner</u>, 96 T.C. at 40 (holding that risk-shifting and risk-distributing "are

necessary to the existence of insurance" (citing <u>Gulf Oil Corp. v. Commissioner</u>,

89 T.C. 1010, 1023 (1987), <u>aff'd</u>, 914 F.2d 396 (3d Cir. 1990))).

    B.    <u>Insurance in the Commonly Accepted Sense</u>

    The absence of risk distribution is enough to conclude that the transactions

between Reserve and its insureds were not insurance transactions.  An alternative

ground for this holding is that they did not constitute insurance in the commonly

accepted sense.  <u>See</u> <u>Avrahami v. Commissioner</u>, 149 T.C. at __ (slip op. at 76).

To determine whether an arrangement constitutes insurance in its commonly

accepted sense we look at a number of factors, including whether the company

was organized, operated, and regulated as an insurance company; whether it was

adequately capitalized; whether the policies were valid and binding; whether the

premiums were reasonable and the result of an arm's-length transaction; and

whether claims were paid.  <u>R.V.I. Guar. Co. & Subs. v. Commissioner</u>, 145 T.C. at

231; <u>Rent-A-Center, Inc. v. Commissioner</u>, 142 T.C. at 24-25; <u>Harper Grp. v.</u>

<u>Commissioner</u>, 96 T.C. at 60.

    Reserve contends that it was formed for a valid business purpose, the

issuance of insurance contracts.  It further contends that each of the contracts at

- 49 -

**[\*49]** issue meets all the requirements for an arrangement that constitutes

insurance in the commonly accepted sense.  In support of its argument Reserve

contends that we should consider 39 determination letters that the Commissioner

issued to other unrelated taxpayers concerning tax-exempt status under section

501(c)(15).  Reserve contends that its captive insurance arrangement is similar to

the 39 other arrangements for which the Feldman firm received approval of an

application for tax-exempt status.

    Respondent contends that Reserve did not provide insurance in the

commonly accepted sense.  Respondent further contends that Peak's premium

payments to Reserve were made at the direction of Zumbaum and Weikel in order

to reduce Peak's profits.

    We will not rely upon the 39 determination letters in our consideration of

whether Reserve offered insurance in the commonly accepted sense.  These

determinations cannot be used as precedent, see sec. 6110(k)(3), but they may be

instructive for revealing the "interpretation put upon the statute by the agency

charged with responsibility of administering the revenue laws", Hanover Bank v.

Commissioner, 369 U.S. 672, 686 (1962).

- 50 -

[*50]        1.    Organization, Operation, and Regulation

Reserve was incorporated as an insurance company in Anguilla, and it was regulated by the Financial Services Commission of Anguilla.  Generally, it complied with the requirements of Anguillan law.  It obtained an insurance license, filed financial statements with regulators, satisfied minimum capitalization requirements, and maintained a business address in Anguilla.  Apart from observing these formalities, however, the facts demonstrate that Reserve was not operated as an insurance company.

Reserve's planning, incorporation, and operations during the tax years in issue were managed entirely by Capstone.  Reserve had no employees of its own that performed services.  Zumbaum, Reserve's 50% owner, president, and chief executive officer, knew virtually nothing about its operations.  At trial he showed very little knowledge of provisions in the policies that Peak and his other entities held with Reserve.  Zumbaum did not know how claims were made or handled, and he did not know where or how Reserve's records were kept. Reserve's operations were managed at Capstone's direction.  It maintained an address in Anguilla, but there is no evidence that any activities were ever performed there.

Other than the feasibility study that Capstone produced, there is no evidence that any due diligence was performed for the policies that Reserve issued.  The

- 51 -

[*51] feasibility study gave an overview of Peak's operations, and some background documents relating to Peak's operations were attached to the feasibility study. However, many of the background documents covered periods after Reserve's incorporation. The feasibility study was not complete when Reserve issued the direct written policies for 2008 or 2009. The feasibility study did not provide details about the other insureds, Rocquest and ZW, and they were parties under every policy that Reserve issued. These two entities were named as insureds on policies that did not seem to apply to their limited activities.

There is no evidence that Reserve performed any due diligence with respect to the reinsurance agreements that it executed with PoolRe. With respect to the quota share arrangement it agreed to assume risks relating to a number of different businesses and a number of different lines of insurance. Nothing in the record indicates that Reserve or anyone performing activities on Reserve's behalf evaluated these risks before executing the quota share policies.

Capstone managed both Reserve and PoolRe, and they were both parties to the quota share policies and the coinsurance contracts. Reserve contends that the reinsurance agreements allowed it to distribute risk. However, Reserve did not show that anyone with a financial interest in its operations considered the details of the quota share policies and the coinsurance contracts and considered whether

- 52 -

[*52] risk was distributed.  Zumbaum did not understand the details of Reserve's

operations and relied upon Capstone's advice.  There is no evidence that Reserve

engaged in any due diligence to determine whether it was adequately distributing

risk.

Only one claim was filed under Reserve's direct written policies.  A claim

notice was generated for the Stillwater loss, but no supporting documentation

accompanied the claim notice.  Peak did not submit and Reserve did not insist on

obtaining any documents to substantiate the occurrence or the amount of the

claimed loss.  The first payment for the Stillwater loss was made out of  Reserve's

bank account more than a month before Reserve and Peak executed the settlement

and release agreement.  Peak received another large payment out of Reserve's

bank account several months after the execution of the settlement and release

agreement.  Reserve did not execute an addendum to the settlement and release

agreement reflecting this payment until years after the tax years in issue.  All

payments for the Stillwater loss were made by checks that Howard, a Peak

employee, signed.

In considering whether Reserve operated as an insurance company, we

"look beyond the formalities and consider the realities of the purported insurance

transactions".  Hosp. Corp. of Am. v. Commissioner, T.C. Memo. 1997-482, slip

- 53 -

[**\*53**] op. at 59 (citing <u>Malone & Hyde, Inc. v. Commissioner</u>, 62 F.3d 835, 842-843 (6th Cir. 1995), <u>rev'g</u> T.C. Memo. 1989-604).  In reality the interested parties to Reserve's insurance transactions did not participate in structuring or executing those transactions; little or no due diligence was performed with respect to the direct written policies or the reinsurance agreements; and for all of the tax years in issue only one claim was filed under Reserve's policies, and that claim was handled in an irregular manner.  Capstone directed Reserve's activities and directed a series of transactions between its managed entities so that Reserve appeared to be engaged in the business of issuing insurance contracts.  The facts establish that Reserve was not operated as an insurance company in the commonly accepted sense.

> 2.    <u>Adequate Capitalization</u>

During the tax years in issue Reserve met the minimum capitalization requirements of Anguilla.  Generally our caselaw holds that meeting the statutory requirements of the captive's domicile jurisdiction is sufficient to show that the captive was adequately capitalized.  <u>See</u> <u>Avrahami v. Commissioner</u>, 149 T.C. at __ (slip op. at 80-81); <u>R.V.I. Guar. Co. & Subs. v. Commissioner</u>, 145 T.C. at 231; <u>Rent-A-Center, Inc. v. Commissioner</u>, 142 T.C. at 13, 23-24; <u>Harper Grp. v. Commissioner</u>, 96 T.C. at 50, 60.

- 54 -

[*54]        3.    Valid and Binding Policies

To be valid and binding an insurance policy should, at a minimum, identify

the insured, define an effective period for the policy, specify what is covered by

the policy, state the premium amount, and be signed by authorized representatives

of the parties.  See Avrahami v. Commissioner, 149 T.C. at    (slip op. at 81);

Securitas Holdings v. Commissioner, at *28.  In R.V.I. Guar. Co. & Subs. v.

Commissioner, 145 T.C. at 231, we held that policies were valid and binding

where the insureds filed claims for all covered losses and the captive paid them.

Generally, Reserve's direct written policies contained the necessary terms to

make them valid and binding insurance, and they were signed by representatives

of Reserve and the insureds.  We agree with respondent, however, that the direct

written policies were "cookie cutter" policies.  The policies on their face indicate

that they were the copyrighted material of Capstone, and Capstone employees

testified at trial that they administered many of the same policies for all of their

clients.  In many instances the policies were not reasonably suited to the needs of

the insureds, particularly Rocquest and ZW, both of which had extremely limited

operations.

Peak did file one claim under one of the direct written policies, and Reserve

paid the claim.  However, the evidence of this claim that Reserve provided does

- 55 -

[*55] not show that either party performed due diligence to determine whether the claim was actually covered by the relevant policy.  Payment of the claim on Reserve's behalf was handled by an employee of Peak.  Evidence regarding the validity of Peak's policies is mixed, and we conclude it is a neutral factor.

      4.   <u>Reasonableness of Premiums</u>

Reserve put forward experts to opine that the premiums charged for its direct written policies during the tax years in issue were reasonable.  Capstone employees, particularly McNeel, were responsible for determining the premium amounts for the policies.  Zumbaum and Weikel always approved the amounts that Capstone advised, and Zumbaum testified that he was aware that the amounts would generate substantial deductions for Peak.

In preparing the rating worksheets for Reserve's policies, McNeel used rating bases specific to Peak's business, and he applied base rates that were within ranges shown on Capstone's base rate spreadsheet.  McNeel produced the base rate spreadsheet by reviewing the premiums that other Capstone entities had charged for various lines of coverage.  Capstone obtained pricing indications from employees of Mid-Continent.  McNeel testified that these indications were critical to Capstone's pricing methodology and were used to establish the base rates for policies shown on the base rate spreadsheet.

- 56 -

**[*56]**  Despite the methodology that Reserve has shown Capstone used internally to calculate premiums, there are a number of factors which indicate that the premiums that the insureds were required to pay under the direct written policies were not reasonable in relation to the risk of loss.  For 2007 Peak paid insurance expenses of $95,828.  For 2008 Peak and two affiliates that had no active business operations were obligated to pay premiums of $412,089, and this was in addition to the premiums that Peak continued to pay for third-party commercial insurance. Reserve's policies covered only losses that were not covered by Peak's third-party policies.  Peak's general liability policy with EMC had a policy limit of $2 million and covered several major categories of risks, including personal injury and products/completed operations liability.

Seven of the 2008 policies had retroactive dates.  For 2008 the punitive wrap liability policy was retroactive, and it had a combined premium of $55,233 and a policy limit of $1 million.  For both 2009 and 2010 the premium for the punitive wrap liability policy was $40,500 and the aggregate coverage was $500,000.  Reserve provided no explanation as to why the policy limit was decreased to $500,000 and why a policy for four years with greater coverage cost only approximately $15,000 more than a policy for one year with half the coverage.

- 57 -

[*57] Six of the 2008 policies had no look-back provisions.  For 2008 the regulatory changes policy had a policy period from December 4, 2008, to January 1, 2009, and the premium was $64,899 and the policy limit was $1 million.  For both 2009 and 2010 the premium for the regulatory changes policy had a premium of $47,588 and a limit of $500,000.  Reserve provided no explanation for why the limit was reduced from $1 million for one month of coverage to $500,000 for a year of coverage.  It also provided no explanation why more was spent for one month of insurance coverage than a year of coverage.

Reserve contends that Peak was on a Superfund site and could have been exposed to pollution liability, for which no third-party coverage was available.  Peak itself did not engage in mining practices that spread pollutants, and it already had systems in place to control the fluid runoff when it cleaned equipment used in polluted mines.  In 2008 Peak had operated in Osburn continuously for over 10 years.  Reserve provided no evidence that Peak had ever incurred costs during that time for excess pollution liability.

In his testimony Zumbaum indicated that EMC's refusal in 2007 to cover the full amount needed to repair Peak's damaged roof was a reason for obtaining additional insurance in 2008.  He testified that Peak incurred a $25,000 expense to repair the roof, although no documentation was produced to substantiate the

- 58 -

[*58] amount of the loss.  Zumbaum also testified about having to pay additional taxes for tax years prior to the tax years in issue.  His testimony did not include how much additional tax was owed.

Despite Zumbaum's purported discontent with EMC's coverage, Peak subsequently kept its policies with EMC.  Reserve has failed to explain why Peak would maintain its full set of third-party commercial insurance coverage, which it contends was insufficient, even after it paid roughly 400% more for additional coverage from Reserve.  Zumbaum did not know which of Peak's policies with Reserve would have covered a loss like the one that was not covered by EMC in February 2008.

Zumbaum testified that in 2007 Peak's business was growing and that he expected it to continue growing during the next few years.  He testified that he and Weikel had concerns about additional risks as the business grew.  However, the rating worksheets that Capstone produced for calculating Reserve's premiums reflect that Peak's projected sales stayed the same for all of the tax years in issue. Peak actually had fewer employees in 2010 than it did in 2008.

Reserve contends that if one of Peak's products had failed then Peak would have been liable.  There is no convincing evidence that legitimate concerns about this kind of liability should have been greater in 2008 than in previous years, and

- 59 -

[*59] during the tax years in issue Peak continued to maintain substantial

commercial insurance coverage with third-party insurers.  The feasibility study

provided no information on the probability of a loss event that the direct written

policies covered.  It also did not explain in detail how the direct written policies

would supplement Peak's existing insurance.

Peak filed only one claim under Reserve's policies during the tax years in

issue, which occurred about one month after Reserve's incorporation.  For the

remainder of the tax years in issue Peak and the other insureds did not file any

claims or report any additional losses.  This supports our conclusion that any

purported concerns about increased risks for the insureds were unfounded.

In cases involving brother-sister captive arrangements in which we

determined that the premiums charged were reasonable, we have also found that

the arrangement under scrutiny was undertaken principally to achieve a business

purpose.  See, e.g., Rent-A-Center, Inc. v. Commissioner, 142 T.C. at 3-5 (the

principal objective of the arrangement was to reduce costs, improve efficiency,

obtain otherwise unavailable coverage, and provide accountability and

transparency); Securitas Holdings v. Commissioner, at *7-*8 (finding the captive

insurance arrangement at issue provided more cost-effective insurance coverage

than would have otherwise been available).  Generally, we conclude that

- 60 -

[*60] premiums are reasonable when it can be shown that the amounts agreed upon by the parties were the result of arm's-length negotiations.  See R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. at 231-232; Harper Grp. v. Commissioner, 96 T.C. at 60.  In determining whether an arrangement constitutes insurance in the commonly accepted sense we consider more than whether the premiums chosen can be arrived at by actuarial means.  We consider whether the facts demonstrate that the terms of the arrangement were driven by arm's-length considerations.  See R.V.I. Guar. Co. & Subs. v. Commissioner, 145 T.C. at 234-235 (finding the subject policies constituted insurance in the commonly accepted sense because the policies' terms "correspond to, and are driven by, the characteristics and business needs of the underlying * * * transactions").

The facts do not reflect that Peak had a genuine need for acquiring additional insurance during the tax years in issue.  There was no significant history of losses that would justify such a drastic increase, and Zumbaum's testimony that he was concerned about increased risks beginning in 2008 did not support a significant increase in insurance coverage.  All the direct written policies included a provision that the coverage afforded by the policy would be valid only after insurance coverage from other insurers was exhausted.  Peak had never come close to exhausting the policy limits of its third-party commercial insurance coverage.

- 61 -

**[\*61]** With respect to premiums, the facts and circumstances of this case demonstrate that the direct written policies were not the result of arm's-length negotiations. Taking into consideration all the surrounding facts and circumstances, we conclude that no unrelated party would reasonably agree to pay Reserve the premiums that Peak and the other insureds did for the coverage provided by the direct written policies. Although Capstone calculated Reserve's premiums using objective criteria and what appear to be actuarial methods, the absence of a real business purpose for Reserve's policies leads us to conclude that the premiums paid for the polices were not reasonable and not negotiated at arm's length.

     5.    <u>Payment of Claims</u>

Reserve paid the one claim that Peak filed during the tax years in issue. As we noted in connection with other factors, the circumstances surrounding the payment of that claim were unusual. Although this factor weighs slightly in Reserve's favor, we do not regard the payments made in connection with the Stillwater loss as overwhelming evidence that Reserve's direct written or reinsurance policies constituted insurance in the commonly accepted sense.

- 62 -

[*62]       6.    Conclusion

Reserve was organized and regulated as an insurance company, and it satisfied the regulatory requirements of its domicile jurisdiction.  It also paid a claim filed under one of its policies.  However, it was not operated as a bona fide insurance company, and there was no legitimate business purpose for the policies that Reserve issued for the insureds.  The direct written policies increased Peak's insurance coverage and expenses for the tax years in issue, when it also continued to hold policies with third-party insurers.  In the light of all the facts and circumstances the premiums charged for the policies were unreasonable.  We conclude that Reserve's transactions were not insurance transactions in the commonly accepted sense.[3]

III.    Taxability of Reserve's Revenue

We concluded that Reserve did not issue insurance or reinsurance contracts during the tax years in issue and therefore it did not receive more than 50% of its gross receipts from insurance premiums.  See secs. 501(c)(15), 816(a).  Because Reserve is not an insurance company, it is not eligible to make an election under section 953(d).  Section 953(d) applies only to a foreign company which would

---

[3]Since we conclude Reserve's transactions were not insurance transactions, we do not need to address respondent's argument that Reserve's insurance and reinsurance arrangements lack economic substance.

- 63 -

[**63**] qualify as an insurance company under subchapter L of the Code if it were a

domestic corporation.  See sec. 953(d)(1)(B).

Because Reserve was not eligible to make an election under section 953(d),

for the tax years in issue it should be treated as a foreign corporation.  See sec.

953(d).  For each of the tax years in issue Reserve reported the gross premiums for

the direct written policies and the reinsurance agreements as program service

revenue on Forms 990.  For each of the tax years in issue Reserve also reported

revenue from investment income, and for 2009 and 2010 it reported "other

revenue".

Section 881(a)(1) generally imposes a tax of 30% on "fixed or determinable

annual or periodical" income (FDAP income) received by a foreign corporation

from sources within the United States if the income is not effectively connected

with the conduct of a U.S. trade or business.  FDAP income includes interest,

dividends, rents, salaries, wages, premiums, annuities, compensations,

remunerations, and emoluments.  Sec. 881(a)(1).  It includes all income included

in gross income under section 61, except for items specifically excluded by the

regulations.  Sec. 1.1441-2(b)(1)(i), Income Tax Regs.  The U.S. payors of FDAP

income are generally required to deduct and withhold therefrom an amount equal

to the tax imposed by sections 881.  See secs. 1441 and 1442.

- 64 -

**[\*64]**  In the notice respondent determined that the amounts reported as Reserve's

program service revenue were taxable as FDAP income from sources within the

United States and were subject to the 30% withholding tax pursuant to section

881.  Respondent conceded that the withholding tax should not apply to the

amounts for the tax years in issue which Reserve contends were gross premiums

received for the coinsurance contracts, which are $69,500, $76,500, and $66,000,

respectively.  Respondent maintains that the remainder of Reserve's self-reported

program service revenue is taxable under section 881.

Reserve contends that if the payments it received for the tax years in issue

were not for insurance, then amounts received from its affiliated insureds should

be treated as contributions to capital or nontaxable advances or deposits.  It

contends that if we conclude that it had taxable revenue, then it is entitled to

deductions in computing its taxable income.

Reserve bears the burden of showing that the income it received is not

FDAP income as respondent determined in the notice.  See Rule 142(a).  Reserve

did not produce evidence which showed that the amounts at issue are not FDAP

income subject to the 30% tax.  We reject Reserve's contention that the amounts it

received during the tax years in issue were capital contributions or nontaxable

deposits.

- 65 -

**[\*65]** Zumbaum and Weikel capitalized Reserve shortly after its organization with $100,000, as required by Anguillan law. The record does not reflect that the parties to the purported insurance transactions treated or intended the amounts paid to Reserve as additional capital contributions. See Bd. of Trade v. Commissioner, 106 T.C. 369, 381 (1996) (holding that a payor's motive controls whether a payment is a contribution to capital). Reserve failed to specify why the payments might otherwise be treated as nontaxable deposits. There is no evidence indicating that the parties intended the payments as loans or gifts. See Neely v. Commissioner, 85 T.C. 934, 952 (1985) (holding that the most critical consideration in determining whether a transfer is a gift is the transferor's intention); Beaver v. Commissioner, 55 T.C. 85, 91 (1970) (holding that an essential element of a loan is that the recipient intends to make repayment and the person advancing the funds intends to enforce such repayment).

Reserve contends it should be allowed deductions for the tax years in issue. It bears the burden of proof on this issue. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). It contends that under section 1.882-4(a)(3)(ii), Income Tax Regs., it had reasonable cause for filing Forms 990 rather than Forms 1120-F.

- 66 -

**[*66]** However, even if Reserve established that it had reasonable cause for filing incorrect returns, we would not conclude that it is entitled to deductions.  Section 1.882-4(b)(1), Income Tax Regs., provides generally that deductions are allowed to a foreign corporation only to the extent they are connected with gross income which is effectively connected, or treated as effectively connected, with the conduct of a trade or business in the United States.  Reserve failed to establish that it was engaged in or received income treated as income effectively connected with a trade or business within the United States.

We sustain respondent's determination in the notice that for the tax years in issue Reserve had FDAP income from sources within the United States which is subject to the 30% tax under section 881.  Reserve has not met its burden of proving its entitlement to any deductions.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

From: **Stewart A. Feldman** sfeldman@feldlaw.com
Subject: Re: [EXTERNAL] Cerberus captive
Date: October 15, 2019 at 8:22 AM
To: Scott Sullivan scottsullivanmd@gmail.com

We have heard this from David and we'll follow up.

Stewart A. Feldman
1980 Post Oak Blvd., Suite 1900
Houston, TX 77056
Off: 713.850.0700

cell: 713.724.6000

**From:** Scott Sullivan <scottsullivanmd@gmail.com>
**Sent:** Tuesday, October 15, 2019 7:10 AM
**To:** sfeldman@feldlaw.com
**Subject:** [EXTERNAL] Cerberus captive

Not sure if Dave Sherman told you, but I want to start the wind down of this captive. What is the process?
Thx
Scott Sullivan

Sent from my iPhone
----------

This email has been scanned for spam and viruses by Proofpoint Essentials. Visit the following link to report this email as spam: https://us3.proofpointessentials.com/index01.php?mod_id&mod_option=gitem&mail_id71141430-7qXoUQVMA-an&r_address=eldman%40feldlaw.com&report=

**EXHIBIT C**

From: **Scott Sullivan** scottsullivanmd@gmail.com
Subject: Re: Potential termination for St. Charles captives
Date: October 21, 2019 at 9:23 PM
To: Stewart A. Feldman sfeldman@feldlaw.com
Cc: Frank J. DellaCroce (drd@breastcenter.com) drd@breastcenter.com, David Kushner (david@ki-cpa.com) david@ki-cpa.com,
Sarah H. Underwood* (Sarah.Underwood@SCSH.com) Sarah.Underwood@scsh.com, David R. Sherman drs@chehardy.com

I realize we have a couple of years to complete our contractual obligation for you to assist in management of our captives.
However, as owner of the captive I am directing its closure by the end of this year at the latest. We can negotiate terms of remaining
payments. I do not care to be in this space anymore.
Thank you
Scott

Sent from my iPhone

On Oct 21, 2019, at 1:36 PM, Stewart A. Feldman <sfeldman@feldlaw.com> wrote:

*Attorney/client privilege*

*Following is a summary or overview of the terms associated with providing notice of a possible termination of services under the current engagement agreement dated October 22, 2015 (revised November 10, 2015) concerning the three St. Charles captives (Cerberus Insurance Corp., Janus Insurance Corp., and Orion Insurance Corp.) (referred to as the "St. Charles captives").*

*The current term of the agreement runs through August 31, 2021. The St. Charles captives may cancel the ongoing services provided by Capstone and The Feldman Law Firm LLP under the agreement, with the earliest end of services being August 31, 2021, which ends Capstone's and the Law Firm's ongoing responsibilities as of that date. Written notice must be received prior to December 31, 2019. Other provisions apply. See agreement. If not terminated in this fashion, this agreement will automatically renew for a three-year period.*

*Upon liquidation, assuming a 30% combined federal, state and ACA tax rate, <u>a rough estimate of the tax due is $4.7 million.</u>*

*To effect the wind-up and ultimately the liquidation in 2021, Capstone will coordinate multiple projects in 2020/ 2021 including:*

1. *Coordinating a final audit by the companies' independent auditors.*
2. *Adopting a plan of liquidation,*
3. *Settling the Company's accounts,*
4. *Obtaining releases of any residual insurance coverages,*
5. *Distribution of assets to shareholders after payment of debts and*

**EXHIBIT D**

*satisfaction of obligations,*

6. *Notifying the IRS of the adoption of the plan of liquidation,*
7. *Preparing an outline of the final Company tax return, and*
8. *Filing liquidation documents with the Delaware Department of Insurance and seeking approval for the liquidation.*

*There are currently policies in force for each of the captives with coverage periods of December 21, 2018 through December 21, 2019, which we assume will be renewed for 2020. Additionally, many of the policies have extended reporting periods of up to four years which means there could be claims made up until December 21, 2023, for losses which occurred during the coverage period. If the decision is made to terminate the insurance entities and liquidate them effective late 2021, part of the settling of the captives' accounts will be a release of any residual insurance coverages for any policies which are still in their extended reporting periods.*

*<u>Also, it is important to identify and report all claims and losses for policies written by the St. Charles captives. We continue to solicit claims from the insureds with little success heretofore. It is critical that the St. Charles captives operate as insurance companies and continue to so operate.</u>*

*We also note the email attached as being notice terminating services for Cerebus only and acknowledge receipt of this email.*

*We are expecting that the Reserve case decision will be handed down during summer 2020, which might alleviate any concerns on your part.*

*Please let me know if you have any additional questions. Thank you. saf*

STEWART A. FELDMAN
sfeldman@feldlaw.com
www. feldlaw.com

713/850-0700 * Fax: 713/850-8530 * Cell: 713/724-6000
<image002.jpg>

<image004.jpg>

**From:** David Kushner
**Sent:** Wednesday, October 30, 2019 6:52 AM
**To:** Stewart A. Feldman - The Feldman Law Firm LLP (sfeldman@feldlaw.com) <sfeldman@feldlaw.com>
**Cc:** Scott Sullivan <scottsullivanmd@gmail.com>; Frank DellaCroce <fjdellacroce@gmail.com>; Sarah Underwood <Sarah.Underwood@scsh.com>; Jeff Carlson <JCarlson@capstoneassociated.com>; drs@chehardy.com; William B. Hamilton <will@kl-cpa.com>
**Subject:** orion,cerebrus,janus

As we discussed last evening,the doctors have decided to activate the notification provision in the engagement agreement that they wish to terminate .
This is done well before the December 31,2019 deadline.
They  also no longer wish to purchase additional insurance coverages for future years.
They want the 3 entities wound down and liquidated.
Please confirm receipt.
Thank you


S. David Kushner, CPA, CrFA
Tax Partner
☎ :504-838-9991  📠 :504-833-7971 ✉ :david@kl-cpa.com

*Kushner LaGraize*, L.L.C.

3330 W Esplanade Ave. Suite 100
Metairie, La 70002
Website: http://www.kl-cpa.com

CPAmerica
Member    Crowe Global

INSIDE
TOP 300 FIRMS

CPABUSINESS
2018
Best Places
to Work

---

Confidentiality Notice:
This email message and any attachments may contain information that

**EXHIBIT E**

 **Department of the Treasury**
**Internal Revenue Service**
**LB&I**
3651 S. IH 35
MS 4301AUSC
Austin, TX 78741

Date:
   3/20/2020
Taxpayer ID number:
   XXX-XX-3247
Telephone number:
   737-800-7995
Response due date:
   5/4/2020

44657 PAAA
SCOTT K SULLIVAN JR MD & M M COOPER
106 FONTAINBLEAU DR
MANDEVILLE, LA 70471

**Micro-Captive Insurance**

Dear SCOTT K SULLIVAN JR MD & M M COOPER:

**Why we're writing to you**

We have information that you've taken a deduction or other tax benefit related to micro-captive insurance on a prior year tax return and disclosed pursuant to Notice 2016-66 and Notice 2017-08.

Several recent U.S. Tax Court decisions have confirmed that certain micro-captive arrangements are not eligible for claimed Federal tax benefits. We're notifying you regarding IRS compliance activity in this area so you can make informed decisions about claiming tax deductions for micro-captive insurance premiums. The IRS is increasing enforcement activity in this area and has deployed several examination teams to open additional examinations of returns that included micro-captive insurance transactions. Examinations may result in full disallowance of claimed micro-captive insurance deductions, inclusion of income by the captive entity, and imposition of applicable penalties.

**What you need to do**

If you're no longer claiming deductions or other tax benefit for any micro-captive insurance transactions covered under Notice 2016-66 on your Federal income tax returns, please notify us by sending a letter to the address shown above. You must send it by the response due date shown at the top of this letter. This written notification must include:

- A signed penalties of perjury statement (see below),
- The last tax year in which you claimed deductions or other tax benefit for micro-captive insurance premiums, and
- If applicable, the date you ceased participating in the micro-captive insurance transaction.

If you continue to participate in a micro-captive insurance transaction covered under Notice 2016-66,

## EXHIBIT F

Letter 6336 (3-2020)
Catalog Number 74004E

Unofficial Copy Office of Marilyn Burgess District Clerk

you must continue to disclose your participation in the transaction.

Before you file your 2019 Federal income tax return, we recommend you consult an independent, competent tax advisor on the proper treatment for past and future tax years and consider your best options for any improperly claimed deductions or other tax benefit, including filing amended returns. For more information, visit www.irs.gov/filing. You can find tax forms or publications by visiting www.irs.gov/forms-pubs or calling 800-TAX-FORM (800-829-3676).

We'll take your actions in response to this letter into account when considering future compliance activity related to your micro-captive insurance arrangement.

**Penalties of perjury statement**

I, _____, declare under penalties of perjury that I have examined this entire document, including all attachments and accompanying statements, and that the enclosed is true, correct, and complete. I also understand with respect to any submission that the IRS reserves the right to make further contacts with me and my representatives to clarify any written explanation or any other documents. Statements and documents sent under this option will be checked against other sources for accuracy.

Last tax year in which I claimed deductions or other tax benefit for micro-captive insurance premiums:

_____

Date I ceased participating in the micro-captive insurance transaction (if applicable):

_____

Signature: _____

Date:      _____

**If you need to file an amended return**

If you're filing an individual amended return, write "Microcaptive" at the top of the first page of the Form 1040X and mail the amended return to:

> Internal Revenue Service
> 2970 Market Street
> Philadelphia, PA 19104

If you're filing a business amended return:

- If you're filing on paper, write "Microcaptive" at the top of the first page of the amended return and mail to the address listed in the instructions for the amended return.
- If you're filing electronically, include "Microcaptive" when explaining the reasons for the changes.

**If we don't hear from you by the "respond by" date**

We may refer your return for examination. Please be aware that underpayments of tax are subject to interest and penalties.