Case 4:20-cv-02236   Document 51   Filed on 12/04/20 in TXSD   Page 1 of 20

United States District Court
Southern District of Texas
**ENTERED**
December 04, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SCOTT SULLIVAN, FRANK DELLACROCE, *et al.*, <br><br> Plaintiffs, <br><br> VS. <br><br> STEWART A. FELDMAN, THE FELDMAN LAW FIRM LLP, *et al.*, <br><br> Defendants. | § § § § § § § § § § § § § CIVIL ACTION NO. H-20-2236 |

**MEMORANDUM AND OPINION**

The court confronts what could be the *Bleak House* of arbitration. This litigation gives lie to the judgment by, and the hope of, Congress that arbitration is "cheaper and faster than litigation." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 280 (1995) (quoting H.R. Rep. No. 97–542, 13 (1982)). This litigation involves 21 parties spread across six different arbitrations in front of six different arbitrators. This court previously ordered certain parties to arbitrate two of their disputes before Judge Grant Dorfman and Judge Caroline Baker in Houston, Texas, relying on the written arbitration agreement. (Docket Entry No. 26). The court then stayed an arbitration pending before Judge Stanwood Duval in Louisiana and the related proceedings in this federal litigation so that the arbitration could go forward. While the court was making this decision, the plaintiffs filed a fourth arbitration in front of arbitrator Robert A. Kutcher, in Louisiana.

After this court issued its decision to stay this litigation, the plaintiffs appealed. The plaintiffs also filed a fifth arbitration, based on allegedly newly discovered facts, before Judge Lloyd Medley, who is also in Louisiana. The defendants filed an emergency motion asking this court to lift its stay and enjoin the fourth and fifth arbitrations. The plaintiffs then filed a sixth

arbitration before Judge Carolyn Gill-Jefferson, who is also in Louisiana. The arbitrators in the first and second arbitrations are in Houston, Texas; the arbitrators in the third, fourth, fifth, and sixth arbitrations are in New Orleans, Louisiana; and the final hearings in all the arbitrations are scheduled to take place in Houston, Texas.

The defendants argue that the fourth, fifth, and sixth arbitrations contravene this court's order allowing the first and second arbitrations to go forward in Houston and violate the parties' arbitration agreement. The defendants argue that these "new" arbitrations are not "proceeding" in Houston, because each arbitrator is in Louisiana. The plaintiffs respond by arguing that this court does not have jurisdiction to stay ongoing arbitrations or review interim arbitration awards. They also point out that the final hearing in each arbitration is scheduled to take place in Houston, Texas.

After the emergency motion was filed, Judge Dorfman issued a final award in the arbitration pending before him, which was the first arbitration filed. The defendants then moved this court to confirm that award. The plaintiffs argue that this court lacks jurisdiction to confirm the award because they are appealing the court's decision allowing arbitration before Judge Dorfman.

Based on the pleadings; the motions, responses, and replies; the record; and the applicable law, the court finds no appropriate circumstances justifying an order lifting the stay in this case to stay the recently filed fourth, fifth, and sixth arbitrations. The defendants' motion to confirm Judge Dorfman's award is also denied for lack of jurisdiction given the pending appeal.

These proceedings were inefficient and messy when this court compelled arbitration in August 2020. They have become messier and more inefficient since. But the arbitrators in at least three of these arbitrations, with the parties' input, have begun discussing ways to consolidate and streamline the issues. The fastest, most efficient, and most timely way to conclude these various arbitrations, despite the parties' best efforts to thwart those goals and distort the process, is a

procedural decision best left to the arbitrators to decide. The parties applied their contract to make this mess but agreed that arbitration would resolve their disputes, no matter how messy. This court will not step in to clean it up and risk making it worse.

The reasons for these rulings are explained below.

## I.     Background

### A.     The Parties and the Arbitration Agreement

There are three groups of plaintiffs in this case: (1) Drs. Scott Sullivan and Frank DellaCroce ("the Doctors"); (2) the Center for Restorative Breast Surgery, St. Charles Surgical Hospital, LLC, St. Charles Holdings, LLC, and Sigma Delta Billing, LLC ("the Doctor Entities"); and (3) Cerberus Insurance Corp., Janus Insurance Corp., and Orion Insurance Corp. ("the Captive Insurers"). The Doctors perform restorative breast surgeries for women with breast cancer at the Center for Restorative Breast Surgery in New Orleans, Louisiana. (Docket Entry No. 1-1 at ¶ 19). The Doctors own and control, as part of their business, St. Charles Surgical Hospital, LLC, St. Charles Holdings, LLC, and Sigma Delta Billing, LLC. The Doctors also own the Captive Insurers.[1]

The Doctors contacted Stewart Feldman and the Feldman Law Firm, a law firm in Houston, about an alternative risk-planning program that was billed as a way for the Doctors and the Doctor Entities to avoid "a multitude of loss exposures and also provide tax benefits." (Docket Entry No. 1-1 at ¶ 20). The Feldman Law Firm, Capstone Insurance Management, Ltd., Capstone Associate Services (Wyoming), LP, and Capstone Associated Services, Ltd., ("the Lawyer Entities"), agreed to provide "a wide range of services for an ongoing term for a fixed, quarterly fee." (Docket Entry

---

[1] Cerberus Insurance Corp., Janus Insurance Corp., and Orion Insurance Corp., now Delaware entities, were originally Bahamian entities organized as Cerberus Casualty, Janus Casualty, and Orion Casualty. (*See* Docket Entry No. 7-2 at 5; Docket Entry No. 10-3). This reorganization is not important for purposes of this decision.

3

No. 2 at 2). This agreement was memorialized in a 2015 Engagement Letter and the Capstone Services Agreement. (Docket Entry No. 7-2). The Engagement Letter explained that the Lawyer Entities would perform work "on behalf of, as appropriate: (i) the owners of the captives insurer in connection with the formation of the captives; (ii) the Clinic and certain of its affiliates as the insureds; and (ii) the captives, Cerberus CC, Janus CC, and Orion CC, as the insurers." (*Id.* at 2).

The Engagement Letter included the following arbitration clause:

> With respect to any and all other controversies, disputes or claims whatsoever between (x) the Firm (including its lawyers) and/or its affiliates (including Capstone Associated Services, Ltd., Capstone Insurance Management (Anguilla), Ltd., and/or Export Assurance) . . . and (y) any client of the Firm and/or its affiliates related to or arising out of the Firm's or its affiliates' services or arising under or in connection with or related to any of the parties' agreements . . . either party may submit the dispute to any recognized, neutral (x) arbitral association or (y) arbitrator for final resolution in an arbitration proceeding to be concluded within four months . . . Submission of the dispute to arbitration under this agreement shall be the sole and exclusive forum for resolving any and all disputes between the parties . . .
>
> . . . [A]ll arbitrations – regardless of the arbitral organization or arbitrator actually hearing the dispute – shall be conducted in Houston, Texas applying Texas substantive law pursuant to the Commercial Arbitration Rules . . . of the American Arbitration Association (AAA) then in effect, whose Expedited Procedures shall apply regardless of the monetary size of the dispute or the number of parties to the proceeding, with only a single arbitrator hearing the dispute, again all regardless of the organization sponsoring the arbitration in question. All parties acknowledge and agree that this arbitration agreement modifies the AAA arbitration rules regarding, inter alia, the selection of the arbitrator and the administration of the arbitration in that: (1) either party may directly appoint the single arbitrator or the arbitral association who/which shall proceed to resolve the dispute, provided that the arbitrator is recognized and neutral; (2) the AAA is not required to administer and shall not administer the arbitration; and (3) any recognized and neutral arbitrator himself/herself or arbitral association may administer the arbitration. The arbitrator or arbitral association appointed to resolve the dispute shall have the sole and exclusive ability to rule on all aspects of the arbitrator's appointment, including, but not limited to, disputes or challenges of bias and neutrality. . .

(*Id.* at 15). The Capstone Services Agreement incorporated the Engagement Letter's arbitration clause. (*Id.* at 27).

The Doctors signed the Engagement Letter individually and signed the Capstone Services Agreement on behalf of themselves, the Captive Insurers, St. Charles Surgical Hospital, and "all respective Affiliates." (*Id.* at 12, 29). "Affiliates" is defined in the Agreement as:

> any person directly or indirectly controlled by or under common control with another person (whether such be an individual or an entity of any sort) and, in the case of partnerships, shall specifically include all partners, owners and beneficial holders of a person, and additionally includes their signatories, agents, employees, independent contractors, transferees, assigns, officers, members, directors, those with an interest in and all those in privity therewith.

(*Id.*).

**B.     Factual Overview**

The Doctors hired Feldman and the Lawyer Entities to "design, implement, and administer an alternative risk planning program for the Doctors through the creation of" the Captive Insurers. (Docket Entry No. 46-1 at ¶ 6). Feldman allegedly "represented that this alternative risk-management program would protect the Doctors and their business entities . . . against a multitude of loss exposures and provide tax benefits." (*Id.*). Feldman also represented that the Doctors and Doctor Entities could direct him to wind up and liquidate the Captive Insurers at any point. (*Id.* at ¶¶ 12, 20). Feldman encouraged the Doctors and Doctor Entities to have the Captive Insurers participate in "third[-]party insurance and reinsurance through PoolRe," which is a "risk pooling arrangement involving sets of generally similar policies covering generally similar risks of closely-held businesses, wherein each captive assumes reinsurance on policies covering other clients" of Feldman and the Lawyer Entities. (*Id.* at ¶ 13). The plaintiffs allege that Feldman did not disclose that he also used the PoolRe insurance pool to underwrite legal malpractice claims filed against him. (*Id.* at ¶ 27).

Later, the United States Tax Court issued an opinion about another Feldman client that "could have very negative consequences for [the p]laintiffs." (*Id.* at ¶ 15). The Tax Court held that the PoolRe arrangement was not "a bona fide insurance company." (*Id.* at ¶ 16). The Doctors

5

asked Feldman and the Lawyer Entities to "liquidate and wind down Plaintiffs' program that the Defendants designed, implemented, and administered." (Docket Entry No. 1-1 at ¶¶ 25–30). Feldman and the Lawyer Entities allegedly did not respond, perform the wind down and liquidation, or provide relevant documents to a third party the Doctors hired to complete the wind down and liquidation. (*Id.* at ¶¶ 18–24).

The plaintiffs allege that, in August 2020, they learned that Feldman and the Lawyer Entities had a number of "open claims" that they had "submitted to the [PoolRe] risk pool," which prevented "wind down and liquidation of the Captive Insurers." (*Id.* at ¶ 27). According to the plaintiffs, "a substantial portion of these open claims and unresolved liabilities arose from claims under errors and omissions policies, legal expenses policies, and legal professional liability policies, by Feldman and [the Lawyer Entities] against their own clients, effectively forcing Feldman and [the Lawyer Entities'] clients to unknowingly underwrite the costs of . . . litigation efforts relating to . . . malpractice and breach of fiduciary duty claims." (*Id.* at ¶ 28).

### C. The First Three Arbitrations, before Judges Baker and Dorfman in Houston and Judge Duval in New Orleans

The Lawyers preemptively initiated arbitration before Conflict Resolution Solutions, PLLC in Houston on May 7, 2020, to "resolve disputes over dissolving, liquidating, and winding down the" insurance arrangement "by a certain date," as well as claims for "breach of contract, declaratory relief, attorney's fees," legal malpractice, and misappropriation of intellectual property. (Docket Entry No. 16 at 4). In this first arbitration, the parties were assigned to former Harris County Judge Grant Dorfman as the arbitrator. (Docket Entry No. 2 at 9). In July 2020, Judge Dorfman ruled that Feldman and the Lawyer Entities' declaratory judgment claim seeking a judgment of "non liability for alleged legal malpractice was 'legally invalid'" because they were asserted defensively. (Docket Entry No. 44-1 at 1). On November 9, 2020, Judge Dorfman entered a final award that Feldman and the Lawyer Entities were not required to immediately wind down

6

and liquidate the Captive Insurers. (Docket Entry No. 47-1 at 16). Judge Dorfman denied Feldman's and the Lawyer Entities' other breach of contract claims. (*Id.* at 18, 19).

On May 28, 2020, the Doctors initiated the second arbitration, this one in Houma, Louisiana, before retired U.S. District Court Judge Stanwood Duval as the arbitrator. (Docket Entry No. 2-6). The Doctors asserted Texas state-law claims for breach of contract, breach of fiduciary duty, tort, legal malpractice, and breach of professional obligations. (*Id.* at 7–9).

On June 17, 2020, the Doctors, Doctor Entities, and Captive Insurers filed this lawsuit in Harris County, Texas, asserting the same Texas-law claims for breach of contract, breach of fiduciary duty, tort, legal malpractice, and breach of professional obligations. (Docket Entry No. 1-1 at ¶ 17). The Feldman and the Lawyer Entities timely removed and then moved in this court to compel the arbitrations to proceed in Houston, Texas. (Docket Entry Nos. 1, 2). They also explained that both sides had initiated competing arbitrations. (Docket Entry No. 2 at 9).

The Doctors responded with a cross-motion to compel arbitration before Judge Duval, arguing that Judge Dorfman was improperly appointed and that the Doctor Entities had not agreed to arbitrate in Texas. (Docket Entry No. 10 at 1). The Doctors also moved to stay the Texas arbitration before Judge Dorfman while this court considered the motions, and for an expedited ruling on the motion to stay. (Docket Entry Nos. 12, 13).

Feldman and the Lawyer Entities argued that "because Judge Dorfman denied leave for the defendants to supplement their arbitration demands to include submission of the [Lawyer Entities'] claims," they had "initiated an arbitration with former Judge Caroline Baker on Monday, July 20, 2020, to submit for resolution the claims alleged by the [Lawyer Entities] in this suit." (Docket Entry No. 16; Docket Entry No. 19 at 3). This was the third arbitration.

This court granted the Lawyers' motion to compel the participation of the Doctors, the Doctor Entities, and the Captive Insurers in the Houston arbitrations then pending before Judge

7

Baker and Judge Dorfman. (Docket Entry No. 31 at 2, 12). This court also denied the Doctors' motion to compel arbitration in Louisiana before Judge Duval. (*Id.*). The court stayed the arbitration before Judge Duval "until the resolution of the Texas arbitration." (*Id.* at 6 n.1). The court held that the Engagement Letter forum-selection clause required arbitration in Houston, Texas, and that the Doctor Entities and the Captive Insurers were bound by the terms of the Engagement Letter. (*Id.* at 11–13). The court then stayed this litigation pending resolution of the Texas arbitrations. (*Id.* at 18). The plaintiffs appealed the court's ruling. (Docket Entry No. 32). That appeal is currently pending. *See Scott Sullivan, et al. v. Stewart A. Feldman, et al.*, Case No. 20-20462 (5th Cir. Sept. 1, 2020).

### D. The Fourth, Fifth, and Sixth Arbitrations, before Arbitrator Kutcher, Judge Medley, and Judge Gill-Jefferson in Louisiana

While the court was deciding the parties' competing motions to compel, the Doctor Entities and a new party, Sunrise Production, LLC, initiated a fourth arbitration. This was before Robert A. Kutcher, an arbitrator who lives in Louisiana, and against Feldman and the Lawyer Entities. (Docket Entry No. 31 at 6 n.2). The plaintiffs requested that the final hearing take place in Houston, Texas. (Docket Entry No. 36-2 at 13). The Kutcher arbitration demand asserts the same tort, legal-malpractice, breach-of-fiduciary-duty, breach-of-professional-obligations, breach-of-contract, and negligent-misrepresentation claims at issue in the first (Dorfman), second (Duval), and third (Baker) arbitrations, as well as a claim under the Texas Deceptive Trade Practices Act. (*Id.* at 18–20). The plaintiffs assert that the Kutcher arbitration was initiated to "pick the time and place to affirmatively assert their tort and malpractice claims." (*Id.* at 19).

On August 23, 2020, the plaintiffs initiated the fifth arbitration, this one before Judge Lloyd Medley, Jr., who lives in Louisiana, against Feldman, the Lawyer Entities, PoolRe Insurance Corp., and the owner and two directors of PoolRe, Stephen Friedman, Dana Moore, and Robert L. Snyder, II ("the PoolRe Parties"). (Docket Entry No. 36-5). The plaintiffs requested that the final

hearing take place in Houston, Texas. (*Id.*). The Medley arbitration demand goes beyond the Duval, Baker, Dorfman, and Kutcher arbitrations, adding new facts that the plaintiffs allegedly learned in August 2020. The arbitration demand alleges that Feldman and the Lawyer Entities refused to wind up the Captive Insurers because they had used the same underlying PoolRe insurance pools to "underwrite the costs of Feldman's defense against malpractice and breach of fiduciary duty claims." (*Id.* at 12). Feldman allegedly submitted claims to the insurance pool, many of which are still pending, resulting in "open claims and unresolved liabilities." (*Id.* at 13). Feldman and the Lawyer Entities, however, "did not disclose" that they were covered by the same insurance "policies reinsured by the Captive Insurers." (*Id.*).

In the fifth arbitration, the plaintiffs also sought to certify a class. (*Id.* at 19). They requested: (1) damages for "legal fees improperly submitted to PoolRe's risk pools" and for "wrongful, intentional, and/or conspiratorial actions"; (2) "inspection and production of the documents, books, records, and information related to PoolRe's risk pools"; (3) disgorgement of amounts paid to Feldman, the Lawyer Entities, and PoolRe; and (4) a declaration that the plaintiffs do not "owe any indemnity" to Feldman or the Lawyer Entities. (*Id.* at 20–21).

On November 10, 2020, the plaintiffs initiated the sixth arbitration. This is against Feldman, the Lawyer Entities, and the PoolRe Parties, and the demand requested arbitration in Houston, Texas before Judge Carolyn Gill-Jefferson, who lives in Louisiana. (Docket Entry No. 46-1). The plaintiffs asserted the same claims as in the fifth (Medley) arbitration, and added claims under the Racketeer and Influenced and Corrupt Organizations Act. (*Id.* at 28).

### E. The Current Motions

In October 2020, Feldman and the Lawyer Entities filed this emergency motion to lift the stay pending arbitration that this court entered on August 14, 2020. (Docket Entry No. 36). The motion argued that the plaintiffs had improperly started "copycat" arbitrations before Mr. Kutcher

9

and Judge Medley in Louisiana, seeking to resolve the same "core dispute" at issue in the Judge Baker and Judge Dorfman arbitrations in Texas. (*Id.* at 1–2). Feldman and the Lawyer Entities asked the court to vacate the interim decisions by Mr. Kutcher and Judge Medley and to stay the Kutcher and Medley arbitrations. (*Id.* at 5–7). The court asked for additional briefs on whether it should lift the stay in the litigation, stay the Kutcher and Medley arbitrations, or vacate interim decisions made in those arbitrations. (Docket Entry No. 42). Both parties filed briefs. (Docket Entry Nos. 44, 45). Feldman and the Lawyer Entities then notified the court that the plaintiffs had initiated the sixth (Gill-Jefferson) arbitration, this one in Louisiana. (Docket Entry No. 46). The Texas Baker and Louisiana Kutcher arbitrations were stayed pending resolution of this motion. (Docket Entry No. 45-1 at 14).

On November 11, 2020, Feldman and the Lawyer Entities moved to confirm the final award issued by Judge Dorfman, in the second arbitration. (Docket Entry No. 47). The plaintiffs oppose the motion, arguing that the court lacks jurisdiction to lift the stay it imposed on the case and confirm an award by Judge Dorfman because the plaintiffs appealed aspects of this court's decision compelling arbitration before him. (Docket Entry No. 48).

## II.  The Legal Standards

A district court's discretionary authority to issue a stay is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 243 (5th Cir. 2009) (citing *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 761 F.2d 198, 204 n.6 (5th Cir. 1985)). How and whether to enter a stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). The "stay of a pending matter is ordinarily within the trial court's wide discretion to

control the course of litigation." *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990) (citation omitted).

The Federal Arbitration Act authorizes courts to compel unwilling parties to arbitrate their disputes. 9 U.S.C. § 4. The Act, however, does not expressly authorize courts to stay or enjoin an arbitration. Nevertheless, the Fifth Circuit has authorized courts to stay an arbitration in appropriate circumstances. *Tai Ping Ins. Co., Ltd. v. M/V Warschau*, 731 F.2d 1141, 1144 (5th Cir. 1984) ("There is no provision in the Act for a stay of arbitration. Nonetheless, the case law clearly establishes that, in the appropriate circumstances, such an order is within the power of the district court."). Other courts have reached the same conclusion.[2] Texas law gives courts the power to stay an arbitration if there is no agreement to arbitrate. Tex. Civ. Prac. & Rem. Code Ann. § 171.023; *see also BHP Billiton Petroleum (Americas) Inc. v. Atlantia Offshore Ltd.*, 312 S.W.3d 813, 821 (Tex. App.—Houston [1st Dist.] 2009) ("[W]e conclude that the trial court, under section 4 of the FAA, was authorized to enter an order staying the AAA arbitration.").

---

[2] *See In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 (2d Cir. 2011) ("It makes little sense to us to conclude that district courts lack the authority to order the cessation of an arbitration by parties within its jurisdiction where such authority appears necessary in order for a court to enforce the terms of the parties' own agreement, as reflected in a settlement agreement."); *Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1233–34 (E.D. Cal. 2015) ("Given that federal courts sometimes must determine whether a party has a right to arbitration (e.g., in the context of a motion to compel arbitration), it follows that the federal judiciary may enjoin arbitration if necessary to enforce its orders."), *aff'd*, 659 F. App'x 402 (9th Cir. 2016) ("If arbitration proceedings were not enjoined, [the defendant's] extended delay in asserting his arbitration right would force [the plaintiff] to re-litigate claims it likely has no duty to arbitrate at all."); *Societe Generale de Surveillance, S.A. v. Raytheon Eur. Mgmt. & Sys. Co.*, 643 F.2d 863, 868 (1st Cir. 1981) ("To allow a federal court to enjoin an arbitration proceeding which is not called for by the contract interferes with neither the letter nor the spirit of this law. Rather, to enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present.").

### III. Analysis

#### A. The Motion to Stay the Kutcher, Medley, and Gill-Jefferson Arbitrations in Louisiana

The defendants ask the court to lift the stay it imposed stopping this litigation and the Louisiana arbitration then on file, after ordering arbitration in Houston, Texas. (Docket Entry No. 36). If the court lifts this stay, the defendants ask the court to stay the later-filed Kutcher, Medley, and Gill-Jefferson arbitrations. (*Id.*). The defendants argue that the court should stay these Louisiana arbitrations because (1) they are proceeding in an improper venue and (2) they are inefficient "copycat" arbitrations.

##### 1. The Venue Question

Courts distinguish between questions of arbitrability, which courts decide, and questions of procedure, which arbitrators decide. *See Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("[P]rocedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." (quotation marks and citations omitted)). Procedural questions include disputes that call the arbitration agreement's "grievance procedures into play." *Howsam*, 537 U.S. at 85 (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 559 (1964)). Determining "the place of the arbitration is simply a procedural matter and hence for the arbitrator." *Richard C. Young & Co. v. Leventhal*, 389 F.3d 1, 4–5 (1st Cir. 2004); *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 655 (2d Cir. 2011) ("[D]isputes over the interpretation of forum selection clauses in arbitration agreements raise presumptively arbitrable procedural questions."); *see also Cent. W. Va. Energy, Inc. v. Bayer Cropscience LP*, 645 F.3d 267, 276 (4th Cir. 2011).

Courts holding that forum is a procedural question have typically addressed ambiguous forum-selection clauses. For example, in *Central West Virginia Energy, Inc.*, 645 F.3d at 276, the

court addressed two competing arbitrations in Virginia and West Virginia and the parties' arbitration agreement seemingly authorized arbitration in both states. In *Richard C. Young & Co.*, 389 F.3d at 2, 4, the forum-selection clause required the initial arbitration demand to be filed in Boston but did not specify where the arbitration proceedings must take place. And in *UBS Financial Services, Inc.*, 660 F.3d at 655, the parties' agreement contained two conflicting forum-selection clauses.

One line of cases presents an exception to the general rule that arbitration forum is a procedural question. Several courts have enjoined arbitrations because they were in a location clearly foreclosed by the parties' forum-selection clause. *See Leong v. The Goldman Sachs Grp. Inc.*, No. 13-CV-8655 (JMF), 2016 WL 1736164, at *2 (S.D.N.Y. May 2, 2016) ("Plaintiff does not even attempt to argue that his claims in the reparations proceeding are different than the claims that he pursued earlier in this case or that those claims fall outside the scope of the parties' arbitration clause, which—as the Court has already held—requires arbitration in London."); *Renaissance Cap. Grp., Ltd. v. Hedge Fund Adm'rs, Ltd.*, No. 00-CV-3260 (NRB), 2000 WL 1716353, at *3 (S.D.N.Y. Nov. 15, 2000) (enjoining an National Association of Securities Dealers arbitration in California and directing that arbitration proceed in London under the parties' agreement); *L.F. Rothschild & Co. v. Katz*, 702 F. Supp. 464, 467-68 (S.D.N.Y. 1988) ("This court has the power to enjoin [the defendants] from proceeding with the [other] arbitration, and by doing so it effectively can stay that arbitration."); *Societe Generale de Surveillance*, 643 F.2d at 869 ("Arbitration in Boston, not having been agreed to by the parties, should be enjoined.").

These courts took forum questions away from the arbitrator if the chosen forum was clearly foreclosed by the parties' agreement. These courts noted that arbitration is a matter of contract, not coercion, but the arbitrators in these cases were coercing parties to arbitrate in locations not mentioned in the parties' forum-selection clauses. *See, e.g.*, *Leong*, 2016 WL 1736164, at *2

13

("[D]istrict courts have 'the authority to order the cessation of an arbitration by parties within its jurisdiction where such authority appears necessary in order for a court to enforce the terms of the parties' own agreement.'" (quoting *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 (2d Cir. 2011)); *Societe Generale de Surveillance*, 643 F.2d at 868 ("The Act expressly provides federal courts with the power to order parties to a dispute to proceed to arbitration where arbitration is called for by the contract."); *see also Nat'l Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 330 (5th Cir. 1987) ("The right and duty to arbitrate disputes is purely a matter of contractual agreement between the parties. . . . An arbitration agreement, including its forum selection clause is a freely-negotiated contract between the parties. Courts must give effect to such freely negotiated forum selection clauses."). Ambiguous forum-selection clauses, like those addressed in *Richard C. Young* and *UBS Financial*, present fewer concerns that a party is being coerced to arbitrate in an unagreed-to location. *See John Wiley*, 376 U.S. at 557–58 ("[A] court could deny arbitration only if it could confidently be said not only that a claim was strictly 'procedural,' . . . but also that it should operate to bar arbitration altogether, and not merely limit or qualify an arbitral award.").

While the language of the forum-selection clause in this case is clear, the facts present an unclear procedural question appropriately left to the arbitrator. This court previously held that arbitrations involving the same parties and the same Engagement Letter must proceed in Houston, Texas.[3] (Docket Entry No. 26 at 11). The Engagement Letter forum-selection clause states that

---

[3] Feldman and the Lawyer Entities suggest that the Kutcher, Medley, and Gill-Jefferson arbitrations include nonsignatories who did not agree to submit to arbitration. (Docket Entry No. 36 at 6). The court held that the forum-selection clause was binding on Dr. Sullivan, Dr. DellaCroce, St. Charles Surgical Hospital, St. Charles Holding, the Center for Restorative Breast Surgery, LLC, Sigma Delta Billing, LLC, Janus Insurance Corp., Cerberus Insurance Corp., and Orion Insurance Corp. (Docket Entry No. 26 at 8–11). The three new arbitrations also involve Dr. Sullivan, Dr. DellaCroce, St. Charles Surgical Hospital, St. Charles Holding, the Center for Restorative Breast Surgery, LLC, Sigma Delta Billing, LLC, Janus Insurance Corp., Cerberus Insurance Corp., and Orion Insurance Corp. (Docket Entry Nos. 35-2, 35-6, 46-1). The respondents in each arbitration are Feldman, the Feldman Law Firm, LLP, Capstone Associate Services (Wyoming, LP, Capstone Associated Services, Ltd., Capstone Insurance Management, Ltd., and Jeff Carlson. (Docket Entry Nos. 35-2, 35-6, 46-1). The PoolRe Parties were not addressed by the court's

"all arbitrations—regardless of the arbitral organization or arbitrator actually hearing the dispute—shall be conducted in Houston, Texas." (Docket Entry No. 7-2 at 15; Docket Entry No. 26 at 3).

Contrary to the defendants' claims, the more recently filed fourth, fifth, and sixth arbitrations are not necessarily taking place outside Houston, Texas. The Kutcher, Medley, and Gill-Jefferson arbitration demands all make clear that the final hearing will take place in Houston, as required by the Engagement Letter. (Docket Entry Nos. 36-2, 26-5, 46-1). Mr. Kutcher and Judge Medley have issued two interim decisions in those arbitrations from Louisiana, (Docket Entry No. 36-8), but both required the plaintiffs to inspect the "requested books and records" in Houston, (Docket Entry Nos. 36-4, 36-6). The arbitrators have not required the parties to travel to Louisiana, instead hearing disputes virtually. (Docket Entry No. 36-8 at 8; Docket Entry No. 36-9 at 17, Docket Entry No. 44-5 at 1). No final hearings have been held.

Whether only the final hearing, or also all interim hearings, must occur in Houston—that is, if the place where the arbitrators are sitting during the Zoom proceeding is in Houston—and the manner the arbitrators may use to appear in Houston, are procedural questions that call "the grievance procedures [agreed to by the parties] into play." *Howsam*, 537 U.S. at 85. The Engagement Letter requires arbitration to "be conducted" from Houston. It is unclear whether this requirement applies to all interim hearings or to only the final hearing. The Engagement Letter requires the arbitrator to interpret this ambiguous phrase. The Letter makes clear that arbitration "shall be the sole and exclusive forum for resolving any and all disputes between the parties," including "any and all other controversies, disputes or claims whatsoever . . . arising under or in connection with or related to any of the parties' agreements." (Docket Entry No. 7-1 at 15). The application of the forum-location language "aris[es] under . . . the parties' agreement." (*Id.*).

---

prior decision, but these parties did not request a decision on whether they were bound by the Engagement Letter.

15

The AAA Commercial Arbitration Rules, which were incorporated by the Engagement Letter, (Docket Entry No. 7-1 at 15), also provide that the AAA and the arbitrator have the authority to "determine the locale" of the arbitration when "reference to a locale in the arbitration agreement is ambiguous." American Arbitration Association, Commercial Arbitration Rules, Rule 11, https://adr.org/sites/default/files/Commercial%20Rules.pdf.

Even if the Engagement Letter required every hearing to be in, and decision to be issued from, Houston, it is unclear whether and how the arbitrators could use technology to meet that requirement. Other courts have recognized that "appearing" in a particular location is easier with modern technology. For example, some courts have held that technology allows arbitration decisions to be made in a place other than where the arbitrators are physically located or the final decision is signed. *See, e.g.*, *Moyett v. Lugo-Sanchez*, 321 F. Supp. 3d 263, 267 (D.P.R. 2018) ("Despite the physical distance between the arbitrators, who may physically be in Georgia, and the FINRA litigants, who are in Puerto Rico, the arbitrators 'sit' in Puerto Rico with the aid of videoconferencing technology."); *NGC Network Asia, LLC v. PAC Pac. Grp. Int'l, Inc.*, No. 09-CV-8684, 2010 WL 3701351, at *3 (S.D.N.Y. Sept. 20, 2010) ("[A]n arbitration award is 'made' in the district where the hearing is held, not the place from which the award was written or mailed." (citation omitted)). The Engagement Letter does not appear to prohibit arbitrators from sitting in Louisiana but virtually appearing in Houston.

### 2. The Copycat-Arbitration Issue

Feldman and the Lawyer Entities also argue that the court should stay the Louisiana Kutcher, Medley, and Gill-Jefferson arbitrations—the fourth, fifth, and sixth filed—because they are inefficient "copycat" arbitrations. The court disagrees. The Supreme Court has cautioned against federal courts "impos[ing their] own conception of sound" arbitration procedures unless the parties' agreement allows for it. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662,

16

675 (2010); *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) ("[W]e rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation."). The Fifth Circuit has made clear that a district court may not stay an arbitration simply to prevent "[d]uplication of effort" and "piecemeal resolution of the dispute." *Tai Ping Ins. Co.*, 731 F.2d at 1146.

The Engagement Letter does not preclude the parties from proceeding with separate arbitrations for disputes involving overlapping but different facts. The Letter does not foreclose multiple "arbitrations," but simply requires that a "dispute" be heard before "a single arbitrator." (Docket Entry No. 7-2 at 15). The AAA Commercial Rules do not require or prohibit consolidation of multiple arbitrations. Instead, the Rules leave issues related to the "consolidation of the claims or counterclaims with another arbitration" in the "discretion of the arbitrator." American Arbitration Association, Commercial Arbitration Rules, Rule P-2, https://www.adr.org/sites/default/files/CommercialRules_Web.pdf.

Judge Duval, Judge Baker, and Mr. Kutcher have issued a joint proposal to streamline the issues presented in their three arbitrations. (Docket Entry No. 44-4). They developed a proposal to rule on "issues common to all three arbitrations, including discovery issues, dispositive motions, or evidentiary rulings." (*Id.*). Both sides have also submitted their own proposals to streamline the arbitrations. (Docket Entry No. 44-5). While the parties have not agreed to all these proposals, the disagreements do not preclude additional proposals to consolidate. Nor do they preclude each arbitrator from going forward with his or her arbitration. If the parties continue with several separate arbitrations, arbitrators will begin issuing "binding, final, and non-appealable" decisions and awards. (Docket Entry No. 2-4 at 10). The arbitrators are authorized to determine whether

17

and when earlier decisions or awards have preclusive effects.[4] *See Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 131 (2d Cir. 2015) ("[C]laim preclusion [is] not a question of arbitrability because it, like other affirmative defenses such as time limits and laches, [is] a legal defense to the opposing party's claims and, as such, [is] "itself a component of the dispute on the merits."); *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1132 (9th Cir. 2000) ("[A] res judicata objection based on a prior arbitration proceeding is a legal defense that, in turn, is a component of the dispute on the merits and must be considered by the arbitrator, not the court.").

If the parties disagree about the procedures used, or decisions issued, by these arbitrators, the parties can seek vacatur once final awards are issued. But the court will not impose its own view of efficient procedure when those decisions are properly left to arbitrators. *See Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 220 (E.D.N.Y. 2013) ("It is no doubt unwise for a Court to simply step in and stay a contractually deserved arbitration merely because the Court sees a potentially more efficient use of time and resources by litigants, arbitrators, and judges."). As this court held in an earlier opinion, the "parties' own contracts and conduct" resulted in "piecemeal presentations before . . . different arbitrators," which is "not efficient, and certainly not pretty." (Docket Entry No. 26 at 2). More piecemeal presentations and inefficiency are not reason to impose new language on the parties' contracts.

In short, while the more recently filed arbitrations must "proceed" in Houston under the Engagement Letter, the required location for interim hearings, the manner in which arbitrators must appear in a location, and permissible consolidation procedures are not addressed, much less clearly set, by the Engagement Letter. Applying the Engagement Letter arbitration clause to these

---

[4] Similarly, Texas's first-to-file rule is a legal defense that the arbitrators may consider. *See Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992) (noting that "Texas law favors the joint resolution of multiple claims to prevent multiple determinations of the same matter" and holding that the plaintiff's claims were "subject to the arbitration provision of the contract").

18

disputes raises procedural questions about the parties' agreed grievance mechanisms. The arbitrators should address these disputes, not the court.[5]

### B. The Motion to Confirm Judge Dorfman's Award

Feldman and the Lawyer Entities also moved to confirm the final award issued by Judge Dorfman. (Docket Entry No. 47). The plaintiffs argue that the court lacks jurisdiction to lift the stay it imposed on this litigation and confirm an award by Judge Dorfman because they have appealed this court's decision compelling arbitration before him. (Docket Entry No. 48). The court agrees, in part, with the plaintiffs.

A notice of appeal "is an event of jurisdictional significance . . . [that] confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Co.*, 459 U.S. 56, 58 (1982). This rule is designed to prevent "the simultaneous exercise of jurisdiction by a district court and a court of appeals, because that could lead to both courts deciding the same issue." *Weingarten Realty Inv'rs v. Miller*, 661 F.3d 904, 908–09 (5th Cir. 2011).

Contrary to the plaintiffs' argument, this court has jurisdiction to lift the stay it imposed on this case. The Supreme Court has made clear that "filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of control over *those aspects of the case involved in the appeal.*" *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379 (1985)

---

[5] Feldman and the Lawyer Entities also argue that the court should vacate Mr. Kutcher's and Judge Medley's decisions to allow the plaintiffs to inspect the books, records, and accounts of the PoolRe risk pools. (Docket Entry No. 38 at 1–6, 295–96; Docket Entry No. 38-1 at 5). Courts are generally permitted to review arbitral awards "only after a final award is made by the arbitrator." *Folse v. Richard Wolf Med. Instruments Corp.*, 56 F.3d 603, 605 (5th Cir. 1995). And when reviewing a final award, courts may only vacate an arbitrator's decisions in "very unusual circumstances." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995); *see also* 9 U.S.C. § 10(a)(4). The court will not vacate the interim decisions by the arbitrators. Feldman and the Lawyer Entities do not argue why the inspection decisions were incorrect, other than the fact that Arbitrator Kutcher and Judge Medley did not issue their decisions from Houston. (Docket Entry No. 44 at 9). As noted above, the Engagement Letter does not clearly forbid them from making interim decisions from Houston.

(emphasis added). This case involves several arbitrations that were not implicated by the plaintiffs' appeal. The court has jurisdiction to lift the stay to address issues in arbitration proceedings not implicated by the plaintiffs' appeal.

The court agrees, however, that the plaintiffs' appeal targets Judge Dorfman's appointment. The plaintiffs appealed Judge Dorfman's appointment and ability to preside over the parties' arbitration. (Docket Entry No. 48 at 3). The defendants are asking the court to confirm an award he granted. (Docket Entry No. 47 at 3). To grant the requested relief, the court would need to decide that Judge Dorfman had the power to grant an arbitration award. Making that decision could produce conflicting decisions from this court and the court of appeals.

The court declines to exercise jurisdiction over issues currently on appeal before the Fifth Circuit.

## IV. Conclusion

The motion filed by Feldman and the Lawyer Entities to lift the stay in this case, (Docket Entry No. 36), and their motion to confirm Judge Dorfman's award, (Docket Entry No. 47), are denied.

SIGNED on December 4, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge