### ARBITRATION FILED WITH AND BEFORE THE HONORABLE CHARLES R. JONES

**SCOTT K. SULLIVAN, et al.,**                    *

    **Claimants**                               *

**V.**                                          *

                                     **Locale of Final Hearing:  Houston, Texas**

**THE FELDMAN LAW FIRM LLP, et al.** *

    **Respondents**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### FINAL ARBITRATION AWARD

The undersigned Arbitrator conducted a final hearing in this arbitration on August 3, 2021, to August 7, 2021; August 9, 2021; August 16, 2021, to August 24, 2021; September 14, 2021; September 23, 2021, to September 24, 2021; and September 28, 2021, to October 3, 2021.  Four arbitrators, including this Arbitrator, heard evidence at the final hearing at the same time (thereby saving the parties the time and expense of four separate hearings), but each arbitrator indicated that he or she would render his or her own reasoned award separately.[1]  This Arbitrator has rendered this Final Arbitration Award separately from the other arbitrators, and the findings of fact and conclusions of law below are this Arbitrator's alone.[2]

---

[1] *See, e.g.,* Order on Pending Motions to Continue at pp. 2, 4 (Mar. 1, 2021).

[2] With respect to any finding of fact that should more accurately be characterized as a conclusion of law or any conclusion of law that should more accurately be characterized a finding of fact, it is so deemed.

EXHIBIT A

By Order of this Arbitrator dated July 18, 2021, their remains to be rendered an award for damages in the class proceeding (except for PoolRe to which the class proceeding does not apply). This Arbitrator retains jurisdiction to conduct all further proceedings necessary to render a Final Award on class damages.

The arbitration clause governing this arbitration is contained in the Joint Engagement Letter for Captive Formation/Administration, dated October 22, 2015 (Revised November 10, 2015).[3]    The Joint Engagement Letter states that the arbitration shall apply Texas substantive law and the Commercial Arbitration Rules of the American Arbitration Association.[4]    Pursuant to AAA Rule 46(b), this Arbitrator believes that the seriousness and complexity of the issues raised, and the Parties' extensive efforts in prosecuting and defending this matter, warrant the following reasoned award.

---

[3] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011081.  A substantially similar, if not identical, arbitration clause exists between Respondents and each of the Class Members.  *See* Exhibit DRS-2245, Family Parties' Joint Engagement Letter; Exhibit DRS-2246, Logistics Parties' Joint Engagement Letter; Exhibit-2247, McAda Parties' Joint Engagement Letter; Exhibit DRS-2248, Clear Parties' Joint Engagement Letter; Exhibit DRS-2249, HEC Parties' Joint Engagement Letter; Exhibit DRS-2250, Stampings Parties' Joint Engagement Letter; Exhibit DRS-2251, Communication Parties' Joint Engagement Letter; Exhibit DRS-2252, Foundation Parties' Engagement Letter; Exhibit DRS-2253, Generative Parties' Joint Engagement Letter; Exhibit DRS-2254, Lumbar Parties' Joint Engagement Letter; Exhibit DRS-2255, Prosthesis Parties' Joint Engagement Letter; Exhibit DRS-2256, Counsel Parties' Joint Engagement Letter; Exhibit DRS-2257, River Parties' Joint Engagement Letter; Exhibit DRS-2258, Illumination Parties' Joint Engagement Letter.  The Joint Engagement Letters provide that the Arbitrator has "exclusive authority to resolve all disputes and challenges to the formation and enforceability of the parties' agreements as a whole."  *See, e.g.*, Exhibit J-20, Joint Engagement Letter at SULLIVAN011081.  Pursuant to this authority, and to ensure due process, this Arbitrator ruled that the four-month limitation in the Joint Engagement Letter was unenforceable as unconscionable under the circumstances presented.  *See, e.g.*, Order on Pending Motions to Continue at pp. 4-6 (Mar. 1, 2021).  The Arbitrator's ruling regarding the unenforceability of the four-month limitation in the Joint Engagement Letter is adopted herein.

[4] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011081.

2

## THE PARTIES AND THE PROCEEDINGS

**1)**    Claimants are Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp. (collectively, the "Doctors").

**2)**    Claimants appear in both their individual capacities as well as in representative capacities on behalf of a certified class.    Rule 7 of the AAA Supplementary Rules for Class Arbitrations ("AAA Class Rules") provides that the "final award shall be reasoned and shall define the class with specificity."[5] Pursuant to AAA Class Rule 7, and consistent with the Arbitrators' prior orders, this Arbitrator defines the "Class" with specificity as follows:

> All insureds, captives, participants, and owners thereof who participated in the 2018 PoolRe reinsurance risk pool and the 2019 PoolRe reinsurance risk pool.
>
> Excluded from the class are A.M.Y. Property & Casualty Corp. ("A.M.Y."), Stewart A. Feldman, The Feldman Law Firm, LLP, Capstone Associated Services, Wyoming, Limited Partnership, Capstone Associated Services, Ltd., Capstone Insurance Management, Ltd., Jeff Carlson, and all named insureds and additional named insureds in the 2018 and 2019 direct insurance policies issued by A.M.Y, which include but may not be limited to the following entities also excluded from the class: Feldman/Matz Interests, LLP; Marla B. Matz; Stewart A. Feldman & Associates, L.L.P.; Feldman Hanzen, LLP; RSL Funding, LLC; RSL-3B-IL, Limited Partnership; RSL

---

[5] *See* AAA Class Rule 7.

Special-IV, Limited Partnership; RSL-5B-IL, Limited Partnership'
Capstone Insurance Management (Anguilla), Ltd.; POC Lease
Holdings, LLC; Extended Holdings, Limited Partnership; RSL 2012-1,
LP; RSL-3B-IL Management Corp.; RSL Special-IV Management
Corp.; Capstone Holdings Corp.; Extended Holdings Management
Corp.; Chestnut Holdings, LLC; Property Express Funding, Ltd.; PEF
Management Corp.; RSL 2012-1 Management Corp.; PRQ Qualified
Investments, LLC; Capstone Associated Services (Wyoming), LLC;
and RSL-5B-IL Management Corp.[6]

3)    AAA Class Rule 7 states that the final award shall "specify or describe those
to whom the notice provided in Rule 6 was directed, those the arbitrator finds to be
members of the class, and those who have elected to opt out of the class."[7]  On
February 11, 2021, this Arbitrator approved the dissemination of notice to putative
class members, as contemplated by AAA Class Rule 6.[8]  On June 11, 2021, this
Arbitrator ordered further notice to be sent to putative class members.[9]  Pursuant to
the Arbitrators' Orders, notice was sent to putative class members.[10]  Following
extensive argument and briefing from the Parties, on July 8, 2021, this Arbitrator

---

[6] *See* Judge Jones' Order (Feb. 11. 2021) (holding that Judge Medley's Order certifying the class remains in full force and effect in this arbitration); *see also* Judge Medley's Supplemental Order on Claimants' Motion for Class Certification (Nov. 16, 2020) (defining the class); Judge Jones' Order on the Doctors' Motion to Redefine the Class and/or exclude form the Class All A.M.Y. Direct Insureds (June 21, 2021).

[7] *See* AAA Class Rule 7.

[8] *See* Judge Jones' Order (Feb. 11, 2021).

[9] *See* Judge Jones' Order Relating to the Doctors' Supplement to Motion to Deem Opt-Outs Invalid (June 11, 2021).

[10] Pursuant to Orders from Judge Medley and Judge Dollinger, Respondents provided contact information for all putative class members. *See, e.g.*, Judge Dollinger's Order, *PoolRe Insurance Corp. v. Sullivan*, No. 2020-74685 (Dec. 15, 2020) ("Contact information for absent class members shall be produced by noon central standard time December 18, 2020, and notice may be given to absent class members."); *see also* Judge Medley's Order on Motions Heard on November 4, 2020 (Nov. 5, 2020).

accepted the recommendation of the Doctors as to class composition.[11]  This

Arbitrator deems the following individuals / entities to be properly part of the Class:

- The Doctors / Class Representatives include:

  (1)   Janus Insurance Corp.
  (2)   Cerberus Insurance Corp.
  (3)   Orion Insurance Corp.
  (4)   Scott Sullivan, M.D.
  (5)   Frank DellaCroce, M.D.
  (6)   St. Charles Surgical Hospital, LLC
  (7)   St. Charles Holdings, LLC
  (8)   Center for Restorative Breast Surgery, LLC
  (9)   Sigma Delta Billing, LLC

- The "Communication Parties" include:

  (10)   Communication Casualty Corp.
  (11)   Communication Holdings, LLC
  (12)   Cole Speech & Language Center, LP.
  (13)   Cole Consolidated Rehab, LLC
  (14)   AJCR Enterprises, LP
  (15)   AJCR2 Enterprises, LP
  (16)   Cole Ventures, LP
  (17)   JACNY 2000, LLC
  (18)   Cole Health, Inc. fka Northeast Rehab Center, Inc.
  (19)   Cole ABA Solutions, Inc. fka Champions Billing & Bookkeeping Inc.
  (20)   Adam C. Cole

- The "Counsel Parties" include:

  (21)   Counsel Casualty Corp.
  (22)   John D. McMickle
  (23)   JDM Public Strategies, LLC
  (24)   JDM Holdings, Inc.

---

[11] *See* Judge Jones' Order (July 8, 2021).

- The "Foundation Parties" include:

  (25)  Foundation Casualty Corp.
  (26)  Foundation Holdings, LLC
  (27)  Rouillard, Inc.
  (28)  Rouillard Concrete, LLC
  (29)  Rou Leasing, Inc.
  (30)  Carleen Rouillard

- The "Generative Parties" include:

  (31)  Generative Casualty Corp.
  (32)  Nathaniel Zoneraich
  (33)  Beth E. Zoneraich
  (34)  Advanced Fertility Care, PLLC
  (35)  Arizona Advanced Reproductive Laboratories, LLC
  (36)  Arizona Advanced Surgery Center, LLC
  (37)  Arizona Advanced Real Estate, LLC

- The "HEC Parties" include:

  (38)  HEC II Assurance
  (39)  Robert C. Smith
  (40)  Jeff Babin
  (41)  Silverline Capital Holdings, LLC
  (42)  Brookwood Properties, L.L.C.
  (43)  Brookwood - Greenwell Springs, L.L.C.
  (44)  Brookwood - Airport, L.L.C.
  (45)  Brookwood - Essen, L.L.C.
  (46)  Brookwood - Millerville, L.L.C.
  (47)  Brookwood - Prairieville, L.L.C.
  (48)  Brookwood Holdings LA, L.L.C.
  (49)  Brookwood Holdings MS, L.L.C.
  (50)  Brookwood Capital, L.L.C.
  (51)  Brookwood - Camellia, L.L.C.
  (52)  Brookwood - Evangeline, L.L.C.
  (53)  Brookwood - Verot, L.L.C.
  (54)  Brookwood - Behrman, L.L.C.
  (55)  Brookwood - Dutchtown, L.L.C.
  (56)  Brookwood - O'Neal, L.L.C.

6

(57)   Brookwood - Webster, L.L.C.
(58)   Brookwood - Labarre, L.L.C.
(59)   Brookwood - Elmwood, L.L.C.
(60)   Brookwood - Riverside, L.L.C.
(61)   Brookwood - Read, L.L.C.
(62)   Brookwood - Range, L.L.C.
(63)   Provence Pointe Development, L.L.C.

- The "Lumbar Parties" include:

  (64)   Lumbar Casualty Corp.
  (65)   Dr. K Samer Shamieh
  (66)   Jomel Whittington
  (67)   Diagnostic and Interventional Spinal Care of Louisiana, Inc.
  (68)   Fairway Medical Center, LLC

- The "Prosthesis Parties" include:

  (69)   Prosthesis Casualty Corp.
  (70)   Brett S. Basanez
  (71)   Michael T. Boyd
  (72)   EverGen Surgical Inc.

- The "River Parties" include:

  (73)   River Casualty Corp.
  (74)   Mark Przybysz
  (75)   River Holdings, LLC
  (76)   Enerco Group, Inc.
  (77)   Flex-Tech Hose & Tubing LLC
  (78)   FT Real Estate LLC

- The "Stampings Parties" include:

  (79)   Stampings Casualty Corp.
  (80)   Norman French
  (81)   Stampings Holdings, Limited Partnership
  (82)   Profile Holdings, Inc.
  (83)   Profile Metal Forming, Incorporated
  (84)   Profile, Inc.

7

(85)  Profile Management, LLC
(86)  McKenzie Building 370, L.L.C.
(87)  10 Forbes Road, LLC

- The "Clear Parties" include:

  (88)  Clear Casualty Corp.
  (89)  Don Wootton
  (90)  Clear Holdings, LLC
  (91)  Contemporary Glass Tempering, LLC
  (92)  Donald Wootton Investments, Inc.
  (93)  Houston Flat Glass Products, LLC
  (94)  Marketing Group of Texas, Inc.
  (95)  Donald Wootton Investments Austin, LLC
  (96)  Donald Wootton Investments Long Point, LLC
  (97)  Donald Wootton Investments Eagle Lake Farm, LLC
  (98)  Donald Wootton Investments Campbell Road, LLC

- The "XtraLight Parties" include:

  (99)   Illumination Casualty Corp.
  (100) JC-MC Holdings, LLC
  (101) XtraLight Manufacturing, Ltd.
  (102) Jerry Caroon
  (103) XtraLight Services

- The "McAda Parties" include:

  (104) Fluids Casualty Corp.
  (105) McAda Irrevocable Family Trust
  (106) Sherri S. Mills
  (107) James McAda
  (108) McAda Drilling Fluids, Inc.
  (109) McAda Valve and Supply Inc.

- The "Family Parties" include:

  (110) Family Casualty Corp.
  (111) Family Practice Holdings, LLC
  (112) 1960 Family Practice, P.A.

8

(113) Cypress Creek ER of Harmony, PLLC
(114) ER Cypress Creek, PLC
(115) Providence ER of Northwest PLLC
(116) ER Doctors of Cypress Creek, PLLC
(117) PHNH Physician Associates, PLLC
(118) Providence Hospital Group, LLC
(119) Providence Hospital Holdings, LP
(120) Providence Hospital Partners, LLC
(121) Express Specialty Pharmacy, LLC
(122) Texas Managerial Medical Services, LLC
(123) Texas Radiology Associates, PA
(124) 1960 Physician Associates
(125) Everest Real Estate of Investments, LLP
(126) TMMS Staffing, LLC
(127) Providence ER of Spring, LLC
(128) Express Pharmacy of Spring, LLC
(129) Huong Le, M.D.

- The "Logistics Parties" include:

(130) Logistics Casualty Corp.
(131) Logistics Holdings, LLC
(132) Tratt Properties, LLC
(133) JIM Nile, LLC
(134) JIM Holding, LLC
(135) New Nile, LLC
(136) PBV Logistics Center, LLC
(137) Santa Fe Logistics Center, LLC
(138) SFLC Nile, LLC
(139) WSDC, LLC
(140) ERG Mezz, LLC
(141) Eagle Realty Group, LLC

4)    Pursuant to AAA Class Rule 7, and consistent with the Arbitrator's July 8,

2021, Order, the Arbitrator deems the following entities/individuals to have properly

opted out of the class:

(1)    Advanced Insurance Corp.

9

(2)    Helsinki Investment Trust
(3)    Advanced Facial Plastic Surgery Center
(4)    Merkaz Management, LLC
(5)    Merkaz Holdings, Ltd.
(6)    Michelle Bassichis
(7)    Ben Bassichis
(8)    Airline Casualty Corp.
(9)    Bruce D. Burglass, Jr.
(10)   Burglass & Tankersley, LLC
(11)   Align Casualty Corp.
(12)   Jack P. Devereux
(13)   Phuong N. Nguyen
(14)   Devereux and Nguyen, LLC
(15)   Devereux and Nguyen South, LLC
(16)   Devereux and Nguyen Properties, LLC
(17)   SmileLogics, LLC
(18)   Smile Partners of DN, LLC
(19)   Astin Farm & Ranch Casualty Corp.
(20)   Sam Astin
(21)   Buffy S. Astin
(22)   Astin Family Farms Inc.
(23)   Astin Farms Inc.
(24)   Astin Ranch, Inc.
(25)   MPB Farms, Inc.
(26)   Aviation Casualty Corp.
(27)   The Leroy George Taylor Management Trust
(28)   Andrew W. Taylor
(29)   Taylor Aviation, Inc.
(30)   New Frontier Aviation, Inc.
(31)   SBA, Inc.
(32)   A-S Ranch, Inc.
(33)   Basin Casualty Corp.
(34)   Craig Charbonnet
(35)   Craig S. Charbonnet, Inc.
(36)   Benefit Casualty Corp.
(37)   Vincent Munno
(38)   Nathan W. Medin
(39)   Universal Financial Consultants, Inc.
(40)   Broker Insurance Marketing, Inc.
(41)   Caring Casualty Corp.

10

(42)  Timothy G. Goux
(43)  CareRise, LLC
(44)  The Healthcare Proprietors Agency, Inc.
(45)  Rise Above Technologies, LLC
(46)  Chiller Casualty Corp.
(47)  Chiller Holdings, LLC
(48)  Tozour Energy Systems, Inc.
(49)  Tozour-Trane
(50)  3606 Horizon Associates GP, LLC
(51)  3606 Horizon Associates, LP
(52)  Smart Partners LLC
(53)  David Wagner
(54)  Compounding Casualty Corp.
(55)  Khyati Undavia
(56)  Minu RX, Ltd.
(57)  Chartwell Distributors, Inc.
(58)  Providian Holdings, Inc.
(59)  Crucible Casualty Corp.
(60)  Crucible Holdings, LLC
(61)  Service Steel Warehouse Co, L.P.
(62)  Coastal Realty LLC
(63)  Jonathan M. Osborne
(64)  Curb Casualty Corp.
(65)  Leaford J. Shakes
(66)  L.S. Curb Service, Inc.
(67)  L.S. Curb, Inc.
(68)  Dakota Casualty Holdings, Limited Partnership
(69)  Zones IT Solutions Inc.
(70)  Fana Capital Corporation
(71)  FANA 305 LLC
(72)  FANA Auburn LLC
(73)  FANA Auburn 234
(74)  FANA Baker Center LLC
(75)  FANA Brickell 51B LLC
(76)  Michael W. Chase
(77)  FANA  Doyle
(78)  FANA Fisher Island
(79)  FANA Key LLC
(80)  FANA Northlake LLC
(81)  FANA Federal Way Crossings I, LLC

11

(82)  FWC- Federal Way Crossing LLC
(83)  FWC – Fana Capital Corp
(84)  FWC – Remix
(85)  FANA Four 106 LLC
(86)  FANA Property Management Corp.
(87)  FANA 8th & Pine Partners LLC
(88)  FANA 8th & Pink Partners LP
(89)  FANA Burnhamthorpe Inc.
(90)  FANA Park Centre Inc.
(91)  Florida Charters II LLC
(92)  Florida Charters Management LLC
(93)  Zone Aircraft Leasing Inc.
(94)  Seikanon Corp.
(95)  FANA Parklane Ltd.
(96)  FANA 128th Development Corp.
(97)  FANA Federal Way Crossings Limited Partnership
(98)  FANA Federal Way Crossings II, LLC
(99)  Sunray Federal Way Crossings LLC
(100) Sunray Federal Way Crossings II LLC
(101) Sunray Federal Way Crossings III LLC
(102) Trimark-Federal Way Crossings LP
(103) Trimark-Federal Way Crossings II, LP
(104) Trinaf Federal Way Crossings LLC
(105) Trinaf Federal Way Crossings II, LLC
(106) Trinaf Federal Way Crossings III, LLC
(107) Devonshire Property & Casualty Insurance Corporation
(108) Storer Interests, Ltd.
(109) Storer Equipment Company, Ltd.
(110) Storer HVAC Management Corporation
(111) Craig Storer
(112) Distillation Casualty Corp.
(113) Distillation Holdings, LLC
(114) BuzzBallz, LLC
(115) McDaniel Champion, LLC
(116) Alex C. Kick
(117) Distribution Casualty Corp.
(118) MB-DAB Trust
(119) MB-JLB Trust
(120) MB-LJB Trust
(121) LSJ Trust

(122) JBW Trust
(123) TSM Trust
(124) MGW Trust
(125) David A. Barish
(126) The Chair King, Inc.
(127) Eastern Casualty Corp.
(128) Eastern Holdings, Limited Partnership
(129) Eastrock Property & Casualty Insurance Corporation
(130) Jeffery P. Gerber
(131) Pierce Goodwin Alexander & Linville, Inc.
(132) PGAL, LLC
(133) Enhanced Casualty Corp.
(134) Northern Pintail Investments, LLC
(135) Advanced Plastic Surgery Solutions, LLC
(136) Solutions Surgical Center, LLC
(137) 6620 McGinnis Ferry, LLC
(138) 10680 Medlock, LLC
(139) Andrew Jimerson II
(140) Farm & Ranch Casualty Corp.
(141) Farm & Ranch Holdings, LLC
(142) Hutchison, Inc.
(143) Logan Valley Sales, Inc.
(144) Hutchinson Rental, LLC
(145) Hutchinson Partners, LLC
(146) George Hutchison
(147) Forestry Casualty Corp.
(148) Andrew W. Taylor
(149) Taylor Aviation, Inc.
(150) New Frontier Aviation, Inc.
(151) SBA, Inc.
(152) A-S Ranch, Inc.
(153) Heirloom Casualty Corp.
(154) William D. Rau
(155) M.S. Rau Antiques, LLC
(156) U.K. Fine Arts Ltd.
(157) Collector's Capital, Inc.
(158) W&J Trucking, LLC
(159) W&J Investments, LLC
(160) Hospitality Casualty Corp.
(161) Hospitality Enterprises Partners, L.L.P.

13

(162) Bentonville Holdings, LLC
(163) Rogers Hospitality, LLC
(164) Generation Group, LLC
(165) Trident Holdings, LLLP
(166) Wash Cycle, Inc.
(167) Helix Hospitality, LLLP
(168) Southaven Holdings, LLC
(169) Huntsville Holdings, LLC
(170) Shreyas (JR) Patel
(171) Houghton Casualty Corp.
(172) Firoz Lalji
(173) Husky Casualty Corp.
(174) Tisdall Investment Trust
(175) William Alec Tisdall M.D., P.A.
(176) Catherine Tisdall, MD, PLLC
(177) Kasaihw LP
(178) William A. Tisdall
(179) Catherine Tisdall
(180) Texas AMSA LLC
(181) Westover Anesthesia Services, PLLC
(182) Import Casualty Corp.
(183) IM Investors Group, LLC
(184) Jacquelyn L. Barish
(185) Leon J. Barish
(186) Furniture Concepts, LLC
(187) Lawyers-Exchange Casualty Corp.
(188) Mary K. Criaco
(189) Adam P. Criaco
(190) Miller & Criaco, P.C.
(191) Adam Criaco & Associates, LLP
(192) Machinist Casualty Corp.
(193) Machinist Holdings, LLC
(194) Morgan-Kalef Performance, Inc.
(195) Windcrest Group Property Investment Corp.
(196) Marine Casualty Corp.
(197) Marine Holdings, Limited Partnership
(198) Shamrock Marine, LLC
(199) Thomas P. Marian
(200) Mechanical Property & Casualty Insurance Corporation
(201) Hunton Family II Limited Partnership

14

(202) The Hunton Group
(203) Bruce Seher
(204) HTI Management Corp.
(205) Hunton Family Limited Partnership I
(206) Hunton Limited Partnership III
(207) Hunton Family Limited Partnership V
(208) Hunton Family Limited Partnership VI
(209) Hunton Family Limited Partnership VII
(210) HVAC Mechanical Services of Texas, Ltd.
(211) HVAC Management Corp.
(212) HTI, Ltd.
(213) Hunton-Vail Management Corp.
(214) HDP Management Corp.
(215) HDP, Ltd.
(216) Greens Road A, LLC
(217) Convergentz Building Systems, LLC
(218) Seer Holdings, LLC
(219) Bruce Seher
(220) Medical Casualty Corp.
(221) 2016 Georgina Helen Rodriguez Trust
(222) 2016 Ana Rodriguez Reddick Trust
(223) Esteban Rodriguez, Sr.
(224) Ana Avanzini Rodriguez
(225) Anita Reddic
(226) Medical Plus Supplies, Inc.
(227) Mortgage Casualty Corp.
(228) Quality S. Investments, LLC
(229) Jimmy B. Shivers
(230) Mortgage Specialist International, LLC
(231) Steven J. Stallard
(232) Nautical Casualty Corp.
(233) Nautical Holdings, LLC
(234) Buffalo Marine Service, Inc.
(235) North Plains Casualty Corp.
(236) Suzanne L. Sooter
(237) Perry Lee Sooter
(238) The Toby Lee Sooter Investment Trust
(239) The Wendi Lavon Evans Investment Trust
(240) Western Hot Oil Service, Inc.
(241) Panhandle Disposal Service, Inc.

15

(242) Nutraceutical Casualty Corp.
(243) Nutraceutical Holdings, LLC
(244) Bluebonnet Nutrition Corporation
(245) Bluebonnet Nutraceutical, Ltd.
(246) Bluebonnet Real Estate, Inc.
(247) Ashford Enterprises, Inc.
(248) Robert L. Barrows
(249) Pacificus Casualty Corp.
(250) Pacificus Holdings, Ltd.
(251) Pacific Coast Sales & Service, Inc.
(252) Michael J. Wood
(253) Donald S. Druyanoff
(254) Petroguard Property & Casualty Insurance Corp.
(255) Caldwell Family Trust
(256) RBC Energy Services, LLC
(257) BLSR Operating, Ltd.
(258) John H. Caldwell
(259) Printing Casualty Corp.
(260) Robert H. Kanner
(261) Pubco Corporation
(262) Seaside Factors, LLC
(263) Kroy, LLC
(264) Buckeye Business Products, Inc.
(265) Kelley Avenue
(266) Public Warehouse Company
(267) Allied Construction Products, Inc.
(268) Stephen Kalette
(269) Recovery Casualty Corp.
(270) Recovery Holdings, LLC
(271) Venturetech, LP
(272) Larry Keast
(273) Redwood Casualty Corp.
(274) Redwood Casualty Holdings, LLC
(275) Dr. Teodoro P. Nissen, MD., Inc.
(276) Ambulatory Surgery and Sports Medicine
(277) Ambulatory Surgery Associates, LLC
(278) Center for Specialized Surgery, LLC
(279) Joseph Centeno
(280) Reinforced Casualty Corp.
(281) MWC Irrevocable Trust

(282) Stainless Hose Fittings, Ltd.
(283) Stainless Hose Fittings Management, Inc.
(284) SHF Building Ltd.
(285) Michael W. Chapman
(286) Restoration Casualty Corp.
(287) Restoration Holdings, LLC
(288) Texas Healthnet Medical Clinic, Ltd.
(289) Texas Healthnet Medical, Clinic, Ltd.
(290) Jose Reyes
(291) Seer Casualty Corp.
(292) Seer Holdings, LLC
(293) SNF Casualty Corp.
(294) SNF Holdings, Limited Partnership
(295) Pontchartrain Pharmacy, L.L.C.
(296) Idaho Immovables, L.L.C.
(297) Waldon Operations, L.L.C.
(298) Riverside Immovables, L.L.C.
(299) Metairie Operations, L.L.C.
(300) Tim Goux
(301) Steelco Casualty Corp.
(302) Steelco Holdings, Ltd.
(303) Supply Casualty Corp.
(304) Vincent A. Bogucki
(305) Bogucki Enterprises, L.L.C.
(306) Kitchen Home Goods Limited Liability Company
(307) Bogucki Fulfillment, LLC
(308) Traffic Casualty Corp.
(309) Ramesh and Laxmi Gunda 2013 Family Trust
(310) Gunda Corporation, LLC
(311) Ramesh Gunda
(312) Transport Casualty Corp.
(313) Transport Holdings, LLC
(314) Russell Transport, Inc.
(315) Jaber Leasing, LLC
(316) Janus Logistics, LLC
(317) Russell Risk Management, Inc.
(318) Rami Abdeljaber
(319) Vulcan Casualty Corp.
(320) Oyvind Ragnhildstveit
(321) Ren Jones

17

(322) Royce Judd
(323) Michael Beck
(324) Kai Data, LLC
(325) Symphony Source, LLC
(326) Radio and Digital, LLC
(327) CORR Investments, LLC
(328) Bear River Management, LLC
(329) Wellness Casualty Corp.
(330) Michael A. Adams
(331) NN Store, LLC
(332) Triple Eight Holdings, LLC
(333) Webseed Inc.
(334) CWC Labs, LLC
(335) Jaz Natural, LLC
(336) Chief Originals, LLC
(337) Ananda Bhakti, LLC
(338) Sacred Lotus Acupuncture Clinic, L.L.C.
(339) Adam Property & Casualty Insurance Corporation
(340) HomeCo Holdings, Ltd.
(341) MHI Partnership, Ltd.
(342) McGuyer Homebuilders, Inc.
(343) MHI Models, Ltd.
(344) Homeco Purchasing Company, Ltd.
(345) 7676 Woodway, Ltd.
(346) 7676 Woodway GP, LLC
(347) FMR IP, LLC
(348) Gary Tesch

**5)**     Respondents are Stewart Feldman and The Feldman Law Firm LLP (collectively, "Feldman"); Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd. (collectively, "Capstone"); PoolRe Insurance Corp. ("PoolRe); and Jeff Carlson (the FCP parties).  PoolRe is not a Respondent in the Class Action.

**6)**    The Doctors filed an Original Arbitration Demand with this Arbitrator on December 19, 2020, and amended and/or supplemented their arbitration demands on December 23, 2020; December 24, 2020; January 15, 2021; January 16, 2021; and January 20, 2021.  The Doctors' arbitration demands and pre-trial pleadings assert a variety of claims against Respondents, including, *inter alia*, professional malpractice; breach of fiduciary duty; professional negligence; negligence; fraudulent misrepresentation; negligent misrepresentation; violations of the Texas Deceptive Trade Practice Act; violations of the Texas Insurance Code; alter ego, joint enterprise, joint, several, and solidary theories of liability, and/or vicarious theory of liability; requests for declaratory judgment; and violations of the Racketeer Influenced and Corrupt Organization Act ("RICO").  This Arbitrator addresses each of Claimants' claims against Respondents below in this final award.

### JURISDICTION

**7)**    This proceeding commenced on December 19, 2020, when the Doctors asserted claims against Mr. Feldman, Capstone, and PoolRe (collectively, "FCP").[12] At that time, the Doctors had previously asserted various claims, including but not limited to class action claims against Mr. Feldman and Capstone (but not PoolRe), which were pending before Judge Medley.  Judge Medley had indicated that he

---

[12] Respondents use the abbreviation "FCP" to refer jointly to Feldman, Capstone, and PoolRe.  This Arbitrator may use that reference for consistency's sake – however, any reference to FCP should *not* be construed to suggest that PoolRe is a party to the class action claims pending in this proceeding.

would not complete the class action claims because of the expiration of the four-month time limitation on his arbitration.  Judge Medley indicated further that he would leave class-related issues to be addressed by a subsequent arbitrator.

**8)**    Judge Medley certified a class on November 5, 2020.    Judge Medley's decision not to complete the class proceedings before him was caused or contributed to by FCP's actions, including the procuring of a contractually prohibited temporary restraining order from a Texas state court, which froze Judge Medley's proceeding in place for weeks at a time, as well as allegations that failed to comply with discovery obligations in that proceeding.

**9)**    The Joint Engagement Letter provides that upon the expiration of four-months from the commencement of an arbitration, "any party then may file another written arbitration demand for arbitration of the dispute with another recognized neutral, arbitrator."[13]  Upon the expiration of Judge Medley's jurisdiction on December 23, 2020, the Doctors then timely submitted the claims previously before Judge Medley to this Arbitrator, both on December 23, 2020, and December 24, 2020.  This Arbitrator was the first to receive an arbitration demand containing the claims previously before Judge Medley upon the expiration of Judge Medley's jurisdiction on December 23, 2020.  Pursuant to the Doctors' arbitration demands and extensive

---

[13] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011081.

briefing from the Parties, this Arbitrator concluded that he has sole and exclusive jurisdiction over the Doctors' class-related claims.

**10)** On November 10, 2020, the Doctors filed an arbitration demand with Judge Carolyn Gill-Jefferson, asserting claims against Mr. Feldman, Capstone, and PoolRe under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964. On December 10, 2020, Judge Gill-Jefferson declined to arbitrate the dispute. After Judge Gill-Jefferson announced that she would not serve as arbitrator, and still on December 10, 2020, the Doctors filed a formal arbitration demand with Judge Medley, which contained the claims previously before Judge Gill-Jefferson. Judge Medley was the first to receive a formal arbitration demand containing the claims previously before Judge Gill-Jefferson after Judge Gill-Jefferson indicated that she would not serve as arbitrator. However, as discussed above, Judge Medley declined to extend his jurisdiction past December 23, 2020, and the Doctors were the first to properly submit, on December 23, 2020, the claims previously before Judge Medley, including the RICO claims, to a replacement arbitrator (*i.e.*, this Arbitrator). Pursuant to the Doctors' arbitration demands, this Arbitrator concluded that he has jurisdiction over the Doctors' RICO claims.

**11)** Arbitration is a creature of contract.[14] The scope of this Arbitrator's jurisdiction is established by the Joint Engagement Letter signed on December 7,

---

[14] *See Jody James Farms, JV, Altman Group, Inc.*, 547 S.W.3d 624, 629 (Tex. 2018).

2015.[15]   The Joint Engagement Letter's arbitration clause expressly contemplates multiple "arbitrations" – plural – and this construction has been confirmed in Judge Dorfman's judicially-confirmed November 9, 2020, award,[16] by Judge Rosenthal,[17] and by this Arbitrator.[18]

**12)**   The Joint Engagement Letter incorporates the Commercial Arbitration Rules of the AAA.  Both the plain language of the Joint Engagement Letter and the AAA Commercial Arbitration Rules grant the Arbitrator broad powers to construe his or her own authority.   The Joint Engagement Letter provides, *inter alia*, that "the arbitrator . . . shall have the sole and exclusive ability to rule on all aspects of the arbitrator's appointment," and "the issue of arbitrability shall likewise be decided by the arbitrator, and not by any other person."[19]

**13)**   In addition, Rule 7 of the AAA Commercial Arbitration Rules empowers the arbitrator "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the

---

[15] *See* Exhibit J-20 in this, Joint Engagement Letter, at SULLIVAN011079-81.

[16] *See* Exhibit J-115, Judge Dorfman's Final Award, at ¶ 56 ("That language is further supported by the language in the arbitration clause that contemplates multiple 'arbitrations' (note the plural), as well as the absence of any requirement regarding the pleading of compulsory counterclaims in either the Engagement Letter or the AAA Rules governing this proceeding."

[17] *See Sullivan v. Feldman*, 2020-2236, 2020 WL 7129879 (S.D. Tex. 12/4/2020) (Rosenthal, J.) ("The Engagement Letter does not preclude the parties from proceeding with separate arbitrations for disputes involving overlapping but different facts.  The letter does not foreclose multiple 'arbitrations,' but simply requires that a 'dispute' be heard before 'a single arbitrator.'"

[18] *See, e.g.*, Order denying FCP's Jurisdictional Objection and Request for Dismissal (Feb. 8, 2021); Order on Pending Motions to Continue at pp. 2-3 (Mar. 1, 2021).  This Arbitrator expressly adopts and incorporates all its former rulings and orders issued in these arbitration proceedings.

[19] *See* Exhibit J-20, Joint Engagement Letter, at SULLIVAN 011081.

arbitrability of any claim or counterclaim."[20]  In light of this provision, along with the above-quoted language from the Joint Engagement Letter, this Arbitrator has the authority to decide his own jurisdiction, and correspondingly, no other arbitrator can infringe upon this Arbitrator's jurisdiction to determine what claims are – or are not – before this Arbitrator.

**14)**    FCP has challenged this Arbitrator's authority and jurisdiction throughout these proceedings, including but not limited to, the maintenance of the class action claims against Mr. Feldman and Capstone.[21]   This Arbitrator rejected these challenges to the class action in orders dated, February 8, 2021, February 11, 2021, July 18, 2021, and November 9, 2021, which are adopted and incorporated herein. Once again, this Arbitrator rejects Mr. Feldman's and Capstone's challenges and maintains his sole and exclusive jurisdiction over the class.

**15)**    This Arbitrator holds that the Doctors can file their tort claims before this Arbitrator, as Judge Dorfman specifically stated that tort claims were not before him. Therefore, it is error to suggest that in this arbitration the Doctors are seeking to recast their tort claims. And, this Arbitrator previously concluded that "the application of Texas substantive law, particularly In Re Houston Specialty Ins. Co.

---

[20] *See* AAA Commercial Rules, Rule R-7.

[21] The cover page to the FCP Parties' post-hearing brief expressly incorporates and reiterates all previously lodged objections to this Arbitrator's jurisdiction.

569 S.W. 3d 18, 141 (Tex. 2019) is controlling."[22]  To the extent that FCP seek declarations or determinations of nonliability for tort, professional malpractice, statutory violations, or the breach of fiduciary duties, such attempts to recast the Doctors' tort claims are "legally invalid, have 'no basis in the law,' and are dismissed."[23]

**16)**    The claims before this Arbitrator fall squarely within the rule of *in re Houston Specialty Insurance Co.*, as recognized by this Arbitrator's February 8, 2021, Order denying FCP's jurisdictional objections and motion to dismiss this proceeding, which is adopted and incorporated herein.  No circumstances have changed since this Arbitrator entered that ruling that warrant revisiting or altering that ruling.  As such, this Arbitrator can and will exercise his jurisdiction over the Doctors' tort claims.

**17)**    And because FCP has renewed their previously raised objections to this Arbitrator's jurisdiction, this Arbitrator finds it necessary to briefly dispose of these arguments.    First, there is no basis for FCP to suggest that this Arbitrator's jurisdiction has lapsed by operation of the language in the Joint Engagement Agreement requiring arbitrations to be concluded within four months from inception.  This Arbitrator found this provision to be "unconscionable," contrary to

---

[22] *See* Order denying FCP's Jurisdictional Objection and Request for Dismissal (Feb. 8, 2021).
[23] 569 S.W.3d at 141 (citing *Abor v. Black*, 695 S.W.2d 564 (Tex. 1985); *In re Essex Ins. Co.*, 450 S.W.3d 524, 527-28 (Tex. 2014); Tex. R. Civ. P. 91a.1).

due process, and legally unenforceable in the context of these proceedings, and specifically, considering FCP's noncompliance with their discovery obligations.[24]

**18)**    To the extent that FCP continues to challenge this Arbitrator's neutrality, that argument is once again denied.[25]   Again, the Joint Engagement Letter vests this Arbitrator with the sole authority to resolve challenges to his neutrality.   As set forth in this Arbitrator's November 9, 2021, Order denying FCP's Objection to Continued Service of Arbitrator, which is fully adopted and incorporated herein, the objection to this Arbitrator's neutrality is factually and legally meritless.   No additional circumstances have arisen or have been articulated by FCP that would render the challenge to this Arbitrator's neutrality meritorious.

**19)**    This Arbitrator further concludes that he retains sole and exclusive jurisdiction to decide the merits of the claims asserted by the Doctors on behalf of the Class.   Judge Medley originally certified the class via his November 5, 2020, Order, and he issued a supplemental order consisting of a Clause Construction Award and a Class Determination Award on November 16, 2020.   This Arbitrator issued a February 11, 2021, Order, which is adopted and incorporated herein, recognizing that Judge Medley's class-certification order remained in full force and effect in this arbitration.   As discussed in greater detail below, this Arbitrator once

---

[24] *See* Order on Pending Motions to Continue at pp. 4-5 (Mar. 1, 2021).

[25] *See* Order denying FCP's Objection to Continued Service of Arbitrator (Nov. 9, 2021) (adopted and incorporated herein).

again concludes that (1) he has jurisdiction over the class, and (2) class wide relief against Feldman and Capstone is appropriate and authorized by the Joint Engagement Letter.

20)    AAA Commercial Arbitration Rule 7 provides each arbitrator with exclusive authority to determine his or her own jurisdiction.  Correspondingly, no other arbitrator can determine or restrict the jurisdiction of this arbitrator.  Any ruling rendered by any other arbitrator as to this Arbitrator's jurisdiction over the class claims in this proceeding is a nullity, with no legal effect whatsoever.  Consequently, "an arbitrator has no power to overrule a prior decision by another arbitrator."[26]

21)    With respect to the class, this Arbitrator held that the class certified by Judge Medley remains in full force and effect in this arbitration.  This Arbitrator notes that Arbitrator Glasser, in his February 11, 2021 email, noted that he disagreed with Judge Medley's certification decision, distinguished between "[this Arbitrator's] matter" and "my matter," and later noted at a March 1, 2021 hearing that "I can't tell [the Doctors] they can't do something in another arbitration," and "I can't countermand [this Arbitrator's] order."[27]

22)    In a July 27, 2021 Order, Arbitrator Glasser purported to decertify the class in the proceeding before this Arbitrator, stating, "Having here granted [FCP]'s Motion

---

[26] *Graphic Arts Int'l Union v. Haddon Craftsmen, Inc.,* 489 F.Supp. 1088, 1091 (M.D. Pa. 1979).
[27] *See* E-mail, February 11, 2021, at 6:54 p.m; Transcript from March 1, 2021, Hearing, at p. 77.

to Decertify Class Action, it is therefore **ORDERED** that any and all class certifications previously granted by Judge Medley and Arbitrator Jones in any arbitration proceeding are here [sic] **DECERTIFIED** and **VACATED**, as are any orders entered in furtherance of such certifications."[28]   In light of AAA Rule 7, coupled with the above-quoted recognition by Arbitrator Glasser of his inability to intrude upon this arbitration proceeding, this Arbitrator declares that the July 27, 2021 decertification/ vacatur ruling by Arbitrator Glasser constitutes an invalid attack upon this Arbitrator's jurisdiction. This Arbitrator previously held in its Order of June 8, 2021 that "purported Orders from other arbitrators regarding the certified class before this Tribunal, the validity of opt-outs, and/or the procedure for opting-out of the certified class before this Tribunal, are without effect in this Tribunal's arbitration, and not to be complied with."[29]   No ruling by Arbitrator Glasser can impair this Arbitrator's jurisdiction; indeed, Arbitrator Glasser could not rule on any class-related issues once he issued his original order denying the class in his proceeding.[30]

---

[28] *See* Order by Arbitrator Glasser (July 27, 2021) (emphasis in original).

[29] *See* Order regarding (1) Motion for Sanctions for Interference with the Effectuation of this Tribunal's Order regarding Class Notice; and (2) Emergency Motion for Injunctive Relief against Respondents to Protect and Preserve this Tribunal's Jurisdiction (June 8, 2021) (adopted and incorporated herein).

[30] *See Lusardi v. Lechner*, 855 F.2d 1062, 1079 (3d Cir. 1988); *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 170 (3d Cir. 2011) (holding that a district court's injunction was invalid because it "effectively allowed the Court to retain jurisdiction over the claims of former class members despite decertification").

23)    Based on all the foregoing, this Arbitrator holds that he has exclusive jurisdiction to decide the Doctors' affirmative claims and the Class' affirmative claims.

**DOCTORS' FACTUAL ALLEGATIONS**

24)    Dr. Scott Sullivan and Dr. Frank DellaCroce jointly own various business entities relating to their medical practice performing reconstructive surgeries for women with breast cancer.[31]  Together, they own St. Charles Surgical Hospital, LLC, Center for Restorative Breast Surgery, LLC, St. Charles Holdings, LLC, Sigma Delta Billing, LLC, and Sunrise Productions, LLC.  Dr. Sullivan and Dr. DellaCroce also own three captive insurance companies, Cerberus Casualty Corp., Orion Casualty Corp., and Janus Casualty Corp., which insured the Doctors and their business entities.[32]

25)    Captive insurance is a highly specialized area.    Many sophisticated tax practitioners and CPA's lack expertise in captive insurance.[33]    For that reason, captive owners often hire specialized captive managers and captive lawyers to administer their captive insurance companies.  Owning a captive insurance company

---

[31] *See* Transcript, Volume 1, August 3, 2021, at p. 153, line 11 – p. 155, line 14; p. 163, line 13 – p. 164, line 19 (Dr. Scott Sullivan).

[32] Dr. Sullivan owns Cerberus, Dr. DellaCroce owns Orion, and Dr. Sullivan and Dr. DellaCroce jointly own Janus.

[33] *See* Transcript, Volume 17, September 23, 2021, at p. 6667, line 9 – p. 6676, line 25 (Jason Sharp); Transcript, Volume 20, September 29, 2021, at p. 7901, lines 5-13; p. 7902, line 23 – p. 7903, line 8 (David Sherman); Volume 20, September 29, 2021, at p. 8004, lines 2-14; p. 8018, lines 3-20; p. 8141, lines 9-25 (David Kushner).

can provide benefits to the captive insurance company's owners, including beneficial tax treatment.[34]

**26)**    In 2011, Dr. Sullivan and Dr. DellaCroce established their three captive insurance companies, which were domiciled in the Bahamas under the management of Peter Strauss.[35]

**27)**    In 2014, Dr. Sullivan and Dr. DellaCroce became increasingly concerned by heightened risks from the IRS posed by owning offshore captives.[36]  Dr. Sullivan and Dr. DellaCroce expressed these concerns regarding IRS scrutiny to their CPA, David Kushner, who recommended that the Doctors meet with Mr. Feldman.[37]  Mr. Feldman is the sole owner and partner of the Feldman Law Firm.[38]  Mr. Feldman is also the owner, general counsel, and CEO of Capstone, which he ultimately controls.[39]

---

[34] *See, e.g.*, Exhibit J-20, Joint Engagement Letter at SULLIVAN011096 ("The intention is to structure and operate the captive insurer so as to qualify for partial tax-exempt status . . ..").

[35] *See* Transcript, Volume 1, August 3, 2021, at p. 166, line 16 – p. 167, line 9 (Dr. Scott Sullivan).

[36] *See* Transcript, Volume 1, August 3, 2021, at p. 161, lines 14-19; p. 167, line 21 – p. 168, line 23 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1942, lines 4-19 (Dr. Frank DellaCroce).

[37] *See* Transcript, Volume 20, September 29, 2021, at p. 8007, line 23 – p. 8008, line 11 (David Kushner).

[38] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 13-17 (Stewart Feldman); Transcript, Volume 15, August 24, 2021, p. 6018, lines 3-9 (Jeff Carlson).

[39] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 18-19; p. 5117, line 25 – p. 5118, line 5 (Stewart Feldman). Capstone's Vice President and Head of Operations, Daniel Calderon, testified that everyone within the organization reports to Stewart Feldman. *See* Transcript, Volume 16, September 14, 2021, at p. 6330, lines 8-13 (Daniel Calderon). *See* Transcript, Volume 22, October 1, 2021, at p. 8961, line 4 – p. 8692, line 8 (Robert Snyder) (citing, *e.g.*, Exhibit DRS-2003 at Joint-364817, Claims Reserve Payment Agreement at § 2(C)). Twelve other Claims Reserve Payment Agreements are included in Exhibit DRS 2003, which all include the same language at § 2(C) regarding Mr. Feldman's ultimate ownership and control over Capstone.

28)  Capstone and Feldman jointly offer "turnkey" administrative and management services for captive insurance owners, like Dr. Sullivan and Dr. DellaCroce.  The stated purpose of the Feldman / Capstone captive program is to structure and operate captive insurance companies to qualify for partial tax-exempt status under the Internal Revenue Code.[40]  And Feldman and Capstone promoted themselves and their captive program by extolling their numerous successes against the IRS.[41]

29)  Mr. Kushner assisted in setting up a meeting between the Doctors and Feldman and Capstone, which took place on January 19, 2015, in New Orleans, Louisiana.[42]     Dr. Sullivan, Dr. DellaCroce, Mr. Kushner, and the Doctors' healthcare lawyer, David Sherman, attended the meeting on behalf of the Doctors.[43] Feldman and Capstone were represented at the meeting by Mr. Feldman, Stephen Cohen (an attorney with the Feldman Law Firm), and Lance McNeel of Capstone.[44]

---

[40] See Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096; see also Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23; p. 2982, lines 6-9 (Richard Amoroso); Exhibit DRS-2491, Video of Mr. Feldman's August 6, 2015, Speech (Mr. Feldman declaring, "Really, what we're talking about is God's work here. We're talking about reducing federal income taxes.").

[41] See Transcript, Volume 10, August 19, 2021, at p. 4211, lines 13 – 24 (Professor Beckett Cantley) ("So, yeah, Feldman and Capstone would kind of meet the textbook definition of promoters. You know, what they do is sell a tax product, and just like, you know, other promotors, they always talk about how they are different and superior and a better work product, et cetera. So, yeah, they fit the definition of 6700 promoter under the Code.").

[42] See Transcript, Volume 20, September 29, 2021, at p. 8008, line 25 – p. 8009, line 10 (David Kushner).

[43] See Transcript, Volume 1, August 3, 2021, at p. 169, lines 6-19 (Dr. Scott Sullivan); Volume 20, September 29, 2021, at p. 8009, lines 11-17 (David Kushner). The Hospital's COO, Cheri Saltaformaggio, and the Hospital's CFO, Sarah Underwood, also attended the meeting.

[44] See Transcript, Volume 1, August 3, 2021, at p. 169, lines 6-19 (Dr. Scott Sullivan); Volume 20, September 29, 2021, at p. 8009, lines 11-17 (David Kushner).

30)    As stated above, captive insurance is a highly specialized area of law.  Neither

Mr. Sherman nor Mr. Kushner had expertise regarding captive insurance.[45] Mr.

Sherman's practice is primarily corporate law, with a focus on health care; his

limited tax practice primarily deals with estate planning.[46]  Mr. Kushner deals with

the IRS "a couple times a year at most" regarding the inception of an audit, and he

has only been involved in one case in U.S. Tax Court – nearly 40 years ago.[47]

Because of Mr. Sherman's and Mr. Kushner's lack of expertise in captive insurance,

it was necessary for the Doctors to rely upon experts in the captive insurance field,

like Mr. Feldman and Capstone.

31)    At or around the time of the January 2015 meeting, Mr. Feldman provided the

Doctors a compilation of marketing materials and information regarding Feldman

and Capstone.[48]   Mr. Feldman helped write these marketing materials,[49] which

boasted that the Feldman and Capstone team had over 125 years of federal and state

income, estate and gift tax, and corporate, regulatory and insurance experiences.[50]

The Feldman/Capstone marketing materials discussed Mr. Feldman's "30 + year"

experience as a tax attorney and Capstone's formation "in excess of 120 captive

---

[45] *See* Transcript, Volume 20, September 29, 2021, at p. 7902, line 23 – p. 7903, line 8 (David Sherman); Volume 20, September 29, 2021, at p. 8004, lines 2-14 (David Kushner).

[46] *See* Transcript, Volume 20, September 29, 2021, at p. 7901, lines 5-13 (David Sherman).

[47] *See* Transcript, Volume 20, September 29, 2021, at p. 8018, lines 3-20 (David Kushner).

[48] *See* Transcript, Volume 13, August 22, 2021, at p. 5139, line 22 – p. 5140, line 20 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials).

[49] *See* Transcript, Volume 13, August 22, 2021, at p. 5141, line 20 – p. 5142, line 4 (Stewart Feldman).

[50] *See* Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman).

insurance companies" since 1998.[51]   The Feldman/Capstone marketing materials discussed the "significant insurance and tax benefits of captives for owners of middle-market businesses," stating that the "mechanics of alternative risk planning are straightforward with property and casualty insurance premiums being 100% deductible to the insured as its ordinary and necessary business expense."[52]   The Feldman/Capstone marketing materials stated, "Statutory authority plus various IRS pronouncement and interpretive court decisions make this an ideal time for closely held businesses to consider a captive."[53]   And the Feldman/Capstone marketing materials stated: "It is crucial that [the captives] are managed properly in both the short and long term.   That is why having the appropriate professionals involved when considering a captive is paramount."[54]

**32)**     During the January 2015 meeting, Dr. Sullivan, and Dr. DellaCroce allegedly conveyed their concerns regarding IRS scrutiny.[55]   In response, Mr. Feldman touted his spotless record before the IRS, with more than fifty successful outcomes.[56]   Mr.

---

[51] *See* Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman).

[52] *See* Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001738 – 39).

[53] *See* Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001739).

[54] *See* Transcript, Volume 13, August 22, 2021, at p. 5150, line 11 – p. 5151, line 6. (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001739).

[55] *See* Transcript, Volume 1, August 3, 2021, at p. 171, lines 5-23 (Dr. Scott Sullivan).

[56] *See* Transcript, Volume 1, August 3, 2021, at p. 178, line 19 – p. 179, line 1 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1930, line 1 – p. 1931, line 6 (Dr. Frank DellaCroce); Volume 20, September 29, 2021, at p. 7910, lines 8-17 (David Sherman); Volume 20, September 29, 2021, at p. 8014, lines 10-19 (David Kushner).

Feldman did not disclose any facts regarding IRS adverse findings against the Feldman/Capstone captive program at the January 2015 meeting.[57]

33)    At the January 2015 meeting, the Doctors allegedly also raised concerns regarding being able to exit the captive space fast.[58]  In response, Mr. Feldman led the Doctors to believe that winding down their captives "was a quick and easy process."[59]

34)    Following the January 2015 meeting, the Doctors engaged Mr. Feldman and Capstone. The Doctors signed an initial retention letter on March 3, 2015, hiring Feldman to conduct a "Health Check-Up" – an analysis of the Doctors' existing captive program under Mr. Strauss.[60]  Mr. Feldman and Capstone sent a preliminary draft of the Health Check-Up to the Doctors on May 29, 2015,[61] and sent the final version on August 4, 2015.[62]

35)    The Health Check-Up criticized Mr. Strauss's stewardship of the Doctors' captives.[63]  The Health Check-Up warned the Doctors: (1) that, under Mr. Strauss,

---

[57] See, e.g., Transcript, Volume 1, August 3, 2015, at p. 178, line 19 – p. 179, line 17 (Dr. Scott Sullivan).

[58] See Transcript, Volume 1, August 3, 2021, at p. 168, lines 12-23 (Dr. Scott Sullivan); Transcript, Volume 3, August 5, 2021, at p. 1056, lines 10-18 (Dr. Scott Sullivan).

[59] See Transcript, Volume 3, August 5, 2021, at p. 1059, lines 2-11 (Dr. Scott Sullivan) (citing Exhibit FC-261, E-mail from Dr. Scott Sullivan (Oct. 31, 2019)); see also Exhibit J-88, E-mail from Dr. Scott Sullivan at SULLIVAN002920 (Dec. 5, 2019) ("After all, the multiple times we asked about closing the captive out when you were soliciting our business, you made it sound as easy as hitting the sell button on my E*TRADE account.").

[60] See Exhibit DRS-491, Letter from David Kushner enclosing signed Engagement Memorandum, March 3, 2015; see also Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

[61] See Exhibit J-12, Preliminary Draft of Health Check-Up (May 29, 2015).

[62] See Exhibit J-16, E-mail from Capstone's Lance McNeil (Aug. 4, 2015) (transmitting the Health Check-Up Report (Aug. 3, 2015)).

[63] See Transcript, Volume 1, August 3, 2015, at p. 175, line 19 – p. 178, line 18 (Dr. Scott Sullivan) (citing Exhibit J-16, Health Check-Up Report at JOINT-002718 (Aug. 3, 2015)).

there was no "'captain of the ship' that takes responsibility for the planning's design, implementation and operation," (2) about "unnecessary risks associated with operating in a fringe domicile like the Bahamas," and (3) about "questions as to risk distribution" involved in Mr. Strauss's captive program.[64]

36)    Risk distribution is essential for a captive insurance company to qualify for tax beneficial treatment from the IRS.[65]  As stated by Mr. Feldman in the Health Check-Up: "Courts have stated that for a true insurance arrangement to exist, there must be . . . risk distribution."[66]  Mr. Feldman stated further that, "[t]o achieve risk distribution, the insurance company must distribute its risks among a pool of risks."[67]

37)    The "pool of risks" used by Mr. Feldman and Capstone was PoolRe.[68] PoolRe is a mere instrumentality used by Mr. Feldman and Capstone for the purpose of satisfying the IRS's risk distribution requirement.   Mr. Feldman caused the incorporation of PoolRe.[69]  PoolRe receives no business except that given to it by Feldman and Capstone.[70] PoolRe does not have any employees or an office.[71]

---

[64] *See* Exhibit J-16, Health Check-Up Report at JOINT-002718 (Aug. 3, 2015).

[65]  *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.

[66] *See* Exhibit J-16, Health Check-Up Report at JOINT-002721 (Aug. 3, 2015).

[67] *See* Exhibit J-16, Health Check-Up Report at JOINT-002721 (Aug. 3, 2015).

[68] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

[69] *See* Transcript, Volume 11, August 20, 2021, at p. 4421, line 16 – p. 4422, line 5 (Stewart Feldman) ("And the firm formed PoolRe").

[70] *See* Exhibit J-20 at SULLIVAN011104, Exhibit E to Joint Engagement Letter; *see also* Transcript, Volume 22, October 1, 2021, at p. 9123, lines 11-19 (Jeff Carlson) ("Only clients of both the [Feldman Law] Firm and Capstone . . . may participate in" PoolRe's risk pools.").

[71] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 22-24 (Stewart Feldman); Transcript Volume 22, October 1, 2021, at p. 8840, lines 13-15 (Robert Snyder); Transcript, Volume 15, August 24, 2021, at p. 6026, line 24 – p. 6027, line 12 (Jeff Carlson).

Capstone is the manager and handles the day-to-day operations of PoolRe.[72]  And Capstone exercises significant decision-making authority on behalf of PoolRe "without even consulting or conferring with anyone from PoolRe."[73]

**38)**    The strategy recommended by Feldman/Capstone to achieve adequate risk distribution for the Doctors' captives, so that they would qualify for tax beneficial treatment with the IRS, was to have the Doctors' captives participate in the PoolRe risk pool.[74]  While soliciting the Doctors' business, Mr. Feldman touted "how good PoolRe was and how confident he was" that PoolRe qualified as a more structurally sound reinsurance risk pool than Mr. Strauss's risk pool.[75]  Mr. Feldman did not disclose to the Doctors any IRS findings regarding PoolRe's inability to satisfy risk distribution for Capstone-administered captives or that Mr. Feldman was using PoolRe's risk pool to provide himself and his related entities with their primary malpractice and legal expense insurance coverages.[76]

**39)**    Based on Mr. Feldman's and Capstone's representations concerning their successes against the IRS, the strength of PoolRe's risk pools, and criticisms of Mr. Strauss's captive program, the Doctors engaged Mr. Feldman and Capstone to

---

[72] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 19-21 (Stewart Feldman); Transcript, Volume 22, October 1, 2021, at p. 8840, lines 16-18 (Robert Snyder).

[73] *See* Transcript, Volume 22, October 1, 2021, at p. 8947, line 25 – p. 8948, line 12 (Robert Snyder).

[74] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

[75] *See* Transcript, Volume 1, August 3, 2015, at p. 179, lines 8-17 (Dr. Scott Sullivan).

[76] *See* Transcript, Volume 1, August 3, 2021, at p. 184, line 23 – p. 186, line 19; p. 240, lines 17 – 25; p. 243, line 22 – p. 245, line 15 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1933, lines 16-20; p. 1938, line 19 – p. 1940, line 1; p. 1957, line 5 – p. 1958, line 10; p. 1978, line 25 – p. 1980, line 24 (Dr. Frank DellaCroce).

administer their captives and agreed to participate in PoolRe's risk pools.[77]  The Doctors signed the Joint Engagement Letter with Feldman and Capstone on December 7, 2015.[78]  The stated purpose of the Joint Engagement Letter was for Feldman and Capstone to structure and operate the Doctors' captive insurance companies so as to qualify for partial tax-exempt status under the Internal Revenue Code.[79]  In order to obtain tax-exempt status, the Doctors had to participate in PoolRe, and Feldman and Capstone both "expected" and "encouraged" the Doctors to participate in PoolRe.[80]

**40)**    The Doctors assert that at the time they signed the Joint Engagement Letter or agreed to participate in PoolRe, the Feldman / Capstone captive program, PoolRe's risk pools and Mr. Feldman personally were under extreme scrutiny from the IRS, as discussed below.  The Doctors were also unaware that they would be reinsuring the professional liabilities, errors & omissions, and legal expenses of their own lawyer, Mr. Feldman, and their own captive manager, Capstone, by participating in PoolRe's risk pools, as also discussed below.  These material facts were concealed

---

[77] *See* Transcript, Volume 1, August 3, 2015, at p. 185, line 11 – p. 186, line 19 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1927, line 12 – p. 1932, line 16 (Dr. Frank DellaCroce).

[78] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011078.

[79] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096; *see also* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23; p. 2982, lines 6-9 (Richard Amoroso); Exhibit DRS-2491, Video of Mr. Feldman's August 6, 2015, Speech (Mr. Feldman declaring, "Really, what we're talking about is God's work here. We're talking about reducing federal income taxes.").

[80] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN 011071 ("It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement"); at SULLIVAN011104 ("Capstone encourages participation in . . . PoolRe").

by Mr. Feldman and Capstone when soliciting business from the Doctors. Had these material facts been fully disclosed, the Doctors would not have engaged Mr. Feldman or Capstone.[81]

**41)** The Doctor's argue that Mr. Feldman and Capstone failed to make disclosures of material facts. They argue that Mr. Feldman and Capstone understood that the captive insurance work they performed "creat[ed] unusual exposures" for Mr. Feldman and Capstone.[82] That Mr. Feldman and Capstone protected against these exposures by including in the risk pool insurance policies covering Mr. Feldman's and Capstone's lawyers' professional liabilities, errors & omissions, and legal expense liabilities as primary coverage for Mr. Feldman and the Feldman Law Firm.

**42)** That Mr. Feldman's and Capstone's policies included in the risk pool exposed their clients to substantial risks and liabilities, especially considering their vexatious history of litigiousness against their clients,[83] and that Mr. Feldman's litigious tendencies were well documented.

**43)** The Doctors further argue that a Business Operations Summary of Mr. Feldman and Capstone, prepared by Mr. Feldman and Capstone, further establishes the degree and likelihood of exposure from Feldman's and Capstone's policies

---

[81] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

[82] *See* Exhibit DRS 2681 at FCP_0063500, A.M.Y.'s Business Operations Summary at p. 5.

[83] See Transcript, Volume 8, August 17, 2021, at p. 3000, line 15 – p. 3003, line 4 (Richard Amoroso), *In re Matthew John Date.* 20-878, 2020 WL 7059872 at *6 (S.D. Tex. Dec. 1, 2020); Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman).

included in the risk pool.[84]   That this Business Operations Summary noted that obtaining coverage for Mr. Feldman's lawyers professional liabilities through conventional insurance markets "would be very difficult" considering the volume of "past claims . . . and related breach of fiduciary claims" involving Mr. Feldman and Capstone.[85]

**44)**   The Doctors argue that each of the policies in the pool should state:

> **THE COVERAGES AFFORDED BY THIS POLICY ARE EXCESS OVER, AND SHALL NOT CONTIRBUTE WITH, ANY OTHER VALID AND COLLECTIBLE INSURANCE POLICY ISSUED BY ANY OTHER INSURER, BE IT STATED AS PRIMARY, CONTRIBUTORY, EXCESS, CONTINGENT, OR OTHERWISE . . . THE COVERAGES AFFORDED HEREIN WILL DROP DOWN AND PROVIDE COVERAGE ONLY IF THERE ARE NO OTHER VALID AND COLLECTIBLE INSURANCE POLICIES IN FORCE TO WHICH A CLAIM WOULD APPLY, SUBJECT TO THIS POLICY'S TERMS AND LIMITS.[86]**

**45)**   The Doctors further allege that Mr. Feldman does not carry lawyers' professional liability insurance through conventional markets.[87]  Thus, the fact that Mr. Feldman did not have any other insurance covering its lawyers' professional

---

[84] Capstone's Head of Operations, Daniel Calderon, testified that somebody at A.M.Y. or Feldman would, in the ordinary course of business, review the Business Operations Summary and sign off on it for accuracy. *See* Transcript, Volume 16, September 14, 2021, at p. 6281, lines 7-16 (Daniel Calderon).

[85] *See* Exhibit DRS-1856 at FCP_0063500, Business Operations Summary of Feldman and Capstone at p. 5 ("The Law Firm does not carry lawyers' professional liability through conventional insurance markets . . . . Because of past claims . . . and related breach of fiduciary claims, obtaining coverage would be very difficult.").

[86] *See, e.g.,* Exhibit DRS-2109, A.M.Y.'s 2019 Lawyers Professional Liability Insurance Policy at Joint-331738 (emphasis in original).

[87] *See* Transcript, Volume 14, August 23, 2021, at p. 5346 line 6 – p.5357, line 11 (Stewart Feldman). "There is no dispute" that the A.M.Y. policies included in the risk pool provided the "primary malpractice coverage for [the] Feldman Law Firm."[87] *See* Transcript, Volume 11, August 20, 2021, at p. 4545, lines 10-14 (Representation by FCP's counsel during testimony of Stewart Feldman).

liabilities increased the likelihood of exposure and amount of risks to Mr. Feldman's clients participating in the pool from Mr. Feldman's professional lawyers' liabilities.[88]

**46)**    That the Business Operations Summary stated that Feldman and Capstone had incurred "20± million" in "[i]nsured and uninsured losses" and that lawsuits had been filed against Feldman and Capstone "with very significant litigation expenses incurred."[89]  The Business Operations Summary further noted that Mr. Feldman and Capstone "ha[d] a policy of collecting [their] outstanding billings and in the past ha[d] demonstrated a willingness to sue clients for outstanding fees, which leads to the usual counterclaims against the Law Firm and Capstone and their principals."[90] From September 22, 2018 to July 22, 2020 alone, Mr. Feldman or Capstone commenced at least eight separate arbitrations against fifty of their own clients participating in the Feldman/Capstone captive program.[91]  At least twenty-nine of

---

[88] *See* Transcript, Volume 6, August 9, 2021, at p. 2338, line 15 – p. 2340, line 22 (Richard Amoroso).

[89] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 5, FCP_0063500.

[90]   *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at pp. 5-6, FCP_0063500 to 01.  Capstone's Head of Operations, Daniel Calderon, testified that somebody at A.M.Y. or Feldman would, in the ordinary course of business, review the Business Operations Summary and sign off on it for accuracy. *See* Transcript, Volume 16, September 14, 2021, at p. 6281, lines 7-16 (Daniel Calderon).

[91] *See* Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman) (citing Exhibit DRS-1462, Capstone's Arbitration Demand against (1) Nestor Martinez; (2) NM Health Services-North, P.A.; (3) Pain & Recovery Clinic of North Houston; and (4) Caguas Casualty Corp. (Sept. 22, 2018); Exhibit DRS-1478, Capstone's Arbitration Demand against (5) James McAda; (6) Sherri Mills; (7) McAda Drilling Fluids, Inc.; (8) McAda Valve and Supply, Inc.; (9) Fluids Casualty Corp.; and (10) McAda Irrevocable Family Trust (June 28, 2019); Exhibit DRS-2671, Capstone's Arbitration Demand against (11) Frank J. Reyna; (12) Patricia Reyna; (13) Enerset Electric Ltd.; and (14) Intersect Casualty Corp. (Aug. 9, 2019);  Exhibit DRS-1424, Capstone's Arbitration Demand against (15) Dr. Houng Le; (16) Dr. Minh Nguyen; (17) 1960 Family Practice, P.A.; (18) Le Nguyen Family, L.P.; (19) Family Practice Holdings, LLC; (20) and (21) Family Casualty Corp. (Jan. 10, 2020); Exhibit DRS-1423, Capstone's Arbitration Demand against (22) Thomas Bunkley; (23) Matthew Keegan; (24) Caprock Land Company, LLC; (25) Pieta Insurance Company; (26) and Plains Insurance Company (Jan. 22, 2020); Exhibit DRS-1425, Capstone's Arbitration Demand against (27) Jonathan Tratt; (28) Tratt Properties, LLC; (29) Logistics Holdings, LLC;

these clients responded to being sued by Mr. Feldman or Capstone by filing their own counterclaims or demands against Mr. Feldman and Capstone.[92] That Mr. Feldman and Capstone then submitted twenty-three separate insurance claims to PoolRe relating to these arbitrations and lawsuits, thereby subjecting their clients to a situation in which the clients will have to pay (or have already paid) for Mr. Feldman's and Capstone's legal expenses in fighting against their clients.[93] That thirteen of these insurance claims submitted by Mr. Feldman and Capstone to PoolRe remain open and pending through the arbitration hearing due to an intentional decision by Mr. Feldman, Capstone, and PoolRe to delay resolution of these open claims.[94]

---

(30) Logistics Casualty Corp.; (31) Elwood Logistics Center, LLC; (32) JIM Holdings, LLC; (33) and JIM Amazon, LLC (Mar. 6, 2020); Exhibit DRS-1460, Capstone's Arbitration Demand against (34) Dr. Scott Sullivan; (35) Dr. DellaCroce; (36) St. Charles Surgical Hospital, LLC; (37) St. Charles Holdings, LLC; (38) Center for Restorative Breast Surgery, LLC; (39) Sigma Delta Billing, LLC; (40) Cerberus Insurance Corp.; (41) Janus Insurance Corp.; (42) and Orion Insurance Corp. (May 7, 2020); Exhibit DRS-2677, Capstone's Arbitration Demand against (43) John Caldwell, (44) BLSR Operating, Ltd.; (45) BLSR Management Corp.; (46) RBC Interests, Ltd.; (47) RBC Energy Services, LLC; (48) Petroguard Property & Casualty Insurance Corporation; (49) Tammie Caldwell; and (50) Caldwell Investment, Ltd. (July 22, 2020).

[92] *See* Exhibit DRS-1458, Martinez Parties' Counter Petition in Arbitration (Dec. 7, 2018); Exhibit DRS-1482, McAda Parties' Original Complaint (July 15, 2019); Exhibit DRS-2672, Reyna Parties' Answer and Counterclaim; Exhibit DRS-1428, The Caprock Parties' Answer, Counterclaim, and Third-Party Claim (Mar. 4, 2020); Exhibit DRS-1816, Doctors' Arbitration Demand against Capstone and Feldman (Dec. 23, 2020).

[93] *See* Transcript, Volume 11, August 20, 2021, at p. 4318, line 7 – p. 4320, line 1 (citing Exhibit DRS-2000, 2019 Claims Summary Chart); Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart A. Feldman (June 6, 2020, 17:17 CST); Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[94] *See* Transcript Volume 16, September 14, 2021, at p. 6174, line 1 – p. 6177, line 25; p. 6314, lines 16-22; p. 6436, line 7 – p. 6439, line 1 (Daniel Calderon). In addition to the nine claims that Mr. Calderon confirmed were still open, FCP's Post-Hearing Brief identifies that the four claims relating to the Family Parties and Logistics Parties "are still pending." *See* Volume 16, September 14, 2021, at p. 6270 lines 12-20 (Daniel Calderon); FCP's Post-Hearing Brief at p. 204, n. 53 ("In fact, these claims are still pending because these two captives renewed the 2019 dispute by joining the SCP class action.")

**47)**    That the totality of evidence and testimony in the record leads this Arbitrator to find that Mr. Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities were substantial exposures and risks that Mr. Feldman and Capstone should have fully disclosed to their clients.

**48)**    That since as early as 2010, Mr. Feldman and Capstone put their Lawyers Professional Liability, Errors & Omissions, and Legal Expense Reimbursement policies in PoolRe's risk pools.[95]    That Mr. Feldman and Capstone placed these policies in the risk pool through an undisclosed captive insurance company, A.M.Y. Property & Casualty Insurance Corporation ("A.M.Y."), which is owned and controlled by Mr. Feldman.[96]

**49)**    The Doctors assert that "There is no dispute" that the A.M.Y. policies included in the risk pool provided the "primary malpractice coverage for [the] Feldman Law Firm."[97]    That Mr. Feldman did not disclose to his clients that his clients were primarily insuring the significant malpractice liabilities of Mr. Feldman. Nor did Mr. Feldman or Capstone disclose to their clients that their clients were the

---

[95] *See* Exhibit DRS-1512 at pp. 5-8, FCP's Joint Objections and Responses to Respondents' First Set of Discovery Requests at Answers to Requests for Admission Nos. 1-12 (Jan. 27, 2021); Transcript, Volume 13, August 22, 2021, at p. 5127, lines 8-18; p. 5383, lines 14-23 (Stewart Feldman); Transcript, Volume 7, August 16, 2021, at p. 2624, lines 10-24 (Richard Amoroso).

[96] *See* Transcript, Volume 11, August 20, 2021, at p. 4426, lines 1-10 (Stewart Feldman); Transcript, Volume 13, August 22, 2021, at p. 5123, line 21-24 (Stewart Feldman); *see also* Transcript, Volume 23, October 2, 2021, at p. 9237, line 6 – p. 9240, line 21 (Jeff Carlson); Transcript, Volume 16, September 14, 2021, at p. 6437, line 10 – p. 6439, line 1 (Daniel Calderon).

[97] *See* Transcript, Volume 11, August 20, 2021, at p. 4545, lines 10-14 (Representation by FCP's counsel during examination of Stewart Feldman).

primary insurers of Mr. Feldman's and Capstone's errors & omissions and legal expenses even in lawsuits or arbitrations against those clients.[98]

**50)**    That considering Mr. Feldman's and Capstone's "uninsurable risk" and litigious tendencies,[99] Mr. Feldman's and Capstone's undisclosed insurance policies included in PoolRe's risk pool, coupled with Mr. Feldman's and Capstone's control over PoolRe provided a mechanism to foist substantial portions of Mr. Feldman's and Capstone's litigation expenses and professional liabilities onto their own, unknowing clients.

**51)**    That the coverages provided by PoolRe participants to Mr. Feldman and Capstone under the A.M.Y. Lawyers Professional Liability policies, Errors & Omissions policies, and Legal Expense Reimbursement policies were extremely broad.[100]  These policies covered "all **Damages** [Mr. Feldman and Capstone] become legally obligated to pay and **Defense Expense** as a result of any **Claim** first made against [them] during the policy period."[101]  These policies further covered almost

---

[98] Feldman and Capstone argue that they maintain primary errors & omissions insurance policies through conventional markets. *See* FCP's Post-Hearing Brief at p. 156. However, Feldman and Capstone did not introduce or identify any such insurance policy at the final hearing, even after Arbitrators instructed FCP's counsel to confirm whether a primary E&O policy existed or had been produced. *See* Transcript, Volume 14, p. p. 5349, line 11 – p. 5362, line 23 (Representations of FCP's counsel during examination of Stewart Feldman).  Feldman and Capstone's failure to produce or introduce into the record any commercial, primary E&O policy precludes them from now arguing that such a policy exists.

[99] *See* Exhibit DRS-1856 at FCP_0063500, Business Operations Summary of Feldman and Capstone at p. 5; *see also* Transcript, Volume 8, August 17, 2021, at p. 3000, line 15 – p. 3003, line 4 (Richard Amoroso); Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman).

[100] *See* Exhibit DRS-2108, A.M.Y.'s Errors & Omissions Policy; Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy; Exhibit DRS-2110, A.M.Y.'s Legal Expense Reimbursement Policy.

[101] *See, e.g.,* Exhibit DRS- 2108, A.M.Y.'s Errors & Omissions Policy at § 1, Joint-331513 (emphasis in original); Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy at § 1, Joint-331740 (emphasis in original).

every expense that Mr. Feldman or Capstone might incur in lawsuits or arbitrations against their clients, including "Defense Expense," which was defined as:[102]

> **Defense Expense** means the expenses directly allocated to a particular **Claim** including but not limited to: all governmental, administrative agency, alternative dispute resolution, arbitration, and court costs, fees, and expenses; fees, costs, and expenses for legal service, whether by outside or our staff counsel; photographic costs; materials and labor; experts' fees or costs; costs of copies of documents or records; costs of depositions and court reporters or recorded statements and similar fees; medical costs containment expenses; cost of autopsies; costs of medical examinations of a claimant to determine liability, or the degree of permanency or length of disability; and all other compensation, fees, costs, and expenses chargeable to the investigation or defense of **Claims** or the investigation or prosecution of fraud or criminal conduct involving a **Claim**.

52)    The Doctors allege that they did not know that they were insuring Mr. Feldman's and Capstone's professional liabilities, errors & omissions, and legal expenses. That Dr. Sullivan testified that Feldman and Capstone never disclosed that if the Doctors sued Feldman or Capstone for malpractice, that Feldman and Capstone could submit the claim to the pool and make the Doctors pay for part of Feldman's and Capstone's defense of the Doctors' claims against Feldman and Capstone.[103] Dr. DellaCroce also testified that he was unaware that he would be insuring Feldman and Capstone's malpractice and legal expense liabilities.[104]

---

[102] *See*, Exhibit DRS- 2108, A.M.Y.'s Errors & Omissions Policy at § 3(H), Joint-331533; Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy at § 3(H), Joint-331760.

[103] *See* Transcript, Volume 1, August 3, 2021, at p. 240, lines 17 – 25; p. 243, line 22 – p. 245, line 15 (Dr. Scott Sullivan).

[104] *See* Transcript, Volume 5, August 7, 2021, at p. 1978, line 25 – p. 1980, line 24; p. 1957, line 5 – p. 1958, line 10 (Dr. Frank DellaCroce).

53)    This Arbitrator Holds that the Doctors were unaware that their lawyer, Mr. Feldman, and captive manager, Capstone, had subjected them "to a situation where if [the Doctors] were sued by Mr. Feldman and his companies, [the Doctors] would end up being responsible for paying for [Mr. Feldman's and Capstone's] legal fees and other associated costs with those pursuits."[105]

54)    The Doctors also argue that Mr. Feldman's longstanding ethics advisor and expert, James McCormack, conceded that Mr. Feldman and Capstone did not disclose to their clients that the clients were reinsuring Mr. Feldman and Capstone's malpractice liabilities and legal expenses:[106]

> Arbitrator Kutcher:
> Are you saying the disclosures regarding the fact that the captive, AMY, wrote the primary malpractice for Mr. Feldman and in the event, Feldman was sued for malpractice, that AMY could be called to bear on that and, as a result, perhaps the other captives as well within the pool was adequately disclosed in J-20?
>
> The Witness:
> I think not in that detail at all.
>
> Arbitrator Kutcher:
> Okay. All right. It doesn't say anywhere in there –
>
> The Witness:
> It doesn't mention AMY. It doesn't mention –
>
> Arbitrator Kutcher:

---

[105] *See, e.g.*, Transcript, Volume 5, August 7, 2021, at p. 1912, lines 13-21 (Dr. Frank DellaCroce).

[106] *See* Transcript, Volume 19, September 28, 2021, at p. 7630, line 1 – p. 7633, line 4 (James McCormack) (emphasis added).

Does it even mention Mr. Feldman is the primary malpractice carriers in the pool – the primary malpractice carriers?

The Witness:
The joint engagement agreement does not say that.

Arbitrator Baker:
--part of my legal expenses. That's I think the question Arbitrator Kutcher is asking you. Are you saying that you think what was disclosed in this engagement letter is sufficient to advise the clients of that?

The Witness:
It doesn't say that.

55)    This Arbitrator finds that the inclusion of Mr. Feldman's and Capstone's professional malpractice liabilities, errors & omissions, and legal expenses liabilities in the risk pool was material information that needed to be disclosed by Mr. Feldman and Capstone to their clients.  The Arbitrator finds further that Mr. Feldman and Capstone did not disclose to their clients that the clients were insuring Mr. Feldman's and Capstone's professional malpractice liabilities, errors & omissions, and legal expenses liabilities.

56)    The Doctors also argue that Exhibit E to the Engagement Letter does not disclose that Mr. Feldman's and Capstone's clients were reinsuring Mr. Feldman's and Capstone's professional liabilities, errors & omissions and legal expenses. The Doctors argue that Mr. Feldman and Capstone rely upon a single sentence in Exhibit E to the Joint Engagement Letter to suggest that they made adequate disclosure to

45

their clients that their clients would be insuring Mr. Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.[107] This sentence in Exhibit E states, "Note that among the several hundred policies in the pool are policies issued to Capstone _or_ the Firm (_or_ their affiliates) and that their affiliated captives **_may_** participate in the pool."[108] This sentence regarding the mere possibility that a captive affiliated with Mr. Feldman or Capstone or their affiliates might participate in the pool is not adequate disclosure under applicable law. It does not suggest or state the fact that Mr. Feldman and Capstone were in fact getting their clients to be their primary malpractice insurers.

**57)**   They suggest that this sentence regarding the possibility that a captive affiliated with Mr. Feldman or Capstone (or an affiliate of Mr. Feldman or Capstone) might participate in the risk pool was misleading and incomplete for numerous reasons.

**58)**   The Doctors further submit that they had no reason to suspect that Mr. Feldman's and Capstone's primary malpractice insurance coverages were in the risk pools. The Doctors allege that Mr. Feldman and Capstone misrepresented to their clients, the Doctors and Class Members, that the PoolRe risk pool consisted of

---

[107] This sentence regarding the possibility that a captive affiliated with Capstone and Feldman may participate in the pool was contained in Exhibit E to certain Joint Engagement Letters and sent as part of a yearly insurance binder _after_ coverages had already been bound. Neither disclosure was adequate. _See, e.g._, Transcript Volume 6, August 9, 2021, at p. 2447, line 14 – p. 2448, line 18 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, at p. 2508, line 22 – p. 2509, line 7 (Richard Amoroso).

[108] _See_ Exhibit J-20, Joint Engagement Letter at SULLIVAN011104 (emphasis added).

"generally similar policies covering generally similar risks."[109]   That Mr. Feldman and Capstone misrepresented that "all of these [policies in the pool] were going to be homogenous."[110]   But the risks in the pool were not similar or homogenous.[111] The risks insured by the A.M.Y. policies were far more substantial, and presented substantially greater exposure to the risk pool participants, than the risks put in the pool by the Doctors' captives.   That Mr. Feldman and Capstone's primary malpractice and legal expense liability policies in the risk pools exposed pool participants to significant risks far greater than any risks put into the pool by the Doctors' captives.   The magnitude of the risks and exposures that Mr. Feldman and Capstone put into the pool were outlined in the "Business Operations Summary" prepared by Mr. Feldman and Capstone, which provides in pertinent part:

> The Law Firm does not carry lawyers' professional liability through conventional insurance markets, instead placing this coverage through a captive where it can obtain more stable pricing and coverage terms and have better control over its losses.   Because of past claims . . . and related breach of fiduciary claims, obtaining coverage would be very difficult... The Law Firm and Capstone have a policy of collecting its outstanding billings and in the past have demonstrated a willingness to sue clients for outstanding fees, which leads to the usual counterclaims against the Law Firm and Capstone and their principals.   Also, because the Law Firm's client base consists of highly successful businesspeople, these clients have ready access to other counsel and are not reluctant to utilize them.[112]

---

[109] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.

[110] *See* Transcript, Volume 3, August 5, 2021, at p. 1232, lines 21-23 (Dr. Scott Sullivan).

[111] *See* Transcript, Volume 7, August 16, 2021, at p. 2491, line 18 – p. 2494, line 13 (Richard Amoroso).

[112] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at pp. 5-6, FCP_0063500 to 01.  Capstone's Head of Operations, Daniel Calderon, testified that somebody at A.M.Y. or Feldman would, in the ordinary course of

47

*    *    *

The entities and their beneficial owners have been involved in multiple lawsuits over the years for various causes of actions. Insured and uninsured losses on both sides of the controversies have been paid in the amount of $20± million. Lawsuits have been filed against the insureds with very significant litigation expenses incurred. The captive work by the Law Firm and Capstone is especially sophisticated and involves sensitive tax and corporate matters, creating unusual exposures.[113]

*    *    *

The Law Firm along with the related businesses are strong proponents of arbitration which in the past has led to extensive litigation just to be able to exercise such arbitration rights.[114]

*    *    *

Directors and Officers liability is a significant risk exposure as Stewart A. Feldman and Marla B. Matz serve as directors and officers of several organizations, and alter ego, [Uniform Fraudulent Transfer Act], and similar claims have been brought and litigated in the past. There are also significant fiduciary concerns with regard to D&O liability given the number of related business operations.[115]

59)    That the Doctors maintained professional liability insurance through

LAMMICO, along with the state-operated patient compensation fund.[116]    Under

---

business, review the Business Operations Summary and sign off on it for accuracy. *See* Transcript, Volume 16, September 14, 2021, at p. 6281, lines 7-16 (Daniel Calderon).

[113] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 5, FCP_0063500.

[114] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 6, FCP_0063501.

[115] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 8, FCP_0063503.

[116] *See* Transcript, Volume 2, August 4, 2021, at p. 648, line 25 – p. 649, line 17 (Dr. Scott Sullivan). LAMMICO is the Louisiana Medical Malpractice Insurance Company.

Louisiana law, medical malpractice claims are subject to a $500,000 cap.[117]  The Doctors' LAMMICO policy and the state compensation fund cover that $500,000 liability.[118]  The Health Check-Up issued by Mr. Feldman acknowledged that the Doctors had this malpractice coverage through LAMMICO and the patient compensation fund.[119]

**60)**  That Mr. Feldman and Capstone did not disclose material information to the Doctors concerning the IRS's adverse determinations against Capstone-administered captives before the Joint Engagement Letter was executed, including the following facts:

> ➢ In July 2013, the IRS determined that Reserve Mechanical, a captive insurer structured by Mr. Feldman and administered by Capstone, failed to qualify as an insurance company.[120]
> ➢ That Mr. Feldman knew in 2013 that:
> ➢
> > o  the IRS found that Reserve Mechanical was not an insurance company;[121]
> >
> > o  the IRS had determined that Reserve lacked the essential element of risk distribution.[122]

---

[117] LA. REV. STAT. § 40:1231.2(B)(1) ("The total amount recoverable for all malpractice claims for injuries to or death of a patient . . . shall not exceed five hundred thousand dollars plus interest and cost.").

[118] *See* Transcript, Volume 2, August 4, 2021, at p. 648, line 25 – p. 649, line 8 (Dr. Scott Sullivan).

[119] *See* Exhibit DRS-77, Preliminary Draft of Health Check-Up, May 29, 2015, at SULLIVAN 015793.  *See also* Transcript, Volume 14, August 23, 2021, at p. 5377, line 8 – p. 5378, line 1 (Stewart Feldman).

[120] *See* Exhibit DRS-2715, IRS Examination Report of Reserve Mechanical, July 24, 2013, at Joint-340830.

[121] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[122] *See* Transcript, Volume 21, September 30, 2021, at p. 8555, lines 14-18 (Steven Cohen).

    o  the IRS had determined that the PoolRe pooling arrangement did not provide sufficient risk distribution for Reserve to be treated as an insurance company.[123]

➢ That Reserve's 2013 Protest to the IRS audit Examination Report, which Mr. Cohen, a Feldman lawyer helped prepare, acknowledged that the IRS audit (1) found that Reserve was not an insurance company and (2) suggested that PoolRe was not insurance.[124]

➢ In addition to the IRS audit of Reserve, the IRS issued adverse audit Examination Reports with respect to six other Capstone-administered captives.[125]   Each of these other adverse audit Examination Reports were issued before the Doctors signed the 2015 Joint Engagement Letter.   Those captives stipulated to be bound by Reserve Mechanical's final resolution.[126]   The entire Feldman / Capstone captive insurance program was thus jeopardized by the ongoing IRS scrutiny.

➢ As of the December 2015 signing of the Joint Engagement Letter, Mr. Feldman and Capstone failed to disclose to the Doctors any of the substance of the Reserve Mechanical audit or the other six adverse IRS audits.[127]

**61)**   That the stated purpose of the Feldman / Capstone captive insurance program was to structure and operate the captive insurer so as to qualify for partial tax-exempt status under Internal Revenue Code § 831(b), as stated on the first page of Exhibit

---

[123] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

[124] *See* Exhibit DRS-2715, July 24, 2013, IRS Examination Report; Exhibit DRS-1874, Letter to IRS, September 3, 2013.

[125] *See* Transcript, Volume 20, September 30, 2021, at p. 8521, line 15 – p. 8522, line 15 (Steven Cohen); Transcript, Volume 9, August 18, 2021, at p. 3423, lines 5-23 (Lyle Press).  *See also* Exhibit DRS-2598, IRS audit report of Columbia, September 3, 2013; Exhibit DRS-2604, IRS audit report of Marylebone, March 14, 2014; Exhibit DRS-2606, IRS audit report for Performance, July 11, 2013; Exhibit DRS-2609, IRS audit report for Restoration, May 9, 2013; Exhibit DRS-2612, IRS audit report for Security, June 19, 2014; Exhibit DRS-2617, IRS audit report for Treadwell, June 10, 2013.   Each of these IRS audits of Capstone-administered captives were issued prior to the December 2015 execution of the Joint Engagement Letter.

[126] *See* Transcript, Volume 21, September 30, 2021, at p. 8521, line 15 – p. 8523, line 15 (Steven Cohen).

[127] *See* Transcript, Volume 1, August 3, 2021, at p. 180, line 22 – p. 181, line 3; p. 182, line 13 – p. 184, line 22 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1935, line 2 – p. 1936, line 10; p. 1939, line 15 – p. 1940, line 1; p. 1951, line 4 – p. 1952, line 2 (Dr. Frank DellaCroce).

C to the Joint Engagement Letter.[128]  A captive insurer must be acting as an insurance company to qualify for favorable tax treatment.[129]  If a determination is made that a captive is not an insurance company, then it would not be entitled to tax benefits under Section 831(b).[130]  Having a certain percentage of unrelated (third-party) insurance business is required in order to satisfy the criterion that there be "risk distribution" for insurance to exist, as also stated in the Joint Engagement Letter.[131] In most cases, Capstone-administered captives need to participate in a risk pool to satisfy the IRS's risk distribution requirement.[132]

62)    The strategy recommended by Feldman/Capstone to achieve adequate risk distribution of the Doctors' captives, so that they would qualify as an insurance company in the eyes of the IRS, was to have the captives participate in the PoolRe

---

[128] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.  Exhibit C to the Joint Engagement Letter (*i.e.*, the disclosure form) states, "The intention is to structure and operate the captive insurer so as to qualify for partial **tax-exempt** status ...."  *See* Exhibit J-20, Joint Engagement Letter, at Exhibit C, SULLIVAN 011096.  Feldman and Capstone had long recognized that the favorable tax treatment was a primary inducement for their clientele to engage in captive insurance transactions.  Richard Amoroso highlighted multiple provisions in the Joint Engagement Letter where Feldman and Capstone emphasized the tax advantages of the turnkey Capstone program. *See* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23 (Richard Amoroso).  To achieve this tax-exempt status, Feldman and Capstone "encourage[d]" and "expected" their clients to participate in the PoolRe risk pool.  *See* Exhibit J-20, at SULLIVAN 011071 ("It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement", *id.* at SULLIVAN 011104 ("Capstone encourages participation in . . . PoolRe".).  Mr. Feldman advised the Doctors that it was "ill-advised" to decline participating in PoolRe and that in order to obtain beneficial tax treatment, the Doctors "must distribute [their] risks among a pool of risks."  *See* Transcript, Volume 1, August 3, 2021, at p. 252, lines 1-10 (Dr. Scott Sullivan).  *See* Exhibit J-12, Memorandum from Stewart Feldman, May 29, 2015, at SULLIVAN 015783.  And Mr. Feldman declared in an August 6, 2015, speech, "Really, what we're talking about is God's work here.  We're talking about reducing federal income taxes." *See* Exhibit DRS-2491, Video, August 6, 2015, speech; *see also* Transcript, Volume 8, August 17, 2021, at p. 2982, lines 6-9 (video of Mr. Feldman played during examination of Richard Amoroso).

[129] *See* Transcript, Volume 21, September 30, 2021, at p. 8471, lines 9-20 (Steven Cohen).

[130] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011098: Transcript, Volume 21, September 30, 2021, at p. 8514, lines 17-23 (Steven Cohen).

[131] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.

[132] *See* Transcript, Volume 21, September 30, 2021, at p. 8502, line 22 through p. 8503, line 4 (Steven Cohen).

risk pool.[133]  Likewise, Capstone-administered captive, Reserve Mechanical, also relied on PoolRe for adequate risk distribution.[134]

**63)**    In the July 2013 IRS Examination Report of Reserve Mechanical, the IRS found that Reserve Mechanical was not an insurance company.[135]  As acknowledged by Steve Cohen, it was clear in July 2013 that the IRS had determined that Reserve Mechanical lacked the essential element of risk distribution.[136]

**64)**    Mr. Cohen was a lawyer at the Feldman Law Firm who participated in the IRS audit of Reserve Mechanical, which began in 2010.[137]  Mr. Cohen was involved with the IRS audit of Reserve Mechanical from its beginning in 2010.  Mr. Cohen helped respond to the Information Document Requests that initiated the IRS audit of Reserve Mechanical in 2010,[138] providing the PoolRe risk pool documents to the IRS to attempt to demonstrate that Reserve Mechanical had sufficient risk distribution.[139]

**65)**    As of September 2013, Mr. Cohen knew that the IRS had determined that the PoolRe pooling arrangement did not provide sufficient risk distribution for Reserve Mechanical to be treated as an insurance company.[140]  Mr. Cohen, and the Feldman Law Firm, knew in 2013 that the IRS had rejected the Capstone-administered

---

[133] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

[134] *See* Transcript, Volume 21, September 30, 2021, at p. 8502, line 22 – p. 8503, line 4 (Steven Cohen).

[135] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[136] *See* Transcript, Volume 21, September 30, 2021, at p. 8555, lines 14-18 (Steven Cohen).

[137] *See* Transcript, Volume 21, September 30, 2021, at p. 8530, line 12 – p. 8531, line 23 (Steven Cohen).

[138] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

[139] *See* Transcript, Volume 21, September 30, 2021, at p. 8542, lines 16-24 (Steven Cohen).

[140] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

captive's tax position and found that the Capstone-administered captive (which relied on PoolRe for risk distribution) lacked adequate risk distribution. But Mr. Feldman and Capstone failed to disclose these important points, or any of the substance of the adverse Reserve Mechanical audit, to the Doctors in, or before they signed, the Joint Engagement Letter.

**66)** Both Dr. Sullivan and Dr. DellaCroce testified that they would not have agreed to sign the Joint Engagement Letter had Feldman and Capstone fully disclosed the nature of the ongoing IRS scrutiny of the Capstone insurance program, including the PoolRe risk pool.[141]

**67)** The Doctors further suggest that Mr. Feldman and Capstone argue that Exhibit C to the Joint Engagement Letter adequately disclosed to the Doctors the adverse IRS audits of Capstone-administered captives. This Arbitrator disagrees.

**68)** The Doctors submit that nothing in Exhibit C to the Joint Engagement Letter disclosed the substance of the IRS audit of Reserve Mechanical, as concluded by the Doctors' IRS expert, Lyle Press.[142] Mr. Cohen identified Subpart D of Exhibit C to the Joint Engagement as an apparent anonymous reference to Reserve Mechanical, but he conceded that **"the firm did not say anything in this section about the specific issues that were involved in the Reserve Mechanical audit."**[143] Mr.

---

[141] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 18-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, lines 6-18 (Dr. Frank DellaCroce).

[142] *See* Transcript, Volume 9, August 18, 2021, at p. 3448, lines 3-13 (Lyle Press).

[143] *See* Transcript, Volume 21, September 30, 2021, at p. 8359, line 12 – p. 8360, line 2 (Steven Cohen).

Cohen never offered any cogent description of any location within Exhibit C disclosing the substance of the adverse Reserve Mechanical audit.

**69)**   The Doctors argue that Mr. Cohen helped prepare the September 2013 Protest letter that responded to the July 2013 IRS Examination Report of Reserve Mechanical.[144]   Mr. Cohen had reviewed the 43-page July 2013 IRS Examination Report of Reserve Mechanical, which included extensive descriptions of the risk distribution legal requirements and the PoolRe pooling arrangement.[145]   In its assessment of PoolRe in the July 2013 Examination Report, the IRS found: "[I]t is highly likely that the entire pool, which is insured by PoolRe and reinsured on a quota share basis with each of the pool participants, is primarily comprised of direct contracts that the Service would deem not to be insurance in the commonly accepted sense."[146]

**70)**   They argue that although Mr. Cohen dismissed this IRS finding with respect to PoolRe as a "garbage" argument, he acknowledged that it appeared in the IRS July 2013 Examination Report.[147]   Mr. Cohen admitted that, as of 2013, the IRS had identified the issue that it is highly likely that the entire pool would not be deemed to be insurance in the commonly accepted sense.[148]

---

[144] *See* Transcript, Volume 21, September 30, 2021, at p. 8572, line 10 – p. 8573, line 1 (Steven Cohen).

[145] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[146] *See* Exhibit DRS 1873, July 2013 IRS Examination Report of Reserve, at Joint-340824; Transcript, Volume 21, September 30, 2021, at p. 8554, lines 7-22 (Steven Cohen).

[147] *See* Transcript, Volume 21, September 30, 2021, at p. 8566, line 16 – p. 8567 line 14 (Steven Cohen).

[148] *See* Transcript, Volume 21, September 30, 2021, at p. 8562, lines 4-14 (Steven Cohen).

**71)**    The September 2013 Protest letter submitted by Reserve Mechanical in response to the July 2013 IRS Examination Report, which Mr. Cohen helped prepare, recapitulated these points by the IRS.  Page 13 restated the IRS's findings that the IRS suggested that the PoolRe quota share reinsurance program is not insurance:[149]

> ***Quota Share Reinsurance Program*** – The Service suggest that the quota share reinsurance program is not insurance in sating the following:
>
> Therefore, it is highly likely that the entire pool, which is insured by PoolRe and reinsured on a quota share basis with each of the pool participants, is primarily comprised of direct written contracts that the Service would deem not to be insurance in the commonly accepted sense. *See Examination Report at Page 28.*

Page 5 of the September 2013 Protest also re-stated the IRS's findings: "The Examination Report concludes that Reserve [Mechanical] was not an insurance company."[150]

**72)**    The Doctors also allege Mr. Feldman failed to disclose the IRS's scrutiny of Capstone-administered captives and the PoolRe risk pool during the January 19, 2015, meeting with the Doctors,[151] or in subsequent communications with their health-care attorney, Mr. Sherman, or their CPA, Mr. Kushner.   Mr. Sherman and

---

[149] *See* Exhibit DRS-2715, July 24, 2013, IRS Examination Report; Exhibit DRS-1874, Protest Letter to IRS, September 3, 2013.

[150] *See* Exhibit DRS-2715, July 24, 2013, IRS Examination Report; Exhibit DRS-1874, Protest Letter to IRS, September 3, 2013.

[151] *See* Transcript, Volume 1, August 3, 2021, at p. 184, lines 13-22 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 19 – p. 1942, line 3 (Dr. Frank DellaCroce).

Mr. Kushner each confirmed that Mr. Feldman never disclosed the substantive findings by the IRS that Reserve Mechanical failed to satisfy the IRS's risk distribution requirement notwithstanding participation in PoolRe.[152]   Mr. Kushner testified that he asked Mr. Feldman about any ongoing issues with the IRS, and "the impression that [Mr. Kushner] was left with was, [Feldman's] undefeated and [Feldman's] got whatever issues are out there under control."[153]

## FCP's FACTUAL ALLEGATIONS

73)    The FCP parties have also submitted argument to this arbitrator, noting that "The office of pleadings is to define the issues at trial," *Murray v. OA Express, Inc.*, 630 S.W.2d 633, 636 (Tex. 1982), and to "give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). Adequate notice is a guaranteed right to litigants in court and arbitration. *See* U.S. Const amend. XIV § 1; Tex. Const.art I, § 13, 19; *Ewing v. Act Catastrophe-Tex. L.C.*, 375 S.W.3d 545, 551 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("Parties in an arbitration proceeding have due process rights to notice and a meaningful opportunity to be heard.") A plaintiff is "bound by their pleadings [and] can recover, if at all, only on the cause of action pleaded by him." *Safety Cas. Co. v. Wright*, 160 S.W.2d 238, 245 (Tex. 1942). "A party may not

---

[152] *See* Transcript, Volume 20, September 29, 2021, at p. 7909, lines 8-23; p. 7910, lines 8-17 (David Sherman); Volume 20, September 29, 2021, at p. 8014, line 10 – p. 8015, line 18 (David Sherman).

[153] *See* Transcript, Volume 20, September 29, 2021, at p. 8017, line 19 - p. 8018, line 2 (David Kushner).

obtain a judgment based on a theory not pled." *Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 863 (Tex. App.—Dallas 2003, pet. denied); *see also Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983) ("a party may not be granted relief in the absence of pleadings to support that relief"); TR Vol. 3 at 1128-1130 (the parties andarbitrators recognizing that requesting relief not pled requires, at a minimum, leave to supplement the live pleadings). The AAA's Commercial Arbitration Rules, which apply here, contain a similar  notice pleading requirement in Rule R-4(e)(iv), which states that a party's arbitration demand must contain "a statement setting forth the nature of the claim including the relief sought and the amountinvolved." *See also* AAA Rules R-6(b) and R-32(a).

**74)**    The Feldman and Capstone Parties argue that they have a right to rely on SCP's pleadings as setting the boundaries for the issues to be tried. *Westinghouse Elec. Corp. v. Pierce*, 153 Tex. 527, 531, 271 S.W.2d 422, 424 (1954) ("The defendants had a right to assume that the case as made by the pleadings and testimony was the case and the only case, they were called upon to defend and to prepare their defense accordingly.").

**75)**    The FCP parties argue that on January 20, 2021, the Doctors submitted their Amended Demand for Arbitration and Statementof Claims ("Amended Demand") to this Arbitrator, and that pleading statement defines the Doctors claims pending before this Arbitrator. They argue that the Amended Demand articulates no

allegations, claims, or requests for relief except for those articulated within the incorporated demands. *See, generally, id*. The Amended Demand adopted the seven previously filed arbitration filings with the Arbitrator "as if fully pleaded herein." Amended Demand at 4-5. The Amended Demand also "adopt[ed] and incorporate[d] as if filly pleaded herein" all arbitration pleadings submitted to Judge Lloyd Medley. *Id*. at 5-6. According to SCP, the "Class Action claims pleaded before Judge Medley are properly before this Tribunal." *Id*. at 7.

76)    The Amended Demand also "adopt[ed] and incorporate[d] as if fully pleaded herein" the arbitration demand originally submitted to Judge Carolyn Gill-Jefferson on November 10, 2020. *Id*. at 8. That the Doctors explain in the Amended Demand that they "pleaded RICO claims and claims for [] anticipatory repudiation and rejection of the escrow agreement proposed to [FCP]" in the Gill- Jefferson demand, which is "properly before this Tribunal." *Id*.

77)    FCP argues that the Doctors' malpractice claims are **not** pending before this Arbitrator. *Id*. at 9. That as the Doctors explain, the "Amended Demand" leaves Arbitrator Kutcher with Claimants' malpractice claims, and it does not in any way divest Arbitrator Kutcher of jurisdiction." *Id*. Only "to the extent that Arbitrator Kutcher does not render an award on any or all of Claimants' malpractice claims, Claimants request that this Tribunal . . . decide those claims." *Id*. This Arbitrator notes that Arbitrator Kutcher intends to issue an award. However, this Arbitrator also finds

that the Amended Demand places all of the claims of the Doctors in this arbitration squarely before him for consideration, including the Doctors' malpractice claims.

**78)** Considering the Demand as Amended, the claims and requests for relief originally submitted to Judge Medley, Judge Gill-Jefferson and this Arbitrator are the claims and requests for relief—as defined in the latest-in-time live pleadings—to be resolved by this Arbitrator in this final award.

**79)** FCP also argues that the amended pleadings do not articulate claims on behalf of the class. This assertion is in error, as the Doctors amended their claim before Judge Medley specifically requesting class certification. Thus, as previously stated, the class issue is properly before this Arbitrator, and the class claims are before this Arbitrator.

**80)** That the Gill-Jefferson claims and requests for relief largely mirror the Medley claims and requests, with a few notable differences or additions. First, the Gill-Jefferson claims and requests are not class claims. *See* Amended Demand at 5-8 (differentiating between the Medley class claimsand the Gill-Jefferson claims); *id* at Ex. Q (original Gill-Jefferson demand, which is not a class demand). Second, the Gill-Jefferson demand articulates a RICO claim. *See id*; *see also* TR Vol. 4at 1399 (RICO is not part of the class). Third, the Gill-Jefferson demand articulates an anticipatoryrepudiation claim. *See* Amended Demand Ex. Q. And fourth, the Gill-Jefferson demand alleges "PoolRe, Capstone, and Feldman are conspiring and have

conspired to prevent the [SCP captives] from winding down by improperly submitting and/or accepting claims that are not properly part of PoolRe's 2019 risk pool." *Id.* at ¶ 50.

**81)**    Again, I reiterate that all claims filed before Judge Medley and Judge Gill-Jefferson are each properly before this Arbitrator.

**82)**    The FCP parties' recitation of the facts in this arbitration are consistent with that of the Doctors through the period of January 2015.

**83)**    That by January 2015, the Doctors were concerned about increased IRS scrutiny of captive insurance companies. *Id.*; TR Vol. 5 at 1926. Accordingly, the Doctors, along with their attorney David Sherman and their CPA David Kushner, met with Mr. Feldman in New Orleans to discuss the Doctors' ongoing captive operations and structure. EX J-115 at ¶ 11; TR Vol. 5 at 2042-43. This meeting led to the Doctors eventually engaging the Feldman and Capstone Parties to conduct a "health check-up" of the Doctors' captive operations with Mr. Strauss. EX J-115 at ¶ 13; TR Vol. 2 at 554-56; EXs FC37.2, FC-38, FC-40, FC-41, FC-44.

**84)**    The Feldman and Capstone Parties provided their health check-up report to the Doctors, Mr. Sherman, and Mr. Kushner in the summer of 2015. EX FC-60. The Doctors discussed the health check-up with Mr. Sherman and Mr. Kushner, who in turn offered their own analyses of the report. *See, e.g.*, EXs FC-56, FC-58, FC-68, FC-472. Mr. Sherman and Mr. Kushner interfaced with the Feldman and

Capstone Parties on the Doctors. *See, e.g.*, EX J-115 at ¶¶ 13, 24.[8]

**85)**    That the Doctors contemplated using the health check-up to negotiate lower rates with Mr. Strauss. EX FC-70. Ultimately, however, the Doctors decided to transition administration of their captives from Mr. Strauss to Capstone. EX J-115 at ¶ 15. Part of this transition included re- domiciling Orion, Janus, and Cerberus as Delaware captives. *See* EX J-20. At some point in mid-2015, the Feldman and Capstone Parties provided the Doctors, Mr. Sherman, and Mr. Kushner a draft engagement letter (which included a Capstone Services Agreement). EX J-115 at ¶ 13. Thereafter, Mr. Feldman communicated with Mr. Sherman and Mr. Kushner regarding the contents of the engagement letter. *Id.* During these ongoing discussions, Mr. Sherman, Mr. Kushner, and Mr. Feldman discussed an article highlighting IRS scrutiny of, and accordant risks with, captive insurance—an article that Mr. Sherman shared with the group. EXs J-140, J-17. Mr. Feldman and Mr. Kushner also discussed the fact that an IRS agent had conducted an on-site review of approximately 135 banker boxes of documents related to the Feldman and Capstone Parties' captive operations. EX J-17. At the Doctors' urging, the parties negotiated a five-year term to the engagement letter in exchange for lower quarterly fees. EX J- 115 at ¶ 13.

**86)**    On December 7, 2015, the Doctors executed the engagement letter with the Feldman and Capstone Parties (the "2015 Engagement Letter"). *Id.* at ¶ 14. The

2015 Engagement Letter incorporates the Capstone Services Agreement. *Id.* at ¶ 18. As determined by Judge Dorfman, the parties to the 2015 Engagement Letter are sophisticated and intelligent, possessing similar levels of sophistication, and were represented by counsel (and certified public accountants) of their choosing both in negotiating the terms of the engagements over many months and throughout therelationship. *Id.* at ¶¶ 29-30. Following the execution of the 2015 Engagement Letter, the Feldman and Capstone Parties began the process of re-domiciling the Doctors' captives in Delaware and took over, from Mr. Strauss, the administration of the captives.

**87)**    The 2015 Engagement Letter, including the Capstone Services Agreement, provides that Capstone will provide certain turn-key services to the Doctors in exchange for a quarterly fee. EXJ-20. The Doctors paid all fees to Capstone, which in turn paid The Feldman Law Firm LLP for services performed. *Id.* The Doctors never paid fees directly to the Feldman Parties pursuant to the2015 Engagement Letter. *Id.* That after execution of the 2015 Engagement Letter in December 2015, the re-domiciled Orion, Janus, Cerberus captives (the Doctors' captives") issued insurance policies to various of the Doctors' other entities for 2016. *See, e.g.,* EXs FC-374.1, FC-376.2; TR Vol. 2 at 656. The Doctors' captives issued insurance policies to various of the Doctors' other entities for 2017 and 2018, as well. *See, e.g.,* EXs FC-376.2, FC-376.6, FC-374.7. For 2016, 2017, and 2018, the Doctors

elected to have their captives participate in PoolRe's reinsurance risk pools and executed the respective Stop Loss Reinsurance Agreements and Quota Share Reinsurance Policies. *See, e.g.*, EXs FC-376.2; FC-238; TR Vol. 2 at 810.

**88)** That in June 2018, the United States Tax Court issued its decision in *Reserve Mechanical Corp. v. Commissioner of Internal Revenue*, T.C. Memo 2018-86 (2018). EX J-53. Reserve Mechanical was a client of the Feldman and Capstone Parties. *Id.* The *Reserve Mechanical* case concerned Reserve's captive operations for 2008, 2009, and 2010. *Id.* Reserve Mechanical's captive was an offshore captive, not a domestically domiciled captive. *Id.* The Tax Court determined that, for the years in question, Reserve's captive operations did not constitute real insurance for the purposes of taking tax deductions. *Id.*

**89)** That one day after the Tax Court issued its decision, Capstone alerted all clients—including theDoctors and Mr. Sherman and Mr. Kushner—of the adverse opinion. EXs J-54, FC-187. Dr. Sullivan, in an email to Dr. DellaCroce, Mr. Sherman, and Mr. Kushner, stated the decision "was not good for captives." EX FC-189. Mr. Feldman and Capstone shared additional follow-up emailsand had additional follow-up conversations with their clients and agents, including Mr. Sherman and Mr. Kushner, throughout 2018. *See, e.g.*, EX FC-192, FC-193, FC-194, FC-207, FC-208, FC-212.

**90)** That in December 2018, the Doctors decided to continue their captive

operations for 2019. *See, e.g.*, EXs FC-215, FC-215.2. The Doctors' respective issued numerous insurance policies for 2019 to various of the Doctors' entities. *See, e.g.*, FC-374.11, 376.2. The Doctors captives also elected to participate in the 2019 PoolRe reinsurance pool and executed the respective 2019 Stop Loss Reinsurance Agreements and Quota Share Reinsurance Policies with PoolRe. *See, e.g.*, EXs J-72,FC 367.4, FC-367.6, FC 370.12.

**91)**    That in October 2019, Dr. Sullivan—and his agents, Mr. Sherman and Mr. Kushner— communicated to Mr. Feldman (a) Dr. Sullivan's desire to immediately liquidate and wind down the Doctors' captives, and (b) his intention not to renew the 2015 Engagement Letter when it expired.EX J-115 at ¶¶ 21-24; State Court Lawsuit at ¶¶ 30-32. According to the Doctors, they had become disenchanted with the notion of captive insurance and concluded that the costs of continuing their captive operations outweighed the benefits. EX J-115 at ¶ 21.

**92)**    That in an October 21, 2019, e-mail, Mr. Feldman identified an eight-step process that would allow for the Doctors captives to be liquidated by or around August 2021—the year-end termination date in the 2015 Engagement Letter. *Id.* at ¶ 23; EX J-86. Afterwards, Mr. Kushner on the Doctors' behalf reiterated the demand to "wind down" the Doctors captives by the end of 2019. EX J-115 at ¶24.

**93)**    That in December 2019, Dr. Sullivan expressed his frustration with Mr. Feldman in an email, stating that "He's fired." EX FC-268. Later in December

2019, Dr. Sullivan wrote another email expressing his frustration and telling Mr. Feldman that "[i]t seems to me you are conflicted, pick a side." EX J-91. In that same email, Dr. Sullivan stated that he had been conducting his own research into whether a captive can be closed whenever and found that it can be closed whenever, "some easily and some less." *Id*. Dr. Sullivan did not mention *Reserve Mechanical* or tax risks in any of these emails. The Doctors never introduced any documentary evidence indicating that Reserve Mechanical or tax risks were an issue prior to May 2020, when the Doctors raised those issues in arbitration pleadings—including their answering statement in the Dorfman proceeding.

**94)**    That on January 5, 2020, the Feldman Parties formally withdrew from their representation of the Doctors captives because of the deterioration of the relationship between Dr. Sullivan and Mr. Feldman. EX FC-275. In an April 2020 email, Dr. Sullivan indicates that he (and Dr. DellaCroce)had fired Capstone as insurance manager. EX FC-299. Dr. Sullivan, in that email, outlined his frustration that the Doctors captives were not wound down by the end of 2019 as requested. *Id*. Dr. Sullivan did not mention, reference, or allude to any tax risks or *Reserve Mechanical*.

## THE DORFMAN ARBITRATION

**95)**    The Capstone Parties and PoolRe filed an arbitration demand on May 7, 2020, with ConflictResolution Services, PLLC against the Doctors, the Doctors' captives,

and various of the Doctors' entities—*i.e.*, the "Doctors" parties in this arbitration. The Hon. (Ret.) Grant Dorfman was appointed arbitrator. The Feldman Law Firm LLP and Stewart Feldman intervened on June 1, 2020.

**96)**     Among the disputes submitted to Judge Dorfman were: "whether there is a clear contractual(or other) basis that required the Capstone Parties [*Note*: Judge Dorfman defined "Capstone Parties" in his final award to mean the Feldman, Capstone, and PoolRe parties collectively.] to honor and/or use due diligence to effectuate Respondents' request for wind down and liquidation at a time more or less of Respondents' own choosing" and "whether the Capstone Parties were obligated to pursue such methods [*i.e.*, novation, commutation, or escrow] when [the Doctors] requested an early dissolution for the [Doctors' captives]." EX J-115 at ¶¶ 34, 40.

**97)**     The Doctors filed an answering statement. They pled as defenses, *inter alia*, "misrepresentation fraud, fraudulent inducement, bad faith, and vices of consent"; that FCP's "decisions and acts that put [them] in a conflict situation with respect to their other clients" did not justify any of FCP's acts or omissions vis-à-vis SCP; and that the "2015 Engagement Letter precludes the relief requested by [FCP]." Their Answer Statement in Dorfman Arbitration at 15-16. The Doctors also defensively pled and raised many more issues that FCP argues are the same as in this Arbitration. On November 9, 2020, Judge Dorfman issued his final award. EX

J-115.

**98)**  On January 11, 2021, Judge Scot Dollinger of the 189th Judicial District Court for Harris County, Texas confirmed the final award as a Final Judgment of the Court. *Id.* Judge Dorfman found and concluded, *inter alia*, that: "neither the contractual agreements nor the duty of utmost good faith compel the Capstone Parties to effectuate" an early or immediate wind down and liquidation of the SCP captives; "contrary to [the Doctors'] insistence that Capstone's relationship to them was quasi-fiduciary in nature," Capstone did not owe fiduciary duties to the Doctors; "Capstone has the right to liquidate the [Doctors' captives] in a necessary, orderly, and prudent manner . . ."; " [the Doctors] do not have the right under the parties' agreements to demand that "FCP" cause the immediate or expedited wind-up/liquidation of the [Doctors' captives]"; and "the Capstone Parties have no obligation to remake or renegotiate the agreements among their joint clients in an attempt to liquidate their captive insurance companies on a schedule not in compliance with the parties' agreements." *Id.* at ¶¶ 38-39, 41-46.

**99)**  FCP argues that it is undisputed that in a prior arbitration involving the same parties as those participating in this arbitration, Judge Grant Dorfman issued a final arbitration award on November 9, 2020, which was confirmed as a final judgment (now not even appealable) by a Texas state district court on January 11, 2021. *See* EX. J-115. The Dorfman arbitration involved the same nucleus of operative facts

and claims as this arbitration. Both arbitrations involve the same material facts, the same parties, the same transactional documents, the same years, the same PoolRe reinsurance riskpool, the same complaints, the same *Reserve Mechanical* decision, the same fact witnesses, the same expert witnesses, and many of the same lawyers. Thus, the claims and disputes the Doctors raise in this arbitration arise out of the same transaction or occurrence as the claims, disputes, and defenses that arose in the Dorfman arbitration.

**100)**    As a result, *res judicata* applies to this arbitration and bars relitigation (sic) in "a second action by the parties and their privies not only on matters actually litigated, but also on causes of action or defenses which arise out of the same subject matter, and which might have been litigated in the first suit." *Texas Water Rights Comm'n v. Crow Iron Works,* 582 S.W.2d 768, 771-72 (Tex. 1979); *see also Cooper v. City of Dallas*, 2008 WL 3380554, at *5 (N.D. Tex. Aug. 11, 2008), *aff'd*, 42F. App'x 891 (5th Cir. 2010) (same quotation); *Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 58 (Tex. 2006) ("*res judicata*, or claim preclusion, bars a second action by parties and their privies on matters actually litigated in a previous suit, as well as claims 'which, through the exercise of diligence, *could* have been litigated in a prior suit.'") (Quoting *Getty Oil Co. v. Ins. Co. of N. Am.,* 845 S.W.2d 794, 799 (Tex. 1992)).

**101)** They further argue that according to Texas' single action rule, the Doctors

could have, and should have, brought in the Dorfman arbitration all the claims they assert now, and their failure to do so proves fatal and preclusive. *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992) (orig. proceeding); *Pustejovsky v. Rapid-Am. Corp.*, 35 S.W.3d 643, 646–47 (Tex. 2000). Despite the Doctors' contentions  that the lack of a *procedural* rule in the AAA's Commercial Arbitration Rules proves fatal to FCP's *res judicata* defense, it does not. Texas has applied the *substantive* rule of *res judicata* long before the rules of civil procedure took effect for actions in state court in 1941, which required a defendant to bring a compulsory counterclaim. *Compare Foster v. Wells*, 4 Tex. 101 (1849) *with* TEX. R. CIV. P. 814 (TRCP took effect on September 1, 1941). And, as a matter of black-letter Texas *substantive* law, procedural rules do not override substantive rights, such as *res judicata*. TEX. GOV'T CODE § 22.004(a) (procedural "rules may not abridge, enlarge, or modify the substantive rights of a litigant"); TEX. R. CIV. P. 815 ("These rules shall not be construed to enlarge or diminish any substantive rights or obligations of any party to any civil action."). In addition, Texas substantive law applies *res judicata* to defenses where no "compulsory defense" rule or requirement exists at all. *See Mercer v. Rubey*, 108 S.W.2d 677, 680 (Tex. Civ. App. – Fort Worth 1937, writ ref'd); *see also Barr v. Resolution Tr. Corp.*, 837 S.W.2d 627, 630-31 (Tex. 1992). Accordingly, the lack of a AAA Commercial Arbitration Rule mandating compulsory counterclaims is irrelevant.

**102)** That this Arbitrator should apply *res judicata* and find that after reviewing and considering the facts the Doctors alleged and what events gave rise to the Dorfman arbitration, and not the Doctors' strategic or procedural decision-making in choosing another form in which to file and/or pursue claims, is what matters for purposes of *res judicata*. *See W. Dow Hamm III Corp. v. Millennium Income Fund, L.L.C.*, 237 S.W.3d 745, 753-57 (Tex. App. Houston [1st Dist.] 2007, no pet.). That These facts and events are the same facts and events that underlie the Doctors' claims here, and the Doctors had the opportunity to file and should have filed these claims in the Dorfman arbitration. Thus, *res judicata* precludes their relitigation (sic) in this arbitration. *Texas Water Rights Comm'n*, 582 S.W.2d at 771-72; *Cooper*, 2008 WL 3380554, at *5; *Hallco Tex., Inc.*, 221 S.W.3d at 58; *Getty Oil Co.,* 845 S.W.2d at 799.

**103)** This Arbitrator disagrees. As previously stated herein, the issue of resolution of tort claims was not submitted to Judge Dorfman in his arbitration as specifically noted by Judge Dorfman. Thus, these tort claims were properly presented to Judge Medley, Judge Gill-Jefferson and to this Arbitrator.

## RESOLUTION OF THE DOCTORS' CLAIMS

**104)** The Doctors argue that Mr. Feldman and Capstone did not disclose that the Doctors were reinsuring Mr. Feldman's and Capstone's professional liabilities, errors & omissions, and legal expenses when they signed the Engagement letter. The

FCP parties argue that Exhibit E of the Engagement letter clearly makes all necessary disclosures to the Doctors that the Doctors may be insuring Mr. Feld and Capstone. This Arbitrator disagrees and holds that the disclosures in Exhibit E were inadequate to put the doctors and any other parties on notice that engaging with Mr. Feldman and Capstone would result in insuring Mr. Feldman and Capstone for their professional liabilities, errors & omissions, and legal expenses.

**105)** This Arbitrator agrees with the Doctors that Mr. Feldman and Capstone understood that the captive insurance work they performed "creat[ed] unusual exposures" for Mr. Feldman and Capstone,[154] and that Mr. Feldman and Capstone protected against these exposures by including in the risk pool insurance policies covering Mr. Feldman's and Capstone's lawyers' professional liabilities, errors & omissions, and legal expense liabilities.

**106)** I find that Mr. Feldman's and Capstone's policies included in the risk pool exposed their clients to substantial risks and liabilities, especially considering their vexatious history of litigiousness against their clients.[155] I find that Mr. Feldman's litigious tendencies were documented by Mr. Feldman himself. And I find that a Business Operations Summary of Mr. Feldman and Capstone, prepared by Mr. Feldman and Capstone, further establishes the degree and likelihood of exposure

---

[154] *See* Exhibit DRS 2681 at FCP_0063500, A.M.Y.'s Business Operations Summary at p. 5.

[155] See Transcript, Volume 8, August 17, 2021, at p. 3000, line 15 – p. 3003, line 4 (Richard Amoroso), *In re Matthew John Date.* 20-878, 2020 WL 7059872 at *6 (S.D. Tex. Dec. 1, 2020); Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman).

from Mr. Feldman's and Capstone's policies included in the risk pool.[156]  This Business Operations Summary noted that obtaining coverage for Mr. Feldman's lawyers professional liabilities through conventional insurance markets "would be very difficult" considering the volume of "past claims . . . and related breach of fiduciary claims" involving Mr. Feldman and Capstone.[157]

**107)**  The record clearly established that Mr. Feldman does not carry lawyers' professional liability insurance through conventional markets.[158] Thus, the fact that Mr. Feldman did not have any other insurance covering its lawyers' professional liabilities increased the likelihood of exposure and amount of risks to Mr. Feldman's clients participating in the pool from Mr. Feldman's professional lawyers' liabilities, those clients being the Doctors and members of the class.[159]

**108)**  The Business Operations Summary stated that Mr. Feldman and Capstone had incurred "20± million" in "[i]nsured and uninsured losses" and that lawsuits had been filed against Feldman and Capstone "with very significant litigation expenses

---

[156] Capstone's Head of Operations, Daniel Calderon, testified that somebody at A.M.Y. or Feldman would, in the ordinary course of business, review the Business Operations Summary and sign off on it for accuracy. *See* Transcript, Volume 16, September 14, 2021, at p. 6281, lines 7-16 (Daniel Calderon).

[157] *See* Exhibit DRS-1856 at FCP_0063500, Business Operations Summary of Feldman and Capstone at p. 5 ("The Law Firm does not carry lawyers' professional liability through conventional insurance markets . . . . Because of past claims . . . and related breach of fiduciary claims, obtaining coverage would be very difficult.").

[158] *See* Transcript, Volume 14, August 23, 2021, at p. 5346 line 6 – p.5357, line 11 (Stewart Feldman). "There is no dispute" that the A.M.Y. policies included in the risk pool provided the "primary malpractice coverage for [the] Feldman Law Firm."[158] *See* Transcript, Volume 11, August 20, 2021, at p. 4545, lines 10-14 (Representation by FCP's counsel during testimony of Stewart Feldman).

[159] *See* Transcript, Volume 6, August 9, 2021, at p. 2338, line 15 – p. 2340, line 22 (Richard Amoroso).

incurred."[160]  The Business Operations Summary further noted that Mr. Feldman and

Capstone "ha[d] a policy of collecting [their] outstanding billings and in the past

ha[d] demonstrated a willingness to sue clients for outstanding fees, which leads to

the usual counterclaims against the Law Firm and Capstone and their principals."[161]

From September 22, 2018 to July 22, 2020 alone, Mr. Feldman or Capstone

commenced at least eight separate arbitrations against fifty of their own clients

participating in the Feldman / Capstone captive program.[162]  At least twenty-nine of

these clients responded to being sued by Mr. Feldman or Capstone by filing their

own counterclaims or demands against Mr. Feldman and Capstone.[163]  Mr. Feldman

---

[160] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 5, FCP_0063500.

[161] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at pp. 5-6, FCP_0063500 to 01.  Capstone's Head of Operations, Daniel Calderon, testified that somebody at A.M.Y. or Feldman would, in the ordinary course of business, review the Business Operations Summary and sign off on it for accuracy. *See* Transcript, Volume 16, September 14, 2021, at p. 6281, lines 7-16 (Daniel Calderon).

[162] *See* Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman) (citing Exhibit DRS-1462, Capstone's Arbitration Demand against (1) Nestor Martinez; (2) NM Health Services-North, P.A.; (3) Pain & Recovery Clinic of North Houston; and (4) Caguas Casualty Corp. (Sept. 22, 2018); Exhibit DRS-1478, Capstone's Arbitration Demand against (5) James McAda; (6) Sherri Mills; (7) McAda Drilling Fluids, Inc.; (8) McAda Valve and Supply, Inc.; (9) Fluids Casualty Corp.; and (10) McAda Irrevocable Family Trust (June 28, 2019); Exhibit DRS-2671, Capstone's Arbitration Demand against (11) Frank J. Reyna; (12) Patricia Reyna; (13) Enerset Electric Ltd.; and (14) Intersect Casualty Corp. (Aug. 9, 2019);  Exhibit DRS-1424, Capstone's Arbitration Demand against (15) Dr. Houng Le; (16) Dr. Minh Nguyen; (17) 1960 Family Practice, P.A.; (18) Le Nguyen Family, L.P.; (19) Family Practice Holdings, LLC; (20) and (21) Family Casualty Corp. (Jan. 10, 2020); Exhibit DRS-1423, Capstone's Arbitration Demand against (22) Thomas Bunkley; (23) Matthew Keegan; (24) Caprock Land Company, LLC; (25) Pieta Insurance Company; (26) and Plains Insurance Company (Jan. 22, 2020); Exhibit DRS-1425, Capstone's Arbitration Demand against (27) Jonathan Tratt; (28) Tratt Properties, LLC; (29) Logistics Holdings, LLC; (30) Logistics Casualty Corp.; (31) Elwood Logistics Center, LLC; (32) JIM Holdings, LLC; (33) and JIM Amazon, LLC (Mar. 6, 2020); Exhibit DRS-1460, Capstone's Arbitration Demand against (34) Dr. Scott Sullivan; (35) Dr. DellaCroce; (36) St. Charles Surgical Hospital, LLC; (37) St. Charles Holdings, LLC; (38) Center for Restorative Breast Surgery, LLC; (39) Sigma Delta Billing, LLC; (40) Cerberus Insurance Corp.; (41) Janus Insurance Corp.; (42) and Orion Insurance Corp. (May 7, 2020); Exhibit DRS-2677, Capstone's Arbitration Demand against (43) John Caldwell, (44) BLSR Operating, Ltd.; (45) BLSR Management Corp.; (46) RBC Interests, Ltd.; (47) RBC Energy Services, LLC; (48) Petroguard Property & Casualty Insurance Corporation; (49) Tammie Caldwell; and (50) Caldwell Investment, Ltd. (July 22, 2020).

[163] *See* Exhibit DRS-1458, Martinez Parties' Counter Petition in Arbitration (Dec. 7, 2018); Exhibit DRS-1482, McAda Parties' Original Complaint (July 15, 2019); Exhibit DRS-2672, Reyna Parties' Answer and Counterclaim;

and Capstone then submitted twenty-three separate insurance claims to PoolRe relating to these arbitrations and lawsuits, thereby subjecting their clients to a situation in which the clients will have to pay  (or have already paid) for Mr. Feldman's and Capstone's legal expenses in fighting against their clients.[164]  This Arbitrator finds that Thirteen of these insurance claims submitted by Mr. Feldman and Capstone to PoolRe remain open and pending due to an intentional decision by Mr. Feldman, Capstone, and PoolRe to delay resolution of these open claims.[165] Thus, the totality of evidence and testimony in the record leads this Arbitrator to find that Mr. Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities were substantial exposures and risks that Mr. Feldman and Capstone should have fully disclosed to their clients.

**109)**    The record indicates that as early as 2010, Mr. Feldman and Capstone put their Lawyers Professional Liability, Errors & Omissions, and Legal Expense Reimbursement policies in PoolRe's risk pools.[166]   Mr. Feldman and Capstone

---

Exhibit DRS-1428, The Caprock Parties' Answer, Counterclaim, and Third-Party Claim (Mar. 4, 2020); Exhibit DRS-1816, Doctors' Arbitration Demand against Capstone and Feldman (Dec. 23, 2020).

[164] *See* Transcript, Volume 11, August 20, 2021, at p. 4318, line 7 – p. 4320, line 1 (citing Exhibit DRS-2000, 2019 Claims Summary Chart); Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart A. Feldman (June 6, 2020, 17:17 CST); Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[165] *See* Transcript Volume 16, September 14, 2021, at p. 6174, line 1 – p. 6177, line 25; p. 6314, lines 16-22; p. 6436, line 7 – p. 6439, line 1 (Daniel Calderon).  In addition to the nine claims that Mr. Calderon confirmed were still open, FCP's Post-Hearing Brief identifies that the four claims relating to the Family Parties and Logistics Parties "are still pending."  *See* Volume 16, September 14, 2021, at p. 6270 lines 12-20 (Daniel Calderon); FCP's Post-Hearing Brief at p. 204, n. 53 ("In fact, these claims are still pending because these two captives renewed the 2019 dispute by joining the SCP class action.")

[166] *See* Exhibit DRS-1512 at pp. 5-8, FCP's Joint Objections and Responses to Respondents' First Set of Discovery Requests at Answers to Requests for Admission Nos. 1-12 (Jan. 27, 2021); Transcript, Volume 13, August 22, 2021,

placed these policies in the risk pool through an undisclosed captive insurance company, A.M.Y. Property & Casualty Insurance Corporation ("A.M.Y."), which is owned and controlled by Mr. Feldman.[167]

**110)**    The parties do not dispute that the A.M.Y. policies included in the risk pool provided the "primary malpractice coverage for [the] Feldman Law Firm."[168]  Mr. Feldman did not disclose to his clients that his clients were primarily insuring the significant malpractice liabilities of Mr. Feldman.  Nor did Mr. Feldman or Capstone disclose to their clients that their clients were the primary insurers of Mr. Feldman's and Capstone's errors & omissions and legal expenses even in lawsuits or arbitrations against those clients.[169]

**111)**    There is ample evidence in the record that Mr. Feldman's and Capstone's "uninsurable risk" and litigious tendencies,[170] Mr. Feldman's and Capstone's

---

at p. 5127, lines 8-18; p. 5383, lines 14-23 (Stewart Feldman); Transcript, Volume 7, August 16, 2021, at p. 2624, lines 10-24 (Richard Amoroso).

[167] *See* Transcript, Volume 11, August 20, 2021, at p. 4426, lines 1-10 (Stewart Feldman); Transcript, Volume 13, August 22, 2021, at p. 5123, line 21-24 (Stewart Feldman); *see also* Transcript, Volume 23, October 2, 2021, at p. 9237, line 6 – p. 9240, line 21 (Jeff Carlson); Transcript, Volume 16, September 14, 2021, at p. 6437, line 10 – p. 6439, line 1 (Daniel Calderon).

[168] *See* Transcript, Volume 11, August 20, 2021, at p. 4545, lines 10-14 (Representation by FCP's counsel during examination of Stewart Feldman).

[169] Feldman and Capstone argue that they maintain primary errors & omissions insurance policies through conventional markets. *See* FCP's Post-Hearing Brief at p. 156.  However, Feldman and Capstone did not introduce or identify any such insurance policy at the final hearing, even after Arbitrators instructed FCP's counsel to confirm whether a primary E&O policy existed or had been produced. *See* Transcript, Volume 14, p. p. 5349, line 11 – p. 5362, line 23 (Representations of FCP's counsel during examination of Stewart Feldman).  Feldman and Capstone's failure to produce or introduce into the record any commercial, primary E&O policy precludes them from now arguing that such a policy exists.

[170] *See* Exhibit DRS-1856 at FCP_0063500, Business Operations Summary of Feldman and Capstone at p. 5; *see also* Transcript, Volume 8, August 17, 2021, at p. 3000, line 15 – p. 3003, line 4 (Richard Amoroso); Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman).

undisclosed insurance policies included in PoolRe's risk pool, coupled with Mr. Feldman's and Capstone's control over PoolRe, provided a mechanism to foist substantial portions of Mr. Feldman's and Capstone's litigation expenses and professional liabilities onto their own, unknowing clients in this arbitration, the Doctors and members of the class.

**112)** The coverages provided by PoolRe participants to Mr. Feldman and Capstone under the A.M.Y. Lawyers Professional Liability policies, Errors & Omissions policies, and Legal Expense Reimbursement policies were extremely broad.[171] These policies covered "all **Damages** [Feldman and Capstone] become legally obligated to pay and **Defense Expense** as a result of any **Claim** first made against [them] during the policy period."[172] These policies further covered almost every expense that Mr. Feldman or Capstone might incur in lawsuits or arbitrations against their clients, including "Defense Expense," which was defined as:[173]

> **Defense Expense** means the expenses directly allocated to a particular **Claim** including but not limited to: all governmental, administrative agency, alternative dispute resolution, arbitration, and court costs, fees, and expenses; fees, costs, and expenses for legal services, whether by outside or our staff counsel; photographic costs; materials and labor; experts' fees or costs; costs of copies of documents or records; costs of depositions and court

---

[171] *See* Exhibit DRS-2108, A.M.Y.'s Errors & Omissions Policy; Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy; Exhibit DRS-2110, A.M.Y.'s Legal Expense Reimbursement Policy.

[172] *See, e.g.*, Exhibit DRS- 2108, A.M.Y.'s Errors & Omissions Policy at § 1, Joint-331513 (emphasis in original); Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy at § 1, Joint-331740 (emphasis in original).

[173] *See*, Exhibit DRS- 2108, A.M.Y.'s Errors & Omissions Policy at § 3(H), Joint-331533; Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy at § 3(H), Joint-331760.

> reporters or recorded statements and similar fees; medical cost containment expenses; cost of autopsies; cost of medical examinations of a claimant to determine liability, or the degree of permanency or length of disability; and all other compensation, fees, costs, and expenses chargeable to the investigation or defense of **Claims** or the investigation or prosecution of fraud or criminal conduct involving a **Claim**.

**113)** The Doctors argue that they did not know that they were insuring Mr. Feldman's and Capstone's professional liabilities, errors & omissions and legal expenses. They note that Dr. Sullivan testified that Mr. Feldman and Capstone did not disclosed that if the Doctors sued Feldman or Capstone for malpractice, that Feldman and Capstone could submit the claim to the pool and make the Doctors pay for part of Feldman's and Capstone's defense of the Doctors' claims against Feldman and Capstone.[174] Dr. DellaCroce also testified that he was unaware that he would be insuring Feldman and Capstone's malpractice and legal expense liabilities.[175]

**114)** That Mr. James McCormack, Mr. Feldman's longstanding ethics advisor and expert conceded that Mr. Feldman and Capstone did not disclose to their clients that

---

[174] *See* Transcript, Volume 1, August 3, 2021, at p. 240, lines 17 – 25; p. 243, line 22 – p. 245, line 15 (Dr. Scott Sullivan).

[175] *See* Transcript, Volume 5, August 7, 2021, at p. 1978, line 25 – p. 1980, line 24; p. 1957, line 5 – p. 1958, line 10 (Dr. Frank DellaCroce).

the clients were reinsuring Mr. Feldman and Capstone's malpractice liabilities and

legal expenses:[176]

> Arbitrator Kutcher:
> Are you saying the disclosures regarding the fact that the captive, AMY, wrote the primary malpractice for Mr. Feldman and in the event, Feldman was sued for malpractice, that AMY could be called to bear on that and, as a result, perhaps the other captives as well within the pool was adequately disclosed in J-20?
>
> The Witness:
> I think not in that detail at all.
>
> Arbitrator Kutcher:
> Okay. All right. It doesn't say anywhere in there –
>
> The Witness:
> It doesn't mention AMY. It doesn't mention –
>
> Arbitrator Kutcher:
> Does it even mention Mr. Feldman is the primary malpractice carriers in the pool – the primary malpractice carriers?
>
> The Witness:
> The joint engagement agreement does not say that.
>
> Arbitrator Baker:
> --part of my legal expenses. That's I think the question Arbitrator Kutcher is asking you. Are you saying that you think what was disclosed in this engagement letter is sufficient to advise the clients of that?
>
> The Witness:
> It doesn't say that.

---

[176] *See* Transcript, Volume 19, September 28, 2021, at p. 7630, line 1 – p. 7633, line 4 (James McCormack) (emphasis added).

**115)**    This Arbitrator finds that the inclusion of Mr. Feldman's and Capstone's professional malpractice liabilities, errors & omissions, and legal expenses liabilities in the risk pool was material information that needed to be disclosed by Mr. Feldman and Capstone to their clients.   The Arbitrator finds further that Mr. Feldman and Capstone did not disclose to their clients that the clients were insuring Mr. Feldman's and Capstone's professional malpractice liabilities, errors & omissions, and legal expenses liabilities. That these facts support the Doctors' claims against Mr. Feldman and Capstone for professional malpractice, breach of fiduciary duty, professional negligence, negligence, fraudulent misrepresentation, negligent misrepresentation, violations of the Texas Deceptive Trade Practices Act, and violations of the Texas Insurance Code, and RICO.

**116)**    The Doctors also argue that Exhibit E to the Engagement Letter does not disclose that the Doctors were reinsuring Mr. Feldman's and Capstone's professional liabilities, errors & omissions and legal expenses. They argue that FCP relies upon a single sentence in Exhibit E to the Joint Engagement Letter to suggest that they made adequate disclosure to their clients that their clients would be insuring Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.[177] This sentence in Exhibit E states, "Note that among the several

---

[177] This sentence regarding the possibility that a captive affiliated with Capstone and Feldman may participate in the pool was contained in Exhibit E to certain Joint Engagement Letters and sent as part of a yearly insurance binder *after* coverages had already been bound. Neither disclosure was adequate. *See, e.g.*, Transcript Volume 6, August 9, 2021,

hundred policies in the pool are policies issued to Capstone *or* the Firm (*or* their affiliates) and that their affiliated captives ***may*** participate in the pool."[178]  This sentence regarding the mere possibility that a captive affiliated with Feldman or Capstone or their affiliates might participate in the pool is not adequate disclosure under applicable law, as discussed in Section IX(B) below.  It does not suggest or state the fact that Feldman and Capstone were in fact getting their clients to be their primary malpractice insurers.

**117)**  They argue that this sentence regarding the possibility that a captive affiliated with Mr. Feldman or Capstone (or an affiliate of Mr. Feldman or Capstone) might participate in the risk pool was misleading and incomplete.

**118)**  Mr. Feldman and Capstone suggest that their clients should have asked Mr. Feldman and Capstone questions regarding the coverages in the risk pool insuring Mr. Feldman and Capstone.  But the evidence in the record supports a finding that the duty was on Mr. Feldman and Capstone to disclose – the duty was not on the client to ask.[179]

**119)**  And, that the Doctors had no reason to suspect that Mr. Feldman's and Capstone's primary malpractice insurance coverages were in the risk pools is

---

at p. 2447, line 14 – p. 2448, line 18 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, at p. 2508, line 22 – p. 2509, line 7 (Richard Amoroso).

[178] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011104 (emphasis added).

[179] *See* Transcript, Volume 4, August 6, 2021, at p. 1551, line 10 – p. 1555, line 8; p. 1568, line 18 – p. 1570, line 16 (Thomas Watkins).

evidence that allows this Arbitrator find to that Mr. Feldman and Capstone misrepresented to their clients, the Doctors and Class Members, that the PoolRe risk pool consisted of "generally similar policies covering generally similar risks."[180] That Mr. Feldman and Capstone misrepresented that "all of these [policies in the pool] were going to be homogenous."[181] But the risks in the pool were not similar or homogenous.[182] The risks insured by the A.M.Y. policies were far more substantial, and presented substantially greater exposure to the risk pool participants, than the risks put in the pool by the Doctors' captives.

120) The Doctors argue that this Arbitrator should reject Mr. Feldman's and Capstone's contention that the Doctors should have known that Mr. Feldman's and Capstone's primary professional malpractice liabilities were in the risk pool. As Dr. Sullivan explained:[183]

> Q: And did you have any reason to think that the insurance afforded by Feldman's and Capstone's captive would be primarily orders of professional liability, errors and omissions, and legal expense coverage?
>
> A: I had no reason to think that because of all the policies within the pool, in order to qualify, have to be similar. They have to be similar risk profile. They have to be homogeneous.

---

[180] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.
[181] *See* Transcript, Volume 3, August 5, 2021, at p. 1232, lines 21-23 (Dr. Scott Sullivan).
[182] *See* Transcript, Volume 7, August 16, 2021, at p. 2491, line 18 – p. 2494, line 13 (Richard Amoroso).
[183] *See* Transcript, Volume 1, August 3, 2021, at p. 228, line 18 – p. 229, line 24 (Dr. Scott Sullivan).

Q:     And based on what you and Dr. DellaCroce were insuring, can you explain to the Arbitrators, why is that? Why did you assume that based on what you were doing?

A:     So, number one, either everyone had their primary malpractice in, and we did not, which would have disqualified us, or everyone was supposed to have it as secondary policies, which we assumed, since we qualified for the pool.

We have very good commercial insurance for E&O, D&O, malpractice, legal expense, very, very good, so this is supposed to be excess. There's no other reason for us to assume that someone who cannot qualify for commercial insurance, malpractice insurance, would be able to qualify their policies for exceptions into a risk pool, which in order to qualify, have to be not only homogeneous, similar policies, but the risk for the policy has to be the same.

**121)**   The Doctors maintained that they had their professional liability insurance through LAMMICO, along with the state-operated patient compensation fund.[184] Under Louisiana law, medical malpractice claims are subject to a $500,000 cap.[185] The Doctors' LAMMICO policy and the state compensation fund cover that $500,000 liability.[186]  The Health Check-Up issued by Feldman acknowledged that the Doctors had this malpractice coverage through LAMMICO and the patient compensation fund.[187]

---

[184] See Transcript, Volume 2, August 4, 2021, at p. 648, line 25 – p. 649, line 17 (Dr. Scott Sullivan).  LAMMICO is the Louisiana Medical Malpractice Insurance Company.

[185] LA. REV. STAT. § 40:1231.2(B)(1) ("The total amount recoverable for all malpractice claims for injuries to or death of a patient . . . shall not exceed five hundred thousand dollars plus interest and cost.").

[186] See Transcript, Volume 2, August 4, 2021, at p. 648, line 25 – p. 649, line 8 (Dr. Scott Sullivan).

[187] See Exhibit DRS-77, Preliminary Draft of Health Check-Up, May 29, 2015, at SULLIVAN 015793. See also Transcript, Volume 14, August 23, 2021, at p. 5377, line 8 – p. 5378, line 1 (Stewart Feldman).

122) That Mr. Feldman and Capstone suggested that the Doctors should have known that Mr. Feldman and Capstone's primary malpractice polices were in the pool because of an insurance binder issued to the Doctors in 2016, reflecting the issuance of a gap medical malpractice policy by Janus.[188]    That this gap policy would, however, only provide coverage in the event that LAMMICO became insolvent.[189] The issuance of this gap insurance policy did not reasonably notify the Doctors of the likelihood that Feldman and Capstone would have their primary malpractice liabilities in risk pool.

123) Mr. Feldman and Capstone argue that both Mr. Sherman and Mr. Kushner were aware that Feldman and Capstone had policies in the risk pool.[190]   But Mr. Sherman testified that Feldman told him that "PoolRe excludes primary policies from the pool."[191] Mr. Sherman testified further that the Doctors "specifically asked about certain primary policies like the [D]octor's medical malpractice insurance" and that "Mr. Feldman was clear [the pool] was not for primary insurance."[192] Similarly, Mr. Kushner testified that he did not know that the Doctors were insuring Feldman's professional malpractice liabilities:

---

[188] *See* Exhibit FC-376.2, at p. 6, Joint-315169; *see also* Exhibit FC-374.1, at Joint-327097 (sending binder of policies with policy period beginning December 21, 2015, on February 23, 2016 – more than two months into policy period).

[189] *See* Transcript, Volume 2, at p. 647, line 25 – p. 649, line 17 (Dr. Scott Sullivan).

[190] *See* FCP's Post-Trial Brief at p. 147.

[191] *See* Transcript, Volume 20, September 29, 2021, at p. 7963, line 5 – p. 7966, line 1; p. 7994, line 24 – p. 7995, line 17 (David Sherman).

[192] *See* Transcript, Volume 20, September 29, 2021, at p. 7963, line 5 – p. 7966, line 1; p. 7994, line 24 – p. 7995, line 17 (David Sherman).

[T]he impression and what I always heard is it was similar risks in the pool as to the other client and it wasn't going to be the main insurance or malpractice insurance of a particular being issued by the pool, because all the other clients were being told it was for excess risk, it was for other types of risk that were not of the main types of policies – mainstream policies one would get . . .. But I never thought the main insurance policy of malpractice was inside The Feldman Law Firm and that clients were insuring that. That's all I stated. That was a surprise to me.[193]

124) Mr. Sherman testified that none of his communications with Mr. Feldman disclosed that Feldman was using the risk pool for its legal malpractice and litigation expense coverages.[194] Mr. Kushner testified that (1) he did not understand that if the Doctors sued Mr. Feldman for legal malpractice or breach of fiduciary duty, that the captives would be required to pay a portion of Feldman's defense expense; and (2) Feldman never told him that he used the pool for his primary malpractice coverage.[195] This Arbitrator finds that Mr. Feldman led the Doctors' advisors, Mr. Sherman and Mr. Kushner, to believe that the pool was not for anyone's primary malpractice liabilities.

125) Considering the totality of the evidence and testimony in the record, this Arbitrator finds that Mr. Feldman and Capstone did not disclose to their clients that their clients would be the primary insurers of Mr. Feldman's and Capstone's

---

[193] *See* Transcript, Volume 20, September 29, 2021, at p. 8074, line 24 – p. 8077, line 2 (David Kushner).

[194] *See* Transcript, Volume 20, September 29, 2021, at p. 7909, line 24 – p. 7910, line 7; p. 7928, line 25 – p. 7929, line 13 (David Sherman).

[195] *See* Transcript, Volume 20, September 29, 2021, at p. 8010, lines 12-19; p. 8016, lines 17 – p. 8017, line 18 (David Kushner).

professional liabilities, errors & omissions, and legal expenses. This Arbitrator finds further that the clients did not know, and should not have reasonably been expected to know, that they were reinsuring the professional liabilities and legal expenses of their lawyer, Mr. Feldman, and captive manager, Capstone.

## IRS DISCLOSURE

**123)**    The Doctors argue that Mr. Feldman and Capstone did not disclose material information to the Doctors concerning the IRS's adverse determinations against Capstone-administered captives before the Joint Engagement Letter was executed. Specifically, the Doctors argue that Mr. Feldman and Capstone did not disclose the IRS's adverse determinations against Capstone-administered captives. That in fact, some of the following facts were excluded from their clients:

- ➤ In July 2013, the IRS determined that Reserve Mechanical, a captive insurer structured by Feldman and administered by Capstone, failed to qualify as an insurance company.[196]

- ➤ Mr. Feldman knew in 2013 that:

  - ○ the IRS found that Reserve Mechanical was not an insurance company;[197]

  - ○ the IRS had determined that Reserve lacked the essential element of risk distribution.[198]

---

[196] *See* Exhibit DRS-2715, IRS Examination Report of Reserve Mechanical, July 24, 2013, at Joint-340830.

[197] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[198] *See* Transcript, Volume 21, September 30, 2021, at p. 8555, lines 14-18 (Steven Cohen).

      o  the IRS had determined that the PoolRe pooling arrangement did not provide sufficient risk distribution for Reserve to be treated as an insurance company.[199]

**124)**  The stated purpose of the Feldman / Capstone captive insurance program was to structure and operate the captive insurer so as to qualify for partial tax-exempt status under Internal Revenue Code § 831(b), as stated on the first page of Exhibit C to the Joint Engagement Letter.[200]  A captive insurer must be acting as an insurance company to qualify for favorable tax treatment.[201]  If a determination is made that a captive is not an insurance company, then it would not be entitled to tax benefits under Section 831(b).[202]  Having a certain percentage of unrelated (third-party) insurance business is required in order to satisfy the criterion that there be "risk distribution" for insurance to exist, as also stated in the Joint Engagement Letter.[203]

---

[199] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

[200] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.  Exhibit C to the Joint Engagement Letter (*i.e.*, the disclosure form) states, "The intention is to structure and operate the captive insurer so as to qualify for partial *tax-exempt* status ...."  *See* Exhibit J-20, Joint Engagement Letter, at Exhibit C, SULLIVAN 011096. Feldman and Capstone had long recognized that the favorable tax treatment was a primary inducement for their clientele to engage in captive insurance transactions. Richard Amoroso highlighted multiple provisions in the Joint Engagement Letter where Feldman and Capstone emphasized the tax advantages of the turnkey Capstone program. *See* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23 (Richard Amoroso).  To achieve this tax-exempt status, Feldman and Capstone "encourage[d]" and "expected" their clients to participate in the PoolRe risk pool. *See* Exhibit J-20, at SULLIVAN 011071 ("It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement", *id.* at SULLIVAN 011104 ("Capstone encourages participation in . . . PoolRe".).  Mr. Feldman advised the Doctors that it was "ill-advised" to decline participating in PoolRe and that in order to obtain beneficial tax treatment, the Doctors "must distribute [their] risks among a pool of risks." *See* Transcript, Volume 1, August 3, 2021, at p. 252, lines 1-10 (Dr. Scott Sullivan). *See* Exhibit J-12, Memorandum from Stewart Feldman, May 29, 2015, at SULLIVAN 015783. And Mr. Feldman declared in an August 6, 2015, speech, "Really, what we're talking about is God's work here.  We're talking about reducing federal income taxes." *See* Exhibit DRS-2491, Video, August 6, 2015, speech; *see also* Transcript, Volume 8, August 17, 2021, at p. 2982, lines 6-9 (video of Mr. Feldman played during examination of Richard Amoroso).

[201] *See* Transcript, Volume 21, September 30, 2021, at p. 8471, lines 9-20 (Steven Cohen).

[202] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011098: Transcript, Volume 21, September 30, 2021, at p. 8514, lines 17-23 (Steven Cohen).

[203] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.

In most cases, Capstone-administered captives need to participate in a risk pool to satisfy the IRS's risk distribution requirement.[204]

**125)**  The strategy recommended by Feldman/Capstone to achieve adequate risk distribution of the Doctors' captives, so that they would qualify as an insurance company in the eyes of the IRS, was to have the captives participate in the PoolRe risk pool.[205]  Likewise, Capstone-administered captive, Reserve Mechanical, also relied on PoolRe for adequate risk distribution.[206]

**126)**  Both Dr. Sullivan and Dr. DellaCroce testified that they would not have agreed to sign the Joint Engagement Letter had Mr. Feldman and Capstone fully disclosed the nature of the ongoing IRS scrutiny of the Capstone insurance program, including the PoolRe risk pool.[207]

**127)**  The Doctors also argue that Exhibit C to the Joint Engagement Letter failed to disclose the adverse IRS audits. However, Mr. Feldman and Capstone argue that Exhibit C to the Joint Engagement Letter adequately disclosed to the Doctors the adverse IRS audits of Capstone-administered captives.  The Doctors further argue that nothing in Exhibit C to the Joint Engagement Letter disclosed the substance of the IRS audit of Reserve Mechanical, as concluded by the Doctors' IRS expert, Lyle

---

[204] *See* Transcript, Volume 21, September 30, 2021, at p. 8502, line 22 through p. 8503, line 4 (Steven Cohen).

[205] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

[206] *See* Transcript, Volume 21, September 30, 2021, at p. 8502, line 22 – p. 8503, line 4 (Steven Cohen).

[207] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 18-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, lines 6-18 (Dr. Frank DellaCroce).

Press.[208]  That Mr. Cohen identified Subpart D of Exhibit C to the Joint Engagement as an apparent anonymous reference to Reserve Mechanical, but he conceded that "the firm did not say anything in this section about the specific issues that were involved in the Reserve Mechanical audit."[209]  Mr. Cohen never offered any cogent description of any location within Exhibit C disclosing the substance of the adverse Reserve Mechanical audit.

**128)** While a plain reading of Exhibit C to the Joint Engagement Letter demonstrates that none of the substance of the IRS's findings in the 2013 Examination Report of Reserve Mechanical were disclosed to the Doctors before they signed the Joint Engagement Letter, this Arbitrator cannot say that the failure to provide further information regarding the IRS and its investigation of the captive insurance program was required to be disclosed by Mr. Feldman and Capstone. That the Doctors who had extensive experience in the Captive Insurance business should have known of the status of Captive Insurance and its scrutiny by the IRS.

**129)** Based on the totality of evidence and testimony presented at trial, this Arbitrator cannot say that Mr. Feldman and Capstone failed to disclose the IRS's adverse determinations against Capstone-administered captives, nor that Exhibit C to the Joint Engagement Letter failed to disclose adverse IRS audits, which resulted

---

[208] *See* Transcript, Volume 9, August 18, 2021, at p. 3448, lines 3-13 (Lyle Press).
[209] *See* Transcript, Volume 21, September 30, 2021, at p. 8359, line 12 – p. 8360, line 2 (Steven Cohen).

in damages to the Doctors. This Arbitrator finds that information relating to the fact that the IRS found that Reserve Mechanical was not an insurance company, that Reserve Mechanical lacked risk distribution, and that the PoolRe pooling arrangement did not provide sufficient risk distribution, should have been industry information available to all participants in the captive insurance business, as the Doctors were for many years.

**130)**    The Doctors also argue that Mr. Feldman and Capstone failed to disclose the IRS audit of Mr. Feldman for promoting abusive tax shelters under IRC Sec 6700. They argue that Approximately four months before Mr. Feldman sent the Joint Engagement Letter to the Doctors, on June 8, 2015, Mr. Feldman received notice of an IRS audit for promoting abusive tax shelters under Internal Revenue Code § 6700 based upon his "participation in tax avoidance transactions."[210]  This June 8, 2015 letter from the IRS to Mr. Feldman noted that the IRS was considering "penalties and injunctions" against Mr. Feldman under seven different sections of the Internal Revenue Code for "promoting and/or preparing documents relating to these transactions":[211]

> Dear Dr. Feldman,
>
> We have reviewed materials regarding your participation in tax avoidance transactions. We are considering penalties and injunctions under Internal Revenue Code sections 6694, 6695, 6700, 6701, 7402,

---

[210] *See* Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

[211] *See* Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

7407, and 7408 for promoting and/or preparing documents relating to these transactions. In addition, we will consider issuing "pre-filing notification" letters to persons participating in these transactions.

**131)** The enumerated statutory violations included Section 6700 of the Internal Revenue Code, which governs "Promoting Abusive Tax Shelters."[212] That the June 8, 2015 letter from the IRS to Mr. Feldman also contained an Information Document Request concerning "all owners of any Captive Insurance Companies from every year in which you sold or advertised Captive Insurance Companies through Capstone Associated Services," and requested a broad list of information pertaining to each of the Capstone-associated captives.[213]

**132)** That the consequences of a promoter audit, from the standpoint of a captive client, cannot be overstated: the commencement of the promoter audit against Mr. Feldman precludes his clients from filing a qualified amended return that would allow the clients to avoid paying accuracy-related penalties.[214] A client can only file a qualified amended return *before* a promoter audit is instituted – not afterward.[215] Moreover, the information request also provides the IRS with a play-card to identify targets for additional audits and enforcement activity.

---

[212] 26 U.S.C. § 6700.

[213] *See* Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

[214] *See* Transcript, Volume 9, August 18, 2021, at p. 3614, line 4 – p. 3616, line 1 (Lyle Press).

[215] *See* Transcript, Volume 9, August 18, 2021, at p. 3615, line 18 – p. 3616, line 1 (Lyle Press).

**133)**  That upon receiving notice of the promoter audit, Mr. Feldman sought guidance from his longstanding ethics attorney, Mr. McCormack.[216]  The reference to Section 6700 in the June 8, 2015 letter from the IRS was important enough that Mr. McCormack circled that statutory reference on his copy of the document.[217]  But Mr. Feldman consciously omitted any reference to this statutory provision in the written disclosures provided to the Doctors.

**134)**  Mr. Feldman and Capstone suggest that Paragraph (G) of Exhibit C to the Joint Engagement Letter discloses the promoter audit to the Doctors.  But Paragraph (G) makes no mention of a "promoter audit" or Section 6700 of the Internal Revenue Code.[218] And Paragraph (G) provides no information regarding the substance of the inquiry:[219]

> G.    In June 2015, the IRS notified either Stewart A. Feldman of the Firm or Capstone (the addressee of the inquiry is unclear) that the captive insurance/alternative risk planning program is the subject of a review by the IRS and issued an information document request (IDR). The firm is unclear whether this IDR is unconnected with the audits of any particular captive client but is likely connected to the IRS's examination of captive insurance programs generally. The firm believes that the inquiring IRS agent was unaware of the dozens of completed IRS reviews of the planning resulting in it agreeing with the taxpayers' positions. After a three-day review by the IRS agent and

---

[216] *See* Exhibit DRS-1921, E-mail from Stewart Feldman, July 14, 2015 ("before sending it out wholesale, I will send it to ethics counsel"); *see also*, Transcript, Volume 19, September 28, 2021, at p. 7695, line 16 – p. 7696, line 13 (James McCormack).   Remarkably, as January 2021, Mr. Feldman has paid Mr. McCormack in excess of $112,000 for ethics guidance dating back to 2005.  *See* Exhibit DRS-1512, Discovery Responses, at p. 15, Response to Interrogatory No. 11.

[217] *See* Transcript, Volume 19, September 28, 2021, at p. 7703, line 24- p. 7704, line 4; p. 7704, lines 22-24; p. 7705, lines 8-15 (James McCormack).

[218] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, at SULLIVAN 011102.

[219] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, at SULLIVAN 011102.

after providing him evidence of the more than 50 prior successful rulings by the IRS, this matter has been dormant.

**135)** However, even Mr. Feldman conceded, when asked whether anything within the disclosure form or Paragraph (G) "identifies that audit as examining you for promoting abusive tax shelters," that "those words are not there."[220]

**136)** Both Doctors testified that Paragraph (G) did not inform them regarding the pending promoter audit of Mr. Feldman.[221] Mr. Sherman testified that Mr. Feldman never disclosed the promoter audit to him, either orally or in writing.[222]  Mr. Kushner, a practicing CPA for over 40 years, testified that he did not have experience in dealing with promoter audits and did not recognize Paragraph (G) to be alluding to a promoter audit.[223]

**137)** Mr. Kushner sent Mr. Feldman an article concerning promoter audits in August 2015 – just two months after the promoter audit of Mr. Feldman began – yet Mr. Feldman failed to respond to that e-mail and disclose the recently-commenced promoter audit.[224]  Indeed, Mr. Kushner did not learn about Mr. Feldman's promoter

---

[220] *See* Transcript, Volume 14, August 23, 2021, at p. 5323, lines 18-24 (Stewart Feldman) (emphasis added).

[221] *See* Transcript, Volume 1, August 3, 2021, at p. 217, line 22 – p. 218, line 4 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1966, line 16 – p. 1967, line 12 (Dr. Frank DellaCroce).

[222] *See* Transcript, Volume 20, September 29, 2021, at p. 7922, lines 19-24 (David Sherman).

[223] *See* Transcript, Volume 20, September 29, 2021, at p. 8140, line 22 – p. 8141, line 13; p. 8142, lines 1-12 (David Kushner).

[224]  *See* Transcript, Volume 20, September 29, 2021, at p. 8025, line 21 – p. 8026, line 5 (David Kushner); *see also* Exhibit FC-71, E-mail from David Kushner, August 10, 2015.

audit until October 2019 – *after* the Doctors had expressed their desire to wind their captives down.[225]

**138)** Mr. Watkins testified that Paragraph (G) *"hides"* the truth regarding the promoter audit.[226]  Mr. Watkins further explained the need for Mr. Feldman to provide *full* disclosure regarding the pending promoter audit:[227]

> Additionally, you got to make a disclosure of – you know, the IRS had already identified that he was being – that Mr. Feldman was being investigated for a bad – my term, "bad promoter." You got to tell them that.
>
> In fact, I don't see how anybiy can claim that this is full disclosure if that letter wasn't shown to these two people prior to the time they signed this contract. Anthng less than that, any kind of vague description of how it might happen is not complete candor, full disclosure.
>
> I don't know about you all, but I certainly wouldn't want to invest in something where the IRS is already after the guy who's going to protect me from the IRS. And I don't care how it ultimately turns out, there has to be full disclosure when the contract is entered into and there was not.

**139)** Mr. McCormack agreed that Paragraph (G) "does not specifically state that Feldman received an IDR that included a disclosure that he was being investigated as a promoter of abusive tax shelters and the IRS was considering penalties and

---

[225] *See* Transcript, Volume 20, September 29, 2021, at p. 8015, line 19 – p. 8016, line 8; p. 8025, line 21 – p. 8027, line 1; p. 8153, line 12 – p. 8154, line 12 (David Kushner).

[226] *See* Transcript, Volume 4, August 6, 2021, at p. 1611, line 21 – p. 1612, line 4 (Thomas Watkins) (emphasis added).

[227] *See* Transcript, Volume 4, August 6, 2021, at p. 1542, line 16 – p. 1543, line 11 (Thomas Watkins) (emphasis added).

injunctive relief pursuant to a number of sections of the IRS Code including [Section] 6700."[228]

**140)** Mr. Feldman's expert and tax attorney Marcus Brooks also acknowledged that Paragraph (G) does not state that "the IRS had reviewed materials regarding Mr. Feldman's participation in tax avoidance transactions," or that "the IRS was investigating Mr. Feldman for promoting and preparing documents relating to abusive tax shelters."[229]

**141)** Mr. Brooks further acknowledged that, while he may have recognized the oblique language in Paragraph (G) to refer to a promoter audit, he analyzed that language from the perspective of an attorney with a specialized tax practice.[230] Mr. Brooks pointedly avoided offering any opinion as to whether the Doctors would read Paragraph (G) the same way.[231]

**142)** Considering the totality of the evidence and testimony presented at trial, this Arbitrator finds that the IRS § 6700 audit of Mr. Feldman was material information that should have been disclosed to the Doctors prior to the execution of the Joint

---

[228] *See* Transcript, Volume 19, September 28, 2021, at p. 7723, lines 4-12 (James McCormack).

[229] *See* Transcript, Volume 23, October 2, 2021, at p. 9440, line 15 – p. 9441, line 10 (Marcus Brooks).

[230] *See* Transcript, Volume 23, October 2, 2021, at p. 9397, lines 9-21 (Marcus Brooks).

[231] *See* Transcript, Volume 23, October 2, 2021, at p. 9442, line 16 – p. 9443, line 2 (Marcus Brooks). Capstone and Feldman will likely rely upon testimony from Lyle Press wherein Mr. Press testified that he recognized the language in Paragraph (G) to refer to a promoter audit under 26 U.S.C. §6700. *See* Transcript, Volume 9, August 18, 2021, at p. 3747, line 25 – p. 3748, line 3 (Lyle Press). Mr. Press was not advising the Doctors in 2015. Mr. Kushner was advising the Doctors – and Mr. Kushner had no background in addressing promoter audits. *See* Transcript, Volume 20, September 29, 2021, at p. 8141, lines 9-25 (David Kushner). Unlike Mr. Press, Mr. Kushner was not a thirty-year veteran IRS litigator who had prosecuted dozens of cases in tax court. Consequently, Mr. Press's ability to identify the hidden subtext of Paragraph (G) is immaterial to whether Feldman and Capstone employed absolute, perfect candor in disclosing the Section 6700 promoter audit. Plainly, they did not.

Engagement Letter. This Arbitrator finds further that Mr. Feldman and Capstone failed to adequately disclose the pendency of the IRS § 6700 audit of Mr. Feldman to the Doctors before they signed the Joint Engagement Letter under applicable law. Mr. Feldman was going to be the lawyer for the Doctors and the class, and they should have been informed that their lawyer was under investigation for the very activities he was engaging the Doctors and Class Members as their attorney

**143)** This Arbitrator holds that the above findings of fact support the Doctors' claims against Mr. Feldman and Capstone for professional malpractice, breach of fiduciary duty, professional negligence, negligence, fraudulent misrepresentation, negligent misrepresentation, violations of the Texas Deceptive Trade Practices Act, and violations of the Texas Insurance Code, and RICO.

## MR. FELDMAN'S DUTY TO WIND-DOWN

**144)** The Doctors also argue that Mr. Feldman, their attorney, had a duty to put forth a diligent effort on their behalf when the Doctors request on a wind-down of their captive program. This Arbitrator agrees.

**145)** The Doctors' expert, Richard Amoroso, testified that Mr. Feldman owed fiduciary duties to provide honest advice and assistance to the Doctors when the Doctors requested a liquidation or termination of their captive insurance companies.[232] Mr. Feldman's fiduciary duties included standing ready to assist the

---

[232] *See* Volume 7, August 16, 2021, at p. 2693, lines 1-13 (Richard Amoroso).

Doctors in shutting down the captives and putting forth a diligent effort on the Doctors' behalf, providing, where possible, an alternative course of action to accomplish the Doctors' requests.[233]

**146)** As of October 2, 2019, Mr. Kushner, on behalf of Dr. Sullivan, had communicated to Mr. Feldman that Dr. Sullivan wanted to exit the captive space.[234] On October 22, 2019, Mr. Feldman sent an email to Mr. Kushner and Mr. Sherman, asking them to "explain to [Dr. Sullivan]" that Dr. Sullivan's "agreement extends to 2021.'"[235] Mr. Feldman further stated that his firm could "not be in the position of assisting one client's defaulting on obligations to other clients."[236]   That   Mr. Feldman had, and recognized that he had, a concurrent conflict of interests representing the Doctors and his other clients.

**147)** Dr. Sullivan understood Mr. Feldman's position to be that a liquidation of the Doctors' captives before August 2021 was "impossible" and "could not be done" – that an early liquidation would somehow be breaching obligations to Feldman and its other clients, and that Mr. Feldman "would not assist a client in defaulting on obligations to another client."[237]   Mr. Feldman testified that the early liquidation

---

[233] *See, e.g.* Volume 7, August 16, 2021, at p. 2693, lines 1-13 (Richard Amoroso); *see also* Exhibit J-20, Joint Engagement Letter at SULLIVAN011074 & SULLIVAN011079.

[234] *See* Volume 20, Sept. 29, 2021, at p. 8155, lines 3 – 11.

[235] *See* Exhibit J-84, E-mail from Stewart Feldman (Oct. 22, 2019).

[236] *See* Exhibit J-84, E-mail from Stewart Feldman (Oct. 22, 2019).

[237] *See* Transcript, Volume 1, August 3, 2021, at p. 274, line 21 – p. 275, line 1; p. 281, lines 5-9 (Dr. Scott Sullivan); Transcript, Volume 13, August 22, 2021, at p. 5037, line 10 – p. 5039, line 14 (Stewart Feldman); *see also* Exhibit J-84, E-mail from Stewart Feldman (Oct. 22, 2019) (stating that Feldman could "not be in the position of assisting one client's defaulting on obligations to other clients.").

"wasn't possible."[238]    But Mr. Feldman and Capstone had, in fact, offered and effectuated a "special, earlier liquidation" for other captive clients.[239] Mr. Feldman and Capstone knew, therefore, that an early liquidation was possible.

**148)**  Mr. Feldman also testified allegedly falsely that "Capstone's direction has always been" from PoolRe, and "was in this particular situation," that "if you want to come into the pool, come into the pool but once you come into the pool, you're in the pool and you are subject to the contract and PoolRe is not interested in renegotiating it."[240] Mr. Feldman knew that this testimony has been controversial. Mr. Feldman was personally involved in assisting PoolRe re-negotiate its Quota Share Agreements, through the execution of "Claims Reserve Payment Agreements" and "PoolRe Release Letters," with numerous other captive clients to effectuate those captive clients' early liquidations.[241] Mr. Feldman personally signed six letters on behalf of PoolRe advising the Delaware Department of Insurance that six

---

[238] *See* Volume 13, Aug. 22, 2021, at p. 5037, line 10 – p. 5040, line 14 (Stewart Feldman).

[239] *See, e.g.*, Exhibit DRS 2570, E-mail from Jeff Carlson (Feb. 19, 2020); *see also* Transcript, Volume 8, August 17, 2021, at p. 2958, line 4 – p. 2962, line 16 (Richard Amoroso).

[240] *See* Transcript, Volume 13, August 22, 2021, at p. 5031, line 22 – p. 5039, line 14 (Stewart Feldman).

[241] *See* Exhibit DRS 2003, Claims Reserve Payment Agreement and PoolRe Release Letters; *see also* Transcript, Volume 22, October 1, 2021, at p. 8960, line 12 – p. 8962, line 8 (Robert Snyder). Robert Snyder testified as to how the Claims Reserve Payment Agreements modified the Quota Share Agreements by transferring the obligations from the captive to the captive's owner. *See* Transcript, Volume 22, October 1, 2021, at p. 8962, line 9 – p. 8968, line 14 (Robert Snyder). Robert Snyder also testified falsely at the Dorfman trial by testifying that in order to let the Doctors' captives out of the pool, all other captives participating in the pool would have to agree, which Mr. Snyder knew to be false. *See* Transcript, Volume 22, October 1, 2021, at p. 8978, line 13 – p. 8980, line 17 ("ARBITRATOR KUTCHER: But we've seen these documents where there is no consent from the other captives to let these captives out. I'm stunned that you would testify to Judge Dorfman as an expert that you need signatures for more approval from all the captives to let a captive out when you've got an Exhibit 2003 document showing you let – PoolRe let captives out without other captives' consent.")).

Capstone-administered captives were liquidating early.[242]    And Mr. Feldman

provided counsel to PoolRe and thirteen Capstone-administered captives in

connection with Claims Reserve Payment Agreements that allowed these thirteen

Capstone-administered captives to liquidate early.[243]

**149)**  Mr. Feldman also testified allegedly falsely that throughout this time period,

he told Mr. Kushner and Mr. Sherman that "PoolRe is not going to renegotiate this

deal."[244]  Mr. Feldman's e-mails responding to the Doctors' request for a wind down

did not even reference PoolRe or state that it would be PoolRe's decision.[245]  Neither

Mr. Feldman nor Capstone conveyed in writing the Doctors' request for a liquidation

to anyone at PoolRe.[246]  Neither Mr. Feldman nor Capstone asked PoolRe whether

PoolRe would allow the Doctors' captives to exit the pool early.[247]  PoolRe's

Director, Bob Snyder, testified that before his July 15, 2020 deposition, he had "not

received any written documents, emails, letters or correspondence regarding the

---

[242] *See* Exhibit DRS-2003, PoolRe release letters at Joint-364793, Joint-364799, Joint-364804, Joint-364809, Joint-364814, Joint-364822.

[243] *See* Exhibit DRS-2003, Claims Reserve Payment Agreements at § 2(c), Joint-364788, Joint-364796, Joint-64802, Joint-364806, Joint-364811, Joint-364817, Joint-364819, Joint-364824, Joint-364828, Joint-364835, Joint-364843, Joint-364851, Joint-364859 ("The Parties acknowledge that with respect to the execution of this Agreement, the Parties have sought and obtained the counsel of The Feldman Law Firm LLP with the knowledge and understanding that (i) such firm has provided legal representation to [the captive] in certain matters including the formation of and operation of [the captive]; (ii) such firm has provided legal representation to PoolRe from time-to-time; and (iii) Capstone Associated Services, Ltd. (a service provider to [the captive]) is ultimately owned and controlled by Stewart A. Feldman, principal and managing partner of The Feldman Law Firm LLP.").

[244] *See* Volume 13, August 22, 2021, at p. 5039, line 8 – p. 5040, line 4 (Stewart Feldman).

[245] *See* Volume 13, August 22, 2021, at p. 5037, line 13 – p. 5038, line 4 (Statement by Arbitrator Kutcher).

[246] *See* Volume 22, October 1, 2021, at p. 8848, lines 19-25 (Robert Snyder); Transcript, Volume 23, October 2, 2021, at p. 9511, lines 2-9 (Stephen Friedman).

[247] *See* Volume 22, October 1, 2021, at p. 8848, lines 19-25 (Robert Snyder); Transcript, Volume 23, October 2, 2021, at p. 9511, lines 2-9 (Stephen Friedman).

[D]octor's request to wind down and liquidate their captives.[248]  PoolRe's Director, Stephen Friedman, likewise testified that, as of his July 29, 2020 deposition, he was not aware of "any written communication, any written document whatsoever, that would reflect or relate to a dispute with the [D]octors."[249]  They argue that there is no credible evidence in the record to suggest that Mr. Feldman or Capstone even asked PoolRe what PoolRe's position was with respect to the Doctors' request for an early liquidation.

**150)**  Mr. Friedman testified that he "did not have any conversations with Mr. Feldman regarding any problems or disputes with the Doctors" and had no role in any "decision relating to whether the [D]octors could get out of their stop-loss and quota share contracts early."[250]  Mr. Friedman testified that he could not recall "any other communications or conversations relating to the [D]octors' request to wind down or liquidate their captive insurance companies" other than "one conversation [he] recall[ed] with Mr. Snyder approximately 12 months" before his July 29, 2020 deposition.[251]  Not only did Mr. Snyder not recall any such conversation with Mr. Friedman,[252] but the Doctors had not even requested a wind down or liquidation at

---

[248] *See* Volume 22, October 1, 2021, at p. 8848, lines 19-25 (Robert Snyder).

[249] *See* Transcript, Volume 23, October 2, 2021, at p. 9511, lines 2-9 (Stephen Friedman).

[250] *See* Transcript, Volume 23, October 2, 2021, at p. 9510, line 15-20 (Stephen Friedman).

[251] *See* Transcript, Volume 23, October 2, 2021, at p. 9510, line 15-20 (Stephen Friedman).

[252] *See* Transcript, Volume 22, October 1, 2021, at p. 8863, line 8 – p. 8865, line 20 (Robert Snyder).

any time around July 29, 2019.[253] These facts render Mr. Friedman's purported recollection implausible.

**151)**  Mr. Feldman and PoolRe had effectuated the early liquidation of fifteen other captives through executing "Claims Reserve Payment Agreements," whereby the captive owner assumes the liabilities of the captive insurance company.[254]  Mr. Feldman did not ever discuss or address with Mr. Snyder or Mr. Friedman the possibility of entering into a Claims Reserve Payment Agreement with the Doctors.[255]

**152)**  Further, Mr. Snyder logs and bills his time spent on behalf of PoolRe.[256]  Mr. Snyder records his time spent on behalf of PoolRe even to the tenth of an hour.[257] Mr. Snyder's earliest entry of time spent on an issue relating to the Doctors was July 5, 2020, which states: "Phone call with Stewart Feldman regarding the St. Charles group arbitration.  Timing for depositions and arbitrations.  0.4 hours."[258]  Mr. Snyder's earliest time entry relating to the Doctors was about nine months after the Doctors first requested a wind-down of their captives.  Mr. Snyder's earliest time

---

[253] *See* Exhibit FC-540, E-mail from Dr. Scott Sullivan (Oct. 1, 2019) (reflecting the earliest written communication regarding Doctor Sullivan's intent to wind down the captives).

[254] *See* Exhibit DRS-2003, Claims Reserve Payment Agreements.

[255] *See* Transcript, Volume 22, October 1, 2021, at p. 8969, lines 16-21; p. 8972, lines 1-16 (Robert Snyder); Transcript, Volume 23, October 2, 2021, at p. 9510, line 15-20 (Stephen Friedman).

[256] *See* Transcript, Volume 22, October 1, 2021, at p. 8703, lines 5-11; p. 8865, line 14 p. 8868, line 6 (Robert Snyder) (citing Exhibit DRS-2718, Robert Snyder's Invoices).

[257] *See* Transcript, Volume 22, October 1, 2021, at p. 8869, line 21 – p. 8871, line 8 (Robert Snyder) (citing Exhibit DRS-2718, Robert Snyder's Invoices).

[258] *See* Transcript, Vol. 22, October 1, 2021, at p. 8899, lines 11-25 (Robert Snyder).

entry relating to the Doctors was also: (1) after Capstone, in the name of PoolRe, had sued the Doctors in the Dorfman arbitration;[259] and (2) after Feldman and Capstone had already taken $10,000 out of PoolRe's account to pay for arbitration fees incurred in the Dorfman arbitration.[260]  The Doctors argue that the record evidence reflects that Mr. Feldman and Capstone made the decision to reject the Doctors' request to wind-down early without even consulting anyone from PoolRe.[261] The record evidence does not reflect that Mr. Feldman ever diligently represented the Doctors' interests regarding an early wind-down in discussions with anyone at PoolRe.

**153)**  Mr. Feldman and Capstone argue that Mr. Feldman disclosed the existence of an "'escrow' arrangement or early 'liquidation'" in an e-mail Mr. Feldman sent December 16, 2019.[262]  But Mr. Feldman's December 16, 2019 e-mail rejected the Doctors' request for an early liquidation, stating that the parties meant to "establish a long-term relationship and to provide for the management of the captives throughout the term of the contract" (*i.e.*, August 2021).[263] Mr. Feldman further sent an e-mail to the Doctors twelve days later on December 28, 2019, rejecting again the

---

[259] *See* Transcript, Volume 22, October 1, 2021, at p. 8862, line 4 – p. 8865, line 25 (Robert Snyder).  The May 7, 2020, arbitration demand filed by Capstone and PoolRe against the Doctors in the Dorfman Arbitration is in the record at Exhibit DRS-1460.

[260] *See* Transcript, Volume 22, October 1, 2021, at p. 8983, line 13 – p. 8987, line 15 (Robert Snyder).  The ACH transfer of $10,000 from PoolRe's account to pay for arbitration fees in the Dorfman arbitration can be found in the record at Exhibit DRS-2004 at Joint-401677.

[261] *See* Transcript, Volume 22, October 1, 2021, at p. 8947, line 25 – p. 8948, line 12 (Robert Snyder).

[262] *See* FCP's Post-Trial Brief at p. 224 (citing Exhibit FC-270, E-mail from Mr. Feldman (Dec. 16. 2019)).

[263] *See* Exhibit FC-270, E-mail from Mr. Feldman at FC-270.0001.

Doctors' request for an early liquidation, in which Mr. Feldman stated that "the term through August 2021 means exactly that – a term through August 2021."[264]   The record does not support Mr. Feldman's or Capstone's contention that Mr. Feldman put forth any effort in assisting the Doctors with shutting down their captive program early.

**154)**   The Doctors argue that before filing suit against the Doctors on May 7, 2020, Mr. Feldman did not discuss with anyone from PoolRe the possibility of entering into a Claims Reserve Payment Agreement or some other mechanism to facilitate an early liquidation of the Doctors' captives,[265] just as Mr. Feldman and PoolRe had done for thirteen other clients in the span of merely two years.[266]

**155)**   The Doctors argue further that it was feasible for Mr. Feldman to facilitate or assist with the early liquidation of the Doctors' captives.[267]  The only liabilities that needed to be resolved before the captives could liquidate were risk pool claim losses and administrative expenses.[268]  These losses and expenses were historically non-

---

[264] *See* Exhibit J-90, E-mail from Stewart A. Feldman at C_19549 (Dec. 28, 2019); *see also* Transcript, Volume 8, August 17, 2021, at p. 2963, line 7 – p. 2965, line 20 (Richard Amoroso).

[265] *See, e.g.*, Transcript, Volume 22, October 1, 2021, at p. 8967, line 16 – p. 8969, line 21; p. 8972, lines 1-16 (Robert Snyder).

[266] *See* Exhibit DRS 2006, Chart Summarizing Dates of Claims Reserve Payment Agreements executed by PoolRe.

[267] The PoolRe agreements contemplate early termination from the pool, stating, "Any intent to liquidate or wind up or notice of same terminates participation in the Risk Pool unless expressly waived in writing by PoolRe making specific reference to this Paragraph 3.B." *See* Transcript, Volume 22, October 1, 2021, at p. 8920, lines 11-19 (Robert Snyder). Reinsurance industry custom and practice made it feasible to allow the captives to exit the pool early. *See* Transcript, Volume 11, August 20, 2021, at p. 4285, line 16 – p. 4291, line 15 (Pete Rauner).

[268] *See* Transcript, Volume 22, October 1, 2021, at p. 8952, lines 13-17 (Robert Snyder).

existent or *de minimis*.[269] From 2008 to 2016, pool participants incurred $0 in claim losses and $0 in administrative expenses.[270] In the 2017 risk pool, the Doctors' quota share of administrative expenses was "short of $1,800," and their share of claim losses was only about $29,155.[271] The 2017 risk pool held $229,659.12 of retained premiums belonging to the Doctors' captives, which far exceeded the amount needed to pay the 2017 pool's *de minimis* administrate expenses and claim losses.[272] In the history of PoolRe, there has never been a funding call, meaning that the pool participants' retained premiums held in trust by Capstone had always been sufficient to pay claim losses and administrative expenses, if any, in the risk pool.[273]

**156)**  The Doctors also argue that Mr. Feldman represented to the Doctors in the Joint Engagement Letter that they would not be responsible for PoolRe's incremental operating costs.[274] Consistent with that representation, pool participants

---

[269] As Arbitrator Kutcher astutely noted: "[I]sn't the object of this entire exercise, entire turn-key operation, to write policies which create sufficient risk to satisfy IRS requirements but are not likely to be called upon for payment of claims – as opposed to a straight-up malpractice claim or a car accident claim?" *See* Transcript, Volume 13, August 22, 2021, at p. 4927, line 13 – p. 4928, line 3 (Arbitrator Kutcher).

[270] *See Reserve Mech. Corp. v. Comm'r*, 115 T.C.M. 1475, 2018 WL 3046596, at *9 (T.C. 2018) ("Reserve's general ledger reflects that Reserve bore no losses under the quota share policy for 2008. . . For 2009 and 2010 Reserve recorded no losses in connection with the quota share policies."); *see also* Transcript, Volume 11, August 20, 2021, at p. 4372, line 14 – p. 4376, line 9 (Pete Rauner) (citing Exhibit DRS-2277, FCP's Supplemental Joint Objections and Responses to Doctors' First Set of Discovery Requests at Response to Interrogatory No. 7; Exhibit DRS-524, Capstone Memorandum regarding 2016 Risk Pool Final Settlement (Sept. 11, 2017).

[271] *See* Transcript, Volume 11, August 20, 2021, at p. 4376, line 10 – p. 4377, line 10 (Pete Rauner).

[272] *See* Exhibit DRS-525, 2017 Risk Pool Final Settlement at C_19542 (reflecting a total of $229,659.12 for the "Retention" belonging to Janus, Orion, and Cerberus collectively).

[273] *See* Transcript Volume 22, October 1, 2021, at p. 8784, lines 19-23 (Robert Snyder) (citing Exhibit-DRS 525, Capstone Memo regarding 2017 Risk Pool Final Settlement).

[274] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011104 ("PoolRe conducts the pooling program for a fee (that is on a contract basis) paid by Capstone but is independently carried out by PoolRe. There should be no incremental operating cost to the pool participants.")

were charged $0 for PoolRe's operating costs or administrative expenses from 2008 to 2016. Pool participants were then charged a *de minimis* amount for PoolRe's operating costs for the 2017 risk pool. FCP then charged pool participants $250,000 for PoolRe's alleged operating costs or administrative expenses in the 2018 pool[275] and $3,042,427.37 for PoolRe's alleged operating costs or administrative expenses in the 2019 pool.[276] These alleged operating costs or administrative expenses of PoolRe in the 2018 and 2019 risk pools are, in actuality, Feldman's, Capstone's, and PoolRe's attorneys' fees and expenses incurred in these arbitration proceedings.[277]

**157)** That the fact that PoolRe charged 2018 pool participants $250,000 and the 2019 pool participants $3,042,427.37 for FCP's attorneys' fees and expenses in these arbitrations under the guise of PoolRe's alleged operating costs or administrative expenses is improper and reflects Mr. Feldman and Capstone subordinating their clients' interests to their own.[278] This determination is bolstered by PoolRe's

---

[275] *See* Exhibit-DRS 2543, Capstone's Final Report on the 2018 Risk Pool (July 27, 2021); *see also* Transcript, Volume 11, August 20, 2021, p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript Volume 17, September 23, 2021, p. 6857, line 5 – p. 6858, line 18 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 8794, line 8 – p. 8795, line 6 (Robert Snyder); Transcript, Volume 7, August 16, 2021, at p. 2544, lines 3-12 (Richard Amoroso).

[276] *See* Transcript, Volume 18, September 24, 2021, at p. 7013, line 19 – p. 7014, line 9 (Jeff Carlson); Transcript, Volume 7, August 16, 2021, at p. 2552, line 5 – p. 2557, line 23 (Richard Amoroso). From the 2019 risk pool, the retained premium amount was $3,600,262.32. *See* Exhibit DRS-2004, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-401652. Claims losses and expenses for other captives' claims, in an amount of $557,834.94, were deducted from the 2019 pool. *See* Exhibit DRS-2680, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-427016. The remaining $3,042,427.37 from the 2019 pool has been wrongfully converted to pay for FCP's legal fees and expenses in these arbitrations.

[277] *See* Exhibit-DRS 2543, Capstone's Final Report on the 2018 Risk Pool (July 27, 2021); Exhibit DRS-2680, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses.

[278] *See, e.g.,* Transcript, Volumes 6 & 7, August 9 & 16, 2021, at p. 2336, line 24 – p. 2338, line 5; p. 2344, lines 6-15; p. 2348, line 25 – p. 2349, line 16; p. 2510, line 19 – p. 2513, line 10; p. 2536, line 2 – p. 2537, line 11; p. 2540, line 16 – p. 2541, line 19; p. 2544, lines 3-12; p. 2546, line 4 – p. 2549, line 11; p. 2551, lines 10-19; p. 2554, lines 6-

historically non-existent operating costs or administrative expenses and considering Feldman's and Capstone's representation to their clients that they would not be responsible for PoolRe's operating costs.[279]

**158)** That the Doctors' actuarial expert, Pete Rauner, conducted an actuarial estimation of the maximum, worst-case amount of liabilities that the Doctors' captives could owe to the 2019 risk pool. Mr. Rauner provided unrebutted expert testimony that PoolRe was retaining sufficient premiums belonging to the Doctors' captives "well beyond the range . . . of reasonable expectation" to cover the liabilities that the Doctors' captives could possibly owe to the 2019 risk pool.[280] The Doctors argue that considering Mr. Rauner's testimony, there is no good faith explanation for Feldman's failure to assist, let alone put forth a diligent effort in assisting, the Doctors in their request to shut down their captives.

**159)** FCP has consistently argued that this matter of a wind-down was resolved in the Judge Dorfman argitration and is not properly before this Arbitrator. I disagree. The matter is before this Arbitrator to determine whether Mr. Feldman as their attorney had a duty to the Doctors, his clients, to assist in whatever manner he could in their request for a wind-down. Absent an ability to assist his clients or should he

---

16; p. 2555, line 12 – p. 2557, line 23; p. 2564, line 4 – p. 2565, line 23; p. 2568, line 18 – p. 2571, line 13; p. 2579, line 19 – p. 2580, line 8; p. 2584, line 7 – p. 2585, line 6; p. 2598, line 2 – p. 2607, line 18 (Richard Amoroso).

[279] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011104.

[280] *See* Transcript, Volume 11, August 20, 2021, at p. 4301, line 4 – p. 4317, line 13 (citing Exhibit-DRS 2538, Pete Rauner's February 4, 2021, Disclosure; Exhibit DRS-1563, Doctors' Proposed Escrow Agreement); *see also* Exhibit-DRS 2545, Pete Rauner's Updated Disclosure, Dated July 31, 2021.

have found himself with a conflict of interest, Mr. Feldman as attorney for the Doctors owed a duty to assist the Doctors in their wind-down request. The record is clear that Mr. Feldman did not render assistance to his clients, the Doctors upon their request.

**160)**  Based on the totality of evidence and testimony in the record, this Arbitrator finds that Mr. Feldman as attorney for the Doctors failed to put forth a diligent effort on behalf of the Doctors in responding to or assisting the Doctors with their request for a wind-down of their captives, thereby breaching fiduciary and professional duties.

**161)**  This Arbitrator holds that the above findings of fact support the Doctors' claims against Mr. Feldman for legal malpractice, breach of fiduciary duty, professional negligence, negligence, fraudulent misrepresentation, negligent misrepresentation, violations of the Texas Deceptive Trade Practices Act, and violations of the Texas Insurance Code, and RICO.

## SCHEME TO KEEP 2018 AND 2019 RISK POOLS OPEN

**162)**  The Doctors next argue that Mr. Feldman, Capstone and PoolRe perpetrated a scheme to keep the 2018 and 2019 risk pools open and convert their clients' funds held in those risk pools to pay for Mr. Feldman, Capstone and PoolRe's fees and expenses in fighting their clients. While Capstone and Mr. Feldman have still not wound down or liquidated the Doctors' captives, notwithstanding that the Joint

Engagement Letter provides for a liquidation date on or about August 31, 2021.[281] Because the Doctors' captives have not been wound down, the Doctors argue that they have been subjected to Mr. Feldman's and Capstone's scheme to convert the premiums belonging to the Doctors' captives held in the risk pools.

**163)**   This Arbitrator reiterates that the liability for his failure to assist the Doctors with the wind-down request is exclusive to Mr. Feldman as attorney for the Doctors. However, the question as to whether the 2018 and 2019 risk pools are being arbitrarily kept open to assist Mr. Feldman, Capstone and Poolre is the next question before this Arbitrator.

**164)**   The Doctors argue that the entire Feldman / Capstone captive business model was in peril because of the Tax Court's June 18, 2018, decision in *Reserve Mechanical*. That Historically, Mr. Feldman and Capstone assisted many of their captive clients exit early from PoolRe risk pools that closed before the June 18, 2018 *Reserve Mechanical* decision.[282] That Mr. Feldman and Capstone allowed many of their captive clients in the 2016 to 2018 risk pools to liquidate early,.[283] but that Mr. Feldman and Capstone have not allowed any captives in the 2019 risk pool to liquidate early.[284]   They argue that this action of not liquidating is designed to

---

[281] *See* Exhibit J-20, Capstone Services Agreement at § 4.6, at SULLIVAN011090 – 91.

[282] *See* Exhibit DRS-2006, Chart of Captive Liquidations.

[283] *See* Exhibit DRS-2003, Chart of Captive Liquidations (identifying fifteen captives that participated in the 2016 to 2018 risk pools that liquidated early).

[284] *See* Exhibit DRS-2003, Chart of Captive Liquidations (identifying zero captives that participated in the 2019 risk pool that liquidated early).  A "run on the risk pool" was described by a *Forbes* publication.  *See* Exhibit DRS-74,

subordinate the interest of the Feldman/Capstone clients to their own and to the

detriment to the clients. The Doctors argue that Mr. Feldman and Capstone refused

to allow 2019 pool participants to liquidate early so as to avoid a "run on the risk

pool" because of the June 18, 2018, *Reserve Mechanical* decision. As described by

an article concerning *Reserve Mechanical* published in Forbes Magazine:

> There is also the risk that as some clients withdraw their moneys from
> the risk pools and cease to participate in it, this will further destroy the
> risk distribution of the risk pools as well as potentially render it
> insolvent if there are open claims. Thus, it is a very real possibility that
> as a risk pool starts to shrink in size (a/k/a a "run on the risk pool"), the
> captive manager will simply cease allowing their clients to withdraw
> money from the pool and hold the money until all potential liabilities
> are resolved or expired (known as "run off"), which could be some
> years.[285]

**165)** That Mr. Feldman and Capstone were in fact facing such a run on their PoolRe

risk pool after the *Reserve Mechanical* opinion was issued on June 18, 2018. There

were sixty-eight participating captives in the 2018 risk pool as opposed to fifty

participating captives in the 2019 risk pool.[286] There was also an approximate 50%

decrease in PoolRe's assets and an approximate 45% decrease in direct written

---

*Forbes*, Analysis of the IRS's Big Win Against Risk-Pooled Small Captives in Reserve Mechanical at SULLIVAN016268 (June 25, 2018).

[285] *See* Exhibit DRS-74, *Forbes*, Analysis of the IRS's Big Win Against Risk-Pooled Small Captives in Reserve Mechanical at SULLIVAN016268 (June 25, 2018).

[286] *Compare* Exhibit DRS-71A, Schedule of Participating Captives in the 2018 Risk Pool, *with* Exhibit DRS-72A, Schedule of Participating Captives in the 2019 Risk Pool. Forestry CC and Family CC are listed twice in the Schedule of Participating Captives in the 2019 Risk Pool, meaning that there were only fifty participating captives in that 2019 pool year.

premiums to PoolRe from the end of 2018 to the end of 2019.[287]  These facts reflect

the threat posed by the *Reserve Mechanical* opinion to FCP's entire business model.

According to Mr. Feldman, "I think it is fair to say that this case will determine the

fate of the captive industry for the foreseeable future."[288]

**166)**  That shortly after the June 18, 2018, *Reserve Mechanical* decision, *Forbes*

published an article advising participants in PoolRe to "**Get Your Money Out of**

**the Risk Pool Immediately**."[289]  The author of the article described unscrupulous

captive managers using their risk pools and their clients' money to fight against their

clients:

> Indeed, I have seen evidence to suggest that at least some captive
> managers have been using their risk pools to write insurance policies to
> themselves for things such as tax liability and also errors & omissions
> (E&O) and directors & officers (D&O) insurance, such that
> theoretically the captive manager could make claims against the risk
> pool to pay the manager's own tax liabilities and fight their clients'
> lawsuits – with their clients' own money.[290]

**167)**  The Doctors argue that unbeknownst to them, Capstone and Mr. Feldman had

already implemented a scheme to use the PoolRe risk pools to fight their clients'

lawsuits with their clients' money.  Through this scheme, Mr. Feldman and Capstone

---

[287] *See* Transcript, Volume 23, October 2, 2021, at p. 9498, line 16 – p. 9500, line 20 (Steven Friedman) (citing Exhibit DRS-46, PoolRe's Financial Statements – Statutory Basis, December 31, 2019, and 2018).

[288] *See* Transcript, Volume 14, August 23, 2021, at p. 5252, lines 8-19 (Stewart Feldman (citing Exhibit DRS-2001)).

[289] *See* Transcript, Volume 1, August 3, 2021, at p. 294, line 10 – p. 303, line 2 (Dr. Scott Sullivan) (citing Exhibit DRS-74, *Forbes* article, June 25, 2018).

[290] *See* Transcript Volume 1, August 3, 2021, at p. 301, line 4 – p. 303, line 2 (Dr. Scott Sullivan) (citing Exhibit DRS-74, *Forbes* article, June 25, 2018, at SULLIVAN01629) (emphasis in original)).

have converted $3,354,925.37 of their captive clients' premiums to pay for the legal fees and expenses incurred by FCP in these arbitration proceedings

**168)**   FCP argues that the Joint Engagement Letter allows Capstone and PoolRe to keep open a pool with pending claims, and that there are pending claims for both the 2018 and 2019 calendar years. Further, that until those claims are resolved the 2018 and 2019 pools cannot be closed. Additionally, the premiums on deposit are required to pay expenses of the pool claims during those calendar years, and that the claims from those calendar years are still pending.

**169)**   The Doctors further argue that Mr. Feldman disregarded 2019 pool participants' request for an earl liquidation. That Mr. Feldman and Capstone denied 2019 pool participants early liquidations similar to the early liquidations that Mr. Feldman and Capstone offered and effectuated on behalf of fifteen other captives in the 2016 to 2018 risk pools.   For instance, Class Member Family Casualty Corp. was a captive in the 2019 risk pool.[291]  On January 24, 2019, Family Casualty Corp.'s owner, Dr. Houng Le, directed Capstone to "CLOSE OUT" the captive.[292]  That Mr. Feldman and Capstone disregarded Dr. Le's directive, as reflected in the following internal e-mail from Capstone's President, Jeff Carlson:[293]

---

[291] *See* Exhibit DRS-72A, Schedule of 2019 Pool Participants (identifying Family CC as a 2019 pool participant).

[292] *See* Exhibit DRS-2496, E-mail from Dr. Houng Le (Jan. 24, 2019); *see also* Transcript, Volume 23, October 2, 2021, at p. 9196, line 13 – p. 9198, line 12 (Jeff Carlson).

[293] *See* Exhibit DRS-2496, E-mail from Jeff Carlson to Capstone Operations (Jan. 24, 2019) (emphasis added); *see also* Transcript, Volume 23, October 23, 2021, at p. 9196, line 13 – p. 9199, line 16 (Jeff Carlson). Feldman and Capstone's form Engagement Letter with their captive clients provide that Feldman and Capstone stand ready and willing to assist if the client wishes to shut down their captives. *See, e.g.,* Exhibit J-20 at SULLIVAN011073, Joint

Date: Thu, 24 Jan 2019 19:50:21 +0000
From: Jeff Carlson jcarlson@capstoneassociated.com
To:    Capstone Operations Cap0@capstoneassociated.com
Subject:       FW: [EXTERNAL] Re: Family Casualty Corp –
liquidation

Team, per instruction from SAF, no response or action required
at this time in response to Dr. Le email below. Business as usual.
Thanks, JC

**170)** That despite Dr. Le making a request on January 24, 2019, to wind down and liquidate Family Casualty Corp., Capstone has still not liquidated Family Casualty Corp.[294] Capstone's President, Mr. Carlson, testified that the reason that Family Casualty Corp. has not been liquidated is because of Family Casualty Corp.'s obligations to the 2019 risk pool.[295]

**171)** Similarly, Class Member Stampings Casualty Corp. participated in the 2019 risk pool.[296] On July 8, 2019, Norman French, on behalf of Stampings Casualty Corp. and its insured, Class Member Profile Holdings, Inc., provided a "Timely Notice of Termination of Services."[297] The letter indicated that Stampings and Profile would not be renewing the Capstone agreement or "issuing policies in the 2020 fiscal year" and looked forward to "wind[ing] down" their relationship with

---

Engagement Letter with the Doctors at p. 8; Exhibit DRS-2245 at Joint-421887, Joint Engagement Letter with the Family Parties at p. 7.

[294] *See* Transcript, Volume 23, October 2, 2021, at p. 9199, line 17 – p. 9205, line 20 (Jeff Carlson).

[295] *See* Transcript, Volume 23, October 2, 2021, at p. 9204, line 23 – p. 9205, line 20; p. 9226, line 8 – p. 9227, line 6 (Jeff Carlson).

[296] *See* Exhibit DRS-72A, Schedule of 2019 Pool Participants (identifying Stampings CC as a 2019 pool participant).

[297] *See* Transcript, Volume 23, October 2, 2021, at p. 9221, line 24 – p. 9222, line 12 (Jeff Carlson) (citing Exhibit DRS-2508, Stampings Casualty Corp.'s Letter to Capstone (July 8, 2019)).

Capstone."[298] Mr. French, on behalf of Stampings and Profile, followed up with

Capstone on September 13, 2020 regarding the requested "[d]issolution of

Stampings," stating:

> [I]t is imperative that we get this complete as quickly as
> possible. We do not want to spill activity into 2021. . ..
> Stampings and Profile have honored the agreement with
> Capstone paying our administration in full and on time
> each quarter even though we issued no insurance policies
> in 2020. We expect Capstone to do the same and complete
> the dissolution as described in the agreement.[299]

**172)** Despite Stampings Casualty Corp. requesting a wind-down on July 8, 2019,

Capstone has still not wound-down or liquidated Stampings.[300] Capstone's

President, Mr. Carlson, explained that Stampings would have been liquidated "if not

for the fact that the 2019 pool remains open."[301] Mr. Carlson testified that there are

six to eight captives that participated in the 2019 risk pool that want to be wound

down and liquidated but cannot because the 2019 pool remains open.[302] According

to Mr. Carlson, "the only claims that are keeping the 2019 pool open are the policy

claims pending against AMY and costs related to the arbitrations."[303] And the

A.M.Y. claims and costs of these arbitration proceedings have been fraudulently

---

[298] *See* Exhibit DRS-2508, Stampings Casualty Corp.'s Letter to Capstone (July 8, 2019).

[299] *See* Transcript, Volume 23, October 2, 2021, at p. 9223, line 21 – p. 9226, line 7 (Jeff Carlson) (citing Exhibit DRS-2509, E-mail from Norman French (Sept. 13, 2020)).

[300] *See* Transcript, Volume 23, October 2, 2021, at p. 9226, lines 8-16 (Jeff Carlson).

[301] *See* Transcript, Volume 23, October 2, 2021, at p. 9226, line 8 – p. 9227, line 6 (Jeff Carlson).

[302] *See* Transcript, Volume 23, October 2, 2021, at p. 9226, line 8 – p. 9229, line 23 (Jeff Carlson).

[303] *See* Transcript, Volume 23, October 2, 2021, at p. 9232, lines 15-20 (Jeff Carslon).

charged to the 2018 to 2020 risk pools as part of Mr. Feldman's and Capstone's scheme to convert their clients' money to fight against their clients in litigation, as discussed below.

**173)** The Doctors also argue that FCP perpetrated a scheme to improperly keep the 2018 risk pool and 2019 risk pools open to force these pool participants into paying for FCP's litigation fees and expenses in these arbitrations. According to Capstone's President, Mr. Carlson, as long as the risk pool remains open, the captive clients participating in that open pool will be charged a share of Feldman's, Capstone's, and PoolRe's continually accruing legal fees and expenses.[304] FCP has also threatened future funding calls to be paid by 2019 pool participants in unlimited amounts for additional fees and costs incurred by FCP in litigating against their clients. Mr. Carlson testified that there is no limit or cap on the amount of fees and expenses incurred by FCP that FCP can charge to their clients through funding calls.[305]

**174)** As of December 4, 2020, at the latest, all policy claims associated with the 2018 risk pool had been resolved.[306] That the Doctors' reinsurance expert, Mr. Amoroso, explained that the 2018 pool should have been closed and all money held

---

[304] *See, e.g.,* Transcript, Volume 23, October 2, 2021, at p. 9233, line 2 – p. 9234, line 21; p. 9256, line 1 – p. 9257, line 1 (Jeff Carlson).

[305] *See* Transcript, Volume 15, Aug. 24, 2021, at p. 5918, line 1 – p. 5920, line 9 (Jeff Carlson).

[306] *See* Transcript, Volume 7, August 16, 2021, at p. 2535, line 12 – p. 2536, line 1 (Richard Amoroso) (citing Exhibit J-110, Capstone E-mail (Dec. 4, 2020)).

in trust returned to the 2018 pool participants after the last policy claim associated

with the 2019 pool had resolved:

> [I]f there is no claims, there is nothing left related to the 2018 pool
> claims that could, you know, resolve in a claim handling type expense
> or indemnity. So if you've got no claims, you've got nothing to handle,
> you've got nothing to administer, you've got no more claims to resolve,
> I believe the reinsurance agreements are pretty clear and say there
> should be a final resolution or a final accounting at that point and
> whatever money is being held in trust for the 2018 pool participants
> should be sent – should be redistributed back to them.[307]

**175)**    The Doctors argue that FCP did not close the 2018 risk pool in December

2020.[308] Nor did FCP send the 2018 pool participants back their money held in trust

in the 2018 risk pool after the last 2018 policy claim closed.[309] That FCP kept the

2018 risk pool open until July 27, 2021 so that FCP could take $250,000 of the 2018

pool participants' premiums to pay for the legal fees and expenses incurred by FCP

in these arbitration proceedings.[310] That PoolRe director, Mr. Snyder, testified that

FCP "reached kind of an arbitrary decision" in charging the 2018 pool participants

$250,000 for FCP's legal fees and expenses in these arbitration proceedings.[311]

**176)**    The Doctors argue that FCP has not articulated any plausible connection

between the fees and expenses it incurred in these arbitration proceedings and the

---

[307] *See* Transcript, Volume 7, August 16, 2021, at p. 2536, line 2 – p. 2537, line 11 (Richard Amoroso).
[308] *See* Transcript, Volume 7, August 16, 2021, at p. 2537, line 1 – p. 2541, line 19 (Richard Amoroso).
[309] *See* Transcript, Volume 7, August 16, 2021, at p. 2537, line 1 – p. 2541, line 19 (Richard Amoroso).
[310] *See* Transcript, Volume 7, August 16, 2021, at p. 2537, line 1 – p. 2549, line 11 (Richard Amoroso); *see also* Transcript, Volume 22, October 1, 2021, at p. 8956, line 20 – p. 8957, line 24 (Robert Snyder) (citing Exhibit DRS-2543, E-mail from Capstone Accounting Department (July 27, 2017)).
[311] *See* Transcript, Volume 22, October 1, 2021, at p. 8793, line 8 – p. 8794, line 6 (Robert Snyder).

2018 risk pool. The Doctors' reinsurance expert, Mr. Amoroso, provided unrebutted expert testimony that FCP's use of their client's money held in the risk pools to fund FCP's litigation expenses in these arbitration proceedings was "inappropriate based on everything [he] know[s], industry custom and practice, [his] years of dealing with the reinsurance industry. It's just inappropriate."[312]

**177)** The Doctors also argue that the 2019 risk pool has also been kept open improperly. The only claims keeping the 2019 risk pool open are Mr. Feldman and Capstone's own claims.[313] To keep the 2019 risk pool open indefinitely, Mr. Feldman and Capstone submitted, opened, and refused to investigate or close at least twenty-one separate claims under their professional liabilities, errors & omissions, and legal expense policies included in the risk pool.[314] FCP's reinsurance expert, Phil Cabaud, testified that if Capstone or Mr. Feldman do not want to seek reimbursement for their open claims, they could leave those claims open and lock

---

[312] *See, e.g.,* Transcript, Volumes 6 & 7, August 9 & 16, 2021, at p. 2336, line 24 – p. 2338, line 5; p. 2344, lines 6-15; p. 2348, line 25 – p. 2349, line 16; p. 2510, line 19 – p. 2513, line 10; p. 2536, line 2 – p. 2537, line 11; p. 2540, line 16 – p. 2541, line 19; p. 2544, lines 3-12; p. 2546, line 4 – p. 2549, line 11; p. 2551, lines 10-19; p. 2554, lines 6-16; p. 2555, line 12 – p. 2557, line 23; p. 2564, line 4 – p. 2565, line 23; p. 2568, line 18 – p. 2571, line 13; p. 2579, line 19 – p. 2580, line 8; p. 2584, line 7 – p. 2585, line 6; p. 2598, line 2 – p. 2607, line 18 (Richard Amoroso).

[313] *See* Transcript, Volume 7, August 16, 2021, at p. 2527, line 6 – p. 2530, line 2 (Richard Amoroso) ("[T]he only claims preventing the 2019 risk pool from closing . . . were claims files by the Feldman Law Firm and/or Capstone."); Transcript, Volume 23, October 2, 2021, at p. 9232, lines 15-20 (Jeff Carlson).

[314] *See* Transcript, Volume 11, August 20, 2021, at p. 4318, line 7 – p. 4320, line 1 (citing Exhibit DRS-2000, 2019 Claims Summary Chart); Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart A. Feldman (June 6, 2020, 17:17 CST); Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

the captives in the pool indefinitely.[315]    The Doctors argue that this is what Mr. Feldman and Capstone have done precisely.

**178)**    The Doctors further argue that Mr. Feldman and Capstone's intent to keep the 2019 risk pool open indefinitely to the detriment of their clients is further established by Capstone's and Mr. Feldman's allegedly backdating of their own claims regarding the 2020-2021 arbitrations with the Doctors to the 2019 risk pool.    On June 10, 2020, Feldman's and Capstone's Controller, Paul Franks, e-mailed the Capstone Insurance Department the New Claim Report regarding the 2020 arbitrations with the Doctors.[316]    The New Claim Report regarding the 2020 arbitrations with the Doctors provides a false date of loss of December 31, 2019.[317] The New Claim Report also states:[318]

> Insureds may be potentially counter sued by Janus Insurance Corp., Cerberus Insurance Corp., Orion Insurance Corp., Center for Restorative Breast Surgery, LLC, St. Charles Surgical Hospital, and/or related persons or entities alleging Breach of Fiduciary Duty (Claim No. 45). Reserve for $1,000 for Legal Expense.

**179)**    The Doctors argue that it is undisputed that the Doctors did not sue or counter-sue Capstone or Feldman at any time in the 2019 calendar year.[319]    That nonetheless,

---

[315] *See* Transcript, Volume 18, September 24, 2021, at p. 7238, line 21 – p. 7239, line 4; p. 7243, line 1 – p. 7250, line 8 (Phil Cabaud).  As seen in this cited excerpt, a portion of Mr. Cabaud's deposition was read into the record for impeachment purposes.  While Mr. Cabaud stated that he believed he misunderstood the deposition question, the record reflects a clear answer provided under oath by Mr. Cabaud at his deposition, as well as Mr. Cabaud's acknowledgment that it was possible for Feldman and Capstone to leave the clients trapped in the risk pool indefinitely.

[316] *See* Exhibit DRS-1463, E-mail from Paul Franks (June 10, 2020, 17:08 CST) (citing Exhibit DRS-564).

[317] *See* Exhibit DRS-564, New Claim Report for the Dispute with the Doctors.

[318] *See* Exhibit DRS-564, New Claim Report for the Dispute with the Doctors (emphasis added).

[319] *See* Transcript, Volume 16, September 14, 2021, at p. 6392, lines 16-20 (Daniel Calderon).

Capstone opened multiple claims in the 2019 pool relating to the arbitrations with the Doctors that did not commence until 2020.[320]

**180)** That Mr. Feldman and Capstone contend wrongly that "*in 2019*, [Dr. Sullivan] threatened to sue the Feldman and Capstone Parties for damages; stated his intent to file a State Bar complaint; accused the Feldman and Capstone Parties of negligence, 'willful misconduct,' and conflicts of interest; and foreshadowed the flood of litigation to come, proclaiming that '[he's] fine stepping up with the big boys' and 'we will come knocking.' EXs FC-294, FC-297."[321] They argue that the only two exhibits cited by Mr. Feldman and Capstone to support this contention (*i.e.*, EXs FC-294 and FC-297) were e-mails sent by Dr. Sullivan in April *2020*. That Mr. Feldman and Capstone have failed to identify any documents reflecting a threat of litigation sent or a "claim made" by the Doctors in 2019.[322] Nor did Mr. Feldman or Capstone introduce into the record any written notice of loss created or sent by Mr. Feldman or Capstone in the 2019 calendar year.[323] Indeed, as of January 1, 2020, Mr. Feldman and Capstone were still acting officially as the Doctors' lawyer and captive manager respectively.[324]

---

[320] *See* Exhibit DRS-1460, Capstone's Arbitration Demand against the Doctors in the Dorfman Arbitration.

[321] *See* FCP's Post-Trial Brief at p. 10 (emphasis added) (citing Exhibit FC-294, E-mail from Dr. Sullivan (Mar. 21, 2020); FC-Exhibit-297, E-mail from Dr. Sullivan (Apr. 27, 2020)).

[322] The Doctors' claims handling expert, Louis Fey, provided unrebutted expert testimony that a few e-mails sent by Dr. Sullivan in late 2019 expressing some frustration with his lawyer, Mr. Feldman, amounted to nothing more than "sticks and stones" but did not come close to constituting a claim. *See* Transcript, Volume 8, August 17, 2021, at p. 3111, line 12 – p. 3121, line 3 (Louis Fey).

[323] *See* Transcript, Volume 13, August 22, 2021, at p. 5053, line 11 – p. 5060, line 15 (Stewart Feldman).

[324] *See* Transcript, Volume 1, August 3, 2021, at p. 258, line 3 – p. 261, line 11 (Dr. Scott Sullivan).

**181)**  That A.M.Y.'s 2019 legal expense, errors & omissions, and professional liability insurance policies are "CLAIMS MADE POLIC[IES]."[325]  Capstone first sued the Doctors on May 7, 2020.[326]  There was no litigation or arbitrations with the Doctors in 2019.[327]  The Doctors' claims handling expert, Louis Fey, offered unrebutted expert testimony that the claims regarding the Doctors were not covered by the 2019 A.M.Y. policies.[328]  The A.M.Y. claims regarding the Doctors had no business in the 2019 pool and should have been included, if anywhere, in the 2020 pool.

**182)**  That the Doctors did not participate in the 2020 risk pool.[329]  Thus, Capstone and Mr. Feldman could not get the Doctors to pay Capstone's and Mr. Feldman's claim for reimbursement of legal fees incurred in these arbitration proceedings, or get the Doctors to indemnify Capstone or Mr. Feldman for any damages resulting from Capstone's and Mr. Feldman's breach of fiduciary duties or errors & omissions to the Doctors, unless Capstone and Feldman fraudulently backdated their A.M.Y. claims concerning the Doctors to the 2019 pool.  And that Mr. Feldman and Capstone could not use their 2020-commenced arbitrations with the Doctors as the

---

[325] *See* Exhibit DRS-2108, AMY's 2019 Errors & Omissions Insurance Policy at Joint-331505; Exhibit DRS-2110, AMY's 2019 Legal Expenses Reimbursement Policy at Joint-331780; Exhibit DRS-2109, AMY's 2019 Lawyers Professional Liability Insurance Policy at Joint-331732.

[326] *See* Exhibit DRS-1460, Capstone's Arbitration Demand against the Doctors in the Dorfman Arbitration (May 7, 2020).

[327] *See* Transcript, Volume 1, August 3, 2021, at p. 260, lines 9-12 (Dr. Scott Sullivan).

[328] *See* Transcript, Volume 8, August 17, 2021, p. 3103, lines 10-23; p. 3110, line 13 – p. 3111, line 4 (Louis Fey).

[329] *See* Transcript, Volume 22, October 1, 2021, at p. 8786, lines 19-21 (Jeff Carlson).

basis to deny the Doctors' request for a liquidation unless the claims were fraudulently kept open in the 2019 pool.

**183)** That Capstone and Mr. Feldman submitted a backdated New Claim Report for the 2020 arbitrations with the Doctors listing a false date of loss of December 31, 2019.[330] That no record evidence supports any loss occurring on December 31, 2019 or at any time in 2019.[331] That Capstone and Mr. Feldman knew that the December 31, 2019 date of loss was false and that they had not been sued or counter-sued by the Doctors in 2019.

**184)** That the 2019 A.M.Y. Legal Expense Reimbursement Insurance Policy only covers "Litigation Expenses" *"first expensed"* by Capstone or Mr. Feldman *"during the policy period"* (*i.e.*, 2019).[332] Thus, for the legal expense reimbursement claim to be possibly included in the 2019 risk pool, Capstone and Mr. Feldman needed to present an invoice for Litigation Expenses "first expensed" during the 2019 calendar

---

[330] *See* Exhibit DRS 564, New Claim Report for Dispute with the Doctors.

[331] On May 7, 2020, Capstone sued the Doctors in the Dorman Arbitration for alleged breach or anticipatory breach of the parties' agreements regarding the Doctors' request in 2019 that Capstone and Feldman wind down and liquidate the Doctors' captives. *See* Exhibit J-115, Final Arbitration Award at ¶ 31 (Nov. 9, 2020) (Dorfman Arbitration). Judge Dorfman denied Capstone' claim, ruling:

> The Tribunal . . . **DENIES** Capstone's breach of contract action predicated on the breach or anticipatory breach by [the Doctors] requesting that their Captives be wound down and liquidated both quickly and substantially in advance of the Year End Termination Date. *No breach occurred by [the Doctors] request, and no damages to [Capstone] flowed therefrom.*

*Id.* at ¶ 32 (emphasis added and in original). Thus, Capstone cannot demonstrate any damage or loss occurring in the 2019 calendar year relating to the dispute with the Doctors. Judge Dorfman already ruled in his Final Arbitration Award that no damages resulted from the Doctors' mere request for a wind-down and liquidation.

[332] *See* Exhibit DRS 2110, AMY's 2019 Legal Expenses Insurance Policy at Joint-331789 (emphasis added); *see also* Transcript, Volume 8, Aug. 17, 2021, at p. 3086, line 23 – p. 3087, line 6 (Louis Fey). *See id.* at ¶ 32 (emphasis in original and added).

year.[333] That Capstone and Mr. Feldman did not present a single document reflecting litigation expenses first expensed in the 2019 calendar year regarding the dispute with the Doctors.   That in fact, Capstone's President, Mr. Carlson, testified that Capstone did not obtain legal counsel regarding the dispute with the Doctors until January 2020.[334]

**185)** And, Capstone and Mr. Feldman submitted Affidavits regarding "all time entries" of litigation expenses incurred by Mr. Feldman and Capstone relating to the first arbitration with the Doctors, the Dorfman arbitration.[335]  That these Affidavits confirm that Capstone and Mr. Feldman did not incur legal expenses at any time in the 2019 calendar year regarding the dispute with the Doctors.[336]  That these facts establish that Mr. Feldman's and Capstone's legal expense reimbursement claim regarding the Doctors has been backdated and kept open wrongfully in the 2019 pool.

**186)** That Capstone's and Mr. Feldman's actions in keeping open claims in the 2019 risk pool relating to the 2020 arbitrations with the Doctors is part of a

---

[333] *See* Transcript, Volume 8, August 17, 2021, at p. 3093, line 15 – p. 3104, line 21 (Louis Fey).  In its normal course of business, Capstone routinely demands invoices and denies other captives' claims when supporting documentation is not provided promptly. *See, e.g.,* Transcript, Volume 16, September 14, 2021, at p. 6286, line 15 – p. 6309, line 21 (Daniel Calderon).

[334] *See* Transcript, Volume 15, August 24, 2021, at p. 5719, lines 6-11 (Jeff Carlson).

[335] *See* Exhibit DRS-723, Joseph Greenberg's Affidavit at p. 6 (Dorfman Arbitration); Exhibit DRS-724, Andy Paredes' Affidavit at p. 6 (Dorfman Arbitration); *see also* Transcript, Volume 8, August 17, 2021, at p. 3094, line 10 – p. 3103, line 23 (Louis Fey).

[336] *See* Exhibit DRS-723, Joseph Greenberg's Affidavit at p. 6 (Dorfman Arbitration); Exhibit DRS-724, Andy Paredes' Affidavit at p. 6 (Dorfman Arbitration); *see also* Transcript, Volume 8, August 17, 2021, at p. 3094, line 10 – p. 3103, line 23 (Louis Fey).

fraudulent scheme to keep the 2019 pool open indefinitely so as to force 2019 pool participants into paying Feldman's and Capstone's legal fees and expenses in these arbitration proceedings.

**187)** Mr. Feldman and Capstone argue that the Doctors were participants in a risk program where the reinsurance of risk was always there. That the risk pools accepted all claims made in a timely manner and that there is no evidence by the Doctors that the claims remaining open are backdated or untimely. That the Doctors know very well that Capstone does not manage any Captive's claims and that Capstone cannot close any Risk Pool until all claims for the period have been resolved.

**188)** The Doctors further argue that on June 6, 2020, Stewart Feldman directed Feldman's and Capstone's Controller, Paul Franks, and Capstone's Head of Operations, Daniel Calderon, to submit A.M.Y.'s claims to the 2019 risk pool.[337] That four days later, on June 10, 2020, Paul Franks e-mailed the Capstone Insurance Department "six attached New Claim Reports for the Feldman Law Firm."[338] That Daniel Calderon, on behalf of the Capstone Insurance Department and PoolRe, confirmed, via e-mail, receipt of the claims.[339]

---

[337] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart Feldman (June 6, 2020, 17:17 CST)).

[338] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[339] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

**189)**   That five of these New Claims Reports submitted by Feldman and Capstone listed a false date of loss of December 31, 2019.[340]   That no record evidence establishes any loss incurred by Mr. Feldman or Capstone on that date or at any time in the 2019 calendar year relating to those disputes.[341]   That each of these New Claim Reports described the alleged loss to Capstone and Mr. Feldman as follows: "[Capstone and Mr. Feldman] may be potentially countersued" by a captive client of Mr. Feldman and Capstone.[342]

**190)**   The Doctors argue that a potential countersuit in the future does not qualify as a claim.[343] That Capstone knew that a potential countersuit did not qualify as a legitimate claim.   Indeed, Capstone, on behalf of PoolRe, denied another captive's request for legal expense reimbursement when that captive reported a "potential claim" under its 2019 legal expense reimbursement policy.[344] That Mr. Feldman and Capstone knew that a potential counter-suit in the future was not a valid claim but nonetheless submitted and kept open in the 2019 pool numerous insurance claims for reimbursement to Mr. Feldman and Capstone for the legal fees they would incur in "potential" counter-suits against them.

---

[340] *See* Exhibit DRS-560 to DRS-564, New Claim Reports submitted by Feldman and Capstone.

[341] The Doctors' claims handling expert, Louis Fey, provided unrebutted expert testimony that the claims submitted in Exhibit DRS-560 to DRS-564 were not covered by A.M.Y.'s 2019 policies. *See* Transcript, Volume 8, August 17, 2021, at p. 3051, line 8 – p. 3121, line 3 (Louis Fey).

[342] *See* Exhibit DRS-560 to DRS-564, New Claim Reports submitted by Feldman and Capstone.

[343] *See* Transcript, Volume 8, August 17, 2021, at p. 3055, lines 13-19 (Louis Fey).

[344] *See* Transcript, Volume 16, September 14, 2021, at p. 6307, line 3 – p. 6309, line 21 (Daniel Calderon) (discussing Exhibit DRS-2552, March 4, 2020, Denial Letter of HEC II Assurance's 2019 Legal Expense Reimbursement Claim).

**191)**   That two of these six New Claim Reports e-mailed on June 10, 2020 and opened in the 2019 pool pertained to disputes that Mr. Feldman and Capstone had already settled.[345]   That Capstone and Mr. Feldman knew that they were not going to be "potentially counter-sued by" the Family Parties or the Logistics Parties when Mr. Feldman and Capstone e-mailed New Claim Reports to PoolRe on June 10, 2020.[346]   That Capstone and Mr. Feldman executed Settlement Agreements with the Family Parties and the Logistics Parties months before Capstone and Mr. Feldman opened claims in the 2019 pool relating to already-settled disputes with the Family Parties and Logistics Parties.[347]

**192)**   That these Settlement Agreements required the Family Parties and the Logistics Parties to "fully, finally, and forever, release, acquit, forever discharge, and covenant not to sue any of [the Capstone or Mr. Feldman parties] from and/or for any and all claims, demands, counterclaims, losses, actions, complaints grievances, administrative or regulatory actions, costs and causes of action."[348]   That

---

[345] *See* Transcript, Volume 8, August 17, 2021, at p. 3071, line 7 – p. 3076, line 16 (Louis Fey) (citing Exhibit DRS-563, New Claim Report relating to Family Parties' Dispute); *see also* Transcript, Volume 8, August 17, 2021, at p. 3054, line 19 – p. 3062, line 13 (discussing Exhibit DRS-560, New Claim Report regarding Logistics Parties' Dispute).

[346] *See* Exhibit DRS-563, New Claim Report relating to the Family Parties' Dispute; Exhibit DRS-560, New Claim Report regarding Logistics Parties' Dispute.

[347] *See* Exhibit DRS-1430, Mutual Release and Settlement Agreement with the Family Parties (March 31, 2020); Transcript, Volume 8, August 17, 2021, at p. 3073, line 12 – p. 3076, line 16 (Louis Fey); *see also* See Exhibit DRS-1427, Mutual Release and Settlement Agreement with the Logistics Parties (May 1, 2020); Transcript, Volume 8, August 17, 2021, at p. 3057, line 9 – p. 3062, line 13 (Louis Fey).

[348] *See* Exhibit DRS-1430, Mutual Release and Settlement Agreement with the Family Parties at ¶ 5 (March 31, 2020) (emphasis added); Exhibit DRS-1427, Mutual Release and Settlement Agreement with the Logistics Parties at ¶ 5 (May 1, 2020) (emphasis added).

Mr. Feldman and Capstone's submission of already-settled claims regarding the Family Parties and the Logistics Parties to the 2019 pool was fraudulent.[349]

**193)** Paul Franks' e-mail on June 10, 2020 to the Capstone Insurance Department also submitted a New Claim Report regarding Capstone and Mr. Feldman's alleged dispute with the XtraLight Parties, stating that the XtraLight Parties may potentially counter-sue.[350] But Capstone and Mr. Feldman knew that they had not sued the XtraLight Parties when they submitted this New Claim Report in June 2020.[351] That Capstone and Mr. Feldman knew further that the XtraLight Parties were not going to sue or counter-sue Mr. Feldman or Capstone because the XtraLight Parties declared bankruptcy in 2018, and their contracts, engagement letter, and insurance policies with Capstone and Mr. Feldman were discharged in that bankruptcy as of September 11, 2018.[352]

---

[349] According to the Doctors' claims-handling expert, Louis Fey, Feldman and Capstone's submission of the New Claim Reports regarding already-settled dispute raised a "red flag" and a "fraud indicator." *See* Transcript, Volume 8, August 17, 2021, at p. 3075, line 25 – p. 3076, line 16 (Louis Fey). Feldman and Capstone may argue that the Family and Logistics claims were closed without payment from the risk pool in November 2020. But Feldman and Capstone closed the A.M.Y. claims relating to the Family and Logistics Parties *after* the Doctors filed arbitration demands and RICO claims challenging the fraudulent submission of these claims. *See* Transcript Volume 8, August 17, 2021, at p. 3292, line 5 – p. 3297, line 23 (Louis Fey). The submission of A.M.Y. claims regarding "potential future counter-suits" on matters already settled was fraudulent and constitutes additional predicate acts under RICO. Further, Feldman and Capstone are now backtracking from their assertion that they already closed the Family and Logistics claims, noting in their Post-Trial Brief that these claims "are still pending." *See* FCP's Post-Trial Brief at p. 204, n. 53.

[350] *See* Exhibit-DRS 562, New Claim Report regarding XtraLight Parties

[351] *See* Transcript, Volume 8, August 17, 2021, at p. 3067, line 21 – p. 3071, line 6 (Louis Fey).

[352] *See* Transcript, Volume 8, August 17, 2021, at p. 2945, line 13 – p. 2948, line 16 (Richard Amoroso); *see also* Order Confirming Debtor's Plan at Exhibit A, *In re XtraLight Manufacturing, Ltd.*, No. 18-31857 (S.D. Bank. Tex., Sept. 11, 2018) ("All executory contracts shall be deemed assumed, except the following contracts shall be deemed rejected: 1) Engagement Letter for Formation and Administration of a Captive Insurance Program with the Feldman Law Firm LLP dated November 11, 2011; 2) Contract with Capstone Associated Services, Ltd.; and 3) insurance policies and/or contracts with Illumination Casualty Corp.").

**194)**   That despite the fact that the XtraLight Parties had neither sued nor been sued by Capstone and Mr. Feldman for more than a year after this New Claim Report was submitted, Capstone and Mr. Feldman have kept open claims in the 2019 pool relating to the XtraLight Parties.[353]   That these facts "raised red flags of fraud" according to the Doctors' claims handling expert, Mr. Fey.[354]   The A.M.Y. claims relating to the XtraLight Parties are still open in the 2019 pool, notwithstanding the complete lack of any loss incurred or sustained by Mr. Feldman or Capstone in the 2019 calendar year.[355]   That until these claims are closed or denied, the 2019 pool will remain open.[356]

**195)**   That Mr. Feldman and Capstone have also kept open in the 2019 risk pool claims relating to the "McAda Parties," the "Martinez Parties," and the "Enerset Parties."[357]   These claims should have been opened, if anywhere, in the 2018 risk pool.   The McAda Parties' outside retained counsel sent a formal demand letter to Stewart Feldman on December 7, 2018, referencing expressly Mr. Feldman's violations of the Texas Rules of disciplinary conduct and the Texas Penal Code, and

---

[353] *See* Transcript, Volume 16, September 14, 2021, at p. 6310, line 12 – p. 6315, line 9 (Daniel Calderon).

[354] *See* Transcript, Volume 8, August 17, 2021, at p. 3070, lines 17-25 (Louis Fey).

[355] *See* Transcript, Volume 16, September 14, 2021, at p. 6310, line 12 – p. 6315, line 9 (Daniel Calderon).

[356] *See* Transcript, Volume 7, August 16, 2021, at p. 2527, line 6 – p. 2530, line 2 (Richard Amoroso) ("[T]he only claims preventing the 2019 risk pool from closing . . . were claims files by the Feldman Law Firm and/or Capstone or their insureds of the AMY, P&C captive."); Transcript, Volume 23, October 2, 2021, at p. 9232, lines 15-20 (Jeff Carlson); *see also e.g.* Transcript, Volume 23, October 2, 2021, at p. 9233, line 2 – p. 9234, line 21; p. 9256, line 1 – p. 9257, line 1 (Jeff Carlson).

[357] Capstone's Head of Operations, Daniel Calderon, testified about the A.M.Y. claims regarding the McAda Parties, the Enerset Parties, and the Martinez Parties at Transcript, Volume 16, September 14, 2021, at p. 6394, line 14 – p. 6435, line 8 (Daniel Calderon).

stating that the McAda Parties would "seek-all administrative and or legal remedies available to them" if the McAda Parties' demands were not satisfied.[358]    The Martinez Parties filed a counter-petition in arbitration against Capstone in 2018.[359] And that Mr. Feldman and Capstone first began incurring legal expenses relating to their arbitration dispute with the Enerset Parties in November 2018.[360]    That nonetheless, FCP have fraudulently kept these claims regarding 2018 disputes with the Martinez, Enerset, and McAda Parties open in the 2019 pool.[361] And that these claims remain open and unresolved in the 2019 risk pool as of the conclusion of the final hearing.[362]

**196)**  The Doctors also argue that Capstone and Mr. Feldman argued that BakerHostetler determined in a July 15, 2021 memorandum that Mr. Feldman's and Capstone's claims regarding disputes with the McAda, Enerset, and Martinez Parties are covered in the 2019 risk pool.[363]    That, however, the July 15, 2021 BakerHostetler memorandum is flawed and unreliable.[364]    That FCP retained

---

[358] *See* Exhibit DRS-2503, December 7, 2018, Demand Letter from McAda Parties; *see also* Transcript, Volume 16, September 14, 2021, at p. 6402, line 2 – p. 6409, line 1 (Daniel Calderon).

[359] *See* Transcript Volume 16, September 14, 2021, at p. 6423, lines 14 – p. 6424, line 4 (Daniel Calderon) (citing Exhibit DRS-1458, Martinez Parties' Counter-Petition). The counter-petition not only asserted numerous causes of action against Capstone, but also alleged failures and omissions on the part of the "Feldman Law Firm." *See* Exhibit DRS-1458, Martinez Parties' Counter-Petition at ¶ 6; *see also* Transcript, Volume 16, September 14, 2021, at p. 6421, line 12 – p. 6424, line 4 (Daniel Calderon).

[360] *See* Transcript, Volume 16, September 14, 2021, at p. 6426, line 19 – p. 6435, line 8 (Daniel Calderon).

[361] *See* Transcript Volume 16, September 14, 2021, at p. 6436, line 16 – p. 6439, line 1 (Daniel Calderon).

[362] *See* Transcript Volume 16, September 14, 2021, at p. 6397, lines 5-14; p. 6436, line 7 – p. 6439, line 1 (Daniel Calderon).

[363] *See* Transcript, Volume 16, September 14, 2021, at p. 6270, line 12 – p. 6271, line 12 (Daniel Calderon); *see also* Exhibit FC-349, BakerHostetler Memo.

[364] Exhibit FC-349, BakerHostetler Memo.

BakerHostetler to be a "zealous advocate" of FCP's coverage positions.[365] However, BakerHostetler was not an independent, third-party administrator, as would be appropriate.[366]

**197)** And further, BakerHostetler did not perform an independent review or analysis of the A.M.Y. claims. That according to BakerHostetler:

> [W]e have not had an opportunity or been asked to independently analyze all of the facts relevant to each proceeding. Our review consisted only of reviewing claims files and policies provided by Pool Re and discussions with Pool Re's insurance manager, Capstone. We did not conduct independent legal research or analysis of the underlying claims, including the facts upon which claims may be based. We also were not instructed to, nor did we review independent facts regarding the amount and/or veracity of the losses at issue for each insured for the six claims presented.[367]

Therefore, that considering these disclaimers, the BakerHostetler memorandum is inherently unreliable, and that this Arbitrator should give no weight to the BakerHostetler memorandum. However, FCP argue that the BakerHostetler memorandum is independent evidence that there is a legitimate purpose for keeping the pools open and that there is no evidence to suggest that the claims pending or less than legitimate.

**198)** Finally, the Doctors argue that Daniel Calderon, Jeff Carlson, and Stewart Feldman all participated in deciding what materials to send to BakerHostetler

---

[365] *See* Transcript, Volume 8, August 17, 2021, at p. 3271, line 7 – p. 3276, line 15 (Louis Fey).

[366] *See* Transcript, Volume 8, August 17, 2021, at p. 3037, line 8 – 3039, line 7; p. 3127, line 6 – p. 3128, line 16 (Louis Fey).

[367] *See* Exhibit FC-349, BakerHostetler Memo at p. 1.

relating to the A.M.Y. claims.[368] Mr. Calderon testified that there was an intentional decision not to include the McAda Parties' December 2018 demand letter in the claims materials sent to BakerHostetler.[369]   Capstone and Mr. Feldman were also part of an "intentional decision . . . to not include [the Martinez Parties'] counterpetition dated December 2018 in [the] materials" sent to BakerHostetler.[370] And Capstone intentionally omitted all invoices from the Enerset claims file sent to BakerHostetler, which would have shown that Capstone began incurring legal fees for that matter in 2018.[371] That the selective materials given to BakerHostetler render the opinion of BakerHostetler worthless.

**199)**   This Arbitrator finds that FCP did manipulate the presentation of claims file materials sent to BakerHostetler for analysis hoping for support for FCP's preordained coverage decisions.  I hold that the intentional omission of material and documents which may have been harmful to FCP were purposely withheld from documents sent to BakerHostetler, and that this represents evidence of fraudulent intent to support coverage in the 2019 pool for A.M.Y. claims that should not have been submitted or opened in the 2019 pool, let alone kept open in the 2019 pool for years without any legitimate investigation.

---

[368] *See* Transcript, Volume 16, September 14, 2021, at p. 6409, line 25 – p. 6411, line 24; p. 6424, lines 1 – 25; p. 6426, lines 4-18; p. 6431, line 22 – p. 6432, line 5 (Daniel Calderon).

[369] *See* Transcript Volume 16, September 14, 2021, at p. 6410, lines 5-24 (Daniel Calderon).

[370] *See* Transcript, Volume 16, September 14, 2021, at p. 6426, lines 4-18 (Daniel Calderon).

[371] *See* Transcript, Volume 16, September 14, 2021, at p. 6426, line 19 – p. 6428, line 8 (Daniel Calderon).

**200)**    The Doctors also argue that Capstone failed to promptly adjust (and deny) the A.M.Y. claims kept open in the 2019 pool.[372]    That FCP contend  that PoolRe has the ultimate decision-making authority for pool claims.[373]    But it is up to Capstone to first make a recommendation to PoolRe regarding those claims.[374]    And that Daniel Calderon, who is responsible at Capstone for investigating the A.M.Y. claims,[375] testified that he had not even discussed the A.M.Y. claims with anyone at PoolRe almost nine months after the A.M.Y. claims were formally submitted.[376] That as of the final hearing, neither Capstone nor PoolRe had made any legitimate attempt to determine whether the A.M.Y. claims were in fact covered by the 2019 pool.[377]    That Capstone and Mr. Feldman did not introduce any evidence to suggest that they made a legitimate attempt to determine whether the 2019 pool covered the A.M.Y. claims.[378]

**201)**    The Doctors argue that in fact, Mr. Calderon testified that there was an intentional decision, involving himself, Robert Snyder, and Stewart Feldman, to

---

[372] *See* Transcript, Volume 8, August 17, 2021, at p. 3028, lines 3-13; p. 3054, lines 12-18; p. 3060, line 23 – p. 3062, line 13; p. 3076, lines 17-22; p. 3130, line 25 – p. 3131, lines 16 (Louis Fey); Transcript, Volume 22, October 1, 2021, at p. 8765, lines 2-6 (Robert Snyder); *see also* Transcript Volume 23, October 2, 2021, at p. 9236, line 20 – p. 9240, line 21 (Jeff Carlson).

[373] *See* FCP's Post-Trial Brief at p. 187.

[374] *See* Transcript, Volume 16, September 14, 2021, at p. 6076, line 21 – p. 6077, line 11; p. 6079, lines 8-19 (Daniel Calderon).

[375] *See* Transcript, Volume 15, August 24, 2021, at p. 5785, lines 10-14 (Jeff Carlson).

[376] *See* Transcript, Volume 16, September 14, 2021, at p. 6339, lines 1 – 22 (Daniel Calderon).

[377] *See, e.g.,* Transcript, Volume 16, September 14, 2021, at p. 6387, line 14 – p. 6388, line 12 (Daniel Calderon).

[378] As discussed above, this Arbitrator does not give any weight to BakerHostetler's memorandum.

delay resolution of the A.M.Y. claims.[379]   That FCP has kept the 2019 pool open with fraudulent claims that it refuses to investigate / close and, at the same time, contends that the 2019 pool participants are responsible for all of FCP's continuously accruing legal fees and costs until the A.M.Y. claims are resolved, if ever.[380]

**202)**   This Arbitrator finds that the decision to keep the 2019 pool open was improper and injurious to the interests of Mr. Feldman's and Capstone's clients participating in the 2019 pool.   This Arbitrator further finds that FCP have kept the 2019 pool open for the improper purpose of using 2019 pool participants' money to fund FCP's litigation against FCP's clients.

**203)**   The Doctors also argue that to pay for FCP's legal fees and costs in these arbitrations, FCP wrongfully took: $250,000.00 of their captive clients' premiums from the 2018 risk pool;[381] $3,042,427.37 of their captive clients' premiums from

---

[379] *See* Transcript Volume 16, September 14, 2021, at p. 6174, line 1 – p. 6177, line 25; p. 6314, lines 16-22; p. 6436, line 7 – p. 6439, line 1 (Daniel Calderon).

[380] *See* Transcript, Volume 23, October 23, 2021, at p. 9233, line 2 – p. 9234, line 21; p. 9256, line 1 – p. 9257, line 1 (Jeff Carlson).

[381] *See* Exhibit-DRS 2543, Capstone's Final Report on the 2018 Risk Pool (July 27, 2021); *see also* Transcript, Volume 11, August 20, 2021, p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript Volume 17, September 23, 2021, p. 6857, line 5 – p. 6858, line 18 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 8794, line 8 – p. 8795, line 6 (Robert Snyder); Transcript, Volume 7, August 16, 2021, at p. 2544, lines 3-12 (Richard Amoroso).

the 2019 risk pool;[382] and $62,498.00 of their captive clients' premiums from the 2020 risk pool.[383]

**204)** That FCP made clear repeatedly at the final hearing its position that the $3,354,925.37 of their captive clients' premiums it took from the risk pool were not associated with any claim in the risk pool.[384] That as an example, in addressing the $250,000 taken from the 2018 pool, FCP's counsel stated: "It has been our position, and the documents and testimony are clear, what was paid, the 250 [thousand] out of the 2018 pool, was PoolRe expenses. It was not payment on any claim."[385] That FCP contends that the $3,354,925.37 it took from the 2018 to 2020 risk pools were to pay for PoolRe's administrative expenses in administering the pools. That, however, the captive clients' premiums taken from the risk pools were used by Mr. Feldman, Capstone, and PoolRe for a variety of fees and expenses that cannot plausibly be considered PoolRe administrative expenses. That Mr. Feldman,

---

[382] *See* Transcript, Volume 18, September 24, 2021, at p. 7013, line 19 – p. 7014, line 9 (Jeff Carlson); Transcript, Volume 7, August 16, 2021, at p. 2552, line 5 – p. 2557, line 23 (Richard Amoroso). From the 2019 risk pool, the retained premium amount was $3,600,262.32. *See* Exhibit DRS-2004, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-401652. Claims losses and expenses for other captives' claims, in an amount of $557,834.94, were deducted from the 2019 pool. *See* Exhibit DRS-2680, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-427016. The remaining $3,042,427.37 from the 2019 pool has been wrongfully converted to pay for FCP's legal fees and expenses in these arbitrations.

[383] *See, e.g.*, Transcript, Volume 23, October 2, 2021, at p. 9171, line 11 – p. 9176, line 1 (Jeff Carlson).

[384] *See* Transcript, Volume 22, October 1, 2021, at p. 8804, lines 6-11 (Statement by FCP's Counsel); *see also* Transcript, Volume 11, August 20, 2021, at p. 4617, line 16 – p. 4618, line 8 (Stewart Feldman); *see also* Transcript, Volume 15, August 24, 2021, at p. 5983, lines 22-24 (Jeff Carlson); *see also* Transcript, Volume 17, September 23, 2021, at p. 6878, lines 18-20 (Statement of FCP's Counsel) ("PoolRe doesn't have an insurance policy or a claim.").

[385] *See* Transcript, Volume 22, October 1, 2021, at p. 8804, lines 6-11 (Statement by FCP's Counsel).

Capstone, and PoolRe billed and collected from their clients under the guise of "PoolRe administrative expenses" the following:

   a.  fees and expenses incurred by Mr. Feldman in defending against a state bar complaint asserted against Mr. Feldman personally;[386]

   b.  fees and expenses incurred by Mr. Feldman in defending against the Doctors' legal malpractice claims against Mr. Feldman;[387]

   c.  fees and expenses incurred by Mr. Feldman and Capstone in arbitrations in which PoolRe is not even a party;[388] and

   d.  amounts charged by twelve of Mr. Feldman's employees, only six of whom are attorneys, and eighteen Capstone employees, only two of whom are attorneys, at inflated rates that "are not reflective of the actual salaries or compensation" paid by Mr. Feldman or Capstone to these employees.[389]

**205)** That Capstone submitted an affidavit for legal fees in connection with the Judge Dorfman arbitration seeking $434,779 in legal fees and costs.[390]    And Capstone also submitted the $434,779 in legal fees and costs incurred in the Dorfman arbitration to PoolRe, which paid 1/3 of Capstone's legal fees and costs with pool

---

[386] *See* Exhibit DRS 2004 at Joint-401691, Allocation of Arbitration / Litigation Costs & Expenses through 12/6/2020 (reflecting the fees incurred by Feldman in defending the state bar complaint that were charged to pool participants).

[387] *See* Transcript, Volume 22, October 1, 2021, at p. 9120, line 1 – p. 9125, line 20 (Jeff Carlson).

[388] *See, e.g.,* Exhibit DRS-2004, Allocation of Arbitration / Litigation Costs & Expenses through 12/6/2020 (reflecting fees and costs incurred in the Kutcher Arbitrations as being paid out of PoolRe funds); *see also* Transcript, Volume 22, October 1, 2021, at p. 8644, lines 7-25 (Robert Snyder); Transcript, Volume 15, August 14, 2021, at p. 6036, line 15 – p. 6037, line 8 (Jeff Carlson); Transcript, Volume 18, September 24, 2021, at p. 7289, line 4 – p. 7292, line 5 (Robert Snyder).

[389] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021 at Joint 427334, Joint 427335; *see also* Transcript, Volume 22, October 1, 2021, at p. 9033, line 21 – p. 9035, line 3; p. 9074, line 8 – p. 9075, line 1; p. 9090, line 8 – p. 9091, line 21; p. 9094, line 10 – p. 9095, line 21 (Jeff Carlson); Exhibit DRS-2004, Joint 401715- Joint 401716, E-mail from Jeff Carlson to Robert Snyder and Steve Friedman, with copy to Dana Moore (Feb. 3, 2021, 7:29 p.m.).

[390] *See* Exhibit DRS-724, Affidavit of L. Andres Paredes, at p. 15

participants' money.[391] That a significant portion of the legal fees and costs incurred by Capstone in the Judge Dorfman arbitration, and in turn paid unwittingly by PoolRe participants, entailed Capstone's pursuit of an offensive claim against the Doctors for the purported misappropriation of Capstone's intellectual property.[392] Judge Dorfman rejected Capstone's offensive claim against the Doctors concerning Capstone's intellectual property.[393] However, that by taking money from the risk pools for the legal fees and expenses Capstone incurred in the Judge Dorfman arbitration, Capstone has forced its clients to unwittingly subsidize Capstone's pursuit of a wholly unsuccessful offensive claim against the Doctors that was rejected by Judge Dorfman.

**206)** Further, that Mr. Feldman and Capstone authorized or effectuated the following wires out of PoolRe accounts holding the captive clients' premiums to pay for Mr. Feldman's, Capstone's, and PoolRe's legal fees and operating expenses – not any claim in the pool:

   a. On July 3, 2020, $10,000.00 of captive clients' premiums were used to pay Judge Dorfman' arbitrator fees incurred in an arbitration filed by Mr. Feldman, Capstone, and PoolRe against the Doctors.[394]

---

[391] See Exhibit DRS-2004, Allocation of Arbitration / Litigation Costs & Expenses incurred in Dorfman Arbitration at Joint- 401686; see also Transcript, Volume 7, August 16, 2021, at p. 2555, line 12 – p. 2556, line 1; p. 2557, line 6 – 23; p. 2574, line 14 – p. 2580, line 8 (Richard Amoroso).

[392] See generally Exhibit DRS-724, Affidavit of L. Andres Paredes; see also Exhibit J-115, Judge Dorfman's Final Award at ¶ 60 (Nov. 9, 2020) (estimating that 30% of the case related to Capstone's "breach of contract claims regarding intellectual property").

[393] See Exhibit J-115, Judge Dorfman's Final Award at ¶¶ 47-51 (Nov. 9, 2020).

[394] See Exhibit DRS-2004, ACH Wire Transfer, dated July 3, 2020, at Joint-401677.

b. On November 18, 2020, $10,000.00 of captive clients' premiums were used to pay for the expert fees of Jason Sharp, through his firm Briggs & Veselka, in these arbitration proceedings;[395]

c. On November 20, 2020, $11,000.00 of captive clients' premiums were used to pay Judge Baker for arbitrator fees,[396] and $100,000.00 of captive clients' premiums were used to pay AZA for representing Mr. Feldman, Capstone, and PoolRe in these arbitration proceedings;[397]

d. For the November 2020 true-up, $542,000.00 of captive clients' premiums were transferred out of PoolRe's bank account and into Capstone's account to pay for legal fees and expenses incurred by Mr. Feldman and Capstone in these arbitration proceedings;[398]

e. On December 28, 2020, $327,955.00 of captive clients' premiums were used to pay Capstone for the fees and expenses incurred by Mr. Feldman and Capstone in these arbitration proceedings;[399]

f. On January 13, 2021, $2,550.00 of captive clients' premiums were used to pay Judge Medley, $1,417.50 of captive clients' premiums were used to pay Judge Medley's assistant, and $9,181.25 of captive clients' premiums were used to pay Arbitrator Glasser for arbitrator fees incurred in these arbitration proceedings;[400]

---

[395] *See* Exhibit DRS-2004, ACH Wire Transfer, dated November 18, 2020, at Joint-401677.

[396] *See* Exhibit DRS-2004, ACH Wire Transfer, dated November 20, 2020, at Joint-401681.

[397] *See* Exhibit DRS-2004, ACH Wire Transfer, dated November 20, 2020, at Joint-401685. Any suggestion that AZA was solely representing PoolRe's interests, and not the interests of Feldman and Capstone, is refuted by the record. *See* Transcript Volume 17, September 23, 2021, at p. 6924, line 19 – p. 6925, line 10 (Mr. Carlson testifying that AZA was retained "To represent the -- what I would call the F -- what we call the FCP" which included Capstone.") (Jeff Carlson). Further, AZA lawyers formally enrolled as counsel of record on behalf of Capstone during the final hearing. *See* Transcript, Volume 4, August 6, 2021, at p. 1398, lines 9-13 (Shawn Bates). And an AZA lawyer conducted the direct examination of Stewart Feldman. *See generally* Transcript, Volumes 11 – 14, p. 4400, line 19 – p. 5494, line 9 (Stewart Feldman).

[398] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427333. Capstone's President, Jeff Carlson, testified that the $542,000.00 was transferred from PoolRe's bank account to Capstone's bank account. *See* Transcript, Volume 22, October 1, 2021, at p. 9106, line 22 – p. 9111, lines 3-10 (Jeff Carlson). Further, although these payments were wired from PoolRe to Capstone, they payments are to defray the fees and costs also incurred by Feldman. *See* Transcript, Volume 22, October 1, 2021, at p. 9109, line 9 – p. 9110, line 24 (Jeff Carlson).

[399] *See* Exhibit DRS-2004, ACH Wire Transfer, dated December 28, 2020, at Joint-401687.

[400] *See* Exhibit DRS-2004, ACH Wire Transfer, dated January 13, 2021, at Joint-401680.

g. On February 12, 2021, $68,954.00 of captive clients' premiums were used to pay for the fees and expenses incurred by Mr. Feldman and Capstone, and $362,212.15 of fees and expenses incurred by AZA, in these arbitration proceedings;[401]

h. For the February 2021 true-up, $180,599.00 of captive clients' premiums were transferred out of PoolRe's bank account and into Capstone's bank account for payment of fees and expenses incurred by Mr. Feldman and Capstone in these arbitration proceedings;[402]

i. On March 8, 2021, $40,625.00 of the captive clients' premiums were used to pay Arbitrator Glasser, $42,487.50 of captive clients' premiums were used to pay Judge Baker, $41,069,60 of captive clients' premiums were used to pay Arbitrator Kutcher, and $39,650.00 of captive clients' premiums were used to pay this Arbitrator for arbitrator fees in these arbitration proceedings;[403]

j. For the May 2021 true-up, $46,358.00 of captive clients' premiums were transferred out of PoolRe's bank account and into Capstone's account to pay for fees and expenses incurred by Feldman and Capstone in these arbitration proceedings;[404]

k. On April 13, 2021, $292,552.13 of captive clients' premiums were used to pay the fees and expenses incurred by AZA on behalf of Mr. Feldman and Capstone in arbitrations in which Mr. Feldman and Capstone were adverse to their clients;[405]

l. On June 29, 2021, $320,645.00 of captive clients' premiums were used to pay for the legal fees and expenses incurred by Mr. Feldman and Capstone, $124,996.00 of captive clients' premiums were used to pay for the legal fees and expenses incurred by AZA, $19,996.60 of captive

---

[401] *See* Exhibit DRS-2004, ACH Wire Transfer, dated February 12, 2021, at Joint-401708.

[402] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427333. Capstone's President, Jeff Carlson, testified that the true-up payments that are printed in red on Joint-427333 of Exhibit FC-692 reflect payments made with the retained risk pool premiums paid by the captives into the pool. *See* Transcript, Volume 22, October 1, 2021, at p. 9122, line 25 – p. 9123, line 10 (Jeff Carlson).

[403] *See* Exhibit DRS-2004, ACH Wire Transfer, dated March 8, 2021, at Joint-401719.

[404] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427333; *see also* Transcript, Volume 22, October 1, 2021, at p. 9122, line 25 – p. 9123, line 10 (Jeff Carlson).

[405] *See* Exhibit DRS-2004, ACH Wire Transfer, dated April 13, 2021, at Joint-401752.

clients' premiums were used to pay for the legal fees and expenses of BakerHostetler, and $17,835.92 of captive clients' premiums were used to pay for the legal fees and expenses incurred by Reynolds Frizzell in providing legal representation and services to Feldman, Capstone, and PoolRe;[406]

m. For the June 2021 true-up, $213,716.00 of captive clients' premiums were transferred out of PoolRe's bank account and into Capstone's account to pay for fees and expenses incurred by Mr. Feldman and Capstone in these arbitration proceedings;[407]

n. On July 8, 2021, $48,862.50 of captive clients' premiums were used to pay this Arbitrator, $38,500.00 of captive clients' premiums were used to pay Judge Baker; and $30,800 of captive clients' premiums were used to pay Arbitrator Kutcher for arbitrator fees in these arbitration proceedings;[408]

o. On July 19, 2021, $45,500.00 of captive clients' premiums were used to pay Arbitrator Glasser for arbitrator fees in these arbitration proceedings;[409]

p. On July 22, 2021, $10,000.00 of captive clients' premiums were used to pay for the Houstonian hotel fees and expenses incurred by Mr. Feldman, Capstone, and PoolRe in these arbitration proceedings;[410]

q. On August 12, 2021, $40,638.00 of captive clients' premiums were used to pay for the Houstonian hotel fees and expenses incurred by Mr. Feldman, Capstone, and PoolRe as part of these arbitration proceedings;[411]

---

[406] *See* Exhibit DRS-2685, ACH Wire Transfer, dated June 29, 2021, at Joint-421752.

[407] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427333; *see also* Transcript, Volume 22, October 1, 2021, at p. 9122, line 25 – p. 9123, line 10 (Jeff Carlson).

[408] *See* Exhibit DRS-2685, ACH Wire Transfer, dated July 2021, at Joint-421775.

[409] *See* Exhibit DRS-2685, ACH Wire Transfer, dated July 19, 2021, at Joint-421794.

[410] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427331.

[411] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427332.

r.  On August 30, 2021, $1,044.00 of captive clients' premiums were used to pay for court reporting services incurred by Mr. Feldman, Capstone, and PoolRe as part of these arbitration proceedings;[412]

s.  On August 31, 2021, $1,740.00 of captive clients' premiums were used to pay for court reporting services incurred by Mr. Feldman, Capstone, and PoolRe as part of these arbitration proceedings;[413]

t.  On September 21, 2021, $31,291.00 of captive clients' premiums were used to pay DFW Multimedia for litigation support services incurred by Mr. Feldman, Capstone, and PoolRe in these arbitration proceedings;[414] and

u.  On September 22, 2021, $56,341.00 of captive clients' premiums were used to pay for court reporting services incurred by Mr. Feldman, Capstone, and PoolRe in these arbitration proceedings.

207)  That the totality of the evidence and testimony in the record reflects that Mr. Feldman, Capstone, and PoolRe obtained improper benefits, subordinating their clients' interests to their own, by taking $3,354,925.37 of their captive clients' premiums to pay for the legal fees and expenses incurred by Mr. Feldman, Capstone, and PoolRe in these arbitration proceedings. This Arbitrator agrees with the Doctors that the record does not reflect a legitimate purpose for FCP to have converted client funds in the risk pools to pay the expenses of Mr. Feldman, Capstone and PoolRe.

## LIABILITY OF MR. FELDMAN AND MR. CARLSON PERSONALLY

---

[412] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427332.
[413] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427332.
[414] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427331.

**208)** The Doctors also argue that Capstone's President, Mr. Carlson, and Mr. Feldman knowingly participated in the wrongful taking of funds belonging to Mr. Feldman's and Capstone's clients,[415] including, but not limited to:

- the decision to not investigate and to keep the A.M.Y. claims open in the 2019 pool:[416]

- the decision to bill and collect $3,042,427.37 from the 2019 pool participants the fees and expenses incurred by Mr. Feldman, Capstone, and PoolRe in these arbitrations:[417]

- the "arbitrary decision" to bill and collect $250,000 from the 2018 pool participants for the fees and costs incurred by Mr. Feldman, Capstone, and PoolRe in these arbitrations:[418]

- the decision to bill and collect $62,498 from the 2020 risk pool participants to pay for FCP's legal fees and expenses in these arbitrations:[419]

- the decision to bill and collect from the pool participants the fees and costs incurred by Mr. Feldman and Capstone even in arbitrations in

---

[415] *See* Transcript, Volumes 6 & 7, August 9 & 16, 2021, at p. 2348, line 18 – p. 2349, line 16; p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

[416] *See* Transcript, Volume 16, September 14, 2021, at p. 6174 line 1 – p. 6177 line 21; p. 6339, lines 1-22; p. 6436, line 16 – p. 6439, line 1 (Daniel Calderon).

[417] *See* Transcript, Volume 22, October 1, 2021, at p. 8769, line 17 – p. 8770, lines 22; p. 8773, line 7 – p. 8774, line 18; p. 8881, line 22 – p. 8884, line 7; p. 8943, line 16 – p. 8944, line 10 (Robert Snyder); Transcript, Volume 17, September 23, 2021, at p. 6940, line 18 – p. 6941, line 5; p. 6947, line 22 – p. 6948, line 20 (Jeff Carlson); Transcript, Volume 18, p. 7291, line 20 – p. 7292, line 5 (Jeff Carlson).  Jeff Carlson also testified that he had undertaken no study before agreeing to a 50% allocation to the pool participants for FCP's fees and costs incurred in these arbitrations. *See* Transcript, Volume 23, October 2, 2021, at p. 9252, line 17 – p. 9253, line 25 (Jeff Carlson).

[418] *See* Transcript, Volume 22, October 1, 2021, at p. 8793, line 8 – p. 8794, line 6; p. 8881, line 22 – p. 8884, line 7; p. 8943, line 16 – p. 8944, line 10 (Robert Snyder); Transcript, Volume 15, August 24, 2021, at p. 5928, line 17 – p. 5931, line 7 (Jeff Carlson) (citing Exhibit DRS-2543, 2018 Risk Pool Losses and Third-Party Claims Evaluation Expenses Chart). Mr. Carlson admitted that no back-up documentation existed for the $250,000 allocation to the 2018 pool participants.  *See* Transcript, Volume 15, August 24, 2021, at p. 5963, line 12 – p. 5965, line 16 (Jeff Carlson).

[419] *See, e.g.,* Transcript, Volume 23, October 2, 2021, at p. 9171, line 11 – p. 9176, line 1; p. 9179, line 16 – p. 9182, line 3 (Jeff Carlson).

which PoolRe was not a party, including the Kutcher Arbitration and the Judge Duval Arbitration;[420]

- the decision to bill and collect from the pool participants the fees and expenses incurred by Mr. Feldman in defending against a state bar complaint involving only Mr. Feldman;[421]

- the decision to bill and collect from the pool participants the amounts charged by 12 of Mr. Feldman's employees, only six of whom are attorneys, eighteen Capstone employees, only two of whom are attorneys, at inflated rates that "are not reflective of the actual salaries or compensation" of these employees:[422] and

- the decision to bill and collect from the 2018 to 2020 pool participants the fees and expenses incurred in defending against the claims asserted against Mr. Feldman and Mr. Carlson, in their personal capacities.[423]

**209)** The Doctors argue that considering the totality of evidence and testimony presented at trial, that this Arbitrator should find that Mr. Carlson and Mr. Feldman knowingly participated in executing the scheme whereby $3,354,925.37 of funds belonging to the clients of Mr. Feldman and Capstone were wrongfully converted.

**210)** This Arbitrator holds that Mr. Carlson and Mr. Feldman knowingly participated in and executed a scheme whereby $3,354,925.37 of funds belonging to

---

[420] *See* Exhibit DRS-2004 at Joint-401691, Allocation of Arbitration / Litigation Costs & Expenses through 12/6/2020 (reflecting the fees incurred by Feldman in defending against a state bar complaint involving Stewart Feldman only, with such fees being charged to pool participants).

[421] *See* Exhibit DRS 2004 at Joint-401691, Allocation of Arbitration / Litigation Costs & Expenses through 12/6/2020 (reflecting the fees incurred by Feldman and RSL Funding in the Duval and Kutcher arbitrations that were charged to pool participants).

[422] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021 at Joint 427334, Joint 427335; *see also* Transcript, Volume 22, October 1, 2021, at p. 9033, line 21 – p. 9035, line 3; p. 9074, line 8 – p. 9075, line 1; p. 9090, line 8 – p. 9091, line 21; p. 9094, line 10 – p. 9095, line 21 (Jeff Carlson); Exhibit DRS-2004, Joint 401715- Joint 401710, E-mail from Jeff Carlson to Robert Snyder and Steve Friedman, with copy to Dana Moore (Feb. 3, 2021, 7:29 p.m.).

[423] *See, e.g.*, Transcript, Volume 23, October 2, 2021, at p. 9189, line 5 – p. 9190, line 8; p. 9120, line 1 – p. 9125, line 20 (Jeff Carlson).

the risk pools and their clients were improperly converted and used by Capstone, Mr. Feldman and PoolRe.

## INSTRUMENTALITIES OF MR. FELDMAN

**211)**  The Doctors also argue that Capstone, the Feldman Law Firm and PoolRe are nothing more than instrumentalities of Mr. Feldman and are under the control of Mr. Feldman. They argue that Mr. Feldman owns and controls the Feldman Law Firm and Capstone.  That the hierarchical structure of the "whole enterprise ultimately rolls up to" Mr. Feldman.[424] That Mr. Feldman is the sole owner and partner of the Feldman Law Firm, and he is the owner, general counsel, and CEO of Capstone. His Head of Operations, Daniel Calderon, testified that "everybody in the company reports to the CEO," Mr. Feldman.[425] And, they argue, that Capstone "is ultimately owned and controlled by Stewart A. Feldman, principal and managing partner of The Feldman Law Firm, LLP."[426]

**212)**  The Doctors further argue that all allocations of expenses and revenues, and the day-to-day accounting for all of Mr. Feldman's related entities, including Capstone, the Feldman Law Firm, PoolRe, and RSL Funding, are managed directly

---

[424] *See* Transcript, Volume 22, October 22, 2021, at p. 8846, line 25 – p. 8847, line 11 (Robert Snyder) (citing Exhibit DRS-192).

[425] *See* Transcript Volume 16, September 14, 2021, at p. 6330, lines 8-17 (Daniel Calderon).

[426] *See* Transcript, Volume 22, October 1, 2021, at p. 8961, line 4 – p. 8692, line 8 (Robert Snyder) (citing, *e.g.*, Exhibit DRS-2003 at Joint-364817, Claims Reserve Payment Agreement at § 2(C)).  Twelve other Claims Reserve Payment Agreements are included in Exhibit DRS 2003, which all include the same language at § 2(C) regarding Mr. Feldman's ultimate ownership and control over Capstone.

by Mr. Feldman and his controller, Paul Franks, out of a single centralized business office.[427]  That this centralized business office is located on the same floor in the same building where the offices of Capstone, the Feldman Law Firm, and RSL Funding are also located.[428]

**213)**  That Mr. Carlson testified that the only two people who had authority to write checks or engage in financial transactions for Capstone's accounts were Mr. Franks and Stewart Feldman.[429]  That  Mr. Franks is not employed by Capstone but has more authority over its accounts than he, Capstone's President.[430]

**214)**  That Capstone and the Feldman Law Firm also co-mingle assets.  That an example is that the Feldman Law Firm billed approximately $3,813,450 for legal services and costs incurred in these arbitrations, half of which was wired out of PoolRe's bank account directly to Capstone's bank account.[431]  That no record evidence reflects any payments from Capstone to the Feldman Law Firm.  That the

---

[427] *See* Transcript Volume 15, August 24, 2021, at p. 5948, line 8 – p. 5950, line 4; p. 6017, lines 1 - 17 (Jeff Carlson). RSL Funding is another company owned by Mr. Feldman that provided legal representation, through salaried employee, Andy Paredes, to Capstone in the Dorfman arbitration and these arbitrations. *See* Transcript, Volume 15, August 24, 2021, at p. 5718, lines 4-13 (Andy Paredes). But neither RSL Funding nor Mr. Paredes ever submitted a bill for legal services to Capstone. *See* Transcript, Volume 15, August 24, 2021, at p. 5938, line 22 – p. 5943, line 17 (Jeff Carlson).

[428] *See* Transcript, Volume 15, August 24, 2021, at p. 6025, line 8 – p. 6028, line 19 (Jeff Carlson).

[429] *See* Transcript, Volume 17, September 23, 2021, at p. 6828, lines 3-11 (Jeff Carlson).

[430] *See* Transcript, Volume 17, September 23, 2021, at p. 6829, lines 3-24 (Jeff Carlson).

[431] *See* Transcript, Volume 22, October 1, 2021, p. 9082, line 11 – p. 9084, line 21 (Jeff Carlson). Mr. Carlson was unaware of any transfers of funds between Capstone and The Feldman Law Firm's accounts or agreement between the Feldman Law Firm and Capstone regarding how to allocate or split the millions of dollars that were wired out of PoolRe's accounts into Capstone's accounts for legal expenses and costs incurred by Mr. Feldman's entities, including Capstone, RSL Funding, and the Feldman Law Firm. *See, e.g.,* Transcript, Volume 22, October 1, 2021, at p. 9111, line 3 – p. 9113, line 5 (Jeff Carlson).

co-mingling in Capstone's account of millions of dollars for legal services billed by the Feldman Law Firm represents a significant blurring of the lines of distinction between Capstone and Mr. Feldman.

**215)** This Arbitrator notes that many of the exhibits which support these allegations by the Doctors were not produced at trial until after Mr. Feldman had testified, notwithstanding ongoing discovery request for these documents and financial records.

**216)** That the Doctors ask that considering the totality of evidence and testimony in the record, that this Arbitrator find that Capstone and the Feldman Law Firm are mere instrumentalities of Mr. Feldman and under his control.

**217)** The Doctors further argue that PoolRe is also a mere instrumentality of Stewart Feldman and his related entities. That PoolRe does not have any employees and[432]does not have an office.[433] That Capstone is the insurance manager of PoolRe, handles the day-to-day operations of PoolRe.[434] Capstone maintains the books and records for PoolRe.[435] And Capstone exercises significant decision-making authority on behalf of PoolRe "without even consulting or conferring with anyone from PoolRe."[436]

---

[432] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 22-24 (Stewart Feldman); Transcript Volume 22, October 1, 2021, at p. 8840, lines 13-15 (Robert Snyder).

[433] *See* Transcript, Volume 15, August 24, 2021, at p. 6026, line 24 – p. 6027, line 12 (Jeff Carlson).

[434] *See* Transcript, Volume 22, October 1, 2021, at p. 8840, lines 16-18 (Robert Snyder).

[435] *See* Transcript, Volume 15, August 24, 2021, at p. 6026, line 24 – p. 6027, line 12 (Jeff Carlson).

[436] *See* Transcript, Volume 22, October 1, 2021, at p. 8947, line 25 – p. 8948, line 12 (Robert Snyder).

**218)**    The Doctors argue that there was no PoolRe Board meeting or resolution (or even a discussion among PoolRe's Directors) on or before May 7, 2020 that authorized Capstone, purportedly on behalf of PoolRe, to file the May 7, 2020 arbitration demand against the Doctors in the Judge Dorfman Arbitration.[437]    That Capstone made the decision to sue the Doctors on behalf of PoolRe without consulting anyone from PoolRe's Board of Directors.[438]    And Similarly, there was no Board meeting or resolution (or even a discussion among PoolRe's Directors) on or before July 3, 2020 that authorized Capstone to wire $10,000 on July 3, 2020 from PoolRe's account to pay for FCP's arbitration fees in the Judge Dorfman arbitration.[439]    That the Doctors had not sued PoolRe or instituted class proceedings on or before July 3, 2020, when Mr. Feldman and Capstone first began raiding the PoolRe accounts holding their clients' premiums to pay for Mr. Feldman's and Capstone's litigation efforts against their own clients.[440]

---

[437] *See* Transcript, Volume 22, October 1, 2021, at p. 8862, line 4 – p. 8865, line 25 (Robert Snyder).  The May 7, 2020, arbitration demand filed by Capstone and PoolRe against the Doctors in the Dorfman Arbitration is in the record at Exhibit DRS-1460.

[438] *See* Transcript, Volume 22, October 1, 2021, at p. 8862, line 4 – p. 8865, line 25 (Robert Snyder).

[439] *See* Transcript, Volume 22, October 1, 2021, at p. 8983, line 13 – p. 8987, line 15 (Robert Snyder).  The ACH transfer of $10,000 from PoolRe's account to pay for arbitration fees in the Dorfman arbitration can be found in the record at Exhibit DRS-2004 at Joint-401677.

[440] *See* Transcript Volume 8, August 17, 2021, at p. 3292, line 5 – p. 3297, line 23 (Louis Fey) (citing Exhibit DRS 2354).

**219)** That Capstone "has the authority to write checks out of PoolRe's checking account,"[441] and the ACH transfers of funds out of PoolRe's accounts are approved by Mr. Feldman personally.[442]

**220)** That Mr. Feldman caused the incorporation of PoolRe,[443] he provides legal services and representation to PoolRe,[444] and that PoolRe is grossly undercapitalized and without any insurance coverage.[445] That PoolRe makes a nominal net profit of $25,000 per year with a projected net income of $16,718 per year from 2018 to 2022,[446] and that PoolRe receives no business except that given to it by Mr. Feldman and Capstone.[447]

**221)** Further, that Mr. Feldman and Capstone have used the funds held in PoolRe's accounts as their own property,[448] that Mr. Feldman and Capstone have used millions

---

[441] *See* Transcript, Volume 22, October 1, 2021, at p. 8873, line 24 – p. 8874, line 5 (Robert Snyder).

[442] *See* Transcript, Volume 23, October 2, 2021, p. 9275, lines 1 – 6 (Jeff Carlson) (citing Exhibit DRS-2694, Joint-238351 (reflecting Stewart Feldman's initials and "OK" on PoolRe ACH transfer)); Transcript Vol. 23, October 2, 2021, p. 9143, line 23 – p. 9144, line 4 (Jeff Carlson) ("Q. Okay. And if you carry on to page 401708, this is the ACH payment that was okayed by Mr. Feldman on February 14, 2021, to pay a number of invoices including the AZA invoice of $362,212.15, right? A. Yes. It is one of several on this ACH page."); Exhibit DRS-2004, Joint 401708; Transcript Vol. 18, September 24, 2021, at p. 7312, line 21 – p. 7312, line 2 (Jeff Carlson) (Q: [...] underneath that, again, is what purports to be Mr. Feldman's – Mr. Feldman's, Stewart Feldman's initials, right? A: It appears to be, yes."); Exhibit DRS-2004, Joint-401700.

[443] *See* Transcript, Volume 11, August 20, 2021, at p. 4421, line 16 – p. 4422, line 5 (Stewart Feldman) ("And the firm formed PoolRe").

[444] *See* Transcript, Volume 11, August 20, 2021, at p. 4421, line 16 – p. 4422, line 5 (Stewart Feldman).

[445] *See* Transcript, Volume 7, August 16, 2021, at p. 2853, line 3 – p. 2854, line 1; p. 2600, line 21 – p. 2602, line 7 (Richard Amoroso).

[446] *See* Transcript, Volume 15, August 24, 2021, at p. 5997, line 25 – p. 5998, line 10 (Jeff Carlson); Transcript, Volume 23, October 2, 2021, at p. 9458, lines 4-11 (Stephen Friedman).

[447] *See* Exhibit J-20 at SULLIVAN011104, Exhibit E to Joint Engagement Letter; *see also* Transcript, Volume 22, October 1, 2021, at p. 9123, lines 11-19 (Jeff Carlson) ("Only clients of both the [Feldman Law] Firm and Capstone . . . may participate in" PoolRe's risk pools.").

[448] Feldman and Capstone do not have a right to use their clients' money to fund FCP's litigation efforts. The pool premiums are "the property of the . . . pool participants" and were "held in trust by the administrator of PoolRe, which

of dollars of pool funds to pay for the legal fees and expenses incurred by Mr. Feldman and Capstone in these arbitration proceedings, and that for the Judge Dorfman arbitration and these arbitrations, Capstone billed approximately $1.257 million, of which 50% was paid by PoolRe.[449] That similarly, for the Judge Dorfman arbitration and these arbitrations, Mr. Feldman has billed approximately $3.813 million, of which 50% was paid by PoolRe.[450] That these facts reflect the unconscionable situation that Mr. Feldman and Capstone have made approximately $3 million, paid unwittingly by their own clients, merely because Mr. Feldman and Capstone are involved in litigation against their clients.[451]

**222)**    That none of the Feldman, Capstone, or PoolRe witnesses offered at the hearing offered any explanation for PoolRe incurring, much less affording, millions of dollars of legal fees when it only earns $25,000 per year. That the only plausible explanation is that PoolRe is an instrumentality of Mr. Feldman which benefits from but does not have to pay those millions of dollars of legal fees.

---

is Capstone." *See* Transcript, Volume 6, August 9, 2021, at p. 2348, line 18 – p. 2349, line 16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

[449] *See* Transcript, Volume 22, October 1, 2021, at p. 9074, line 13 – p. 9075, line 1 (Jeff Carlson) (citing Exhibit FC-692).

[450] *See* Transcript, Volume 22, October 1, 2021, at p. 9082, line 11 – p. 9084, line 25 (Jeff Carlson) (citing Exhibit FC-692).

[451] *See* Transcript, Volume 22, October 1, 2021, at p. 9062, line 7 – p. 9063, line 3 (statement by Arbitrator Kutcher during testimony of Jeff Carlson); *see also* Transcript, Volume 22, October 1, 2021, at p. 9082, line 11 – p. 9084, line 25 (Jeff Carlson).

**223)**  That Capstone has approximately twenty employees,[452] and the salaries of eighteen of Capstone's employees have been subsidized by funds from PoolRe's accounts.[453]  That similarly, the salaries of twelve Feldman Law Firm employees have been subsidized by funds from PoolRe's accounts.[454]  That the 2018 to 2020 risk pools became a pot of gold for Stewart Feldman to fund the operations of his entities, the Law Firm and Capstone.

**224)**  Moreover, that the Directors of PoolRe have not acted independently in furtherance of PoolRe's interests.[455]  The Directors have barely acted at all, leaving PoolRe's operations entirely in the hands of Mr. Feldman and Capstone.  That there are three Directors on PoolRe's Board: Dana Moore, Robert Snyder, and Stephen Friedman,[456] and each Director's alleged involvement in PoolRe's affairs was established at the final hearing to be virtually non-existent.   That these Directors abdicated their duties to PoolRe, allowing Mr. Feldman and Capstone to treat PoolRe's funds as their own.

**225)**  That Stephen Friedman, who is also the long-standing owner of PoolRe, knew nothing about PoolRe or its operations, testifying that:

---

[452] *See* Transcript, Volume 22, October 1, 2021, at p. 9093, lines 9-21 (Jeff Carlson).

[453] *See* Transcript, Volume 22, October 1, 2021, at p. 9093, lines 9-21 (Jeff Carlson).

[454] *See* Exhibit FC-692 at Joint-427334, The Feldman Law Firm Time Summary.

[455] Amazingly, PoolRe's Director, Robert Snyder, testified that "PoolRe has determined it's in its interest to take a larger share of [the] expenses" incurred by FCP in these arbitrations. *See* Transcript, Volume 22, October 1, 2021, at p. 8772, lines 3-8 (Robert Snyder).

[456] *See* Transcript, Volume 22, October 1, 2021, at p. 8696, lines 14-18 (Robert Snyder).

- he did not "recall any documentation relating to [his] purchase of 100 percent ownership in PoolRe," was "unaware of any information that could help . . . track down or locate documentation relating to [his] ownership in PoolRe," and could not recall whether there was ever a "written document or a contract executed that transferred" ownership of PoolRe to him;[457]

- he had "no conversations with Bob Snyder regarding true-up expenses that have been paid in these arbitrations" and never had "any discussion with Bob Snyder or Dana Moore regarding the fees that were being put into the joint defense pot;"[458]

- he is "not compensated as a director on PoolRe's board;"[459]

- he had not received a distribution from PoolRe in years and had never raised concerns or issues relating to not receiving any distributions;[460]

- he "did not understand, even at a very basic level, how [his] business, PoolRe, makes money or earns revenue;"[461]

- he had no conversations with anyone at Capstone, PoolRe, or Mr. Feldman regarding a 50% decrease in PoolRe's assets and a 45% decrease in written premiums to PoolRe following the *Reserve Mechanical* decision:[462]

- he had no understanding of the *Reserve Mechanical* decision and testified that the name *Reserve Mechanical* did not mean anything to him;[463]

---

[457] *See* Transcript, Volume 23, October 2, 2021, at p. 9482, line 20 – p. 9483, line 23; p. 9482, line 17, p. 9485, line 1 (Stephen Friedman).

[458] *See* Transcript, Volume 23, October 2, 2021, at p. 9471, lines 13-21; p. 9491, line 14 – p. 9492, line 1 (Stephen Friedman).

[459] *See* Transcript, Volume 23, October 2, 2021, at p. 9482, lines 11-14 (Stephen Friedman).

[460] *See* Transcript, Volume 23, October 2, 2021, at p. 9501, line 1 – p. 9503, line 9 (Stephen Friedman).

[461] *See* Transcript, Volume 23, October 2, 2021, at p. 9500, lines 21 -25 (Stephen Friedman).

[462] *See* Transcript, Volume 23, October 2, 2021, at p. 9499, line 1 – p. 9500, line 20 (Stephen Friedman).

[463] *See* Transcript, Volume 23, October 2, 2021, at p. 9503, lines 10-17 (Stephen Friedman).

- he had not had any conversations with anyone at PoolRe, Capstone, or Feldman regarding the financial performance or well-being of his company, PoolRe;[464]

- he could not recall any communications or conversations relating to the Doctors other than one alleged conversation with Mr. Snyder approximately in July 2019 – which Mr. Snyder did not recall.[465]

- there was no meeting, resolution or discussion of PoolRe's Board of Directors regarding filing an arbitration demand against the Doctors;[466]

- he had not received e-mails from Mr. Snyder relating to the administration of the PoolRe risk pools;[467]

- he was not aware of any emails, correspondence, or documents of any sort sent to or by any Director on PoolRe's Board concerning the appropriateness or inappropriateness of including policies in the risk pool covering Mr. Feldman's and Capstone's professional liabilities and legal expense liabilities;[468]

- he was unaware that his company, PoolRe, took out a loan of $103,000 from a company owned and controlled by Mr. Feldman;[469] and

- no one from Capstone, the Feldman Law Firm or PoolRe ever raised an issue with Mr. Friedman regarding the taking of $62,498 of their captive clients' premiums from the 2020 risk pool to pay for FCP's legal fees and expenses in these arbitrations.[470]

---

[464] *See* Transcript, Volume 23, October 2, 2021, at p. 9504, line 16 – p. 9506, line 16 (Stephen Friedman).

[465] *See* Transcript, Volume 23, October 2, 2021, at p. 9524, lines 21 – p. 9525, line 7 (Stephen Friedman); Transcript, Volume 22, October 1, 2021, at p. 8863, line 13 – p. 8865, line 20 (Robert Snyder).

[466] *See* Transcript Volume 24, October 3, 2021, at p. 9527, lines 2-8 (Stephen Friedman).

[467] *See* Transcript Volume 24, October 3, 2021, at p. 9527, lines 13-17 (Stephen Friedman).

[468] *See* Transcript Volume 24, October 3, 2021, at p. 9535, line 22 – p. 9536, line 9 (Stephen Friedman).

[469] *See* Transcript, Volume 24, October 3, 2021, at p. 9543, line 10 – p. 9544, line 116 (Stephen Friedman). Stephen Friedman was also unaware of a $141,966,79 loan he received from Stewart Feldman's company, A.M.Y. *See* Transcript, Volume 24, October 3, 2021, at p. 9547, line 24 – p. 9549, line 1 (Stephen Friedman).

[470] *See, e.g.*, Transcript, Volume 23, October 2, 2021, at p. 9171, line 11 – p. 9176, line 1 (Jeff Carlson).

That Mr. Friedman's testimony established his total lack of involvement in PoolRe's affairs. This Arbitrator agrees.

**226)** That similarly, the record is silent regarding Ms. Moore's purported involvement in PoolRe, and Mr. Snyder could not remember Ms. Moore's name or the fact that there were three directors on PoolRe's Board at his July 15, 2020 deposition.[471] That before these arbitrations, neither Mr. Snyder nor Mr. Friedman had sent or received any correspondence with Ms. Moore regarding the administration of PoolRe.[472] That Mr. Carlson testified that Ms. Moore "would typically not be involved" in discussions regarding the allocations of expenses charged to pool participants,[473] and that Ms. Moore's complete lack of involvement in the administration of PoolRe further establishes the blurred lines of distinction between PoolRe, Mr. Feldman, and Capstone. That these facts reflect that PoolRe functions as a puppet for Mr. Feldman – not as a real company with actual corporate governance by a Board of Directors.

**227)** That the record also reflects that Mr. Snyder did not act often or independently of Capstone in administering PoolRe's affairs. That Mr. Snyder described his role as Director of PoolRe as "ministerial and advisory,"[474] and other than signing off on

---

[471] *See* Transcript, Volume 22, Oct. 1, 2021, at p. 8833, lines 10-13; p. 8837, line 23 – p. 8838, line 7 (Robert Snyder).

[472] *See* Transcript, Volume 22, Oct. 1, 2021, at p. 8839, lines 5-11 (Robert Snyder); Transcript, Volume 24, October 3, 2021, at p. 9528, line 3 – p. 9531, line 9 (Stephen Friedman).

[473] *See* Transcript, Volume 15, August 24, 2021, at p. 5977, line 20 – p. 5978, line 9 (Jeff Carlson).

[474] *See* Transcript, Volume 22, Oct. 1, 2021, at p. 8840, lines 9-12 (Robert Snyder).

meeting minutes or other ministerial acts, Mr. Snyder could "not recall ever communicating with folks at the Feldman Law Firm or Capstone through email regarding the business of PoolRe."[475]

**228)**  Mr. Snyder also could recall only two brief, "unremarkable" conversations regarding the Doctors before Capstone filed suit on behalf of PoolRe against the Doctors on May 7, 2020.[476] He did not record any time on his timesheets concerning these purported conversations,[477] and he did not discuss with either Ms. Moore or Mr. Friedman the dispute with the Doctors before Capstone filed the May 7, 2020 arbitration on the alleged behalf of PoolRe against the Doctors.[478]

**229)**  That Mr. Snyder testified that he was not "involved in any way in the allocation of administrative expenses or claims handling expenses that are paid out of the retained premiums for each PoolRe risk pool,"[479] and  Mr. Snyder testified that he was unaware of any e-mails, correspondence, or documents sent to or by any director on PoolRe's Board concerning the appropriateness or inappropriateness of A.M.Y.'s coverages being included in the risk pools.[480]

---

[475] *See* Transcript, Volume 22, October 1, 2021, at p. 8847, line 25 – p. 8848 line 18 (Robert Snyder).

[476] *See* Transcript, Volume 22, October 1, 2021, at p. 8848, line 19 – 8861, line 22 (Robert Snyder).

[477] *See* Transcript, Volume 22, October 1, 2021, at p. 8893, line 8 – p. 8894, line 1; p. 8896, line 9 – p. 8899, line 25 (Robert Snyder).

[478] *See* Transcript, Volume 22, October 1, 2021, at p. 8872, line 4 – p. 8865, line 25 (Robert Snyder).

[479] *See* Transcript, Volume 22, October 1, 2021, at p. 8873, lines 2-8 (Robert Snyder).

[480] *See* Transcript, Volume 22, October 1, 2021, at p. 9005, line 19 – p. 9006, line 9 (Robert Snyder).

**230)**    That Mr. Snyder recognized that "certain causes of action [in these arbitrations were] direct[ed] specifically at the Feldman Law Firm and not PoolRe," and questioned whether the Feldman "Law Firm [was] in fact being allocated its fair share of the expense" for these arbitrations.[481] That notwithstanding this recognition, Mr. Snyder and the other PoolRe directors did nothing to ensure that Mr. Feldman and Capstone were in fact paying their fair share of expenses for these arbitrations.

**231)**    Further, the Doctors argue, PoolRe used millions of dollars of the captive clients' premiums to pay Capstone for the legal fees and expenses billed by Mr. Feldman and Capstone in these arbitrations even though no one ever provided PoolRe with an invoice or any back-up documentation supporting Capstone's or Mr. Feldman's fees and expenses.[482]    That the fact that PoolRe paid millions of dollars to Capstone without receiving any invoices or back-up documentation establishes further the blurred lines of distinction between Capstone and PoolRe and the ultimate control that Capstone and Mr. Feldman exercised over PoolRe's affairs.

**232)**    That Mr. Feldman personally authorized the payments from PoolRe to Capstone,[483] and at Mr. Feldman's direction, PoolRe used the captive clients'

---

[481] *See* Transcript, Volume 22, October 1, 2021, at p. 9004, line 8 – p. 9005, line 5 (Robert Snyder).

[482] *See* Transcript, Volume 15, August 24, 2021, at p. 5851, line 21 – 5856, line 1; p. 5881, line 24 – p. 5884, line 18 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 8989, line 25 – p. 8990, line 10 (Robert Snyder).

[483] *See* Transcript, Volume 23, October 2, 2021, p. 9275, lines 1 – 6 (Jeff Carlson) (citing Exhibit DRS-2694, Joint-238351 (reflecting Stewart Feldman's initials and "OK" on PoolRe ACH transfer)); Transcript Vol. 23, October 2, 2021, p. 9143, line 23 – p. 9144, line 4 (Jeff Carlson) ("Q. Okay. And if you carry on to page 401708, this is the ACH payment that was okayed by Mr. Feldman on February 14, 2021, to pay a number of invoices including the AZA invoice of $362,212.15, right? A. Yes. It is one of several on this ACH page."); Exhibit DRS-2004, Joint 401708; Transcript Vol. 18, September 24, 2021, at p. 7312, line 21 – p. 7312, line 2 (Jeff Carlson) (Q: [...] underneath that,

premiums to pay for (1) Mr. Feldman's defense of a state bar complaint,[484] (2) Mr. Feldman's and Capstone's fees and expenses in arbitrations in which PoolRe was not even a party,[485] (3) hourly rates for the services of eight attorneys and twenty-two non-attorneys working for Mr. Feldman and Capstone;[486] and (4) a larger share of the expenses and fees in these arbitrations than either Mr. Feldman or Capstone.[487] These facts reflect that PoolRe's directors did not act independently in the best interest of PoolRe or its pool participants, but instead PoolRe acted, if at all, as a rubber stamp in furtherance of the interests of Mr. Feldman and Capstone.

**233)**    FCP argues that the testimony of Mr. Carlson, Mr. Snyder, Mr. Feldman and Mr. Friedman indicate that PoolRe was an independent corporation with a board of directors who regularly oversaw the affairs of the corporation. They testified that Mr. Feldman did not dictate the management and operation of PoolRe nor Capstone, and that these corporations consistently operated independently and in the best interest of their clients. This Arbitrator disagrees.

---

again, is what purports to be Mr. Feldman's – Mr. Feldman's, Stewart Feldman's initials, right? A: It appears to be, yes."); Exhibit DRS-2004, Joint-401700.

[484] *See* Transcript, Volume 15, August 14, 2021, at p. 6034, lines 13-19 (Jeff Carlson).

[485] *See, e.g.*, Exhibit DRS-2004, 2019 Risk Pool Losses and Third-Party Expense Sheet and Backup (reflecting fees and costs incurred in the Kutcher Arbitrations as being paid out of PoolRe funds); *see also* Transcript, Volume 22, October 1, 2021, at p. 8644, lines 7-25 (Robert Snyder); Transcript, Volume 15, August 14, 2021, at p. 6036, line 15 – p. 6037, line 8 (Jeff Carlson); Transcript, Volume 18, September 24, 2021, at p. 7289, line 4 – p. 7292, line 5 (Robert Snyder).

[486] *See* Transcript Volume 22, October 1, 2021, at p. 9093, lines 9-21 (Jeff Carlson).

[487] *See, e.g.*, Transcript Volume 22, October 1, 2021, at p. 8772, lines 3 - 8 (Robert Snyder).

**234)** Considering the totality of evidence and testimony in the record, this Arbitrator finds that PoolRe is a mere instrumentality of Mr. Feldman and Capstone and under their control.

## THE CLASS

**235)** The Doctors argue that Mr. Feldman and Capstone breached their fiduciary duties owed to the Claimants and to Class Members. That under Texas substantive law,[488] a fiduciary is obligated to "render full and fair disclosure of facts material to the client's representation."[489] The term fiduciary "refers to integrity and fidelity" and "contemplates fair dealing and good faith."[490] To this end, the fiduciary relationship is one of "'most abundant good faith,'" "requiring absolute perfect candor, openness and honesty, and the absences of any concealment or deception."[491] According to the Texas Supreme Court, "Not honesty alone, but the punctilio of an honor most sensitive, is then the standard of behavior."[492] That Mr. Feldman and Capstone failed to comport with this standard. And, that under Texas

---

[488] The Joint Engagement Letter calls for the application of Texas substantive law. *See* Exhibit J-20, Joint Engagement Letter at p. 3 of the Guidelines on Administration & Billing, SULLIVAN011081.

[489] *See Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988).

[490] *See Trousdale v. Henry*, 261 S.W.3d 221, 229 (Tex. App. – Houston [14th Dist.] 2008) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942)).

[491] *See Trousdale*, 261 S.W.3d 221 at 229 (citing *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App. – Houston [14th Dist.] 2001).

[492] *See Johnson v. Peckham*, 120 S.W.2d 786, 788 (Tex. 1938).

law, the elements of a breach of fiduciary duty claim include: (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.[493]

**236)** That the burden of proof for a breach of fiduciary duty claim is on the fiduciary, not the client. Texas law establishes that, "when self-dealing by the fiduciary is alleged, as it [is] in this case, a presumption of unfairness automatically arises, and the burden is placed on the fiduciary to prove that the questioned transaction (1) was made in good faith, (2) for fair consideration, and (3) after full disclosure of all material information to the principal,"[494] and that Mr. Feldman and Capstone failed to meet this burden.

**237)** A fiduciary relationship arises as a matter of law "between attorney and client, principal and agent, partners, and joint venturers."[495] Fiduciary duties include, *inter alia*, duties of "utmost candor and full disclosure and loyalty," which, in turn" "would encompass almost everything that's involved in good faith and fair dealing."[496]

---

[493] *See ETC Tex. Pipeline, Ltd. v. Addison Expl. & Dev., LLC*, 582 S.W.3d 823, 840 (Tex. App.—Eastland 2019) (internal citations omitted; *see also Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 752 (Tex. App.—El Paso 2013); *Las Colinas Obstetrics-Gynecology-Infertility Ass'n, P.A. v. Villalba*, 324 S.W.3d 634, 645 (Tex. App. 2010); *Holden v. Holden*, 456 S.W.3d 642, 659 (Tex. App.—Tyler 2015).

[494] *See Gammon v. Hodes*, No. 03-13-00124, 2016 WL 1882274, at *5 (Tex. App. – Austin 2015) (emphasis added); *see also Houston v. Ludwick*, No. 14-09-00600, 2010 WL 4132215, at *7 (Tex. App. – Houston [14th Dist.] Oct. 21, 2010); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App. – Tyler 2000); *Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App. – Houston [14th Dist.] 2011); *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1974); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 576 (Tex. 1963).

[495] *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003) (citing *Ins. Co. of North Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)).

[496] *See* Transcript, Volume 4, August 6, 2021, at p. 1444, lines 5-17 (Thomas Watkins).

**238)**   That Mr. Feldman owed fiduciary duties to the Doctors and Class Members. Mr. Feldman testified that both he and The Feldman Law Firm owed the Doctors fiduciary duties and that a lawyer cannot put his monetary interests above his client's interests.[497]

**239)**   This Arbitrator finds that the attorney-client relationship with the Doctors commenced upon the signing of the initial retention letter on March 3, 2015, hiring Mr. Feldman to conduct the Health Check-Up and perform a feasibility study as to the appropriateness of captive insurance for the Doctors' businesses.[498]   The attorney-client relationship with the Doctors continued with the signing of the Joint Engagement Letter on December 7, 2015.[499]   Likewise, Mr. Feldman's attorney-client relationship with Class Members commenced at least as of the date that Class Members signed their respective Joint Engagement Letters with Feldman.[500]

**240)**   The Joint Engagement Letters were not limited in time or in scope.[501]   As testified to by the Doctors' legal ethics expert, Tom Watkins: "There is no limit on

---

[497] *See* Transcript, Volume 13, August 22, 2021, at p. 5129, lines 1-4 (Stewart Feldman).

[498] *See* Exhibit DRS-491, Letter from David Kushner enclosing signed Engagement Memorandum, March 3, 2015. *See also* Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

[499] *See* Exhibit J-20, Joint Engagement Letter.

[500] *See* Exhibit DRS-2245, Family Parties' Joint Engagement Letter; Exhibit DRS-2246, Logistics Parties' Joint Engagement Letter; Exhibit-2247, McAda Parties' Joint Engagement Letter; Exhibit DRS-2248, Clear Parties' Joint Engagement Letter; Exhibit DRS-2249, HEC Parties' Joint Engagement Letter; Exhibit DRS-2250, Stampings Parties' Joint Engagement Letter; Exhibit DRS-2251, Communication Parties' Joint Engagement Letter; Exhibit DRS-2252, Foundation Parties' Engagement Letter; Exhibit DRS-2253, Generative Parties' Joint Engagement Letter; Exhibit DRS-2254, Lumbar Parties' Joint Engagement Letter; Exhibit DRS-2255, Prosthesis Parties' Joint Engagement Letter; Exhibit DRS-2256, Counsel Parties' Joint Engagement Letter; Exhibit DRS-2257, River Parties' Joint Engagement Letter; Exhibit DRS-2258, Illumination Parties' Joint Engagement Letter

[501] *See* Transcript, Volume 4, August 6, 2021, at p. 1451, line 20 – p. 1452, line 24 (Thomas Watkins); *see also*, Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

the attorney-client relationship created by [the preliminary engagement letter] . . . and in both of [the preliminary engagement letter and in the [Joint Engagement Letter], there is no termination, ever, of the attorney-client relationship. And, in my opinion, no limitations on the fiduciary duties and the DR responsibilities of the Feldman Law Firm to their clients, the Doctors."[502]

**241)**  Mr. Feldman also owed fiduciary duties to the Doctors and Class Members in connection with his status as the owner, CEO, and general counsel of Capstone and in managing PoolRe. Mr. Feldman cannot take off his "lawyer's hat" – he cannot absolve himself of his fiduciary and ethical duties by acting through Capstone or PoolRe rather than through The Feldman Law Firm.[503]  As Mr. Watkins testified, "a lawyer, like Mr. Feldman, cannot do through another entity what he could not do as a lawyer . . . He owes every duty that he acts [sic] on behalf of Capstone if he is doing something on behalf of Capstone. Because he couldn't do as a lawyer, he can't do it through Capstone."[504]

**242)**  Capstone as an agent also owed fiduciary duties to its principals, the Doctors and Class Members.[505]  Texas law imposes a fiduciary relationship as a matter of

---

[502] *See* Transcript, Volume 4, August 6, 2021, at p. 1451, line 20 – p. 1452, line 24 (Thomas Watkins); *see also,* Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

[503] *See, e.g., Matter of Hodge,* 407 P.3d 613, 639-40 (Kan. 2017); *see also Olson v. Estate of Watson,* 52 S.W.3d 865, 868 (Tex. App. – El Paso 2001) ("[A]ny argument that Mr. Olson was wearing his 'friend hat' rather than his 'attorney hat' when he drafted these documents fails as a matter of law.").

[504] *See* Transcript, Volume 4, August 6, 2021, at p. 1481, lines 3-13 (Thomas Watkins).

[505] *See Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003); *see also* Transcript, Volume 6, at p. 2389, line 17 – p. 2392, line 19; p. 2413, line 1 – p. 2415, line 13 (Richard Amoroso).

law between principal and agent.[506]   The Doctors' reinsurance expert, Richard

Amoroso, provided unrebutted expert testimony that a traditional agency / principal

relationship existed between Capstone, as captive manager, and its clients, the

Doctors and Class Members.[507]  Capstone owed the Doctors and Class Members a

"duty of loyalty," a "duty of complete candor and full disclosure," a "duty of fairness

to treat [its] principal fairly and reasonably," and a "duty of impartiality."[508]

**243)**   Further, Capstone owed fiduciary duties to the Doctors and Class Members in

connection with the captive clients' premiums held in trust by Capstone in PoolRe's

risk pools.    Section 4053.106 of the Texas Insurance Code provides that a

"managing general agent holds money on behalf of an insured or insurer in a

fiduciary capacity and shall properly account for that money."[509]   A managing

general agent's responsibilities include issuing policies in an insurer's name;

collecting and handling premiums paid by insureds; and investigating, adjusting, and

paying claims.[510]  Capstone provides all these functions to its clients, the Doctors

and Class Members, as part of the turnkey services it offers its captive

clients.[511]  These turnkey services provided by Capstone to its clients, the Doctors

---

[506] *See Abetter Trucking*, 113 S.W.3d at 508.

[507] *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso).

[508] *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso).

[509] *See* V.T.C.A., Insurance Code § 4053.106.

[510] *See Galindo v. Empower Managing Gen. Agency, Inc.*, No. 1:19-00904, 2020 WL 5409162 (W.D. Tex. Sept. 8, 2020) (quoting *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 719 (5th Cir. 2015); Tex. Ins. Code. sec. 4053.101).

[511] See Exhibit J-20, Joint Engagement Letter at SULLIVAN011082-83.

and Class Members, establish Capstone's role as a managing general agent under the Texas Insurance Code.

**244)**  The Texas Supreme Court has determined that "funds held by managing general agents on behalf of an insurance company must be 'held in a fiduciary capacity.'"[512] And the U.S. Fifth Circuit explained that, "[i]ndeed, control over funds belonging to others is the classic situation in which fiduciary duty arises."[513] Capstone exercised control over its captive clients' premiums paid into the risk pools and owes, therefore, its captive clients fiduciary duties in connection with those premiums.

**245)**  FCP argues that Mr. Feldman and Capstone honored every aspect of their fiduciary duties to both the Doctors and to Class Members in each and every opportunity to represent each. That it was the Doctors who terminated the attorney-client relationship with Mr. Feldman and that the Doctors cannot now argue that somehow Mr. Feldman breached his duty to the Doctors let alone to Class Members. Further, certification was improper.

**246)**  Notwithstanding the legal citations of FCP, the facts presented at trial clearly indicated that a conflict arose between the Doctors and Class Members on one hand and Mr. Feldman and Capstone on the other. Mr. Feldman as counsel for the Doctors

---

[512] *See Nat'l Plains Admins., Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 1999).

[513] *See Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs. Inc.*, 787 F.3d 716, 727-28 (5th Cir. 2015).

had a duty to recuse himself from all matters relating to any conflict between Capstone and the Doctors. However, considering the relationship between Mr. Feldman, Capstone and PoolRe, this Arbitrator holds that one cannot distinguish Mr. Feldman from Capstone from PoolRe.

**247)** Therefore, for all the foregoing reasons, this Arbitrator holds that both Mr. Feldman and Capstone owed independent fiduciary duties to the Doctors and Class Members.

**248)** The Doctors further argue that Mr. Feldman and Capstone breached their fiduciary duties owed to the Doctors and Class Members by engaging in self-dealing, misrepresentation, concealment of material information, and by converting their captive clients' premiums.

**249)** The standard under which fiduciaries are evaluated is an exacting one.[514] The Texas appellate court held in *Kimelco Petroleum, Inc. v. Morrison & Shelton*:

> The essence of a breach of fiduciary duty involves the 'integrity and fidelity' of an attorney. A breach of fiduciary duty occurs when an attorney benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interests to his own, retaining the client's funds, using the client's confidences improperly, taking advantage of the client's trust, engaging in self-dealing, or making misrepresentations.[515]

---

[514] *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 196 (Tex. App. – Houston [14th Dist.] 2002).

[515] 91 S.W.3d 921, 923 (Tex. App – Fort Worth 2002) (quoting *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App – Houston [14th Dist.] 2001)); *see also Spradley v. Michael E. Orsak, LP*, No. 0-19-00186, 2020 WL 739490, at * 8 (Tex App. – Dec. 15, 2020).

250)   The Doctors argue that Mr. Feldman and Capstone breached fiduciary duties by subordinating their clients' interests to their own, retaining their clients' funds, taking advantage of their clients' trust, engaging in self-dealing, making misrepresentations, and concealing material information. They argue that the inclusion of Mr. Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities in the risk pool was material information that needed to be disclosed, but was not disclosed, by Mr. Feldman and Capstone to their clients, the Doctors and Class Members.

251)   The Doctors' ethics expert, Mr. Watkins, testified that Feldman and Capstone had to disclose to the clients that the clients' obligation was to "pay [their] lawyers' defense cost if [the client] sue[s] [the lawyer] for malpractice."[516] This disclosure obligation applies whether it was a "dollar or a million dollars."[517]  Mr. Watkins testified that Feldman committed a serious breach of fiduciary duty by "fail[ing] to inform his clients that [Mr. Feldman] was selling them a product which would enable [Mr. Feldman] to be able to get his attorneys' fees paid by the client."[518]  The Doctors' reinsurance expert, Mr. Amoroso, likewise testified that Mr. Feldman and Capstone breached duties and violated industry custom and practice by failing to disclose to their clients that their clients were reinsuring Mr. Feldman's and

---

[516] *See* Transcript, Volume 4, August 6, 2021, at p. 1541, line 20 – p. 1542, line 15 (Thomas Watkins).
[517] *See* Transcript, Volume 4, August 6, 2021, at p. 1541, line 20 – p. 1542, line 15 (Thomas Watkins).
[518] *See* Transcript, Volume 4, August 6, 2021, at p. 1638, line 21 – p. 1639, line 10 (Thomas Watkins).

Capstone's professional liabilities, errors & omissions, and legal expense liabilities.[519]  That even Mr. Feldman's and Capstone's legal ethics expert, Mr. McCormack, could not defend the adequacy of Mr. Feldman's and Capstone's purported disclosure to their clients that the clients were insuring Mr. Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.[520]

**252)**  This Arbitrator holds that Mr. Feldman and Capstone subordinated their clients' interests to their own, took advantage of their clients' trust, engaged in self-dealing and misrepresentation, and concealed material information in failing to disclose to their clients, the Doctors and Class Members, that their clients were insuring Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.

**253)**  Accordingly, this Arbitrator concludes that Mr. Feldman and Capstone breached fiduciary duties to their clients by failing to adequately disclose that their clients were insuring Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.

---

[519] *See* Transcript, Volume 6, August 9, 2021, at p. 2416, line 23 – p. 2417, line 5; p. 2417, line 18 – p. 2418, line 19; p. 2439, lines 3-16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, at p. 2482, line 8 – p. 2483, line 21; p. 2489, line 11 – p. 2490, line 7; p. 2508, line 22 – p. 2509, line 7; p. 2510, line 19 – p. 2511, line 3 (Richard Amoroso).

[520] *See* Transcript, Volume 19, September 28, 2021, at p. 7630, line 1 – p. 7633, line 4 (James McCormack) (emphasis added).

**254)**  This Arbitrator found that the IRC § 6700 promoter exam of Mr. Feldman was material information that should have been disclosed but was not disclosed to the Doctors before the Doctors executed the Joint Engagement Letter.

**255)**  This Arbitrator holds that Mr. Feldman and Capstone subordinated their clients' interests to their own, took advantage of their clients' trust, engaged in misrepresentation and concealment of material information in failing to disclose to the Doctors the IRS's promoter exam of Mr. Feldman for promoting abusive tax shelters under IRC § 6700 before the Doctors signed the Joint Engagement Letter.

**256)**  Accordingly, this Arbitrator concludes that Feldman and Capstone breached fiduciary duties by failing to disclose to the Doctors the IRS's promoter exam of Mr. Feldman for promoting abusive tax shelters under IRC § 6700.

**257)**  The Doctors assert that Mr. Feldman and Capstone breached fiduciary duties by occupying and acting upon conflicts of interest to their benefit and the detriment of their clients.  This Arbitrator agrees.

**258)**  This Arbitrator found that Mr. Feldman declined to assist his clients, the Doctors from winding down and liquidating the 2019 pool, thus requiring their continued participation in the 2019.  That Mr. Feldman and Capstone refused to allow their clients to exit the 2019 risk pool so as to avoid a run on the risk pool and to force their clients into paying for Mr. Feldman's and Capstone's legal fees and expenses in fighting their clients.  These facts reflect that Mr. Feldman and Capstone

were subordinating their clients' interests to their own and establish Mr. Feldman's and Capstone's breaches of fiduciary duties.

**259)**   This Arbitrator holds that Mr. Feldman and Capstone improperly kept open the 2018 and 2019 risk pools with their own fraudulent claims so as to subject their clients in those pools into paying Feldman's and Capstone's legal fees and expenses in fighting their clients.  These facts further establish that Mr. Feldman and Capstone are subordinating their clients' interests to their own and Mr. Feldman's and Capstone's breaches of fiduciary duties.

**260)**   This Arbitrator found that Mr. Feldman and Capstone wrongfully converted their captive clients' premiums to pay for the legal fees and expenses incurred by Mr. Feldman and Capstone in lawsuits and arbitrations against their clients. Conversion is the "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion or inconsistent with the owner's rights."[521]  Mr. Feldman's, Capstone's, and PoolRe's taking of $3,354,925.37 of their captive clients' premiums to pay for their legal fees and expenses in these arbitration proceedings constitutes conversion.   Feldman's, Capstone's, and PoolRe's conversion of $3,354,925.37 of their captive clients' premiums to pay for their legal fees and expenses incurred in these arbitration proceedings establishes further Mr. Feldman and Capstone subordinating their

---

[521] *See Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971).

clients' interests to their own and Mr. Feldman's and Capstone's breaches of fiduciary duties.

**261)**  In response to the Doctors' conversion claim, Mr. Feldman and Capstone contend that the premiums taken to pay for Mr. Feldman's and Capstone's legal fees and expenses (1) do not belong to the captive clients, and (2) that PoolRe has the right to use these premiums in any manner it chooses without the captive clients' consent.  This Arbitrator rejects both arguments.

**262)**  Mr. Feldman, Capstone, and PoolRe argue that the retained premiums belong to PoolRe, not the captive clients, because the premiums are paid by the captive clients to PoolRe under the Stop Loss Reinsurance Agreement.[522]  Mr. Feldman and Capstone liken the situation to "a person with car insurance, when you pay your premium, that premium belongs to the company, the insurance company."[523]  Mr. Feldman and Capstone ignore, however, that the premiums paid by participating captives to PoolRe under the Stop Loss Reinsurance Agreement are paid back by PoolRe to the same participating captives under the Quota Share Reinsurance Policy.[524]  The pool premiums are paid to the participating captives in exchange for

---

[522] *See* FCP's Post-Trial Brief at pp. 197, 215 (citing Transcript, Volume 16, September 14, 2021, at p. 6126, line 20 – p. 6127, line 6 (Daniel Calderon)).  FCP also cites an inapposite case from the Western District of Missouri to support their contention that the premiums belong to PoolRe.  *See id.* (Citing *Weber Paper Co. v. U.S.*, 204 F.Supp. 394 (W.D. Mo. 1962)).  Nothing in *Weber* supports the contention that premiums belong to PoolRe.

[523] *See* Transcript, Volume 16, September 14, 2021, at p. 6126, line 20 – p. 6127, line 6 (Daniel Calderon)).

[524] *See* Exhibit J-72, 2019 Quota Share Reinsurance Policy at § 1, p. 2, ArbV-R036798 ("In return for payment of the Ceded Premium, and subject to all terms of this Policy, Reinsurers agree to provide reinsurance coverage to [PoolRe]").

the participating captives insuring PoolRe's risks.[525]    Thus, under Mr. Feldman, Capstone, and PoolRe's own logic, the premiums belong to the participating captives because the premiums are paid to the participating captives in exchange for insuring risk.

**263)**    Further, the Doctors' reinsurance expert, Richard Amoroso, offered expert testimony that the premiums are "the property of the [] pool participants" and were "held in trust by the administrator of PoolRe, which is Capstone."[526]    Mr. Amoroso offered expert testimony that the taking of the captive clients' premiums to fund FCP's litigation activities was completely inappropriate, violating duties and industry custom, standards, and practice.[527]

**264)**    This Arbitrator holds that the captive clients' premiums belong to the captive clients and that Mr. Feldman and Capstone violated their clients' trust by wrongfully taking the captive clients' premiums to pay for the legal fees and expenses incurred by Mr. Feldman and Capstone in these arbitration proceedings.

**265)**    Mr. Feldman and Capstone also argue that the PoolRe insurance agreements grant PoolRe an exclusive, unlimited, and unfettered right to use the captive clients'

---

[525] *See* Exhibit J-72, 2019 Quota Share Reinsurance Policy at § 1, p. 2, ArbV-R036798.

[526] *See* Transcript, Volume 6, August 9, 2021, at p. 2348, line 18 – p. 2349, line 16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

[527] *See, e.g.,* Transcript, Volumes 6 & 7, August 9 & 16, 2021, at p. 2336, line 24 – p. 2338, line 5; p. 2344, lines 6-15; p. 2348, line 25 – p. 2349, line 16; p. 2510, line 19 – p. 2513, line 10; p. 2536, line 2 – p. 2537, line 11; p. 2540, line 16 – p. 2541, line 19; p. 2544, lines 3-12; p. 2546, line 4 – p. 2549, line 11; p. 2551, lines 10-19; p. 2554, lines 6-16; p. 2555, line 12 – p. 2557, line 23; p. 2564, line 4 – p. 2565, line 23; p. 2568, line 18 – p. 2571, line 13; p. 2579, line 19 – p. 2580, line 8; p. 2584, line 7 – p. 2585, line 6; p. 2598, line 2 – p. 2607, line 18 (Richard Amoroso).

premiums to pay for Feldman's, Capstone's, and PoolRe's attorneys fees and operating expenses. This contention is rejected. The two contracts between PoolRe and the captive clients are (1) the Quota Share Reinsurance Policy and (2) the Stop Loss Reinsurance Agreement.[528] There is no provision in either of these agreements stating that the captives will pay PoolRe's, Capstone's, or Mr. Feldman's attorneys' fees and expenses.

**266)** The Stop Loss Reinsurance Agreement limits the coverages in PoolRe's risk pools solely to the direct written policies included in the pool:[529]

> THIS AGREEMENT SHALL NOT AND MAY NOT BE CONSTRUED TO PROVIDE ADDITIONAL COVERAGE BEYOND THAT EXPRESSLY CONTEMPLATED BY THE POLICIES ISSUED AND LISTED ABOVE AND IS ONLY EFFECTIVE TO THE EXTENT SUCH POLICIES (AS DEFINED HEREIN OR IN THE COMMON POLICY CONDITIONS) REMAIN IN FULL FORCE AND EFFECT.

**267)** PoolRe is not an insured under any policy included in the risk pools.[530] Nonetheless, Mr. Feldman, Capstone, and PoolRe contend that the risk pools provide additional coverage to PoolRe for all of PoolRe's legal fees and operating expenses in defending itself. Mr. Feldman's and Capstone's contention cannot be reconciled with the emphasized language above.

---

[528] *See* Exhibit DRS-2109 at ArbV-R029384, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement; Exhibit J-72, 2019 Quota Share Reinsurance Policy.

[529] *See* Exhibit DRS-2109 at Joint-331763, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at p. 1 (emphasis added).

[530] *See* Transcript, Volume 7, August 16, 2021, at p. 2853, line 3 – p. 2854, line 1; p. 2600, line 21 – p. 2602, line 7 (Richard Amoroso).

**268)** The Doctors' reinsurance expert, Mr. Amoroso, testified that the PoolRe agreements do not allow PoolRe to defend itself with pool funds.[531] Mr. Amoroso testified that the only losses and expenses subject to payment from the risk pools are the losses and expenses directly associated with "claims" covered by the policies in the risk pools.[532] Mr. Feldman and Capstone conceded at trial that the $3,354,925.37 of premiums taken from the 2018 to 2020 risk pools were not losses or expenses associated with any "claim" covered by any policy in the risk pools.[533] PoolRe was not an insured under any policy in the pool.[534]

**269)** The Doctors argue that Mr. Feldman and Capstone are implying a non-existent provision into the PoolRe agreements that would allow PoolRe to expend its clients' funds from any pool year to pay for PoolRe's, Mr. Feldman's, and Capstone's attorneys' fees and operating expenses. But Mr. Feldman and Capstone represented to their clients in the Joint Engagement Letters that the clients would

---

[531] *See* Transcript Volume 7, August 16, 2021, at p. 2511, line 4 – p. 2513, line 10; p. 2536, lines 2-23; p. 2568, line 18 – p. 2571, line 13; p. 2852, line 6 – p. 2854, line 14 (Richard Amoroso).

[532] *See* Transcript Volume 7, August 16, 2021, at p. 2852, line 6 – p. 2854, line 14 (Richard Amoroso). Mr. Amoroso's construction of the PoolRe agreements is consistent with representations made by the Feldman Law Firm and Capstone to their clients in the Joint Engagement Letters. The Joint Engagement Letters state that because "PoolRe conducts the pooling program for a fee (that is, on a contract basis)," "[t]here should be no incremental operating cost to the pool participants." *See, e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter. Pool participants are only "responsible for insurance losses (claims)." *See id.*

[533] *See* Transcript, Volume 22, October 1, 2021, at p. 8804, lines 6-11 (statement made by Shawn Bates); Transcript, Volume 11, August 20, 2021, at p. 4617, line 16 – p. 4618, line 8 (Stewart Feldman).

[534] *See* Transcript, Volume 17, September 23, 2021, at p. 6878, lines 18-20 (Statement by FCP's Counsel) ("But I'm trying to distinguish, PoolRe doesn't have an insurance policy or a claim.").

"not be responsible for [PoolRe's] incremental operating costs."[535]    PoolRe's

purported authority to expend pool funds to cover PoolRe's, Mr. Feldman's, and

Capstone's attorneys' fees and operating costs cannot be reconciled with

representations made by Feldman and Capstone in the Joint Engagement Letters.[536]

**270)**    Moreover, the Doctors argue, A.M.Y.'s Stop Loss Reinsurance Agreement

provides pre-conditions before the risk pool has any liability:

> The Pool shall have no liability for payments of any claims until the
> aggregate of all claims . . . reported by and paid to [the Feldman Law
> Firm and Capstone] by [A.M.Y.] against the Policies . . . exceeds Thirty
> and 4/10ths Percent (30.4%) of the sum of the Subject Premiums for all
> of the Policies specified above [the "Attachment Threshold"].
>
> *      *      *
>
> If the Attachment Threshold is met, PoolRe . . . will pay from the Pool
> a Final Settlement which is an 80% quota share of the aggregate for all
> claims reported by [the Feldman Law Firm and Capstone] . . . in excess
> of the Attachment Threshold, subject to a maximum of 160% of the
> Subject Premiums.  No Attachment Point shall have been satisfied . . .
> unless and until [A.M.Y.'s] claim has been fully adjusted and paid with
> [A.M.Y.'s] co-insurance responsibility for the remaining 20% of the
> aggregate of all claims reported by [the Feldman Law Firm and
> Capstone] above the Attachment point.[537]

All the Stop Loss Reinsurance Agreements contain the same provisions.

---

[535] *See* Transcript Volume 7, Aug. 16, 2021, p. 2511, line 6 – p. 2513, line 10 (Richard Amoroso) (citing, *e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter ("There should be no incremental operating cost to the pool participants.")).

[536] *See*, *e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter ("There should be no incremental operating cost to the pool participants.")

[537] *See* Exhibit DRS-2109 at Joint-331764 to Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at §§ 3, 4(A), 4(B); *see also* Transcript, Volume 24, October 24, 2021, at p. 9598, line 3 – p. 9602, line 3 (Stephen Friedman).

271)    The Doctors argue that A.M.Y.'s claims pertaining to these arbitrations have not been fully adjusted or paid.[538]  That Mr. Feldman decides whether A.M.Y. will make payment on the A.M.Y. claims,[539] and Mr. Feldman has not yet made that decision.[540]    That A.M.Y. has not satisfied its Attachment Threshold.[541]    Mr. Feldman has not directed A.M.Y. to pay for legal fees or expenses relating to these arbitrations.[542]  Thus the pre-conditions for the risk pool to have any liability to pay A.M.Y., Mr. Feldman, or Capstone have not been satisfied.  Capstone's President, Mr. Carlson, conceded that "[i]t's a requirement that the captive policy pay prior to any participation by the pool."[543]  This requirement has been ignored while PoolRe paid millions of dollars to Mr. Feldman and Capstone without any payments being made by A.M.Y. first or at all.

272)    The Stop Loss Reinsurance Agreement provides further that A.M.Y. "shall be solely responsible for payment of claims against the [A.M.Y.] policies, and neither PoolRe nor the Participating Reinsurers shall be responsible for payment of neither claims or defense thereof" until A.M.Y. satisfies its Attachment Threshold.[544]

---

[538] *See* Transcript, Volume 16, September 14, 2021, at p. 6176, line 20 – p. 6177, line 21 (Daniel Calderon); Transcript, Volume 17, p. 6887, line 22 – p. 6888, line 8, p. 6913, line 23 – p. 6917, line 5 (Jeff Carlson).

[539] *See* Transcript, Volume 17, September 23, 2021, at p. 6929, line 19 – p. 6931, line 14 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 9130, lines 5-9 (Jeff Carlson).

[540] *See* Transcript, Volume 22, October 1, 2021, at p. 9129, line 14 – p. 9132, line 6 (Jeff Carlson).

[541] *See* Transcript, Volume 16, September 14, 2021, at p. 6176, line 20 – p. 6177, line 21 (Daniel Calderon); Transcript, Volume 17, p. 6887, line 22 – p. 6888, line 8, p. 6913, line 23 – p. 6917, line 5 (Jeff Carlson).

[542] *See* Transcript, Volume 22, October 1, 2021, at p. 9129, line 14 – p. 9132, line 6 (Jeff Carlson).

[543] *See* Transcript, Volume 22, October 1, 2021, at p. 9131, lines 11-22 (Jeff Carlson).

[544] *See* Exhibit DRS-2109 at Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at § 4(B).

Because A.M.Y. has not satisfied its Attachment Threshold, the Participating Reinsurers, including the Doctors and Class Members, have no responsibility "for payment of [A.M.Y.] claims or the defense thereof."[545]

**273)**   The Quota Share Reinsurance Policy also does not provide PoolRe a right to use the captive clients' premiums to pay the attorneys' fees and operating expenses of Mr. Feldman, Capstone, and PoolRe.[546] Feldman and Capstone repeatedly argued at trial that "PoolRe has the right to defend itself."[547]  No one disputes that PoolRe has the right to defend itself.  But PoolRe does not have the right to defend itself with other people's money.

**274)**   The Doctors argue that Mr. Feldman, Capstone, and PoolRe incorrectly suggest that PoolRe has the right to use pool funds unassociated with any claim in the pool to pay each of Mr. Feldman's, Capstone's, and PoolRe's attorneys' fees and operating expenses based on a distortion of Section E(2) of the Quota Share Reinsurance Policy.[548] Section E(2) does not state anything about PoolRe using pool

---

[545] *See* Exhibit DRS-2109 at Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at § 4(B).

[546] *See generally* Exhibit J-72, 2019 Quota Share Reinsurance Policy; *see also* Transcript, Volume 6, August 9, 2021, at p. 2348, line 18 – p. 2349, line 16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

[547] *See* Transcript, Volume 22, October 1, 2021, at p. 8804 lines 6-11 (statement made by Shawn Bates); Transcript, Volume 22., October 22, 2021, at p. 8805 lines 5-10 (Shawn Bates); Transcript, Volume 22, October 1, 2021, at p. 8811, lines 12-25 (Shawn Bates); Transcript, Volume 22, October 2, 2021, at p. 8821, lines 10-14 (Robert Snyder); Transcript, Volume 11, August 20, 2021, at p. 4571, line 9 – p. 4572, line 7 (statement made by Cameron Byrd).

[548] *See* Transcript, Volume 22, October 1, 2021, at p. 8808, line 18 – p. 8809, line 1 (Shawn Bates); Transcript, Volume 22, October 1, 2021, at p. 8820, line 6 – p. 8821, line 14; Transcript, Volume 11, August 20, 2021, at p. 4608, line 7 – p. 4615, line 15 (Stewart Feldman).

funds to pay PoolRe's, Mr. Feldman's, or Capstone's attorneys' fees or expenses (or anything about PoolRe's right to defend *itself*). Instead, Section E (2) states:

> The Reinsured is authorized, without any consent of the Reinsurers, to investigate, settle, compromise, discharge, or repudiate any claim, and to institute, prosecute, defend, settle, or compromise any dispute or claim with finality with respect to any interests coming within the scope of this Policy.

**275)**  Section E (2) does not state that participating captives are liable for PoolRe's attorneys' fees or operating expenses, let alone the attorneys' fees and operating expenses of Capstone, Feldman, and PoolRe.   Section E (2) does not address payment by participating captives for losses or expenses.  PoolRe's Director, Mr. Snyder, conceded that Section E(2) does not say anything "about losses or expenses or attorneys' fees or anything like that."[549]  Section E(2) is, thus, different than Sections E(1) and E(3), which both address participating captives' limited responsibility to pay for the "losses and expenses ***connected***" or "***associated with such reported or filed claim***" in the risk pool:[550]

> 1. The Reinsured shall control and settle all claims with binding effect on the Reinsurers, who will bear their proportion of losses and expenses connected therewith according to the settlement of the Reinsured.

> 3.  No Reinsurer shall have liability for claims reported prior to that reinsurer's effective date listed in the column labeled "Effective Date" on the attached Schedule 1 as amended from time to time. All Reinsurers who are actively participating in the Risk Pool at the time of

---

[549] *See* Transcript, Volume 22, October 1, 2021, at p. 8821, line 24 – p. 8822, line 10 (Robert Snyder).

[550] *See* Exhibit J-72 at ArbV-R036800, 2019 Quota Share Reinsurance Policy at §§ E (1), E (3) (emphasis added).

a claim is reported or filed shall be responsible for their portion of the loss and expenses associated with such reported or filed claim.

**276)** The pool losses and expenses that Participating Reinsurers are responsible to pay must be "losses and expenses associated with such reported or filed claim" in the risk pool.[551] Mr. Feldman and Capstone confessed that the millions of dollars taken from the risk pools were not losses or expenses associated or connected with any "claim" in the risk pools.[552] As FCP's counsel stated: "It has been our position, and the documents and testimony are clear, what was paid, the 250 [thousand] out of the 2018 pool, was PoolRe expenses. It was not payment on any claim."[553] Thus, the obligation of participating captives under Sections E(1) and E(3) to share in the "losses and expenses associated with" "claim[s]" has not been triggered.[554] Additionally, A.M.Y. has not satisfied its Attachment Threshold, meaning that the Participating Reinsurers, including the Doctors and Class Members, have no responsibility "for payment of [A.M.Y.] claims or the defense thereof."[555]

**277)** Under Texas law, a writing is generally construed most strictly against its author and in such a manner as to reach a reasonable result consistent with the

---

[551] *See* Exhibit J-72 at ArbV-R036800, 2019 Quota Share Reinsurance Policy at §§ E (1), E (3).

[552] *See* Transcript, Volume 22, October 1, 2021, at p. 8804, lines 6-11 (Statement by FCP's Counsel); *see also* Transcript, Volume 11, August 20, 2021, at p. 4617, line 16 – p. 4618, line 8 (Stewart Feldman); *see also* Transcript, Volume 15, August 24, 2021, at p. 5983, lines 22-24 (Jeff Carlson); *see also* Transcript, Volume 17, September 23, 2021, at p. 6878, lines 18-20 (Statement of FCP's Counsel) ("PoolRe doesn't have an insurance policy or a claim.").

[553] *See* Transcript, Volume 22, October 1, 2021, at p. 8804, lines 6-11 (Statement by FCP's Counsel).

[554] *See* Exhibit J-72 at ArbV-R036800, 2019 Quota Share Reinsurance Policy at §§ E (1), E (3).

[555] *See* Exhibit DRS-2109 at Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at § 4(B).

apparent intent of the parties.[556] FCP drafted the Quota Share Reinsurance Policy.[557] In drafting Section E(2), FCP could have easily stated that the Reinsurers would pay "losses and expenses," just as FCP stated in Sections E(1) and E(3). FCP chose not to include such a "losses and expenses" provision in Section E (2). This Arbitrator will not rewrite the parties' contracts by implying a non-existent attorneys' fees provision into Section E (2) that the parties could have expressly included themselves but did not.

**278)** The Texas Supreme Court has "long held that courts will not rewrite agreements to insert provisions parties could have included."[558] In *FPL Energy, LLC v. TXU Portfolio Management, Co.*, the defendant argued that a liquidated damages clause applied to both "energy" and "renewable energy credits ('REC')" because the contracts covered both energy and REC.[559] However, the liquidated damages clause only referred to REC.[560] According to the Texas Supreme Court, "the lack of reference to electricity or energy in the liquidated damages provisions is critical."[561] The Texas Supreme Court noted that when the parties intended to address both REC

---

[556] *Temple-Eastex Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex. 1984).

[557] *See* Transcript, Volume 23, October 23, 2021, at p. 9455, lines 16-24 (Stephen Friedman); Transcript, Volume 11, August 20, 2021, at p. 4417, lines 9-13 (Stewart Feldman).

[558] *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 68 (Tex. 2014); *Tenneco Inv. v. Enter. Prods. Co.*, 925 S.W. 2d 640, 646 (Tex. 1996) (citing *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (Tex. 1911)).

[559] *See FPL Energy*, 426 S.W.3d at 67.

[560] *See FPL Energy*, 426 S.W.3d at 67-68.

[561] *See FPL Energy*, 426 S.W.3d at 67.

and energy in the contact, they did so.[562]  The Court would not import terms from other sections of the contract to compensate for the absence of the terms in the liquidated damages section.[563]  The Court held that the omission from one contractual section of a term used in other parts of the contract had to be considered "intentional and deliberate."[564]

**279)**  Similarly, FCP's omission of a "losses and expenses" provision in Section E (2) that is the same or similar to the "losses and expenses" provisions used in Sections E (1) and E (3) is considered by this Arbitrator to be intentional and deliberate.

**280)**  Moreover, the attorneys' fees provision that FCP wrongfully attempts to imply in Section E (2) would be far broader than the explicit losses and expenses provisions actually used in Sections E (1) and E (3).  Again, Sections E (1) and E (3) are limited only to losses and expenses *connected or associated with claims*.

**281)**  FCP's expansive construction of Section E (2) does away with all requirements and limitations on claims subject to pool participation.  FCP's expansive and incorrect construction of Section E (2) allows PoolRe to use an

---

[562] *See FPL Energy*, 426 S.W.3d at 67-68.

[563] *See FPL Energy*, 426 S.W.3d at 67-68.

[564] *See FPL Energy*, 426 S.W.3d at 67-68; *see also Nabors Completion & Prod. Servs. Co. v. Chesapeake Operating, Inc*, 648 Fed. Appx. 393, 395 (5th Cir. 2016) (holding that the omission of the term "equipment" in a contract was deliberate); *Fuller v. Wholesale Electric Supply Co. of Houston, Inc.*, No. 14-18-00328, 2020 WL 1528041, at *5 (Tex. App. – Houston [14th Dist.] Mar. 31, 2020) (holding that the definition of "retire" did not encompass "early retirement"); *Houston Metro Ortho & Spine Surgery, LLC v. Juansrirch, Ltd.*, No. 14-19-00732, 2021 WL 2799643, at *7-8 (Tex. App. – Houston [14th Dist.] July 6, 2021) (holding that the omission of the start date in one provision was intentional because the start date was included in other provisions).

unlimited and arbitrary amount of their clients' premiums from any pool year it wants to pay for the attorneys' fees and operating expenses of PoolRe, Capstone, and Mr. Feldman without any contribution whatsoever from A.M.Y.  FCP's expansive construction of Section E (2) cannot be reconciled with the language of the PoolRe agreements.  Nor can FCP's expansive construction of Section (E)(2) be reconciled with Mr. Feldman's and Capstone's representations to their clients that the clients would not be responsible for PoolRe's "incremental operating costs."[565]

**282)**  Considering the totality of the evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator holds that the premiums paid into the risk pool by the participating captives belong to the participating captives and cannot be used by Mr. Feldman, Capstone, or PoolRe for their attorneys' fees and expenses unrelated to a "claim" in the risk pool.  Accordingly, this Arbitrator holds that Mr. Feldman and Capstone breached fiduciary duties to their clients by acting upon conflicts of interest to their clients' detriment, converting $3,354,925.37 of their captive clients' premiums, engaging in self-dealing, and subordinating their clients' interests to their own.

**283)**  As class representatives, the Doctors argue that Mr. Feldman and Capstone breached duties owed to the Class Members.

---

[565] *See* Transcript Volume 7, Aug. 16, 2021, p. 2511, line 6 – p. 2513, line 10 (Richard Amoroso) ("[W]hat's being told to the potential client of Capstone is that if you want to participate in the risk pool that we offer that you're not responsible for operating expenses . . .") (citing, *e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter).

**284)** The burden of proof for a breach of fiduciary duty claim is on the fiduciary, not the client.[566] Mr. Feldman and Capstone did not introduce evidence into the record reflecting that they disclosed to the Class Members that the Class Members were reinsuring Mr. Feldman and Capstone's professional liabilities, errors and omissions, and legal expenses. As contended by Mr. Feldman and Capstone in their Post-Trial Brief, "There was absolutely no evidence put on regarding what representations were or were not made to the other members of the putative class."[567] The Doctors argue that this is because Mr. Feldman and Capstone failed to put on evidence that they disclosed to Class Members that Class Members were insuring Mr. Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities. That Mr. Feldman and Capstone have failed to satisfy their burden that disclosure was made to Class Members.

**285)** The Doctors argue that their reinsurance expert, Mr. Amoroso, reviewed the Joint Engagement Letters between Mr. Feldman and Capstone and the Class Members,[568] and that he confirmed that the Class Members participated in the 2018

---

[566] *See Gammon v. Hodes*, No. 03-13-00124, 2016 WL 1882274, at *5 (Tex. App. – Austin 2015); *Houston v. Ludwick*, No. 14-09-00600, 2010 WL 4132215, at *7 (Tex. App. – Houston [14th Dist.] Oct. 21, 2010); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App. – Tyler 2000); *Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App. – Houston [14th Dist.] 2011); *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1974); *International Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 576 (Tex. 1963).

[567] *See* FCP's Post-Trial Brief at p. 245.

[568] *See* Transcript, Volumes 6 & 7, August 9 & 16, 2021, at p. 2418, lines 20-25; p. 2439, line 3 – p. 2445, line 22; p. 2484, line 19 – p. 2488, line 23 (Richard Amoroso) (citing Exhibit DRS-2245, Family Parties' Joint Engagement Letter; Exhibit DRS-2246, Logistics Parties' Joint Engagement Letter; Exhibit-2247, McAda Parties' Joint Engagement Letter; Exhibit DRS-2248, Clear Parties' Joint Engagement Letter; Exhibit DRS-2249, HEC Parties' Joint Engagement Letter; Exhibit DRS-2250, Stampings Parties' Joint Engagement Letter; Exhibit DRS-2251, Communication Parties' Joint Engagement Letter; Exhibit DRS-2252, Foundation Parties' Engagement Letter;

and/or 2019 risk pools,[569] and that each of the Class Members were owed fiduciary duties as clients of Mr. Feldman and Capstone.[570]

**286)** Mr. Amoroso also determined that Mr. Feldman and Capstone did not disclose to the Class Members that the Class Members were reinsuring the lawyers' professional liabilities, errors & omissions, and legal expenses of Feldman and Capstone.[571] That he offered unrebutted expert testimony that Mr. Feldman and Capstone violated industry custom and practice, and their principal-agency duties by failing to disclose to the captive clients, the Doctors and Class Members, that the captive clients were reinsuring the professional liabilities and legal expenses of Mr. Feldman and Capstone.[572]

**287)** That the Class Members are entitled to all remedies and relief arising from Mr. Feldman's and Capstone's breaches of fiduciary duties. That the Class Members have all been damaged in the same manner as the Doctors by Mr. Feldman and

---

Exhibit DRS-2253, Generative Parties' Joint Engagement Letter; Exhibit DRS-2254, Lumbar Parties' Joint Engagement Letter; Exhibit DRS-2255, Prosthesis Parties' Joint Engagement Letter; Exhibit DRS-2256, Counsel Parties' Joint Engagement Letter; Exhibit DRS-2257, River Parties' Joint Engagement Letter; Exhibit DRS-2258, Illumination Parties' Joint Engagement Letter).

[569] *See* Transcript, Volume 6, August 9, 2021, at p. 2445, line 23 – p. 2446, line 12; p. 2488, line 24 – p. 2489, line 10 (Richard Amoroso); Volume 7, August 16, 2021, at p. 2499, line 24 – p. 2489, line 10 (Richard Amoroso).

[570] *See* fn. 527, *supra* (citing Class Members' Joint Engagement Letters); *see also* Exhibit J-20, Joint Engagement Letter at SULLIVAN 011104 ("Only clients of both the Firm and Capstone . . . may participate in these reinsurance programs.").

[571] *See* Transcript, Volume 6, August 9, 2021, at p. 2446, line 13 – p. 2448, line 18 (Richard Amoroso); Volume 7, August 16, 2021, at p. 2482, line 8 – p. 2483, line 21; p. 2489, line 11 – p. 2490, line 7; p. 2508, line 22 – p. 2509, line 7; p. 2607, lines 5-18 (Richard Amoroso).

[572] *See* Transcript, Volume 7, August 16, 2021, at p. 2510, line 19 – p. 2511, line 3 (Richard Amoroso).

Capstone's breaches of fiduciary duty and improper taking of millions of dollars from the PoolRe risk pools.

**288)** FCP argue that there was no taking of anything from either the Doctors or Class Members, as PoolRe, Capstone and Mr. Feldman each acted in accordance with the Engagement Letters and the reinsurance agreements of the parties.

**289)** This Arbitrator disagrees. As previously stated, the failure to inform both the Doctors and Class Members of their obligation to insure Mr. Feldman and Capstone was material and sufficient to warrant remedies.

**290)** The Doctors also argue that Mr. Feldman's and Capstone's breaches of their fiduciary duties caused the Doctors and the Class Members damages. They argue that they testified that they would not have agreed to execute the Joint Engagement Letter if Mr. Feldman and Capstone had disclosed (1) that the Doctors would be reinsuring Mr. Feldman and Capstone's malpractice liabilities and legal expenses, (2) and the promoter audit of Mr. Feldman.[573] Indeed, as Mr. Sherman testified, "Had we known we when we were going through this and negotiating the engagement letter that there was a promoter audit going on and that one of the programs had already been ruled by the IRS not to be legitimate insurance, we would have run, not walked, away."[574]

---

[573] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).
[574] *See* Transcript, Volume 20, September 29, 2021, at p. 7929, line 24 – p. 7930, line 11 (David Sherman).

291)  The Doctors argue that there is a causal relationship between Mr. Feldman's and Capstone's breaches of fiduciary duty, and the Doctors' and Class Members damages.  The Doctors argue that they would not have incurred $1,250,944 in fees paid to Capstone and Mr. Feldman had they not executed the Joint Engagement Letter.[575]  That these losses are directly related to the misrepresentations and inadequate disclosures made by Mr. Feldman and Capstone.

292)  Similarly, the Doctors argue, their losses attributable to (1) IRS back taxes, penalties, interest, and audit defense costs, (2) foregone investment opportunities, (3) Dr. Sullivan's forced liquidation of Bitcoin, (4) attorneys' fees, costs, and expenses in these arbitrations, and (5) FCP's looting of the premiums belonging to the Doctors and Class Members from the risk pools are also causally connected to these breaches of fiduciary duty.  That these losses would not have been incurred but-for the misrepresentations and insufficient disclosures made by Feldman and Capstone, as well as Feldman and Capstone acting upon their conflicts of interests in manners extremely detrimental to their own clients. This Arbitrator disagrees.

293)  The losses sustained by Dr. Sullivan having sold his Bitcoins are not attributable to Mr. Feldman and Capstone. This Arbitrator finds that Dr. Sullivan had other opportunities to finance this litigation absent selling his assets at a loss.

---

[575] *See* Exhibit FC-600.0020 and FC-600.0021, Bill Legier's Report; *see also* Transcript, Volume 1, August 3, 2021, at p. 350, lines 14-20 (Dr. Scott Sullivan).

Additionally, this Arbitrator holds that Mr. Feldman and Capstone are not liable to the Doctors for any IRS back taxes assessments at this time. The argument that the IRS is going to do something financially injurious to the Doctors because of their Captive Insurance participation is too speculative and premature for this Arbitrator to make an award at this time. However, Mr. Feldman and Capstone are liable to the Doctors for deprivation of investment opportunities, the looting of premiums owed to the Doctors and Class Members, and for attorney's fees, cost and expenses in this arbitration.

**294)**   The Doctors further argue that the breach of fiduciary duty claim entitles the Doctors and Class Members to a return of all fees paid to Capstone and Mr. Feldman under their respective Joint Engagement Letters, and that the Doctors  and Class Members are entitled to a return of these fees automatically as a result of by Mr. Feldman and Capstone's breaches of fiduciary duty, regardless of the other damages to which the Doctors and Class Members are entitled.[576]

**295)**   FCP argue that the Doctors nor Class Members are entitled to reimbursement of any premiums paid because all payment of expenses by FCP were consistent with the plain language of the Engagement Letters and the reinsurance agreements of the parties. FCP argues that the Doctor's and the Class Members' demand for damages be dismissed.

---

[576] *Burrow*, 997 S.W.2d at 243-44.

296) FCP, through the testimony of James McCormack, invoked *Fleming v. Curry*, 412 S.W.3d 723, in opposing the application of the "absolute perfect candor" standard.[577] They argue that under *Fleming,* the disclosures of Mr. Feldman and Capstone to the Doctors and Class Members were consistent with the holding in *Fleming.*

297) The Doctors argue that *Fleming* is inapposite, and that it poses no obstacle to applying the "absolute perfect candor" requirement to Mr. Feldman's disclosure obligations.

298) *Fleming* arose in a markedly different procedural context: the lawyer's clients moved for summary judgment, requiring them to "conclusively *disprove* Fleming's compliance with a fiduciary duty."[578] The appellate court noted that "the question of whether a party breached a fiduciary duty generally is treated as one of fact" – making summary judgment inappropriate.[579] *Fleming* does not alter the applicable standard for evaluating breach of fiduciary duty claims after a full trial on the merits – instead, that case merely recognizes that a plaintiff has a high burden to conclusively prove a breach of fiduciary duty claim at the summary judgment claim.

---

[577] 412 S.W.3d 723 (Tex. App. – Houston [14th Dist.] 2013).
[578] *Fleming,* 412 S.W.3d at 732.
[579] *Fleming,* 412 S.W.3d at 734.

The Doctors argue that the holding was specific to its facts, and *Fleming* does not establish any broader principle applicable here.[580] This Arbitrator agrees.

**299)** FCP also invoked a law review article by Professor Vincent Johnson to minimize the "absolute perfect candor" standard."[581]  The article noted that the "absolute perfect candor" stand applies under the very circumstances present here. Indeed, the article notes that the "absolute, perfect candor" standard applies in certain circumstances, including in situations "where the interests of attorney and client are adverse, as in the case of a business transaction (between them), or to the few areas in which particular rules of conduct call for a higher degree of disclosure, such as . . . contract initiation."[582]  FCP argues that these circumstances exist here. That Mr. Feldman entered into a business transaction with the Doctors and Class Members whereby the Doctors and Class Members would reinsure Mr. Feldman and Capstone against, *inter alia*, legal malpractice and errors and omissions claims brought by the Doctors and Class Members.   Mr. McCormack agreed with the notion that the absolute perfect candor standard should apply to a business transaction between the lawyer and the client.[583]

---

[580]  *See generally*, Transcript, Volume 20, September 29, 2021, at p. 7861, line 21 – p. 7865, line 4 (James McCormack).

[581]  *See* VINCENT JOHNSON, "ABSOLUTE AND PERFECT CANDOR" TO CLIENTS, 34 ST. MARY'S L.J. 737 (2003).

[582]  *See* Exhibit DRS-2710, at p. 27, Joint-427201 (emphasis added).

[583]  *See* Transcript, Volume 19, September 28, 2019, at p. 7785, line 6 – p. 7786, line 18 (James McCormack).

**300)** However, in the matter *sub judice*, there is no doubt that there was not perfect candor by Mr. Feldman in his dealings as a lawyer with the Doctors and Class Members. Thus, Mr. Feldman failed to apply the rule of *Fleming* to the detriment of the Doctors and Class Members, his clients with whom he was doing business. Consequently, that there is no merit to FCP's attempt to minimize the application of the "absolute perfect candor" standard, whether via *Fleming v. Curry* or by Professor Johnson's law review article.

**301)** The Doctors next argue that Capstone, PoolRe and Jeff Carlson are each liable for Mr. Feldman's breaches of fiduciary duties pursuant to the *Kinzback* Rule. They argue that liability for the breach of fiduciary duty is not limited to attorneys or agents,[584] and that under long-standing Texas Supreme Court precedent, parties that knowingly facilitate a breach of fiduciary duty are equally liable.[585]

**302)** That according to the Texas Supreme Court, "It is settled as the law of [the] State [of Texas] that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."[586] This doctrine – known as the *Kinzback* Rule – is often applied by

---

[584] *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003).

[585] *Kinzback Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942).

[586] *Kinzback*, 160 S.W.2d at 514.

Texas courts.[587]    Thus, Capstone,[588] PoolRe, and Jeff Carlson are liable for knowingly participating in and facilitating Mr. Feldman's breaches of fiduciary duties to its clients under the *Kinzbach* rule.

**303)**    That to establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must establish: (1) "the existence of a fiduciary relationship;" (2) "that the third party knew of the fiduciary relationship;" and (3) "that the third party was aware that it was participating in the breach of a fiduciary relationship."[589]

**304)**    In the instant matter, the Doctors argue, first, the fiduciary relationship between Mr. Feldman, as an attorney, and his clients exists as a matter of law, thereby establishing the first element.[590]

**305)**    Second, that Capstone, Mr. Carlson, and PoolRe knew that the nature of the relationship between Mr. Feldman and his clients was fiduciary. That Mr. Feldman is the owner, CEO, and general counsel for Capstone in addition to being the owner, managing member, and a lawyer of the Feldman Law Firm. Thus, Mr. Feldman's

---

[587] *See Cox Texas Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex. App. 2001); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221 (Tex. 2017); *see also D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (citing *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)) (applying Texas law).

[588] Capstone owed fiduciary duties to the Doctors under principles of agency. *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso). But even if Capstone was not a fiduciary, which is rejected by this Arbitrator, Capstone is still liable for Feldman's breaches of fiduciary duty under the *Kinzbach* Rule.

[589] *See D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (citing *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)) (applying Texas law).

[590] *See Trousdale v. Henry*, 261 S.W.3d 221, 229 (Tex. App. – Houston [14th Dist.] 2008).

knowledge is imputed to Capstone.[591] And Mr. Carlson testified that he was aware that all the pool participants were clients of Mr. Feldman and that the participants' funds paid into the risk pools were being used to pay for defending the legal malpractice and breach of fiduciary duties claims asserted against Mr. Feldman.[592]

**306)**  That PoolRe has no employees of its own,[593] so insofar as Capstone knew that Mr. Feldman owed fiduciary duties to the Doctors and Class Members, and PoolRe can only act through Capstone, then Capstone's knowledge is imputed to PoolRe. Additionally, the PoolRe agreements state that the pool is only for clients of "The Feldman Law Firm."[594]  PoolRe Director, Robert Snyder, testified that the pool funds being used to pay for FCP's legal fees and expenses in these arbitrations were "paid through the funds that each of the participating members of PoolRe have provided."[595]

**307)**  Thus, that this Arbitrator should conclude that Capstone, Mr. Carlson, and PoolRe had knowledge of the fiduciary relationship between pool participants and Mr. Feldman.

---

[591] *See La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984); *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 300 (Tex. 1981).

[592] *See* Transcript, Volume 22, October 1, 2021, at p. 9120, line 1 – p. 9125, line 20 (Jeff Carlson).

[593] *See* Transcript, Volume 22, October 1, 2021, at p. 8711, lines 4-13 (Robert Snyder).

[594] *See* Exhibit DRS-2109 at Joint-331770, 2019 Stop Loss Reinsurance Agreement at § 6(B) ("[T]he only Named Insureds benefitting from coverage by PoolRe are active clients in good standing of both The Feldman Law Firm LLP and Capstone Associated Services, Ltd.").

[595] *See* Transcript, Volume 22, October 1, 2021, at p. 8782, line 24 – p. 8783, line 5 (Robert Snyder).

**308)**    The Doctors argue that the third element of the *Kinzbach* Rule is also satisfied. They argue that Mr. Carlson, Capstone, and PoolRe are aware that they participated and are actively participating in the breach of fiduciary duties owed by Mr. Feldman to his clients, the Doctors and Class Members. These actions facilitating the breach of fiduciary duty include, *inter alia*:

> ➤ PoolRe's Directors, Robert Snyder and Stephen Friedman, Capstone's President, Jeff Carlson, and Mr. Feldman authorized an "arbitrary" allocation of $250,000 to the 2018 risk pool[596] and took an additional $3 million from the 2019 pool to cover in part the costs of defending Mr. Feldman and Capstone in these arbitration proceedings.[597]

> ➤ At Mr. Feldman's direction, Mr. Feldman controller Paul Franks submitted fraudulent "New Claim Reports" to Capstone on June 9, 2020 – all of which reflected a purported "date of loss" of December 31, 2019.[598] That date is the very last possible date for a claim to arise in order to trigger the 2019 pool.

> ➤ Mr. Carlson participated in meetings with PoolRe's directors whereby it was agreed that funds from the 2018 and 2019 risk pools would be used to pay legal fees attributable to these arbitrations.[599] To date, over $3 million of pool funds have been used for the defense of FCP.

---

[596] *See* Exhibit DRS-2543, Capstone's Final Report on the 2018 Risk Pool, July 27, 2021; Transcript, Volume 22, October 1, 2021, at p. 8793, line 8 – p. 8794, line 5 (Robert Snyder); *see also* Transcript, Volume 11, August 20, 2021, at p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript Vol. 17, September 23, 2021, p. 6857, line 5 – p. 6858, line 18 (Jeff Carlson); Transcript, Vol. 7, August 16, 2021, at p. 2544, lines 3-12 (Richard Amoroso).

[597] *See* Transcript, Vol. 18, September 24, 2021, at p. 7013, line 20 – p. 7014, line 9 (Jeff Carlson); Transcript, Vol. 7, August 16, 2021, at p. 2552, line 5 – p. 2557, line 23 (Richard Amoroso).

[598] *See* Exhibit DRS-560 to Exhibit DRS-564, New Claims Reports.

[599] *See* Transcript, Volume 15, August 24, 2021, at p. 6035, line 23 – p. 6036, line 9 (Jeff Carlson) (referring to Exhibit DRS-2004, at Joint-401691); Volume 18, September 24, 2021, at p. 7300, line 10 – p. 7301, line 9; p. 7302, line 21 – p. 7303, line 17 (Jeff Carlson).

**309)** That these facts reflect willful participation by Capstone, PoolRe, and Jeff Carlson in Mr. Feldman's breach of fiduciary duties to his clients through the looting of the risk pools to Mr. Feldman's benefit and his clients' detriment. Thus, they argue, that under the *Kinzbach* Rule, Capstone, PoolRe, and Mr. Carlson are liable for Mr. Feldman's breaches of fiduciary duty. And, Mr. Feldman's liability, including Mr. Feldman's personal liability, arises from all claims asserted by the Doctors and Class Members.

**310)** The Doctors also argue that Mr. Feldman's and Capstone's failure to disclose the IRS's promoter exam of Mr. Feldman for promoting abusive tax shelters, also implicated Mr. Feldman's and Capstone's obligations under IRS Circular 230.[600] As confirmed by Mr. Press, the Joint Engagement Letter, including Exhibit C, is written tax advice relating to a federal tax matter.[601] Thus, the Joint Engagement Letter implicates IRS Circular 230 – specifically, Circular 230's requirements concerning the disclosure of all reasonably available information.[602]

**311)** Circular 230 applies to "practitioners," which includes attorneys and accountants who represent taxpayers before the IRS.[603] Circular 230 applies to Mr.

---

[600] Any attempt by Feldman and Capstone to disclaim the effects or applicability of IRS Circular 230 would be "not effective." *See* Transcript, Volume 9, August 18, 2021, at p. 3446, lines 21-24 (Lyle Press).

[601] *See* Transcript, Volume 9, August 18, 2021, at p. 3440, lines 2-6; 3443, line 20 – p. 3444, line 1 (Lyle Press).

[602] *See* Exhibit DRS-580, Circular 230; *see also* Transcript, Volume 9, August 18, 2021, at p. 3440, lines 2-6; p. 3443, line 20 – p. 3444, line 1 (Lyle Press).

[603] *See* Exhibit DRS-580, Circular 230, at §10.0(a), SULLIVAN 018857; *see also*, Transcript, Volume 9, August 18, 2021, at p. 3429, line 14 – p. 3430, line 3 (Lyle Press).

Feldman, insofar as Mr. Feldman wore multiple hats, including serving as the CEO and general counsel of Capstone, and he executed the Joint Engagement Letter on Capstone's behalf, which also made Capstone subject to Circular 230.[604]  Indeed, Mr. Feldman signed the Joint Engagement Letter jointly on behalf of Capstone and Feldman.[605]

**312)**  Section 10.37(a)(ii) of Circular 230 imposes requirements on practitioners in connection with the provision of written advice. Such advice requires the practitioner to, *inter alia*, "reasonably consider all relevant facts and circumstances that the practitioner knows or reasonably should know," "use reasonable efforts to identify and ascertain the facts relevant to written advice on each Federal tax matter," and "relate applicable law and authorities to facts."[606]  Circular 230 requires "all written tax advice to provide a complete, accurate disclosure of all information known or reasonably known."[607]  Mr. Press described this section as "basically instruct[ing] a practitioner to consider all information available or reasonably available, tie them to the known law that they're familiar with, and to place all of that in their writing to the client or the person to whom the writing is addressed."[608]  Further, Section 10.22 of Circular 230 requires practitioners to "exercise due diligence . . . in determining

---

[604] *See* Transcript, Volume 9, August 18, 2021, at p. 3443, line 15 – p. 3444, line 25 (Lyle Press).

[605] *See* Exhibit J-20, Joint Engagement Letter SULLIVAN011077.

[606] *See* Exhibit DRS-580, Circular 230, at §10.37, at SULLIVAN 018878-79.

[607] *See* Transcript, Volume 9, August 18, 2021, at p. 3430, lines 4-8 (Lyle Press).

[608] *See* Transcript, Volume 9, August 18, 2021, at p. 3432, line 4 – p. 3433, line 14 (Lyle Press).

the correctness of oral or written representations made by the practitioner to clients with reference to any matter administered by the Internal Revenue Service."[609]

313)   These provisions required Mr. Feldman and Capstone to exercise proper diligence and candor in advising clients like the Doctors concerning any "Federal tax matter."   That latter term is broadly defined under § 10.37(d) of Circular 230, as "any matter concerning the application or interpretation of . . . any provision of law impacting a person's obligations under the internal revenue laws and regulations, including but not limited to the person's liability to pay tax or obligations to file returns."[610]  Mr. Press called this provision "an extremely broad statement.  It's been determined to be a broad statement to encompass pretty much anything affecting the Internal Revenue Code."[611]

314)   They further argue that the disclosures made by Mr. Feldman and Capstone failed to comply with the requirements of Circular 230.   The Joint Engagement Letter, including its Exhibit C, is written tax advice relating to a federal tax matter, subject to the requirements of Circular 230.[612]  Mr. Press testified that Exhibit C to the Joint Engagement Letter did not adequately disclose the existence or substantive basis for the adverse audit findings of Reserve Mechanical and six other Capstone-

---

[609] *See* Exhibit DRS-580, Circular 230, at §10.22(a)(3).
[610] *See* Exhibit DRS-580, Circular 230, at §10.37(d).
[611] *See* Transcript, Volume 9, August 18, 2021, at p. 3435, line 16 – p. 3436, line 1 (Lyle Press).
[612] *See* Transcript, Volume 9, August 18, 2021, at p. 3440, lines 2-6 (Lyle Press).

administered captives.   As a result, Mr. Press testified that "there was a failure to disclose this information [regarding the IRS's determinations as to Reserve Mechanical and six other audited captives] in the tax risk section of the joint engagement letter of November 2015."[613]   Mr. Feldman and Capstone "did not disclose that information at all" to the Doctors or Class Members prior to the signing of the Joint Engagement Letters.[614]

**315)**  FCP argues that the disclosures in the Engagement Letters were more than adequate to put the Doctors and Class Members on notice of any difficulties associated with the IRS and Mr. Feldman. That FCP expert Mr. Brooks testified that the notices in the Engagement Letters were more than adequate and complied with the notice requirements of Circular 230.

**316)**   This Arbitrator, considering the totality of evidence and testimony presented at trial, the findings of fact set forth above, and applicable law, holds that Mr. Feldman and Capstone breached their obligations to the Doctors and Class Members under IRS Circular 230.

**317)**   The Doctors have asserted a claim for legal malpractice against Mr. Feldman. To prevail on a legal malpractice claim, the client must establish (1) the lawyer owed a duty of care, (2) the lawyer breached that duty, (3) the lawyer's breach proximately

---

[613] *See* Transcript, Volume 9, August 18, 2021, at p. 3470, lines 1-24 (Lyle Press).
[614] *See* Transcript, Volume 9, August 18, 2021, at p. 3471, line 13 – p. 3472, line 1 (Lyle Press).

caused damage to the client, and (4) the client sustained damages.[615] Claims of legal malpractice are rooted in negligence principles and arise from an attorney's failure to exercise ordinary care.[616]

**318)** The Doctors argue that Mr. Feldman owed the Doctors and Class Members a duty of care by virtue of the attorney-client relationship.

**319)** "[T]he first question in a legal malpractice claim is whether there exists an attorney-client relationship, as an attorney only owes a duty to his or her clients."[617] The attorney-client relationship was formed when the Doctors first retained Mr. Feldman in March 2015 and continued with the execution of the Joint Engagement Letter in December 2015.[618] Likewise, Mr. Feldman's attorney-client relationship with Class Members commenced at least as of the date that Class Members signed their respective Joint Engagement Letters with Mr. Feldman.[619]

---

[615] See *Rogers v. Zanetti*, 518 S.W.3d 394, 400 (Tex. 2017); *Saulsberry v. Ross*, 485 S.W.3d 35, 41 (Tex. App.—Houston [14th Dist.] 2015); *Pressil v. Gibson*, 477 S.W.3d 402, 407 (Tex. App.—Houston [14th Dist.] 2015); *Haddy v. Caldwell*, 355 S.W.3d 247, 251 (Tex. App.—El Paso 2011).

[616] *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989).

[617] *Border Demolition & Env., Inc. v. Pineda*, 535 S.W.3d 140, 152 (Tex. App. – El Paso 2017).

[618] See Exhibit DRS-491, Letter from David Kushner enclosing signed Engagement Memorandum, March 3, 2015; Exhibit J-20, Joint Engagement Letter; *see also* Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

[619] See Exhibit DRS-2245, Family Parties' Joint Engagement Letter; Exhibit DRS-2246, Logistics Parties' Joint Engagement Letter; Exhibit-2247, McAda Parties' Joint Engagement Letter; Exhibit DRS-2248, Clear Parties' Joint Engagement Letter; Exhibit DRS-2249, HEC Parties' Joint Engagement Letter; Exhibit DRS-2250, Stampings Parties' Joint Engagement Letter; Exhibit DRS-2251, Communication Parties' Joint Engagement Letter; Exhibit DRS-2252, Foundation Parties' Engagement Letter; Exhibit DRS-2253, Generative Parties' Joint Engagement Letter; Exhibit DRS-2254, Lumbar Parties' Joint Engagement Letter; Exhibit DRS-2255, Prosthesis Parties' Joint Engagement Letter; Exhibit DRS-2256, Counsel Parties' Joint Engagement Letter; Exhibit DRS-2257, River Parties' Joint Engagement Letter; Exhibit DRS-2258, Illumination Parties' Joint Engagement Letter

**320)**    The Doctors argue that Mr. Feldman breached his duty as the attorney for the Doctors and Class Members by failing to act as a reasonably prudent lawyer and by violating multiple Disciplinary Rules of Professional Conduct. They argue that these rules establish a clear standard of care as to how reasonable, prudent lawyers conduct themselves.    Texas jurisprudence instructs, "[A]lthough the Texas Disciplinary Rules do not define the standards of civil liability, they are evidence of an attorney's duty of care."[620]    And Mr. Watkins testified that the violation of disciplinary rules operates as a *de facto* proxy for a finding of negligence: "[E]very expert that testifies will testify that reasonable and prudent lawyers will comply with the disciplinary rules. . . [the violation] creates at least negligence on [Mr. Feldman's] part for not following these rules."[621]

---

[620] *See Milligan, Trustee for Westech Capital Corp. v. Salamone*, 2019 WL 1208999, at p. 5, n. 6 (W.D. Tex. 2019); *see also Two Thirty Nine Joint Venture v. Joe*, 60 S.W.3d 896, 905 (Tex. App.—Dallas 2001), *reversed on other grounds* ("[A] rule or statute regulating the conduct of lawyers does not give rise to an implied cause of action for professional negligence or breach of fiduciary duty, but it may be considered by a trier of fact in understanding and applying the standard of care for malpractice or determining a breach of fiduciary duty. This provision reflects a common-sense approach to using the rules of conduct in a malpractice or breach of fiduciary duty action. A standard of care in a professional negligence suit does and should reflect work custom. Barring the use of the code and denying that the code is relevant to the duties a lawyer has to his client is not logical and would require the re-creation of a standard of care without reference to verifiable or pre-existing rules of conduct. Therefore, the trier of fact may consider the construction of a relevant rule of professional conduct that is designed for the protection of persons in the position of the claimant as evidence of the standard of care and breach of the standard."). Further, in *Alvarado v. Love & Houston, G.P.*, the U.S. District Court for the Southern District of Texas determined that the Texas Disciplinary Rules of Conduct are inapplicable to establish a basis for negligence unless supported by an "expert opining that the standard or care encompasses the conduct discussed in the Texas rules." No. 4:19-CV-2148, 2021 WL 1428477, at * 11 (S.D. Tex. Apr. 15, 2021). Here, Mr. Watkins has offered expert opinion that the standard of care encompasses Feldman's conduct.

[621] *See* Transcript, Volume 4, August 6, 2021, at p. 1536, lines 15-18; p. 1536, line 24 – p. 1537, line 5 (Thomas Watkins).

**321)**   The Doctors argue that Mr. Feldman jointly represented Capstone and PoolRe in addition to representing the Doctors and Class Members,[622] and that this joint representation was a violation of Rule 1.06 and was adverse to the Doctors and Class Members.    That Mr. Feldman failed to fully disclose the consequences of this common representation, and that his joint representation, coupled with the inadequate disclosures discussed infra, violated Rule 1.06 of the Texas Rules of Professional Conduct.[623]

**322)**   Rule 1.06(b) provides, in relevant part, that:

> a lawyer shall not represent a person if the representation of that person:
> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.[624]

**323)**   In turn, Rule 1.06(c) allows a lawyer to represent a client in the above-identified circumstances only "if (1) the lawyer reasonably believes the representation of each client will not be materially affected; *and* (2) each affected or potentially affected client consents to such representation after full disclosure of the

---

[622] *See* Transcript, Volume 13, August 22, 2021, at p. 5122, lines 2-20 (Stewart Feldman); *see also* Exhibit J-20, Joint Engagement Letter at p. 4, SULLIVAN011070 ("Capstone is a significant client of the Firm;" "The Feldman Law Firm LLP also does occasional legal work for PoolRe.").

[623] *See* Exhibit DRS-1540, Rules of Professional Conduct, at p. 28, SULLIVAN 019405. While not formally admitted, the Arbitrators took judicial notice of the Rules of Professional Conduct. *See* Transcript, Volume 4, August 6, 2021, at p. 1445, line 10 – p. 1446, line 17 (Arbitrators).

[624] *See* Exhibit DRS-1540, Rules of Professional Conduct, at p. 28, SULLIVAN 019405

existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any."[625]

**324)**  Mr. Watkins testified that Rule 1.06(b)(1) is "clearly" implicated "because obviously everything Capstone did and everything Mr. Feldman did and everything the Doctors did was a substantially related matter."[626] Because of the interrelated nature of Capstone's duties and Mr. Feldman's duties, Mr. Watkins concluded that Mr. Feldman could not satisfy the requirements of Rule 1.06(c), as "no reasonable, prudent lawyer under the same or similar circumstances could possibly get past (1) in this case.  And that, therefore, he does not get to benefit from Section (2)."[627] However, even if subsection (1) were satisfied, which is denied, subsection (2) was not satisfied because that rule calls for "full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation."[628]

**325)**  Mr. Watkins noted that the contractual structure, whereby the Doctors and Class Members would pay Capstone and some unspecified portion of the funds would be tendered to the Feldman Law Firm, reflected Mr. Feldman's dual loyalties. Mr. Watkins testified that a reasonably prudent lawyer "cannot reasonably believe that he's fulfilling his obligation under 1.06" for the following reasons:[629]

---

[625] *See* Exhibit DRS-1540, Rules of Professional Conduct, at p. 28, SULLIVAN 019405 (emphasis added).

[626] *See* Transcript, Volume 4, August 6, 2021, at p. 1489, line 9 – p. 1490, line 1 (Thomas Watkins).

[627] *See* Transcript, Volume 4, August 6, 2021, at p. 1491, lines 2-6 (Thomas Watkins) (emphasis added).

[628] *See* Exhibit DRS-1540, Rules of Professional Conduct, Rule 1.06(c)(2), at p. 28, SULLIVAN 019405.

[629] *See* Transcript, Volume 4, August 6, 2021, at p. 1495, line 8 – p. 1496, line 15 (Thomas Watkins).

A:    Because this contract – this contract is set up in such a way as to create two streams of income to the lawyer. And I've seen it over and over again. Any time that the lawyer decides to put on the second hat or the third hat or the fourth hat, it is not to benefit the client.

It is to provide an additional stream of income for the lawyer. And, therefore, there is complete adversity between his position Capstone acting as a lawyer and his position as a lawyer for the clients.

And, therefore, on behalf of himself and himself acting through Capstone, he owes full disclosure, full candor. So, I've gone through this contract until I'm blue in the face, and I cannot find full disclosure, absolute candor, any compliance at all with his fiduciary duty or any compliance at all with Rule 1.06.

326)    The Doctors also argue that Mr. Watkins concluded that the conflict arising from Mr. Feldman representing both the Doctors and Capstone simultaneously was unwaivable and that "it's not even ethical to ask the client to waive it."[630]   That Mr. Feldman had a conflict in representing the Doctors and Class Members because he represented and owned Capstone, which had divergent interests to the Doctors and Class Members.   Mr. Feldman owns and is the General Counsel of Capstone and therefore represented Capstone, which also administers PoolRe.[631]   It was in the Doctors' and Class Members' best interests to exit the PoolRe risk pool and avoid

---

[630] *See* Transcript, Volume 4, August 6, 2021, at p. 1500, line 13 – p. 1501, line 15 (Thomas Watkins).

[631] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 18-19; p. 5117, line 25 – p. 5118, line 5 (Stewart Feldman). Capstone's Vice President and Head of Operations, Daniel Calderon, testified that everyone within the organization reports to Stewart Feldman. *See* Transcript, Volume 16, September 14, 2021, at p. 6330, lines 8-13 (Daniel Calderon). *See* Transcript, Volume 22, October 1, 2021, at p. 8961, line 4 – p. 8692, line 8 (Robert Snyder) (citing, *e.g.*, Exhibit DRS-2003 at Joint-364817, Claims Reserve Payment Agreement at § 2(C)).  Twelve other Claims Reserve Payment Agreements are included in Exhibit DRS 2003, which all include the same language at § 2(C) regarding Mr. Feldman's ultimate ownership and control over Capstone.

the potential of suffering the same fate from the IRS of Reserve Mechanical and six other Capstone-administered captives, which were not disclosed to the Doctors. In contrast, it was in Capstone's best interests to keep the Doctors and Class Members in the risk pool and bolster Capstone's argument concerning the efficacy of the pool in satisfying risk distribution. Mr. Feldman, as the owner, CEO, and General Counsel of Capstone, acted adversely to the Doctors and Class Members in concealing risks of the efficacy of the PoolRe risk pool from a tax compliance standpoint. Capstone's interests were adverse to the Doctors and Class Members in connection with the Doctors and Class Members' insuring Capstone's professional liabilities, errors & omissions, and legal expenses for the Doctors' and Class Members' claims against Capstone. Mr. Feldman's representation of Capstone, as its owner and General Counsel, was adverse to Feldman's representation of his other clients, the Doctors and Class Members, with respect to all conflicts outlined above. None of these conflicts were adequately disclosed by Feldman to the Doctors or Class Members, as required by Rule 1.06.

327) Mr. Watkins testified that "there was no time during the representation of both Capstone and the [Doctors] that [the Doctors] were getting a lawyer who was dedicated to protecting their interest and their interest alone. They always had a lawyer who would downplay anything that Capstone did wrong, would try to protect

Capstone from any kind of complaints."[632]  Mr. Watkins further concluded that Mr.
Feldman did not "try to protect his clients in this case. From [the Joint Engagement
Letter] forward, it appeared to [Mr. Watkins] that Mr. Feldman's highest efforts
were spent on trying to keep his clients in the dark about what was actually going
on."[633]  Mr. Feldman's conflicts arising from jointly representing the Doctors / Class
Members and Capstone were not effectively waived – nor could they be, as per Mr.
Watkins.

**328)** The Doctors also argue that FCP's ethics counsel, James McCormack,
acknowledged that the very framework of the relationship created a conflict of
interest from the outset between the Doctors and Mr. Feldman and Capstone.[634]  Mr.
McCormack conceded that "[w]hen the [D]octors signed the [Joint] [E]ngagement
Letter in December of 2015 and their three captive insurance companies began
participating in the . . . risk pools, a conflict of interest existed between the [D]octors
and Mr. Feldman and his law firm and Capstone."[635]  Mr. McCormack further
acknowledged that, if a malpractice claim was filed against Mr. Feldman, "the
Doctors were at risk of paying for the Feldman Law Firm legal fees for defending
against the Doctors' malpractice claims."[636]

---

[632] *See* Transcript, Volume 4, August 6, 2021, at p. 1501, lines 17-25 (Thomas Watkins).

[633] *See* Transcript, Volume 4, August 6, 2021, at p. 1502, lines 1-8 (Thomas Watkins) (emphasis added).

[634] *See* Transcript, Volume 20, September 9, 2021, at p. 7873, lines 9-19 (James McCormack).

[635] *See* Transcript, Volume 20, Sept. 29, 2021, at p. 7873, lines 9-19 (James McCormack).

[636] *See* Transcript, Volume 20, September 9, 2021, at p. 7873, line 20 – p. 7874, line 9 (James McCormack).

**329)** Mr. Watkins concluded that the Joint Engagement Letter failed to fully disclose that Mr. Feldman's representation of the Doctors was, or could be, materially and directly adverse to Capstone and PoolRe, and that Mr. Feldman failed to "fully disclose the existence, nature, implications, and possible adverse consequences of Mr. Feldman's common representation of the Doctors and Capstone."[637]

**330)** Based on the totality of evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator holds that Mr. Feldman violated Rule 1.06 and committed legal malpractice concerning his legal representation of the Doctors and Class Members. This Arbitrator recognizes that there is no liability by Mr. Feldman for violating a Disciplinary Rule. This Arbitrator finds that the conduct of Mr. Feldman was so egregious and prejudicial to the Doctors and the Class Members as their attorney, notwithstanding the requirements of the Disciplinary Rules.

**331)** The Doctors also argue that Mr. Feldman was negligent in entering into a reinsurance business with the Doctors and Class Members without providing full disclosure to his clients in violation of Rule 1.08 of the Texas Disciplinary Rules. Rule 1.08 applies where a lawyer goes into business with a client. Rule 1.08 requires

---

[637] *See* Transcript, Volume 4, August 6, 2021, at p. 1535, lines 9-22 (Thomas Watkins); *see also*, Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 28, SULLIVAN 019405.

full disclosure to be made, as well as an opportunity for the client to seek independent counsel as to whether to participate in the transaction. Rule 1.08 was triggered by the presence of Mr. Feldman's and Capstone's primary malpractice policies in the risk pool, resulting in the expectation that the clients, the Doctors and Class Members, would reinsure Mr. Feldman against malpractice claims – even if the clients sued Feldman for malpractice.

> Rule 1.08(a) provides:
>
> A lawyer shall not enter into a business transaction with a client unless: (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed in a manner which can be reasonably understood by the client; (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) the client consents in writing thereto.[638]

The failure to satisfy any one of these elements violates Rule 1.08(a).

**332)** The Doctors argue that the underlying reinsurance transaction was not fair or reasonable to the clients of Mr. Feldman, and that incredibly, Mr. Feldman asserts that the presence of his primary malpractice policies in the pool was beneficial to the Doctors and Class Members.[639] But Feldman and Capstone concealed the types of policies covering them in the pool, representing falsely that Mr. Feldman's and Capstone's captives "may participate in the pool," and that the risk pool consisted

---

[638] *See* Exhibit DRS-1540, Rule of Professional Conduct 1.08(a), at SULLIVAN 019412-13.

[639] *See generally*, Transcript, Volume 11, August 20, 2021, at p. 4589, line 7 – p. 4607, line 15 (Stewart Feldman). As Judge Baker noted, "You're not suggesting that by those liability malpractice policies being in there, that actually is better for the doctors than not?" *See* Transcript, Volume 11, August 20, 2021, at p. 4590, line 23 – p. 4591, line 3.

of "generally similar policies covering generally similar risks."[640] It is neither "fair" nor "reasonable" for an attorney to require his clients to unknowingly reinsure the attorneys' malpractice liabilities and defense expenses, especially considering the magnitude of exposure arising from Mr. Feldman's malpractice liabilities specifically, the Doctors argue.

**333)** That even assuming that Mr. Feldman having his clients reinsure his malpractice liabilities and defense expenses was "fair" and "reasonable," Mr. Feldman failed to satisfy the "full disclosure" prong of Rule 1.08(a). Considering Mr. Feldman's and Capstone's inadequate disclosures, as discussed in Sections II through IV above, Mr. Feldman violated Rule 1.08(a).

**334)** That because the reinsurance transaction was not properly disclosed to the Doctors or Class Members, any purported written consent was invalid.

Mr. Watkins explained that due to the inadequate disclosure, "this is an impermissible, unwaivable conflict of 1.08."[641]

**335)** Based on the totality of evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator concludes that while Mr. Feldman violated Rule 1.08 and committed legal malpractice, his liability in this matter is not assessed solely because he violated a disciplinary rule. Mr. Feldman is

---

[640] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.
[641] *See* Transcript, Volume 4, August 6, 2021, at p. 1547, line 8 – p. 1548, line 3 (Thomas Watkins)

liable to the Doctors and the Class Members because of his negligent conduct as their lawyer.

**336)** The Doctors also argue that they did not consent to allow Mr. Feldman to represent Capstone or PoolRe adversely to the Doctors or Class Members after Mr. Feldman withdrew from legal representation of the Doctors and Class Members, thus violating Rule 1.09. Mr. Feldman owed obligations to the Doctors and Class Members even after Feldman terminated its legal representation of the Doctors and Class Members. Most importantly, they argue, Mr. Feldman owed the Doctors and Class Members a duty not to represent others, including Capstone or PoolRe, adversely to the Doctors and Class Members concerning the same subject matter as the representation. Mr. Feldman expressly recognized that he could not represent others, including Capstone, after Mr. Feldman withdrew from representing Cerberus, stating: "Our firm will not (and has not) represented Capstone on any matter adverse to Cerberus or its owners."[642] But Mr. Feldman breached this obligation by continuing to represent Capstone and serve as its General Counsel adversely to the interest of Doctors and Class Members.

**337)** Rule 1.09 provides, in relevant part: "Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client . . . if it is the same or a

---

[642] *See* Exhibit FC-275, E-mail from Stewart Feldman (Jan. 5. 2020).

substantially related matter."[643]  Mr. Watkins concluded that Mr. Feldman's January 2020 withdrawal of representation of the Doctors was insufficient because of the multiple hats worn by Mr. Feldman.  Mr. Watkins noted:[644]

> But that doesn't solve the problem, because as soon as you withdraw from one of your clients, they become a former client and it kicks over to 1.09. And 1.09 puts sufficient obligations of the lawyer to a former client that I think that that withdraw doesn't cure the conflict in this case.
>
> They have all the confidential information of their client. They have duties to their former client to not take on any case against them, which is substantially related to the representation of them. That's in 1.09.
>
> Clearly, their continued representation of Capstone, and even if Capstone gets an outside lawyer, the general counsel of Capstone is Mr. Feldman. And Mr. Feldman cannot continue to be general counsel of Capstone against the doctors because that violates 1.09.
>
> If they do take on that joint representation at the beginning, they have to make full disclosure. They didn't do that. Then once they withdraw from representing the doctors, the docs become a 1.09 client and they have obligations to them under Rule 1.09 and they didn't fulfill those.

**338)**  The Doctors argue that they did not validly consent to have Mr. Feldman represent Capstone adversely to the Doctors.[645]  Mr. Watkins emphasized:

> And so, there is no way that they can continue to represent a client against the Doctors on anything related to the captives.  That is the same or the substantially related matter.  And, therefore, it is a violation of 1.09 after he withdrew from representing – after Mr. Feldman withdrew from representing the Doctors, for him to, in any way, continue to

---

[643] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at Rule 1.09(a), at SULLIVAN 019415.

[644] *See* Transcript, Volume 4, August 6, 2021, at p. 1523, line 3 – p. 1524, line 11 (Thomas Watkins) (emphasis added).

[645] *See* Transcript, Volume 4, August 6, 2021, at p. 1525, line 8 – p. 1526, line 8 (Thomas Watkins).

represent, either as general counsel or as an individual lawyer, Capstone.[646]

This rationale is equally applicable to the Class Members.

339) Mr. Feldman and Capstone suggested at the final hearing that Mr. Feldman did not represent Capstone adversely to the Doctors because Capstone was represented by Andy Paredes during the Judge Dorfman arbitration and these arbitration proceedings.[647] This Arbitrator rejects the suggestion that only RSL Funding, but not Mr. Feldman, represented Capstone adversely against the Doctors in these arbitration proceedings. Mr. Feldman served as General Counsel to Capstone throughout the Judge Dorfman arbitration and these arbitrations and could not take off his attorney hat in representing Capstone adversely to the Doctors in these proceedings. Further, Andy Paredes, who was counsel of record for Capstone in the Judge Dorfman arbitration and these arbitrations, is a full-time employee of RSL Funding, and his time is allocated for the work he does on behalf of Capstone.[648] RSL Funding is owned and controlled by Mr. Feldman.[649] These facts reflect Mr. Feldman's adverse representation, through his role as owner, CEO, and General Counsel of Capstone and as owner of RSL directing Mr. Paredes against the Doctors and Class Members in violation of Rule 1.09.

---

[646] See Transcript, Volume 4, August 6, 2021, at p. 1527, lines 2-12 (Thomas Watkins).

[647] See Transcript, Volume 15, August 24, 2021, at p. 5716, line 2 – p. 5719, line 2 (Jeff Carlson).

[648] See Transcript, Volume 15, August 24, 2021, at p. 5718, lines 4-13 (Statement by FCP's Counsel, Andy Paredes).

[649] See Transcript, Volume 15, August 24, 2021, at p. 5718, lines 4-13 (Statement by FCP's Counsel, Andy Paredes).

**340)** Further, Mr. Feldman billed $3,813,450 and collected millions of dollars from PoolRe for providing legal representation on behalf of PoolRe adverse to the Doctors and/or the Class.[650] PoolRe's director, Stephen Friedman, testified that he was aware that the "Feldman Law Firm has billed and been paid for the legal services that the Feldman Law Firm has provided on behalf of PoolRe adverse to the [D]octors in these arbitrations."[651] This testimony further establishes Mr. Feldman's violation of Rule 1.09.

**341)** Based on the totality of evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator concludes that Mr. Feldman violated Rule 1.09 and committed legal malpractice and breached his obligations to his clients, notwithstanding his violation of Rule 1.09.

**342)** The Doctors also argue that Mr. Feldman's violations of Rules 1.06, 1.08 and 1.09 constituted actionable misconduct under Rule 8.04. Rule 8.04 sets forth a broad variety of "misconduct." Rule 8.04(a)(1) provides that "a lawyer shall not violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not the violation occurred in the course of a client-

---

[650] *See* Transcript, Volume 22, October 1, 2021, at p. 9082, line 11 – p. 9084, line 14 (Jeff Carlson) (citing Exhibit FC-692 at FC-692.0004).

[651] *See* Transcript, Volume 24, October 3, 2021, at p. 9553, lines 5-12 (Stephen Friedman) (emphasis added).

lawyer relationship."[652]    In turn, Rule 8.04(a)(3) prohibits attorneys from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation."[653]

**343)** Mr. Watkins explained that pursuant to Rule 8.04(a)(1), Mr. Feldman cannot defend against a disciplinary violation by acting through or on behalf of another entity such as Capstone or PoolRe.  Mr. Watkins noted, "This means that you can't create an entity and then, through that entity, violate these rules," and that there is no need to go through a veil-piercing or alter ego analysis if Mr. Feldman uses Capstone or PoolRe "to do acts that he could not do directly."[654]  In other words, Mr. Feldman could not do indirectly (through Capstone, A.M.Y., or PoolRe) what he was barred under the Rules of Professional Conduct from doing directly.  For instance, Mr.  Feldman could not require his clients to pay for his professional liabilities and legal expenses without full disclosure, which he did not make.  Thus, Mr. Feldman cannot require his clients to pay for his professional liabilities or legal expenses indirectly through A.M.Y. or PoolRe. While FCP consistently argues, correctly, that there is no cause of action to a plaintiff for an attorney's violation of a disciplinary rule in Texas.

**344)** Based on the totality of evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator holds that Mr.

---

[652] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494.

[653] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494.

[654] *See* Transcript, Volume 4, August 6, 2021, at p. 1561, line 4 – p. 1562, line 3 (Thomas Watkins).

Feldman violated Rule 8.04 and committed legal malpractice.[655] And, as previously stated, liability of Mr. Feldman is not found only in his having violated disciplinary rules.

**345)**    The Doctors argue that the legal malpractice by Mr. Feldman by failing to put forth a diligent effort in assisting the Doctors with shutting down their captives' caused damages to the Doctors. As discussed previously, Mr. Feldman failed to exercise "that degree of care, skill, and diligence that professionals of ordinary skill and knowledge commonly possess and exercises" in assisting the Doctors with their request for a wind down and liquidation of their captive program.[656]    That failure is the essence of legal malpractice.    Mr. Feldman misrepresented that what the Doctors were requesting – an early liquidation – "could not be done" because liquidating the Doctors' captives early would be breaching obligations to Mr. Feldman's other clients.[657] But Mr. Feldman and Capstone had, in fact, offered and effectuated a "special, earlier liquidation" for other captive clients.[658] Mr. Feldman was personally involved in assisting PoolRe re-negotiate its Quota Share Agreements with numerous other captive clients to effectuate those

---

[655] *See* Transcript, Volume 4, August 6, 2021, at p. 1563, lines 12-16 (Thomas Watkins).

[656] *See Issacs v. Schleier*, 356 S.W.3d 548, 556 (Tex. App.—Texarkana 2011).

[657] *See* Transcript, Volume 1, August 3, 2021, at p. 274, line 21 – p. 275, line 1; p. 281, lines 5-9 (Dr. Scott Sullivan); Transcript, Volume 13, August 22, 2021, at p. 5037, line 10 – p. 5039, line 14 (Stewart Feldman); *see also* Exhibit J-84, E-mail from Stewart Feldman (Oct. 22, 2019) (stating that Feldman could "not be in the position of assisting one client's defaulting on obligations to other clients.").

[658] *See, e.g.*, Exhibit DRS 2570, E-mail from Jeff Carlson (Feb. 19, 2020); *see also* Transcript, Volume 8, August 17, 2021, at p. 2958, line 4 – p. 2962, line 16 (Richard Amoroso).

captive clients' early liquidations.[659]    Mr. Feldman knew, therefore, that an early liquidation was possible but nonetheless misrepresented to the Doctors that an early liquidation "wasn't possible."[660] There is no record evidence showing that Mr. Feldman ever diligently represented or attempted to assist the Doctors regarding an early wind-down, the Doctors argue.

**346)**    That Under Texas law, "[d]isobeying a client's lawful instruction has been routinely recited to be a malpractice claim."[661]   The Doctors made a lawful request for a wind-down of their captives.[662] Mr. Feldman stated that liquidating the Doctors' captives early would be breaching obligations to Mr. Feldman's other clients and could not be done when he knew it could be done and had been done often for other clients by Mr. Feldman and PoolRe.

**347)**   The Doctors' reinsurance expert, Mr. Amoroso, opined that

---

[659] *See* Exhibit DRS 2003, Claims Reserve Payment Agreement and PoolRe Release Letters; *see also* Transcript, Volume 22, October 1, 2021, at p. 8960, line 12 – p. 8962, line 8 (Robert Snyder). Robert Snyder testified as to how the Claims Reserve Payment Agreements modified the Quota Share Agreements by transferring the obligations from the captive to the captive's owner. *See* Transcript, Volume 22, October 1, 2021, at p. 8962, line 9 – p. 8968, line 14 (Robert Snyder). Robert Snyder also testified falsely at the Dorfman trial by testifying that in order to let the Doctors' captives out of the pool, all other captives participating in the pool would have to agree, which Mr. Snyder knew to be false.  *See* Transcript, Volume 22, October 1, 2021, at p. 8978, line 13 – p. 8980, line 17 ("ARBITRATOR KUTCHER: But we've seen these documents where there is no consent from the other captives to let these captives out.  I'm stunned that you would testify to Judge Dorfman as an expert that you need signatures for more approval from all the captives to let a captive out when you've got an Exhibit 2003 document showing you let – PoolRe let captives out without other captives' consent.")).

[660] *See* Volume 13, Aug. 22, 2021, at p. 5037, line 10 – p. 5040, line 14 (Stewart Feldman).

[661] *See Isaacs v. Schleier*, 356 S.W.3d 548, 557 (Tex. App. – Texarkana 2011) (collecting cases).

[662] Judge Dorfman held that the Doctors did not breach the contract by requesting that Capstone wind down and liquidate the captives more or less immediately.  *See* Exhibit J-115orfman's Final Award at ¶¶ 31, 32.

Mr. Feldman breached fiduciary duties by failing to assist the Doctors with their request for a liquidation.[663]

**348)** This Arbitrator concludes that Mr. Feldman committed legal malpractice in misrepresenting the possibility of winding down the Doctors' captives and in failing to put forth a diligent effort on the Doctors' behalf in assisting the Doctors with their request for a wind down because the Doctors were his clients.

**349)** That this legal malpractice caused the Doctors' damages are causally connected to Mr. Feldman's legal malpractice. These losses are based on Mr. Feldman's breaches of his professional obligations, as well as "misconduct" based on "dishonesty, fraud, deceit, or misrepresentation."[664] The Doctors would never have engaged Feldman or Capstone had Feldman adequately disclosed all material information, including that Mr. Feldman had (1) implemented a scheme to get his clients to pay for Mr. Feldman's malpractice liabilities and legal expenses, and (2) the promoter audit of Mr. Feldman.[665] All damages, costs, and fees incurred by the Doctors, as calculated by the Doctors' damages expert, Mr. Legier, would have never been incurred but for the legal malpractice and misrepresentations of Mr. Feldman.[666]

---

[663] *See* Transcript, Volume 7, August 16, 2021, at p. 2693, line 1 – p. 2700, line 5 (Richard Amoroso).

[664] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494.

[665] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

[666] Feldman placed undue emphasis upon the decision by the Texas Chief Disciplinary Counsel's office not to pursue the bar complaint filed by the Doctors against Mr. Feldman. Bar proceedings have no *res judicata* effects. *See*

**350)**   The Doctors and Class Members next argue that Mr. Feldman and Capstone committed intentional misrepresentations regarding their IRS scrutiny of the Capstone captive program, the promoter audit of Mr. Feldman, and the presence of Mr. Feldman's and Capstone's primary malpractice and liability insurance policies in the risk pool. That Mr. Feldman and Capstone intentionally misrepresented their track record before the IRS by failing to adequately disclose the specific adverse audit findings by the IRS and the IRS's pending promoter exam of Mr. Feldman. And that Mr. Feldman and Capstone intentionally misrepresented the types of policies in the pool and suppressed the material fact that the pool covered Mr. Feldman's and Capstone's primary malpractice and liability policies, and defense expenses.   That Mr. Feldman and Capstone's misrepresentations and failures to disclose material information to their clients constitutes fraud. The Doctors further argue that even without regard to intent, the record evidence establishes that Mr. Feldman and Capstone engaged in negligent misrepresentations concerning the soundness of the Capstone captive program and the extent of Mr. Feldman's and Capstone's actual participation, and the types of policies included in the risk pools.

---

*Gonzalez v. State Bar of Texas*, 904 S.W.2d 823, 830 (Tex. App. – San Antonio 1995); *Comm'n for Lawyer Discipline v. Stern*, 355 S.W.3d 129, 138 (Tex. App. – Houston [1ˢᵗ Dist.] 2011). Bar proceedings are not adversarial proceedings, and "the Grievance Committee is not designed or equipped by the rules and regulations of the State Bar Act to conduct a trial." *Gonzalez*, 904 S.W.2d at 830 (quoting *Smith v. Grievance Committee, State Bar of Texas*, 475 S.W.2d 396, 399 (Tex. App. – Corpus Christi 1972)). Bar proceedings do not feature live testimony or oral arguments, and the rules limit the volume of materials that may be submitted. Moreover, bar grievance committees "will dismiss any grievance which is filed in the midst of a piece of litigation." *See* Transcript, Volume 4, August 6, 2021, at p. 1685, lines 9-17; p. 1687, lines 3-10 (Thomas Watkins).   Further, the Doctors did not have the benefit of discovery at the time the grievance was originally submitted.   The details regarding the promoter audit and the nondisclosure of the adverse Reserve Mechanical audit were not provided until months after the grievance was lodged.

The Doctors argue that Mr. Feldman and Capstone are liable to the Doctors and Class Members for their fraudulent misrepresentations.

**351)**    The Doctors argue that there are four elements to a fraud claim under a Texas law.  A plaintiff must establish (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result.[667]

**352)**    Importantly, they argue, Texas law does not limit fraud claims to the context of affirmative misstatements.    Rather, "silence may be equivalent to a false representation" if the "particular circumstances impose a duty on the party to speak and he deliberately remains silent."[668]    In turn, a duty of disclosure arises from a fiduciary relationship, which arises as a matter of law in the context of an attorney-client or agent-principal relationship.[669]  Moreover, making a *partial* disclosure that conveys a false impression also provides a basis for fraud.[670]  Considering the totality

[667] See *JP Morgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (citations omitted); *Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 695 (Tex. App. – Houston [1st Dist.] 2003) (citing *Formosa Plastics Corp. USA v. Presidio Engs. & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998) (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)); *Alexander v. Kent*, 480 S.W.3d 676, 693 (Tex. App.—Fort Worth 2015); *Woodhaven Partners, Ltd. v. Shamoun & Norman, L.L.P.*, 422 S.W.3d 821, 838 (Tex. App.—Dallas 2014).

[668] See *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (citing *SmithKline Beecham Corp. v. Doe*, 903 S.W.3d 347, 353 (Tex. 1995); *Smith v. Nat'l Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979)).

[669] See *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (citing *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003).

[670] See *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App – Houston [14th Dist.] 1997) (citing *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 941 S.W.2d 138, 146-47 (Tex. App. – Corpus Christi 1995), *rev'd on other grounds*, 960 S.W.2d 41 (1997)).

of the evidence and testimony in the record, the findings of fact above, and applicable law, this Arbitrator concludes that Feldman and Capstone fraudulently concealed material information from the Doctors and Class Members.

**353)** They argue that Mr. Feldman and Capstone made a series of false misrepresentations to, or concealed information from, the Doctors and Class Members, and these misrepresentations and concealed facts were material. That had Mr. Feldman and Capstone exercised absolute perfect candor and the absence of concealment and deception, the Doctors would not have agreed to sign the Joint Engagement Letter.[671]

**354)** The Doctors argue that they executed the Joint Engagement Letter in the errant belief, cultivated by Mr. Feldman and Capstone, that Mr. Feldman had a flawless track record in his dealings with the IRS, and that Mr. Feldman was above reproach. That Mr. Feldman and Capstone made a series of misrepresentations and concealed material information.

**355)** They argue that any one of these misrepresentations or concealments, much less all of them, establish that Mr. Feldman and Capstone committed intentional acts of fraud and intentionally made material misrepresentations.

---

[671] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

356)    The Doctors further argue that Mr. Feldman and Capstone knew that their representations were false and misleading, and that Mr. Feldman and Capstone crafted their disclosures to reveal as little negative information as possible. That adverse details were either ignored outright (*i.e.,* the reinsurance of Mr. Feldman's primary malpractice liabilities), or ambiguously phrased to provide no actionable information (*i.e.,* Paragraph G to the Joint Engagement Letter, which failed to identify the promoter audit of Mr. Feldman for promoting abusive tax shelters or its significance – that it could prevent filing a qualified amended return).

357)    That Mr. Cohen of the Feldman Law Firm served as the IRS's point of contact concerning the Reserve Mechanical audit, and he helped prepare a letter which acknowledged the IRS's adverse findings as to the legitimacy of the PoolRe risk pool, in addition to its adverse findings regarding the captives. [672]    Mr. Cohen testified that Mr. Feldman was aware of the adverse findings in the Reserve Mechanical audit long before the Joint Engagement Letter with the Doctors was executed.[673]    Mr. Feldman was aware of the promoter audit notice.[674]    And Mr. Feldman was aware of the role played by the A.M.Y. policies which insured his and

---

[672] *See* Exhibit DRS-1874, Letter, September 3, 2013, at Joint-339385.

[673] *See* Transcript, Volume 21, September 30, 2013, at p. 8529, line 10 – p. 8530, line 9 (Steven Cohen).

[674] *See* Exhibit DRS-1921, E-mail from Stewart Feldman, July 14, 2015 ("before sending it out wholesale, I will send it to ethics counsel"); *see also,* Transcript, Volume 19, September 28, 2021, at p. 7695, line 16 – p. 7696, line 13 (James McCormack).

his family's various business interests – indeed, Mr. Feldman masterminded the scheme whereby his clients would unwittingly subsidize his litigation expenses.

**358)**  That Mr. Feldman and Capstone intended that the Doctors and Class Members would rely upon the affirmative representations made by Mr. Feldman and Capstone. That Mr. Feldman and Capstone also intended that the Doctors and Class Members would rely upon the corresponding absence of negative information disclosed to them.

**359)**  The Doctors argue that the Joint Engagement Letter operated, according to Mr. Watkins, as a "marketing piece. It constitutes an attempt to try to convince this client … how many times we've been successful, how good we've been in the past causes a client to believe that he doesn't need to worry about what the IRS is doing because of his complete success in the past of handling these kinds of things. And I believe it is the intent of this contract to allay the fears of the Doctors of what the IRS is doing."[675]  That Mr. Feldman and Capstone expected that the Doctors and Class Members would rely upon the puffed-up representations regarding the Capstone program, and the corresponding absence of red flags.

**360)**  That The Doctors and Class Members relied upon the misrepresentations made by Mr. Feldman and Capstone. Both Dr. Sullivan and Dr. DellaCroce testified that they would not have signed the Joint Engagement Letter if Mr. Feldman and

---

[675] *See* Transcript, Volume 4, August 6, 2021, at p. 1496, line 11 – p. 1497, line 3 (Thomas Watkins).

Capstone had fully disclosed (1) the placement of Mr. Feldman's primary malpractice policies in the risk pool, (2) the specific adverse findings of the Reserve Mechanical audit and six other similar audits, or (3) the 2015 promoter audit of Mr. Feldman.[676]

**361)**   This Arbitrator holds that the evidence supports a finding that all elements of a fraudulent misrepresentation claim against Mr. Feldman and Capstone are satisfied, particularly considering that Mr. Feldman was the attorney for the Doctors and Class Members.

## RICO VIOLATIONS

**362)**   The Doctors next argue that Mr. Feldman, Capstone and PoolRe are liable to the Doctors and Class Members for violation of RICO by engaging in wire fraud to convert their clients' funds held in trust in the pool by PoolRe, administered by Capstone. They argue that the Racketeer Influenced and Corrupt Organizations Act ("**RICO**") imposes liability on culpable persons who conduct the affairs of an enterprise through a pattern of racketeering activity.[677] The elements of a civil RICO claim are (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.[678]

---

[676] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).
[677] *See* 18 U.S.C. §§ 1961 *et seq.*
[678] *See Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007); 18 U.S.C. §1962.

**363)** They argue that Mr. Feldman, Capstone, and PoolRe established, conducted, and controlled an enterprise, FCP, that engaged in a pattern of racketeering activity resulting in $3,354,925.37 of their clients' funds being converted for FCP's own purposes to the detriment of their clients.

**364)** The Doctors argue that Mr. Feldman, Capstone and PoolRe are culpable persons acting through the joint enterprise, FCP, under RICO. The Doctors cite *Cedric Kushner Promotions, Ltd. v. King*, the U.S. Supreme Court to explained that to establish RICO liability, "one must allege and prove the existence of two distinct entities: (1) a 'person;' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."[679] The U.S. Fifth Circuit has held that "[a]lthough a defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise."[680]

**365)** A "RICO person is the defendant, while a RICO enterprise can either be a legal entity or an association-in-fact."[681]   The U.S. Fifth Circuit addressed "associations-in-fact" liable under RICO in *St. Paul Mercury Insurance Co. v. Williamson*.[682] The court explained that, if the alleged enterprise is an association-

---

[679] *See* 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001).

[680] *See St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000); *see also JMF Medical, LLC v. Team Health, LLC*, 490 F. Supp. 3d 947, 977 (M.D. La. 2020); *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 650 (S.D. Tex. 2016); *BAC Home Loans Servicing, LP v. Texas Realty Holdings, LLC*, 901 F. Supp. 2d 884, 919-20 (S.D. Tex. 2012).

[681] *See Williamson*, 224 F.3d at 440; *see also U.S. v. Turkette*, 452 U.S. 576, 581–82 (1981). The Fifth Circuit has noted that "this is a very broad definition." *See Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995).

[682] *See Williamson*, 224 F.3d at 440.

in-fact, then the plaintiff "must show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure."[683]

366) The hierarchical decision-making structure of the "whole enterprise ultimately rolls up to" Stewart Feldman.[684] In this RICO enterprise, Mr. Stewart Feldman ultimately controls and directs the operations of The Feldman Law Firm, Capstone, and PoolRe. Even assuming *arguendo* that Mr. Feldman and Capstone do not control PoolRe, which is rejected by this Arbitrator, then the record evidence would nonetheless establish that PoolRe participated in a "consensual decision-making structure" with Mr. Feldman and Capstone concerning the racketeering activities identified below. They argue that whether Mr. Feldman, Capstone, and PoolRe acted "through a hierarchical or consensual decision-making structure" with respect to the racketeering activities identified below is inconsequential. That Mr. Feldman, Capstone, and PoolRe operated as an indistinguishable unit, FCP, with respect to keeping the risk pools open to covert $3,354,925.37 of their clients' funds to pay for their collective defense in arbitrations against their clients.

367) The Doctors further argue that Mr. Feldman, Capstone and PoolRe engaged in a pattern of activities in violation of RICO. They cite to 18 U.S.C. §1961(5) which

---

[683] *See Williamson*, 224 F.3d at 441.

[684] *See* Transcript, Volume 22, October 1, 2021, at p. 8846, line 25 – p. 8847, line 11 (Robert Snyder) (citing Exhibit DRS-192, *Reserve Mechanical* trial transcript).

defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity," occurring within ten years of the "commission of a prior act of racketeering activity."[685] A "pattern" consists of at least two predicate acts that are related to each other and constitute or threaten long-term criminal activity.[686] RICO defines "racketeering activity" broadly to encompass any of the state and federal offenses that are listed in 18 U.S.C. § 1961(1).

**368)**   That wire fraud is included within the scope of racketeering activities.[687] The elements of wire fraud have been identified as: (1) a scheme to defraud; and (2) the use of, or causing the use of, wire communications in furtherance of that scheme.[688] That the record establishes each of these elements and the commission of multiple predicate acts through the wires.   A.M.Y.'s fraudulent claims were submitted and acknowledged via e-mails,[689] and the fraudulent taking of pool funds was perpetrated through numerous ACH wire transfers. That the fraudulent scheme perpetrated by FCP through the wires warrants the imposition of RICO liability on each of Mr. Feldman, Capstone, and PoolRe.

**369)**   The Doctors argue that FCP intended to perpetrate and perpetrated a scheme to defraud their clients, the Doctors and Class Members. A scheme to defraud is

---

[685] *See* 18 U.S.C. §1961(5).

[686] *See Gilkey v. Livingston*, 2007 WL 1953456, at *4 (N.D. Tex. 2007).

[687] *See* 18 U.S.C. § 1343; *c.f. Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190-91 (1997).

[688] *See U.S. v. Rush*, 236 Fed. Appx. 944, 947 (5th Cir. 2007).

[689] Wire fraud, for RICO purposes, encompasses the use of e-mail.  *See U.S. v. Barraza*, 655 F.3d 375, 383 (5th Cir. 2011).

measured by a nontechnical standard.[690] "It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society."[691] The scheme "need not be fraudulent upon its face or misrepresent any material fact. All that is necessary is that it be a scheme reasonably calculated to *deceive* persons of ordinary prudence and comprehension."[692]

**370)** Establishing a scheme to defraud requires "proof that the defendant possessed a fraudulent intent."[693] The U.S. Fifth Circuit has held that fraudulent intent "can be shown by providing that the defendant contemplated or intended some harm to the property rights of his victims."[694] Further, "Direct proof of a fraudulent intent is often unavailable, so circumstantial evidence may be used to prove fraudulent intent."[695]

**371)** Wire fraud claims can be based on fraudulent omissions where the defendant has a duty to disclose the omitted facts.[696] In the matter *sub judice,* Mr. Feldman and Capstone breached their duties to disclose to their clients that the risk pool was providing Mr. Feldman and Capstone with their primary malpractice coverages and

---

[690] *See U.S. v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973).

[691] *Bruce*, 488 F.2d at 1229 (quoting *Gregory v. U.S.*, 253 F.2d 104, 109 (5th Cir. 1958)).

[692] *Bruce*, 488 F.2d at 1229.

[693] *See U.S. v. Rush*, 236 Fed. Appx. 944, 947 (5th Cir. 2007).

[694] *Rush*, 236 Fed. Appx. at 947.

[695] *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 454 (Tex. App. 2012); *see also Roland v. U.S.*, 838 F.2d 1400, 1402-1403 (5th Cir. 1988).

[696] *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) (citing *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002)).

that the risk pool could be used as a mechanism to prevent the liquidation of captive clients, and keeping the risk pool open indefinitely so as to force those clients to pay FCP's legal fees and expenses in perpetuity.[697]    Mr. Feldman and Capstone also represented to their clients that the clients would not be responsible for PoolRe's operating costs only to now contend that those clients are responsible for paying $3,354,925.3 of PoolRe's operating costs in the 2018 to 2020 pools.

372)    That the scheme was clear from its inception, to find a way to provide legal malpractice insurance, errors and omissions insurance to Mr. Feldman and the Feldman law firm, which would otherwise be very expensive for Mr. Feldman considering his history of discipline by the Texas Bar Association.

373)    The Doctors also argue that Mr. Feldman, Capstone, and PoolRe used the wires to perpetuate their fraudulent scheme.    That at Mr. Feldman's direction,[698] Capstone's and Mr. Feldman's controller, Mr. Franks, sent via e-mail fraudulent insurance claims to Capstone.[699]    That Capstone, on behalf of itself and PoolRe,

---

[697] *See* Transcript, Vol 4, August 6, 2021, at p. 1539, line 24 – p. 1543, line 11; p. 1552, line 16 – p. 1553, line 12; p. 1621, lines 10-14; p. 1639, lines 2-10 (Thomas Watkins); Transcript, Volumes 6 & 7, August 9 & 16, 2021, at p. 2383, lines 8-17; p. 2415, lines 5-13; p. 2439, lines 3-16; p. 2447, line 14 – p. 2448, line 18; p. 2489, line 11 – p. 2490, line 7; p. 2497, line 24 – p. 2498, line 10; p. 2508, line 22 – p. 2509, line 7; p. 2510, line 19 – p. 2511, line 3 (Richard Amoroso).

[698] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart Feldman (June 6, 2020, 17:17 CST)).

[699] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart Feldman (June 6, 2020, 17:17 CST)).

acknowledged receipt of these fraudulent claims via e-mail and opened the claims in the 2019 risk pool.[700]

**374)** They further argue that the conversion of $3,354,925.37 of captive clients' premiums to pay for FCP's legal fees and expenses was perpetrated by FCP through numerous ACH wire transfers out of PoolRe's accounts, as discussed in Section VI(C) above.[701] The conversion of $3,354,925.37 through the wires committed by and at the direction of fiduciaries, like Mr. Feldman and Capstone, to the detriment of their own clients is fraudulent, unconscionable, and warrants RICO liability.

**375)** Considering the totality of evidence and testimony in the record, this Arbitrator holds that Mr. Feldman, Capstone and PoolRe intended to perpetrate and did perpetrate a fraudulent scheme by: (1) making misrepresentations and concealing material information regarding PoolRe and pool participants' liabilities in the pool; (2) by preventing their clients from exiting PoolRe's risk pools through the submission of fraudulent insurance claims that Mr. Feldman and Capstone refused to investigate or close; and (3) by converting $3,354,925.37 of their clients' funds from the 2018 to 2020 risk pools to pay for FCP's legal fees and costs incurred in these arbitrations.

**376)** FCP argues that the Doctors pled that the Capstone and Feldman Parties

---

[700] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[701] The numerous ACR wire transfers out of PoolRe's account are reflected in Exhibits DRS-2004 and DRS-2685.

"through their position of control over all aspects of the [sic] PoolRe's business and administration . . . have devised and implemented schemes or artifices to defraud, or for obtaining money or property belong to [the Doctors] by means of false or fraudulent pretenses, representations, or promises." Gill-Jefferson Demand at ¶ 68.[33] That in a conclusory pleading, the Doctors contend that FCP "have unlawfully received income, directly or indirectly, or aided and abetted in the commission of, patterns of racketeering activity and predicate acts under RICO that have caused [the Doctors] injury in their business and property." Gill-Jefferson Demand at ¶ 69.

**377)** FCP argues that The Doctors contend that FCP committed the predicate acts of mail or wire fraud. Gill-Jefferson Demand at ¶ 68. Specifically, The Doctors contend that the Feldman and Capstone Parties committed wire fraud predicate acts by "fraudulently" submitting A.M.Y. insurance claims under 2019 insurance policies to the 2019 PoolRe reinsurance pool. Gill-Jefferson Demand at ¶¶ 70-

**378)** FCP further argues that the Doctors pled verbatim allegations for an A.M.Y. 2019 errors and omissions policy and an A.M.Y. 2019 lawyer professional liability policy. Gill-Jefferson Demand at ¶¶ 71-72.[34] In sum, the Doctors alleged that the Feldman and Capstone Parties violated RICO by *merely* submitting certain claims to the 2019 PoolRe reinsurance risk pool, and that PoolRe, along with the Feldman and Capstone Parties, furthered the commission of these alleged predicate acts (*i.e.*,

wire fraud) by not denying those claims. This, according to the Doctors' pleadings, constituted a scheme aimed to prevent the Doctors from liquidating their captives. *See* Gill-Jefferson Demand at ¶¶ 70-72.

**379)** FCP argues that Mr. Legier nor Mr. Press—spoke to the Doctors' RICO allegations or linked any of their damages-related opinions to the PoolRe reinsurance risk pools (or, specifically, the 2019 PoolRe reinsurance risk pool, which is the only risk pool implicated in the Doctors' RICO pleadings). Nor did the Doctors offer any expert testimony on criminality, even though RICO's concern and focus are long-term criminal activity. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241-42 (1989). The Doctors did, however, states that testimony from Mr. Fey, a commercial insurance claims handling expert, "also supports the RICO claims that [the Doctors] have asserted before Judge Jones." TR Vol. 8 at 3026.

**380)** FCP further argues that in post-hearing briefing, the Doctors' characterization of their RICO claim deviates from their pleadings in significant ways. Notably, SCP summarize their RICO argument as follows: "Feldman, Capstone, and PoolRe violated RICO by engaging in wire fraud to convert more than three million dollars from their clients' funds held in trust in the pool." Doctors' Post-Hearing Brief at 58. SCP argue that FCP committed wire fraud by using wire transfers to convert this money. Doctors' Post-Hearing Brief at 60. SCP's RICO claim now centers on a ***conversion*** allegation, though none of SCP's

RICO pleadings mention conversion and certainly none assert a claim for conversion. SCP also assume (incorrectly) that premium monies that PoolRe—a Delaware-regulated special purpose captive insurance company—collected in exchange for stop loss reinsurance cover are client funds held in trust.

**381)** FCP also argues that presumably because the Doctors identify wire fraud as requiring proof of a scheme to defraud and the use of wires in furtherance of that scheme, they expand their unpled conversion argument to contend that FCP "perpetrated a scheme to (1) lure their clients into PoolRe's risk pools based on material misrepresentations and concealment regarding the coverages in the pool; (2) prevent their captive clients from exiting PoolRe's risk pools; and (3) to use their clients' funds to wrongfully pay for FCP's legal fees and costs incurred in these arbitrations." Doctors' Post-Hearing Brief at 61. The Doctors never explain how this purported "scheme" was not foreclosed by Judge Dorfman, who rejected the Doctors' contentions about their ability to unilaterally exit reinsurance pools. *See* EX J-115. Nor do the Doctors explain how they lacked knowledge of the coverages in the reinsurance pool. The 2015 Engagement Letter unambiguously provides that "client captives and their affiliated insureds are not required by Capstone to participate in the risk pool . . . it is ultimately the clients' sole decision [] whether or not to participate in the pooling arrangement," makes clear that PoolRe is a "risk pooling arrangement involving sets of generally similar policies covering generally

similar risks of close-held businesses." EX J-20 at Ex. F. A review of the Doctors'
pooled policies vis- à-vis the A.M.Y. pooled policies (including the challenged
legal expense, directors' and officers' liability, and professional malpractice
policies) shows that the Doctors' captives and A.M.Y. pooled similar policies:

| 2016 – 2019 SCP Pool Policies | 2016 – 2019 A.M.Y. Pool Policies |
|---|---|
| Cyber Risk Package (FC-376.4.0168) | Cyber Risk Package (FC-379.5.0255) |
| Directors and Officers Liability (FC-376.4.0228) | Directors and Officers Liability (FC-379.5.1464) |
| Employment Practices Liability (FC-376.6.0592) | Employment Practices Liability (FC-379.5.1710) |
| Expense Reimbursement (FC-376.4.0289) | Expense Reimbursement (FC-379.5.0850) |
| Intellectual Property Package (FC-376.4.0344) | Intellectual Property Package (FC-379.5.0485) |
| Legal Expense Reimbursement (FC-376.4.0403) | Legal Expense Reimbursement(FC-379.5.1025) |
| Loss of Services (FC-376.4.0459) | Loss of Services (FC-379.5.0607) |
| Regulatory Changes (FC-376.4.0581) | Regulatory Changes (FC-379.5.0686) |
| Tax Liability (not pooled in 2019) (FC-376.4.0636) | Tax Liability (not pooled in 2019) (FC-379.5.1264) |
| Weather Related Business Interruption (pooled in 2019) (FC-376.4.0693) | Weather Related Business Interruption (FC-379.5.0766) |
| Administrative Hearing (FC–376.6.0001) | Administrative Hearing (FC-379-5.2216) |
| Breach of Privacy (FC-376.6.0120) | Breach of Privacy (FC-379.5.2263) |
| Audit Liability (FC-376.7.1279) | N/A |

| 2016 – 2019 SCP Pool Policies | 2016 – 2019 A.M.Y. Pool Policies |
|---|---|
| Collection Rate (FC-376.4.0111) | N/A |
| Commercial Medical Malpractice Gap (pooled in2017 & 2018) (FC-376.4.1314)? Unauthorized Treatments (FC-376.6.1479) | Lawyers Professional Liability (FC-379.5.0978) |
| Pollution Liability (FC-376.4.0515) | N/A |
| Deductible/SIR Exp  Reimbursement (FC-376.7.0001) | N/A |

**382)**　That just like A.M.Y., the Doctors captives pooled legal expense, director and officers, and professional malpractice policies.

**383)**　That without any link to their RICO pleadings, the Doctors also try and make their RICO claim about tax issues in their post-hearing brief. According to the Doctors, the Feldman and Capstone Parties lured SCP into PoolRe's risk pools by making material misrepresentations regarding those risk pools: "Feldman and Capstone made misrepresentations and suppressed material information related to the alleged tax benefits and success of the risk pool in qualifying clients for beneficial tax treatment." Doctors' Post-Hearing Brief at 61-62. Tangentially, but materially, the evidence in therecord shows that the Doctors claimed tax benefits on annual tax returns based, in part, on the Doctors' captives' *voluntary* participation in the PoolRe risk pools. The individual Doctors and their tax preparers, Kushner LaGraize, both signed these annual returns. To date, the individual Doctors still maintain the benefits of those tax benefits, have not amended those tax returns, and introducedno evidence that any benefits have been challenged

by the IRS or other tax authority.[35]

**384)**    FCP also argues that The Doctors next allege that the Feldman and Capstone Parties backdated claims involving SCP and other clients to submit them to the 2019 PoolRe risk pool. Doctors' Post-Hearing Brief at 62. They identify various claim submissions, submitted via email by Paul Franks on June 10, 2020, as fraudulent acts involving use of wires. *See* Doctors' Post-Hearing Brief at 64-65, 67, 69-70. But it is not The Doctors' contention that these claim submissions are not covered losses *per se*. Instead, the Doctors' contention is narrower: merely that these claim submissions are not 2019 losses. Doctors' Post-Hearing Brief at 67-72.

**385)**    This Arbitrator holds that Mr. Feldman, Capstone, and PoolRe are culpable persons liable under  RICO for the fraud committed in the risk pools and the more than $3 million of their clients' funds converted by the association-in-fact, FCP. This arbitrator holds that the Doctors have met all qualifications for a RICO claim under existing law. This Arbitrator holds that the elements of a civil RICO claim have been met in this Arbitration in that  (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.[702]  That Mr. Feldman is a person who engaged in a pattern of racketeering activity which is connected to the acquisition, establishment, conduct or control of an enterprise. For this Arbitrator, the enterprise is the empire of Mr.

---

[702] *See Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007); 18 U.S.C. §1962.

Feldman, and material parts to the enterprise are PoolRe, who gives an umbrella of cover for Mr. Feldman's criminal acts; Capstone and Mr. Carlson, who control and operate PoolRe in the execution of the demanded criminal acts of Mr. Feldman; and the enterprise is the collection by fraud and deceit the funds of the Doctors and Class Members by Mr. Feldman and the criminal enterprise. That the primary motivation for the enterprise is to provide to Mr. Feldman and Capstone liability, errors and omissions insurance at almost no costs when to secure this coverage on the open market would be very expensive to Mr. Feldman and the Feldman Law Firm. The fact that more than $3 million have been provided to Mr. Feldman, Capstone and PoolRe for their legal defense, costs and fees demonstrates that the enterprise is operating as contemplated by Mr. Feldman. And, that the more than $3 million have come from the participants in the pools. Further, that the payment of the more than $3 million was by ACH or electronic payment, therefore demonstrating that wire fraud was used in this enterprise.

386) The fact that there are no records before this Arbitrator demonstrating that Mr. Feldman himself has paid for any expenses relating to his defense in this Arbitration further assures this Arbitrator that this result was contemplated and desired by Mr. Feldman.

387) Therefore, this Arbitrator holds that there has been a RICO violation by Mr. Feldman, Capstone and PoolRe and will award damages accordingly.

**388)** Considering the totality of evidence and testimony in the record, this Arbitrator holds that Mr. Feldman, Capstone and PoolRe intended to perpetrate and did perpetrate a fraudulent scheme by: (1) making misrepresentations and concealing material information regarding PoolRe and pool participants' liabilities in the pool; (2) by preventing their clients from exiting PoolRe's risk pools through the submission of fraudulent insurance claims that Mr. Feldman and Capstone refused to investigate or close; and (3) by taking by fraud $3,354,925.37 of their clients' funds from the 2018 to 2020 risk pools to pay for FCP's legal fees and costs incurred in these arbitrations.

**389)** This Arbitrator holds Mr. Feldman, Capstone, and PoolRe are culpable persons liable under RICO for the fraud committed in the risk pools and the more than $3,354,925.37 of their clients' funds by the enterprise, FCP. This arbitrator holds that the Doctors have met all qualifications for a RICO claim under existing law. This Arbitrator holds that the that the elements of a civil RICO claim have been met in this Arbitration in that (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.[703] That Mr. Feldman is a person who engaged in a pattern of racketeering activity which is connected to the acquisition, establishment, conduct or control of an enterprise.

---

[703] *See Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007); 18 U.S.C. §1962.

228

## TEXAS DECEPTIVE TRADE PRACTICES ACT (DTPA)

**390)** The Doctors next argue that FCP violated the provisions of the Texas Deceptive Practices Act (DTPA), as well as corresponding provisions of the Texas Insurance Code. They argue that the Texas law prohibits deceptive conduct in commerce and, specifically, in the business of insurance. FCP has violated the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") and the Texas Insurance Code by engaging in unlawful deceptive trade practices "in the business of insurance."[704]

**391)** The Doctors argue that FCP violated the DTPA which prohibits the use of false, misleading, or deceptive actions in commerce. Claims under the DTPA may overlap with other causes of action.[705] The DTPA "shall be liberally construed and applied to promote its underlying purposes."[706] Texas courts recognize that "DTPA claims generally are also punitive rather than remedial," and emphasize that it adds remedies – it does not merely duplicate them.[707] The Texas Supreme Court recognized in *Smith v. Baldwin* that one of the DTPA's primary purposes was to create "a cause of action for deceptive trade practices without the burden of proof

---

[704] TEX. INS. CODE § 541.003.

[705] *See PPG Indus. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 89 (Tex. 2004) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *Marek v. Lehrer*, 17-00509, 2018 WL 6217566, at *5 (Tex. App. – Austin 11/29/2018)).

[706] TEX. BUS. & COM. § 17:44(a).

[707] *See Marek*, 2018 WL 6217566, at *5 (citing *PPG Indus.*, 146 S.W.3d at 89; TEX. BUS. & COM. § 17:50(b)(1)).

and numerous defenses encountered in a common law fraud or breach of warranty suit."[708]

**392)** The Doctors argue that FCP violated two separate provisions of the DTPA. Section 17.46(b)(24) prohibits the nondisclosure of information which is intended to induce the consumer to enter into a transaction in which the consumer would otherwise not partake if the information had been properly disclosed.[709] Section 17.50(a)(3) prohibits "any unconscionable action or course of action by any person."[710] That FCP violated both these provisions.

**393)** The Doctors argue that Mr. Feldman and Capstone violated Section 17.46(b)(24) of the DTPA by making material misrepresentations to induce the Doctors and Class Members to sign the Joint Engagement Letters. That Section 17.46(b) of the DTPA lists nearly three dozen non-exclusive "false, misleading, or deceptive acts or practices."[711] The performance of any of these enumerated acts constitutes a violation of the DTPA. Section 17.46(b)(24) prohibits "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce

---

[708] *See* 611 S.W.2d 611, 616 (Tex. 1980).
[709] TEX. BUS. & COM. § 17:46(b).
[710] TEX. BUS. & COM. § 17:50(a)(3) (emphasis added).
[711] TEX. BUS. & COM. § 17:46(b).

the consumer into a transaction into which the consumer would not have entered had the information been disclosed."[712]

**394)** That Section 17.46(b)(24) also contains an intent requirement. The intent requirement under the DTPA can be proven via circumstantial evidence.[713] This is not a demanding burden: the Texas Supreme Court held in *Tony Gullo Motors I, L.P. v. Chapa* that "slight circumstantial evidence" of the defendant's intent satisfied the intent requirement of the DTPA.[714]

**395)** That Mr. Feldman and Capstone had fraudulent intent in making misrepresentations to and concealing material information from their clients, as discussed in Sections XIII(A) and XIV(C) above. That Mr. Feldman and Capstone failed to make material disclosures regarding the IRS's adverse determinations against the Feldman / Capstone captive program, the promoter exam of Mr. Feldman for promoting abusive tax shelters, and that Mr. Feldman and Capstone's clients were insuring Mr. Feldman and Capstone's malpractice liabilities and legal expenses even in disputes with the clients, as discussed in Sections II to IV above. That had Feldman and Capstone made full disclosure to the Doctors, then the Doctors would have refused to execute the Joint Engagement Letter.[715]

---

[712] TEX. BUS. & COM. § 17:46(b)(24) (emphasis added).

[713] *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006); *Marek v. Lehrer*, 17-00509, 2018 WL 6217566 (Tex. App. – Austin 11/29/2018).

[714] 212 S.W. 3d 299, 305 (Tex. 2006).

[715] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

**396)** Considering the totality of the evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator concludes that Feldman and Capstone are liable under Section 17.46(b)(24) of the DTPA.

**397)** The Doctors also argue that FCP violated the DTPA by engaging in unconscionable actions, and that absent specific misrepresentations, a party may be liable under the DTPA for engaging in an "unconscionable act or course of action."[716] That the DTPA defines an unconscionable act or course of action as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[717] The Texas Supreme Court has held that this is an objective standard "for which *scienter* is irrelevant."[718]

**398)** They argue that Mr. Feldman and Capstone took advantage of their clients' lack of knowledge, deceiving their clients into reinsuring Mr. Feldman's and Capstone's malpractice liabilities and legal expense liabilities. Moreover, that Mr. Feldman and Capstone are using their control over the captive program to keep the 2019 risk pool open indefinitely and force their clients to cover the expenses and fees incurred by FCP in fighting their clients. $3,354,925.37 has already been taken, with Mr. Feldman and Capstone threatening future, unlimited liabilities in the form

---

[716] *See First Tex. Sav. Ass'n v. Stiff Properties*, 685 S.W.2d 703, 706 (Tex. App. – Corpus Christi 1984).

[717] Tex. Bus. & Com. § 17:45(5).

[718] *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998).

of funding calls.[719] That by any plausible measure, Mr. Feldman and Capstone took advantage of their clientele "to a grossly unfair degree."[720]    As Dr. DellaCroce explained:

> We were sort of tricked, deceived, relative to the disclosures of what was going on in the program that we were being corralled into, and we were trapped.  We were trapped with this AMY construct, which is sort of a very creative but very dark way to do business with people.[721]

> \*        \*        \*

> [F]or me, it's more about betrayal, betrayal of trust, being deceived and corralled into a program that the sellers of that program knew was already defective, without being told about that before signing on.

> Not being told that that may very well subject me to heightened scrutiny by the IRS above what I was already concerned about.

> About not being told that I was being brought in, sold a system that would include a trap door that was Mr. Feldman's liability – malpractice liability insurance and legal expense, primary malpractice insurance, being rolled in with my and all of the other captive insurance owners' less significant risks.

> And that same trap door could be used against me such that if I, in their eyes, became a problem or a threat or they wanted to come at me legally in whatever way they chose, that not only would I be subjected to the implications of that, but that I would be forced to pay for it.

> And that their internal adjustors and those that approved those claims are all in the same collective.

---

[719] *See* Transcript, Volume 22, October 1, 2021, at p. 8781, line 19 – p. 8782, line 5; p. 8783, line 18 – p. 8785, line 5 (Robert Snyder); Transcript, Volume 18, September 24, 2021, at p. 7024, lines 11-16 (Jeff Carlson).  Mr. Carlson testified that there is no limit or cap on the amount of fees and expenses that FCP can charge to their clients for PoolRe's purported administrative expenses. *See* Transcript, Volume 15, Aug. 24, 2021, at p. 5918, line 1 – p. 5920, line 9 (Jeff Carlson).

[720] TEX. BUS. & COM. § 17:45(5).

[721] *See* Transcript, Volume 5, August 7, 2021, at p. 1912, line 22 – p. 1913, line 5 (Dr. Frank DellaCroce).

> And that if I wanted to get out of the program early, the old early
> windup thing; that that then also could be used to trap me, to trap me
> within the program with technicalities that could easily have been
> avoided – all of this could have been avoided, quite frankly, had the –
> had the disclosures been made early, fully, candidly, and completely.[722]

399)  That FCP took advantage of their clients' ignorance and trust, preventing its

clients that were participating in the 2019 risk pool from exiting the program and

forcing those clients to pay for FCP's litigation efforts against them. That FCP's

unconscionable acts to the detriment of their clients violate Section 17.50(a)(3) of

the DTPA.

400)  The Doctors also argue that they and the Class Members are proper DTPA

plaintiffs, to with the FCP parties take material exception. They argue that while

FCP invokes certain statutory exceptions to the DTPA to argue that the Doctors

cannot maintain their DTPA claims.[723]   That this Arbitrator should reject the

assertion for the following.

401)  That at the outset,  Section 17.44(a) of the DTPA mandates that the DTPA

"shall be liberally construed and applied to promote its underlying purposes."[724]

Correspondingly, it follows that exceptions to the DTPA should be narrowly

construed.[725]   As an article in the _Baylor Law Review_ noted, "Section 17.44(a) sets

---

[722] _See_ Transcript, Volume 5, August 7, 2021, at p. 1923, line 1 – p. 1925, line 10 (Dr. DellaCroce).

[723] _See_ FCP's Post-Hearing Brief at pp. 184-86.

[724] TEX. BUS. & COM. § 17:44(a).

[725] _See Harris County Appraisal Dist. v. Integrity Title Co., LLC_, 483 S.W.d 62, 69 (holding that where a statute
contains a requirement that it be liberally construed, "courts consistently narrowly construe exceptions.")

out the DTPA's unyielding mandate: to construe the DTPA liberally for the benefit of consumers. This provision implicitly mandates a logical corollary: to construe any DTPA exemptions narrowly, so that potential defendants may not easily escape liability, to the detriment of consumers."[726]

**402)** That FCP argues that the definition of a "business consumer" capable of maintaining a DTPA claim excludes those with a net worth exceeding $25 million. And while this exception may apply to Dr. Sullivan and Dr. DellaCroce as individual plaintiffs, the exception does not apply to their business entities, their captive insurers, or Class Members. FCP bears the burden of proof that the Doctors' entities and captives and Class Members do not qualify as consumers.[727] The Doctors argue that FCP made no showing at the hearing as to the value of assets owned by the Doctors' captives or Class Members. Thus, Dr. DellaCroce's and Dr. Sullivan's captives, Janus, Cerberus, and Orion, and Class Members each qualify as "consumers" for DTPA purposes.

**403)** Further, that the evidence also reflects that none of the Doctors' captives had more than $25 million in assets. Dr. Sullivan testified that the collective amount

---

[726] THE DTPA'S PROFESSIONAL SERVICES EXEMPTION: LET 'EM BE DOCTORS AND LAWYERS AND SUCH, DAVID SKEELS, 55 Baylor L. Rev. 783, 791 (2003).

[727] *See NationsBank of Texas, N.A. v. Akin, Gump, Hauer & Feld, L.L.P.*, 979 S.W.2d 385, 392 (Tex. App. 1998) (citing *Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672, 674 (Tex.1990) ("As the defendant below, Akin Gump had the burden to plead and prove the applicability of the business consumer status as an affirmative defense.")).

invested in the three captives totaled approximately $19 million – meaning that none of the three captives could have individually exceeded $25 million.[728]

404)    That Section 17.45(4) of the DTPA   also excludes from the definition of a consumer a consumer that is "owned or controlled by a corporation or entity with assets of $25 million or more."[729]   Section 17.45(4) speaks only to ownership by a *corporation* or *entity*.  Section 17.45(4) is silent, however, with respect to ownership or control by *individuals*.  As a result, Section 17.45(4), narrowly construed, does not restrict the right of the Doctors' business entities or captive insurers to pursue DTPA claims.

405)    The Doctors also argue that to the extent that the DTPA's statutory exclusion regarding consumer status applies here, the exclusion limits only Dr. DellaCroce's and Dr. Sullivan's individual claims but not those of the Doctors' captives or business entities or Class Members.    As discussed below in Section XV(B), however, Dr. DellaCroce and Dr. Sullivan may still personally recover for FCP's violations of the DTPA as "persons" under the Texas Insurance Code, regardless of their consumer status under the DTPA.   Under the Texas Insurance Code, Dr. DellaCroce's and Dr. Sullivan's consumer status under the DTPA is irrelevant.

---

[728] *See* Transcript, Volume 1, August 3, 2021, at p. 158, lines 6-11 (Dr. Scott Sullivan).
[729] *See* TEX. BUS. & COM. CODE §17.45(4).

**406)** The Doctors argue that FCP also invokes the exception found in Section 17.49(f) of the DTPA, which excludes transactions involving consideration by the consumer of more than $100,000 where the consumer is represented by legal counsel who is independent from the defendant.[730]  The purpose of this exception is to prevent contractual misunderstandings by (1) allowing the consumer to have input on the substantive terms of the engagement, and (2) to allow an attorney to identify misleading or otherwise troublesome provisions. These purposes are thwarted, however, where the DTPA defendant refuses to afford the attorney the opportunity to provide input, or where the DTPA defendant actively conceals information from the attorney – thereby preventing the attorney from properly advising the consumer.

**407)** The purposes underlying the narrow exception to the DTPA in Section 17.49(f) are not satisfied here.  That Mr. Sherman testified that Mr. Feldman refused to consider Mr. Sherman's list of comments to the Joint Engagement Letter, and that, other than adjusting the term and the price, the contract was "take it or leave it."[731] In addition, Mr. Feldman and Capstone actively concealed information from Mr. Sherman regarding the presence of Mr. Feldman's and Capstone's primary malpractice, errors and omissions, and legal expense policies in the pool, the 2015 promoter audit, or the specific issues cited by the IRS which called the viability of

---

[730] *See* TEX. BUS. & COM. CODE §17.49(f); *see also* FCP's Post-Hearing Brief at p. 185.

[731] *See* Transcript, Volume 20, September 29, 2021, at p. 7925, line 19 – p. 7927, line 3 (David Sherman).

the Capstone insurance program into grave doubt.[732]  And that by actively concealing adverse information from Mr. Sherman, Mr. Feldman and Capstone defeated the purpose of the narrow exception found in Section 17.49(f) of the DTPA, rendering that exception inapplicable.

**408)**  The Doctors also argue that the narrow exception found in Section 17.49(f) is also inapplicable with respect to the DTPA claims asserted by Cerberus, Janus, Orion.   They argue that section applies only to a written contract where, "in negotiating the contract, the consumer is represented by legal counsel..."[733]  And while the captive insurers signed the Stop Loss and Quota Share Agreements, those contracts were not "negotiated," and Mr. Sherman played no role in the signing of those contracts.   Mr. Sherman disclaimed having any background in the highly specialized area of captive insurance.[734]  The captive insurers were thus not "represented by legal counsel" in connection with the signing of the Stop Loss and Quota Share Agreements each year.   Further, Capstone and Feldman failed to put on any evidence that Class Members were represented by legal counsel in connection with their respective Joint Engagement Letters or Stop Loss and Quota Share Agreements.   Mr. Feldman and Capstone failed, therefore, to satisfy their affirmative defense that Section 17.49(f) excludes, Cerberus, Janus, Orion, or Class Members

---

[732] *See* Transcript, Volume 20, September 29, 2021, at p. 7909, line 8 – p. 7910, line 17; p. 7916, lines 8-19; p. 7927, line 2 – p. 7930, line 30 (David Sherman).

[733] *See* TEX. BUS. & COM. CODE §17.49(f).

[734] *See* Transcript, Volume 20, September 29, 2021, at p. 7901, line 21 – p. 7902, line 6 (David Sherman).

from recovering under the DTPA. Thus, the narrow exception found in Section 17.49(f) of the DTPA does not exclude Cerberus, Janus, Orion, or Class Members from being able to assert DTPA claims.

**409)** FCP argues that the Doctors cannot recover damages under the DTPA or Texas Insurance Code. That in post-hearing briefing, the Doctors contend that "FCP violated the provisions of the Texas Deceptive Trade Practices Act [the "DTPA"], as well as corresponding provisions of the Texas Insurance Code." Doctors' Post-Hearing Brief at 82. As explained herein, these allegations are intertwined.

**410)** That the DTPA prohibits the use of false, misleading, or deceptive actions in commerce. Only a "consumer," as defined within the DTPA, may maintain a private action under the DTPA—a fact acknowledged by SCP. Doctors' Post-Hearing Brief at 87. Dr. Sullivan and Dr. DellaCroce do not qualify as consumers because of their considerable net worth—another fact conceded by SCP. *Id.* SCP, however, contend that the SCP captives—Janus, Cerberus, and Orion—and class members qualify as consumers because FCP did not introduce evidence showing that each of them had a net worth or asset valuation that exceeded the maximum threshold to qualify as a DTPA consumer. *Id.* (arguing that "Janus, Cerberus, and Orion, and Class Members each qualify as 'consumers' for DTPA purposes").

**411)** That on behalf of the Doctors' captives and, apparently, class members, the

Doctors allege that FCP committed prohibited actions under two subdivisions in the DTPA:

a. Section 17.46(b)(24), which prohibits "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed"; and

b.     Section 17.50(a)(3), which prohibits "any unconscionable action or course of action by any person."

Doctors' Post-Hearing Brief at 83.

**412)** That As a trigger for § 17.46(b)(24), The Doctors rely on their professional malpractice contentions that the Feldman and Capstone Parties failed to make material disclosures regarding IRS activity vis- à-vis the Feldman and Capstone Parties' various captive activities as well as their purported lack of knowledge that the Feldman and Capstone Parties had insurance policies in the pool.[29] Doctors' Post-Hearing Brief at 84. That The Doctors argue in conclusory fashion that had the Feldman and Capstone Parties disclosed all material information, the Doctors would have never executed the 2015 Engagement Letter and cite to testimony from the individual Doctors as support for this contention. *Id.* at 84-85. In the cited testimony, the Doctors do not distinguish whether they were testifying in their individual capacities as signatories to the 2015 Engagement Letter or whether they were testifying only on behalf of their respective captives or as class

representatives.

**413)** That as a trigger for § 17.50(a)(3), the Doctors contend that the Feldman and Capstone Parties implemented an unconscionable act or course of action by "deceiving their clients into reinsuring Feldman's and Capstone's malpractice liability and legal expenses." Doctors' Post-Hearing Brief at 85. As support, the Doctors cite to testimony from Dr. DellaCroce who testified that he felt that the way A.M.Y. (the captive insurer of the Feldman and Capstone Parties) was involved in the PoolRe reinsurance pools was a "very creative but very dark way to do business with people." *Id.* at 86. Dr. DellaCroce testified in his individual capacity; he did not cabin this or any other testimony to be on behalf of his captives or the purported class members.

**414)** That even though the Doctors characterize both the § 17.46(b)(24) and § 17.50(a)(3) allegations as being on behalf of class members, the Doctors identify no class wide evidence nor any evidence specific to members of the class other than the individual Doctors. Specifically, regarding the § 17.46(b)(24) allegation, they cite no evidence or testimony that members of the class could and should have, but did not, receive certain disclosures from the Feldman and Capstone Parties. Nor do they identify any evidence or testimony that class members would not have executed their respective engagement letters had they received certain disclosures. In other words, the Doctors identify no proof for a

class claim. Similarly, for the § 17.50(a)(3) allegation, they cite no evidence or testimony that class members were deceived or lacked knowledge about the Feldman and Capstone Parties' participation in the PoolRe reinsurance pools. Again, that The Doctors identify no proof for a class claim. The Doctors do not allege that any of FCP violated a specific provision of the Insurance Code. Instead, they argue that a "tie-in" provision within the Insurance Code makes *certain* violations of the DTPA, including one (but not both) aforementioned alleged violations, also actionable under the Insurance Code. *See id.* at 87-88 (citing TEX. INS. CODE § 541.151). The Doctors appear to rely on the Insurance Code tie-in provision to allow Dr. Sullivan and Dr. DellaCroce to recover under the DTPA. Doctors' Post-Hearing Brief at 87 ("Dr. DellaCroce and Dr. Sullivan may still personally recover for FCP's violations of the DTPA as 'persons' under the Texas Insurance Code, rendering Dr. DellaCroce's and Dr. Sullivan's consumer status irrelevant."). The specific allegations of what was not purportedly disclosed to The Doctors are addressed in Sections VII (C) and (D).

**415)**    Section 541.151 of the Insurance Code provides that "a person who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice: . . . (2) specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person

relied on the act or practice to the person's detriment." TEX. INS. CODE § 541.151
(cited in Doctors' Post-Hearing Brief at 88). According to The Doctors, § 541.151's
use of the word "person" indicates the Dr. Sullivan and Dr. DellaCroce may bring
an action regardless of the DTPA's restrictive definition of consumer because the
Insurance Code defines "person" to be "any individual, corporation, association,
partnership, reciprocal or interinsurance exchange, Lloyds' plan, fraternal benefit
society, or other legal entity *engaged in the business of insurance*, including an
agent, broker, or adjuster." TEX. INS. CODE § 541.002(2) (emphasis added). The
Doctors specifically cite *Centaurus Unity v. Lexington Insurance Company*, a
federal case interpreting Texas law, for the proposition that the Insurance Code
"permits an insured to bring a cause of action" under the Insurance Code for
deceptive trade practices defined in § 17.46(b) of the DTPA. 766 F.Supp.2d 780,
787 (S.D. Tex. 2011) (cited in Doctors' Post-Hearing Brief at 88). Hence, they
contend that Dr. Sullivan, Dr. DellaCroce, the other Doctors' entities, and class
members may recover damages stemming from FCP's alleged violation of
§17.46(b)(24) of the DTPA notwithstanding the claimants' lack of consumer status.
Doctors' Post-Hearing Brief at 87-88.

**416)**    For damages, the Doctors request over $135 million under the DTPA and
the Texas Insurance Code's DTPA tie-in. That The Doctors contend that
"Feldman/Capstone/PoolRe are liable to the Doctors' captives and entities and

Class Members for violating the [DTPA]" and request $5,019,441 in "tax-related losses, penalties, and interest to the three [SCP] captives" as outlined in Mr. Legier's damages model. Doctors' Post-Hearing Brief at 124-25. They request far more under the Insurance Code. Due to their position that no consumer status limitation exists under the Insurance Code, the Doctors requests "the full measure of [the Doctors'] damages" trebled, for a total of $130,155,264.75. Doctors' Post-Hearing Brief at 125. And Notably, because the Insurance Code tie-in does not tie-in SCP's § 17.50(a)(3) claim, it appears that the Doctors admit they have no damages related to the Feldman and Capstone Parties' participation in the PoolRe reinsurance pools since the Doctors are contending that the entirety of their damages is recoverable under § 17.46(b)(24).

417)    FCP also contend that the DTPA and Insurance Code claim fails for various threshold reasons, including lack of consumer status, the monetary value of the transaction, and lack of pleadings to support such a claim. FCP further argues that the Doctors' DTPA and Insurance Code claim and request for damages fails for at least ten independent reasons.

418)    FCP also contend that the Doctors cannot recover under the DTPA or Insurance Code because the Doctors did not prove the underlying alleged deceptive practices. I disagree. That the Doctors contend that the Feldman and Capstone Parties violated the DTPA (a) by failing to make material disclosures regarding the

Feldman and Capstone Parties' knowledge of IRS inquiries at the time of the 2015 Engagement Letter, and (b) by engaging in an "unconscionable" effort to deceive the Doctors into reinsuring the Feldman and Capstone Parties' professional liabilities via the PoolRe reinsurance pools. The Doctors contend that the non-disclosure allegation is also actionable under the Insurance Code via its limited DTPA tie-in provision. That the Doctors request that all FCP be held liable for these allegations. Rather than marshal proof in their DTPA/Insurance Code section of their post-hearing brief, The Doctors simply make conclusory statements and allude to their arguments and proof for their other claims as probative of their DTPA/Insurance Code claim. Accordingly, if The Doctors' proof and argument on their other claims fail, so must their DTPA/Insurance Code claim fail as well.

**419)**   That The Doctors cannot recover on any of these allegations because they failed to prove any of the deceptive conduct or acts complained about. That Mr. Feldman and Capstone Parties did not fail to make material disclosures. The Feldman and Capstone Parties did not improperly deceive The Doctors into reinsuring the Feldman and Capstone Parties' captive insurer. Moreover, to the extent that any of the Doctors' allegations sound in legal malpractice or professional negligence, those allegations cannot be turned into a DTPA claim as a matter of law. *Border Demolition & Envt'l, Inc. v. Pineda*, 535 S.W.3d 140, 159 (Tex. App.—El Paso 2017, no pet.) ("When a client truly has only one claim for relief sounding in legal

malpractice, however,he is prohibited from dividing or fracturing that claim into other related claims."). The Doctor's underlying allegations do, in fact, sound in legal malpractice. This is because under Texas' anti-fracturing rule, the Doctors' allegations that there was a failure to disclose a conflict of interest"challenge the degree of care, skill, or diligence in performing [the] duty to inform [clients] about issues that could arise during the representation of multiple clients and [the lawyers'] duty to communicate with and among the clients [they] represented." *Fitts v. Richards-Smith*, No. 06-15-00017-CV, 2016 WL 626220, at *11 (Tex. App.— Texarkana Feb. 17, 2016, pet. denied) (mem. op.); *see also Murphy v. Gruber*, 241 S.W.3d 689, 696 (Tex. App.—Dallas 2007, pet. denied). Accordingly, those allegations must sound only in negligence and professional malpractice and not under the DTPA. *Id.*

**420)** FCP also argue that none of the Doctors may maintain an action under the DTPA because they do not qualify as a consumer. "A plaintiff must be a 'consumer' to maintain a private action under the DTPA." *Eckman Centennial Sav. Bank*, 784 S.W.2d 672, 674 (Tex. 1990); TEX. BUS. & COM. CODE § 17.50(a). Under the DTPA, a "consumer" is "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 millionor more, or that is owned or controlled by a corporation or entity

with assets of $25 million or more." TEX. BUS. & COM. CODE § 17.45(4). The DTPA defines "business consumer" as "an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use." TEX. BUS. & COM. CODE § 17.45(10). "Thus, business consumers, whether individuals or businesses, with assets of $25,000,000 or more are excluded from DTPA coverage." *Eckman*, 784 S.W.2d at 674. Neither Dr. Sullivan nor Dr. DellaCroce qualify as a consumer under DTPA because of their net worth. Dr. Sullivan's net worth exceeds $80 million. TR Vol. 3 at 1268-69. Dr.DellaCroce's net worth exceeds $180 million. TR Vol. 5 at 2153. Neither can therefore maintain an action under the DTPA. SCP do not contest this conclusion. *See* Doctors' Post-Hearing Brief at 87.

**421)**    That The Doctors' entities and their captives likewise do not qualify as consumers under the DTPA and thus cannot maintain private actions under the DTPA. The DTPA also excludes from its definition of consumer any entity "that is owned or controlled by a corporation or entity with assetsof $25 million or more." TEX. BUS. & COM. CODE § 17.45(4). The Doctor's captives and their entities are unambiguously owned and controlled by Drs. Sullivan and DellaCroce, both of whom have assets of $25 million or more. Though ownership and control are not contested, one needs not lookat anything other than the various Doctors' tax returns to see that the individual Doctors have completecontrol and ownership. *See, e.g.*, EXs

247

J-141 through J-173. The Doctors' attempt to semantically separate the individual Doctors from the other Doctors' entities is thus an effort without import. At bottom, the individual Doctors own and control everything.

**422)** FCP also argue that the Doctors cannot maintain a DTPA claim because the transaction(s) at issue exceed $100,000 and that the Doctors were advised by independent legal counsel. FCP argues that the DTPA contains several exemptions. TEX. BUS. & COM. CODE § 17.49 (listing exemptions). One of those exemptions provides that:

> Nothing in the [DTPA] shall apply to a claim arising out of a written contract if:
>
>> (1) the contract relates to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000.
>>
>> (2) in negotiating the contract, the consumer is represented by legal counsel who is not directly or indirectly identified, suggested, or selected by the defendant or an agent of the defendant; and
>>
>> (3) the contract does not involve the consumer's residence.
>
> TEX. BUS. & COM. CODE § 17.49(f).

**423)** That these three elements of this exemption are satisfied as a matter of law here. Number one, the contract(s) upon which the Doctors could possibly base their claim relate to a project or series of transactions related to the same project, and the

total consideration exceeds $100,000. *See e.g.,* EX J-20 at 9. Number two, the Doctors were represented by legal counsel in negotiating the contract—a fact already found by Judge Dorfman in the prior arbitration between the parties and binding here. *See* EX J-115 at 9-10. ("The Parties to this proceeding are sophisticated and intelligent individuals **and were represented by counsel (and certified public accountants) of their choosing both in negotiating the terms of the engagements between them** over many months, and throughout the course of the relationship **through to the present day**.") And number three, the 2015 Engagement Letter does not involve either of the residences of Dr. DellaCroce or Dr. Sullivan. *See* EX J-20. **That The Doctors cannot maintain a DTPA claim because the transaction(s) at issue exceed $500,000.**

**424)**   FCP also argue that the Doctors cannot maintain a DTPA claim because the transaction(s) at issue exceed $500,000. That even if TEX. BUS. & COM. CODE § 17.49(f) did not apply (which it does), yet another DTPA exemption is applicable here and bars the Doctors' DTPA claim. TEX. BUS. & COM. CODE § 17.49(g) provides that "[n]othing in this subchapter shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence." Here, the Doctors paid Capstone more than $500,000 pursuant to the terms of the 2015 Engagement Letter. EX J-20

at 9. Dr. Sullivan confirmed this fact during his testimony:

Q.    And do you seek a clawback of management fees?

A.    Yes, sir.

Q.    And how much is that?

A.    Management fees are approximately 1.25 million paid by DellaCroce and myself to Capstone/Feldman.

TR Vol. 1 at 350.

**425)**  That accordingly, by the plain language of the statute, and according to the uncontroverted evidence, TEX. BUS. & COM. CODE § 17.49(g) exempts The Doctors' claims from the DTPA under Texas law.

**426)**  The Doctors go on to argue that Section 17.49(f) is not incorporated into the Texas Insurance Code.[735]    Thus, even if Section 17.49(f) barred the DTPA claims of the Doctors or Class Members, which is rejected for the reasons above, Section 17.49(f) of the DTPA does not preclude the Doctors or Class Members from recovering for Feldman's and Capstone's unconscionable actions violating the Texas Insurance Code, as discussed in Section XV(B) below.

**427)**  That FCP also invokes the narrow exception found in Section 17.49(g) of the DTPA, which excludes transactions where the consideration exceeds $500,000. The text of this exemption means "that the $500,000 cap must be applied on an

---

[735] *See Crown Life Ins. Co.*, 22 S.W.3d at 386 (noting that the tie-in statute of the Texas Insurance Code "does not incorporate the entire DTPA.") (Emphasis added).

individual-consumer basis."[736]  Thus, the parties should not be aggregated for purposes of analyzing whether this statutory exception applies, especially given the narrow construction mandated by Section 17.44(a) of the DTPA.[737]

**428)** That each year, the three captive insurers – Cerberus, Janus, and Orion – separately contracted with PoolRe via the Stop-Loss and Quota Share Agreements. Neither Cerberus, Janus, nor Orion ever paid more than $500,000 to PoolRe in subject premiums in a single year at issue.  These transactions should be viewed separately by captive and by year, for purposes of applying the Section 17.49(g) exception, in light of the above-quoted language used in *Neese v. Lyon*.[738] And Feldman and Capstone failed to put on any evidence to satisfy their burden of proof that Section 17.49(g) excludes the DTPA claims of Class members.

**429)**  That this Arbitrator should concludes that none of the statutory exceptions to the DTPA identified by FCP apply to the claims brought by the Doctors' captives, Doctors' business entities or Class Members.  Regardless of the statutory exceptions found in the DTPA, those exceptions are not imported into the Insurance Code.[739] Thus, the Doctors and Class Members can recover for FCP's violations of Section

---

[736] *Neese v. Lyon*, 479 S.W.3d 368, 392 (Tex. App – Dallas 2015).

[737] *See* TEX. BUS. & COM. § 17.44(a).

[738] *Neese v. Lyon*, 479 S.W.3d 368, 392 (Tex. App – Dallas 2015).

[739] *See Crown Life Ins. Co.*, 22 S.W.3d at 386 (noting that the tie-in statute of the Texas Insurance Code "does not incorporate the entire DTPA.") (Emphasis added).

17.46(b) of the DTPA pursuant to the Texas Insurance Code, which does not incorporate the DTPA's statutory exclusions, as discussed below.

**430)** The Doctors also argue that the Texas Insurance Code through its "tie-in" statute prohibits the same conduct contemplated by the DTPA, but without the limitations on who constitutes a "consumer". That the conduct that violates the DTPA also violates the Texas Insurance Code. The Texas Insurance Code's "tie-in" statute imports the prohibited actions set forth in Section 17.46(b) of the DTPA.[740] The Texas Insurance Code does not import the statutory restrictions regarding consumer status or amount in controversy as set forth in Sections 17.45(4), 17.49(f), or 17.49(g). Instead, the Insurance Code broadly affords remedies to "persons" who sustain damages.[741]

**431)** That the term "person" is defined in the Insurance Code as "any individual, corporation, association, partnership, reciprocal or interinsurance exchange, Lloyds' plan, fraternal benefit society, or other legal entity engaged in the business of insurance, including an agent, broker, or adjuster."[742] The Insurance Code's provisions are "liberally construed."[743]

---

[740] TEX. INS. CODE § 541.151(2).
[741] TEX. INS. CODE § 541.151.
[742] TEX. INS. CODE § 541.002(2) (emphasis added).
[743] TEX. INS. CODE § 541.008

**432)**  The Doctors also argue that Dr. DellaCroce and Dr. Sullivan fall within the definition of "persons." Therefore, Dr. DellaCroce and Dr. Sullivan can personally assert claims under the Texas Insurance Code based on FCP's deceptive insurance practices that violate the DTPA.

**433)**  And That the key provisions of the Texas Insurance Code and its "tie-in" statute are as follows:

> A person who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice:
>
> *    *    *
>
> (2) specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment.[744]

**434)**  Also, that courts have held that the statute "permits an insured to bring a cause of action" under the Insurance Code for deceptive trade practices which violate Section 17.46(b) of the DTPA.[745]   Accordingly, through § 541.151(2) of the Insurance Code, Dr. Sullivan, Dr. DellaCroce, their captives, and Class Members all constitute persons who have been damaged by, and can recover for, FCP's unconscionable insurance misconduct.

---

[744] TEX. INS. CODE § 541.151(2).

[745] *See Centaurus Unity v. Lexington Ins. Co.*, 766 F.Supp.2d 780, 787 (S.D. Tex. 2011).

**435)** The Doctors argue that this Arbitrator reject FCP's argument that the Doctors and Class Members cannot maintain claims under the Texas Insurance Code because the Texas Insurance Code does not apply to captive insurance companies,[746] and hold that the Texas Insurance Code applies in a wide variety of circumstances and is to be "liberally construed."[747]

**436)** However, FCP relies on Section 964.002 of the Insurance Code, which provides that, other than certain specified provisions, the Code "does not apply to a captive insurance company." While a captive insurance company may not be subject to claims for deceptive trade practices as a defendant, in light of the typical relationship between a captive and its owners/ insureds, this rationale vanishes in the context of claims against a captive promoter or captive attorney who is unaffiliated with the captive.

**437)** The rationale behind Section 964.002 is further diminished by the role of the risk pool, whereby the Doctors reinsured hundreds of other entities, including Feldman and Capstone. Under those circumstances, the challenged relationship goes beyond captive insurance, and Section 964,002's exemption does not apply.

**438)** The Doctors also argue that FCP identifies no case suggesting that the language of Section 964.002 of the Insurance Code should be read to prohibit claims

---

[746] *See, e.g.,* FCP's Post-Hearing Brief at p. 186.
[747] TEX. INS. CODE § 541.008

for deceptive trade practices against a risk pool's administrator, a captive manager, or captive attorney. In light of the mandate in Section 541.008 that the Insurance Code's provisions shall be "liberally construed," this Arbitrator does not interpret the language in Section 964.002 to prohibit claims for deceptive practices against a captive administrator, captive attorney, or risk pool administrator, such as FCP.[748]

**439)** And that FCP argues that the Texas Insurance code is not applicable because the Doctors did not "enter [] an 'insurance policy' with an FCP party."[749] This argument distorts the operative language of the Texas Insurance Code, and this Arbitrator rejects that defense. FCP invokes Section 541.051 of the Texas Insurance Code, claiming that this section "limit[s] claims to acts involving an insurance 'policy issued or to be issued.'"[750] FCP's argument ignores altogether the fact that the Insurance Code expressly imports the list of acts that violate the DTPA, as set forth in Section 17.46(b) of the DTPA.[751] Further, Section 541.061 of the Texas Insurance Code contains additional substantive provisions prohibiting misrepresentations regarding insurance policies.[752] FCP further ignores that the Insurance Code's provisions shall be "liberally construed," as per Section 541.008.[753]

---

[748] TEX. INS. CODE § 541.008
[749] *See* FCP Post-Hearing Brief, at p. 185-186.
[750] *See* FCP Post-Hearing Brief, at p. 185 (citing TEX. INS. CODE. §541.051).
[751] TEX. INS. CODE §541.151(2).
[752] TEX. INS. CODE §§ 541.051, 541.061.
[753] TEX. INS. CODE § 541.008

**440)**  The Doctors argue that in any event, Section 541.051 does not help FCP.  That section addresses misrepresentations made "in the business of insurance."[754]  FCP are engaged in "the business of insurance," and as the entities that created the captive insurance scheme at issue, drafted the policies, and made key misrepresentations to the Doctors, they are covered by the statute.

**441)**  That FCP's reliance on *USAA Texas Lloyds Co. v. Menchaa* is similarly unavailing.[755]   FCP oversimplifies that case by suggesting that it stands for the proposition that an "insurance policy must exist to trigger application of the Insurance Code."[756]  This argument is beside the point: unquestionably, the policies issued by Capstone "exist."   *USAA* discussed the relationship between statutory violations of the Insurance Code and damages under the policy(ies) at issue.   *USAA* held that "extra-contractual liability" under the Insurance Code "is 'distinct' from []  liability for benefits under the insurance policy."[757]  This statement recognizes that a party can be liable under the Insurance Code regardless of whether that party is responsible for paying "benefits" under the policy.  Consequently, this Arbitrator rejects FCP's attempt to evade liability under the Insurance Code on the purported basis that the captive insurance policies at issue were not "issued" by FCP.

---

[754] TEX. INS. CODE §541.151(1).

[755] 545 S.W.3d 479 (Tex. 2018)

[756] *See* FCP's Post-Hearing Brief at p. 185.

[757] *USAA*, 545 S.W.3d at 499 (citing *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 214 (Tex. 1988), *overruled on other grounds by Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 441 (Tex. 2012)).

**442)** That indeed, FCP's premise is undermined by the fact that a party need not be an insurer to be liable under the Insurance Code: insurance agents have been held subject to the requirements of the Insurance Code.[758] Agents are obviously not the insurers – thereby demonstrating the invalidity of FCP's overly-narrow reading of the Insurance Code. Consequently, this Arbitrator rejects FCP's attempt to evade liability under the Insurance Code on the purported basis that the captive insurance policies at issue were not "issued" by FCP.

**443)** Considering the totality of the evidence and testimony in the record, the above findings of fact, and applicable law, this Arbitrator concludes that Mr. Feldman and Capstone are not liable to the Doctors and Class Members under the Texas Insurance Code as captive insurers are excluded from the insurance code.

**(444)** The Doctors also argue that Mr. Feldman and Capstone having breached fiduciary duties to their clients, the remedy under Texas law for breach of fiduciary duty includes fee forfeiture, and that this Arbitrator should not allow Mr. Feldman to evade his obligation to forfeit all fees paid to him or Capstone by the Doctors and Class Members through a fiction of Capstone's corporate separateness.

**(445)** The Doctors are also arguing that FCP is using corporate fictions of separateness to justify their wrong behavior. They argue that the Texas Supreme Court has concluded that Texas law disregards corporate fictions "where the

---

[758] *See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 485-86 (Tex. 1998).

corporate fiction is relied upon as a protection of crime or to justify wrong.'"[759] Here, the corporate fiction of PoolRe's alleged separateness is being used by Feldman and Capstone to justify their taking of millions of dollars of their clients' money to pay for Mr. Feldman's and Capstone's legal fees and expenses incurred in these arbitration proceedings. This Arbitrator has concluded that Mr. Feldman's and Capstone's conversion of their clients' money held in trust in the risk pool is improper and wrong. That this Arbitrator will not allow Mr. Feldman or Capstone to justify that wrong through the fiction of PoolRe's alleged separateness or under the false guise of PoolRe's alleged administrative expenses.

**(446)** The Doctors argue that they and Class Members do not need to wait until after they obtain and are unable to collect on a Judgment in order to bring their alter ego claims. They reply to the FCP contention that the Doctors' alter ego claim fails because alter ego claims may only be brought after the claimant has obtained a judgment and has been unable to collect on that judgment.[760] FCP cites only *Kern v. Gleason* to support this incorrect position.[761] *Kern* was a mandamus action challenging an overbroad discovery order. The court found that ordering production of the defendant shareholder's financial records in order to show the corporate veil should be pierced was inappropriate because "the net worth of the corporation, not

---

[759] *See SSP Partners*, 275 S.W.3d at 454.

[760] *See* FCP's Post-Hearing Brief at p. 233-34 (citing *Kern v. Gleason*, 840 S.W. 2d 730, 736 (Tex. App. – Amarillo 1992).

[761] 840 S.W.2d 730 (Tex. App. – Amarillo 1992).

[the shareholder], is the basis for determining exemplary damages."[762] The underlying liability claims were not at issue in *Kern*.  FCP's reliance on *Kern* is misplaced and contrary to Texas law regarding alter ego claims.[763]

**(447)** For instance, in *Rio Grande Valley Gas Co. v. City of Edinburg*, the Texas appellate court explained:

> The prospect that a claimant will not be able to collect a judgment unless the corporate form is disregarded is part of the justification for doctrines such as alter ego and single business enterprise. That does not mean, however, that a claimant may not pursue theories for piercing the corporate veil at the same time that basic liability issues are litigated. Countless Texas cases . . . allow claimants to litigate underlying liability issues at the same time and in the same proceeding as veil-piercing theories.[764]

**(448)** That based on the foregoing, this Arbitrator should reject FCP's contention that the Doctors and Class Members must first prevail on liability and then prove inability to collect on the judgment before they can litigate the alter ego status of Feldman, Capstone, and PoolRe.

**(449)** The Doctors argue that the Texas Supreme Court has instructed that it will "disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the

---

[762] *Id* at 736-737.

[763] *See Vladmir, Ltd. v. Pacific Parts Supply Co.*, 2009 WL 10670043 (W.D. Tex. Jul. 8, 2009) (allowing plaintiff to amend petition pleading fraud, deceptive trade practices, and breach of contract to include alter ego liability).

[764] *See Rio Grande Valley Gas Co. v. City of Edinburg*, 59 S.W.3d 199, 210 (Tex. App. Corpus Christi 2000).

corporate form has been used as part of a basically unfair device to achieve an inequitable result."[765]

**(450)** FCP argue that the Doctors' alter ego allegations fail for several reasons. First, alter ego is not a standalone cause of action. *Kern v. Gleason*, 840 S.W.2d 730, 736 (Tex. App.—Amarillo 1992, no writ) ("alter ego" is "not a separate cause of action against the corporation or the individual."). Alter ego is "only remedial" and "only expand[s] the potential sources for recovery" **after** a plaintiff has obtained a judgment on a valid cause of action and **after** the plaintiff has been unable to collect on a judgment due to the illegal abuse of the corporate formalities of the judgment debtor. *Id.* Because The Doctors are not using alter ego to collect on a judgment that a FCP party cannot pay, their alter-ego claim fails as a matter of law.

**(451)** Second, the Doctors alter-ego claim fails because no FCP Party is "undercapitalized and unable to pay a judgment" such that it is proper to prematurely "disregard [] the[ir] corporate identities" and legal separateness. *See Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir. 1999) (rejecting alter ego against the U.S. entity because there was no judgment against the Mexican affiliate or proof that the affiliate was "undercapitalized or unable to pay a judgment"). As Mr. Feldman testified, there is no insolvency because liabilities have never exceeded assets for the Feldman Law Firm, a Capstone Party, or

---

[765] *See SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008).

PoolRe. TR Vol. 13 at 5102. Put simply, the Doctors presented no evidence that any of the FCP parties are insolvent.

**(452)** Third, FCP also argues that the Doctors did not prove the elements of alter ego. Alter ego requires that one entity has been "operated as a mere business conduit of another," with the "separateness of the two [entities]ha[ving] ceased" such that there is a "blending of identities, or a blurring of lines of distinction, both formal and substantive." *Gardemal*, 186 F.3d at 593-95. This is a high bar in Texas:

> Many wholly owned subsidiaries and closely held corporations are not factually distinct from their owners. Many are in fact controlled and operated in close concert with the interests of the owners, and do not have separate factual existence: [do not have] separate employees, offices, or properties; [do have] consolidated financial reporting and tax returns; and the like. **Such conduct is perfectly natural and proper and provides no basis for ignoring legal independence.**

*Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1287-88 (5th Cir. 1988) (emphasis added).

**(453)** Accordingly, instead of proving mere common control or joint enterprise, the Doctors bore the burden to prove that: (1) the corporate separateness of the Feldman Parties, Capstone Parties, andPoolRe "**ceased**"; (2) "through a dishonesty of purpose and intent to deceive," Mr. Feldman abused the corporate form of the Feldman Law Firm, the Capstone Parties, and PoolRe for the express purpose of perpetuating an actual fraud against the Doctors; **and** (3) Mr. Feldman in fact used thecorporate form of the Feldman Law Firm, the Capstone Parties, and PoolRe to misuse funds received under the Stop Loss and Quota Share agreements for the

261

direct personal benefit of a FCP entity. *See id.*; *Gardemal*, 186 F.3d at 593-95;

*Viajes Gerpa, S.A. v. Fazeli*, 522 S.W.3d 524, 531-35 (Tex. App.—Houston [14th

Dist. 2016, pet. denied). That the Doctors did not meet this burden. Instead, the

evidence at trial established:

a) The Feldman and Capstone Parties do not have a common owner or director with PoolRe.

b) Each FCP Party files separate tax returns and has separate financial statements, bank accounts, books, and records.

c) The Feldman Parties, Capstone Parties, and PoolRe keep each other's assets separate.

d) Transactions between or among the Feldman Parties, Capstone Parties, and PoolRe aredocumented and happen under written contracts.

e) The Feldman Parties, Capstone Parties, and PoolRe have not caused each other to become undercapitalized or insolvent.

f) Profits and losses are allocated among the Feldman Parties, Capstone Parties, and PoolRe.

g) Capstone and PoolRe do not have common employees. Instead, Capstone employees provides services to PoolRe under a written contract.

h) The Feldman Parties, Capstone Parties, and PoolRe do not pay each other's business expenses absent a contractual obligation to do so.

i) The Feldman Parties, Capstone Parties, and PoolRe did not enter the 2015 EngagementLetter or Stop Loss and Quota Share agreements to defraud or deceive SCP. Indeed, PoolRe is not party to the 2015 Engagement Letter at all.

j) The Feldman Parties, Capstone Parties, and PoolRe did not use any

contractual funds received from SCP for purposes not allowed under the Engagement Letter or Section 3(E) of the 2019 Quota Share agreement.

k) Mr. Amoroso and Mr. Rauner, experts proffered by SCP, both testified that the structure of PoolRe is a standard structure for a reinsurance pooling company. TR Vol. 13 at 5102-5105; *see also* EX J-72 at 5-6, Section 3(E)(1)-(7); TR Vol. 11 at 4607- 4632; TR Vol. 6 at 2322-2323; TR Vol. 7 at 2497-2501; TR Vol. 11 at 4262.

That this evidence is **uncontroverted**. That the Doctors did not cross examine Mr. Feldman on these issues.

**(454)** That in their post-hearing briefing, the Doctors make several counterpoints. The Doctors' counterpoints are incorrect. Even if they were correct, they are insufficient for the Doctors to meet their burden to prove each element of alter ego by a preponderance of the evidence. Specifically:

a) The Doctors argue that Capstone and the Feldman Law Firm "co-mingle assets." Doctors' Post-Hearing Brief at 95. The only evidence the Doctors cite is the Feldman Law Firm and Capstone sharing expenses for this litigation. *Id.* This is not co-mingling. This evidence is not probative of whether the Feldman Law Firm and Capstone keep their assets in separate accounts. The Doctors also argue that there is "[n]o record evidence reflect[ing] any payments from Capstone to the Feldman Law Firm." *Id.* The Doctors bear the burden to prove undocumented transactions. SCP failed to meet this burden. The only evidence on this topic is Mr. Feldman's uncontroverted testimony that there are no undocumented transfers and that all FCP parties keep their assets in separate accounts. TR Vol. 13 at 5102-05.

b) They argue that Capstone exercised decision-making authority for PoolRe without conferring with anyone from PoolRe. Doctors' Post-Hearing Brief at 95-96. SCP argue, for instance, that Capstone filed the May 7, 2020, arbitration demand without PoolRe's approval. *Id.* This is false. Mr. Friedman's uncontroverted testimony is that he authorized

the filing of the May 7, 2020, arbitration demand and related expenses on PoolRe's behalf. TR Vol. 23 at 9466.

c) The Doctors argue that PoolRe is "grossly undercapitalized." Doctors' Post-Hearing Brief at 97. The Doctors offered no fact or expert testimony regarding PoolRe's solvency or capitalization and did not cross examine any FCP witness on solvency or capitalization. As stated above, the trial testimony is uncontroverted that PoolRe was always solvent because the value of PoolRe's assets exceeded the value of PoolRe's liabilities. TR Vol. 13 at 5102-5105. PoolRe's audited financial statements from Munninghoff accounting firm establish PoolRe's solvency and that PoolRe has millions of dollars in capital and assets. *See* EX DRS 46. PoolRe also has the right to make a funding call for tens of millions of dollars owed from Participating Reinsurers. *See* EX FC 367.4 at 6. As a matter of law, the Doctors cannot establish insolvency without "offering evidence showing [PoolRe's] full assets and debts at a fair valuation." *In re Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 121-22 (5th Cir. 1994). As for capitalization, SCP introduced no evidence that any FCP party lacked adequate capital to pay debts as they became due. *See Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 540 (Tex. App.—Corpus Christi 1989, writ denied) (recognizing "232.00" as adequate capitalization). Perhaps due to the absence of an expert on the subject, the Doctors improperly conflate "assets" and "capitalization" (both of which are large for PoolRe) with "net profit." *See* Doctors' Post-Hearing Brief at 97. The Doctors cite no case law that supports an alter ego finding simply because a corporation's net profit is small.

d) The Doctors argue that funds paid under the cost-sharing agreement is evidence of alter ego. *See* Doctors' Post-Hearing Brief at 97-98, 100-102. As stated above, this preliminary allocation of fees and expenses for these Arbitrations is no basis for liability under any pleaded claim. SCP cite no authority that supports that a preliminary cost-sharing arrangement between aligned parties—entered into after litigation began—can serve as a basis to bootstrap liability for facts that did not exist at the time suit was filed. *See* Doctors' Post-Hearing Brief at 97-98. Moreover, SCP cite no evidence that the Feldman Law Firm or Capstone spent any money received from PoolRe, let alone to pay for salaries of the Feldman Law Firm or Capstone employees. In fact, SCP

264

did not cross examine Mr. Feldman on any of these points. As for the finer points of this cost-sharing agreement: because it is preliminary in nature, PoolRe director Mr. Snyder is still involved in making sure that final allocation is fair to PoolRe. *See e.g.*, TR Vol. 22 at 8990-93.

e) SCP point to Mr. Friedman's lack of knowledge of the details of PoolRe as evidence of alter ego. SCP ignore that, under Delaware law, Mr. Friedman, as an owner, officer, and director of PoolRe, acts within the business judgment rule in the management of his company. *See e.g., Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993)("The [business judgment] rule operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation."). And SCP are not shareholders of PoolRe with any standing to second-guess its operations.

f) SCP cite to no authority, nor do they have standing to allege, that Mr. Friedman violated any duty to PoolRe (a) by delegating certain management and other decision-making of PoolRe to director Mr. Snyder, or (b) by delegating, through PoolRe's contract with Capstone, certain administrative functions of PoolRe to Capstone as its captive and insurance manager.

g) SCP point to Dana Moore's passive involvement with PoolRe. Under Delaware law, all Delaware corporations must have a resident director. *See* Del. Code Ann. tit. 8, § 132(2).

h) SCP cite no authority that Ms. Moore's role as a Delaware resident director was improper. Indeed, Ms. Moore served—and perhaps still serves—as the resident director of Orion, Janus, and Cerberus. SCP failed to show any evidence that her services as director to the SCP captives differed in any way.

**(455)** That Mr. Watkins's testimony that the Doctors can disregard corporate formalities based solely on the Texas Disciplinary Rules (the "DRs") is also no basis for an alter ego finding. *See* TR Vol. 4 at 143-46. In Texas, the DRs "do [] not establish a basis for civil liability" and do not "in any way set a standard for

civil liability either for negligence or breach of fiduciary duty." *Alvarado v. Love & Hutson, G.P.*, No. 4:19-CV-2148, 2021 WL 1428477, at *11 (S.D. Tex. Apr. 15, 2021).

> FCP also argue that the Doctors cannot obtain relief on their single business theory. That the Doctors stated in opening statements that they were relying solely on single business enterprise. TR Vol. 1 at 76. Luckily, whether SCP may recover or obtain relief under the doctrine of single business entity is an easy question: they cannot. The Texas Supreme Court flatly rejected the doctrine in *SSP Partners*, 275 S.W.3d (Tex. 2008).

**(456)**   That whether the Doctors are entitled to a finding of joint enterprise liability turns on the evidence presented, not the Doctors' characterizations of the relationship between the FCP Parties or The Doctors' attempt to shoehorn the rejected single business entity doctrine into the guise of joint enterprise. Similarly, whether The Doctors can rely on a sham to perpetuate a fraud theory to piece the corporate veil turns on whether they have met their proof burden on such a theory. Because they address these theories together in post-hearing briefing, the Arbitrator addresses them together as well. That for both joint enterprise and sham to perpetuate a fraud, The Doctors failed to establish the requisite proof. That the Doctors never pled "sham to perpetuate a fraud." Instead they raised this theory for the first time after the close of evidence in its post-hearing briefing, depriving FCP of any meaningful opportunity to conduct discovery on the allegation and present evidence in defense.

**(457)** That even absent the due process concerns, the Doctors failed to prove they are entitled to any judgment, relief, or determination on their sham to perpetuate a fraud theory. Their argument is based on broad characterizations and not hard evidence. For example, to establish a sham to perpetuate a fraud, The Doctors must show that they detrimentally relied on a specific representation from one FCP party that, in the event of the insolvency of another FCP party, the FCP party at issue would personally pay for the debts of the insolvent party. *See Fid. & Deposit Co. v. Commercial Cas. Consultants, Inc.*, 976 F.2d 272, 275 (5th Cir. 1992) (the "sham to perpetrate a fraud" veil- piercing theory requires proof of "reli[ance] on the financial backing of the owners" of the entity in the event of the entity's "insolvency"). There is zero evidence in the record that any FCP party made any such representation or that they relied on any such representation.

**(458)** That the Doctors fare no better on their joint enterprise theory. To be clear, joint enterprise liability does not pierce the corporate veil for any relief like an alter ego finding. Joint enterprise liability only extends liability of one member of an enterprise to another for torts committed within the common purpose of that enterprise. *See Bechtel Corp.*, 28 S.W.3d 64. They appear, instead, to be trying to obtain an amorphous and unpleaded finding that FCP are interchangeable for all purposes. To obtain joint enterprise liability The Doctors must prove (1) an agreement, express or implied, among the FCP parties; (2) a common purpose to

be carried out by FCP; (3) a community of pecuniary interest in that purpose among FCP; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control to all FCP members **and** that one of the FCP parties committed a tort against them within the common purpose of the alleged enterprise. *See St. Joseph Hospital*, 94 S.W.3d at 526; *Bechtel Corp.*, 28 S.W.3d at 67. The Texas Supreme Court has clarified that the elements must interrelate so that all parties to the alleged joint enterprise (1) agree to a common purpose; (2) have a community of pecuniary interest in *that* common purpose; and (3) have an equal right of control over the enterprise or project formed to carry out that purpose. *Id.* at 528.

**(459)** That during the final hearing and in their post-hearing brief, the Doctors made no attempt to establish shall require elements for joint enterprise liability. They spend fewer than two full pages briefing their joint enterprise/sham to perpetuate a fraud contention. *See* Doctors' Post-Hearing Brief at 103-05. At no point do they even allege that:

    (a) the Feldman, Capstone, and PoolRe had an express or implied agreement for

    (b) a common purpose wherein

    (c) the Feldman, Capstone, and PoolRe parties shared a community of pecuniary interest (as opposed to just common interest) in that common purpose, and

    (d) all the Feldman, Capstone, and PoolRe parties shared an equal right of control to the alleged joint enterprise.

Nor do the Doctors identify what tort any of the FCP parties allegedly committed against the Doctors within the scope of the alleged joint enterprise. They have no free-standing tort allegations against PoolRe. And the tort allegations that they have against the Feldman and/or Capstone Parties arise from within the Feldman and Capstone and the Doctors relationship (the 2015 Engagement Letter), a relationship that does not involve PoolRe. Furthermore, as this Award explains, SCP have not proven any tort allegation.

**(460)** To avoid inequitable results and considering the totality of evidence reflecting blurred lines of distinction between Mr. Feldman, Capstone, and PoolRe, this Arbitrator holds that the Feldman Law Firm, Capstone, and PoolRe are alter egos of each other and Mr. Feldman and that Mr. Feldman is ultimately liable and responsible for all torts committed by Mr. Feldman, Capstone, and PoolRe.

## DAMAGES

In summation, considering the totality of evidence and testimony in the record and the findings of fact and conclusions of law above:

a)   **IT IS ORDERED, ADJUDGED, AND DECREED** that there be judgment in favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., against Respondents, Stewart Feldman; The Feldman Law Firm LLP;

Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; Capstone Insurance Management, Ltd.; PoolRe Insurance Corp. and Jeff Carlson, finding Respondents jointly, severally, and solidarily liable to Claimants for breaching fiduciary duties, committing professional malpractice, making fraudulent and negligent misrepresentations, fraud, conversion, violating the Texas Deceptive Trade Practice Act, and violating RICO as discussed in more detail in the foregoing findings of fact and conclusions of law.

b)    **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that there be judgment in favor of <u>Class Members</u>, as defined above, against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; Capstone Insurance Management, Ltd.; and Jeff Carlson, finding Respondents jointly, severally, and solidarity liable to <u>Class Members</u> for breaching fiduciary duties, committing professional malpractice, fraud, conversion, making fraudulent and negligent misrepresentations, violating the Texas Deceptive Trade Practice Act, and violating RICO as discussed in more detail in the foregoing findings of fact and conclusions of law. <u>Class Members</u>' damages, attorneys' fees, costs, pre-judgment interest, and post-judgment interest will be quantified by this Arbitrator in a subsequent phase of this bifurcated arbitration.

c)    **IT FURTHER IS ORDERED, ADJUDGED, AND DECREED** that Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; Capstone Insurance Management, Ltd.; Jeff Carlson; and PoolRe Insurance Corp., are jointly, severally, and solidarily liable to and must pay Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., in a total amount of $70,336,224.60, exclusive of attorneys' fees and costs, pre-judgment interest, and post-judgment interest, for the foregoing torts and breaches identified above, which includes the following amounts:

i.    $23,224,403 for lost profits and loss of opportunity to investment profits (which includes the $1,250,9944 in fees paid by the Doctors to be forfeited by Feldman and Capstone).

    ii.    $221,005.21 for the risk pool premiums belonging to the Doctors converted by Feldman and Capstone.

    iii.    For the amounts listed above (a sub-total of $23,445,408.20), the Doctors are entitled to treble damages for Respondents' violations of RICO, the DTPA and Texas Insurance Code, making their total award, exclusive of attorneys' fees, pre-judgment interest, and post-judgment interest, $70,336,224.60.

## ATTORNEY'S FEES

**d)**    **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that there be judgment in the favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; Capstone Insurance Management, Ltd.; PoolRe Insurance Corp., and Jeff Carlson, awarding the Claimants their attorneys' fees and costs incurred in these arbitration proceedings, in an amount of $18,348,294.60.

    **e)**    **IT IS FURTHER ORDERED ADJUDGED AND DECREED** that there be judgment in the favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; Capstone Insurance Management, Ltd.; and Jeff Carlson, awarding the Claimants pre-judgment interest at a rate, consistent with the post-judgment interest rate below, of 5%, beginning to accrue on July 29, 2020 and end on the day preceding when this Final Award is executed.

**f)**    **IT IS FURTHER ORDERED ADJUDGED AND DECREED** that there be judgment in the favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative

Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; Capstone Insurance Management, Ltd.; and Jeff Carlson, awarding the Doctors post-judgment interest consistent with Tex. Fin. Code § 304.003, at a rate of 5% beginning to apply on the date this Final Award is executed.

**g)    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that there be Declaratory Judgment entered in favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd.; and Jeff Carlson, declaring that Stewart Feldman and those in active concert with him, including his related entities / alter egos, Capstone and PoolRe, cannot tender to the risk pool or pool participants for payment or reimbursement any portion of: (1) A.M.Y. Property & Casualty Insurance Corp.'s claims, (2) the legal fees and expenses incurred in the Judge Dorfman arbitration, these arbitrations, other related arbitrations or proceedings in state or federal court, and state bar proceedings, or (3) any damages award that may be issued in these or related arbitration proceedings.

**h)    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that there be Declaratory Judgment entered in favor of Class Members, as defined above, and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd.; and Jeff Carlson, declaring that Stewart Feldman and those in active concert with him, including his related entities / alter egos, Capstone and PoolRe, cannot tender to the risk pool or pool participants for payment or reimbursement any portion of: (1) A.M.Y. Property & Casualty Insurance Corp.'s claims, (2) the legal fees and expenses incurred in the Judge Dorfman arbitration, these arbitrations, other related arbitrations or proceedings in state or federal court, and state bar proceedings, or (3) any damages award that may be issued in these or related arbitration proceedings.

**i)    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and

Capstone Insurance Management, Ltd.; PoolRe Insurance Corp. and Jeff Carlson, take nothing and their claims, affirmative defenses, and any and all relief sought are rejected and dismissed with prejudice.

Signed on this 29th day of March 2022.

Charles R. Jones
Arbitrator