### ARBITRATION FILED WITH AND BEFORE THE
### HONORABLE ARBITRATOR, ROBERT A. KUTCHER

DR. SCOTT SULLIVAN, M.D., DR. FRANK
DELLACROCE, M.D., ST. CHARLES
SURGICAL HOSPITAL, L.L.C., ST.
CHARLES HOLDINGS, L.L.C., CENTER
FOR RESTORATIVE BREAST SURGERY,
LLC, SIGMA DELTA BILLING, LLC,
SUNRISE PRODUCTIONS, LLC,
CERBERUS INSURANCE
CORPORATION, JANUS INSURANCE
CORPORATION, AND ORION
INSURANCE CORPORATION

V.

CAPSTONE ASSOCIATED SERVICES,          **Locale of Final Hearing: Houston, Texas**
LTD., CAPSTONE ASSOCIATED
SERVICES (WYOMING), LIMITED
PARTNERSHIP, CAPSTONE INSURANCE
MANAGEMENT, LTD., THE FELDMAN
LAW FIRM LLP, STEWART A.
FELDMAN, JEFF CARLSON

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### FINAL ARBITRATION AWARD

EXHIBIT
B

## <u>TABLE OF CONTENTS</u>

Final Arbitration Award..................................................................................................... 1

Part One: The Parties and the Proceedings ...................................................................... 2

Part Two: Background and Jurisdiction............................................................................. 3

Part Three: Findings of Facts ............................................................................................ 8

   I.     The Doctors meet Feldman and execute the Joint Engagement Letter........................... 8

   II.    Mr. Feldman, the Feldman Law Firm and Capstone did not disclose that the Doctors were reinsuring Feldman/Capstone's professional liabilities, errors & omissions, and legal expenses .................................................................................................................. 17

       A.    The Doctors did not know that they were insuring Feldman's and Capstone's professional liabilities, errors & omissions, and legal expenses................................ 21

       B.    Exhibit E to the Engagement Letter does not disclose that Feldman's and Capstone's clients were reinsuring Feldman's and Capstone's professional liabilities, errors & omissions, and legal expenses.................................................................................... 22

       C.    The Doctors had no reason to suspect that Feldman/Capstone's primary malpractice insurance coverages were in the risk pools ................................................................ 24

   III.   Mr. Feldman, the Feldman Law Firm and Capstone did not disclose the IRS's adverse determinations against Capstone-administered captives ............................................. 26

   IV.   Mr. Feldman, the Feldman Law Firm and Capstone failed to disclose the IRS audit of Mr. Feldman for promoting abusive tax shelters under IRC § 6700 ............................ 36

   V.    The wind-down of the captive program....................................................................... 39

   VI.   Mr. Feldman, the Feldman Law Firm and Capstone perpetrated a scheme to keep the 2018 and 2019 risk pools open and convert their clients' funds held in those risk pools to pay for Feldman, Capstone, and PoolRe's fees and expenses in fighting their clients ....................................................................................................................................... 46

       A.    Mr. Feldman, the Feldman Law Firm and Capstone disregarded 2019 pool participants' requests for an early liquidation............................................................ 48

       B.    Mr. Feldman, the Feldman Law Firm and Capstone perpetrated a scheme to keep the risk pools open so as to force participants in those pools to pay Feldman's and Capstone's legal fees and expenses in these arbitrations........................................... 48

1.    Mr. Feldman, the Feldman Law Firm and Capstone's claims regarding the Doctors
       arose in 2020 but were backdated to 2019............................................................ 51

2.    Mr. Feldman, the Feldman Law Firm and Capstone fraudulently submitted and/or
       kept open numerous other claims in the 2019 risk pool ...................................... 55

3.    Mr. Feldman, the Feldman Law Firm, Capstone, and PoolRe failed to conduct a
       prompt or diligent investigation of the A.M.Y. claims......................................... 58

C.    Mr. Feldman, the Feldman Law Firm and Capstone converted their clients' money
       held in trust ............................................................................................................. 59

VII.   Capstone, the Feldman Law Firm, and PoolRe were all acting under Mr. Feldman's
       control and supervision .......................................................................................... 64

Part Four: Conclusions of Law ............................................................................................. 73

VIII.  Mr. Feldman, the Feldman Law Firm and Capstone breached their fiduciary duties
       owed to Claimants .................................................................................................. 73

A.    Mr. Feldman, the Feldman Law Firm and Capstone owed fiduciary duties to the
       Doctors .................................................................................................................... 75

B.    Mr. Feldman, the Feldman Law Firm and Capstone breached fiduciary duties owed
       to the Doctors by engaging in self-dealing, misrepresentation, concealment of
       material information, and by converting their captive clients' premiums ............... 78

1.    Feldman/Capstone breached fiduciary duties by failing to disclose to their clients
       that their clients were insuring Feldman's and Capstone's professional liabilities,
       errors & omissions, and legal expense liabilities................................................... 78

2.    Mr. Feldman, the Feldman Law Firm and Capstone breached fiduciary duties by
       failing to disclose material information concerning the IRS's adverse
       determinations and scrutiny of the Feldman/Capstone captive insurance program
       ................................................................................................................................. 80

3.    Mr. Feldman, the Feldman Law Firm and Capstone breached fiduciary duties by
       failing to disclose the IRS's § 6700 promoter exam of Mr. Feldman for his actions
       in promoting abusive tax shelters .......................................................................... 80

4.    Mr. Feldman, the Feldman Law Firm and Capstone breached fiduciary duties by
       refusing to allow their clients to exit the risk pool and by converting their clients'
       premiums to pay for Feldman's and Capstone's legal fees and expenses incurred
       in these arbitration proceedings ............................................................................. 81

i.    The premiums belong to the captive clients ........................................................ 82

ii.   The PoolRe agreements do not grant PoolRe an unlimited or unfettered right to
       pay for the attorneys' fees and operating expenses of Feldman/Capstone, and
       PoolRe...................................................................................................................... 84

C.     Mr. Feldman, the Feldman Law Firm and Capstone's breaches of fiduciary duties caused the Doctors' damages ....................................................................... 87

IX.    Capstone is also liable for Feldman's breaches of fiduciary duties pursuant to the Kinzbach Rule........................................................................................................ 88

X.     Liability of Jeff Carlson ....................................................................................... 89

XI.    Mr. Feldman, the Feldman Law Firm and Capstone breached IRS Circular 230's requirements......................................................................................................... 89

XII.   Feldman committed legal malpractice .................................................................. 91

A.     Feldman owed the Doctors a duty of care by virtue of the attorney-client relationship ................................................................................................................................. 91

B.     Feldman breached his duty by failing to act as a reasonably prudent lawyer........... 92

1.     Feldman violated Rule 1.06 by representing Capstone, PoolRe, and the Doctors ... 92

2.     Feldman breached his obligations by entering into a reinsurance business transaction with the Doctors without providing full disclosure ............................................... 94

3.     The Doctors did not consent to allow Mr. Feldman to continue to represent Capstone or PoolRe adversely to the Doctors after Feldman withdrew from legal representation.  Thus, Mr. Feldman violated Rule 1.09........................................ 95

4.     Feldman's actions constituted actionable "misconduct" under Rule 8.04 ............... 97

C.     Feldman committed legal malpractice by failing to put forth a diligent effort in assisting the Doctors with shutting down their captives .......................................... 98

D.     Feldman's legal malpractice caused the Doctors to incur damages ....................... 100

XIII.  Feldman/Capstone committed intentional misrepresentations regarding IRS scrutiny of the Capstone captive program, the promoter audit of Mr. Feldman, and the presence of Feldman/Capstone's primary malpractice policies in the risk pool ........................... 100

A.     Feldman and Capstone are liable to the Doctors for their fraudulent misrepresentations ................................................................................................. 101

1.     Feldman and Capstone made false material representations ................................... 102

2.     Feldman and Capstone knew that their representations were false and misleading 103

3.     Feldman and Capstone intended to induce the Doctors to rely upon their representations ...................................................................................................... 104

4.     The Doctors justifiably relied upon the false and misleading representations made by Feldman and Capstone ......................................................................................... 104

XIV.   Feldman/Capstone's liability under the Texas Deceptive Trade Practices Act and the corresponding provisions of the Texas Insurance Code ........................................... 105

A.      The Texas Insurance Code, through its "tie-in" statute, prohibits the same conduct contemplated by the DTPA, but without the limitations on who constitutes a "consumer." .......................................................................................................... 106

XV.     Mr. Feldman is ultimately responsible and liable for the wrongful acts of the Feldman Law Firm, Capstone, and PoolRe ............................................................................ 109

A.      The fictions of corporate separateness between the Feldman Law Firm, Capstone, and PoolRe is being used to perpetrate fraud ........................................................... 110

B.      Capstone, The Feldman Law Firm and PoolRe were all acting under the control and supervision of Stewart Feldman ................................................................................ 111

C.      Mr. Feldman, the Feldman Law Firm and Capstone have resorted to fictions of corporate separateness as a means of evading existing legal obligations ............... 112

D.      Corporate fictions of separateness are being used by Feldman and Capstone to justify a wrong ......................................................................................................... 114

Part Five: Damages and Relief ................................................................................................ 115

XVI.    The Doctors are entitled to recover damages based on Feldman and Capstone's violations of fiduciary, tort, professional, and statutory duties .................................. 115

XVII.   The Doctors are not entitled to recover all amounts owed to the IRS (including back taxes, penalties, interest) for tax years dating back to 2015 ........................................ 116

XVIII.  The Doctors are entitled to recover the amount of premiums belonging to their captives that were converted by Mr. Feldman, the Feldman Law Firm and Capstone ............. 119

XIX.    Mr. Feldman, the Feldman Law Firm and Capstone are liable for violating the Texas Insurance Code ......................................................................................................... 120

XX.     The Doctors are entitled to recover all fees paid to Feldman/Capstone due to the serious breaches of fiduciary duties ........................................................................... 121

XXI.    Feldman/Capstone have failed to pay sanctions previously ordered by this Arbitrator .................................................................................................................................. 124

XXII.   The Doctors are entitled to recover pre-judgment and post-judgment interest .......... 124

XXIII.  The Doctors are entitled to a declaration that Feldman/Capstone, and those in concert with them, including PoolRe, cannot submit any portion of their legal fees or operating expenses or any damages award to the risk pools for payment .................................. 127

Part Six: Conclusion ............................................................................................................... 128

iv

**ARBITRATION FILED WITH AND BEFORE THE
HONORABLE ARBITRATOR, ROBERT A. KUTCHER**

**DR. SCOTT SULLIVAN, M.D., DR. FRANK
DELLACROCE, M.D., ST. CHARLES
SURGICAL HOSPITAL, L.L.C., ST.
CHARLES HOLDINGS, L.L.C., CENTER
FOR RESTORATIVE BREAST SURGERY,
LLC, SIGMA DELTA BILLING, LLC,
SUNRISE PRODUCTIONS, LLC,
CERBERUS INSURANCE
CORPORATION, JANUS INSURANCE
CORPORATION, AND ORION
INSURANCE CORPORATION**

**V.**

**CAPSTONE ASSOCIATED SERVICES,**          **Locale of Final Hearing: Houston, Texas**
**LTD., CAPSTONE ASSOCIATED
SERVICES (WYOMING), LIMITED
PARTNERSHIP, CAPSTONE INSURANCE
MANAGEMENT, LTD., THE FELDMAN
LAW FIRM LLP, STEWART A.
FELDMAN, JEFF CARLSON**

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## FINAL ARBITRATION AWARD

The undersigned Arbitrator conducted a final hearing in this Arbitration on August 3, 2021

to August 7, 2021; August 9, 2021; August 16, 2021 to August 24, 2021; September 14, 2021;

September 23, 2021 to September 24, 2021; and September 28, 2021 to October 3, 2021. The

undersigned and three other Arbitrators heard evidence at the final hearing at the same time

(thereby saving the parties the time and expense of four separate hearings), but each Arbitrator

ruled on all objections separately and all indicated that he or she would render his or her own

1

reasoned award separately.[1] This Arbitrator has rendered this Final Award separately from the other Arbitrators, and the findings of fact and conclusions of law below are this Arbitrator's alone.[2]

The arbitration clause governing this Arbitration is contained in the Joint Engagement Letter for Captive Formation/Administration, dated October 22, 2015 (Revised November 10, 2015).[3] The Joint Engagement Letter states that the arbitration shall apply Texas substantive law and the Commercial Arbitration Rules of the American Arbitration Association.[4] Pursuant to AAA Rule 46(b), this Arbitrator believes a reasoned award is required.

### PART ONE: THE PARTIES AND THE PROCEEDINGS

1)      Claimants are Dr. Scott Sullivan, Dr. Frank DellaCroce, St. Charles Surgical Hospital, LLC, St. Charles Holdings, LLC, Center for Restorative Breast Surgery, LLC, Sigma Delta Billing, LLC, Sunrise Productions, LLC, Cerberus Insurance Corp., Janus Insurance Corp., and Orion Insurance Corp. (collectively, the "Doctors").

2)      Respondents are Stewart Feldman ("Mr. Feldman") and The Feldman Law Firm LLP (the "Feldman Law Firm"), Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership, and Capstone Insurance Management, Ltd. (collectively, "Capstone"), and Jeff Carlson. The Respondents, other than Jeff Carlson,

---

[1] *See, e.g.*, Order on Pending Motions to Continue at pp. 2, 4 (Mar. 1, 2021).

[2] With respect to any finding of fact that should more accurately be characterized as a conclusion of law or any conclusion of law that should more accurately be characterized a finding of fact, it is so deemed.

[3] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011081. The Joint Engagement Letter provide that the Arbitrator has "exclusive authority to resolve all disputes and challenges to the formation and enforceability of the parties' agreements as a whole." *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011081. Pursuant to this authority, and to ensure due process, this Arbitrator ruled that the four-month limitation in the Joint Engagement Letter was unenforceable as unconscionable under the circumstances presented. *See, e.g.*, Order on Pending Motions to Continue at pp. 4-6 (Mar. 1, 2021). The Arbitrator's ruling regarding the unenforceability of the four-month limitation in the Joint Engagement Letter is adopted herein.

[4] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011081.

collectively are referred to as "Feldman/Capstone." For reasons stated in this Award, all claims against Jeff Carlson are dismissed with prejudice. PoolRe is not a party in this Arbitration.

3)    Claimants filed their Original Arbitration Demand with this Arbitrator on July 29, 2020, and amended and/or supplemented their arbitration demands on August 21, 2020 and February 12, 2021.[5] Claimants' arbitration demands and pre-trial pleadings assert multiple claims against Feldman/Capstone and Carlson, including professional malpractice, breach of fiduciary duty, professional negligence, negligence, fraudulent misrepresentation, negligent misrepresentation, violations of the Texas Deceptive Trade Practice Act, violations of the Texas Insurance Code, joint, several, and solidary theories of liability, and/or vicarious theory of liability, and requests for declaratory judgment. This Arbitrator addresses each of Claimants' claims against Respondents below.

## PART TWO: BACKGROUND AND JURISDICTION

4)    This proceeding commenced on July 29, 2020, when certain of the Doctors' businesses entities asserted arbitration claims based in tort, legal malpractice, and breach of fiduciary duties against Feldman/Capstone.

5)    Prior to this Arbitration, Capstone filed on May 7, 2020 a limited arbitration against the Doctors, which was pending before Judge Grant Dorfman.[6]  In its May 7, 2020 arbitration demand, Capstone stated that Feldman was "not a party in [that] proceeding."[7]  According to the Honorable Stanwood Duval, Capstone's May 7, 2020 arbitration demand "focused solely on the

---

[5] Although Dr. Scott Sullivan and Dr. Frank DellaCroce, individually, were not originally Claimants in this matter, by Order of this Arbitrator on February 29, 2021, the claims of Dr. Scott Sullivan and Dr. Frank DellaCroce, individually, were included in this Arbitration.

[6] *See* Exhibit DRS-1460, Capstone's Arbitration Demand (May 7, 2020) (Dorfman Arbitration).

[7] *See* Exhibit DRS-1460, Capstone's Arbitration Demand at p. 5, n.3 (May 7, 2020) (Dorfman Arbitration).

wind down operations of" the Doctors' captives.[8]  The Dorfman Arbitration did not include any "issue of malpractice or the allegations that, as the result of the holding in *Reserve Mechanical Corp. v. Commissioner of Internal Revenue*, the Doctors may suffer adverse tax consequences and penalties."[9]

6)      On May 28, 2020, the Doctors submitted their affirmative claims against Feldman/ Capstone, including breach of fiduciary duty and professional malpractice, to Judge Duval.[10]  On June 26, 2020, Judge Duval found that he had jurisdiction over the Doctors' tort claims, but nonetheless stayed his arbitration so as to allow the parties to complete the previously-filed arbitration before Judge Dorfman (which did not include the Doctors' affirmative claims).[11]  While Judge Duval's arbitration was stayed, Feldman, Capstone, and PoolRe commenced a new arbitration before Judge Caroline Baker on July 20, 2020,[12] and the Doctor entities filed the arbitration before this Arbitrator on July 29, 2020.[13]  The claims submitted to Judge Duval, Judge Baker, and this Arbitrator were substantively the same.

7)      At various times, "virtually every arbitrator, individually or jointly, has tried to bring some order out of the chaotic circumstances of multiple arbitrations.  There is no question that the cause of the multiple arbitrations and the chaos is the arbitration provision of the

---

[8] *See* Exhibit DRS-1366, Doctors' Arbitration Demand at ¶ 13 (July 20, 2020) (Kutcher Arbitration) (citing Judge Duval's Order No. 4 at p. 3 (June 26, 2020), which was attached as Exhibit 5 to that Arbitration Demand).

[9] *See* Exhibit DRS-1366, Doctors' Arbitration Demand at ¶ 13 (July 20, 2020) (citing Judge Duval's Order No. 4 at p. 3 (June 26, 2020)).

[10] *See* Exhibit DRS-1365, Doctors' Arbitration Demand (May 28, 2020) (Duval Arbitration).

[11] *See* Judge Duval's Order No. 4 (June 26, 2020) (which was attached as Exhibit 5 to Exhibit DRS-1366, Doctors' Arbitration Demand at ¶ 13 (July 20, 2020)).

[12] *See* Exhibit DRS-1365, Feldman/Capstone's Arbitration Demand (July 20, 2020) (Baker Arbitration).

[13] Exhibit DRS-1366, Doctors' Arbitration Demand at ¶ 13 (July 20, 2020) (Kutcher Arbitration).

4

Engagement Letter entered into by the parties."[14]  Ultimately, on December 23, 2020, Judge Duval stayed his proceeding in deference to this Arbitrator.[15]  Judge Duval noted that U.S. District Court Judge Lee Rosenthal held in a December 4, 2020 ruling that the arbitration demand before this Arbitrator asserts the same claims as those before Judge Duval.[16]

8)     On February 24, 2021, this Arbitrator allowed Dr. Sullivan and Dr. DellaCroce to assert their individual claims in this proceeding.  However, the Class claims, RICO claims, and claims against PoolRe are not before this Arbitrator. Pursuant to the deference of Judge Duval, this Arbitrator is deciding the Doctors' affirmative claims pending in the stayed Duval Arbitration.

9)     Arbitration is a creature of contract.[17]  The scope of this Arbitrator's jurisdiction is established by the Joint Engagement Letter signed on December 7, 2015.[18]  The Joint Engagement Letter's arbitration clause expressly contemplates multiple "arbitrations" – and this construction was confirmed in Judge Dorfman's judicially-confirmed November 9, 2020 Final Arbitration Award,[19] by Judge Rosenthal,[20] and by this Arbitrator.[21]

---

[14] *See* Exhibit DRS-2330, Order on Pending Motions to Continue at p. 3 (Mar. 1, 2020).

[15] *See* Exhibit DRS-2314, Order (Dec. 23, 2020) (Duval Arbitration).

[16] *See* Exhibit DRS-2314, Order (Dec. 23, 2020) (Duval Arbitration) (citing *Sullivan v. Feldman*, 2020-2236, 2020 WL 7129879 (S.D. Tex. 12/4/2020).

[17] *See Jody James Farms, JV, Altman Group, Inc.*, 547 S.W.3d 624, 629 (Tex. 2018).

[18] *See* Exhibit J-20, Joint Engagement Letter, at SULLIVAN011079-81.

[19] *See* Exhibit J-115, Judge Dorfman's Final Award, at ¶ 56 ("That language is further supported by the language in the arbitration clause that contemplates multiple 'arbitrations' (note the plural), as well as the absence of any requirement regarding the pleading of compulsory counterclaims in either the Engagement Letter or the AAA Rules governing this proceeding."

[20] *See Sullivan v. Feldman*, 2020-2236, 2020 WL 7129879 (S.D. Tex. 12/4/2020) (Rosenthal, J.) ("The Engagement Letter does not preclude the parties from proceeding with separate arbitrations for disputes involving overlapping but different facts.  The letter does not foreclose multiple 'arbitrations,' but simply requires that a 'dispute' be heard before 'a single arbitrator.'"

[21] *See, e.g.*, Order on Motion to Disqualify at pp. 6-7 (Jan. 26, 2021); Order on Pending Motions to Continue at pp. 2-3 (Mar. 1, 2021).  This Arbitrator expressly adopts and incorporates all its former rulings and orders issued in these arbitration proceedings.

10)     The Joint Engagement Letter incorporates the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). Both the plain language of the Joint Engagement Letter and the AAA Rules grant arbitrators broad powers to construe their own authority. The Joint Engagement Letter provides, *inter alia*, that "the arbitrator . . . shall have the sole and exclusive ability to rule on all aspects of the arbitrator's appointment," and "the issue of arbitrability shall likewise be decided by the arbitrator, and not by any other person."[22]

11)     In addition, Rule 7 of the AAA Commercial Rules empowers the arbitrator "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."[23] In light of this provision and the Joint Engagement Letter, this Arbitrator has the authority to decide his own jurisdiction, and, correspondingly, no other arbitrator can infringe upon this Arbitrator's jurisdiction to determine what claims are – or are not – before this Arbitrator. The fact that there are multiple arbitrations is solely the product of the arbitration language contained in the Engagement Letter.

12)     As is their right, Feldman/Capstone have challenged this Arbitrator's authority and jurisdiction throughout these proceedings. This challenge has been repeated in virtually every pleading filed by Feldman/Capstone. This Arbitrator rejected those challenges, including in its January 26, 2021 Order, which is adopted and incorporated herein.

13)     Because Feldman/Capstone have renewed their previously-raised objections to this Arbitrator's jurisdiction, this Arbitrator finds it necessary to address these arguments. First, I once

---

[22] *See* Exhibit J-20, Joint Engagement Letter, at SULLIVAN 011081.

[23] *See* AAA Commercial Rules, Rule R-7.

again reject the notion that jurisdiction has lapsed by operation of the language in the Joint Engagement Letter requiring arbitrations to be concluded within four months from inception. All four Arbitrators found this so-called "pumpkin provision" to be "unconscionable," contrary to due process, and legally unenforceable in the context of these proceedings, and, specifically, in light of Feldman/Capstone's noncompliance with their discovery obligations.[24] The enforcement of the arbitrary four month requirement would allow a party to simply drag its feet on discovery and "run out the clock." The record in this case is replete with multiple motions to compel, orders that were disregarded, and subsequent orders, which were likewise disregarded. For the reasons stated in the Joint Order, this effort to run out the clock should not be sanctioned as it is a violation of fundamental due process rights.

14)     Additionally, any suggestion that this Arbitrator's jurisdiction lapsed ignores the fact that this Arbitrator stayed this proceeding on October 28, 2020.[25] That stay was entered based on considerations of "achieving due process."[26] That fundamental consideration transcends the four-month contractual provision. Any subsequent attempt by Feldman/Capstone to divest this Arbitrator of jurisdiction in light of this stay order is invalid and without legal effect.

15)     To the extent that Feldman/Capstone's renewed jurisdictional objection can be construed to renew Feldman/Capstone's challenge to this Arbitrator's neutrality, that objection is once again overruled. Again, the Joint Engagement Letter vests this Arbitrator with the sole authority to resolve challenges to his neutrality. No additional circumstances have arisen or have

---

[24] *See* Joint Order, March 1, 2021, at pp. 4-5.

[25] *See* Joint Order, October 28, 2020. That stay order was necessitated by, *inter alia*, a hurricane, COVID-19 delays, and the Judge Dorfman proceeding extending months beyond its anticipated end date.

[26] *See* Joint Order, October 28, 2020.

been articulated by Feldman/Capstone that would render their challenge to this Arbitrator's neutrality meritorious.

16)     Feldman/Capstone also assert that the doctrine of *res judicata* precludes the Doctors from obtaining relief, the theory being that Judge Dorfman has decided this matter. I disagree. In the Order on Rule 33 Motion to Dispose of Wind Down Liquidation and Proxy Disputes, dated July 19, 2021, it was noted that Judge Dorfman's Order specifically excluded all tort and related claims. It is those claims which are asserted in this Arbitration. As stated by U.S. District Judge Rosenthal in a Memorandum and Opinion dated December 4, 2020:

> The Engagement Letter does not preclude the parties from proceeding with separate arbitrations for disputes involving overlapping but different facts. The Letter does not foreclose multiple "arbitrations," but simply requires that a "dispute" be heard before "a single arbitrator."

As Judge Rosenthal observed, this Arbitration was and continues to be an inefficient and messy process, but it is the Engagement Letter which created this mess. Because Judge Dorfman's Order specifically carved out tort and related claims, Feldman/Capstone's *res judicata* argument is overruled. The tort and related claims which the Doctors assert against Feldman/Capstone are properly in this Arbitration.

17)     Accordingly, I conclude that jurisdiction exists to decide the merits of the Doctors' tort claims submitted by the Doctors to this Arbitrator.

**PART THREE: FINDINGS OF FACTS**

**I.**     **The Doctors meet Feldman and execute the Joint Engagement Letter**.

18)     Dr. Scott Sullivan and Dr. Frank DellaCroce jointly own various business entities relating to their medical practice performing reconstructive surgeries for women with breast

8

cancer.[27]  Together, they own St. Charles Surgical Hospital, LLC, Center for Restorative Breast Surgery, LLC, St. Charles Holdings, LLC, Sigma Delta Billing, LLC, and Sunrise Productions, LLC.  Dr. Sullivan and Dr. DellaCroce also own three captive insurance companies, Cerberus Casualty Corp., Orion Casualty Corp., and Janus Casualty Corp., which insured the Doctors and their business entities.[28]

19)    In 2011, Dr. Sullivan and Dr. DellaCroce established their three captive insurance companies, which were domiciled in the Bahamas under the management of Peter Strauss.[29]

20)    In 2014, Dr. Sullivan and Dr. DellaCroce became concerned by heightened risks from the IRS posed by owning offshore captives.[30]  Dr. Sullivan and Dr. DellaCroce expressed these concerns regarding IRS scrutiny to their CPA, David Kushner, who recommended that the Doctors meet with Mr. Feldman.[31]  Mr. Kushner had other clients who employed Feldman/Capstone's services. Mr. Feldman is the sole owner of the Feldman Law Firm.[32]  Mr. Feldman is also the owner, general counsel, and CEO of Capstone, which he completely controls.[33]

---

[27] *See* Transcript, Volume 1, August 3, 2021, at p. 153, line 11 – p. 155, line 14; p. 163, line 13 – p. 164, line 19 (Dr. Scott Sullivan).

[28] Dr. Sullivan owns Cerberus, Dr. DellaCroce owns Orion, and Dr. Sullivan and Dr. DellaCroce jointly own Janus.

[29] *See* Transcript, Volume 1, August 3, 2021, at p. 166, line 16 – p. 167, line 9 (Dr. Scott Sullivan).

[30] *See* Transcript, Volume 1, August 3, 2021, at p. 161, lines 14-19; p. 167, line 21 – p. 168, line 23 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1942, lines 4-19 (Dr. Frank DellaCroce).

[31] *See* Transcript, Volume 20, September 29, 2021, at p. 8007, line 23 – p. 8008, line 11 (David Kushner).

[32] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 13-17 (Stewart Feldman); Transcript, Volume 15, August 24, 2021, at p. 6018, lines 3-9 (Jeff Carlson).

[33] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 18-19; p. 5117, line 25 – p. 5118, line 5 (Stewart Feldman). Capstone's Vice President and Head of Operations, Daniel Calderon, testified that everyone within the organization reports to Stewart Feldman. *See* Transcript, Volume 16, September 14, 2021, at p. 6330, lines 8-13 (Daniel Calderon). *See* Transcript, Volume 22, October 1, 2021, at p. 8961, line 4 – p. 8692, line 8 (Robert Snyder) (citing, *e.g.*, Exhibit DRS-2003 at Joint-364817, Claims Reserve Payment Agreement at § 2(C)). Twelve other Claims Reserve Payment Agreements are included in Exhibit DRS 2003, which all include the same language at § 2(C) regarding Mr. Feldman's ultimate ownership and control over Capstone.

9

The hearing testimony also establishes that Mr. Feldman controls all aspects of the Feldman Law Firm, Capstone and, to a very significant extent, PoolRe.

21)     Captive insurance is a highly specialized area.  Many tax practitioners and CPAs lack expertise in captive insurance. David Kushner, the Doctors' CPA, had no such expertise.[34] For that reason, captive owners often hire specialized captive managers and captive lawyers to administer their captive insurance companies.  Owning a captive insurance company can provide benefits to the captive insurance company's owners, including beneficial tax treatment.[35]

22)     Feldman/Capstone jointly offer "turnkey" administrative and management services for captive insurance owners, like Dr. Sullivan and Dr. DellaCroce.  The stated purpose of the Feldman/Capstone captive program is to structure and operate captive insurance companies so as to qualify for partial tax-exempt status under the Internal Revenue Code.[36] And Feldman/Capstone promoted themselves and their captive program by extolling their numerous successes against the IRS.[37]

23)     Mr. Kushner assisted in setting up a meeting between the Doctors and Feldman/Capstone, which took place on January 19, 2015 in New Orleans, Louisiana.[38]  Dr. Sullivan, Dr. DellaCroce, Mr. Kushner, and Mr. David Sherman, the Doctors' lawyer, attended the

---

[34] *See* Transcript, Volume 17, September 23, 2021, at p. 6667, line 9 – p. 6676, line 25 (Jason Sharp); Transcript, Volume 20, September 29, 2021, at p. 7901, lines 5-13; p. 7902, line 23 – p. 7903, line 8 (David Sherman); Transcript, Volume 20, September 29, 2021, at p. 8004, lines 2-14; p. 8018, lines 3-20; p. 8141, lines 9-25 (David Kushner).

[35] *See, e.g.*, Exhibit J-20, Joint Engagement Letter at SULLIVAN011096 ("The intention is to structure and operate the captive insurer so as to qualify for partial tax exempt status . . . .").

[36] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096; *see also* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23; p. 2982, lines 6-9 (Richard Amoroso); Exhibit DRS-2491.

[37] *See* Transcript, Volume 10, August 19, 2021, at p. 4211, lines 13 – 24 (Professor Beckett Cantley) ("So, yeah, Feldman and Capstone would kind of meet the textbook definition of promoters. You know, what they do is sell a tax product, and just like, you know, other promotors, they always talk about how they are different and superior and a better work product, et cetera. So, yeah, they fit the definition of 6700 promoter under the Code.").

[38] *See* Transcript, Volume 20, September 29, 2021, at p. 8008, line 25 – p. 8009, line 10 (David Kushner).

meeting on behalf of the Doctors.[39]  Feldman/Capstone were represented at the meeting by Mr.

Feldman, Stephen Cohen (an attorney with the Feldman Law Firm and college classmate of David

Kushner), and Lance McNeel of Capstone.[40]

24)     Neither Mr. Sherman nor Mr. Kushner had expertise regarding captive insurance.[41]

Mr. Sherman's practice is primarily corporate, with a focus on health care; his tax practice

primarily deals with estate planning.[42]  Mr. Kushner deals with the IRS "a couple times a year at

most" regarding the inception of an audit, and he has only been involved in one case in U.S. Tax

Court – nearly 40 years ago.[43]  Because of Mr. Sherman and Mr. Kushner's lack of expertise in

the specialized area of captive insurance, it was necessary for the Doctors to rely upon experts in

the captive insurance field, like Feldman/Capstone. Feldman/Capstone asserts that both Sherman

and Kushner had the requisite expertise with respect to captive insurance. This Arbitrator disagrees

with that proposition. There is no question that Mr. Feldman was, as he put it, "the captain of the

ship."[44]  I find that the Doctors, Sherman and Kushner all relied on Mr. Feldman's superior

knowledge and expertise in this area, and any attempt to shift responsibility from

Feldman/Capstone to Sherman and Kushner as agents of the Doctors is improper.

---

[39] *See* Transcript, Volume 1, August 3, 2021, at p. 169, lines 6-19 (Dr. Scott Sullivan); Transcript, Volume 20, September 29, 2021, at p. 8009, lines 11-17 (David Kushner). The Hospital's COO, Cheri Saltaformaggio, and the Hospital's CFO, Sarah Underwood, also attended the meeting.

[40] *See* Transcript, Volume 1, August 3, 2021, at p. 169, lines 6-19 (Dr. Scott Sullivan); Transcript, Volume 20, September 29, 2021, at p. 8009, lines 11-17 (David Kushner).

[41] *See* Transcript, Volume 20, September 29, 2021, at p. 7902, line 23 – p. 7903, line 8 (David Sherman); Transcript, Volume 20, September 29, 2021, at p. 8004, lines 2-14 (David Kushner).

[42] *See* Transcript, Volume 20, September 29, 2021, at p. 7901, lines 5-13 (David Sherman).

[43] *See* Transcript, Volume 20, September 29, 2021, at p. 8018, lines 3-20 (David Kushner).

[44] See Transcript, Volume 20, September 29, 2021, at p. 7903, lines 10-15 (David Sherman).

11

25)     At or around the time of the January 2015 meeting, Mr. Feldman provided the Doctors a compilation of marketing materials and information regarding the Feldman Law Firm and Capstone.[45]  Mr. Feldman helped write these marketing materials,[46] which boasted that the Feldman/Capstone team had over 125 years of federal and state income, estate and gift tax, and corporate, regulatory and insurance experiences.[47] The Feldman/Capstone marketing materials discussed Mr. Feldman's "30 + year" experience as a tax attorney and Capstone's formation of "in excess of 120 captive insurance companies" since 1998.[48]  The Feldman/Capstone marketing materials discussed the "significant insurance and tax benefits of captives for owners of middle-market businesses," stating that the "mechanics of alternative risk planning are straightforward with property and casualty insurance premiums being 100% deductible to the insured as its ordinary and necessary business expense."[49]  The Feldman/Capstone marketing materials stated, "Statutory authority plus various IRS pronouncement and interpretive court decisions make this an ideal time for closely held businesses to consider a captive."[50]  And the Feldman/Capstone marketing materials stated: "It is crucial that [the captives] are managed properly in both the short and long term.  That is why having the appropriate professionals involved when considering a captive is paramount."[51]

---

[45] See Transcript, Volume 13, August 22, 2021, at p. 5139, line 22 – p. 5140, line 20 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials).

[46] See Transcript, Volume 13, August 22, 2021, at p. 5141, line 20 – p. 5142, line 4 (Stewart Feldman).

[47] See Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman).

[48] See Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman).

[49] See Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001738 – 39).

[50] See Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001739).

[51] See Transcript, Volume 13, August 22, 2021, at p. 5150, line 11 – p. 5151, line 6. (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001739).

26)     During the January 2015 meeting, Dr. Sullivan and Dr. DellaCroce conveyed their concerns regarding IRS scrutiny.[52]  In response, Mr. Feldman touted his spotless record before the IRS, with more than fifty successful outcomes.[53]  Mr. Feldman did not adequately disclose any facts regarding IRS adverse findings against the Feldman/Capstone captive program at the January 2015 meeting.[54] This failure to disclose already known IRS issues in the captive area was improper and misleading.

27)     At the January 2015 meeting, the Doctors also raised concerns regarding being able to exit the captive space.[55]  In response, Mr. Feldman led the Doctors to believe that winding down their captives "was a quick and easy process."[56]

28)     Following the January 2015 meeting, the Doctors engaged Feldman/Capstone. The Doctors signed an initial retention letter on March 3, 2015, hiring Feldman to conduct a "Health Check-Up" – an analysis of the Doctors' existing captive program under Mr. Strauss.[57]

---

[52] *See* Transcript, Volume 1, August 3, 2021, at p. 171, lines 5-23 (Dr. Scott Sullivan).

[53] *See* Transcript, Volume 1, August 3, 2021, at p. 178, line 19 – p. 179, line 1 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1930, line 1 – p. 1931, line 6 (Dr. Frank DellaCroce); Transcript, Volume 20, September 29, 2021, at p. 7910, lines 8-17 (David Sherman); Transcript, Volume 20, September 29, 2021, at p. 8014, lines 10-19 (David Kushner).

[54] *See, e.g.*, Transcript, Volume 1, August 3, 2015, at p. 178, line 19 – p. 179, line 17 (Dr. Scott Sullivan).

[55] *See* Transcript, Volume 1, August 3, 2021, at p. 168, lines 12-23 (Dr. Scott Sullivan); Transcript, Volume 3, August 5, 2021, at p. 1056, lines 10-18 (Dr. Scott Sullivan).

[56] *See* Transcript, Volume 3, August 5, 2021, at p. 1059, lines 2-11 (Dr. Scott Sullivan) (citing Exhibit FC-261, E-mail from Dr. Scott Sullivan (Oct. 31, 2019)); *see also* Exhibit J-88, E-mail from Dr. Scott Sullivan at SULLIVAN002920 (Dec. 5, 2019) ("After all, the multiple times we asked about closing the captive out when you were soliciting our business, you made it sound as easy as hitting the sell button on my E*TRADE account.").

[57] *See* Exhibit DRS-491, Letter from David Kushner enclosing signed Engagement Memorandum, March 3, 2015; *see also* Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

Feldman/Capstone sent a preliminary draft of the Health Check-Up to the Doctors on May 29, 2015,[58] and sent the final version on August 4, 2015.[59]

29)    The Health Check-Up criticized Mr. Strauss's stewardship of the Doctors' captives.[60] The Health Check-Up also warned the Doctors: (1) that, under Mr. Strauss, there was no "'captain of the ship' that takes responsibility for the planning's design, implementation and operation," (2) about "unnecessary risks associated with operating in a fringe domicile like the Bahamas," and (3) about "questions as to risk distribution" involved in Mr. Strauss's captive program.[61]

30)    Risk distribution is essential for a captive insurance company to qualify for tax beneficial treatment from the IRS.[62] As stated by Feldman in the Health Check-Up: "Courts have stated that for a true insurance arrangement to exist, there must be . . . risk distribution."[63] Feldman stated further that, "[t]o achieve risk distribution, the insurance company must distribute its risks among a pool of risks."[64]

31)    The "pool of risks" used by Feldman/Capstone was PoolRe.[65] PoolRe is a vehicle used by Feldman/Capstone for the purpose of satisfying the IRS's risk distribution requirement. Virtually all of its activities are directed and conducted by Feldman/Capstone.  Mr. Feldman

---

[58] *See* Exhibit J-12, Preliminary Draft of Health Check-Up (May 29, 2015).

[59] *See* Exhibit J-16, E-mail from Capstone's Lance McNeil (Aug. 4, 2015) (transmitting the Health Check-Up Report (Aug. 3, 2015)).

[60] *See* Transcript, Volume 1, August 3, 2021, at p. 175, line 19 – p. 178, line 18 (Dr. Scott Sullivan) (citing Exhibit J-16, Health Check-Up Report at JOINT-002718 (Aug. 3, 2015)).

[61] *See* Exhibit J-16, Health Check-Up Report at JOINT-002718 (Aug. 3, 2015).

[62]  *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.

[63] *See* Exhibit J-16, Health Check-Up Report at JOINT-002721 (Aug. 3, 2015).

[64] *See* Exhibit J-16, Health Check-Up Report at JOINT-002721 (Aug. 3, 2015).

[65] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

caused the incorporation of PoolRe.[66]   PoolRe receives no business except that given to it by Feldman/Capstone.[67] PoolRe does not have any employees or an office.[68]   Capstone is the manager and handles the day-to-day operations of PoolRe.[69]   And Capstone exercises significant decision-making authority on behalf of PoolRe "without even consulting or conferring with anyone from PoolRe."[70] The sole shareholder of PoolRe, Stephen Friedman, was shockingly ignorant of even the most fundamental aspects of PoolRe's activities. This Arbitrator concludes that, based on the testimony, and, as for the reasons stated herein, Mr. Feldman effectively controlled all aspects of PoolRe's operations.

32)   The strategy recommended by Feldman/Capstone to achieve adequate risk distribution for the Doctors' captives, so that they would qualify for tax beneficial treatment with the IRS, was to have the Doctors' captives participate in the PoolRe risk pool.[71]   While soliciting the Doctors' business, Mr. Feldman touted "how good PoolRe was and how confident he was" that PoolRe qualified as a more structurally sound reinsurance risk pool than Mr. Strauss's risk pool.[72]   Mr. Feldman did not disclose to the Doctors any IRS findings regarding PoolRe's inability to satisfy risk distribution for Capstone-administered captives or that Mr. Feldman was using

---

[66] *See* Transcript, Volume 11, August 20, 2021, at p. 4421, line 16 – p. 4422, line 5 (Stewart Feldman) ("And the firm formed PoolRe").

[67] *See* Exhibit J-20 at SULLIVAN011104, Exhibit E to Joint Engagement Letter; *see also* Transcript, Volume 22, October 1, 2021, at p. 9123, lines 11-19 (Jeff Carlson) ("Only clients of both the [Feldman Law] Firm and Capstone . . . may participate in" PoolRe's risk pools.").

[68] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 22-24 (Stewart Feldman); Transcript, Volume 22, October 1, 2021, at p. 8840, lines 13-15 (Robert Snyder); Transcript, Volume 15, August 24, 2021, at p. 6026, line 24 – p. 6027, line 12 (Jeff Carlson).

[69] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 19-21 (Stewart Feldman); Transcript, Volume 22, October 1, 2021, at p. 8840, lines 16-18 (Robert Snyder).

[70] *See* Transcript, Volume 22, October 1, 2021, at p. 8947, line 25 – p. 8948, line 12 (Robert Snyder).

[71] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

[72] *See* Transcript, Volume 1, August 3, 2015, at p. 179, lines 8-17 (Dr. Scott Sullivan).

PoolRe's risk pool to provide him and his related entities with their primary malpractice and legal expense insurance coverages.[73]

33)      Based on Feldman/Capstone's representations concerning their successes against the IRS, the strength of PoolRe's risk pools, and criticisms of Mr. Strauss's captive program, the Doctors engaged Feldman/Capstone to administer their captives and agreed to participate in PoolRe's risk pools.[74]  Except for the fees and contract length, Mr. Feldman rejected all changes to the Engagement Letter. It was presented on an essentially take it or leave it basis.[75]  The Doctors signed the Joint Engagement Letter with Feldman/Capstone on December 7, 2015.[76]  The stated purpose of the Joint Engagement Letter was for Feldman/Capstone to structure and operate the Doctors' captive insurance companies so as to qualify for partial tax-exempt status under the Internal Revenue Code.[77]  In order to obtain tax-exempt status, the Doctors had to participate in PoolRe, and Feldman/Capstone both "expected" and "encouraged" the Doctors to participate in PoolRe.[78]

---

[73] *See* Transcript, Volume 1, August 3, 2021, at p. 184, line 23 – p. 186, line 19; p. 240, lines 17 – 25; p. 243, line 22 – p. 245, line 15 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1933, lines 16-20; p. 1938, line 19 – p. 1940, line 1; p. 1957, line 5 – p. 1958, line 10; p. 1978, line 25 – p. 1980, line 24 (Dr. Frank DellaCroce).

[74] *See* Transcript, Volume 1, August 3, 2015, at p. 185, line 11 – p. 186, line 19 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1927, line 12 – p. 1932, line 16 (Dr. Frank DellaCroce).

[75] See Transcript, Volume 20, September 29, 2021, at p. 7925, line 19 through p. 7927, line 3 (David Sherman).

[76] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011078.

[77] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096; *see also* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23; p. 2982, lines 6-9 (Richard Amoroso); Exhibit DRS-2491, Video of Mr. Feldman's August 6, 2015 Speech (Mr. Feldman declaring, "Really, what we're talking about is God's work here. We're talking about reducing federal income taxes.").

[78] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN 011071 ("It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement"); at SULLIVAN011104 ("Capstone encourages participation in . . . PoolRe").

**II.    Mr. Feldman, the Feldman Law Firm and Capstone did not disclose that the Doctors were reinsuring Feldman/Capstone's professional liabilities, errors & omissions, and legal expenses.**

34)    The entire Engagement Letter is an exercise in obfuscation. The testimony establishes that it was written in such a way as to enable Feldman/Capstone to point to some provision and argue adequacy of disclosure while hiding the actual reality.

35)    Prior to and at the time of execution of the Joint Engagement Letter, Feldman did not disclose that the Doctors would be reinsuring the professional liabilities, errors & omissions, and legal expenses of their own lawyer, Mr. Feldman and the Feldman Law Firm, and their own captive manager, Capstone, by participating in PoolRe's risk pools.  These material facts were concealed by Feldman/Capstone when soliciting business from the Doctors.  Had these material facts been fully disclosed, the Doctors would not have engaged Feldman or Capstone.[79]

36)    Feldman/Capstone understood that the captive insurance work they performed "creat[ed] unusual exposures" for Feldman/Capstone.[80] Feldman/Capstone protected against these exposures by including in the risk pool insurance policies covering Feldman/Capstone's lawyers professional liabilities, errors & omissions, and legal expense liabilities.

37)    The inclusion of Feldman/Capstone's policies in the risk pool exposed Feldman/Capstone's clients to substantial risks and liabilities.[81]

38)    A Business Operations Summary of Feldman/Capstone, prepared by Feldman/Capstone, highlighted the degree and likelihood of exposure from Feldman/Capstone's

---

[79] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

[80] *See* Exhibit DRS 2681 at FCP_0063500, A.M.Y.'s Business Operations Summary at p. 5.

[81] See Transcript, Volume 8, August 17, 2021, at p. 3000, line 15 – p. 3003, line 4 (Richard Amoroso).

17

policies included in the risk pool.[82]   This Business Operations Summary noted that obtaining
coverage for Feldman's lawyers professional liabilities through conventional insurance markets
"would be very difficult" considering the volume of "past claims . . . and related breach of fiduciary
claims" involving Feldman/Capstone.[83]

39)   Each of the policies in the pool state:

THE COVERAGES AFFORDED BY THIS POLICY ARE EXCESS OVER, AND
SHALL NOT CONTRIBUTE WITH, ANY OTHER VALID AND
COLLECTIBLE INSURANCE POLICY ISSUED BY ANY OTHER INSURER,
BE IT STATED AS PRIMARY, CONTRIBUTORY, EXCESS, CONTINGENT,
OR OTHERWISE . . . **THE COVERAGES AFFORDED HEREIN WILL
DROP DOWN AND PROVIDE COVERAGE ONLY IF THERE ARE NO
OTHER VALID AND COLLECTIBLE INSURANCE POLICIES IN FORCE
TO WHICH A CLAIM WOULD APPLY, SUBJECT TO THIS POLICY'S
TERMS AND CONDITIONS**.[84]

40)   Feldman does not carry lawyers professional liability insurance through
conventional markets.[85] Thus, the fact that Feldman did not have any other insurance covering its
lawyers professional liabilities increased the likelihood of exposure and amount of risks to
Feldman's clients participating in the pool from Feldman's professional lawyers liabilities.[86] In
simple terms, Feldman, who has a documented history of litigiousness, did not tell the Doctors

---

[82] Capstone's Head of Operations, Daniel Calderon, testified that somebody at A.M.Y. or Feldman would, in the
ordinary course of business, review the Business Operations Summary and sign off on it for accuracy. *See* Transcript,
Volume 16, September 14, 2021, at p. 6281, lines 7-16 (Daniel Calderon).

[83] *See* Exhibit DRS-1856 at FCP_0063500, Business Operations Summary of Feldman and Capstone at p. 5 ("The
Law Firm does not carry lawyers professional liability through conventional insurance markets . . . . Because of past
claims . . . and related breach of fiduciary claims, obtaining coverage would be very difficult.").

[84] *See, e.g.,* Exhibit DRS-2109, A.M.Y.'s 2019 Lawyers Professional Liability Insurance Policy at Joint-331738
(emphasis in original). Because Mr. Feldman did not have primary insurance, the policies written by his insurance
company, A.M.Y., "dropped down" and became primary coverage.

[85] *See* Transcript, Volume 14, August 23, 2021, at p. 5346 line 6 – p. 5357, line 11 (Stewart Feldman). "There is no
dispute" that the A.M.Y. policies included in the risk pool provided the "primary malpractice coverage for [the]
Feldman Law Firm."[85] *See* Transcript, Volume 11, August 20, 2021, at p. 4545, lines 10-14 (Representation by counsel
during testimony of Stewart Feldman).

[86] *See* Transcript, Volume 6, August 9, 2021, at p. 2338, line 15 – p. 2340, line 22 (Richard Amoroso).

that, if he was sued by them or any of his other clients, all of the clients in the risk pool would be

paying his fees and also any potential award.[87] In other words, a client's malpractice claim would

be defended by the client's money, and those defense costs would be primary, not excess. Further,

if damages were in excess of the attachment point, the clients' captive insurers would be liable for

their own lawyers' malpractice. This should have been clearly and distinctly disclosed.

      41)     The Business Operations Summary stated that Feldman/Capstone had incurred

"20± million" in "[i]nsured and uninsured losses" and that lawsuits had been filed against

Feldman/Capstone "with very significant litigation expenses incurred."[88] The Business Operations

Summary further noted that Feldman/Capstone "ha[d] a policy of collecting [their] outstanding

billings and in the past ha[d] demonstrated a willingness to sue clients for outstanding fees, which

leads to the usual counterclaims against the Law Firm and Capstone and their principals."[89] From

September 22, 2018 to July 22, 2020 alone, Feldman or Capstone commenced at least eight

separate arbitrations against fifty of their own clients participating in the Feldman/Capstone

---

[87] All PoolRe policies had an "attachment point," below which the sole obligation for coverage lay with the captive insurer. In the Feldman/Capstone case, A.M.Y. In 2018, A.M.Y.'s attachment point was 252,000. In 2019, it was 266,675. However, as long as the claim was never resolved, A.M.Y. had no financial obligation. To this day, the claims are unresolved, and A.M.Y. has paid nothing.

[88] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 5, FCP_0063500.

[89]  *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at pp. 5-6, FCP_0063500 to 01. Capstone's Head of Operations, Daniel Calderon, testified that somebody at A.M.Y. or Feldman would, in the ordinary course of business, review the Business Operations Summary and sign off on it for accuracy. *See* Transcript, Volume 16, September 14, 2021, at p. 6281, lines 7-16 (Daniel Calderon).

captive program.[90] At least twenty-nine of these clients responded to being sued by Feldman or Capstone by filing their own counterclaims or demands against Feldman/Capstone.[91] Feldman/Capstone then submitted twenty-three separate insurance claims to PoolRe relating to these arbitrations and lawsuits, thereby subjecting their clients to a situation in which the clients will have to pay (or have already paid) for Feldman/Capstone's legal expenses in fighting against their clients.[92] Thirteen of these insurance claims submitted by Feldman/Capstone to PoolRe remain open and pending due to an intentional decision by Feldman and Capstone to delay resolution of these open claims.[93] The net result of this practice is that both the Feldman Law Firm and Capstone actually made money on any client lawsuit by having the clients pay fees and costs

---

[90] *See* Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman) (citing Exhibit DRS-1462, Capstone's Arbitration Demand against (1) Nestor Martinez; (2) NM Health Services-North, P.A.; (3) Pain & Recovery Clinic of North Houston; and (4) Caguas Casualty Corp. (Sept. 22, 2018); Exhibit DRS-1478, Capstone's Arbitration Demand against (5) James McAda; (6) Sherri Mills; (7) McAda Drilling Fluids, Inc.; (8) McAda Valve and Supply, Inc.; (9) Fluids Casualty Corp.; and (10) McAda Irrevocable Family Trust (June 28, 2019); Exhibit DRS-2671, Capstone's Arbitration Demand against (11) Frank J. Reyna; (12) Patricia Reyna; (13) Enerset Electric Ltd.; and (14) Intersect Casualty Corp. (Aug. 9, 2019); Exhibit DRS-1424, Capstone's Arbitration Demand against (15) Dr. Houng Le; (16) Dr. Minh Nguyen; (17) 1960 Family Practice, P.A.; (18) Le Nguyen Family, L.P.; (19) Family Practice Holdings, LLC; (20) and (21) Family Casualty Corp. (Jan. 10, 2020); Exhibit DRS-1423, Capstone's Arbitration Demand against (22) Thomas Bunkley; (23) Matthew Keegan; (24) Caprock Land Company, LLC; (25) Pieta Insurance Company; (26) and Plains Insurance Company (Jan. 22, 2020); Exhibit DRS-1425, Capstone's Arbitration Demand against (27) Jonathan Tratt; (28) Tratt Properties, LLC; (29) Logistics Holdings, LLC; (30) Logistics Casualty Corp.; (31) Elwood Logistics Center, LLC; (32) JIM Holdings, LLC; (33) and JIM Amazon, LLC (Mar. 6, 2020); Exhibit DRS-1460, Capstone's Arbitration Demand against (34) Dr. Scott Sullivan; (35) Dr. DellaCroce; (36) St. Charles Surgical Hospital, LLC; (37) St. Charles Holdings, LLC; (38) Center for Restorative Breast Surgery, LLC; (39) Sigma Delta Billing, LLC; (40) Cerberus Insurance Corp.; (41) Janus Insurance Corp.; (42) and Orion Insurance Corp. (May 7, 2020); Exhibit DRS-2677, Capstone's Arbitration Demand against (43) John Caldwell, (44) BLSR Operating, Ltd.; (45) BLSR Management Corp.; (46) RBC Interests, Ltd.; (47) RBC Energy Services, LLC; (48) Petroguard Property & Casualty Insurance Corporation; (49) Tammie Caldwell; and (50) Caldwell Investment, Ltd. (July 22, 2020).

[91] *See* Exhibit DRS-1458, Martinez Parties' Counter Petition in Arbitration (Dec. 7, 2018); Exhibit DRS-1482, McAda Parties' Original Complaint (July 15, 2019); Exhibit DRS-2672, Reyna Parties' Answer and Counterclaim; Exhibit DRS-1428, The Caprock Parties' Answer, Counterclaim, and Third-Party Claim (Mar. 4, 2020).

[92] *See* Transcript, Volume 11, August 20, 2021, at p. 4318, line 7 – p. 4320, line 1 (citing Exhibit DRS-2000, 2019 Claims Summary Chart); Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart A. Feldman (June 6, 2020, 17:17 CST); Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[93] *See* Transcript Volume 16, September 14, 2021, at p. 6174, line 1 – p. 6177, line 25; p. 6314, lines 16-22; p. 6436, line 7 – p. 6439, line 1 (Daniel Calderon).

of defense. Moreover, because Capstone controls the adjustment process, Feldman's own captive, A.M.Y., may never be called upon to pay a claim. For that reason, the attachment point, up to which A.M.Y. (or any other captive) would be solely liable, is meaningless, unless Mr. Feldman chose to adjust the claim. Feldman/Capstone made more money by never adjusting the claim.

42) The totality of evidence and testimony in the record leads me to find that Feldman's and Capstone's professional liabilities, errors and omissions, and legal expense liabilities were substantial exposures and risks that Feldman/Capstone should have fully disclosed to their clients.

**A.** **The Doctors did not know that they were insuring Feldman's and Capstone's professional liabilities, errors & omissions, and legal expenses.**

43) Dr. Sullivan testified that Feldman/Capstone never disclosed that if the Doctors sued Feldman or Capstone for malpractice, that Feldman/Capstone could submit the claim to the pool and make the Doctors pay for part of Feldman/Capstone's defense of the Doctors' claims against Feldman/Capstone.[94]   Dr. DellaCroce also testified that he was unaware that he would be insuring Feldman/Capstone's malpractice and legal expense liabilities.[95] This Arbitrator accepts this testimony as credible and finds that the Doctors were unaware that their lawyer, Mr. Feldman, and captive manager, Capstone, had subjected them "to a situation where if [the Doctors] were sued by Mr. Feldman and his companies, [the Doctors] end up being responsible for paying for [Feldman's and Capstone's] legal fees and other associated costs with those pursuits."[96] It defies

---

[94] *See* Transcript, Volume 1, August 3, 2021, at p. 240, lines 17 – 25; p. 243, line 22 – p. 245, line 15 (Dr. Scott Sullivan).

[95] *See* Transcript, Volume 5, August 7, 2021, at p. 1978, line 25 – p. 1980, line 24; p. 1957, line 5 – p. 1958, line 10 (Dr. Frank DellaCroce).

[96] *See*, *e.g.*, Transcript, Volume 5, August 7, 2021, at p. 1912, lines 13-21 (Dr. Frank DellaCroce).

credibility that any reasonable client would ever engage a lawyer if the lawyer told him, in plain English, "if you sue me, I will use your money to defend the claim."

44)    Even Feldman's longstanding ethics advisor and expert, James McCormack, conceded that Feldman/Capstone did not disclose to their clients that the clients were reinsuring Feldman/Capstone's malpractice liabilities and legal expenses:[97]

45)    This Arbitrator finds that the inclusion of Feldman's and Capstone's professional malpractice liabilities, errors & omissions, and legal expenses liabilities in the risk pool was material information that needed to be clearly disclosed by Feldman/Capstone to the Doctors.  I further find that Feldman/Capstone did not disclose to the Doctors that the Doctors were insuring Feldman's and Capstone's professional malpractice liabilities, errors and omissions, and legal expenses liabilities.

**B.    Exhibit E to the Engagement Letter does not disclose that Feldman's and Capstone's clients were reinsuring Feldman's and Capstone's professional liabilities, errors & omissions, and legal expenses.**

46)    As noted, the Engagement Letter was crafted in such a way as to contain language upon which Feldman/Capstone attempt to argue adequate disclosure despite the fact that the language, in fact, obscured the actual reality. In this instance, Feldman/Capstone rely upon a single sentence in Exhibit E to the Joint Engagement Letter to suggest that they made adequate disclosure to their clients that their clients would be insuring Feldman/Capstone's professional liabilities,

---

[97] *See* Transcript, Volume 19, September 28, 2021, at p. 7630, line 1 – p. 7633, line 4 (James McCormack) (emphasis added).

errors & omissions, and legal expense liabilities.[98]  This sentence in Exhibit E states, "Note that among the several hundred policies in the pool are policies issued to Capstone or the Firm (or their affiliates) and that their affiliated captives **may** participate in the pool."[99]  This sentence regarding the mere possibility that a captive affiliated with Feldman or Capstone or their affiliates might participate in the pool is not adequate disclosure.  It does not state the fact that Feldman/Capstone were, in fact, getting their clients to be their primary malpractice insurers and had been doing so since at least 2010.[100]

47)     This sentence regarding the possibility that a captive affiliated with Feldman or Capstone might participate in the risk pool was misleading and incomplete for numerous reasons, including, *inter alia*:

- Exhibit E states falsely that Capstone *or* Feldman – *or* their unspecified affiliates – "***may*** participate in the pool."  In fact, Feldman and Capstone had participated in the pool every year since 2010, at least.[101]  Feldman and Capstone misled the Doctors by presenting Feldman's and Capstone's actual participation in the pool as a mere possibility.

- Exhibit E does not reflect the nature of the coverages provided by pool participants to Feldman and Capstone.  Exhibit E does not disclose that Feldman's and

---

[98] This sentence regarding the possibility that a captive affiliated with Capstone and Feldman may participate in the pool was contained in Exhibit E to certain Joint Engagement Letters and sent as part of a yearly insurance binder *after* coverages had already been bound.  Neither disclosure was adequate.  *See, e.g.,* Transcript Volume 6, August 9, 2021, at p. 2447, line 14 – p. 2448, line 18 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, at p. 2508, line 22 – p. 2509, line 7 (Richard Amoroso).

[99] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011104 (emphasis added).

[100] *See* Exhibit DRS-1512 at pp. 5-8, Feldman/Capstone's Joint Objections and Responses to Respondents' First Set of Discovery Requests at Answers to Requests for Admission Nos. 1-12 (Jan. 27, 2021).

[101] *See* Transcript, Volume 7, August 16, 2021, at p. 2603, lines 7-12 (Richard Amoroso); Transcript, Volume 13, August 22, 2021, at p. 5127, lines 8-18; p. 5383, lines 14-23 (Stewart Feldman); Exhibit DRS-1512, Discovery Responses, January 27, 2021.  In addition, Mr. Amoroso described an e-mail sent by Mr. Feldman to a class member in the Jones Arbitration noting that Mr. Feldman's captive had "been in the pool since 1998." *See* Transcript, Volume 7, August 16, 2021, at p. 2624, lines 10-24 (Richard Amoroso).

Capstone's primary malpractice and legal expense insurance coverages were in the pool and being insured by Feldman's and Capstone's clients.[102]

48)     The duty is on Feldman and Capstone to disclose – the duty is not on the client to ask. Mr. Watkins referred to the Engagement Letter as a "scavenger hunt."[103] I agree. A lawyer's obligation to disclose is not a shell game.

## C.     The Doctors had no reason to suspect that Feldman/Capstone's primary malpractice insurance coverages were in the risk pools.

49)     This Arbitrator finds that Feldman/Capstone misrepresented to the Doctors that the PoolRe risk pool consisted of "generally similar policies covering generally similar risks."[104] Feldman/Capstone represented that "all of these [policies in the pool] were going to be homogenous."[105] But the risks in the pool were not similar or homogenous.[106] The risks insured by the A.M.Y. policies were far more substantial, and presented substantially greater exposure to the risk pool participants, than the risks put in the pool by the Doctors' captives.

50)     This Arbitrator disagrees with Feldman/Capstone's contention that the Doctors should have known that Feldman/Capstone's primary professional malpractice liabilities were in the risk pool. Dr. Sullivan's testimony is to the contrary.[107]

51)     Under Louisiana law, medical malpractice claims are subject to a $500,000 cap.[108] The Doctors maintained professional liability insurance through LAMMICO, along with the state-

---

[102] See Transcript, Volume 6, August 9, 2021, at p. 2416, line 23 – p. 2417, line 5; p. 2439, lines 3-16 (Richard Amoroso).

[103] See Transcript, Volume 4, August 6, 2021, at p. 1555, line 19 through p. 1556, line 17 (Thomas Watkins).

[104] See Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.

[105] See Transcript, Volume 3, August 5, 2021, at p. 1232, lines 21-23 (Dr. Scott Sullivan).

[106] See Transcript, Volume 7, August 16, 2021, at p. 2491, line 18 – p. 2494, line 13 (Richard Amoroso).

[107] See Transcript, Volume 1, August 3, 2021, at p. 228, line 18 – p. 229, line 24 (Dr. Scott Sullivan).

[108] LA. REV. STAT. § 40:1231.2(B)(1) ("The total amount recoverable for all malpractice claims for injuries to or death of a patient . . . shall not exceed five hundred thousand dollars plus interest and cost.").

operated patient compensation fund.[109]  That is the Doctors' primary malpractice coverage.  The Doctors also had gap coverage[110] and an "Unauthorized Treatments" policy.[111]  That is not homogenous with the Feldman, Capstone and A.M.Y. coverages.[112]

52)  Feldman/Capstone argue that both Mr. Sherman and Mr. Kushner were aware that Feldman/Capstone had policies in the risk pool.[113]  But Mr. Sherman testified that Feldman told him that "PoolRe excludes primary policies from the pool."[114]  Mr. Sherman testified further that the Doctors "specifically asked about certain primary policies like the [D]octor's medical malpractice insurance" and that "Mr. Feldman was clear [the pool] was not for primary insurance."[115]  Similarly, Mr. Kushner testified that he did not know that the Doctors were insuring Feldman's professional malpractice liabilities:

> [T]he impression and what I always heard is it was similar risks in the pool as to the other client and it wasn't going to be the main insurance or malpractice insurance of a particular being issued by the pool, because all the other clients were being told it was for excess risk, it was for other types of risk that were not of the main types of policies – mainstream policies one would get . . ..  But I never thought the main insurance policy of malpractice was inside The Feldman Law Firm and that clients were insuring with that.  That's all I stated.  That was a surprise to me.[116]

---

[109] *See* Transcript, Volume 2, August 4, 2021, at p. 648, line 25 – p. 649, line 17 (Dr. Scott Sullivan).  LAMMICO is the Louisiana Medical Malpractice Insurance Company.

[110] *See* Exhibit FC-376.2, at p. 6, Joint-315169; *see also* Exhibit FC-374.1, at Joint-327097 (sending binder of policies with policy period beginning December 21, 2015 on February 23, 2016 – more than two months into policy period).

[111] *See* Exhibit FC-376.6.1480, at Joint-320635.

[112] The entire purpose of the captive business model was to obtain coverage for unusual occurrences which were not likely to occur and to obtain a tax deduction for the premiums paid. A primary malpractice policy and related coverages do not fall within that model.

[113] *See* Feldman/Capstone's Post-Trial Brief at p. 147.

[114] *See* Transcript, Volume 20, September 29, 2021, at p. 7963, line 5 – p. 7966, line 1; p. 7994, line 24 – p. 7995, line 17 (David Sherman).

[115] *See* Transcript, Volume 20, September 29, 2021, at p. 7963, line 5 – p. 7966, line 1; p. 7994, line 24 – p. 7995, line 17 (David Sherman).

[116] *See* Transcript, Volume 20, September 29, 2021, at p. 8074, line 24 – p. 8077, line 2 (David Kushner).

53)     Mr. Sherman testified that none of his communications with Feldman disclosed that Feldman was using the risk pool for its legal malpractice and litigation expense coverages.[117] Mr. Kushner testified that (1) he did not understand that if the Doctors sued Feldman for legal malpractice or breach of fiduciary duty, that the captives would be required to pay a portion of Feldman's defense expense; and (2) Feldman never told him that he used the pool for his primary malpractice coverage.[118] This Arbitrator accepts the testimony of Mr. Sherman and Mr. Kushner that they were unaware that the Doctors were insuring Feldman/Capstone's professional malpractice liabilities.  Further, this Arbitrator finds that Mr. Feldman led the Doctors' advisors, Mr. Sherman and Mr. Kushner, to believe that the pool was not for anyone's primary malpractice liabilities, much less the lawyer who was responsible for putting the program together.

54)     Considering the totality of the evidence and testimony in the record, this Arbitrator finds that Feldman/Capstone did not disclose to the Doctors that the Doctors would be the primary insurers of Feldman/Capstone's professional liabilities, errors & omissions, and legal expenses. The Arbitrator finds further that the Doctors did not know, and could not have reasonably been expected to know, that they were reinsuring the professional liabilities and legal expenses of their lawyer, Feldman, and captive manager, Capstone.

## III.     Mr. Feldman, the Feldman Law Firm and Capstone did not disclose the IRS's adverse determinations against Capstone-administered captives.

55)     The Joint Engagement Letter was executed on December 7, 2015. Feldman/Capstone also did not disclose material information to the Doctors concerning the IRS's

---

[117] *See* Transcript, Volume 20, September 29, 2021, at p. 7909, line 24 – p. 7910, line 7; p. 7928, line 25 – p. 7929, line 13 (David Sherman).

[118] *See* Transcript, Volume 20, September 29, 2021, at p. 8010, lines 12-19; p. 8016, lines 17 – p. 8017, line 18 (David Kushner).

adverse determinations against Capstone-administered captives before the Joint Engagement Letter was executed, including the following facts:

- In July 2013, more than two years before the Engagement Letter was executed, the IRS determined that Reserve Mechanical, a captive insurer structured by Feldman and administered by Capstone, failed to qualify as an insurance company.[119]

- Feldman knew in 2013 that:

  - the IRS found that Reserve Mechanical was not an insurance company;[120]

  - the IRS had determined that Reserve Mechanical lacked the essential element of risk distribution;[121]

  - the IRS had determined that the PoolRe pooling arrangement did not provide sufficient risk distribution for Reserve Mechanical to be treated as an insurance company.[122]

- Reserve's 2013 Protest to the IRS audit Examination Report, which Mr. Cohen, a Feldman Law Firm lawyer, helped prepare, acknowledged that the IRS audit (1) found that Reserve Mechanical was not an insurance company and (2) suggested that PoolRe was not insurance.[123]

- In addition to the IRS audit of Reserve Mechanical, the IRS issued adverse audit Examination Reports with respect to six other Capstone-administered captives.[124] Each of these other adverse audit Examination Reports were issued before the Doctors signed the 2015 Joint Engagement Letter. Those captives stipulated to be

---

[119] *See* Exhibit DRS-2715, IRS Examination Report of Reserve Mechanical, July 24, 2013, at Joint-340830. The Reserve Mechanical file was only produced by Feldman/Capstone after multiple Orders to compel. See Order dated March 8, 2022. In point of fact, Mr. Feldman was aware of the IRS inquiry into Reserve Mechanical as early as 2010 when the Reserve Mechanical audit began.

[120] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[121] *See* Transcript, Volume 21, September 30, 2021, at p. 8555, lines 14-18 (Steven Cohen).

[122] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

[123] *See* Exhibit DRS-2715, July 24, 2013 IRS Examination Report; Exhibit DRS-1874, Letter to IRS, September 3, 2013.

[124] *See* Transcript, Volume 21, September 30, 2021, at p. 8521, line 15 – p. 8522, line 15 (Steven Cohen); Transcript, Volume 9, August 18, 2021, at p. 3423, lines 5-23 (Lyle Press).  *See also* Exhibit DRS-2598, IRS audit report of Columbia, September 3, 2013; Exhibit DRS-2604, IRS audit report of Marylebone, March 14, 2014; Exhibit DRS-2606, IRS audit report for Performance, July 11, 2013; Exhibit DRS-2609, IRS audit report for Restoration, May 9, 2013; Exhibit DRS-2612, IRS audit report for Security, June 19, 2014; Exhibit DRS-2617, IRS audit report for Treadwell, June 10, 2013.   Each of these IRS audits of Capstone-administered captives were issued prior to the December 2015 execution of the Joint Engagement Letter.

bound by Reserve Mechanical's final resolution.[125]  The entire Feldman/Capstone captive insurance program was jeopardized by the ongoing IRS scrutiny.

- As of the December 2015 signing of the Joint Engagement Letter, Feldman/Capstone failed to disclose to the Doctors any of the substance of the Reserve Mechanical audit or the other six adverse IRS audits.[126]

56)     The stated purpose of the Feldman/Capstone captive insurance program was to structure and operate the captive insurer so as to qualify for partial tax-exempt status under Internal Revenue Code § 831(b), as stated on the first page of Exhibit C to the Joint Engagement Letter.[127] A captive insurer must be acting as an insurance company to qualify for favorable tax treatment.[128] If a determination is made that a captive is not an insurance company, then it would not be entitled to tax benefits under Section 831(b).[129]  Having a certain percentage of unrelated (third-party) insurance business is required in order to satisfy the criterion that there be "risk distribution" for insurance to exist, as also stated in the Joint Engagement Letter.[130]  In most cases, Capstone-

---

[125] *See* Transcript, Volume 21, September 30, 2021, at p. 8521, line 15 – p. 8523, line 15 (Steven Cohen).

[126] *See* Transcript, Volume 1, August 3, 2021, at p. 180, line 22 – p. 181, line 3; p. 182, line 13 – p. 184, line 22 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1935, line 2 – p. 1936, line 10; p. 1939, line 15 – p. 1940, line 1; p. 1951, line 4 – p. 1952, line 2 (Dr. Frank DellaCroce).

[127] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.  Exhibit C to the Joint Engagement Letter (*i.e.*, the disclosure form) states, "The intention is to structure and operate the captive insurer so as to qualify for partial *tax* exempt status ... ."  *See* Exhibit J-20, Joint Engagement Letter, at Exhibit C, SULLIVAN 011096.  Feldman and Capstone had long recognized that the favorable tax treatment was a primary inducement for their clientele to engage in captive insurance transactions.  Richard Amoroso highlighted multiple provisions in the Joint Engagement Letter where Feldman and Capstone emphasized the tax advantages of the turnkey Capstone program.  *See* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23 (Richard Amoroso).  To achieve this tax-exempt status, Feldman and Capstone "encourage[d]" and "expected" their clients to participate in the PoolRe risk pool.  *See* Exhibit J-20, at SULLIVAN 011071 ("It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement"; *id.* at SULLIVAN 011104 ("Capstone encourages participation in . . . PoolRe".).  Mr. Feldman advised the Doctors that it was "ill-advised" to decline participating in PoolRe and that in order to obtain beneficial tax treatment, the Doctors "must distribute [their] risks among a pool of risks."  *See* Transcript, Volume 1, August 3, 2021, at p. 252, lines 1-10 (Dr. Scott Sullivan).  *See* Exhibit J-12, Memorandum from Stewart Feldman, May 29, 2015, at SULLIVAN 015783.

[128] *See* Transcript, Volume 21, September 30, 2021, at p. 8471, lines 9-20 (Steven Cohen).

[129] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011098; Transcript, Volume 21, September 30, 2021, at p. 8514, lines 17-23 (Steven Cohen).

[130] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.

administered captives need to participate in a risk pool to satisfy the IRS's risk distribution requirement.[131]

57)      The strategy recommended by Feldman/Capstone to achieve adequate risk distribution of the Doctors' captives, so that they would qualify as an insurance company in the eyes of the IRS, was to have the captives participate in the PoolRe risk pool.[132]   Likewise, a Capstone-administered captive, Reserve Mechanical, also relied on PoolRe for adequate risk distribution.[133]

58)      In the July 2013 IRS Examination Report of Reserve Mechanical, the IRS found that Reserve Mechanical was not an insurance company.[134]   As acknowledged by Steve Cohen, it was clear in July 2013 that the IRS had determined that Reserve Mechanical lacked the essential element of risk distribution.[135]

59)      Mr. Cohen was a lawyer at the Feldman Law Firm who participated in the IRS audit of Reserve Mechanical, which began in 2010.[136]   Mr. Cohen was involved with the IRS audit of Reserve Mechanical from its beginning in 2010.  Mr. Cohen helped respond to the Information Document Requests that initiated the IRS audit of Reserve Mechanical in 2010,[137] providing the PoolRe risk pool documents to the IRS to attempt to demonstrate that Reserve Mechanical had sufficient risk distribution.[138]

---

[131] *See* Transcript, Volume 21, September 30, 2021, at p. 8502, line 22 through p. 8503, line 4 (Steven Cohen).

[132] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

[133] *See* Transcript, Volume 21, September 30, 2021, at p. 8502, line 22 – p. 8503, line 4 (Steven Cohen).

[134] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[135] *See* Transcript, Volume 21, September 30, 2021, at p. 8555, lines 14-18 (Steven Cohen).

[136] *See* Transcript, Volume 21, September 30, 2021, at p. 8530, line 12 – p. 8531, line 23 (Steven Cohen).

[137] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

[138] *See* Transcript, Volume 21, September 30, 2021, at p. 8542, lines 16-24 (Steven Cohen).

60)     As of September 2013, Mr. Cohen knew that the IRS had determined that the PoolRe pooling arrangement did not provide sufficient risk distribution for Reserve Mechanical to be treated as an insurance company.[139] Mr. Cohen, Mr. Feldman and the Feldman Law Firm knew in 2013 that the IRS had rejected the Capstone-administered captive's tax position and found that the Capstone-administered captive (which relied on PoolRe for risk distribution) lacked adequate risk distribution. But Feldman/Capstone failed to disclose these facts, or any of the substance of the adverse Reserve Mechanical audit, to the Doctors in, or before they signed, the Joint Engagement Letter. Whether Mr. Feldman thought the IRS determination was irrelevant or wrong or that it would be reversed at some future date is of no moment. It should have been clearly disclosed.

61)     Both Dr. Sullivan and Dr. DellaCroce testified that they would not have agreed to sign the Joint Engagement Letter had Feldman/Capstone fully disclosed the nature of the ongoing IRS scrutiny of the Capstone insurance program, including the PoolRe risk pool.[140] This Arbitrator accepts the Doctors' testimony as credible considering the materiality of the undisclosed information.

62)     Feldman/Capstone also argue that Exhibit C to the Joint Engagement Letter adequately disclosed to the Doctors the adverse IRS audits of Capstone-administered captives. This Arbitrator disagrees.

---

[139] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

[140] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 18-25 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1941, lines 6-18 (Dr. Frank DellaCroce).

63)     Nothing in Exhibit C to the Joint Engagement Letter disclosed the substance of the IRS audit of Reserve Mechanical.[141]  Mr. Cohen identified Subpart D of Exhibit C to the Joint Engagement Letter as an apparent anonymous reference to Reserve Mechanical, but he conceded that "the firm did not say anything in this section about the specific issues that were involved in the Reserve Mechanical audit."[142]  Mr. Cohen could not identify where in Exhibit C was the substance of the adverse Reserve Mechanical audit disclosed.

64)     Mr. Cohen helped prepare the September 2013 Protest letter that responded to the July 2013 IRS Examination Report of Reserve Mechanical.[143]  Mr. Cohen had reviewed the 43-page July 2013 IRS Examination Report of Reserve Mechanical, which included extensive descriptions of the risk distribution legal requirements and the PoolRe pooling arrangement.[144]  In its assessment of PoolRe in the July 2013 Examination Report, the IRS found: "[I]t is highly likely that the entire pool, which is insured by PoolRe and reinsured on a quota share basis with each of the pool participants, is primarily comprised of direct contracts that the Service would deem not to be insurance in the commonly accepted sense."[145]

65)     Although Mr. Cohen dismissed this IRS finding with respect to PoolRe as a "garbage" argument, he acknowledged that it appeared in the IRS July 2013 Examination Report.[146]  Mr. Cohen admitted that, as of 2013, the IRS had identified the issue that it is highly

---

[141] *See* Transcript, Volume 9, August 18, 2021, at p. 3448, lines 3-13 (Lyle Press).

[142] *See* Transcript, Volume 21, September 30, 2021, at p. 8359, line 12 – p. 8360, line 2 (Steven Cohen).

[143] *See* Transcript, Volume 21, September 30, 2021, at p. 8572, line 10 – p. 8573, line 1 (Steven Cohen).

[144] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[145] *See* Exhibit DRS 1873, July 2013 IRS Examination Report of Reserve, at Joint-340824; Transcript, Volume 21, September 30, 2021, at p. 8554, lines 7-22 (Steven Cohen).

[146] *See* Transcript, Volume 21, September 30, 2021, at p. 8566, line 16 – p. 8567 line 14 (Steven Cohen).

likely that the entire pool would not be deemed to be insurance in the commonly accepted sense.[147]

Again, because a lawyer in the Feldman Law Firm thought the IRS' position was "garbage" is not

a basis for failure to disclose.

66)   The September 2013 Protest letter submitted by Reserve Mechanical in response to

the July 2013 IRS Examination Report recapitulated these points by the IRS. Page 13 restated the

IRS's findings that the IRS suggested that the PoolRe quota share reinsurance program is not

insurance.[148]   Page 5 of the September 2013 Protest also re-stated the IRS's findings: "The

Examination Report concludes that Reserve [Mechanical] was not an insurance company."[149]

67)   In preparing the September 2013 Protest, Mr. Cohen knew that the IRS had

determined that "Reserve [Mechanical] was not an insurance company" and that the PoolRe "quota

share reinsurance program is not insurance."[150]   But Exhibit C to the Joint Engagement Letter did

not disclose either of these material points.

68)   A plain reading of Exhibit C to the Joint Engagement Letter demonstrates that

neither of these critical points, nor any of the substance of the IRS's findings in the 2013

Examination Report, were disclosed to the Doctors before they signed the Joint Engagement

Letter.

69)   Exhibit C to the Joint Engagement Letter provides great detail about Feldman's

successes against the IRS, while minimizing adverse developments. This document, according to

---

[147] See Transcript, Volume 21, September 30, 2021, at p. 8562, lines 4-14 (Steven Cohen).

[148] See Exhibit DRS-2715, July 24, 2013 IRS Examination Report; Exhibit DRS-1874, Protest Letter to IRS, September 3, 2013. A finding that the entire pool was not insurance "in the commonly accepted sense" is fatal to the entire Feldman/Capstone program.

[149] See Exhibit DRS-2715, July 24, 2013 IRS Examination Report; Exhibit DRS-1874, Protest Letter to IRS, September 3, 2013.

[150] See Exhibit DRS-1874, Protest Letter to IRS, September 3, 2013.

legal ethics expert Tom Watkins, "is a marketing piece. It constitutes an attempt to try to convince this client . . . about how many times we've been successful, how good we've been in the past causes a client to believe that he doesn't need to worry about what the IRS is doing because of his complete success in the past of handling these kinds of things."[151]   Exhibit C provided no specific details regarding adverse developments with the IRS that were specific to the Feldman/Capstone captive insurance program, and minimized the problems that were ongoing in December 2015. I agree with Mr. Watkins' characterization. The Engagement Letter is long on promotion and short on disclosure.

70)    Paragraph (A) of Exhibit C to the Joint Engagement Letter emphasizes the "thirty-nine (39) favorable rulings by the IRS which issued favorable Form 1024 tax exemption determination letters after exhaustive submissions to the service."[152]   Paragraph (B) emphasized twelve audits of captives, all but one of which were closed out at the audit level, and "each case was closed with no change in tax due and no interest or penalties due."[153]   Paragraph (C) identified three more successes: although "notices of deficiency" were issued, "IRS Appeals conceded all the issues in these three cases, with no taxes, interest or penalties due," and thus, judgment was entered in the captives' favor.  Taken together, Paragraphs (A) through (C) advertised Feldman's track record against the IRS as an unblemished 54-0, a success rate sure to attract investors. The dark clouds on the horizon were ignored.

71)    Nowhere in the Joint Engagement Letter does it disclose the findings by the IRS in the July 2013 Examination Report that another Capstone-administered captive, Reserve

---

[151] *See* Transcript, Volume 4, August 6, 2021, at p. 1496, lines 11-21 (Thomas Watkins).

[152] *See* Exhibit J-20, Joint Engagement Letter at Exhibit C, p. 6, at SULLIVAN 011101.

[153] *See* Exhibit J-20, Joint Engagement Letter at Exhibit C, p. 6, at SULLIVAN 011101.

Mechanical, "was not an insurance company" and that the quota share reinsurance program administered by PoolRe "is not insurance."[154]

72)    Paragraph (D) fails to identify (1) the substance of the Reserve Mechanical audit and its six companion audits or (2) any of the specific problems with the Capstone captive insurance program identified by the IRS.    Paragraph (D) does not state that the Capstone-administered captives were found to lack risk distribution, notwithstanding participation in PoolRe risk pools, and do not constitute insurance.    Instead, this paragraph minimizes the IRS's findings, suggests that they are the handiwork of a rogue IRS agent, and emphasized that these cases are "factually similar" to those referenced in Paragraph (C), which IRS Appeals "conceded."[155]

73)    No better proof of the opaqueness of Paragraph (D) comes from the testimony of retired IRS prosecutor Lyle Press.    Mr. Press testified that, although he first reviewed the Joint Engagement Letter in July 2020, it did not become apparent to him that Exhibit C referred to the Reserve Mechanical audit until January 2021 – and then only because he had reviewed supplemental discovery responses issued by Feldman/Capstone providing additional statements leading to that conclusion.[156]    Mr. Press, who spent three decades as an IRS prosecutor, did not understand that the disclosure form referred to Reserve Mechanical without having the benefit of discovery responses issued in January 2021.

74)    It is not surprising that if a retired IRS prosecutor could not divine the adverse findings regarding Reserve Mechanical, a client investing with Mr. Feldman could not either.    Mr.

---

[154] *See* Exhibit DRS-2715, IRS Examination Report of Reserve Mechanical, July 24, 2013, at Joint-340824, 340830.

[155] *See* Exhibit J-20, Joint Engagement Letter at Exhibit C, p. 6, at SULLIVAN 011101.    This paragraph emphasized, "[A] single IRS audit issued adverse audit rulings on 12 captives, despite the prior decade plus-long Capstone/ Firm experience to the contrary by other IRS auditors and without regard to the 39 favorable tax exempt rulings."

[156] *See* Transcript, Volume 9, August 18, 2021, at p. 3449, line 21 – p. 3452, line 16 (Lyle Press).

Press also testified that, without the January 2021 discovery responses, he could not determine anything regarding the adverse audits of Reserve Mechanical or the six other Capstone-administered captives.[157] Further there was "nothing" written regarding the *substance* of the audits referenced in Paragraph D.[158] That latter point was conceded by Mr. Cohen.[159]

75)     This Arbitrator finds that, like much of the Engagement Letter, the language in Paragraph (D) was crafted to reassure clients, not fully disclose. Dr. Sullivan emphasized that the undisclosed information was "highly relevant and material" as it "condemns the entire pool."[160] Dr. DellaCroce explained that Exhibit C "bolstered his confidence" in Feldman/Capstone, and that the undisclosed information "completely undermines" the rosy portrait painted by Mr. Feldman.[161] This nondisclosure of adverse facts was intentional.

76)     Mr. Feldman also failed to disclose the IRS's scrutiny of Capstone-administered captives and the PoolRe risk pool during the January 19, 2015 meeting with the Doctors,[162] or in subsequent communications with their attorney, David Sherman, or their CPA, David Kushner. Mr. Sherman and Mr. Kushner each confirmed that Mr. Feldman never disclosed the substantive findings by the IRS that Reserve Mechanical failed to satisfy the IRS's risk distribution requirement notwithstanding participation in PoolRe.[163]   Mr. Kushner testified that he asked Mr.

---

[157] *See* Transcript, Volume 9, August 18, 2021, at p. 3455, line 23 – p. 3456, line 6 (Lyle Press).

[158] *See* Transcript, Volume 9, August 18, 2021, at p. 3456, lines 7-10 (Lyle Press). Mr. Press testified that he could only piece together the substance of those audits by conducting research on the U.S. Tax Court website. Transcript, Volume 9, August 18, 2021, at p. 3458, line 24 – p. 3461, line 9 (Lyle Press).

[159] *See* Transcript, Volume 21, September 30, 2021, at p. 8359, line 12 – p. 8360, line 2 (Steven Cohen).

[160] *See* Transcript, Volume 1, August 3, 2021, at p. 182, line 13 – p. 184, line 12 (Dr. Scott Sullivan).

[161] *See* Transcript, Volume 5, August 7, 2021, at p. 1969, line 2 – p. 1970, line 5 (Dr. Frank DellaCroce).

[162] *See* Transcript, Volume 1, August 3, 2021, at p. 184, lines 13-22 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1941, line 19 – p. 1942, line 3 (Dr. Frank DellaCroce).

[163] *See* Transcript, Volume 20, September 29, 2021, at p. 7909, lines 8-23; p. 7910, lines 8-17 (David Sherman); Transcript, Volume 20, September 29, 2021, at p. 8014, line 10 – p. 8015, line 18 (David Sherman).

Feldman about any ongoing issues with the IRS, and "the impression that [Mr. Kushner] was left with was, [Feldman's] undefeated and [Feldman's] got whatever issues are out there under control."[164]

77)    Based on the totality of evidence and testimony presented at trial, this Arbitrator finds that Feldman/Capstone failed to disclose to the Doctors the substance of adverse IRS audits of Capstone-administered captives, including that the IRS found that Reserve Mechanical was not an insurance company, that Reserve Mechanical lacked risk distribution, and that the PoolRe pooling arrangement did not provide sufficient risk distribution.

## IV.    Mr. Feldman, the Feldman Law Firm and Capstone failed to disclose the IRS audit of Mr. Feldman for promoting abusive tax shelters under IRC § 6700.

78)    Approximately four months before Mr. Feldman sent the Joint Engagement Letter to the Doctors, on June 8, 2015, Mr. Feldman received notice of an IRS audit for promoting abusive tax shelters under Internal Revenue Code § 6700 based upon his "participation in tax avoidance transactions."[165]   This June 8, 2015 letter from the IRS stated that the IRS was considering "penalties and injunctions" against Mr. Feldman under seven different sections of the Internal Revenue Code for "promoting and/or preparing documents relating to these transactions."[166]

79)    The statutory violations included Section 6700 of the Internal Revenue Code, which governs "Promoting Abusive Tax Shelters."[167]

80)    The June 8, 2015 letter from the IRS to Mr. Feldman also contained an Information Document Request ("IDR") concerning "all owners of any Captive Insurance Companies from

---

[164] *See* Transcript, Volume 20, September 29, 2021, at p. 8017, line 19 - p. 8018, line 2 (David Kushner).

[165] *See* Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

[166] *See* Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

[167] 26 U.S.C. § 6700.

36

every year in which you sold or advertised Captive Insurance Companies through Capstone Associated Services," and requested a broad list of information pertaining to each of the Capstone-associated captives.[168]  Once again, there was incomplete and misleading disclosure.

81)     Upon receiving notice of the promoter audit, Mr. Feldman sought guidance from his longstanding ethics attorney, Mr. James McCormack.[169]  But Feldman/Capstone intentionally omitted any reference to this statutory provision in the written disclosures provided to the Doctors.

82)     Feldman/Capstone suggest that Paragraph (G) of Exhibit C to the Joint Engagement Letter discloses the promoter audit to the Doctors.  But Paragraph (G) makes no mention of a "promoter audit" or Section 6700 of the Internal Revenue Code.[170]  And Paragraph (G) provides no information regarding the substance of the inquiry:[171]

> G. In June 2015, the IRS notified either Stewart A. Feldman or the Firm or Capstone (the addressee of the inquiry is unclear) that the captive insurance/alternative risk planning program is the subject of a review by the IRS and issued an information document request (IDR). The Firm is unclear whether this IDR is unconnected with the audits of any particular captive client, but is likely connected to the IRS's examination of captive insurance programs generally. The Firm believes that the inquiring IRS agent was unaware of the dozens of completed IRS reviews of the planning resulting in its agreeing with the taxpayers' positions. After a three day review by the IRS agent and after providing him evidence of the more than 50 prior successful rulings by the IRS, this matter has been dormant.

83)     Even Mr. Feldman conceded, when asked whether anything within the disclosure form or Paragraph (G) "identifies that audit as examining you for promoting abusive tax shelters,"

---

[168] *See* Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

[169] *See* Exhibit DRS-1921, E-mail from Stewart Feldman, July 14, 2015 ("before sending it out wholesale, I will send it to ethics counsel"); *see also*, Transcript, Volume 19, September 28, 2021, at p. 7695, line 16 – p. 7696, line 13 (James McCormack).

[170] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit C, at SULLIVAN 011102.

[171] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit C, at SULLIVAN 011102.

that "those words are not there."[172] The Engagement Letter was an exercise in obfuscation. This nondisclosure is of the same pattern. Write something so you can point to it, but never disclose in plain English.

84)    Both Doctors testified that Paragraph (G) did not inform them regarding the pending promoter audit of Mr. Feldman.[173]    Mr. Sherman testified that Mr. Feldman never disclosed the promoter audit to him, either orally or in writing.[174]    Mr. Kushner, a practicing CPA for over 40 years, testified that he did not have experience in dealing with promoter audits and did not recognize Paragraph (G) to be alluding to a promoter audit.[175]

85)    Mr. Watkins testified that Paragraph (G) hid the truth regarding the promoter audit.[176]    Mr. Watkins further explained the need for Mr. Feldman to provide *full* disclosure regarding the pending promoter audit.[177]

86)    Mr. McCormack, Mr. Feldman's own ethics expert, agreed that Paragraph (G) "does not specifically state that Feldman received an IDR that included a disclosure that he was being investigated as a promoter of abusive tax shelters and the IRS was considering penalties and injunctive relief pursuant to a number of sections of the IRS Code including [Section] 6700."[178]

---

[172] *See* Transcript, Volume 14, August 23, 2021, at p. 5323, lines 18-24 (Stewart Feldman) (emphasis added).

[173] *See* Transcript, Volume 1, August 3, 2021, at p. 217, line 22 – p. 218, line 4 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1966, line 16 – p. 1967, line 12 (Dr. Frank DellaCroce).

[174] *See* Transcript, Volume 20, September 29, 2021, at p. 7922, lines 19-24 (David Sherman).

[175] *See* Transcript, Volume 20, September 29, 2021, at p. 8140, line 22 – p. 8141, line 13; p. 8142, lines 1-12 (David Kushner).

[176] *See* Transcript, Volume 4, August 6, 2021, at p. 1611, line 21 – p. 1612, line 4 (Thomas Watkins) (emphasis added).

[177] *See* Transcript, Volume 4, August 6, 2021, at p. 1542, line 16 – p. 1543, line 11 (Thomas Watkins) (emphasis added).

[178] *See* Transcript, Volume 19, September 28, 2021, at p. 7723, lines 4-12 (James McCormack).

87)     Feldman's expert and tax attorney Marcus Brooks also acknowledged that Paragraph (G) does not state that "the IRS had reviewed materials regarding Mr. Feldman's participation in tax avoidance transactions," or that the IRS was investigating Mr. Feldman for promoting and preparing documents relating to abusive tax shelters.[179]

88)     Considering the totality of the evidence and testimony presented at trial, this Arbitrator finds that the IRS § 6700 audit of Mr. Feldman was material information that should have been clearly disclosed to the Doctors prior to the execution of the Joint Engagement Letter. I further find that such act was intentional, as disclosure of the promoter audit would have materially disrupted Feldman/Capstone's business model and its continued viability. This Arbitrator finds further that Feldman/Capstone intentionally failed to adequately disclose the pendency of the IRS § 6700 audit of Mr. Feldman to the Doctors before they signed the Joint Engagement Letter under applicable law.

## V.     The wind-down of the captive program.

89)     The Doctors argue that Feldman/Capstone did not diligently wind down their captive programs. The issue of whether Feldman/Capstone had a contractual duty to do so was decided in the Dorfman Arbitration. Judge Dorfman determined that there was no such contractual obligation. This Arbitrator (and all the other Arbitrators) held that Judge Dorfman's ruling would not be disturbed or revisited. However, given the arbitration language in the Engagement Letter, the Dorfman ruling did not preclude a determination of whether the Doctors had a tort claim against Feldman/Capstone for their failure to wind down. Judge Dorfman did not address any tort claims

---

[179] *See* Transcript, Volume 23, October 2, 2021, at p. 9441, lines 17-19 (Marcus Brooks).

in his order.[180] For these reasons, this Arbitrator must consider whether Feldman/Capstone's failure to respond to the wind down request was injurious to the Doctors. It was.

90)      The Doctors' expert on insurance, Richard Amoroso, testified that Feldman owed fiduciary duties to provide honest advice and assistance to the Doctors when the Doctors requested a liquidation or termination of their captive insurance companies.[181]  Feldman's fiduciary duties included standing ready to assist the Doctors in shutting down the captives and putting forth a diligent effort on the Doctors' behalf, providing, where possible, alternative course of action to accomplish the Doctors' requests.[182]

91)      As of October 2, 2019, Mr. Kushner, on behalf of Dr. Sullivan, had communicated to Mr. Feldman that Dr. Sullivan wanted to exit the captive space.[183]  On October 22, 2019, Mr. Feldman sent an email to Mr. Kushner and Mr. Sherman, asking them to "explain to [Dr. Sullivan]" that Dr. Sullivan's "agreement extends to 2021."[184]  Mr. Feldman further stated that his firm could "not be in the position of assisting one client's defaulting on obligations to other clients."[185]  Mr. Feldman had, and recognized that he had, a concurrent conflict of interests representing the Doctors and his other clients.

92)      Although Mr. Feldman testified that the early liquidation "wasn't possible,"[186] Feldman/Capstone had, in fact, offered and effectuated a "special, earlier liquidation" for other

---

[180] See Exhibit J-115.

[181] *See* Transcript, Volume 7, August 16, 2021, at p. 2693, lines 1-13 (Richard Amoroso).

[182] *See, e.g.*, Transcript Volume 7, August 16, 2021, at p. 2693, lines 1-13 (Richard Amoroso); *see also* Exhibit J-20, Joint Engagement Letter at SULLIVAN011074 & SULLIVAN011079.

[183] *See* Transcript, Volume 20, September 29, 2021, at p. 8155, lines 3-11 (David Kushner).

[184] *See* Exhibit J-84, E-mail from Stewart Feldman (Oct. 22, 2019).

[185] *See* Exhibit J-84, E-mail from Stewart Feldman (Oct. 22, 2019).

[186] *See* Transcript, Volume 13, August 22, 2021, at p. 5037, line 10 – p. 5040, line 14 (Stewart Feldman).

captive clients.[187] Feldman/Capstone knew, therefore, that an early liquidation was possible. The evidence establishes that, although possible, an early liquidation would deprive Feldman/Capstone of access to millions of dollars of pool money, which Feldman/Capstone used to pay themselves for defending this action.

93)     Mr. Feldman also testified that "Capstone's direction has always been" from PoolRe, and "was in this particular situation," that "if you want to come into the pool, come into the pool but once you come into the pool, you're in the pool and you are subject to the contract and PoolRe is not interested in renegotiating it."[188] This testimony was inconsistent with past liquidations. Mr. Feldman was personally involved in assisting PoolRe re-negotiate its Quota Share Agreements, through the execution of "Claims Reserve Payment Agreements" and "PoolRe Release Letters," with numerous other captive clients to effectuate those captive clients' early liquidations.[189] Mr. Feldman personally signed six letters on behalf of PoolRe advising the Delaware Department of Insurance that six Capstone-administered captives were liquidating early.[190] And Feldman provided counsel to PoolRe and thirteen Capstone-administered captives

---

[187] *See, e.g.*, Exhibit DRS 2570, E-mail from Jeff Carlson (Feb. 19, 2020); *see also* Transcript, Volume 8, August 17, 2021, at p. 2958, line 4 – p. 2962, line 16 (Richard Amoroso).

[188] *See* Transcript, Volume 13, August 22, 2021, at p. 5031, line 22 – p. 5039, line 14 (Stewart Feldman).

[189] *See* Exhibit DRS 2003, Claims Reserve Payment Agreement and PoolRe Release Letters; *see also* Transcript, Volume 22, October 1, 2021, at p. 8960, line 12 – p. 8962, line 8 (Robert Snyder). Robert Snyder testified as to how the Claims Reserve Payment Agreements modified the Quota Share Agreements by transferring the obligations from the captive to the captive's owner. *See* Transcript, Volume 22, October 1, 2021, at p. 8962, line 9 – p. 8968, line 14 (Robert Snyder). Robert Snyder also testified as an expert at the Dorfman hearing that in order to let the Doctors' captives out of the pool, all other captives participating in the pool would have to agree. That testimony was not correct and inconsistent with Mr. Snyder's testimony in this matter. *See* Transcript, Volume 22, October 1, 2021, at p. 8978, line 13 – p. 8981, line 6 (Robert Snyder) ("ARBITRATOR KUTCHER: But we've seen these documents where there is no consent from the other captives to let these other captives out. I'm stunned that you would testify to Judge Dorfman as an expert that you need signatures for more approval from all the captives to let a captive out when you've got an Exhibit 2003 document showing you let – PoolRe let captives out without other captives' consent.")).

[190] *See* Exhibit DRS-2003, PoolRe release letters at Joint-364793, Joint-364799, Joint-364804, Joint-364809, Joint-364814, Joint-364822.

41

in connection with Claims Reserve Payment Agreements that allowed these thirteen Capstone-administered captives to liquidate early.[191] It is clear that Feldman/Capstone could effectuate an early wind down. It was just in their own self-interest not to. Feldman/Capstone's failure to assist was improper.

94)    Feldman and PoolRe had effectuated the early liquidation of fifteen other captives through executing "Claims Reserve Payment Agreements," whereby the captive owner assumes the liabilities of the captive insurance company.[192]  Mr. Feldman did not ever discuss or address with Mr. Snyder, a PoolRe director, or Mr. Friedman, the PoolRe owner, the possibility of entering into a Claims Reserve Payment Agreement with the Doctors.[193]  Mr. Feldman alone made that decision.

95)    Feldman/Capstone argue that Mr. Feldman disclosed the existence of an "'escrow' arrangement or early 'liquidation'" in an e-mail Mr. Feldman sent December 16, 2019.[194]  But Mr. Feldman's December 16, 2019 e-mail rejected the Doctors' request for an early liquidation, stating that the parties meant to "establish a long-term relationship and to provide for the management of the captives throughout the term of the contract" (*i.e.*, August 2021).[195]  Mr. Feldman further sent

---

[191] *See* Exhibit DRS-2003, Claims Reserve Payment Agreements at § 2(c), Joint-364788, Joint-364796, Joint-64802, Joint-364806, Joint-364811, Joint-364817, Joint-364819, Joint-364824, Joint-364828, Joint-364835, Joint-364843, Joint-364851, Joint-364859 ("The Parties acknowledge that with respect to the execution of this Agreement, the Parties have sought and obtained the counsel of The Feldman Law Firm LLP with the knowledge and understanding that (i) such firm has provided legal representation to [the captive] in certain matters including the formation of and operation of [the captive]; (ii) such firm has provided legal representation to PoolRe from time-to-time; and (iii) Capstone Associated Services, Ltd. (a service provider to [the captive]) is ultimately owned and controlled by Stewart A. Feldman, principal and managing partner of The Feldman Law Firm LLP.").

[192] *See* Exhibit DRS-2003, Claims Reserve Payment Agreements.

[193] *See* Transcript, Volume 22, October 1, 2021, at p. 8969, lines 16-21; p. 8972, lines 1-16 (Robert Snyder); Transcript, Volume 23, October 2, 2021, at p. 9510, lines 15-20 (Stephen Friedman).

[194] *See* Exhibit FC-270, E-mail from Mr. Feldman.

[195] *See* Exhibit FC-270, E-mail from Mr. Feldman at FC-270.0001.

an e-mail to the Doctors twelve days later on December 28, 2019, rejecting again the Doctors' request for an early liquidation, in which Mr. Feldman stated that "the term through August 2021 means exactly that – a term through August 2021."[196]  The record establishes that Feldman /Capstone put forth no effort in assisting the Doctors with shutting down their captive program early.

96)      Before filing suit against the Doctors on May 7, 2020, Mr. Feldman did not discuss with anyone from PoolRe the possibility of entering into a Claims Reserve Payment Agreement or some other mechanism to facilitate an early liquidation of the Doctors' captives,[197] just as Feldman and PoolRe had done for thirteen other clients in the span of two years.[198]

97)      It was certainly feasible for Feldman to facilitate or assist with the early liquidation of the Doctors' captives.[199]  The only liabilities that needed to be resolved before the captives could liquidate were risk pool claim losses and administrative expenses.[200]  These losses and expenses were historically non-existent or *de minimis*.  From 2008 to 2016, pool participants incurred $0 in

---

[196] *See* Exhibit J-90, E-mail from Stewart A. Feldman at C_19549 (Dec. 28, 2019); *see also* Transcript, Volume 8, August 17, 2021, at p. 2963, line 7 – p. 2965, line 20 (Richard Amoroso).

[197] *See*, *e.g.*, Transcript, Volume 22, October 1, 2021, at p. 8967, line 16 – p. 8969, line 21; p. 8972, lines 1-16 (Robert Snyder).

[198] *See* Exhibit DRS 2006, Chart Summarizing Dates of Claims Reserve Payment Agreements executed by PoolRe.

[199] The PoolRe agreements contemplate early termination from the pool, stating, "Any intent to liquidate or wind up or notice of same terminates participation in the Risk Pool unless expressly waived in writing by PoolRe making specific reference to this Paragraph 3.B." *See* Transcript, Volume 22, October 1, 2021, at p. 8920, lines 11-19 (Robert Snyder). Reinsurance industry custom and practice made it feasible to allow the captives to exit the pool early. *See* Transcript, Volume 11, August 20, 2021, at p. 4285, line 16 – p. 4291, line 15 (Pete Rauner).

[200] *See* Transcript, Volume 22, October 1, 2021, at p. 8952, lines 13-17 (Robert Snyder).

claim losses and $0 in administrative expenses.[201]  In the 2017 risk pool, the Doctors' quota share

of administrative expenses was "short of $1,800," and their share of claim losses was only about

$29,155.[202]  The 2017 risk pool held $229,659.12 of retained premiums belonging to the Doctors'

captives, which far exceeded the amount needed to pay the 2017 pool's *de minimis* administrate

expenses and claim losses.[203]

98)     Feldman represented to the Doctors in the Joint Engagement Letter that they would

not be responsible for PoolRe's incremental operating costs.[204] Consistent with that representation,

pool participants were charged $0 for PoolRe's operating costs or administrative expenses from

2008 to 2016.  Pool participants were then charged a *de minimis* amount for PoolRe's operating

costs for the 2017 risk pool. Feldman/Capstone then charged pool participants $250,000 for

PoolRe's alleged operating costs or administrative expenses in the 2018 pool[205] and $3,042,427.37

---

[201] *See Reserve Mech. Corp. v. Comm'r*, 115 T.C.M. 1475, 2018 WL 3046596, at *9 (T.C. 2018) ("Reserve's general ledger reflects that Reserve bore no losses under the quota share policy for 2008. . .  For 2009 and 2010 Reserve recorded no losses in connection with the quota share policies."); *see also* Transcript, Volume 11, August 20, 2021, at p. 4372, line 14 – p. 4376, line 9 (Pete Rauner) (citing Exhibit DRS-2277, Feldman/Capstone's Supplemental Joint Objections and Responses to Doctors' First Set of Discovery Requests at Response to Interrogatory No. 7; Exhibit DRS-524, Capstone Memorandum regarding 2016 Risk Pool Final Settlement (Sept. 11, 2017).

[202] *See* Transcript, Volume 11, August 20, 2021, at p. 4376, line 10 – p. 4377, line 10 (Pete Rauner).

[203] *See* Exhibit DRS-525, 2017 Risk Pool Final Settlement at C_19542 (reflecting a total of $229,659.12 for the "Retention" belonging to Janus, Orion, and Cerberus collectively).

[204] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011104 ("PoolRe conducts the pooling program for a fee (that is on a contract basis) paid by Capstone but is independently carried out by PoolRe.  There should be no incremental operating cost to the pool participants.")

[205] *See* Exhibit DRS 2543, Capstone's Final Report on the 2018 Risk Pool (July 27, 2021); *see also* Transcript, Volume 11, August 20, 2021, p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript Volume 17, September 23, 2021, p. 6857, line 5 – p. 6858, line 18 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 8794, line 8 – p. 8795, line 6 (Robert Snyder); Transcript, Volume 7, August 16, 2021, at p. 2544, lines 3-12 (Richard Amoroso).

for PoolRe's alleged operating costs or administrative expenses in the 2019 pool.[206] These alleged operating costs or administrative expenses of PoolRe in the 2018 and 2019 risk pools are, in actuality, Feldman's, Capstone's, and PoolRe's attorneys' fees and expenses incurred in these arbitration proceedings.[207] More egregiously, as outlined in Section VI, the looting of the 2018 and 2019 pool money was for a proceeding commenced in 2020.

99)     The fact that PoolRe charged 2018 pool participants $250,000 and the 2019 pool participants $3,042,427.37 for Feldman/Capstone's attorneys' fees and expenses in these arbitration proceedings under the guise of PoolRe's alleged operating costs or administrative expenses is improper and reflects Feldman/Capstone subordinating the Doctors' interests to their own.[208]

100)     The Doctors' actuarial expert, Pete Rauner, conducted an actuarial estimation of the maximum, worst-case amount of liabilities that the Doctors' captives could owe to the 2019 risk pool. Mr. Rauner provided unrebutted expert testimony that PoolRe was retaining sufficient premiums belonging to the Doctors' captives well beyond reasonable expectation to cover the

---

[206] *See* Transcript, Volume 18, September 24, 2021, at p. 7013, line 19 – p. 7014, line 9 (Jeff Carlson); Transcript, Volume 7, August 16, 2021, at p. 2552, line 5 – p. 2557, line 23 (Richard Amoroso). From the 2019 risk pool, the retained premium amount was $3,600,262.32. *See* Exhibit DRS-2004, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-401652. Claims losses and expenses for other captives' claims, in an amount of $557,834.94, were deducted from the 2019 pool. *See* Exhibit DRS-2680, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-427016. The remaining $3,042,427.37 from the 2019 pool has been wrongfully converted to pay for Feldman/Capstone's legal fees and expenses in these arbitrations.

[207] *See* Exhibit-DRS 2543, Capstone's Final Report on the 2018 Risk Pool (July 27, 2021); Exhibit DRS-2680, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses.

[208] *See, e.g.,* Transcript, Volumes 6 and 7, August 9 and 16, 2021, at p. 2336, line 24 – p. 2338, line 5; p. 2344, lines 6-15; p. 2348, line 25 – p. 2349, line 16; p. 2510, line 19 – p. 2513, line 10; p. 2536, line 2 – p. 2537, line 11; p. 2540, line 16 – p. 2541, line 19; p. 2544, lines 3-12; p. 2546, line 4 – p. 2549, line 11; p. 2551, lines 10-19; p. 2554, lines 6-16; p. 2555, line 12 – p. 2557, line 23; p. 2564, line 4 – p. 2565, line 23; p. 2568, line 18 – p. 2571, line 13; p. 2579, line 19 – p. 2580, line 8; p. 2584, line 7 – p. 2585, line 6; p. 2598, line 2 – p. 2607, line 18 (Richard Amoroso).

liabilities that the Doctors' captives could possibly owe to the 2019 risk pool.[209]  Considering Mr.

Rauner's testimony, there is no good faith explanation for Feldman's failure to assist, let alone put

forth a diligent effort in assisting, the Doctors in their request to shut down their captives.

101)    Based on the totality of evidence and testimony in the record, this Arbitrator finds

that Feldman/Capstone failed to put forth a diligent effort on behalf of the Doctors in responding

to or assisting the Doctors with their request for a wind-down of their captives, and that they did

so for their own personal self-interest, thereby breaching fiduciary and professional duties.

102)    Feldman/Capstone have still not wound down or liquidated the Doctors' captives,

notwithstanding that the Joint Engagement Letter provides for a liquidation date on or about

August 31, 2021.[210]  Because the Doctors' captives have not been wound down, the Doctors

continue to be subjected to Feldman/Capstone's scheme to convert the premiums belonging to the

Doctors' captives held in the risk pools, as discussed below.

## VI.    Mr. Feldman, the Feldman Law Firm and Capstone perpetrated a scheme to keep the 2018 and 2019 risk pools open and convert their clients' funds held in those risk pools to pay for Feldman, Capstone, and PoolRe's fees and expenses in fighting their clients.

103)    The entire Feldman/Capstone captive business model was in peril because of the

Tax Court's June 18, 2018 decision in *Reserve Mechanical*.  Historically, Feldman/Capstone

assisted captive clients exit early from PoolRe risk pools that closed before the June 18, 2018

*Reserve Mechanical* decision.[211] Feldman/Capstone allowed captive clients in the 2016 to 2018

---

[209] *See* Transcript, Volume 11, August 20, 2021, at p. 4301, line 4 – p. 4317, line 13 (citing Exhibit-DRS 2538, Pete Rauner's February 4, 2021 Disclosure; Exhibit DRS-1563, Doctors' Proposed Escrow Agreement); *see also* Exhibit-DRS 2545, Pete Rauner's Updated Disclosure, Dated July 31, 2021.

[210] *See* Exhibit J-20, Capstone Services Agreement at § 4.6, at SULLIVAN011090 – 91.

[211] *See* Exhibit DRS-2006, Chart of Captive Liquidations.

risk pools to liquidate early.[212] But Feldman/Capstone have not allowed any captives in the 2019 risk pool to liquidate early.[213] Subordinating their clients' interests to their own, Feldman/Capstone refused to allow 2019 pool participants to liquidate early so as to avoid a run on the risk pool because of the June 18, 2018 *Reserve Mechanical* decision.

104)   Feldman/Capstone were in fact facing such a run on their PoolRe risk pool after the *Reserve Mechanical* opinion was issued on June 18, 2018. There were sixty-eight participating captives in the 2018 risk pool as opposed to fifty participating captives in the 2019 risk pool. A drop of approximately 25%.[214] There was also an approximate 50% decrease in PoolRe's assets and an approximate 45% decrease in direct written premiums to PoolRe from the end of 2018 to the end of 2019.[215] These facts reflect the existential threat posed by the *Reserve Mechanical* opinion to Feldman/Capstone's entire business model. According to Mr. Feldman, "I think it is fair to say that this case [Reserve Mechanical] will determine the fate of the captive industry for the foreseeable future."[216]

105)   Feldman/Capstone implemented a scheme to use the PoolRe risk pools to fight their clients' lawsuits with their clients' money. Through this scheme, Feldman/Capstone have converted $3,354,925.37 of their captive clients' premiums to pay for the legal fees and expenses

---

[212] *See* Exhibit DRS-2006, Chart of Captive Liquidations (identifying fifteen captives that participated in the 2016 to 2018 risk pools that liquidated early).

[213] *See* Exhibit DRS-2006, Chart of Captive Liquidations (identifying zero captives that participated in the 2019 risk pool that liquidated early).

[214] *Compare* Exhibit DRS-71A, Schedule of Participating Captives in the 2018 Risk Pool, *with* Exhibit DRS-72A, Schedule of Participating Captives in the 2019 Risk Pool. Forestry CC and Family CC are listed twice in the Schedule of Participating Captives in the 2019 Risk Pool, meaning that there were only fifty participating captives in that 2019 pool year.

[215] *See* Transcript, Volume 23, October 2, 2021, at p. 9498, line 16 – p. 9500, line 20 (Stephen Friedman) (citing Exhibit DRS-46, PoolRe's Financial Statements – Statutory Basis, December 31, 2019 and 2018).

[216] *See* Transcript, Volume 14, August 23, 2021, at p. 5252, lines 8-19 (Stewart Feldman (citing Exhibit DRS-2001)).

47

incurred by Feldman/Capstone and PoolRe in these arbitration proceedings, as discussed in Section VI below.

### A.    Mr. Feldman, the Feldman Law Firm and Capstone disregarded 2019 pool participants' requests for an early liquidation.

106)    In addition to the Doctors, Feldman/Capstone denied several 2019 pool participants early liquidations similar to the early liquidations that Feldman/Capstone offered and effectuated on behalf of fifteen other captives in the 2016 to 2018 risk pools.[217]

107)    Capstone's president, Jeff Carlson, testified that there are several other captives that participated in the 2019 risk pool that want to be wound down and liquidated but cannot because the 2019 pool remains open.[218]    According to Mr. Carlson, "[t]he only claims that are keeping the 2019 pool open are the policy claims pending against AMY and costs related to the arbitrations."[219]

### B.    Mr. Feldman, the Feldman Law Firm and Capstone perpetrated a scheme to keep the risk pools open so as to force participants in those pools to pay Feldman's and Capstone's legal fees and expenses in these arbitrations.

108)    Feldman/Capstone perpetrated a scheme to improperly keep the 2018 risk pool and 2019 risk pools open to force these pool participants into paying for Feldman's and Capstone's litigation fees and expenses in these arbitrations.    According to Mr. Carlson, as long as the risk pool remains open, the captive clients participating in that open pool will be charged a share of Feldman's, Capstone's, and PoolRe's continually accruing legal fees and expenses.[220]    Feldman, Capstone, and PoolRe have also threatened future funding calls to be paid by 2019 pool

---

[217] *See* Exhibit DRS-72A, Schedule of 2019 Pool Participants (identifying Family CC as a 2019 pool participant).

[218] *See* Transcript, Volume 23, October 2, 2021, at p. 9226, line 8 – p. 9229, line 23 (Jeff Carlson).

[219] *See* Transcript, Volume 23, October 2, 2021, at p. 9231, line 24 through p. 9234, line 12 (Jeff Carslon).

[220] *See, e.g.* Transcript, Volume 23, October 2, 2021, at p. 9233, line 2 – p. 9234, line 21; p. 9256, line 21 – p. 9257, line 15 (Jeff Carlson).

participants in unlimited amounts for additional fees and costs incurred Feldman/Capstone, and

PoolRe in litigating against their clients.  Mr. Carlson testified that there is no limit or cap on the

amount of fees and expenses incurred by Feldman/Capstone and PoolRe that they can charge to

their clients through funding calls.[221]

109)    As of December 4, 2020, at the latest, all policy claims associated with the 2018

risk pool had been resolved.[222]  The Doctors' reinsurance expert, Mr. Amoroso, explained that the

2018 pool should have been closed and all money held in trust returned to the 2018 pool

participants after the last policy claim associated with the 2018 pool had resolved:

> [I]f there is no claims, there is nothing left related to the 2018 pool claims that
> could, you know, resolve in a claims handling type expense or indemnity.  So if
> you've got no claims, you've got nothing to handle, you've got nothing to
> administer, you've got no more claims to resolve, I believe the reinsurance
> agreements are pretty clear and say there should be a final resolution or a final
> accounting at that point and whatever money is being held in trust for the 2018 pool
> participants should be sent – should be redistributed back to them.[223]

110)    But Feldman/Capstone did not close the 2018 risk pool in December 2020.[224]  Nor

did Feldman/Capstone send the 2018 pool participants back their money held in trust in the 2018

risk pool after the last 2018 policy claim closed.[225]  Instead, Feldman/Capstone improperly kept

the 2018 risk pool open until July 27, 2021 so that Feldman/Capstone could take $250,000 of the

2018 pool participants' premiums to pay for the legal fees and expenses incurred by Feldman,

---

[221] *See* Transcript, Volume 15, August 24, 2021, at p. 5918, line 1 – p. 5920, line 9 (Jeff Carlson).

[222] *See* Transcript, Volume 7, August 16, 2021, at p. 2535, line 12 – p. 2536, line 1 (Richard Amoroso) (citing Exhibit J-110, Capstone E-mail (Dec. 4, 2020)).

[223] *See* Transcript, Volume 7, August 16, 2021, at p. 2536, line 2 – p. 2537, line 11 (Richard Amoroso).

[224] *See* Transcript, Volume 7, August 16, 2021, at p. 2537, line 1 – p. 2541, line 19 (Richard Amoroso).

[225] *See* Transcript, Volume 7, August 16, 2021, at p. 2537, line 1 – p. 2541, line 19 (Richard Amoroso).

Capstone and PoolRe in these arbitration proceedings, which did not commence until 2020.[226] PoolRe's director, Mr. Snyder, testified that Feldman, Capstone, and PoolRe "reached kind of an arbitrary decision" in charging the 2018 pool participants the last remaining $250,000 in the pool for Feldman's, Capstone's, and PoolRe's legal fees and expenses in these arbitration proceedings.[227] This "arbitrary" decision was solely for the benefit of Feldman/Capstone so they could obtain money from the 2018 risk pool, including the Doctors' money, to defend a 2020 claim. There was no legitimate basis to use 2018 pool funds for what should have been a 2020 claim.

111)    Feldman/Capstone did not articulate any plausible connection between the fees and expenses they incurred in these arbitration proceedings and the 2018 risk pool. In fact, none exists. The Doctors' reinsurance expert, Mr. Amoroso, provided unrebutted expert testimony that Feldman/Capstone's use of their client's money held in the risk pools to fund their litigation expenses in these arbitration proceedings was "inappropriate based on everything [he] know[s], industry custom and practice, [his] years of dealing with the reinsurance industry. It's just inappropriate."[228] This Arbitrator agrees.

---

[226] *See* Transcript, Volume 7, August 16, 2021, at p. 2537, line 1 – p. 2549, line 11 (Richard Amoroso); *see also* Transcript, Volume 22, October 1, 2021, at p. 8956, line 20 – p. 8957, line 24 (Robert Snyder) (citing Exhibit DRS-2543, E-mail from Capstone Accounting Department (July 27, 2017)).

[227] *See* Transcript, Volume 22, October 1, 2021, at p. 8793, line 8 – p. 8794, line 6 (Robert Snyder).

[228] *See, e.g.,* Transcript, Volumes 6 and 7, August 9 and 16, 2021, at p. 2336, line 24 – p. 2338, line 5; p. 2344, lines 6-15; p. 2348, line 25 – p. 2349, line 16; p. 2510, line 19 – p. 2513, line 10; p. 2536, line 2 – p. 2537, line 11; p. 2540, line 16 – p. 2541, line 19; p. 2544, lines 3-12; p. 2546, line 4 – p. 2549, line 11; p. 2551, lines 10-19; p. 2554, lines 6-16; p. 2555, line 12 – p. 2557, line 23; p. 2564, line 4 – p. 2565, line 23; p. 2568, line 18 – p. 2571, line 13; p. 2579, line 19 – p. 2580, line 8; p. 2584, line 7 – p. 2585, line 6; p. 2598, line 2 – p. 2607, line 18 (Richard Amoroso).

112)    The 2019 risk pool has also been kept open improperly. The only claims keeping the 2019 risk pool open are Feldman/Capstone's own claims.[229]  To keep the 2019 risk pool open indefinitely, Feldman/Capstone submitted, opened, and refused to investigate or close at least twenty-one separate claims under their professional liabilities, errors & omissions, and legal expense policies included in the risk pool.[230]  Feldman/Capstone's reinsurance expert, Phil Cabaud, testified that if Capstone or Feldman do not want to seek reimbursement for their open claims, they could leave those claims open and lock the captives in the pool indefinitely.[231] Feldman/Capstone have done precisely that. It is to Feldman and Capstone's benefit to keep the claims open. If there is no resolution, Feldman/Capstone's insurer, A.M.Y., has no exposure, and the pool money is available for expenses, proper or otherwise.

## 1.    Mr. Feldman, the Feldman Law Firm and Capstone's claims regarding the Doctors arose in 2020 but were backdated to 2019.

113)    Feldman and Capstone's intent to keep the 2019 risk pool open indefinitely to the detriment of their clients (including the Doctors) is further established by Capstone's and Feldman's backdating of their own claims regarding the arbitrations with the Doctors to the 2019 risk pool. The claim filing procedure allowing for a six month reporting tail after expiration of the

---

[229] *See* Transcript, Volume 7, August 16, 2021, at p. 2527, line 6 – p. 2530, line 2 (Richard Amoroso) ("[T]he only claims preventing the 2019 risk pool from closing . . . were claims files by the Feldman Law Firm and/or Capstone."); Transcript, Volume 23, October 2, 2021, at p. 9232, lines 15-20 (Jeff Carlson).

[230] *See* Transcript, Volume 11, August 20, 2021, at p. 4318, line 7 – p. 4320, line 1 (citing Exhibit DRS-2000, 2019 Claims Summary Chart); Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart A. Feldman (June 6, 2020, 17:17 CST); Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[231] *See* Transcript, Volume 18, September 24, 2021, at p. 7238, line 21 – p. 7239, line 4; p. 7243, line 1 – p. 7250, line 8 (Phil Cabaud).  As seen in this cited excerpt, a portion of Mr. Cabaud's deposition was read into the record for impeachment purposes.  While Mr. Cabaud stated that he believed he misunderstood the deposition question, the record reflects a clear answer provided under oath by Mr. Cabaud at his deposition, as well as Mr. Cabaud's acknowledgment that it was possible for Feldman and Capstone to leave the clients trapped in the risk pool indefinitely.

covered period. However, this tail still required that a claim arise within the covered period. In this instance, the claim reported was a fiction, and it was reported as arising on the last day of the coverage period, December 31, 2019.

114)    On June 10, 2020, Feldman and Capstone's Controller, Paul Franks, e-mailed the Capstone Insurance Department the New Claim Report regarding the 2020 arbitrations with the Doctors.[232]  The New Claim Report regarding the 2020 arbitrations with the Doctors provides a date of loss of December 31, 2019.[233]  The New Claim Report also states:[234]

> Insureds may be **potentially counter-sued** by Janus Insurance Corp.,
> Cerberus Insurance Corp., Orion Insurance Corp., Center for Restorative
> Breast Surgery, LLC, St. Charles Surgical Hospital, and/or related persons
> or entities alleging Breach of Fiduciary Duty (Claim No. 45). Reserve for
> $1,000 for Legal Expense. (Emphasis added.)

115)    It is undisputed that the Doctors did not sue or counter-sue Capstone or Feldman at any time in the 2019 calendar year.[235]  The Doctors' threat to terminate the relationship or the fact that Dr. Sullivan stated in an email about Feldman, "f___ him," is insufficient to create a claim.[236]

116)    Feldman/Capstone have failed to identify any documents reflecting a threat of litigation or a "claim made" by the Doctors in 2019.[237]  Nor did Feldman or Capstone introduce into the record any written notice of loss created or sent by Feldman or Capstone in the 2019

---

[232] *See* Exhibit DRS-1463, E-mail from Paul Franks (June 10, 2020, 17:08 CST) (citing Exhibit DRS-564).

[233] *See* Exhibit DRS-564, New Claim Report for the Dispute with the Doctors.

[234] *See* Exhibit DRS-564, New Claim Report for the Dispute with the Doctors (emphasis added).

[235] *See* Transcript, Volume 16, September 14, 2021, at p. 6392, lines 16-20 (Daniel Calderon).

[236] See Exhibit FC 268. Similarly, calling Mr. Feldman an a...hole does not create a claim. See Exhibit 540.

[237] The Doctors' claims handling expert, Louis Fey, provided unrebutted expert testimony that a few e-mails sent by Dr. Sullivan in late 2019 expressing some frustration with his lawyer, Mr. Feldman, amounted to nothing more than "sticks and stones" but did not come close to constituting a claim. *See* Transcript, Volume 8, August 17, 2021, at p. 3111, line 12 – p. 3121, line 3 (Louis Fey).

calendar year.[238] Indeed, as of January 1, 2020, Feldman and Capstone were still acting as the Doctors' lawyer and captive manager respectively.[239] Judge Dorfman found that Feldman did not withdraw as counsel until January 5, 2020.[240]

117)   A.M.Y.'s 2019 legal expense, errors & omissions, and professional liability insurance policies are "CLAIMS MADE POLIC[IES]."[241]   Capstone first sued the Doctors on May 7, 2020.[242] There was no litigation or arbitration with the Doctors in 2019.[243] The Doctors' claims handling expert, Louis Fey, offered expert testimony that the claims regarding the Doctors were not covered by the 2019 A.M.Y. policies.[244] The A.M.Y. claims regarding the Doctors had no business in the 2019 pool and should have been included, if anywhere, in the 2020 pool.

118)   The number of participants in 2020 dropped precipitously from the number of 2019 participants. This included the Doctors.[245] Thus, Feldman/Capstone could not get the Doctors to pay Capstone's and Feldman's claim for reimbursement of legal fees incurred in these arbitration proceedings, or get the Doctors to indemnify Capstone/Feldman for any damages resulting from Capstone's and Feldman's breach of fiduciary duties or errors & omissions to the Doctors, unless Feldman/Capstone backdated their A.M.Y. claims concerning the Doctors to the 2019 pool.  Nor could Feldman/Capstone use their 2020-commenced arbitrations with the Doctors as the basis to

---

[238] *See* Transcript, Volume 13, August 22, 2021, at p. 5053, line 11 – p. 5060, line 15 (Stewart Feldman).

[239] *See* Transcript, Volume 1, August 3, 2021, at p. 258, line 3 – p. 261, line 11 (Dr. Scott Sullivan).

[240] See Exhibit J-115, p. 8.

[241] *See* Exhibit DRS-2108, AMY's 2019 Errors & Omissions Insurance Policy at Joint-331505; Exhibit DRS-2110, AMY's 2019 Legal Expenses Reimbursement Policy at Joint-331780; Exhibit DRS-2109, AMY's 2019 Lawyers Professional Liability Insurance Policy at Joint-331732.

[242] *See* Exhibit DRS-1460, Capstone's Arbitration Demand against the Doctors in the Dorfman Arbitration (May 7, 2020).

[243] *See* Transcript, Volume 1, August 3, 2021, at p. 260, lines 9-12 (Dr. Scott Sullivan).

[244] *See* Transcript, Volume 8, August 17, 2021, p. 3103, lines 10-23; p. 3110, line 13 – p. 3111, line 4 (Louis Fey).

[245] *See* Transcript, Volume 22, October 1, 2021, at p. 8786, lines 19-21 (Jeff Carlson).

deny the Doctors' request for a liquidation unless the claims were fraudulently opened in the 2019 pool.

119)   No record evidence supports any loss occurring in the calendar year 2019. Feldman/Capstone knew that the December 31, 2019 date of loss was false and that they had not been sued or counter-sued by the Doctors in 2019. The existence of a "potential counter-suit" requires an underlying claim. There was none as of December 31, 2019. I conclude that the sole reason for reporting a 2019 claim was to gain access to the 2019 risk pool funds.

120)   The 2019 A.M.Y. Legal Expense Reimbursement Insurance Policy only covers "Litigation Expenses" "*first expensed*" by Capstone or Feldman "*during the policy period*" (*i.e.*, 2019).[246] Thus, for the legal expense reimbursement claim to be possibly included in the 2019 risk pool, Feldman/Capstone needed to present an invoice for Litigation Expenses "first expensed" during the 2019 calendar year.[247] No such expenses were introduced into evidence. In fact, Capstone's President, Mr. Carlson, testified that Capstone did not obtain legal counsel regarding the dispute with the Doctors until January 2020.[248]

121)   Moreover, Feldman/Capstone submitted Affidavits regarding "all time entries" of litigation expenses incurred by Feldman/Capstone relating to the first arbitration with the Doctors,

---

[246] *See* Exhibit DRS 2110, AMY's 2019 Legal Expenses Insurance Policy at Joint-331789 (emphasis added); *see also* Transcript, Volume 8, August 17, 2021, at p. 3086, line 23 – p. 3087, line 6 (Louis Fey). *See id.* at ¶ 32 (emphasis in original and added).

[247] *See* Transcript, Volume 8, August 17, 2021, at p. 3093, line 15 – p. 3104, line 21 (Louis Fey). In its normal course of business, Capstone routinely demands invoices and denies other captives' claims when supporting documentation is not provided promptly. *See, e.g.*, Transcript, Volume 16, September 14, 2021, at p. 6286, line 15 – p. 6309, line 21 (Daniel Calderon).

[248] *See* Transcript, Volume 15, August 24, 2021, at p. 5719, lines 6-11 (Jeff Carlson).

the Dorfman arbitration.[249] These Affidavits confirm that Feldman/Capstone did not incur any legal expenses in the 2019 calendar year regarding the dispute with the Doctors.[250] These facts establish that Feldman/Capstone's legal expense reimbursement claim regarding the Doctors has been backdated and kept open wrongfully in the 2019 pool.

122) Capstone/Feldman's actions in keeping open claims in the 2019 risk pool relating to the 2020 arbitrations with the Doctors is part of a fraudulent scheme to keep the 2019 pool open indefinitely so as to force 2019 pool participants into paying Feldman/Capstone's legal fees and expenses in these arbitration proceedings.

2. **Mr. Feldman, the Feldman Law Firm and Capstone fraudulently submitted and/or kept open numerous other claims in the 2019 risk pool.**

123) On June 6, 2020, Stewart Feldman directed the Feldman Law Firm and Capstone's Controller, Paul Franks, and Capstone's Head of Operations, Daniel Calderon, to submit A.M.Y.'s claims to the 2019 risk pool.[251] Four days later, on June 10, 2020, Paul Franks e-mailed the Capstone Insurance Department "six attached New Claim Reports for the Feldman Law Firm."[252]

---

[249] *See* Exhibit DRS-723, Joseph Greenberg's Affidavit at p. 6 (Dorfman Arbitration); Exhibit DRS-724, Andy Paredes' Affidavit at p. 6 (Dorfman Arbitration); *see also* Transcript, Volume 8, August 17, 2021, at p. 3094, line 10 – p. 3103, line 23 (Louis Fey).

[250] *See* Exhibit DRS-723, Joseph Greenberg's Affidavit at p. 6 (Dorfman Arbitration); Exhibit DRS-724, Andy Paredes' Affidavit at p. 6 (Dorfman Arbitration); *see also* Transcript, Volume 8, August 17, 2021, at p. 3094, line 10 – p. 3103, line 23 (Louis Fey).

[251] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart Feldman (June 6, 2020, 17:17 CST)).

[252] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

Daniel Calderon, on behalf of the Capstone Insurance Department and PoolRe, confirmed, via e-mail, receipt of the claims.[253]

124)   Five of these New Claims Reports submitted by Feldman/Capstone listed an incorrect date of loss of December 31, 2019.[254] No record evidence establishes any loss incurred by Feldman/Capstone on that date or at any time in the 2019 calendar year relating to those disputes.[255] Each of these New Claim Reports described the alleged loss to Capstone/Feldman as follows: "[Capstone and the Feldman Law Firm] may be potentially counter-sued" by a captive client of Feldman and Capstone.[256]

125)   A potential counter-suit does not qualify as a claim.[257] Indeed, Capstone, on behalf of PoolRe, denied another captive's request for legal expense reimbursement when that captive reported a "potential claim" under its 2019 legal expense reimbursement policy.[258] Feldman/Capstone knew, or should have known, that a potential counter-suit in the future was not a valid claim but nonetheless submitted and kept open in the 2019 pool numerous insurance claims for reimbursement to Feldman/Capstone for the legal fees they would incur in "potential" counter-suits against them.

---

[253] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[254] *See* Exhibit DRS-560 to DRS-564, New Claim Reports submitted by Feldman and Capstone.

[255] The Doctors' claims handling expert, Louis Fey, provided unrebutted expert testimony that the claims submitted in Exhibit DRS-560 to DRS-564 were not covered by A.M.Y.'s 2019 policies. *See* Transcript, Volume 8, August 17, 2021, at p. 3051, line 8 – p. 3121, line 3 (Louis Fey).

[256] *See* Exhibit DRS-560 to DRS-564, New Claim Reports submitted by Feldman and Capstone.

[257] *See* Transcript, Volume 8, August 17, 2021, at p. 3055, lines 13-19 (Louis Fey).

[258] *See* Transcript, Volume 16, September 14, 2021, at p. 6307, line 3 – p. 6309, line 21 (Daniel Calderon) (discussing Exhibit DRS-2552, March 4, 2020 Denial Letter of HEC II Assurance's 2019 Legal Expense Reimbursement Claim).

126)     Two of these six New Claim Reports e-mailed on June 10, 2020 and opened in the 2019 pool pertained to disputes that Feldman/Capstone had already settled.[259] Based on the totality of the evidence, this Arbitrator concludes that the sole purpose of keeping the 2018 and 2019 risk pools open was to allow Feldman/Capstone to access the risk pool funds for the personal benefit of Feldman/Capstone, and the argument of a "potential countersuit" as grounds for keeping the 2019 pool open is without merit.

127)     As cover for its actions, Capstone and Feldman engaged the law firm of BakerHostetler to review the propriety of the claims opening. Feldman/Capstone argued that BakerHostetler determined in a July 15, 2021 memorandum that Feldman/Capstone's claims regarding disputes with the McAda, Enerset, and Martinez Parties are covered in the 2019 risk pool.[260]   But the July 15, 2021 BakerHostetler memorandum is flawed.[261]   BakerHostetler, although a well-respected multi-national law firm, was not an independent, third-party administrator, as would be appropriate.[262] Instead, BakerHostetler was only told what Feldman/Capstone wanted it to know.  The information provided to BakerHostetler preordained the opinion provided.

128)     Specifically, BakerHostetler did not perform an independent review or analysis of the A.M.Y. claims.  According to BakerHostetler:

---

[259] *See* Transcript, Volume 8, August 17, 2021, at p. 3071, line 7 – p. 3076, line 16 (Louis Fey) (citing Exhibit DRS-563, New Claim Report relating to Family Parties' Dispute); *see also* Transcript, Volume 8, August 17, 2021, at p. 3054, line 19 – p. 3062, line 13 (discussing Exhibit DRS-560, New Claim Report regarding Logistics Parties' Dispute).

[260] *See* Transcript, Volume 16, September 14, 2021, at p. 6270, line 12 – p. 6271, line 12 (Daniel Calderon); *see also* Exhibit FC-349, BakerHostetler Memo.

[261] Exhibit FC-349, BakerHostetler Memo.

[262] *See* Transcript, Volume 8, August 17, 2021, at p. 3037, line 8 – p. 3039, line 7; p. 3127, line 6 – p. 3128, line 16 (Louis Fey).

[W]e have not had an opportunity or been asked to independently analyze all of the facts relevant to each proceeding. Our review consisted only of reviewing claims files and policies provided by Pool Re and discussions with Pool Re's insurance manager, Capstone. We did not conduct independent legal research or analysis of the underlying claims, including the facts upon which claims may be based. We also were not instructed to nor did we review independent facts regarding the amount and/or veracity of the losses at issue for each insured for the six claims presented.[263]

Considering these disclaimers and the limited information provided to it, I conclude that BakerHostetler was not engaged to provide an independent answer, but to provide an opinion, based on limited data, that Feldman/Capstone could rely upon if their decision was questioned.

129)    This Arbitrator finds that Feldman/Capstone manipulated the presentation of claims file materials to BakerHostetler to support Feldman/Capstone's desired coverage decisions. The intentional omission of material documents sent to BakerHostetler represents additional evidence of fraudulent intent to support coverage in the 2019 pool for A.M.Y. claims that should never have been submitted or opened in the 2019 pool, let alone kept open in the 2019 pool for years without any legitimate investigation.

### 3.    Mr. Feldman, the Feldman Law Firm, Capstone, and PoolRe failed to conduct a prompt or diligent investigation of the A.M.Y. claims.

130)    Capstone failed to promptly adjust the A.M.Y. claims kept open in the 2019 pool.[264] While PoolRe may have ultimate decision-making authority for pool claims, it is up to Capstone to first make a recommendation to PoolRe regarding those claims.[265]  And Daniel Calderon, who

---

[263] *See* Exhibit FC-349, BakerHostetler Memo at p. 1.

[264] *See* Transcript, Volume 8, August 17, 2021, at p. 3028, lines 3-13; p. 3054, lines 12-18; p. 3060, line 23 – p. 3062, line 13; p. 3076, lines 17-22; p. 3130, line 25 – p. 3131, lines 16 (Louis Fey); Transcript, Volume 22, October 1, 2021, at p. 8765, lines 2-6 (Robert Snyder); *see also* Transcript Volume 23, October 2, 2021, at p. 9236, line 20 – p. 9240, line 21 (Jeff Carlson).

[265] *See* Transcript, Volume 16, September 14, 2021, at p. 6076, line 21 – p. 6077, line 11; p. 6079, lines 8-19 (Daniel Calderon).

is responsible at Capstone for investigating the A.M.Y. claims,[266] testified that he had not even discussed the A.M.Y. claims with anyone at PoolRe almost nine months after the A.M.Y. claims were formally submitted.[267]  As of the final hearing, neither Capstone nor PoolRe had made any legitimate attempt to determine whether the A.M.Y. claims were in fact covered by the 2019 pool.[268]

131)    In fact, Mr. Calderon testified that there was an intentional decision to delay resolution of the A.M.Y. claims.[269]  Feldman, Capstone, and PoolRe have kept the 2019 pool open with fraudulent claims that they refuse to investigate / close and, at the same time, contend that the 2019 pool participants are responsible for Feldman's, Capstone's, and PoolRe's continuously accruing legal fees and costs until the A.M.Y. claims are resolved, if ever.[270]  This Arbitrator finds such conduct injurious to the interests of Feldman's and Capstone's clients, including the Doctors, participating in the risk pools.  This Arbitrator further finds that Feldman/Capstone have kept the 2019 pool open for the improper purpose of using 2019 pool participants' money to fund Feldman's, Capstone's, and PoolRe's litigation against their clients.

### C.    Mr. Feldman, the Feldman Law Firm and Capstone converted their clients' money held in trust.

132)    To pay for their legal fees and costs in these arbitration proceedings, Feldman, Capstone, and PoolRe wrongfully took: $250,000.00 of their captive clients' premiums from the

---

[266] *See* Transcript, Volume 15, August 24, 2021, at p. 5785, lines 10-14 (Jeff Carlson).

[267] *See* Transcript, Volume 16, September 14, 2021, at p. 6339, lines 1 – 22 (Daniel Calderon).

[268] *See, e.g.*, Transcript, Volume 16, September 14, 2021, at p. 6387, line 14 – p. 6388, line 12 (Daniel Calderon).

[269] *See* Transcript Volume 16, September 14, 2021, at p. 6174, line 1 – p. 6177, line 25 (Daniel Calderon).

[270] *See* Transcript, Volume 23, October 2, 2021, at p. 9233, line 2 – p. 9234, line 21; p. 9256, line 1 – p. 9257, line 1 (Jeff Carlson). A.M.Y. has no incentive to adjust claims. As long as a claim remains open, A.M.Y. has no financial obligation to pay, and Feldman and Capstone can continue to use pool money for expenses.

2018 risk pool;[271] $3,042,427.37 of their captive clients' premiums from the 2019 risk pool;[272] and $62,498.00 of their captive clients' premiums from the 2020 risk pool.[273]

133) Feldman/Capstone made clear at the final hearing its position that the $3,354,925.37 of their captive clients' premiums it took from the risk pool were not associated with any claim in the risk pool.[274] Feldman/Capstone contend that the $3,354,925.37 it took from the 2018 to 2020 risk pools were to pay for PoolRe's administrative expenses in administering the pools. Even assuming that a claim was properly in the 2019 pool year, at best, expenses would only be applicable to the claim asserted. That did not happen in this case. The captive clients' premiums taken from the risk pools were used by Feldman/Capstone for a variety of fees and expenses that cannot plausibly be considered PoolRe administrative expenses. For instance, Feldman/Capstone billed and collected from their clients under the guise of "PoolRe administrative expenses" the following:

- fees and expenses incurred by Feldman in defending against a state bar complaint asserted against Mr. Feldman personally;[275]

---

[271] *See* Exhibit-DRS 2543, Capstone's Final Report on the 2018 Risk Pool (July 27, 2021); *see also* Transcript, Volume 11, August 20, 2021, p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript Volume 17, September 23, 2021, p. 6857, line 5 – p. 6858, line 18 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 8794, line 8 – p. 8795, line 6 (Robert Snyder); Transcript, Volume 7, August 16, 2021, at p. 2544, lines 3-12 (Richard Amoroso).

[272] *See* Transcript, Volume 18, September 24, 2021, at p. 7013, line 19 – p. 7014, line 9 (Jeff Carlson); Transcript, Volume 7, August 16, 2021, at p. 2552, line 5 – p. 2557, line 23 (Richard Amoroso). From the 2019 risk pool, the retained premium amount was $3,600,262.32. *See* Exhibit DRS-2004, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-401652. Claims losses and expenses for other captives' claims, in an amount of $557,834.94, were deducted from the 2019 pool. *See* Exhibit DRS-2680, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-427016. The remaining $3,042,427.37 from the 2019 pool has been wrongfully converted to pay for Feldman/Capstone's legal fees and expenses in these arbitrations.

[273] *See, e.g.*, Transcript, Volume 23, October 2, 2021, at p. 9171, line 11 – p. 9176, line 1 (Jeff Carlson).

[274] *See* Transcript, Volume 22, October 1, 2021, at p. 8804, lines 6-11 (Statement by Feldman/Capstone's Counsel); *see also* Transcript, Volume 11, August 20, 2021, at p. 4617, line 16 – p. 4618, line 8 (Stewart Feldman); *see also* Transcript, Volume 15, August 24, 2021, at p. 5983, lines 22-24 (Jeff Carlson); *see also* Transcript, Volume 17, September 23, 2021, at p. 6878, lines 18-20 (Statement of Feldman/Capstone's Counsel) ("PoolRe doesn't have an insurance policy or a claim.").

[275] *See* Exhibit DRS 2004 at Joint-401691, Allocation of Arbitration / Litigation Costs & Expenses through 12/6/2020 (reflecting the fees incurred by Feldman in defending the state bar complaint that were charged to pool participants).

- fees and expenses incurred by Feldman in defending against the Doctors' legal malpractice claims against Feldman;[276]

- fees and expenses incurred by Feldman/Capstone in arbitrations in which PoolRe is not even a party;[277] and

- amounts charged by twelve Feldman employees, only six of whom are attorneys, and eighteen Capstone employees, only two of whom are attorneys, at inflated rates that "are not reflective of the actual salaries or compensation" paid by Feldman or Capstone to these employees.[278]

134) Further, Feldman/Capstone authorized or effectuated numerous wires out of PoolRe accounts holding the captive clients' premiums to pay for Feldman's, Capstone's, and PoolRe's legal fees and operating expenses – not any claim in the pool. Some examples include:

- On July 3, 2020, $10,000.00 of captive clients' premiums were used to pay Judge Dorfman' arbitrator fees incurred in an arbitration filed by Feldman, Capstone, and PoolRe against the Doctors.[279]

- On November 18, 2020, $10,000.00 of captive clients' premiums were used to pay for the expert fees of Jason Sharp, through his firm Briggs & Veselka, in these arbitration proceedings;[280]

- On November 20, 2020, $11,000.00 of captive clients' premiums were used to pay Judge Baker for arbitrator fees,[281] and $100,000.00 of captive clients' premiums were used to pay AZA for representing Feldman, Capstone, and PoolRe in these arbitration proceedings;[282]

---

[276] *See* Transcript, Volume 22, October 1, 2021, at p. 9120, line 1 – p. 9125, line 20 (Jeff Carlson).

[277] *See, e.g.,* Exhibit DRS-2004, Allocation of Arbitration / Litigation Costs & Expenses through 12/6/2020 (reflecting fees and costs incurred in the Kutcher Arbitrations as being paid out of PoolRe funds).

[278] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of mid September 2021 at Joint 427334, Joint 427335; *see also* Transcript, Volume 22, October 1, 2021, at p. 9033, line 21 – p. 9035, line 3; p. 9074, line 8 – p. 9075, line 1; p. 9090, line 8 – p. 9091, line 21; p. 9094, line 10 – p. 9095, line 21 (Jeff Carlson); Exhibit DRS-2004, Joint 401715- Joint 401716, E-mail from Jeff Carlson to Robert Snyder and Steve Friedman, with copy to Dana Moore (Feb. 3, 2021, 7:29 p.m.).

[279] *See* Exhibit DRS-2004, ACH Wire Transfer, dated July 3, 2020, at Joint-401677.

[280] *See* Exhibit DRS-2004, ACH Wire Transfer, dated November 18, 2020, at Joint-401677.

[281] *See* Exhibit DRS-2004, ACH Wire Transfer, dated November 20, 2020, at Joint-401681.

[282] *See* Exhibit DRS-2004, ACH Wire Transfer, dated November 20, 2020, at Joint-401685.

- For the November 2020 true-up, $542,000.00 of captive clients' premiums were transferred out of PoolRe's bank account and into Capstone's account to pay for legal fees and expenses incurred by Feldman and Capstone in these arbitration proceedings;[283]

- On December 28, 2020, $327,955.00 of captive clients' premiums were used to pay Capstone for the fees and expenses incurred by Feldman/Capstone in these arbitration proceedings;[284]

- On February 12, 2021, $68,954.00 of captive clients' premiums were used to pay for the fees and expenses incurred by Feldman/Capstone, and $362,212.15 of fees and expenses incurred by AZA, in these arbitration proceedings;[285]

- For the February 2021 true-up, $180,599.00 of captive clients' premiums were transferred out of PoolRe's bank account and into Capstone's bank account for payment of fees and expenses incurred by Feldman/Capstone in these arbitration proceedings;[286]

- On March 8, 2021, $40,625.00 of the captive clients' premiums were used to pay Arbitrator Glasser, $42,487.50 of captive clients' premiums were used to pay Judge Baker, $41,069,60 of captive clients' premiums were used to pay this Arbitrator, and $39,650.00 of captive clients' premiums were used to pay Judge Jones for arbitrator fees in these arbitration proceedings;[287]

- For the May 2021 true-up, $46,358.00 of captive clients' premiums were transferred out of PoolRe's bank account and into Capstone's account to

---

[283] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427333. Capstone's President, Jeff Carlson, testified that the $542,000.00 was transferred from PoolRe's bank account to Capstone's bank account. *See* Transcript, Volume 22, October 1, 2021, at p. 9106, line 22 – p. 9107, line 1; p. 9111, lines 3-10 (Jeff Carlson). Further, although these payments were wired from PoolRe to Capstone, they payments are to defray the fees and costs also incurred by Feldman. *See* Transcript, Volume 22, October 1, 2021, at p. 9109, line 9 – p. 9110, line 24 (Jeff Carlson).

[284] *See* Exhibit DRS-2004, ACH Wire Transfer, dated December 28, 2020, at Joint-401687.

[285] *See* Exhibit DRS-2004, ACH Wire Transfer, dated February 12, 2021, at Joint-401708.

[286] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427333. Capstone's President, Jeff Carlson, testified that the true-up payments that are printed in red on Joint-427333 of Exhibit FC-692 reflect payments made with the retained risk pool premiums paid by the captives into the pool. *See* Transcript, Volume 22, October 1, 2021, at p. 9122, line 25 – p. 9123, line 10 (Jeff Carlson).

[287] *See* Exhibit DRS-2004, ACH Wire Transfer, dated March 8, 2021, at Joint-401719.

pay for fees and expenses incurred by Feldman/Capstone in these arbitration proceedings;[288]

- On April 13, 2021, $292,552.13 of captive clients' premiums were used to pay the fees and expenses incurred by AZA on behalf of Feldman/Capstone in arbitrations in which Feldman/Capstone were adverse to their clients;[289]

- On June 29, 2021, $320,645.00 of captive clients' premiums were used to pay for the legal fees and expenses incurred by Feldman/Capstone, $124,996.00 of captive clients' premiums were used to pay for the legal fees and expenses incurred by AZA, $19,996.60 of captive clients' premiums were used to pay for the legal fees and expenses of BakerHostetler, and $17,835.92 of captive clients' premiums were used to pay for the legal fees and expenses incurred by Reynolds Frizzell in providing legal representation and services to Feldman, Capstone, and PoolRe;[290]

- For the June 2021 true-up, $213,716.00 of captive clients' premiums were transferred out of PoolRe's bank account and into Capstone's account to pay for fees and expenses incurred by Feldman/Capstone in these arbitration proceedings;[291]

- On July 8, 2021, $48,862.50 of captive clients' premiums were used to pay Judge Jones, $38,500.00 of captive clients' premiums were used to pay Judge Baker; and $30,800 of captive clients' premiums were used to pay this Arbitrator for arbitrator fees in these arbitration proceedings;[292]

135)    The totality of the evidence and testimony in the record reflects that Feldman/Capstone obtained improper benefits, subordinating the Doctors' interests to their own, by taking, without any disclosure, $3,354,925.37 of their captive clients' premiums to pay for the

---

[288] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427333; *see also* Transcript, Volume 22, October 1, 2021, at p. 9122, line 25 – p. 9123, line 10 (Jeff Carlson).

[289] *See* Exhibit DRS-2004, ACH Wire Transfer, dated April 13, 2021, at Joint-401752.

[290] *See* Exhibit DRS-2685, ACH Wire Transfer, dated June 29, 2021, at Joint-421752.

[291] *See* Exhibit FC-692, Draft of Consolidated Payments, SCP Litigation as of Mid-September 2021, at Joint-427333; *see also* Transcript, Volume 22, October 1, 2021, at p. 9122, line 25 – p. 9123, line 10 (Jeff Carlson).

[292] *See* Exhibit DRS-2685, ACH Wire Transfer, dated July, 2021, at Joint-421775.

legal fees and expenses incurred by Feldman, Capstone, and PoolRe in these arbitration proceedings.

## VII.   Capstone, the Feldman Law Firm, and PoolRe were all acting under Mr. Feldman's control and supervision.

136)   The totality of the evidence establishes that Mr. Feldman, individually, was fully aware of and approved all actions of his Firm, Capstone and PoolRe, including, without limitation, the A.M.Y. investigation and payment of fees in connection with the disciplinary complaint.

137)   Mr. Feldman owns and controls the Feldman Law Firm and Capstone.   The hierarchical structure of the "whole enterprise ultimately rolls up to" Mr. Feldman.[293] Mr. Feldman is the sole owner and partner of the Feldman Law Firm.[294] Mr. Feldman is the owner, general counsel, and CEO of Capstone.[295] Capstone's Head of Operations, Daniel Calderon, testified that, directly or indirectly, "everybody in the company reports to the CEO."[296] And Capstone "is ultimately owned and controlled by Stewart A. Feldman, principal and managing partner of The Feldman Law Firm, LLP."[297]

138)   Further, all allocations of expenses and revenues, and the day-to-day accounting, for all of Mr. Feldman's related entities, including Capstone, the Feldman Law Firm, PoolRe, and

---

[293] *See* Transcript, Volume 22, October 1, 2021, at p. 8846, line 25 – p. 8847, line 11 (Robert Snyder) (citing Exhibit DRS-192).

[294] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 13-17 (Stewart Feldman); Transcript, Volume 15, August 24, 2021, p. 6018, lines 3-9 (Jeff Carlson).

[295] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 18-19; p. 5117, line 25 – p. 5118, line 5 (Stewart Feldman). Capstone's Vice President and Head of Operations, Daniel Calderon, testified that everyone within the organization reports to Stewart Feldman. *See* Transcript, Volume 16, September 14, 2021, at p. 6330, lines 8-13 (Daniel Calderon).

[296] *See* Transcript Volume 16, September 14, 2021, at p. 6330, lines 8-17 (Daniel Calderon).

[297] *See* Transcript, Volume 22, October 1, 2021, at p. 8961, line 4 – p. 8692, line 8 (Robert Snyder) (citing, *e.g.*, Exhibit DRS-2003 at Joint-364817, Claims Reserve Payment Agreement at § 2(C)).   Twelve other Claims Reserve Payment Agreements are included in Exhibit DRS 2003, which all include the same language at § 2(C) regarding Mr. Feldman's ultimate ownership and control over Capstone.

RSL Funding (another Feldman company which employs Mr. Paredes, one of the lawyers in this case), are managed directly by Mr. Feldman and his controller, Paul Franks, out of a single centralized business office.[298] This centralized business office is located on the same floor in the same building where the offices of Capstone, the Feldman Law Firm, and RSL Funding are also located.[299]

139)   Mr. Carlson testified that the only two people who have authority to write checks or engage in financial transactions for Capstone's accounts were Mr. Franks and Stewart Feldman.[300] Mr. Franks is not employed by Capstone.

140)   Capstone and the Feldman Law Firm also co-mingle assets. For instance, the Feldman Law Firm billed approximately $3,813,450 for legal services and costs incurred in these arbitrations, half of which was wired out of PoolRe's bank account directly to Capstone's bank account.[301] No record evidence reflects any payments from Capstone to the Feldman Law Firm. The co-mingling in Capstone's account of millions of dollars for legal services billed by the Feldman Law Firm represents a significant blurring of the lines of distinction between Capstone, the Feldman Law Firm and Mr. Feldman.

---

[298] *See* Transcript Volume 15, August 24, 2021, at p. 5948, line 8 – p. 5950, line 4; p. 6017, lines 1 - 17 (Jeff Carlson). RSL Funding is a company owned by Mr. Feldman and his spouse, Marla Matz. It provided legal representation, through a salaried employee, Andy Paredes, to Capstone in the Dorfman arbitration and these arbitrations. *See* Transcript, Volume 15, August 24, 2021, at p. 5718, lines 4-13 (Andy Paredes). But neither RSL Funding or Mr. Paredes ever submitted a bill for legal services to Capstone. *See* Transcript, Volume 15, August 24, 2021, at p. 5938, line 22 – p. 5943, line 17 (Jeff Carlson).

[299] *See* Transcript, Volume 15, August 24, 2021, at p. 6025, line 8 – p. 6028, line 19 (Jeff Carlson).

[300] *See* Transcript, Volume 17, September 23, 2021, at p. 6828, lines 3-11 (Jeff Carlson).

[301] *See* Transcript, Volume 22, October 1, 2021, p. 9082, line 11 – p. 9084, line 25 (Jeff Carlson). Mr. Carlson was unaware of any transfers of funds between Capstone and The Feldman Law Firm's accounts or agreement between the Feldman Law Firm and Capstone regarding how to allocate or split the millions of dollars that were wired out of PoolRe's accounts into Capstone's accounts for legal expenses and costs incurred by Mr. Feldman's entities, including Capstone, RSL Funding, and the Feldman Law Firm. *See, e.g.,* Transcript, Volume 22, October 1, 2021, at p. 9111, line 3 – p. 9113, line 5 (Jeff Carlson).

141)    Considering the totality of evidence and testimony in the record, this Arbitrator finds that Capstone and the Feldman Law Firm were acting under the direction and control of Mr. Feldman.

142)    PoolRe, while not owned by Mr. Feldman, was effectively controlled by him. PoolRe does not have any employees.[302]  PoolRe does not have an office.[303]  Capstone, which is 100% owned by Feldman, is the insurance manager of PoolRe.[304]  Capstone handles the day-to-day operations of PoolRe.[305]  Capstone maintains the books and records for PoolRe.[306] And Capstone exercises significant decision-making authority on behalf of PoolRe "without even consulting or conferring with anyone from PoolRe."[307]

143)    PoolRe's bank statements are mailed to Mr. Feldman's personal residence.[308]

144)    Capstone made the decision to sue the Doctors on behalf of PoolRe without consulting anyone from PoolRe's Board of Directors.[309]

---

[302] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 22-24 (Stewart Feldman); Transcript Volume 22, October 1, 2021, at p. 8840, lines 13-15 (Robert Snyder).

[303] *See* Transcript, Volume 15, August 24, 2021, at p. 6026, line 24 – p. 6027, line 12 (Jeff Carlson).

[304] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 19-21 (Stewart Feldman).

[305] *See* Transcript, Volume 22, October 1, 2021, at p. 8840, lines 16-18 (Robert Snyder).

[306] *See* Transcript, Volume 15, August 24, 2021, at p. 6026, line 24 – p. 6027, line 12 (Jeff Carlson).

[307] *See* Transcript, Volume 22, October 1, 2021, at p. 8947, line 25 – p. 8948, line 12 (Robert Snyder).

[308] Exhibit DRS 2698.

[309] *See* Transcript, Volume 22, October 1, 2021, at p. 8862, line 4 – p. 8865, line 25 (Robert Snyder).

145)     Capstone (meaning only Mr. Feldman and Mr. Franks) "has the authority to write checks out of PoolRe's checking account."[310] And the ACH transfers of funds out of PoolRe's accounts are approved by Mr. Feldman personally.[311]

146)     Mr. Feldman caused the incorporation of PoolRe.[312]   Feldman provides legal services and representation to PoolRe.[313] PoolRe makes a gross profit of $75,000 per year and, out of that, pays Capstone $50,000 per year for services. Thus, at best, PoolRe's net profit is $25,000 per year. It had a projected net income of $16,718 per year from 2018 to 2022.[314] And PoolRe receives no business except that given to it by the Feldman Law Firm and Capstone.[315]

147)     Further, Feldman/Capstone have used the funds held in PoolRe's accounts as their own property.[316]   Feldman/Capstone have used millions of dollars of pool funds to pay for the legal fees and expenses incurred by Feldman/Capstone in these arbitration proceedings.   For the

---

[310] *See* Transcript, Volume 22, October 1, 2021, at p. 8873, line 24 – p. 8874, line 5 (Robert Snyder).

[311] *See* Transcript, Volume 23, October 2, 2021, p. 9275, lines 1 – 6 (Jeff Carlson) (citing Exhibit DRS-2694, Joint-238351 (reflecting Stewart Feldman's initials and "OK" on PoolRe ACH transfer)); Transcript Volume 23, October 2, 2021, p. 9143, line 23 – p. 9144, line 4 (Jeff Carlson) ("Q. Okay. And if you carry on to page 401708, this is the ACH payment that was okayed by Mr. Feldman on February 14, 2021, to pay a number of invoices including the AZA invoice of $362,212.15, right? A. Yes. It is one of several on this ACH page."); Exhibit DRS-2004, Joint 401708; Transcript Vol. 18, September 24, 2021, at p. 7312, line 21 – p. 7312, line 2 (Jeff Carlson) (Q: [...]underneath that, again, is what purports to be Mr. Feldman's – Mr. Feldman's, Stewart Feldman's initials, right? A: It appears to be, yes."); Exhibit DRS-2004, Joint-401700.

[312] *See* Transcript, Volume 11, August 20, 2021, at p. 4421, line 16 – p. 4422, line 5 (Stewart Feldman) ("And the firm formed PoolRe").

[313] *See* Transcript, Volume 11, August 20, 2021, at p. 4421, line 16 – p. 4422, line 5 (Stewart Feldman).

[314] *See* Transcript, Volume 15, August 24, 2021, at p. 5995, line 24 – p. 5996, line 15, p. 5997, line 25 – p. 5998, line 10 (Jeff Carlson); Transcript, Volume 23, October 2, 2021, at p. 9458, lines 4-11 (Stephen Friedman).

[315] *See* Exhibit J-20 at SULLIVAN011104, Exhibit E to Joint Engagement Letter; *see also* Transcript, Volume 22, October 1, 2021, at p. 9123, lines 11-19 (Jeff Carlson) ("Only clients of both the [Feldman Law] Firm and Capstone . . . may participate in" PoolRe's risk pools.").

[316] Feldman and Capstone do not have a right to use their clients' money to fund Feldman/Capstone's litigation efforts. The pool premiums are "the property of the . . . pool participants" and were "held in trust by the administrator of PoolRe, which is Capstone." *See* Transcript, Volume 6, August 9, 2021, at p. 2348, line 18 – p. 2349, line 16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

Dorfman arbitration and these arbitrations, Capstone billed approximately $1.257 million, of which 50% was paid by PoolRe.[317] Similarly, for the Dorfman arbitration and these arbitrations, Feldman has billed approximately $3.813 million, of which 50% was paid by PoolRe.[318] These facts reflect the inappropriate situation that Feldman/Capstone have made millions, paid unwittingly by their own clients, merely because Feldman/Capstone are involved in litigation against their clients.

148)   None of the Feldman, Capstone, or PoolRe witnesses offered any explanation for PoolRe incurring, much less affording, millions of dollars of legal fees when it only nets, at best, $25,000 per year, particularly when PoolRe is not even a party in the Baker or this Arbitration. The only explanation is that PoolRe is controlled by Mr. Feldman, and it was to his personal advantage to allow PoolRe to pay expenses using client funds.

149)   Capstone has approximately twenty employees.[319]   The salaries of eighteen of Capstone's employees have been subsidized by funds from PoolRe's accounts.[320]   Similarly, the salaries of twelve Feldman Law Firm employees have been subsidized by funds from PoolRe's accounts.[321]   The 2018 to 2020 risk pools funded the operations of his entities, the Law Firm and Capstone.

---

[317] *See* Transcript, Volume 22, October 1, 2021, at p. 9074, line 13 – p. 9075, line 1 (Jeff Carlson) (citing Exhibit FC-692).

[318] *See* Transcript, Volume 22, October 1, 2021, at p. 9082, line 11 – p. 9084, line 25 (Jeff Carlson) (citing Exhibit FC-692). For reasons never credibly enunciated, in the Dorfman arbitration, the Feldman Law Firm, Capstone and PoolRe each paid one-third of the expenses. Yet, in these arbitrations, two of which did not even include PoolRe, the allocation was 50% PoolRe and 50% Feldman/Capstone. Other than increasing the amount of pool funds to cover the arbitration costs of Feldman/Capstone, this allocation makes no sense. I conclude this allocation was done solely in order to increase the amount of pool money available to Feldman/Capstone to defend the arbitrations.

[319] *See* Transcript, Volume 22, October 1, 2021, at p. 9093, lines 9-21 (Jeff Carlson).

[320] *See* Transcript, Volume 22, October 1, 2021, at p. 9093, lines 9-21 (Jeff Carlson).

[321] *See* Exhibit FC-692 at Joint-427334, The Feldman Law Firm Time Summary.

150)   Moreover, although a separate juridical entity, the Directors of PoolRe did not act independently in furtherance of PoolRe's interests.[322]   There is no evidence that the directors met to discuss this taking of pool funds.   PoolRe's operations are entirely in the hands of Feldman/Capstone.   There are three Directors on PoolRe's Board: Dana Moore, Robert Snyder, and Stephen Friedman.[323]   Each Director's alleged involvement in PoolRe's affairs was established at the final hearing to be minimal or non-existent.   These Directors allowed Feldman/Capstone to treat PoolRe's funds as their own.

151)   Stephen Friedman, who is also the owner of PoolRe, knew nothing about PoolRe or its operations, testifying that:

- he did not "recall any documentation relating to [his] purchase of 100 percent ownership in PoolRe," was "unaware of any information that could help . . . track down or locate documentation relating to [his] ownership in PoolRe," and could not recall whether there was ever a "written document or a contract executed that transferred" ownership of PoolRe to him;[324]

- he had "no conversations with Bob Snyder regarding true-up expenses that have been paid in these arbitrations" and never had "any discussion with Bob Snyder or Dana Moore regarding the fees that were being put into the joint defense pot;"[325]

- he is "not compensated as a director on PoolRe's board;"[326]

- he had not received a distribution from PoolRe in years and had never raised concerns or issues relating to not receiving any distributions;[327]

---

[322]   Without any business justification, PoolRe's Director, Robert Snyder, agreed with counsel's statement that "PoolRe has determined it's in its interest to take a larger share of [the] expenses" incurred by Feldman/Capstone in these arbitrations. *See* Transcript, Volume 22, October 1, 2021, at p. 8772, lines 3-8 (Robert Snyder).

[323]   *See* Transcript, Volume 22, October 1, 2021, at p. 8696, lines 14-18 (Robert Snyder).

[324]   *See* Transcript, Volume 23, October 2, 2021, at p. 9482, line 20 – p. 9483, line 23; p. 9482, line 17, p. 9485, line 1 (Stephen Friedman).

[325]   *See* Transcript, Volume 23, October 2, 2021, at p. 9471, lines 13-21; p. 9491, line 14 – p. 9492, line 1 (Stephen Friedman).

[326]   *See* Transcript, Volume 23, October 2, 2021, at p. 9482, lines 11-14 (Stephen Friedman).

[327]   *See* Transcript, Volume 23, October 2, 2021, at p. 9501, line 1 – p. 9503, line 9 (Stephen Friedman).

- he "did not understand, even at a very basic level, how [his] business, PoolRe, makes money or earns revenue;"[328]

- he had no conversations with anyone at Capstone, PoolRe, or Feldman regarding a 50% decrease in PoolRe's assets and a 45% decrease in written premiums to PoolRe following the *Reserve Mechanical* decision;[329]

- he had no understanding of the *Reserve Mechanical* decision and testified that the name *Reserve Mechanical* did not mean anything to him;[330]

- he had not had any conversations with anyone at PoolRe, Capstone, or Feldman regarding the financial performance or well-being of his company, PoolRe;[331]

- he could not recall any communications or conversations relating to the Doctors other than one alleged conversation with Mr. Snyder approximately in July 2019 – which Mr. Snyder did not recall.[332]

- there was no meeting, resolution or discussion of PoolRe's Board of Directors regarding filing an arbitration demand against the Doctors;[333]

- he had not received e-mails from Mr. Snyder relating to the administration of the PoolRe risk pools;[334]

- he was not aware of any emails, correspondence, or documents of any sort sent to or by any Director on PoolRe's Board concerning the appropriateness or inappropriateness of including policies in the risk pool covering Feldman's and Capstone's professional liabilities and legal expense liabilities;[335]

---

[328] *See* Transcript, Volume 23, October 2, 2021, at p. 9500, lines 21 -25 (Stephen Friedman).

[329] *See* Transcript, Volume 23, October 2, 2021, at p. 9499, line 1 – p. 9500, line 20 (Stephen Friedman).

[330] *See* Transcript, Volume 23, October 2, 2021, at p. 9503, lines 10-17 (Stephen Friedman).

[331] *See* Transcript, Volume 23, October 2, 2021, at p. 9504, line 16 – p. 9506, line 16 (Stephen Friedman).

[332] *See* Transcript, Volume 23, October 2, 2021, at p. 9524, lines 21 – p. 9525, line 7 (Stephen Friedman); Transcript, Volume 22, October 1, 2021, at p. 8863, line 13 – p. 8865, line 20 (Robert Snyder).

[333] *See* Transcript Volume 24, October 3, 2021, at p. 9527, lines 2-8 (Stephen Friedman).

[334] *See* Transcript Volume 24, October 3, 2021, at p. 9527, lines 13-17 (Stephen Friedman).

[335] *See* Transcript Volume 24, October 3, 2021, at p. 9535, line 22 – p. 9536, line 9 (Stephen Friedman).

- he was unaware that his company, PoolRe, took out a loan of $103,000 from a company owned and controlled by Mr. Feldman;[336] and

- no one from Capstone, the Feldman Law Firm or PoolRe ever raised an issue with Mr. Friedman regarding the taking of $62,498 of their captive clients' premiums from the 2020 risk pool to pay for Feldman/Capstone's legal fees and expenses in these arbitrations.[337]

- Mr. Friedman, the owner of PoolRe, did not even know that funds were taken from the 2020 risk pool until October 2, 2021, after his direct examination was completed (literally at the very end of the hearing). His counsel informed him of that fact.[338]

Mr. Friedman's testimony established his total lack of involvement in PoolRe's affairs. His lack of knowledge or even apparent interest in the operations of a company of which he owns 100% only buttresses the conclusion that it was Mr. Feldman who called all the PoolRe shots, directly or indirectly.

152)   The record also reflects that Mr. Snyder, a lawyer by training, did not act often or independently of Capstone in administering PoolRe's affairs.  Mr. Snyder described his role as Director of PoolRe as "ministerial and advisory."[339]  Other than signing off on meeting minutes or other ministerial acts, Mr. Snyder could "not recall ever communicating with folks at the Feldman Law Firm or Capstone through email regarding the business of PoolRe."[340]

153)   Mr. Snyder testified that he was not "involved in any way in the allocation of administrative expenses or claims handling expenses that are paid out of the retained premiums

---

[336] *See* Transcript, Volume 24, October 3, 2021, at p. 9543, line 10 – p. 9544, line 116 (Stephen Friedman).  Stephen Friedman was also unaware of a $141,966,79 loan he received from Stewart Feldman's company, A.M.Y.  *See* Transcript, Volume 24, October 3, 2021, at p. 9547, line 24 – p. 9549, line 1 (Stephen Friedman).

[337] *See, e.g.*, Transcript, Volume 23, October 2, 2021, at p. 9171, line 11 – p. 9176, line 1 (Jeff Carlson).

[338] *See* Transcript, Volume 24, October 3, 2021, at p. 9582, line 18 – p. 9587, line 22 (Stephen Friedman).

[339]  *See* Transcript, Volume 22, October 1, 2021, at p. 8840, lines 9-12 (Robert Snyder).

[340] *See* Transcript, Volume 22, October 1, 2021, at p. 8847, line 25 – p. 8848 line 18 (Robert Snyder).

for each PoolRe risk pool."[341]   Mr. Snyder testified that he was unaware of any e-mails, correspondence, or documents sent to or by any director on PoolRe's Board concerning the appropriateness or inappropriateness of A.M.Y.'s coverages being included in the risk pools.[342]

154)   Mr. Snyder recognized that "certain causes of action [in these arbitrations were] direct[ed] specifically at the Feldman Law Firm and not PoolRe" and questioned whether the Feldman "Law Firm [was] in fact being allocated its fair share of the expense" for these arbitrations.[343] Notwithstanding this recognition, Mr. Snyder and the other PoolRe directors did nothing to ensure that Feldman/Capstone were in fact paying their fair share. Instead, PoolRe continued to pay 50% of all arbitration costs, including arbitrations in which it was not a party.

155)   PoolRe used millions of dollars of the captive clients' premiums to pay for the legal fees and expenses billed by the Feldman Law Firm and Capstone in these arbitrations even though no one ever provided PoolRe an invoice or any back-up documentation supporting Capstone's or the Feldman Law Firm's fees and expenses.[344]

156)   Mr. Feldman personally authorized the payments from PoolRe to Capstone.[345]   At Mr. Feldman's direction, PoolRe used the captive clients' premiums to pay for (1) Mr. Feldman's

---

[341] *See* Transcript, Volume 22, October 1, 2021, at p. 8873, lines 2-8 (Robert Snyder).

[342] *See* Transcript, Volume 22, October 1, 2021, at p. 9005, line 19 – p. 9006, line 9 (Robert Snyder).

[343] *See* Transcript, Volume 22, October 1, 2021, at p. 9004, line 8 – p. 9005, line 5 (Robert Snyder).

[344] *See* Transcript, Volume 15, August 24, 2021, at p. 5851, line 21 – 5856, line 1; p. 5881, line 24 – p. 5884, line 18 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 8989, line 25 – p. 8990, line 10 (Robert Snyder).

[345] *See* Transcript, Volume 23, October 2, 2021, p. 9275, lines 1 – 6 (Jeff Carlson) (citing Exhibit DRS-2694, Joint-238351 (reflecting Stewart Feldman's initials and "OK" on PoolRe ACH transfer)); Transcript, Volume 23, October 2, 2021, p. 9143, line 23 – p. 9144, line 4 (Jeff Carlson) ("Q. Okay. And if you carry on to page 401708, this is the ACH payment that was okayed by Mr. Feldman on February 14, 2021, to pay a number of invoices including the AZA invoice of $362,212.15, right? A. Yes. It is one of several on this ACH page."); Exhibit DRS-2004, Joint 401708; Transcript Vol. 18, September 24, 2021, at p. 7312, line 21 – p. 7312, line 2 (Jeff Carlson) (Q: [...]underneath that, again, is what purports to be Mr. Feldman's – Mr. Feldman's, Stewart Feldman's initials, right? A: It appears to be, yes."); Exhibit DRS-2004, Joint-401700.

defense of a state bar complaint,[346] (2) Feldman and Capstone's fees and expenses in arbitrations in which PoolRe was not even a party,[347] (3) hourly rates for the services of eight attorneys and twenty-two non-attorneys working for Feldman/Capstone;[348] and (4) a larger share of the expenses and fees in these arbitrations than either Feldman or Capstone.[349] These facts reflect that PoolRe's directors did not act independently in the best interest of PoolRe or its pool participants. Instead, PoolRe acted in furtherance of the interests of Feldman/Capstone as directed by Mr. Feldman.

157) Considering the totality of evidence and testimony in the record, this Arbitrator finds that PoolRe was effectively controlled by Mr. Feldman.

## PART FOUR: CONCLUSIONS OF LAW

## VIII. Mr. Feldman, the Feldman Law Firm and Capstone breached their fiduciary duties owed to Claimants.

158) Under Texas substantive law,[350] a fiduciary is obligated to "render full and fair disclosure of facts material to the client's representation."[351] The term fiduciary "refers to integrity and fidelity" and "contemplates fair dealing and good faith."[352] To this end, the fiduciary relationship is one of "most abundant good faith," "requiring absolute perfect candor, openness

---

[346] *See* Transcript, Volume 15, August 24, 2021, at p. 6034, lines 13-19 (Jeff Carlson).

[347] *See, e.g.*, Exhibit DRS-2004, 2019 Risk Pool Losses and Third-Party Expense Sheet and Backup (reflecting fees and costs incurred in the Kutcher Arbitrations as being paid out of PoolRe funds).

[348] *See* FC-692; Transcript, Volume 22, October 1, 2021, at p. 9032, line 12 – p. 9051, line 2 (Jeff Carlson).

[349] *See, e.g.*, Transcript, Volume 22, October 1, 2021, at p. 8772, lines 3 - 8 (Robert Snyder).

[350] The Joint Engagement Letter calls for the application of Texas substantive law. *See* Exhibit J-20, Joint Engagement Letter at p. 3 of the Guidelines on Administration & Billing, SULLIVAN011081.

[351] *See Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988).

[352] *See Trousdale v. Henry*, 261 S.W.3d 221, 229 (Tex. App. – Houston [14th Dist.] 2008) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942)).

and honesty, and the absences of any concealment or deception."[353]  Feldman/Capstone failed to comply with this standard.

159)    Feldman/Capstone argues that the "absolute perfect candor" requirement enunciated in *Trousdale* should be applied "pragmatically and not literally."[354] This Arbitrator need not determine whether the standard is "pragmatic" or "literal," regardless of the standard, the evidence establishes that the fiduciary obligations were breached.

160)    Under Texas law, the elements of a breach of fiduciary duty claim include: (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.[355]

161)    The burden of proof for a breach of fiduciary duty claim is on the fiduciary.  Texas law establishes that, "when self-dealing by the fiduciary is alleged, as it [is] in this case, a presumption of unfairness automatically arises, and the burden is placed on the fiduciary to prove that the questioned transaction (1) was made in good faith, (2) for fair consideration, and (3) after full disclosure of all material information to the principal."[356]  Feldman/Capstone failed to meet this burden.

---

[353] *See Trousdale*, 261 S.W.3d 221 at 229 (citing *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App. – Houston [14th Dist.] 2001).

[354] Feldman/Capstone Post-Hearing Brief, pp. 102-105.

[355] *See ETC Tex. Pipeline, Ltd. v. Addison Expl. & Dev., LLC*, 582 S.W.3d 823, 840 (Tex. App.—Eastland 2019) (internal citations omitted; *see also Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 752 (Tex. App.—El Paso 2013); *Las Colinas Obstetrics-Gynecology-Infertility Ass'n, P.A. v. Villalba*, 324 S.W.3d 634, 645 (Tex. App. 2010); *Holden v. Holden*, 456 S.W.3d 642, 659 (Tex. App.—Tyler 2015).

[356] *See Gammon v. Hodes*, No. 03-13-00124, 2016 WL 1882274, at *5 (Tex. App. – Austin 2015) (emphasis added); *see also Houston v. Ludwick*, No. 14-09-00600, 2010 WL 4132215, at *7 (Tex. App. – Houston [14th Dist.] Oct. 21, 2010); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App. – Tyler 2000); *Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App. – Houston [14th Dist.] 2011); *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1974); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 576 (Tex. 1963).

A.    **Mr. Feldman, the Feldman Law Firm and Capstone owed fiduciary duties to the Doctors.**

162)    A fiduciary relationship arises as a matter of law "between attorney and client, principal and agent, partners, and joint venturers."[357]

163)    Feldman owed fiduciary duties to the Doctors.  Mr. Feldman testified that both he and The Feldman Law Firm owed the Doctors fiduciary duties and that a lawyer cannot put his monetary interests above his client's interests.[358]  This Arbitrator concludes that is precisely what Mr. Feldman did.

164)    The attorney-client relationship with the Doctors commenced upon the signing of the initial retention letter on March 3, 2015, hiring Feldman to conduct the Health Check-Up and perform a feasibility study as to the appropriateness of captive insurance for the Doctors' businesses.[359]  The attorney-client relationship with the Doctors continued with the signing of the Joint Engagement Letter on December 7, 2015.[360]

165)    The Joint Engagement Letters were not limited in time or in scope.[361]  Mr. Feldman did not terminate the attorney-client relationship any earlier than January 5, 2020.  Further, even after the termination, Mr. Feldman and the Feldman Law Firm owed certain continuing obligations to the Doctors.

---

[357] *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003) (citing *Ins. Co. of North Am. v. Morris*, 981 S.W. 2d 667, 674 (Tex. 1998)).

[358] *See* Transcript, Volume 13, August 22, 2021, at p. 5129, lines 1-4 (Stewart Feldman).

[359] *See* Exhibit DRS-491, Letter from David Kushner enclosing signed Engagement Memorandum, March 3, 2015. *See also* Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

[360] *See* Exhibit J-20, Joint Engagement Letter.

[361] *See* Transcript, Volume 4, August 6, 2021, at p. 1451, line 20 – p. 1452, line 24 (Thomas Watkins); *see also*, Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

166)     The attorney-client relationship imposes the highest standards of ethical conduct upon attorneys.  As explained by the Texas Supreme Court in *Hoover Slovacek LLP v. Walton*:

> In Texas, we hold attorneys to the highest standards of ethical conduct in their dealings with their clients. The duty is highest when the attorney contracts with his or her client or otherwise takes a position adverse to his or her client's interests.[362]

167)     Mr. Feldman cannot avoid his obligation by purporting to act through Capstone or PoolRe. He was the owner of the former and effectively controlled the latter. He cannot take off his "lawyer's hat" and absolve himself of his fiduciary and ethical duties by acting through Capstone or PoolRe rather than through The Feldman Law Firm.[363]  As Mr. Watkins testified, "a lawyer, like Mr. Feldman, cannot do through another entity what he could not do as a lawyer . . . ."[364]

168)     Capstone as an agent also owed a separate fiduciary duty to its principals, the Doctors.[365]  Texas law imposes a fiduciary relationship as a matter of law between principal and agent.[366]  The Doctors' reinsurance expert, Richard Amoroso, provided unrebutted expert testimony that a traditional agency / principal relationship existed between Capstone, as captive manager, and its clients, the Doctors.[367]  Capstone owed the Doctors a "duty of loyalty," a "duty

---

[362] 206 S.W. 3d 557, 560-61 (Tex. 2006) (quoting *Lopez v. Munoz, Hockema & Reed, LLP,* 22 S.W. 3d 857, 866-868 (Tex. 2000) (Gonzales, J., concurring and dissenting) (alteration in original) (citations omitted)).

[363] *See, e.g., Matter of Hodge*, 407 P.3d 613, 639-40 (Kan. 2017); *see also Olson v. Estate of Watson*, 52 S.W.3d 865, 868 (Tex. App. – El Paso 2001) ("[A]ny argument that Mr. Olson was wearing his 'friend hat' rather than his 'attorney hat' when he drafted these documents fails as a matter of law.").

[364] *See* Transcript, Volume 4, August 6, 2021, at p. 1481, lines 3-13 (Thomas Watkins).

[365] *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003); *see also* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2392, line 19; p. 2413, line 1 – p. 2415, line 13 (Richard Amoroso).

[366] *See Abetter Trucking*, 113 S.W.3d at 508.

[367] *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso).

of complete candor and full disclosure," a "duty of fairness to treat [its] principal fairly and reasonably," and a "duty of impartiality."[368]

169)    Further, Capstone owed fiduciary duties to the Doctors in connection with the captive clients' premiums held in trust by Capstone in PoolRe's risk pools.   Section 4053.106 of the Texas Insurance Code provides that a "managing general agent holds money on behalf of an insured or insurer in a fiduciary capacity and shall properly account for that money."[369]   A managing general agent's responsibilities generally include issuing policies in an insurer's name; collecting and handling premiums paid by insureds; and investigating, adjusting, and paying claims.[370]  Capstone provides all these functions to the Doctors as part of the turnkey services it offers.[371]  These turnkey services provided by Capstone the Doctors establish Capstone's role as a managing general agent under the Texas Insurance Code.

170)    The Texas Supreme Court has determined that "funds held by managing general agents on behalf of an insurance company must be 'held in a fiduciary capacity.'"[372] And the U.S. Fifth Circuit explained that, "[i]ndeed, control over funds belonging to others is the classic situation in which fiduciary duty arises."[373]  Capstone exercised control over its captive clients' retained premiums paid into the risk pools and owes, therefore, its clients fiduciary duties in connection with those premiums.

---

[368] *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso).

[369] *See* V.T.C.A., Insurance Code § 4053.106.

[370] See *Galindo v. Empower Managing Gen. Agency, Inc*., No. 1:19-00904, 2020 WL 5409162 (W.D. Tex. Sept. 8, 2020) (quoting *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc*., 787 F.3d 716, 719 (5th Cir. 2015); Tex. Ins. Code. sec. 4053.101).

[371] See Exhibit J-20, Joint Engagement Letter at SULLIVAN011082-83.

[372] *See Nat'l Plains Admins., Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 1999).

[373] *See Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs. Inc.*, 787 F.3d 716, 727-28 (5th Cir. 2015).

77

171)   For all the foregoing reasons, this Arbitrator concludes that Mr. Feldman, the

Feldman Law Firm and Capstone each owed independent fiduciary duties to the Doctors.

**B.**   **Mr. Feldman, the Feldman Law Firm and Capstone breached fiduciary duties owed to the Doctors by engaging in self-dealing, misrepresentation, concealment of material information, and by converting their captive clients' premiums.**

172)   The standard under which fiduciaries are evaluated is an exacting one.[374]   The

Texas appellate court held in *Kimelco Petroleum, Inc. v. Morrison & Shelton*:

> The essence of a breach of fiduciary duty involves the 'integrity and fidelity' of an attorney.  A breach of fiduciary duty occurs when an attorney benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interests to his own, retaining the client's funds, using the client's confidences improperly, taking advantage of the client's trust, engaging in self-dealing, or making misrepresentations.[375]

173)   Feldman/Capstone breached fiduciary duties by subordinating Doctors' interests to

their own, retaining the Doctors' funds, taking advantage of the Doctors' trust, engaging in self-

dealing, making misrepresentations, and concealing material information, as discussed below.

**1.**   **Feldman/Capstone breached fiduciary duties by failing to disclose to their clients that their clients were insuring Feldman's and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.**

174)   As discussed in Section II, this Arbitrator found that the inclusion of Feldman's and

Capstone's professional liabilities, errors & omissions, and legal expense liabilities in the risk pool

was material information that should have been but was not disclosed by Feldman and Capstone

to their clients, the Doctors.

---

[374] *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 196 (Tex. App. – Houston [14th Dist.] 2002).

[375] 91 S.W.3d 921, 923 (Tex. App – Fort Worth 2002) (quoting *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App – Houston [14th Dist.] 2001)); *Spradley v. Michael E. Orsak, LP*, No. 0-19-00186, 2020 WL 739490, at * 8 (Tex App – Dec. 15, 2020).

175)   The Doctors' ethics expert, Mr. Watkins, testified that Feldman/Capstone had to disclose to the clients that the clients' obligation was to "pay [their] lawyers' defense cost if [the client] sue[s] [the lawyer] for malpractice."[376]   Mr. Watkins testified that Feldman committed a serious breach of fiduciary duty by "fail[ing] to inform his clients that [Feldman] was selling them a product which would enable [Feldman] to be able to get his attorneys' fees paid by the client."[377] The Doctors' reinsurance expert, Mr. Amoroso, likewise testified that Feldman/Capstone breached duties and violated industry custom and practice by failing to disclose to the Doctors that the Doctors were reinsuring Feldman and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.[378]

176)   This Arbitrator holds that Feldman/Capstone subordinated the Doctors' interests to their own, took advantage of the Doctors' trust, engaged in self-dealing and misrepresentation, and concealed material information in failing to disclose to their clients, the Doctors, that the Doctors were insuring Feldman and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.

177)   Accordingly, this Arbitrator concludes that Feldman/Capstone breached fiduciary duties to the Doctors by failing to adequately disclose that the Doctors were insuring Feldman and Capstone's professional liabilities, errors & omissions, and legal expense liabilities.

---

[376] *See* Transcript, Volume 4, August 6, 2021, at p. 1541, line 20 – p. 1542, line 15 (Thomas Watkins).

[377] *See* Transcript, Volume 4, August 6, 2021, at p. 1638, line 21 – p. 1639, line 10 (Thomas Watkins).

[378] *See* Transcript, Volume 6, August 9, 2021, at p. 2416, line 23 – p. 2417, line 5; p. 2417, line 18 – p. 2418, line 19; p. 2439, lines 3-16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, at p. 2482, line 8 – p. 2483, line 21; p. 2489, line 11 – p. 2490, line 7; p. 2508, line 22 – p. 2509, line 7; p. 2510, line 19 – p. 2511, line 3 (Richard Amoroso).

**2.      Mr. Feldman, the Feldman Law Firm and Capstone breached fiduciary duties by failing to disclose material information concerning the IRS's adverse determinations and scrutiny of the Feldman/Capstone captive insurance program.**

178)     As discussed in Section III, the IRS made determinations in the adverse audits of Reserve Mechanical and other Capstone-administered captives, including that Reserve Mechanical was not an insurance company, that Reserve Mechanical lacked the essential element of risk distribution, and that the PoolRe pooling arrangement did not provide sufficient risk distribution for Reserve Mechanical to be treated as an insurance company.  This was material information that needed to be disclosed, but was not disclosed, by Feldman/Capstone to the Doctors.

179)     Feldman/Capstone subordinated the Doctors' interests to their own, took advantage of the Doctors' trust, engaged in self-dealing and misrepresentation, and concealed material information.

180)     Accordingly, this Arbitrator concludes that Feldman/Capstone breached fiduciary duties to the Doctors by failing to disclose that the IRS had determined that a Capstone-administered captive was not an insurance company, that the Capstone-administered captive lacked the essential element of risk distribution, and that the PoolRe pooling arrangement did not provide sufficient risk distribution for the Capstone-administered captive to be treated as an insurance company.

**3.      Mr. Feldman, the Feldman Law Firm and Capstone breached fiduciary duties by failing to disclose the IRS's § 6700 promoter exam of Mr. Feldman for his actions in promoting abusive tax shelters.**

181)     As discussed in Section IV, this Arbitrator found that the § 6700 promoter exam of Mr. Feldman was material information that should have been disclosed, but was not disclosed.

182)    Feldman and Capstone subordinated the Doctors' interests to their own, took advantage of the Doctors' trust, engaged in misrepresentation and concealment of material information in failing to disclose to the Doctors the IRS's promoter exam of Mr. Feldman for promoting abusive tax shelters under IRC § 6700 before the Doctors signed the Joint Engagement Letter.

183)    Accordingly, I conclude that Feldman/Capstone breached fiduciary duties by failing to disclose to the Doctors the IRS's promoter exam of Mr. Feldman for promoting abusive tax shelters under IRC § 6700.

### 4.    <u>Mr. Feldman, the Feldman Law Firm and Capstone breached fiduciary duties by refusing to allow their clients to exit the risk pool and by converting their clients' premiums to pay for Feldman's and Capstone's legal fees and expenses incurred in these arbitration proceedings.</u>

184)    The Doctors assert that Feldman/Capstone breached fiduciary duties by occupying and acting upon conflicts of interest to their benefit and the detriment of their clients.  This Arbitrator agrees.

185)    As discussed in Section VI(B), this Arbitrator found that Feldman/Capstone improperly kept open the 2018 and 2019 risk pools with their own fraudulent claims so as to subject their clients in those pools into paying Feldman/Capstone's legal fees and expenses in fighting their clients.  These facts further establish Feldman/Capstone subordinating their clients' interests to their own and Feldman/Capstone's breaches of fiduciary duties.

186)    As discussed in Section VI(C), this Arbitrator found that Feldman/Capstone wrongfully converted their captive clients' premiums to pay for the legal fees and expenses incurred by Feldman/Capstone in lawsuits and arbitrations against their clients as well as completely unrelated matters such as defending Mr. Feldman's disciplinary action.  Conversion is

81

the "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion or inconsistent with the owner's rights."[379] Feldman/Capstone's taking of $3,354,925.37 of their captive clients' premiums to pay for Feldman/Capstone's legal fees and expenses in these arbitration proceedings constitutes conversion. Feldman/Capstone's conversion of $3,354,925.37 of their captive clients' premiums to pay for Feldman/Capstone's legal fees and expenses incurred in these arbitration proceedings establishes further Feldman/Capstone subordinating their clients' interests to their own and Feldman/Capstone's breaches of fiduciary duties.[380]

### i.     The premiums belong to the captive clients.

187)     Feldman/Capstone argue that the retained premiums belong to PoolRe, not the captive clients, because the premiums are paid by the captive clients to PoolRe under the Stop Loss Reinsurance Agreement.[381]  Feldman/Capstone liken the situation to "a person with car insurance, when you pay your premium, that premium belongs to the company, the insurance company."[382] Feldman/Capstone ignore, however, that the premiums paid by participating captives to PoolRe under the Stop Loss Reinsurance Agreement are paid back by PoolRe to the same participating

---

[379] *See Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971).

[380] The full extent of the raiding of the 2018 and 2019 risk pools was not fully disclosed by Feldman/Capstone until the middle of the hearing when Feldman/Capstone was ordered to produce all relevant documents. For this reason, the Doctors were not aware of the extent of taking until the time of the hearing. Although conversion is not specifically pled, this Arbitrator concludes that, because the facts were not fully disclosed pre-hearing despite the Doctors' efforts, fairness dictates the conversion be considered. The undisclosed and unauthorized taking of almost $3.5 million cannot be ignored when the full facts of the taking and who was receiving pool money were not fully disclosed until after the hearing commenced.

[381] *See* Feldman/Capstone's Post-Trial Brief at pp. 197, 215 (citing Transcript, Volume 16, September 14, 2021, at p. 6126, line 20 – p. 6127, line 6 (Daniel Calderon)).

[382] *See* Transcript, Volume 16, September 14, 2021, at p. 6126, line 20 – p. 6127, line 6 (Daniel Calderon)).

captives under the Quota Share Reinsurance Policy.[383]  The pool premiums are paid to the participating captives in exchange for the participating captives insuring PoolRe's risks.[384]  Thus, under Feldman/Capstone's own logic, the premiums belong to the participating captives because the premiums are paid to the participating captives in exchange for insuring risk.

188)   Further, the Doctors' reinsurance expert, Richard Amoroso, offered unrebutted expert testimony that the premiums are "the property of the [] pool participants" and were "held in trust by the administrator of PoolRe, which is Capstone."[385]  Mr. Amoroso testified that the taking of the captive clients' premiums to fund Feldman/Capstone's litigation activities was completely inappropriate, violating duties and industry custom, standards, and practice.[386]

189)   This Arbitrator accepts the expert testimony of Mr. Amoroso, concluding that the captive clients' premiums belong to the captive clients and that Feldman/Capstone violated their clients' trust by wrongfully taking the captive clients' premiums to pay for the legal fees and expenses incurred by Feldman/Capstone in these arbitration proceedings.

---

[383] *See* Exhibit J-72, 2019 Quota Share Reinsurance Policy at § 1, p. 2, ArbV-R036798 ("In return for payment of the Ceded Premium, and subject to all terms of this Policy, Reinsurers agree to provide reinsurance coverage to [PoolRe]").

[384] *See* Exhibit J-72, 2019 Quota Share Reinsurance Policy at § 1, p. 2, ArbV-R036798.

[385] *See* Transcript, Volume 6, August 9, 2021, at p. 2348, line 18 – p. 2349, line 16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

[386] *See*, *e.g.*, Transcript, Volumes 6 and 7, August 9 and 16, 2021, at p. 2336, line 24 – p. 2338, line 5; p. 2344, lines 6-15; p. 2348, line 25 – p. 2349, line 16; p. 2510, line 19 – p. 2513, line 10; p. 2536, line 2 – p. 2537, line 11; p. 2540, line 16 – p. 2541, line 19; p. 2544, lines 3-12; p. 2546, line 4 – p. 2549, line 11; p. 2551, lines 10-19; p. 2554, lines 6-16; p. 2555, line 12 – p. 2557, line 23; p. 2564, line 4 – p. 2565, line 23; p. 2568, line 18 – p. 2571, line 13; p. 2579, line 19 – p. 2580, line 8; p. 2584, line 7 – p. 2585, line 6; p. 2598, line 2 – p. 2607, line 18 (Richard Amoroso).

ii.     **The PoolRe agreements do not grant PoolRe an unlimited or unfettered right to pay for the attorneys' fees and operating expenses of Feldman/Capstone, and PoolRe.**

190)    The PoolRe insurance agreements do not grant PoolRe an unlimited right to use the captive clients' premiums to pay for Feldman's, Capstone's, and PoolRe's attorneys fees and operating expenses.  The two contracts between PoolRe and the captive clients are (1) the Quota Share Reinsurance Policy and (2) the Stop Loss Reinsurance Agreement.[387]  There is no provision in either of these agreements stating that the captives will pay PoolRe's, Capstone's, or Feldman's attorneys' fees and expenses.

191)    The Stop Loss Reinsurance Agreement limits the coverages in PoolRe's risk pools solely to the direct written policies included in the pool:[388]

192)    PoolRe is not an insured under any policy included in the risk pools.[389]  It was not entitled to use pool funds to defend Feldman/Capstone or itself, especially in matters in which it is not even a party.

193)    The Doctors' reinsurance expert, Mr. Amoroso, testified that the PoolRe agreements do not allow PoolRe to defend itself with pool funds.[390]  Mr. Amoroso testified that the only losses and expenses subject to payment from the risk pools are the losses and expenses

---

[387] *See* Exhibit DRS-2109 at ArbV-R029384, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement; Exhibit J-72, 2019 Quota Share Reinsurance Policy.

[388] *See* Exhibit DRS-2109 at Joint-331763, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at p. 1 (emphasis added).

[389] *See* Transcript, Volume 7, August 16, 2021, at p. 2853, line 3 – p. 2854, line 1; p. 2600, line 21 – p. 2602, line 7 (Richard Amoroso).

[390] *See* Transcript Volume 7, August 16, 2021, at p. 2511, line 4 – p. 2513, line 10; p. 2536, lines 2-23; p. 2568, line 18 – p. 2571, line 13; p. 2852, line 6 – p. 2854, line 14 (Richard Amoroso).

directly associated with "claims" covered by the policies in the risk pools.[391]  PoolRe was not an insured under any policy in the pool.[392]  Moreover, A.M.Y.'s Stop Loss Reinsurance Agreement required an attachment point prior to any pool liability.[393]

194)    Even now, A.M.Y.'s claims pertaining to these arbitrations have not been adjusted or paid.[394]  Mr. Feldman decides when, whether or if A.M.Y. will make payment on the A.M.Y. claims.[395]  Mr. Feldman has not yet made that decision.[396]  A.M.Y. has not satisfied its Attachment Threshold.[397]  Mr. Feldman has not directed A.M.Y. to pay for legal fees or expenses relating to these arbitrations.[398]  The pre-conditions for the risk pool to have any liability to pay have not been satisfied.  Capstone's President, Jeff Carlson, conceded that "[i]t's a requirement that the captive policy pay prior to any participation by the pool."[399]  Despite this requirement, PoolRe paid millions of dollars to Feldman/Capstone without any payments being made by A.M.Y. first or at all.

---

[391] *See* Transcript Volume 7, August 16, 2021, at p. 2852, line 6 – p. 2854, line 14 (Richard Amoroso). Mr. Amoroso's construction of the PoolRe agreements is consistent with representations made by the Feldman Law Firm and Capstone to their clients in the Joint Engagement Letters.  The Joint Engagement Letters state that because "PoolRe conducts the pooling program for a fee (that is, on a contract basis)," "[t]here should be no incremental operating cost to the pool participants." *See, e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter.    Pool participants are only "responsible for insurance losses (claims)." *See id.*

[392] *See* Transcript, Volume 17, September 23, 2021, at p. 6878, lines 18-20 (Statement by Feldman/Capstone's Counsel) ("But I'm trying to distinguish, PoolRe doesn't have an insurance policy or a claim.").

[393] See fn. 87, *supra*.

[394] *See* Transcript, Volume 16, September 14, 2021, at p. 6176, line 20 – p. 6177, line 21 (Daniel Calderon); Transcript, Volume 17, September 23, 2021, at p. 6887, line 22 – p. 6888, line 8, p. 6913, line 23 – p. 6917, line 5 (Jeff Carlson).

[395] *See* Transcript, Volume 17, September 23, 2021, at p. 6929, line 19 – p. 6931, line 14 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 9130, lines 5-9 (Jeff Carlson).

[396] *See* Transcript, Volume 22, October 1, 2021, at p. 9129, line 14 – p. 9132, line 6 (Jeff Carlson).

[397] *See* Transcript, Volume 16, September 14, 2021, at p. 6176, line 20 – p. 6177, line 21 (Daniel Calderon); Transcript, Volume 17, September 23, 2021, at p. 6887, line 22 – p. 6888, line 8, p. 6913, line 23 – p. 6917, line 5 (Jeff Carlson).

[398] *See* Transcript, Volume 22, October 1, 2021, at p. 9129, line 14 – p. 9132, line 6 (Jeff Carlson).

[399] *See* Transcript, Volume 22, October 1, 2021, at p. 9131, lines 11-22 (Jeff Carlson).

195) Also, the Quota Share Reinsurance Policy does not provide PoolRe a right to use the captive clients' premiums to pay the attorneys' fees and operating expenses of Feldman/Capstone and PoolRe.[400]

196) The pool losses and expenses that Participating Reinsurers are responsible to pay must be "losses and expenses associated with such reported or filed claim" in the risk pool.[401] That is not how the pool funds were used. Additionally, as noted earlier, A.M.Y. has not satisfied its Attachment Threshold, meaning that the Participating Reinsurers, including the Doctors' captives, have no responsibility "for payment of [A.M.Y.] claims or the defense thereof."[402]

197) Based on the totality of the evidence and testimony in the record, the findings of fact set forth above, and applicable law, I conclude that the premiums paid into the risk pool by the participating captives belong to the participating captives and cannot be used by Feldman/Capstone directly or indirectly for their attorneys' fees and expenses unrelated to a "claim" in the risk pool. Accordingly, this Arbitrator holds that Feldman/Capstone breached fiduciary duties to their clients by acting upon conflicts of interest to their clients' detriment, converting $3,354,925.37 of their captive clients' premiums, engaging in self-dealing, and subordinating their captive clients' interests to their own.

---

[400] *See generally* Exhibit J-72, 2019 Quota Share Reinsurance Policy; *see also* Transcript, Volume 6, August 9, 2021, at p. 2348, line 18 – p. 2349, line 16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

[401] *See* Exhibit J-72 at ArbV-R036800, 2019 Quota Share Reinsurance Policy at §§ E(1), E(3).

[402] *See* Exhibit DRS-2109 at Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at § 4(B).

C.    **Mr. Feldman, the Feldman Law Firm and Capstone's breaches of fiduciary duties caused the Doctors' damages.**

198)    The Doctors testified that they would not have agreed to execute the Joint Engagement Letter if Feldman/Capstone had disclosed (1) the Doctors would be reinsuring Feldman/Capstone's malpractice liabilities and legal expenses, (2) the adverse audit findings by the IRS regarding Reserve Mechanical and six other Capstone-administered captives, and (3) the promoter audit of Mr. Feldman.[403]    Indeed, as Mr. Sherman testified, "Had we known we when we were going through this and negotiating the engagement letter that there was a promoter audit going on and that one of the programs had already been ruled by the IRS not to be legitimate insurance, we would have run, not walked, away."[404]

199)    A causal relationship exists between Feldman/Capstone's breaches of fiduciary duties and the Doctors' damages.    The Doctors would not have incurred $1,250,944 in fees paid to Feldman/Capstone had they not executed the Joint Engagement Letter.[405]    These losses are directly related to the misrepresentations and inadequate disclosures made by Feldman/Capstone.

200)    The breach of fiduciary duty claim entitles the Doctors to a return of all fees paid to Feldman/Capstone under their respective Joint Engagement Letters, as discussed in Section XVIII.    The Doctors are entitled to a return of these fees as a result of by Feldman/Capstone's breaches of fiduciary duty.[406]    These damages are discussed in more detail in Part V, Damages and Relief Sought.

---

[403] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

[404] *See* Transcript, Volume 20, September 29, 2021, at p. 7929, line 24 – p. 7930, line 11 (David Sherman).

[405] *See* Exhibit FC-600.0020 and FC-600.0021, Bill Legier's Report; *see also* Transcript, Volume 1, August 3, 2021, at p. 350, lines 14-20 (Dr. Scott Sullivan).

[406] *Burrow*, 997 S.W.2d at 243-44.

## IX. Capstone is also liable for Feldman's breaches of fiduciary duties pursuant to the Kinzbach Rule.

201)     Because I have already determined that Capstone owed and breached its own fiduciary duty to the Doctors, there is no need to determine if Capstone has liability for Feldman's breach under the rule enunciated in *Kinzbach Tool Co. v. Corbett-Wallace Corp.*[407]

202)     According to the Texas Supreme Court, "It is settled as the law of [the] State [of Texas] that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."[408] This doctrine – known as the *Kinzbach* Rule – is often applied by Texas courts.[409] Thus, in addition to its own breach of fiduciary duties, Capstone[410] is liable to the Doctors for knowingly participating in and facilitating Feldman's breaches of fiduciary duties to its clients under the *Kinzbach* rule.

203)     The facts reflect willful participation by Capstone in Feldman's breach of fiduciary duties to his clients through the looting of the risk pools to Feldman's benefit and the clients' detriment. Thus, under the *Kinzbach* Rule, Capstone is also liable for Feldman's breaches of fiduciary duty. Feldman's liability, including Mr. Feldman's personal liability, arises from all claims asserted by the Doctors.

---

[407] *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942).

[408] *Kinzbach*, 160 S.W.2d at 514.

[409] *See Cox Texas Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex. App. 2001); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221 (Tex. 2017); *see also D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (citing *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)) (applying Texas law).

[410] Capstone owed fiduciary duties to the Doctors under principles of agency. *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso). But even if Capstone was not a fiduciary, which is rejected by this Arbitrator, Capstone is still liable for Feldman's breaches of fiduciary duty under the *Kinzbach* Rule.

## X.    **Liability of Jeff Carlson.**

204)    The Doctors seek to hold Mr. Carlson personally liable for his participation to the

schemes described in this Order. With respect to Mr. Carlson, this Arbitrator concludes that, based

on the totality of the evidence, there is no basis for finding Mr. Carlson personally liable. Mr.

Carlson became the President of Capstone in November of 2017, after the initial engagement

occurred. Moreover, while his title was President, the testimony established that his actual

authority was very limited. His primary role is to have oversight in the delivery of administrative

services. His role is focused on insurance operations aspects. He acted at the direction of Mr.

Feldman. He had no check signing authority, very little decision-making authority, and essentially

was directed by Mr. Feldman. Nor can this Arbitrator conclude that Mr. Carlson was negligent in

allowing himself to be directed by the owner of Capstone. The fault lies with Mr. Feldman, not

Mr. Carlson. For these reasons, this Arbitrator concludes that Mr. Carlson is not individually liable

for any acts of Capstone, and all claims against him are dismissed, with prejudice.

## XI.    **Mr. Feldman, the Feldman Law Firm and Capstone breached IRS Circular 230's requirements.**

205)    Feldman/Capstone's failure to disclose the adverse IRS audits of Reserve and six

other Capstone-administered captives, as discussed in Section III, and Feldman/Capstone's failure

to disclose the IRS's promoter exam of Mr. Feldman for promoting abusive tax shelters, as

discussed in Section IV, also implicated Feldman/Capstone's obligations under IRS Circular

230.[411] The Joint Engagement Letter, including Exhibit C, is written tax advice relating to a federal

---

[411] Any attempt by Feldman and Capstone to disclaim the effects or applicability of IRS Circular 230 would be "not effective." *See* Transcript, Volume 9, August 18, 2021, at p. 3446, lines 21-24 (Lyle Press).

tax matter.[412]   Thus, the Joint Engagement Letter implicates IRS Circular 230 – specifically, Circular 230's requirements concerning the disclosure of all reasonably available information.[413]

206)   Circular 230 applies to "practitioners," which includes attorneys and accountants who represent taxpayers before the IRS.[414]   Circular 230 applies to Feldman, insofar as Mr. Feldman wore multiple hats, including serving as the CEO and general counsel of Capstone, and executed the Joint Engagement Letter on Capstone's behalf, Capstone is also subject to Circular 230.[415]   Mr. Feldman signed the Joint Engagement Letter jointly on behalf of Capstone and Feldman.[416]

207)   These provisions of Circular 230 required Feldman/Capstone to exercise proper diligence and candor in advising clients like the Doctors concerning any "Federal tax matter." That latter term is broadly defined under § 10.37(d) of Circular 230, as "any matter concerning the application or interpretation of . . . any provision of law impacting a person's obligations under the internal revenue laws and regulations, including but not limited to the person's liability to pay tax or obligations to file returns."[417]

208)   The disclosures made by Feldman/Capstone failed to comply with the requirements of Circular 230.   The Joint Engagement Letter, including its Exhibit C, is written tax advice relating to a federal tax matter, subject to the requirements of Circular 230.[418]   Exhibit C to the

---

[412] *See* Transcript, Volume 9, August 18, 2021, at p. 3440, lines 2-6; 3443, line 20 – p. 3444, line 1 (Lyle Press).

[413] *See* Exhibit DRS-580, Circular 230; *see also* Transcript, Volume 9, August 18, 2021, at p. 3440, lines 2-6; p. 3443, line 20 – p. 3444, line 1 (Lyle Press).

[414] *See* Exhibit DRS-580, Circular 230, at §10.0(a), SULLIVAN 018857; *see also*, Transcript, Volume 9, August 18, 2021, at p. 3429, line 14 – p. 3430, line 3 (Lyle Press).

[415] *See* Transcript, Volume 9, August 18, 2021, at p. 3443, line 15 – p. 3444, line 25 (Lyle Press).

[416] *See* Exhibit J-20, Joint Engagement Letter SULLIVAN011077.

[417] *See* Exhibit DRS-580, Circular 230, at §10.37(d).

[418] *See* Transcript, Volume 9, August 18, 2021, at p. 3440, lines 2-6 (Lyle Press).

Joint Engagement Letter did not adequately disclose the existence or substantive basis for the adverse audit findings of Reserve Mechanical and six other Capstone-administered captives. Mr. Press testified that "there was a failure to disclose this information [regarding the IRS's determinations as to Reserve Mechanical and six other audited captives] in the tax risk section of the joint engagement letter of November 2015."[419]

209)    Based on the totality of evidence and testimony presented at trial, the findings of fact set forth above, and applicable law, this Arbitrator concludes that Feldman/Capstone breached their obligations to the Doctors under IRS Circular 230.

## XII.    Feldman committed legal malpractice.

210)    The Doctors have asserted a claim for legal malpractice against Feldman. To prevail on a legal malpractice claim, the client must establish (1) the lawyer owed a duty of care, (2) the lawyer breached that duty, (3) the lawyer's breach proximately caused damage to the client, and (4) the client sustained damages.[420]  Claims of legal malpractice are rooted in negligence principles and arise from an attorney's failure to exercise ordinary care.[421]

### A.    Feldman owed the Doctors a duty of care by virtue of the attorney-client relationship.

211)    "[T]he first question in a legal malpractice claim is whether there exists an attorney-client relationship, as an attorney only owes a duty to his or her clients."[422] There is no dispute that such a relationship existed.

---

[419] *See* Transcript, Volume 9, August 18, 2021, at p. 3470, lines 1-24 (Lyle Press).

[420] *See Rogers v. Zanetti*, 518 S.W.3d 394, 400 (Tex. 2017); *Saulsberry v. Ross*, 485 S.W.3d 35, 41 (Tex. App.—Houston [14th Dist.] 2015); *Pressil v. Gibson*, 477 S.W.3d 402, 407 (Tex. App.—Houston [14th Dist.] 2015); *Haddy v. Caldwell*, 355 S.W.3d 247, 251 (Tex. App.—El Paso 2011).

[421] *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989).

[422] *Border Demolition & Env., Inc. v. Pineda*, 535 S.W.3d 140, 152 (Tex. App. – El Paso 2017).

**B.**   **Feldman breached his duty by failing to act as a reasonably prudent lawyer.**

212)   The evidence establishes that Mr. Feldman did not act as a reasonably prudent lawyer. There was extensive testimony regarding Mr. Feldman's violation of multiple Disciplinary Rules of Professional Conduct, including Rules 1.06, 1.08, 1.09 and 8.04. This Arbitrator agrees that violation of these rules does not, in and of itself, create a cause of action, but the underlying facts may be evidence of a lawyer's standard of a duty of care and his breach thereof.

213)   This Arbitrator finds that Mr. Feldman violated these rules, and the violation of these rules establishes that Mr. Feldman's conduct fell below the duty of care owed by a lawyer to his client.

214)   Mr. Watkins testified that the violation of disciplinary rules operates as a *de facto* proxy for a finding of negligence: "[E]very expert that testifies will testify that reasonable and prudent lawyers will comply with the disciplinary rules. . . [the violation] creates at least negligence on [Mr. Feldman's] part for not following these rules."[423]

**1.**   **Feldman violated Rule 1.06 by representing Capstone, PoolRe, and the Doctors.**

215)   Feldman jointly represented Capstone and PoolRe in addition to representing the Doctors.[424] This joint representation was adverse to the Doctors.  Feldman failed to fully disclose the consequences of this common representation.

216)   Mr. Watkins testified that "there was no time during the representation of both Capstone and the [Doctors] that [the Doctors] were getting a lawyer who was dedicated to

---

[423] *See* Transcript, Volume 4, August 6, 2021, at p. 1536, lines 15-18; p. 1536, line 24 – p. 1537, line 5 (Thomas Watkins).

[424] *See* Transcript, Volume 13, August 22, 2021, at p. 5122, lines 2-20 (Stewart Feldman); *see also* Exhibit J-20, Joint Engagement Letter at p. 4, SULLIVAN011070 ("Capstone is a significant client of the Firm;" "The Feldman Law Firm LLP also does occasional legal work for PoolRe.").

protecting their interest and their interest alone.  They always had a lawyer who would downplay anything that Capstone did wrong, would try to protect Capstone from any kind of complaints."[425] Mr. Watkins further concluded that Mr. Feldman did not "try to protect his clients in this case. From [the Joint Engagement Letter] forward, it appeared to [Mr. Watkins] that Mr. Feldman's highest efforts were spent on trying to keep his clients in the dark about what was actually going on."[426]

217)    Feldman/Capstone's ethics counsel, James McCormack, acknowledged that the very framework of the relationship created a conflict of interest from the outset between the Doctors and Feldman/Capstone.[427]  Mr. McCormack conceded that "[w]hen the [D]octors signed the [Joint] [E]ngagement Letter in December of 2015 and their three captive insurance companies began participating in the . . . risk pools, a conflict of interest existed between the [D]octors and Mr. Feldman and his law firm and Capstone."[428]

218)    Mr. Watkins concluded that the Joint Engagement Letter failed to fully disclose that Mr. Feldman's representation of the Doctors was, or could be, materially and directly adverse to Capstone and PoolRe, and that Feldman failed to "fully disclose the existence, nature, implications, and possible adverse consequences of Mr. Feldman's common representation of the Doctors and Capstone."[429]

---

[425] *See* Transcript, Volume 4, August 6, 2021, at p. 1501, lines 17-25 (Thomas Watkins).

[426] *See* Transcript, Volume 4, August 6, 2021, at p. 1502, lines 1-8 (Thomas Watkins) (emphasis added).

[427] *See* Transcript, Volume 20, September 29, 2021, at p. 7873, lines 9-19 (James McCormack).

[428] *See* Transcript, Volume 20, September 29, 2021, at p. 7873, lines 9-19 (James McCormack).

[429] *See* Transcript, Volume 4, August 6, 2021, at p. 1535, lines 9-22 (Thomas Watkins); *see also*, Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 28, SULLIVAN 019405.

219)   Based on the totality of evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator concludes that Feldman committed legal malpractice concerning his legal representation of the Doctors.

## 2.   Feldman breached his obligations by entering into a reinsurance business transaction with the Doctors without providing full disclosure.

220)   Rule 1.08 applies where a lawyer goes into business with a client.  Rule 1.08 requires full disclosure to be made, as well as an opportunity for the client to seek independent counsel as to whether to participate in the transaction.  Rule 1.08 was triggered by the presence of Feldman's and Capstone's primary malpractice policies in the risk pool, resulting in the expectation that the clients, the Doctors, would reinsure Feldman against malpractice claims – even if the Doctors sued Feldman for malpractice.

221)   Rule 1.08(a) provides:

A lawyer shall not enter into a business transaction with a client unless: (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed in a manner which can be reasonably understood by the client; (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) the client consents in writing thereto.[430]

The failure to satisfy any one of these elements violates Rule 1.08(a).

222)   Here, the underlying reinsurance transaction was not fair or reasonable to the client. Mr. Feldman asserts that the presence of his primary malpractice policies in the pool was beneficial to the Doctors.[431]  I disagree.  Feldman/Capstone concealed the types of policies covering them in

---

[430] *See* Exhibit DRS-1540, Rule of Professional Conduct 1.08(a), at SULLIVAN 019412-13.

[431] *See generally*, Transcript, Volume 11, August 20, 2021, at p. 4589, line 7 – p. 4607, line 15 (Stewart Feldman). As Judge Baker noted, "You're not suggesting that by those liability malpractice policies being in there, that actually is better for the doctors than not?" *See* Transcript, Volume 11, August 20, 2021, at p. 4590, line 25 – p. 4591, line 3.

the pool, representing falsely that Feldman/Capstone's captives "may participate in the pool," and that the risk pool consisted of "generally similar policies covering generally similar risks."[432] It is neither "fair" nor "reasonable" for an attorney to require his clients to unknowingly reinsure the attorneys' malpractice liabilities and defense expenses

223)   Feldman also failed to satisfy the "full disclosure" prong of Rule 1.08(a). Considering Feldman/Capstone's inadequate disclosures, as discussed in Sections II through IV, Feldman violated Rule 1.08(a).

224)   Because the reinsurance transaction was not properly disclosed to the Doctors, any purported written consent was invalid.  Mr. Watkins explained that due to the inadequate disclosure, "this is an impermissible, unwaivable conflict of 1.08," and Mr. Feldman's conduct falls below the standard of care.[433]

### 3.   The Doctors did not consent to allow Mr. Feldman to continue to represent Capstone or PoolRe adversely to the Doctors after Feldman withdrew from legal representation. Thus, Mr. Feldman violated Rule 1.09.

225)   Mr. Feldman owed obligations to the Doctors even after Feldman terminated its legal representation of the Doctors.  Most importantly, Feldman owed the Doctors a duty not to represent others, including Capstone or PoolRe, adversely to the Doctors concerning the same subject matter as the representation.  Mr. Feldman expressly recognized that he could not represent others, including Capstone, after Feldman withdrew from representing Cerberus, stating: "Our firm will not (and has not) represented Capstone on any matter adverse to Cerberus or its

---

[432] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.

[433] *See* Transcript, Volume 4, August 6, 2021, at p. 1547, line 8 – p. 1548, line 3 (Thomas Watkins)

owners."[434] But Mr. Feldman breached this obligation by continuing to represent Capstone and serve as its General Counsel adversely to the Doctors.

226)   Rule 1.09 provides, in relevant part: "Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client . . . if it is the same or a substantially related matter."[435] Mr. Watkins concluded that Feldman's January 2020 withdrawal of representation of the Doctors did not solve the problem because of the multiple hats worn by Mr. Feldman.[436]

227)   Feldman/Capstone suggested at the final hearing that Feldman did not represent Capstone adversely to the Doctors because Capstone was represented by Andy Paredes during the Dorfman arbitration and these arbitration proceedings.[437]   This Arbitrator rejects the suggestion that only Andy Paredes, but not Feldman, represented Capstone adversely against the Doctors in this arbitration proceeding. Mr. Feldman served as General Counsel to Capstone throughout these arbitrations and could not take off his attorney hat in representing Capstone adversely to the Doctors in these proceedings.  Further, Andy Paredes, who was counsel of record for Capstone in this arbitration, is a full-time employee of RSL Funding, and his time is allocated for the work he does on behalf of Capstone.[438]   RSL Funding is also owned and controlled by Mr. Feldman.[439] These facts reflect Feldman's adverse representation, through his role as owner, CEO, and General

---

[434] *See* Exhibit FC-275, E-mail from Stewart Feldman (Jan. 5. 2020).

[435] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at Rule 1.09(a), at SULLIVAN 019415.

[436] *See* Transcript, Volume 4, August 6, 2021, at p. 1522, line 14 – p. 1524, line 11 (Thomas Watkins).

[437] *See* Transcript, Volume 15, August 24, 2021, at p. 5716, line 2 – p. 5719, line 2 (Jeff Carlson).

[438] *See* Transcript, Volume 15, August 24, 2021, at p. 5718, lines 4-13 (Statement by Feldman/Capstone's Counsel, Andy Paredes).

[439] *See* Transcript, Volume 15, August 24, 2021, at p. 5718, lines 4-13 (Statement by Feldman/Capstone's Counsel, Andy Paredes).

Counsel of Capstone and as owner of RSL (along with his spouse) directing Mr. Paredes, against the Doctors in violation of Rule 1.09.

228)    Further, Feldman billed and collected millions of dollars from PoolRe, for providing legal representation on behalf of himself, the Feldman Law Firm, Capstone and PoolRe adverse to the Doctors.[440] PoolRe's owner, Stephen Friedman, testified that he was aware that the "Feldman Law Firm has billed and been paid for the legal services that the Feldman Law Firm has provided on behalf of PoolRe adverse to the [D]octors in these arbitrations."[441]

229)    Based on the totality of evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator concludes that Feldman committed legal malpractice.

### 4.    **Feldman's actions constituted actionable "misconduct" under Rule 8.04.**

230)    Mr. Feldman, through the conduct described above, also violated Rule 8.04(a)(1) and 8.04(a)(3).    Rule 8.04 sets forth a broad variety of "misconduct."    Rule 8.04(a)(1) provides that "a lawyer shall not violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not the violation occurred in the course of a client-lawyer relationship."[442] In turn, Rule 8.04(a)(3) prohibits attorneys from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation."[443]

231)    Mr. Feldman cannot defend against a disciplinary violation by acting through or on behalf of another entity such as Capstone or PoolRe.    Mr. Watkins noted, "This means that you

---

[440] *See* Transcript, Volume 22, October 1, 2021, at p. 9082, line 11 – p. 9084, line 14 (Jeff Carlson) (citing Exhibit FC-692 at FC-692.0004).

[441] *See* Transcript, Volume 24, October 3, 2021, at p. 9553, lines 5-12 (Stephen Friedman) (emphasis added).

[442] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494.

[443] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494.

can't create an entity and then, through that entity, violate these rules," and that there is no need to go through a veil-piercing or alter ego analysis if Mr. Feldman uses Capstone or PoolRe "to do acts that he could not do directly."[444] In other words, Mr. Feldman could not do indirectly (through Capstone, A.M.Y., or PoolRe) what he was barred under the Rules of Professional Conduct from doing directly.

232)    Based on the totality of evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator concludes that Feldman committed legal malpractice.[445]

### C.    Feldman committed legal malpractice by failing to put forth a diligent effort in assisting the Doctors with shutting down their captives.

233)    As discussed in Section V, Feldman failed to exercise "that degree of care, skill, and diligence that professionals of ordinary skill and knowledge commonly possess and exercises" in assisting the Doctors with their request for a wind down and liquidation of their captive program. That failure is the essence of legal malpractice. Feldman misrepresented that what the Doctors were requesting – an early liquidation – "could not be done" because liquidating the Doctors' captives early would be breaching obligations to Feldman's other clients.[446]    But Feldman/Capstone had, in fact, offered and effectuated a "special, earlier liquidation" for other captive clients.[447] Mr. Feldman was personally involved in assisting PoolRe re-negotiate its Quota

---

[444] *See* Transcript, Volume 4, August 6, 2021, at p. 1561, line 4 – p. 1562, line 3 (Thomas Watkins).

[445] *See* Transcript, Volume 4, August 6, 2021, at p. 1563, lines 12-16 (Thomas Watkins).

[446] *See* Transcript, Volume 1, August 3, 2021, at p. 274, line 21 – p. 275, line 1; p. 281, lines 5-9 (Dr. Scott Sullivan); Transcript, Volume 13, August 22, 2021, at p. 5037, line 10 – p. 5039, line 14 (Stewart Feldman); *see also* Exhibit J-84, E-mail from Stewart Feldman (Oct. 22, 2019) (stating that Feldman could "not be in the position of assisting one client's defaulting on obligations to other clients.").

[447] *See, e.g.,* Exhibit DRS 2570, E-mail from Jeff Carlson (Feb. 19, 2020); *see also* Transcript, Volume 8, August 17, 2021, at p. 2958, line 4 – p. 2962, line 16 (Richard Amoroso).

Share Agreements with numerous other captive clients to effectuate those captive clients' early liquidations.[448]   Feldman knew, therefore, that an early liquidation could be done but nonetheless misrepresented to the Doctors that an early liquidation "wasn't possible."[449]  As found in Section V, there is no record evidence showing that Feldman ever diligently represented or attempted to assist the Doctors regarding an early wind-down.

234)    Under Texas law, "[d]isobeying a client's lawful instruction has been routinely recited to be a malpractice claim."[450]  The Doctors made a lawful request for a wind-down of their captives.[451]  And in response, their lawyer misrepresented what was possible.  Mr. Feldman stated that liquidating the Doctors' captives early would be breaching obligations to Feldman's other clients and could not be done when he knew it could be done and had been done often for other clients by Feldman and PoolRe.

235)    The Doctors' reinsurance expert, Mr. Amoroso, opined that Feldman breached fiduciary duties by failing to assist the Doctors with their request for a liquidation.[452]   This Arbitrator concludes that Feldman committed legal malpractice in misrepresenting the possibility of winding down the Doctors' captives and in failing to put forth a diligent effort on the Doctors' behalf in assisting the Doctors with their request for a wind down.

---

[448] *See* Exhibit DRS 2003, Claims Reserve Payment Agreement and PoolRe Release Letters; *see also* Transcript, Volume 22, October 1, 2021, at p. 8960, line 12 – p. 8962, line 8 (Robert Snyder). *See* fn. 189, *supra*.

[449] *See* Transcript, Volume 13, August 22, 2021, at p. 5037, line 10 – p. 5040, line 14 (Stewart Feldman).

[450] *See Isaacs v. Schleier*, 356 S.W.3d 548, 557 (Tex. App. – Texarkana 2011) (collecting cases).

[451] Judge Dorfman held that the Doctors did not breach the contract by requesting that Capstone wind down and liquidate the captives more or less immediately. *See* Exhibit J-115orfman's Final Award at ¶¶ 31, 32.

[452] *See* Transcript, Volume 7, August 16, 2021, at p. 2693, line 1 – p. 2700, line 5 (Richard Amoroso).

**D.**    **Feldman's legal malpractice caused the Doctors to incur damages.**

236)    The Doctors' damages are causally connected to Feldman's legal malpractice. These losses arise based on Feldman's breaches of his professional duties, as well as "misconduct" based on "dishonesty, fraud, deceit, or misrepresentation."[453]    The Doctors would never have engaged the Feldman Law Firm or Capstone had Feldman adequately disclosed all material information, including that Feldman had (1) implemented a scheme to get his clients to pay for Feldman's malpractice liabilities and legal expenses, (2) the adverse audit findings by the IRS regarding Reserve Mechanical and six other Capstone-administered captives, and (3) the promoter audit of Mr. Feldman.[454]    All damages, costs, and fees incurred by the Doctors would have never been incurred but for the legal malpractice and misrepresentations of Feldman.

**XIII.**    **Feldman/Capstone committed intentional misrepresentations regarding IRS scrutiny of the Capstone captive program, the promoter audit of Mr. Feldman, and the presence of Feldman/Capstone's primary malpractice policies in the risk pool.**

237)    Feldman/Capstone intentionally misrepresented their track record before the IRS by failing to adequately disclose the specific adverse audit findings by the IRS and the IRS's pending promoter exam of Mr. Feldman, as discussed in Sections III and IV. And Feldman/Capstone intentionally misrepresented the types of policies in the pool and suppressed the material fact that the pool covered Feldman and Capstone's primary malpractice liabilities and defense expenses, as discussed in Section II. Feldman/Capstone's intentional misrepresentations and failures to disclose material information to their clients constitutes fraud.

---

[453] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494.

[454] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

## A. **Feldman and Capstone are liable to the Doctors for their fraudulent misrepresentations**.

238) There are four elements to a fraud claim under a Texas law. A plaintiff must establish (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result.[455]

239) Texas law does not limit fraud claims to the context of affirmative misstatements. Rather, "silence may be equivalent to a false representation" if the "particular circumstances impose a duty on the party to speak and he deliberately remains silent."[456] In turn, a duty of disclosure arises from a fiduciary relationship, which arises as a matter of law in the context of an attorney-client or agent-principal relationship.[457] Moreover, making a *partial* disclosure that conveys a false impression also provides a basis for fraud.[458] Considering the totality of the evidence and testimony in the record, the findings of fact above, and applicable law, this Arbitrator concludes that Feldman and Capstone fraudulently concealed material information from the Doctors.

---

[455] *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (citations omitted); *Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 695 (Tex. App. – Houston [1st Dist.] 2003) (citing *Formosa Plastics Corp. USA v. Presidio Engs. & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998) (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)); *Alexander v. Kent*, 480 S.W.3d 676, 693 (Tex. App.—Fort Worth 2015); *Woodhaven Partners, Ltd. v. Shamoun & Norman, L.L.P.*, 422 S.W.3d 821, 838 (Tex. App.—Dallas 2014).

[456] *See Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (citing *SmithKline Beecham Corp. v. Doe*, 903 S.W.3d 347, 353 (Tex. 1995); *Smith v. Nat'l Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979)).

[457] *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (citing *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003).

[458] *See Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App – Houston [14th Dist.] 1997) (citing *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 941 S.W.2d 138, 146-47 (Tex. App. – Corpus Christi 1995), *rev'd on other grounds*, 960 S.W.2d 41 (1997)).

1.    **Feldman and Capstone made false material representations.**

240)    As detailed in Sections II to IV, Feldman and Capstone made a series of false representations to, or concealed information from, the Doctors, and these misrepresentations and concealed facts were material.  Had Feldman and Capstone not concealed or obfuscated the true facts, the Doctors would not have agreed to sign the Joint Engagement Letter.[459]

241)    The Doctors executed the Joint Engagement Letter in the belief, cultivated by Feldman and Capstone, that Feldman had a flawless track record in his dealings with the IRS, and that Mr. Feldman was undefeated and untied in his IRS dealings.  Feldman and Capstone made a series of misrepresentations and concealed material information.   These material misrepresentations and concealed facts include:

- Feldman and Capstone misrepresented the extent and nature of their participation in PoolRe's risk pools.

- Feldman and Capstone concealed that the risk pool provided primary insurance to Feldman and Capstone for their professional malpractice liabilities, errors & omissions, and legal expense liabilities.[460]

- Feldman and Capstone concealed that if the Doctors sued Feldman or Capstone for malpractice, the Doctors would have to pay a portion of Feldman and Capstone's defense expenses and liabilities in such a suit.[461]

- Feldman and Capstone misrepresented that the pool consisted of "generally similar policies covering generally similar risks"[462]  In practice, the risks insured by the A.M.Y. policies were far more substantial, and presented substantially greater

---

[459] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

[460] *See* Transcript, Volume 1, August 3, 2021, at p. 240, lines 17 – 25; p. 243, line 22 – p. 245, line 15 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1978, line 25 – p. 1980, line 24; p. 1957, line 5 – p. 1958, line 10 (Dr. Frank DellaCroce).

[461] *See, e.g.,* Transcript, Volume 5, August 7, 2021, at p. 1912, lines 13-21 (Dr. Frank DellaCroce).

[462] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.

exposure to the risk pool participants, than the risks put in the pool by the Doctors' captives.

- Feldman and Capstone misrepresented their track record in dealing with the IRS, as discussed in Section III. Feldman and Capstone failed to disclose that the entire Capstone captive program and its ability to provide tax-beneficial treatment to its clients was jeopardized by the adverse audit findings from the IRS of Reserve Mechanical and six other Capstone-administered captives.

- Feldman and Capstone concealed the IRS's § 6700 audit of Mr. Feldman for promoting abusive tax shelters, as discussed in Section IV. The fact of an IRS audit into the very same tax shelter is something any reasonable investor would want to know.

- Feldman and Capstone misrepresented to their clients, the Doctors, that their clients would not be responsible for PoolRe's operating costs if they participated in PoolRe's risk pools.[463]

242)    Each and every one of these misrepresentations or concealments establish that Feldman and Capstone committed intentional acts of fraud and made material misrepresentations.

### 2.    **Feldman and Capstone knew that their representations were false and misleading.**

243)    Feldman and Capstone crafted their disclosures to reveal as little negative information as possible. Adverse details were either ignored outright or ambiguously phrased to provide no actionable information.

244)    Mr. Feldman masterminded the entire tax shelter program, including causing his clients to unwittingly subsidize his litigation expenses. Lawyers should not use their clients' money to defend malpractice suits brought by their clients.

---

[463] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011104.

### 3.    Feldman and Capstone intended to induce the Doctors to rely upon their representations.

245)    Feldman and Capstone intended that the Doctors would rely upon the affirmative representations made by Feldman and Capstone. Feldman and Capstone also intended that the Doctors would rely upon the corresponding absence of negative information disclosed to them.

246)    The Joint Engagement Letter operated, according to Mr. Watkins, as a "marketing piece. It constitutes an attempt to try to convince this client ... how many times we've been successful, how good we've been in the past causes a client to believe that he doesn't need to worry about what the IRS is doing because of his complete success in the past of handling these kinds of things. And I believe it is the intent of this contract to allay the fears of the Doctors of what the IRS is doing."[464] This Arbitrator agrees. Feldman and Capstone expected that the Doctors would rely upon the puffed-up and misleading representations regarding the Capstone program, and the corresponding absence of red flags.

### 4.    The Doctors justifiably relied upon the false and misleading representations made by Feldman and Capstone.

247)    The Doctors relied upon the misrepresentations made by Feldman/Capstone. Specifically, both Dr. Sullivan and Dr. DellaCroce testified that they would not have signed the Joint Engagement Letter if Feldman/Capstone had fully disclosed (1) the placement of Feldman's primary malpractice policies in the risk pool, (2) the specific adverse findings of the Reserve Mechanical audit and six other similar audits, or (3) the 2015 promoter audit of Mr. Feldman.[465]

---

[464] *See* Transcript, Volume 4, August 6, 2021, at p. 1496, line 11 – p. 1497, line 3 (Thomas Watkins).

[465] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

This Arbitrator accepts the testimony of the Doctors as credible and concludes that all elements of a fraudulent misrepresentation claim against Feldman/Capstone are satisfied.

## XIV.  Feldman/Capstone's liability under the Texas Deceptive Trade Practices Act and the corresponding provisions of the Texas Insurance Code.

248)    The Doctors contend that the Feldman/Capstone violated the DTPA. The Doctors further contend that the non-disclosure allegation is also actionable under the Insurance Code via its DTPA tie-in provision. I find that recovery is precluded under the DTPA but is allowable under the Insurance Code tie-in.

249)    "A plaintiff must be a 'consumer' to maintain a private action under the DTPA."[466] Under the DTPA, a "consumer" is "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more."[467] The DTPA defines "business consumer" as "an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use."[468] "Thus, business consumers, whether individuals or businesses, with assets of $25,000,000 or more are excluded from DTPA coverage."[469]

250)    Given their net worth, neither Dr. Sullivan nor Dr. DellaCroce qualify as a consumer under DTPA.

---

[466] *Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672, 674 (Tex. 1990); TEX. BUS. & COM. CODE § 17.50(a).
[467] TEX. BUS. & COM. CODE § 17.45(4).
[468] TEX. BUS. & COM. CODE § 17.45(10).
[469] *Eckman*, 784 S.W.2d at 674.

251)    The Doctor captives and other Doctor entities likewise do not qualify as consumers under the DTPA and thus cannot maintain private actions under the DTPA. The DTPA also excludes from its definition of consumer any entity "that is owned or controlled by a corporation or entity with assets of $25 million or more."[470]  The Doctor captives and other Doctor entities are owned and controlled by Drs. Sullivan and DellaCroce, both of whom have assets of $25 million or more.

252)    This Arbitrator finds that the Doctor entities do not qualify as consumers for the purposes of the DTPA. The DTPA requires a private claimant to be a "consumer" to maintain a private action.[471] Given the conclusion that the DTPA does not apply because of its definition of "consumer," there is no need to consider whether the transaction limitations of the DTPA apply.

### A. The Texas Insurance Code, through its "tie-in" statute, prohibits the same conduct contemplated by the DTPA, but without the limitations on who constitutes a "consumer."

253)    Conduct that violates the DTPA also violates the Texas Insurance Code.  The Texas Insurance Code's "tie-in" statute imports the prohibited actions set forth in Section 17.46(b) of the DTPA.[472] However, the critical difference between the two is that the Texas Insurance Code does not import the statutory restrictions regarding consumer status or amount in controversy as set forth in the DTPA.  Instead, the Insurance Code broadly affords remedies to "persons" who sustain damages.[473]

---

[470] TEX. BUS. & COM. CODE § 17.45(4).

[471] TEX. BUS. & COM. CODE § 17.50(a).

[472] TEX. INS. CODE § 541.151.

[473] TEX. INS. CODE § 541.151.

254)    The term "person" is defined in the Insurance Code as "any individual, corporation, association, partnership, reciprocal or interinsurance exchange, Lloyds' plan, fraternal benefit society, or other legal entity engaged in the business of insurance, including an agent, broker, or adjuster."[474] The Insurance Code's provisions are "liberally construed."[475]

255)    I conclude that the Doctors fall within the definition of "persons" for purposes of the Insurance Code. Therefore, the Doctors can assert claims under the Texas Insurance Code based on Feldman/Capstone's deceptive insurance practices that violate the DTPA as incorporated in Tex. Ins. Code § 541.151.

256)    The key provisions of the Texas Insurance Code and its "tie-in" statute are as follows:

> A person who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice:
>
> *    *    *
>
> (2) specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment.[476]

257)    Courts have held that the statute "permits an insured to bring a cause of action" under the Insurance Code for deceptive trade practices which violate Section 17.46(b) of the DTPA.[477] Accordingly, through § 541.151(2) of the Insurance Code, Dr. Sullivan, Dr. DellaCroce,

---

[474] TEX. INS. CODE § 541.002(2).

[475] TEX. INS. CODE § 541.008

[476] TEX. INS. CODE § 541.151(2).

[477] *See Centaurus Unity v. Lexington Ins. Co.*, 766 F.Supp.2d 780, 787 (S.D. Tex. 2011).

and their captives all constitute persons who have been damaged by, and can recover for, Feldman and Capstone's unconscionable insurance misconduct.

258)    Feldman/Capstone's arguments that the Insurance Code does not apply to captives is rejected in this instance where the captives are complainants. While a captive insurance company may not be subject to claims for deceptive trade practices as a defendant, in light of the typical relationship between a captive and its owners/ insureds, this rationale vanishes in the context of claims against a captive promoter or captive attorney who is unaffiliated with the captive.

259)    The rationale behind Section 964.002 is further diminished by the role of the risk pool, whereby the Doctors reinsured hundreds of other entities, including Feldman/Capstone. Under those circumstances, the challenged relationship goes beyond captive insurance, and Section 964,002's exemption does not apply.[478]

260)    Feldman/Capstone are engaged in "the business of insurance," and as the entities that created the captive insurance scheme at issue, drafted the policies, and made misrepresentations to the Doctors, they are covered by the statute.

261)    Considering the totality of the evidence and testimony in the record, the above findings of fact, and applicable law, this Arbitrator concludes that Feldman/Capstone are liable to the Doctors for their unconscionable insurance misconduct in: (1) making material misrepresentations and concealing material information regarding the types of policies (such as Feldman and Capstone's professional malpractice and legal expense liabilities) included in the risk pool, as discussed in Section II; (2) making material misrepresentations and concealing material information regarding the adverse findings of the IRS in the audits of Reserve Mechanical and six

---

[478] TEX. INS. CODE § 964.001, *et seq.*

other Capstone-administered captives, as discussed in Section III; (3) making material misrepresentations and concealing material information regarding the IRS's promoter exam of Mr. Feldman for promoting abusive tax shelters, as discussed in Section IV; and (4) Feldman/Capstone's misconduct in submitting fraudulent insurance claims and keeping the 2018 and 2019 risk pools open so as to force their clients into paying for the legal fees and expenses incurred by Feldman and Capstone in fighting their clients, as discussed in Section VI.

## XV.  Mr. Feldman is ultimately responsible and liable for the wrongful acts of the Feldman Law Firm, Capstone, and PoolRe.

262)    The Texas Supreme Court has held that it will "disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result."[479]  Situations where the Texas Supreme Court will disregard the corporate fiction include, without limitation:

(1) when the fiction is used as a means of perpetrating fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; and

(4) where the corporate fiction is relied upon as a protection of crime or to justify wrong.[480]

In these circumstances, the Texas Supreme Court explained that "holding only the corporation liable would result in injustice."[481]  This Arbitrator concludes that each of the above circumstances

---

[479] See SSP Partners v. Gladstrong Investments (USA) Corp., 275 S.W.3d 444, 454 (Tex. 2008).

[480] See SSP Partners, 275 S.W.3d at 454.

[481] See SSP Partners, 275 S.W.3d at 454.

provide a basis for disregarding the fictions of corporate separateness between the Feldman Law Firm, Capstone, and PoolRe to the effect that Feldman is ultimately liable and responsible for the torts and actions committed by the Feldman Law Firm, Capstone and PoolRe.

A.    **The fictions of corporate separateness between the Feldman Law Firm, Capstone, and PoolRe is being used to perpetrate fraud.**

263)    As stated above, the Texas Supreme Court has concluded that Texas law disregards corporate fictions "where the fiction is used as a means of perpetrating fraud."[482] As discussed in Section VI, Feldman/Capstone have perpetrated a fraudulent scheme to keep the 2018 and 2019 risk pools open and convert $3,354,925.37 of their clients' funds held in trust in PoolRe's risk pools. The millions of dollars taken from the pools have been used by Feldman/Capstone to pay for their malpractice liabilities and legal expenses in fighting against their own clients. Feldman/Capstone continue to perpetrate the fraud that this money was taken to pay for PoolRe's administrative expenses or operating costs, even though significant portions of the funds taken from the pools have no connection to PoolRe, including those set forth in Section VI(C), pp. 59-64. The fraud committed by Feldman/Capstone in connection with converting millions of dollars of their clients' funds to pay for their malpractice defense under the false guise of "PoolRe's administrative expenses" can only be remedied by disregarding the corporate fiction of PoolRe's alleged separateness and holding Feldman/Capstone ultimately responsible and liable for all actions and torts committed by PoolRe.

---

[482] *See SSP Partners*, 275 S.W.3d at 454.

**B.    Capstone, The Feldman Law Firm and PoolRe were all acting under the control and supervision of Stewart Feldman.**

264)    The Texas Supreme Court has concluded that Texas law disregards corporate fictions "where a corporation is organized and operated as a mere tool or business conduit of another corporation."[483]    Although not pleaded as an "alter ego" claim, the Doctors, in their arbitration demand, alleged that those acting under Mr. Feldman's "control and supervision" were liable.[484]  For the reasons stated, this Arbitrator concludes that the Law Firm, Capstone and PoolRe were all operating under Mr. Feldman's direction and control and are, therefore, their improper acts are attributable to Mr. Feldman.  Capstone, the Feldman Law Firm and PoolRe were all controlled by Mr. Feldman.  While this is a "direction and control" case and not a strict "alter ego" case, the case law on alter ego is persuasive.  The "alter ego" theory applies "where a corporation is organized and operated as a mere tool or business conduit of another corporation."[485] Alter ego or direction and control determinations are intensely fact-based. They "require considering the totality of the circumstances,[486] as "no single factor is determinative."[487] Section VII sets forth the facts establishing Mr. Feldman's control over all the entities, including PoolRe.

265)    All of these facts and circumstances establish that the Feldman Law Firm, Capstone, and PoolRe were all operating under the direction and control of Mr. Feldman.  In Section VIII, this Arbitrator recited numerous facts showing a "blend of identities, or a blurring of

---

[483] *See SSP Partners*, 275 S.W.3d at 454.

[484] *See* the Doctors' Original Arbitration Demand, ¶ 45, p. 20, submitted July 29, 2020, First Amended Arbitration Demand, ¶ 45, p. 18, submitted August 6, 2020.

[485] *See Hideca Petrol. Corp. v. Tampimex Oil Intern., Ltd.*, 740 S.W.2d 838, 843 (Tex. App. 1987).

[486] *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003).

[487] *See Bridas S.A.P.I.C.*, 345 F.3d at 359.

lines of distinction, both formal and substantive, between" Feldman, Capstone, and PoolRe.[488]

This Arbitrator found that Capstone, the Feldman Law Firm, and PoolRe were under the ultimate

control of Mr. Feldman.   Considering the totality of the evidence and testimony in the record, the

findings of fact set forth above, and applicable law, this Arbitrator holds that Mr. Feldman is

personally liable and responsible for the torts committed by the Feldman Law Firm, Capstone and

PoolRe.

### C.    Mr. Feldman, the Feldman Law Firm and Capstone have resorted to fictions of corporate separateness as a means of evading existing legal obligations.

266)    As stated above, the Texas Supreme Court has concluded that Texas law disregards

corporate fictions "where the corporate fiction is resorted to as a means of evading an existing

legal obligation."[489] Feldman and Capstone had fiduciary obligations arising as a matter of law to

fully disclose to their clients that their clients were insuring Feldman's and Capstone's professional

malpractice liabilities, errors and omissions, and legal expense liabilities.[490]   Feldman and

Capstone could not legally get their clients to pay for their malpractice liabilities, errors &

omissions, and legal expense liabilities without making full disclosure to their clients with absolute

perfect candor.[491]

267)    Despite this fiduciary obligation and their failure to make full disclosure, Feldman

and Capstone have used the fiction of PoolRe's corporate separateness as an improper means to

have their clients pay for Feldman's and Capstone's malpractice liabilities and legal expenses.

---

[488] *See Hideca Petrol.*, 740 S.W.2d at 843.

[489] *See SSP Partners*, 275 S.W.3d at 454.

[490] *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 196 (Tex. App. – Houston [14th Dist.] 2002); *see also Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003) (citing *Ins. Co. of North Am. v. Morris*, 981 S.W. 2d 667, 674 (Tex. 1998)).

[491] *See* Transcript, Volume 4, August 6, 2021, at p. 1541, line 20 – p. 1542, line 15 (Thomas Watkins).

Through the fiction of PoolRe's corporate separateness, and under the false guise of "PoolRe administrative expenses," Feldman and Capstone have taken millions of dollars of their clients' money to subsidize Feldman's and Capstone's malpractice defense and legal expenses. It would be inappropriate to allow Feldman or Capstone to benefit from evading their fiduciary obligations to their clients or employ fictions of PoolRe's corporate separateness to force their clients into paying Feldman's and Capstone's malpractice defense and legal expenses. Accordingly, PoolRe's alleged corporate separateness must be disregarded in order to prevent the injustice of Feldman and Capstone taking millions of dollars of their clients' money to subsidize Feldman's and Capstone's malpractice defense and legal expenses.

268)    Feldman, as a fiduciary, has a legal obligation to forfeit the fees he has been paid by his clients if he breaches fiduciary duties.[492]  Feldman and Capstone argue that "the remedy of fee forfeiture [does not] lie against the Feldman Law Firm because [the Doctors] never paid any fees directly to the firm, but rather paid quarterly service fees to Capstone, which then separately paid legal fees to the Feldman Law Firm."[493]  As an initial matter, these facts further support this Arbitrators' conclusion above concerning the blurred lines of distinction between the Feldman Law Firm and Capstone. Mr. Feldman has set up his businesses in a manner where payment by his clients for legal services provided by the Feldman Law Firm are paid directly to Capstone, with no evidence in the record reflecting that Capstone ever paid the Feldman Law Firm for any of those legal fees.

---

[492] *See Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999).

[493] *See* Feldman/Capstone's Post-Hearing Brief at p. 96.

269)    This Arbitrator has concluded that Feldman and Capstone breached fiduciary duties to their clients.  The remedy under Texas law for breach of fiduciary duty includes fee forfeiture. It is inappropriate to allow Feldman to evade its obligation to forfeit all fees paid to it or Capstone by the Doctors through a fiction of Capstone's corporate separateness.  Accordingly, this Arbitrator disregards the fiction of Capstone's corporate separateness from the Feldman Law Firm and orders Mr. Feldman, the Feldman Law Firm, and Capstone to forfeit all fees paid to them by the Doctors.

**D.    Corporate fictions of separateness are being used by Feldman and Capstone to justify a wrong.**

270)    As stated above, the Texas Supreme Court has concluded that Texas law disregards corporate fictions "where the corporate fiction is relied upon as a protection of crime or to justify wrong."[494] Here, the corporate fiction of PoolRe's alleged separateness is being used by Feldman and Capstone to justify their taking of millions of dollars of their clients' money to pay for Feldman's and Capstone's legal fees and expenses incurred in these arbitration proceedings.  This Arbitrator has concluded that Feldman's and Capstone's conversion of their clients' money held in trust in the risk pool was improper.  This Arbitrator will not allow Feldman or Capstone to justify that wrong through the fiction of PoolRe's alleged separateness or under the false guise of PoolRe's alleged administrative expenses.

271)    It would be manifestly unjust if Feldman or Capstone were able to pay for their malpractice liabilities or legal expenses in any manner with their clients' money, whether through the pending A.M.Y. claims in the 2019 risk pool or under the alleged guise of PoolRe administrative expenses incurred in the 2018 and 2019 risk pools.  In order to prevent manifest

---

[494] *See SSP Partners*, 275 S.W.3d at 454.

injustice, and considering the totality of evidence and testimony in the record, this Arbitrator disregards the alleged corporate separateness between Feldman, Capstone, and PoolRe, holding that Mr. Feldman is liable and responsible for the actions and torts of the Feldman Law Firm, Capstone, and PoolRe. Although PoolRe is not a party to this Arbitration, Mr. Feldman is, and it is his actions which caused the injury to the Doctors acting through the Feldman Law Firm, Capstone and PoolRe.

## PART FIVE: DAMAGES AND RELIEF

### XVI. The Doctors are entitled to recover damages based on Feldman and Capstone's violations of fiduciary, tort, professional, and statutory duties.

272)    The Doctors have prayed for damages falling into the following categories:

| Claim | Amount owed |
|---|---|
| Additional taxes owed to IRS | $8,625,238 |
| Additional IRS interest | $1,864,817 |
| IRS penalties | $1,711,618 |
| Lost opportunities (includes $1,250,944 in quarterly fees paid by Doctors) | $23,224,403 |
| Forced liquidation of Bitcoin | $2,495,280.72 |
| Projected costs of IRS audit | $5,000,000 |
| Doctors' share of premiums converted from 2018/2019 risk pool | $221,005.21 |
| *Subtotal* | $43,142,361.93 |
| The *"Subtotal"* trebled pursuant to DTPA, Texas Insurance Code | $129,427,085.79 ($43,142,361.60 x 3) |

| Attorneys' fees and costs | To be decided by this Arbitrator in a subsequent award limited to fees and costs. |
|---|---|
| ***GRAND TOTAL*** | $129,427,085.79 plus pre-judgment interest, post-judgment interest, and attorneys' fees and costs |

273)    For the reasons stated in this Award, this Arbitrator denies the Doctors' prayer for recovery of additional taxes, additional interest, IRS penalties, lost opportunity (except for fee forfeiture in the amount of $1,250,944), forced liquidation of Bitcoin, and projected costs of IRS audit.

274)    This Arbitrator does find that the Doctors are entitled to fee forfeiture and their share of premiums converted from the 2018/2019 risk pools. I also find that Capstone violated the Texas Insurance Code, thus entitling the Doctors to treble damages, attorneys' fees, and costs, and pre and post judgment interest.

## XVII.  **The Doctors are not entitled to recover all amounts owed to the IRS (including back taxes, penalties, interest) for tax years dating back to 2015.**

275)    The Doctors' demand for damages relative to potentially disallowed deductions is denied for several reasons.

276)    First, there is no doubt that, regardless of the multiple failures to disclose by Feldman/Capstone, the Doctors did get the benefit of their bargain. At its most basic level, they invested in order to obtain coverage for unusual perils and obtain a tax deduction. As of this date, that is precisely what happened.

277)    Mr. Press' testimony that it is more likely than not that the deductions will be disallowed in the future is insufficient to support an award of damages for disallowance of tax

deductions. There are simply too many hurdles to overcome. The first being the appropriate statute

of limitations. The parties agree that a three year statute of limitations applies except for a six year

statute for substantial omission of gross income in excess of 25%.[495] The latter, assuming it may

apply, would only be applicable to the captive insurance companies since, if the deductions were

disallowed, they would then have underreported their income by more than 25%.

     278)    However, it is not clear from the testimony that the disallowance of the deduction

would trigger a 'substantial omission" penalty. The captive insurance companies disclosed all

income received. It is the deductions which would be disallowed. Feldman/Capstone's expert,

Marcus Brooks, acknowledged that, even in the case of Mr. Feldman's own captive, A.M.Y., the

deductions were "knocked out" on the insured side but:

> [T]hey did not whipsaw the Feldman group by saying, "Well, you don't get
> any premium deductions, but you also have premium – premium income at
> the same time."[496]

     279)    If the IRS did not apply the "substantial omission" penalty or limitations period to

A.M.Y. and Mr. Feldman, the acknowledged "master of the ship" for this captive program. It is

not reasonable to conclude the six year limitations period would apply to the captives.

     280)    Even if the six years applies to the captives, the remaining non-captive Doctor

parties are subject to the three year limitations period.[497]

     281)    Applying the three year limitation period, the only tax years open are 2818 and

2019.

---

[495] I.R.C. §6501(e)(1)(A).

[496] *See* Transcript, Volume 23, October 2, 2021, at p. 9322, lines 6-9 (Marcus Brooks).

[497] Further, it is not clear whether the six year statute of limitations would even apply to the insurers. Since they did not underreport but, in fact, disclosed all income, they simply took the deduction.

282)    The Doctors argue that the IRS may pressure a taxpayer to agree to an extension, but it was established that may occur only before the limitation period has run.[498] There was no evidence of any such extension effort by the IRS.

283)    Further, as of the date of this opinion, there is no evidence that there is an audit or even an IDR issued by the IRS for the insurers. There were IDRs issued for the Doctors, individually, and Sigma Delta, the billing company.[499] There is nothing in the record, save Lyle Press' opinion, that it is more likely than not that deductions will be disallowed. Against the contrary evidence, Mr. Press' opinion is not persuasive. The ongoing exchange between the Doctors and the IRS has nothing to do with the captive insurers,[500] the statute of limitations is either past or ticking.[501]

284)    All of these factors lead to the conclusion that the damages sought for disallowed deductions is speculative. For these reasons, there is no need in addressing the merits of the Doctors' damage expert, William Legier. He prepared an arithmetic calculation based on input and assumptions from others. As I find that the underlying assumptions and input provided Mr. Legier were not proven, the damage analysis need to go no further.

---

[498] FC 614.

[499] As Mr. Brooks testified, none of the captives received a notice of audit and "none of the flow-throughs that take the deductions have received a notice of audit." (*See* Transcript, Volume 23, October 2, 2021, at p. 9361, lines 14-16 (Marcus Brooks).) Exhibits J-109, J-117, FC-598 and FC-597 constitute the universe of communications between Dr. Sullivan, Dr. DellaCroce and the IRS in the record. It is correct that J-109 does include a request for tax returns for two of the captives, Janus and Cerberus, for the years 2016 through 2018. However, there is no indication of any issue with captives in the documents request, and, as of this date, only the 2018 and 2019 years are still open. None of those address the captive insurance companies. While the future of Mr. Feldman's business model is cloudy, given all the facts, it is not reasonable to conclude that it is more likely than not that the deductions taken will be disallowed.

[500] None of these communications reflect any IRS inquiry about the captive insurance deductions.

[501] The Doctors' 2018 returns were filed no later than October of 2019. Thus, the three year limitation period would expire in October of 2022. The 2019 statute would expire in October of 2023. I find credible the testimony of Marcus Brooks that the IRS "almost never opens an examination with less than a year left on the statute of limitations ... ." *See* Transcript, Volume 23, October 2, 2021, at p. 9309, lines 17-25.

285)    The Doctors, at least thus far, have received the benefit of their bargain. For that reason, the damage claims listed below are denied.

| Claim | Amount Owed |
|---|---|
| Additional Taxes Owed to IRS | $8,625,238 |
| Additional IRS Interest | $1,864,817 |
| IRS Penalties | $1,711,618 |
| Lost Opportunities | $21,973,459 |
| Forced Liquidation of Bitcoin | $2,495,280.72 |
| Projected Costs of IRS Audit | $5,000,000[502] |

## XVIII. The Doctors are entitled to recover the amount of premiums belonging to their captives that were converted by Mr. Feldman, the Feldman Law Firm and Capstone.

286)    Feldman/Capstone are liable for the amounts of their clients' premiums converted from the 2018 and 2019 risk pools. From the 2018 pool, Feldman and Capstone converted $250,000.[503] From the 2019 risk pool, $3,042,427.37 was wrongfully converted to pay for Feldman/Capstone's legal fees and expenses in these arbitrations.[504] Capstone confirmed in a July 27, 2021 e-mail that the retention from the 2019 risk pool "has been largely expended," that no

---

[502] See Transcript, Volume 1, August 3, 2021, at p. 350, lines 8-13 (Dr. Scott Sullivan).

[503] See Exhibit DRS-2543, Capstone Report on 2018 Risk Pool, July 27, 2001; See also Transcript, Volume 11, August 20, 2021, p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript, Volume 17, September 23, 2021, p. 6857, line 5- p. 6858, line 18 (Jeff Carlson).

[504] The total amount of retained premiums belonging to all captives participating in the 2019 pool was $3,600,262.32 See Exhibit DRS-2004, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-401652. Claims losses and expenses for other captives' claims (as in losses from non-A.M.Y. claims), in an amount of $557,834.94 were deducted from the 2019 pool. See Exhibit DRS-2680, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-427016. Thus, the 2019 pool had left $3,042,427.37, which Feldman/Capstone used to pay for their legal fees and expenses in these arbitrations.

distributions are expected, and that a reinsurer funding call is contemplated.[505]    Mr. Amoroso

explained that this language means that "the money is gone for all intents and purposes."[506]

287)    Applying the applicable quota share percentages for 2018 and 2019, the Doctors'

share of the risk pool funds improperly converted by Feldman/Capstone break down as follows:

| Year | Amount taken by Feldman/ Capstone/ PoolRe | Quota Share % | Doctors' share of amounts taken |
|------|-------------------------------------------|---------------|--------------------------------|
| 2018 | $250,000.00 | 3.9443%[507] | $9,860.75 |
| 2019 | $3,042,427.37 | 6.94%[508] | $211,144.46 |
| **Total** | $3,292,427.37 | | **$221,005.21** |

Feldman/Capstone have converted $221,005.21 of premiums belonging to the Doctors' captives.

This Arbitrator concludes that the Doctors are entitled to an award that includes $221,005.21 for

Feldman/Capstone's conversion of those funds. I also conclude that the Doctors shall be relieved

of any potential future funding calls with respect to the 2019 pool.

### XIX.    Mr. Feldman, the Feldman Law Firm and Capstone are liable for violating the Texas Insurance Code.

288)    As discussed in Section XIV, Feldman and Capstone are liable to the Doctors

under the Texas Insurance Code.

289)    Claims under the DTPA tie-in to the Insurance Code are subject to treble damages

if the violative conduct was committed "knowingly" and/or "intentionally."    Section 541.152 of

the Texas Insurance Code authorizes awards of actual damages, costs, attorneys' fees, as well as

---

[505] *See* Exhibit DRS-2753, E-mail from Capstone Accounting Department, July 27, 2021.

[506] *See* Transcript, Volume 7, August 16, 2021, at p. 2554, lines 6-16 (Richard Amoroso).

[507] *See* Exhibit DRS-71A, 2018 Reinsurers List. The Doctors' share of 3.9443% is derived from taking the sum of the amounts attributable to Cerberus (1.2042%), Orion (1.2042%), and Janus (1.5359%).

[508] *See* Exhibit DRS-72A, 2019 Reinsurers List.  The Doctors' share of 6.94% is derived from taking the sum of the amounts attributable to Cerberus (2.093%), Orion (2.249%), and Janus (2.598%).

treble damages if the defendants "knowingly committed the act complained of."[509]  All damages to which the Doctors are therefore subject to the treble damages, under the Texas Insurance Code.

290)    Based on the totality of evidence and testimony in the record, the findings of fact set forth above, and applicable law, this Arbitrator concludes that Feldman/Capstone acted knowingly and intentionally and that the Doctors are entitled to three times the total amount of their damages under the Texas Insurance Code in a total amount of $1,471,949.21.  The Doctors are also entitled to recover their attorneys' fees and costs in an amount to be decided by this Arbitrator in a subsequent award limited to fees and costs.

## XX.    The Doctors are entitled to recover all fees paid to Feldman/Capstone due to the serious breaches of fiduciary duties.

291)    The Doctors are entitled to an award of $1,250,944 paid by the Doctors to Feldman and Capstone in quarterly fees under the Joint Engagement Letter.

292)    The Texas Supreme Court recognized in *Burrow v. Arce* that a "client need not prove actual damages in order to obtain forfeitures of an attorney's fee for the attorney's breach of fiduciary duty to the client."[510]

293)    In *Burrow*, the Texas Supreme Court noted, "Ordinarily, forfeiture extends to all fees for the matter for which the lawyer was retained."[511]  The Court also cited several non-exclusive considerations, including "the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies."[512]  Importantly, *Burrow* also added one additional

---

[509] *See* TEX. INS. CODE §541.152(a), (b).

[510] *Burrow*, 997 S.W.2d 229, 240 (Tex. 1999).

[511] *Burrow*, 997 S.W.2d at 243.

[512] *Burrow*, 997 S.W.2d at 243.

consideration "that must be given great weight in applying the remedy of fee forfeiture: the public interest in maintaining the integrity of attorney-client relationships."[513]

294) Here, Feldman/Capstone's conduct implicates the public interest. Feldman/Capstone deceived their clients, the Doctors, and multiple other clients into unwittingly subsidizing Feldman/Capstone's malpractice liabilities and defense expenses. Actual harm has occurred, as Feldman/Capstone already raided the risk pools of more than $3 million to pay for their legal expenses and fees in defending against malpractice claims brought by their clients.[514] And Feldman/Capstone have threatened future harm in the form of funding calls to be paid by their clients in unlimited amounts to pay for additional fees and costs incurred by Feldman/Capstone in these arbitrations.[515]

295) Fee forfeiture is imposed due to an attorney's breach of the duty of loyalty, irrespective of any resulting harm.[516] *Burrow* justified fee forfeiture on the basis that the underlying relationship is rooted in trust, and "the person is not entitled to be paid when he has not provided the loyalty bargained for and promised."[517] *Burrow* further emphasized, "It is the agent's disloyalty, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation. An agent's compensation is not only for specific results but also for loyalty."[518]

---

[513] *Burrow*, 997 S.W.2d at 244.

[514] *See* Transcript, Volume 18, September 24, 2021, at p. 7013, line 19 – p. 7014, line 9 (Jeff Carlson); Transcript, Volume 7, August 16, 2021, at p. 2552, line 5 – p. 2557, line 23 (Richard Amoroso).

[515] Capstone's President, Jeff Carlson, testified that there is no limit or cap on the amount of fees and expenses that Feldman/Capstone can charge to their clients for PoolRe's alleged administrative expenses. *See* Transcript, Volume 15, August 24, 2021, at p. 5918, line 1 – p. 5920, line 9 (Jeff Carlson).

[516] *Burrow v. Arce*, 997 S.W.2d at 238.

[517] *Burrow*, 997 S.W.2d at 237-38.

[518] *Burrow*, 997 S.W.2d at 238.

Indeed, "the central purpose of the equitable remedy of forfeiture is to protect relationships of trust by discouraging agents' disloyalty."[519]

296) Feldman/Capstone' breaches of fiduciary duties pervade every aspect of the Doctors' relationship with Feldman/Capstone. *Burrow* spoke of fee forfeiture in the context of a "serious breach of fiduciary duty to a client." That standard is easily satisfied.[520] Mr. Watkins explained a "serious breach" as follows:

> A serious breach of fiduciary duty is, in my mind, a violation of loyalty, full candor, full disclosure, and compliance with all of the [Disciplinary Rules] are to such a nature that it caused a serious economic result for the client. Secondly, it has – if it became obvious that the lawyer is acting in the interest of somebody besides his client, then – to his own economic advantage, then I think it clearly is a serious breach.[521]

297) Mr. Watkins further identified the particular conduct constituting the "serious breach."[522]

298) As detailed above, Feldman's and Capstone's breaches of fiduciary duties were "serious," pervasive, and resulted in actual harm and threatened future harm in substantial amounts. The Doctors are entitled to recover the full amount of fees paid to Feldman/Capstone in an amount of $1,250,944.[523]

---

[519] *Burrow*, 997 S.W.2d at 238.

[520] *Burrow*, 997 S.W.2d at 240 (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, §49 (Proposed Final Draft No. 1, 1996)).

[521] *See* Transcript, Volume 4, August 6, 2021, at p. 1637, lines 8-18 (Thomas Watkins).

[522] *See* Transcript, Volume 4, August 6, 2021, at p. 1639, lines 2-25 (Thomas Watkins).

[523] *See* Exhibit FC-600.0020 and FC-600.0021, Bill Legier's Report; *see also* Transcript, Volume 1, August 3, 2021, at p. 350, lines 14-20 (Dr. Scott Sullivan). This amount is included in Mr. Legier's calculation as to total damages that should be awarded.

**XXI.    Feldman/Capstone have failed to pay sanctions previously ordered by this Arbitrator**.

299)    On January 7, 2021, this Arbitrator ordered Feldman and Capstone to pay the Doctors the sum of $17,319.32 within thirty days.[524] This sanction was necessitated by Feldman's and Capstone's willful refusal to comply with an order affording the Doctors their contractual right of inspection.  The Doctors advised Feldman and Capstone that the Doctors' counsel would fly from New Orleans to Houston on August 31, 2020 to conduct an inspection previously authorized by this Arbitrator.  In what was a "stunning lack of professionalism,"[525] Feldman and Capstone did not respond to the Doctors, did not tell counsel the inspection would not be permitted, and, after counsel arrived at the Feldman/Capstone offices, refused to allow the Doctors' counsel to access the premises. Instead, they called the police and had the Doctors' counsel escorted off the premises by the Houston police.   This Arbitrator includes in this award $17,319.32 owed by Feldman and Capstone to the Doctors pursuant to this Arbitrator's January 7, 2021 award, which is incorporated herein.

300)    Further, to the extent not paid, this Arbitrator also incorporates in this award attorneys' fees in the amount of $126,383.75 as set forth in the Order dated March 8, 2022.

**XXII.  The Doctors are entitled to recover pre-judgment and post-judgment interest**.

301)    An arbitrator may award as part of the final award "interest at such rate and from such date as the arbitrator may deem appropriate."[526]  Under Texas law, prevailing parties receive

---

[524] *See* Order by Arbitrator Kutcher, January 7, 2021.

[525] *See* Hearing Transcript, October 19, 2021, at pp. 44-45.

[526] AAA Commercial Rule 47(d)(i).

prejudgment interest as a matter of course.[527] There are two legal sources for an award of prejudgment interest: (1) general principles of equity; and (2) an enabling statute.[528]

302)    Under Texas statutes, pre-judgment interest applies to judgments in wrongful death, personal injury, property damage, and condemnation cases.[529] If pre-judgment interest is not authorized by statute, the court can award prejudgment interest under the general principles of equity.[530] In cases of equity, Texas common law governs the award of pre-judgment interest.[531]

303)    In an action for legal malpractice, the plaintiff may recover pre-judgment and post-judgment interest.[532] In an action under the Texas Deceptive Trade Practices Act, the plaintiff may recover pre-judgment and post-judgment interest.[533] I find no authority prohibiting recovery of interest under the Texas Insurance Code, but, given the tie-in, I conclude that interest is recoverable under the Texas Insurance Code.

304)    Pre-judgment interest accrues on the amount of a judgment on the date the suit is filed and ends on the day preceding the date judgment is rendered.[534] Pre-judgment interest is computed as simple interest and does not compound.[535] Texas common law allows pre-judgment interest to accrue at the same rate as post-judgment interest.[536] Likewise, Texas statutes enabling

---

[527] *Cavnar v. Quality Control Parking*, 696 S.W.2d 549 (Tex. 1985).

[528] *Cavnar v. Quality Control Parking Inc.*, 696 S.W.2d 549, 552 (Tex. 1985); *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 629 S.W.2d 480, 483-85 (Tex. 1978).

[529] Tex. Fin. Code Ann. § 304.102.

[530] *Perry Roofing v. Olcott*, 744 S.W.2d 929 (Tex. 1988).

[531] *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 530 (Tex. 1998).

[532] *See, e.g., Law Office of Oscar C. Gonzalez, Inc. v. Sloan*, 447 S.W.3d 98, 115–16 (Tex. Ct. App.—San Antonio 2014); *Sample v. Freeman*, 873 S.W.2d 470, 476 (Tex. Ct. App.—Beaumont 1994).

[533] *See, e.g., Roberts v. Grande*, 868 S.W.2d 956 (Tex. App.—Houston [14th Dist.] 1994).

[534] Tex. Fin. Code Ann. § 304.104.

[535] Tex. Fin. Code Ann. § 304.104.

[536] *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998).

pre-judgment interest for wrongful death, personal injury, property damage, and condemnation cases calculate the pre-judgment interest as the rate equal to post-judgment interest at the time of judgment.[537]

305)    Claimants filed their Original Arbitration Demand with this Arbitrator on July 29, 2020. Thus, prejudgment interest, at the post-judgment rate discussed below, shall begin on and accrue from July 29, 2020 and end on the day preceding this judgment.

306)    Under Texas law, "[a] money judgment of a court in [Texas] must specify the postjudgment interest rate applicable to that judgment."[538] The post-judgment rate applicable to the Doctors' claims is governed by Tex. Fin. Code Ann. § 304.003, which authorizes the Texas consumer credit commissioner to determine the post-judgment rate. According to Tex. Fin. Code Ann. § 304.003, "[on] the 15[th] day of each month, the consumer credit commissioner shall determine the postjudgment interest rate to be applied to a money judgment rendered during the succeeding calendar month."

307)    As of January 28, 2022, the post-judgment rate for a money judgment rendered during the month of February 2022 is 5%.[539] Post-judgment interest begins to accrue on the date of the judgment.[540] Accordingly, the pre-judgment rate of 5% shall apply to this final award beginning on July 29, 2020, and the post-judgment rate of 5% shall apply beginning on the date of this judgment.

---

[537] Tex. Fin. Code Ann. § 304.103.

[538] Tex. Fin. Code Ann. § 304.001.

[539] *Interest Rates*, TEXAS OFFICE OF CONSUMER CREDIT, https://occc.texas.gov/publications/interest-rates (last visited January 28, 2022).

[540] Tex. Fin. Code Ann. § 304.005.

**XXIII. The Doctors are entitled to a declaration that Feldman/Capstone, and those in concert with them, including PoolRe, cannot submit any portion of their legal fees or operating expenses or any damages award to the risk pools for payment.**

308)    The Doctors did not agree to subsidize the malpractice liabilities or litigation expenses of their lawyer, Feldman, or their captive manager, Capstone.[541]  It would be grossly inequitable to allow Feldman/Capstone to tender any portion of the A.M.Y. claims to the pool participants for reimbursement. Similarly, it would be grossly inequitable to allow Feldman/Capstone to subsidize their litigation expenses indirectly under the guise of PoolRe administrative expenses or operating costs.

309)    Texas law provides courts with the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."[542]  The Declaratory Judgment Act's stated "purpose is to settle and to afford relief from uncertainty with respect to rights, status, and other legal relations."[543]    The Declaratory Judgment Act is to be "liberally construed and administered."[544]

310)    This Arbitrator grants the Doctors' request for declaratory relief that Mr. Feldman and those in active concert with him, including his related entities which he controls, The Feldman Law Firm, Capstone and PoolRe, cannot tender to the risk pool or pool participants for payment or reimbursement any portion of: (1) the A.M.Y. claims, (2) the legal fees and expenses incurred

---

[541] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1957, line 5 – p. 1958, line 10; p. 1978, line 19 – p. 1980, line 24 (Dr. Frank DellaCroce); *see also* Transcript, Volume 6, August 9, 2021, at p. 2418, lines 20 - 25; p. 2439, line 3 – p. 2448, line 18 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, at p. 2482, line 8 – p. 2513, line 10 (Richard Amoroso)

[542] *See* Tex. Civ. Prac. & Rem. Code § 37.003(a). As with the conversion claim discussed in Section VI(C), a declaratory judgment claim with respect to the taking of pool money was not contained in the Doctors' demand. However, for the reasons set forth in fn. 380, a declaratory judgment is appropriate.

[543] *See Allstate Insurance Co. v. Irwin*, 627 S.W.3d 263, 269 (Tex. 2021) (citing Tex. Civ. Prac. & Rem. Code § 37.002(b)).

[544] *See id.*

in the Dorfman arbitration, these arbitrations, other related arbitrations or proceedings in state or federal court, and state bar proceedings, or (3)  any damages award that may be issued by these Tribunals.

### PART SIX: CONCLUSION

311)    Considering the totality of evidence and testimony in the record and the findings of fact and conclusions of law above:

a) **IT IS ORDERED, ADJUDGED, AND DECREED** that there be judgment in favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., finding Respondents jointly, severally, and solidarily liable to Claimants for breaching fiduciary duties, committing professional malpractice, fraud, conversion, making fraudulent misrepresentations, and violating the Texas Insurance Code, for the reasons set forth in these findings of fact and conclusions of law.

b) **IT FURTHER IS ORDERED, ADJUDGED, AND DECREED** that Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., are jointly, severally, and solidarily liable to and must pay Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., the amount of $1,471,949.21, exclusive of attorneys' fees and costs, pre-judgment interest, and post-judgment interest, for the foregoing torts and breaches identified above, which includes the following amounts:

   i.    The $1,250,9944 in fees paid by the Doctors to be forfeited by Feldman/Capstone;

   ii.   $221,005.21 for the risk pool premiums belonging to the Doctors converted by Feldman/Capstone;

128

     iii.    For the amounts listed above ($1,471,949.21), the Doctors are entitled to treble damages for Respondents' violations of the DTPA and Texas Insurance Code, making their total award $4,415,847.63 (inclusive of treble damages, exclusive of attorneys' fees, pre-judgment interest, and post-judgment interest);

c)  **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Doctors shall be relieved of any future funding calls.

d)  **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that there be judgment in the favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., awarding the Claimants their attorneys' fees and costs incurred in this arbitration proceeding, in an amount to be decided by this Arbitrator, after contradictory hearing, in a subsequent award limited to fees and costs.

e)  **IT IS FURTHER ORDERED ADJUDGED AND DECREED** that there be judgment in the favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., awarding the Claimants pre-judgment interest at a rate, consistent with the post-judgment interest rate below, of 5%, beginning to accrue on July 29, 2020 and end on the day preceding when this Final Award is executed.

f)  **IT IS FURTHER ORDERED ADJUDGED AND DECREED** that there be judgment in the favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., awarding the Doctors post-judgment interest consistent with Tex. Fin. Code § 304.003, at a rate of 5% beginning to apply on the date this Final Award is executed.

g) **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that there be Declaratory Judgment entered in favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., declaring that Stewart Feldman and those in active concert with him, including those entities which he controls, the Feldman Law Firm, Capstone and PoolRe, cannot tender to the risk pool or pool participants for payment or reimbursement any portion of: (1) A.M.Y. Property & Casualty Insurance Corp.'s claims, (2) the legal fees and expenses incurred in this arbitration, other future proceedings in state or federal court, and state bar proceedings arising out of the same transactions or occurrences which give rise to this arbitration, or (3) any damages award that may be issued in this arbitration proceeding.

h) **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Feldman and Capstone pay the Doctors the sum of $17,319.32, as set forth in the Order dated January 7, 2021.

i) **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, to the extent not paid, this Arbitrator includes in this award attorneys' fees in the amount of $126,383.75, as set forth in the Order dated March 8, 2022.

j) **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all claims against Jeff Carlson, in his individual capacity, are dismissed with prejudice.

k) **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., take nothing and their claims, affirmative defenses, and any and all relief sought are rejected and dismissed with prejudice.

l) **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that any relief sought by any party which is not specifically ruled upon in this Order is **DENIED**.

Date:  March 22 , 2022

**ROBERT A. KUTCHER, ARBITRATOR**

130

ARBITRATION FILED WITH AND BEFORE THE
HONORABLE ARBITRATOR, ROBERT A. KUTCHER

DR. SCOTT SULLIVAN, M.D., DR. FRANK
DELLACROCE, M.D., ST. CHARLES
SURGICAL HOSPITAL, L.L.C., ST.
CHARLES HOLDINGS, L.L.C., CENTER
FOR RESTORATIVE BREAST SURGERY,
LLC, SIGMA DELTA BILLING, LLC,
SUNRISE PRODUCTIONS, LLC,
CERBERUS INSURANCE
CORPORATION, JANUS INSURANCE
CORPORATION, AND ORION
INSURANCE CORPORATION

V.

CAPSTONE ASSOCIATED SERVICES,          Locale of Final Hearing: Houston, Texas
LTD., CAPSTONE ASSOCIATED
SERVICES (WYOMING), LIMITED
PARTNERSHIP, CAPSTONE INSURANCE
MANAGEMENT, LTD., THE FELDMAN
LAW FIRM LLP, STEWART A.
FELDMAN, JEFF CARLSON

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## ORDER ON ATTORNEYS' FEES AND COSTS

On March 22, 2022, this Arbitrator issued an Award in favor of Dr. Scott Sullivan, Dr.
Frank DellaCroce, St. Charles Surgical Hospital, LLC, St. Charles Holdings, LLC, Center for
Restorative Breast Surgery, LLC, Sigma Delta Billing, LLC, Sunrise Productions, LLC, Cerberus
Insurance Corp., Janus Insurance Corp., and Orion Insurance Corp. (collectively, the "Doctors")
and against Stewart Feldman ("Mr. Feldman"), The Feldman Law Firm LLP (the "Feldman Law
Firm"), Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited
Partnership, and Capstone Insurance Management, Ltd. (collectively, "Feldman/Capstone").

1

Left open for later resolution in that Award was the amount of attorneys' fees and costs to which the Doctors are entitled under the Texas Insurance Code and the Texas Declaratory Judgment Act.[1]

By consent of the parties to a briefing schedule, this matter was heard on April 1 and resumed on April 11, 2022.

At the outset, Feldman/Capstone has asserted that the January 28, 2022 Affidavit and Submission (Hilbert Fee Affidavit) is based upon the fees and costs incurred in connection with the RICO claim, and, therefore, consideration of those fees and costs "subverted due process and has prevented the Capstone Parties from receiving a fundamentally fair hearing and resolution to the claims [the Doctors] asserted against them … ."

I disagree. The fees and costs outlined in the Hilbert Affidavit clearly set forth all fees and costs incurred. To the extent there was any confusion, that issue was resolved at the April 1, 2022 hearing and by the supplemental memoranda and exhibits. The undersigned Arbitrator and Feldman/Capstone are capable of determining applicability to the award of fees and costs under the Texas Insurance Code and the Texas Declaratory Judgment Act based on the documentation provided. Neither side has cited any law indicating a different standard of the permitted scope of recovery of fees and costs under RICO than under the Texas Insurance Code and the Texas Declaratory Judgment Act. This award is not made under the RICO statute but, instead, is under the Texas Insurance Code and the Texas Declaratory Judgment Act.[2]

---

[1] Texas Insurance Code § 541.152; TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

[2] Section 37.009 of the Texas Declaratory Judgment Act allows for the award of costs and reasonable and necessary attorney's fees as are "equitable and just." For the reasons stated herein, this Arbitrator finds that the fees and costs awarded are both equitable and just and reasonable and necessary.

There is no dispute that this matter was unique in that there were four separate Arbitration hearings that were conducted at the same time, and each Arbitrator heard the same evidence and each individually ruled on each objection. This Arbitrator previously found that no authority existed which allowed any Arbitrator to rule on any issue beyond the scope of that Arbitrator's Arbitration.

In support of their fee application, the Doctors argued that, in this Arbitration, they should be awarded all costs and fees incurred in all four of the Arbitrations so that the Doctors may be made whole. I do not agree. There were four Arbitrators who heard this matter. One of the Arbitrators saw fit to award the Doctors the entire amount prayed for. The other two Arbitrators apparently did not award attorneys' fees and costs. It is not this Arbitrator's province to impinge upon the decisions of the other Arbitrators.

I believe the separate nature of the award and, indeed, the very requirement of separate awards applies with respect to any fee determination. For that reason, this Arbitrator believes that only fees reasonably attributable to the above Arbitration may be awarded.

Because all four Arbitrations were heard at the same time, this Arbitrator concludes that the appropriate starting point is to consider, as potential recovery, 25% of the hearing and post-hearing briefing. This represents this Arbitration's portion of those fees.

This Arbitrator has a different view with respect to expenses. In light of the fact that all of the hearing expenses would have been incurred, regardless of whether there were one or four

hearings, all hearing expenses are potentially recoverable. It is against this standard that the amount of fees and costs to be awarded will be considered.[3]

## THE APPLICABLE LAW

Texas law states that an award of attorneys' fees must find a basis in statutory law or the parties' contract,[4] failing which the American Rule applies. In this case, the Doctors are entitled to recover attorneys' fees and costs through the Texas Insurance Code and may recover under the Texas Declaratory Judgment Act.[5]  Texas jurisprudence has developed factors set forth in *Arthur Andersen v. Perry*[6] to evaluate the reasonableness and necessity of attorneys' fees:

(1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2)    the likelihood … that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)    the fee customarily charged in the locality for similar legal services;

(4)    the amount involved and the results obtained;

(5)    the time limitations imposed by the client or by the circumstances;

(6)    the nature and length of the professional relationship with the client;

(7)    the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)    whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

---

[3] Any award in this matter applies only to the extent that it is not duplicative of any other fee award by any other Arbitrator. The Doctors have acknowledged, and this Arbitrator agrees, that there shall be no double recovery.
[4] *See Dallas Cent. Appraisal Dist. V. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex. 1992).
[5] *See* fn. 1, *supra*.
[6] 945 S.W.2d 812 (Tex. 1997).

In *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019), the

Texas Supreme Court further refined this analysis by applying the lodestar method for determining

the reasonableness and necessity of attorneys' fees in a fee shifting situation, such as this matter.

The Supreme Court approvingly quoted its position in the *El Apple* case, as follows:

> Under the lodestar method, the determination of what constitutes a
> reasonable attorney's fee involves two steps. First, the [fact finder] must
> determine the reasonable hours spent by counsel in the case and a
> reasonable hourly rate for such work. The [fact finder] then multiplies the
> number of such hours by the applicable rate, the product of which is the
> base fee or lodestar. The [fact finder] may then adjust the base lodestar up
> or down (apply a multiplier), if relevant factors indicate an adjustment is
> necessary to reach a reasonable fee in the case.

*Rohrmoos* at p. 48.[7]

Section 541.152 of the Texas Insurance Code and §37.009 of the Texas Declaratory

Judgment Act allow for the award of court costs and reasonable and necessary attorneys' fees. In

the case of the Declaratory Judgment Act, the fees must also be equitable and just. Further, the

Texas Supreme Court held that:

> When the causes of action involved in the suit are dependent upon the same
> set of facts or circumstances and thus are intertwined to the point of being
> inseparable, the party suing for attorney's fees may recover the entire
> amount covering all claims.[8]

I find that the claims of the Doctors and the legal services of Sher Garner are sufficiently

"intertwined" so that the Doctors need not segregate the fees and costs among the several claims.[9]

This entire Arbitration was of one piece that arose out of a single, albeit complicated, set of facts.

---

[7] *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757 (Tex. 2012).
[8] *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10-11 (Tex. 1991) (emphasis added); *see also, Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017); *see also Ventana Investments v. 909 Corp.*, 879 F.Supp. 676, 678 (E.D.Tex. 1995) ("In some cases, the prevailing party may recover attorneys' fees covering all claims"). The modification of *Sterling*, as set forth in *Tony Gullo Motors I, LP v. Chapa*, 212 S.W.3d 299 (Tex. 2006), does not change that analysis.
[9] *Rainbow Group, Ltd. v. Johnson*, 2002 WL 1991141 at *10 (Tex. App. 2002).

For that reason, there is no need to segregate the claims under the fee shifting statutes from the other claims asserted against Feldman/Capstone, which do not.

Each of the *Arthur Andersen* factors shall be addressed separately.

**1.    The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly.**

This dispute was contested throughout and well lawyered on both sides. It involved complex and, in some instances, novel issues including:

- captive insurance;
- IRS investigations and audits;
- the promotion of abusive tax shelters;
- attorney malpractice and misconduct;
- deceptive and fraudulent trade practices;
- breaches of fiduciary duty;
- protracted discovery disputes that resulted in (1) multiple sanctions hearings and the issuance of sanctions orders and (2) hundreds of thousands of pages of documents being received and reviewed by the Doctors' counsel up to and during the final hearing.

**2.    The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.**

It is reasonable to conclude that the amount of resources demanded by this time-consuming case impacted Sher Garner's capacity to work on other matters. Mr. Hilbert, a partner at Sher Garner, testified that this matter was extremely time consuming and absorbed most of the time for the lawyers involved. Sher Garner lawyers and professionals have spent tens of thousands of hours on this dispute, as well as the other related Arbitrations. The commitment to this engagement precluded Sher Garner's work on other matters.

**3.    The fee customarily charged in the locality for similar legal services.**

Sher Garner's hourly rates are substantially less than most commercial litigators in the

Houston legal market.[10] This observation was previously made in the Order dated March 8, 2022. Sher Garner's hourly rates for its most experienced lawyers are $495 per hour, less that Stewart Feldman's hourly rate of $575 per hour:[11]

| Professional | Rate |
|---|---|
| Senior Member: James Garner, Peter Hilbert | $495/hr. |
| Member: Thomas J. Madigan, II, Jeffrey Kessler, Ashley G. Coker | $445/hr. |
| Senior Associate: Wade B. Hammett | $375/hr. |
| Associate: David Freedman, Curtis Case, Elise Benezech, Andrew Noell | $275/hr. |
| Paralegal: Laura Erskin, Cory Harrell | $150/hr. |

The Doctors also used contract document reviewers. These document reviewers, who are licensed lawyers, were billed at the paralegal rate of $150 per hour. This Arbitrator, who has practiced law in New Orleans, Louisiana for over 40 years, finds that fees charged by Sher Garner were consistent with New Orleans market rates and generally lower than the prevailing Houston market rates.

**4.      The amount involved and the results obtained.**

It is with respect to this criteria that some adjustment of fees is required. The Doctors sought damages in excess of $43,000,000.00. This Arbitrator awarded the amount of $1,471,949.21 before trebling. Thus, the results obtained were significantly less than the amount

---

[10] *See* Hilbert Affidavit, Exhibit A.
[11] *See* Trial Exhibit DRS 723 (Affidavit of Joe Greenberg in support of FCP's fee submission in the Dorfman Arbitration).

prayed for. The award was approximately 11% of the amount requested. Offset against this is the fact that the Doctors were successful on their liability claims against all Respondents, except Jeff Carlson.[12] This requires some adjustment downward of the fees.

### 5.    The time limitations imposed by the client or by the circumstances.

Time compression and acceleration have been significant factors in this dispute. Initially, the Parties and Arbitrators were constrained by the four-month jurisdictional limit in the arbitration provision in the Joint Engagement Letter. That four month period was unworkable as outlined in this Arbitrator's Award of March 22, 2022 and other prior Orders. There were also numerous delays and side issues which increased the Doctors' fees and costs in this Arbitration. The compression and acceleration created more work hours and staffing issues. Thousands of documents were produced in non-searchable formats which significantly increased the time and cost of discovery. Additional document production continued through the hearing of this matter. Several thousands of pages were produced during the course of the hearing itself. This resulted in additional fees and costs, which could otherwise be avoided in other situations that allow enough time for more organizing, planning, and sequencing the legal work. Having to transition from tasks and fit a significant amount of work in a limited amount of time contributed to increased fees and costs in this Arbitration.

Ultimately, after several postponements, the Arbitration hearing began on August 3, 2021 and did not conclude until October 3, 2021. There were a total of approximately 24 days of hearings. On the way to the hearing, there were multiple detours to the state and federal courts, different arbitrations demands, including a blatant attempt by Feldman/Capstone to deprive all

---

[12] The time spent addressing Mr. Carlson's liability was *de minimis*.

four Arbitrators of jurisdiction by filing yet another Arbitration. There were also discovery delays, all of which added significantly to the work necessary to bring this matter to hearing.

6.    **The nature and length of the professional relationship with the client.**

Sher Garner has a preexisting client relationship with the Doctors, having worked on multiple other legal matters for them. Sher Garner has handled over two dozen prior engagements for the Doctors.

7.    **The experience, reputation, and ability of the lawyer or lawyers performing the services.**

This Arbitrator had the opportunity firsthand to observe the ability of Doctors' counsel. All were capable and provided quality litigation skills.

8.    **Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.**

Doctors' counsel rendered services on hourly rates in this proceeding, which is appropriate for a complex commercial case. The uncertainty of collection is low risk.

Applying these factors, I conclude that there must be downward adjustment to the fee request based on results obtained.

## ANALYSIS

The Doctors initially submitted, in the Jones Arbitration for the RICO claim, the following description of fees and costs:

| | | |
|---|---|---|
| (a) | Sher Garner fees/costs [non-Dorfman] | $9,199,984.75 |
| (b) | Third-party vendors (including arbitrator fees) | $2,737,228.81 |
| (c) | Expert witness fees/costs [non-Dorfman] | $3,111,941.60 |
| (d) | Other counsel fees/costs [non-Dorfman] | $62,372.91 |

9

(e)      Dorfman Arbitration                              $3,236,766.53

In addition, by supplemental memo, the Doctors sought an additional $542,664.03 for fees incurred subsequent to the January 28, 2022 Affidavit and Submission.

In this matter, following an initial hearing on April 1, 2022, the Doctors submitted a revised summary as ordered by this Arbitrator. This revised request allocated 25% of the Sher Garner fees to this Arbitration (as there were three other Arbitrations), allocated 25% of the supplemental claim (as there were three other Arbitrations), deleted all costs unrelated to this Arbitration, deleted all requests for any award for Dorfman fees and expenses, and modified the request for expert witness fees. Each category shall be addressed separately.

**9.      Sher Garner Fees/Costs [non-Dorfman]**

Sher Garner's revised Submission in Exhibit A-1 seeks fees and costs for what is characterized as non-Dorfman matters in the amount of $3,256,464.62, which represents 100% of the Kutcher fees and costs through June, 2021. It also seeks $1,050,923.40, which represents 25% of the fees incurred in all four Arbitration hearings and 25% of the fees incurred in post-hearing briefing.

In addition, Sher Garner seeks direct cost reimbursement of $61,539.31 (through final hearing) and $4,134.96 (25% of post hearing costs).

For the reasons stated, this Arbitrator has no authority to issue an award of fees and costs in any matter other than this Arbitration. Because all of the Arbitrations were heard at the same time in order to avoid multiple hearings, this Arbitrator believes the appropriate starting point for a fee analysis is $4,373,068.00, representing the Kutcher time and costs as reflected on the invoices.

10

However, there are certain time entries on the Kutcher invoices which do not apply to this Arbitration. This issue was addressed in detail at the April 11, 2022 hearing. Although *de minimis* in the overall billing, approximately 200 hours were identified as improper, either at the hearing or by subsequent review. Those time entries are not recoverable. Using a blended rate of $325, a reduction of $65,000.00 is appropriate. Additionally, because the Doctors did not receive the amount prayed for, in this Arbitrator's opinion, a further reduction of $325,000.00 is warranted.

Also included in the Kutcher invoices submitted by Sher Garner are fees incurred in connection with two sanction hearings. In the first sanction hearing, the Doctors sought $21,257.50. In the second, the Doctors requested $126,383.75. Since awards have already been made with respect to those claims, those sums must also be deducted from any award.

Accordingly, applying the *Andersen* factors, as well as the standard espoused in *Rohrmoos*, the Doctors are awarded total fees and costs in the amount of **$3,835,426.75**.

### 10.    Third-Party Vendors (including arbitrator fees)

Because this Arbitrator has already determined that the authority granted to award fees and costs is limited solely to this particular Arbitration, it would be inappropriate to award any expenses of third-party vendors which were not incurred in connection with this Arbitration. However, it is proper to include all third-party costs incurred in connection with the preparation of and appearance at the hearing since all such costs would have been incurred.

It would be improper to include in this Award all third-party vendor expenses which were not specifically attributable either to this matter individually or to the joint hearing. This includes, but is not limited to, all of the fees paid to any other Arbitrator other than the undersigned. It also

11

includes any fees and costs for which recovery was already awarded, including the two awards of sanctions referenced herein.

The Doctors provided a revised Exhibit A-2, which sets forth all third-party costs paid for the Doctors directly. In Exhibit A-2, the Doctors requested $1,470,228.44 in recoverable costs based on this Arbitrator's instruction. Of that amount, I find that $236,104.73 of that amount is not recoverable. These costs include charter airfare, including a request for $16,295.46 which was the subject of a sanctions order, service of process, and costs for electronic filing in a state court proceeding, and arbitration fees paid to other Arbitrators.

For these reasons, the Doctors are awarded the sum of **$1,234,123.71** for third-party costs.

**11.    Expert Witness Fees/Costs [non-Dorfman]**

The award of expert witness fees presents two issues:

(a)    Are such fees properly costs, and, if so,

(b)    Which fees are recoverable?

The Doctors contend that R-47(d)(ii) and R-54 of the AAA Rules allows for the award of fees. That is correct with the limitation that it be "an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement." Attorneys' fees and costs are authorized by law. The parties have not consented to the award of fees to the prevailing party nor is it contained in the arbitration agreement. For that reason, it is appropriate to follow Texas law with respect to the award of expert witness fees and costs.

"The general rule in Texas is that expert witness fees are not recoverable as costs of litigation." *Bundren v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 440 (Tex. App.— Dallas 2011, pet. denied); *see also May v. Ticor Title Ins.*, 422 S.W.3d 93, 106 (Tex. App.—

Houston [14th Dist.] 2014, no pet.) (expert fees not recoverable); *May v. Ticor Title Ins.*, 422 S.W.3d 93, 106 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Expert fees are not court costs … ."); *Bundren v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 439-40 (Tex. App.— Dallas 2011, pet. denied) (expert fees not recoverable as costs).

Although Texas law does not generally allow for the award of expert witness fees, the Texas Declaratory Judgment Act allows for the award as an equitable remedy. I conclude that equity requires that expert witness fees and costs be awarded, but only for those experts who testified in this Arbitration and whose testimony assisted the trier of fact. This Arbitrator does not agree with Feldman/Capstone's argument that the Declaratory Judgment Act is procedural only and does not allow for a separate remedy. The Act's language clearly allows for an award which is "just and equitable."

The Doctors provided a revised Exhibit A-3 as directed by this Arbitrator. In that exhibit, the Doctors identified $1,770,072.59 in expert witness fees. However, that amount included $240,875.00 for Howard Hirsch and Francine Semaya of the Gerson Lehrman Group, Inc. Neither Mr. Hirsch nor Ms. Semaya appeared at the hearing, and this Arbitrator does not believe it is appropriate to award those expenses.

For that reason, the total award for expert witness fees is **$1,529,197.59**.

## 12.    Other Counsel Fees/Costs [non-Dorfman]

The Doctors seek fees and costs totaling $62,372.91 for fees incurred by counsel other than Sher Garner (Exhibit A-4 to the Doctors' January 28, 2022 Submission). During the entire course of this proceeding, the "other counsel" had no apparent role in this hearing, although they may have provided services in other proceedings. Their fee records, which were produced, do not

13

address specifically this Arbitration hearing.  Indeed, some of the invoices provided predate the filing of this Arbitration Demand and relate to the Dorfman Arbitration.

For that reason, this Arbitrator concludes that these fees and costs are not recoverable.

### 13.    Dorfman Arbitration

In their January 28, 2022 Submission, the Doctors also requested an award for fees and costs in the Dorfman Arbitration (Exhibit A-5).

Feldman/Capstone has asserted that the Doctors cannot recover for fees and costs incurred in connection with the Dorfman Arbitration. I agree. The only authority which this Arbitrator has is to award fees and costs incurred in connection with this Arbitration.

For that reason, any claim for fees and costs incurred in connection with any other Arbitration is rejected.

### 14.    Conclusion

This Arbitrator specifically finds that the fees and costs awarded herein were reasonable, necessary, and just and equitable.

**FOR THESE REASONS, IT IS ORDERED, ADJUDGED, AND DECREED** that there be judgment in favor of Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., finding Respondents jointly, severally, and solidarily liable to Claimants for fees and costs as follows:

| | |
|---|---|
| **Sher Garner Fees** | **$3,835,426.75** |
| **Third-Party Costs** | **$1,234,123.71** |
| **Expert Witness Fees** | **$1,529,197.59** |
| **TOTAL** | **$6,598,748.05** |

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that payment of this amount is to be made within thirty (30) days of this Order.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Order and the reasoned Award dated March 22, 2022 are certified as final for purposes of judicial review.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that any relief sought by any party which is not specifically ruled upon in this Order is **DENIED**.

Date:    April 14, 2022

_____

**ROBERT A. KUTCHER, ARBITRATOR**

15