**Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership, and Capstone Insurance Management, Ltd., PoolRe Insurance Corp., The Feldman Law Firm LLP, and Stewart Feldman, individually,**

Claimants,

**v.**

**St. Charles Surgical Hospital, L.L.C.; St. Charles Holdings, L.L.C.; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC, Sunrise Productions, LLC, Cerberus Insurance Corp., Janus Insurance Corp., Orion Insurance Corp., Scott Sullivan, and Frank DellaCroce,**

Respondents.

## FINAL ARBITRATION AWARD

ARBITRATOR:

Mark K. Glasser,

Presiding

EXHIBIT
1

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   PARTIES ........................................................................................................... 2

III.  THE PARTIES' ARBITRATION AGREEMENTS .......................................... 3

IV.   PROCEDURAL HISTORY ................................................................................ 6

V.    JURISDICTION ................................................................................................ 8

VI.   BACKGROUND TO THE PARTIES' RELATIONSHIP ACCORDING TO FCP'S FILINGS
      (ALLOWING FOR ARGUMENT ALONG THE WAY) ................................. 13

VII.  THE DORFMAN ARBITRATION (ACCORDING TO FCP) ......................... 18

VIII. THE EFFECT OF THE DORFMAN AWARD (ACCORDING TO SCP)....................................... 21

IX.   THIS ARBITRATOR'S RULING ON *RES JUDICATA* .................................. 23

X.    BACKGROUND TO THE PARTIES' RELATIONSHIP ACCORDING TO SCP'S FILINGS
      (AGAIN ALLOWING FOR ARGUMENT ALONG THE WAY) .................... 26

XI.   THE PENDING DISPUTES AND SCP'S ARGUMENTS IN SUPPORT OF THEIR CLAIMS
      AND AFFIRMATIVE DEFENSES ................................................................ 33

XII.  THE DOCTORS' EXPLANATION OF THEIR CLAIMS  (IN THEIR OWN WORDS) .............. 35

XIII. FCP'S LIABILITY (ACCORDING TO SCP)................................................... 39

XIV.  DEFENSES TO SCP'S CLAIMS AND REFUTATION OF SCP'S AFFIRMATIVE DEFENSES
      (ACCORDING TO FCP) ................................................................................ 119

XV.   THIS ARBITRATOR'S ANALYSIS OF SCP'S CLAIMS AND AFFIRMATIVE DEFENSES .. 325

XVI.  SCP's THEORIES OF SINGLE BUSINESS ENTITY, ALTER EGO, JOINT ENTERPRISE, AND
      PERSONAL LIABILITY OF JEFF CARLSON............................................. 331

XVII. THE DOCTORS' CLAIM FOR DAMAGES (IN THEIR OWN WORDS)................................ 331

XVIII. FCP'S RESPONSE TO THE DOCTORS' DAMAGE CLAIMS................................ 346

XIX.  THIS ARBITRATOR'S ANALYSIS OF DAMAGES CLAIMED BY SCP .............................. 365

XX.   THIS ARBITRATOR'S ANALYSIS OF FCP'S CLAIM FOR ATTORNEY'S FEES.............. 367

XXI.  THE PUTATIVE CLASS ACTION ............................................................... 368

XXII. FINAL ARBITRATION AWARD ................................................................. 402

## IN THE ARBITRATION

| | | |
|---|---|---|
| Capstone Associated Services, Ltd., | § | |
| Capstone Associated Services (Wyoming), | § | |
| Limited Partnership, and Capstone | § | |
| Insurance Management, Ltd., PoolRe | § | |
| Insurance Corp., The Feldman Law Firm | § | |
| LLP, and Stewart Feldman, individually, | § | |
| | § | |
| Claimants | § | |
| | § | |
| v. | § | Pending Before |
| | § | Mr. Mark Glasser, Arbitrator |
| St. Charles Surgical Hospital, L.L.C.; | § | |
| St. Charles Holdings, L.L.C.; | § | |
| Center for Restorative Breast | § | |
| Surgery, LLC; Sigma Delta Billing, | § | |
| LLC, Sunrise Productions, LLC, | § | |
| Cerberus Insurance Corp., | § | |
| Janus Insurance Corp., Orion | § | |
| Insurance Corp., Scott Sullivan, and Frank | § | |
| DellaCroce, | § | |
| | § | |
| Respondents | § | |

## <u>FINAL ARBITRATION AWARD</u>

### I.    INTRODUCTION

This Award emanates from a particularly contentious and protracted dispute that played-out under an arbitration provision with terms so foreign to the salutary goals of arbitration as to make a mockery of this form of dispute resolution. But the parties agreed to operate under that provision, and by doing so invited a procedural morass requiring, at one time or another, the involvement of nine different arbitrators, the years-long attention of four independent arbitrators, sitting not as a tribunal but as four independent factfinders, who heard 24 nine-and-ten hour days of conflicting testimony from approximately 20 witnesses, and who received hundreds of hearing exhibits. At the close of proof, the parties were asked to submit post-hearing briefs and proposed

awards. The parties' briefs ran to 257 pages each, with footnotes numbering, in one instance, 697, and proposed awards numbering 335 and 263 pages, with footnotes numbering, in one instance, 1096.  As these lengthy submissions reflect extraordinary effort by counsel, as well as the parties' apparent agreement that this dispute cannot be comprehended and properly resolved without this level of detail, and although this Arbitrator's view is otherwise, the effort put into these filings by all counsel entitles the parties to their close consideration and substantial (but abbreviated) inclusion here. Further condensing the parties' filings to a more summary form poses the risk that something of importance to one or both sides would then be left behind. While cumbersome, the inclusion of the parties' contentions at length here permits this Arbitrator, in rendering this Award, to take full account of all proof, authorities, and arguments presented by the parties before, at, and after the close of the evidentiary hearing herein.  It also permits this Arbitrator to identify and adopt those portions of the parties' submissions that are believed to support the outcome here, without recapitulating those submissions, agreements, and authorities in detail a second time.  If the resulting length of this Award is without precedent, it is in that respect faithful to every other aspect of these proceedings.

## II.     PARTIES

The live pleadings in this arbitration are FCP's ( or "Claimants" as defined herein) January 20, 2021 FourthAmended and Restated Arbitration Demand and SCP's (or "Respondents" as defined herein) January 25, 2021 Answering Statement. Both agree to the listing of the parties below.

1.      Stewart A. Feldman ("Feldman");

2.      The Feldman Law Firm LLP ("Law Firm") (Feldman and the Law Firm are collectively the "Feldman Parties");

3.      Capstone Associated Services, Ltd. ("Capstone");

4.      Capstone Associated Services (Wyoming), Limited Partnership ("Capstone Wyoming");

5.      Capstone Insurance Management, Ltd. ("Capstone Insurance Management"); (Capstone, Capstone Wyoming, Capstone Insurance Management, and Carlson are collectively the "Capstone Parties");

6.      PoolRe Insurance Corp. ("PoolRe") (the Feldman Parties, the Capstone Parties, and PoolRe are collectively "FCP");

7.      Scott Sullivan ("Sullivan");

8.      Frank DellaCroce ("DellaCroce");

9.      St. Charles Surgical Hospital, L.L.C. ("St. Charles");

10.     St. Charles Holdings, L.L.C. ("St. Charles Holdings");

11.     Center for Restorative Breast Surgery, LLC ("Center");

12.     Sigma Delta Billing, LLC ("Sigma Delta");

13.     Sunrise Productions, LLC ("Sunrise");

14.     Cerberus Insurance Corp. ("Cerberus"), wholly owned by Dr. Sullivan;

15.     Orion Insurance Corp. ("Orion"), wholly owned by Dr. DellaCroce; and

16.     Janus Insurance Corp. ("Janus"), owned 50% - 50% by Doctors Sullivan and DellaCroce (Sullivan, DellaCroce, St. Charles, St. Charles Holdings, Center, Sigma Delta, and Sunrise are collectively referred to as "SCP" or the "St. Charles Parties.").

## III.    THE PARTIES' ARBITRATION AGREEMENTS

FCP invoked the arbitration agreements contained in a December 2015 Joint Engagement Letter ("2015 Engagement Letter") and the 2018 and 2019 Stop Loss Reinsurance Agreements

and Quota Share Reinsurance Policies. PoolRe is not bound by the 2015 Engagement Letter.

The arbitration provisions in these agreements are essentially the same. As an exemplar, the 2015 Engagement Letter's arbitration provision provides:

> With respect to any and all other controversies, disputes or claims whatsoever between (x) the Firm (including its lawyers) and/or its affiliates (including Capstone Associated Services, Ltd., Capstone Insurance Management (Anguilla), Ltd., and/or Export Assurance) (including their employees, officers and directors) and (y) any client of the Firm and/or its affiliates related to or arising out of the Firm's or its affiliates' services or arising under or in connection with or related to any of the parties' agreements (but in <u>no event</u> for attorneys' fees for services previously rendered, see preceding paragraph), either party may submit the dispute to any recognized, neutral (x) arbitral association or (y) arbitrator for final resolution in an arbitration proceeding to be concluded within four months, except that the American Arbitration Association (AAA) shall not administer the arbitration. Submission of the dispute to arbitration under this agreement shall be the sole and exclusive forum for resolving any and all disputes between the parties, except for attorneys' fees for services previously rendered which are before the HBA's FDC.
>
> Except as to the HBA's FDC which shall apply its own rules, all arbitrations -- regardless of the arbitral organization or arbitrator actually hearing the dispute -- shall be conducted in Houston, Texas applying Texas substantive law pursuant to the Commercial Arbitration Rules (and not the rules for Large, Complex Commercial Cases) of the American Arbitration Association (AAA) then in effect, whose Expedited Procedures shall apply regardless of the monetary size of the dispute or the number of parties to the proceeding, with only a single arbitrator hearing the dispute, again all regardless of the organization sponsoring the arbitration in question. All parties acknowledge and agree that this arbitration agreement modifies the AAA arbitration rules regarding, inter alia, the selection of the arbitrator and the administration of the arbitration in that: (1) either party may directly appoint the single arbitrator or the arbitral association who/which shall proceed to resolve the dispute, provided that the arbitrator is recognized and neutral; (2) the AAA is not required to administer and shall not administer the arbitration; and (3) any recognized and neutral arbitrator himself/herself or arbitral association may administer the arbitration. The arbitrator or arbitral association appointed to resolve the dispute shall have the sole and exclusive ability to rule on all aspects of the arbitrator's appointment, including, but not limited to, disputes or challenges of bias and neutrality.
>
> In all cases, the parties shall be deemed to have adopted the Optional Rules of the AAA For Emergency Measures of Protection (regarding injunctive or equitable relief, which requests for relief shall exclusively be submitted to the arbitrator). In all events, the parties waive the right to trial by jury in any action or proceeding.

This arbitration provision shall be effective notwithstanding any actions that may later take place. The parties agree that the issue of arbitrability shall likewise be decided by the arbitrator, and not by any other person. That is, the question of whether a dispute itself is arbitrable shall be decided solely by the arbitrator and not, for example, by any court. The parties agree that the arbitrator has exclusive authority to resolve all disputes and challenges to the formation and enforceability of this arbitration agreement, and decide all disputes or challenges to the enforceability of the parties' agreements as a whole. The parties agree that their intent is to divest the courts of all powers in disputes involving the parties, except to compel arbitration, and to confirm, vacate or enforce award. The courts shall have no jurisdiction over legal or equitable (including injunctive) matters. The arbitration decision shall be final and binding in all respects. Any person may have a U.S. District Court or another court of competent jurisdiction enter the findings of the arbitrator for all purposes, including for the confirmation and enforcement of any award.

If the first arbitrator or arbitral organization which receives a written demand for arbitration of the dispute from either of us does not complete the arbitration to finality within four months of receiving the written demand, any party then may file another written demand for arbitration of the dispute with another recognized, neutral, arbitrator or arbitral association, with the prior arbitrator or arbitral association then being immediately divested of jurisdiction, and the replacement arbitrator or arbitral association being required to render a final award within four months of the new, written demand being filed with the replacement arbitrator or arbitral organization. The replacement arbitrator shall not be the original arbitrator. Additionally, the parties agree that the dispute resolution process set forth above concerning the first (non-HBA FDC) arbitration demand, shall apply to every subsequent arbitration. We look forward to working with you.

As indicated above, the 2015 Engagement Letter requires that a single arbitrator resolve the arbitration to finality within four months of receiving the original written demand for arbitration. Together with other Arbitrators, this Arbitrator ruled that such a temporal limitation is unconscionable and therefore unenforceable as applied here. Other arbitrators found the same, two of whom had already refused to enforce the four-month limitation on due process grounds.[1] This Arbitrator did not otherwise modify the arbitration agreement in any way. Pursuant to the arbitration agreement, Texas substantive law governs this proceeding and the AAA Commercial Rules, as modified by the parties' arbitration agreement, apply.

---

[1] This Arbitrator is not a party to the Order finding the four-month limitation void on due process grounds.

### IV.     PROCEDURAL HISTORY

On December 7, 2020, FCP submitted an original written arbitration demand to this Arbitrator. Relying on the four-month divestment provisions in the parties' arbitration agreements, the Original Arbitration Demand came to this Arbitrator because Judge Baker's and Arbitrator Kutcher's respective four-month jurisdictions had purportedly expired without the entry of a final award by either Arbitrator. On the same day that FCP submitted the Original Demand for Arbitration to this Arbitrator, this Arbitrator accepted his appointment.

On December 11, 2020, FCP submitted an Amended Arbitration Demand to this Arbitrator.

On December 14, 2020, this Arbitrator issued his disclosures and signed oath.

On December 19, 2020, Claimant FCP submitted a Supplemental Arbitration Demand to this Arbitrator. The Supplemental Arbitration Demand placed their own claims, along with the claims, disputes, and controversies originally pled by SCP in still another proceeding—the Arbitration before Judge Medley—to this Arbitrator for final determination because Judge Medley declined SCP's request to extend his jurisdiction and had issued no final award within his jurisdictional window.

On December 20, 2020, this Arbitrator informed the parties that he considered the claims, disputes, and controversies originally pending in the prior arbitration to be properly before this Arbitrator.  SCP asserted, however, and persists in the assertion, that the claims in the prior Medley Arbitration, including class action related claims, lie only before Judge Jones by virtue of *In Re Houston Specialty Insurance Company*, 569 S.W.3d 138 (Tex. 2019). The issue of my jurisdiction was later resolved through the entry of my Order of May 2, 2021, adopted *infra* at pp 8-12.

On January 15, 2021 this Arbitrator entered a Scheduling Order. The Scheduling Order set a deadline of January 20, 2021 for the filing of any amended statement of claims. The Scheduling

Order also set a deadline of April 6, 2021, for this Arbitrator to issue a reasoned award. The Preliminary Scheduling Order goes on to state, "[n]o party's agreement to this order shall prejudice, in any way that party's rights or constitute a waiver of any rights or arguments, and the right to challenge the jurisdiction of the arbitration is expressly reserved in favor of the party."

On January 20, 2021, FCP submitted their Fourth Amended and Restated Arbitration Demand. This Arbitrator finds this to be FCP's live pleading in this Arbitration.

On January 25, 2021, SCP filed their Answering Statement to Fourth Amended and Restated Arbitration Demand.

On or about February 23, 2021, this Arbitrator re-scheduled the final hearing in this Arbitration to commence on March 8, 2021.

On February 24, 2021, SCP filed a motion to continue the final hearing.

On March 1, 2021, this Arbitrator granted SCP's request to continue the final hearing and ordered it to begin March 23, 2021.

On March 14, 2021, SCP filed a motion to re-set the final hearing again, requesting this Arbitrator to reset the final hearing "to an uninterrupted block allowing for three weeks of trial time, plus a consecutive spill-over week immediately thereafter, that comports with the availability of counsel and the arbitrators."

On March 15, 2021, this Arbitrator reset the final hearing to commence on August 2, 2021 and to conclude on August 25, 2021.

This Arbitrator issued new scheduling orders on May 20, 2021 and June 29, 2021, respectively, setting forth interim deadlines and final hearing procedures.

On July 21, 2021, the parties filed pre-hearing briefs.

On August 3, 2021, the final hearing in this Arbitration commenced.

On October 3, 2021, the final hearing concluded and evidence closed in this Arbitration.

On December 3, 2021, the parties filed their respective post-hearing briefs.

On January 28, 2021, the parties filed their proposed final awards.

All jurisdictional objections raised by the parties throughout these proceedings were preserved. This Arbitrator specifically notes, finds, and holds that none of the parties has waived any objection by continuing to participate in this proceeding subject to those objections and that all parties should be permitted to reprise those objections in later proceedings, subject to the applicable provisions of the arbitration agreements, the Rules of the American Arbitration Association, and the Federal Arbitration Act.

## V.    JURISDICTION

The parties' 2015 Joint Engagement Letter expressly incorporates the Commercial Arbitration Rules of the American Arbitration Association ("AAA").[2]   Rule 7 of the AAA Commercial Rules empowers the arbitrator "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."[3]   In light of this provision, this Arbitrator exercised his authority to decide his own jurisdiction through the entry of the above-referenced Order of May 2, 2021. That Order is incorporated and adopted in full here:

---

[2] *See* Exhibit J-20, Joint Engagement Letter, at SULLIVAN011079-81.
[3] *See* AAA Commercial Rules, Rule R-7.

**IN THE ARBITRATION OF**

| | |
|---|---|
| Capstone Associated Services, Ltd., | § |
| Capstone Associated Services (Wyoming), | § |
| Limited Partnership, and Capstone | § |
| Insurance Management, Ltd., PoolRe | § |
| Insurance Corp., The Feldman Law Firm | § |
| LLP, and Stewart Feldman, individually, | § |
|    Claimants | § |
| | § |
| v. | § |
| | § |
| St. Charles Surgical Hospital, L.L.C.; | § |
| St. Charles Holdings, L.L.C.; | § |
| Center for Restorative Breast | § |
| Surgery, LLC; Sigma Delta Billing, | § |
| LLC, Sunrise Productions, LLC, | § |
| Cerberus Insurance Corp., | § |
| Janus Insurance Corp., Orion | § |
| Insurance Corp., Scott Sullivan; Frank | § |
| DellaCroce, | § |
|    Respondents | § |

Pending Before

Mr. Mark Glasser, Arbitrator

### ORDER ON RESPONDENTS' RULE 33 MOTION TO DISMISS (*HOUSTON SPECIALTY*) AND RESPONDENTS' JURISDICTIONAL OBJECTIONS REGARDING CAPSTONE AND FELDMAN'S DEFECTIVE AND PREMATURE DEMAND

Pending before me are Respondents' Rule 33 Motion to Dismiss (*Houston Specialty*) and Respondents' Jurisdictional Objections Regarding Capstone and Feldman's Defective and Premature Demand. For the reasons stated below, both Motions are denied.

### THE RULE 33 MOTION

In their Motion under AAA Rule 33, Respondents complain that Claimants' filing and prosecution of their claims before me contravenes the Texas Supreme Court's ruling in *Houston Specialty Insurance Co.*, 569 S.W.3d 138 (Tex 2019). Specifically, Respondents contend that Claimants' filing offends the rule that a Texas state court litigant may not preemptively file a first or original action seeking a declaration of non-liability in tort so as to beat the potential plaintiff to the courthouse and thus deny the potential plaintiff the forum of its choosing. *Id.* at

Page 1 of 4

140. But for the reasons identified below, my view is that the holding in *Houston Specialty* is not offended by the Claimants' filing here.

First, the matters before me, and those before three other arbitrators, are controlled not by what a litigant may or may not do before a Texas state tribunal but by the terms of a particularly detailed arbitration agreement. As two courts have already found, that agreement does not limit its signatories to a single forum. Instead, that agreement permits the parties to litigate their disputes in multiple fora, just as the parties here have done. In two of those fora, Respondents here are Claimants, having chosen those fora on their own and having for many months now freely prosecuted their claims of tortious conduct by the Claimants here. Accordingly, as the Claimants prosecuting claims of tortious conduct in not one but two fora of their own choosing, Respondents here have no valid complaint under *Houston Specialty*.

Second, no prior action undertaken by Claimants here interfered with or purported to undermine Respondents' filings first in a Texas state court and later before Judge Stanwood Duval in arbitration, thus permitting Respondents to choose the time and place for the original filing of their tort claims. That those claims have now landed in a different forum—or in multiple fora—is not the product of wrongful conduct by the Claimants here. It is the product of the arbitration agreement to which all parties freely subscribed.

Finally, as any application of *Houston Specialty* obviously requires a threshold finding that one party has acted preemptively to seek a declaratory finding of non-liability on another party's tort claims, *Houston Specialty* cannot apply here, where Claimants have not alleged before me any such claim. In fact, from the filing of their first Complaint through their most recent, Claimants have expressly disavowed a request for such relief. This factor alone distinguishes this case from the facts before the Court in *Houston Specialty*, as well as those

Page 2 of 4

before arbitrator Dorfman, meaning that neither precedent nor any form of collateral estoppel bars the prosecution of the claims before me.

For all of these reasons, Respondents' Rule 33 Motion to Dismiss (*Houston Specialty*) is **DENIED**.

<u>**RESPONDENTS' JURISDICTIONAL OBJECTIONS**</u>

Respondents' Jurisdictional Objections complain that I am without jurisdiction to hear the matters pending here because the arbitration demand before me was prematurely filed and was procedurally defective. To the extent these objections spill-over to Respondents' complaints under Rule 33, and for the reasons stated above, those complaints are again denied.

Respondents' principal jurisdictional complaint relates to the timing of the filing of the first arbitration Complaint before me. The argument is that because the first filing before me was made before the lapse of jurisdiction by one (or more) other arbitrators, that filing was premature and defective, thus requiring the filing before me to take a back seat to the Respondents' filing made shortly thereafter before Judge Charles Jones.

I do not agree with the argument that the filing before me was in any way defective. I do not believe that it was even premature. It was a filing made in contemplation of and dependent for its efficacy upon an event that was believed to be imminent, *i.e.* the lapse of a previous arbitrator's jurisdiction. That event in fact occurred shortly after the complained-of filing, at which time that filing took legal effect. Filings such as this, made in contemplation of a future event and slated to become effective upon the occurrence of that event are a routine part of litigation and arbitration. At least one such filing was made by Respondents here as well. My view is that so long as no relief under such a filing is sought or granted before the occurrence of the later event, the filing need not be displaced. And as that is the case here, I reiterate my earlier finding that mine is the first-filed case as between myself and Judge Charles Jones, for whatever

Page 3 of 4

effect that may have upon the breadth, priority, or sanctity of this or any other pending matters.

Respondents' Jurisdictional Objections are therefore **OVERRULED.**

Signed this 2ⁿᵈ day of May, 2021

_____
Mark K. Glasser, Arbitrator

As previously noted, Claimants' January 20, 2021, Fourth Amended and Restated Arbitration Demand confirms the bases for this Arbitrator's jurisdiction, as that filing at page 14 not only expressly disclaimed any request for a declaratory judgment of nonliability on any tort claim, and so negated any complaint that *Houston Specialty* applies here, but it also set forth six specific and independent requests for affirmative relief—none of which is barred by *Houston Specialty*.

Of equal importance to my assumption of jurisdiction over the Respondents' claims is what the Respondents' themselves put before me in their January 25, 2021, Answering Statement to Fourth Awarded and Reinstated Arbitration Award. There, under the heading "AFFIRMATIVE DEFENSES', Respondents specifically requested that I take up those defenses and that I find as follows:

"9. The circumstances and problems complained of by Claimants were caused, in whole or in part, by its own and/or third-parties' errors, acts, decisions, omissions, negligence, assumption of the risk and/or fault. Such errors, acts, decisions, omissions, negligence, assumption of the risk and/or fault should operate to bar, in whole or, alternatively, in part Claimants' claims."

By these allegations, Respondents expressly placed before this Arbitrator as defenses the same allegations of tortious and other wrongdoing by Claimants for which Respondents seek the recovery of damages in other arbitrations. For Respondents to contend otherwise is disingenuous.[4]

## VI.    BACKGROUND TO THE PARTIES' RELATIONSHIP ACCORDING TO FCP'S FILINGS (ALLOWING FOR ARGUMENT ALONG THE WAY)

In approximately 2011, Dr. Sullivan and Dr. DellaCroce created and began operating captive insurance companies named Orion, Janus, and Cerberus. TR Vol 2 at 623. The Doctors established these captives as offshore captives, domiciled in the Bahamas. EX J-115 at ¶ 11. Peter Strauss served as the Doctors' captive attorney and captive insurance manager. *Id*.

By January 2015, the Doctors were concerned about increased IRS scrutiny of captive insurance companies. *Id*.; TR Vol. 5 at 1926.  Accordingly, the Doctors, along with their attorney David Sherman and their CPA David Kushner, met with Mr. Feldman in New Orleans to discuss

---

[4]  This position taken by Respondents mirrors their approach to the issue of Class Notice and Certification, where, as I explained in previous Orders, Respondents first expressly sought my ruling on Class related matters, but then, unhappy with that ruling, simply ignored it in favor of an Arbitrator whose ruling they preferred. That history is captured at pp 358 *et seq., infra*.

the Doctors' ongoing captive operations and structure. EX J-115 at ¶ 11; TR Vol. 5 at 2042-43. This meeting led to the Doctors eventually engaging the Feldman and Capstone Parties to conduct a "health check-up" of the Doctors' captive operations with Mr. Strauss. EX J-115 at ¶ 13; TR Vol. 2 at 554-56; EXs FC37.2, FC-38, FC-40, FC-41, FC-44.

The Feldman and Capstone Parties provided their health check-up report to the Doctors, Mr. Sherman, and Mr. Kushner in the summer of 2015. EX FC-60. The Doctors discussed the health check-up with Mr. Sherman and Mr. Kushner, who in turn offered their own analyses of the report. *See, e.g.*, EXs FC-56, FC-58, FC-68, FC-472. Mr. Sherman and Mr. Kushner interfaced with the Feldman and Capstone Parties for the Doctors. *See, e.g.*, EX J-115 at ¶¶ 13, 24.[5]

The Doctors contemplated using the health check-up to negotiate lower rates with Mr. Strauss. EX FC-70. Ultimately, however, the Doctors decided to transition administration of their captives from Mr. Strauss to Capstone. EX J-115 at ¶ 15. Part of this transition included re-domiciling Orion, Janus, and Cerberus as Delaware captives. *See* EX J-20.

At some point in mid-2015, the Feldman and Capstone Parties provided the Doctors, Mr. Sherman, and Mr. Kushner a draft engagement letter (which included a Capstone Services Agreement). EX J-115 at ¶ 13. Thereafter, Mr. Feldman communicated with Mr. Sherman and Mr. Kushner regarding the contents of the engagement letter. *Id*. During these ongoing discussions, Mr. Sherman, Mr. Kushner, and Mr. Feldman discussed an article highlighting IRS scrutiny of, and accordant risks with, captive insurance—an article that Mr. Sherman shared with the group. EXs J-140, J-17. Mr. Feldman and Mr. Kushner also discussed the fact that an IRS agent had conducted an on-site review of approximately 135 banker boxes of documents related to the

---

[5] It is undisputed that Mr. Sherman and Mr. Kushner interfaced with the Feldman and Capstone Parties on behalf of the SCP parties. Further, in the state court petition SCP filed in June 2020, SCP identify Mr. Kushner and Mr. Sherman as individuals who spoke and communicated "on behalf of the Doctors." *See* State Court Lawsuit at ¶¶ 30-32.

Feldman and Capstone Parties' captive operations. EX J-17. At the Doctors' urging, the parties negotiated a five-year term to the engagement letter in exchange for lower quarterly fees. EX J-115 at ¶ 13.

On December 7, 2015, the Doctors executed the engagement letter with the Feldman and Capstone Parties (the "2015 Engagement Letter"). *Id.* at ¶ 14. The 2015 Engagement Letter incorporates the Capstone Services Agreement. *Id.* at ¶ 18. As determined in a previous arbitration conducted by Judge Grant Dorfman, the parties to the 2015 Engagement Letter are sophisticated and intelligent, possessing similar levels of sophistication, and were represented by counsel (and certified public accountants) of their choosing both in negotiating the terms of the engagements over many months and throughout the relationship. *Id.* at ¶¶ 29-30. Following the execution of the 2015 Engagement Letter, the Feldman and Capstone Parties began the process of re-domiciling the Doctors' captives in Delaware and took over from Mr. Strauss, the administration of the captives.

The 2015 Engagement Letter, including the Capstone Services Agreement, provides that Capstone will provide certain turn-key services to the Doctors in exchange for a quarterly fee. EX J-20. The Doctors paid all fees to Capstone, which in turn paid The Feldman Law Firm LLP for services performed. *Id.* The Doctors never paid fees directly to the Feldman Parties pursuant to the 2015 Engagement Letter. *Id.*

After execution of the 2015 Engagement Letter in December 2015, the re-domiciled Orion, Janus, and Cerberus captives (the "SCP captives") issued insurance policies to various of the Doctors' other entities for 2016. *See, e.g.*, EXs FC-374.1, FC-376.2; TR Vol. 2 at 656. The SCP captives issued insurance policies to various of the Doctors' other entities for 2017 and 2018, as well. *See*, *e.g.*, EXs FC-376.2, FC-376.6, FC-374.7. For 2016, 2017, and 2018, SCP elected to have their captives participate in PoolRe's reinsurance risk pools and executed the respective Stop

Loss Reinsurance Agreements and Quota Share Reinsurance Policies. *See, e.g.*, EXs FC-376.2; FC-238; TR Vol. 2 at 810.

In June 2018, the United States Tax Court issued its decision in *Reserve Mechanical Corp. v. Commissioner of Internal Revenue*, T.C. Memo 2018-86 (2018). EX J-53. Reserve Mechanical was a client of the Feldman and Capstone Parties. *Id.* The *Reserve Mechanical* case concerned Reserve's captive operations for 2008, 2009, and 2010. *Id.* Reserve Mechanical's captive was an offshore captive, not a domestically domiciled captive. *Id.* The Tax Court determined that, for the years in question, Reserve's captive operations did not constitute real insurance for the purposes of taking tax deductions. *Id.*

One day after the Tax Court issued its decision, Capstone alerted all clients—including the Doctors and Mr. Sherman and Mr. Kushner—of the adverse opinion. EXs J-54, FC-187. Dr. Sullivan, in an email to Dr. DellaCroce, Mr. Sherman, and Mr. Kushner, stated the decision "was not good for captives." EX FC-189. Mr. Feldman and Capstone shared additional follow-up emails and had additional follow-up conversations with their clients and agents, including Mr. Sherman and Mr. Kushner, throughout 2018. *See, e.g.*, EX FC-192, FC-193, FC-194, FC-207, FC-208, FC-212.

In December 2018, the Doctors decided to continue their captive operations for 2019. *See, e.g.*, EXs FC-215, FC-215.2. The SCP captives issued numerous insurance policies for 2019 to various of the Doctors' entities. *See, e.g.*, FC-374.11, 376.2. The SCP captives also elected to participate in the 2019 PoolRe reinsurance pool and executed the respective 2019 Stop Loss Reinsurance Agreements and Quota Share Reinsurance Policies with PoolRe. *See, e.g.*, EXs J-72, FC 367.4, FC-367.6, FC 370.12.

In October 2019, Dr. Sullivan—and his agents, Mr. Sherman and Mr. Kushner—

communicated to Mr. Feldman (a) Dr. Sullivan's desire to immediately liquidate and wind down the SCP captives, and (b) his intention not to renew the 2015 Engagement Letter when it expired. EX J-115 at ¶¶ 21-24; State Court Lawsuit at ¶¶ 30-32. According to the Doctors, they had become disenchanted with the notion of captive insurance and concluded that the costs of continuing their captive operations outweighed the benefits. EX J-115 at ¶ 21.

In an October 21, 2019, e-mail, Mr. Feldman identified an eight-step process that would allow for the SCP captives to be liquidated by or around August 2021—the year-end termination date in the 2015 Engagement Letter. *Id.* at ¶ 23; EX J-86. Afterwards, Mr. Kushner on the Doctor's behalf reiterated the demand to "wind down" the SCP captives by the end of 2019. EX J-115 at ¶ 24.

In December 2019, Dr. Sullivan expressed his frustration with Mr. Feldman in an email, stating that "He's fired." EX FC-268. Later in December 2019, Dr. Sullivan wrote another email expressing his frustration and telling Mr. Feldman that "[i]t seems to me you are conflicted, pick a side." EX J-91. In that same email. Dr. Sullivan stated that he had been conducting his own research into whether a captive can be closed whenever and found that it can be closed whenever, "some easily and some less." *Id.* Dr. Sullivan did not mention *Reserve Mechanical* or tax risks in any of these emails. SCP never introduced any documentary evidence indicating that Reserve Mechanical or tax risks were an issue prior to May 2020, when SCP raised those issues in arbitration pleadings—including their answering statement in the (below-referenced) Dorfman proceeding.

On January 5, 2020, the Feldman Parties formally withdrew from their representation of the SCP captives because of the deterioration of the relationship between Dr. Sullivan and Mr. Feldman. EX FC-275. In an April 2020 email, Dr. Sullivan indicated that he (and Dr. DellaCroce)

had fired Capstone as insurance manager. EX FC-299. Dr. Sullivan, in that email, outlined his frustration that the SCP captives were not wound down by the end of 2019 as requested. *Id*. Dr. Sullivan did not mention, reference, or allude to any tax risks or *Reserve Mechanical*.

## VII.   THE DORFMAN ARBITRATION (ACCORDING TO FCP)

The Capstone Parties and PoolRe filed an arbitration demand on May 7, 2020 with Conflict Resolution Services, PLLC against the Doctors, the SCP captives, and various of the Doctors' entities—*i.e.*, the "SCP" parties in this arbitration. The Hon. (Ret.) Grant Dorfman was appointed arbitrator. The Feldman Law Firm LLP and Stewart Feldman intervened on June 1, 2020.

Among the disputes submitted to Judge Dorfman were: "whether there is a clear contractual (or other) basis that required the Capstone Parties [*Note*: Judge Dorfman defined "Capstone Parties" in his final award to mean the Feldman, Capstone, and PoolRe parties collectively] to honor and/or use due diligence to effectuate Respondents' request for wind down and liquidation at a time more or less of Respondents' own choosing" and "whether the Capstone Parties were obligated to pursue such methods [*i.e.*, novation, commutation, or escrow] when [SCP] requested an early dissolution for the [SCP captives]." EX J-115 at ¶¶ 34, 40.

SCP filed an Answering Statement. SCP pled as defenses, *inter alia*, "misrepresentation fraud, fraudulent inducement, bad faith, and vices of consent"; that FCP's "decisions and acts that put [them] in a conflict situation with respect to their other clients" did not justify any of FCP's acts or omissions vis-à-vis SCP; and that the "2015 Engagement Letter precludes the relief requested by [FCP]." SCP's Answering Statement in Dorfman Arbitration at 15-16. SCP also defensively pled and raised factually the following, which bears quoting at length:

> As explained further below, the Doctors' request for wind down and liquidation was also justified by the risks reflected in the *Reserve Mechanical* decision adverse to Claimants' client, Reserve Mechanical. . . .

As part of the turnkey services, Claimants offered participation in third-party insurance through Claimants' PoolRe arrangement, which the Agreement describes as a "risk pooling arrangement involving sets of generally similar policies covering generally similar risks of closely held businesses, wherein each captive assumes reinsurance on policies covering other client of Capstone." Participation in Claimants' PoolRe arrangement was represented to be the key to obtaining the tax benefits of the program designed, implemented, and administered by Claimants. To obtain the tax benefits from the insurance program designed, implemented, and administered by Claimants, the Doctors participated in the Claimants' PoolRe arrangement as directed by Claimants.

In the latter part of 2019, the Doctors became aware that a decision by the Tax Court in the case of *Reserve Mechanical Corp. v. Comm'r of Internal Revenue*, 115 T.C.M. (CCH) 1475 (T.C. 2018), could have very negative consequences for the Doctors. **Claimants had failed to provide any meaningful disclosure to the Doctors regarding this IRS litigation against Reserve Mechanical**. Reserve Mechanical was another one of Claimants' clients with a captive insurance program designed and implemented in the same substantial form as Claimants had designed and implemented for the Doctors.

In *Reserve Mechanical*, the United States Tax Court concluded that "that PoolRe was not a bona fide insurance company." In addition, the Tax Court determined Reserve Mechanical "was not operated as a bona fide insurance company, and there was no legitimate business purpose for the policies that Reserve issued for the insureds." The Tax Court found "that Reserve's transactions were not insurance transactions in the commonly accepted sense."

The Reserve Mechanical program was also set up by Claimants. In particular, the PoolRe arrangement that the Tax Court found "not to be a bona fide insurance company" was the same PoolRe involved in the Doctors' insurance program. **Claimants never provided any meaningful disclosure of the risks reflected in the Reserve Mechanical decision and never offered any options or alternatives to address those risks**.

**Accordingly**, the Doctors requested in late 2019 that Claimants liquidate and wind down the Doctors' program that the Claimants had designed, implemented, and administered. For example, on October 15, 2019, the Doctors sent an email asking Claimants to initiate the wind down: "Not sure if Dave Sherman told you, but I want to start the wind down of this captive. What is the process?" The Doctors reiterated their requests for wind down and liquidation on multiple occasions, as acknowledged throughout Claimants' Original Arbitration Demand.

The Doctors also chose not to fund any further insurance through the Claimants' program for future years, starting in 2020. The Doctors provided timely

notice of termination by December 31, 2019, as required under the terms of the 2015 Engagement Letter. Nevertheless, the Doctors continue to fulfill obligations and pay all amounts owed under the Agreement with a full reservation of their rights and remedies.

The Doctors' fears regarding the risks reflected in Reserve Mechanical were reinforced when they later received a threatening letter from the IRS. On March 20, 2020, the Internal Revenue Service sent correspondence to the Doctors regarding their insurance program administered by Claimants. The IRS correspondence advised of potential adverse consequences, including disallowance of deductions taken pursuant to the Doctors' insurance program that was designed, implemented, and administered by Claimants.

**Therefore, particularly in light of the risks reflected in Reserve Mechanical, the Doctors were justified in requesting wind down and liquidation**. In addition, in light of the provisions in the 2015 Engagement Letter providing the Doctors with complete managerial and decision-making control, the Doctors were well within their contractual rights to request wind down and liquidation. Accordingly, Claimants' Requests for Relief Nos. 2-4 – that the Doctors somehow do not have the right to request wind down and liquidation – should be rejected and dismissed.

*Id*. at 9-13.

The final hearing in the Dorfman arbitration commenced in August 2020. On August 27, 2020, the parties to the Dorfman arbitration jointly stipulated to an extension of Judge Dorfman's deadline to issue a final award, "acknowledg[ing] that th[e] stipulation modifies the parties' arbitration agreement by extending the Arbitrator's jurisdiction through and including October 16, 2020, despite that such date is past the four-month limitation set forth in the parties' arbitration agreements" with the parties further "agree[ing] that unless a final award is issued by 11:59 p.m. Central Standard Time on October 16, 2020, or by further written agreement of the Parties, Arbitrator Dorfman will be divested of jurisdiction." Stipulation Regarding Conclusion of Final Hearing and Issuance of Arbitrator's Award (August 27, 2020). The parties stipulated to further extensions of Judge Dorfman's jurisdiction. See, e.g., Order No. 9, Order No. 10, and Order No. 11.

On November 9, 2020, Judge Dorfman issued his final award. EX J-115. On January 11, 2021, Judge Scot Dollinger of the 189th Judicial District Court for Harris County, Texas confirmed the final award as a Final Judgment of the Court. *Id.* Judge Dorfman found and concluded, *inter alia*, that: "neither the contractual agreements nor the duty of utmost good faith compel the Capstone Parties to effectuate" an early or immediate wind down and liquidation of the SCP captives; "contrary to [SCP's] insistence that Capstone's relationship to them was quasi-fiduciary in nature," Capstone did not owe fiduciary duties to SCP; "Capstone has the right to liquidate the [SCP captives] in a necessary, orderly, and prudent manner . . ."; " [SCP] do not have the right under the parties' agreements to demand that "FCP" cause the immediate or expedited wind-up/liquidation of the [SCP captives]"; and "the Capstone Parties have no obligation to remake or renegotiate the agreements among their joint clients in an attempt to liquidate their captive insurance companies on a schedule not in compliance with the parties' agreements." *Id.* at ¶¶ 38-39, 41-46.[6]

## VIII.    THE EFFECT OF THE DORFMAN AWARD (ACCORDING TO SCP)

FCP points to the Dorfman Award and Judge Dollinger's confirmation of that award as a disposition in Claimants' favor of all of the Respondents' affirmative claims here, based upon the doctrine of *res judicata*.  In their submission to this Arbitrator, SCP claims the contrary, as stated below:

In his separate arbitration, Judge Grant Dorfman issued a Final Arbitration Award on November 9, 2020.[7] Judge Dorfman ruled on certain discrete, contractual claims brought by

---

[6] FCP's quotation and characterization of the Dorfman proceedings ends here.

[7] *See* Exhibit J-115, Judge Dorfman's Final Award (Nov. 9, 2020).

Feldman, Capstone, and PoolRe against the Doctors.[8] Feldman's, Capstone's, and PoolRe's contractual claims addressed by Judge Dorfman are different than the Doctors' tort claims in this arbitration. At a high level, Judge Dorfman:

(a)  "**DENIE[D]** Capstone's breach of contract action predicated on the breach or anticipatory breach by [the Doctors] requesting that their Captives be wound down and liquidated both quickly and substantially in advance of the Year End Termination Date;"[9]

(b)  "**DENIE[D]**" Capstone's claim that "[the Doctors] breached or anticipatorily breached the Agreements by blocking Capstone from winding down the Captives and/or by seeking to have a third party (Mr. Strauss and his affiliated companies) wind down and liquidate them;"[10]

(c)  "**DEN[IED]** Capstone's breach of contract claim(s) arising from [the Doctors] seeking to obtain and/or retaining and transferring to Peter Strauss the documents at issue, in alleged violation of the terms of the Article V license;"[11]

(d)  "**DEN[IED]** the Capstone Parties' breach of contract claims arising from [the Doctors'] alleged wrongful refusal to arbitrate in good faith;"[12] and

(e)  "**GRANT[ED]** the Capstone Parties' request(s) for declaratory relief and decree[d] as follows:

- Capstone has the right to liquidate the Captives in a necessary, orderly and prudent manner, as provided for in the Capstone Services Agreement, on or about August 31, 2021, which is the Year End Termination Date as defined in § 4.6 of the Capstone Services Agreement;

- [The Doctors] do not have the right under the Parties' agreements to demand that the Claimants cause the immediate or expedited wind-up/liquidation of the Captives; and

- The Capstone Parties have no contractual obligation to remake or renegotiate the agreements among their joint clients in an attempt to

---

[8] *See* Exhibit J-115, Judge Dorfman's Final Award (Nov. 9, 2020).

[9] *See* Exhibit J-115, Judge Dorfman's Final Award ¶ 32 (Nov. 9, 2020) (emphasis in original).

[10] *See* Exhibit J-115, Judge Dorfman's Final Award ¶ 33 (Nov. 9, 2020) (emphasis in original).

[11] *See* Exhibit J-115, Judge Dorfman's Final Award ¶ 51 (Nov. 9, 2020) (emphasis in original).

[12] *See* Exhibit J-115, Judge Dorfman's Final Award ¶ 57 (Nov. 9, 2020) (emphasis in original).

liquidate their captive insurance companies on a schedule not in compliance with the Parties' agreement."[13]

Judge Dorfman's November 9, 2020 Final Arbitration Award did not address or rule upon the Doctors' tort claims against Feldman and Capstone, including, *inter alia*, the Doctors' professional malpractice and breach of fiduciary duty claims. According to Judge Dorfman:

> On July 11, 2020, this Tribunal dismissed all "tort [and related] claims owned by [the Doctors] and/or their affiliated entities" pursuant to AAA Rule 33. *(Order No. 4 dated July 11, 2020)*. **[The Doctors'] tort claims (including, inter alia, [the Doctors'] professional malpractice and breach of fiduciary duty claims against Capstone and Feldman) are pending before other arbitrators**.[14]

Judge Dorfman's July 11, 2020 Order No. 4, cited above, held:

> [The Doctors'] Rule 33 Motion is hereby GRANTED. *See In re Houston Specialty Ins. Co.*, 569 S.W.3d 138 (Tex. 2019) (orig. proceeding) (per curiam) (holding that a declaratory judgment cause of action seeking a declaration of law firm's non-liability for alleged legal malpractice is "legally invalid" and ha[s] no basis in [Texas] law,'" and granting mandamus relief to correct the trial court's abuse of discretion in denying Rule 91a motion to dismiss same). **To the extent that [the Feldman Parties'] amended arbitration demands assert tort claims owned by [the Doctors] and/or their affiliated entities, those claims are hereby DISMISSED**.[15]

## IX.    THIS ARBITRATOR'S RULING ON *RES JUDICATA*

As stated, FCP argues that, under the doctrine of *res judicata*, Judge Dorfman's November 9, 2020 Final Arbitration Award precludes litigation of the Doctors' tort claims against Feldman and Capstone in this arbitration, even though Judge Dorfman's November 9, 2020 Final

---

[13] *See* Exhibit J-115, Judge Dorfman's Final Award ¶ 46 (Nov. 9, 2020) (emphasis in original).

[14] *See* Exhibit J-115, Judge Dorfman's Final Award at ¶ 6 (Nov. 9, 2020) (emphasis added).

[15] *See* Exhibit DRS-70, Judge Dorfman's Order No. 4 at ¶ 2 (July 11, 2020) (emphasis added). During a hearing on August 21, 2020, Judge Dorfman also stated that it would be for other arbitrators to decide "whether the law firm had an obligation to propose, effectuate commutations or other terminations, potential termination. That's part and parcel of the legal obligation and the relationship. . . so that's also an issue not before me." *See* Exhibit DRS-2648, Hearing Transcript at p. 92, line 15 – p. 93, line 7 (Aug. 21, 2020).

Arbitration Award preserves the Doctors' right to pursue their tort claims before other arbitrators.[16] FCP's argument is not supported by the facts or the relevant case law.

In *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, the trial court severed an intervention claim for fees from a malpractice claim and then tried the intervention claim for fees alone.[17] The Texas Supreme Court was called upon to "determine the preclusive effect, if any, of the trial on the intervention claim for fees with respect to the malpractice claim."[18] The Texas Supreme Court explained that "***the res judicata effects of an action <u>cannot</u> preclude litigation of claims that a trial court explicitly separates or severs from the action***."[19]  Accordingly, the Texas Supreme Court held, "[s]ince the trial court granted separate trials for the intervention claim for fees and the malpractice counterclaim, the *res judicata* effects of the action on the intervention claim for fees cannot preclude the malpractice counterclaim."[20]

Similar to *Van Dyke*, Judge Dorfman severed or separated the Doctors' affirmative tort claims and did not decide those tort claims as part of his arbitration. Because Judge Dorfman severed and did not decide the Doctors' tort claims in his arbitration, the *res judicata* effects of Judge Dorfman's arbitration "cannot preclude" the Doctors' tort claims in these arbitration proceedings.

Further, Texas law on *res judicata* or collateral estoppel arising from an arbitration award is limited only to issues actually decided in the prior arbitration.[21] In *Casa Del Mar Association,*

---

[16] *See* FCP's Post-Trial Brief at § IV; *see also* Exhibit J-115, Judge Dorfman's Final Award at ¶¶ 6, 54 (Nov. 9, 2020).

[17] *See Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697, S.W.2d 381, 382-84 (Tex. 1985).

[18] *See Van Dyke*, 697 S.W.2d at 384.

[19] *See Van Dyke*, 697 S.W.2d at 384 (emphasis added).

[20] *See Van Dyke*, 697 S.W.2d at 384.

[21] *See, e.g., Walter v. Marathon Oil Corp.*, 422 S.W.3d. 848, 860 (Tex. App. – Houston [14th Dist.] 2014); *Casa Del Mar Ass'n, Inc. v. Gossen Livingston Associates, Inc.*, 434 S.W.3d 211, 219 (Tex. App. – Houston [1st Dist.] 2014); *see also Postlewaite v. McGraw-Hill*, 333 F.3d 42, 49 (2d Cir. 2003) ("'[T]he party asserting preclusion bears the burden of showing *with clarity and certainty* what was determined by the prior judgment,' and 'issue preclusion will

*Inc. v. Gossen Livingston Associates, Inc.*, the Texas appellate court held, "***If an issue was not actually decided in a prior arbitration proceeding or if its resolution was not necessary to the arbitration award, its litigation in a subsequent proceeding is not barred by collateral estoppel***."[22] The Doctors' tort claims were not decided in the Dorfman arbitration.[23]  Thus, the Doctors' tort claims are not barred by collateral estoppel.

Likewise, *res judicata* applies only if the party had a "***full and fair opportunity to litigate the issue***."[24] In *Kremer v. Chemical Construction Corp.*, the United States Supreme Court explained that the "source of the 'full and fair opportunity' proviso is the due process clause of the Constitution."[25] Due process would be violated if the doctrine of *res judicata* was applied to bar the Doctors' tort claims in these proceedings. The Doctors did not litigate, let alone have a full or fair opportunity to litigate, their tort claims in the Dorfman arbitration. Judge Dorfman's November 9, 2020 Award expressly recognized that the Doctors' tort claims were not before Judge Dorfman and were pending before other arbitrators.[26]

This Arbitrator therefore agrees with Respondents and holds that *res judicata* does not bar the Doctors' tort claims in this arbitration. This is "further supported," as Judge Dorfman noted, "by the language in the arbitration clause that contemplates multiple 'arbitrations', as well as the absence of any requirement regarding the pleading of compulsory counterclaims in either the

---

apply only if it is *quite clear* that this requirement has been met.'") (emphasis in original) (quoting *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997)).

[22] *See Casa Del Mar Ass'n, Inc. v. Gossen Livingston Associates, Inc.*, 434 S.W.3d 211, 219 (Tex. App. – Houston [1st Dist.] 2014) (emphasis added).

[23] *See* Exhibit J-115, Judge Dorfman's Final Award at ¶¶ 6, 54 (Nov. 9, 2020).

[24] *See Miller v. Nationwide Life Ins. Co.*, No. 06-06-31178, 2008 WL 3086783, at *6 (5th Cir. Aug. 6, 2008) (emphasis added); *see also Hayes v. Pin Oak Petrol., Inc.*, 798 S.W.2d 668, 672 (Tex. App. – Austin 1990); *Johnson v. Levy*, 725 S.W.2d 473, 476-77 (Tex. App. – Houston [1st Dist.] 1987); *United Home Rentals, Inc. v. Tex. Real Estate Comm'n*, 716 F.2d 324, 330-31 (5th Cir. 1983).

[25] *See Fehlaber v. Fehlaber*, 681 F.2d 1015, 1021 n.6 (5th Cir. 1982) (citing *Kremer v. Chem. Constr. Corp.*, 451 U.S. 461, (1982)).

[26] *See* Exhibit J-115, Judge Dorfman's Final Award at ¶¶ 6, 54 (Nov. 9, 2020).

Engagement Letter or the AAA Rules governing this proceeding."[27]  It would be fundamentally unfair and violate due process to bar the Doctors from pursuing their tort claims in this arbitration considering that Judge Dorfman separated or severed the Doctors' tort claims from his arbitration and held that the Doctors were not required to assert their tort claims in his arbitration, thereby preserving the Doctors' right to pursue their tort claims before other arbitrators. For all the foregoing reasons, this Arbitrator rejects FCP's assertions of *res judicata* and collateral estoppel. This Arbitrator holds that Judge Dorfman's November 9, 2020 Final Arbitration Award does not bar or preclude the Doctors' tort claims against Feldman and Capstone in this arbitration.

**However**, to the extent that Respondents here seek relief upon an issue that quite clearly *was submitted to and resolved* in the Dorfman arbitration, they are precluded by *res judicata* from raising it in another form here. Judge Dorfman having plainly decided that the Capstone Service Agreement granted Capstone the unfettered right to liquidate the Captives in the manner provided for in that Agreement, and not in response to any earlier demand by Respondents, any effort by Respondents to re-cast that particular complaint as one for negligence, breach of fiduciary duty, fraud, or the like is barred by *res judicata* here and any relief sought or complaint advanced in respect of that particular matter here is of no force.

Regrettably, the Dorfman Award did not end the fight, as the following background provided by Respondents explains.

## X.    BACKGROUND TO THE PARTIES' RELATIONSHIP ACCORDING TO SCP'S FILINGS (AGAIN ALLOWING FOR ARGUMENT ALONG THE WAY)

### A.    <u>The Doctors meet Feldman and execute the Joint Engagement Letter.</u>

1)  Dr. Scott Sullivan and Dr. Frank DellaCroce jointly own various business entities relating to their medical practice performing reconstructive surgeries for

---

[27] *See* Exhibit J-115, Judge Dorfman's Final Award at ¶ 54 (Nov. 9, 2020).

women with breast cancer.[28] Together, they own St. Charles Surgical Hospital, LLC, Center for Restorative Breast Surgery, LLC, St. Charles Holdings, LLC, Sigma Delta Billing, LLC, and Sunrise Productions, LLC. Dr. Sullivan and Dr. DellaCroce also own three captive insurance companies, Cerberus Casualty Corp., Orion Casualty Corp., and Janus Casualty Corp., which insured the Doctors and their business entities.[29]

2) Captive insurance is a highly specialized area. Many sophisticated tax practitioners and CPA's lack expertise in captive insurance.[30] For that reason, captive owners often hire specialized captive managers and captive lawyers to administer their captive insurance companies. Owning a captive insurance company can provide benefits to the captive insurance company's owners, including beneficial tax treatment.[31]

3) In 2011, Dr. Sullivan and Dr. DellaCroce established their three captive insurance companies, which were domiciled in the Bahamas under the management of Peter Strauss.[32]

4) In 2014, Dr. Sullivan and Dr. DellaCroce became increasingly concerned by heightened risks from the IRS posed by owning offshore captives.[33] Dr. Sullivan

---

[28] *See* Transcript, Volume 1, August 3, 2021, at p. 153, line 11 – p. 155, line 14; p. 163, line 13 – p. 164, line 19 (Dr. Scott Sullivan).

[29] Dr. Sullivan owns Cerberus, Dr. DellaCroce owns Orion, and Dr. Sullivan and Dr. DellaCroce jointly own Janus.

[30] *See* Transcript, Volume 17, September 23, 2021, at p. 6667, line 9 – p. 6676, line 25 (Jason Sharp); Transcript, Volume 20, September 29, 2021, at p. 7901, lines 5-13; p. 7902, line 23 – p. 7903, line 8 (David Sherman); Volume 20, September 29, 2021, at p. 8004, lines 2-14; p. 8018, lines 3-20; p. 8141, lines 9-25 (David Kushner).

[31] *See, e.g.*, Exhibit J-20, Joint Engagement Letter at SULLIVAN011096 ("The intention is to structure and operate the captive insurer so as to qualify for partial tax exempt status . . ..").

[32] *See* Transcript, Volume 1, August 3, 2021, at p. 166, line 16 – p. 167, line 9 (Dr. Scott Sullivan).

[33] *See* Transcript, Volume 1, August 3, 2021, at p. 161, lines 14-19; p. 167, line 21 – p. 168, line 23 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1942, lines 4-19 (Dr. Frank DellaCroce).

and Dr. DellaCroce expressed these concerns regarding IRS scrutiny to their CPA, David Kushner, who recommended that the Doctors meet with Mr. Feldman.[34] Mr. Feldman is the sole owner and partner of the Feldman Law Firm.[35] Mr. Feldman is also the owner, general counsel, and CEO of Capstone, which he ultimately controls.[36]

5) Capstone and Feldman jointly offer "turnkey" administrative and management services for captive insurance owners, like Dr. Sullivan and Dr. DellaCroce. The stated purpose of the Feldman / Capstone captive program is to structure and operate captive insurance companies so as to qualify for partial tax-exempt status under the Internal Revenue Code.[37]

6) Mr. Kushner assisted in setting up a meeting between the Doctors and Feldman and Capstone, which took place on January 19, 2015 in New Orleans, Louisiana.[38] Dr. Sullivan, Dr. DellaCroce, Mr. Kushner, and Mr. Sherman attended the meeting on behalf of the Doctors.[39] Feldman and Capstone were represented at

---

[34] *See* Transcript, Volume 20, September 29, 2021, at p. 8007, line 23 – p. 8008, line 11 (David Kushner). .

[35] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 13-17 (Stewart Feldman); Transcript, Volume 15, August 24, 2021, p. 6018, lines 3-9 (Jeff Carlson).

[36] *See* Transcript, Volume 13, August 22, 2021, at p. 5116, lines 18-19; p. 5117, line 25 – p. 5118, line 5 (Stewart Feldman). Capstone's Vice President and Head of Operations, Daniel Calderon, testified that everyone within the organization reports to Stewart Feldman. *See* Transcript, Volume 16, September 14, 2021, at p. 6330, lines 8-13 (Daniel Calderon). *See* Transcript, Volume 22, October 1, 2021, at p. 8961, line 4 – p. 8692, line 8 (Robert Snyder) (citing, *e.g.*, Exhibit DRS-2003 at Joint-364817, Claims Reserve Payment Agreement at § 2(C)). Twelve other Claims Reserve Payment Agreements are included in Exhibit DRS 2003, which all include the same language at § 2(C) regarding Mr. Feldman's ultimate ownership and control over Capstone.

[37] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096; *see also* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23; p. 2982, lines 6-9 (Richard Amoroso); Exhibit DRS-2491, Video of Mr. Feldman's August 6, 2015 Speech (Mr. Feldman declaring, "Really, what we're talking about is God's work here. We're talking about reducing federal income taxes.").

[38] *See* Transcript, Volume 20, September 29, 2021, at p. 8008, line 25 – p. 8009, line 10 (David Kushner).

[39] *See* Transcript, Volume 1, August 3, 2021, at p. 169, lines 6-19 (Dr. Scott Sullivan); Volume 20, September 29, 2021, at p. 8009, lines 11-17 (David Kushner). The Hospital's COO, Cheri Saltaformaggio, and the Hospital's CFO, Sarah Underwood, also attended the meeting.

the meeting by Mr. Feldman, Stephen Cohen (an attorney with the Feldman Law Firm), and Lance McNeel of Capstone.[40]

7)    At or around the time of the January 2015 meeting, Mr. Feldman provided the Doctors a compilation of marketing materials and information regarding Feldman and Capstone.[41] Mr. Feldman helped write these marketing materials,[42] which stated that the Feldman and Capstone team had over 125 years of federal and state income, estate and gift tax, and corporate, regulatory and insurance experiences.[43] The Feldman / Capstone marketing materials discussed Mr. Feldman's "30 + year" experience as a tax attorney and Capstone's formation "in excess of 120 captive insurance companies" since 1998.[44] The Feldman / Capstone marketing materials discussed the "significant insurance and tax benefits of captives for owners of middle-market businesses," stating that the "mechanics of alternative risk planning are straightforward with property and casualty insurance premiums being 100% deductible to the insured as its ordinary and necessary business expense."[45] The Feldman / Capstone marketing materials stated, "Statutory authority plus various IRS pronouncement and interpretive court decisions make this an ideal time for closely held businesses to consider a captive."[46] And the Feldman / Capstone marketing

---

[40] *See* Transcript, Volume 1, August 3, 2021, at p. 169, lines 6-19 (Dr. Scott Sullivan); Volume 20, September 29, 2021, at p. 8009, lines 11-17 (David Kushner).

[41] *See* Transcript, Volume 13, August 22, 2021, at p. 5139, line 22 – p. 5140, line 20 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials).

[42] *See* Transcript, Volume 13, August 22, 2021, at p. 5141, line 20 – p. 5142, line 4 (Stewart Feldman).

[43] *See* Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman).

[44] *See* Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman).

[45] *See* Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001738 – 39).

[46] *See* Transcript, Volume 13, August 22, 2021, at p. 5140, line 21 – p. 5142, line 15 (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001739).

materials stated: "It is crucial that [the captives] are managed properly in both the short and long term. That is why having the appropriate professionals involved when considering a captive is paramount."[47]

8)    During the January 2015 meeting, Dr. Sullivan and Dr. DellaCroce conveyed their concerns regarding IRS scrutiny.[48] In response, Mr. Feldman described his record before the IRS, with more than fifty successful outcomes.[49] Mr. Feldman did not disclose any facts regarding IRS adverse findings against the Feldman / Capstone captive program at the January 2015 meeting.[50]

9)    Following the January 2015 meeting, the Doctors engaged Feldman and Capstone. The Doctors signed an initial retention letter on March 3, 2015, hiring Feldman to conduct a "Health Check-Up" – an analysis of the Doctors' existing captive program under Mr. Strauss.[51] Feldman and Capstone sent a preliminary draft of the Health Check-Up to the Doctors on May 29, 2015,[52] and sent the final version on August 4, 2015.[53]

10)    The Health Check-Up criticized Mr. Strauss's stewardship of the Doctors' captives.[54] The Health Check-Up warned the Doctors: (1) that, under Mr. Strauss, there

---

[47] *See* Transcript, Volume 13, August 22, 2021, at p. 5150, line 11 – p. 5151, line 6. (Stewart Feldman) (citing Exhibit J-118, Capstone Marketing Materials at SULLIVAN001739).

[48] *See* Transcript, Volume 1, August 3, 2021, at p. 171, lines 5-23 (Dr. Scott Sullivan).

[49] *See* Transcript, Volume 1, August 3, 2021, at p. 178, line 19 – p. 179, line 1 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1930, line 1 – p. 1931, line 6 (Dr. Frank DellaCroce); Volume 20, September 29, 2021, at p. 7910, lines 8-17 (David Sherman); Volume 20, September 29, 2021, at p. 8014, lines 10-19 (David Kushner).

[50] *See, e.g.*, Transcript, Volume 1, August 3, 2015, at p. 178, line 19 – p. 179, line 17 (Dr. Scott Sullivan).

[51] *See* Exhibit DRS-491, Letter from David Kushner enclosing signed Engagement Memorandum, March 3, 2015; *see also* Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

[52] *See* Exhibit J-12, Preliminary Draft of Health Check-Up (May 29, 2015).

[53] *See* Exhibit J-16, E-mail from Capstone's Lance McNeil (Aug. 4, 2015) (transmitting the Health Check-Up Report (Aug. 3, 2015)).

[54] *See* Transcript, Volume 1, August 3, 2015, at p. 175, line 19 – p. 178, line 18 (Dr. Scott Sullivan) (citing Exhibit J-16, Health Check-Up Report at JOINT-002718 (Aug. 3, 2015)).

was no "'captain of the ship' that takes responsibility for the planning's design, implementation and operation," (2) about "unnecessary risks associated with operating in a fringe domicile like the Bahamas," and (3) about "questions as to risk distribution" involved in Mr. Strauss's captive program.[55]

11)    Risk distribution is essential for a captive insurance company to qualify for tax beneficial treatment from the IRS.[56] As stated by Feldman in the Health Check-Up: "Courts have stated that for a true insurance arrangement to exist, there must be . . . risk distribution."[57]   Feldman stated further that, "[t]o achieve risk distribution, the insurance company must distribute its risks among a pool of risks."[58]

12)    The "pool of risks" used by Feldman and Capstone was PoolRe.[59] PoolRe is a mechanism used by Feldman and Capstone for the purpose of satisfying the IRS's risk distribution requirement.  Mr. Feldman caused the incorporation of PoolRe.[60] PoolRe receives no business except that given to it by Feldman and Capstone.[61] PoolRe does not have any employees or an office.[62] Capstone is the manager and handles the day-to-day

---

[55] *See* Exhibit J-16, Health Check-Up Report at JOINT-002718 (Aug. 3, 2015).

[56]  *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.

[57] *See* Exhibit J-16, Health Check-Up Report at JOINT-002721 (Aug. 3, 2015).

[58] *See* Exhibit J-16, Health Check-Up Report at JOINT-002721 (Aug. 3, 2015).

[59] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

[60] *See* Transcript, Volume 11, August 20, 2021, at p. 4421, line 16 – p. 4422, line 5 (Stewart Feldman) ("And the firm formed PoolRe").

[61] *See* Exhibit J-20 at SULLIVAN011104, Exhibit E to Joint Engagement Letter; *see also* Transcript, Volume 22, October 1, 2021, at p. 9123, lines 11-19 (Jeff Carlson) ("Only clients of both the [Feldman Law] Firm and Capstone . . . may participate in" PoolRe's risk pools.").

[62] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 22-24 (Stewart Feldman); Transcript Volume 22, October 1, 2021, at p. 8840, lines 13-15 (Robert Snyder); Transcript, Volume 15, August 24, 2021, at p. 6026, line 24 – p. 6027, line 12 (Jeff Carlson).

operations of PoolRe.[63] And Capstone exercises certain decision-making authority on behalf of PoolRe "without even consulting or conferring with anyone from PoolRe."[64]

13)    The strategy recommended by Feldman/Capstone to achieve adequate risk distribution for the Doctors' captives, so that they would qualify for tax beneficial treatment with the IRS, was to have the Doctors' captives participate in the PoolRe risk pool.[65] Mr. Feldman did not disclose to the Doctors any IRS findings regarding PoolRe's inability to satisfy risk distribution for Capstone-administered captives or that Mr. Feldman was using PoolRe's risk pool to provide him and his related entities with their primary malpractice and legal expense insurance coverages.[66]

14)    The Doctors engaged Feldman and Capstone to administer their captives and agreed to participate in PoolRe's risk pools.[67] The Doctors signed the Joint Engagement Letter with Feldman and Capstone on December 7, 2015.[68] The stated purpose of the Joint Engagement Letter was for Feldman and Capstone to structure and operate the Doctors' captive insurance companies so as to qualify for partial tax-exempt status under the Internal Revenue Code.[69]    In order to obtain tax-exempt status, the

---

[63] *See* Transcript, Volume 13, August 22, 2021, at p. 5117, lines 19-21 (Stewart Feldman); Transcript, Volume 22, October 1, 2021, at p. 8840, lines 16-18 (Robert Snyder).

[64] *See* Transcript, Volume 22, October 1, 2021, at p. 8947, line 25 – p. 8948, line 12 (Robert Snyder).

[65] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

[66] *See* Transcript, Volume 1, August 3, 2021, at p. 184, line 23 – p. 186, line 19; p. 240, lines 17 – 25; p. 243, line 22 – p. 245, line 15 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1933, lines 16-20; p. 1938, line 19 – p. 1940, line 1; p. 1957, line 5 – p. 1958, line 10; p. 1978, line 25 – p. 1980, line 24 (Dr. Frank DellaCroce).

[67] *See* Transcript, Volume 1, August 3, 2015, at p. 185, line 11 – p. 186, line 19 (Dr. Scott Sullivan); Transcript, Volume 5, August 7, 2021, at p. 1927, line 12 – p. 1932, line 16 (Dr. Frank DellaCroce).

[68] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011078.

[69] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096; *see also* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23; p. 2982, lines 6-9 (Richard Amoroso); Exhibit DRS-2491, Video of Mr. Feldman's August 6, 2015 Speech (Mr. Feldman declaring, "Really, what we're talking about is God's work here. We're talking about reducing federal income taxes.").

Doctors had to participate in PoolRe, and Feldman and Capstone both "expected" and "encouraged" the Doctors to participate in PoolRe.[70]

15)    Unbeknownst to the Doctors at the time they signed the Joint Engagement Letter or agreed to participate in PoolRe, the Feldman / Capstone captive program, PoolRe's risk pools, and Mr. Feldman personally were under extreme scrutiny from the IRS, as discussed below. The Doctors were also unaware that they would be reinsuring the professional liabilities, errors & omissions, and legal expenses of their own lawyer, Feldman, and their own captive manager, Capstone, by participating in PoolRe's risk pools, as also discussed below.  These material facts were concealed by Feldman and Capstone when soliciting business from the Doctors. Had these material facts been fully disclosed, the Doctors would not have engaged Feldman or Capstone.[71]

## XI.    THE PENDING DISPUTES AND SCP'S ARGUMENTS IN SUPPORT OF THEIR CLAIMS AND AFFIRMATIVE DEFENSES

In their December 3, 2021, Post-Hearing Brief, Respondents state at page 1:

The Doctors' and the Class's claims against Feldman, Capstone, and Pool Re broadly fall into two general categories: (1) breach of fiduciary duty / legal malpractice claims arising from Feldman's and Capstone's material nondisclosures and misrepresentations, and (2) conversion and RICO claims arising from Feldman's and Capstone's stealing of millions of dollars belonging to their clients to use against their clients.

At page 4 of the same Brief, the Doctors state that for this wrongdoing they are entitled to

---

[70] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN 011071 ("It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement"); at SULLIVAN011104 ("Capstone encourages participation in . . . PoolRe").

[71] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

recover the following damages from FCP:

- The Doctors are entitled to a ***full refund*** of all fees paid to Feldman and Capstone ($1,250,944) based upon the breach of fiduciary duties.   In *Burrow v. Arce,* the Texas Supreme Court held that a "client need ***not prove actual damages*** in order to obtain ***forfeiture of an attorney's fee*** for the attorney's breach of fiduciary duty to the client."[72] Rather, fee forfeiture is warranted due to the attorney's breach of the duty of loyalty, without regard to the resulting harm.[73]

- The Doctors are entitled to recover back taxes, interest, and IRS penalties based upon their participation in the captive insurance scheme, and its undisclosed failures, perpetrated by Feldman and Capstone, as well as the Doctors' costs of defending themselves against the IRS.

- Because of the misrepresentations and inadequate disclosures by Feldman and Capstone, the Doctors are entitled to turn back the clock and recover what they would have earned had they not entrusted their funds to Capstone. The unrebutted testimony and evidence demonstrate that Dr. DellaCroce earned annualized investment returns of 22.5% both over a three-year and a five-year period.[74] Dr. Sullivan testified that his long-term investment performance exceeds that 22.5% benchmark.[75]

- Dr. Sullivan would not have had to liquidate a lucrative investment in Bitcoin but for these arbitration proceedings.[76]

- Because the conduct of Feldman, Capstone, and PoolRe violates RICO, the Texas Deceptive Trade Practices Act, and that latter statute's tie-in under the Texas Insurance Code, the Doctors and Class Members are entitled to recover ***treble damages*** plus attorneys' fees.

- Feldman, Capstone, and PoolRe operated as a joint enterprise, making "each party thereto the agent of the other and thereby to hold each other responsible for the negligent act of the other."[77] Indeed, as PoolRe Director

---

[72] *See Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999) (emphasis added).

[73] *See Burrow*, 997 S.W.3d at 238.

[74] *See* Exhibit DRS-1588, at SULLIVAN 019899; *see also,* Transcript, Volume 5, August 7, 2021, at p. 1994, lines 1-15 (Dr. Frank DellaCroce).

[75] *See* Transcript, Volume 1, August 3, 2021, p. 345, lines 9-21; p. 346, line 19 – p. 347, line 9 (Dr. Scott Sullivan).

[76] *See* Transcript, Volume 1, August 3, 2021, p. 347, line 23 – p. 348, line 9 (Dr. Scott Sullivan).

[77] *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex. 2000) (quoting *Shoemaker v. Whistler's Estate*, 513 S.W.2d 10, 14 (Tex. 1974)).

Robert Snyder previously testified at the *Reserve Mechanical* trial, "***the whole enterprise ultimately rolls up to [Mr. Feldman]***."[78]

Respondents' claims for the recovery of damages are of six types:

1. Claims that Feldman and Capstone breached fiduciary duties owed to the Doctors.

2. Claims that Feldman committed legal malpractice.

3. Claims that Feldman and Capstone committed intentional or negligent representation of the risks and functions of the captive program and its operation.

4. Claims that Feldman converted the Doctors' funds.

5. Claims that Feldman, Capstone and PoolRe violated RICO by engaging in wire fraud.

6. Claims that FCP violated the Texas Deceptive Trade Practices Act and the Texas Insurance Code.

Both sides have brought extraordinary evidentiary detail to the assertion and the defense of each of these claims in their filings—in my view, more than enough. But as stated above, because it is apparently all parties' view that their allegations require this level of detail in order to be fairly assessed and resolved, I here replicate, largely *verbatim*, Respondents' complaints and affirmative defenses on each count, followed by Claimants' responses thereto, and, finally, my resolution of each.

## XII.  THE DOCTORS' EXPLANATION OF THEIR CLAIMS (IN THEIR OWN WORDS)

The Doctors' claims against Feldman, Capstone, and PoolRe broadly fall into two general categories: (1) breach of fiduciary duty / legal malpractice claims arising from Feldman's and Capstone's material nondisclosures and misrepresentations, and (2) conversion and RICO claims arising from Feldman's and Capstone's stealing of millions of dollars belonging to their clients to

---

[78] *See* Transcript, Volume 22, October 1, 2021, at p. 8846, line 25 – p. 8847, line 11; *see also* Exhibit DRS-192, *Reserve Mechanical* transcript, April 27, 2017, at p. 43, C-01852.

use against their clients.[79] The essence of these claims can be narrowed to three words apiece:

***absolute, perfect candor*** and ***other people's money***.  The evidence and testimony presented at the

multiweek Final Hearing establish:

> ➤ Feldman and Capstone failed to disclose that their clients, the Doctors and Class Members, were ensuring Feldman's and Capstone's malpractice liabilities and legal expenses even in disputes involving the clients.
>
>> o Under Texas law, a lawyer engaging in a transaction with a client owes a fiduciary duty to the client "of 'most abundant good faith,' requiring ***absolute perfect candor***, openness, and honesty, and the absence of any concealment or deception."[80]
>>
>> o The burden of proof in a breach of fiduciary duty claim is on the attorney – not the client. "[W]hen self-dealing by the fiduciary is alleged, as it [is] in this case, a ***presumption of unfairness automatically arises***, and ***the burden is placed on the fiduciary*** to prove that the questioned transaction (1) was made in good faith, (2) for fair consideration, and (3) after ***full disclosure of all material information*** to the principal."[81]
>>
>> o FCP's ethics expert, James McCormack, agreed that "business transactions between lawyer and client are presumptively fraudulent,"[82] and that "the lawyer must err on the side of full disclosure."[83]
>>
>> o Mr. McCormack further agreed that the Engagement Letter failed to adequately disclose the role of Mr. Feldman's captive, A.M.Y. Property & Casualty Corp. ("A.M.Y."). Mr. McCormack conceded that the

---

[79] The Feldman Law Firm, LLP, Stewart Feldman, Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), LP, Capstone Insurance Management, Ltd., Jeff Carlson, and PoolRe Insurance Corporation are collectively identified as "FCP." Mr. Feldman and the Feldman Law Firm are collectively identified as "Feldman." The three Capstone-named entities are collectively identified as "Capstone." Dr. Scott Sullivan, Dr. Frank DellaCroce, Cerberus Insurance Corp, Janus, Insurance Corp., Orion Insurance Corp., St. Charles Hospital, L.L.C., St. Charles Holdings, L.L.C., Center for Restorative Breast Surgery, L.L.C., Sigma Delta Billing, L.L.C., and Sunrise Productions, LLC are collectively identified as the "Doctors." The Doctors appear both in an individual capacity and, in the Jones Arbitration, as class representatives. To the extent applicable, the term Doctors is used in both capacities.  A list identifying Class Members accompanies this Post-Trial Brief as Appendix A, which is incorporated herein.

[80] *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 196 (Tex. App. – Houston [14th Dist.] 2002) (emphasis added).

[81] *See Gammon v. Hodes*, No. 03-13-00124, 2016 WL 1882274, at *5 (Tex. App. – Austin 2015) (emphasis added); *see also Houston v. Ludwick*, No. 14-09-00600, 2010 WL 4132215, at *7 (Tex. App. – Houston [14th Dist.] Oct. 21, 2010); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App. – Tyler 2000); *Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App. – Houston [14th Dist.] 2011); *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1974); *International Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 576 (Tex. 1963).

[82] *See* Transcript, Volume 20, Sept. 29, 2021, at p. 7833, line 10 – p. 7834, line 5 (James McCormack).

[83] *See* Transcript, Volume 20, Sept. 29, 2021, at p. 7844, lines 3-13 (James McCormack).

Engagement Letter "doesn't say that" clients were advised that Mr. Feldman's primary malpractice policies were in the risk pool, and thus, the client would have to pay a portion of Mr. Feldman's malpractice defense expenses.[84]

o   As the Doctors' ethics expert, Tom Watkins, testified, "I don't see how anybody can take the position that when you sign this engagement fee agreement, that you understood that you might end up paying the – part of the lawyers' defense costs,"[85] and "the fact that it says you may know that [A.M.Y.] may get put into the pool is *not full disclosure*. It doesn't tell you that it's going to be *arranged by my firm that if, in fact, anybody sues me for malpractice, you guys are going to help pay for my defense*."[86]

➢   Feldman and Capstone failed to disclose material information regarding the IRS's adverse audits against the Capstone insurance program and the audit of Mr. Feldman for promoting abusive tax shelters.

o   Feldman and Capstone *knew in 2013* that the IRS (1) determined that Reserve Mechanical was not an insurance company and (2) suggested that PoolRe was not insurance.[87] Six other Capstone-administered captives stipulated to have the same final outcome as Reserve Mechanical.

o   None of the substance of the adverse IRS audit was disclosed in the Doctors' Joint Engagement Letter. Adverse audit results were dismissed as the work of a single rogue auditor, as Feldman and Capstone reassured the Doctors that any adverse audits were "factually similar" to Tax Court cases which the IRS conceded.[88]

o   Exhibit C to the Engagement Letter provided ***no information*** as to *why* the Capstone-administered captives were being audited. Nowhere does the disclosure form state that the IRS had determined in a July 24, 2013 audit that Reserve Mechanical "does not qualify as an insurance company," and further, that "it is highly likely that the entire pool, which is insured by PoolRe and reinsured on a quota share basis with each of the pool participants, is primarily comprised of direct written contracts that the Service would deem not to be insurance in the commonly accepted sense."[89]

---

[84] *See* Transcript, Volume 19, Sept. 28, 2021, at p. 7630, line 1 – p. 7631, line 9; p. 7632, line 8 – p. 7633, line 5 (James McCormack).

[85] *See* Transcript, Volume 4, August 6, 2021, at p. 1546, lines 9-13 (Thomas Watkins).

[86] *See* Transcript, Volume 4, August 6, 2021, at p. 1541, line 22 – p. 1542, line 3 (Thomas Watkins) (emphasis added).

[87] *See* Exhibit DRS-2715, July 24, 2013 IRS Examination Report; Exhibit DRS-1874, Letter to IRS, Sept. 3, 2013.

[88] *See* Exhibit J-20, Engagement Letter, at Exhibit C, p. 6, at SULLIVAN 011101.

[89] *See* Exhibit DRS-2715, July 24, 2013 IRS Examination Report, at Joint-340824, Joint-340830. While Feldman and Capstone now dispute whether the IRS made any findings as to PoolRe, Steven Cohen helped prepare a response letter to the IRS on behalf of Reserve Mechanical. That letter quoted the above-cited language in acknowledging that the IRS "suggests that the quota share reinsurance program is not insurance." *See* Exhibit DRS-1874, Letter to IRS,

➤ Approximately four months before Mr. Feldman sent the Joint Engagement Letter to the Doctors, he received notice of an IRS audit for promoting abusive tax shelters under 26 U.S.C. § 6700.[90]  Neither Feldman nor Capstone disclosed this promoter audit before the Doctors signed the Joint Engagement Letter.

➤ The Doctors testified that they would not have agreed to execute the Joint Engagement Letter if Feldman and Capstone had disclosed: (1) the Doctors would be reinsuring Feldman and Capstone's malpractice liabilities and legal expenses, (2) the adverse audit findings by the IRS regarding Reserve Mechanical and six other Capstone-administered captives, and (3) the promoter audit of Mr. Feldman.[91]

➤ FCP engaged in illicit racketeering activities resulting in the conversion of ***over three million dollars from their clients***.  These illicit activities establish the severity of Feldman's and Capstone's breaches of fiduciary duties and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").[92]

  o Feldman and Capstone fraudulently submitted and kept open fraudulent claims in PoolRe's 2018 and 2019 risk pools.

  o FCP fraudulently kept open the 2018 and 2019 pools to ***pay for their litigation fees and expenses in these arbitrations***.

    ▪ FCP undertook no effort to adjust, investigate, or close their own fraudulent claims. Over ***three million dollars were transferred from the 2019 pool***, including, *inter alia*, funds paid to Capstone for non-attorney staff at exorbitant hourly rates.[93]

    ▪ FCP raided $250,000 from the 2018 pool and $62,000 from the 2020 risk pool to pay for their legal fees and expenses in these proceedings, even though this dispute has no plausible connection to claims submitted to either of these risk pools.[94]

Taken together, the record establishes (1) Feldman's and Capstone's inadequate

---

Sept. 3, 2013, at p. 12, Joint-339385.   Feldman's and Capstone's assertion that the audit report does not implicate PoolRe constitutes nothing more than revisionist history.

[90] *See* Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

[91] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

[92] 18 U.S.C. § 1961, *et seq.*

[93] *See* Transcript, Volume 22, October 1, 2021, at p. 9042, lines 2-12; p. 9051, lines 11-21; p. 9085, line 19 – p. 9090, line 14; p. 9100, lines 3-24 (Jeff Carlson).

[94] *See* Exhibit-DRS 2543, Capstone's Final Report on the 2018 Risk Pool (July 27, 2021); Transcript, Volume 11, August 20, 2021, p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript Vol. 17, September 23, 2021, p. 6857, line 5 – p. 6858, line 18 (Jeff Carlson); Transcript, Vol. 7, August 16, 2021, at p. 2544, lines 3-12 (Richard Amoroso); Exhibit DRS-2685b, at Joint-421759; Transcript, Volume 23, October 2, 2021, at p. 9175, line 10 – p. 9176, line 1 (Jeff Carlson).

disclosures and misrepresentations, (2) Feldman's and Capstone's unconscionable plundering of the funds belonging to their clients, and (3) the significant damages incurred as a result of Feldman's and Capstone's lack of candor, concealment, and deception.

## XIII.   FCP'S LIABILITY (ACCORDING TO SCP)

### A.    <u>Feldman and Capstone breached fiduciary duties owed to the Doctors and the Class.</u>

Under Texas substantive law,[95] a fiduciary is obligated to "render full and fair disclosure of facts material to the client's representation."[96] The term fiduciary "refers to integrity and fidelity" and "contemplates fair dealing and good faith."[97] To this end, the fiduciary relationship is one of "'most abundant good faith,'" "***requiring absolute perfect candor, openness and honesty, and the absences of any concealment or deception***."[98] According to the Texas Supreme Court, "Not honesty alone, but the punctilio of an honor most sensitive, is then the standard of behavior."[99] Feldman and Capstone have failed to comport with this standard. Their failure to disclose material information to the Doctors and Class Members falls demonstrably short of the "absolute perfect candor" standard required by Texas law.[100]

Under Texas law, the elements of a breach of fiduciary duty claim include: (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.[101] Significantly, ***the***

---

[95] The parties' agreement calls for the application of Texas substantive law.  *See* Exhibit J-20, Joint Engagement Letter at p. 3 of the Guidelines on Administration & Billing, SULLIVAN011081.

[96] *See Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988).

[97] *See Trousdale v. Henry*, 261 S.W.3d 221, 229 (Tex. App. – Houston [14th Dist.] 2008) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942)).

[98] *See Trousdale*, 261 S.W.3d 221 at 229 (citing *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App. – Houston [14th Dist.] 2001) (emphasis added).

[99] *See Johnson v. Peckham*, 120 S.W.2d 786, 788 (Tex. 1938).

[100] *Deutsch v. Hoover, Bax & Slovacek, L.L.P*, 97 S.W.3d 179, 196 (Tex. App. – Hou. 2002) (internal citations omitted).

[101] *See ETC Tex. Pipeline, Ltd. v. Addison Expl. & Dev., LLC*, 582 S.W.3d 823, 840 (Tex. App.—Eastland 2019) (internal citations omitted; *see also Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs.,*

**burden of proof for a breach of fiduciary duty claim is on the fiduciary, not the client**. Texas law establishes that, "when self-dealing by the fiduciary is alleged, as it [is] in this case, a presumption of unfairness automatically arises, and the burden is placed on the fiduciary to prove that the questioned transaction (1) was made in good faith, (2) for fair consideration, and (3) after **full disclosure of all material information** to the principal."[102] Feldman and Capstone failed to meet this heavy burden.

### B. Feldman and Capstone owed fiduciary duties to the Doctors and Class Members.

A fiduciary relationship arises as a matter of law "between attorney and client, principal and agent, partners, and joint venturers."[103] Fiduciary duties include, *inter alia*, duties of "utmost candor and full disclosure and loyalty," which, in turn" "would encompass almost everything that's involved in good faith and fair dealing."[104]

Feldman owed fiduciary duties to their clients, the Doctors and Class Members. Mr. Feldman conceded on cross-examination that both Mr. Feldman and the Feldman Law Firm owed the Doctors fiduciary duties and that a lawyer cannot put his monetary interests above his client's interests.[105] The attorney-client relationship with the Doctors commenced upon the signing of the initial retention letter on March 3, 2015, hiring Feldman to conduct the Health Check-Up and perform a feasibility study as to the appropriateness of captive insurance for the Doctors'

---

*LLC*, 404 S.W.3d 737, 752 (Tex. App.—El Paso 2013); *Las Colinas Obstetrics-Gynecology-Infertility Ass'n, P.A. v. Villalba*, 324 S.W.3d 634, 645 (Tex. App. 2010); *Holden v. Holden*, 456 S.W.3d 642, 659 (Tex. App.—Tyler 2015).

[102] *See Gammon v. Hodes*, No. 03-13-00124, 2016 WL 1882274, at *5 (Tex. App. – Austin 2015) (emphasis added); *see also Houston v. Ludwick*, No. 14-09-00600, 2010 WL 4132215, at *7 (Tex. App. – Houston [14th Dist.] Oct. 21, 2010); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App. – Tyler 2000); *Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App. – Houston [14th Dist.] 2011); *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1974); *International Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 576 (Tex. 1963).

[103] *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003) (citing *Ins. Co. of North Am. v. Morris*, 981 S.W. 2d 667, 674 (Tex. 1998)).

[104] *See* Transcript, Volume 4, August 6, 2021, at p. 1444, lines 5-17 (Thomas Watkins).

[105] *See* Transcript, Volume 13, August 22, 2021, at p. 5129, lines 1-4 (Stewart Feldman).

businesses.[106] The attorney-client relationship with the Doctors continued with the signing of the Joint Engagement Letter on December 7, 2015.[107] Likewise, Feldman's attorney-client relationship with Class Members commenced at least as of the date that Class Members signed their respective Joint Engagement Letters with Feldman.[108]

The Joint Engagement Letters were not limited in time or in scope. As Mr. Watkins testified, "There is no limit on the attorney-client relationship created by this document . . . and in both of this document and in the [Joint Engagement Letter], there is no termination, ever, of the attorney-client relationship. And, in my opinion, no limitations on the fiduciary duties and the DR responsibilities of the Feldman Law Firm to their clients, the Doctors."[109]

The attorney-client relationship imposes the highest standards of ethical conduct upon attorneys. As described in *Lopez v. Munoz, Hockema & Reed, LLP*:

> In Texas, we hold attorneys to the **highest standards of ethical conduct** in their dealings with their clients. The duty is highest when the attorney contracts with his or her client or otherwise takes a position adverse to his or her client's interests. As Justice Cardozo observed, '[a fiduciary] is held to something stricter than the morals of the marketplace. . . . Accordingly, a lawyer must conduct his or her business with **inveterate honesty and loyalty, always keeping the client's best interest in mind**.[110]

Mr. Feldman also owed fiduciary duties to the Doctors and Class Members in connection with his status as the owner, CEO, and general counsel of Capstone and in managing PoolRe. Mr. Feldman cannot take off his proverbial hat – he cannot absolve himself of his fiduciary and ethical

---

[106] *See* Exhibit DRS-491, Letter from David Kushner enclosing signed Engagement Memorandum, March 3, 2015. *See also* Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins). The Joint Engagement Letters with the Class Members [evidence an attorney-client relationship].

[107] *See* Exhibit J-20, Joint Engagement Letter.

[108] *See*, fn. 527, *infra* (citing Class Members' Joint Engagement Letters).

[109] *See* Transcript, Volume 4, August 6, 2021, at p. 1451, line 20 – p. 1452, line 24 (Thomas Watkins). *See also*, Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

[110] 22 S.W. 3d 856, 866-868 (Tex. 2000) (Gonzales, J., concurring and dissenting) (alteration in original) (citations omitted) (emphasis added).

duties by acting through Capstone or PoolRe rather than through The Feldman Law Firm.[111] As Mr. Watkins testified, "a lawyer, like ***Mr. Feldman, cannot do through another entity what he could not do as a lawyer*** . . . He owes every duty that he acts [sic] on behalf of Capstone if he is doing something on behalf of Capstone.  Because he couldn't do as a lawyer, he ***can't do it through Capstone***."[112]

Capstone as an agent also owed fiduciary duties to its principals, the Doctors and Class Members.[113] Texas law imposes a fiduciary relationship as a matter of law between principal and agent.[114] The Doctors' reinsurance expert, Richard Amoroso, opined that a traditional agency / principal relationship existed between Capstone, as captive manager, and its clients.[115] Capstone owed the Doctors and Class Members a "duty of loyalty," a "duty of complete candor and full disclosure," a "duty of fairness to treat [its] principal fairly and reasonably," and a "duty of impartiality."[116]

### C.     Feldman and Capstone breached fiduciary duties owed to the Doctors and Class Members.

The standard under which fiduciaries are evaluated is an exacting one.[117] The Texas appellate court held in *Kimelco Petroleum, Inc. v. Morrison & Shelton*:

> The essence of a breach of fiduciary duty involves the 'integrity and fidelity' of an attorney.  A breach of fiduciary duty occurs when an ***attorney benefits improperly from the attorney-client relationship*** by, among other things, ***subordinating his client's interests to his own***, retaining the client's funds, using the client's confidences improperly, taking advantage of the client's trust, ***engaging in self-***

---

[111] *See, e.g.*, *Matter of Hodge*, 407 P.3d 613, 639-40 (Kan. 2017); *see also Olson v. Estate of Watson*, 52 S.W.3d 865, 868 (Tex. App. – El Paso 2001) ("[A]ny argument that Mr. Olson was wearing his 'friend hat' rather than his 'attorney hat' when he drafted these documents fails as a matter of law.").

[112] *See* Transcript, Volume 4, August 6, 2021, at p. 1481, lines 3-13 (Thomas Watkins) (emphasis added).

[113] *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003); *see also* Transcript, Volume 6, at p. 2389, line 17 – p. 2392, line 19; p. 2413, line 1 – p. 2415, line 13 (Richard Amoroso).

[114] *See Abetter Trucking*, 113 S.W.3d at 508.

[115] *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso).

[116] *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso).

[117] *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 196 (Tex. App. – Houston [14th Dist.] 2002).

*dealing, or making misrepresentations*.[118]

Feldman and Capstone breached fiduciary duties by engaging in self-dealing, misrepresentation, and concealment of material information, as discussed below.

> **1.    Feldman and Capstone breached fiduciary duties by failing to disclose that their clients were reinsuring Feldman and Capstone's professional liabilities and legal expenses.**

Feldman and Capstone did not disclose to their clients that the clients were primary insurers of Feldman and Capstone's professional liabilities, errors & omissions, and legal expenses – even if the clients sued Feldman or Capstone for professional malpractice. The coverages afforded to Feldman and Capstone under their Lawyers Professional Liability policies, Errors & Omissions policies, and Legal Expense Reimbursement policies were extremely broad.[119] These policies covered "all **Damages** [Feldman and Capstone] become legally obligated to pay and **Defense Expense** as a result of any **Claim** first made against [them] during the policy period."[120] These policies further covered almost every expense that Feldman or Capstone might incur (and often incurred) in disputes with their clients, including "Defense Expense," which was defined as:[121]

---

[118]  91 S.W.3d 921, 923 (Tex. App – Fort Worth 2002) (quoting *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App – Houston [14th Dist.] 2001)) (emphasis added).

[119] *See* Exhibit DRS-2108, A.M.Y.'s Errors & Omissions Policy; Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy; Exhibit DRS-2110, A.M.Y.'s Legal Expense Reimbursement Policy.

[120] *See*, *e.g.*, Exhibit DRS- 2108, A.M.Y.'s Errors & Omissions Policy at § 1, Joint-331513 (emphasis in original); Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy at § 1, Joint-331740 (emphasis in original).

[121] *See*, Exhibit DRS- 2108, A.M.Y.'s Errors & Omissions Policy at § 3(H), Joint-331533; Exhibit DRS-2109, A.M.Y.'s Lawyers Professional Liability Policy at § 3(H), Joint-331760.

> **Defense Expense** means the expenses directly allocated to a particular **Claim** including but not limited to: all governmental, administrative agency, alternative dispute resolution, arbitration, and court costs, fees, and expenses; fees, costs, and expenses for legal services, whether by outside or our staff counsel; photographic costs; materials and labor; experts' fees or costs; costs of copies of documents or records; costs of depositions and court reporters or recorded statements and similar fees; medical cost containment expenses; cost of autopsies; cost of medical examinations of a claimant to determine liability, or the degree of permanency or length of disability; and all other compensation, fees, costs, and expenses chargeable to the investigation or defense of **Claims** or the investigation or prosecution of fraud or criminal conduct involving a **Claim**.

For at least a decade, Feldman and Capstone put their Lawyers Professional Liability, Errors & Omissions, and Legal Expense Reimbursement policies in the pool.[122] And in light of Feldman's and Capstone's litigious tendencies,[123] these undisclosed insurance policies, coupled with Feldman and Capstone's control over PoolRe, provided an unconscionable mechanism to foist substantial portions of their litigation expenses and liabilities onto their own, unknowing clients. By failing to make "***full disclosure of <u>all</u> material information***" regarding the coverages provided to Feldman and Capstone in the pool, Feldman and Capstone prevented their clients from making an informed decision as to whether to participate in the pool.[124] As Dr. Sullivan testified, "I can't seek counsel and advice for something that's not disclosed to me."[125]

---

[122] *See* Exhibit DRS-1512 at pp. 5-8, FCP's Joint Objections and Responses to Respondents' First Set of Discovery Requests at Answers to Requests for Admission Nos. 1-12 (Jan. 27, 2021); Transcript, Volume 13, August 22, 2021, at p. 5127, lines 8-18; p. 5383, lines 14-23 (Stewart Feldman); Transcript, Volume 7, August 16, 2021, at p. 2624, lines 10-24 (Richard Amoroso).

[123] *See* Exhibit DRS-1856 at FCP_0063500, Business Operations Summary of Feldman and Capstone at p. 5 ("The Law Firm does not carry lawyers' professional liability through conventional insurance markets . . . . Because of past claims . . . and related breach of fiduciary claims, obtaining coverage would be very difficult."); *see also* Transcript, Volume 8, August 17, 2021, at p. 3000, line 15 – p. 3003, line 4 (Richard Amoroso). Feldman's vexatiously litigious tendencies were documented by Judge Lee Rosenthal in the recent opinion of *In re Matthew John Date*. 20-878, 2020 WL 7059872 (S.D. Tex. Dec. 1, 2020), at *6. There, Judge Rosenthal described Mr. Feldman as a "frequent litigant," noting that "Feldman, and his entities, have a long history of being sanctioned for bad faith litigation tactics and baseless (another word for frivolous) arguments and positions," and noted that he had a lengthy track record of "various acts of misconduct" in abusing the litigation process. *Id*. at *6. That order addressed the violation of an injunction issued by a United States Bankruptcy Court aimed "to curb Feldman's vexatious litigation tactics." *Id*. Feldman and Capstone have also been involved in numerous arbitrations and lawsuits with their own clients and had a past practice of submitting those claims to A.M.Y. and PoolRe. *See* Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman).

[124] *See Gammon v. Hodes*, No. 03-13-00124, 2016 WL 1882274, at *5 (Tex. App. – Austin 2015) (emphasis added).

[125] *See* Transcript, Volume 1, August 3, 2021, at p. 250, lines 13-19 (Dr. Scott Sullivan).

i.    **Capstone and Feldman did not disclose that their clients were insuring Feldman and Capstone's professional liabilities, errors & omissions, and legal expenses.**

Dr. Sullivan testified that Feldman never disclosed that if Dr. Sullivan sued Feldman for malpractice, that Feldman could submit the claim to the pool and make Dr. Sullivan pay for part of Feldman's defense.[126] Dr. DellaCroce also testified that he was unaware that he would be insuring Feldman and Capstone's malpractice liabilities and defense.[127] The Doctors were unaware that their lawyer, Feldman, and captive manager, Capstone, had subjected them "to a situation where if [the Doctors] were sued by Mr. Feldman and his companies, [the Doctors] end up being responsible for paying for their legal fees and other associated costs with those pursuits."[128]

The Doctors' advisors, David Kushner and David Sherman, also testified that they were unaware that the Doctors were reinsuring Feldman and Capstone's primary malpractice liabilities. David Sherman testified that none of his communications with Feldman disclosed that Feldman was using the risk pool for his legal malpractice and expense coverages.[129] David Kushner testified that (1) he did not understand that if the Doctors sued Feldman for legal malpractice or breach of fiduciary duty, that the captives would be required to pay a portion of Feldman's defense expense; and (2) Feldman never told him that he used the pool for his primary malpractice coverage.[130]

The Doctors' ethics expert, Tom Watkins, testified that "to get into a captive insurance business in which part of my obligation . . . is going to help pay my lawyers' defense cost if I sue

---

[126] *See* Transcript, Volume 1, August 3, 2021, at p. 240, lines 17 – 25; p. 243, line 22 – p. 245, line 15 (Dr. Scott Sullivan).

[127] *See* Transcript, Volume 5, August 7, 2021, at p. 1978, line 25 – p. 1980, line 24; p. 1957, line 5 – p. 1958, line 10 (Dr. Frank DellaCroce).

[128] *See*, *e.g.*, Transcript, Volume 5, August 7, 2021, at p. 1912, lines 13-21 (Dr. Frank DellaCroce).

[129] *See* Transcript, Volume 20, September 29, 2021, at p. 7909, line 24 – p. 7910, line 7; p. 7928, line 25 – p. 7929, line 13 (David Sherman).

[130] *See* Transcript, Volume 20, September 29, 2021, at p. 8010, lines 12-19; p. 8016, lines 17 – p. 8017, line 18 (David Kushner).

him for malpractice" had to be disclosed, whether it was a "dollar or a million dollars."[131] Mr. Watkins testified that Feldman committed a serious breach of fiduciary duty by "fail[ing] to inform his clients that [Feldman] was selling them a product which would enable [Feldman] to be able to get his attorneys' fees paid by the client."[132] The Doctors' reinsurance expert, Richard Amoroso, likewise testified that Feldman and Capstone breached duties and violated industry custom and practice by failing to disclose that their clients, the Doctors and Class Members, were reinsuring Feldman and Capstone's professional liabilities, errors & omissions, and legal expenses.[133]

Even Feldman's longstanding ethics advisor, James McCormack, could not defend the indefensible. Mr. McCormack concede that Feldman and Capstone did not adequately disclose the fact that Feldman and Capstone got their clients to reinsure Feldman and Capstone's malpractice liabilities and legal expenses:[134]

---

[131] *See* Transcript, Volume 4, August 6, 2021, at p. 1541, line 20 – p. 1542, line 15 (Thomas Watkins).

[132] *See* Transcript, Volume 4, August 6, 2021, at p. 1638, line 21 – p. 1639, line 10 (Thomas Watkins).

[133] *See* Transcript, Volume 6, August 9, 2021, at p. 2416, line 23 – p. 2417, line 5; p. 2417, line 18 – p. 2418, line 19; p. 2439, lines 3-16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, at p. 2482, line 8 – p. 2483, line 21; p. 2489, line 11 – p. 2490, line 7; p. 2508, line 22 – p. 2509, line 7; p. 2510, line 19 – p. 2511, line 3 (Richard Amoroso).

[134] *See* Transcript, Volume 19, September 28, 2021, at p. 7630, line 1 – p. 7633, line 4 (James McCormack) (emphasis added).

ARBITRATOR KUTCHER: Are you saying the disclosures regarding the fact that the captive, AMY, wrote the primary malpractice for Mr. Feldman and in the event Feldman was sued for malpractice, that AMY could be called to bear on that and, as a result, perhaps the other captives as well within the pool was adequately disclosed in J-20?

THE WITNESS: I think not in that detail at all.

ARBITRATOR KUTCHER: Okay. All right. It doesn't say anywhere in there --

THE WITNESS: It doesn't mention AMY. It doesn't mention --

ARBITRATOR KUTCHER: Does it even mention Mr. Feldman is the primary malpractice carriers in the pool -- the primary malpractice carriers?

THE WITNESS: The joint engagement agreement does not say that.

ARBITRATOR BAKER: -- part of my legal expenses. That's I think the question Arbitrator Kutcher is asking you. Are you saying that you think what was disclosed in this engagement letter is sufficient to advise the clients of that?

THE WITNESS: It doesn't say that.

The inclusion of Feldman and Capstone's professional liabilities, errors & omissions, and legal expenses coverages in the risk pool was material information that needed to be disclosed. Feldman and Capstone breached their fiduciary duties by failing to disclose the material information that their clients were obligated to pay for Feldman and Capstone's professional liabilities, errors & omissions, and legal expenses.

/ / /

/ / /

ii.     **Exhibit E to the Engagement Letter does not fully disclose that Feldman's and Capstone's clients were reinsuring Feldman's and Capstone's professional liabilities and legal expenses.**

Feldman and Capstone rely upon a single sentence buried in Exhibit E to the Joint Engagement Letter to suggest that they made adequate disclosure that their clients would be the

primary insurers of Feldman and Capstone's professional liabilities and legal expenses.[135] This sentence in Exhibit E states, "Note that among the several hundred policies in the pool are policies issued to Capstone _or_ the Firm (_or_ their affiliates) and that ***their affiliated captives _may_ participate in the pool***."[136] This sentence regarding the mere possibility that a captive affiliated with Feldman or Capstone ***may participate*** in the pool is not full disclosure. It does not suggest or state the fact that Feldman and Capstone were surreptitiously requiring their clients to be their primary malpractice insurers.

Exhibit E was crafted by Feldman and Capstone to obscure information, not reveal it. The problems with this so-called "disclosure" are legion, including the following defects:

➢    Exhibit E does not identify Mr. Feldman's captive, A.M.Y., by name.

➢    Exhibit E states falsely that Capstone _or_ Feldman – _or_ their unspecified affiliates – "***may*** participate in the pool." In fact, Feldman and Capstone had participated in the pool every year since 2010, at least.[137] Feldman and Capstone misled the Doctors by presenting their actual participation in the pool as a mere possibility.

➢    Exhibit E does not reflect the nature of the coverages provided by A.M.Y. Exhibit E does not disclose that Feldman's and Capstone's primary malpractice and legal expense insurance coverages were in the pool.[138]

Feldman and Capstone may argue that their clients should have had the foresight to ask the proper questions regarding the coverages in the pool insuring Feldman and Capstone. The ***duty is on Feldman to disclose*** – the duty is not on the client to play connect-the-dots as part of a

---

[135] The single, inadequate sentence regarding the possibility that a captive affiliated with Capstone and Feldman may participate in the pool was contained in Exhibit E to certain Joint Engagement Letters and sent as part of a yearly insurance binder _after_ coverages had already been bound. Neither disclosure was adequate. _See, e.g._, Transcript Volume 6, August 9, 2021, at p. 2447, line 14 – p. 2448, line 18 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, at p. 2508, line 22 – p. 2509, line 7 (Richard Amoroso).

[136] _See_ Exhibit J-20, Joint Engagement Letter at SULLIVAN011104 (emphasis added).

[137] _See_ Transcript, Volume 7, August 16, 2021, at p. 2603, lines 7-12 (Richard Amoroso); Transcript, Volume 13, August 22, 2021, at p. 5127, lines 8-18; p. 5383, lines 14-23 (Stewart Feldman); Exhibit DRS-1512, Discovery Responses, January 27, 2021. In addition, Mr. Amoroso described an e-mail sent by Mr. Feldman to a class member noting that Mr. Feldman's captive had "been in the pool since 1998." _See_ Transcript, Volume 7, August 16, 2021, at p. 2624, lines 10-24 (Richard Amoroso).

[138] _See_ Transcript, Volume 6, August 9, 2021, at p. 2416, line 23 – p. 2417, line 5; p. 2439, lines 3-16 (Richard Amoroso).

"scavenger hunt."[139]

Remarkably, Feldman and Capstone expected the Doctors to take time away from treating cancer patients to travel to Houston to inspect PoolRe documents.[140] There is no assurance that such a trip, even if requested, would have been productive. When the Doctors first sought to exercise their contractual right to inspect PoolRe's books and records, Feldman and Capstone stonewalled the Doctors' counsel and had them escorted off the premises by the police.[141]

### iii.  The Doctors had no reason to suspect that Feldman's and Capstone's primary malpractice insurance coverages were in the pools.

Feldman and Capstone misrepresented to the Doctors that the PoolRe risk pool consisted of "generally similar policies covering generally similar risks."[142] Feldman and Capstone misrepresented that "all of these [policies in the pool] were going to be homogenous."[143] But the risks in the pool were not similar or homogenous.[144] The risks insured by the A.M.Y. policies were far more substantial, and presented substantially greater exposure to the pool, than the tertiary risks insured by the Doctors' captives.

Feldman's and Capstone's primary malpractice and legal expense liabilities exposed pool participants to significant risks far greater than any risks put into the pool by the Doctors. The magnitude of these risks and exposures that Feldman and Capstone put into the pool were outlined in a "Business Operations Summary" prepared by Feldman and Capstone, which provides in pertinent part:

The ***Law Firm does not carry lawyers' professional liability through conventional***

---

[139] *See* Transcript, Volume 4, August 6, 2021, at p. 1551, line 10 – p. 1555, line 8; p. 1568, line 18 – p. 1570, line 16 (Thomas Watkins).

[140] *See* Transcript, Volume 3, August 5, 2021, at p. 1212, line 14 – p. 1213, line 18 (Dr. Scott Sullivan).

[141] *See* Transcript, Volume 2, August 4, 2021, at p. 565, line 5 – p. 566, line 18 (Dr. Scott Sullivan).

[142] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.

[143] *See* Transcript, Volume 3, August 5, 2021, at p. 1232, lines 21-23 (Dr. Scott Sullivan).

[144] *See* Transcript, Volume 7, August 16, 2021, at p. 2491, line 18 – p. 2494, line 13 (Richard Amoroso).

*insurance markets*, instead placing this coverage through a captive where it can obtain more stable pricing and coverage terms and have better control over its losses.  Because of past claims . . . and related breach of fiduciary claims, *obtaining coverage would be very difficult*… The Law Firm and Capstone have a policy of collecting its outstanding billings and in the past have demonstrated a *willingness to sue clients* for outstanding fees, which leads to the usual counterclaims against the Law Firm and Capstone and their principals.  Also, because the Law Firm's client base consists of highly successful business people, these clients have ready access to other counsel and are not reluctant to utilize them.[145]

*        *        *

The entities and their beneficial owners have been involved in multiple lawsuits over the years for various causes of actions.  Insured and uninsured losses on both sides of the controversies have been paid in the amount of $20± million.  Lawsuits have been filed against the insureds with very significant litigation expenses incurred . . . .  The captive work by the Law Firm and Capstone is especially sophisticated and involves sensitive tax and corporate matters, creating unusual exposures.[146]

*        *        *

The Law Firm along with the related businesses are strong proponents of arbitration which in the past has led to *extensive litigation* just to be able to exercise such arbitration rights.[147]

*        *        *

Directors and Officers liability is a *significant risk exposure* as Stewart A. Feldman and Marla B. Matz serve as directors and officers of several organizations, and alter ego, [Uniform Fraudulent Transfer Act], and similar claims have been brought and litigated in the past.  *There are also significant fiduciary concerns* with regard to D&O liability given the number of related business operations.[148]

As a vexatious litigant with "uninsurable risk,"[149] Mr. Feldman had a strong incentive to

---

[145] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at pp. 5-6, FCP_0063500 to 01 (emphasis added).  Capstone's Head of Operations, Daniel Calderon, testified that somebody at A.M.Y. or Feldman would, in the ordinary course of business, review the Business Operations Summary and sign off on it for accuracy. *See* Transcript, Volume 16, September 14, 2021, at p. 6281, lines 7-16 (Daniel Calderon).

[146] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 5, FCP_0063500.

[147] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 6, FCP_0063501 (emphasis added).

[148] *See* Exhibit DRS-2681, Business Operations Summary, August 2018, at p. 8, FCP_0063503 (emphasis added).

[149] See Transcript, Volume 8, August 17, 2021, at p. 3000, line 15 – p. 3003, line 4 (Richard Amoroso); *In re Matthew John Date*. 20-878, 2020 WL 7059872 at *6 (S.D. Tex. Dec. 1, 2020); Transcript, Volume 14, August 23, 2021, at p. 5403, line 1 – p. 5453, line 13 (Stewart Feldman).

use his captive insurer, A.M.Y., to provide him with liability coverage. By doing so, Mr. Feldman could require his clientele to unwittingly subsidize his legal expenses (even in litigation between Feldman and his clients). Such a scheme, however, required Feldman and Capstone to reveal as little as possible to their clients.

The Doctors had ***no reason to expect that Feldman and Capstone's primary professional malpractice insurance was in the risk pool***. As Dr. Sullivan explained:[150]

>     Q.    And did you have any reason to think that the insurance afforded by Feldman's and Capstone's captive would be primarily orders of professional liability, errors and omissions, and legal expense coverage?
>     A.    I had no reason to think that because all the policies within the pool, in order to qualify, have to be similar. They have to be similar risk profile. They have to be homogeneous.
>     Q.    And based on what you and Dr. DellaCroce were insuring, can you explain to the Arbitrators, why is that? Why did you assume that based on what you were doing?

>     A.    So, number one, either everyone had their primary malpractice in and we did not, which would have disqualified us, or everyone was supposed to have it as secondary policies, which we assumed, since we qualified for the pool.
>     We have very good commercial insurance for E&O, D&O, malpractice, legal expense, very, very good, so this is supposed to be in excess. There's no other reason for us to assume that someone who cannot qualify for commercial insurance, malpractice insurance, would be able to qualify their policies for exception into a risk pool, which in order to qualify, have to be not only homogeneous, similar policies, but the risk for the policy has to be the same.

The Doctors maintained professional liability insurance through LAMMICO, along with the state-operated patient compensation fund.[151] Under Louisiana law, medical malpractice claims are subject to a $500,000 cap.[152] The Doctors' LAMMICO policy and the state compensation fund cover that $500,000 liability.[153] The Health Check-Up Letter issued by Feldman acknowledged that the Doctors had this malpractice coverage through LAMMICO and the patient compensation

---

[150] *See* Transcript, Volume 1, August 3, 2021, at p. 228, line 18 – p. 229, line 24 (Dr. Scott Sullivan).

[151] *See* Transcript, Volume 2, August 4, 2021, at p. 648, line 25 – p. 649, line 17 (Dr. Scott Sullivan). LAMMICO is the Louisiana Medical Malpractice Insurance Company.

[152] LA. REV. STAT. § 40:1231.2(B)(1) ("The total amount recoverable for all malpractice claims for injuries to or death of a patient . . . shall not exceed five hundred thousand dollars plus interest and cost.").

[153] *See* Transcript, Volume 2, August 4, 2021, at p. 648, line 25 – p. 649, line 8 (Dr. Scott Sullivan).

fund.[154] Therefore, the Doctors had no reason to believe that Feldman and Capstone were putting their primary malpractice coverages in the pool.

Feldman and Capstone suggested that the Doctors should have known that Feldman and Capstone's primary malpractice polices were in the pool because of an insurance binder issued to the Doctors in 2016, reflecting the issuance of a _gap_ medical malpractice policy by Janus.[155] This gap policy would provide coverage _only_ in the event that LAMMICO became insolvent.[156] The likelihood of this gap policy being triggered, conditioned upon the insolvency of a 40+ year insurance company, was remote at best.  Plainly, the issuance of this gap insurance policy did not reasonably notify the Doctors of the likelihood that Feldman and Capstone would have their **primary** malpractice liabilities in the risk pool.

Feldman and Capstone also emphasized an "Unauthorized Treatments" policy that was issued by Janus, effective December 21, 2017.[157] This policy was issued to the Center for Restorative Breast Surgery (the clinic) and Sigma Delta Billing, LLC (the billing company).[158] Contrary to Feldman's and Capstone's assertions, this policy did not provide primary malpractice coverage to the doctors, nurses, physician assistants and nurse anesthetists at the Doctors' hospital. All of those individuals were covered by the Doctors' primary policies through LAMMICO.[159] The Unauthorized Treatments policy purports to provide coverage for medical residents, fellows,

---

[154] _See_ Exhibit DRS-77, Health Check-Up Memo, May 29, 2015, at SULLIVAN 015793.  _See also_ Transcript, Volume 14, August 23, 2021, at p. 5377, line 8 – p. 5378, line 1 (Stewart Feldman).

[155] _See_ Exhibit FC-376.2, at p. 6, Joint-315169; _see also_ Exhibit FC-374.1, at Joint-327097 (sending binder of policies with policy period beginning December 21, 2015 on February 23, 2016 – more than two months into policy period).

[156] _See_ Transcript, Volume 2, at p. 647, line 25 – p. 649, line 17 (Dr. Sullivan).  Curiously, Capstone arranged for Janus to issue this gap **medical** malpractice coverage to Sigma Delta Billing, LLC (the billing entity) and Sunrise Productions, LLC (a film production company) – neither of which engaged in patient care.  _See_ Exhibit FC-376.2, at p. 6, Joint-315169 (list of named insureds).

[157] _See_ Exhibit FC-376.6.1480, at Joint-320635.

[158] _See_ Exhibit FC-376.6.1481, at Joint-320636; _see also_, Transcript, Volume 21, September 30, 2021, at p. 8632, line 21 – p. 8633, line 18 (Dr. Scott Sullivan).

[159] _See_ Transcript, Volume 21, September 30, 2021, at p. 8635, lines 9-18 (Dr. Sullivan).

and interns.[160] This coverage was illusory because the Doctors have ***never employed*** any residents, fellows, or interns.[161] Consequently, this "Unauthorized Treatments" policy sent to the Doctors more than two years ***after*** they executed the Joint Engagement Letter could not possibly put them on notice that Feldman and Capstone's primary legal malpractice policies were also in the pool.

2. **Feldman and Capstone breached fiduciary duties by failing to disclose the IRS's adverse determinations against Capstone-administered captives.**

Unbeknownst to the Doctors, the Feldman / Capstone captive insurance program was under intense scrutiny by the IRS before the Doctors signed the Joint Engagement Letter. Feldman and Capstone breached fiduciary duties by failing to disclose material information to the Doctors concerning the IRS's adverse determinations against Capstone-administered captives before the Joint Engagement Letter was executed, including the following facts:

➢ In July 2013, the IRS determined that Reserve Mechanical, a captive insurer structured by Feldman and administered by Capstone, failed to qualify an insurance company.[162]

➢ Feldman knew in 2013 that:

  ○ the IRS found that Reserve Mechanical was not an insurance company;[163]

  ○ the IRS had determined that Reserve lacked the essential element of risk distribution.[164]

  ○ the IRS had determined that the PoolRe pooling arrangement did not provide sufficient risk distribution for Reserve to be treated as an insurance company.[165]

---

[160] *See* Exhibit FC-376.6.1489, at Joint-320644

[161] *See* Transcript, Volume 21, September 30, 2021, at p. 8635, line 19 – p. 8636, line 1.

[162] *See* Exhibit DRS-2715, IRS Examination Report of Reserve Mechanical, July 24, 2013, at Joint-340830.

[163] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[164] *See* Transcript, Volume 21, September 30, 2021, at p. 8555, lines 14-18 (Steven Cohen).

[165] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

> ➤ Reserve's 2013 Protest to the IRS audit Examination Report, which Cohen helped prepare, acknowledged that the IRS audit (1) found that Reserve was not an insurance company and (2) suggested that PoolRe was not insurance.[166]

> ➤ In addition to the IRS audit of Reserve, the IRS issued adverse audit Examination Reports with respect to six other Capstone-administered captives.[167] Each of these other adverse audit Examination Reports were issued before the Doctors signed the 2015 Joint Engagement Letter. Those captives stipulated to be bound by Reserve Mechanical's final resolution.[168] The entire Capstone insurance program was thus jeopardized by the ongoing IRS scrutiny.

> ➤ As of the December 2015 signing of the Joint Engagement Letter, Feldman and Capstone failed to disclose to the Doctors any of the substance of the Reserve Mechanical audit or the other six adverse IRS audits.[169]

Feldman and Capstone withheld this material information from the Doctors. It is insufficient that Feldman and Capstone made generalized disclosures as to risks of IRS scrutiny. What matters is that Feldman and Capstone failed to disclose the IRS's adverse findings against Capstone-administered captives, which implicated the risk distribution and the PoolRe pooling arrangement. As Dr. DellaCroce explained, "We understood the general risks, ***but not the risks that were relative to this case, in particular, those of ongoing investigations***. I wasn't aware of those risks. Those were the ones that I was surprised by, concerned by, and infuriated by."[170]

    i.    **<u>Exhibit C to the Joint Engagement Letter failed to disclose the adverse IRS audits</u>**.

---

[166] *See* Exhibit DRS-2715, July 24, 2013 IRS Examination Report; Exhibit DRS-1874, Letter to IRS, September 3, 2013.

[167] *See* Transcript, Volume 20, September 30, 2021, at p. 8521, line 15 – p. 8522, line 15 (Steven Cohen); Transcript, Volume 9, August 18, 2021, at p. 3423, lines 5-23 (Lyle Press). *See also* Exhibit DRS-2598, IRS audit report of Columbia, September 3, 2013; Exhibit DRS-2604, IRS audit report of Marylebone, March 14, 2014; Exhibit DRS-2606, IRS audit report for Performance, July 11, 2013; Exhibit DRS-2609, IRS audit report for Restoration, May 9, 2013; Exhibit DRS-2612, IRS audit report for Security, June 19, 2014; Exhibit DRS-2617, IRS audit report for Treadwell, June 10, 2013. Each of these IRS audits of Capstone-administered captives were issued prior to the December 2015 execution of the Joint Engagement Letter.

[168] *See* Transcript, Volume 21, September 30, 2021, at p. 8521, line 15 – p. 8523, line 15 (Steven Cohen).

[169] *See* Transcript, Volume 1, August 3, 2021, at p. 180, line 22 – p. 181, line 3; p. 182, line 13 – p. 184, line 22 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1935, line 2 – p. 1936, line 10; p. 1939, line 15 – p. 1940, line 1; p. 1951, line 4 – p. 1952, line 2 (Dr. Frank DellaCroce).

[170] *See* Transcript, Volume 5, August 7, 2021, at p. 2085, lines 19-25 (Dr. Frank DellaCroce) (emphasis added).

The stated purpose of the Capstone program was to structure and operate the captive insurer so as to qualify for partial tax-exempt status under Internal Revenue Code § 831(b), as stated on the first page of Exhibit C to the Joint Engagement Letter.[171] A captive insurer must be acting as an insurance company to qualify for favorable tax treatment.[172] If a determination is made that a captive is not an insurance company, then it would not be entitled to tax benefits under Section 831(b).[173] Having a certain percentage of unrelated (third-party) insurance business is required in order to satisfy the criterion that there be "risk distribution" for insurance to exist, as also stated on the first page of the Joint Engagement Letter.[174] In most cases, Capstone-administered captives need to participate in a risk pool to satisfy the IRS's risk distribution requirement.[175]

The strategy recommended by Feldman/Capstone to achieve adequate risk distribution of the Doctors' captives, so that they would qualify as an insurance company in the eyes of the IRS, was to have the captives participate in the PoolRe risk pool.[176] Likewise, Capstone-administered

---

[171] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096. Exhibit C to the Joint Engagement Letter (*i.e.*, the disclosure form) states, "The ***intention*** is to structure and operate the captive insurer so as to qualify for partial ***tax exempt status*** … ." *See* Exhibit J-20, Joint Engagement Letter, at Exhibit C, SULLIVAN 011096 (emphasis added). Feldman and Capstone had long recognized that the favorable tax treatment was a primary inducement for their clientele to engage in captive insurance transactions. Richard Amoroso highlighted multiple provisions in the Joint Engagement Letter where Feldman and Capstone emphasized the tax advantages of the turnkey Capstone program. *See* Transcript, Volume 8, August 17, 2021, at p. 2970, line 10 – p. 2972, line 23 (Richard Amoroso). To achieve this tax-exempt status, Feldman and Capstone "encourage[d]" and "expected" their clients to participate in the PoolRe risk pool. *See* Exhibit J-20, at SULLIVAN 011071 ("It is expected that the captives will apply to PoolRe for participation in the annual pooling arrangement"; *id.* at SULLIVAN 011104 ("Capstone encourages participation in . . . PoolRe".). Mr. Feldman advised the Doctors that it was "ill-advised" to decline participating in PoolRe and that in order to obtain beneficial tax treatment, the Doctors "***must*** distribute [their] risks among a pool of risks." *See* Transcript, Volume 1, August 3, 2021, at p. 252, lines 1-10 (Dr. Scott Sullivan). *See* Exhibit J-12, Memorandum from Stewart Feldman, May 29, 2015, at SULLIVAN 015783 (emphasis added). Eliminating any doubt as to the tax-reduction goals of the Capstone program, Mr. Feldman declared in an August 6, 2015 speech, "Really, what we're talking about is ***God's work*** here. We're talking about ***reducing federal income taxes***." *See* Exhibit DRS-2491, Video, August 6, 2015 speech; *see also* Transcript, Volume 8, August 17, 2021, at p. 2982, lines 6-9 (video of Mr. Feldman played during examination of Richard Amoroso).

[172] *See id.*; Transcript, Volume 21, September 30, 2021, at p. 8471, lines 9-20 (Steven Cohen).

[173] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011098; Transcript, Volume 21, September 30, 2021, at p. 8514, lines 17-23 (Steven Cohen).

[174] *See* Exhibit J-20, 2015 Joint Engagement Letter, at Sullivan 011096.

[175] *See* Transcript, Volume 21, September 30, 2021, at p. 8502, line 22 through p. 8503, line 4 (Steven Cohen).

[176] *See* Transcript, Volume 21, September 30, 2021, at p. 8501, lines 2-14 (Steven Cohen).

captive, Reserve Mechanical, also relied on PoolRe for adequate risk distribution.[177]

In the July 2013 IRS Examination Report of Reserve Mechanical, the IRS found that Reserve Mechanical was not an insurance company.[178] As acknowledged by Steve Cohen, it was clear in July 2013 that the IRS had determined that Reserve Mechanical lacked the essential element of risk distribution.[179]

Mr. Cohen was a lawyer at the Feldman Law Firm who participated in the IRS audit of Reserve Mechanical, which began in 2010.[180] Mr. Cohen was involved with the IRS audit of Reserve Mechanical from its beginning in 2010. Mr. Cohen helped respond to the Information Document Requests that initiated the IRS audit of Reserve Mechanical in 2010,[181] providing the PoolRe reinsurance risk pool documents to the IRS to attempt to demonstrate that Reserve Mechanical had sufficient risk distribution.[182]

As of September 2013, Mr. Cohen knew that the IRS had determined that the PoolRe pooling arrangement did not provide sufficient risk distribution for Reserve Mechanical to be treated as an insurance company.[183] Mr. Cohen, and the Feldman Law Firm, knew in 2013 that the IRS had rejected the Capstone-administered captive's tax position and found that the Capstone-administered captive (which relied on PoolRe for risk distribution) lacked adequate risk distribution. But Feldman and Capstone failed to disclose these important points, or any of the substance of the adverse Reserve Mechanical audit, to the Doctors in, or before they signed, the Joint Engagement Letter.

---

[177] *See* Transcript, Volume 21, September 30, 2021, at p. 8502, line 22 – p. 8503, line 4 (Steven Cohen).
[178] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.
[179] *See* Transcript, Volume 21, September 30, 2021, at p. 8555, lines 14-18 (Steven Cohen).
[180] *See* Transcript, Volume 21, September 30, 2021, at p. 8530, line 12 – p. 8531, line 23 (Steven Cohen).
[181] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).
[182] *See* Transcript, Volume 21, September 30, 2021, at p. 8542, lines 16-24 (Steven Cohen).
[183] *See* Transcript, Volume 21, September 30, 2021, at p. 8586, lines 11-17 (Steven Cohen).

Mr. Cohen also helped prepare the "disclosures" in Exhibit C to the Joint Engagement Letter.[184] Nothing in Exhibit C to the Joint Engagement Letter disclosed the substance of the IRS audit of Reserve Mechanical, as concluded by IRS expert Lyle Press.[185] Mr. Cohen identified Subpart D of Exhibit C to the Joint Engagement as an apparent anonymous reference to Reserve Mechanical, but he conceded that "*the firm did not say anything in this section about the specific issues that were involved in the Reserve Mechanical audit*."[186] Mr. Cohen never offered any cogent description of any location within Exhibit C disclosing the substance of the adverse Reserve Mechanical audit.

Mr. Cohen helped prepare the September 2013 Protest letter that responded to the July 2013 IRS Examination Report.[187] Mr. Cohen had reviewed the 43-page July 2013 IRS Examination Report of Reserve, which included extensive descriptions of the risk distribution legal requirements and the PoolRe pooling arrangement.[188] In its assessment of PoolRe in the July 2013 Examination Report, the IRS found: "[I]t is highly likely that the entire pool, which is insured by PoolRe and reinsured on a quota share basis with each of the pool participants, is primarily comprised of direct contracts that the Service would deem not to be insurance in the commonly accepted sense."[189] Although Mr. Cohen dismissed this IRS finding with respect to PoolRe as a "garbage" argument, he acknowledged that it appeared in the IRS July 2013 Examination Report.[190] Mr. Cohen admitted that, as of 2013, the IRS had identified the issue that it is highly

---

[184] *See* Transcript, Volume 21, September 30, 2021, at p. 8292, line 16 – p. 8293, line 16 (Steven Cohen).

[185] *See* Transcript, Volume 9, August 18, 2021, at p. 3448, lines 3-13 (Lyle Press).

[186] *See* Transcript, Volume 21, September 30, 2021, at p. 8359, line 12 – p. 8360, line 2 (Steven Cohen) (emphasis added).

[187] *See* Transcript, Volume 21, September 30, 2021, at p. 8572, line 10 – p. 8573, line 1 (Steven Cohen).

[188] *See* DRS 2715 (alt. DRS 1873), July 2013 IRS Examination Report of Reserve Mechanical.

[189] *See* Exhibit DRS 1873, July 2013 IRS Examination Report of Reserve, at Joint-340824; Transcript, Volume 21, September 30, 2021, at p. 8554, lines 7-22 (Steven Cohen).

[190] *See* Transcript, Volume 21, September 30, 2021, at p. 8566, line 16 – p. 8567 line 14 (Steven Cohen).

likely that the entire pool would not be deemed to be insurance in the commonly accepted sense.[191]

The September 2013 Protest letter submitted by Reserve Mechanical in response to the July 2013 IRS Examination Report, which Mr. Cohen helped prepare, recapitulated these points by the IRS. Page 13 restated the IRS's findings that the IRS suggested that the PoolRe quota share reinsurance program is not insurance:[192]

> **Quota Share Reinsurance Program** - The Service suggests that the quota share reinsurance program is not insurance in stating the following:
>
> Therefore, it is highly likely that the entire pool, which is insured by PoolRe and reinsured on a quota share basis with each of the pool participants, is primarily comprised of direct written contracts that the Service would deem not to be insurance in the commonly accepted sense. *See Examination Report at page 28.*

Page 5 of the September 2013 Protest also re-stated the IRS's findings: "The Examination Report concludes that Reserve [Mechanical] was not an insurance company."[193]

Mr. Cohen, in preparing the Protest, knew that the IRS had made both of these findings in its July 2013 Examination Report – that "Reserve [Mechanical] was not an insurance company" and that the PoolRe "quota share reinsurance program is not insurance."[194] But Exhibit C to the Joint Engagement Letter, which Mr. Cohen also drafted, did not disclose either of these points. A plain reading of Exhibit C to the Joint Engagement Letter demonstrates that neither of these critical points, nor any of the substance of the IRS's findings in the 2013 Examination Report, were disclosed to the Doctors before they signed the Joint Engagement Letter. Those failures to adequately disclose fall well below the "absolute perfect candor" requirement, causing the damages described below, which include (1) taxes, penalties, and interest, (2) lost profits and the

---

[191] *See* Transcript, Volume 21, September 30, 2021, at p. 8562, lines 4-14 (Steven Cohen).
[192] *See* Exhibit DRS-2715, July 24, 2013 IRS Examination Report; Exhibit DRS-1874, Protest Letter to IRS, September 3, 2013.
[193] *Id.*
[194] *See* Exhibit DRS-1874, Protest Letter to IRS, September 3, 2013.

opportunity to invest the profits, and (3) the bitcoin liquidation loss.

> ### ii.    Exhibit C to the Engagement Letter was crafted in a manner designed to paint a rosy picture of the Capstone insurance program.

Exhibit C to the Joint Engagement Letter fails to satisfy the standard of "absolute perfect candor." Rather, Exhibit C provides great detail about Feldman's successes against the IRS, while minimizing adverse developments. This self-serving document, as per legal ethics expert Tom Watkins, "is a marketing piece. It constitutes an attempt to try to convince this client . . . about how many times we've been successful, how good we've been in the past causes a client to believe that he doesn't need to worry about what the IRS is doing because of his complete success in the past of handling these kinds of things."[195] Exhibit C provided no specific details regarding adverse developments with the IRS that were specific to Capstone's insurance program, and minimized the problems that were already afoot in December 2015.

Nowhere in the Joint Engagement Letter does it disclose the specific findings by the IRS in the July 2013 Examination Report that another Capstone-administered captive, Reserve Mechanical, "was not an insurance company" and that the quota share reinsurance program administered by PoolRe "is not insurance."[196] Paragraph (A) of Exhibit C to the Joint Engagement Letter emphasizes the "***thirty-nine (39) favorable rulings*** by the IRS which issued favorable Form 1024 tax exemption determination letters after exhaustive submissions to the service."[197] Paragraph (B) emphasized twelve audits of captives, all but one of which were closed out at the audit level, and "each case was closed with no change in tax due and no interest or penalties due."[198] Paragraph (C) identified three more successes: although "notices of deficiency" were

---

[195] *See* Transcript, Volume 4, August 6, 2021, at p. 1496, lines 11-21 (Thomas Watkins).

[196] *See* Exhibit DRS-2715, IRS Examination Report of Reserve Mechanical, July 24, 2013, at Joint-340824, 340830.

[197] *See* Exhibit J-20, at Exhibit C, p. 6, at SULLIVAN 011101 (emphasis added).

[198] *See* Exhibit J-20, at Exhibit C, p. 6, at SULLIVAN 011101 (emphasis added).

issued, "IRS Appeals conceded all the issues in these three cases, with no taxes, interest or penalties due," and thus, judgment was entered in the captives' favor. Taken together, Paragraphs (A) through (C) advertised Feldman's track record against the IRS as a sparkling 54-0.

Paragraph (D) fails to identify (1) the substance of the Reserve Mechanical audit and its six companion audits or (2) any of the specific problems with the Capstone captive insurance program identified by the IRS. Paragraph (D) does not state that the Capstone-administered captives were found to lack risk distribution and do not constitute insurance. Instead, this paragraph minimizes the IRS's findings, suggests that they are the handiwork of a rogue IRS agent, and emphasized that these cases are "factually similar" to those referenced in Paragraph (C), which IRS Appeals "conceded."[199]

Perhaps no better proof of the opaqueness of Paragraph (D) comes from the testimony of retired IRS prosecutor Lyle Press. Mr. Press testified that, although he first reviewed the Joint Engagement Letter in July 2020, it did not become apparent to him that Exhibit C referred to the Reserve Mechanical audit until January 2021 – and then only because he had reviewed supplemental discovery responses issued by Feldman and Capstone providing additional statements leading to that conclusion.[200] Mr. Press, who spent three decades as an IRS prosecutor, could not understand that the disclosure form referred to Reserve Mechanical without having the benefit of discovery responses in January 2021. It is unsurprising, therefore, that the adverse findings regarding Reserve Mechanical were not apparent to the Doctors, Mr. Kushner, or Mr. Sherman. Mr. Press also testified that, without the January 2021 discovery responses, he could not determine anything regarding the adverse audits of Reserve Mechanical or the six other Capstone-

---

[199] *See* Exhibit J-20, at Exhibit C, p. 6, at SULLIVAN 011101.   This paragraph emphasized, "[A] single IRS audit issued adverse audit rulings on 12 captives, despite the prior decade plus-long Capstone/ Firm experience to the contrary by other IRS auditors and without regard to the 39 favorable tax exempt rulings."
[200] *See* Transcript, Volume 9, August 18, 2021, at p. 3449, line 21 – p. 3452, line 16 (Lyle Press).

administered captives.[201]  Further there was "nothing" written regarding the _substance_ of the audits referenced in Paragraph D.[202]  That latter point was conceded by Mr. Cohen.[203]

The language in Paragraph (D) was carefully crafted to reassure clients such as the Doctors. Dr. Sullivan emphasized that the undisclosed information was "highly relevant and material" as it "condemns the entire pool."[204] Dr. DellaCroce explained that Exhibit C "bolstered his confidence" in Mr. Feldman and Capstone, and that the undisclosed information "completely undermines" the rosy portrait painted by Mr. Feldman:[205]

> **Q.** All right.  After you read Exhibit C, how did you feel in regards to Mr. Feldman and his law firm and Capstone's ability to structure the captive insurance companies you and Dr. Frank [sic] were getting into business with, Mr. Feldman and his law firm and Capstone, to comply with federal tax law?
>
> **A.** It bolstered my confidence, and because he had successfully defended all challenges and had a spotless track record.

> **Q.** Would you have felt different had the July 24, 2013, examination report of Reserve Mechanical, which is Exhibit Doctors 1873, had been disclosed in Exhibit J-20, the joint engagement letter, particularly Exhibit C, that talks about Tax Risks and Responsibilities Under IRC Section 831(b)?
>
> **A.** Yeah, it completely undermines the whole tone of that narrative to have had it revealed to me that the program they were contemplating signing me up for had not even qualified as a bona fide insurance company for insurance purposes and the IRS was on them, on them seriously.
> It would have turned that list of accomplishments into a matter of suspect in my mind because they're contradictory.

Mr. Feldman also failed to disclose the IRS's scrutiny of Capstone-administered captives and the PoolRe risk pool during the January 19, 2015 meeting with the Doctors,[206] or in subsequent communications with their health-care attorney, David Sherman, or their CPA, David Kushner.

---

[201] _See_ Transcript, Volume 9, August 18, 2021, at p. 3455, line 23 – p. 3456, line 6 (Lyle Press).

[202] _See_ Transcript, Volume 9, August 18, 2021, at p. 3456, lines 7-10 (Lyle Press).  Mr. Press testified that he could only piece together the substance of those audits by conducting research on the U.S. Tax Court website.  Transcript, Volume 9, August 18, 2021, at p. 3458, line 24 – p. 3461, line 9 (Lyle Press).

[203] _See_ Transcript, Volume 21, September 30, 2021, at p. 8359, line 12 – p. 8360, line 2 (Steven Cohen).

[204] _See_ Transcript, Volume 1, August 3, 2021, at p. 182, line 13 – p. 184, line 12 (Dr. Scott Sullivan).

[205] _See_ Transcript, Volume 5, August 3, 2021, at p. 1969, line 2 – p. 1970, line 5 (Dr. Frank DellaCroce) (emphasis added).

[206] _See_ Transcript, Volume 1, August 3, 2021, at p. 184, lines 13-22 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 19 – p. 1942, line 3 (Dr. Frank DellaCroce).

Mr. Sherman and Mr. Kushner each confirmed that Mr. Feldman never disclosed the substantive findings by the IRS that Reserve Mechanical failed to distribute risk.[207] Mr. Kushner testified that he orally asked Mr. Feldman about any ongoing issues with the IRS, and "the impression that I was left with was, I'm undefeated and I've got whatever issues are out there under control."[208]

Both Dr. Sullivan and Dr. DellaCroce testified that they would not have agreed to sign the Joint Engagement Letter had Feldman and Capstone fully disclosed the nature of the ongoing IRS scrutiny of the Capstone insurance program, including the PoolRe risk pool.[209]

### iii.    The Engagement Letter constituted "tax advice," rendering Feldman and Capstone subject to IRS Circular 230's requirements.

In addition to breaching in the fiduciary duty of "absolute perfect candor," Feldman's and Capstone's failure to disclose the adverse IRS audits of Reserve and six other Capstone-administered captives also breached their obligations under IRS Circular 230. Because the Joint Engagement Letter provided tax advice, that document implicates IRS Circular 230 – specifically, Circular 230's requirements concerning the disclosure of all reasonably available information.[210]

Circular 230 applies to "practitioners," which includes attorneys and accountants who represent taxpayers before the IRS.[211] This section unquestionably covers Feldman; insofar as Mr. Feldman wore multiple hats, including serving as the CEO and general counsel of Capstone, and executed the Joint Engagement Letter on Capstone's behalf, Capstone should also be subject to Circular 230.[212] Indeed, Feldman signed the Joint Engagement Letter jointly on behalf of Capstone

---

[207] *See* Transcript, Volume 20, September 29, 2021, at p. 7909, lines 8-23; p. 7910, lines 8-17 (David Sherman); Volume 20, September 29, 2021, at p. 8014, line 10 – p. 8015, line 18 (David Sherman).

[208] *See* Transcript, Volume 20, September 29, 2021, at p. 8017, line 19 - p. 8018, line 2 (David Kushner).

[209] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 18-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, lines 6-18 (Dr. Frank DellaCroce).

[210] *See* Exhibit DRS-580, Circular 230.

[211] *See* Exhibit DRS-580, Circular 230, at §10.0(a), SULLIVAN 018857; *see also*, Transcript, Volume 9, August 18, 2021, at p. 3429, line 14 – p. 3430, line 3 (Lyle Press).

[212] *See* Transcript, Volume 9, August 18, 2021, at p. 3443, line 15 – p. 3444, line 25 (Lyle Press).

and Feldman.

Section 10.37(a)(ii) of Circular 230 imposes requirements on practitioners in connection with the provision of written advice. Such advice requires the practitioner to, *inter alia*, "reasonably consider all relevant facts and circumstances that the practitioner knows or reasonably should know," "use reasonable efforts to identify and ascertain the facts relevant to written advice on each Federal tax matter," and "relate applicable law and authorities to facts."[213] Mr. Press described this section as "basically instruct[ing] a practitioner to consider all information available or reasonably available, tie them to the known law that they're familiar with, and to place all of that in their writing to the client or the person to whom the writing is addressed."[214] Further, Section 10.22 of Circular 230 requires practitioners to "exercise due diligence . . . in determining the correctness of oral or written representations made by the practitioner to clients with reference to any matter administered by the Internal Revenue Service."[215]

These provisions required Feldman and Capstone to exercise proper diligence and candor in advising clients like the Doctors concerning any "Federal tax matter." That latter term is broadly defined under §10.37(d), as "any matter concerning the application or interpretation of . . . any provision of law impacting a person's obligations under the internal revenue laws and regulations, including but not limited to the person's liability to pay tax or obligations to file returns."[216] Mr. Press called this provision "an extremely broad statement. It's been determined to be a broad statement to encompass pretty much anything affecting the Internal Revenue Code."[217]

The disclosures made by Feldman and Capstone not only failed under the standard of

---

[213] *See* Exhibit DRS-580, Circular 230, at §10.37, at SULLIVAN 018878-79.

[214] *See* Transcript, Volume 9, August 18, 2021, at p. 3432, line 4 – p. 3433, line 14 (Lyle Press).

[215] *See* Exhibit DRS-580, Circular 230, at §10.22(a)(3).

[216] *See* Exhibit DRS-580, Circular 230, at §10.37(d).

[217] *See* Transcript, Volume 9, August 18, 2021, at p. 3435, line 16 – p. 3436, line 1 (Lyle Press).

"absolute perfect candor" to inform the Doctors of the known risks regarding the existing challenges to the Capstone insurance structure, but they also violated Circular 230. Mr. Press testified that Exhibit C to the Joint Engagement Letter did not adequately disclose the existence or substantive basis for the adverse audit findings of Reserve Mechanical or six other Capstone-administered captives. As a result, "there was a failure to disclose this information [regarding the IRS's determinations as to Reserve Mechanical and six other audited captives] in the tax risk section of the joint engagement letter of November 2015."[218] Feldman and Capstone "did not disclose that information at all" prior to the signing of the Joint Engagement Letter.[219]

Finally, as per Mr. Press, any attempt by Feldman and Capstone to disclaim the effects or applicability of IRS Circular 230 would be "not effective."[220]

### iv.    Feldman failed to disclose the IRS audit of Mr. Feldman for promoting abusive tax shelters under IRC § 6700.

Approximately four months before Mr. Feldman sent the Joint Engagement Letter to the Doctors, he received notice of an IRS audit for promoting abusive tax shelters under Internal Revenue Code § 6700 based upon his "participation in tax avoidance transactions."[221] This letter noted that the IRS was considering "penalties and injunctions" against Mr. Feldman under seven different sections of the Internal Revenue Code for "promoting and/or preparing documents relating to these transactions":[222]

> Dear Mr. Feldman,
>
> We have reviewed materials regarding your participation in tax avoidance transactions.  We are considering penalties and injunctions under Internal Revenue Code sections 6694, 6695, 6700, 6701, 7402, 7407 and 7408 for promoting and/or preparing documents relating to these transactions.  In addition, we will consider issuing "pre-filing notification" letters to persons participating in these transactions.

---

[218] See Transcript, Volume 9, August 18, 2021, at p. 3470, lines 1-24 (Lyle Press).

[219] See Transcript, Volume 9, August 18, 2021, at p. 3471, line 13 – p. 3472, line 1 (Lyle Press).

[220] See Transcript, Volume 9, August 18, 2021, at p. 3446, lines 21-24 (Lyle Press).

[221] See Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

[222] See Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

The enumerated statutory violations included Section 6700 of the Internal Revenue Code, which governs "Promoting Abusive Tax Shelters."[223]

The letter also contained an Information Document Request concerning "all owners of any Captive Insurance Companies from every year in which you sold or advertised Captive Insurance Companies through Capstone Associated Services," and requested a broad list of information pertaining to each of the Capstone-associated captives.[224]

The consequences of a promoter audit, from the standpoint of a captive client, cannot be overstated: the information request provides the IRS with a play-card to identify targets for additional audits and enforcement activity. Importantly, the commencement of the promoter audit of Mr. Feldman also precludes his clients from filing a qualified amended return that would allow the clients to avoid paying accuracy-related penalties.[225]  A client can only file a qualified amended return *before* a promoter audit is instituted – not afterward.[226]

Upon receiving notice of the promoter audit, Mr. Feldman sought guidance from his longstanding ethics attorney, Mr. McCormack.[227] Paragraph (G) of Exhibit C to the Joint Engagement Letter makes ***no mention of a "promoter audit" or Section 6700*** of the Internal Revenue Code.[228] And Paragraph (G) provides no information regarding the substance of the inquiry:[229]

---

[223] 26 U.S.C. § 6700.

[224] *See* Exhibit DRS-2529, IRS Audit Letter, June 8, 2015.

[225] *See* Transcript, Volume 9, August 18, 2021, at p. 3614, line 4 – p. 3616, line 1 (Lyle Press).

[226] *See* Transcript, Volume 9, August 18, 2021, at p. 3615, line 18 – p. 3616, line 1 (Lyle Press).

[227] *See* Exhibit DRS-1921, E-mail from Stewart Feldman, July 14, 2015 ("before sending it out wholesale, I will send it to ethics counsel"); *see also*, Transcript, Volume 19, September 28, 2021, at p. 7695, line 16 – p. 7696, line 13 (James McCormack).   Remarkably, as January 2021, Mr. Feldman has paid Mr. McCormack in excess of $112,000 for ethics guidance dating back to 2005.  *See* Exhibit DRS-1512, Discovery Responses, at p. 15, Response to Interrogatory No. 11.

[228] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, at SULLIVAN 011102.

[229] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, at SULLIVAN 011102.

> G. In June 2015, the IRS notified either Stewart A. Feldman or the Firm or Capstone (the addressee of the inquiry is unclear) that the captive insurance/alternative risk planning program is the subject of a review by the IRS and issued an information document request (IDR). The Firm is unclear whether this IDR is unconnected with the audits of any particular captive client, but is likely connected to the IRS's examination of captive insurance programs generally. The Firm believes that the inquiring IRS agent was unaware of the dozens of completed IRS reviews of the planning resulting in its agreeing with the taxpayers' positions. After a three day review by the IRS agent and after providing him evidence of the more than 50 prior successful rulings by the IRS, this matter has been dormant.

The reference to Section 6700 was important enough that Mr. McCormack circled that statutory reference on his copy of the document, presumably based on a discussion with Mr. Feldman.[230] But Feldman consciously omitted any reference to this statutory provision in the disclosure language. Even Mr. Feldman conceded, when asked whether anything within the disclosure form or Paragraph (G) "identifies that audit as examining you for promoting abusive tax shelters," that "*those words are not there*."[231]

Both Doctors testified that Paragraph (G) did not inform them regarding the pending promoter audit of Mr. Feldman.[232] Mr. Sherman testified that Mr. Feldman **_never_** disclosed the promoter audit to him, either orally or in writing.[233] Mr. Kushner, a practicing CPA for over 40 years, testified that he did not have experience in dealing with promoter audits and did not recognize Paragraph (G) to be alluding to a promoter audit.[234] Remarkably, Mr. Kushner sent Mr. Feldman an article concerning promoter audits in August 2015 – just two months after the promoter audit of Mr. Feldman began – yet Mr. Feldman conspicuously failed to respond to that

---

[230] *See* Transcript, Volume 19, September 28, 2021, at p. 7703, line 24- p. 7704, line 4; p. 7704, lines 22-24; p. 7705, lines 8-15 (James McCormack).

[231] *See* Transcript, Volume 14, August 23, 2021, at p. 5323, lines 18-24 (Stewart Feldman) (emphasis added).

[232] *See* Transcript, Volume 1, August 3, 2021, at p. 217, line 22 – p. 218, line 4 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1966, line 16 – p. 1967, line 12 (Dr. Frank DellaCroce).

[233] *See* Transcript, Volume 20, September 29, 2021, at p. 7922, lines 19-24 (David Sherman).

[234] *See* Transcript, Volume 20, September 29, 2021, at p. 8140, line 22 – p. 8141, line 13; p. 8142, lines 1-12 (David Kushner).

e-mail and disclose the recently-commenced promoter audit.[235]  Indeed, Mr. Kushner did not learn

about Mr. Feldman's promoter audit until October 2019 – *after* the Doctors had expressed their

desire to wind their captives down.[236]

 Mr. Watkins testified that Paragraph (G) *"hides"* the truth regarding the promoter audit.[237]

Mr. Watkins further explained the need for Mr. Feldman to provide *full* disclosure regarding the

pending promoter audit:[238]

>  Additionally, you got to make a disclosure of -- you know, the IRS had already identified that he was being -- that Mr. Feldman was being investigated for a bad -- my term, "bad promoter."  You got to tell them that.
>  In fact, I don't see how anybody can claim that this is full disclosure if that letter wasn't shown to these two people prior to the time they signed this contract.  Anything less than that, any kind of vague description of how it might happen is not complete candor, full disclosure.
>  I don't know about you all, but I certainly wouldn't want to invest in something where the IRS is already after the guy who's going to protect me from the IRS.  And I don't care how it ultimately turns out, there has to be full disclosure when the contract is entered into and there was not.

 Mr. McCormack agreed that Paragraph (G) "does not specifically state that Feldman

received an IDR that included a disclosure that he was being investigated as a promoter of abusive

tax shelters and the IRS was considering penalties and injunctive relief pursuant to a number of

sections of the IRS Code including [Section] 6700."[239] Tax attorney Marcus Brooks acknowledged

that Paragraph (G) *does not state* that "the IRS had reviewed materials regarding Mr. Feldman's

participation in tax avoidance transactions," or that "the IRS was investigating Mr. Feldman for

promoting and preparing documents relating to abusive tax shelters."[240] Mr. Brooks further

---

[235] *See* Transcript, Volume 20, September 29, 2021 at p. 8025, line 21 – p. 8026, line 5 (David Kushner); *see also* Exhibit FC-71, E-mail from David Kushner, August 10, 2015.

[236] *See* Transcript, Volume 20, September 29, 2021, at p. 8015, line 19 – p. 8016, line 8; p. 8025, line 21 – p. 8027, line 1; p. 8153, line 12 – p. 8154, line 12 (David Kushner).

[237] *See* Transcript, Volume 4, August 6, 2021, at p. 1611, line 21 – p. 1612, line 4 (Thomas Watkins) (emphasis added).

[238] *See* Transcript, Volume 4, August 6, 2021, at p. 1542, line 16 – p. 1543, line 11 (Thomas Watkins) (emphasis added).

[239] *See* Transcript, Volume 19, September 28, 2021, at p. 7723, lines 4-12 (James McCormack).

[240] *See* Transcript, Volume 23, October 2, 2021, at p. 9440, line 15 – p. 9441, line 10 (Marcus Brooks).

acknowledged that, while *he* may have recognized the oblique language in Paragraph (G) to refer to a promoter audit, he analyzed that language from the perspective of an attorney with a specialized tax practice.[241] Mr. Brooks pointedly *avoided* offering any opinion as to whether the Doctors would read Paragraph (G) the same way.[242]

The pending promoter exam of Feldman was unquestionably material information that should have been disclosed to the Doctors prior to the execution of the Joint Engagement Letter. Feldman and Capstone failed to adequately disclose the pendency of the promoter exam and breached their fiduciary duties through that material omission.

### D.    **Feldman and Capstone's breaches of fiduciary duties caused the Doctors' damages**.

As discussed in Section IX(A) below, the Doctors do not need to prove actual damages or harm arising from Feldman and Capstone's breaches of fiduciary duties to recover the fees the Doctors paid Feldman and Capstone.[243] But the Doctors did in fact incur significant damages as a result of Feldman and Capstone's breaches of fiduciary duty and should be compensated fully for those damages, as calculated by the Doctors' expert forensic accountant, Bill Legier.[244]

The Doctors testified that they would not have agreed to execute the Joint Engagement Letter if Feldman and Capstone had disclosed (1) the Doctors would be reinsuring Feldman and Capstone's malpractice liabilities and legal expenses, (2) the adverse audit findings by the IRS regarding Reserve Mechanical and six other Capstone-administered captives, and (3) the promoter audit of Mr. Feldman.[245] Indeed, as Mr. Sherman testified, "Had we known we when we were

---

[241] *See* Transcript, Volume 23, October 2, 2021, at p. 9397, lines 9-21 (Marcus Brooks).

[242] *See* Transcript, Volume 23, October 2, 2021, at p. 9442, line 16 – p. 9443, line 2 (Marcus Brooks).

[243] *Burrow*, 997 S.W.2d at 243-44.

[244] *See* FC-600, Bill Legier's Report.

[245] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

going through this and negotiating the engagement letter that there was a promoter audit going on and that one of the programs had already been ruled by the IRS not to be legitimate insurance, **we would have run, not walked, away**."[246]

A causal relationship exists between Feldman's and Capstone's breaches of fiduciary duty, and the Doctors' damages. The Doctors would not have incurred $1,250,944 in fees paid to Capstone and Feldman had they not executed the Joint Engagement Letter.[247] These losses are directly related to the misrepresentations and inadequate disclosures made by Feldman and Capstone.

Similarly, the Doctors' losses attributable to (1) anticipated IRS back taxes, penalties, interest, and audit defense costs, (2) foregone investment opportunities, (3) Dr. Sullivan's forced liquidation of Bitcoin, (4) attorneys' fees, costs, and expenses in these arbitrations, and (5) FCP's looting of more than $3 million from the risk pools are also causally connected to these breaches of fiduciary duty. These losses would not have been incurred but-for the misrepresentations and insufficient disclosures made by Feldman and Capstone, as well as Feldman and Capstone acting upon their conflicts of interests in manners extremely detrimental to their clients.

### E.    Capstone, PoolRe, and Jeff Carlson are liable for Feldman's breaches of fiduciary duties pursuant to the *Kinzbach* Rule.

Liability for the breach of fiduciary duty is not limited to attorneys or agents.[248] Rather, under long-standing Texas Supreme Court precedent, parties that knowingly facilitate a breach of fiduciary duty are equally liable.[249] According to the Texas Supreme Court, "It is settled as the law

---

[246] *See* Transcript, Volume 20, September 29, 2021, at p. 7929, line 24 – p. 7930, line 11 (David Sherman) (emphasis added).

[247] *See* Exhibit FC-600.0020 and FC-600.0021, Bill Legier's Report; *see also* Transcript, Volume 1, August 3, 2021, at p. 350, lines 14-20 (Dr. Scott Sullivan).

[248] *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003).

[249] *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942).

of [the] State [of Texas] that *where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such*."[250] This doctrine – known as the *Kinzbach* Rule – is often applied by Texas courts.[251] Thus, Capstone,[252] PoolRe, and Jeff Carlson are liable to the Doctors for knowingly participating in and facilitating Feldman's breaches of fiduciary duty to his clients under the *Kinzbach* rule.

To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must establish: (1) "the existence of a fiduciary relationship;" (2) "that the third party knew of the fiduciary relationship;" and (3) "that the third party was aware that it was participating in the breach of a fiduciary relationship."[253] *First*, the fiduciary relationship between Feldman, as an attorney, and his clients exists as a matter of law, thereby establishing the first element.[254]

*Second*, Capstone, Jeff Carlson, and PoolRe knew that the nature of the relationship between Feldman and his clients was fiduciary. Mr. Feldman is the owner, CEO, and general counsel for Capstone in addition to being the owner, managing member, and a lawyer of the Feldman Law Firm. Thus, Mr. Feldman's knowledge is imputed to Capstone. And Jeff Carlson testified that he was aware that all the pool participants were clients of Feldman and that the participants' funds paid into the risk pools were being used to pay for defending the legal malpractice and breach of fiduciary duties claims asserted against Feldman.[255]

---

[250] *Kinzbach*, 160 S.W.2d at 514.

[251] *See Cox Texas Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex. App. 2001); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221 (Tex. 2017); *see also D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (citing *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)) (applying Texas law).

[252] Capstone owed fiduciary duties to the Doctors under principles of agency. *See* Transcript, Volume 6, August 9, 2021, at p. 2389, line 17 – p. 2390, line 20 (Richard Amoroso). But even if Capstone was not a fiduciary, which is denied, Capstone is still liable for Feldman's breaches of fiduciary duty under the *Kinzbach* Rule.

[253] *See D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (citing *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)) (applying Texas law).

[254] *See Trousdale v. Henry*, 261 S.W.3d 221, 229 (Tex. App. – Houston [14th Dist.] 2008).

[255] *See* Transcript, Volume 22, October 1, 2021, at p. 9120, line 1 – p. 9125, line 20 (Jeff Carlson).

PoolRe has no employees of its own.[256] Thus, insofar as Capstone knew that Feldman owes fiduciary duties, and PoolRe can only act through Capstone, Capstone's knowledge is imputed to PoolRe. Additionally, the PoolRe agreements state that the pool is only for clients of "The Feldman Law Firm."[257] And PoolRe Director, Robert Snyder, testified that the pool funds being used to pay for FCP's legal fees and expenses in these arbitrations were "paid through the funds that each of the participating members of PoolRe have provided."[258] Thus, Capstone, Mr. Carlson, and PoolRe had knowledge of the fiduciary relationship between pool participants and Feldman.

The third element under *Kinzbach* is also satisfied. Mr. Carlson, Capstone, and PoolRe are aware that they participated and are actively participating in the breach of fiduciary duties owed by Feldman to his clients, the Doctors and Class Members. These actions facilitating the breach of fiduciary duty take many forms, such as:

➢ PoolRe's Directors, Robert Snyder and Stephen Friedman, Capstone's President, Jeff Carlson, and Feldman authorized an "arbitrary" allocation of $250,000 to the 2018 risk pool[259] and took an additional $3 million from the 2019 pool to cover costs of defending Feldman and Capstone in these arbitration proceedings.[260]

➢ At Mr. Feldman's direction, Feldman controller Paul Franks submitted fraudulent "New Claim Reports" to Capstone on June 9, 2020 – all of which reflected a purported "date of loss" of December 31, 2019.[261] That date is the very last possible date for a claim to arise in order to trigger the 2019 pool.

➢ Mr. Carlson participated in meetings with PoolRe's directors whereby it was agreed that funds from the 2018 and 2019 risk pools would be used to pay legal fees

---

[256] *See* Transcript, Volume 22, October 1, 2021, at p. 8711, lines 4-13 (Robert Snyder).

[257] *See* Exhibit DRS-2109 at Joint-331770, 2019 Stop Loss Reinsurance Agreement at § 6(B) ("[T]he only Named Insureds benefitting from coverage by PoolRe are active clients in good standing of both The Feldman Law Firm LLP and Capstone Associated Services, Ltd.").

[258] *See* Transcript, Volume 22, October 1, 2021, at p. 8782, line 24 – p. 8783, line 5 (Robert Snyder).

[259] *See* Exhibit DRS-2543, Capstone's Final Report on the 2018 Risk Pool, July 27, 2021; Transcript, Volume 22, October 1, 2021, at p. 8793, line 8 – p. 8794, line 5 (Robert Snyder); *see also* Transcript, Volume 11, August 20, 2021, at p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript Vol. 17, September 23, 2021, p. 6857, line 5 – p. 6858, line 18 (Jeff Carlson); Transcript, Vol. 7, August 16, 2021, at p. 2544, lines 3-12 (Richard Amoroso).

[260] *See* Transcript, Vol. 18, September 24, 2021, at p. 7013, line 20 – p. 7014, line 9 (Jeff Carlson); Transcript, Vol. 7, August 16, 2021, at p. 2552, line 5 – p. 2557, line 23 (Richard Amoroso).

[261] *See* Exhibit DRS-560 to Exhibit DRS-564, New Claims Reports.

attributable to these arbitrations.[262] To date, over $3 million of pool funds have been used for the defense of FCP.

These facts reflect willful participation by Capstone, PoolRe, and Jeff Carlson in Feldman's breach of fiduciary duty to his clients through the looting of the risk pools. Thus, under the *Kinzbach* Rule, Capstone, PoolRe, and Jeff Carlson are liable for Feldman's breaches of fiduciary duty.

## I.    Feldman committed legal malpractice.

Feldman is liable to the Doctors for legal malpractice. This malpractice claim arises from Feldman's active concealment of (1) known risks specific to the Capstone captive program, (2) Feldman's pending promoter audit, and (3) the undisclosed presence of Feldman's legal malpractice and defense expense exposures in the risk pool. Feldman also committed legal malpractice in failing to put forth a diligent effort on the Doctors' behalf in assisting them with shutting down their captive program.

To establish legal malpractice, a client must establish (1) the lawyer owed a duty of care, (2) the lawyer breached that duty, (3) the lawyer's breach proximately caused damage to the client, and (4) the client sustained damages.[263] Claims of legal malpractice are rooted in negligence principles and arise from an attorney's failure to exercise ordinary care.[264]

### A.    Feldman owed the Doctors a duty of care by virtue of the attorney-client relationship.

"[T]he first question in a legal malpractice claim is whether there exists an attorney-client

---

[262] *See* Transcript, Volume 15, August 24, 2021, at p. 6035, line 23 – p. 6036, line 9 (Jeff Carlson) (referring to Exhibit DRS-2004, at Joint-401691); Volume 18, September 24, 2021, at p. 7300, line 10 – p. 7301, line 9; p. 7302, line 21 – p. 7303, line 17 (Jeff Carlson).

[263] *See Rogers v. Zanetti*, 518 S.W.3d 394, 400 (Tex. 2017); *Saulsberry v. Ross*, 485 S.W.3d 35, 41 (Tex. App.—Houston [14th Dist.] 2015); *Pressil v. Gibson*, 477 S.W.3d 402, 407 (Tex. App.—Houston [14th Dist.] 2015); *Haddy v. Caldwell*, 355 S.W.3d 247, 251 (Tex. App.—El Paso 2011).

[264] *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989).

relationship, as an attorney only owes a duty to his or her clients."[265] The attorney-client relationship was formed when the Doctors first retained Feldman in March 2015 and continued with the execution of the Joint Engagement Letter in December 2015.[266]

### B. Feldman breached his duty by failing to act as a reasonably prudent lawyer and by violating multiple Disciplinary Rules of Professional Conduct.

Mr. Feldman violated several Texas Disciplinary Rules of Professional Conduct. These rules establish a clear standard of care as to how reasonable, prudent lawyers conduct themselves. Mr. Watkins testified that the violation of disciplinary rules operates as a *de facto* proxy for a finding of negligence: "[E]very expert that testifies will testify that reasonable and prudent lawyers will comply with the disciplinary rules. . . [the violation] creates at least negligence on [Mr. Feldman's] part for not following these rules."[267]

### 1. Feldman was negligent in jointly representing Capstone, PoolRe, and the Doctors in violation of Rule 1.06.

Feldman jointly represented Capstone and PoolRe in addition to representing the Doctors and Class Members.[268] This joint representation was adverse to the Doctors and Class. Feldman failed to fully disclose the consequences of this common representation. Feldman's joint representation, coupled with the inadequate disclosures discussed in Section I(B) above, violated Rule 1.06 of the Texas Rules of Professional Conduct.[269]

---

[265] *Border Demolition & Env., Inc. v. Pineda*, 535 S.W.3d 140, 152 (Tex. App. – El Paso 2017).

[266] *See* Exhibit DRS-491, Letter from David Kushner enclosing signed Engagement Memorandum, March 3, 2015; Exhibit J-20, Joint Engagement Letter; *see also* Transcript, Volume 4, August 6, 2021, at p. 1454, line 21 – p. 1455, line 6 (Thomas Watkins).

[267] *See* Transcript, Volume 4, August 6, 2021, at p. 1536, lines 15-18; p. 1536, line 24 – p. 1537, line 5 (Thomas Watkins).

[268] *See* Transcript, Volume 13, August 22, 2021, at p. 5122, lines 2-20 (Stewart Feldman); *see also* Exhibit J-20, Joint Engagement Letter at p. 4, SULLIVAN011070 ("Capstone is a significant client of the Firm;" "The Feldman Law Firm LLP also does occasional legal work for PoolRe.").

[269] *See* Exhibit DRS-1540, Rules of Professional Conduct, at p. 28, SULLIVAN 019405. While not formally admitted, the Arbitrators took judicial notice of the Rules of Professional Conduct. *See* Transcript, Volume 4, August 6, 2021, at p. 1445, line 10 – p. 1446, line 17 (Arbitrators).

Rule 1.06(b) provides, in relevant part, that:

a lawyer shall not represent a person if the representation of that person: (1) involves a **_substantially related matter_** in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or (2) reasonably appears to be or become **_adversely limited by the lawyer's or law firm's responsibilities to another client_** or to a third person or by the lawyer's or law firm's own interests.[270]

In turn, Rule 1.06(c) allows a lawyer to represent a client in the above-identified circumstances only "if (1) the lawyer reasonably believes the representation of each client will not be materially affected; _and_ (2) each affected or potentially affected client **_consents to such representation_** after **_full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation_** and the advantages involved, if any."[271]

Mr. Watkins testified that Rule 1.06(b)(1) is "clearly" implicated "because obviously everything Capstone did and everything Mr. Feldman did and everything the Doctors did was a substantially related matter."[272] Because of the interrelated nature of Capstone's duties and Feldman's duties, Mr. Watkins concluded that Mr. Feldman could not satisfy the requirements of Rule 1.06(c), as "no reasonable, prudent lawyer under the same or similar circumstances could possibly get past (1) in this case. And that, therefore, he does not get to benefit from Section (2)."[273] However, even if subsection (1) were satisfied, which is denied, subsection (2) was not satisfied because that rule calls for "**_full disclosure_** of the existence, nature, implications, and possible adverse consequences of the common representation."[274]

Mr. Watkins noted that the contractual structure, whereby the Doctors would pay Capstone

---

[270] _See_ Exhibit DRS-1540, Rules of Professional Conduct, at p. 28, SULLIVAN 019405

[271] _See_ Exhibit DRS-1540, Rules of Professional Conduct, at p. 28, SULLIVAN 019405 (emphasis added).

[272] _See_ Transcript, Volume 4, August 6, 2021, at p. 1489, line 9 – p. 1490, line 1 (Thomas Watkins).

[273] _See_ Transcript, Volume 4, August 6, 2021, at p. 1491, lines 2-6 (Thomas Watkins) (emphasis added).

[274] _See_ Exhibit DRS-1540, Rules of Professional Conduct, Rule 1.06(c)(2), at p. 28, SULLIVAN 019405.

and some unspecified portion of the funds would be tendered to the Feldman Law Firm, reflected Mr. Feldman's dual loyalties. Mr. Watkins testified that a reasonably prudent lawyer "cannot reasonably believe that he's fulfilling his obligation under 1.06" for the following reasons:[275]

> A.   Because this contract -- this contract is set up in such a way as to create ==two streams of income to the lawyer.==  And I've seen it over and over again.  Any time that the lawyer decides to put on the second hat or the third hat or the fourth hat, it is ==not to benefit the client.==
>
> It is to provide an additional stream of income for the lawyer.  And, therefore, there is ==complete adversity between his position with Capstone== acting as a lawyer and his position as a lawyer for the clients.
>
> And, therefore, on behalf of himself and himself acting through Capstone, he ==owes full disclosure, full candor.==  So I've gone through this contract until I'm blue in the face, and I ==cannot find full disclosure, absolute candor, any compliance at all with his fiduciary duty or any compliance at all with Rule 1.06.==

Mr. Watkins concluded that the conflict between the Doctors and Capstone was *unwaivable* and that "it's not even ethical to ask the client to waive it."[276] Mr. Watkins testified that "there was no time during the representation of both Capstone and the [Doctors] that [the Doctors] were getting a lawyer who was dedicated to protecting their interest and their interest alone.  They *always had a lawyer who would downplay anything that Capstone did wrong, would try to protect Capstone from any kind of complaints*."[277] Mr. Watkins further concluded that Mr. Feldman did not "try to protect his clients in this case. From this contract forward, it appeared to me that *Mr. Feldman's highest efforts were spent on trying to keep his clients in the dark* about what was actually going on."[278] This conflict was not effectively waived – nor could it be, as per Mr. Watkins.

Even Feldman's ethics counsel, James McCormack, acknowledged that the very framework of the relationship created a *conflict of interest* from the outset between the Doctors

---

[275] *See* Transcript, Volume 4, August 6, 2021, at p. 1495, line 8 – p. 1496, line 15 (Thomas Watkins) (emphasis added).

[276] *See* Transcript, Volume 4, August 6, 2021, at p. 1500, line 13 – p. 1501, line 15 (Thomas Watkins) (emphasis added).

[277] *See* Transcript, Volume 4, August 6, 2021, at p. 1501, lines 17-25 (Thomas Watkins) (emphasis added).

[278] *See* Transcript, Volume 4, August 6, 2021, at p. 1502, lines 1-8 (Thomas Watkins) (emphasis added).

and Feldman and Capstone.[279] Mr. McCormack further acknowledged that, if a malpractice claim was filed against Feldman, "the Doctors were at risk of paying for the Feldman Law Firm legal fees for defending against the Doctors' malpractice claims."[280]

Mr. Watkins concluded that the Joint Engagement Letter failed to fully disclose that Mr. Feldman's representation of the Doctors was, or could be, materially and directly adverse to Capstone and PoolRe, and that Feldman failed to "fully disclose the existence, nature, implications, and possible adverse consequences of Mr. Feldman's common representation of the Doctors and Capstone."[281] Thus, the violation of Rule 1.06 leads to the conclusion that Feldman breached duties owed to the Doctors.

### 2. Feldman was negligent in entering into a reinsurance business transaction with the Doctors and Class members without providing full disclosure, violating Rule 1.08.

Rule 1.08 applies where a lawyer goes into business with a client. This Rule requires full disclosure to be made, as well as an opportunity for the client to seek independent counsel as to whether to participate in the transaction. This rule was triggered by the presence of Feldman's and Capstone's primary malpractice policies in the risk pool, resulting in the expectation that the clients, the Doctors and Class Members, would reinsure Feldman against malpractice claims – even if the clients sued Feldman for malpractice.

Rule 1.08(a) provides:

> A lawyer **shall not enter into a business transaction** with a client unless: (1) the transaction and terms on which the lawyer acquires the interest are **fair and reasonable to the client** and are **fully disclosed** in a manner which can be reasonably understood by the client; (2) the client is given a **reasonable opportunity to seek the advice of independent counsel** in the transaction; and (3) the client

---

[279] *See* Transcript, Volume 20, September 9, 2021, at p. 7873, lines 9-19 (James McCormack).

[280] *See* Transcript, Volume 20, September 9, 2021, at p. 7873, line 20 – p. 7874, line 9 (James McCormack).

[281] *See* Transcript, Volume 4, August 6, 2021, at p. 1535, lines 9-22 (Thomas Watkins). *See also*, Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 28, SULLIVAN 019405.

*consents in writing* thereto.[282]

The failure to satisfy any one of these elements violates Rule 1.08(a).

Here, the underlying reinsurance transaction was not fair or reasonable to the client. Incredibly, Mr. Feldman had the temerity to assert that the presence of his primary malpractice policies in the pool was *beneficial* to the Doctors and Class Members.[283] But Feldman and Capstone concealed the types of policies covering them in the pool, representing falsely that Feldman's and Capstone's captives "may participate in the pool," and that the risk pool consisted of "generally similar policies covering generally similar risks."[284] It is neither "fair" nor "reasonable" for an attorney to require his clients to unknowingly reinsure the attorneys' malpractice liabilities and defense expenses, especially considering the magnitude of exposure arising from Feldman's malpractice liabilities specifically.[285]

Even assuming that Feldman getting his clients to reinsure Feldman's malpractice liabilities and defense expenses was "fair" and "reasonable," which is denied, Feldman failed to satisfy the "full disclosure" prong of Rule 1.08(a). The Doctors addressed Feldman's and Capstone's failures to make full disclosure at length in Section I(B) above. Considering Feldman's and Capstone's inadequate disclosures, Feldman violated Rule 1.08(a).

Because the reinsurance transaction was not properly disclosed to the Doctors, any purported written consent was invalid. Mr. Watkins explained that due to the inadequate disclosure, "this is an impermissible, unwaivable conflict of 1.08."[286] Thus, the violation of Rule

---

[282] *See* Exhibit DRS-1540, Rule of Professional Conduct 1.08(a), at SULLIVAN 019412-13 (emphasis added).

[283] *See generally*, Transcript, Volume 11, August 20, 2021, at p. 4589, line 7 – p. 4607, line 15 (Stewart Feldman). As Judge Baker noted, "You're not suggesting that by those liability malpractice policies being in there, that actually is better for the doctors than not?" *See* Transcript, Volume 11, August 20, 2021, at p. 4590, line 23 – p. 4591, line 3.

[284] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.

[285] *See* fn. 52, *supra*.

[286] *See* Transcript, Volume 4, August 6, 2021, at p. 1547, line 8 – p. 1548, line 3 (Thomas Watkins)

1.08 constitutes a separate breach of duties owed by Feldman to the Doctors and Class Members.

> **3.** **The Doctors and Class Members did not consent to allow Mr. Feldman to represent Capstone or PoolRe adversely to the Doctors or Class Members after Feldman withdrew from legal representation. Thus, Mr. Feldman violated Rule 1.09.**

Mr. Feldman owed obligations to the Doctors even after Feldman terminated its legal representation of the Doctors and Class Members. Most importantly, Feldman owed the Doctors a duty not to represent Capstone or PoolRe adversely to the Doctors and Class Members concerning the same subject matter as the representation. The fiction that only RSL Funding, but not Mr. Feldman, represents Capstone, is undermined by his role as the general counsel of Capstone and his ownership and control over RSL Funding, which provided legal representation to Capstone in the Dorfman arbitration and these arbitrations.[287]

Rule 1.09 provides, in relevant part: "Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client . . . if it is the same or a substantially related matter."[288]

Mr. Watkins concluded that Feldman's January 2020 withdrawal of representation of the Doctors was insufficient because of the multiple hats worn by Mr. Feldman. Mr. Watkins noted:[289]

> But that doesn't solve the problem, because as soon as you withdraw from one of your clients, they become a former client and it kicks over to 1.09. And **1.09 puts sufficient obligations of the lawyer to a former client that I think that that withdraw doesn't cure the conflict** in this case.
>
> They have all the confidential information of their client. They have **duties to their former client to not take on any case against them, which is substantially related** to the representation of them. That's in 1.09.

> Clearly, their continued representation of Capstone, and even if Capstone gets an outside lawyer, the **general counsel of Capstone is Mr. Feldman.** And **Mr. Feldman cannot continue to be general counsel of Capstone against the doctors** because that violates 1.09.
>
> .    .    .
>
> If they do take on that joint representation at the beginning, they have to make full disclosure. They didn't do that. Then once they withdraw from representing the doctors, the **docs become a 1.09 client and they have obligations to them under Rule 1.09 and they didn't fulfill those.**

---

[287] *See* Transcript, Volume 13, August 22, 2021, at p. 5118, lines 3-5 (Stewart Feldman); Transcript, Volume 15, August 24, 2021, at p. 5718, lines 4-13 (Andy Paredes).

[288] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at Rule 1.09(a), at SULLIVAN 019415.

[289] *See* Transcript, Volume 4, August 6, 2021, at p. 1523, line 3 – p. 1524, line 11 (Thomas Watkins) (emphasis added).

The Doctors did not validly consent to have Mr. Feldman represent Capstone adversely to the Doctors.[290] Mr. Watkins emphasized:

> And so there is no way that they can continue to represent a client against the Doctors on anything related to the captives. That is the same or the substantially related matter. And, therefore, it is a violation of 1.09 after he withdrew from representing – after Mr. Feldman withdrew from representing the Doctors, for him to, in any way, continue to represent, either as general counsel or as an individual lawyer, Capstone.[291]

This rationale is equally applicable to the Class Members.

Further, Feldman billed $3,813,450 and collected millions of dollars from PoolRe, for providing legal representation on behalf of PoolRe and Capstone adverse to the Doctors.[292] PoolRe's purported owner, Stephen Friedman, testified that he was aware that the "***Feldman Law Firm has billed and been paid for the legal services that the Feldman Law Firm has provided on behalf of PoolRe adverse to the [D]octors in these arbitrations***."[293] This testimony further establishes Feldman's violation of Rule 1.09.

### 4. <u>Feldman's violations of Rules 1.06, 1.08 and 1.09 constituted actionable "misconduct" under Rule 8.04.</u>

Mr. Feldman, through the conduct described above, also violated Rule 8.04(a)(1) and 8.04(a)(3). Rule 8.04 sets forth a broad variety of "misconduct." Rule 8.04(a)(1) provides that "a lawyer shall not violate these rules, knowingly assist or induce another to do so, or do so ***through the acts of another***, whether or not the violation occurred in the course of a client-lawyer relationship."[294] In turn, Rule 8.04(a)(3) prohibits attorneys from "engag[ing] in conduct involving

---

[290] *See* Transcript, Volume 4, August 6, 2021, at p. 1525, line 8 – p. 1526, line 8 (Thomas Watkins).

[291] *See* Transcript, Volume 4, August 6, 2021, at p. 1527, lines 2-12 (Thomas Watkins).

[292] *See* Transcript, Volume 22, October 1, 2021, at p. 9082, line 11 – p. 9084, line 14 (Jeff Carlson) (citing Exhibit FC-692 at FC-692.0004).

[293] *See* Transcript, Volume 24, October 3, 2021, at p. 9553, lines 5-12 (Stephen Friedman) (emphasis added).

[294] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494 (emphasis added).

*dishonesty, fraud, deceit, or misrepresentation*."[295]

Mr. Watkins explained that, pursuant to Rule 8.04(a)(1) Mr. Feldman cannot defend against a disciplinary violation by acting through or on behalf of another entity such as Capstone or PoolRe. Mr. Watkins noted, "This means that you can't create an entity and then, through that entity, violate these rules," and that there is no need to go through a veil-piercing or alter ego analysis if Mr. Feldman uses Capstone or PoolRe "to do acts that he could not do directly."[296] In other words, Mr. Feldman could not do indirectly (through Capstone or PoolRe) what he was barred under the Rules of Professional Conduct from doing directly. Each of the above-described violations of Rules 1.06, 1.08, and 1.09 also constitute "misconduct" under Rule 8.04.[297]

### C. Feldman committed legal malpractice by failing to put forth a diligent effort in assisting the Doctors with shutting down their captives.

Feldman owed a fiduciary obligation to the Doctors when the Doctors requested assistance with liquidating their captives.[298] The Joint Engagement Letter provides: "At some point you may ask the Firm to assist in distributing the captives' profits and even shutting down the captives; *we stand ready to assist in that regard as part of our regular, quarterly retainer, without further charge*."[299] Feldman also promised in the Joint Engagement Letter to "put forth a diligent effort on [the Doctors'] behalf" and to "provide [the Doctors], where possible, with available, alternative courses of action."[300]

The Doctors first asked for Mr. Feldman's assistance in shutting down their captives in

---

[295] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494 (emphasis added).

[296] *See* Transcript, Volume 4, August 6, 2021, at p. 1561, line 4 – p. 1562, line 3 (Thomas Watkins).

[297] *See* Transcript, Volume 4, August 6, 2021, at p. 1563, lines 12-16 (Thomas Watkins).

[298] *See* Transcript, Volume 7, August 16, 2021, at p. 2693, lines 1-13 (Richard Amoroso).

[299] *See* Exhibit J-20, Joint Engagement Letter at p. 8, SULLIVAN011074 (emphasis added).

[300] *See* Exhibit J-20, Joint Engagement Letter at SULLIVAN011079.

October 2019.[301]  Mr. Feldman responded by stating that it was "impossible" – that Mr. Feldman "would not assist a client in [allegedly] defaulting on obligations to another client."[302]  Mr. Feldman represented falsely that "it was impossible to liquidate the captives before the end of the term" of the Joint Engagement Letter.[303]  Feldman and Capstone had, in fact, offered and effectuated a "special, earlier liquidation" for another captive client.[304]

Mr. Feldman also testified falsely that "PoolRe's direction has always been, if you want to come into the pool, come into the pool but once you come into the pool, you're in the pool and you are subject to the contract and PoolRe is not interested in renegotiating it."[305]  Mr. Feldman knew that this testimony was false.  Mr. Feldman was personally involved in assisting PoolRe re-negotiate its Quota Share Agreements, through the execution of "Claims Reserve Payment Agreements" and "PoolRe Release Letters," with numerous other captive clients to effectuate those captive clients' early liquidations.[306]

Mr. Feldman did not even broach the topic of an early liquidation of the Doctors' captives

---

[301] *See* Transcript, Volume 1, August 3, 2021, at p. 274, lines 18-20 (Dr. Sullivan); *see* Exhibit FC-549, E-mail from David Kushner (Oct. 31, 2019); Exhibit FC-260, E-mail from David Kushner (Oct. 30, 2019).

[302] *See* Transcript, Volume 1, August 3, 2021, at p. 274, line 21 – p. 275, line 1 (Dr. Sullivan).

[303] *See* Transcript, Volume 1, August 3, 2021, at p. 281, lines 5-9 (Dr. Sullivan).

[304] *See* Exhibit DRS 2570, E-mail from Jeff Carlson (Feb. 19, 2020); *see also* Transcript, Volume 8, August 17, 2021, at p. 2958, line 4 – p. 2962, line 16 (Richard Amoroso).

[305] *See* Transcript, Volume 13, August 22, 2021, at p.p 5031, line 22 – p. 5039, line 14 (Stewart Feldman).

[306] *See* Exhibit DRS 2003, Claims Reserve Payment Agreement and PoolRe Release Letters; *see also* Transcript, Volume 22, October 1, 2021, at p. 8960, line 12 – p. 8962, line 8 (Robert Snyder).  Robert Snyder testified as to how the Claims Reserve Payment Agreements modified the Quota Share Agreements by transferring the obligations from the captive to the captive's owner. *See* Transcript, Volume 22, October 1, 2021, at p. 8962, line 9 – p. 8968, line 14 (Robert Snyder).  Robert Snyder also perjured himself at the Dorfman trial by testifying that in order to let the Doctors' captives out of the pool, all other captives participating in the pool would have to agree, which Mr. Snyder knew to be false.  *See* Transcript, Volume 22, October 1, 2021, at p. 8978, line 13 – p. 8980, line 17 ("ARBITRATOR KUTCHER: But we've seen these documents where there is no consent from the other captives to let these captives out.  ***I'm stunned that you would testify to Judge Dorfman as an expert that you need signatures for more approval from all the captives to let a captive out when you've got an Exhibit 2003 document showing you let – PoolRe let captives out without other captives' consent***.") (emphasis added)).

with the Doctors or anyone at PoolRe.[307]  Before filing suit against the Doctors, Mr. Feldman did

not discuss with anyone from PoolRe the possibility of entering into a Claims Reserve Payment

Agreement with the Doctors,[308] just as Feldman and PoolRe had done for thirteen other clients in

the span of merely two years.[309]

Under Texas law, "[d]isobeying a client's lawful instruction has been routinely recited to

be a malpractice claim."[310]  The Doctors made a lawful request for a wind-down as contemplated

by the Joint Engagement Letter.[311]  And in response, their lawyer lied.  Mr. Feldman stated that

what the Doctors were requesting was impossible when he knew it could be done and had been

done often for other clients by Feldman and PoolRe.

Feldman made no effort to accomplish (or even see if PoolRe would be willing to allow)

an early wind-down just as he and PoolRe had accomplished for numerous other clients.  And it

would have been incredibly easy for Feldman to facilitate the early liquidation of the Doctors'

captives.[312]  Pool losses and administrative expenses (the only liabilities that needed to be resolved

before the captives can liquidate)[313] were historically non-existent or *de minimis*.[314]  From 2008 to

---

[307] *See*, *e.g.*, Transcript, Volume 1, August 3, 2021, at p. 280, line 21 – p. 281, line 13 (Dr. Sullivan); Transcript, Volume 8, August 17, 2021, at p. 2962, line 17 – p. 2963, line 7 (Richard Amoroso).

[308] *See*, *e.g.*, Transcript, Volume 22, October 1, 2021, at p. 8967, line 16 – p. 8969, line 21; p. 8972, lines 1-16 (Robert Snyder).

[309] *See* Exhibit DRS 2006, Chart Summarizing Dates of Claims Reserve Payment Agreements executed by PoolRe.

[310] *See Isaacs v. Schleier*, 356 S.W.3d 548, 557 (Tex. App. – Texarkana 2011) (collecting cases).

[311] Judge Dorfman held that the Doctors did not breach the contract by requesting that Capstone wind down and liquidate the captives more or less immediately.  *See* Exhibit J-115orfman's Final Award at ¶¶ 31, 32.

[312] The PoolRe agreements contemplate early termination from the pool, stating, "Any intent to liquidate or wind up or notice of same terminates participation in the Risk Pool unless expressly waived in writing by PoolRe making specific reference to this Paragraph 3.B." *See* Transcript, Volume 22, October 1, 2021, at p. 8920, lines 11-19 (Robert Snyder). Reinsurance industry custom and practice made it feasible to allow the captives to exit the pool early. *See* Transcript, Volume 11, August 20, 2021, at p. 4285, line 16 – p. 4291, line 15 (Pete Rauner).

[313] *See* Transcript, Volume 22, October 1, 2021, at p. 8952, lines 13-17 (Robert Snyder).

[314] As Arbitrator Kutcher astutely noted: "[I]sn't the object of this entire exercise, entire turn-key operation, to write policies which create sufficient risk to satisfy IRS requirements but ***are not likely to be called upon for payment of claims*** – ***as opposed to a straight-up malpractice claim*** or a car accident claim?"  *See* Transcript, Volume 13, August 22, 2021, at p. 4927, line 13 – p. 4928, line 3 (Arbitrator Kutcher) (emphasis added).

2016, pool participants bore **no losses and no administrative expense**.[315]  And in 2017, the Doctors' quota share of Pool administrative expense was "short of $1,800," and their share of claim losses was only about $29,155.[316]  In the history of PoolRe, there has never been a funding call, meaning that the pool participants' retained premiums held in trust by Capstone, as administrator of PoolRe, had always been sufficient to pay all losses and expenses of the pool.[317]

The fact that PoolRe is now attempting to charge 2019 pool participants _millions of dollars_ for claims handling and administrative expenses raised red flags in the mind of the Doctors' actuarial expert, Pete Rauner.[318]  Mr. Rauner conducted an actuarial estimation of the maximum, worst-case liability to the 2019 pool and determined that PoolRe was retaining sufficient premium "well beyond the range . . . of reasonable expectation" to cover the liabilities that could possibly be incurred by the 2019 pool.[319]  Considering Mr. Rauner's testimony, there is no good faith explanation for Feldman's failure to assist the Doctor's in their request for a wind-down.  Instead, the only reason that Feldman refused to assist was to trap the Doctors in the pool and use their funds to pay for Feldman's malpractice liabilities and legal expenses.

The Doctors' reinsurance expert, Mr. Amoroso, opined that Feldman breached fiduciary duties by failing to assist the Doctors with their request for a liquidation.[320]  Feldman failed to

---

[315] *See Reserve Mech. Corp. v. Comm'r*, 115 T.C.M. 1475, 2018 WL 3046596, at *9 (T.C. 2018) ("Reserve's general ledger reflects that Reserve bore no losses under the quota share policy for 2008. . .  For 2009 and 2010 Reserve recorded no losses in connection with the quota share policies."); *see also* Transcript, Volume 11, August 20, 2021, at p. 4372, line 14 – p. 4376, line 9 (Pete Rauner) (citing Exhibit DRS-2277, FCP's Supplemental Joint Objections and Responses to Doctors' First Set of Discovery Requests at Response to Interrogatory No. 7; Exhibit DRS-524, Capstone Memorandum regarding 2016 Risk Pool Final Settlement (Sept. 11, 2017).

[316] *See* Transcript, Volume 11, August 20, 2021, at p. 4376, line 10 – p. 4377, line 10 (Pete Rauner).

[317] *See* Transcript Volume 22, October 1, 2021, at p. 8784, lines 19-23 (Robert Snyder) (citing Exhibit-DRS 525, Capstone Memo regarding 2017 Risk Pool Final Settlement).

[318] *See* Transcript, Volume 11, August 20, 2021, at p. 4378, line 11 – p. 4379, line 6 (Pete Rauner).

[319] *See* Transcript, Volume 11, August 20, 2021, at p. 4301, line 4 – p. 4317, line 13 (citing Exhibit-DRS 2538, Pete Rauner's February 4, 2021 Disclosure; Exhibit DRS-1563, Doctors' Proposed Escrow Agreement); *see also* Exhibit-DRS 2545, Pete Rauner's Updated Disclosure, Dated July 31, 2021.

[320] *See* Transcript, Volume 7, August 16, 2021, at p. 2693, line 1 – p. 2700, line 5 (Richard Amoroso).

exercise "that degree of care, skill, and diligence that professionals of ordinary skill and knowledge commonly possess and exercises."[321] That failure is the essence of legal malpractice.

### D.    Feldman's legal malpractice caused the Doctors to incur damages.

For all the reasons addressed in Section I(C) above, the Doctors' damages are causally connected to Feldman's legal malpractice. These losses arise based on Feldman's breaches of his professional obligations, as well as "misconduct" based on "dishonesty, fraud, deceit, or misrepresentation."[322]  The Doctors would never have engaged Feldman or Capstone had Feldman adequately disclosed all material information, including that Feldman had (1) implemented a scheme to get his clients to pay for Feldman's malpractice liabilities and legal expenses, (2) the adverse audit findings by the IRS regarding Reserve Mechanical and six other Capstone-administered captives, and (3) the promoter audit of Mr. Feldman.[323]  All damages, costs, and fees incurred by the Doctors, as calculated by Mr. Legier, would have never been incurred but for the legal malpractice of Feldman.[324]

### II.    Feldman and Capstone committed intentional or, alternatively, negligent misrepresentations regarding IRS scrutiny of the Capstone captive program, the promoter audit of Mr. Feldman, and the presence of Feldman's and Capstone's primary malpractice policies in the risk pool.

---

[321] *See Issacs v. Schleier*, 356 S.W.3d 548, 556 (Tex. App.—Texarkana 2011).

[322] *See* Exhibit DRS-1540, Texas Rules of Professional Conduct, at p. 117, SULLIVAN 019494.

[323] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

[324] Feldman placed undue emphasis upon the decision by the Texas Chief Disciplinary Counsel's office not to pursue the bar complaint filed by the Doctors against Mr. Feldman.  Bar proceedings have no *res judicata* effects. *See Gonzalez v. State Bar of Texas*, 904 S.W.2d 823, 830 (Tex. App. – San Antonio 1995); *Comm'n for Lawyer Discipline v. Stern*, 355 S.W.3d 129, 138 (Tex. App. – Houston [1st Dist.] 2011). Bar proceedings are not adversarial proceedings, and "the Grievance Committee is not designed or equipped by the rules and regulations of the State Bar Act to conduct a trial." *Gonzalez*, 904 S.W.2d at 830 (quoting *Smith v. Grievance Committee, State Bar of Texas*, 475 S.W.2d 396, 399 (Tex. App. – Corpus Christi 1972)).  Bar proceedings do not feature live testimony or oral arguments, and the rules limit the volume of materials that may be submitted. Moreover, bar grievance committees "will dismiss any grievance which is filed in the midst of a piece of litigation." *See* Transcript, Volume 4, August 6, 2021, at p. 1685, lines 9-17; p. 1687, lines 3-10 (Thomas Watkins).   Further, the Doctors did not have the benefit of discovery at the time the grievance was originally submitted.  The details regarding the promoter audit and the nondisclosure of the adverse Reserve Mechanical audit were not provided until months after the grievance was lodged.

Feldman and Capstone intentionally misrepresented their track record before the IRS by failing to adequately disclose the specific adverse audit findings by the IRS and the IRS's pending promoter exam of Mr. Feldman, as discussed in Section I(B)(2) and I(B)(3) above. And Feldman and Capstone intentionally misrepresented the types of policies in the pool and suppressed the material fact that the pool covered Feldman's and Capstone's primary malpractice liabilities and defense expenses, as discussed in Section I(B)(1) above.

Feldman and Capstone's misrepresentations and failures to disclose material information to their clients constitutes fraud. Alternatively, Feldman and Capstone engaged in negligent misrepresentations concerning the soundness of the Capstone captive program and the extent of Feldman's and Capstone's actual participation, and the types of policies included, in the pool.

### A.    Feldman and Capstone are liable to the Doctors and Class Members for their fraudulent misrepresentations.

There are four elements to a fraud claim under a Texas law. A plaintiff must establish (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result.[325]

Importantly, Texas law does not limit fraud claims to the context of affirmative misstatements. Rather, "silence may be equivalent to a false representation" if the "particular circumstances impose a duty on the party to speak and he deliberately remains silent."[326] In turn,

---

[325] *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (citations omitted); *Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 695 (Tex. App. – Houston [1st Dist.] 2003) (citing *Formosa Plastics Corp. USA v. Presidio Engs. & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998) (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)); *Alexander v. Kent*, 480 S.W.3d 676, 693 (Tex. App.—Fort Worth 2015); *Woodhaven Partners, Ltd. v. Shamoun & Norman, L.L.P.*, 422 S.W.3d 821, 838 (Tex. App.—Dallas 2014).

[326] *See Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (citing *SmithKline Beecham Corp. v. Doe*, 903 S.W.3d 347, 353 (Tex. 1995); *Smith v. Nat'l Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979)).

a duty of disclosure arises from a fiduciary relationship, which arises as a matter of law in the context of an attorney-client or agent-principal relationship.[327]  Moreover, making a *partial* disclosure that conveys a false impression also provides a basis for fraud.[328]  With these considerations in mind, Feldman and Capstone fraudulently concealed the truth from the Doctors.

### 1.   **Feldman and Capstone made false material representations.**

As detailed in Section I(B) above, Feldman and Capstone made a series of false representations to the Doctors, and these representations were material.  Had Feldman and Capstone exercised absolute perfect candor and the absence of concealment and deception, the Doctors would not have agreed to sign the Joint Engagement Letter.  The Doctors executed the Joint Engagement Letter in the errant belief, cultivated by Feldman and Capstone, that Feldman had a flawless track record in his dealings with the IRS, and that Mr. Feldman was above reproach.

Feldman and Capstone made a series of misrepresentations by omission and by half-truths. This material misrepresentations include:

> ➢ Feldman and Capstone misrepresented the extent and nature of their participation in the risk pool.  Exhibit E to the Joint Engagement Letter stated only that Feldman's and Capstone's "affiliated captives may participate in the pool."[329]  They further represented that the pool consisted of "generally similar policies covering generally similar risks."[330]  But Feldman and Capstone *never disclosed that they had their primary malpractice coverages in the pool*.  Feldman and Capstone never disclosed that if the Doctors sued Feldman or Capstone for malpractice, the Doctors would have to pay a portion of Feldman and Capstone's defense expenses and liabilities.

> ➢ Feldman and Capstone misrepresented their track record in dealing with the IRS. Feldman and Capstone failed to disclose that the very framework of the Capstone captive program was jeopardized by a series of adverse audit findings.  Feldman and Capstone *never identified the specific findings by the IRS that the Capstone-*

---

[327] *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (citing *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003).

[328] *See Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App – Houston [14th Dist.] 1997) (citing *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 941 S.W.2d 138, 146-47 (Tex. App. – Corpus Christi 1995), *rev'd on other grounds*, 960 S.W.2d 41 (1997)).

[329] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.

[330] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit E, SULLIVAN 011104.

***administered captive failed to constitute bona fide insurance***, and instead, merely implied that any adverse actions were the result of a rogue IRS agent.[331]

➢ Feldman and Capstone never disclosed the promoter audit of Mr. Feldman. Mr. Feldman also failed to respond when Mr. Kushner sent him an article about promoter audits just two months after the IRS commenced its promoter audit of Mr. Feldman.[332]

Any one of these misrepresentations-by-silence, much less all of them, provides the factual predicate for the Doctors' fraud claim.

## 2. <u>Feldman and Capstone knew that their representations were false, or at the very least, misleading.</u>

Feldman and Capstone crafted their disclosures to reveal as little negative information as possible. Adverse details were either ignored outright (*i.e.,* the reinsurance of Feldman's malpractice policies), or ambiguously phrased to provide no actionable information (*i.e.,* Paragraph G to the Joint Engagement Letter, which failed to identify the promoter audit).

Mr. Cohen of the Feldman Law Firm served as the IRS's point of contact concerning the Reserve Mechanical audit, and he helped prepare a letter which acknowledged the IRS's adverse findings as to the legitimacy of the PoolRe risk pool, in addition to its adverse findings regarding the captives.[333] Mr. Cohen testified that Mr. Feldman was aware of the adverse findings in the Reserve Mechanical audit long before the Joint Engagement Letter with the Doctors was executed.[334] Mr. Feldman was aware of the promoter audit notice.[335] And Mr. Feldman was aware of the role played by the A.M.Y. policies which insured his and his family's various business interests – indeed, Mr. Feldman masterminded the scheme whereby his clients would unwittingly

---

[331] *See* Exhibit J-20, Joint Engagement Letter, at Exhibit C, SULLIVAN 011102.

[332] *See* Transcript, Volume 20, September 29, 2021, at p. 8025, line 21 – p. 8026, line 11 (David Kushner).

[333] *See* Exhibit DRS-1874, Letter, September 3, 2013, at Joint-339385.

[334] *See* Transcript, Volume 21, September 30, 2013, at p. 8529, line 10 – p. 8530, line 9 (Steven Cohen).

[335] *See* Exhibit DRS-1921, E-mail from Stewart Feldman, July 14, 2015 ("before sending it out wholesale, I will send it to ethics counsel"); *see also*, Transcript, Volume 19, September 28, 2021, at p. 7695, line 16 – p. 7696, line 13 (James McCormack).

subsidize his litigation expenses.

### 3.    Feldman and Capstone intended to induce the Doctors to rely upon their representations.

Feldman and Capstone intended that the Doctors would rely upon the affirmative representations made by Feldman and Capstone.  Feldman and Capstone also intended that the Doctors would rely upon the corresponding absence of negative information disclosed to them.

The Joint Engagement Letter operated, according to Mr. Watkins, as a "marketing piece. It constitutes an attempt to try to convince this client … how many times we've been successful, how good we've been in the past causes a client to believe that he doesn't need to worry about what the IRS is doing because of his complete success in the past of handling these kinds of things. And I believe it is the intent of this contract to allay the fears of the Doctors of what the IRS is doing."[336]   Feldman and Capstone expected that the Doctors to rely upon the puffed-up representations regarding the Capstone program, and the corresponding absence of red flags.

### 4.    The Doctors justifiably relied upon the false and misleading representations made by Feldman and Capstone.

The Doctors relied upon the misrepresentations made by Feldman and Capstone. Specifically, both Dr. Sullivan and Dr. DellaCroce testified that they would not have signed the Joint Engagement Letter if Feldman and Capstone had fully disclosed (1) the placement of Feldman's primary malpractice policies in the risk pool, (2) the specific adverse findings of the Reserve Mechanical audit and six other similar audits, or (3) the 2015 promoter audit of Mr. Feldman.[337]   Thus, the Doctors satisfied all elements of a fraudulent misrepresentation claim against Feldman and Capstone.

---

[336] *See* Transcript, Volume 4, August 6, 2021, at p. 1496, line 11 – p. 1497, line 3 (Thomas Watkins).

[337] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

**B.** **Alternatively, Feldman and Capstone are liable to the Doctors for negligent misrepresentations to the Doctors.**

In the alternative, the facts discussed above give rise to a claim of negligent misrepresentation in favor of the Doctors against Feldman and Capstone. The elements of a claim of negligent misrepresentation include: (1) the defendant made a representation to the plaintiff in the course of the defendant's business, or in a transaction in which the defendant had an interest; (2) the defendant provided false information for the guidance of others; (3) the defendant failed to exercise reasonable care or competence in obtaining or communicating information; (4) the plaintiff justifiably relied upon the defendant's representation; and (5) the negligent misrepresentation proximately caused the plaintiff's injury.[338]

Here, the first element is satisfied: Feldman and Capstone made representations to the Doctors in the course of soliciting the Doctors' business with respect to a reinsurance transaction in which Feldman and Capstone each had an interest, as discussed in Section I(B) above. The second element is also satisfied, as the representations made by Feldman and Capstone were false, as also discussed in Section I(B) above. The third element – the lack of reasonable care – is also satisfied, as discussed in Section II above. The same considerations that support a finding of legal malpractice also support this element of the negligent misrepresentation claim. The remaining elements (reliance and proximate cause of damages) mirror those previously analyzed in the context of fraud, as discussed in Section II(A)(3) & (4) above.

Therefore, while the Doctors submit that Feldman and Capstone engaged in fraud by intentionally suppressing vital information, at a bare minimum and in the alternative, the Doctors satisfy the elements of a negligent misrepresentation claim.

---

[338] *See Willis v. Marshall*, 401 S.W.3d 689, 698 (Tex. App.—El Paso 2013).

**III.    Feldman, Capstone, and PoolRe violated RICO by engaging in wire fraud to convert more than three million dollars from their clients' funds held in trust in the pool.**

The Racketeer Influenced and Corrupt Organizations Act ("RICO") imposes liability on culpable persons who conduct the affairs of an enterprise through a pattern of racketeering activity.[339]  The elements of a civil RICO claim are (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.[340]  Feldman, Capstone, and PoolRe established, conducted, and/or controlled an enterprise, FCP, that engaged in a pattern of racketeering activity resulting in more than $3 million of their clients' funds being converted for FCP's own purposes.

**A.    Feldman, Capstone, and PoolRe are "culpable persons" under RICO.**

In *Cedric Kushner Promotions, Ltd. v. King*, the U.S. Supreme Court explained that to establish RICO liability, "one must allege and prove the existence of two distinct entities: (1) a 'person;' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."[341]  The U.S. Fifth Circuit Court of Appeals has held that "[a]lthough a defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise."[342]

A "RICO person is the defendant, while a RICO enterprise can either be a legal entity or an association-in-fact."[343]  The U.S. Fifth Circuit Court of Appeals addressed "associations-in-fact" liable under RICO in *St. Paul Mercury Insurance Co. v. Williamson*.[344]  The court explained

---

[339] *See* 18 U.S.C. §§ 1961 *et seq.*

[340] *See Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007); 18 U.S.C. §1962.

[341] *See* 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001).

[342] *See St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000); *see also JMF Medical, LLC v. Team Health, LLC*, 490 F. Supp. 3d 947, 977 (M.D. La. 2020); *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 650 (S.D. Tex. 2016); *BAC Home Loans Servicing, LP v. Texas Realty Holdings, LLC*, 901 F. Supp. 2d 884, 919-20 (S.D. Tex. 2012).

[343] *See Williamson*, 224 F.3d at 440; *see also U.S. v. Turkette*, 452 U.S. 576, 581–82 (1981). The Fifth Circuit has noted that "this is a very broad definition." *See Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995).

[344] *See Williamson*, 224 F.3d at 440.

that, if the alleged enterprise is an association-in-fact, then the plaintiff "must show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure."[345]

Here, FCP acted as an ongoing organization functioning as a joint enterprise with respect to the following racketeering activities: (1) submitting and then refusing to investigate or close fraudulent claims in the risk pools, and (2) the wrongful taking millions of dollars of the captive clients' funds to pay for FCP's litigation fees and expenses.

The hierarchical decision-making structure of the "whole enterprise ultimately rolls up to" Stewart Feldman.[346] As discussed in more detail in Section VII below, Stewart Feldman ultimately controls and directs the operations of The Feldman Law Firm, Capstone, and PoolRe. These entities, collectively referred to as FCP, operated as an indistinguishable unit throughout these arbitrations and purposefully blurred the lines of distinction between them in order to convert pool funds for their collective defense. Feldman, Capstone, and PoolRe should each be held to be a culpable person liable under RICO for the fraud committed and the more than $ 3 million of their clients' funds converted by the association-in-fact, FCP.

/ / /

## B.    FCP engaged in a pattern of racketeering activity.

18 U.S.C. § 1961(5) defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity," occurring within ten years of the "commission of a prior act of racketeering activity."[347] A "pattern" consists of at least two predicate acts that are related to each

---

[345] *See Williamson*, 224 F.3d at 441.

[346] *See* Transcript, Volume 22, October 1, 2021, at p. 8846, line 25 – p. 8847, line 11 (Robert Snyder) (citing Exhibit DRS-192, *Reserve Mechanical* trial transcript).

[347] *See* 18 U.S.C. § 1961(5).

other and constitute or threaten long-term criminal activity.[348]    RICO defines "racketeering activity" broadly to encompass any of the state and federal offenses that are listed in 18 U.S.C. § 1961(1).  Wire fraud is included within the scope of racketeering activities.[349] The elements of wire fraud have been identified as: (1) a scheme to defraud; and (2) the use of, or causing the use of, wire communications in furtherance of that scheme.[350]

As detailed below, the record establishes each of these elements and the commission of multiple predicate acts through the wires.  The fraudulent claims were submitted and acknowledged via e-mails,[351] and the fraudulent taking of pool funds was perpetrated through ACH wire transfers.  The fraudulent scheme perpetrated by FCP through the wires warrants the imposition of RICO liability on each of Feldman, Capstone, and PoolRe.

### C.    FCP intended to perpetrate and perpetrated a scheme to defraud their clients.

A scheme to defraud is measured by a nontechnical standard.[352]  "It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society."[353]  The scheme "need not be fraudulent upon its face or misrepresent any material fact.  All that is necessary is that it be a scheme reasonably calculated to *deceive* persons of ordinary prudence and comprehension."[354]

Critical to a showing of a scheme to defraud is "proof that the defendant possessed a fraudulent intent."[355]  The U.S. Fifth Circuit has held that fraudulent intent "can be shown by

---

[348] *See Gilkey v. Livingston*, 2007 WL 1953456, at *4 (N.D. Tex. 2007).

[349] *See* 18 U.S.C. § 1343; *c.f. Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190-91 (1997).

[350] *See U.S. v. Rush*, 236 Fed. Appx. 944, 947 (5th Cir. 2007).

[351] Wire fraud, for RICO purposes, encompasses the use of e-mail.  *See U.S. v. Barraza*, 655 F.3d 375, 383 (5th Cir. 2011).

[352] *See U.S. v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973).

[353] *Bruce*, 488 F.2d at 1229 (quoting *Gregory v. U.S.*, 253 F.2d 104, 109 (5th Cir. 1958)).

[354] *Bruce*, 488 F.2d at 1229.

[355] *See U.S. v. Rush*, 236 Fed. Appx. 944, 947 (5th Cir. 2007).

providing that the defendant contemplated or intended some harm to the property rights of his victims."[356]  Further, "Direct proof of a fraudulent intent is often unavailable, so circumstantial evidence may be used to prove fraudulent intent."[357]

Here, the record evidence is far more than circumstantial in establishing that FCP perpetrated a scheme to: (1) lure their clients into PoolRe's risk pools based on material misrepresentations and concealment regarding the coverages in the pool; (2) prevent their captive clients from exiting PoolRe's risk pools; and (3) to use their clients' funds to wrongfully pay for FCP's legal fees and costs incurred in these arbitrations. This fraudulent scheme has inflicted significant damages to the pool participants who are unwittingly paying for their own lawyers' and captive manager's malpractice defense and legal expenses.

### 1.    FCP perpetrated a fraudulent scheme to lure its captive clients into PoolRe's risk pools.

FCP lured the Doctors and other captive clients into PoolRe's risk pools based on material misrepresentations regarding the risk pools.  As discussed in Section I(B)(2) above, Feldman and Capstone made misrepresentations and suppressed material information related to the alleged tax benefits and success of the risk pool in qualifying clients for beneficial tax treatment.  And as discussed in Section I(B)(1) above, Feldman and Capstone made misrepresentations regarding the types of policies in the pool and concealed material information concerning Feldman and Capstone's use of the pool for their primary malpractice and legal expense coverages.

Wire fraud claims can be based on fraudulent omissions where the defendant has a duty to disclose the omitted facts.[358] And here, Feldman and Capstone breached their duties to disclose to

---

[356] *Rush*, 236 Fed. Appx. at 947.

[357] *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 454 (Tex. App. 2012); *see also Roland v. U.S.*, 838 F.2d 1400, 1402-1403 (5th Cir. 1988).

[358] *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) (citing *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002)).

their clients that the risk pool was providing Feldman and Capstone with their primary malpractice coverages and that the risk pool could be used as a mechanism to prevent the liquidation of captive clients, trapping those clients into paying FCP's legal fees and expenses in perpetuity and in unlimited amounts.[359]

## 2.    FCP perpetrated a fraudulent scheme to prevent captive clients from exiting the PoolRe risk pools.

Shortly after the June 18, 2018 *Reserve Mechanical* decision was released, *Forbes* published an article advising participants in PoolRe to "**Get Your Money Out of the Risk Pool Immediately**."[360] The author of the article ominously described unscrupulous captive managers trapping their clients in risk pools and using their clients' money to fight against their clients:

> Indeed, I have seen evidence to suggest that at least some captive managers have been using their risk pools to write insurance policies to themselves for things such as tax liability and also errors & omissions (E&O) and directors & officers (D&O) insurance, such that theoretically the captive manager could make claims against the risk pool to pay the manager's own tax liabilities and fight their clients' lawsuits – with their clients' own money.[361]

Unbeknownst to the Doctors, Capstone and Feldman had *already* implemented a scheme to use the PoolRe risk pools to pay their legal fees incurred in lawsuits brought by or against their clients and to trap their captive clients in PoolRe's risk pools.

With its entire captive program in peril, FCP trapped its captive clients in the risk pool and have attempted to force those clients into paying for FCP's continuously accruing litigation fees

---

[359] *See* Transcript, Vol 4, August 6, 2021, at p. 1539, line 24 – p. 1543, line 11; p. 1552, line 16 – p. 1553, line 12; p. 1621, lines 10-14; p. 1639, lines 2-10 (Thomas Watkins); Transcript, Volumes 6 & 7, August 9 & 16, 2021, at p. 2383, lines 8-17; p. 2415, lines 5-13; p. 2439, lines 3-16; p. 2447, line 14 – p. 2448, line 18; p. 2489, line 11 – p. 2490, line 7; p. 2497, line 24 – p. 2498, line 10; p. 2508, line 22 – p. 2509, line 7; p. 2510, line 19 – p. 2511, line 3 (Richard Amoroso).

[360] *See* Transcript, Volume 1, August 3, 2021, at p. 294, line 10 – p. 303, line 2 (Dr. Scott Sullivan) (citing Exhibit DRS-74, *Forbes* article, June 25, 2018).

[361] *See* Transcript Volume 1, August 3, 2021, at p. 301, line 4 – p. 303, line 2 (Dr. Scott Sullivan) (citing Exhibit DRS-74, *Forbes* article, June 25, 2018 at SULLIVAN01629) (emphasis in original)).

and expenses in fighting against their clients.[362]  The only claims keeping the 2019 risk pool open are FCP's own claims fraudulently included or kept open in the risk pool.[363]  The clients trapped in the risk pool as a result of these fraudulent actions provided proper notice to Feldman, Capstone, and PoolRe of their intent to terminate and wind-down their captives.[364]

Feldman and Capstone's responses (or lack thereof) to their clients' requests for a wind-down establishes Feldman and Capstone's intent to trap their clients.  An example of Feldman and Capstone's disregard of their obligation to "stand ready to assist" their clients' request of "shutting down" their captives than Feldman's and Capstone's internal response to Dr. Le's request to shut down her captive, Family Casualty:[365]

```
Date: Thu, 24 Jan 2019 19:50:21 +0000
From: Jeff Carlson <JCarlson@capstoneassociated.com>
To: Capstone Operations <CapO@capstoneassociated.com>
Subject: FW: [EXTERNAL] Re: Family Casualty Corp - liquidation

Team, per instruction from SAF, no response or action required at this time in response
to Dr. Le email below. Business as usual.
Thanks, JC
```

To trap their clients in the risk pool, Feldman and Capstone submitted and opened at least twenty-one separate claims under their professional liabilities, errors & omissions, and legal

---

[362] According to FCP, as long as the captive clients remain trapped in the risk pool, the captive clients can be continuously charged a share of FCP's continually accruing legal fees and expenses.  *See, e.g.* Transcript, Volume 23, October 2, 2021, at p. 9233, line 2 – p. 9234, line 21; p. 9256, line 1 – p. 9257, line 1 (Jeff Carlson).

[363] *See* Transcript, Volume 7, August 16, 2021, at p. 2527, line 6 – p. 2530, line 2 (Richard Amoroso) ("[T]he only claims preventing the 2019 risk pool from closing . . . were claims files by the Feldman Law Firm and/or Capstone."); Transcript, Volume 23, October 2, 2021, at p. 9232, lines 15-20 (Jeff Carlson).

[364] *See* Transcript, Volume 23, October 2, 2021, at p. 9196, line 13 – p. 9205, line 20; p. 9221, line 24 – p. 9229, line 23 (Jeff Carlson).

[365] *See* Exhibit DRS-2496, E-mail from Jeff Carlson to Capstone Operations (Jan. 24, 2019) (emphasis added); *see also* Transcript, Volume 23, October 23, 2021, at p. 9196, line 13 – p. 9199, line 16 (Jeff Carlson). Feldman and Capstone's form Engagement Letter with their captive clients provide that Feldman and Capstone stand ready and willing to assist if the client wishes to shut down their captives. *See, e.g.,* Exhibit J-20 at SULLIVAN011073, Joint Engagement Letter with the Doctors at p. 8; Exhibit DRS-2245 at Joint-421887, Joint Engagement Letter with the Family Parties at p. 7.

expense policies included in the risk pool.[366]  FCP's reinsurance expert, Phil Cabaud, testified that if Capstone or Feldman do not want to seek reimbursement for their open claims, they could leave those claims open and lock the captives in the pool indefinitely.[367]  That unconscionable scenario is precisely what FCP has done.  The claims submitted by Capstone and Feldman to the 2019 pool were fraudulent when submitted and/or have been fraudulently kept open.

### i.    Capstone and Feldman fraudulently backdated claims regarding the Doctors to the 2019 risk pool.

Feldman and Capstone's intent to defraud is established by Capstone and Feldman's handling (or non-handling) of claims regarding the dispute with the Doctors kept unjustifiably open in the 2019 risk pool.  On June 10, 2020, Feldman's and Capstone's Controller, Paul Franks, e-mailed the Capstone Insurance Department the New Claim Report regarding the dispute with the Doctors.[368]  The New Claim Report regarding the Doctors provides a fraudulent date of loss as of December 31, 2019 and described the loss as follows:[369]

> Insureds may be potentially counter-sued by Janus Insurance Corp., Cerberus Insurance Corp., Orion Insurance Corp., Center for Restorative Breast Surgery, LLC,  St. Chalres Surgical Hospital, and/or related persons or entities alleging Breach of Fiduciary Duty (Claim No. 45). Reserve for $1,000 for Legal Expense.

It is undisputed that the Doctors did not sue or counter-sue Capstone or Feldman at any time in the 2019 calendar year.[370]  Nonetheless, Capstone opened multiple claims in the 2019 pool

---

[366] *See* Transcript, Volume 11, August 20, 2021, at p. 4318, line 7 – p. 4320, line 1 (citing Exhibit DRS-2000, 2019 Claims Summary Chart); Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart A. Feldman (June 6, 2020, 17:17 CST); Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[367] *See* Transcript, Volume 18, September 24, 2021, at p. 7238, line 21 -7239, line 4; p. 7243, line 1 – p. 7250, line 8 (Phil Cabaud).

[368] *See* Exhibit DRS-1463, E-mail from Paul Franks (June 10, 2020, 17:08 CST) (citing Exhibit DRS-564).

[369] *See* Exhibit DRS-564, New Claim Report for the Dispute with the Doctors.

[370] *See* Transcript, Volume 16, September 14, 2021, at p. 6392, lines 16-20 (Daniel Calderon).

relating to the arbitrations with the Doctors that did not commence until 2020.[371]

AMY's 2019 legal expense, errors & omissions, and professional liability insurance policies are "CLAIMS MADE POLIC[IES]."[372]  Capstone and Feldman first sued the Doctors on May 7, 20**20**.[373]  There was no litigation or arbitrations with the Doctors in 2019.  ***The Doctors' claims handling expert, Louis Fey, offered unrebutted expert testimony that the claims regarding the Doctors were not covered by the 2019 A.M.Y. policies***.[374] These claims had no business in the 2019 pool and should have been included, if anywhere, in the 2020 pool.

But the Doctors did not participate in the 2020 risk pool.[375]  Thus, Capstone and Feldman could not get the Doctors to pay Capstone and Feldman's claims for legal fees incurred in these arbitrations, or get the Doctors to pay for damages resulting from Capstone and Feldman's breach of fiduciary duties or errors & omissions to the Doctors, unless Capstone and Feldman fraudulently backdated the claims to the 2019 pool.  Nor could Feldman and Capstone use their dispute with the Doctors as the basis to deny the Doctors' request for a liquidation unless the claims were fraudulently kept open in the 2019 pool.

With fraudulent intent, Capstone and Feldman submitted a backdated New Claim Report for the dispute with the Doctors listing an alleged date of loss of December 31, 2019.[376]  No record evidence supports any loss occurring on that date or at any time in 2019.[377]

---

[371] *See* Exhibit DRS-1460, Capstone's Arbitration Demand against the Doctors in the Dorfman Arbitration.

[372] *See* Exhibit DRS-2108, AMY's 2019 Errors & Omissions Insurance Policy at Joint-331505; Exhibit DRS-2110, AMY's 2019 Legal Expenses Reimbursement Policy at Joint-331780; Exhibit DRS-2109, AMY's 2019 Lawyers Professional Liability Insurance Policy at Joint-331732.

[373] *See* Exhibit DRS-1460, Capstone's Arbitration Demand against the Doctors in the Dorfman Arbitration.

[374] *See* Transcript, Volume 8, August 17, 2021, p. 3103, lines 10-23; p. 3110, line 13 – p. 3111, line 4 (Louis Fey).

[375] *See* Transcript, Volume 22, October 1, 2021, at p. 8786, lines 19-21 (Jeff Carlson).

[376] *See* Exhibit DRS 564, New Claim Report for Dispute with the Doctors.

[377] On May 7, 2020, Capstone sued the Doctors in the Dorman Arbitration for alleged breach or anticipatory breach of the parties' agreements regarding the Doctors' request in 2019 that Capstone and Feldman wind down and liquidate the Doctors' captives. *See* Exhibit J-115, Final Arbitration Award at ¶ 31 (Nov. 9, 2020) (Dorfman Arbitration). Judge Dorfman denied Capstone' claim, ruling:

Capstone and Feldman's improper submission to, and scheme to keep open, the claims regarding the Doctors in the 2019 pool is fraudulent.   The 2019 A.M.Y. Legal Expense Reimbursement Insurance Policy only covers "Litigation Expenses" "*first expensed*" by Capstone or Feldman "*during the policy period*" (*i.e.*, 2019).[378]   Thus, for the legal expense reimbursement claim to be possibly included in the 2019 risk pool, Capstone and Feldman need to present an invoice for Litigation Expenses "first expensed" during the 2019 calendar year.[379]

Capstone and Feldman have not presented a single document reflecting an invoice first expensed in the 2019 calendar year regarding the dispute with the Doctors.   In fact, Capstone's President, Jeff Carlson, testified that Capstone did not obtain legal counsel with respect to the dispute with the Doctors until January 20*20*.[380]

Moreover, Capstone and Feldman submitted Affidavits regarding "all time entries" made by Feldman and Capstone that were invoiced relating to the first arbitration, the Dorfman Arbitration, with the Doctors.[381]   These Affidavits confirm that Capstone and Feldman did not invoice any time or incur any legal fees in the 2019 calendar year regarding the dispute with the

---

The Tribunal . . . **DENIES** Capstone's breach of contract action predicated on the breach or anticipatory breach by [the Doctors] requesting that their Captives be wound down and liquidated both quickly and substantially in advance of the Year End Termination Date.  *No breach occurred by [the Doctors] request, and no damages to [Capstone] flowed therefrom*.

*Id.* at ¶ 32 (emphasis added and in original).  Thus, Capstone cannot demonstrate any damage or loss occurring in the 2019 calendar year relating to the dispute with the Doctors.  Judge Dorfman already ruled in his Final Arbitration Award that no damages resulted from the Doctors' mere request for a wind-down and liquidation.

[378] *See* Exhibit DRS 2110, AMY's 2019 Legal Expenses Insurance Policy at Joint-331789 (emphasis added); *see also* Transcript, Volume 8, Aug. 17, 2021, at p. 3086, line 23 – p. 3087, line 6 (Louis Fey). *See id.* at ¶ 32 (emphasis in original and added).

[379] *See id.* In its normal course of business, Capstone routinely demands invoices and denies other captives' claims when supporting documentation is not provided promptly. *See*, *e.g.*, Transcript, Volume 16, September 14, 2021, at p. 6286, line 15 – p. 6309, line 21 (Daniel Calderon).

[380] *See* Transcript, Volume 15, August 24, 2021, at p. 5719, lines 6-11 (Jeff Carlson).

[381] *See* Exhibit DRS-723, Joseph Greenberg's Affidavit at p. 6 (Dorfman Arbitration); Exhibit DRS-724, Andy Paredes' Affidavit at p. 6 (Dorfman Arbitration); *see also* Transcript, Volume 8, August 17, 2021, at p. 3094, line 10 – p. 3103, line 23 (Louis Fey).

Doctors.[382]  These facts establish that Feldman and Capstone's legal expense reimbursement claim regarding the Doctors has been fraudulently backdated and kept open in the 2019 pool.

Capstone and Feldman's actions in fraudulently keeping open in the 2019 risk pool claims relating to the 2020 arbitrations with the Doctors is part of a fraudulent scheme to keep the 2019 pool open and the Doctors trapped in FCP's unconscionable captive program.

### ii.    Capstone and Feldman fraudulently submitted and/or kept open numerous other claims in the 2019 risk pool.

On June 10, 2020 (*i.e.*, four days after Stewart Feldman directed Paul Franks and Daniel Calderon to submit A.M.Y.'s claims),[383] Paul Franks e-mailed the Capstone Insurance Department "six attached New Claim Reports for the Feldman Law Firm."[384]  Daniel Calderon, on behalf of the Capstone Insurance Department and PoolRe, confirmed, via e-mail, receipt of the claims.[385]

Five of these New Claims Reports submitted by Feldman and Capstone fraudulently listed a date of loss of December 31, 2019.[386]  No record evidence establishes any loss being incurred by Feldman or Capstone on that date or at any time in the 2019 calendar year.[387]  Each of these New Claim Reports described the alleged loss to Capstone and Feldman as follows: "[Capstone and Feldman] *may* be ***potentially countersued***" by a captive client of Feldman and Capstone.[388]

---

[382] *See* Exhibit DRS-723, Joseph Greenberg's Affidavit at p. 6 (Dorfman Arbitration); Exhibit DRS-724, Andy Paredes' Affidavit at p. 6 (Dorfman Arbitration); *see also* Transcript, Volume 8, August 17, 2021, at p. 3094, line 10 – p. 3103, line 23 (Louis Fey).

[383] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart Feldman (June 6, 2020, 17:17 CST)).

[384] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[385] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[386] *See* Exhibit DRS-560 to DRS-564, New Claim Reports submitted by Feldman and Capstone.

[387] The Doctors' claims handling expert, Louis Fey, provided unrebutted expert testimony that the claims submitted in Exhibit DRS-560 to DRS-564 were not covered by A.M.Y.'s 2019 policies. *See* Transcript, Volume 8, August 17, 2021, at p. 3051, line 8 – p. 3121, line 3 (Louis Fey).

[388] *See* Exhibit DRS-560 to DRS-564, New Claim Reports submitted by Feldman and Capstone (emphasis added).

A potential countersuit or suit *in the future* does not qualify as a legitimate claim.[389] And Capstone knew that a potential countersuit did not qualify as a legitimate claim. Indeed, Capstone, on behalf of PoolRe, denied another captive's request for legal expense reimbursement when that captive reported a "potential claim" under its 2019 legal expense reimbursement policy.[390] Feldman and Capstone knew that a potential counter-suit in the future was not a valid claim but nonetheless fraudulently submitted and kept open numerous "potential" claims in the 2019 pool.

Two of these six New Claim Reports e-mailed on June 10, 2020 and fraudulently opened in the 2019 pool pertained to disputes that Feldman and Capstone had *already settled*.[391] Capstone and Feldman knew that they were not going to be "potentially counter-sued by" the "Family Parties" or the "Logistics Parties" when Feldman and Capstone e-mailed New Claim Reports to PoolRe on June 10, 2020.[392] Months before Capstone and Feldman opened claims in the 2019 pool relating to these disputes, ***Capstone and Feldman executed Settlement Agreements with the Family Parties and the Logistics Parties***.[393]

These Settlement Agreements required the Family Parties and the Logistics Parties to "fully, finally, and forever, release, acquit, forever discharge, and ***covenant not to sue*** any of [the Capstone or Feldman] from and/or for any and all claims, demands, counterclaims, losses, actions,

---

[389] *See* Transcript, Volume 8, August 17, 2021, at p. 3055, lines 13-19 (Louis Fey).

[390] *See* Transcript, Volume 16, September 14, 2021, at p. 6307, line 3 – p. 6309, line 21 (Daniel Calderon) (discussing Exhibit DRS-2552, March 4, 2020 Denial Letter of HEC II Assurance's 2019 Legal Expense Reimbursement Claim).

[391] *See* Transcript, Volume 8, August 17, 2021, at p. 3071, line 7 – p. 3076, line 16 (Louis Fey) (citing Exhibit DRS-563, New Claim Report relating to Family Parties' Dispute); *see also* Transcript, Volume 8, August 17, 2021, at p. 3054, line 19 – p. 3062, line 13 (discussing Exhibit DRS-560, New Claim Report regarding Logistics Parties' Dispute).

[392] *See* Exhibit DRS-563, New Claim Report relating to the Family Parties' Dispute; Exhibit DRS-560, New Claim Report regarding Logistics Parties' Dispute.

[393] *See* Exhibit DRS-1430, Mutual Release and Settlement Agreement with the Family Parties (March 31, 2020); Transcript, Volume 8, August 17, 2021, at p. 3073, line 12 – p. 3076, line 16 (Louis Fey); *see also See* Exhibit DRS-1427, Mutual Release and Settlement Agreement with the Logistics Parties (May 1, 2020); Transcript, Volume 8, August 17, 2021, at p. 3057, line 9 – p. 3062, line 13 (Louis Fey).

complaints grievances, administrative or regulatory actions, costs and causes of action."[394] Feldman and Capstone's submission of already-settled claims regarding the Family Parties and the Logistics Parties to the 2019 pool was fraudulent.[395]

Paul Franks' e-mail on June 10, 2020 to the Capstone Insurance Department also submitted a fraudulent New Claim Report regarding Capstone and Feldman's alleged dispute with their the "XtraLight Parties."[396]  Capstone and Feldman _knew_ that they had not sued the XtraLight Parties when they submitted this fraudulent New Claim Report to A.M.Y. and PoolRe in June 2020.[397] Capstone and Feldman knew further that XtraLight Parties were not going to sue or counter-sue Feldman or Capstone alleging breach of fiduciary duty.  XtraLight Manufacturing declared bankruptcy in 2018, and their contracts, engagement letter, and insurance policies with Capstone and Feldman were discharged in that bankruptcy as of September 11, 2018.[398]

Despite the fact that the XtraLight Parties had neither sued or been sued by Capstone and Feldman for more than a year after this fraudulent New Claim Report was submitted, Capstone and Feldman have kept open claims in the 2019 pool relating to the XtraLight Parties.[399]  These

---

[394] _See_ Exhibit DRS-1430, Mutual Release and Settlement Agreement with the Family Parties at ¶ 5 (March 31, 2020) (emphasis added); Exhibit DRS-1427, Mutual Release and Settlement Agreement with the Logistics Parties at ¶ 5 (May 1, 2020) (emphasis added).

[395] According to the Doctors' claims-handling expert, Louis Fey, Feldman and Capstone's submission of the New Claim Reports regarding already-settled dispute raised a "red flag" and a "fraud indicator."  _See_ Transcript, Volume 8, August 17, 2021, at p. 3075, line 25 – p. 3076, line 16 (Louis Fey).  Feldman and Capstone may argue that the Family and Logistics claims were closed without payment from the risk pool in November 2020.  But Feldman and Capstone closed the A.M.Y. claims relating to the Family and Logistics Parties _after_ the Doctors filed arbitration demands and RICO claims challenging the fraudulent submission of these claims.  _See_ Transcript Volume 8, August 17, 2021, at p. 3292, line 5 – p. 3297, line 23 (Louis Fey). The submission of A.M.Y. claims regarding "potential future counter-suits" on matters already settled was fraudulent and constitutes additional predicate acts under RICO.

[396] _See_ Exhibit-DRS 562, New Claim Report regarding XtraLight Parties

[397] _See_ Transcript, Volume 8, August 17, 2021, at p. 3067, line 21 – p. 3071, line 6 (Louis Fey).

[398] _See_ Transcript, Volume 8, August 17, 2021, at p. 2945, line 13 – p. 2948, line 16 (Richard Amoroso); _see also_ Order Confirming Debtor's Plan at Exhibit A, _In re XtraLight Manufacturing, Ltd._, No. 18-31857 (S.D. Bank. Tex., Sept. 11, 2018) ("All executory contracts shall be deemed assumed, except the following contracts shall be deemed rejected: 1) Engagement Letter for Formation and Administration of a Captive Insurance Program with the Feldman Law Firm LLP dated November 11, 2011; 2) Contract with Capstone Associated Services, Ltd.; and 3) insurance policies and/or contracts with Illumination Casualty Corp.").

[399] _See_ Transcript, Volume 16, September 14, 2021, at p. 6310, line 12 – p. 6315, line 9 (Daniel Calderon).

facts "raised red flags of fraud" according to the Doctors' claims handling expert, Louis Fey.[400] The claims relating to the XtraLight Parties are still open in the 2019 pool, notwithstanding the complete lack of any loss incurred or sustained by Feldman or Capstone in the 2019 calendar year.[401]  Until these fraudulent claims are closed or denied, the Doctors' captives and other pool participants remain trapped in the 2019 pool.[402]

Feldman and Capstone have also fraudulently kept open in the 2019 risk pool claims relating to the "McAda Parties," the "Martinez Parties," and the "Enerset Parties."[403]  These claims should have been opened, if anywhere, in the 2018 risk pool.  The McAda Parties sent a demand letter to Stewart Feldman on December 7, 20*18*, referencing Feldman's violations of the Texas Rules of disciplinary conduct and Texas Penal Code, and stating that the McAda Parties may "seek all administrative and or legal remedies available to them" if their demands were not satisfied.[404] The Martinez Parties *filed a counter-petition in arbitration against Capstone in 2018*.[405]  And Feldman and Capstone first began incurring legal expenses relating to their arbitration dispute with the Enerset Parties in November 20*18*.[406]  Nonetheless, FCP have fraudulently kept these claims

---

[400] *See* Transcript, Volume 8, August 17, 2021, at p. 3070, lines 17-25 (Louis Fey).

[401] *See* Transcript, Volume 16, September 14, 2021, at p. 6310, line 12 – p. 6315, line 9 (Daniel Calderon).

[402] *See* Transcript, Volume 7, August 16, 2021, at p. 2527, line 6 – p. 2530, line 2 (Richard Amoroso) ("[T]he only claims preventing the 2019 risk pool from closing . . . were claims files by the Feldman Law Firm and/or Capstone or their insureds of the AMY, P&C captive."); Transcript, Volume 23, October 2, 2021, at p. 9232, lines 15-20 (Jeff Carlson); *see also e.g.* Transcript, Volume 23, October 2, 2021, at p. 9233, line 2 – p. 9234, line 21; p. 9256, line 1 – p. 9257, line 1 (Jeff Carlson).

[403] Capstone's Head of Operations, Daniel Calderon, testified about the A.M.Y. claims regarding the McAda Parties, the Enerset Parties, and the Martinez Parties at Transcript, Volume 16, September 14, 2021, at p. 6394, line 14 – p. 6435, line 8 (Daniel Calderon).

[404] *See* Exhibit DRS-2503, December 7, 2018 Demand Letter from McAda Parties; *see also* Transcript, Volume 16, September 14, 2021, at p. 6402, line 2 – p. 6409, line 1 (Daniel Calderon).

[405] *See* Transcript Volume 16, September 14, 2021, at p. 6423, lines 14 – p. 6424, line 4 (Daniel Calderon) (citing Exhibit DRS-1458, Martinez Parties' Counter-Petition). The counter-petition not only asserted numerous causes of action against Capstone, but also alleged failures and omissions on the part of the "Feldman Law Firm." *See* Exhibit DRS-1458, Martinez Parties' Counter-Petition at ¶ 6; *see also* Transcript, Volume 16, September 14, 2021, at p. 6421, line 12 – p. 6424, line 4 (Daniel Calderon).

[406] *See* Transcript, Volume 16, September 14, 2021, at p. 6426, line 19 – p. 6435, line 8 (Daniel Calderon).

regarding 2018 disputes with the Martinez, Enerset, and McAda Parties open in the 2019 pool.[407]

These claims remained open and unresolved in the 2019 risk pool at the conclusion of trial.[408]

Capstone and Feldman may argue that BakerHostetler determined in a July 15, 2021 memorandum that Feldman and Capstone's claims regarding disputes with the McAda, Enerset, and Martinez Parties are covered in the 2019 risk pool.[409]  But the July 15, 2021 BakerHostetler memorandum is flawed and unreliable.[410]  FCP retained BakerHostetler to be a "zealous advocate" of FCP's coverage positions.[411]  BakerHostetler was not an independent, third-party administrator, as would be appropriate.[412]

Further, BakerHostetler did not perform an independent review or analysis of the A.M.Y. claims.  According to BakerHostetler:

> [*W]e have not had an opportunity or been asked to independently analyze all of the facts relevant to each proceeding*.  Our review consisted only of reviewing claims files and policies provided by Pool Re and discussions with Pool Re's insurance manager, Capstone.  *We did not conduct independent legal research or analysis of the underlying claims*, including the facts upon which claims may be based.  We also were not instructed to nor did we review independent facts regarding the amount and/or veracity of the losses at issue for each insured for the six claims presented.[413]

Considering these disclaimers, the BakerHostetler memorandum is inherently unreliable.

Further, Daniel Calderon, Jeff Carlson, and Stewart Feldman all participated in deciding

---

[407] *See* Transcript, Volume 16, September 14, 2021, at p. 6436, line 16 – p. 6439, line 1 (Daniel Calderon).

[408] *See* Transcript Volume 16, September 14, 2021, at p. 6397, lines 5-14; p. 6436, line 7 – p. 6439, line 1 (Daniel Calderon).

[409] *See* Transcript, Volume 16, September 14, 2021, at p. 6270, line 12 – p. 6271, line 12 (Daniel Calderon); *see also* Exhibit FC-349, BakerHostetler Memo.

[410] Exhibit FC-349, BakerHostetler Memo.

[411] *See* Transcript, Volume 8, August 17, 2021, at p. 3271, line 7 – p. 3276, line 15 (Louis Fey).

[412] *See* Transcript, Volume 8, August 17, 2021, at p. 3037, line 8 – p. 3039, line 7; p. 3127, line 6 – p. 3128, line 16 (Louis Fey).

[413] *See* Exhibit FC-349, BakerHostetler Memo at p. 1 (emphasis added).

what materials to send to BakerHostetler relating to these claims.[414]  Daniel Calderon testified that he intentionally decided not to include the McAda Parties' December 2018 demand letter to Capstone and Feldman in the claims materials sent to BakerHostetler.[415]  Capstone and Feldman were also part of an "intentional decision . . . to not include [the Martinez Parties'] counterpetition dated December 2018 in [the] materials" sent to BakerHostetler.[416]  And Capstone intentionally omitted all invoices from the Enerset claims file sent to BakerHostetler, which would have shown that Capstone began incurring legal fees for that matter in 20**_18_**.[417]

*FCP manipulated the presentation of documentation to BakerHostetler to support FCP's preordained coverage decisions*.  The intentional omission of material documents sent to BakerHostetler represents additional evidence of fraudulent intent to support coverage in the 2019 pool for A.M.Y. claims that should never have been submitted or opened in the 2019 pool.

### iii.    FCP failed to conduct a prompt or diligent investigation of the A.M.Y. claims.

Capstone failed to promptly adjust (or deny) the fraudulent claims kept open in the 2019 pool.[418]  Daniel Calderon, who is responsible at Capstone for investigating the A.M.Y. claims,[419] testified that he had ***not even discussed the A.M.Y. claims with anyone at PoolRe almost fifteen months*** after Feldman and Capstone knew about the claims, or nine months after the claims were submitted.[420]  Six weeks into the Final Hearing, Capstone had still not made any legitimate attempt

---

[414] *See* Transcript, Volume 16, September 14, 2021, at p. 6409, line 25 – p. 6411, line 24; p. 6424, lines 1 – 25; p. 6426, lines 4-18; p. 6431, line 22 – p. 6432, line 5 (Daniel Calderon).

[415] *See* Transcript Volume 16, September 14, 2021, at p. 6410, lines 5-24 (Daniel Calderon).

[416] *See* Transcript, Volume 16, September 14, 2021, at p. 6426, lines 4-18 (Daniel Calderon).

[417] *See* Transcript, Volume 16, September 14, 2021, at p. 6426, line 19 – p. 6428, line 8 (Daniel Calderon).

[418] *See* Transcript, Volume 8, August 17, 2021, at p. 3028, lines 3-13; p. 3054, lines 12-18; p. 3060, line 23 – p. 3062, line 13; p. 3076, lines 17-22; p. 3130, line 25 – p. 3131, lines 16 (Louis Fey); Transcript, Volume 22, October 1, 2021, at p. 8765, lines 2-6 (Robert Snyder); *see also* Transcript Volume 23, October 2, 2021, at p. 9236, line 20 – p. 9240, line 21 (Jeff Carlson).

[419] *See* Transcript, Volume 15, August 24, 2021, at p. 5785, lines 10-14 (Jeff Carlson).

[420] *See* Transcript, Volume 16, September 14, 2021, at p. 6339, lines 1 – 22 (Daniel Calderon).

to determine whether the A.M.Y. claims were in fact covered by the 2019 pool.[421]

In fact, Mr. Calderon testified that there was an ***intentional decision***, involving himself, Robert Snyder, and Stewart Feldman, to delay resolution of the A.M.Y. claims pending resolution of these arbitrations.[422] FCP has kept the 2019 pool open with fraudulent claims that it refuses to investigate and, at the same time, contends that the 2019 pool participants are responsible for all of FCP's continuously accruing legal fees and costs until the claims are resolved, if ever.[423]

### 3. <u>FCP perpetrated a fraudulent scheme to convert its clients' money</u>.

To pay for FCP's legal fees and costs in these arbitrations, FCP wrongfully took: $250,000 of their captive clients' premiums from the 2018 risk pool;[424] in excess of $3 million of their captive clients' premiums from the 2019 risk pool;[425] and $62,498 of their captive clients' premiums from the 2020 risk pool.[426] FCP has also threatened future funding calls to be paid by their clients in <u>unlimited</u> amounts for additional fees and costs incurred by FCP adverse to their clients.[427] These activities establish FCP's fraudulent scheme implemented in June 2020, and continuing into the foreseeable future, regarding FCP's wrongful conversion of its own clients' money to pay for FCP's litigation fees and costs.

FCP has no right to use its clients' money to fund FCP's litigation activities. The risk pool

---

[421] *See, e.g.*, Transcript, Volume 16, September 14, 2021, at p. 6387, line 14 – p. 6388, line 12 (Daniel Calderon).

[422] *See* Transcript Volume 16, September 14, 2021, at p. 6174, line 1 – p. 6177, line 25; p. 6314, lines 16-22; p. 6436, line 7 – p. 6439, line 1 (Daniel Calderon).

[423] *See* Transcript, Volume 23, October 23, 2021, at p. 9233, line 2 – p. 9234, line 21; p. 9256, line 1 – p. 9257, line 1 (Jeff Carlson).

[424] *See* Exhibit-DRS 2543, Capstone's Final Report on the 2018 Risk Pool (July 27, 2021); *see also* Transcript, Volume 11, August 20, 2021, p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Transcript Volume 17, September 23, 2021, p. 6857, line 5 – p. 6858, line 18 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 8794, line 8 – p. 8795, line 6 (Robert Snyder); Transcript, Volume 7, August 16, 2021, at p. 2544, lines 3-12 (Richard Amoroso).

[425] *See* Transcript, Volume 18, September 24, 2021, at p. 7013, line 19 – p. 7014, line 9 (Jeff Carlson); Transcript, Volume 7, August 16, 2021, at p. 2552, line 5 – p. 2557, line 23 (Richard Amoroso).

[426] *See, e.g.*, Transcript, Volume 23, October 2, 2021, at p. 9171, line 11 – p. 9176, line 1 (Jeff Carlson).

[427] Capstone's President, Jeff Carlson, testified that there is no limit or cap on the amount of fees and expenses that FCP can charge to their clients for PoolRe's alleged administrative expenses. *See* Transcript, Volume 15, Aug. 24, 2021, at p. 5918, line 1 – p. 5920, line 9 (Jeff Carlson).

premiums are "the property of the [] pool participants" and were "held in trust by the administrator of PoolRe, which is Capstone."[428]   PoolRe's Director, Mr. Snyder, conceded that pool funds expended by FCP to pay for their fees and expenses in these arbitrations "is paid through the funds that each of the participating members of PoolRe have provided."[429]   The Feldman Law Firm and Capstone breached their duties and violated their clients' trust by taking their clients' money to fund FCP's litigation activities adverse to their clients.[430]

The two contracts between PoolRe and the captive clients are (1) the Quota Share Reinsurance Policy and (2) the Stop Loss Reinsurance Agreement.[431]   ***There is no provision in either of these agreements stating that the captives will pay PoolRe's attorneys' fees***.

The Stop Loss Reinsurance Agreement limits the coverages in PoolRe's risk pools solely to the direct written policies included in the pool:[432]

> THIS AGREEMENT SHALL NOT AND MAY NOT BE CONSTRUED TO PROVIDE ADDITIONAL COVERAGE BEYOND THAT EXPRESSLY CONTEMPLATED BY THE POLICIES ISSUED AND LISTED ABOVE, AND IS ONLY EFFECTIVE TO THE EXTENT SUCH POLICIES (AS DEFINED HEREIN OR IN THE COMMON POLICY CONDITIONS) REMAIN IN FULL FORCE AND EFFECT.

PoolRe is not an insured under any policy included in the risk pools.[433]   Nonetheless, FCP contends that the risk pools provide additional coverage to PoolRe for all of PoolRe's legal fees and expenses.   FCP's contention cannot be reconciled with the emphasized language above.

The Doctors' reinsurance expert, Richard Amoroso, testified that the PoolRe agreements

---

[428] *See* Transcript, Volume 6, August 9, 2021, at p. 2348, line 18 – p. 2349, line 16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

[429] *See* Transcript, Volume 22, October 1, 2021, at p. 8782, line 24 – p. 8783, line 5 (Robert Snyder).

[430] *See*, *e.g.*, Transcript, Volume 7, August 16, 2021, p. 2598, line 2 – p. 2607, line 18 (Richard Amoroso).

[431] *See* Exhibit DRS-2109 at ArbV-R029384, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement; Exhibit J-72, 2019 Quota Share Reinsurance Policy.

[432] *See* Exhibit DRS-2109 at Joint-331763, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at p. 1 (emphasis added).

[433] *See* Transcript, Volume 7, August 16, 2021, at p. 2853, line 3 – p. 2854, line 1; p. 2600, line 21 – p. 2602, line 7 (Richard Amoroso).

do not allow PoolRe to defend itself with pool funds.[434]  Mr. Amoroso testified that the only losses and expenses subject to payment from the risk pools are the losses and expenses directly associated with claims covered by the policies in the risk pools.[435]  FCP conceded at trial that the approximately $3.5 million of premiums taken from the 2018 to 2020 risk pools were not losses or expenses associated with any "claim" under any policy in the risk pools.[436]

FCP is fraudulently implying a provision into the PoolRe agreements that allows PoolRe to expend its clients' funds from any pool year to pay for PoolRe's, Feldman's, and Capstone's attorneys' fees and operating expenses.  But Feldman and Capstone represented to their clients in the Joint Engagement Letters that the **clients would "not be responsible for [PoolRe's] incremental operating expenses**."[437]  FCP's purported authority to expend pool funds for PoolRe's, Feldman's, and Capstone's attorneys' fees and operating expenses cannot be reconciled with representations made by Feldman and Capstone in the Joint Engagement Letters.[438]

Moreover, the Stop Loss Reinsurance Agreement provides pre-conditions before the risk pool has any liability:

> **The Pool shall have no liability** for payments of any claims until the aggregate of all claims . . . reported by and paid to [the Feldman Law Firm and Capstone] by [A.M.Y.] against the Policies . . . exceeds Thirty and 4/10ths Percent (30.4%) of the sum of the Subject Premiums for all of the Policies specified above [the

---

[434] *See* Transcript Volume 7, August 16, 2021, at p. 2511, line 4 – p. 2513, line 10; p. 2536, lines 2-23; p. 2568, line 18 – p. 2571, line 13; p. 2852, line 6 – p. 2854, line 14 (Richard Amoroso).

[435] *See* Transcript Volume 7, August 16, 2021, at p. 2852, line 6 – p. 2854, line 14 (Richard Amoroso). Mr. Amoroso's construction of the PoolRe agreements is consistent with representations made by the Feldman Law Firm and Capstone to their clients in the Joint Engagement Letters.  The Joint Engagement Letters state that because "PoolRe conducts the pooling program for a fee (that is, on a contract basis)," "[t]here should be no incremental operating cost to the pool participants." *See*, *e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter.  Pool participants are only "responsible for insurance losses (claims)." *See id.*

[436] *See* Transcript, Volume 22, October 1, 2021, at p. 8804, lines 6-11 (statement made by Shawn Bates); Transcript, Volume, 11, August 20, 2021, at p. 4617, line 16 – p. 4618, line 8 (Stewart Feldman).

[437] *See* Transcript Volume 7, Aug. 16, 2021, p. 2511, line 6 – p. 2513, line 10 (Richard Amoroso) (citing, *e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter ("There should be no incremental operating cost to the pool participants.")) (emphasis added).

[438] *See*, *e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter ("There should be no incremental operating cost to the pool participants.")

"Attachment Threshold"].

*    *    *

If the Attachment Threshold is met, PoolRe . . . will pay from the Pool a Final Settlement which is an 80% quota share of the aggregate for all claims reported by [the Feldman Law Firm and Capstone] . . . in excess of the Attachment Threshold, subject to a maximum of 160% of the Subject Premiums. ***No Attachment Point shall have been satisfied . . . unless and until [A.M.Y.'s] claim has been fully adjusted and paid*** with [A.M.Y.'s] co-insurance responsibility for the remaining 20% of the aggregate of all claims reported by [the Feldman Law Firm and Capstone] above the Attachment point.[439]

A.M.Y.'s claims pertaining to these arbitrations have not been fully adjusted or paid.[440] Mr. Feldman decides whether A.M.Y. will make payment on the A.M.Y. claims.[441] Mr. Feldman has not yet made that decision.[442]  A.M.Y. has not satisfied its Attachment Threshold.[443]  Mr. Feldman has not directed A.M.Y. to pay for legal fees or expenses relating to these arbitrations.[444] Thus, the pre-conditions for the risk pool to have liability to pay A.M.Y., Feldman, or Capstone have not been satisfied.

The Stop Loss Reinsurance Agreement provides further that A.M.Y. "shall be ***solely responsible*** for payment of claims against the [A.M.Y.] policies, and ***neither PoolRe nor the Participating Reinsurers shall be responsible for payment of neither claims or defense thereof***"

---

[439] *See* Exhibit DRS-2109 at Joint-331764 to Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at §§ 3, 4(A), 4(B) (emphasis added); *see also* Transcript, Volume 24, October 24, 2021, at p. 9598, line 3 – p. 9602, line 3 (Stephen Friedman).

[440] *See* Transcript, Volume 16, September 14, 2021, at p. 6176, line 20 – p. 6177, line 21 (Daniel Calderon); Transcript, Volume 17, p. 6887, line 22 – p. 6888, line 8, p. 6913, line 23 – p. 6917, line 5 (Jeff Carlson).

[441] *See* Transcript, Volume 17, September 23, 2021, at p. 6929, line 19 – p. 6931, line 14 (Jeff Carlson); Transcript, Volume 22, October 1, 2021, at p. 9130, lines 5-9 (Jeff Carlson).

[442] *See* Transcript, Volume 22, October 1, 2021, at p. 9129, line 14 – p. 9132, line 6 (Jeff Carlson).

[443] *See* Transcript, Volume 16, September 14, 2021, at p. 6176, line 20 – p. 6177, line 21 (Daniel Calderon); Transcript, Volume 17, p. 6887, line 22 – p. 6888, line 8, p. 6913, line 23 – p. 6917, line 5 (Jeff Carlson).

[444] *See* Transcript, Volume 22, October 1, 2021, at p. 9129, line 14 – p. 9132, line 6 (Jeff Carlson).

until A.M.Y. satisfies its Attachment Threshold.[445]  Thus, the Participating Reinsurers, including the Doctors' and the Class Members' captives, have no responsibility "for payment of [A.M.Y.] claims or the defense thereof."[446]

The Quota Share Reinsurance Policy also does not provide PoolRe a right to use the captive clients' money to pay FCP's attorneys' fees and operating expenses.[447]  FCP repeatedly argued at trial that "PoolRe has the right to defend itself."[448]  But PoolRe does not have the right to defend itself with **other people's money**.

FCP wrongfully justified using pool funds to defend itself based on a distortion of Section E(2) of the Quota Share Reinsurance Policy.[449]  Section E(2) does not state anything about PoolRe using pool funds to pay PoolRe's attorneys' fees, losses, or expenses (or anything about PoolRe's right to defend _itself_).  Instead, Section E(2) states:

> (2)  The Reinsured is authorized, without any consent of the Reinsurers, to investigate, settle, compromise, discharge, or repudiate any claim, and to institute, prosecute, defend, settle, or compromise any dispute or claim with finality with respect to any interests coming within the scope of this Policy.

Section E(2) does not state that participating captives are liable for PoolRe's attorneys'

---

[445] *See* Exhibit DRS-2109 at Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at § 4(B) (emphasis added). Capstone's President, Jeff Carlson, conceded that "[i]t's a requirement that the captive policy pay prior to any participation by the pool."  *See* Transcript, Volume 22, October 1, 2021, at p. 9131, lines 11-22 (Jeff Carlson).  This requirement has been ignored while PoolRe paid millions of dollars to Feldman and Capstone without any payments being made by A.M.Y.

[446] *See* Exhibit DRS-2109 at Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at § 4(B).

[447] *See generally* Exhibit J-72, 2019 Quota Share Reinsurance Policy; *see also* Transcript, Volume 6, August 9, 2021, at p. 2348, line 18 – p. 2349, line 16 (Richard Amoroso); Transcript, Volume 7, August 16, 2021, p. 2540, line 16 – p. 2541, line 2; p. 2551, lines 10-19 (Richard Amoroso).

[448] *See* Transcript, Volume 22, October 1, 2021, at p. 8804 lines 6-11 (statement made by Shawn Bates); Transcript, Volume 22., October 22, 2021, at p. 8805 lines 5-10 (Shawn Bates); Transcript, Volume 22, October 1, 2021, at p. 8811, lines 12-25 (Shawn Bates); Transcript, Volume 22, October 2, 2021, at p. 8821, lines 10-14 (Robert Snyder); Transcript, Volume 11, August 20, 2021, at p. 4571, line 9 – p. 4572, line 7 (statement made by Cameron Byrd).

[449] *See* Transcript, Volume 22, October 1, 2021, at p. 8808, line 18 – p. 8809, line 1 (Shawn Bates); Transcript, Volume 22, October 1, 2021, at p. 8820, line 6 – p. 8821, line 14; Transcript, Volume 11, August 20, 2021, at p. 4608, line 7 – p. 4615, line 15 (Stewart Feldman).

fees.  PoolRe's Director, Robert Snyder, conceded that Section E(2) does not say anything "about losses or expenses or attorneys' fees or anything like that."[450]  Section E(2) is, thus, different than Sections E(1) and E(3), which both address participating captives' limited responsibility for "losses and expenses *associated with*" or "*connected*" to "*claims*" in the risk pools:[451]

| (1) | The Reinsured shall control and settle all claims with binding effect on the Reinsurers, who will bear their proportion of losses and expenses connected therewith according to the settlements of the Reinsured. |
| --- | --- |
| (3) | No Reinsurer shall have liability for claims reported prior to that reinsurer's effective date listed in the column labeled "Effective Date" on the attached Schedule 1 as amended from time to time.  All Reinsurers who are actively participating in the Risk Pool at the time of a claim is reported or filed shall be responsible for their portion of the loss and expenses associated with such reported or filed claim. |

The pool losses and expenses that Participating Reinsurers are responsible for have to be "connected" or "associated with" "claims" "according to the settlements" of PoolRe.[452]  Mr. Snyder conceded that there have been no settlements of claims between A.M.Y. and PoolRe.[453]  Further, FCP confessed that the millions of dollars taken from the risk pools were not losses or expenses associated or connected with any claim in the risk pools.[454]  Thus, the obligation of participating captives under Sections E(1) and E(3) to share in the "losses and expenses associated with" "claim[s]" has not been triggered.[455]

    Under Texas law, a writing is generally construed most strictly against its author and in

---

[450] *See* Transcript, Volume 22, October 1, 2021, at p. 8821, line 24 – p. 8822, line 10 (Robert Snyder).

[451] *See* Exhibit J-72 at ArbV-R036800, 2019 Quota Share Reinsurance Policy at §§ E(1), E(3) (emphasis added).

[452] *See* Exhibit J-72 at ArbV-R036800, 2019 Quota Share Reinsurance Policy at §§ E(1), E(3).

[453] *See* Transcript, Volume 22, October 1, 2021, at p. 8826, lines 13-23 (Robert Snyder).

[454] *See* Transcript, Volume 22, October 1, 2021, at p. 8804, lines 6-11 (Shawn Bates); Transcript, Volume 11, August 20, 2021, at p. 4617, line 16 – p. 4618, line 8 (Stewart Feldman); *see also* Transcript, Volume 15, August 24, 2021, at p. 5983, lines 22-24 (Jeff Carlson); *see also* Transcript, Volume 17, September 23, 2021, at p. 6878, lines 18-20 (Andy Paredes) ("PoolRe doesn't have an insurance policy or a claim.").

[455] *See* Exhibit J-72 at ArbV-R036800, 2019 Quota Share Reinsurance Policy at §§ E(1), E(3).

such a manner as to reach a reasonable result consistent with the apparent intent of the parties.[456] FCP drafted the Quota Share Reinsurance Policy.[457]  In drafting Section E(2), FCP could have easily stated that the Reinsurers would pay "losses and expenses," just as FCP stated in Sections E(1) and E(3).  FCP chose not to include such a "losses and expenses" provision in Section E(2). The Arbitrators should not rewrite the parties' contracts by implying a non-existent attorneys' fees provision into Section E(2) that the parties could have expressly included themselves but did not.

The Texas Supreme Court has "long held that courts will not rewrite agreements to insert provisions parties could have included."[458]  In *FPL Energy, LLC v. TX*, the defendant argued that a liquidated damages clause applied to both "energy" and "renewable energy credits ('REC')" because the contracts covered both energy and REC.[459]  However, the liquidated damages clause only referred to REC.[460]  According to the Texas Supreme Court, "the lack of reference to electricity or energy in the liquidated damages provisions is critical."[461]

The Texas Supreme Court noted that when the parties intended to address both REC and energy in the contact, they did so.[462]  The Court would not import terms from other sections of the contract to compensate for the absence of the terms in the liquidated damages section.[463]  The Court held that the omission from one contractual section of a term used in other parts of the

---

[456] *Temple-Eastex Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex. 1984).

[457] *See* Transcript, Volume 23, October 23, 2021, at p. 9455, lines 16-24 (Stephen Friedman); Transcript, Volume 11, August 20, 2021, at p. 4417, lines 9-13 (Stewart Feldman).

[458] *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 68 (Tex. 2014); *Tenneco Inv. v. Enter. Prods. Co.*, 925 S.W. 2d 640, 646 (Tex. 1996) (citing *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (Tex. 1911)).

[459] *See FPL Energy*, 426 S.W.3d at 67.

[460] *See FPL Energy*, 426 S.W.3d at 67-68.

[461] *See FPL Energy*, 426 S.W.3d at 67.

[462] *See FPL Energy*, 426 S.W.3d at 67-68.

[463] *See FPL Energy*, 426 S.W.3d. at 67-68.

contract had to be considered "intentional and deliberate."[464]   Similarly, FCP's omission of a "losses and expenses" provision in Section E(2) that is the same or similar to the "losses and expenses" provisions used in Sections E(1) and E(3) must be considered intentional and deliberate.

Moreover, the attorneys' fees provision that FCP wrongfully attempts to imply in Section E(2) would be far broader than the explicit losses and expenses provisions actually used in Sections E(1) and E(3).   Again, Sections E(1) and E(3) are limited only to losses and expenses *connected or associated with* _claims_.   "Claims" in the risk pool have clear limitations, including: (1) when the claim arose,[465] (2) when the claim was reported,[466] (3) the maximum amount that the policy could possibly pay for that claim,[467] and (4) requirements that the captive pay first its Attachment Threshold, and an additional 20% of amounts above the Attachment Threshold, before the pool contributes even a penny.[468]

FCP's egregiously expansive construction of Section E(2) – allowing PoolRe to use an **_unlimited_** amount of their clients' money for PoolRe's attorneys' fees and operating expenses without any contribution whatsoever from A.M.Y. – cannot possibly be reconciled with the language of the PoolRe agreements and Joint Engagement Letters or the intent of the parties.[469]

---

[464] *See FPL Energy*, 426 S.W.3d at 67-68; *see also Nabors Completion & Prod. Servs. Co. v. Chesapeake Operating, Inc*, 648 Fed. Appx. 393, 395 (5th Cir. 2016) (holding that the omission of the term "equipment" in a contract was deliberate); *Fuller v. Wholesale Electric Supply Co. of Houston, Inc.*, No. 14-18-00328, 2020 WL 1528041, at *5 (Tex. App. – Houston [14th Dist.] Mar. 31, 2020) (holding that the definition of "retire" did not encompass "early retirement"); *Houston Metro Ortho & Spine Surgery, LLC v. Juansrirch, Ltd.*, No. 14-19-00732, 2021 WL 2799643, at *7-8 (Tex. App. – Houston [14th Dist.] July 6, 2021) (holding that the omission of the start date in one provision was intentional because the start date was included in other provisions).

[465] *See* Exhibit J-72 at ArbV-R036797, 2019 Quota Share Reinsurance Policy ("Claims occurring after 12:01 a.m. local time on January 1, 2020 will not be subject to this Policy.").

[466] *See* Exhibit J-72 at ArbV-R036797, 2019 Quota Share Reinsurance Policy ("Claims reported after 12:01 a.m. Standard Time on July 1, 2020 . . . will not be subject to this Policy.").

[467] *See*, *e.g.*, Exhibit DRS-2110 at Joint-331780, A.M.Y.'s 2019 Legal Expense Reimbursement Policy (providing a maximum, aggregate limit that the policy will pay at $1 million).

[468] *See* Exhibit-DRS 2109 at Joint-331765, A.M.Y.'s 2019 Stop Loss Reinsurance Agreement at § 4(B) (emphasis added). Capstone's President, Jeff Carlson, conceded that "[i]t's a requirement that the captive policy pay prior to any participation by the pool." *See* Transcript, Volume 22, October 1, 2021, at p. 9131, lines 11-22 (Jeff Carlson).

[469] *See* Transcript Volume 7, Aug. 16, 2021, p. 2511, line 6 – p. 2513, line 10 (Richard Amoroso) ("[W]hat's being

FCP's conversion through the wires of more than $3 million from the risk pools was unconscionable and fraudulent, exposing Feldman, Capstone, and PoolRe each to RICO liability.

### D.   Feldman, Capstone, and PoolRe used the wires in furtherance of their fraudulent scheme.

Feldman, Capstone, and PoolRe used the wires to perpetuate their fraudulent scheme.  At Mr. Feldman's direction,[470] Paul Franks sent via e-mail the fraudulent insurance claims to Capstone.[471]  Capstone, on behalf of itself and PoolRe, acknowledged receipt of these fraudulent claims via e-mail and opened the claims in the 2019 risk pool.[472]

Further, the conversion of more than $3 million of pool funds to pay for FCP's legal fees and expenses was perpetrated by FCP through ACH wire transfers out of PoolRe's accounts.[473] The conversion of more than $3 million through the wires committed by and at the direction of fiduciaries, like Feldman and Capstone, to the detriment of their own clients is fraudulent, unconscionable, and warrants RICO liability.

### IV.   FCP violated the provisions of the Texas Deceptive Trade Practices Act, as well as corresponding provisions of the Texas Insurance Code.

Texas law prohibits deceptive conduct in commerce and, specifically, in the business of insurance.  FCP has violated the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") and the Texas Insurance Code by engaging in unlawful deceptive trade practices "in

---

told to the potential client of Capstone is that if you want to participate in the risk pool that we offer that you're not responsible for operating expenses . . .") (citing, *e.g.*, Exhibit J-20 at SULLIVAN011104, Exhibit E to the Joint Engagement Letter).

[470] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart Feldman (June 6, 2020, 17:17 CST)).

[471] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1998, E-mail from Stewart Feldman (June 6, 2020, 17:17 CST)).

[472] *See* Transcript, Volume 16, September 14, 2021, at p. 6327, line 8 – p. 6330, line 7 (Daniel Calderon) (citing Exhibit DRS-1463, E-mail from Paul Franks, Controller on behalf of Feldman and Capstone (June 10, 2020, 17:08 CST)).

[473] The numerous ACR wire transfers out of PoolRe's account are reflected in Exhibits DRS-2004 and DRS-2685.

the business of insurance."[474]

**A.** **FCP violated the DTPA by failing to disclose vital information to the Doctors and Class Members and by engaging in an unconscionable scheme whereby FCP's clients would insure Feldman's and Capstone's malpractice defense.**

The DTPA prohibits the use of false, misleading, or deceptive actions in commerce. Claims under the DTPA may overlap with other causes of action.[475] The DTPA "shall be liberally construed and applied to promote its underlying purposes."[476] Texas courts recognize that "DTPA claims generally are also punitive rather than remedial," and emphasize that it adds remedies – it does not merely duplicate them.[477] The Texas Supreme Court recognized in *Smith v. Baldwin* that one of the DTPA's primary purposes was to create "a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit."[478] Thus, the standard for the Doctors to establish a DTPA violation is more generous than under common-law fraud.

FCP has violated, at minimum, two separate provisions of the DTPA. Section 17.46(b)(24) prohibits the nondisclosure of information which is intended to induce the consumer to enter into a transaction in which the consumer would otherwise not partake if the information had been properly disclosed.[479] Section 17.50(a)(3) prohibits "any unconscionable action or course of action by any person."[480] FCP violated both these provisions, as discussed below.

/ / /

---

[474] TEX. INS. CODE § 541.003.

[475] *See PPG Indus. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 89 (Tex. 2004) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *Marek v. Lehrer*, 17-00509, 2018 WL 6217566, at *5 (Tex. App. – Austin 11/29/2018)).

[476] TEX. BUS. & COM. § 17:44(a).

[477] *See Marek*, 2018 WL 6217566, at *5 (citing *PPG Indus.*, 146 S.W.3d at 89; TEX. BUS. & COM. § 17:50(b)(1)).

[478] *See* 611 S.W.2d 611, 616 (Tex. 1980).

[479] TEX. BUS. & COM. § 17:46(b).

[480] TEX. BUS. & COM. § 17:50(a)(3) (emphasis added).

1.    **Feldman and Capstone violated Section 17.46(b)(24) of the DTPA by making material misrepresentations to induce the Doctors and Class Members to sign the Joint Engagement Letters.**

Section 17.46(b) of the DTPA lists nearly three dozen non-exclusive "false, misleading, or deceptive acts or practices."[481] The performance of any of these enumerated acts constitutes a violation of the DTPA. Section 17.46(b)(24) prohibits "***failing to disclose information*** concerning goods or services which was known at the time of the transaction if such failure to disclose such information was ***intended to induce the consumer into a transaction into which the consumer would not have entered*** had the information been disclosed."[482]

Section 17.46(b)(24) also contains an intent requirement. The intent requirement under the DTPA can be proven via circumstantial evidence.[483]  This is not a demanding burden: the Texas Supreme Court held in *Tony Gullo Motors I, L.P. v. Chapa* that "slight circumstantial evidence" of the defendant's intent satisfied the intent requirement of the DTPA.[484]

For all the reasons cited in Sections III(A), and IV(C) above, Feldman and Capstone had fraudulent intent in failing to make material disclosures to their clients. And for all the reasons cited in Section I(B) above, Feldman and Capstone failed to make vital disclosures regarding the IRS's adverse determinations against the Feldman / Capstone captive program, the promoter exam of Feldman, and that Feldman and Capstone's clients were insuring Feldman and Capstone's malpractice liabilities and legal expenses even in disputes with the clients. Had Feldman and Capstone disclosed all material information to the Doctors, then the Doctors would have refused

---

[481] TEX. BUS. & COM. § 17:46(b).

[482] TEX. BUS. & COM. § 17:46(b)(24) (emphasis added).

[483] *Tony Gullo Motors I, L.P.. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006); *Marek v. Lehrer*, 17-00509, 2018 WL 6217566 (Tex. App. – Austin 11/29/2018).

[484] 212 S.W. 3d 299, 305 (Tex. 2006).

to execute the Joint Engagement Letter.[485]    Thus, Feldman and Capstone should be held liable

under Section 17.46(b)(24) of the DTPA for failing to disclose material information.

### 2.    FCP also violated the DTPA by engaging in unconscionable actions.

Even in the absence of specific misrepresentations, a party may be liable under the DTPA

for engaging in an "unconscionable act or course of action."[486]    The DTPA defines an

unconscionable act or course of action as "an act or practice which, to a consumer's detriment,

takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a

grossly unfair degree."[487]    The Texas Supreme Court has held that this is an objective standard

"for which *scienter* is irrelevant."[488]

Feldman and Capstone took advantage of their clients' lack of knowledge, deceiving their

clients into reinsuring Feldman's and Capstone's malpractice liabilities and legal expenses.

Moreover, Feldman and Capstone are using their control over the captive program to trap their

clients in the pool and force their clients to cover the expenses and fees incurred by FCP in fighting

their clients.  More than $3 million has already been taken, with Feldman and Capstone threatening

future, unlimited liabilities in the form of funding calls.[489]

By any plausible measure, Feldman and Capstone took advantage of their clientele "to a

grossly unfair degree."[490]    As Dr. DellaCroce explained:

"We were sort of tricked, deceived, relative to the disclosures of what was going

---

[485] *See* Transcript, Volume 1, August 3, 2021, at p. 185, lines 11-25 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1941, line 6 – p. 1942, line 3; p. 1971, lines 18-25; p. 1978, line 19 – p. 1980, line 13 (Dr. Frank DellaCroce).

[486] *See First Tex. Sav. Ass'n v. Stiff Properties*, 685 S.W.2d 703, 706 (Tex. App. – Corpus Christi 1984).

[487] Tex. Bus. & Com. § 17:45(5).

[488] *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998).

[489] *See* Transcript, Volume 22, October 1, 2021, at p. 8781, line 19 – p. 8782, line 5; p. 8783, line 18 – p. 8785, line 5 (Robert Snyder); Transcript, Volume 18, September 24, 2021, at p. 7024, lines 11-16 (Jeff Carlson).  Mr. Carlson testified that there is no limit or cap on the amount of fees and expenses that FCP can charge to their clients for PoolRe's purported administrative expenses.  *See* Transcript, Volume 15, Aug. 24, 2021, at p. 5918, line 1 – p. 5920, line 9 (Jeff Carlson).

[490] Tex. Bus. & Com. § 17:45(5).

on in the program that we were being corralled into, and we were trapped. We were trapped with this AMY construct, which is sort of a very creative but very dark way to do business with people."[491]

*　　　*　　　*

[F]or me, it's more about betrayal, betrayal of trust, being deceived and corralled into a program that the sellers of that program knew was already defective, without being told about that being signing on;

Not being told that that may very well subject me to heightened scrutiny by the IRS above what I was already concerned about;

About not being told that I was being brought in, sold a system that would include a trap door that was Mr. Feldman's liability – malpractice liability insurance and legal expense, primary malpractice insurance, being rolled in with my and all of the other captive insurance owners' less significant risks;

And that same trap door could be used against me such that if I, in their eyes, became a problem or a threat or they wanted to come at me legally in whatever way they chose, that not only would I be subjected to the implications of that, but that I would be forced to pay for it;

And that their internal adjustors and those that approved those claims are all in the same collective;

And that if I wanted to get out of the program early, the old early windup thing; that that then also could be used to trap me, to trap me within the program with technicalities that could easily have been avoided – all of this could have been avoided, quite frankly, had the – had the disclosures been made early, fully, candidly, and completely.[492]

FCP took advantage of their clients' ignorance and trust, trapping the clients in the captive program and forcing the clients to pay for FCP's litigation efforts against them. FCP's unconscionable acts and course of action to the detriment of their clients violate Section 17.50(a)(3) of the DTPA.

### 3.　　The Doctors' captives and Class Members constitute "consumers" under the DTPA.

---

[491]　*See* Transcript, Volume 5, August 7, 2021, at p. 1912, line 22 – p. 1913, line 5 (Dr. Frank DellaCroce).

[492]　*See* Transcript, Volume 5, August 7, 2021, at p. 1923, line 1 – p. 1925, line 10 (Dr. DellaCroce).

Claims under the DTPA can only be asserted by a "consumer."[493]   FCP will likely argue that Dr. Sullivan and Dr. DellaCroce do not qualify as "consumers" based on their respective net worths.[494]   But FCP has introduced no evidence that the Doctors' captives, Janus, Cerberus, and Orion, or Class Members do not qualify as consumers eligible to assert DTPA claims.  FCP bears the burden of proof that the Doctors' captives and Class Members do not qualify as consumers.[495] FCP made no showing as to the value of assets owned by the Doctors' captives or Class Members. Thus, Dr. DellaCroce's and Dr. Sullivan's captives, Janus, Cerberus, and Orion, and Class Members each qualify as "consumers" for DTPA purposes.

Therefore, to the extent that the DTPA's statutory exclusion regarding consumer status applies here, it limits *only* Dr. DellaCroce's and Dr. Sullivan's individual claims but not those of the Doctors' captives or business entities.   As discussed below, however, Dr. DellaCroce and Dr. Sullivan may still personally recover for FCP's violations of the DTPA as "persons" under the Texas Insurance Code, rendering Dr. DellaCroce's and Dr. Sullivan's consumer status irrelevant.

**B.    The Texas Insurance Code, through its "tie-in" statute, prohibits the same conduct contemplated by the DTPA, but without the limitations on who constitutes a "consumer."**

Conduct that violates the DTPA also violates the Texas Insurance Code.   The Texas Insurance Code's "tie-in" statute imports the prohibited actions set forth in Section 17.46(b) of the DTPA.[496]   But the Texas Insurance Code does *not* import the statutory restrictions regarding consumers.   Instead, the Insurance Code broadly affords remedies to "persons" who sustain

---

[493] TEX. BUS. & COM. § 17.46.

[494] Section 17.45(4) of the DTPA provides that a "consumer," for purposes of that statute, "does not include a business consumer that has assets of $25 million or more, or that is owned by a corporation or entity with assets of $25 million or more."  TEX. BUS. & COM. § 17:45(4).

[495] *See NationsBank of Texas, N.A. v. Akin, Gump, Hauer & Feld, L.L.P.*, 979 S.W.2d 385, 392 (Tex. App. 1998) (citing *Eckman v. Centennial Sav. Bank,* 784 S.W.2d 672, 674 (Tex.1990) ("As the defendant below, Akin Gump had the burden to plead and prove the applicability of the business consumer status as an affirmative defense.")).

[496] TEX. INS. CODE § 541.151(2).

damages.[497]   The term "person" is defined in the Insurance Code as "any individual, corporation, association, partnership, reciprocal or interinsurance exchange, Lloyds' plan, fraternal benefit society, or other legal entity *engaged in the business of insurance*, including an agent, broker, or adjuster."[498]   The Insurance Code's provisions are "liberally construed."[499]

Dr. DellaCroce and Dr. Sullivan fall within the definition of "persons."   Therefore, Dr. DellaCroce and Dr. Sullivan can personally assert claims under the Texas Insurance Code based on FCP's deceptive insurance practices that violate the DTPA.

The key provisions of the Texas Insurance Code and its "tie-in" statute are as follows:

*A person* who sustains actual damages may bring an action against another person for those damages *caused by the other person* engaging in an act or practice:

\*        \*        \*

(2) *specifically enumerated in Section 17.46(b), Business & Commerce Code*, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment.[500]

Courts have held that the statute "permits an insured to bring a cause of action" under the Insurance Code for deceptive trade practices which violate Section 17.46(b) of the DTPA.[501] Accordingly, through § 541.151(2) of the Insurance Code, Dr. Sullivan and Dr. DellaCroce.

## XIV.   DEFENSES TO SCP'S CLAIMS AND REFUTATION OF SCP'S AFFIRMATIVE DEFENSES (ACCORDING TO FCP)

SCP's claim for "attorney malpractice" sounds in negligence. *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989). To prevail on their claim for negligence / legal malpractice. SCP

---

[497] TEX. INS. CODE § 541.151.

[498] TEX. INS. CODE § 541.002(2) (emphasis added).

[499] TEX. INS. CODE § 541.008

[500] TEX. INS. CODE § 541.151(2).

[501] *See Centaurus Unity v. Lexington Ins. Co.*, 766 F.Supp.2d 780, 787 (S.D. Tex. 2011).

must prove the Feldman and Capstone Parties: (a) owed a duty to one or members of SCP; (b) breached that duty through an act or omission; (c) that breach caused harm; and (d) SCP suffered damages. *See Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016); *Nabors Drilling, U.S.A. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). "A lawyer in Texas is held to the standard of care which would be exercised by a reasonably prudent attorney." *Cosgrove*, 774 S.W.2d at 664. "'Due care' is that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances." *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 597 (Tex. App.—Fort Worth 2008, pet. denied).

To prove that the Feldman Law Firm breached any duty in negligence, SCP must first establish the applicable standard of care. *See Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019). The essential element of breaching a standard of care stands separate and apart from the existence of a legal duty. *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983). "A contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances." *Dukes*, 252 S.W.3d at 594.

"Attorneys cannot be held strictly liable for all of their clients' unfulfilled expectations. An attorney who makes a reasonable decision in the handling of a case may not be held liable if the decision later proves to be imperfect." *Cosgrove*, 774 S.W.2d at 665. A fact-finder "must evaluate his conduct based on the information the attorney has at the time of the alleged act of negligence." *Id*. at 664. "No attorney can guarantee future results." *Pub. Citizen Inc. v. La. Attorney Disciplinary Bd.*, 632 F.3d 212, 218–19 (5th Cir. 2011).

### 1. Anti-fracturing

The Texas anti-fracturing rule prohibits a party from asserting torts other than legal

malpractice when all those claims rely on the same allegedly tortious acts or omissions and the same damages. *See Border Demolition & Envt'l, Inc. v. Pineda*, 535 S.W.3d 140, 159-61 (Tex. App. – El Paso 2017, no pet.); *Murphy v. Gruber*, 241 S.W.3d 689, 698 (Tex. App. – Dallas 2007, pet. denied). Applying the anti-fracturing rule presents a question of law for the Arbitrator. *Murphy*, 241 S.W.3d at 692. The substance of a party's claim defines the cause of action for purposes of the anti-fracturing rule, and the Arbitrator resolves that substantive nature as a matter of law. *Tex. Pharmomed. Exports, Inc. v. Wang*, No. 14-19-00888-CV, 2021 WL 2325085, at *5 (Tex. App. – Houston [14th Dist.] June 8, 2021, pet. denied) (mem. op.); *Border Demolition*, 535 S.W.3d at 159; *Murphy*, 241 S.W.3d at 697.

A claim for professional negligence exists, and the anti-fracturing rule applies, when the factual allegations disclose the attorney failed to exercise that "degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess." *Border Demolition*, 535 S.W.3d at 159; *see also Wang*, 2021 WL 2325085 at *5-6 (same rule for accountants). In other words, such a negligence claim focuses on whether the attorney(s) adequately performed their legal duties by undertaking to exercise ordinary skill and knowledge. *Wang*, 2021 WL 2325085 at *5-6; *Border Demolition*, 535 S.W.3d at 159-62; *Murphy*, 241 S.W.3d at 692-93, 698-99. Complaining about the quality or adequacy of the legal representation or advice sounds strictly in professional negligence. *Won Pak v. Harris*, 313 S.W.3d 454, 457 (Tex. App. – Dallas 2010, pet. denied); *Murphy*, 241 S.W.3d at 692-93, 696, 698-99; *see also Wang*, 2021 WL 2325085 at *5-6.

Texas law holds that "[e]ven if a complaint implicates a lawyer's fiduciary duties, it does not necessarily follow that such a complaint is actionable apart from a negligence claim." *Won Pak*, 313 S.W.3d at 458. This rule applies because of the duality created by the inherently fiduciary nature of the attorney-client relationship, which conflates the standard of care for negligence

claims. *Murphy*, 241 S.W.3d at 696. Alleging any breach of fiduciary duty that supposedly prevented the attorney *from adequately representing the client's interests* leaves the client with only a claim for professional negligence. *See id.*

A professional-malpractice claim focuses on whether the attorney represented the client "with the requisite level of skill." *Ashton v. KoonsFuller, PC*, No. 05-16-00130-CV, 2017 WL 1908624, at *4 (Tex. App. – Dallas May 10, 2017, no pet.) (mem. op.). This acid test includes allegations that the legal representation provided by the attorney "fell below the quality [of representation] required under the law." *Murphy*, 241 S.W.3d at 699.

"[A] professional negligence claim [arises] if the claim is really that the lawyer's conflict of interest prevented him from adequately representing the client." *Id.* at 696. To this end, allegations that an attorney failed to disclose a conflict of interest "challenge the degree of care, skill, or diligence in performing [the] duty to inform [clients] about issues that could arise during the representation of multiple clients and [the lawyers'] duty to communicate with and among the clients [they] represented." *Fitts v. Richards-Smith*, No. 06-15-00017-CV, 2016 WL 626220, at *11 (Tex. App. – Texarkana Feb. 17, 2016, pet. denied) (mem. op.); *see also Murphy*, 241 S.W.3d at 696.

Any claim that turns on "advice, judgment, or opinion arising from the attorney-client relationship" sounds in professional negligence alone, including giving bad or faulty legal advice and improperly representing the client. *Fitts*, 2016 WL 626220 at *10-11 (citing cases). In Texas, "an attorney can commit legal malpractice by giving an erroneous legal opinion or erroneous advice, by failing to give any advice or opinion when legally obliged to do so, by disobeying a client's lawful instruction, by taking an action when not instructed by the client to do so, by delaying or failing to handle a matter entrusted to the attorney's care by the client, or by not using

an attorney's ordinary care in preparing, managing, and presenting litigation that affects the client's interests." *NexBank, SSB v. Winstead PC*, No. 05-18-01345-CV, 2020 WL 1921683, at *5 (Tex. App. – Dallas Apr. 21, 2020, no pet.) (mem. op.). In *NexBank*, the anti-fracturing rule applied to a negligent-misrepresentation claim alleging a law firm "negligently supplied false information for the purpose of guiding [NexBank] in [its] decisions about whether and how to foreclose on" property securing a loan. *Id.* at *6. The anti-fracturing rule also applies to claims asserting that an attorney gave the client faulty tax advice. *J.A. Green Dev. Corp. v. Grant Thornton, LLP*, No. 05-15-00029-CV, 2016 WL 3547964, at *6-8 (Tex. App. – Dallas June 28, 2016, pet. denied).

## 2.    Breach of Fiduciary Duty

To prevail on a claim for breach of fiduciary duty under Texas law, SCP must prove the Feldman and Capstone Parties: (a) owed a fiduciary duty to SCP; (b) breached that fiduciary duty; and (c) the breach harmed SCP or improperly benefited the Feldman and Capstone Parties. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

As a threshold matter, the Arbitrator must decide whether the Feldman and Capstone Parties owed fiduciary duties to SCP. "The existence of a fiduciary duty is an element of a claim for breach of fiduciary duty." *Van Duren v. Chife*, 569 S.W.3d 176, 190 (Tex. App. – Houston [1st Dist.] 2018, no pet.) (citing *First United Pentecostal Church*, 514 S.W.3d at 220). As the one seeking relief on this claim, SCP must identify the specific fiduciary relationships they claim exist with the Feldman and Capstone Parties. *See Belliveau v. Barco, Inc.*, 987 F.3d 122, 132-33 (5th Cir. 2021).

Texas attorneys owe fiduciary duties to their clients as a matter of law. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988). These fiduciary duties include a duty of full and fair disclosure of facts material to the client's representation. *Id.* Texas law further holds attorneys to the highest

standards of ethical conduct in their dealings with their clients, requiring them to "conduct their business with their clients with inveterate honesty and loyalty" and to "keep the client's best interest in mind." *Izen v. Laine*, 614 S.W.3d 775, 784 (Tex. App. – Houston [14th Dist.] 2020, pet. filed). Attorneys also must provide a clear fee agreement. *Id*. (citing *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 70 (Tex. App.—Houston [14th Dist.] 2016, no pet.)).

A fiduciary obligation may also arise out of a special relationship. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 (Tex. 1992). "Where a party is accustomed to being guided by the judgment or advice of another in legal and accounting matters relating to income taxation, *and there exists **a long association** in a business relationship, as well as a personal friendship*, the first party is justified in placing confidence in the belief that the other party will act in his best interest.  Under these circumstances, a fiduciary relationship has been held to exist." *Dominguez v. Brackey Enters., Inc.*, 756 S.W.2d 788, 791 (Tex. App. – El Paso 1988, writ denied) (emphasis added).

A mere contractual relationship never imposes fiduciary duties. *See Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 203 (Tex. 2002). Texas courts remain reluctant "to recognize fiduciary relationships, especially in the commercial context." *Willis v. Donnelly*, 199 S.W.3d 262, 278 (Tex. 2006). This rule prevails in the state "[i]n order to give full force to contracts" and to encourage parties to contract as they see fit. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex. 1997). "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist **prior to, and apart from,** the agreement made the basis of the suit." *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 288 (Tex. 1998) (emphasis in original).

> **3. The scope of representation dictates the boundaries of the Feldman and Capstone Parties' duties and any liability to**

## SCP

Applying Texas law, the Arbitrator must first address the scope of representation involving the relationship between SCP and the Feldman and Capstone Parties. This threshold inquiry governs what legal duties, fiduciary or otherwise, the Feldman and Capstone Parties may owe to SCP. The scope of the representation also dictates whether the Feldman and Capstone Parties breached any duties to SCP. If SCP's allegations concerning negligence and breach of fiduciary duty fall within the scope of representation, then liability may arise; however, if those allegations lie outside the scope of representation, no duty, and therefore no liability, exist. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159-60 (Tex. 2004). The Feldman Parties' expert on legal ethics and legal malpractice, Jim McCormack, summed up the effect of the scope of representation on the fiduciary duties the Feldman Parties owed to SCP:

```
11        Q.      (BY MR. GREENBERG)  All right.
12   Getting back to it, Mr. McCormack, let me ask
13   you this:  Did The Feldman Law Firm and
14   Mr. Feldman owe to the doctors any fiduciary
15   duties that are not within the scope of their
16   representation?
17        A.      No.
```

Vol. 19 at 7536.

### a. The 2015 Engagement Letter Unambiguously Limits the Scope of Representation

In describing the attorney-client relationship with the Feldman Parties, SCP contend that "[t]he Joint Engagement Letters were not limited in time or in scope." SCP Post-Hearing Brief at 7. SCP cite to the expert testimony of their legal ethicist, Tom Watkins, to claim that "[t]here is no

limit on the attorney-client relationship created by this document . . . and in both of this document and in the [Joint Engagement Letter], there is no termination, ever, of the attorney-client relationship. And, in my opinion, no limitations on the fiduciary duties and the DR responsibilities of the Feldman Law Firm to their clients, the Doctors." *Id.*

The Arbitrator [should reject] SCP's position that nothing limits the 2015 Engagement Letter in time or scope or extent of "the fiduciary duties and DR responsibilities of the Feldman Law Firm to their clients, the Doctors." "Generally, a lawyer's fiduciary duties to a client, although extremely important extend only to dealings within the scope of the underlying relationship of the parties." *Joe*, 145 S.W.3d at 159. "An attorney also owes a client a duty to inform the client of matters material to and within the scope of the representation." *Neese v. Lyon*, 479 S.W.3d 368, 387 (Tex.App.—Dallas 2015, no pet.). "Fiduciary duties do not extend beyond the scope of the fiduciary relationship." *Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 256 (Tex. App.– Houston [14th Dist.] 2018, no pet.); *see also Warner v. Winn,* 197 S.W.2d 338, 342 (Tex. 1946) (specific terms of parties' contract determine existence and extent of fiduciary duties).

First and foremost, the Arbitrator [should] determine that the rulings made by Judge Dorfman in his Final Award refute Mr. Watkins' opinion that no limits on the scope of representation exist. As one limitation, Judge Dorfman specifically held that the 2015 Engagement Letter "does not include any right or discretion in the Respondents to oppose or overrule the Captives' dissolution and liquidation on or about the Year End Termination Date, provided the Engagement Letter is non-renewed." EX J-115 at 12 ¶ 37. Judge Dorfman placed other clear limitations on the scope of representation in issuing declaratory relief:

46.  Based upon the foregoing, I hereby **GRANT** the Capstone Parties' request(s) for declaratory relief and decree as follows:

- Capstone has the right to liquidate the Captives in a necessary, orderly and prudent manner, as provided for in the Capstone Services Agreement, on or about August 31, 2021, which is the Year End Termination Date as defined in § 4.6 of the Capstone Services Agreement;

- Respondents do not have the right under the Parties' agreements to demand that the Claimants cause the immediate or expedited wind-up/liquidation of the Captives; and

- The Capstone Parties have no contractual obligation to remake or renegotiate the agreements among their joint clients in an attempt to liquidate their captive insurance companies on a schedule not in compliance with the Parties' agreement.

EX J-115 at 17.[502]

The 2015 Engagement Letter, as Judge Dorfman determined, places no duty on the Capstone and Feldman Parties to dissolve or liquidate the SCP captive insurers before the contractual termination date of August 31, 2021. In line with Judge Dorfman's determination, the Arbitrator [should] conclude that no duty can arise in tort that falls outside the scope of this representationas limited by contract. Without the essential element of duty, the other elements for SCP's tort claims, such as damages, become immaterial. *See S. Pine Lumber Co. v. Andrade*, 124 S.W.2d 334, 374-75 (Tex. 1939). SCP does not dispute the validity or enforceability of the 2015 Engagement Letter:

---

[502] The term "Capstone Parties" was defined to include "Claimants" and "Intervenors," which includes the Capstoneand Feldman Parties in this arbitration.

```
12              ARBITRATOR GLASSER:  As I
13    understand, the question was:  Does
14    anybody contend the contract is not
15    valid?
16              MR. HILBERT:  That's correct.
17    We contend that we paid all -- we met
18    every obligation required of the
19    doctors in that contract.
20              ARBITRATOR GLASSER:  All right.
21    Nobody's looking for a recision or
22    anything like that?
23              MR. HILBERT:  No.
24              ARBITRATOR BAKER:  Okay.  You
25    may proceed, Mr. Hilbert.
```

TR Vol. 4 at 1853.

The Arbitrator [should] also conclude that the terms of the 2015 Engagement Letter itself place important limits on the parties' scope of representation. Judge Dorfman made a finding, which carries preclusive effect in this arbitration, that SCP and FCP "agree that the Engagement Letters,and all other relevant contractual documents between them, are unambiguous." EX J-115 at 7 ¶ 16 Among these express limitations are the following:

"This is the joint engagement letter regarding the formation and operation of an alternative risk planning arrangement." EX J-20 at 1.

7.    We will work with the current banking and captive management providers to re-establish the bank account's ownership as that of the separate Delaware captives. Neither Capstone nor our firm ever holds authority to sign on clients' accounts or make investment decisions on their behalf.[6]

EX J-20 at 4.

or a particular form of securities in which they must be held[1].  Neither Capstone nor our Firm will handle the checkbook or the brokerage investment accounts, nor will we advise on the specific investments being made by the captives.  However, our Firm and Capstone (and ~~person acting on behalf of these entities) will handle the design, formation and all aspects~~

EX J-20 at 2.

materials listed on www.CapstoneAssociated.com.  In connection with our work, it is additionally important that you commit to retain the services of a highly competent and diligent CPA, whose involvement is critical to maintain the interface of the Clinic and your captives, and to review and file the various state and federal tax returns which will be presented in draft form for signature.

EX J-20 at 10.

**ADDITIONAL PLANNING.**  Captive insurance planning opens up the opportunity for related business, financial and tax planning.  This and other opportunities will be brought to your attention for your consideration.  As discussed previously, these additional planning matters are not included in the turnkey fee arrangement discussed above, and for such work we would separately invoice you if requested to perform such.

EX J-20 at 10.

Should the IRS challenge the planning being done herein as to its IRC Section 831(b) status, subject to the timely payment by you of the fees due us from time-to-time, such fees being in all ways current, and the uninterrupted and continued retention of the Firm and Capstone for the scope of services described in this agreement, the Firm agrees to represent you without further payment of legal fees in any IRS audit (either field, office or by mail), before IRS Appeals, in an IRS mediation, and then, if appropriate, file on your behalf a petition and an opening legal brief in the U.S. Tax Court regarding the issues related to the planning being done herein under IRC Section 831(b) (and no other issues but those specified herein). Note that our obligations under this paragraph run only for federal or state tax challenges which relate to the captives' operations post-December 31, 2015 (the beginning of Capstone's and the Firm's role) and not for prior work done by your existing service providers.  To be clear, legacy work is not covered, but the Firm is likely willing to take on any challenge under a separate fee agreement.

EX J-20 at 10.

"Unless expressly stated otherwise in writing, any U.S federal tax advice provided by this Firm or its lawyers, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service."

EX J-20 at 13.

"As with any type of legal representation, advanced financial structuring or sophisticated business planning, no one can provide guaranties regarding the outcome of any matter. We do commit, however, to use reasonable care and put forth a diligent effort on your behalf."

EX J-20 at 13

As is true of any business enterprise, there is some uncertainty in the amount of costs and expenses which we will incur in providing this service. In complex endeavors such as this, there is an extra level of unpredictability in quantifying such costs, recognizing that you desire as much certainty as possible in committing to this project. To this end, we have assembled a turnkey service package[10] and fee structure which only *excludes*:

(i) any taxes or related payments which any State government, any other country or the Internal Revenue Service (IRS) assesses or is due on or with respect to: (a) the captives; (b) the insured companies; or (c) the parent-owners[11].

EX J-20 at 8.

"You understand and acknowledge that although we will endeavor to provide you with recommendations and alternatives based on our best judgment, there can be no guarantee of successful consummation of any transaction, that each decision must be your own, and that the ultimate responsibility of each decision must necessarily be yours." EX J-20 at 13.

"Accordingly, you may incur substantial fees and other expenses in connection with matters we will handle on your behalf, even though you may not achieve your desired result alternatives based on our best judgment, there can be no guarantee of successful consummation of any transaction, that each decision must be your own, and that the ultimate responsibility of each decision must necessarily be yours."

EX J-20 at 13.

You may terminate our legal representation at any time upon written request. The Firm may withdraw from your legal representation should: (i) it believe such continuation is prohibited by the Code of Professional Responsibility; (ii) you fail to comply with our agreements as reflected in your engagement letter or any subsequent agreements or commitments to the Firm; or (iii) the Firm believes, for any reason, the attorney/client relationship is compromised or has been detrimentally affected. In the event the Firm withdraws, you agree to promptly retain other legal counsel. Upon termination or withdrawal, you agree immediately to pay all accrued and outstanding attorneys' fees and expenses including through the conclusion of any fixed price assignment or for a given term, plus subsequent fees incurred by the Firm to facilitate the transfer of representation to any subsequent law firm and/or for the Firm to fully and completely withdraw. If you have contracted with Capstone, the withdrawal of the Firm will not affect Capstone's obligations to you or your obligations to Capstone, which as to called for non-legal services and fees shall be undiminished.

EX J-20 at 14.

**POTENTIAL CONFLICTS.**   When we are asked to provide legal services for more than one person (e.g., multiple owners of a business or a husband and a wife in an estate planning assignment or a business matter), conflicts may arise.  If we are to act as attorneys for multiple persons, we must balance the interests of all persons involved.  Therefore, we cannot be an advocate for any one person against another in the case of multiple representation.  The process could favor one to the detriment of the other.  By way of further example, a substantial conflict could arise in the determination of what constitutes community property versus separate property.  That determination may be more beneficial for one spouse than the other.  Further, while divorce may not be contemplated, it is important to realize that estate planning, and especially estate planning that incorporates declarations of gift, could have consequences that either spouse may find adverse in the event of divorce.  As an additional example, because the Firm represents and Capstone administers many insurers (captive and otherwise), including for those of affiliates of the Firm and Capstone, the Firm will not take on representation adverse to or to the detriment of or against those persons within the scope of the Firm's representation.  Similarly, our recommendations could affect the income, property, and support provisions in any divorce or after the death of one of the spouses or that of one business partner versus another.  For these and other reasons, each person or entity is advised to and welcome to have separate counsel.

EX J-20 at 14.                              *              *              *

Engagement Letter.  However, from time-to-time opportunities or issues may arise outside of the scope of standard legal services provided by the Firm, for which the companies may require legal and/or other professional services.  For example, if the Companies wish to make an investment in other than Delaware Department of Insurance approved securities or a loan secured by collateral other than accounts receivable, equipment, or inventory, the qualification of that investment with Delaware DOI and the documentation of that investment would be outside the scope of the standard legal services provided by the Firm in coordination with Capstone and the Firm's and Capstone's related services shall be separately charged to and borne by the Companies.  Additionally, the Companies at their own expense may request the Firm to supplement such standard legal services by separate arrangements with the Firm.

EX J-20 at 22.

These disclosures, not to mention "Exhibit C" providing "Tax Disclosures" and Exhibit E" describing "Third Party Insurance," exist right in the contract signed by the Doctors, reviewed by them "dozens of times," and examined by their team of skilled professionals. TR Vol. 1 at 204; TR Vol. 2 at 722-23; TR Vol. 20 at 7925-29.

> **b.  The Attorney-Client Relationship Terminated by January 2020 and Cut Off Any Fiduciary Duties**

The Arbitrator [should disagree] with SCP that the 2015 Engagement Letter contained no limitation as to time. *See* SCP Post-Hearing Brief at 7. SCP's position does not accurately reflect

Texas law on when the attorney-client relationship terminates. Nor does the undisputed evidence in the record reflecting the provisions of the 2015 Engagement Letter support SCP's assertion.

The attorney-client relationship arises by contract in Texas. *LeBlanc v. Lange*, 365 S.W.3d 70, 79 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "Under Texas law, an attorney-client relationship terminates upon completion of the purpose of the employment, absent an agreement to the contrary. *Id*. (*quoting Stephenson*, 16 S.W.3d at 836). The attorney-client relationship likewise terminates as a matter of law when the client discharges the lawyer with or without cause or when the lawyer withdraws from representing the client. *See Hume v. Zuehl*, 119 S.W.2d 905, 907 (Tex. Civ. App.—San Antonio 1938, writ ref'd). The lawyer's fiduciary obligations to the client thus cease when the attorney-client relationship ends. *Stephenson,* 16 S.W.3d at 836*.* Nor would the Capstone Parties have any fiduciary duties after they were fired that may have arisen out of their ordinary arm's-length business relationship. *Id.*

The evidence shows that the attorney-client relationship began deteriorating in December 2019, leading to its termination beginning in that month and concluding by April 2020. EXs FC-268; FC-275; FC-297; FC-299.  SCP fired Capstone no later than April 2020. EX FC-299. In his final award, Judge Dorfman made an explicit finding regarding the termination of the attorney-client relationship: "[o]n January 5, 2020, Mr. Feldman on behalf of the Feldman Law Firm terminated Dr. Sullivan and Cerberus as clients, encouraging them to retain new captive counsel. *Exhibit R-88.* This termination effectively operated to terminate the law firm's relationship with Dr. DellaCroce and the Doctors' entities as well." EX J-115 at 8; *see Range v. Calvary Christian Fellowship*, 530 S.W.3d 818, 834–35 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (advising client that lawyer is withdrawing from representation terminates the attorney-client relationship).

### c. SCP's Claims Lack a Direct Nexus With the Scope of Representation as Limited by the 2015 Engagement Letter

Applying Texas law, the Arbitrator must also determine whether the fiduciary duty exists within the scope of representation as defined by the 2015 Engagement Letter and whether any breach of that specific duty occurred.

"The existence of a fiduciary relationship does not by itself establish a claim for breach of fiduciary duty. A plaintiff also must establish that the defendant breached a fiduciary duty *arising from that relationship*." *Richard Nugent & CAO, Inc.*, 543 S.W.3d at 256 (emphasis added). Thus, a direct nexus requires any fiduciary duty to arise out of the specific fiduciary relationship as defined by the scope of the attorney's representation. *See Joe*, 145 S.W.3d at 159-60; *Richard Nugent & CAO, Inc.*, 543 S.W.3d at 256-57.

Given this direct-nexus requirement, SCP can never hold the Feldman Parties liable for breaching a fiduciary duty that falls outside the scope of their attorney-client relationship as cabined by the 2015 Engagement Letter. *See Joe*, 145 S.W.3d at 159-60 (law firm owed no duty to warn client of upcoming city council vote to place moratorium on land sales where scope of representation covered only reviewing and drafting documents for selling affected parcel); *Richard Nugent & CAO, Inc.*, 543 S.W.3d at 256-57 (attorney-in-fact acting under power of attorney owed no fiduciary duty to maintain insurance on house where deed of trust assigned that task to seller).

The Arbitrator [should] not impose fiduciary duties on the Feldman Parties in derogation of the contract's specific terms and the holding in *National Plan Administrators*. *See Nat'l Plan Admins., Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700-01 (Tex. 2007). As in *National Plan Administrators, Joe*, and *Richard Nugent*, other Texas courts refuse to go outside the contract and scope of representation in breach of fiduciary duty cases. *See Joseph v. State*, 3 S.W.3d 627, 639

(Tex. App. – Houston [14th Dist.] 1999, no pet.) (no ineffective assistance of counsel arose on criminal charges for which client never retained attorney to represent and defend him); *Klager v. Worthing*, 966 S.W.2d 77, 83 (Tex. App. – San Antonio 1996, no writ) (law firm that represented client in silicone breast implant litigation assumed no duty to supervise or direct her medical care while safeguarding her implants and tissue samples). Nor [should] the Arbitrator attach, as SCP urge, a presumption of unfairness to the 2015 Engagement Letter because Judge Dorfman's confirmed Award makes a preclusive determination that SCP negotiated that contract as sophisticated and intelligent parties represented by a team of professionals, including tax counsel and a CPA. EX J-115 at 8-9; SCP's Post-Hearing Brief at 1, 6. *See Tanox, Inc.*, 105 S.W.3d at 265 (no presumption of unfairness arises when sophisticated parties negotiate a fee agreement with a lawyer at arm's length).

SCP isolate a single sentence in the 39-page 2015 Engagement Letter to contend that "[t]he stated purpose of the Capstone program was to structure and operate the captive insurer so as to qualify for partial tax-exempt status under Internal Revenue Code § 831(b) . . .." SCP's Post-Hearing Brief at 21. Ignoring everything else in the 2015 Engagement Letter, SCP embrace this one sentence *in the contract* as the basis for creating the *tort* duties they say the Feldman and Capstone Parties owed. SCP's interpretation runs afoul of long-standing rules of contract interpretation, which require the Arbitrator to give every word meaning and to read all the contract's provisions in context and harmony. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

By focusing exclusively on the "intention" language, SCP can recast or rewrite those tort duties however they want. The foundation on which SCP assert liability against the Feldman and Capstone Parties centers on this tax treatment: "A captive insurer must be acting as an insurance company to qualify for favorable tax treatment. If a determination is made that a captive is not an

insurance company, then it would not be entitled to tax benefits under Section 831(b)." SCP's Post-Hearing Brief at 21-22.

Dr. Sullivan's own testimony confirms that SCP's tort claims rest upon a duty to "guarantee" favorable tax treatment for the captive insurance transactions – one that far exceeds the scope of the Feldman and Capstone Parties' representation as stated by the four corners of the 2015 Engagement Letter:

```
13        Q.      So this engagement letter
14   actually contemplated that there may be an
15   IRS audit of -- regarding captive issues and
16   you and Dr. DellaCroce made an agreement with
17   the firm for representation in that potential
18   audit, correct?
19        A.      No.  Earlier when we signed
20   this, we trusted Mr. Feldman's guidance
21   greatly.  We thought he was very capable.  He
22   touted over 50 successful defenses of the IRS
23   without a failure.
24            So this all was great.  This
25   compelled us even further to feel confident
```

1    because he was essentially guaranteeing the
2    success for a secure structure of
3    Capstone's -- of Capstone's captives, turnkey
4    structure.
5         Q.     You believe Mr. Feldman and
6    Capstone were guaranteeing a result through
7    this engagement letter?
8         A.     I'm telling you how I feel.
9    There are no guarantees in this engagement
10   letter, but when someone gives you,
11   quote/unquote, guarantee or warranty and
12   selling you the car and replace all your flat
13   tires for the whole life of it, something
14   like that, an analogy, so there is a
15   confidence that one provides.
16             If they are providing you a
17   service or providing you a product and they
18   give you a warranty of representation, that
19   could be very expensive if there was some
20   question brought about to the product or
21   service that they provided you.
22             For the consumer, me being the
23   consumer, Dr. DellaCroce being the consumer,
24   and all of those in the class being
25   consumers, it brings confidence to the

1    promoter of that, the dispenser of the
2    service or product.

TR Vol. 2 at 702-04.

The Arbitrator [should reject] SCP's position that the Feldman and Capstone Parties guaranteed any type of tax treatment for the Captive Insurers and Insureds, let alone one affording tax-exempt status without any risk or threat of IRS scrutiny. On the contrary, the 2015 Engagement Letter expressly disclaimed any such guarantee or warranty:

You understand and acknowledge that although we will endeavor to provide you with recommendations and alternatives based on our best judgment, there can be no guarantee of successful consummation of any transaction, that each decision must be your own, and that the ultimate responsibility of each decision must necessarily be yours. Accordingly, you may incur substantial fees and other expenses in connection with matters we will handle on your behalf, even though you may not achieve your desired result. Unless expressly stated otherwise in writing, any U.S. federal tax advice provided by this Firm or its lawyers, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service.

In the history of Capstone and our Firm with respect to alternative risk planning dating back to our beginnings in 1998, we have never gone beyond this point (that is, the point covered by our fixed fee arrangement) and have been able to resolve issues satisfactorily (that is, with "no change") well short of even basic discovery in the U.S. Tax Court, which (as noted) is outside of the scope of the fixed fee portion of this agreement. Of course, in connection therewith, we cannot guarantee any particular result, and several others are still in process.

EX J-20 at 10;

4.8    **Relationship of Parties.** Nothing in this Article shall be construed as (a) the guarantee by Capstone of the success of the Companies' insurance or investment activities; (b) an assumption by Capstone of any financial obligation of the Companies; (c) the creation of any employment relationship between (x) the Companies and (y) employees or consultants of Capstone and its affiliated entities; (d) an assumption by Capstone of any responsibility for the work performed by outside suppliers or consultants employed by the Companies, except where such work is performed at the suggestion or recommendation of Capstone; or (e) the delegation of any managerial authority over the Companies to Capstone. The Companies acknowledge that Capstone will make recommendations and offer advice pursuant to this Agreement but that all decisions with respect thereto shall remain those of the Companies' officers and directors.

EX J-20 at 25.

It also warned SCP numerous times of adverse action the IRS may take, and further advised SCP that the Law Firm would represent the Captive Insurers or Insureds in any tax controversy

that arose with the IRS. Thus, the nature and scope of representation that defined the relationship between SCP and the Feldman and Capstone Parties repudiates SCP's attempt to create tort duties where none otherwise exist.

The Arbitrator [should conclude] that the scope of representation described by the unambiguous 2015 Engagement Letter specifically contemplated that the SCP Captive Insurers and Insureds might possibly face an IRS audit or other enforcement action.

> Should the IRS challenge the planning being done herein as to its IRC Section 831(b) status, subject to the timely payment by you of the fees due us from time-to-time, such fees being in all ways current, and the uninterrupted and continued retention of the Firm and Capstone for the scope of services described in this agreement, the Firm agrees to represent you without further payment of legal fees in any IRS audit (either field, office or by mail), before IRS Appeals, in an IRS mediation, and then, if appropriate, file on your behalf a petition and an opening legal brief in the U.S. Tax Court regarding the issues related to the planning being done herein under IRC Section 831(b) (and no other issues but those specified herein). Note that our obligations under this paragraph run only for federal or state tax challenges which relate to the captives' operations post-December 31, 2015 (the beginning of Capstone's and the Firm's role) and not for prior work done by your existing service providers. To be clear, legacy work is not covered, but the Firm is likely willing to take on any challenge under a separate fee agreement.

EX J-20 at 10. In addition to this disclosure, Exhibit C to the 2015 Engagement Letter, covering Tax Risks and Responsibilities under Section 831(b), contained a "Summary of The Feldman Law Firm LLP's IRS Experience With Capstone-Administered Captive / Alternative Risk Planning." *Id.* at 30-37. This multi-page summary identified over 50 instances where the Feldman Law Firm represented Capstone-administered captives before the IRS and revealed over a dozen "adverse exam reports," multiple cases pending before IRS appeals, and at least three cases that had reached the U.S. Tax Court after the IRS had issued notices of deficiency to the taxpayer. *Id.* at 34-36.

The Supreme Court's decision in *Joe v. Two Thirty Nine Joint Venture* illustrates how the scope of representation limits an attorney's (1) duties to the client, (2) professional legal services, and (3) exposure to liability for legal malpractice and breach of fiduciary duty. *See Joe*, 145 S.W.3d at 159-60. An attorney owes a client no duty that falls outside the scope of a limited representation

nor can the attorney breach a duty of care or fiduciary duty in that circumstance. Thus, the attorney's duty to disclose does not extend to matters beyond the scope of the representation. *Id.*

In *Joe*, a shareholder at a law firm representing the client in a real estate transaction served on the Irving City Council. *Id*. at 154. At a city council meeting, the attorney voted in favor of an ordinance that adversely affected his firm's client, a joint venture, and caused a conflict of interest. *Id*. This ordinance placed a moratorium on constructing apartment complexes, the type of business conducted by the joint venture. *Id*. While the firm represented the joint venture in acquiring, developing, and selling a parcel of land for building an apartment complex, the scope of its representation extended only to reviewing and drafting documents to complete the sale. *Id*. at 160. After the moratorium took effect, the buyer canceled the contract with the joint venture. *Id*. at 154. The joint venture sued the attorney and his firm for legal malpractice and breach of fiduciary duty. *Id*. The pleadings alleged that the lawyer and his firm not only failed to disclose a conflict of interest, but also committed legal malpractice by negligently failing to discloseinformation material to the representation – the upcoming city council meeting at which thermoratorium passed. *Id*. The attorney / councilperson never advised the firm or the client about the council meeting, the proposed moratorium, his leadership position advocating for that ordinance, or his vote to pass the ordinance. *Id*. at 160.

The Supreme Court concluded that "the scope of [the firm's] representation included . . . reviewing and drafting sale documents for the 11–acre tract but did not include representation of 239 JV in matters before the Irving City Council." *Id*. at 160. The client "handled its planning and zoning issues before the Irving City Council internally and that [the firm] never represented [the joint venture] in such matters. Such matters were thus beyond the agreed scope of representation between" the client and the firm. *Id*. The scope of representation negated any duty:

> Because representing [the joint venture] before the City Council was not included in the scope of [the firm's] representation, [the firm] had no duty to inform [the joint venture] of the September 7, 1994 meeting. Thus, the trial court properly granted summary judgment in favor of [the firm] on [the joint venture's] claim that [the firm] negligently failed to inform [the joint venture] about the September 7, 1994 City Council meeting on the moratorium.

*Id.*

Applying *Joe* as the "Texas substantive law," as required by the arbitration agreements, the Arbitrator must measure any tort duty by first examining the scope of representation. *See Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683 (2010) (arbitrators derive their powers to resolve the disputes from the terms of the arbitration agreement). Rather than warrant or guarantee any favorable tax treatment, the scope of engagement set out in the 2015 Engagement Letter sought only to "form and operate" a captive insurance risk planning arrangement that was intended to "qualify for partial tax exempt status." EX J-20 at 1, 30 ("The intention is to structure and operate the captive insurer to as to qualify for partial tax exempt status").

Given all the disclaimers in the 2015 Engagement Letter, SCP can point to no warranty or guaranty that exists by operation of Texas law, let alone an independent tort duty. *See First Commerce Bank v. Palmer*, 226 S.W.3d 396, 399 (Tex. 2007). SCP instead consented to giving up its right to a guaranteed result promising risk-free tax benefits. *See id.*; *FDIC v. Coleman*, 795 S.W.2d 706, 710 (Tex. 1990). Because negligence arises "only through failure to discharge a duty," where "the law did not impose that duty upon [the Feldman Law Firm], its act did not amount to negligence, and no recovery can be predicated upon it." *Denison Light & Power Co. v. Patton*, 154 S.W.2d 540, 541 (Tex. 1913).

In a claim for negligence, "the question of duty is a question of law which must be decided before the issue of standard of care arises." *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995). "It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort

liability." *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993). "The nonexistence of a duty ends the inquiry into whether negligence liability may be imposed." *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998). The absence of any duty thus precludes any liability for negligence. *Denison Light & Power Co.*, 154 S.W.2d at 541; *Dobbins v. Mo., Kan. & Tex. Ry.*, 41 S.W. 62, 63 (Tex. 1897).

Where the Feldman Law Firm owes no legal duty, moreover, no breach can occur. *McCall v. Marshall*, 398 S.W.2d 106, 108 (Tex. 1965). To prove that the Feldman Law Firm breached any duty in negligence, SCP must first establish the applicable standard of care. *See Windrum*, 581 S.W.3d at 768. The essential element of breaching a standard of care stands separate and apart from the existence of a legal duty. *Otis Eng'g Corp.*, 668 S.W.2d at 309. Because the Feldman Law Firm gave SCP no warranties or guaranties, it breached no duty to them. *See McCall*, 398 S.W.2d at 108.

As for their breach of fiduciary duty claims alleging failures to disclose, SCP can never prove that the Feldman and Capstone Parties owed them a duty to disclose facts that sought to guarantee a tax-compliant captive arrangement because the scope of representation never contemplated any such guarantee. The 2015 Engagement Letter disclaimed any such result and explicitly warned SCP what could happen in a potential IRS enforcement action. No direct nexus exists because SCP's claims do not arise out of the specific fiduciary relationship as defined by the scope of the representation. *See Joe*, 145 S.W.3d at 159-60; *Richard Nugent & CAO, Inc.*, 543 S.W.3d at 256-57.

In their post-hearing brief,[503] SCP also base part of their negligence and breach of fiduciary

---

[503] In none of the arbitrations did SCP ever state a claim for negligence and breach of fiduciary duty in their pleadings based on the allegation that they served as "primary" insurers of liabilities of the Feldman and Capstone Parties. In the Baker and Kutcher arbitrations, SCP filed no pleadings complaining about the presence of the A.M.Y. policies in the PoolRe risk pool.

duty claims on the false premise that they served as "primary" insurers of liabilities of the Feldman and Capstone Parties:

- "Feldman and Capstone did not disclose to their clients that the clients were primary insurers of Feldman and Capstone's professional liabilities, errors & omissions, and legal expenses. . .. " SCP's Post Hearing Brief at 9.

- "Feldman and Capstone rely upon a single sentence buried in Exhibit E to the Joint Engagement Letter to suggest that they made adequate disclosure that their clients would be the primary insurers of Feldman and Capstone's professional liabilities and legal expenses." SCP's Post Hearing Brief at 14.

- Exhibit E to the 2015 Engagement Letter "does not suggest or state the fact that Feldman and Capstone were surreptitiously requiring their clients to be their primary malpractice insurers." SCP's Post Hearing Brief at 14.

The Feldman and Capstone Parties' affiliated captive insurer, A.M.Y. (not the PoolRe reinsurance arrangement, SCP's captives (Janus, Cerberus, and Orion) and the other 50 pool participants), provide primary direct-written coverage to the Feldman and Capstone Parties on their errors & omissions, legal expense reimbursement, loss of services and malpractice policies. Based on the structure of the pool and the very nature of **reinsurance**, PoolRe (and by extension, the participating captives in PoolRe quota share program) provide zero primary coverage to the Feldman and Capstone Parties. That is because A.M.Y. must pay out coverage up to the attachment point or attachment threshold before the pool's reinsurance layers can even be triggered. That is, _the first dollars of coverage are always paid by A.M.Y. and no one else_. *See* TR Vol. 16 at 6105 (Calderon testimony that the pool would have no obligation unless claim exceeds attachment threshold).

For 2018, the A.M.Y. attachment point was $252,000. EX DRS-1997. This threshold means that, for 2018, the primary layer of insurance to be paid by A.M.Y. for the Feldman and Capstone Parties' professional liabilities was at least $252,000, for which pool participants had

zero obligations. *See, e.g.*, EX FC-370.12 at § 7.D ("Notwithstanding anything to the contrary herein, PoolRe shall not be obligated to complete its processing of a claim and to provide reimbursement with respect to such claim, unless and until, the Lead Insurer shall have fully processed and provided reimbursement with respect to its underlying claim submitted to the pool"). Further, SCP's own witness testified that there was no evidence that the 2018 pool paid any money on A.M.Y. claims. TR Vol. 7 at 2815.

For 2019, the A.M.Y. attachment point is $266,675 TR Vol. 11 at 4539; *see also* EX DRS-2000. This threshold means that, for 2019, the primary layer of insurance for the Feldman and Capstone Parties' professional liabilities was at least $266,675 for which pool participants had zero obligations. TR Vol. 11 at 4539 ("Up to the attachment threshold, A.M.Y. pays a hundred percent of the approved claims, or the losses."). Again, SCP presented no evidence that showed that any 2019 pool money had been paid out on any 2019 A.M.Y. claim.

In fact, SCP provided zero evidence that a PoolRe reinsurance pool had ever paid a penny on any A.M.Y. claim, and in fact the evidence showed the opposite – that PoolRe has never paid a penny to A.M.Y. on a claim. *See, e.g.*, TR Vol. 16 at 6120. And yet, over the years, A.M.Y. has paid out significant monies to its insureds on claims. *See, e.g.*, TR Vol. 16 at 6141-42; EX FC-647. SCP did not—and cannot—explain how the pool participants in PoolRe are supposedly the "primary" insurers for any risks attributable to the Feldman and Capstone Parties, but yet A.M.Y. and not PoolRe has paid out monies on A.M.Y. claims.

Accordingly, the Arbitrator [should reject] SCP's mischaracterization that Cerberus, Janus, and Orion functioned as "primary insurers" for the Feldman and Capstone Parties' liabilities. In reality,Cerberus, Janus, and Orion acted as reinsurers on any claims that A.M.Y. submitted to the PoolRereinsurance risk pool that qualified for reinsurance coverage by exceeding the contractual

attachment point. *See, e.g.*, TR Vol. 11 at 4539; TR Vol. 16 at 6105 (Calderon testimony that the pool would have no obligation unless claim exceeds attachment threshold); EX FC-370.12 at § 7.D; EX DRS-1997.

While A.M.Y. issues direct-written or first-dollar or primary policies to its insureds, including the Feldman and Capstone Parties, no reinsurers in the risk pool, such as SCP, covered such risks or would ever pay the first dollar in coverage to A.M.Y.'s insureds. On the contrary, theQuota Share Reinsurance Policy operated as "excess" coverage for all the pool participants by onlyindemnifying a percentage of loss that exceeds the contract's attachment point. *See Gill v. Blackhawk Mut. Ins. Co.*, 152 N.E.2d 210, 213 (Ill. App. Ct. 1958). In *Gill*, which involved a similar reinsurance arrangement, the appellate court upheld a summary judgment against a policyholder that argued, just like SCP do here, that the reinsurer had to pay the policy holder for the primary insurer directly instead of paying the primary insurer itself as the reinsured. *Id*.

> By none of the provisions of the agreement did [the reinsurer] obligate itself to pay any loss sustained by a policy holder of the Blackhawk Company to such policy holder. Its agreement was to pay the Blackhawk Company but only after the Blackhawk Company had paid a loss on a claim in excess of $5,000. The express language of this agreement makes it an excess reinsurance contract and as such its provisions are not enforceable by [the policy holder].

*Id*.

Under the reinsurance contracts here, no privity of contract exists between the SCP captives – Cerberus, Janus, and Orion – and the Feldman and Capstone Parties. *See Mission Grove, LP v. Hall*, 503 S.W.3d 546, 551-52 (Tex. App. – Houston [14th Dist.] 2016, no pet.). The privity of contract lies only between the Feldman and Capstone Parties and A.M.Y. *See id.* This lack of privity eliminates any direct nexus between the scope of representation defined by the contracts here and the tort duties SCP claim to exist. *See Joe*, 145 S.W.3d at 159-60; *Richard Nugent &*

*CAO, Inc.*, 543 S.W.3d at 256-57.

Because the evidence conclusively establishes that Cerberus, Janus, and Orion served as reinsurers under the PoolRe reinsuring agreements rather than primary insurers as to the Feldman and Capstone Parties, the Feldman and Capstone Parties had no legal duty to disclose to SCP that Cerberus, Janus, and Orion would or could serve as the "primary insurers of Feldman and Capstone's professional liabilities, errors & omissions, and legal expenses – even if the clients sued Feldman or Capstone for professional malpractice." SCP's Post-Hearing Brief at 9. In the absence of any duty owed by the Feldman and Capstone Parties to make all the disclosures that give rise to SCP's claims, **the Arbitrator [should rule] that SCP TAKE NOTHING on their claims for legal malpractice / negligence and breach of fiduciary duty.**

   2. **SCP did not prove its claim for negligence / professional malpractice**

      a. **SCP's Attempt to Establish the Standard of Care SolelyThrough the Disciplinary Rules Fails**

The Texas Disciplinary Rules of Professional Conduct ("DRs") have never provided a basis for creating civil liability for attorneys in this state. TEX. DISCIPLINARY R. PROF'L CONDUCT PREAMBLE § 15; *see Joe*, 145 S.W.3d at 158 n.2.  Nor do the DRs set forth a standard of care the breach of which gives rise to negligence *per se. Cruse v. O'Quinn*, 273 S.W.3d 766, 775 (Tex. App. – Houston [14th Dist.] 2008, pet. denied). SCP cast aside this long-standing law and substitute their own standard of care in its place – one for which they cite no Texas authority whatever: "Mr. Feldman violated several Texas Disciplinary Rules of Professional Conduct. These rules establish *a clear standard of care* as to how reasonable, prudent lawyers conduct themselves." SCP's Post-Hearing Brief at 40 (emphasis added) (citing no Texas case law, statute, or rule).  SCP never specifically alleged any violation of a DR in any of their pleadings in the State

Court Lawsuit, the Baker arbitration, the Kutcher arbitration, the Glasser arbitration, or the Jones arbitration.

Rather than relying on the DRs, Texas law requires expert testimony to prove the standard of care for both a breach of fiduciary duty and a professional malpractice claim against the Feldman Parties. *Kastner v. Martin & Drought, Inc.*, No. 04-07-00342-CV, 2009 WL 260601, at *5-6 (Tex. App. – San Antonio Feb. 4, 2009, pet. denied) (mem. op.). SCP did not satisfy this requirement. Testifying about the standard of care, SCP's legal expert instead devised a circular, but legally impermissible, methodology by basing his opinions and mental impressions on the DRs. SCP's Post-Hearing Brief makes it clear that Mr. Watkins relied on the DRs to impose civil liability because Mr. Feldman allegedly violated those DRs:

> Mr. Watkins testified that the violation of disciplinary rules operates as a *de facto* proxy for a finding of negligence: "[E]very expert that testifies will testify that reasonable and prudent lawyers will comply with the disciplinary rules. . . [the violation] creates at least negligence on [Mr. Feldman's] part for not following these rules."

SCP's Post-Hearing Brief at 40-41(citing TR Vol. 4 at 1536:15-18, 24; 1537:5).

Yet the Texas Supreme Court has refused to recognize the DRs as the "substantive law" of Texas. *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 503 (Tex. 2015). The Arbitrator derives his power to adjudicate this dispute from the parties' arbitration agreements, which call for "applying Texas substantive law." EX J-20 at 15; *see Stolt-Nielsen SA*, 559 U.S. at 682-83. Because the DRs do not make up any part of "Texas substantive law," the arbitration agreements prohibit the Arbitrator from applying them to resolve SCP's negligence / legal malpractice claims.

Mr. Watkins used the DRs to establish the standard of care that governed SCP's negligence and fiduciary duty claims, even though such rules explicitly state that "the Rules do not define

standards of civil liability of lawyers for professional conduct." *Joe*, 145 S.W.3d at 158 n.2; *see also* TR Vol. 4 at 1536-34 ("So in this case Mr. Feldman's not complying with the DRs in terms of his duties under 1.06 and 1.09 and under fiduciary duty is not a reasonably prudent lawyer would do and it causes -- it creates at least negligence on his part for not following these rules.").

Mr. Watkins opined that the Feldman Parties violated Rules 1.06 and 1.08, thereby giving rise to professional negligence. TR Vol. 4 at 1536-60. Yet, Mr. Watkins conceded on cross-examination that the DRs do not set the standard for civil liability against an attorney, create any legal duty, or serve as a basis for a cause of action against the Feldman Parties. TR Vol. 5 at 1851-52; DRs Preamble § 15; *see also Fleming v. Kinney ex rel. Shelton*, 395 S.W.3d 917, 931 (Tex. App. – Houston [14th Dist.] 2013, pet. denied); *Jurek v. Kivell*, No. 01-10-00040-CV, 2011 WL 1587375, at *7 (Tex. App. – Houston [1st Dist.] Apr. 21, 2011, no pet.). "These rules do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached." DRs Preamble § 15.

The testimony given by Mr. Watkins attributing liability to the Feldman Parties repudiates the very DRs he purported to rely on as stated by the Preamble:

> The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, *does not imply that an antagonist in a collateral proceeding* or transaction *has standing to seek enforcement of the rule*. Accordingly, *nothing in the rules* should be deemed to augment *any substantive legal duty* of lawyers or *the extra-disciplinary consequences of violating such a duty*.

*Id.* (emphasis added). Mr. McCormack, the Feldman Parties' legal ethics expert, also agrees that a violation of the DRs does not create any civil liability in Texas:

```
 7          Q.      Can a disciplinary rule
 8   violation create civil liability in Texas?
 9          A.      No.
```

TR Vol. 19 at 7620.

Mr. McCormack explained the basis for this response, which rested on the Preamble to the DRs and Texas case law. TR Vol. 19 at 7622. According to Mr. McCormack, "a violation of the disciplinary rule doesn't automatically equal a breach of fiduciary duty [because] they kind of exist on separate tracks," and "a violation of a disciplinary rule doesn't equal the breach of a legal duty owed by a lawyer to a client." TR Vol. 19 at 7622-23. Contrary to the opinions expressed by Mr. Watkins, Mr. McCormack had never been permitted to testify in a civil case that the DRs set forth the standard of care underlying claims for legal malpractice and breach of fiduciary duty. *See also* TR Vol. 19 at 7622-24.

Notably, uncontroverted evidence in the record establishes that the Doctors filed a grievance against Mr. Feldman with the State Bar of Texas, which is the only body with authority to enforce the DRs against a lawyer licensed to practice law in this state. *McGuire, Craddock, Strother & Hale, P.C. v. Transcont'l Realty Inv'rs, Inc.*, 251 S.W.3d 890, 895-96 (Tex. App. – Dallas 2008, pet. denied). The undisputed evidence further showed that a summary disposition panel dismissed this complaint against Mr. Feldman without taking any action. TR Vol. 4 at 1671-99. Mr. Watkins agreed that the grievance committee represents "a reasonable mind that can differ" with the allegations raised by SCP regarding breach of fiduciary duty and professional malpractice. TR Vol. 4 at 1671-99.

The Arbitrator [should find] that in this arbitration, which is a "collateral proceeding" to

any State Bar action regarding alleged violations of the DRs, SCP lacks "standing" to assert the DRs as a basis for civil liability that sounds in negligence and breach of fiduciary duty. *McGuire, Craddock,Strother & Hale*, 251 S.W.3d at 895-96. <u>*Only the State Bar of Texas possesses jurisdiction to enforce the DRs*</u> against the Feldman Parties – action that enforcement body refused to take as Mr. McCormack confirmed and as was conceded by Mr. Watkins. *See id.*; TR Vol. 4 at 1671-99; TR Vol. 19 at 7647-49.

Nothing in the DRs cited by Mr. Watkins acts as Texas "substantive law" that can bind attorneys in civil litigation. *Royston, Rayzor*, 467 S.W.3d at 503. In using those DRs as a basis for civil liability and in giving expert testimony on this pure issue of law (rather than fact), Mr. Watkins made his (conclusory) expert testimony unreliable. *Fleming*, 395 S.W.3d at 928-31. In short, Mr. Watkins is basing his opinions and mental impressions on nothing but *ipse dixit*. *Rogers v. Zanetti*, 518 S.W.3d 394, 405, 405-10 (Tex. 2017). "An *ipse dixit* is still an *ipse dixit* even if offered by the most trustworthy of sources." *Id.* at 409.

This unreliable and conclusory expert testimony is incompetent evidence, rendering it legally insufficient to prove disputed facts even when admitted without objection. *City of Keller v. Wilson*, 168 SW3d 802, 812-13 (Tex. 2005); *Coastal Transp. Co. v. Crown Cent. Transp. Corp.*, 136 SW3d 227, 232-33 (Tex. 2004). As a result, SCP proved no breach of fiduciary duty or negligence through Mr. Watkins's expert testimony that relied on the Texas DRs. *Fleming*, 395 S.W.3d at 928-31. Nor does it matter that Mr. Watkins expressed numerous opinions on legal malpractice based on the DRs. In Texas, a bunch of "no evidence" nevertheless remains no evidence–that is, legally insufficient to create a fact issue, let alone prove a fact by a preponderance of the evidence. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 148 (Tex. 2004).

The Arbitrator [should conclude] that any evidence and expert testimony regarding alleged

violations of the DRs is irrelevant, not probative of SCP's claims against the Feldman Parties, and

will not be considered as a basis of civil liability in this arbitration. The Arbitrator [should further

conclude] that because SCP sought to establish the standard of care solely through incompetent

expert testimony that in turn relied solely on the DRs, SCP failed to establish a proper standard of

care to support a negligence claim.

          **b.  SCP Failed to Prove that The Feldman and Capstone Parties Fell Below the Standard of Care by Violating Multiple Disciplinary Rules as Interpreted by SCP[504]**

              **i.  The 2015 Engagement Letter Limits the FeldmanParties' Scope of Representation by Carving OutAny Dual Representation of SCP Adverse to Capstone Or PoolRe that Would Implicate DR 1.06**

Although SCP, relying on the testimony of Mr. Watkins, contend that Mr. Feldman

"clearlyimplicated" DR 1.06(b)(1) by failing to fully disclose alleged conflicts of interest, the

Arbitrator [should disagree]. SCP's Post-Hearing Brief at 42. Mr. Watkins admitted that

reasonable minds could differ in construing and applying the DRs:

---

[504] Because the Feldman and Capstone Parties owed SCP no tort duty that could give rise to negligence under the narrow scope of representation, and because SCP failed to establish the applicable negligence standard of care with competent evidence, the Arbitrator [should conduct] this analysis in the alternative.

```
10         Q.      I understand.  And you agree
11    that -- let me ask very specifically, because
12    I want to talk about construing those rules
13    and applying those rules.  Okay?
14              So reasonable minds could
15    differ on how they construed Rule 106 and
16    Rule 108.  You agree with that?
17         A.      That's correct.
18         Q.      In applying those rules,
19    likewise, reasonable minds could differ on
20    the proper application of that construction,
21    correct?
22         A.      Yes.
```

TR Vol. 4 at 1677.

As pointed out by the Feldman Parties' expert on legal ethics, Jim McCormack, lawyers may limit the potential for conflicts by restricting the scope of representation to exclude such situations:

```
15          Q.      Is there a way that lawyers and
16    clients can draft their legal services
17    agreements to avoid specific situations that
18    would involve a conflict of interest?
19          A.      I think it happens all the
20    time.  We just don't think of it, that that's
21    necessarily what we're doing.  Anytime we
22    limit a scope of representation, we are
23    limiting the number of conflicts that could
24    come up.
```

Mr. McCormack also opined, and the Arbitrator agrees, that the 2015 Engagement Letter

excluded from the scope of representation "representation adverse to or to the detriment of or

against" the "many insurers" that are represented by the Firm and administered by Capstone:

**POTENTIAL CONFLICTS.** When we are asked to provide legal services for more than one person (e.g., multiple owners of a business or a husband and a wife in an estate planning assignment or a business matter), conflicts may arise. If we are to act as attorneys for multiple persons, we must balance the interests of all persons involved. Therefore, we cannot be an advocate for any one person against another in the case of multiple representation. The process could favor one to the detriment of the other. By way of further example, a substantial conflict could arise in the determination of what constitutes community property versus separate property. That determination may be more beneficial for one spouse than the other. Further, while divorce may not be contemplated, it is important to realize that estate planning, and especially estate planning that incorporates declarations of gift, could have consequences that either spouse may find adverse in the event of divorce. As an additional example, because the Firm represents and Capstone administers many insurers (captive and otherwise), including for those of affiliates of the Firm and Capstone, the Firm will not take on representation adverse to or to the detriment of or against those persons within the scope of the Firm's representation. Similarly, our recommendations could affect the income, property, and support provisions in any divorce or after the death of one of the spouses or that of one business partner versus another. For these and other reasons, each person or entity is advised to and welcome to have separate counsel.

EX J-20 at 14; TR Vol. 14 at 7490-91. Mr. McCormack reinforced the effect of this carve-out

during cross examination:

```
15        Q.     The sentence that's highlighted
16   on slide 41 (as read):  "As an additional
17   example, because the firm represents and
18   Capstone administers many insurers (captive
19   and otherwise), including for those of
20   affiliates of the firm and Capstone, the firm
21   will not take on representation adverse to or
22   to the detriment of or against those persons
23   within the scope of the firm's
24   representation."
25              Mr. Feldman is stating in that
```

```
1   sentence, the highlighted sentence, that he
2   will not take on the representation of a
3   client to the detriment of or against one or
4   more of his other clients.  Correct?
5        A.     Right, he won't be adverse to
6   another client on behalf of -- one client on
7   behalf of another client.
8        Q.     Right.  But in this instance,
9   that's what happened.  When the doctors
10   signed the engagement letter, J-20,
11   Mr. Feldman became adverse to the clients,
12   correct?
13        A.     I don't agree.
14        Q.     You don't understand that when
15   the doctors signed J-20, that there was a
16   conflict of interest between the doctors and
17   Stewart Feldman and his firm?
18        A.     Right.  We talked about that
19   last night, and I disagreed.
```

TR Vol. 20 at 7868-69.

Given the specific carve-out in the 2015 Engagement Letter, the Arbitrator [should find]

that Feldman did not "jointly represent" SCP, Capstone, and PoolRe in an "adverse" manner. SCP's Post-Hearing Brief at 41.

The above disclosure, which appears under the heading of "Potential Conflicts" in the 2015 Engagement Letter, also refutes Mr. Watkins' testimony that there was no disclosure "at all" on these issues:

```
 3                   And, therefore, on behalf of
 4   himself and himself acting through Capstone,
 5   he owes full disclosure, full candor.  So
 6   I've gone through this contract until I'm
 7   blue in the face, and I cannot find full
 8   disclosure, absolute candor, any compliance
 9   at all with his fiduciary duty or any
10   compliance at all with Rule 1.06.
```

TR Vol. 4 at 1496. The expert opinion expressed by Mr. Watkins is divorced from the unambiguous language in the 2015 Engagement Letter, making that opinion incompetent because he based it "on assumed facts that vary materially from the actual, undisputed facts." *Rogers*, 518 S.W.3d at 410.

Applying Texas law, the Arbitrator [should] assess SCP's specific conflict-of-interest allegations and the tort duties allegedly owed by the Feldman Parties in light of the scope of representation at the time the parties entered into the 2015 Engagement Letter. *See McGuire, Craddock, Strother & Hale*, 251 S.W.3d at 895-97. Under this standard, if a lawyer is representing a client on matters A, B, and C, but not on matters X, Y, and Z, then the lawyer owes the client no legal duty as to matters X, Y, and Z, and therefore can face no liability in negligence in the absence

of such a duty. Because the Feldman Parties and SCP agreed at the outset of the relationship that the Feldman Parties would not represent SCP adverse to Capstone, PoolRe, and the participants in the PoolRe risk pools, the Arbitrator [should conclude] that the disclosure obligations of DR 1.06(b)-(c) are not implicated.

ii.  **The Feldman Parties Complied With Their Disclosure Obligations, Even Under SCP's Interpretation of DR 1.06**

Even if the disclosure obligations under DR 1.06(c) were implicated, the Arbitrator [should find] that the Feldman Parties satisfied their duty to disclose. From the outset of the relationship in 2015, the Feldman Parties unambiguously and repeatedly disclosed that they provided legal representation to the Capstone Parties, PoolRe, and SCP. EX J-20 at 4 ("To be clear, however, Capstone is a significant client of the Firm . . ..") ("The Feldman Law Firm LLP also does occasional legal work for PoolRe."). The 2015 Engagement Letter even included an unambiguous and enforceable waiver of conflict regarding the Feldman Law Firm's representation of Capstone:

> ▪ Performing services in coordination with and under the oversight of the Firm and in Capstone's so doing, performing the services specified in Exhibit "A" to the Engagement Letter, further subject to the Sections 4.1(f) and (n) below. Capstone (with the Firm acting as disbursing agent on behalf of Capstone) will compensate the Firm for its services. The undersigned expressly acknowledge and understand that the Firm represents Capstone as well as the Companies and that as such the signatories hereto waive any conflict that may exist, with each signatory hereto retaining the right to separately retain at its expense separate counsel.

EX J-20 at 21. SCP knew that Mr. Feldman owned both Capstone and The Feldman Law Firm LLP, and Mr. Feldman signed the 2015 Engagement Letter on behalf of both:

Please sign below and return a copy of this agreement to us to that Capstone and our Firm can continue our joint work on this project. We look forward to working with you.

Very truly yours,

Stewart A. Feldman on behalf of
Capstone and the Firm

EX J-20 at 11; EX J-118 at 25 (Capstone Marketing Materials describing Mr. Feldman's bio).

The 2015 Engagement Letter also clearly disclosed in plain English that Capstone administered PoolRe: "We will also endeavor to make available to you an insurance pooling arrangement through PoolRe (see Exhibit E) which Capstone administers on behalf of many joint clients of Capstone and the Firm (and their affiliated insureds) as well as the owners of PoolRe." *Id*. at 2; *see also id.* at 4 ("Note that pooling and other third party insurance is offered in conjunction with PoolRe Insurance Corp., which is independently owned by a third party but is administered by Capstone under the direction of PoolRe's officers and directors.").

The 2015 Engagement Letter also makes clear that "[t]he voluntary or involuntary termination of the Firm will nonetheless obligate Capstone and Capstone obligates [SCP] to this agreement for the contract term provided herein in all situations." *Id.* at 6 n.8. It also states (1) that "[i]f you have contracted with Capstone, the withdrawal of the Firm will not affect Capstone's obligations to you or your obligations to Capstone, which as to called for non-legal services and fees shall be undiminished." *Id*. at 14. These provisions make clear that Capstone, which Mr. Feldman owns, would expect to be paid the full amount of the turnkey fees even if there were a voluntary or involuntary termination of the Feldman Parties as lawyers, which would also prevent SCP's participation in the PoolRe risk pool. Thus, the 2015 Engagement Letter adequately advised SCP that Capstone's interests in getting paid would override any issues that might arise from

ending the attorney-client relationship with the Feldman Parties.

The Arbitrator [should also conclude] that SCP mischaracterize the payment mechanism created by the 2015 Engagement Letter. Relying solely on Mr. Watkins again, while disregarding the unambiguous terms of the 2015 Engagement Letter, SCP base their negligence claim on the false premise that the contract establishes "two streams of income *to the lawyer*." TR Vol. 4 at 1495 (emphasis added); SCP's Post-Hearing Brief at 42 (emphasis added). Reading its clear language, the Arbitrator [should conclude] that the 2015 Engagement Letter (repeatedly) provides for only one stream of income payable by SCP to Capstone alone. See EX J-20 at 8 ("In general, Capstone's turnkey fee (which is inclusive of fees then paid by Capstone to the Firm) is inclusive of such significant matters as compensating the statutory captives manager (one of our affiliates)"); EX J-20 at 9 ("The overall fees, which are paid to Capstone (which in turn pays the Firm for legal work undertaken whether or not in excess of the total fees paid) for their respective services, total as follows:"); EX J-20 at 14 ("If you have contracted with Capstone, the withdrawal of the Firm will not affect Capstone's obligations to you or your obligations to Capstone, which as to called for non-legal services and fees shall be undiminished"); EX J-20 at 22 ("Generally speaking, the legal services being provided by the Firm in coordination with Capstone, for which Capstone compensates the Firm, include the standard legal support services for the day-to-day operation of the companies such as monitoring and responding to regulatory changes, manuscripting insurance policies for licensing by Capstone, drafting standardized line of credit agreements and updating corporate records, along with the other legal services specified in Exhibit "A" to the Engagement Letter. Additionally, Capstone stands ready to compensate the Firm for the legal and tax defense set forth in the Engagement Letter."); EX J-20 at 25 ("All fees under the Engagement Letter, as amended from time-to-time, shall be due and payable to Capstone through

the later to occur of the dissolution of the Companies or the Year End Termination Date."); EX J-20 at 25 ("In consideration of services to be provided by Capstone to the Companies under this Article, the Companies and/or the Client agree to pay Capstone a fee in accordance with and on a time schedule as agreed to from time-to-time between Capstone and the Client in the aforementioned Engagement Letter, as amended in writing from time-to-time.").

Although the "turnkey" fee in the 2015 Engagement Letter, payable to Capstone, may also go to cover legal services provided by the Feldman Parties to SCP, *nothing in the 2015 Engagement Letter obligates SCP to pay any legal fees directly to the Feldman Parties*. And the Arbitrator [should find] that SCP produced no evidence, other than the *ipse dixit* of Mr. Watkins, indicating or proving that "the contract is set up in such a way as to create two streams of income to the lawyer." SCP produced no evidence of a single payment they made to The Feldman Law Firm LLP or even a single payment that Capstone made to The Feldman Law Firm out of the service fees SCP paid to Capstone. Thus, the Arbitrator [should reject] SCP's bare contention that "the contractual structure, whereby the Doctors would pay Capstone and some unspecified portion of the funds would be tendered to the Feldman Law Firm, reflected Mr. Feldman's dual loyalties." SCP's Post-Hearing Brief at 42. The supposed conflict SCP alleges triggered the Feldman Parties' disclosure obligations under DR 1.06 did not exist.

SCP and their advisors accepted these "unambiguous" provisions of the 2015 Engagement Letter without objection, without making further inquiry or challenge, or asking for clarification, or raising any concerns. This is despite the 2015 Engagement Agreement being negotiated by SCP, including their attorney Mr. Sherman, over a period of months. Only after litigation arose and SCP hired litigation attorneys to pursue claims against the Feldman and Capstone Parties did SCP raise the argument that disclosures were somehow insufficient.

Given the sophistication of SCP and their advisors, the disclosures in the 2015 Engagement Letter were sufficient to advise SCP of the Feldman Parties' simultaneous representation of the Capstone Parties, PoolRe, and SCP. The Feldman Parties therefore did not breach any applicable standard of care.

### iii. The Feldman Parties Never Entered into a Business Transaction with SCP Through the PoolRe Reinsuring Agreements that Would Violate DR 1.08

Although SCP contend otherwise, the Arbitrator [should conclude] that the 2015 Engagement Letter did not constitute a business transaction with a client via A.M.Y.'s participation in the PoolRe risk pool because no direct insuring relationship arose out of that agreement. EX J-20. The legal malpractice expert for the Feldman Parties, Jim McCormack, opined that no business transaction with a client arose in this situation:

```
18        Q.      Okay.  Do you believe that
19   there was a business transaction with a
20   client by -- in regards to Mr. Feldman and
21   the law firm, by virtue of the fact that the
22   doctors' captive insurance companies were in
23   the same reinsurance pool as a captive owned
24   by Mr. Feldman?
25        A.      No.
```

TR Vol. 19 at 7599. The Arbitrator [should find] this expert testimony more credible than that offered by SCP's Mr. Watkins. Mr. McCormack went on to explain that DR 1.08 is implicated in "direct business transactions with clients" and that no such direct transactions were present here:

```
14        Q.    Have you seen any contracts
15   that are specifically between AMY Property &
16   Casualty Insurance Company and the doctors'
17   captives, Cerberus, Janus, or Orion?
18        A.    You mean a direct contract
19   within the pool?  No.
```

*Id*. at 7600. Mr. Sherman admitted that, when he reviewed the 2015 Engagement Letter for the Doctors, he understood that the 2015 Engagement Letter is not: (1) an insurance or reinsurance contract of any kind; (2) a contract between PoolRe and Cerberus, Janus, and Orion; and (3) a stop-loss or quota-share contract between PoolRe and Cerberus, Janus, or Orion. TR Vol. 20 at 7940-43.

The undisputed evidence supports this expert conclusion reached by Mr. McCormack because Stephen Friedman, not Mr. Feldman, owns PoolRe:

```
15        Q.    I'd like to talk to you about
16   PoolRe.
17              Do you own PoolRe?
18        A.    Yes, I do.
19        Q.    What is the percentage of your
20   ownership of PoolRe?
21        A.    A hundred percent.
```

*See* TR Vol. 23 at 9454. Capstone's President Jeff Carlson further confirmed that PoolRe made its own decisions without any control by Mr. Feldman or Capstone. TR Vol. 23 at 9273-74.

The documentary evidence likewise makes clear that PoolRe enters into independent contracts and business transactions. *See* EX J-20 at 4 n.5 ("Note that pooling and other third party

insurance is offered in conjunction with PoolRe Insurance Corp., which is independently owned by a third party but is administered by Capstone under the direction of PoolRe's officers and directors. The Feldman Law Firm LLP also does occasional legal work for PoolRe."). There is no evidence in the record that any company owned or controlled by Mr. Feldman *directly* contracted with SCP for reinsurance coverage in the PoolRe risk pool.  In fact, the evidence is conclusive that the Cerberus, Janus, and Orion contracted solely with PoolRe and their own affiliated insureds regarding their participation in the PoolRe risk pools. *See, e.g.*, EX 367.4 at 21, 40, 48; EX 370.12 at 14.

The Arbitrator [should therefore conclude] that the Feldman Parties had no duty to comply with DR 1.08 as interpreted by SCP by virtue of the SCP captives' participation in the 2018 and 2019 PoolRe risk pools.

### iv. The Feldman Parties Complied With Their Disclosure Obligations, Even Under SCP's Interpretation of DR 1.08

According to SCP, "Rule 1.08 applies where a lawyer goes into business with a client." SCP's Post-Hearing Brief at 44. Even assuming this simplistic interpretation of DR 1.08 applies here to the Feldman Parties because of A.M.Y.'s participation in the PoolRe risk pool, the Feldman Parties adequately disclosed this transaction to SCP and their authorized agents who actually negotiated the 2015 Engagement Letter. Exhibit E to the 2015 Joint Engagement Letter includes the following unambiguous paragraph that addresses the presence of policies issued by A.M.Y. that cover risks that may affect the Feldman and Capstone Parties:

> This reinsurance facility is available to qualifying clients of Capstone subject to any captive participant or policy deemed inappropriate by PoolRe for any reason and thereby excluded (i.e., particular insurance policies and/or particular clients and/or policy pricing may be deemed unsuitable for or "non-homogeneous" with the risk pool).  The risk pool conducted by PoolRe enables participating captive insurance companies to diversify their underwriting risks, furthering the insurance aspects (that is, the "law of large numbers") of the planning. Note that among the several hundred policies in the pool are policies issued to Capstone or the Firm (or their affiliates) and that their affiliated captives may participate in the pool.

EX J-20 at 38.[505]

As interpreted by SCP, DR 1.08 "requires full disclosure" of "the presence of Feldman's and Capstone's primary policies in the risk pool, resulting in the expectation that the clients, the Doctors and Class Members, would reinsure Feldman against malpractice claims – even if the clients sued Feldman for malpractice." SCP's Post-Hearing Brief at 44. The Arbitrator [should adhere] to Judge Dorfman's determination that no ambiguity exists in the quoted paragraph from Exhibit E or anywhere else in the 2015 Engagement Letter.[506] Contrary to SCP's argument, this paragraph in Exhibit E *and other provisions in the 2015 Engagement Letter* made appropriate disclosures to them, chief among them being this plain statement: "[A]mong the several hundred policies ***in the pool are policies*** issued to Capstone or the Feldman Law Firm (or their affiliates)." *Id*. (emphasis added).  Exhibit E further disclosed to SCP, as they admit in their post-hearing brief, that PoolRe's "risk pool consisted of 'generally similar policies covering generally similar risks.'" SCP's Post- Hearing Brief at 45 (quoting EX J-20 at 38).

Given their previous experience with captive insurance arrangements and risk pools when they worked with Peter Strauss, SCP and their team of expert advisers therefore knew from the language of the entire 2015 Engagement Letter that (1) a captive insurer issued policies to the Feldman and Capstone Parties, (2) these policies covered risks that affected the business conducted by the Feldman and Capstone Parties, (3) the risks covered by these policies involved generally

---

[505] The Feldman and Capstone Parties made this same disclosure repeatedly <u>before</u> and <u>during</u> their engagement with SCP. *See, e.g.,* EX J-9 at 18 (March 3, 2015) (originally sent to SCP on January 28, 2015); EX FC-274-1 (February 2016); EX FC-375.1 (March 2016); EX FC-374.7 (March 2018); EX FC-274.11 (April 2019); EX FC-374.1 at 8 (February 2016); and EX FC-374.11 at 8 (April 2019).

[506] Judge Dorfman observed in his Final Award that "[FCP] and [SCP] agree that the Engagement Letters, and all other relevant contractual documents between them, are unambiguous." EX J-115 ¶ 16. This finding made by Judge Dorfman collaterally estops SCP from arguing otherwise. *See Wilhite v. Adams*, 640 S.W.2d 875, 876 (Tex. 1982) (per curiam) (collateral estoppel bars relitigating same issues a tribunal has already decided).

similar risks to ones that faced other insureds who were reinsured through the risk pool, and (4) the policies issued to the Feldman and Capstone Parties went into the PoolRe risk pool along with several hundred other policies covering generally similar risks.

Even though no business transaction existed between the Feldman Parties and SCP that involved participation in the PoolRe risk pool, the Arbitrator [should conclude] that the risk pooling agreements here were nonetheless fair and reasonable to SCP and that the Feldman and Capstone Parties met the requisite standard of care. To this end, SCP must mischaracterize the unambiguous terms of the 2015 Engagement Letter to try to state the claim for negligence they base on DR 1.08: "It is neither 'fair' nor 'reasonable' for an attorney **_to require his clients_** to unknowingly reinsure the attorneys' malpractice liabilities and defense expenses, especially considering the magnitude of exposure arising from Feldman's malpractice liabilities specifically." SCP's Post Hearing Brief at 45 (emphasis added). To the contrary, the 2015 Engagement Letter makes clear that participating in the PoolRe risk pools was "recommended" but "not required":

> Client captives and their affiliated insureds are <mark>not required</mark> by Capstone to participate in the risk pool; Capstone and the Firm make this opportunity available to their joint clients but do not require their participation. It is ultimately the clients' sole decision (the clients being the captive insurer, its owners and officers, and the related insureds) as to whether or not to participate in the pooling arrangement. And, as mentioned above, once a client has decided to participate in the risk pool, it is within PoolRe's discretion as to which policies and insureds are included/excluded from the pool.

EX J-20 at 39; *see also* EX J-20 at 4 n.5. The Arbitrator [must consider] this unambiguous language to be the best evidence that refutes SCP's negligence claim that argues unfair and unreasonable terms. The undisputed testimony [should corroborate] the Arbitrator's reading of Exhibit E. Responding to a question asked by an arbitrator whether a captive is not required to seek entry to the pool, Capstone's Vice President of Operations, Daniel Calderon confirmed: "Absolutely

correct. There have been times where captives have not wanted to participate in the pool and they've gone a hundred percent direct written policy coverages." TR Vol. 16 at 6125-26.

The Arbitrator [should also find] that the SCP captives did not "unknowingly" insure the Feldman and Capstone Parties' liabilities. SCP knew that whatever policies were in the pool, they were "homogeneous" with other policies in the pool: "particular insurance policies and/or particular clients and/or policy pricing may be deemed unsuitable for or 'non-homogeneous' with the risk pool." EX J-20 at 38. Exhibit E also specifies that PoolRe, acting in its sole discretion, can exclude from the risk pool any nonconforming policies or risks, thereby making those that remain in the pool similar or homogenous. *Id.* at 38-39. The SCP captives also wrote policies similar to those

A.M.Y. issued to the Feldman and Capstone Parties. Because Cerberus, Janus, and Orion **wrote and pooled** legal expense, director and officers' liability, loss of services and professional malpractice policies, SCP were aware of the possibility that other pooled policies might also include professional malpractice, loss of services and legal expense reimbursement policies:

**STOP LOSS REINSURANCE AGREEMENT**

INSURERS:  Janus Insurance Corp. ("Lead Insurer" whether one or more)

PoolRe Insurance Corp. ("PoolRe") which serves as a stop loss insurer.

A "Participating Reinsurer" means those reinsurers listed on Attachment A hereto in the percentages so specified.

STOP LOSS REINSURANCE AGREEMENT EFFECTIVE DATE: December 21, 2018 at 12:01 a.m.

This agreement is attached to, and becomes part of, the following policies (the "Policies"), including without limitation the Common Policy Conditions applicable thereto:

| POLICY(IES) | POLICY NO. | POLICY EFFECTIVE DATE |
|---|---|---|
| Special Risk - Loss of Services | JNS-LOSSRVC-1801 | 12/21/18 |
| Cyber Risk Package | JNS-CYB-1801 | 12/21/18 |
| Directors & Officers Liability | JNS-DOL-1801 | 12/21/18 |
| Special Risk - Expense Reim. | JNS-EXPREIM-1801 | 12/21/18 |
| Legal Expense Reimbursement | JNS-LEGEXP-1801 | 12/21/18 |
| Pollution Liability | JNS-POLL-1801 | 12/21/18 |
| Breach of Privacy | JNS-BP-1801 | 12/21/18 |
| Special Risk - Collection Rate | JNS-C-RATE-1801 | 12/21/18 |
| Intellectual Property Package | JNS-IPP-1801 | 12/21/18 |
| Administrative Hearings | JNS-AH-1801 | 12/21/18 |
| Special Risk - Regulatory Changes | JNS-REG- 1801 | 12/21/18 |
| Employment Practices Liability | JNS-EPL-1801 | 12/21/18 |
| Unauthorized Treatments | JNS-UT-1801 | 12/21/18 |
| Audit Liability | JNS-PAY-1801 | 12/21/18 |
| Special Risk - Weather Re. Bus. Int. | JNS-WRBI-1801 | 12/21/18 |

**STOP LOSS ENDORSEMENT**

INSURERS:  Janus Insurance Corp. ("Lead Insurer" whether one or more)

PoolRe Insurance Corp. ("PoolRe") which serves as a stop loss insurer.

A "Participating Reinsurer" means each of those reinsurers under the Quota Share Policy defined below and listed on Attachment A.

A "Pool Participant" means each of those Named Insureds under the each Policy subject to this Endorsement.

STOP LOSS ENDORSEMENT EFFECTIVE DATE: December 21, 2017 at 12:01 a.m.

This endorsement is attached to, and becomes part of, the following policies (the "Policies"), subject to the Common Policy Conditions applicable thereto:

| POLICY(IES) | POLICY NO. | POLICY EFFECTIVE DATE |
|---|---|---|
| Administrative Hearings | JNS-AH-1701 | 12/21/17 |
| Breach of Privacy | JNS-BP-1701 | 12/21/17 |
| Special Risk - Collection Rate | JNS-C-RATE-1701 | 12/21/17 |
| Cyber Risk Package | JNS-CYB-1701 | 12/21/17 |
| Directors & Officers Liability | JNS-DOL-1701 | 12/21/17 |
| Employment Practices Liability | JNS-EPL-1701 | 12/21/17 |
| Special Risk - Expense Reim. | JNS-EXPREIM-1701 | 12/21/17 |
| Intellectual Property Package | JNS-IPP-1701 | 12/21/17 |
| Legal Expense Reimbursement | JNS-LEGEXP-1701 | 12/21/17 |
| Special Risk - Loss of Services | JNS-LOSSRVC-1701 | 12/21/17 |
| Special Risk - Com. Med. Mal. Gap | JNS-MEDMAL-GP-1701 | 12/21/17 |
| Pollution Liability | JNS-POLL-1701 | 12/21/17 |
| Special Risk - Regulatory Changes | JNS-REG- 1701 | 12/21/17 |
| Special Risk - Tax Liability | JNS-TAX-1701 | 12/21/17 |
| Unauthorized Treatments | JNS-UT-1701 | 12/21/17 |

EXs FC-370.12, FC-370.6; *see also* TR Vol. 13 at 4961 (uncontroverted testimony that SCP captives issued legal expense and professional malpractice policies). In fact, 70-90% of the participating captives in PoolRe wrote legal expense reimbursement policies. TR Vol. 13 at 4970-71.

The three SCP captives are a part of the larger PoolRe risk pool that in 2019 alone, contained *over 600 policies with a face value of $428,500,000.00*. *See* EX FC 378.1 at 17. The audited financials of PoolRe from 2016 further demonstrate the scope of the risks covered by the pool. *See* EX FC 197 at 13. A review of Exhibit FC 378.1 shows that the policies included in the PoolRe risk pool for 2019 were of a similar nature and covered similar risks, even containing multiple "Lawyers Professional Liability" policies. EX FC 378.1 at 1, 9.

SCP's knowledge regarding the types of policies in the pool must also be viewed through the eyes of their authorized agent and attorney, David Sherman, as well as their authorized agent and CPA, David Kushner. Texas law imputes to SCP all knowledge acquired or possessed by Mr. Kushner and Mr. Sherman—and other agents—while acting within the scope of their agency. *See La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984). "[I]t is well

settled that if an agent's acts are within the scope of his authority, then notice to the agent of matters over which the agent has authority is deemed notice to the principal." *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 300 (Tex. 1981).

Dr. Sullivan admitted during his testimony that he "authorized" Mr. Kushner and Mr. Sherman to structure the new captive arrangement and to negotiate terms of the two engagement letters with the Feldman and Capstone Parties. TR Vol. 1 at 468-69, 476-82, 498-500; TR Vol. 2 at 662-66, 760. Mr. Kushner and Mr. Sherman agreed that they possessed authority to represent the Doctors' interests in reviewing and commenting on the drafts of the March and December 2015 engagement letters, as well as negotiating their key terms. TR Vol. 20 at 7926-27, 7938-41, 7943, 7965-66, 8012-14, 8117-18. With the Doctors' permission, Mr. Kushner and Mr. Sherman similarly held themselves out as the Doctors' agents in performing these tasks and thereby bound the Doctors. TR Vol. 20 at 7938-41, 7943, 7965-66, 8012-14, 8117-18. *See Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984).

Here, the evidence shows that SCP, through their agents, were aware of the fact that Mr. Feldman's captive insurance company was in the risk pool. *Mr. Sherman, as the Doctors' tax attorney, and Mr. Kushner, as their accountant and CPA, admitted knowing that the Feldman and Capstone Parties had a captive in PoolRe's risk pool in 2015 before the Doctors signed the 2015 Engagement Letter.* TR Vol. 20 at 7965-66, 8074-75. Having negotiated the 2015 Engagement Letter over the course of many months, the Doctors, Mr. Sherman, and Mr. Kushner also knew that the risks covered by the policies issued by A.M.Y. arose out of the business conducted by the Feldman and Capstone Parties. Given their working relationship over the years, Mr. Sherman and Mr. Kushner further knew the nature of the business operated by the Feldman and Capstone Parties and that it centered on captive insurance. *See e.g.,* EX FC-463. The Doctors, Mr. Sherman, and Mr.

Kushner knew that SCP were entering into business with the Feldman and Capstone Parties.

Specifically, Mr. Sherman testified that he "[a]bsolutely" understood that the Feldman and Capstone Parties had policies in the reinsurance pools. TR Vol. 20 at 7966. Mr. Sherman further testified that, in working with the Feldman and Capstone Parties, "[w]e had the opportunity to ask any questions we wanted." TR Vol. 20 at 7966. Mr. Sherman never asked for the name of the Feldman and Capstone-affiliated captive insurer, though he did subsequently learn that it was called A.M.Y. TR Vol. 20 at 7966. SCP have never been able to articulate why the name mattered. The Arbitrator [should find] Mr. Sherman's knowledge as the Doctors' authorized agent the most injurious to their position that they lacked any knowledge about what types of policies A.M.Y. issued to the Feldman Parties.

Notably, Mr. Sherman founded his law firm Chehardy Sherman Williams and "has served on its management committee since its inception." EX FC-400. By this very fact alone, the Arbitrator can reasonably infer that Mr. Sherman would know what kind of insurance coverage a prudent law firm would need, require, desire, or use. As a board-certified tax attorney and Fellow of the American College of Tax Counsel, the Arbitrator can reasonably infer that Mr. Sherman further knows the intricacies posed by the Internal Revenue Code, which would cause a law firm consisting of tax lawyers to obtain adequate legal malpractice coverage. All during the months the parties negotiated the 2015 Engagement Letter, Mr. Sherman acted as the Doctors' authorized agent and attorney they could have consulted on these insurance coverage issues. EX J-115 at 8-9.

The evidence also reflects that the Doctors and their expert advisers knew more than just the fact that the Feldman and Capstone Parties had insurance policies in the PoolRe reinsurance pools. The Doctors and their advisers also knew that all the pooled policies were of a similar or

homogenous nature as determined by PoolRe.  Dr. Sullivan understood, for example, that "to qualify for the pool . . . the pool has to determine if your policy is homogeneous." TR Vol. 3 at 1278.  And he drew this understanding from the 2015 Engagement Letter and the PoolRe agreements themselves. TR Vol. 1 at 243.  After all, Dr. Sullivan, like Dr. DellaCroce, had operated a captive insurance program since 2011 with Peter Strauss – one that featured a similar risk pool administered by Worldwide Property & Casualty, Ltd. SAC. EX FC-64 at 8; EX FC-73 (stating that Mr. Strauss owned the pooling arrangement SCP participated in while he served as their captive manager and attorney). Thus, the Arbitrator [should conclude] that the Doctors knew that a captive insurer participating in a reinsurance risk pool would reinsure the risks of others.

Dr. DellaCroce testified similarly: "based on [his] understanding of the pool, similar risks among the various insured participating in the pool [went] into the pool." TR Vol. 5 at 2080. Dr. DellaCroce also acknowledged that he, through his captives, pooled policies for (i) director's and officer's liability, and (ii) legal expense reimbursement. TR Vol. 5 at 2079-80. Thus, the Arbitrator [should conclude] that, based on his admitted understanding, Dr. DellaCroce and SCP must reasonably have anticipated that policies issued to the Feldman and Capstone Parties might include the same policies that were issued to the SCP captives, including Loss of Services, Director's & Officer's Liability, Professional Liability, and Legal Expense Reimbursement.

Further, the Arbitrator [should find] that as late as 2019, SCP also "acknowledged and accepted" that they had the opportunity to review information regarding the industries, locations, operations, and types of risks insured for the participants in the PoolRe risk pools:

> Officers of Corporation have had the opportunity to review information regarding Corporation's participation in the risk pooling arrangement facilitated by PoolRe and information regarding other participants in the risk pool.  Information regarding participants' industries, locations, operations, types of risks insured and exposures to risk are available for review at the offices of Capstone.

EX 373.4 at 4. Passing up this opportunity, SCP nevertheless voluntarily chose to participate in

the 2018 and 2019 PoolRe risk pools about which they now complain. These corporate minutes are binding on SCP and preclude them from taking a position that differs from the indifference they demonstrated before this dispute began.

The reinsuring transactions involving the SCP captives were also fair and reasonable because PoolRe's risk pool functioned as a normal reinsurance pool. SCP's captives reinsured the risks of the Feldman and Capstone Parties just as A.M.Y. (the captive owned by Mr. Feldman) reinsured the risks of the Doctors, St. Charles Surgical Hospital, and their affiliates. In other words, the reinsuring relationship was not a one-way street. The coverage afforded by the PoolRe risk pool qualified as excess coverage because any claim had to meet or exceed a certain attachment point. *Blackhawk Mut. Ins. Co.*, 152 N.E.2d at 213. The SCP Captives received reinsurance premiums from PoolRe to cover the risks ceded to PoolRe by A.M.Y., and A.M.Y. paid reinsurance premiums for reinsuring the policies issued to the Feldman and Capstone Parties through PoolRe (and its participating captives, such as Cerberus, Janus, and Orion). Neither the Doctors themselves nor their advisors were unfamiliar with how such reinsurance pools operated, and nothing out of the ordinary made the reinsuring transactions with PoolRe unfair or unreasonable.

Thus, because, the Feldman and Capstone Parties met the standard of care as interpreted by SCP, the Arbitrator [should deny] SCP's claim for negligence based on the failure to comply with DR 1.08.

### v. The Feldman Parties Did Not Represent Capstone Or PoolRe Adversely to SCP

SCP contend the Feldman Parties represented Capstone and PoolRe in this arbitration adversely to the Doctors, thereby violating DR 1.09. *See* SCP's Post-Hearing Brief at 45-47. To

support this argument, SCP refer to the expert testimony of Mr. Watkins, who again relies on a DR (DR 1.09) to accuse the Feldman Parties of negligence. *Id.* at 46. Throughout this entire arbitration, as reflected by all the pleadings on file and by counsel's appearances at the final hearing, counsel other than the Feldman Parties have represented the Capstone Parties and PoolRe. They have been represented by Mr. Andy Paredes, who is not a lawyer at The Feldman Law Firm LLP, and by the AZA law firm. In fact, from the moment they withdrew from representing all SCP members in April 2020 at the latest, the Feldman Parties recognized this responsibility:

> *Please deal with Capstone on any outstanding issues.  Our firm will not (and has not) represented Capstone on any matter adverse to Cerberus or its owners.*

EX FC-275 at 1.

Mr. Feldman had no duty to withdraw as Capstone's general counsel (indeed, he is also Capstone's CEO and owner), a position that was disclosed far in advance of the parties' execution of the 2015 Engagement Letter:

**CAPSTONE ASSOCIATED SERVICES, LTD.**
CAPSTONE HOLDINGS CORPORATION

**STEWART A. FELDMAN**
CHIEF EXECUTIVE OFFICER & GENERAL COUNSEL

(713) 800-0550                    TWO POST OAK CENTRAL
(713) 623-0329 FAX          1980 POST OAK BLVD., SUITE 1950
(713) 724-6000 CELL             HOUSTON, TEXAS 77056-3877
            sfeldman@CapstoneAssociated.com

*See* EX J-118 at 2; *see also* TR Vol. 1 at 448 (Dr. Sullivan recalls that he "most probably" presented

with EX J-118 at the January 2015 meeting in New Orleans, which contained a "folder full of materials that explained The Feldman Law Firm and Capstone's background in captive insurance matters.").

Jim McCormack, the Feldman Parties' expert, testified that it was proper for Mr. Feldman to hire outside counsel, such as Mr. Paredes and the AZA law firm, to represent Capstone in connection with Capstone's disputes with SCP:

```
22        Q.     Would it be permissible for
23   Mr. Feldman acting on behalf of Capstone to
24   hire an attorney to represent Capstone in
25   connection with its disputes with the
```

```
1    doctors?
2         A.     I think that would have been
3    the proper approach.  Talking about outside
4    counsel?
5         Q.     Correct.
6         A.     Yes.
7         Q.     And if Mr. Feldman hired, for
8    instance, Mr. Paredes to draft and file the
9    Dorfman arbitration demand and the other
10   pleadings in these various arbitrations on
11   behalf of Capstone, that would not run afoul
12   of the conflict withdrawal rule, I will call
13   it.
14        A.     As outside counsel?  I'm sorry.
15   Yeah.
```

TR Vol. 19 at 7592. The Arbitrator [should find] that Mr. Paredes and AZA properly represented the Capstone Parties and PoolRe in defending against claims brought by SCP, thereby rendering DR 1.09 inapplicable.

The record in this arbitration and the presentation of evidence reflects that the Feldman Parties have never represented either the Capstone Parties or PoolRe in a matter adverse to SCP that is substantially related to the Feldman Parties previous representation of SCP. Accordingly, the Feldman Parties met the standard of care as interpreted by SCP and did not violate DR 1.09.

### vi. Feldman Did Not Commit Actionable Misconductor Violate DR 8.04.

The Arbitrator [should reject] SCP's contention that "actionable misconduct" occurred or that Feldman violated DR 8.04. Because the Arbitrator [should conclude] that the Feldman and Capstone Parties met the standard of care and that there were no violations of DRs 1.06, 1.08, and 1.09, Mr.Feldman committed no actionable misconduct that gives rise to a negligence claim under DR 8.04 as interpreted by SCP. The only evidence before the Arbitrator establishes that Mr. Feldman appeared as counsel in this arbitration only for the Feldman Parties and represented no other party.

### c. Feldman Had No Duty to Assist the Doctors With Dissolving and Liquidating Their Captives Prior to the Year End Termination Date as Stated in the 2015 Engagement Letter

Under SCP's negligence theory alleging that the Feldman and Capstone Parties failed to put forth a diligent effort in effectuating the wind-up of the SCP captive insurers, Janus, Cerberus, and Orion, the Arbitrator must first analyze whether the Feldman and Capstone Parties owed any such duty to SCP. SCP argue that the Feldman and Capstone Parties allegedly "disobeyed" a client's "lawful request for a wind-down as contemplated by the Joint Engagement Letter." SCP's

Post-Hearing Brief at 50. This allegation rests on the precondition that SCP's must have made a "lawful request" that comported with the 2015 Engagement Letter.

The Arbitrator [should find] that SCP made no such "lawful" request to "wind down" the SCP captives that comported with the 2015 Engagement Letter. According to the confirmed Final Award in Judge Dorfman's arbitration, which is entitled to preclusive effect, the 2015 Engagement Letter did not include "any right or discretion in the Respondents to oppose or overrule the Captives' dissolution and liquidation on or about the Year End Termination Date, provided the Engagement Letter is non-renewed." EX J-115 at 12 (p. 11 of the Award itself). In granting the Capstone Parties' request for declaratory relief, Judge Dorfman plainly stated as follows:

- Capstone has the right to liquidate the Captives in a necessary, orderly and prudent manner, as provided for in the Capstone Services Agreement, on or about August 31, 2021, which is the Year End Termination Date as defined in § 4.6 of the Capstone Services Agreement;

- Respondents do not have the right under the Parties' agreements to demand that the Claimants cause the immediate or expedited wind-up/liquidation of the Captives; and

- The Capstone Parties have no contractual obligation to remake or renegotiate the agreements among their joint clients in an attempt to liquidate their captive insurance companies on a schedule not in compliance with the Parties' agreement.

*Id*. at 16.

Accordingly, there was no duty on the part of the Feldman and Capstone Parties to put forth a diligent effort to dissolve and liquidate the SCP captive insurers on any schedule other than what is set forth in the 2015 Engagement Letter. *Id*. Because there is no contractual duty to act upon SCP's premature request, there can be no negligence in not acting on a request outside of the scope of representation. Therefore, the Arbitrator [should conclude] that SCP TAKE NOTHING

on its negligence claim for allegedly failing to put forth a diligence effort to assist SCP with shutting down their captives.

### 3. Texas' anti-fracturing rule is applicable

SCP sued the Feldman Parties for legal malpractice / negligence, but then sought to go beyond this claim by alleging fraud, negligent misrepresentation, breach of fiduciary duty, and DTPA violations. Yet Texas law prohibits SCP from recasting as separate claims against the Feldman Parties a cause of action that sounds only in negligence. *See Border Demolition & Envt'l, Inc. v. Pineda*, 535 S.W.3d 140, 159 (Tex. App. – El Paso 2017, no pet.); *Murphy v. Gruber*, 241 S.W.3d 689, 698 (Tex. App. – Dallas 2007, pet. denied). Under the doctrine known as the anti-fracturing rule, SCP cannot split up a professional malpractice claim to try to get multiple bites at the same apple. *See Border Demolition*, 535 S.W.3d at 159. Allegations that an attorney fell below the standard of care by giving poor legal advice to the client or by otherwise inadequately representing the client, for example, sound in negligence alone. *Murphy*, 241 S.W.3d at 698-99.

The anti-fracturing rule applies here because SCP's pleadings base multiple theories of recovery on the same allegedly tortious acts or omissions. *See Border Demolition*, 535 S.W.3d at159-61. SCP also seek the same damages from FCP on all their claims, further implicating the anti-fracturing rule. *See Murphy*, 241 S.W.3d at 698; *J.A. Green Dev. Corp.*, 2016 WL 3547964 at *6-8. The same facts underlie all of SCP's claims against the Feldman Parties, leaving only a professional malpractice claim. *Wang*, 2021 WL 2325085 at *5; *J.A. Green Dev. Corp.*, 2016 WL3547964 at *6-8. To avoid the anti-fracturing rule, SCP must allege and prove the independent elements of dishonesty of purpose, intentional deception, and improper benefit. *See Border Demolition*, 535 S.W.3d at 160-62; *Won Pak*, 313 S.W.3d at 457-58; *Murphy*, 241 S.W.3d at 692-93, 698-99.

SCP never proved that the Feldman Parties obtained an "improper benefit" during the attorney-client relationship, such as by subordinating the client's interests to the attorney's, misappropriating client funds, misusing client confidences, failing to disclose conflicts of interests, engaging in self-dealing, or making misrepresentations to the client to achieve these improper ends. *Border Demolition*, 535 S.W.3d at 160.

While SCP attempt to show that the Feldman Parties misappropriated or "converted" their funds as the clients, this allegation fails on several levels. SCP point to the reinsurance premiums that went in to the PoolRe risk pool as the funds FCP supposedly misappropriated. SCP's Post-Hearing Brief at 1-5, 37-39. Depending on the year, the Captive Insurers or the Captive Insureds would pay reinsurance premiums to PoolRe for coverage provided by its risk pool. Once the SCP Captive Insurers or Insureds paid those premiums in to the pool, they lost all rights of ownership, dominion, possession, or control over those funds that commingled with all the other reinsurance premiums paid by the other pool participants. *See Weber Paper Co. v. United States*, 204 F. Supp. 394, 397, 400 (W.D. Mo. 1962), *aff'd*, 320 F.2d 199 (8th Cir. 1963).

Once the risk pool received the stop loss premiums, those commingled funds lost their separate identity and the original insureds lost their right to control the use of those fungible funds. *Id.* at 399-400. The commingled nature of the pooled funds prevents SCP from proving the essential element of a conversion action requiring that SCP "owned, possessed, or had the right to immediate possession of property." *Lawyers Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex. App. – Dallas 2014, pet denied). SCP paid the stop loss premiums *to PoolRe* for one purpose – to reinsure the SCP captives' qualifying losses through the risk pool – and received a quota share premium *from PoolRe* for a different purpose – to reinsure PoolRe for qualifying losses suffered by *any of the captives* participating in the pool.

The SCP Captive Insurers or Insureds paid reinsurance premiums *to PoolRe* that became *PoolRe's property* pursuant to the terms of the Stop Loss Reinsurance Agreement. *See e.g.*, EX J-72 at 12. Title to these reinsurance premiums passed to PoolRe. EX J-72. While the Quota Share Reinsurance Policy obligated PoolRe to pay all pool participants back a certain amount if the pool paid no claims or expenses during the applicable policy period, this contingent obligation represents a general debt owed by PoolRe.

But PoolRe did not and could not return *the identical funds* to the pool participants after they had been commingled with other funds in PoolRe's general account. The undisputed testimony establishes that PoolRe did not maintain these funds in a trust account for the pool participants or otherwise keep the funds separate and identifiable. TR Vol. 23 at 9270-73.

Although PoolRe does not function as a bank, the relationship between the bank and its depositor resembles how reinsurance premiums lose their identifiable nature once those funds to into the pool. Title to money deposited with a bank passes to the bank and creates a general debt whereby "the bank need not pay the depositor back with the same funds deposited to the bank to begin with." *Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Civ. App. – Houston [14th Dist.] 1981, writ ref'd n.r.e.). "An action for conversion will not lie for money represented by a general debt." *Id.* Thus, the Arbitrator [should conclude] that SCP can state no claim that *the Feldman Parties* misappropriated or "converted" their identifiable funds and thereby obtained an improper benefit. Thus, SCP's claim for breach of fiduciary duty fails on this count.

SCP claim that subsequent to the termination of the attorney-client relationship, FCP improperly "converted" client funds by PoolRe's use of pool monies to prosecute and defend actions against the pool.[507] The Arbitrator [should reject] this contention.

---

[507] The  Quota  Share  Reinsurance  Policy  provides  for  2019,  that  as  to  PoolRe,  the  Reinsured:

Without explaining why FCP decided to agree to a cost-sharing arrangement, SCP accuse FCP of "raiding" and "looting" $3.8 million from the 2018, 2019, and 2020 "risk pool[s] to pay for their legal fees and expenses in these proceedings, even though this dispute has no plausible connection to claims submitted to either of these risk pools." *E.g.*, SCP's Post-Hearing Brief at 3-4, 36-37, 39, 47, 96, 103, 109. Capstone's President, Jeff Carlson, testified at length about the reasons prompting FCP to agree to two such arrangements: the first that split fees and expenses on a 33% - 33% - 33% basis among the Feldman Parties, the Capstone Parties, and PoolRe when they were arbitrating before Judge Dorfman, and the second that split fees and expenses on a 50% - 50% basis when FCP were arbitrating in every proceeding other than Judge Dorfman's, whereby the Feldman and Capstone Parties bore 50% of the fees and expenses and PoolRe incurred the other half. *See* TR Vol. 22 at 9063-94, 9122-34, 9150-55. And the minutes of PoolRe's Board of Directors' Meeting covered these reasons in depth. EX FC-331.

FCP agreed to these cost-sharing arrangements because the shifting allegations made by SCP targeted PoolRe's reinsurance risk pools for the years 2018 and 2019, complaining about the

---

(1)    The Reinsured shall control and settle all claims with binding effect on the Reinsurers, who will bear their proportion of losses and expenses connected therewith according to the settlements of the Reinsured.

(2)    The Reinsured is authorized, without any consent of the Reinsurers, to investigate, settle, compromise, discharge, or repudiate any claim, and to institute, prosecute, defend, settle, or compromise any dispute or claim with finality with respect to any interests coming within the scope of this Policy. . . .

(4)    All payments in connection with the Original Direct Policies, including expenses, costs, and interest shall be binding on the Reinsurers but only to the extent of the portion of claims due as specified by the Stop Loss Reinsurance Agreements, and although the total claims payable assuming the prompt and uncontested payment of a Funding Call may exceed the amount of Ceded Premium, the total claims payable assuming the prompt and uncontested payment of a Funding Call is subject to the Maximum Funding Call limit specified below.  Also, the Reinsurers' obligations under this Policy are subject to the Limited Liability Notice conditions below.

EX FC-366.4 at 5.

reinsurance obligations SCP and other Class Members owed under their Quota Share Reinsurance Policies. *See* EX FC-331; EX DRS 2004 at JT 401689-91, JT401698-99, JT 401710-17, JT 401754-58, JT 401770-72; TR Vol. 15 at 5803-08. SCP entered into the Quota Share Agreements with PoolRe on a yearly basis, thereby implicating PoolRe's interests in its risk pools and its contractual obligations to defend those interests. *See, e.g.*, EX J-71; EX J-72; EX FC-367.4, EX FC-367.6. The Quota Share Agreement specifically "authorized [PoolRe], *without any consent of [SCP and the Class Members]*, to investigate, settle, compromise, discharge, or repudiate any claim, and *to institute, prosecute, defend,* settle, or compromise *any dispute or claim with finality* with respect to any interests coming within the scope of this Policy." EX J-72 at 4 ¶ 3(E)(2) (emphasis added).

The Feldman Law Firm entered the cost-sharing agreement long after the attorney-client relationship with SCP ended. Given this timeline, the Firm no longer owed fiduciary duties to SCP that may have given rise to their specific complaints about "looting" the funds in PoolRe's risk pool. *See Stephenson*, 16 S.W.3d at 835-36. Nor did the Firm own, manage, or control the funds in PoolRe's risk pool; rather, PoolRe exercised the exclusive right under the Quota Share Agreements for 2018 and 2019 to spend those funds for purposes identified by the contract. *See* EX J-72 at 4 ¶ 3(E)(2); EX FC-331; TR Vol. 23 at 9270-74. The Firm entered the cost-sharing agreement to manage expense flow because of SCP's improper liquidation demand and the Dorfman Arbitration. TR Vol. 15 at 5886-87.

As for contesting PoolRe's defense costs, SCP and Mr. Sherman had the opportunity to review Paragraph 3(E) in its entirety before anyone signed the 2015 Engagement Letter or the 2015 Quota Share Agreement. *See* EX J-72 at 4-5, Section 3(E)(1)-(8); TR Vol. 11 at 4607-32. Neither SCP nor any one of their tax professional advisers raised any alarms or even inquired about

this provision that vested PoolRe with the exclusive power to spend pool funds for litigation purposes. *See Nat'l Prop. Holdings*, 453 S.W.3d at 424-26 (parties are bound by contracts they sign). SCP continued to sign the annual Quota Share Agreements without objection all the way through 2019. Nor could the Firm even disclose the cost-sharing agreement before 2020 after the dispute among the parties began.

Citing only to a portion of Mr. Carlson's testimony, SCP contend "FCP raided . . . $62,000 from the 2020 risk pool" in paying their litigation costs. SCP's Post-Hearing Brief at 4 & n.16, 90. This position misstates Mr. Carlson's entire testimony on the subject, clarifying that PoolRe erroneously charged the 2020 risk pool for $62,498. TR Vol. 23 at 9174-79. In uncontroverted testimony, Mr. Carlson confirmed he had never approved such a charge on the 2020 pool and a "true-up" would have to address, account for this "error," and post the charge to the 2019 risk pool. TR Vol. 23 at 9175-79.

Finally, the Arbitrator [should clear] up the mechanism by which the Feldman and Capstone Parties would seek to recover their arbitration fees and costs for the arbitrations post-Dorfman. The cost-sharing agreement accounts for 50% of those fees and costs. TR Vol. 23 at 9249-50. The other 50% remained unpaid at the time of the final hearing. TR Vol. 23 at 9240-42, 9249-50. While the Feldman and Capstone Parties submitted a claim to A.M.Y. to cover this other 50%, A.M.Y. had not paid that claim when the final hearing took place. TR Vol. 23 at 9240-45. A.M.Y. processed that claim under the appropriate policies, "clearly accepted those claims," "acknowledged" some amount of "coverage," and then sought reinsurance from the PoolRe risk pool for the qualifying amount. TR Vol. 23 at 9240-47. To evaluate A.M.Y.'s reinsurance claim, PoolRe retained BakerHostetler to review the coverage. EX FC-642. BakerHostetler advised PoolRe. EX FC 349; TR Vol. 22 at 8758-59; TR Vol. 23 at 9240-55. But PoolRe had paid A.M.Y.

nothing out of the pool funds on this claim. TR Vol. 23 at 9240-42, 9249-50.

And for purposes of applying the anti-fracturing rule, the contention that FCP improperly "converted" client funds by PoolRe's use of pool monies to prosecute and defend actions against the pool is irrelevant because even if true, the alleged conduct and the alleged harm occurred *after the attorney-client relationship ended* and any fiduciary duties had expired. EXs FC-268; FC-275; FC-297; FC-299; *Stephenson,* 16 S.W.3d at 836.

SCP's Post-Hearing Brief contends that the same alleged acts or omissions give rise to SCP's supposedly separate claims for (1) breach of fiduciary duty; (2) legal malpractice; (3) DTPA violations, and (4) fraud / negligent misrepresentation. *See* SCP's Post Hearing Brief at 20-57. In summary, SCP alleges that the Feldman and Capstone Parties breached fiduciary duties to SCP, were negligent by breaching the ordinary standard of care to SCP, and intentionally/negligently misrepresented facts to SCP – all arising out of the disclosures made (or allegedly not made) in the context of the 2015 Joint Engagement Letter. *Id*. In short, SCP were expecting a tax-exempt and risk-free captive insurance arrangement provided by FCP but failed to get those benefits. *See id.* at 21.

For all these causes of action, the allegedly bad conduct centers on three central disclosure issues: whether the Feldman and Capstone Parties should have made additional disclosures about (1) IRS activity regarding other clients' captive transactions, (2) a "promotor [*sic*] audit" of Mr. Feldman, and (3) the Feldman and Capstone Parties' insurance policies being insured through the PoolRe risk pool. SCP contend in their post-hearing brief that Cerberus, Janus, and Orion served as the "primary insurers" for the policies covering the Feldman and Capstone Parties. SCP Post-Hearing Brief at 9, 14. The Arbitrator [should reject] this mischaracterization of the captive insurance arrangement because Cerberus, Janus, and Orion in reality served as reinsurers on any

claims that A.M.Y. submitted to the PoolRe reinsurance risk pool and those claims qualified for reinsurance coverage by exceeding the contractual attachment point. *See, e.g.*, TR Vol. 11 at 4539; TR Vol. 16 at 6105 (Calderon testimony that the pool would have no obligation unless claim exceeds attachment threshold); EX FC-370.12 at § 7.D; EX DRS-1997.

SCP contend the Feldman Parties failed to disclose material facts about the captive insurance arrangement and tax benefits. Without any evidence the Feldman Parties achieved an improper benefit through deception or self-dealing, these allegations represent the functional equivalent of failing to disclose material facts about a case in litigation. *See Border Demolition*, 535 S.W.3d at 160-62; *Won Pak*, 313 S.W.3d at 457-58; *Murphy*, 241 S.W.3d at 692-93, 698-99. As such, SCP stated only a claim for professional malpractice. *See Border Demolition*, 535 S.W.3d at 160-62.

The Arbitrator [should find] the reasoning in *J.A. Green Dev. Corp*. persuasive and weighs in favor of ruling that SCP take nothing on their fractured tort claims. In *J.A. Green*, the taxpayer made allegations against the Akin, Gump law firm seeking to recover for professional negligence, fraud, and breach of fiduciary duty. *See J.A. Green Dev. Corp*., 2016 WL 3547964 at *6-8. The identical allegations gave rise to all three claims, the same injury, and the same damages. *Id*. The court applied the anti-fracturing rule and upheld a take-nothing summary judgment against the taxpayer on its claims for fraud and breach of fiduciary duty:

> the essence of J.A. Green's complaint is the advice it was given during the audit phase of a tax matter. Its pleaded allegations charge that the advice was wrong and was incomplete. In both instances, the focus of J.A. Green's allegations is on the adequacy of its representation by Akin Gump and Grant Thornton, and that is a professional negligence claim.

*Id.* at *8.

Even SCP's claim that the Feldman Parties allegedly failed to disclose a conflict of interest

triggers the anti-fracturing rule. *Fitts*, 2016 WL 626220 at *11; *see also Murphy*, 241 S.W.3d at 696. SCP point to the testimony of Tom Watkins opining "there was no time during the representation of both Capstone and the [Doctors] that [the Doctors] were getting a lawyer who was dedicated to protecting their interest and their interest alone. They always **had a lawyer who would downplay anything that Capstone did wrong, would try to protect Capstone from any kind of complaints**." *See* SCP's Post-Hearing Brief at 43. Yet the existence of a purported conflict rises no higher than negligence when where SCP merely allege that *conflict supposedly kept the Feldman Parties from adequately representing their clients*. *See Murphy*, 241 S.W.3d at 698-99.

Further, the Arbitrator [should conclude] that it is beside the point that SCP seek fee forfeiture as a remedy for breach of fiduciary duty. *Id*. at 698. In Texas, "the remedy sought is only one factor [courts] consider when determining the nature of the claims." *Id*. (fee forfeiture and constructive trust were "not a dispositive factor" for establishing a fiduciary-duty claim). To allow the equitable remedy of fee forfeiture to dictate whether SCP may avoid the anti-fracturing rule would enable the ends to swallow the means of first establishing a tort other than professional negligence.

Nor does the remedy of fee forfeiture lie against the Feldman Law Firm because SCP never paid any fees directly to the firm, but rather paid quarterly service fees to Capstone, which then separately paid legal fees to the Feldman Law Firm. EX J-20 at 8-9; TR Vol. 14 at 5589-92. *See Brenner v. Centurion Logistics LLC*, No. 05-20-00308-CV, 2020 WL 7332847, at *10 (Tex. App. – Dallas Dec. 14, 2020, no pet. h.) (mem. op.) (no fee forfeiture when third party pays legal fees to attorney or law firm); *Swank v. Cunningham,* 258 S.W.3d 647, 673-74 (Tex. App. – Eastland 2008, pet. denied) (same). SCP admit this payment method in its post-hearing brief, "whereby the Doctors would pay Capstone and some unspecified portion of the funds would be tendered to the

Feldman Law Firm." SCP Post-Hearing Brief at 42. Because the Doctors paid The Feldman Law Firm indirectly through a third party, the equitable remedy of fee forfeiture fails for lack of any evidence.

SCP further concede with this same admission they produced no evidence of any specific amount they allegedly paid to The Feldman Law Firm, thereby precluding the remedy of fee forfeiture. As an equitable remedy, fee forfeiture "essentially returns to the principal the value of what it paid for because it did not receive the trust or loyalty." *AZZ, Inc. v. Morgan*, 462 S.W.3d 284, 298 (Tex. App. – Fort Worth 2015, no pet.). But this remedy requires "proof of the fiduciary's salary, profits, or other income during the time of his breach of fiduciary duty," not to mention "proof of what he was actually entitled to receive." *Id.* The attorney-client relationship between SCP and the Feldman Parties terminated by January [or April 2020] at the latest, creating only a brief window of time in which the remedy of fee forfeiture or fee disgorgement would apply. EX FC-275.

By stating that "some unspecified portion of the [Capstone services fees] would be tendered to the Feldman Law Firm" by Capstone, SCP produced no evidence of any amount received by the Feldman Parties while representing SCP. *See Stephens v. Three Finger Black Shale P'ship*, 580 S.W.3d 687, 730-32 (Tex. App. – Eastland 2019, pet. denied); *AZZ, Inc.*, 462 S.W.3d at 298-99. As required by Texas case law, SCP offered no probative evidence of "the salary, profits, or other income" received by the Law Firm as a fiduciary during the time the Feldman Parties were supposedly breaching fiduciary duties or the amount of money the Firm "was actually entitled to receive." *Stephens*, 580 S.W.3d at 731-32. Because SCP failed to submit evidence proving up "the appropriate amount" the Feldman Parties as fiduciaries should allegedly forfeit or disgorge in fees, *see id.*, the Arbitrator [should rule] that SCP **TAKE NOTHING** on their claim for fee forfeiture or

fee disgorgement.

As a corollary to the anti-fracturing rule, the one-satisfaction rule also applies to restrict SCP to a single action for recovery in negligence / legal malpractice. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000); *see also Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7 (Tex.1991). "Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered." *Crown Life Ins. Co.*, 22 S.W.3d at 390. "This rule applies when multiple defendants commit the same act as well as when defendants commit technically different acts that result in a single injury." *Id.*

SCP has shown only one injury here, complaining they thought they were getting a tax-exempt and risk-free captive insurance arrangement when they supposedly received one fraught with adverse tax consequences. *See First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 78-79 (Tex. 1993); *Stewart Title Guar. Co.*, 822 S.W.2d at 7-8. Confirming they allegedly suffered only a single, indivisible injury, SCP seeks the same measure of damages for all the causes of action they have brought against FCP. SCP's Post-Hearing Brief at 1-5, 35-37, 52, 82, 106-27; *see Stewart Title Guar. Co.*, 822 S.W.2d at 7-8. Nothing separates or distinguishes the damages SCP supposedly incurred regardless of the tort. *See id.* All tortfeasors, which SCP classify as joint tortfeasors, purportedly caused the same damage. *Id.* Thus, the Arbitrator [should conclude] the one-satisfaction rule bolsters the Texas anti-fracturing rule and confirms that SCP brought claims that sound in professional malpractice alone.

Accordingly, applying the anti-fracturing rule to SCP's claims in this arbitration, the Arbitrator [should rule] that SCP TAKE NOTHING on their claims for breach of fiduciary duty, intentional misrepresentation (fraud), DTPA violations, and negligent misrepresentation. The Arbitrator [should] separately consider SCP's claims for negligence and legal malpractice.

### 4.    Breach of Fiduciary Duty

In their briefing, SCP identify three sources they say give rise to fiduciary duties owed by the Feldman and Capstone Parties: (1) the attorney-client relationship that existed with the Feldman Parties; (2) an agency relationship that involved Capstone in its role as captive manager for the SCP Captive Insurers; and (3) Mr. Feldman's role as an attorney at The Feldman Law Firm LLP who also served "as the owner, CEO, and general counsel of Capstone" and assisted "in managing PoolRe." SCP's Post-Hearing Brief at 8-9. "Mr. Feldman cannot take off his proverbial hat – he cannot absolve himself of his fiduciary and ethical duties by acting through Capstone or PoolRe rather than through The Feldman Law Firm." *Id.* at 8.

### a.    The Capstone Parties owed no fiduciary duties to SCP

As a threshold matter, the Arbitrator must decide whether the Capstone Parties owed fiduciary duties to SCP. "The existence of a fiduciary duty is an element of a claim for breach of fiduciary duty." *Van Duren v. Chife*, 569 S.W.3d 176, 190 (Tex. App. – Houston [1st Dist.] 2018, no pet.) (citing *First United Pentecostal Church*, 514 S.W.3d at 220). As the one seeking relief on this claim, SCP must identify the specific fiduciary relationships they claim exists with the Capstone Parties. *See Belliveau v. Barco, Inc.*, 987 F.3d 122, 132-33 (5th Cir. 2021).

Without contradiction, Jeff Carlson testified as Capstone's President that Capstone had never operated as a law firm. TR Vol. 14 at 5496-97. No attorney-client relationship ever existed between the Capstone Parties and SCP for any fiduciary duty to arise as a matter of law. TR Vol. 14 at 5497. *See Mellon Serv. Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 437 (Tex. App. – Houston [1st Dist.] 2000, no pet.) ("Touche offered, and was hired by Granada, to perform accounting, auditing and management consulting services, not legal services."). The Capstone Services Agreement, which the 2015 Engagement Letter incorporates, confirms that "since it is not a law

firm or a CPA firm, under no circumstances will Capstone itself provide any legal or CPA services." EX J-20 at 24. The evidence reflects that the Capstone Parties exist separately from the Feldman Parties and have never practiced law or held themselves out as lawyers. TR Vol. 14 at 5497, 5569-70.

The 2015 Engagement Letter, whose terms are unambiguous, reflects that only the Firm would provide legal advice to SCP, not Capstone. EX J-20 at 4 ("Advice and counsel as to the legal, tax and regulatory issues will come from the attorneys of the Firm. Neither Capstone nor its employees and representatives provide any legal, tax or regulatory advice"). The Capstone Services Agreement reinforces this prohibition: "Capstone does not and shall not provide as part of this or any other service, professional accounting, tax or legal services, such as, by way of example and not by way of limitation, any legal, tax or regulatory advice." EX J-20 at 21. SCP knew of Capstone's relationship with the Feldman Parties upfront and in fact sought out Capstone and the Feldman Parties for their "turnkey" services, as was found by Judge Dorfman: "The Doctors came to [Capstone and the Feldman Law Firm] seeking, and found, an essentially off-the-shelf "turnkey" (as the contract documents refer to it) operation to set up and operate the Captives as onshore/domestic captive insurance companies." EX J-115 at 9.

While SCP argue otherwise, no agency relationship existed with Capstone as a matter of law. *See* SCP's Post-Hearing Brief at 8-9. The Capstone Services Agreement dictated the administrative services Capstone performed on behalf of Cerberus, Janus, and Orion and defined the independent role played by Capstone:

- In all instances where actions or judgments of Capstone are called for under this Article [governing the administrative services to be provided], such shall be made in the reasonable judgment of Capstone, subject to the Companies reserving the sole and absolute discretion to direct Capstone otherwise by a written notice within thirty (30) days of Companies having actual notice of any such action having been taken

which the Companies wish to contradict. Any actions taken by Capstone which are not contradicted by the Companies in this manner shall be deemed to be actionsof the Companies for all purposes. EX J-20 at 19.

- Capstone is hereby expressly authorized to provide Administrative Servicesin a manner as Capstone considers reasonable and appropriate (such to be determined in the sole and absolute discretion of Capstone – subject to the Companies' reserved sole and absolute discretion to direct Capstone otherwise) to fulfill its obligations under this Agreement. EX J-20 at 19-20.

The Capstone Services Agreement also contained a section entitled "Relationship of Parties," which stated as follows:

4.8    **Relationship of Parties.** Nothing in this Article shall be construed as (a) the guarantee by Capstone of the success of the Companies' insurance or investment activities; (b) an assumption by Capstone of any financial obligation of the Companies; (c) the creation of any employment relationship between (x) the Companies and (y) employees or consultants of Capstone and its affiliated entities; (d) an assumption by Capstone of any responsibility for the work performed by outside suppliers or consultants employed by the Companies, except where such work is performed at the suggestion or recommendation of Capstone; or (e) the delegation of any managerial authority over the Companies to Capstone. The Companies acknowledge that Capstone will make recommendations and offer advice pursuant to this Agreement but that all decisions with respect thereto shall remain those of the Companies' officers and directors.

EX. J-20 at 25.

To create a principal–agent relationship, the principal must be able to control the putative agent's actions. *Dipprey v. Double Diamond, Inc.*, No. 11-19-00250-CV, 2021 WL 4899078, at *12 (Tex. App. – Eastland Oct. 21, 2021, no pet. h.) (mem. op.). "This right to control includes not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task." *Id.*; *see also Olympia Capital Assocs., LP v. Jackson*, 247 S.W.3d 399, 413 (Tex. App. – Dallas 2008, no pet.).

The evidence does not establish that the SCP Captive Insurers ever directed Capstone to perform a specific assignment (other than Dr. Sullivan's instruction to liquidate them early). As between the SCP Captive Insurers and Capstone, the SCP Captive Insurers never told Capstone how to do its job – what tasks to do, when to do them, or how to do them. As a result, the Arbitrator [should rule] that Capstone NEVER ACTED as SCP's agent.

A fiduciary obligation may also arise out of a special relationship. *See Crim Truck &* *Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 (Tex. 1992). "Where a party is accustomed to being guided by the judgment or advice of another in legal and accounting matters relating to income taxation, *and there exists **a long association** in a business relationship, as well as a personal friendship*, the first party is justified in placing confidence in the belief that the other party will act in his best interest. Under these circumstances, a fiduciary relationship has been held to exist." *Dominguez v. Brackey Enters., Inc.*, 756 S.W.2d 788, 791 (Tex. App. – El Paso 1988, writ denied) (emphasis added).

SCP never argues or even suggests in its post-hearing briefing that an informal fiduciary relationship with the Capstone Parties arose out of a special relationship of a high degree of trust and confidence. At the final hearing, SCP offered no or insufficient proof that they maintained such a long business relationship with the Capstone Parties. And "mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship." *Id.* The Capstone Services Agreement refutes the existence of any such special or fiduciary relationship by denying Capstone the right to handle any of SCP's assets:

- "Provided, however, as explained further under subparagraph (e) below, Capstone does not serve in a custodial or investment function with regard to the Companies' assets." EX J-20 at 21.

- "However, Capstone does not have and shall not have any control or custody over the nature or type of the Companies' investments or procedures relating to the Companies' cash, securities and other valuables."EX J-20 at 22.

Judge Dorfman's Final Arbitration Award, whose effects this Arbitrator [allegedly] is bound to apply, finds that "[t]he Parties to this proceeding are sophisticated and intelligent individuals and were represented by counsel (and certified public accountants) of their choosing

both negotiating the terms of the engagements between them over many months, and ***throughout the course of the relationship through to the present day***. The Doctors came to the Capstone Parties seeking, and found, an essentially off-the-shelf "turnkey" (as the contract documents refer to it) operation to set up and operate the Captives as onshore/domestic captive insurance companies." EX J-115 at 8-9. (emphasis added). That Award also finds "that the parties possess similar levels of sophistication (in general, not in the specific area of insurance products)." *Id*. at 9.

After finding that SCP granted the Capstone Parties an "irrevocable proxy" to dissolve and liquidate the SCP captive insurers at or near the Year End Termination Date" (as defined by the 2015 Engagement Letter), Judge Dorfman quoted section 4.6 of the Capstone Services Agreement and found as follows:

> [T]he purpose of this provision is, in part, to protect Capstone's reputational interests[508] and limit its economic exposure with respect to its contractual undertaking to provide the Captives with "ongoing tax controversy support." ***<u>This seems contrary to Respondents' insistence that Capstone's relationship to them was quasi-fiduciary in nature</u>***, and that the Capstone Parties are obligated to eschew their self-interest in favor of the Respondents - particularly as relates to the dissolution and liquidation of the Captives.

*Id*. at 13 ¶ 38 (p. 12 of the Award) (emphasis added).  Judge Dorfman's Final Award is entitled to preclusive effect. Accordingly, the Arbitrator [should conclude] that the Capstone Parties' relationship with SCP arose out of arms-length dealing, and that there was no special relationship between the Capstone Parties and SCP that resulted in a fiduciary relationship. *Cf. Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 105 S.W.3d 244, 265 (Tex. App. – Houston [14th Dist.] 2003, pet. denied) (no presumption of unfairness arises when sophisticated parties represented by independent counsel negotiate a fee agreement with lawyer at arm's length).

---

[508] The Arbitrator deals elsewhere with SCP's class or collective action notices to hundreds of persons in derogation of this Arbitrator's rulings and its effect on Capstone's desire to protect its "reputational interests."

Further, as a captive insurance manager, the Capstone Parties owe no fiduciary duties to SCP under a management contract like the Capstone Services Agreement. *See* EX J-20 at 18-29; *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 298 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015); *Mount Mansfield Ins. Grp., Inc. v. Am. Int'l Grp., Inc.*, No. 1-11-0379, 2011 WL 10088206, at *12-13 (Ill. Ct. App. Nov. 15, 2011); *see also Nat'l Plan Admins., Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700-01 (Tex. 2007). Analogizing to military rank, Mr. Carlson testified that captive insurers like Cerberus, Janus, and Orion occupied the role of "generals" while Capstone served as the "private" or "foot soldier." TR Vol. 14 at 5517. Capstone never received any insurance premiums on behalf of Cerberus, Janus, or Orion, never held any of their funds in trust, and never exercised any ultimate decision-making power over those funds. *See* EX J-20 at 21-22; TR Vol. 23 at 9270-73. As such, Capstone never acted as SCP's agent as they contend in their post-hearing brief.  *See* SCP Post-Hearing Brief at 8-9.

A mere contractual relationship like the one that existed between Capstone and SCP never imposes fiduciary duties. *See Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 203 (Tex. 2002). Texas courts remain reluctant "to recognize fiduciary relationships, especially in the commercial context." *Willis v. Donnelly*, 199 S.W.3d 262, 278 (Tex. 2006). This rule prevails in the state "[i]n order to give full force to contracts" and to encourage parties to contract as they see fit. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex. 1997). "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist **prior to, and apart from,** the agreement made the basis of the suit." *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 288 (Tex. 1998) (emphasis in original).

The 2015 Engagement Letter (which includes the Capstone Services Agreement), along

with the Dorfman Award, conclusively refutes any suggestion that Capstone owed fiduciary duties to SCP. Those contracts vest ultimate decision-making authority, managerial control, and financial power in Cerberus, Janus, and Orion, as Capstone's President, Jeff Carlson, testified. TR Vol. 14 at 5517.

Nor does any fiduciary relationship with the Capstone Parties arise out of the fact that Mr. Feldman served as Capstone's general counsel. SCP alleges that Mr. Feldman, acting as Capstone's General Counsel, in fact represents SCP because SCP have a contract with Capstone. *See* SCP Post-Hearing Brief at 8. But Mr. Feldman as Capstone's General Counsel owes fiduciary duties only to Capstone, not to any third party. *See McAmish, Martin, Brown & Loeffler*, 991 S.W.3d at 792; *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996); *LeBlanc v. Lange*, 365 S.W.3d 70, 81 (Tex. App. – Houston [1st Dist.] 2011, no pet.).

Mr. Feldman never represented any member of SCP as their lawyer simply by serving as Capstone's General Counsel. *See Span Enterprises v. Wood*, 274 S.W.3d 854, 858-59 (Tex. App. – Houston [1st Dist.] 2008, no pet.); *accord Belliveau*, 987 F.3d at 133-34. The "privity barrier" that applies in Texas bars any cross-over representation of a non-client. *Barcelo*, 923 S.W.2d at 577. Rather, direct privity must exist for creating an attorney-client relationship. *Id.* Under *McAmish* and *Barcelo*, no direct privity, and thus no attorney-client relationship, ever existed between SCP and Mr. Feldman in his capacity as Capstone's General Counsel.

In addition, the "business judgment rule" protects from liability corporate officers & directors like Mr. Feldman while acting in his capacity as Capstone's CEO and General Counsel. *Sneed v. Webre*, 465 S.W.3d 169, 173 (Tex. 2015). The "business judgment" rule likewise protects Jeff Carlson from liability while taking any action as Capstone's President. *See Sneed*, 465 S.W.3d at 173. Aside from that protective cloak, Mr. Carlson could identify no testimony whereby SCP

accused him of doing anything wrong. TR Vol. 14 at 5500-03. Nor did Mr. Carlson even work at Capstone during the operative timeframe in 2015 when SCP contend tortious acts or omissions occurred. TR Vol. 14 at 5498, 5554.

In summary, the Arbitrator [should conclude] that the Capstone Parties (including Jeff Carlson, Capstone's President and in his capacities as Capstone's CEO and General Counsel) owed no fiduciary duties to SCP [and that] **SCP shall therefore TAKE NOTHING on their claims for breach of fiduciary duty against the Capstone Parties.**

### b. The Feldman Parties

As explained above, the Feldman Parties owed their clients, SCP, fiduciary duties within the scope of the representation as it was limited by the 2015 Engagement Letter. *See Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700-03 (contract limits fiduciary duties one party may owe another). Any fiduciary duties the Feldman Parties may have owed to SCP "extended only to dealings within the scope of the underlying relationship of the parties." *Rankin*, 557 S.W.2d at 944; *see also Joe*, 145 S.W.3d at 159-60. The Arbitrator [should conclude] that because the 2015 Engagement Letter limits the scope of legal representation, it also limits the fiduciary duties owed by the Feldman Parties. *See Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700-03 (contract limits fiduciary duties one party may owe another).

The contract that existed between the Feldman Law Firm and SCP serves as the source of, and fixed the boundaries for, any fiduciary duty. *Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700-03. In Texas, "the substance of the agreement to act on behalf of a [client] must be considered in determining the exact nature of the [attorney-client] relationship." *Id.* at 702-03. To this end, the dispositive nature of the scope of representation *as defined by 2015 Engagement Letter* limited the Feldman Law Firm's fiduciary duties to SCP.

### i.  Existence of A.M.Y. Policies

To state a claim for breach of fiduciary duty, SCP rely on allegations that the Feldman Parties not only failed to disclose material facts about the A.M.Y. policies in the PoolRe risk pool, but also made affirmative misrepresentations. The Arbitrator [should] judge these claims according to the scope of the Feldman Parties' representation as defined by the 2015 Engagement Letter. SCP base these allegations on their contractual expectation that they would benefit from the opportunity "*to qualify for partial tax-exempt status* under Internal Revenue Code § 831(b), as stated on the first page of Exhibit C to the Joint Engagement Letter." SCP's Post-Hearing Brief at 21 (emphasis added). Far from any protection afforded *by tort law*, SCP make clear that their fiduciary duty claim arises in contract by pointing to specific language within the four corners of the 2015 Engagement Letter they label as a "misrepresentation." *Id.* at 14-15.

SCP argue that Exhibit E to the 2015 Engagement Letter "states falsely that Capstone *or* Feldman – or their unspecified affiliates – '*may* participate in the pool.'  In fact, Feldman and Capstone had participated in the pool every year since 2010, at least.  Feldman and Capstone misled the Doctors by presenting their actual participation in the pool as a mere possibility." *Id.* at 14 (emphasis added). Citing Exhibit E to the 2015 Engagement Letter again, SCP contend (1) that "Feldman and Capstone misrepresented to the Doctors that the PoolRe risk pool consisted of 'generally similar policies covering generally similar risks.'"; and (2) that "Feldman and Capstone misrepresented that 'all of these [policies in the pool] were going to be homogenous.' But the risks in the pool were not similar or homogenous." *Id.* at 15.

The so-called "misrepresentations" identified by SCP appear *in writing* right in the parties' contract. SCP are not even relying on oral statements that would have preceded signing the 2015 Engagement Letter. Applying Texas law, the Arbitrator [should determine] that SCP must protect

their own interests by reading what they signed, and it is undisputed that the Doctors signed the 2015 Engagement Letter on behalf of themselves and all other members of SCP. *See Nat'l Prop. Holdings, LP v. Westergren*, 453 S.W.3d 419, 425-26 (Tex. 2015). Texas law charges SCP with knowledge of the contract's terms, the meaning of those terms, and their binding legal effect. *Indem. Ins. Co. of N. Am. v. W.L. Macatee & Sons*, 101 S.W.2d 553, 556 (Tex. 1937). Pleading or feigning ignorance of contract language offers no excuse. *Id.* The Feldman Parties owed no fiduciary duty to disclose their interpretation of the 2015 Engagement Letter to SCP *Tamez v. Southwestern Motor Transport, Inc.,* 155 S.W.3d 564, 570 (Tex. App. – San Antonio 2004, no pet.).

No tort duty required the Feldman or Capstone Parties to disclose language that appears right in the contract itself. *See McCranie v. Chamberlain, Hrdlicka, White, Williams & Martin, PC*, No. 14-04-00793-CV, 2006 WL 278276, at *5 (Tex. App. – Houston [14th Dist.] Feb. 7, 2006, pet. denied) (mem. op.); *First City Mortg. Co. v. Gillis*, 694 S.W.2d 144, 147 (Tex. App. – Houston [14th Dist.] 1985, writ ref'd n.r.e.). Rather, the duty fell on the Doctors and their advisers to make a diligent inquiry if any questions or uncertainty existed about what those provisions meant. *McCranie*, 2006 WL at *5; *First City Mortg. Co.*, 694 S.W.2d at 147. Because the Doctors and their team of professional advisers "had a reasonable opportunity to review the written agreement but failed to exercise ordinary care to do so," no actionable misrepresentation occurred. *Nat'l Prop. Holdings*, 453 S.W.3d at 425.

In addition, the statement that "Feldman or Capstone may participate in the pool" was entirely accurate because the 2015 Engagement Letter itself discloses that captive insurers and insureds may elect to do so on a year-to-year basis and that PoolRe could exclude any policy or insured. *See* EX J-20 at 5, 38-39. In arguing that risks in the pool were not similar or homogenous,

SCP overlook contract language that entitles PoolRe to exclude a policy or insured for that very reason. By including A.M.Y.'s policies in the risk pool rather than excluding them, PoolRe made the determination, in exercising its sole discretion under the contract, that those policies qualified as similar to the others in the pool. *See* TR Vol. 3 at 1278; EX J-20 at 38 ("[T]he final inclusion/exclusion decision is in the sole and absolute judgment of PoolRe"), 39 ("[I]t is within PoolRe's discretion as to which policies and insureds are included/excluded from the pool.").

Texas law prohibits SCP from turning *truthful* statements that appear in the 2015 Engagement Letter into actionable misrepresentations. *See Tri-Legends Corp. v. Ticor Title Ins. Co. of Cal.*, 889 S.W.2d 432, 443-44 (Tex. App. – Houston [14th Dist.] 1994, writ denied). The Feldman Parties told the truth to SCP by representing that A.M.Y. and its insureds "may participate" in the PoolRe risk pool on an annual basis. The Feldman Parties also accurately described, as "generally similar," the types of risks and policies that would go into the pool each year. Otherwise, PoolRe, which managed the pool, could exclude dissimilar policies using its sole discretion. The Feldman Parties did not dictate the type of policies that went into the risk pool managed exclusively by PoolRe.

**The Arbitrator therefore [should Rule] that SCP TAKE NOTHING on their claim for breach of fiduciary duty that rests on these alleged misrepresentations.**

The Arbitrator [should further reject] SCP's allegations that the Feldman Parties failed to disclose the presence of A.M.Y. policies in the pool covering risks attributable to professional misconduct and legal expenses. As Judge Dorfman found, SCP's team of expert advisers included an attorney and CPAs who represented SCP while negotiating the 2015 Engagement Letter. EX J-115 at 8-9.Under Texas law, SCP is bound by what a diligent inquiry from SCP's authorized agents, Mr. Kushner and Mr. Sherman, would have revealed. *See La Sara Grain Co.*, 673 S.W.2d

at 563; *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 300; *Williams v. Jennings*, 755 S.W.2d 874, 883 (Tex. App. – Houston [14th Dist.] 1988, writ denied). In imputing "notice to the agent" to the principal, "it is immaterial that the principal has not actually been informed of the particular facts under consideration, *and a principal may be deemed to be bound by knowledge that his agent, by the use of ordinary care, could have acquired, especially where the agent has information sufficient to instigate an inquiry.*" *Williams*, 755 S.W.2d at 883 (emphasis added). Under this standard, Texas law bars Mr. Kushner and Mr. Sherman, as tax professionals, from sticking their heads in the sand and claiming ignorance. Given their qualifications, Mr. Kushner and Mr. Sherman owed the Doctors a duty to investigate any information about all the information, disclosures, warnings, and concepts in the 2015 Engagement Letter they did not understand. *See id.* Because they passed up this opportunity, Mr. Kushner and Mr. Sherman bound SCP to what a diligent inquiry into the scope, substance, and meaning of the 2015 Engagement Letter would have revealed. *See id.*

"Since the principal, if he had conducted the transaction for himself, would in all probability have ascertained the facts which came to the knowledge of the agent in making the transaction, he should not be allowed to avail himself of the circumstance that he acted through an agent, and to say that, although his agent was affected with notice, he acted in good faith." *Teagarden v. R. B. Godley Lumber Co.*, 154 S.W. 973, 975 (Tex. 1913). And the law of agency presumes that Mr. Kushner and Mr. Sherman disclosed to SCP all facts and information that came within their knowledge or possession, such as the extensive disclosures made in the 2015 Engagement Letter. *See Mays v. First State Bank of Keller*, 247 S.W. 845, 846 (Tex. Comm'n App. 1923, judgm't adopted).

In 2015, the Doctors and their team of independent advisers possessed a high degree of

sophistication and knowledge in conducting business affairs and operating captive insurers. EX J-115 ¶¶ 29-30. The Feldman and Capstone Parties could expect and rely on this heightened level of sophistication, understanding, and expertise in working with Mr. Kushner and Mr. Sherman given their extensive tax backgrounds. *See Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1974). Rather than dealing with laypeople, the Feldman and Capstone Parties were finalizing a tax-related transaction with tax professionals. While the Doctors and their team of tax professionals "might not have understood the transactions after they had been explained to them, but it does not follow that [the Feldman Parties] would necessarily know of this misunderstanding unless it was communicated to [them]." *Id.* Because no evidence shows the Feldman Parties knew that the Doctors and their advisers misunderstood the 2015 Engagement Letter or the captive insurance planning, SCP failed to prove a breach of fiduciary duty by failure to disclose. *See id.*

Also fatal to SCP's breach of fiduciary duty claim based on a failure to disclose the existence of the A.M.Y. policies in the PoolRe risk pool, SCP's own documents show that they had the opportunity to get additional information regarding their captives' "participation in the risk pooling arrangement facilitated by PoolRe and information regarding other participants in the risk pool" but chose not to do so. EX FC-373.4 at 4. SCP's captives passed a formal resolution every year that "acknowledges and accepts" the following:

> Officers of Corporation have had the opportunity to review information regarding Corporation's participation in the risk pooling arrangement facilitated by PoolRe and information regarding other participants in the risk pool. Information regarding participants' industries, locations, operations, types of risks insured and exposures to risk are available for review at the offices of Capstone.

*Id*. A diligent inquiry from Mr. Kushner and Mr. Sherman on SCP's behalf would have revealed the "types of risk insured" and the "exposure to risk," including the existence of the specific policies that covered the Feldman and Capstone Parties' professional liabilities, errors & omissions, and legal expenses. Thus, the disclosures made were sufficient and SCP's claim for

breach of fiduciary duty regarding the sufficiency of the A.M.Y. disclosures fails.

SCP also mischaracterizes the testimony of Jim McCormack, the Feldman Parties legal ethics and malpractice expert. SCP avers that Mr. McCormack "concede[d] that Feldman and Capstone did not adequately disclose the fact that Feldman and Capstone got their clients to reinsure Feldman and Capstone's malpractice liabilities and legal expenses." SCP's Post-Hearing Brief at 12-13. In fact, Mr. McCormack testified that only "reasonable disclosure" was necessary in this instance and that additional disclosures may be necessary only "in hindsight" due to this case, which he referred to as a "tsunami arbitration." TR Vol. 19 at 7628, 7631, 7669. The Arbitrator concludes that the Feldman Parties did not have to disclose the precise nature of the policies issued by A.M.Y. included in the PoolRe risk pool because the possibility that one of the captive insurers in the pool would be called on to pay on those policies was remote, speculative, and contingent. Mr. McCormack confirmed that calling on a pool participant to pay out on a claim by the Feldman or Capstone Parties had never happened before. TR Vol. 19 at 7628-29. The specific information SCP contends had to be disclosed was not material to the representation or the terms of the 2015 Engagement Letter. Attorneys such as the Feldman Parties have no duty to disclose immaterial information. *See White v. Weinstein*, No. 05-02-00608-CV, 2002 WL 31831362, at *1 (Tex. App. – Dallas Dec. 18, 2002, no pet.); *STAR Centers, Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 77 (Minn. 2002); *Cf. Pride Intern., Inc. v. Bragg*, 259 S.W.3d 839, 849 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (no duty to disclose speculative or contingent information).

Finally, the Arbitrator [should refer] to and incorporate his findings from above, see section C, subpart (iii)(2)(b)(v) on SCP's negligence claim based on DR 1.08, and find here that the Feldman Parties adequately disclosed the presence of A.M.Y.'s policies in the risk pool that covered the

liabilities of the Feldman and Capstone Parties.

**The Arbitrator [should thus RULE] that SCP TAKE NOTHING on their claim for breach of fiduciary duty relating to the A.M.Y. policies.**

### ii.   IRS Scrutiny and Captive Audits

SCP contend the Feldman Parties breached fiduciary duties to SCP by inadequately disclosing information regarding ongoing IRS scrutiny and audits of Capstone-administered captives, namely Reserve Mechanical. The Arbitrator [should reject] this claim for the following reasons.

**1.   Disclosures by the Feldman Parties are viewed in light of the Doctors' preexisting knowledge of the tax risks associated with captive planning**

No breach of fiduciary duty results by failing to disclose any material fact about which SCP already knew. *See Mayes v. Stewart*, 11 S.W.3d 440, 451 (Tex. App. – Houston [14th Dist.] 2000, pet. denied) ("Actual knowledge is inconsistent with the claim that the defrauded party has been deceived, and it negates the essential element of reliance upon the truth of the representation."). Here, the evidence shows that SCP possessed independent knowledge about increased IRS scrutiny of captives and the corresponding tax risks years before engaging the Feldman and Capstone Parties in December 2015. TR Vol. 1 at 161-62, 167-68, 171, 200, 362-63, 425-31, 438-46, 476-78; TR Vol. 5 at 1923, 1927-28, 1942-43, 2100. As far back as September 2013, Dr. Sullivan received, from a fellow surgeon, colleague, and "good friend," an informative article published by Bloomberg's Bureau of National Affairs ("BNA") identifying the "key issue" as the "IRS is taking closer look at micro captive insurance companies to see if tax or business driven." EX FC-27. From this article sent by Dr. Thomas, Dr. Sullivan learned that "the Internal Revenue Service likely will increase its scrutiny of micro captive insurance companies falling

under tax code Section 831(b)." *Id.*

In the timeframe leading up to 2015, the Doctors "as a general practice" involved their attorney Mr. Sherman and CPAs Mr. Kushner and Ms. Underwood in making decisions about "the captive insurance plan" because "[t]hey had accounting knowledge and legal knowledge." TR Vol. 1 at 425; *see* EX FC-8 at 2. The Doctors had been relying on these professional advisers for years to perform "due diligence" on their behalf when considering a captive arrangement or potential tax deduction. TR Vol. 1 at 427.

The uncontroverted evidence reflects that Mr. Kushner, a founding partner at the accounting firm Kushner LeGraize, LLC, served as the Doctors' CPA who did their tax accounting work and provided tax advice. EXs FC-109, FC-508; TR Vol. 20 at 8001-03, 8078-87. Mr. Kushner's firm prepared and signed tax returns for the Doctors and their entities, including specialized captive insurance reporting under IRS Forms 8886, 8275, and 1120-PC. *See, e.g.,* EXs DRS-1612, DRS-1617, DRS-1622, J-168, J-169, J-170; TR Vol. 20 at 8003, 8030-43, 8198-8202.

For four decades, Mr. Kushner further represented clients in tax controversies with the IRS, thereby possessing knowledge of how such enforcement actions work. TR Vol. 20 at 8052-53. Mr. Kushner is currently representing Dr. Sullivan during his audit by the IRS. TR Vol. 20 at 8159.

Other uncontroverted evidence also showed that Mr. Sherman, who has served as the long-time attorney for the Doctors, is a founding partner of Chehardy Sherman Williams, earned an LLM in Taxation, holds the distinction as Fellow of the American College of Tax Counsel, and practices as a Louisiana Board-Certified Tax Attorney and Board-Certified Estate Planning and Administration Specialist who assists clients with their "tax and business planning." EX FC-400; TR Vol. 1 at 502-03. While SCP and Mr. Sherman insisted that he served only as their "health-care lawyer," internal emails established that he read as much as he could about captive insurance

so that he could represent his clients. *See, e.g.*, TR Vol. 2 at 800; TR Vol. 5 at 2039; TR Vol. 20 at 7901-02; EX FC-68.

Mr. Sherman acted as the conduit for connecting the Doctors first with Mr. Strauss in 2011 and then later (along with Mr. Kushner) with the Feldman and Capstone Parties in 2015. EXs FC-6, FC-8, FC-9.2, FC-68, FC-461; TR Vol. 20 at pp. 7905-06, 7923, 7937. Having worked with Mr. Feldman and Capstone on several captive projects over the years, Mr. Kushner referred the Doctors to them as a replacement for or "alternative" to Mr. Strauss. EX FC-461; TR Vol. 20 at pp. 7905-06, 7937-38, 8006-08, 8125-26. Because they assisted the Doctors with captive planning, Mr. Sherman and Mr. Kushner "read as much as [they] could" about captive planning to stay up to speed. EX FC-68. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924-25 (Tex. 2010) (imputing authorized agent's knowledge to principal).

Years before Feldman and Capstone came on the scene, at least by 2013, the Doctors "had advisors that were independent of [their] captive advisors that were advising [them] on the potential tax consequences of a transaction involving a captive insurance company under Section 806." TR Vol. 1 at 428.

This preexisting knowledge of and concern over increased IRS scrutiny of "micro captive insurance companies" drove the Doctors to explore potentially switching captive managers from Peter Strauss to the Capstone Parties. EXs FC-37.2, FC-46, FC-51, FC-57, FC-68. Judge Dorfman even made a fact finding on this precise point in his final confirmed Award, thereby giving rise to collateral estoppel: "The Doctors were concerned about increased IRS scrutiny of offshore captive insurance companies, and so approached Mr. Feldman and the Capstone Parties regarding the possibility of re-domiciling their existing Bahamian captive insurance companies to an onshore (Delaware-based) captive insurance program." EX J-115 at 5 ¶ 11; *see Wilhite v. Adams*, 640

S.W.2d 875, 876 (Tex. 1982) (per curiam) (collateral estoppel bars relitigating same issues a tribunal has already decided).

In forming and operating captive insurance companies in 2011, the Doctors engaged Peter Strauss as their attorney along with his company, Hamilton Captive Management, as the captive manager for Cerberus, Janus, and Orion. EX FC-9; EX J-115 at 5 ¶¶ 11-12; TR Vol. 2 at 599. Despite using a captive manager, the Doctors claimed they still retained all authority to make important "business and policy decisions" on behalf of their offshore captives. EX FC-9 at 2; EX J-115 at 11 ¶¶ 35-36; *see also* EX FC-69 at 2 (Dr. Sullivan states that Dr. DellaCroce manages his captive Orion). When dealing with Mr. Strauss, SCP gained substantial experience over a five year period in making decisions for their captive insurance companies, buying (through their entities) millions of dollars of insurance from their captive insurers each year, taking action as owners of the SCP captives and their insureds, entering into pooling arrangements with Mr. Strauss / Worldwide Property & Casualty, Ltd. SAC, taking millions of dollars of tax deductions related to captives, and working with an attorney who owned the captive management company that serviced their captives. *See* EXs FC-68, FC-69.

According to Dr. Sullivan, Dr. DellaCroce managed his own captive Orion even though they had retained the services of Peter Strauss. EX FC-69 at 2. In the Arbitrator's [proposed] view, therefore, Dr. DellaCroce would have (or should have) acquired a working knowledge of how to operate and make decisions for a captive insurer. However, in any event, the Arbitrator [should note] that added advice and expertise of Mr. Strauss, Mr. Sherman, Mr. Kushner, Ms. Underwood, Mr. Kushner, Mr. Strauss (and his companies) and Mr. Theriot enhanced Dr. DellaCroce's managerial knowledge years before he ever met Mr. Feldman in early 2015 or signed the 2015 Engagement Letter.

Before ever seeing the 2015 Engagement Letter, or the "Tax Risks Disclosures" in Exhibit C provided by the Feldman Law Firm in July, October, November and December 2015, the Doctors and their advisers, Mr. Kushner and Mr. Sherman understood that many tax risks accompanied captive insurance planning. EXs FC-11, FC-26, FC-27, FC-35, FC-38, FC-57, FC-58, FC-68. SCP's awareness of the tax risks associated with this sophisticated planning came from multiple sources that found their way into the hands of the Doctors and their advisers by early 2015, which included the IRS "Dirty Dozen" notice issued by the IRS and other warnings given by their own expert advisers, the mainstream media, or specialized publications like BNA. EXs FC-35, FC-43; EX J-140, EX DRS-138; TR Vol. 1 at 476-78; TR Vol. 2 at 722; TR Vol. 5 at 2100; TR Vol. 20 at 8007-08, 8022-23, 8089-97. *Rather than merely having indirect knowledge, the Doctors possessed direct knowledge of these tax risks.*

Further, by November 2014 (before even meeting or speaking with Mr. Feldman), Mr. Kushner sent a New York Times article to the Doctors discussing captive insurance, IRS scrutiny of captives, and tax concerns. EX FC-35. In August 2015, Mr. Kushner sent Mr. Sherman an article entitled, "The IRS has Declared War on the Abusive Use of Micro-Captive Insurers," explaining how budget cuts had forced the IRS into conducting "promoter audits" in the captive insurance industry that examined the captive promoter, the captive insurer, and entities or individuals affiliated with the captive insurer. EX FC-71. This article gave Mr. Sherman and Mr. Kushner knowledge or at least awareness of using the promoter audit as an IRS enforcement tool. Dr. Sullivan admitted reviewing this latter article after receiving it in an August 2015 email from Mr. Sherman. *See* TR Vol. 2 at 601-07, 612-18. The month before, Capstone sent the July 17, 2015 version of Exhibit C ("Tax Risks Disclosures") to Mr. Kushner, notifying him that the IRS was conducting that same type of inquiry into Capstone's captive arrangements. EX FC-63.

Mr. Feldman himself sent an email to Mr. Kushner and Mr. Sherman on February 6, 2015 advising them that the IRS added "abusive micro-captive" transactions to its "Dirty Dozen" list of "tax scams." EX FC-43; TR Vol. 20 at 8089-92. This email warning about the "Dirty Dozen" followed on the heels of the January 19, 2015 meeting, a mere two weeks before, where representatives of the Feldman and Capstone Parties discussed with the Doctors, Mr. Kushner, Mr. Sherman, and CFO Ms. Underwood valid reasons for reorganizing and domesticating SCP's offshore captive arrangement into U.S.-domiciled regulated insurers. *See* EX J-6; EXs FC-38, FC-58.  Shortly after that meeting, Capstone's Vice President and Chartered Property & Casualty Underwriter ("CPCU") Lance McNeel sent the Doctors, Mr. Kushner, Mr. Sherman, and Ms. Underwood *4 published articles* that further explained captive insurance while cautioning about IRS activity in the area. EX FC-38. SCP obtained all this information only months before the Doctors signed the 2015 Engagement Letter in December 2015. *See* EX J-20.

The "captive health check-up" presented by the Feldman law Firm in final form on August 3, 2015 (earlier drafts had been circulated to SCP's advisors) identified numerous tax concerns that impacted the existing offshore captive program set up and administered by Mr. Strauss and Hamilton Captive Management. *See* EX J-16. Besides pointing out issues, the "captive health check-up" offered solutions and gave the Doctors and their advisers a primer on examining legitimate deductions for captives under federal tax laws. *Id.* The "captive health check-up" also included an analytical article written by Feldman Law Firm tax attorney Logan Gremillion, "Beyond Safe Harbors: Recent Developments in Insurance and Risk Distribution," which addressed the legal requirements captives must meet to qualify as an insurance company for federal income tax purposes. *Id.* at 16-24. BNA published this article in its nationally recognized Tax Management Memoranda in July 2015. EX DRS-138.

The "Tax Risks Disclosures" that appeared in Exhibit C to the 2015 Engagement Letter likewise alerted the Doctors that "[i]n February 2015, the IRS added abusive captive insurance arrangements to its annual list of tax scams known as the "Dirty Dozen" for the 2015 filing season." EX J-20 at 33; *see* TR Vol. 20 at 721-22. At the very least, the Doctors or their advisers received Exhibit C in July, October, and November 2015. EXs FC-63, FC-77; EX J-20. And in August 2015, Mr. Feldman separately sent Mr. Sherman the same BNA article written by the Feldman Law Firm tax attorney Mr. Gremillion that identified tax issues facing captives, notwithstanding express Congressional statutory authorization for this financial arrangement in the IRC. EX DRS-138; EX J-16; TR Vol. 20. at 7924-25. By the time the 2015 Engagement Letter took effect, the Doctors and their advisers had been keenly aware for years that the IRS had soured on captive insurance and fostered an enforcement environment that disfavored captive insurance transactions.

Recognizing that *some* disclosures were in fact made, SCP attempts to pivot or refine this broad allegation by claiming that the disclosures were insufficient to specifically inform them of the details of the IRS' multiple audits of Capstone-administered captive insurers. Nonetheless, the evidence shows that the "Tax Risks Disclosures" in Exhibit C unambiguously explained that Capstone clients were going through audits and how they were faring in numerous IRS enforcement actions, including actions in the United States Tax Court. *See* EX J-20 at 30-36. Even though these provisions are unambiguous and need no further explanation, SCP and their advisers reviewed the document at least three times, negotiating its terms and conditions along the way, before directing the Doctors to sign it. The SCP team had every opportunity to ask the Feldman and Capstone Parties any questions raised by the extensive disclosures that critical document contained. *See* EXs FC-63, FC-77, FC-78; EXs J-19, J-20; TR Vol. 20 at 7939, 7962, 7966. Mr. Kushner in particular received a substantively identical form of tax risk disclosures in July 2015

disclosing these same tax risks, but recalled asking no follow-up IRS questions to the Feldman and Capstone Parties. EX FC-63; TR Vol. 20 at 8146.

Although they identified no other captive clients by name or discussed the specifics of a past or present tax controversy, the disclosures in Exhibit C covered topics ranging from (1) substantive tax risks facing captive insurers to various actions the IRS had taken to investigate Capstone-administered captive insurance arrangements, (2) the "information document request (IDR)" the IRS sent to the Feldman or Capstone Parties in June 2015 that "is likely connected to the IRS's examination of captive insurance programs generally" to the IRS "review" of "the captive insurance / alternative risk planning program" that gave rise to that IDR, and (3) any details surrounding captive tax controversies the Feldman Law Firm handled before the IRS over the years involving Capstone-administered captives, which included at least 9 adverse decisions as of the June 2015 timeframe, to the results reached in IRS audits, IRS appeals, notices of deficiencies, tax court litigation, or otherwise where the Feldman Law Firm played a role. *See* EX J-20 at 30-36.

In disclosing this material information and more, Exhibit C made clear that the Feldman and Capstone Parties welcomed any inquiries by SCP or their advisers: ***"We are available to discuss or further explain these issues in more detail as needed to enable you to make an informed decision on these matters."*** EX J-20 at 36. After providing SCP and their advisers all necessary information, the Feldman and Capstone Parties expressly encouraged them to follow up with any questions or concerns. They did not do so. TR Vol 20 at 8146:1-5. And again, SCP are bound by what a diligent inquiry from Mr. Kushner and Mr. Sherman would have revealed with regard to the tax risk disclosures. *See La Sara Grain Co.*, 673 S.W.2d at 563; *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 300; *Williams*, 755 S.W.2d at 883. SCP presented no evidence that they would not have been provided with additional information or disclosures had they asked

for them.  In fact, Dr. Sullivan explicitly tasked Mr. Sherman and Mr. Kushner to determine whether there were "any disclosures that need to be made." EX FC-463 at 1.

> **2. The Feldman Parties did not breach any fiduciary duties by failing to disclose IRS concerns and tax risks.**

Before anyone signed the 2015 Engagement Letter, the Feldman and Capstone Parties made extensive and specific written disclosures to SCP on multiple occasions about the tax risks and IRS enforcement environment facing captive insurance planning. The breadth of these disclosures contrasts with the dearth of disclosures made by Mr. Sherman, Mr. Kushner or Mr. Strauss.

Many of the disclosures made by the Feldman and Capstone Parties appeared in Exhibit C to the 2015 Engagement Letter, while other disclosures came from the captive insurance articles, tax articles, and informative communications the Doctors and their advisers received from the Feldman and Capstone Parties leading up to the execution of the 2015 Engagement Letter and thereafter. *See* EX J-16, EX J-20; EX FC-38; EX DRS-138; EX FC-229. Private emails among SCP's inner circle confirm that the Doctors and their expert advisers knew and understood such risks, not to mention that they discussed and evaluated them internally at length, declining to invite the Feldman and Capstone Parties into the process. EXs FC-68, FC-69.

The disclosures and disclaimers in "Exhibit C" providing "Tax Risks Disclosures" and "Exhibit E" describing "Third Party Insurance," exist in the very contract signed by the Doctors, not to mention that the contract was reviewed by them at least "dozens of times," and vetted by their team of skilled professionals. TR Vol. 1 at 204; TR Vol. 2 at 722-23; TR Vol. 20 at 7925-29. In his final award, Judge Dorfman found that SCP and FCP "agreed" that the 2015 Engagement Letter, including the "Tax Risks Disclosures" in Exhibit C, contain "unambiguous" language. EX

J-115 at ¶ 16.

The Arbitrator [should conclude] that Exhibit C to the 2015 Joint Engagement Letter was not required to contain an exhaustive discussion of every single issue or every factual scenario or instance involved in captive planning. No lawyer should be expected to provide a custom-tailored written treatise of the legal issues their potential client may face as part of a proposed engagement agreement. Exhibit C instead made clear that it was providing, "on a non-exhaustive basis," only a *summary* of (1) tax risks facing captives, (2) potential IRS challenges targeting "the tax deductibility of [captive] insurance premiums," and (3) legal grounds for assailing "the tax-exempt status" of captive insurers. EX J-20 at 30, 34.

Notwithstanding its intent to be of a "summary" nature, Exhibit C provided extensive disclosures to the Doctors and their advisers about the "significant tax and IRS enforcement risks surrounding" captive transactions. EX FC-385 at 1; TR Vol. 23 at 9302, 9376-80, 9386-97; TR Vol. 19 at 7636-39. Exhibit C in its final form hardly represented some *pro forma* or cookie-cutter disclosure statement unrelated to the legal work at hand. To the contrary, it was specifically tailored for its targeted audience and focused on the germane issues to a potential captive insurance client. Three experienced tax lawyers at the Feldman Law Firm revised and refined the disclosures in Exhibit C in mid-2015 after engaging for months in numerous discussions with Mr. Kushner and Mr. Sherman that covered those topics. EXs J-13, J-14, J-15; TR Vol. 11 at 4483:21 4485:22.

Mr. Kushner received and reviewed an updated version of Exhibit C in July 2015 – months before the Doctors executed the 2015 Engagement Letter – that expanded the disclosures that previously appeared in the March 3, 2015 Engagement Letter. EXs FC-47, FC-63; TR Vol. 20 at 8011-12, 8134. According to Mr. Kushner, the July 2015 iteration of Exhibit C "look[ed] similar to the Exhibit C that was included in the doctors [sic] engagement agreement with Mr. Feldman

and Capstone." TR Vol. 20 at 8134-36. As of July 2015, therefore, "Mr. Feldman has alerted . . .
Mr. Kushner that there were nine audits that are with IRS Appeals" and that those "cases . . . will
likely go to Tax Court" unless IRS Appeals concedes them. TR Vol. 20 at 8136-38.

Exhibit C in all its updated forms produced later in 2015 contained detailed information,
updates, and analysis about real-time developments in case law governing captive insurance, IRS
enforcement actions involving other clients of the Feldman Law Firm and Capstone, and IRS
revenue rulings. EX J-20 at 31, 34-36; EX FC-63 at 9-11. These updates continued as new
developments occurred.[509]  *See* EXs FC-63, FC-77, FC-229; EXs J-18, J-19, J-20.  For example,
the July 2015 version of Exhibit C stated in Paragraph G that the IRS had begun an examination
of the Capstone captive insurance program; the December 2015 version disclosed that the IRS
agent had already conducted an in-person document examination over 3 days in August 2015 and
"the matter ha[d] been dormant" since then. *Compare* EX FC-63 at 11 *with* EX J-20 at 36. The
resulting Exhibit C turned out as even more robust and updated work product that reflected a
compendium of intervening written and oral disclosures the Feldman and Capstone Parties
provided to SCP from January to July 2015, demonstrating the Feldman Law Firm's efforts to
provide accurate and timely disclosures.

While SCP complains that the Feldman Parties failed to disclose material facts to them,
Exhibit C explicitly disclosed the following critical information to SCP in the 2015 Engagement
Letter:

1.    That captive planning involved "inherent risks" and should only be undertaken by
      those "people who can understand and evaluate and accept those risks." EX J-20 at

---

[509] The email transmitting the July 2015 iteration of the "Tax Risks Disclosures" embodied by Exhibit C stated the
logical reason for these periodic updates: "From time to time clients have asked about our Firm's experience with the
IRS regarding captive insurance/alternative risk planning. In an effort to formalize the information and to provide the
same comprehensive information to all, we have prepared an addendum and update to our "Tax Risks" disclosure
which we are attaching. See especially 'Summary of The Feldman Law Firm LLP's IRS Experience With Capstone-
Administered Captive/Alternative Risk Planning.'" EX FC-63.

30; EX J-18 at 38; TR Vol. 2 at 721. To this end, the very first paragraph of the Tax Risks Disclosures warned that "[t]ax and business planning, even without the overlay of alternative risk management planning, has its own inherent risks. This planning, as other types of business and tax planning, involves inherent risks and should only be undertaken by those who can identify and evaluate such risks and understand and accept them."  J-20 at 30 (emphasis added).

2.      That "the risks include that the Internal Revenue Service will challenge the tax deductibility of the insurance premiums paid by the insureds and also disallow the tax exempt status of the captive and assess back taxes, interest and penalties." EX J-20 at 30.

3.      That "[t]he tax deductibility of the insurance premiums and tax exempt status of the captive insurer is an issue of fact that turns on, among other issues: (i) whether the captive is in fact acting as an 'insurance company' (see discussion below); and (ii) whether or not the coverage provided by the captive is truly an act of insuring a risk (and not merely an act of reserving for a risk)." EX J-20 at 30.

4.      That court cases and IRS Rulings have "distilled" the issues regarding tax exempt status and deductibility of the premiums into an inquiry that explores 3 crucial areas: (1) corporate structure to ensure proper "risk shifting"; (2) having a certain percentage of unrelated, third-party insurance business to ensure that "risk distribution" exists; and (3) "having a legitimate business purpose for forming and operating the captive insurer beyond that of merely gaining a tax benefit in order to satisfy the criterion that the business structure and the transactions connected to it not be a mere sham designed solely to gain tax advantages." EX J-20 at 30-31.

5.      That "the U.S. Tax Court in R.V.I. Guaranty Co., Ltd." held that "the taxpayer, which issued residual value insurance contracts, was an insurance company for federal income tax purposes," which was "contrary to the position taken by the IRS in administrative rulings and published materials stating that the risks involved in residual value insurance was an 'investment risk' and not an insurable risk." EX J-20 p. at 31.

6.      That the IRS uses the term "insurance company" generally to mean "any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. EX J-20 at 32.

7.      That "[w]hether more than half of the business activity is related to the issuing of insurance or annuity contracts will depend on facts and circumstances" and the

"[f]actors to be considered in evaluating this 'more than half of the business' test may include the relative distribution of the number of employees assigned to, the amount of space allocated to, and the net income derived from, the various business activities." EX J-20 at 32.

8.    That "[a] company whose investment activities 'outweigh' its insurance activities is not considered to be an insurance company for tax purposes." EX J-20 at 32.

9.    That "[t]he captive needs to conduct its business, including its investment activities, like an insurance company" because "tax practitioners" "generally agree that secured loans must be on a commercial and arm's length basis and that the higher the relative amount of secured loans, the less the captive looks like an insurance company." EX J-20 at 32.

10.    That there were "legislative and regulatory risks that could change or reduce or eliminate the benefits under IRS § 831(b)." EX J-20 at 33.

11.    That "[i]n February 2015, the IRS added abusive captive insurance arrangements to its annual list of tax scams known as the 'Dirty Dozen' for the 2015 filing season. The IRS stated that an otherwise legitimate tax structure involving small or 'micro' captives was subject to abuse by unscrupulous promoters. The result of this IRS announcement will most likely be a notable increase in IRS scrutiny and audits of captive insurance companies and their captive managers, whether such arrangements are legitimate or abusive." EX J-20 at 33.

12.    That beginning in 2012, Capstone and the Feldman Law Firm "recommended and Capstone made available a 50% outside (unaffiliated) business program in an effort to meet the 50% safe harbor test set forth in Rev. Rul. 2002-89" because the IRS's "then unexplained actions of its tax exempt division regarding section 501(c)(15) captives;" EX J-20 at 35.

13.    That there had been at least 3 statutory notices of deficiency issued by the IRS regarding Capstone-administered captives, and that the IRS National Office had issued adverse rulings, which were ultimately conceded by IRS Appeals, "with no taxes. Interest or penalties due, and resulting in a decision entered in favor of the captives by the U.S. Tax Court. EX J-20 at 35.

14.    That there had been 9 audits resulting in adverse exam reports which were currently in IRS Appeals, and that if IRS Appeals did not concede the cases, they would

likely to proceed to U.S. Tax Court. EX J-20 at 35-36.

15.    That there was an additional audit initiated by the IRS in June of 2015. EX J-20 at 36.

16.    That the IRS in June 2015 issued initiated a review of the Capstone captive insurance/alternative risk planning program and that this was likely connected to the IRS's examination of captive insurance programs generally. EX J-20 at 36.

17.    That "IRS Appeals declined to follow the IRS National Office's determination in the two cases in which the National Office had originally issued adverse rulings," signifying a conflict within the agency over characterizing the tax positions taken by captive insurers and insureds. EX J-20 at 35.

18.    That there would be a tax due upon liquidation of the captives: "Further, in order to meet the partial tax exempt provisions of IRC §831 (b), the captive must be operated in a manner consistent with relevant provisions of the Internal Revenue Code. Such exempt status, of course, does not extend to the captive's liquidation or sale, which generally results in a long term capital gain tax being assessed on the gain as well as, in the case of a liquidation, an income tax internal to the captive on its appreciated assets." EX J-20 at 32.

The Feldman or Capstone Parties delivered to SCP or their advisers substantially the same or similar (revised and updated over time) written tax disclosures on July 31, 2015, October 22, 2015, November 2, 2015, and February 9, 2016. *See* EXs FC-063, FC-077, FC-229; EX J-18. The update on February 9, 2016 also disclosed that 2 taxpayers had refused to extend the statute of limitations further and that, as a result, IRS Appeals issued adverse determination letters. EX FC-229 at 10. That update also disclosed that "90-day letters" (*i.e.*, notices of deficiency) were expected to be issued and that those taxpayers would file petitions in the U.S. Tax Court in response. *Id*. Reserve of course represented one of those two unnamed clients. Rather than fail to disclose, the Feldman and Capstone Parties disclosed favorable and unfavorable experiences with the IRS. Even after being told of the upcoming 4th and 5th tax court case involving Capstone-

administered captives, SCP moved forward, as was its right.  However, in doing so, it cannot look to the Feldman Parties or the Capstone Parties as guarantors of SCP's tax decisions.

FCP's expert on legal ethics, Jim McCormack, also reviewed and commented on the draft of Exhibit C in June 2015, paying special attention to the issue of disclosing client confidential information. *See* TR Vol. 19 at 7391-92; EX FC-621 at 2; EX FC-622 at 3-19. Mr. McCormack reviewed the disclosures in real time in July 2015 from an ethics perspective and participated in a lengthy conference call with the Feldman Law Firm's Mr. Feldman, Mr. Cohen, Mr. Gremillion, as well as Val Albright of the Gardere firm (now Foley Gardere), to discuss the disclosures and their contours. *See id.* Conforming with this process, Mr. Cohen also testified that a part of the analysis in determining what to disclose in Exhibit C depended on client confidentiality concerns and the duties the Feldman Law Firm owed to *other* clients as their attorneys. TR. Vol. 21 at 8624.

In addition, tax lawyers at two outside firms, Denton's Chas Lavelle and  Gardere's  Val Albright, performed a similar review of the same document at this same time. *See* EXs J-14, J-15, J-139. Thus, the written tax risks disclosures in Exhibit C went through multiple levels of review by 6 different attorneys, all of whom concentrated their practice on tax law involving captives or legal ethics. These tax risks disclosures benefitted and improved from all this input.

FCP's tax expert Marcus Brooks, the Chair of Winstead's tax group whose practice focuses on tax controversy and tax litigation, described Exhibit C's "Tax Risks and Responsibilities" as *"the most exhaustive series of tax risk disclosures provided by a law firm or a services organization that [he] ha[d] ever reviewed in [his] career."* EX FC-385 at 1.  In Mr. Brooks's expert opinion, these tax risk disclosures in Exhibit C adequately and thoroughly disclosed the risks the Doctors could face in operating a captive, which included losing the tax advantages associated with a captive and facing IRS enforcement actions due to increased scrutiny of the

captive industry. EX FC-385; TR Vol. 23 at 9302, 9376-80. According to Mr. Brooks, Exhibit C set forth the specific grounds used by the IRS to challenge the tax-exempt status of captive transactions and warned about "a great deal of enforcement activity taking place." EX FC-385; TR Vol. 23 at 9376-80, 9386-97. Specifically, Mr. Brooks referenced in his report the following with regard to developments in the IRS enforcement regarding captives:

- 12 clients with completed audits resulting in "no changes" to the clients

- 3 Notices of Deficiency (1 from the above audits) issued resulting in 3 Tax Court cases, which were resolved favorably at appeals. It notes: "IRS Appeals declined to follow the IRS National Office's determination in the two cases in which the National Office had originally issued adverse rulings." This **informed the clients that the National Office had taken positions adverse to Feldman/Capstone's clients**, even though appeals had disagreed, which would have been based on hazards of litigation. This is incredibly fact specific and useful information.

- 9 additional pending audits (exclusive of the one recent (June 2015) audit – see below) remain, which are now in IRS Appeals. … "IRS Appeals has recently issued adverse determination letters with respect to those two cases. It is expected that the IRS will eventually issue 90-day letters with respect to such two cases, and the taxpayers will file petitions in U. S. Tax Court as a result thereof." I note that one of these nine cases was **the firm's client, Reserve. SCP were therefore apprised of Reserve (just not by name)**

– and that it was going to get a statutory notice and head to Tax Court. It is difficult to imagine what more SCP thinks they were entitled to here regarding information pertaining to another client. They were later apprised when the case was in trial, and promptly notified when an opinion came out. Anything more than that would have been inappropriate – potentially waiving attorney-client privilege belonging to Reserve and being a wrongful disclosure to a third party of Reserve's confidential client information.

- 1 additional audit of a captive that was initiated in June 2015 through an audit of a client's operating business.

- In June 2015, the IRS notified either Stewart A. Feldman or the Firm or Capstone (the addressee of the inquiry is unclear) that the **captive insurance/alternative risk planning program is the subject of a review by the IRS and issued an information document request (IDR) to Feldman/Capstone itself.** "The Firm is unclear whether this IDR is unconnected with the audits of any particular captive client, but is likely connected to the IRS's examination of captive insurance programs generally."

- **"The owner of one captive which received a favorable tax determination ruling more than a decade ago under Section 501(c)(15) nonetheless recently had tax deductions disallowed by the Service for premiums paid by the owner's operating business to such captive. As part of the Firm's obligations under its engagement letter with the captive's owner, a tax court petition was filed in late December 2015** contesting the Service's position that is contrary to the prior favorable determination letter issued by the Service."

EX FC-385 at 3.

The Doctors had their board-certified tax attorney Mr. Sherman and their CPA Mr. Kushner (both of whom have decades of tax experience) review the 2015 Engagement Letter and all its attachments over a period of months before signing. TR Vol. 1 at 522-23; TR Vol. 2 at 667-69; TR Vol. 20 at 7925-27, 7939, 8013, 8117; *see* EX J-18; EX FC-78.  In acting for the Doctors, Mr. Sherman and Mr. Kushner had negotiated the terms for the engagement agreement over a period of months and understood the finer points of the contractual arrangement, captive planning, and tax consequences. EXs FC-46, FC-69. Mr. Sherman and Mr. Kushner received the first draft of the engagement letter and its attachments on or about October 22, 2015, studying and continuing to negotiate its terms for 6+ weeks through its December 7, 2015 execution. EXs FC-77, FC-78. In fact, the negotiations over the terms of what became the December 2015 Engagement Letter

date back to February 2015. EX FC-46.

SCP and their professional advisors never complained that they lacked sufficient time or opportunity to review the contracts and their attachments or that the Feldman and Capstone Parties prevented them from reviewing those documents. TR Vol. 20 at 7939, 7962, 7966. *See Nat'l Prop. Holdings, LP*, 453 S.W.3d at 424-25. Texas law charges the Doctors and the SCP entities with knowing the entire contents of the contracts they signed, the meaning of the words in those documents, and the legal effect of the contract's terms. *Indem. Ins. Co. of N. Am.*, 101 S.W.2d at 556. This rule captures any document incorporated by reference, such as Exhibits C and E to the 2015 Engagement Letter and the Capstone Services Agreement. *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008).

Indeed, Dr. Sullivan conceded that Exhibit C to the 2015 Engagement Letter "disclose[d] that there would be a notable increase in IRS scrutiny and audits of insurance companies and their captive managers, whether such arrangements are legitimate or abusive." TR Vol. 2 at 722. Dr. DellaCroce likewise testified that he reasonably anticipated that an audit was possible based on the 2015 Engagement Letter. TR Vol. 5 at 2071. To avoid the adequate notice given by Exhibit C, SCP try to reframe the issue as one that involves the vagaries of "captive insurance" with which they lack any expertise. *See* TR Vol. 1 at 169-71, 442-45; TR Vol. 5 at 1906, 1930-31; TR Vol. 20 at 7901-06, 8002-05. Yet the record shreds this false flag. *See, e.g.*, EXs FC-68, FC-69; TR Vol. 1 at 359, 444-46, 468-69, 476-81, 498-500; TR Vol. 2 at 662-66, 760.

The duty of SCP's agents to investigate the "Tax Disclosures" in Exhibit C attaches with particular force because Dr. DellaCroce described it as "a hypercomplex legal document that would take about an hour to navigate through and [you] probably still wouldn't understand it completely." TR Vol. 5 at 1960. Without understanding Exhibit C completely, Dr. DellaCroce

nonetheless signed the 2015 Engagement Letter. If the Doctors and their agents never asked any questions about the disclosures made by Exhibit C, the Feldman and Capstone Parties could assume the other side understood those disclosures. *Swenson*, 517 S.W.2d at 261. After all, Judge Dorfman observed in his final award that "Claimants / Intervenors and Respondents agree that the Engagement Letters, and all other relevant contractual documents between them, are unambiguous." EX J-115 ¶ 16.

Marcus Brooks – a "tax professional" like Mr. Kushner and Mr. Sherman under IRS Circular 230 – also debunked this fallacy, explaining that the tax risk disclosures in Exhibit C described increasingly aggressive ***enforcement actions*** taken by the IRS that focused on the captive industry:

        12· · · · ·Q.· · ·Okay.· In reviewing that
        13· ·section, did you rely on your review of that
        14· ·section in forming your opinion regarding the
        15· ·adequacy of the disclosures?

        16· · · · ·A.· · ·I did.

        17· · · · ·Q.· · ·What did you draw from your
        18· ·review of that opinion, or that section?

        19· · · · ·A.· · ·That there is a great deal of
        20· ·enforcement activity taking place.

        21················The IRS has ceased issuing
        22· ·letter rulings.· That's a warning sign.· The
        23· ·Feldman clients have prevailed in a few
        24· ·appeals, which is positive for them, but
        25· ·they've done it over the objection of the
            ·national office.· That means these things are
        ·2· ·going to keep coming.· Right?· That the
        ·3· ·national office is positioned against them.

        ·4··············There are still a lot of cases
        ·5· ·out there and that's just what is with the
        ·6· ·Feldman group right now.

·7· · · · · · · · · · · ·There are audits that are being
·8· ·kicked up from other directions, you know.
·9· ·There's some audits of operating businesses
10· ·that are getting into the captives.

11· · · · · · · · · · ·And the Feldman firm itself has
12· ·been hit with an audit, which is a different
13· ·level of occurrence.· That's a different
14· ·thing.· That told me that that's either a
15· ·promoter audit or it's something like a
16· ·promoter audit.[510]

17· · · · · · · · And, you know, that's -- that
18· ·adds another level of risk because that means
19· ·the IRS either has your client list or is
20· ·going to get your client list.

21· · · · · · · · So I see a -- I see a scenario
22· ·in which they have had a lot of success
23· ·getting letter rulings for a long time,
24· ·they've had some success defending some
25· ·audits and winning some appeals, but they're
·1· ·in an enforcement environment that is very
·2· ·hot and unpredictable.

TR Vol. 23 at 9395-97.

Because the Doctors read them, the thorough tax risks disclosures that appear in Exhibit C

to the 2015 Engagement Letter defeat SCP's claims for breach of fiduciary duty. *See McCranie v.*

*Chamberlain, Hrdlicka, White, Williams & Martin, PC*, No. 14-04-00793-CV, 2006 WL 278276,

at *5 (Tex. App. – Houston [14th Dist.] Feb. 7, 2006, pet. denied) (mem. op.); *First City Mortg.*

*Co. v. Gillis*, 694 S.W.2d 144, 147 (Tex. App. – Houston [14th Dist.] 1985, writ ref'd n.r.e.).  SCP

has alleged no trickery or artifice that prevented the Doctors or their highly sophisticated team of

tax and legal advisors and what Judge Dorfman called "sophisticated and intelligent individuals"[511]

---

[510] Like Mr. Brooks, SCP's "tax professional," Lyle Press, admitted recognizing that Paragraph G in Exhibit C disclosed "a promoter audit." TR Vol. 9 at 3747-48.

[511] "The Parties to this proceeding are sophisticated and intelligent individuals and were represented by counsel (and certified public accountants) of their choosing both in negotiating the terms of the engagements between them over

from reading or understanding Exhibit C and the entire 2015 Engagement Letter. *See Nat'l Prop. Holdings, LP*, 453 S.W.3d at 424-25.  As concluded by Judge Dorfman: ". . .  I find that the parties possess similar levels of sophistication (in general, not in the specific area of insurance products)." EX J-115 at 10.

The tax risks disclosures appeared in an exhibit devoted specifically to explaining the IRS enforcement activity that targeted captives – one the Doctors admitted to reading before they signed the 2015 Engagement Letter.  *See McCranie*, 2006 WL 278276 at *5; *First City Mortg. Co.*, 694 S.W.2d at 147. The Doctors seem to be brushing aside their ". . . *Responsibilities Under Section 831(b)*," which certainly would include reading and understanding what they were signing. Thus, the breach of fiduciary duty (and the fraud and DTPA claims, to the extent they survive application of the anti-fracturing rule) all fail.

Here, the Doctors retained and drew on the advice and expertise of CPAs and tax attorneys in negotiating and committing to the 2015 Engagement Letter, not to mention that they already had owned and operated captives for approximately four years under the guidance of those same advisors plus attorney and "captive expert" Peter Strauss. TR Vol. 1 at 359, 444-46, 468-69, 476-81, 498-500; TR Vol. 2 at 662-66, 760; TR Vol. 5 at 1921-22; 2043; 2045-46. Texas law imposes no duty to disclose information that appears in black and white in the very document about which the Doctors complain. *McCranie*, 2006 WL 278276 at *5; *First City Mortg. Co.*, 694 S.W.2d at 147.

No duty exists under Texas law to explain "every detail" of the 2015 Engagement Letter along with the contents of Exhibits C ("Tax Risks Disclosures") and E ("Third Party Insurance"). *Cendant Mobility Servs. Corp. v. Falconer*, 135 S.W.3d 349, 354 (Tex. App. – Texarkana 2004,

---

many months, and throughout the course of the relationship through to the present day." EX J-115 at 9-10.

no pet.). "Even where there exists a fiduciary relationship . . ., there is no duty under the DTPA [or other Texas law] to orally disclose the contents of a written contract." *Id.* (citing *First City Mort. Co.*, 694 S.W.2d at 146-47). "The failure of one party to read a contract, or any of the materials appertaining to it, however, does not equate with a failure of the other party to disclose the information contained within the four corners of the contract." *Id.* at 355; *see also McCranie*, 2006 WL 278276 at *5.

The burden instead falls on SCP to protect themselves by reading and understanding what they signed – or ask questions about the contract's language or have their legal and accounting experts ask questions for them. *See Cendant Mobility Servs. Corp.*, 135 S.W.3d at 355. The "conscious ignorance doctrine" consequently defeats SCP's position that they could sit back, do nothing, and blame the Feldman and Capstone Parties for failing to make "perfect" disclosures. *See Cherry v. McCall*, 138 S.W.3d 35, 40 (Tex. App. – San Antonio 2004, pet. denied). "Under the 'conscious ignorance' doctrine, a party bears the risk of mistake [or misunderstanding] when . . . he knowingly treats his limited knowledge of the facts surrounding the mistake as sufficient." *Guggenheim Corp. Funding, LLC v. Valerus Compression Servs., LP*, 465 S.W.3d 673, 690-91 (Tex. App. – Houston [14th Dist.] 2015, pet. denied). Once again, Texas law keeps SCP and their advisers from contending they can stick their heads in the sand when they should have been asking questions about the tax risks facing captives identified by Exhibit C.

Texas law further excuses the Feldman Parties from having to disclose inaccurate, misleading, or confusing legal opinions, not to mention confidential client information. *See Neely v. Comm'n for Lawyer Discipline*, 196 S.W.3d 174, 187 (Tex. App. – Houston [1st Dist.] 2006, pet. denied) ("The disciplinary rules advance a substantial government interest in protecting the public from false, deceptive or misleading lawyer communications."); *Rodgers v. Comm'n for*

*Lawyer Discipline*, 151 S.W.3d 602, 612 (Tex. App. – Fort Worth 2004, pet. denied). Confidential client information consists of any information, whether privileged or unprivileged, that an attorney learns through his representation of a client. *See* TEX. PROF. R. DISCL'P CONDUCT 1.05(a), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G. app. A (State Bar R. art. X, § 9). "A lawyer has a solemn obligation not to reveal privileged and other confidential client information, except as permitted or required in certain limited circumstances as provided in the rules." *Duncan v. Bd. of Disciplinary Appeals*, 898 S.W.2d 759, 761 (Tex. 1995).

The "Tax Risks Disclosures" in Exhibit C protected this confidentiality – the same practice Mr. Kushner followed with his clients. TR Vol. 20 at 8077-78. Paragraphs B through G in Exhibit C to the 2015 Engagement Letter reflect this concern by disclosing the number and summary nature of adverse audits of Feldman and Capstone-administered captives, while keeping client identities and other details confidential. EX J-20 at 30-36. Other parts of Exhibit C explained the specific challenges used by the IRS in scrutinizing captive arrangements – examining the insurance elements of risk shifting, risk distribution, insurable risk, and a legitimate business purpose. *Id.* The Feldman Parties were not required (nor were they permitted) to disclose to SCP any other clients' confidential information. *SCP never offered any testimony nor cite to evidence explaining why the name "Reserve" is of consequence.*

The Tax Risk Disclosures repeatedly reflect that prior to SCP's decision to execute the December 2015 Engagement Letter, that SCP was well aware the IRS was regularly taking aggressive positions toward captive arrangements, which Exhibit C reflected, by revealing the existence of 12 IRS audits (9 of which were pending), 3 IRS notices of deficiency, 3 Tax Court suits involving captives administered by Capstone, and a formal IRS investigation into the Capstone captive planning. *Id.* SCP was well-aware of the uncertain regulatory environment. By

December 2015, Capstone clients had filed multiple actions in the U.S. Tax Court to contest the IRS's notices of deficiency, with more suits expressly stated in the Tax Risk Disclosures. *Id.* Rather than running away from the planning, the threat of IRS enforcement action resulted in SCP hiring they Capstone and the Feldman Parties, whom they believed offered more robust support than Mr. Strauss.

Even after the December 2015 Engagement Letter was executed, just two months later on February 9, 2016, Mr. Kushner was provided further updated disclosures. In addition to apprising SCP of the late December 2015 enacted legislation on Section 831(b) captives, that transmission stated as an update to the December 2015 disclosure:

> D. Nine audits (exclusive of the one recent (June 2015) audit - see paragraph E below) remain, which are now in IRS Appeals. All nine audits, which were conducted by the same IRS agent referenced in Section C. above, are before IRS Appeals which is considering the taxpayer's request for reversal of the IRS agent's adverse exam reports. As a result of two of the nine taxpayers' refusal to extend the statute of limitations any further, IRS Appeals has recently issued adverse determination letters with respect to those two cases. It is expected that the IRS will eventually issue 90-day letters with respect to such two cases, and the taxpayers will file petitions in U. S. Tax Court as a result thereof. All cases are factually similar to the cases ruled upon by IRS Appeals referenced in Section C. above and in the 39 favorable Form 1024 tax exemption letters and the 12 completed
>
> audits. That is, a single IRS auditor issued adverse audit rulings on 12 captives, despite the prior decade plus-long Capstone/Firm experience to the contrary by other IRS auditors and without regard to the 39 favorable tax exempt rulings.
>
> The IRS Appeals officer who ruled upon the concession leading to the U.S. Tax Court entry of judgment in the taxpayers' favor referenced in Section C. above is now the group manager over the team handling these matters in IRS Appeals. A decision is expected over the next six months with respect to the seven remaining cases. Should IRS Appeals not concede these cases, they will likely proceed to the U.S. Tax Court.

FC-229 at 10-11.

As Marcus Brooks testified, Exhibit C disclosed that IRS enforcement activity was intensifying by emphasizing that the IRS stopped issuing favorable Form 1024 determination letters and later started issuing adverse audit reports and notices of deficiency. *See* TR Vol. 23 at 9395-97. The IRS also began a formal investigation of the Capstone-administered captive program, which Paragraph G of Exhibit C made clear. *See id.*; *see also* EX J-20 at 36. Exhibit C

further disclosed in December 2015 that 9 additional "adverse exam reports" were pending before IRS Appeals, which Mr. Kushner knew to mean the "taxpayer disagrees" with the audit's "adverse finding" such that "a dispute between the taxpayer and the government" still exists. EX J-20 EX; TR Vol. 20 at 8132-33, 8136-38.  As Exhibit C explained, the IRS closed out 11 audits at the audit level without any change in tax liability and IRS Appeals previously conceded 3 cases "in favor of Capstone's clients." EX J-20 at 35-36. Mr. Brooks summed up the landscape of the tax enforcement activity in December 2015 wherein the IRS had recently decided to flex its enforcement muscles: while the Feldman Law Firm had achieved some successes before the IRS, the IRS was still focusing on and paying special attention to captive insurance, and the future was uncertain as to the outcome of these matters. *See* J-20 at 35-36; TR Vol. 23 at 9395-97.

These detailed disclosures go way beyond the information other tax professionals, such as CPA Kushner, generally give to clients like the SCP. Unlike Exhibit C, Mr. Kushner admitted his "engagement letter" does not disclose that his "clients . . . have had adverse audit examinations that have gone to [IRS] appeals." TR Vol. 20 at 8077-78.  Nor would the Doctors know the identity of Mr. Kushner's other clients who pursued adverse audits to IRS Appeals or the number of adverse audits involving his clients that have gone to IRS Appeals. TR Vol. 20 at 8078. Dr. Sullivan testified that even he would not expect disclosures that identified specific clients, such as Reserve. TR Vol. 2 at 730-34. Yet in a convenient about-face, Dr. Sullivan makes the exact opposite claim here, arguing that the name of the client "Reserve" should have been brought to SCP's attention. TR Vol. 1 at 212, 214; *see* SCP's Pretrial Brief of July 21, 2015 at 3-6.

The Arbitrator [should conclude] that Exhibit C far exceeds the level of disclosure used by Mr. Kushner – a 40-year accounting professional and CPA – for clients who come to him for tax-related services. The Feldman Parties disclosed the conflicting results seen in IRS audit

examinations, IRS Appeals, and Tax Court litigation. *E.g.*, EX J-20 at 31 ("However, a favorable pro-taxpayer view was adopted in ***September 2015*** by the U.S. Tax Court in *R.V.I. Guaranty Co., Ltd.* In that case, the court held that the taxpayer, which issued residual value insurance contracts, was an insurance company for federal income tax purposes. This decision of the U.S. Tax Court is contrary to the position taken the IRS in administrative rulings and published materials stating that the risks involved in residual value insurance was an 'investment risk' and not an insurable risk. The distinction of insurance risk versus investment or business risk in light of the R.V.I. decision and its application to captive insurance companies is unclear.") (emphasis added).

Conflicting results on these tax controversies, audits, and appeals, not to mention the evolutionary nature of the law generally, prevented the Feldman Parties from predicting future IRS positions – one of the principal reasons the Feldman and Capstone Parties made no guaranties or assurances to SCP in the written contract. Exhibit C gave the Doctors and their expert advisers all the details they needed to ask additional questions or investigate the issue of captive planning further. Disregarding the contract they negotiated, read and signed, SCP now demand perfection from the Feldman Parties, which they measure with 20/20 hindsight. Yet Texas law required the Feldman Parties to use only "reasonable clarity" in the contract or make a "good-faith effort" to provide a "full and fair disclosure." *Anglo-Dutch Petroleum*, 352 S.W.3d at 451; *Maverick*, 760 S.W.2d at 645; *Swenson*, 517 S.W.2d at 261. The Feldman Parties complied with that fiduciary standard.

SCP first sued the Feldman and Capstone Parties alleging (1) that "[i]n the latter part of 2019, [SCP] became aware that a decision by the Tax Court in the case of *Reserve Mech. Corp. v. Comm'r of Internal Revenue*, 115 T.C.M. (CCH) 1475 (T.C. 2018), could have very negative consequences for [SCP]"; (2) that "Feldman and Respondents knew or should have known about

the deficiencies relating to *Reserve Mechanical* and the negative implications that the matter could have posed to Claimants as early as March 29, 2016, and potentially even earlier, when the Internal Revenue Service sent a Notice of Deficiency to Reserve Mechanical"; and (3) that "Feldman breached fiduciary duties and duties of loyalty, good faith, and fair dealing by failing to disclose those risks to Claimants at least by the time the Internal Revenue Service sent its notice of deficiency on March 29, 2016." SCP's 1st Am. Arb. Demand (Kutcher Arbitration) dated August 6, 2020 at 15-16, ¶¶ 35-36.

The evidence in the record refutes the false flags flown by SCP in their pleadings. The Feldman and Capstone Parties advised the Doctors or their advisers in writing (1) in 2015 of imminent tax court litigation in Exhibit C's "Tax Risk Disclosures," *see* EX J-20 at 35-36 ¶ D, and even updated them in the February 2016 version that IRS Appeals had rejected 2 of the 9 adverse audits, with tax court challenges imminent, EX FC-229 at 10-11 (updated ¶ D); (2) of the pending/anticipated litigation in the *Reserve Mechanical* case, the upcoming Tax Court trial, and, later, the post-trial briefing, in 2017, *see* EX FC-153; EXs J-32, J-33, J-41; and (3) of the issuance of the *Reserve Mechanical* decision ***in June 2018***, thereby falsifying the first allegation. EXs FC-189, FC-191, FC-192, FC-193, FC-194. The various iterations of the "Tax Risks Disclosures" in Exhibit C, *beginning in July 2015* and continuing with the updated version contained in what became the executed 2015 Engagement Letter, addressed and resolved the first of the allegations. *See* EXs FC-63, FC-77; EXs J-18, J-20.  So does the further updated version of Exhibit C that CFO / CPA Ms. Underwood and CPA Mr. Kushner received on February 9, 2016.  *See* EX FC-229.

At trial, the discredited allegations in the pleadings morphed into complaints that Mr. Feldman never disclosed to SCP that the IRS determined in the 2013 audit of Reserve Mechanical for the 2008, 2009, and 2010 tax years that PoolRe was not "insurance" and that it was not a "bona

fide insurance company." *E.g.*, SCP July 21, 2021 Prehearing Brief at 1-3. Counsel for SCP repeated this whack-a-mole argument in his opening statement:

```
18          Feldman and Capstone didn't
19    tell the doctors that the IRS had
20    found that Reserve Mechanical and the
21    PoolRe risk pool were not real
22    insurance and thus not subject to tax
23    sanctity with the IRS.
```

TR Vol. 1 at 28. SCP continued to claim that the IRS determined in its 2013 audit that Reserve Mechanical "did not operate as real insurance" and "that the PoolRe risk pool failed to adequately distribute risk." TR Vol. 20 at 7910, 7928, 8009-10, 8014-15. SCP doubles down on this argument in its post-hearing briefing, contending that "Mr. Cohen never offered any cogent description of any location within Exhibit C disclosing the substance of the adverse Reserve Mechanical audit." FCP's Post-Hearing Brief at 24.

SCP clings to these complaints despite the specific "facts and circumstances" nature of tax litigation Exhibit C referenced and explained,[512] EX J-20 at 30-33, which limits (i) any applicability of the *Reserve Mechanical* case involving an Anguilla captive operating under IRC Section 501(c)(15) during the tax years 2008–2010 to (ii) SCP's Delaware captives operating under IRC Section 831(b) under a twice restructured risk pool (the PoolRe risk pool went from a 30% pool to a 50% pool) during later tax years with the notable distinction that the IRS has never audited any of the SCP captives or SCP insured entities. TR Vol. 21 at 8283. Indeed, PoolRe itself was not audited as a part of the *Reserve* case nor any other audit since.

---

[512] "The final determination of these issues could ultimately depend on an assessment of all the relevant facts andcircumstances by a court." EX J-20 at 30.

As confirmed by the 2013 IRS audit report for Reserve Mechanical, the testimony of Steve Cohen, and the testimony of Marcus Brooks*, the 2013 audit report made no such findings (1) that PoolRe failed to function to redistribute risk, (2) that PoolRe was "not a bona fide insurance company," or (3) that PoolRe was not real "insurance."* EX FC-675 at 9-63; TR Vol. 21 at 8395, 8442-43; TR Vol. 23 at 9413. The 2013 audit report for Reserve Mechanical never even addressed these issues, much less made adverse determinations as claimed by SCP. EX FC-675 at 9-63.

To the contrary, Steve Cohen's testimony (along with the audit report itself) identified the actual primary issues examined in the 2013 audit report for Reserve Mechanical:

```
15          Q.     (BY MR. GREENBERG)  Okay.
16    First of all, from your perspective,
17    Mr. Cohen, explain -- or summarize for us
18    what were the main issues involved in the
19    Reserve Mechanical audit?
20          A.     There were two main issues.
21    The first issue, the IRS contended that the
22    direct -- that 12 of the 14 -- it varied from
23    year to year, but most of the direct written
24    contracts issued by Reserve did not cover
25    insurable risk.  Instead, they contended that
```

```
1    they were either business or investment risk.
2         Q.     Okay.  That was issue 1 or --
3         A.     Issue number 1.
4         Q.     Okay.
5         A.     Issue number 2, the IRS
6    contended that Reserve had too few -- had too
7    much concentration of risk in too few
8    affiliated insureds.
```

TR Vol. 21 at 8361-62. The 2013 audit report itself confirms his testimony. *See* EX FC-675 at 29-36 (examining the issue of insurable risk for Reserve's policies for the 2008, 2009, and 2010 tax years); 38-41 (examining the issue of risk distribution and concluding, based on IRS revenue rulings, that the risks covered by Reserve were too heavily concentrated in Reserve's affiliated insureds).

As identified by Mr. Cohen, issue number 1 dealt with the issue of insurable risk as it pertained to the 14 individual direct written insurance policies that Reserve issued covering its affiliated insureds. TR Vol. 21 at 8361-62. Mr. Cohen provided direct testimony explaining the issue how this issue intersected with the disclosure in the 2015 Engagement Letter of the 2015 U.S. Tax Court decision in *R.V.I. Guaranty Co., Ltd.*:

5          Q.     Okay.  When -- what was the

6     issue that was meant to be discussed and

7     disclosed with the discussion of the R.V.I.

8     Guaranty case?

9          A.     This was the issue of insurable

10    risk, which the IRS contended that 12 of the

11    14 direct written contracts issued by Reserve

12    did not cover insurance risk but instead

13    business or investment risk.

14               The R.V.I. Guaranty case --

15         Q.     Hold on.  Let me ask you a

16    question about that.

17         A.     Oh, I'm sorry.

18         Q.     So the IRS's position in the

19    Reserve audit with regard to insurable risk

20    was what?

21         A.     Was that there was not

22    sufficient insurable risk because they

23    contended that 12 of the 14 direct written

24    contracts issued by Reserve did not cover

25    insurable risk.  Instead, they were covering

It is undeniable that a discussion relating to these issues is present in the 2015 Engagement

Letter:

Additionally, the Service stated in Rev. Rul. 2005-40 that to be an insurable risk the transferred risk must contemplate "the fortuitous occurrence of a stated contingency," and must "not be merely an investment or business risk." This was consistent with prior case law. However, a broader and more favorable pro-taxpayer view was adopted in September 2015 by the U.S. Tax Court in R.V.I. Guaranty Co., Ltd. In that case, the court held that the taxpayer, which issued residual value insurance contracts, was an insurance company for federal income tax purposes. This decision of the U.S. Tax Court is contrary to the position taken by the IRS in administrative rulings and published materials stating that the risks involved in residual value insurance was an "investment risk" and not an insurable risk. The distinction of insurance risk versus investment or business risk in light of the R.V.I. decision and its application to captive insurance companies is unclear. If it is determined that a policy is not for "insurance," the captive's status as an insurance company could be in jeopardy if such determination caused the captive's investment income to exceed its underwriting income for the year.

EX J-20 at 31. Therefore, SCP cannot credibly claim that there was a failure to disclose the issues surrounding the IRS's examination of the issue of insurable risk as it pertained to Reserve Mechanical in Reserve's 2013 audit report.

Further, the audit report itself confirms that the IRS made no finding in 2013 that PoolRe was not a bona fide insurance company or that the PoolRe risk pool was not "real insurance." EX FC-675 38-41. Counsel for SCP prefaced Mr. Cohen's testimony on this topic as follows:

```
11                ARBITRATOR GLASSER:  Okay.
12        Mr. Greenberg, help me understand the
13        ultimate purpose of going into this
14        detail.
15                I'm not saying there is not
16        one.  It's just not clear to me what
17        it might be.
18                MR. GREENBERG:  Sure.  The
19        contention in this case is that there
20        should have been a disclosure that the
21        IRS made a determination in 2013 that
22        PoolRe was not a bona fide insurance
23        company.
24                ARBITRATOR GLASSER:  Right.
25                MR. GREENBERG:  We're
```

```
1         distinguishing what the IRS was
2         actually looking at and whether those
3         issues they were actually looking at
4         were disclosed within Exhibit C.
```

TR Vol. 21 at 8365-66. Mr. Cohen then testified regarding two revenue rulings handed down by

the IRS:

```
20        Q.      (BY MR. GREENBERG)  Mr. Cohen,

21   in connection with the Reserve audit, you

22   mentioned two revenue rulings that the IRS

23   was relying on?

24        A.      Yes.

25        Q.      What were those?

1                 Do you remember the numbers?

2        A.      Yes, I do.

3        Q.      What are they?

4        A.      Revenue Ruling 2002-89 and

5   Revenue Ruling 2005-40.
```

TR Vol. 21 at 8364-65. Again, the 2013 audit report itself reflects that these revenue rulings, and

not whether PoolRe was a bona fide insurance company or was "real insurance," were examined

in the IRS's examination of Reserve's risk distribution. EX FC-675 at 38-41.

In this regard, both Revenue Ruling 2005-40 and 2002-89 are specifically discussed in the

2015 Engagement Letter:

In this regard, the Service released Rev. Rul. 2005-40 which concerns a single insured and an
insurer insuring only that insured. Although the arrangement may shift the risks to the insurer, the
Service concluded in this revenue ruling that those risks are not, in turn, sufficiently distributed
among other insureds or policyholders. Therefore, such arrangement did not constitute insurance
for federal income tax purposes.  As an aside, we note that the Service's example of non-
compliant planning is more aggressive than that typically undertaken for the Firm's clients.

EX. J-20 at 30.

A.  Thirty-nine (39) favorable rulings by the IRS which issued favorable Form 1024 tax
exemption determination letters after exhaustive submissions to the Service. Each of these
submissions comprised hundreds of pages of documents, such prepared by the Firm on
behalf of clients, with significant input from Capstone. These captives were originally all
section 501(c)(15) captives, most of which (to the extent still in operation) now have
migrated to operate under Code section 831(b), although some of which continue to
operate under Code section 501(c)(15).  As originally filed, this planning was based upon
the Harper decision in which 30% outside (unaffiliated) business was considered sufficient
for risk distribution. Beginning in 2012, because of the Service's then unexplained actions
of its tax exempt division regarding section 501(c)(15) captives, the Firm recommended
and Capstone made available a 50% outside (unaffiliated) business program in an effort
to meet the 50% safe harbor test set forth in Rev. Rul. 2002-89. We have since continued
this enhanced risk sharing program. The 50% pool is available to both section 501(c)(15)
and 831(b) captives.

EX. J-20 at 35. The Feldman and Capstone Parties obviously had no duty to disclose to SCP a fact that was not true (that the IRS had determined in 2013 that PoolRe was not a bona fide insurance company), and it appears to this Arbitrator that the Feldman and Capstone Parties discharged any duty they may have had to disclose the issues examined in the Reserve Mechanical audit. Mr. Cohen further gave direct testimony regarding what modifications were reflected in the 2015 Engagement Letter as a result of the IRS's position in the Reserve audit. TR Vol 21 at 8615-19; see also EX. J-20 at 35. Quite simply, at the time that the 2015 Engagement Letter was signed, there was no failure to disclose the actual issues the IRS examined in the 2013 audit report of Reserve Mechanical.

Indeed, to the contrary of SCP's assertions, in the 2013 audit report itself, the IRS found that all but 1 or 2 (depending on the year under examination) of Reserve Mechanical's insurance policies did not cover "insurable risks" but rather pertained to (according to the IRS) investment or business risk. EX FC-675 at 29-36. According to Reserve Mechanical's 2013 audit report, the fact that the payments for these policies were not included as "premium" income to Reserve Mechanical caused Reserve Mechanical to fail the statutory "gross receipts test" under IRC 501(c)(15)(i). EX FC-675 at 42. In other words, the IRS used its position in the 2013 audit report on the issue of "insurable risk" to disqualify from the "gross receipts" test most of the direct written premiums Reserve Mechanical received from its insureds. That income consequently never counted as premiums that paid for "insurance."

The IRS found that Reserve Mechanical, not PoolRe, failed the "gross receipts test," which measures whether more than 50 percent of an insurance company's gross receipts consist of premiums for insurance. *See* IRC 501(c)(15)(A)(i).[513] Because less than 50% of the premiums paid

---

[513] The "gross receipts test" under IRC 501(c)(15) is not applicable to SCP captives, which operate as IRC 831(b)captives.

by Reserve Mechanical's insureds served to cover "insurable risk," the policies linked to those funds failed as insurance. FC-675 at 41-43. The 2013 audit report never addressed PoolRe's role as an insurer or reinsurer, and never made any finding that PoolRe failed to qualify as a *bona fide* insurance company, failed to provide "real insurance," or failed to distribute any risk.



EX FC-675 at 42.

In any event, Exhibit C to the 2015 Engagement Letter explained to SCP in writing the distinction between insurable risk and investment risk as those factors apply to captives. EX J-20 at 31. The precise concern that supported the adverse finding made by the IRS in the 2013 Reserve audit report appeared as a material part of the "Tax Risks Disclosures" provided by the Feldman and Capstone Parties.

As for the premiums received by Reserve Mechanical *from PoolRe*¸ the IRS "deemed" them to be insurance in the 2013 audit of Reserve Mechanical, notwithstanding SCP's erroneous claims to the contrary. EX FC-675 at 42. The page from the audit report reproduced above confirms that the IRS "deemed" the amounts PoolRe paid to Reserve Mechanical for "Quota Share Premiums" **in fact to be "reinsurance premiums"** for federal income tax purposes. *Id*. This undeniable fact – that the IRS treated PoolRe quota-share premiums as insurance in 2013 – conclusively rebuts SCP's baseless argument that the Feldman and Capstone Parties owed and then breached a duty to disclose that PoolRe was not a "bona fide insurance company" or that PoolRe did not provide "insurance."  Because the IRS never made any such findings in the 2013 audit report, the Feldman and Capstone Parties could never truthfully disclose those facts to SCP in 2015.

Between the Reserve Mechanical audit in 2013 and the 2015 Engagement Letter, the U.S. Tax Court decided *Rent-A-Center., Inc. v. Commissioner*, 142 T.C. 1, 22 (2014), *Securitas Holdings, Inc. v. Commissioner*, 108 T.C.M. 490 (T.C. 2014), and *R.V.I. Guaranty Co., Ltd. & Subsidiaries v. Commissioner*, 145 T.C. 209, 235 (2015).  *All 3 of these cases were taxpayer favorable and made a big impact on the law governing captive insurance for federal income tax purposes.* As confirmed by Mr. Cohen and Mr. Brooks, the *R.V.I.* case by itself made it extremely difficult for the IRS to contend that the insurance policies at issue here failed to cover "insurable

risks." TR Vol. 21 at 8385-89; TR Vol. 23 at 9389-94. While the test for "insurable risk" no longer posed the same threat it once did, Exhibit C nevertheless disclosed the issue in discussing the *R.V.I.* decision that came out *in September 2015*, only weeks before the December 2015 Engagement Letter was executed. The discussion explained how the *R.V.I.* analysis conflicted with the IRS position on "insurable risk" that the IRS had taken in the Reserve Mechanical audit. EX J-20 at 31 ("This decision of the U.S. Tax Court is contrary to the position taken the IRS in administrative rulings and published materials stating that the risks involved in residual value insurance was an 'investment risk' and not an insurable risk."); *see also* TR Vol. 21 at 8386. Exhibit C also examined the intervening 2014 decisions in *Rent-a-Center* and *Securitas*, which addressed the issue of risk distribution for captives, among other matters. EX J-20 at 31.

In summary, SCP distorts Reserve Mechanical's 2013 audit report in making their arguments about nondisclosure. But Exhibit C disclosed and discussed the substance of issues addressed by the IRS in that audit report, as well as reported on intervening, material developments in the law. EX FC-675 at 9-63; EX J-20 at 30-36. Because the *Reserve Mechanical* decision from the tax court **from June 2018** first determined that PoolRe failed to qualify as a *bona fide* insurance company for federal income tax purposes, neither the 2015 Engagement Letter nor any earlier communication could have disclosed that information to SCP. TR Vol. 21 at 8440-43. The undisputed facts disprove SCP's complaints that the Feldman and Capstone Parties failed to disclose material information about captive planning or issues. SCP's claim for breach of fiduciary duty therefore must fail.

**Accordingly, the Arbitrator [should conclude] that SCP TAKE NOTHING on its claim for breach of fiduciary duty for allegedly failing to disclose facts regarding alleged adverse determinations against Capstone-administered captives.**

### 3. No Causal Connection Exists Between the Alleged Breach and SCP's Claimed Damages

SCP insist that "[i]f a determination is made that a captive is not an insurance company, then it would not be entitled to tax benefits under Section 831(b)." SCP's Post-Hearing Brief at 22. Given this "if-then" hypothetical, the IRS – a third party – must make "a determination" that Cerberus, Janus, and Orion are "not an insurance company" as a condition precedent to denying "tax benefits under Section 831(b)."

In the instant case, the undisputed evidence conclusively establishes that the IRS has made no such determination with regard to any of the SCP captives. As their only evidence on the element of proximate cause, SCP relied on the *ipse dixit* of Lyle Press *speculating* whether the IRS would audit any of the SCP captives. *See Axcess Int'l, Inc. v. Baker Botts, LLP*, No. 05-14-01151-CV, 2016 WL 1162208, at *4-5 (Tex. App. – Houston [14th Dist.] Mar. 24, 2016, pet. denied) (mem. op.) (action a third party might have taken too speculative to prove causation). Thus, SCP failed to prove any alleged breach of fiduciary duty proximately caused any of the damages they claim. *See id.*; *Thompson & Knight LLP v. Patriot Exploration, LLC*, 444 S.W.3d 157, 162-67 (Tex. App. – Dallas 2014, no pet.).

### iii. IRS Inquiry of Capstone Alternative Risk / Captive Insurance Program

#### 1. The Feldman and Capstone Parties disclosed the "promoter" audit, which closed without any adverse findings

Although it appears nowhere in any arbitration demand or pleading, SCP identified the non-disclosure of a so-called "promoter" audit as an issue during these arbitrations and attempted to make the alleged non-disclosure of a promoter audit an issue during the final hearing. This was improper, went beyond the pleadings, and constituted trial by ambush—and the Feldman and

Capstone Parties did not consent to trying this issue. SCP thus cannot obtain any recovery on this issue.

Further, SCP's allegation that the Feldman and Capstone Parties failed to disclose the promoter audit is false, thus independently preventing any recovery on this issue.

Exhibit C to the 2015 Engagement Letter unambiguously disclosed that the IRS was looking into the Feldman and Capstone Parties' captive planning operations:

> G.  In June 2015, the IRS notified either Stewart A. Feldman or the Firm or Capstone (the addressee of the inquiry is unclear) that the captive insurance/alternative risk planning program is the subject of a review by the IRS and issued an information document request (IDR). The Firm is unclear whether this IDR is unconnected with the audits of any particular captive client, but is likely connected to the IRS's examination of captive insurance programs generally. The Firm believes that the inquiring IRS agent was unaware of the dozens of completed IRS reviews of the planning resulting in its agreeing with the taxpayers' positions.  After a three day review by the IRS agent and after providing him evidence of the more than 50 prior successful rulings by the IRS, this matter has been dormant.

J-20 at Ex. C at 7, ¶ G. Mr. Brooks testified that Section G to Exhibit C to the Engagement Letter disclosed that either the Feldman Parties or the Capstone Parties were subject to "a promoter audit or [] something like a promoter audit." TR Vol. 23 at 9396. Mr. Press testified that Section G disclosed to a tax professional operating under Circular 230 (which includes Mr. Kushner, here[514]) that the Feldman or Capstone Parties were under examination for a promoter audit. TR Vol. 9 at 3747-48.

Mr. Brooks further clarified that it was clear from the face of Section G that a promoter audit had been opened, with no one at the Feldman Law Firm LLP or Capstone having informed

---

[514] According to Mr. Press, anyone who could be listed as a taxpayer representative on IRS Form 2848 is subject to Circular 230. TR Vol. 9 at 3735:1-10. Mr. Kushner is thus subject to Circular 230 because he is listed on several Forms 2848 for SCP. *See id.* at 3735:13-20; *see also* FC-324.

Mr. Brooks about the promoter audit prior to his review of Exhibit C. TR Vol 23 at 9397-98. The fact that paragraph G did not use the word "promoter" was of no consequence: "To me the salient facts here are the preparer is getting audited and the IRS is asking him a bunch of questions. That's – that's bad." *Id*. at 9399-9400; *see also id*. at 9401:9-9402:4 (Brooks explaining that the significant information is the IRS activity and interest in the planning, which is disclosed in paragraph G). Mr. Kushner, consistent with Mr. Brooks, testified that that paragraph G indicated to him that there was "an inquiry from the IRS." TR Vol. 20 at 8142.

Months prior to the execution of the 2015 Engagement Letter, on August 10, 2015, Mr. Sherman shared an article with Mr. Kushner discussing the rise in so-called promoter audits into captive managers. EX FC-71. Mr. Kushner recalled receiving and reviewing this email and its attachment. TR Vol. 20 at 8022. Mr. Sherman carbon copied Mr. Feldman on this email to Mr. Kushner. *Id*. That article—titled "The IRS Has Declared War on the Abusive Use of Micro Captive Insurers"—explained that the IRS had placed captives on the IRS's "dirty dozen list," which identifies areas of heighten IRS scrutiny, and explained how the IRS utilized promoter audits as an effort to weed out abusive captive planning. *Id*.

Mr. Sherman testified that he knew that Section 6700 of the Internal Revenue Code dealt with promoter activity and promoter penalties. TR Vol. 20 at 791213. Mr. Sherman and Mr. Kushner, both sophisticated tax professionals, were thus aware of the IRS's strategy of promoter audits prior to reviewing the 2015 Engagement Letter in November and December 2015. *See also* EX FC-57 at 2 (Mr. Sherman recognizes Mr. Strauss as a captive "promoter" as of July 2015). But neither Mr. Sherman nor Mr. Kushner testified that they asked related follow-up questions of the Feldman and Capstone Parties. TR Vol. 20 at 8146.

***Only hours*** after Mr. Sherman sent the above-mentioned article to Mr. Kushner, Mr.

Feldman sent an email to Mr. Kushner that contained information about the IRS's interest in the Capstone-administered captive planning. EX J-17.[515]  Specifically, Mr. Feldman wrote to Mr. Kushner that:

> [L]ast week the IRS did an examination of our captive program. In the case of the IRS "forensic" auditor from last week, after three full days of looking through six plus bankers boxes of the detailed planning (client permission had been obtainedin advance) and another 135 boxes of information that was offered to him, and hisasking detailed questions, the "forensic" agent left seemingly satisfied that we're covering all bases. At the end of his onsite investigation (conducted off premises atour firm's lawyer's offices), the "forensic" auditor had no substantive issues, leaving us with little in the way of needed follow up.[516]

*Id.* Thus, Mr. Kushner was aware of both (a) the IRS's heightened use of promoter audits in the captive sector, and (b) the IRS's specific interest in the Feldman and Capstone planning.

During the final hearing, Mr. Kushner did not deny having read the promoter audit article, having received Mr. Feldman's email with information about the IRS "forensic examination, or having read paragraph G of Exhibit C to the 2015 Engagement Letter. TR Vol. 20 at 8022, 8140-43. Mr. Kushner, as mentioned earlier, testified that paragraph G stated that there was "an inquiry from the IRS." Vol. 20 at 8142. That is the salient information to any tax professional, according to Mr. Brooks and Mr. Press.  Mr. Kushner undeniably knew that an IRS agent spent at least three days analyzing Feldman and Capstone planning. Mr. Kushner had ample opportunity to ask follow-up questions or inquire further. But although Mr. Kushner understood paragraph G to Exhibit C to unambiguously disclose "an inquiry from the IRS," TR Vol 20 at 8142, and was informed of the IRS's specific review efforts, Mr. Kushner testified that he did not follow-up with Mr. Feldman for more information. *Id.* at 8146. Whether a follow-up was prudent reflects Mr.

---

[515] Mr. Sherman's email, EX FC-71, was sent on August 10, 2015 at 10:57 a.m. Mr. Feldman's email, EX J-17, wassent on August 10, 2015 at 6:10 p.m.

[516] This quote is edited slightly from the exhibit for capitalization and punctuation.

Kushner's judgment, not the adequacy of the disclosure.

The Feldman and Capstone Parties also went beyond these written disclosures. The Feldman and Capstone Parties discussed the promoter audit issue with Mr. Sherman and Mr. Kushner orally.[517] Mr. Feldman explained that he discussed the IRS review of the Feldman and Capstone planning with Mr. Sherman and Mr. Kushner "orally . . . three or four times," TR Vol 13 at 4873, and expressly referred to the audit as a "6700 audit." TR Vol 13 at 4872-3. Mr. Feldman made himself available to discuss any aspects of paragraph G, and there is no testimony from any SCP witness that Mr. Feldman failed to provide information or responses to questions in the months leading up to the December 2015 execution of the Engagement Letter. Nothing was concealed.

Finally, in October 2019, Mr. Feldman sent both Mr. Kushner and Mr. Sherman a copy of the letter from the IRS discontinuing the investigation under IRC § 6700:

| From: | Stewart A. Feldman <sfeldman@feldlaw.com> |
| --- | --- |
| Sent time: | 10/02/2019 05:24:47 PM |
| To: | David Kushner (david@kl-cpa.com) <david@kl-cpa.com>; David R. Sherman <drs@chchardy.com> <drs@chchardy.com> |
| Cc: | Steve Cohen <scohen@feldlaw.com>; Logan Gremillion <lgremillion@feldlaw.com> |
| Subject: | follow up |
| Attachments: | irs 6700 closing letter 5.6.19.pdf |

*here's the copy of the irs closing letter that I mentioned in the St. Charles call today.....saf*

STEWART A. FELDMAN

---

[517] Mr. Sherman and Mr. Kushner dispute this.



Department of the Treasury
Internal Revenue Service
Tax Exempt and Government Division
915 Second Avenue
Seattle WA, 98174

Date: May 6, 2019

Taxpayer ID number ending in:
1375
Person to contact:
John T. Leahy
Contact telephone number:
(206) 946-3514
Contact fax number:
(855) 267-9049
Employee ID number:
1000278086

Mr. Stewart Feldman
5542 Tilbury Dr.
Houston, TX 77056

Dear: Mr. Feldman,

We are discontinuing our investigation into whether you are liable for a penalty under Internal Revenue Code (IRC) section(s) 6700 and 6701. This letter should not be construed to mean that the Internal Revenue Service (IRS) approves your conduct; rather, it is simply a notice that our investigation has been discontinued at this time. This investigation did not constitute an examination of your income tax return(s).

The IRS is not precluded from taking any additional action against you or others with respect to your conduct. This includes the commencement of income tax examinations of investors/participants whom you advised or aided.

If you have any questions, please contact me.

Thank you for your cooperation.

Sincerely,

John T. Leahy
Internal Revenue Agent

EX FC 251 at 1, 3. The evidence at the hearing failed to show that Kushner or Sherman ever expressed surprise, concern, or even interest about this IRS investigation. EX FC 251 also refutes SCP's repeated assertions that the Feldman Parties never disclosed the investigation under IRC § 6700 until shortly before the final hearing – the justification SCP cited for attempting to raise this claim at the final hearing without ever pleading it. The IRS investigation closed without any adverse findings against either the Feldman or Capstone Parties. EX FC-251 at 3. Mr. Kushner testified that when he received the email indicating the investigation had been closed, it did not raise any alarms and he did not even inform SCP that a so-called "promoter audit" existed. TR Vol. 20 at 8153-54.

SCP's allegations that the Feldman and Capstone Parties failed to disclose the existence of

the IRS investigation are refuted by the evidence in the record. SCP do not allege, and cannot allege, that any damages arise from the existence of the IRS investigation.

During the examination of Mr. Press, SCP's counsel tried to make an issue out of the fact that the existence of a promoter audit could preclude the filing of a qualified amended tax return. TR Vol. 9 at 3615-16. A taxpayer may file a qualified amended tax return to correct an error on an already-filed tax return and avoid penalties. TR Vol. 9 at 3614. But because the IRS investigation closed without adverse consequences, SCP is not—and has not been since 2019 when the Feldman and Capstone Parties received notice of the IRS closing investigation—precluded from filing any qualified amended tax returns for their captive operations.

**For these reasons, the Arbitrator [should conclude] that SCP TAKE NOTHING on its claim that the Feldman Parties failed to disclose the IRS investigation under IRC § 6700.**

### c. SCP did not prove that they are entitled to disgorgement.

Judge Dorfman determined that SCP are "sophisticated," have "similar levels of sophistication" to the Feldman and Capstone Parties and were "represented by counsel (and certified public accountants) of [SCP's] choosing both in negotiating the terms of the engagements . . . and throughout the course of the relationship." EX J-115 at 9-10.  Accordingly, SCP had the burden to prove each element of SCP's fiduciary-duty claims. *See Tanox*, 105 S.W.3d at 264-65. As set forth *supra*, SCP did not meet their burden to prove a "breach" regarding:

1.  PoolRe including A.M.Y.'s LPL policy in the 2019 Pool;

2.  An alleged 2013 audit finding that PoolRe is not a bona fide insurance company;

3.  The promotor audit; or

4.  SCP's 2019 demand for immediate liquidation of Cerberus, Janus, and Orion.

Separate from the "breach" element, SCP also did not meet their burden to prove that each

alleged breach "is clear and serious, whether forfeiture of any fees should be required, and, if so, what amount." *See Burrow*, 997 S.W.2d at 243. "Fee forfeiture" of any amount "is never mandatory" or "automatic." *Fleming*, 412 S.W.3d at 738. Forfeiture of "all compensation" is not appropriate for a six-year contract like the 2015 Engagement Letter but instead is proper only for fees earned from a "single, narrow transaction." *Burrow*, 997 S.W.3d at 240-42. "[T]o require an agent to forfeit all compensation for every breach of fiduciary duty, or even every serious breach, would deprive the remedy of its equitable nature" and result in an improper "windfall" to clients. *Id.* "It would be inequitable for an agent who had performed extensive services faithfully to be denied all compensation for some slight, inadvertent misconduct that left the principal unharmed, and the threat of so drastic a result would unnecessarily and perhaps detrimentally burden the agent's exercise of judgment in conducting the principal's affairs." *Id.*; *see, e.g., Fleming*, 412 S.W.3d at 729-30 (approving forfeiture of "32%" of the fees received after finding "clear and serious" breaches).

For both the "clear and serious" analysis and for the forfeiture analysis, SCP did not meet their burden to prove the *Burrow* factors, namely, that:

1. SCP suffered "harm" or the Feldman Law Firm received an undisclosed "benefit" from each breach;

2. Each breach was "willful" as opposed to "inadvertent";

3. Each breach had a material "timing" and "gravity";

4. Each breach affected the "value of the [Firm's] work" for SCP;

5. Remedies other than complete forfeiture are inadequate, especially considering the equities of SCP's request for forfeiture of fees from 2015 to 2021 instead of for just discrete tasks and even though the Feldman Law Firm withdrew formally no later than January 5, 2020;

6. For each breach, "a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful"; and

7. The Feldman Law Firm "offend[ed] a public sense of justice."

*Id.* at 239-44. Mr. Watkins offered no testimony regarding "whether" or "how much" "fee forfeiture is appropriate." TR Vol. 4 at 1631. Mr. Watkins also did not opine on how the *Burrow* factors make any of these four alleged breaches "clear and serious." TR Vol. 4 at 1621-40. Because SCP failed to meet their burden of proof, SCP are not entitled to a "clear and serious" breach finding or to forfeiture.

Moreover, as mentioned *supra*, SCP paid all fees to Capstone and not the Feldman Parties. So SCP also failed to show any applicable fees that may be disgorged.

### i. SCP are not entitled to fee forfeiture regarding A.M.Y.'s policies in the 2019 Pool.

SCP are not entitled to any forfeiture of fees paid under the 2015 Engagement Letter regarding A.M.Y.'s policies in the 2019 Pool because: (1) SCP's alleged breach only relates to the malpractice policy, entitled the Lawyers Professional Liability ("LPL") policy; (2) any forfeiture would arise under the 2019 Stop Loss, not the Engagement Letter; and (3) the *Burrow* factors do not support a "clear and serious" finding or forfeiture.

### 1. SCP's alleged breach only concerns the LPL policy.

SCP's complaints regarding A.M.Y.'s policies only relate to the Feldman Law Firm's LPL policy with A.M.Y. In his rebuttal, Sullivan clarified that SCP has no complaint that A.M.Y. has policies (including the Feldman Law Firm's LPL policy) in the annual PoolRe risk pools. Instead, Dr. Sullivan re-formed SCP's complaint as follows:

```
17        A.    It is not an issue of if he has
18   policies in the pool.  In fact, it said
19   Mr. Feldman, Capstone, or his affiliates may
20   participate in the pool.
21              The issues that we have are the
22   content of the policies.  To have a primary
23   malpractice policy insuring an individual
24   that is uninsurable is not homogeneous with
25   what is in the pool.  It's not similar risk
                                        Page 8631
1    policies.
2              To have policies that are
3    undisclosed regarding legal expenses, one in
4    which a attorney, who is determined to have
5    frivolous lawsuits and policy within
6    documents within his company that states they
7    simply -- they have a tendency to sue their
8    clients, would make no sense for anyone
9    participating in the pool to agree to pay for
10   and endorse that policy.
11             So it is the content of the
12   policies, not simply the participation in the
13   pool.
```

TR Vol. 21 at 8630-31. Based on this clarification, SCP's complaints boil down to allegations that: (1) A.M.Y.'s policies in the pool are "primary" when (purportedly) all other policies in the annual risk pools—including SCP's policies—are "excess" policies; (2) Feldman is "uninsurable"; and (3) Feldman has a history of "frivolous lawsuits." *Id.*

Based on SCP's clarification, only the Feldman Law Firm's primary LPL policy is truly in dispute. First, because SCP's D&O policy is a primary policy, Sullivan's rebuttal and Amoroso's and Watkins's opinions do not complain about A.M.Y.'s D&O policy. EX J-10 at 34 (feasibility study concludes that the Doctors do not carry D&O coverage through a commercial carrier); TR Vol. 21 at 8630-31; TR Vol. 6 at 2337-40, 2357-62, 2416-18; TR Vol. 4 at 1543-44.

Second, the Feldman Law Firm and Capstone maintained commercial, primary E&O coverages. TR Vol. 14 at 5349-55.

Third, for the legal expense reimbursement policy ("LEGEXP"), SCP cannot complain because SCP's LEGEXP policy is identical to the Feldman Law Firm's LEGEXP policy. As

explained to the Doctors in the preliminary health checkup, a LEGEXP policy covers when "there is no underlying insurance to provide defense." EX J-10 at 69. SCP cannot maintain a breach or forfeiture claim based on the Feldman Law Firm having a LEGEXP policy that works the same as SCP's policy.

> ## 2. The 2019 Stop Loss—not the 2015 Engagement Letter—is the applicable contract.

SCP are not entitled to forfeiture of fees that SCP paid under the 2015 Engagement Letter for two reasons. First, any benefit from PoolRe accepting the Feldman Law Firm's LPL policy in an annual pool would arise from a stop-loss contract between PoolRe and A.M.Y.—not the 2015 Engagement Letter between SCP and the Feldman Law Firm and Capstone. The Engagement Letter specifies that "[t]he particulars of [the PoolRe] insurance program [] for any given year are described in the **insurance contracts which are the definitive documents that control the respective insurance programs**." EX J-20 at 39 (emphasis added). Mr. Sherman admitted that, when he reviewed the 2015 Engagement Letter for the Doctors, he understood that the 2015 Engagement Letter is not: (1) an insurance or reinsurance contract of any kind; (2) a contract between PoolRe and Cerberus, Janus, and Orion; and (3) a stop-loss or quota-share contract between PoolRe and Cerberus, Janus, or Orion. TR Vol. 20 at 7940-43.

Second, the **2019** Stop Loss is the only contract with **potential** benefits to the Feldman Law Firm or non-party A.M.Y. For **actual** benefits, PoolRe paid zero pennies in stop-loss coverage to A.M.Y. (or the Feldman Law Firm) for any year, including the 2016, 2017, 2018, and 2019 years in which Cerberus, Janus, and Orion participated in the annual stop-loss and quota-share contracts. TR Vol. 11 at 4553-55. A.M.Y.'s claims for the 2019 stop-loss contract are open, but, as of now, neither PoolRe, nor Cerberus, nor Janus, nor Orion, nor any other participating reinsurer

has paid a penny on potential quota-share obligations for these claims. *Id.* at 4553-67. Because coverage for 2016-2018 is not at issue, only the 2019 Stop Loss is at issue.

> ### 3.  SCP have no harm and the Feldman Law Firm has no benefit from the 2019 Stop Loss.

For the first *Burrow* factor, SCP are not entitled to forfeiture because SCP has suffered no harm and the Feldman Law Firm has no benefit from the 2019 Stop Loss. From 2016 to the present, PoolRe has **paid zero pennies** in stop-loss coverage to A.M.Y. for **any** claim. TR Vol. 11 at 4553-67.   Therefore, as of today and assuming SCP's theory of harm could be action (it is not), SCP have **zero harm** and A.M.Y. and the Feldman Law Firm have **zero benefit** from **any** A.M.Y. policy in the 2019 Pool, including the primary LPL policy. Forfeiture is inappropriate when the harm or benefit are speculative.

> ### 4. The Feldman Parties acted with good-faith intent to benefit SCP.

In assessing "absolute, perfect candor," Texas law only requires that the Feldman Law Firm make a "good-faith effort to fully inform [SCP] of all **material** information," which is information "a reasonable person would attach importance to and would be induced to act on in determining his choice of actions in the transaction in question." *Fleming* 412 S.W.3d at 736-38. For ***thirteen*** reasons, the Feldman Parties acted with the good-faith intent to benefit SCP and to fully disclose all **material** facts to SCP based on SCP's sophistication level. If there were any omission, it was inadvertent and is no basis for a "clear and serious" finding or for forfeiture.

First, Dr. Sullivan (a sophisticated party) knew that captives write professional liability policies (including covering the SCP insureds as discussed below) and include those policies in reinsurance pools. TR Vol. 21 at 8655. Dr. Sullivan signed the 2019 Stop Loss on November 13, 2019 after Dr. Sullivan and Mr. Sherman, in October 2019, read and discussed the Adkisson article

that allegedly "enlightened" Dr. Sullivan to the risk of captive managers including professional liability policies in risk pools with clients. TR Vol. 3 at 974-76, 1295-96; EX FC-262; EX FC-253.

Second, from January 2015 on, the Feldman Parties repeatedly disclosed—and Mr. Sherman and SCP understood—that the Feldman Law Firm's and Capstone's captive and insurance policies "are" in the annual pools. TR Vol. 20 at 7963-66; TR Vol. 11 at 4475-76. Whether the Feldman and Capstone Parties identified A.M.Y. by name is immaterial; the operative facts—*i.e.*, that policies insuring the Feldman and Capstone parties *are* in the reinsurance pools—are unambiguous. Even Mr. Watkins admits that any alleged omission is at most "negligent" and not "intentional." TR Vol. 4 at 1632.

Third, Feldman believed that having the LPL policy in the pool had no material risk of harm to SCP because in all previous PoolRe risk pools (pre-2019) the historic risk of burden or harm to SCP was **zero** because PoolRe has **never** paid a penny in stop-loss coverage to A.M.Y. for any policy, including LPL. TR Vol. 11 at 4553-67, 4585-4607.

Fourth, in 2018, Mr. Feldman disclosed to Mr. Sherman, Mr. Kushner, and SCP when the likelihood of SCP paying stop-loss coverage on A.M.Y.'s policies (including LPL) **increased**. Specifically, on October 26, 2018, Feldman notified SCP in writing that PoolRe was proposing to (and then did) lower the Attachment Point for the 2018 and 2019 stop-loss and quota-share contracts to address criticisms raised in the June 18, 2018 *Reserve Mechanical* decision. EX FC-208 at 1. These changes **increased** the likelihood of Cerberus, Janus, and Orion paying on stop-loss claims. *Id.* This disclosure included **every single historic** A.M.Y. stop-loss claim, including claims for "Lawyers Professional Liability":



EX FC-208 at 25. This disclosure highlights that, under the new Attachment Point, the Participating Reinsurers would have (but had not) paid $323,710 to A.M.Y. exclusively for LPL policies in 2014 and 2015:

| Capstone Associated Services, Ltd. Group Level Loss | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C= | D= | E= | F= | G | H= | I= |
| | per Exhibit 3 | per Capstone | B @ 2% / yr | 30.4% * C | Max[0,A-D] | 0.80*E | per Capstone | C * 160% | Min [ F , H ] |
| | Limited Trended GU | | Trended Subject | | Loss > AP | | | PoolRe Limit @ | |
| Group# | Ult Loss | Subject Premium | Premium | AP @ 30.4% | @30.4% | 80%PoolRe | Loss Year | 160% SP | PoolRe Limited Loss |
| 5 | 224,085 | 251,088 | 282,766 | 85,899 | 138,186 | 110,548 | 2013 | 452,425 | 110,548 |
| 6 | 352,429 | 256,340 | 283,020 | 85,977 | 266,453 | 213,162 | 2014 | 452,832 | 213,162 |

EX FC-208 at 22. Mr. Sherman did not dispute that Mr. Feldman provided, and that Mr. Sherman and SCP had the opportunity to review, this information before Cerberus, Janus, and Orion executed the 2019 stop-loss and quota-share contracts. TR Vol. 20 at 7994, 7947-48, 7960.

Fifth, it is uncontroverted that the intent for including the LPL policy (and E&O and LEGEXP policies) in the 2019 Pool was in part to **benefit** Cerberus, Janus, and Orion and to **burden** A.M.Y. TR Vol. 11 at 4585-4607. Specifically, uncontroverted testimony established that including the LPL, E&O, and LEGEXP policies in the 2019 Pool had the following effects:

1. **A.M.Y.'s Subject Premium was higher.** A.M.Y.'s Subject Premium with these three policies in the 2019 Pool is $877,221. Without these policies in the 2019 Pool, A.M.Y.'s Subject Premium would have been $696,705.

2. **A.M.Y.'s Attachment Point was higher.** A.M.Y.'s Attachment Point with these three policies in the 2019 Pool is $266,675. Without these policies in the 2019 Pool, A.M.Y.'s Attachment Point would have been $211,798.

3. **A.M.Y.'s odds of coverage were lower.** Because A.M.Y.'s Attachment Point was higher,
   A.M.Y. was less likely to receive stop-loss coverage, which means the Feldman Law Firmwas less likely to receive any benefit from having these three policies in the 2019 Pool.

4. **A.M.Y.'s Quota Share was higher.** A.M.Y.'s 2019 Quota Share with these three policiesin the 2019 Pool is 2.704%. Without these policies in the 2019 Pool, A.M.Y.'s Quota Sharewould have been 2.159%.

5. **SCP's Quota Share was lower.** The combined Quota Share obligation of Cerberus, Janus,and Orion with these three policies in the 2019 Pool is 6.940%. Without these policies in the 2019 Pool, their combined Quota Share obligation would be 6.978%.

**A.M.Y. 2019 Pool Coverage Comparison**

| A.M.Y. 2019 POOL COVERAGE | 2019 ACTUAL POLICIES IN POOL | 2019 LPL, LEXEXP, E&O REMOVED FROM POOL | |
|---|---|---|---|
| A.M.Y. SUBJECT PREMIUM | $877,221 | $696,705 | ↓ |
| SCP TOTAL SUBJECT PREMIUMS | $2,251,231 | $2,251,231 | |
| TOTAL SUBJECT PREMIUMS FOR ALL POOL PARTICIPANTS | $32,440,229 | $32,259,713 | ↓ |
| A.M.Y.'S ATTACHMENT THRESHOLD | $266,675 | $211,798 | ↓ |
| A.M.Y.'S QUOTA SHARE | 2.704% | 2.159% | ↓ |
| SCP'S QUOTA SHARE | 6.940% | 6.978% | ↑ |

**SOURCE:** EX J072.012-013; EX J074.003-004

7

TR Vol. 11 at 4585-4607; PoolRe Slide 7. Based on the increased burden to A.M.Y. and the decreased burden to SCP, Mr. Feldman believed including A.M.Y.'s policies in the 2019 Pool was fair and reasonable to Cerberus, Janus, and Orion; benefitted SCP; did not harm SCP; and did not indirectly benefit the Feldman Law Firm or Capstone. *Id.*

Seventh, Dr. Sullivan's testimony regarding SCP's **potential** obligations for LPL claims is incorrect. Dr. Sullivan inaccurately testified that, for the Feldman Law Firm's legal disputes, SCP would pay 7%, A.M.Y. would pay 2.7%, and the other Participating Reinsurers would pay 97.3% (including SCP's 7%). TR Vol. 1 at 239-40. The calculations at trial revealed that, on $3 million in *accepted* claims, A.M.Y. would pay for 55% ($1,634,398); Cerberus, Janus, and Orion pay 3% ($97,406); and the other Participating Reinsurers pay 42% ($1,268,196):

**Participating Reinsurer Obligations on $3 Million in Claims from A.M.Y.**

| POOL PARTICIPANT | TOTAL OBLIGATION | PERCENTAGE OBLIGATION |
|---|---|---|
| A.M.Y. | $1,634,398 | 55% |
| CERBERUS, JANUS, ORION | $97,406 | 3% |
| OTHER | $1,268,196 | 42% |

SOURCE: FC EX 370.12.0015

TR Vol. 11 at 4541-4607; PoolRe Slides 4-5.

Eighth, the fact that A.M.Y.'s LPL policy is primary and not excess makes **zero pennies** of difference because the Quota Share for Cerberus, Janus, and Orion is $97,406 **either way.** *Id.* SCP never offered a contrary calculation through any witness. Under the primary LPL policy, A.M.Y. covers "dollar one" to the Attachment Point of "$266,675" after the Feldman Law Firm's $25,000 deductible; A.M.Y. covers $546,665 of the 80%-20% Participation Level; the Participating Reinsurers Cover $1,403,554 (of which A.M.Y., Cerberus, Janus, and Orion each pay their Quota Share percentage); and A.M.Y. covers the $783,106 of the "Excess Participation Level":



TR Vol. 11 at 4541-4607; PoolRe Slides 4-5, 7. If the Feldman Law Firm had a $500,000 commercial LPL policy like SCP's $500,000 LAMMICO policy, the only change is that, on $3 million in claims, a commercial carrier would cover $500,000 of the "Excess Participation Level"

that **A.M.Y.** would cover. For instance, on $3 million in claims, **SCP's** Quota Share of $97,406 is

**the same**:

| Coverage Tranche Title | Coverage Tranche Amount | A.M.Y. Pays | SCP Pays | Other Participating Reinsurers Pay | Commercial Carrier Pays |
|---|---|---|---|---|---|
| Primary Commercial | $00.01-$500,000 | $0 | $0 | $0 | $500,000 |
| A.M.Y. Attachment | $500,000-$766,675 | $266,675 | $0 | $0 | $0 |
| A.M.Y. 80-20 Obligation | $766,675-$1,313,340 | $546,665 | $0 | $0 | $0 |
| Participating Reinsurers 80-20 Obligation | $1,313,340-$2,716,894 | $37,952 | $97,406 | $1,268,196 | $0 |
| Excess Participation Level Obligation | $2,716,894-$3,000,000 | $283,106 | $0 | $0 | $0 |

*Id.* Here, SCP forced FCP to spend millions on fees and costs, and SCP seeks to recover

over $130 million in actual and treble damages, fee forfeiture, and attorney's fees and costs **in**

**multiple forums**.[518] With over $130 million in exposure, a $500,000 primary, commercial LPL policy would make **zero pennies** of difference to SCP's **potential $97,406 Quota Share** related to claims that A.M.Y. submitted to PoolRe regarding these Arbitrations. *Id.* Therefore, the difference between a primary and excess LPL policy is immaterial for assessing intent, harm, or benefit.

Ninth, even if A.M.Y. did not submit a claim for an LPL policy of any kind, SCP would nonetheless have quota-share obligations related to this dispute under **at least** three other A.M.Y underwritten policies. Specifically, because SCP sued both Mr. Carlson and Mr. Feldman in their capacity as officers of Capstone, SCP would have quota-share obligations related to: (1) A.M.Y.'s **D&O policy**, which SCP never challenged in any way; or (2) A.M.Y.'s **E&O and LEGEXP policies**, for which SCP failed to raise any genuine dispute of fact. *Id.*

Tenth, the primary-excess distinction is contrary to written representations made throughout the parties' relationship, is unsupported by any document in this case, and thus is no basis to find, by a preponderance of the evidence, an intent to deceive or to gain an undisclosed benefit:

1. The Feldman Law Firm and Capstone repeatedly disclosed in writing from early 2015 on that the policies are "primary":

---

[518] Because SCP's post-hearing brief fails to distinguish between damages requests via-a-vis specific arbitrations, it appears that SCP are actually requesting over $260 million in damages.

**POOLRE INSURANCE CORP.**
**NOTES TO THE FINANCIAL STATEMENTS**
**STATUTORY BASIS**
December 31, 2015 and 2014

**A.   NATURE OF BUSINESS**

PoolRe Insurance Corp. (the "Company" or "PoolRe") was incorporated in the British Virgin Islands in 2001 and during 2009 merged into a newly formed Company in Anguilla, British West Indies. The Company primarily functions to serve the needs of unrelated insurance companies by serving as the risk pooling facility for those insureds.  In its capacity as a risk pooling vehicle, PoolRe underwrites stop loss coverage on a variety of property and casualty insurance policies for business risks, then as the pooling intermediary, it reinsures on a quota share basis those risks with the unrelated insurance companies that are the participants of the pool ("pool participants" or "participants").   As a pooling vehicle, the Company retains only residual underwriting risk in providing this facility to the participating insurers. The stop loss coverages are written as endorsements on other primary insurance policies.

*See, e.g.,* EX DRS-2389 at 79 (emphasis added).

2. Mr. Amoroso agrees that there is not one document in which Dr. Sullivan, Dr. DellaCroce, Mr. Kushner, or Mr. Sherman raised the idea that the policies in the annual pools are only excess policies and not primary policies. TR Vol. 7 at 2629-30.

3. Mr. Feldman and Mr. Sherman agree that the Feldman Law Firm and Capstone never represented to SCP that **all** the policies from all Participating Reinsurers or **all** policies related to the Feldman Law Firm or Capstone are excess. TR Vol. 13 at 4920-24; TR Vol. 20 at 7961-66. Instead, Mr. Sherman confirmed that Mr. Feldman only stated that the **Doctors** could "keep **their** commercial insurance" for "medical malpractice insurance" and that the **Doctors** could put "excess" policies into the pool. TR Vol. 20 at 7963 (emphasis added).

4. Mr. Feldman and Mr. Amoroso agree that many of the policies in the pool are not excess policies. Mr. Feldman testified that many of the policies in the pool are not excess policies and that many can provide first-dollar coverage. TR Vol. 13 at 4920-27. Mr. Feldman and Mr. Amoroso agree that: (a) the nature of the claim and the potential third-party policies determine whether a captive policy provides first-dollar coverage, and (b) the face of a policy alone cannot determine whether a policy is primary or excess. *Id.*; TR Vol. 7 at 2656-59, 2780-82. Despite agreeing with Mr. Feldman's analysis, Mr. Amoroso testified that he did no analysis of whether any captive policy from any Participating Reinsurer (Cerberus, Janus, Orion, A.M.Y., or otherwise) provides first-dollar coverage. TR Vol. 7 at 2656-59, 2780-82.

5. Some SCP policies provide first dollar coverage and are thus "similar" to and

"homogenous" with the Feldman Law Firm having a primary policy insured by A.M.Y. and reinsured in the pools. The feasibility study specifically recognizes that SCP's D&O policy is primary because SCP has no commercial D&O coverage. EX J-10 at 34; TR Vol. 13 at 4961. Dr. Sullivan admits that SCP's tax-liability policy is primary and not excess.

TR Vol. 2 at 29-30. Mr. Feldman testified, and Mr. Amoroso acknowledged, that SCP's unauthorized treatments policy provides first-dollar coverage because, by definition, this policy covers what SCP's LAMMICO policy excludes. TR Vol. 13 at 4920-27; TR Vol. 14 at 5471-77; TR Vol. 7 at 2780-82.

Based on this evidence, the distinction between primary and excess is no basis for a "clear and serious" finding or forfeiture. Mr. Feldman had a good-faith basis to believe that SCP understood that the policies in the pool could be primary policies and had no basis to believe that SCP relied upon the policies being exclusively excess policies.

Eleventh, the Feldman Law Firm's history of alleged frivolous disputes with clients is no basis for a "clear and serious" finding or forfeiture because:

1. Before signing the Engagement Letter, Dr. Sullivan and SCP knew about Mr. Feldman's disputes with clients. TR Vol. 1 at 506-08.

2. Through 2019, PoolRe has never paid a penny in stop-loss coverage related to a dispute between the Feldman Law Firm and a captive client. SCP's unprecedented tactics in these Arbitrations were unforeseeable and are the sole cause of the risk that the 2019 Pool may pay on LPL claims from A.M.Y. TR Vol. 11 at 4553-679, 4585-4607.

3. SCP introduced zero evidence of frivolous lawsuits. For instance, SCP lost the Dorfman Arbitration. *See* EX J115. Mr. Amoroso admitted that the Feldman Law Firm's withdrawal in the Tratt lawsuit was appropriate and admits that he did not analyze whether other lawsuits were frivolous. TR Vol. 8 at 2942-52.

4. Judge Jones agreed there is nothing wrong with suing clients for unpaid fees. TR Vol. 6 at 2387-88.

Twelfth, SCP did not establish that Mr. Feldman was "uninsurable." SCP cited a draft, unsigned memorandum that noted that a commercial LPL policy would be more expensive than a

captive policy. TR Vol. 14 at 5393-5401. Moreover, this draft memorandum is from **2018**, and thus concerns information that is different from what the Feldman Law Firm could have disclosed in **2015**. *See id.* Because SCP did not establish that the Feldman Law Firm was "uninsurable" **and** that the Feldman Law Firm could have disclosed this status as of December 7, 2015, there is no basis to conclude that the Feldman Law Firm could have disclosed such a fact before SCP signed the Engagement Letter.

Finally, SCP refused to use material benefits available under their policies. Because of *SCP's LEGEXP policy*, if the Feldman Law Firm sued SCP and SCP made a LEGEXP claim for defending, then **A.M.Y. would pay 2.704% of SCP's legal fees** above the Attachment Point. The only reason this has not happened is because SCP refused to treat Cerberus, Janus, and Orion like real insurance companies that pay on claims to their insureds and that seek stop-loss coverage from PoolRe. Instead, Dr. Sullivan ignored these policies and simply paid for these lawsuits by draining funds from Cerberus, Janus, and Orion independent of the claims process. TR Vol. 3 at 1359.

For these reasons, SCP have not met their burden to prove that Mr. Feldman lacked a good-faith intent to benefit SCP, to avoid harm to SCP, to avoid undisclosed benefits to the Feldman Law Firm, and to disclose all material facts regarding SCP's participation in PoolRe's pools.

        a.      **SCP did not meet their burden on the other Burrow factors.**

SCP did not meet their burden to prove a "clear and serious" breach related to A.M.Y.'s LPL policy or a right to forfeiture related to this policy because:

1. **The timing and gravity are immaterial.** Including the primary LPL policy in the 2019 Pool caused no harm, no material risk of harm, and no improper benefit. SCP also did not lose any meaningful opportunity because of the LPL policy in the 2019 Pool. The Firm did not obtain any benefit (improper or otherwise) because of the timing of the disclosures the Feldman Law Firm made to SCP regarding the A.M.Y. policies in the 2019 Pool.

2. **The alleged violation had no impact on the Feldman Law Firm's work for SCP.** SCP presented no evidence that the presence of a primary LPL policy in the 2019 Pool caused the Feldman Law Firm to perform any specific legal task differently than the Feldman Law Firm would have performed the task without the primary LPL policy in the 2019 Pool.

3. **There are alternative remedies.** No remedy is appropriate, and this Arbitrator awards no remedy. But, for the avoidance of doubt, the maximum remedy SCP would be entitled to would be a declaration that Cerberus, Janus, and Orion are exempt from paying between $6,035 and $19,620 in potential quota-share obligations related to the Feldman Law Firm's policies in the 2019 Pool. If the LPL, E&O, and LEGEXP policies were removed from the 2019 Pool, then SCP's Quota Share drops from $97,406 to $77,786. TR Vol. 11 at 4541-4607; PoolRe Slides 4-5, 28. By the same math, if just the LPL is removed, SCP's Quota Share drops from $97,406 to $91,371. Id.

4. **A reasonable lawyer would not have known the alleged conduct was wrongful.** A reasonable lawyer would not have believed that including a primary (as opposed to excess) LPL policy in the 2019 Pool was wrongful because including this policy caused no harm to SCP, caused no materially different risk of harm to SCP, caused no undisclosed benefit to the Feldman Law Firm, and was not the result of bad intent or the lack of good faith.

5. **The duration of services and the benefits obtained do not support forfeiture.** As explained, including A.M.Y.'s LPL policy in the 2019 Pool is unrelated to any contractual benefit obtained under the separate Engagement Letter. Requiring disgorgement of over $1 million in the 2015 Engagement Letter fees would be especially inequitable because, as a result of the Feldman Law Firm's services: (a) SCP obtained and retained millions in annual tax exemptions for tax years 2015-2019; and (b) the Feldman Law Firm and Capstone provided SCP with re-domiciled captives in Delaware, years of regulatory planning, years of administrative services and disbursement were made, and years of insurance and re-insurance coverage worth tens of millions of dollars were facilitated for SCP's benefit as requested by SCP. TR Vol. 13 at 5103-12.

6. **This dispute does not relate to the public interest.** This dispute is the result of Dr. Sullivan's improper request to liquidate the SCP Captives on demand. SCP's complaints about the distinction between a primary and excess LPL policy have no bearing on the public's interest in attorney-client relationships.

7. **SCP's claim for forfeiture is inequitable.** These disputes arise from Dr. Sullivan's improper request to liquidate the SCP Captives on demand. SCP caused the legal spend in these cases. Had SCP not done so, A.M.Y. would not have hit the Attachment Point on any policy. SCP cannot obtain an equitable remedy when SCP's litigation conduct is the sole reason that a dispute over A.M.Y.'s policies exists.

For these reasons, SCP are not entitled to a finding that including A.M.Y.'s primary LPL policy in the 2019 Pool is a "clear and serious" breach that supports fee forfeiture.

### ii. SCP are not entitled to forfeiture regarding the 2013 Reserve audit.

SCP's Reserve-centric complaints concern an alleged failure to disclose that the IRS determined in July 2013 that PoolRe is not a bona fide insurance company through which a captive can distribute risk. TR Vol. 1 at 491-82. As discussed above, SCP did not meet their burden to prove a breach on this issue. The IRS never reached such a determination in 2013. Similarly, under the *Burrow* factors, SCP did not meet their burden to prove that the Feldman Law Firm committed a "clear and serious" breach regarding the 2013 Reserve audit or that SCP are entitled to forfeiture regarding this allegation.

First, SCP have zero harm, and the Feldman Law Firm has zero undisclosed benefit, regarding the 2013 Reserve audit. For SCP's alleged harm, Dr. Sullivan admitted that:

1. "We have not suffered any tax liability loss" for any reason, let alone due to an adverse finding from the IRS regarding risk distribution through PoolRe. TR Vol. 2 at 660.

2. Dr. Sullivan's current position is that Cerberus, Janus, and Orion **are** insurance companiesfor federal tax purposes for tax year 2019. TR Vol. 2 at 913-14.

3. No document supports Dr. Sullivan's allegation that SCP would have liquidated their captives in 2015 had SCP known of the 2013 Reserve audit. TR Vol. 2 at 597.

4. SCP made no attempt to mitigate their damages in 2018 (or any time thereafter) by filing amended returns and paying the taxes that the Doctors claim may one day become due, which is the latest date that SCP could claim they were apprised of the *Reserve* case.

SCP also has identified no undisclosed benefit to the Feldman Law Firm. Merely paying fees

under the 2015 Engagement Letter does not count. *See Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 433 (Tex. App.—Austin 2009, no pet.) (holding that "an expectation of fees from continuing to represent" a client is not a "subordination of [the] client's interests to [theattorney's interest]" because this "factor [is] present in virtually every attorney-clientrelationship").

For intent, the Feldman Parties acted with good-faith intent to disclose all actual adverse findings from the 2013 Reserve Mechanical audit because:

1. The Feldman Parties accurately believed that, in July 2013, the IRS did not find that PoolRe was not a bona fide insurance company through which a captive like Reserve could distribute risk. TR Vol. 12 at 4714-16. The IRS **did not even raise this issue**. *Id.* This finding did not exist until the June 18, 2018 *Reserve* decision. TR Vol. 13 at 64835-42. Before June 8, 2018, it was **unforeseeable** that a captive would fail an audit based on whether PoolRe is a bona fide insurance company through which a captive can distribute risk. *Id.* To reach such a conclusion, the IRS would need to audit every captive in the pool,which the IRS has never done. *Id.*

2. In July 2013, the Feldman Parties correctly believed that the IRS made a **positive** finding for PoolRe because the IRS "deemed" the PoolRe reinsurance premiums to be insurance for the "gross receipts" analysis of whether Reserve was an insurance company for federal tax purposes. TR Vol. 12 at 4744-67; EX FC-675 at 42.

3. As distinct from any issue related to **PoolRe**, in July 2013, the IRS found that **Reserve** did not distribute risk because Reserve had only 30% outside business. TR Vol. 12 at 4744-67; EX FC-675 at 40. This finding was contrary to 2013 case law, contrary to thirty-nine favorable 1024 determinations from the IRS for Capstone-administered captives, and thus was not foreseeable. TR Vol. 12 at 4744:10-4767:20. In response, the Feldman Law Firm and Capstone adjusted the planning for Capstone-administered captives so that over 50% of their revenues came from outside business like PoolRe. TR Vol. 12 at 4744-836. The Feldman Law Firm and Capstone disclosed this exact issue regarding the IRS's "unexplained actions" in the twelve adverse audits described in EX J-20 and in conversations with Sherman and Kushner. TR Vol. 12 at 4744-96. This testimony at trial is **uncontroverted**. Dr. Sullivan even admitted that the Feldman Law Firm's and Capstone's disclosures explain that the main risk for achieving risk distribution is having 50% outside business. TR Vol. 2 at 562.

4. In the July 2013 audit, the only hypothetical "question" raised as to PoolRe did not involve the tests for risk distribution test or bona fide insurance. TR Vol. 12 at 4715-30. Instead,

the question related to whether direct-insurance policies written by Reserve to its direct insureds, RocQuest and ZW, involved insurance risk and not business risk. *Id.* An IRS agent raised the hypothetical question that, if twelve of fourteen of Reserve's direct policies lack insurance risk, and PoolRe is composed of similar policies, then PoolRe may reinsure policies that lack insurance risk. *Id.*; EX FC-675 at 37.

5. The Feldman Parties did not disclose this "question"—which is not an adverse finding—because it was immaterial. The IRS "deemed" findings in favor of PoolRe's premiums. TR Vol. 12 at 4745:13-4756:5. This question was "shocking" and contrary to thirty-nine 1024 rulings that approved PoolRe and the specific direct policies of thirty-nine different Capstone-administered captives. TR Vol. 12 at 4715-23. The IRS conceded, and the tax court rejected, these same arguments in three Tax Court cases the next year in 2014, before SCP signed the 2015 Engagement Agreement in December 2015. TR Vol. 12 at 4797-47801. Later, but before SCP entered into the December 2015 Engagement Letter, other intervening case law affirmed an easier standard for proving insurance risk in the *RVI* case, which also caused the IRS to abandon any attack on insurance risk once the Reserve audit progressed to Tax Court. TR Vol. 23 at 9390-94. In contrast, the Tax Court cannot review or rely upon preliminary audit reports, which are inadmissible in Tax Court and which often differ from positions the IRS takes in tax court. TR Vol. 23 at 9296-98.

6. Mr. Brooks opined that Exhibit C to the 2015 Engagement Letter adequately discloses the Doctors' tax risks for Reserve issues, including risk shifting, risk distribution, insurance risk, common notions of insurance, and "Dirty Dozen" audit scrutiny. TR Vol. 23 at 9376-77.

7. The 2015 Engagement Letter discloses the general risk of failing to prove insurance risk resulting in a failure of both the test for insurance risk and the test for gross receipts. TR Vol. 12 at 4786-4801. The 2015 Engagement Letter also discloses the risk that the IRS will take enforcement positions that are contrary to prior practice and established law in an increasingly "dynamic environment" for enforcement. *Id.*

8. In February 2016, the Feldman Parties further disclosed that the Reserve audit was going to tax court and explained the exact legal findings from this audit. TR Vol. 12 at 4804-06.

9. The Feldman Law Firm disclosed the finding that PoolRe is not a bona fide insurance company through which a captive can distribute risk one day after the June 18, 2018 *Reserve* decision **and** provided SCP and Mr. Sherman the complete opinion and transcript. TR Vol. 13 at 4842-47. Mr. Sherman admits he had full opportunity to review the 2018 *Reserve* decision and transcript before the Doctors signed the 2018 and 2019 stop-loss and quota-share contracts on May 9, 2019 and November 13, 2019. TR Vol. 20 at 7967-69.

10. The Feldman Parties had five other attorneys—lawyers Lavelle, Cohen, Gremillion,

McCormack, and Albright— review the tax-risks disclosure to ensure accuracy. TR Vol. 13 at 4893.

11. Even Mr. Watkins admits that any alleged breach regarding these disclosures is "negligent" and not "intentional." TR Vol. 4 at 1632.

Based on these facts, SCP have not proven that the Feldman Parties acted with bad intent or a lack of good faith regarding the disclosure of the material facts for the 2013 Reserve audit.

Third, the timing and gravity of the alleged violation is immaterial. Dr. Sullivan and Mr. Sherman also had the opportunity to read the *Reserve Mechanical* opinion and transcript in June 2018 before signing the 2018 and 2019 stop-loss and quota-share contracts on May 9, 2019 and November 13, 2019, respectively. TR Vol. 20 at 7967-69. Dr. Sullivan also obtained a "master's degree" in, and "full consciousness" of, the risks of PoolRe, the *Reserve* decision, and captives from reading and discussing the Jay Adkisson article in October 2019 before signing the 2019 Stop Loss on November 13, 2019. Vol 1 at 160-62; TR Vol. 3 at 974-76, 1295-96; TR Vol. 1 at 160-62, 442-43. There is thus no basis for SCP to maintain that SCP would have done one thing differently had SCP obtained different disclosures.

Fourth, SCP have not identified any legal task that the Feldman Law Firm should or could have performed better or differently regarding achieving risk distribution through PoolRe.

Fifth, as explained *supra*, the Feldman Law Firm should not forfeit the fees for years of work under the 2015 Engagement Letter when SCP has not identified an issue with a single discrete service regarding the 2013 Reserve audit. SCP are not entitled to other remedies like damages because SCP has no damages. Though this Arbitrator awards no forfeiture, this Arbitrator notes that no forfeiture greater than $10,000 would even be worth considering.

Sixth, no reasonable attorney would have viewed the Feldman Law Firm's disclosures regarding the 2013 Reserve audit as wrongful because the Feldman Law Firm disclosed all

material facts, SCP were not harmed, the Feldman Law Firm did not improperly benefit, and the Feldman Law Firm acted with good-faith intent.

Seventh, SCP's meritless complaints about the 2013 Reserve audit do not concern the public interest in the practice of law in general or the quality of the Feldman Law Firm's services to other clients.

Finally, it is inequitable to consider fee forfeiture regarding the Reserve issues in these Arbitrations while SCP maintains the exact opposite position with the IRS in tax returns signed under penalty of perjury.

For these reasons, SCP has not met their burden to prove by a preponderance of the evidence that the Feldman Law Firm committed a "clear and serious" breach regarding the 2013 Reserve audit or that such a breach entitles SCP to forfeiture of fees paid under the 2015 Engagement Letter.

### iii. SCP are not entitled to forfeiture regarding the promotor audit.

SCP did not meet their burden under the *Burrow* factors to prove a "clear and serious" breach regarding the promotor audit or to prove that the promotor audit supports fee forfeiture.

First, SCP did not prove any harm to SCP or improper benefit to the Feldman Law Firm regarding the promotor audit. Paying continued fees under the 2015 Engagement Letter is not harm that supports a finding of "clear and serious" breach or a forfeiture award. *See Beck*, 284 S.W.3d at 433. As for other potential harms, there is zero evidence that the promotor audit resulted in an audit of or damages to SCP.

In fact, the 2015 Engagement Letter discloses that the promotor audit was "dormant" as of December 7, 2015. EX J-20 at 37. Because the promotor audit was dormant at the time SCP signed the 2015 Engagement Letter, there is no evidence that the IRS obtained any information about

SCP **through the promotor audit**. Instead, the IRS obtained SCP's information because of SCP's own 8886 tax filings and under the 2016-66 requirements, which Sullivan admits that the Feldman Law Firm disclosed to SCP and other clients in **2018**. TR Vol. 2 at 863-66; EX FC-210. This is critical because the only hypothetical risk of harm to SCP from a promotor audit is that the IRS might use information obtained in a promotor audit in hypothetical audits of SCP. TR Vol. 2 at 599; EX FC-73.

Second, the Feldman Parties acted with good-faith intent to disclose all material facts about the promotor audit to SCP before SCP signed the Engagement Letter because:

1. Mr. Press agrees that the 2015 Engagement Letter discloses the promotor audit. TR Vol. 9 at 3743-48. Mr. Brooks reiterated that the 2015 Engagement Letter informed readers [here, sophisticated parties] of "a promoter audit or [] something like a promoter audit." TR Vol. 23 at 9396. Mr. Kushner testified that the 2015 Engagement Letter informed him that there was "an inquiry from the IRS." TR Vol. 20 at 8142.

2. The Feldman Parties had five other attorneys—Lavelle, Cohen, Gremillion, McCormack, and Albright—review the tax-risks disclosures to ensure accuracy. TR Vol. 13 at 4893.

3. Mr. Feldman disclosed the promotor audit to SCP in July 2015. TR Vol. 13 at 4870-85. Mr. Feldman also told Mr. Kushner in August 2015 that "last week the IRS did an examination of our captive program" and reviewed banker boxes of information. EX J-17. Mr. Feldman shared this information in response to an email from Mr. Sherman (copying Mr. Kushner) attaching an article discussing promoter audits within the captive industry. EX FC-71.

4. In their pre-2015 Engagement-Letter discussions, Messrs. Feldman, Kushner, and Sherman referred to the promotor audit as the "6700 audit." *Id.*

5. The 2015 Engagement Letter disclosed the risk of promotor audits because captives were on the IRS "Dirty Dozen" list. *Id.*

6. The Feldman Parties disclosed that the promotor audit was dormant as of December 2015. *Id.*

7. Mr. Sherman, Mr. Kushner, and the Doctors never expressed any confusion about the promotor audit or its status before SCP signed the 2015 Engagement Letter. *Id.*

8. Messrs. Sherman and Kushner also expressed no surprise or confusion about the promotor audit in 2019 when Mr. Feldman provided the formal closing letter. *Id.*

9. If not a promotor audit, Messrs. Sherman and Kushner **never** identified what type of "program" audit they believed the 2015 Engagement Letter disclosed.

10. Mr. Watkins admits that any alleged breach regarding disclosures is "negligent" and not "intentional." TR Vol. 4 at 1632.

Any alleged confusion about the details of the promotor audit was inadvertent and not the result of bad intent or a lack of good faith.

Third, the timing and gravity of the alleged violation is immaterial. The IRS obtained no information regarding SCP because of the promotor audit.

Fourth, there is no evidence that the promotor audit affected the Feldman Law Firm's performance of a single task for SCP.

Fifth, as explained *supra*, it is inequitable to order forfeiture of all fees paid under the 2015 Engagement Letter when the Feldman Law Firm provided years of service. Though this Arbitrator [should award] no forfeiture, this Arbitrator [should also note] that no forfeiture greater than $10,000 would even be worth considering.

Sixth, no reasonable attorney would have viewed the Feldman Law Firm's disclosures regarding the promotor audit as wrongful because the Feldman Law Firm disclosed all material facts, SCP were not harmed, the Feldman Law Firm did not improperly benefit, and the Feldman Law Firm acted with good-faith intent.

Finally, SCP's litigation fiction about the promotor audit has no impact on the public

interest in attorney-client relationships.

For these reasons, SCP has not met their burden to prove that the Feldman Law Firm committed a "clear and serious" breach regarding the promotor audit or that SCP are entitled to forfeiture.

### iv. SCP are not entitled to forfeiture regarding SCP's liquidation demand.

SCP have not met their burden to prove a "clear and serious" breach or a forfeiture award regarding SCP's demand for liquidation of Cerberus, Janus, and Orion.

First, Judge Dorfman resolved the liquidation dispute. Any relief that touches on liquidation would improperly undue or ignore the Dorfman final award, now confirmed as a judgement [*sic*] of court.

Second, SCP have identified no harm to SCP and no improper benefit to the Feldman Law Firm. Regardless of when liquidation occurred, SCP still owed fees through the term of the Engagement Letter, and continued payment of fees is not a harm or benefit that supports forfeiture. *See Beck*, 284 S.W.3d at 433.

Third, the Feldman Law Firm acted with good-faith intent regarding this request because:

1. The 2015 Engagement Letter specifies that liquidation may take "twenty months." EX J-20 at 25. Judge Dorfman found that SCP are not entitled to a faster liquidation. EX J-115.

2. Mr. Feldman offered to explore an "escrow" with Dr. Sullivan in December 2019, and Dr. Sullivan ignored this offer. TR Vol. 13 at 5029-51.

3. Contrary to SCP's incorrect arguments, every captive that requested early liquidation that SCP identified liquidated in 16-24 months (not immediately). TR Vol. 13 at 5060-65. Accordingly, Mr. Feldman and the Feldman Law Firm made no misrepresentation.

4. Mr. Watkins admits that any breach is "negligent" and not "intentional." TR Vol. 4 at 1632.

Fourth, the timing and gravity of the alleged violation is immaterial. SCP presented no evidence that SCP would have paid over $8 million to make the concept of liquidation by the end of 2019 worth serious discussion. TR Vol. 13 at 5029-43.

Fifth, there is no evidence that the liquidation demand affected the Feldman Law Firm's performance of other tasks for SCP, especially given that Dr. Sullivan directed the Feldman Law Firm to cease work after December 2019.

Sixth, as explained *supra*, it is inequitable to order forfeiture of all fees paid under the 2015 Engagement Letter when the Feldman Law Firm provided years of service. SCP has not identified any discrete task that the Feldman Law Firm failed to perform that the Feldman Law Firm was required to perform. For alternative remedies, though this Arbitrator awards no forfeiture, this Arbitrator notes that no forfeiture greater than $10,000 would even be worth considering.

Seventh, no reasonable attorney would have viewed the Feldman Law Firm's handling of SCP's liquidation demand as wrongful because the Feldman Law Firm disclosed all material facts, SCP were not harmed, the Feldman Law Firm did not improperly benefit, the Feldman Law Firm acted with good-faith intent, and the Feldman Law Firm acted within the express terms of the 2015 Engagement Letter.

Finally, SCP's instant-liquidation request has no impact on the public interest in attorney-client relationships.

For these reasons, SCP has not met their burden to prove that the Feldman Law Firm committed a "clear and serious" breach regarding SCP's liquidation demand or that SCP are entitled to forfeiture.

>    **v.  SCP are not entitled to forfeiture regarding the Feldman Law Firm's and Capstone's cost-sharing agreement with PoolRe.**

For five reasons, SCP did not meet their burden to prove a "clear and serious" breach or a right to forfeiture regarding the Feldman Law Firm's, Capstone's, and PoolRe's cost-sharing agreement.

First, SCP have pled no claim regarding the cost-sharing agreement.

Second, the cost-sharing agreement is independent of SCP's complaint regarding A.M.Y.'s LPL policy. The cost-sharing agreement arose from SCP's improper demand for immediate liquidation of Cerberus, Janus, and Orion, and the ensuing myriad of litigation that has followed— an unprecedent situation for FCP. TR Vol. 15 at 5867-68; TR Vol. 23 at 9467-68. Therefore, the cost-sharing agreement would exist even if A.M.Y. had zero policies in the PoolRe reinsurance pools or even if SCP had no claims regarding the A.M.Y. policies. Similarly, because Section 3(E) of the 2019 Quota Share gives PoolRe the right to incur costs that form part of each Participating Reinsurer's quota-share obligation, whether PoolRe accepts coverage on A.M.Y.'s 2019 claims is independent from whether SCP has quota-share obligations for PoolRe's defense costs. *See* EX J-72 at 5-6, Section 3(E)(1)-(7); TR Vol. 11 at 4607-32. For instance, PoolRe could **deny** A.M.Y.'s stop-loss claims for 2019 and this would have **no impact** on SCP's potential quota-share obligations for PoolRe's defense costs. *See* EX J-72 at 5-6, Section 3(E)(1)-(7); TR Vol. 11 at 4607-32; *see also* TR Vol. 22 at 8820-21.

Third, even if SCP had pleaded a fiduciary-duty claim regarding the cost-sharing agreement, SCP cannot obtain forfeiture of any preliminary "true up" payment from PoolRe to the Feldman Law Firm or Capstone. It is "well-settled law" that a "client seeking forfeiture of an attorney's fees is not entitled to recover fees paid by another party." *Gregory v. Porter & Hedges, LLP*, 398 S.W.3d 881, 885-86 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (denying a plaintiff's request for forfeiture of attorney's fees paid by a third party). Equitable remedies like

forfeiture do not support the "improper windfall" that would result from allowing a plaintiff "to recover fees paid to the lawyers by another party." *Id.* (citations omitted). The deterrent rationale of attorney fee forfeiture is no basis for the Arbitrators to order disgorgement of fees paid to the Feldman Law Firm or Capstone from non-SCP entities like PoolRe. *Id.*; *see Liberty Mut. Ins. Co. v. Gardere & Wynne, L.L.P.*, 82 Fed. App'x 116 (5th Cir. 2003) (specifically rejecting the plaintiff's forfeiture argument that "focuse[d] heavily on deterrence as a justification" for supporting "the forfeiture" to the plaintiff of fees that a third party paid to the attorney).

Fourth, even if SCP had pled a fiduciary-duty claim regarding the cost-sharing agreement, the *Burrow* factors do not support a "clear and serious" finding or a forfeiture award:

1. SCP chose not to cross examine Mr. Feldman on the cost-sharing agreement.

2. SCP did not incur an undisclosed burden and the Feldman Law Firm did not obtain an undisclosed benefit from the cost-sharing agreement. The 2019 Quota Share expressly provides that PoolRe has broad discretion to incur costs to prosecute or defend claims an expressly provides that these costs form the basis of SCP's Quota Share obligation. *See* J-72 at 5-6, Section 3(E)(1)-(7); TR Vol. 11 at 4607-32. As for "true up" payments from PoolRe to the Feldman Law Firm, these payments are preliminary and subject to change. TR Vol. 15 at 5876-78. Moreover, based on the division of costs and fees going forward, the Feldman Law Firm may end up paying significant fees and costs for PoolRe from August 2021 to the present. *See id.*

3. There is no basis to infer bad intent or lack of good faith. The Feldman Law Firm entered the cost-sharing agreement after the Feldman Law Firm and SCP ended the attorney-client relationship. The firm entered the cost-sharing agreement to manage expense flow because of SCP's improper liquidation demand and the Dorfman Arbitration. TR Vol. 15 at 5886-87. As for PoolRe's defense costs, SCP and Sherman had the opportunity to review Section3(E) before signing. *See* EX J-72 at 5-6, Section 3(E)(1)-(7); TR Vol. 11 at 4607-32. The Firm could not disclose the cost-sharing agreement before 2020 after the dispute among the parties began.

4. SCP offered no evidence regarding the timing or gravity of the cost-sharing agreement.

5. The cost-sharing agreement did not affect the Feldman Law Firm's work for SCP

becausethe attorney-client relationship no longer existed when the Feldman Law Firm entered thecost-sharing agreement.

6. As explained *supra*, it is inequitable to order forfeiture of all fees paid under the 2015 Engagement Letter when the Feldman Law Firm provided years of service. SCP has not identified any discrete task that the Feldman Law Firm failed to perform that the FeldmanLaw Firm was required to perform. Also, other remedies are adequate.

7. SCP offered no evidence regarding whether a reasonable attorney would have viewed thecost-sharing agreement as wrongful considering the nature of these Arbitrations and the nature of the contracts at issue. In fact, SCP offered no evidence that PoolRe's defense costs are higher because of the cost-sharing agreement. PoolRe's costs are certainly lower,which means that the Quota Share obligations of each Participating Reinsurer (including Cerberus, Janus, and Orion) are lower than they would be if the cost-sharing agreement didnot exist.

8. The cost-sharing agreement is unique to these Arbitrations and does not affect the public interest in the attorney-client relationship.

9. Finally, it is inequitable to order forfeiture of any kind regarding the cost-sharing agreement when these Arbitrations arise solely out of SCP's improper demand for instantliquidation and SCP's willingness to repudiate potential quota-share obligations to PoolRebefore PoolRe's final resolution of the 2019 Pool.

**For these reasons, the cost-sharing agreement is no basis for a "clear and serious" finding or for forfeiture and the Arbitrator [should deny] SCP's claim for fee forfeiture and disgorgement.**

### A.    SCP's Claim for Intentional Misrepresentation/Fraud and Negligent Misrepresentation

#### i.    Parties' Contentions

##### 1.    SCP's Contentions

SCP allege that the Feldman and Capstone Parties "intentionally misrepresented their track record before the IRS by failing to adequately disclose the specific adverse audit findings by the IRS and the IRS's pending promoter exam of Mr. Feldman." SCP's Post-Hearing Brief at 53.

According to SCP, they "executed the Joint Engagement Letter in the errant belief, cultivated by Feldman and Capstone, that Feldman had a flawless track record in his dealings with the IRS, and that Mr. Feldman was above reproach." *Id.* at 54.

Rather than focus on affirmative misstatements, SCP allege that the Feldman and Capstone Parties failed to disclose material information, namely: (1) the extent and nature of their participation in the risk pool; (2) their actual track record in dealing with the IRS whereby a series of adverse audit findings supposedly jeopardized the very framework of the Capstone captive program; and (3) the promoter audit of Mr. Feldman. *Id.* at 54-55. These so-called "misrepresentations-by-silence," whether alone or in any combination, supposedly "provide [ ] the factual predicate for the Doctors' fraud claim." *Id.* at 55. SCP blame the Feldman and Capstone Parties for "intentionally suppressing vital information" and say that "Mr. Feldman masterminded the scheme whereby his clients would unwittingly subsidize his litigation expenses." *Id.* at 56, 58.

In arguing that the Feldman and Capstone Parties knew the materiality of the information they possessed and intentionally concealed it, SCP urge that "Feldman and Capstone crafted their disclosures to reveal as little negative information as possible." *Id*. at 55. SCP also rely on former Feldman Law Firm attorney Steve Cohen's participation in the audit of another law firm client – Reserve Mechanical – to try to establish the misleading nature of the disclosures made by the Feldman and Capstone Parties. *Id*.

As for the element of inducing them to execute the 2015 Engagement Letter, SCP allege that the Feldman and Capstone Parties intended them to rely on both "affirmative representations" and the "absence of negative information disclosed to them." *Id.* at 56. SCP finally assert that they justifiably relied on the misrepresentations and failures to disclose by signing the 2015 Engagement Letter. *Id*. at 56.

SCP pleads in the alternative that the alleged misrepresentations also render the Feldman and Capstone Parties liable for negligent misrepresentation. *Id*. at 57.

## 2. The Feldman and Capstone Parties' Contentions

The Feldman and Capstone Parties deny making any false misrepresentations to SCP, whether through affirmative misstatements, or by deliberately failing to disclose information when the circumstances require disclosure. First and foremost, no formal or informal fiduciary relationship existed between the Capstone Parties and SCP whereby the Capstone Parties would have owed a duty to disclose. The Feldman and Capstone Parties take the position that the Feldman Law Firm expressed *opinions or predictions* about the proposed tax treatment of SCP's anticipated captive transactions. FCP's Post Hearing Brief at 101 (citing *Safety Cas. Co. v. McGee*, 127 S.W.2d 176, 177 (Tex. 1939)). Expressing a pure opinion about the law or a future event fails to give rise to fraud.

The Feldman and Capstone Parties also rely on Judge Dorfman's finding that the Doctors qualified as sophisticated and intelligent parties who were represented at all material times by an attorney and CPAs. Given this team of experts, the Doctors possess equal bargaining power and engaged in an arm's-length transaction with the Feldman and Capstone Parties. Because of this arm's-length relationship, SCP had a duty according to the Feldman and Capstone Parties to investigate the captive transaction and protect their interests, which they failed to do. As a result, the Feldman and Capstone Parties allege SCP is charged with all knowledge a diligent investigation would have revealed.

The Feldman and Capstone Parties further challenge the essential element of justifiable reliance. Because a team of experts represented them, SCP could not justifiably rely on any alleged misrepresentation or failure to disclose. Nor can SCP justifiably rely on what they characterize as

a misrepresentation when the unambiguous language of the 2015 Engagement Letter contradicts it.

### ii. Applicable Law

To prevail on their claim for intentional misrepresentation or common-law fraud, SCP must prove the following elements:

1. The Feldman and Capstone Parties made a representation to SCP;
2. The representation was material;
3. The representation was false;
4. When the Feldman and Capstone Parties made the representation, they either:
   a. Knew the representation was false, or
   b. Made the representation recklessly, as a positive assertion, and without knowledge of its truth;
5. The Feldman and Capstone parties made the representation with the intent that SCP act on it;
6. SCP justifiably relied on the representation; and
7. The representation caused SCP's injury.

*See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

The elements of a cause of action for negligent misrepresentation consist of: "(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation." *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991); *see also McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791-92 (Tex. 1999).

As essential elements, fraud and negligent misrepresentation require a false representation of a material fact. *Jones v. Zearfoss*, 456 S.W.3d 618, 623 (Tex. App. – San Antonio 2015, no

pet.).  A misrepresentation arises when one conveys a false, deceptive, or misleading statement to another about a past or present fact. *Custom Leasing, Inc. v. Tex. Bank & Tr. Co.*, 516 S.W.2d 138, 142 (Tex. 1974). By concealing or failing to disclose a material fact where a duty to disclose lies, a party may also make an actionable misrepresentation. *Id.* "Misrepresentation and fraudulent concealment are not separate causes of action. Instead, a misrepresentation is an essential element of common law fraud. Concealment by silence, or fraudulent concealment, is a type of misrepresentation." *Nelson v. Regions Mortg., Inc.*, 170 S.W.3d 858, 862 (Tex. App. – Dallas 2005, no pet.).

"Pure expressions of opinion are not representations of material fact, and thus cannot provide a basis for a fraud claim." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337-38 (Tex. 2011). Nor do opinions or predictions about how a business or an investment may perform in the future qualify as an actionable misrepresentation that would give rise to fraud. *Maness v. Reese*, 489 S.W.2d 660, 663 (Tex. Civ. App. – Beaumont 1972, writ ref'd n.r.e.). "In order to effect a sale, induce the making of a contract, or place a proposed investment in a favorable light, it is quite common to make representations as to future value, productiveness, efficiency, or economy, or as to expected earnings or profits. But since that which lies in the future cannot be a matter of certain knowledge, it is held that all such representations must be taken and understood as mere expressions of opinion, and therefore their nonfulfillment cannot be treated as fraud." *Lloyd v. Junkin*, 75 S.W.2d 712, 714 (Tex. Civ. App. – Dallas 1934, no writ).

For both intentional and negligent misrepresentations, "[i]n determining whether justifiable reliance is negated as a matter of law, courts must consider the nature of the parties' relationship and the contract." *JP Morgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018).  "**<u>In an arm's length transaction, the party alleging fraud must have exercised</u>**

**ordinary care to protect its own interests and cannot blindly rely on the defendant's reputation, representations, or conduct where the plaintiff's knowledge, experience, and background warrant investigation. And when a party fails to exercise such diligence, it is charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated**." *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 563 (Tex. 2019) (citations and quotations omitted).

"It is well-established that '[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.'" *Nat'l Prop. Holdings*, 453 S.W.3d at 424 (quoting RESTATEMENT (SECOND) OF TORTS § 541 (1977)). As parties to a written contract, SCP cannot justifiably rely even on oral misrepresentations regarding the contract's unambiguous terms. *Id.* (citing *Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex. 1962)). "In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests . . .. [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Thigpen*, 363 S.W.2d at 251.

### iii.  Analysis

#### 1.  Several of SCP's claims turn on the common element of a misrepresentation of a material fact

SCP state several causes of action that rely on the common element of "a false representation" of material fact or "material misrepresentation" – fraud, DTPA violations, and negligent misrepresentation. *See Zearfoss*, 456 S.W.3d at 623; *Best Auto v. Autohaus, LLC*, 339 S.W.3d 372, 375 (Tex. App. – Dallas 2011, no pet.). "Liability for fraud and a DTPA violation may also follow from a failure to disclose information." *Best Auto*, 339 S.W.3d at 375. "A misrepresentation may consist of the concealment or nondisclosure of a material fact when there is a duty to disclose." *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 345 (Tex.

App. – Fort Worth 2003, pet. denied). A duty to disclose arises, among other times, where a fiduciary duty or confidential relationship exists. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219-20 (Tex. 2019).

## 2. No presumption of fraud exists in favor of SCP

Following Texas law, the Arbitrator [should presume] the absence of fraud in the transaction under review instead of its presence. *See Fossier v. Morgan*, 474 S.W.2d 801, 803-04 (Tex. Civ. App. – Houston [1st Dist. 1971, no writ). The Arbitrator will accordingly view through this clear lens the contentions made by SCP alleging that the Feldman and Capstone Parties misrepresented and failed to disclose material facts about the tax risks and pool liabilities for the captive insurance arrangement. The year 2015 marks the relevant timeframe when SCP claim the Feldman and Capstone Parties engaged in fraud by misrepresenting what would happen *in the future*.

The Arbitrator [should] find that the record supports this presumption against fraud. No evidence in the record proves by a preponderance of the evidence that the Feldman and Capstone Parties misrepresented, in the 2015 Engagement Letter, facts regarding the tax aspects that may affect captive insurance planning. Steve Cohen, a former lawyer with the Feldman Law Firm, testified that the disclosures and other information provided to SCP in Exhibit C to the 2015 Engagement Letter were true and accurate. *See* TR Vol. 21 at 8334, 8357-59; 8391, 8395.

Reinforcing this point, the Arbitrator [should] note that the Captive Insurers and Insurers have taken – for four years – the tax benefits offered by captive insurance without any adverse decision made by the IRS. According to SCP, the opportunity "to qualify for partial tax-exempt status under Internal Revenue Code § 831(b)" embodied the "stated purpose" of the 2015 Engagement Letter.

SCP's Post-Hearing Brief at 21. Because SCP received the precise benefit of their bargain, the Feldman and Capstone Parties made no misrepresentations that would give rise to fraud.

### 3.  The Capstone Parties owe SCP no duty to disclose

The Arbitrator [should] determine in this Award that no formal or informal fiduciary relationship exists between the Capstone Parties and SCP. In the absence of any fiduciary duty, the Capstone Parties owe no duty to disclose material information to SCP. *See Bradford v. Vento*, 48 S.W.3d 749, 755-56 (Tex. 2001). The Capstone Parties therefore committed no fraud.

### 4.  SCP impermissibly bases their claim for misrepresentation on pure expressions of opinion and predictions of future events

SCP's allegations complain the Feldman Parties failed to disclose or misrepresented pure issues of law, namely (1) whether the captive insurance investment would provide risk-free tax benefits in the future, (2) whether the 2015 Engagement Letter adequately advised SCP about tax risks and reinsurance obligations they owed under the PoolRe risk pool. *See* SCP's Post-Hearing Brief at 54-55. No claim arises in Texas for failing to disclose information at odds with a representation that, even if made, "would merely be opinion, in which case there would be no actionable fraud." *Stephanz v. Laird,* 846 S.W.2d 895, 904 (Tex. App. – Houston [1st Dist.] 1993, writ denied).

Whether a transaction qualifies as insurance that merits a tax deduction or exemption for federal income tax purposes frames "a question of law subject to de novo review." *AMERCO, Inc. v. Comm'r*, 979 F.2d 162, 164 (9th Cir. 1992); *see also* TR Vol. 20 at p. 8042 ("bona fide insurance" presented "a legal issue"). And whether the 2015 Engagement Letter provides adequate disclosures likewise poses a pure question of law – one of contractual interpretation – no fact finder can decide. *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965). Because Judge

Dorfman made the determination that an unambiguous contract exists, the Arbitrator [should] interpret the "bargained-for" 2015 Engagement Letter as a matter of law. decide. EX J-115 at ¶ 16; TR Vol.20 at 7926-27; *see Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479, 487 (Tex. 2019).

In Texas, expressing an opinion on a matter of law does not give rise to an actionable misrepresentation. *Safety Cas. Co. v. McGee*, 127 S.W.2d 176, 177 (Tex. 1939). "The reason usually given for the rule is that everyone is presumed to know the law, and hence has no right to rely upon representations made to him by another, and that such representations are to be treated as mere statements of opinions and not of fact." *McGee*, 127 S.W.2d at 177. "To be actionable fraud, the misrepresentation complained of must concern a material fact as distinguished from a mere matter of opinion, judgment, probability, or expectation." *Jeffcoat v. Phillips*, 534 S.W.2d 168, 171 (Tex. Civ. App. – Houston [14th Dist.] 1976, writ ref'd n.r.e.).

The statements in the December 2015 Engagement Letter describing tax protections allegedly afforded by captive insurance fall under this long-standing rule of law. "A representation as to the legal effect of a document is regarded as a statement of opinion rather than of fact and will not ordinarily support an action for fraud." *Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex. 1987). This rule defeats SCP's claim that the December 2015 Engagement Letter misrepresented that the policies issued by Cerberus, Janus, and Orion would qualify as *bona fide* insurance for federal income tax purposes or that the Stop Loss and Quota Share policies would meet legal requirements for distributing risk.

It is beside the point the Feldman Parties represented SCP while they negotiated the 2015 Engagement Letter. Despite this fiduciary relationship, any misrepresentation about the law or its effect does not become actionable when "the parties are in an equal bargaining position with equal

access to legal advice. This is because under such circumstances each party has an opportunity to make their own investigation and determination of the legal effect of their actions." *Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 746 (Tex. App. – Dallas 2012, no pet.). Judge Dorfman found that such an arm's-length relationship existed between SCP and the Feldman Parties because SCP were represented at all relevant times by an attorney and CPAs. EX J-115 at 8-9.

Nor did the Feldman Parties employ any "artifice or fraud" to prevent SCP and their team of expert advisers from conducting their own investigation into the facts and law governing tax exemptions for captives or IRS risks facing captives. *See Fina Supply, Inc*., 726 S.W.2d at 540. Thus, no actionable "misrepresentation" occurred. *Nat'l Prop. Holdings*, 453 S.W.3d at 424-25. While SCP claim that the Feldman Parties touted their "flawless track record in dealings with the IRS," the robust disclosures in Exhibit C to the 2015 Engagement Letter point out adverse results suffered by Capstone-administered captives. *See* SCP's Post-Hearing Brief at 54. "Thus, as Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Nat'l Prop. Holdings*, 453 S.W.3d at 424.

It is also beside the point that SCP contend Mr. Feldman possessed superior expertise in dealing with captive insurance and any tax consequences that may arise. Texas law distinguishes between superior *expertise* and superior *knowledge* when it comes to deciding whether a duty exists to disclose a mere opinion or a prediction about future events. *See McCollum v. P/S Invs., Ltd.*, 764 S.W.2d 252, 255 (Tex. Civ. App. – Dallas 1988, writ denied). An opinion remains an opinion instead of an actionable misrepresentation where no superior knowledge exists. *Paull v. Capital Resource Mgmt., Inc.*, 987 S.W.2d 214, 219-20 (Tex. App. – Austin 1999, pet. denied); *McCollum*, 764 S.W.2d at 255.

Neither SCP nor the Feldman Parties could have predicted in 2015 (1) how the U.S. Tax Court would have decided the *Reserve Mechanical* case in June 2018 using a *bona fide* insurance company / sham transaction analysis of the captive manager PoolRe that first appeared in the *Avrahami* case in 2017; (2) how the U.S. Tax Court would have decided the *Avrahami* case that came out in 2017; (3) how aggressively the IRS would pursue captive insurance arrangements after issuing Notice 2016-66 making captives a reportable transaction; (4) how aggressively the IRS would pursue captive insurance arrangements after *Avrahami* came out; or (5) how any future enforcement action by the IRS would conclude. In short, the Feldman Parties possessed no *superior knowledge* over SCP about predicting what future enforcement actions the IRS would take or whether the IRS would prevail in those enforcement actions. *See Paull*, 987 S.W.2d at 219-20; *McCollum, Ltd*., 764 S.W.2d at 255. Because neither could see what the future would bring, SCP and the Feldman Parties had equal knowledge instead of gaining any kind of an advantage over the other.

The Arbitrator [should reject] SCP's attempt to turn the disclosures made by the Feldman and Capstone Parties *in 2015* into a guarantee that the SCP Captive Insurers and Insureds will face no tax risks, IRS audit, or other IRS enforcement action *in the future*. The 2015 Engagement Letter signed by SCP explicitly disclaimed and excluded any such warranty or guarantee. EX J-20 at 10, 13, 25. Any such predictive statement, expectation, belief, opinion, educated guesses, or estimated outcomes all fail as actionable misrepresentations. *See Paull*, 987 S.W.2d at 218-20.

The Arbitrator [should adhere] to this legal principle in rejecting SCP's misrepresentation claims, which include any failure to disclose. Thus, "assurances" made by a bank officer with "very strong confidence" that a loan would close within a certain timeframe for a set sum stated nothing more than a prediction or opinion. *Absolute Resource Corp. v. Hurst Tr. (In re Absolute*

*Resource Corp.)*, 76 F. Supp. 2d 723, 729-32 (N.D. Tex. 1999). Even a guarantee that investing in a company's water-flood project presented a "very low risk" and would fit the investor's needs amount to mereopinions and not actionable misrepresentations. *Paull*, 987 S.W.2d at 219-20.

> **5. The 2015 Engagement Letter confirms that the Feldman and Capstone Parties merely expressed opinion about seeking to achieve favorable tax treatment for SCP**

The 2015 Engagement Letter disclaims and excludes any guarantees or warranties of a successful outcome while establishing that the Feldman and Capstone Parties would use their "best judgment" in providing services to SCP:

> As with any type of legal representation, advanced financial structuring or sophisticated business planning, no one can provide guaranties regarding the outcome of any matter. We do commit, however, to use reasonable care and put forth a diligent effort on your behalf.

> You understand and acknowledge that although we will endeavor to provide you with recommendations and alternatives based on our best judgment, there can be no guarantee of successful consummation of any transaction, that each decision must be your own, and that the ultimate responsibility of each decision must necessarily be yours.

> Accordingly, you may incur substantial fees and other expenses in connection with matters we will handle on your behalf, even though you may not achieve your desired result alternatives based on our best judgment, there can be no guarantee of successful consummation of any transaction, that each decision must be your own, and that the ultimate responsibility of each decision must necessarily be yours.

EX J-20 at 13.

Just as the Strauss Law Firm made clear that it was only expressing "matters of attorney opinion only," the 2015 Engagement Letter stated that the Feldman and Capstone Parties "will endeavor to provide you with recommendations and alternatives based on our best judgment." *Compare* EX J-20 at 13 *with* EX FC-9 at 4. "To be actionable fraud the misrepresentation complained of must concern a material fact as distinguished from a mere matter of opinion, judgment, probability, or expectation." *Jeffcoat*, 534 S.W.2d at 171.

The Arbitrator therefore [should conclude] that SCP base their allegations of misrepresentation on mere statements of opinion, advice, or judgment that Texas law rejects as actionable.

### 6. The Feldman Parties discharged their fiduciary duty to disclose material information to SCP before SCP signed the 2015 Engagement Letter

The Feldman and Capstone Parties provided extensive disclosures to the Doctors and their team of expert advisers warning about tax risks facing captive insurers. These disclosures appeared in the 2015 Engagement Letter, particularly in Exhibits C and E to that contract, in published scholarly articles, in news accounts, and in substantive emails. In this arm's-length transaction as found by Judge Dorfman, the Feldman Parties lacked any basis for thinking that the Doctors and their expert advisers would profess ignorance about those tax risks and IRS enforcement actions. *See Bradford*, 48 S.W.3d at 756. The record evidence establishes that the Doctors and their team admitted that nothing prevented them from asking questions or investigating matters further. *See id.*; TR Vol. 20 at 7939, 7962, 7965-66.

Exhibit C to the 2015 Engagement Letter, which addresses all the tax risks and IRS enforcement actions up to July 2015, expressly invited the Doctors and their advisers to ask any questions that came to mind. EX J-20 at 36. The Doctors and their advisers could have obtained any additional information about the captive insurance arrangement and the PoolRe risk pool they thought they needed. *See Bradford*, 48 S.W.3d at 756. The corporate minutes for the Captive Insurers made clear that this opportunity existed on a yearly basis – an opportunity they passed up.

> Officers of Corporation have had the opportunity to review information regarding Corporation's participation in the risk pooling arrangement facilitated by PoolRe and information regarding other participants in the risk pool. Information regarding participants' industries, locations, operations, types of risks insured and exposures to risk are available for review at the offices of Capstone.

EX 373.4 at 4. Passing up this opportunity, SCP nevertheless voluntarily chose to participate

in the 2018 and 2019 PoolRe risk pools about which they now complain. These corporate minutes are binding on SCP and preclude them from taking a position that differs from the indifference they demonstrated before this dispute began.

According to the *Bradford* case, the Feldman and Capstone Parties could reasonably expect the Doctors and their tax professional advisers to inquire into and obtain all necessary information. *See Bradford*, 48 S.W.3d at 756. Thus, the Feldman and Capstone Parties owed SCP no duty to disclose. *See id.* Nor have SCP proved the essential element of justifiable reliance. "In an arm's-length transaction, the party alleging fraud must have exercised ordinary care to protect its own interests and cannot blindly rely on the defendant's reputation, representations, or conduct where the plaintiff's knowledge, experience, and background warrant investigation. And when a party fails to exercise such diligence, it is charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." *Mercedes-Benz USA*, 583 S.W.3d at 563.

In his final arbitration award, Judge Dorfman concluded that an arm's-length transaction occurred because "[t]he Parties to this proceeding are sophisticated and intelligent individuals and were represented by counsel (and certified public accountants) of their choosing both in negotiating the terms of the engagements between them over many months, and throughout the course of the relationship through to the present day. The Doctors came to the Capstone Parties seeking, and found, an essentially off-the-shelf 'turnkey' (as the contract documents refer to it) operation to set up and operate the Captives as onshore/domestic captive insurance companies." EX J-115 ¶ 29. Judge Dollinger confirmed Judge Dorfman's award, including this conclusion, with SCP's agreement. EX J-115.

Judge Dorfman's determination that equal bargaining power existed, as confirmed by the

record evidence in these proceedings, defeats SCP's misrepresentation allegations. *See* EX J-115 ¶ 13. "[W]here the parties are in an equal bargaining position with equal access to legal advice, there is no room for application of the doctrine that misrepresentations of points of law will be considered misrepresentations of fact if they were so intended and understood." *Fina Supply*, 728 S.W.2d at 540; *see also JP Morgan Chase Bank, N.A. v. Orca Assets G.P. LLC*, 546 S.W.3d 648, 658-60 (Tex. 2018). Because the Doctors used an army of experts in dealing with FCP, including a tax attorney and CPAs, SCP cannot justifiably rely on any misrepresentations allegedly made by FCP. *Orca Assets*, 546 S.W.3d at 658-60; *Marcus v. Kinabrew*, 438 S.W.2d 431, 432-33 (Tex. Civ. App. – Tyler 1969, no writ).

Further, despite the existence of a fiduciary relationship, any misrepresentation about the law or its effect does not become actionable when "the parties are in an equal bargaining position with equal access to legal advice. This is because under such circumstances each party has an opportunity to make their own investigation and determination of the legal effect of their actions." *Cheung-Loon, LLC v. Cergon, Inc*., 392 S.W.3d 738, 746 (Tex. App. – Dallas 2012, no pet.). Because SCP used an army of experts in dealing with FCP, including a tax attorney and CPAs, SCP cannot justifiably rely on any misrepresentations allegedly made by FCP. *Orca Assets*, 546 S.W.3d at 658-60; *Marcus v. Kinabrew*, 438 S.W.2d 431, 432-33 (Tex. Civ. App. – Tyler 1969, no writ). SCP's claims are viewed with this backdrop.

In any event, the anti-fracturing rule precludes any actionable representation. "Professional negligence, or the failure to exercise ordinary care, includes giving a client bad legal advice or otherwise improperly representing the client." *NexBank*, SSB, 2020 WL 1921683, at *5. In complaining that the Feldman Parties misrepresented the state of the law by providing faulty legal advice, SCP have stated a claim that sounds only in legal malpractice or professional negligence.

*Id*. This complaint violates the anti-fracturing rule, thereby defeating SCP's claims that depend on the essential element of an affirmative misrepresentation – fraud, negligent misrepresentation, and DTPA violations.

### 7.  SCP cannot recover on their negligent misrepresentation claim

#### a.  Misrepresentations regarding future conduct are not actionable

Under Texas law, "[t]he term 'false information,' as used in the elements of a negligent-misrepresentation claim, means a misstatement of existing fact, not a promise of future conduct." *Lindsey Constr., Inc. v. AutoNation Fin. Services, LLC*, 541 S.W.3d 355, 366 (Tex. App. – Houston [14th Dist.] 2017, no pet.). SCP base their negligent misrepresentation claim not on an existing fact, but on supposed representations about a contingent future event (obtaining favorable tax treatment). **The Arbitrator [should thus conclude] that this claim fails as a matter of law and RULE that SCP TAKE NOTHING.** *Id.*

#### b.  The benefit-of-the-bargain damages sought by SCP foreclose their claim for negligent misrepresentation

Similar to the facts in *D.S.A., Inc. v. Hillsboro Independent School District*, SCP's damages model does not "attempt any distinction between its out-of-pocket damages and the benefit of the bargain. *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998). SCP seeks to recover the benefit of the bargain they allegedly made under the 2015 Engagement Letter – a measure of damages Texas law disallows for negligent misrepresentation. *See id.* at 663-64. Because the tort of negligent misrepresentation "implicates only the duty of *care* in supplying commercial information," an injury separate and independent from a contractual one must exist. *Id.* Otherwise, "[r]epudiating the independent injury requirement for negligent misrepresentation claims would potentially convert every contract interpretation dispute into a negligent

misrepresentation claim." *Id.* at 664. **Because SCP measure their damages with a benefit-of-the bargain model, the Arbitrator [should RULE] that they TAKE NOTHING on their claim for negligent misrepresentation.** *See id.* **at 663-64.**

### B.    SCP Cannot Recover Under the DTPA or Texas Insurance Code

### i.    The Parties' Contentions

In post-hearing briefing, SCP contend that "FCP violated the provisions of the Texas Deceptive Trade Practices Act [the "DTPA"], as well as corresponding provisions of the Texas Insurance Code." Doctors' Post-Hearing Brief at 82. As explained herein, these allegations are intertwined.

The DTPA prohibits the use of false, misleading, or deceptive actions in commerce. Only a "consumer," as defined within the DTPA, may maintain a private action under the DTPA—a fact acknowledged by SCP. Doctors' Post-Hearing Brief at 87. Dr. Sullivan and Dr. DellaCroce do not qualify as consumers because of their considerable net worth—another fact conceded by SCP. *Id.* SCP, however, contend that the SCP captives—Janus, Cerberus, and Orion—and class members qualify as consumers because FCP did not introduce evidence showing that each of them had a net worth or asset valuation that exceeded the maximum threshold to qualify as a DTPA consumer. *Id.* (arguing that "Janus, Cerberus, and Orion, and Class Members each qualify as 'consumers' for DTPA purposes").

On behalf of the SCP captives and, apparently, class members, SCP allege that FCP committed prohibited actions under two subdivisions in the DTPA:

a. Section 17.46(b)(24), which prohibits "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed"; and

b.   Section 17.50(a)(3), which prohibits "any unconscionable action or course of action by any person."

Doctors' Post-Hearing Brief at 83.

As a trigger for § 17.46(b)(24), SCP rely on their professional malpractice contentions that the Feldman and Capstone Parties failed to make material disclosures regarding IRS activity vis-à-vis the Feldman and Capstone Parties' various captive activities as well as their purported lack of knowledge that the Feldman and Capstone Parties had insurance policies in the pool.[519] Doctors' Post-Hearing Brief at 84. SCP argue in conclusory fashion that had the Feldman and Capstone Parties disclosed all material information, the Doctors would have never executed the 2015 Engagement Letter and cite to testimony from the individual Doctors as support for this contention. *Id*. at 84-85. In the cited testimony, the Doctors do not distinguish whether they were testifying in their individual capacities as signatories to the 2015 Engagement Letter or whether they were testifying only on behalf of their respective captives or as class representatives.

As a trigger for § 17.50(a)(3), SCP contend that the Feldman and Capstone Parties implemented an unconscionable act or course of action by "deceiving their clients into reinsuring Feldman's and Capstone's malpractice liability and legal expenses." Doctors' Post-Hearing Brief at 85. As support, SCP cite to testimony from Dr. DellaCroce who testified that he felt that the way A.M.Y. (the captive insurer of the Feldman and Capstone Parties) was involved in the PoolRe reinsurance pools was a "very creative but very dark way to do business with people." *Id*. at 86. Dr. DellaCroce testified in his individual capacity; he did not cabin this or any other testimony to be on behalf of his captives or the purported class members.

Even though SCP's brief characterizes both the § 17.46(b)(24) and § 17.50(a)(3)

---

[519] The specific allegations of what was not purportedly disclosed to SCP are addressed in Sections VII(C) and (D).

allegations as being on behalf of class members, SCP identify no class wide evidence nor any evidence specific to members of the class other than the individual Doctors. Specifically, regarding the § 17.46(b)(24) allegation, SCP cite no evidence or testimony that members of the class could and should have, but did not, receive certain disclosures from the Feldman and Capstone Parties. Nor do SCP identify any evidence or testimony that class members would not have executed their respective engagement letters had they received certain disclosures. In other words, SCP identify no proof for a class claim. Similarly, for the § 17.50(a)(3) allegation, SCP cite no evidence or testimony that class members were deceived or lacked knowledge about the Feldman and Capstone Parties' participation in the PoolRe reinsurance pools. Again, SCP identify no proof for a class claim. SCP do not allege that any of FCP violated a specific provision of the Insurance Code. Instead, SCP argue that a "tie-in" provision within the Insurance Code makes *certain* violations of the DTPA, including one (but not both) aforementioned alleged violations, also actionable under the Insurance Code. *See id.* at 87-88 (citing TEX. INS. CODE § 541.151). SCP appear to rely on the Insurance Code tie-in provision to allow Dr. Sullivan and Dr. DellaCroce to recover under the DTPA. Doctors' Post-Hearing Brief at 87 ("Dr. DellaCroce and Dr. Sullivan may still personally recover for FCP's violations of the DTPA as 'persons' under the Texas Insurance Code, rendering Dr. DellaCroce's and Dr. Sullivan's consumer status irrelevant.").

Section 541.151 of the Insurance Code provides that "a person who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice: . . . (2) specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment." TEX. INS. CODE § 541.151 (cited in Doctors' Post-Hearing Brief at 88). According to SCP, § 541.151's use of the word

"person" indicates the Dr. Sullivan and Dr. DellaCroce may bring an action regardless of the DTPA's restrictive definition of consumer because the Insurance Code defines "person" to be "any individual, corporation, association, partnership, reciprocal or interinsurance exchange, Lloyds' plan, fraternal benefit society, or other legal entity *engaged in the business of insurance*, including an agent, broker, or adjuster." TEX. INS. CODE § 541.002(2) (emphasis added). SCP specifically cite *Centaurus Unity v. Lexington Insurance Company*, a federal case interpreting Texas law, for the proposition that the Insurance Code "permits an insured to bring a cause of action" under the Insurance Code for deceptive trade practices defined in § 17.46(b) of the DTPA. 766 F.Supp.2d 780, 787 (S.D. Tex. 2011) (cited in Doctors' Post-Hearing Brief at 88). Hence, SCP contend that Dr. Sullivan, Dr. DellaCroce, the other SCP entities, and class members may recover damages stemming from FCP's alleged violation of §17.46(b)(24) of the DTPA notwithstanding the claimants' lack of consumer status. Doctors' Post-Hearing Brief at 87-88.

For damages, SCP request over $135 million under the DTPA and the Texas Insurance Code's DTPA tie-in. SCP contend that "Feldman/ Capstone/ PoolRe are liable to the Doctors' captives and entities and Class Members for violating the [DTPA]" and request $5,019,441 in "tax-related losses, penalties, and interest to the three [SCP] captives" as outlined in Mr. Legier's damages model. Doctors' Post-Hearing Brief at 124-25. SCP request far more under the Insurance Code. Due to their position that no consumer status limitation exists under the Insurance Code, SCP requests "the full measure of [SCP's] damages" trebled, for a total of $130,155,264.75. Doctors' Post-Hearing Brief at 125. Notably, because the Insurance Code tie-in does not tie-in SCP's § 17.50(a)(3) claim, it appears that SCP admit they have no damages related to the Feldman and Capstone Parties' participation in the PoolRe reinsurance pools since SCP are contending that the entirety of their damages is recoverable under § 17.46(b)(24).

FCP contend that the DTPA and Insurance Code claim fails for various threshold reasons, including lack of consumer status, the monetary value of the transaction, and lack of pleadings to support such a claim.

As explained more fully below, the Arbitrator [should agree] with FCP.

### ii. Analysis of SCP's individual DTPA and Insurance Code claim.

SCP's DTPA and Insurance Code claim and request for damages fails for at least **ten** independent reasons.

1. First, the claim fails because SCP did not prove the underlying alleged deceptive practices.

2. Second, the claim fails because none of SCP may maintain a DTPA action because none qualify as a consumer.

3. Third, the claim fails because the transaction(s) at issue involve more than $100,000 and SCP were advised by independent legal counsel.

4. Fourth, the claim fails because transaction(s) at issue involve more than $500,000.

5. Fifth, SCP's attempt to shoehorn the DTPA claim under the Insurance Code fails because SCP never pled an Insurance Code claim.

6. Sixth, SCP's Insurance Code tie-in argument fails because the specific DTPA violation (§17.46(b)(24)) still turns on the DTPA's definition of "consumer."

7. Seventh, SCP's Insurance Code argument fails because their allegations do not arise within the "business of insurance," and specifically within the context of an insurance policy, as required by the Insurance Code.

8. Eighth, SCP's Insurance Code argument fails because the tie-in provision identified by SCP does not apply to captive insurance.

9. Ninth, SCP's DTPA and Insurance Code claim fails because SCP have not proven actual damages nor offered any model of mental anguish damages.

10. Tenth, SCP's DTPA claim fails because they did not prove FCP committed an unconscionable act while taking advantage of the lack of knowledge, ability, experience, or capacity of SCP to a grossly unfair degree.

Any of these reasons requires the denial of SCP's DTPA and unpled Insurance Code claim.

### 1.    SCP cannot recover under the DTPA or Insurance Code because SCP did not prove the underlying alleged deceptive practices.

SCP contend that the Feldman and Capstone Parties violated the DTPA (a) by failing to make material disclosures regarding the Feldman and Capstone Parties' knowledge of IRS inquiries at the time of the 2015 Engagement Letter, and (b) by engaging in an "unconscionable" effort to deceive SCP into reinsuring the Feldman and Capstone Parties' professional liabilities via the PoolRe reinsurance pools. SCP contend that the non-disclosure allegation is also actionable under the Insurance Code via its limited DTPA tie-in provision. SCP request that all FCP be held liable for these allegations. Rather than marshal proof in their DTPA/Insurance Code section of their post-hearing brief, SCP simply make conclusory statements and allude to their arguments and proof for their other claims as probative of their DTPA/Insurance Code claim. Accordingly, if SCP's proof and argument on their other claims fail, so must their DTPA/Insurance Code claim fail as well.

SCP cannot recover on any of these allegations because SCP failed to prove any of the deceptive conduct or acts complained about. As explained in § VII(C) & (D), *infra*, the Feldman and Capstone Parties did not fail to make material disclosures. As explained in § VII(C) & (D), *infra*, the Feldman and Capstone Parties did not improperly deceive SCP into reinsuring the

Feldman and Capstone Parties' captive insurer.

Moreover, to the extent that any of SCP's allegations sound in legal malpractice or professional negligence, those allegations cannot be turned into a DTPA claim as a matter of law. *See Border Demolition & Envt'l, Inc. v. Pineda*, 535 S.W.3d 140, 159 (Tex. App.—El Paso 2017, no pet.) (" When a client truly has only one claim for relief sounding in legal malpractice, however, he is prohibited from dividing or fracturing that claim into other related claims."). SCP's underlying allegations do, in fact, sound in legal malpractice. This is because under Texas' anti-fracturing rule, SCP's allegations that there was a failure to disclose a conflict of interest "challenge the degree of care, skill, or diligence in performing [the] duty to inform [clients] about issues that could arise during the representation of multiple clients and [the lawyers'] duty to communicate with and among the clients [they] represented." *Fitts v. Richards-Smith*, No. 06-15-00017-CV, 2016 WL 626220, at *11 (Tex. App.—Texarkana Feb. 17, 2016, pet. denied) (mem. op.); *see also Murphy v. Gruber*, 241 S.W.3d 689, 696 (Tex. App.—Dallas 2007, pet. denied). Accordingly, those allegations must sound only in negligence and professional malpractice and not under the DTPA. *Id*.

For all these reasons, **SCP's claim and request for damages under the DTPA and/or the Texas Insurance Code [should be] DENIED**.

> **2.    None of SCP may maintain an action under the DTPA because they do not qualify as a consumer.**

"A plaintiff must be a 'consumer' to maintain a private action under the DTPA." *Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672, 674 (Tex. 1990); TEX. BUS. & COM. CODE § 17.50(a). Under the DTPA, a "consumer" is "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million

or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more." TEX. BUS. & COM. CODE § 17.45(4). The DTPA defines "business consumer" as "an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use." TEX. BUS. & COM. CODE § 17.45(10). "Thus, business consumers, whether individuals or businesses, with assets of $25,000,000 or more are excluded from DTPA coverage." *Eckman*, 784 S.W.2d at 674.

Neither Dr. Sullivan nor Dr. DellaCroce qualify as a consumer under DTPA because of their net worth. Dr. Sullivan's net worth exceeds $80 million. TR Vol. 3 at 1268-69. Dr. DellaCroce's net worth exceeds $180 million. TR Vol. 5 at 2153. Neither can therefore maintain an action under the DTPA. SCP do not contest this conclusion. *See* Doctors' Post-Hearing Brief at 87.

The SCP entities and SCP captives likewise do not qualify as consumers under the DTPA and thus cannot maintain private actions under the DTPA. The DTPA also excludes from its definition of consumer any entity "that is owned or controlled by a corporation or entity with assets of $25 million or more." TEX. BUS. & COM. CODE § 17.45(4). The SCP captives and SCP entities are unambiguously owned and controlled by Drs. Sullivan and DellaCroce, both of whom have assets of $25 million or more. Though ownership and control are not contested, one needs not look at anything other than the various SCP tax returns to see that the individual Doctors have complete control and ownership. *See, e.g.*, EXs J-141 through J-173. SCP's attempt to semantically separate the individual Doctors from the other SCP entities is thus an effort without import. At bottom, the individual Doctors own and control everything.

This Arbitrator hereby finds that none of SCP qualify as consumers for the purposes of the DTPA. Because the DTPA requires a private claimant to be a "consumer" to maintain a private

action, Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 17.50(a), **this Arbitrator [should deny] SCP's claim and requestfor relief under the DTPA.**

> ### 3.  SCP cannot maintain a DTPA claim because the transaction(s) at issue exceed $100,000 and SCP were advised by independent legal counsel.

The DTPA contains several exemptions. Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 17.49 (listing exemptions). One of those exemptions provides that:

> Nothing in the [DTPA] shall apply to a claim arising out of a written contract if:
>
> > (1) the contract relates to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000;
>
> > (2) in negotiating the contract, the consumer is represented by legal counsel who is not directly or indirectly identified, suggested, or selected by the defendant or an agent of the defendant; and
>
> > (3) the contract does not involve the consumer's residence.

Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 17.49(f).

These three elements of this exemption are satisfied as a matter of law here. Number one, the contract(s) upon which SCP could possibly base their claim relate to a project or series of transactions related to the same project, and the total consideration exceeds $100,000.  *See e.g.,* EX J-20 at 9. Number two, SCP were represented by legal counsel in negotiating the contract—a fact already found by Judge Dorfman in the prior arbitration between the parties and binding here. *See* EX J-115 at 9-10 ("The Parties to this proceeding are sophisticated and intelligent individuals **and were represented by counsel (and certified public accountants) of their choosing both in negotiating the terms of the engagements between them** over many months, and throughout the

course of the relationship **through to the present day**.") And number three, the 2015 Engagement Letter does not involve either of the residences of Dr. DellaCroce or Dr. Sullivan. *See* EX J-20. Because the statutory exemption found in TEX. BUS. & COM. CODE § 17.49(f) is satisfied here, **this Arbitrator [should deny] SCP's claim and request for relief under the DTPA.**

### 4.    SCP cannot maintain a DTPA claim because the transaction(s) at issue exceed $500,000.

Even if TEX. BUS. & COM. CODE § 17.49(f) did not apply (which it does), yet another DTPA exemption is applicable here and bars SCP's DTPA claim. TEX. BUS. & COM. CODE § 17.49(g) provides that "[n]othing in this subchapter shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence." Here, SCP paid Capstone more than $500,000 pursuant to the terms of the 2015 Engagement Letter. EX J-20 at 9. Dr. Sullivan confirmed this fact during his testimony:

```
14        Q.     And do you seek a clawback of
15   management fees?
16        A.     Yes, sir.
17        Q.     And how much is that?
18        A.     Management fees are
19   approximately 1.25 million paid by DellaCroce
20   and myself to Capstone/Feldman.
```

TR Vol. 1 at 350.

Accordingly, by the plain language of the statute, and according to the uncontroverted evidence, TEX. BUS. & COM. CODE § 17.49(g) exempts SCP's claims from the DTPA under Texas

law. **Therefore, this Arbitrator [should deny] SCP's claim and request for relief under the DTPA.**

> **5.    SCP cannot maintain an Insurance Code claim because they never pled an Insurance Code claim.**

Texas law is clear that "a party cannot be granted relief in the absence of pleadings to support that relief." *Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983). Simply put, "a party may not obtain a judgment based on a theory not pled." *Vincent v. Bank of Am., N.A*., 109 S.W.3d 856, 863 (Tex. App.—Dallas 2003, pet. denied). The AAA Commercial Rules mirror Texas law on this point. *See, e.g*., AAA Rules R-4, R-6, and R-32. The requirement that a party be bound by its pleadings protects due process rights, which exist equally in court and arbitration. *Saks v. Rogers,* 2017 WL 3159712, at *9 (Tex. App.—San Antonio July 26, 2017, pet. denied).

Counsel for FCP repeatedly throughout the final hearing objected to any trial by consent. All arbitrators, including this Arbitrator, made clear that FCP had preserved their objection on this point and that no trial of any issue, allegation, or claim would be tried by consent. *See, e.g*., TR Vol. 24 at 9618-20. All parties are bound by their pleadings. *See* TR Vol. 3 at 1128-30.

Based on these fundamental considerations of due process and fairness, this Arbitrator [should deny] **any claim and relief which arises under the Texas Insurance Code** because SCP never pled a claim under the Insurance Code in this arbitration (or any other as far as this Arbitrator is aware). The absence of any pleading is fatal to SCP's Insurance Code claim. This Arbitrator shall not countenance SCP's attempt to cure their defective DTPA claim with an unpled Insurance Claim (albeit one that is separately defective on its own).

> **6.    The Insurance Code tie-in provision does not vitiate the DTPA's consumer requirement as relevant here.**

SCP's attempt to assert their DTPA claim through the "tie-in" provision of the Texas

Insurance Code likewise fails. As a threshold matter, "a plaintiff must establish consumer status to bring a claim under section 17.50(h) of the DTPA, which addresses tie-in statutes." *Hunt v. City of Diboll*, 574 S.W.3d 406, 431 (Tex. App.—Tyler 2017, pet. denied); TEX. BUS. & COM. CODE Ann. § 17.50(h); *see also Cushman v. GC Servs*., L.P., 397 Fed. Appx. 24, 27-28 (5th Cir. 2010) (not published); *Deubler v. Bank of New York Mellon*, 2015 WL 3750312, at *6 (Tex. App.— Amarillo June 15, 2015, pet. denied) (mem. op.); *Dodeka, L.L.C. v. Garcia*, 2011 WL 4825893, at *2 (Tex. App.—San Antonio Oct. 12, 2011, no pet.) (mem. op.); *Hansberger v. EMC Mortg. Corp*., 2009 WL 2264996, at *2 (Tex. App.—San Antonio July 29, 2009, pet. denied) (mem. op.). Nothing about Insurance Code § 541.151 overrides the specific language within the DTPA restricting that statute's applicability to DTPA "consumers."

Further, the alleged DTPA tie-in violation expressly requires "consumer" status. Here, SCP contend that DTPA § 17.46(b)(24) is actionable under the Insurance Code's tie-in provision. Section 17.46(b)(24) provides that the following is a deceptive act or practice: "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the **consumer** into a transaction into which the **consumer** would not have entered had the information been disclosed." TEX. BUS. & COM. CODE § 17.46(b)(24) (emphases added). Nothing in Insurance Code § 541.151 eliminates "consumer" from DTPA § 17.46(b)(24). In fact, if "the terms of a subsection of DTPA section 17.46(b) require consumer status, then consumer status is required to bring an action under [predecessor to TEX. INS. CODE § 541.151] for its violation." *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 386 (Tex. 2000). Because none of SCP qualify as a consumer, none of SCP may maintain an Insurance Code claim via its DTPA tie-in provision.

SCP's other DTPA allegation, that under § 17.50(a)(3), is not subject to the Insurance

Code's tie-in provision. *See* TEX. INS. CODE § 541.151 (providing that only § 17.46(b) violations are subject to the tie-in provision). Accordingly, SCP cannot maintain their § 17.50(a)(3) allegation under the Insurance Code.

For the reasons stated above, none of SCP are not a consumer within the meaning of the DTPA, and therefore **this Arbitrator [should deny] SCP's claim and request for relief under the Texas Insurance Code and the tie-in provision of the DTPA**.

7.    **SCP cannot maintain an Insurance Code claim because their allegations arise outside the context of an insurance policy, and thus do not implicate the Insurance Code.**

By SCP's own argument, the Insurance Code "permits an ***insured*** to bring a cause of action" under the Insurance Code for deceptive trade practices defined in § 17.46(b) of the DTPA. *Centaurus Unity*, 766 F. Supp.2d at 787 (cited in Doctors' Post-Hearing Brief at 88) (emphasis added). SCP thus must show that they are an insured. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479. 490-494 (Tex. 2018) (insurance policy must exist to trigger application of Insurance Code). Here, SCP did not and cannot show that there exists any insurance policy between the Feldman and Capstone Parties, on one hand, and any of SCP, on the other hand. Neither the Feldman nor Capstone Parties are insurance companies, and therefore cannot be issuers of insurance policies to any of SCP. Accordingly, SCP is thus not an insured vis-à-vis the Feldman and Capstone Parties and cannot maintain an action under the Insurance Code against them.

Nor do SCP's allegations even arise within the context of an insurance policy; SCP's claim is that the Feldman and Capstone Parties failed to make certain disclosures in negotiating a services contract (the 2015 Engagement Letter), not an insurance policy. SCP's lawyer Mr. Sherman admitted that, when he reviewed the 2015 Engagement Letter for the Doctors, he understood that the 2015 Engagement Letter is not: (1) an insurance or reinsurance contract of any kind; (2) a

contract between PoolRe and Cerberus, Janus, and Orion; and (3) a stop-loss or quota-share contract between PoolRe and Cerberus, Janus, or Orion. TR Vol. 20 at 7940-43. Accordingly, **the Arbitrator [should deny] SCP's attempt to bring an unpled claim under the Insurance Code**.

This Arbitrator's ruling [should be] the same to the extent PoolRe is a defendant to the DTPA and Insurance Code claim. (PoolRe is not a defendant to the extent the claim is before Judge Baker or Arbitrator Kutcher. And if PoolRe is a DTPA defendant, as suggested by SCP's post-hearing brief, then the DTPA and Insurance Code claim cannot be before either Judge Baker or Arbitrator Kutcher.) SCP are an insured only on policies issued by the SCP captives. SCP cannot—and has not—shown any relationship as an "insured" via-a-vis any of Feldman or the Capstone Parties. Though the Doctors' captives participate in PoolRe's reinsurance pool by way of the 2018 and 2019 Quota Share Reinsurance Policies, PoolRe is the reinsured (not the reinsurer) and Cerberus, Janus and Orion are the reinsurers. That is, the Doctors' captives contractually agreed to reinsure PoolRe under the terms of the 2018 and 2019 Quota Share Reinsurance Policies, making the Doctors' captives liable to PoolRe. SCP's argument is simply backwards.

Additionally, the Quota Share and Stop Loss agreements make clear that PoolRe is acting as an administrator. EX FC-370.12 at 5, § 5(E). Moreover, even if the Arbitrator were to determine that SCP's participation in PoolRe's reinsurance pool involves an insurance policy sufficient to trigger the Insurance Code (which it does not), PoolRe—as a captive insurance company—is not subject to the Insurance Code's private action provision (§ 541.151) as a matter of law because the private action and DTPA tie-in provision does not apply to captive insurance companies. TEX. INS. CODE § 964.002 (exempting captive insurance companies from vast majority of Insurance Code, include § 541.151). **Thus, the Arbitrator [should] also DENY SCP's unpled Insurance Code claim against PoolRe**.

**8.    SCP cannot maintain an Insurance Code claim because the "tie-in" provision does not apply to captive insurance.**

As explained above, SCP's allegations do not arise within the context of an insurance policy issued to a Texas insured and thus cannot implicate the Insurance Code or its tie-in provision. If the Arbitrator were to posit for the sake of argument that SCP's allegation arises within the context of insurance, SCP still cannot rely on the Insurance Code's tie-in provision (§ 541.151). This is because most of the Insurance Code, including § 541.151, does not apply to captives and to the extent SCP's DTPA allegations relate to insurance they unambiguously relate to *captive* insurance in Delaware (not Texas).

Chapter 964 of the Insurance Code governs captive insurance in Texas. "Except as otherwise provided by this chapter, this code [i.e., the Insurance Code] does not apply to a captive insurance company except: [listing exceptions that do not include §541.151]." Tex. Ins. Code §964.002. SCP cannot ignore the specific regulatory scheme for captives in Texas. Accordingly, **the Arbitrator [should deny] SCP's DTPA and/or Insurance Code claim for this additional reason.**

**9.    SCP proved no damages and thus proved no right to recovery under the DTPA or Insurance Code.**

Even if SCP had established FCP liability under the DTPA and/or Insurance Code, SCP still did not prove any right of recovery. The DTPA allows recovery of economic damages and damages for mental anguish. Tex. Bus. & Com. Code § 17.50(a). The Insurance Code permits recovery of actual damages on a private cause of action. Tex. Ins. Code §§ 541.151 and 541.152. As to mental anguish damages, SCP submitted no request, argument, or proof. There is thus nothing for this Arbitrator to consider for mental anguish.

As for economic or actual damages, SCP fall well short of their burden of proving them.

As DTPA damages, SCP request a portion of the Legier model of damages. As Insurance Code damages, SCP request the entirety of the Legier model of damages. But as discussed in § VII(K), *infra*, the Legier model of damages is entirely speculative and, thus, defective. It establishes neither economic nor actual damages. At most, the Legier model speculates as what could possibly happen—but as explained in this award, many of the conditions for that future possibility have already been precluded. Therefore, the Legier model cannot serve as the basis of any damages request that requires, as here, the damages to be actual. Accordingly, this Arbitrator [should deny] SCP's request for damages under the DTPA and/or Insurance Code separate and apart from any liability finding.

### 10.    SCP did not prove FCP committed an unconscionable act.

In general, the DTPA provides a remedy for consumers who have been damaged by the deceptive and/or unconscionable actions at the hands of defendant who provided the plaintiff with goods or services. *See Lon Smith & Associates, Inc. v. Key*, 527 S.W.3d 604, 623 (Tex. App.— Fort Worth 2017, pet. denied) (citing TEX. BUS. & COM. CODE ANN. § 17.50(a)(3)). In order to sustain a claim under the DTPA, the plaintiff must first establish that he or she was a consumer under the statutory definition of that term. *Canfield v. Bank One, Texas, N.A.*, 51 S.W.3d 828, 838 (Tex. App.—Texarkana 2001, pet. denied) (citing *Kennedy v. Sale*, 689 S.W.2d 890, 892–93 (Tex. 1985). The Act defines a "consumer" as, among others, an individual "who seeks or acquires by purchase or lease, any goods or services[.]" See TEX. BUS. & COM. CODE ANN. § 17.45(4).

As explained above, SCP are not and cannot be consumers for DTPA purposes. Even if they were, which they are not, SCP must also establish that FCP committed, among other things, a "false, misleading, or deceptive act or practice," which was relied on by SCP to the consumer's detriment, or that FCP committed an "unconscionable action or course of action[.]" *Id*. §

17.50(a)(1) and (3). The Act defines an "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id*. § 17.45(5); *see also Yates Bros. Motor Co., Inc. v. Watson*, 548 S.W.3d 662, 671 (Tex. App.—Texarkana 2018, no pet.) (citing *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001) (quoting *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998))). To prove an unconscionable action or course of action, SCP must show that the Feldman and Capstone Parties took advantage of SCP's lack of knowledge and that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated. *See Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex.2001); *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 745 (Tex. App.-Fort Worth 2005, no pet.).

As noted above, Judge Dorfman found SCP sophisticated and intelligent individuals who were represented by legal counsel in negotiating the December 2015 Engagement Letter. *See* EX J-115 at 9-10 ("The Parties to this proceeding are sophisticated and intelligent individuals ***and were represented by counsel (and certified public accountants) of their choosing both in negotiating the terms of the engagements between them*** over many months, and throughout the course of the relationship ***through to the present day*.") (emphasis added). Because the Doctors were found to be sophisticated and intelligent individuals, a finding that was never challenged by SCP, and because they were represented by an attorney during the negotiations of the December 2015 Engagement Letter, the Arbitrator [should not] objectively see how FCP took advantage of the lack of knowledge, ability, experience, or capacity of the Doctors to a grossly unfair degree. *See Poteet v. Kaiser*, 2-06-397-CV, 2007 WL 4371359, at *13 (Tex. App.—Fort Worth Dec. 13, 2007,pet. denied) (When represented by an attorney, a court cannot see how the party was taken advantage of to a grossly unfair degree) (citing *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731,

745 (Tex. App.—Fort Worth 2005, no pet.). This [proposed] finding is bolstered by the fact Mr. Sherman admitted that he and Mr. Kushner were aware that Feldman's and Capstone's policies were amongthose in the annual risk pools. TR Vol. 20 at 7965-66, 8074-75.

Further, the evidence established that the Feldman and Capstone Parties only acquired insurance policies from A.M.Y—their affiliated captive. In turn A.M.Y., which is not a party to this arbitration, purchased reinsurance *from PoolRe* on a variety of policies and paid *to PoolRe* a stop loss premium of $399,136 in 2019. *See* J-71 at 32. PoolRe then purchased another layer of reinsurance from the pool's participating captives, including paying reinsurance premiums to Cerberus, Janus, and Orion (collectively) of $1,024,309. *Id.* SCP thus received the benefit of its bargaining by entering into the reinsurance transactions with PoolRe because the Doctors' entities, such as St. Charles Surgical Hospital, received an excess layer of insurance coverage from PoolRe in exchange for their premium, while Cerberus, Janus, and Orion undertook a reinsuring obligation in exchange for the premiums PoolRe paid to them. In part as a result of these reinsurance premiums, SCP received additional insurance and the tax benefits associated with them, which the IRS has not determined are invalid or improper. *See e.g.,* EXs J-159 – J-170. This further supports the Arbitrator's conclusions that the Feldman and Capstone Parties committed no unactionable act and that they did not take advantage of SCP's "lack of knowledge, ability, experience, or capacity to a grossly unfair degree." See TEX. BUS. & COM. CODE ANN. § 17.45(5).

**Accordingly, the Arbitrator [should deny] SCP's DTPA and/or Insurance Code claim for this additional reason.**

### iii.      Analysis of SCP's DTPA and Insurance Claim on behalf of the class.

SCP's attempt to maintain a DTPA or Insurance Code claim on behalf of the class fails for at least **six** independent reasons.

1. First, SCP failed to follow DTPA's required procedures for class actions.

2.  Second, because SCP's individual DTPA and Insurance Code claims fail, SCP cannot serve as a class representative for those same claims.

3.  Third, no class claim under either the DTPA or Insurance Code was certified. Nor was any such claim pled.

4.  Fourth, the class claim fails because SCP seek class relief from PoolRe, but the class cannot obtain relief from PoolRe because the class members and PoolRe are parties to contracts that unambiguously prohibit class actions.

5.  Fifth, the DTPA and Insurance Code class claim fail because it involves the PoolRe reinsurance risk pools in which the amounts in the related transactions exceed the DTPA amount threshold of $500,000.

6.  SCP failed to show any competent class-wide proof showing that any of FCP would be liable to class members under the DTPA or Insurance Code.

Any one of these reasons requires the denial of SCP's request for class liability or relief under the DTPA and/or Insurance Code.

### 1.    The class DTPA claim fails because SCP did not follow the DTPA's required class procedures.

Certain procedures must be followed to maintain a class action under the DTPA. *See* TEX. BUS. & COM. CODE § 17.501. For example, putative class representatives must send to the consumer protection division a copy of the required notice under TEX. BUS. & COM. CODE § 17.505(a) simultaneous when the notice is given to the named defendants. *Id*. at § 17.501(a)(1). Putative class representatives must also send to the consumer protection division a copy of the petition or complaint. *Id*. at § 17.501(a)(2). This must be done before any hearing on class certification. *Id*.

SCP failed to adhere to these statutory procedures. No notice was provided to the Feldman

and Capstone Parties as class defendants, and no notice was provided to the consumer protection division. Unlike § 17.505, which provides that a lack of notice defect is essentially waived if the defendant fails to timely raise it, § 17.501 lacks any such waiver provision. *See id*. at § 17.501. Nor can SCP's shunning of procedural requirements be cured at this juncture. SCP's failure to notice DTPA and Insurance Code class claims deprived them of procedural rights under the DTPA class provision. To permit a class action to continue under the DTPA when procedural requirements have been wholly ignored is both inappropriate vis-à-vis controlling Texas law and prejudicial to class defendants. Accordingly, **this Arbitrator [should deny] any class relief under the DTPA**.

> ## 2.    The class DTPA and Insurance Code claim fails because SCP'sindividual claim fails.

SCP's individual claim under the DTPA and/or the Insurance Code fails for multiple reasons, as detailed in § VII(E)(ii), *infra*. Because the claim asserted by SCP as class representatives fails, so too does any related class claim. Therefore, the **Arbitrator [should deny] any class relief under the Texas Insurance Code and under the DTPA.**

> ## 3.    The class DTPA and Insurance Code fails because no such claim was pled or certified.

No class claim under the DTPA or Insurance Code was pled or, notably, certified. Despite the absence of pleadings and certification, SCP argue in post-hearing briefings that there are class claims under the DTPA and Insurance Code pending. *This is incorrect*. None of the class defendants, nor any members of the class, before or after any order regarding certification, have received notices that part of the class claims being asserted are claims under the DTPA or the Texas Insurance Code. The Feldman and Capstone Parties, as class defendants, are entitled to notice of the class claims being asserted against them. To allow DTPA or Insurance Code claims

to proceed on behalf of the class in the wake of no notice deprives the Feldman and Capstone Parties of meaningful due process by depriving them of an adequate opportunity to address potential DTPA and Insurance Code at the certification stage. Accordingly, the **Arbitrator [should deny] any class relief under the Texas Insurance Code and under the DTPA**.

> ### 4. The class DTPA and Insurance Code fails because it involves PoolRe, and all relevant contracts prohibit class treatment.

SCP's allegations under the DTPA and the Texas Insurance Code relate, at least in part, to their involvement in the reinsurance risk pools for 2018 and 2019 which are administered by PoolRe. The 2018 and 2019 pooling agreements (e.g., the Stop Loss and Quota Share) with PoolRe all contain explicit, unambiguous waivers of pursuing a class action, whether in court or arbitration. *See e.g.*, DRS 249 at 9 ("Each party to this agreement expressly waives any rights to pursue disputes between the parties to this agreement in court or in a collective action or class action (regardless of whether that collective action or class action is brought in court or in arbitration)"); FC-370.12 at 12 ("EACH PARTY TO THIS AGREEMENT EXPRESSLY WAIVES ANY RIGHTS TO PURSUE DISPUTES BETWEEN THE PARTIES TO THIS AGREEMENT IN COURT, IN A COLLECTIVE ACTION, OR IN A CLASS ACTION (REGARDLESS OF WHETHER THAT COLLECTIVE ACTION CLASS ACTION IS BROUGHT IN COURT OR IN ARBITRATION)"). The Arbitrator [should] enforce the agreementsas written. Accordingly, because SCP's (purported) class claims under the DTPA and the Texas Insurance Code relate to their involvement in the reinsurance risk pools for 2018 and 2019 administered by PoolRe, and because the pooling agreements contain class-action waivers, this **Arbitrator [should deny] any class relief under the Texas Insurance Code and under the DTPA**.

> ### 5. The class DTPA claim fails because the transaction(s) at

**issue involve more than $500,000.**

As discussed in § VII(E)(ii)(4) above, the claim asserted by SCP under the DTPA involves a transaction over $500,000. Accordingly, the class claims must likewise be denied on this basis. Accordingly, **this Arbitrator [should deny] any class relief under the DTPA.**

> **6.      The class DTPA and Insurance Code claim fails because SCP did not prove the claim using competent, class wide proof.**

SCP failed to prove their (purported) class claims under the DTPA and the Texas Insurance Code because the Feldman and Capstone Parties did not fail to make adequate disclosures to them. *See* §§ VII(C), (D), which are incorporated herein by reference. The questions of disclosure that SCP raised are specific to each class member, thereby precluding any proof common to the class. Just as fatally, SCP provided no evidence regarding the class or class members during the final hearing. *See Blades v. Monsanto Co.*, 400 F.3d 562, 571-72 (8th Cir. 2005) (class representatives must prove injury to each class member *with proof common to the class*). Accordingly, **this Arbitrator [should deny] any class relief under the DTPA and under the Texas Insurance Code.**

> **iii.      Applicable Law**

Congress enacted RICO to "seek eradication of organized crime in the United States" and "to curb the infiltration of legitimate business organizations by racketeers." Pub. L. No. 91-452, 84 Stat. 022 (1970); *see also Beck v. Prupis*, 529 U.S. 494, 496 (2000) ("Congress enacted . . . RICO . . . for the purpose of seek[ing] the eradication of organized crime in the United States.").

A plaintiff "only has standing, and can recover to extent that, he has been injured in his business or property by the conduct constituting a [RICO] violation." *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1996). *Sedima* identifies the elements of standing, which doubles as a damages requirement, as (1) a person (2) who sustained an injury (3) to its business or property

(4) by reason of the alleged violations of 18 U.S.C. § 1962. *Id*. (citing 18 U.S.C. § 1964(c). Thus, a plaintiff—SCP here—must prove both injury and a RICO violation causing that injury. The Fifth Circuit has clarified that a person is considered injured "by reason of" a RICO violation if the violation constitutes both factual (but for) and legal (proximate) causation of the injury. *See Ocean Energy II, Inc. v. Alexander & Alexander, Inc*., 868 F.2d 740, 744 (5th Cir. 1989).

To prove an alleged violation of 18 U.S.C. § 1962, SCP must prove (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998) (citing cases). *Pattern* and *racketeering activity* have specific meanings within the context of a civil RICO lawsuit. *Racketeering activity*, for instance, includes the commission of what the RICO statute defines as "predicate acts." *See In re Mastercard Int'l Inc*., 313 F.3d 257, 261 (5th Cir. 2002). Predicate acts are only those acts listed in 18 U.S.C. § 1961(1). 18 U.S.C. § 1961; *Beck v. Prupis*, 529 U.S. 494, 497 n. 2 (2000) (the statute's list is "exhaustive"); *see also Ennis v. Edwards*, 2003 WL 1560113, at *4 n.16 (E.D. La. Mar. 23, 2003) (only those predicate acts prohibited in § 1961 can serve as predicate offenses for the purpose of a RICO claim). Predicate acts must be the but-for cause of any damages. *Waste Mgmt. of Louisiana, LLC v. River Birch, Inc*., 920 F.3d 958, 965 (5th Cir. 2019).

A *pattern* of racketeering activity "requires two or more predicate acts and a demonstration that the racketeering predicates are related and amount to or pose a threat of *continued* <u>criminal</u> activity." *See In re Mastercard Int'l Inc*., 313 F.3d 257, 261 (5th Cir. 2002) (quoting *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000) (partial emphasis added). The Supreme Court has specified two types of actionable RICO continuity: (1) "open continuity," which is conduct by its nature that projects into the future with a threat of repetition; and (2) "closed continuity," which is past criminal activity that occurred over a "substantial" period of time. *H.J.,*

*Inc. v. Northwestern Bell Tel. Co*., 492 U.S. 229, 241-42 (1989). Because RICO targets long-term criminal activity, an enterprise with a singular objective or a discrete scheme is not sufficient for a RICO claim. *Calcasieu Marine Nat. Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir. 1991); *Manax v. McNamara*, 842 F.2d 808, 811-12 (5th Cir. 1988).

### iv.   Analysis

#### 1.   *Res judicata* precludes SCP obtaining relief on their RICO claim.

The first question this Arbitrator must resolve is whether *res judicata* precludes SCP obtaining relief on their RICO claim. FCP have raised *res judicata* as a legal defense.

Texas employs a transactional approach to *res judicata*. *State & Cnty. Mut. Fire Ins. Co. v. Miller*, 52 S.W.3d 693, 696 (Tex. 2001). The transaction test is whether a claim or dispute "aris[es] out of the transaction or occurrence that is the subject matter of the opposing party's [prior] suit." *Id*. "A determination of what constitutes the subject matter of a suit necessarily requires an examination of the factual basis of the claim or claims in the prior litigation. It requires an analysis of the factual matters that make up the gist of the complaint, without regard to the form of action. Any cause of action which arises out of those same facts should, if practicable, be litigated." *Cooper v. City of Dallas*, 2008 WL 3380554, at *5 (N.D. Tex. Aug. 11, 2008) (citing *Barr v. Resolution Trust Corp*., 837 S.W.2d 627, 631 (Tex. 1992), *aff'd sub. nom. Cooper v. City of Dallas*, 42 F. App'x 891 (5th Cir. 2010).

The analysis here begins (and ends) with SCP's RICO pleadings. As outlined *supra*, SCP repeatedly allege that FCP committed RICO violations "to perpetuate a fraudulent artifice or scheme designed to prevent the Doctors from winding down or liquidating their captives." Gill-Jefferson Demand at ¶¶ 70-72 (repeating allegation in each paragraph). But the Dorfman Award determined that SCP lack the right or ability to liquidate their captives unilaterally at the time of

their choosing. EX J-115 at ¶ 46. Indeed, Judge Dorfman recognized that SCP had contractually granted Capstone an irrevocable proxy to determine the manner and timing of liquidating the SCP captives. *Id*. Moreover, Judge Dorfman ruled that there was no obligation on the part of FCP to renegotiate their contractual agreements. Thus, SCP's RICO pleadings are based on a false premise that the Doctors could unilaterally dictate when their captives would be liquidated. This matter has already been litigated and adjudicated by Judge Dorfman, and the Arbitrator will not revisit nor disturb Judge Dorfman's final rulings.

Moreover, SCP's RICO pleadings make clear that the true intent behind the RICO claim is to re-litigate the liquidation dispute in hopes of a different outcome. SCP even repeat their liquidation allegations in post-hearing briefing. *See, e.g*., Doctors' Post-Hearing Brief at 62.

*Res judicata* serves important policy, efficiency, and fairness interests. Judge Dorfman resolved the parties' liquidation dispute. SCP ultimately did not contest confirming the Dorfman Award. SCP's RICO claim is a new attempt to re-litigate that liquidation dispute. Based on Texas's doctrine of *res judicata*, such an attempt is improper. **The Arbitrator [should therefore CONCLUDE] that SCP's RICO claim is precluded and that SCP take nothing on the claim.**

### 2.    SCP did not prove racketeering activity, i.e., predicate acts.

SCP allege two types of racketeering activities in their post-hearing brief: "(1) submitting and then refusing to investigate or close fraudulent claims in the risk pools, and (2) the wrongful taking [of] millions of dollars of the captive clients' funds to pay for FCP's litigation fees and expenses." Doctors' Post-Hearing Brief at 59. As for category (1), SCP further allege that the racketeering activity is the use of wires by the Feldman and Capstone Parties on June 10, 2020 to submit via e-mail notices of claims under 2019 policies, notices that SCP allege were backdated and fraudulent. Doctors' Post-Hearing Brief at 64-65, 67. These emailed notices were the only

predicate acts that SCP alleged in pleading statements prior to the final hearing in this arbitration. For reasons stated herein, neither type of alleged racketeering activity constitutes actionable predicate acts under RICO. The analysis starts with category (2), which is essentially an unpled conversion allegation.

### a. Conversion cannot sustain a civil RICO action.

To prove the element of racketeering activity, SCP must prove that FCP committed multiple predicate acts. SCP's post-hearing briefing makes clear that their RICO claim is anchored to an unpled tort claim of conversion: "FCP engaged in a pattern of racketeering activities resulting in the conversion of more than $3 million belonging to their clients." Doctors' Post-Hearing Brief at 122. A threshold question, then, is whether conversion even constitutes a predicate act under RICO.

Only those acts specifically enumerated in 18 U.S.C. § 1961(1) suffice as predicate acts. The list is exhaustive. *Beck*, 529 U.S. at 497, n.2. Conversion is not an enumerated predicate offense under RICO. *See* 18 U.S.C. § 1961(1). Accordingly, SCP's allegations of and reliance upon conversion cannot sustain a civil RICO action.

Even if conversion was a cognizable predicate act, SCP failed to prove conversion as a matter of law. Conversion is the wrongful exercise of dominion and control over another's property in denial or inconsistent with his rights. *Brandy v. First State Bank*, 835 S.2d 609, 622 (Tex. 1992) (citation omitted). To prove a cause of action for conversion, SCP must prove that SCP: (1) owned, possessed, or had the right to immediate possession of property; (2) the property was personal property; (3) FCP wrongfully exercised dominion or control over the property; and (4) SCP suffered injury. *Lawyers Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex. App.—Dallas 2014, pet denied). Money only qualifies as personal property subject to a conversion claim

if it is identified as a specific chattel and is not merely an indebtedness. *Estate of Townes v. Townes*, 867 S.W.2d 414, 419 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Money sought in a conversion claim must be: (1) delivered for safekeeping, (2) intended to be kept segregated, and (3) substantially in the form it was received or in an intact fund. *Lawyers Title Co. v. J.G. Cooper Dev., Inc*., 424 S.W.3d 713, 718 (Tex. App.—Dallas 2014, pet denied).

SCP fail to establish the first and second elements of a conversion action: SCP did not establish that at the time of the alleged conversion they were the owner of the specific personal property, the legal possessor of specific personal property, or entitled to immediate possession of the personal property. *See Great W. Drilling, Ltd. v. Alexander*, 305 S.W.3d 688, 695 (Tex. App.—Eastland 2009, no pet.). The alleged personal property here are monies received by PoolRe as premiums for reinsurance. Although SCP witness Mr. Amoroso testified in a conclusory fashion that pool premiums are held in trust by PoolRe, Doctors' Post-Hearing Brief at 74 , the Arbitrator [should find] no basis for that proposition. Neither the Stop Loss nor the Quota Share agreements specifythat PoolRe's premium revenue shall be held separately in trust for each of the respective participating reinsurers—or held in trust at all. *See* EX FC-370.12 at 2, 13 (explaining that monies paid to PoolRe are simply premiums); *see also* EX J-22. Jeff Carlson testified that PoolRe retains premium monies but those monies are not held in trust. TR Vol. 23 at 9271-73. It is widely recognized in the insurance industry that premiums paid to an insurance company are funds that belong to the insurance company. TR Vol. 16 at 6126-27; *see also Weber Paper Co. v. United States*, 204 F. Supp. 394, 399–400 (W.D. Mo. 1962), *aff'd*, 320 F.2d 199 (8th Cir. 1963). SCP proved no ownership or legal right to legal possession of the alleged converted funds (*i.e.*, reinsurance premiums paid to PoolRe in exchange for stop-loss reinsurance coverage). Those funds, as a matter of contract, belong to PoolRe and not SCP or the other participating captive

insurers.

Similarly, SCP cannot rely on an expectation of receiving "unused" pool premiums back from PoolRe. While the evidence in the record indicates that SCP received *some* monies back from the 2016, 2017, and 2018 risk pools, SCP can point to no right or representation that there is a guarantee that: (1) certain monies will remain unused, and (2) those unused monies will be return after a pool is administratively closed. Put simply, there is no guarantee from year-to-year that monies will be returned. If anything, the expectation of receiving back certain monies paid as premiums for reinsurance coverage is a *speculative* future expectancy interest. But even a plaintiff with a *concrete* future interest in property cannot sue under a theory of conversion. *City of Wichita Falls v. ITT Commercial Fin. Corp*., 827 S.W.2d 6, 9-10 (Tex. App.—Fort Worth 1992), *rev'd in part on other grounds*, 835 S.W.2d 65 (Tex. 1992). Likewise, any expectation to receive unused premium monies back is an "expectancy interest" insufficient for the purposes of RICO. *Price v. Pinnacle Brands, Inc*., 138 F.3d 602, 606-07 (5th Cir. 1998). In *Price*, the Fifth Circuit made clear that a party that receives what they bargained for cannot show harm for the purposes of RICO. *Id*. at 607. Here, SCP received reinsurance coverage in exchange for reinsurance premiums paid to PoolRe—exactly what SCP bargained for. *See, e.g*., EX FC-370.12 (Stop Loss Reinsurance Agreement codifying exchange of premiums from SCP captives to PoolRe in exchange for stop loss reinsurance coverage). Any expectation or hope for receiving unused premiums after the 2019 pool closes is a "subjective expectation [that] cannot form the basis of a RICO claim." *Gil Ramirez Grp., LLC v. Houston Indep. Sch. Dist*., 786 F.3d 400, 409-10 (5th Cir. 2015).

At bottom, once the SCP captives paid premiums to PoolRe, those premiums ceased being the property or money of the SCP captives and SCP could exercise no right, dominion, or control over those funds. On this later point, the pool contracts are unequivocal. Moreover, when money

as chattel is the subject of a conversion claim, SCP must prove that the money was delivered for safekeeping and intended to be kept segregated. *Lawyers Title Co. v. J.G. Cooper Dev., Inc*., 424 S.W.3d 713, 718 (Tex. App.—Dallas 2014, pet. denied). SCP did not (and cannot) show that the premiums the SCP captives paid to PoolRe were required or intended to be held in an account separate from PoolRe's other premium revenue. SCP did not (and cannot) show that PoolRe was merely a safekeeper of the SCP captives' premium revenue.

In addition to the above-identified failure to prove the first and second elements of a conversion claim, SCP failed to prove the third and fourth elements of a conversion claim, as well. SCP cannot prove the third element of a conversion claim because, as a matter of contract, all premium revenue under the Quota Share and Stop Loss agreements belong to PoolRe. As for the fourth element—damages—this Award [should analyze] SCP's damages shortcomings *infra*.

### b.  SCP's allegations of wire fraud are not predicate acts.

Alternatively, SCP allege that the Feldman and Capstone Parties made use of wires via email submissions of claims notices on June 10, 2020 as part of their scheme to convert pool funds. SCP identify the use of wires (wire fraud) as a predicate act under RICO. SCP do not allege *with specificity* any other predicate acts in briefing or pleadings.

Wire fraud is among the enumerated predicate acts in the RICO statute. *See* 18 U.S.C. § 1961(1). The use of wires need not be inherently fraudulent so long as the use is in furtherance of a fraudulent scheme. *U.S. v. Rush*, 236 Fed. Appx. 944, 947 (5th Cir. 1973). However, as already analyzed, the allegedly fraudulent scheme is conversion—which SCP failed to prove, and, alternatively, is not actionable under RICO. At a minimum, and notwithstanding the fact that conversion is not an articulated predicate act, the use of wires to perpetuate conversion does not constitute a predicate act when, as here, the underlying "scheme to convert funds" is not proven.

Moreover, the June 10, 2020 claim notices are not fraudulent acts. They were merely reported claims or coverage triggers timely submitted (*e.g.*, before the Extended Reporting Period terminated on June 30, 2020) in accordance with the controlling insurance policies. Experts from both sides agreed that an insured, here the Feldman and Capstone Parties, acts prudently and appropriately by erring on the side of over-reporting potential claims or losses. TR Vol 18 at 7176; TR Vol. 8 at 3225. Similarly, the Arbitrator [should find] merit in the testimony that laundry listing, or thepractice of reporting all possible losses to ensure all potentially available coverage, supports the June 10 submissions by the Capstone and Feldman Parties to A.M.Y. TR Vol. 18 at 7175. Therefore, the predicate acts identified by SCP, without more, do not indicate any fraud.

SCP's response is that the fraud arises from the fact that many of the 2019 A.M.Y. claims (*i.e.*, the 2019 Feldman and Capstone claims) are not covered losses. Although SCP spend some energy developing these arguments, and FCP spend some energy responding to them, the evidence in the record forecloses the need to consider the arguments in-depth. That is because the unrefuted evidence is that no final coverage determinations have been made on the challenged A.M.Y. claims by PoolRe. TR Vol. 22 at 8788; TR Vol. 23 at 9233. Therefore, no concrete injury has arisen from the submission of claims for coverage because no coverage has been awarded by PoolRe. As explained *infra*, a concrete financial injury must stem from the alleged predicate acts. Because the June 10, 2020 claim notices are not the proximate cause of any concrete financial injury, those June 10 claim notices—even if submitted via use of the wires—are not actionable predicate acts.

This analysis, furthermore, does not even acknowledge the (seemingly insurmountable) hurdles that SCP would have to establish to challenge any final coverage determinations by PoolRe. PoolRe has the sole discretion to make coverage decisions on behalf of the participating reinsurers: "[PoolRe"] shall make, by way of example and not by way of limitation, all coverage

and claims handling decisions for the Participating Reinsurers, which shall be bound by PoolRe's decisions to the extent of each Participating Reinsurer's several (but not joint) liability."  EX FC-370.12 at 4. Moreover, the Stop Loss agreements unambiguously provide, "whether or not PoolRe accepts coverage for any one or more claims, the [participating captive insurers] agree to look only to the Lead Insurer [*i.e.*, PoolRe] and [the participating captive insurers] may not maintain any action against PoolRe or any Participating Reinsurer." *Id*.

### c.  SCP's other suggestions of predicate acts fail.

Although SCP do not argue explicitly that claims handling allegations constitute actionable predicate acts, the Arbitrator [should clarify] that they do not give SCP's reliance on Louis Fey, a commercial claims handling expert. RICO does not enumerate claims handling (or unfair settlement practices) as a predicate act. *See* 18 U.S.C. § 1961(1). Accordingly, alleged claims handling violations cannot support a RICO civil claim.

Nor are the claim handling standards Mr. Fey testified about applicable to captive insurance companies in either Texas or Delaware. *See* TEX. INS. CODE § 964 (regulatory scheme for captive insurance that excludes claims handling provisions that apply to commercial insurers); 18 Del. C. § 69 (same). Mr. Fey displayed no knowledge of captive insurance, and that lack of knowledge infected his unreliable testimony. Moreover, Mr. Fey is not an expert on fraud or criminality. SCP's reliance on Mr. Fey for their RICO claim is misplaced and inapt.

For all these reasons, the Arbitrator [should find] that SCP have not articulated any actionable predicate acts as required by RICO. **The Arbitrator therefore DENIES SCP's RICO claim.**

### 3.  SCP did not prove a RICO pattern.

SCP also failed to show a pattern of racketeering, another essential element of a RICO

claim. As explained above, to establish a "pattern," SCP must prove that FCP committed two or more predicate acts that constitute a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell Tel*., 492 U.S. 229, 239 (1989). Continuity may be open or closed so long as the criminal activity occurred over a "substantial" period. *Id*. at 241-42.

Here, the closest SCP come to alleging predicate acts are the various claim submissions that Mr. Franks emailed on June 10, 2020. The emails submitting and confirming the submission of claim or potential claim notices all occurred ***on one day*** in June 2020. Acts occurring in such a narrow period, even if the acts qualify as RICO predicate acts, cannot substantiate a RICO claim because they do not establish the required continuity. *H.J., Inc*., 492 U.S. at 242 ("predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity requirement of RICO]"). The Fifth Circuit has held that conduct occurring over the course of seven months is too short a duration to establish a RICO claim. *Tel-phonic Services, Inc*. *v. TBS Intern, Inc*., 975 F.2d 1134, 1140 (5th Cir. 1992). Much shorter here is SCP's alleged period of predicate acts: a single day in the month of June 2020. That the effects of the alleged wire fraud extend beyond June 2020 has no impact according to the case law because the predicate acts themselves must occur over substantial periods of time.

In what seems to be an attempt to overcome their "continuity' shortcoming, SCP suggest that FCP ***could*** repeat their conduct with future PoolRe reinsurance risk pools. SCP's suggestion is no different that suggesting that anyone *could* commit a crime in the future. This suggestion fails to establish continuity for several reasons. First, SCP never pled this, nor have SCP participated in future reinsurance risk pools. Second, SCP did not offer evidence showing any intent or plan that the Feldman and Capstone Parties were going to submit insurance claims to A.M.Y. in future years, nonetheless "fraudulent" insurance claims; SCP did not even introduce evidence showing that the

Feldman and Capstone Parties purchased insurance from A.M.Y. after 2019. Moreover, the extended reporting period for the 2020 pool terminated on June 30, 2021. SCP conducted no discovery about the 2020 pool and produced no evidence that the Feldman and Capstone Parties, to A.M.Y., submitted any claims under their 2020 policies. If the Feldman and Capstone Parties were continuing the alleged scheme, SCP could have shown it.

Separately, SCP have also not demonstrated continuity because SCP's allegations concern a singular scheme by FCP to convert and "use [pool] funds to wrongfully pay for FCP's legal fees and costs incurred in these arbitrations." Doctors' Post-Hearing Brief at 61. Under SCP's own logic, FCP's wrongful activity is limited to funding the current litigation between SCP and FCP— or a discrete scheme with a singular purpose. But a single, narrow scheme with a single purpose does not give rise to a RICO claim. *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 530 (1st Cir. 2015). This is true even if the predicate acts occur over a longer period, which, as shown above it did not. *Giuliano v. Fulton*, 399 F.3d 381, 390 (1st Cir. 2005) (sixteen predicate acts over six-month period with single objective failed to satisfy RICO continuity requirement); *Efron v. Embassy Suites (P.R.), Inc*., 233 F.3d 12, 20 (1st Cir. 2000) (twenty-one-month scheme to defraud one set of co-investors failed to satisfy continuity requirement). SCP's theory resembles *Efron* and *Fulton* because, like in those cases, the allegation here is one with a singular identifiable purpose with an identifiable end. The objective, based on SCP's own theory, is to fund FCP's litigation expenses in these arbitrations, a scheme that would terminate when the FCP-SCP litigation finally resolves.

Another fatal defect to SCP's RICO theory is their reliance on unpled allegations. SCP never mentioned FCP's litigation cost-sharing agreement, which FCP never concealed, in any RICO pleading statement prior to the final hearing. SCP incorporated this aspect of their RICO

claim during the hearing and in post-hearing briefing for the first time, depriving FCP of fundamental due process and fair notice of these allegations. For that reason alone, the Arbitrator [should deny] any relief pursuant to SCP's RICO claim.

Accordingly, because SCP's theory of their RICO claim is defective, and because SCP did not establish an actionable pattern of racketeering activity, the Arbitrator [should deny] SCP's RICO claim.

### 4. SCP did not prove damages "by reason of" a RICO violation.

To recover under RICO, SCP must prove actual damages "by reason of" a RICO violation. "By reason of" requires both proximate and but-for causation. This includes showing that the identified predicate acts (*i.e.*, the mere submission of insurance claims) caused the alleged damages.

SCP fall short of meeting this burden for several independent reasons. First, the two alternative models of damages—*which SCP identify for the first time in post-hearing briefing*, no less—lack nexus to the conduct SCP identify as violative of RICO. Second, the use of wires to submit claims for potential 2019 losses in June 2020 has not caused SCP to suffer any concrete, financial losses.

### a. SCP's RICO damages, as identified in post-hearing briefing, bear no nexus to the alleged RICO violation and are themselves impermissibly speculative.

In post-hearing brief, SCP allege that "RICO liability should attach to the entirety of the Doctors' claims, including their claims based on tort, such as legal malpractice, breach of fiduciary duty, nondisclosure, or inadequate disclosure. *Thus, the Doctors request three times the total amount of their damages in a total amount of $130,155,264.75*." Doctors' Post-Hearing Brief at 122-23 (emphasis original.) In making this request, SCP adopt the Legier model of damages

regarding their business tort allegations as their RICO model *and seek the exact same damages* under RICO as they seek on their separate and independent legal malpractice, breach of fiduciary duty, and negligence causes of action against the Feldman and Capstone Parties. Such a request is facially defective because (1) the maneuver impermissibly attempts to transform garden-variety business disputes into a RICO action, (2) impermissibly departs from any pleading statement, and (3) SCP make no attempt to link the Legier model to the alleged fraudulent use of the U.S. mails and wires. Instead, as SCP argue elsewhere, the Legier damages model stems not from any emailed claim submissions but from 2015 disclosures.

Relatedly, the allegation that "Feldman and Capstone made misrepresentations and suppressed material information related to the alleged tax benefits and success of the risk pool in qualifying clients for beneficial tax treatment" somehow figures into SCP's RICO claim is logically flawed. *See* Doctors' Post-Hearing Brief at 61-62. As discussed, SCP's RICO pleadings and claim center on the 2019 reinsurance risk pool. SCP elected to have their captives participate in the 2019 reinsurance pool in December 2018—**six months** after Dr. Sullivan commented that the *Reserve Mechanica*l decision was "not good for captives." *See* EX FC-189 (responding to email thread beginning with Capstone notice about *Reserve*). Moreover, Dr. Sullivan signed the 2019 Stop Loss agreement on November 13, 2019—after Dr. Sullivan and Mr. Sherman, in October 2019, read and discussed the Jay Adkisson article that allegedly "enlightened" Dr. Sullivan to the risk of captive managers including professional liability policies in risk pools with clients. TR Vol. 3 at 974-76, 1295-96; EX FC-262; EX FC-253. SCP cannot contend that they lacked knowledge or awareness of the alleged tax issues about which they now complain (the *Reserve*-related tax issues) when they *voluntarily* entered the 2019 reinsurance pool because: (1) SCP had opined about *Reserve Mechanical*'s potential implications six months **before** entering

the 2019 pool, and (2) SCP signed the Stop Loss contracts for the 2019 pool in November 2019 **after** Dr. Sullivan completed his "deep dive." *See* TR Vol. 16 at 6125-26 (unrefuted testimony that participation in PoolRe's reinsurance pools is at the captive's discretion).

For these reasons, the Arbitrator **[should DECLINE]** to award SCP the requested sum as RICO damages.

In the alternative to the above, SCP request the Arbitrator to find that FCP are liable under RICO "at the amount three times the Doctors' quota share of the amounts FCP allegedly converted from the 2018 and 2019 risk pools." Doctors' Post-Hearing Brief at 123. SCP calculate that FCP wrongfully converted $3,292,427.37 from the 2018 and 2019 risk pools, and that SCP's quota share of those amounts total $221,005.21. Doctors' Post-Hearing Brief at 123-24. SCP request a trebling of this amount, for a total of $663,015.63. Doctors' Post-Hearing Brief at 124. Such a request is, again, facially defective because: (1) the request is rooted in SCP's defective and unpled conversion theory, (2) the request radically departs from any live pleading statement before the Arbitrator, and (3) SCP make no attempt to link this damages model, unsupported by competent expert testimony, to the alleged fraudulent use of the U.S. mail and wires, specifically the June 10, 2020 emailed claim submissions. Again, conversion cannot support a RICO claim. SCP have not demonstrated any cognizable but-for and proximate RICO injury and damages. **For those reasons, the Arbitrator [should DECLINE] to award SCP the alternative requested sum.**

### 5. SCP did not prove that the alleged acts of wire fraud but-for and proximately caused SCP any cognizable RICO injury.

RICO permits recovery of only ***actual*** damages and trebling of those actual damages. 18 U.S.C. § 1964(c). Injunctive relief is not available to private plaintiffs in civil RICO actions. *Religious Tech Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986); *see also Bolin v. Sears Roebuck*

*& Co.*, 231 F.3d 970, 977 n.42 (5th Cir. 2000) ("There is considerable doubt that injunctive relief

is available to private plaintiffs under RICO."); *Haley v. Merial, Ltd*., 292 F.R.D. 339, 351 (N.D.

Miss. 2013) ("[I]t is unlikely that injunctive relief is even available to the Plaintiffs in this RICO

action."). Punitive damages are similarly unavailable. *Southwest Marine, Inc. v. Triple A Mach.*

*Shop, Inc*., 720 F. Supp. 805, 810 (N.D. Cal. 1989); *see also Iron Workers Local Union No. 17*

*Ins. Fund and its Trustees v. Philip Morris Inc*., 29 F. Supp. 2d 801, 819 (N.D. Ohio 1998)

(granting defendant's summary judgment motion on punitive damages issue because federal RICO

statute does not provide for punitive damages). And while attorneys' fees may be available under

RICO, SCP is not entitled to recover attorneys' fees here. "Attorneys' fees and costs are only

awarded to a plaintiff who establishes *liability* and *injury*." *Aetna Cas. Sur. Co. v. P & B Autobody*,

43 F.3d 1546, 1570 (1st Cir. 1994) (emphasis added); *Uniroyal Goodrich Tire Co. v. Mutual*

*Trading Corp*., 63 F.3d 516, 525 (7th Cir. 1995) (same).

  When it comes to actual damages, SCP did not prove any actual injury or damages. A

cognizable RICO injury to "business or property" means pecuniary injury to a proprietary interest.

*See, e.g., Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 262 (6th Cir. 2014); *Canyon*

*Cty. v. Syngenta Seeds, Inc*., 519 F.3d 969, 975 (9th Cir. 2008). As the Fifth Circuit explained, a

plaintiff must show a concrete financial loss. *Patterson v. Mobil Oil Corp*., 335 F.3d 476, 492 n.16

(5th Cir. 2003) (J. Duval sitting be designation). A "risk of loss" does not give rise to a RICO

injury. *First Nationwide Bank v. Gelt Funding Corp,* 27 F.3d 763, 768-70 (2d Cir. 1994) ("risk of

loss" is not injury ripe for RICO claim); *In re Taxable Mun. Bond Sec. Litig*., 51 F.3d 518, 521-22

(5th Cir. 1995) (farmer's "lost opportunity" to obtain loan insufficient to constitute injury for RICO

standing). A RICO claimant also may not, "through predictions of a defendant's future plans,

artificially ripen a claim that is unripe." *D'Addario v. D'Addario*, 901 F.3d 80, 95 (2d Cir. 2018).

At no point during the final hearing did SCP present evidence of a concrete financial loss proximately and directly caused by the alleged RICO violations. The Legier model is speculative, therefore lacking RICO's requisite concrete financial injury, and wholly unrelated to SCP's RICO allegations, therefore lacking RICO's requisite causation. For a more exhaustive explanation of why the Legier damages model provides no basis for recovery, see § VII(K), *infra*. Accordingly, the Legier model thus cannot and does not establish RICO standing or injury.

SCP's other pleading arguments and implications also fail. For instance, SCP contend that FCP's alleged RICO violations injured SCP's business and property by preventing the Doctors from liquidating their captives at the time of their choosing. Gill-Jefferson Demand at ¶¶ 70-72. This is not a RICO injury. Judge Dorfman declared that Capstone had the contractual right to wind down and liquidate the SCP captives on or about the 2015 Engagement Letter's year-end termination date. EX J-115 at ¶ 46. SCP did not show, and cannot show, that but-for the submission of the challenged 2019 A.M.Y. insurance claims, SCP could have liquidated their captives because only Capstone—not SCP—has the contractual right to determine when the wind down and liquidation occur. EX J-115 at ¶ 46. Moreover, SCP ignore that no liquidation can occur without regulatory approval. EX J-115. Because SCP "has the burden of establishing that [the predicate offense] was the but for cause and the proximate cause" of the alleged harm, SCP's RICO claim fails because the challenged 2019 A.M.Y. insurance claims did not and could not, as a matter of law as determined by Judge Dorfman, proximately or but-for cause SCP's captives not to liquidate in 2019. *Waste Mgmt. of Louisiana, LLC v. River Birch, Inc*., 920 F.3d 958, 965 (5th Cir. 2019).

### 6. Conclusion: SCP have not established a basis for RICO liability or damages.

Because SCP's RICO claim is merely an attempt to re-litigate the liquidation dispute resolved by Judge Dorfman in his final award, the Arbitrator [should deny] SCP's request for a

finding of RICO liability and request for damages on the basis of *res judicata*.

Even if *res judicata* did not preclude relief, SCP have not carried their evidentiary burden on their RICO claim. Their RICO allegations are plainly reiterations of the ordinary business torts they alleged in previous arbitration demands, rendering them inapt for RICO treatment.

## XV.    THIS ARBITRATOR'S ANALYSIS OF SCP'S CLAIMS AND AFFIRMATIVE DEFENSES

Because the parties to this arbitration have requested the entry of a reasoned award I have set out at extraordinary length their contentions and the reasoning that each has asked me to adopt in rendering an award here. I am therefore able to say when and where I do or do not accept the reasoning behind one party's contentions without replicating a second time the lengthy evidentiary and legal support already offered in support and in opposition to those contentions, all of which I have reviewed at length. Having begun with SCP's claims and affirmative defenses, I take them up first.

### BREACH OF FIDUCIARY DUTY

Based upon the proof adduced at hearing, and after considering all arguments and authority submitted by the parties for and against the proposition that Mr. Feldman and the Feldman Law Firm owed fiduciary duties to SCP, I conclude that they did. I do not understand this proposition to be seriously disputed by Claimants, or how it could be.

I further adopt SCP's arguments and reasoning in support of my findings that this duty extended in time and scope to that point at which Respondents contend they were injured by a breach of those duties, and I reject Claimants' arguments and reasoning that a temporal or other limitation upon those duties arose at some earlier time so as to limit or extinguish those duties. *See, e.g.,* p. 125 *et seq. supra*.

I further find, by virtue of Mr. Feldman's utilization of Capstone as an instrumentality of

the legal services rendered by Mr. Feldman and the Feldman Law Firm to SCP, Capstone took on and breached the same fiduciary duties as Mr. Feldman and the Feldman Law Firm.

I reject SCP's reliance upon the *Kinzbach* opinion for the proposition that a fiduciary duty arose or existed as between any other Claimant here and SCP as unsupported by the facts of this case and the law. *See* p. 69 *et seq., supra*. There is just no support for a finding in the law or in the record that a fiduciary duty or relationship arose in these transactions other than as between Mr. Feldman, his law firm, and Capstone, on one hand, and SCP on the other. I here adopt FCP's rationale for this conclusion.

The question of exactly how Mr. Feldman, the Feldman Law Firm, and Capstone breached their fiduciary duty to SCP is a closer one. As described at length above, SCP points to several instances in which they claim the non-disclosure of facts, or improper benefit, self-dealing, and misrepresentation by Mr. Feldman, the Feldman Law firm, and Capstone constituted an actionable breach of their fiduciary duty. For example, SCP complains that they were wrongfully misled *ab initio* into participation in the Capstone captive program by misleading omissions or statements made by Mr. Feldman regarding the risks associated with the establishment of captive insurers. But the fact is that as more and more markers of the risks inherent in the utilization of captive insurers come to SCP's attention, SCP nevertheless continued with their participation. Even as late as their request for early release from the program, SCP did not complain that they had been wrongfully brought into it. This, coupled with the availability of expertise from Mr. Kushner and Mr. Sherman—whose broad disclaimers of captive-related tax expertise were heard for the first time at trial, but not at the time they rendered such advice to the Doctors—does not support SCP's claims that more and better information from any of the Claimants here would have led SCP to avoid the captive program. Nor would they have been wise to do so, as the credible proof at

hearing, described *infra,* demonstrated relatively modest injury from SCP's participation in the program, offset by the considerable benefits for having done so.

But I am persuaded that the failure of Mr. Feldman, the Feldman Law Firm, and Capstone to disclose that the captive program might later be manipulated in such a way as to require SCP to reinsure Feldman's, Capstone's, and PoolRe's professional liabilities and legal and administrative expenses, *including in litigation against them by the Doctors,* amounted to a breach of fiduciary duty of the first order. Nothing appearing in any agreement, disclosure document, or other communication from Mr. Feldman, the Feldman Law Firm, or Capstone, gave fair and adequate notice either that the reinsurance pool might later be claimed to permit this, or that Mr. Feldman might, if necessary, so interpret the parties' agreements.

### ANTI-FRACTURING

I have carefully considered FCP's argument that SCP has violated the "anti-fracturing" rule in Texas jurisprudence and I reject it. *See* pp. 174-179 *supra.*  It is plain to me that the case law permits the assertion—albeit not necessarily the success—of the alternative causes of action and affirmative defenses pleaded by SCP against FCP.  I therefore proceed to discuss the remaining claims.

### NEGLIGENCE

For the proposition that Mr. Feldman, his firm, and Capstone did not meet the standard of care required of attorneys under Texas law, SCP relies heavily upon the testimony of Mr. Tom Watkins, who in turn relied heavily upon certain provisions of the Texas Rules of Disciplinary Conduct for support of his opinions. FCP correspondingly relied upon the testimony of Mr. James McCormack in refutation of this.

I found both Mr. Watkins and Mr. McCormack to be credible witnesses, each very

knowledgeable about the matters on which they opined. In the end, however, I believe Mr. Watkins to be correct in his assessment that Mr. Feldman, the Feldman Law Firm, and Capstone did not meet the required standard of care under Texas law. Here again, while I do not agree with Mr. Watkins on all points made at hearing, I agree that the failure to fairly and adequately disclose that PoolRe was so structured as to permit FCP to later maintain that SCP must stand good for FCP's fees, costs, and administrative expenses in this dispute violated at least Rule 1.08 of the Disciplinary Rules. And while I understand that the violation of such a Rule, standing alone, is not actionable, that Rule correctly codifies (or captures) what would be the minimum standard of disclosure for an attorney in Mr. Feldman's position under Texas law—a standard that Mr. Feldman, the Feldman Law Firm, and Capstone simply never met. I therefore reach the same conclusion with or without reference to any specific Disciplinary Rule.

### INTENTIONAL OR NEGLIGENT MISREPRESENTATION

As indicated above, I have concluded that Mr. Feldman, the Feldman Law Firm, and Capstone breached their fiduciary duties and acted negligently respecting disclosure of the potential operation of the reinsurance pool to SCP's detriment. But I do not find that this or any other non-disclosure by Mr. Feldman *et al.* amounted to actionable fraud. Rather, I believe these non-disclosures were the product of negligent omission.

Simply stated, I do not find compelling proof that it was FCP's intent to induce SCP to act upon any false or reckless representation or omission *at the inception of these parties' relationship*. Although it is unquestionably the case that the captive program was *later* manipulated and interpreted by Mr. Feldman, the Feldman Law Firm, and Capstone so as to permit Feldman and Capstone to insulate themselves from the legal fees, administrative, and other expenses associated with the defense of SCP's claims, nothing in the record convincingly demonstrates that it was the

preconceived but undisclosed intent of any of these parties *at the time these agreements were entered into*, to so interpret and manipulate the relevant agreements. Stated otherwise, I am not persuaded that, at the time of contracting with SCP, Mr. Feldman either foresaw the likelihood of costly litigation with SCP or that he had by that time formed the intent to manipulate PoolRe as he later did. This is not to excuse FCP's having later done so, but only to say that this does not, in my view, rise to the level of fraud in this inducement. Importantly, the resulting injury to SCP is the same under either theory of liability.

### CONVERSION OF FUNDS

SCP seeks the imposition of liability upon Feldman *et al*. under a claim that the ultimate injury suffered by SCP was the result of the conversion of their funds, to wit, their premiums placed with their captive insurers in the PoolRe pool. Such a theory is valid under Texas law because the true wrong suffered by SCP here is the wrongful exercise of dominion and control over discrete funds placed with PoolRe for purposes other than as ultimately utilized by Feldman *et al*. Texas authority plainly supports a conversion claim under such facts as these, and I believe that it has been proven. *See e.g., Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Civ. App. – Houston [14th Dist.] 1981, writ ref'd n.r.e.). Although FCP complains that SCP's conversion claim was not timely pled, it in fact fits squarely within SCP's allegations of various forms of tortious conduct found in their pleading of affirmative defenses to the claims asserted by Feldman *et al*. in this arbitration. In fact, it is the conversion of funds to which Feldman *et al*. had no valid claim that is, in this Arbitrator's view, the centerpiece of wrongdoing by Feldman *et al*., and the principal cause of any injury to SCP.

### RESPONDENTS' CLAIMS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES ACT AND TEXAS INSURANCE CODE

At page 287 *et seq., supra*, Claimants state the numerous bases upon which they contend

that Respondents may not recover under either the Texas Deceptive Trade Practices Act or under the Texas Insurance Code. I believe those arguments, the reasoning behind them, and the authorities upon which they are based are unassailable, and I therefore here adopt the same reasoning and authorities as my own. SCP fails to qualify for relief under those statutes in every pertinent respect, and this is plainly evident under the law and on the facts of this dispute.

### RESPONDENTS' CLAIMS UNDER RICO

SCP's RICO claims are susceptible to the same summary disposition as their claims under the DTPA and Insurance Code, and for much the same reason: SCP's RICO claims require threshold showings under the law that have not been and cannot be made here, as described at page 308 *et seq., supra*. I here adopt as my own each element of FCP's response to the assertion of RICO liability here, including the rationales for same, with the exception of the contention that SCP's RICO claims constitute an attempt to relitigate the liquidation dispute. Without limitation, I therefore adopt as my own FCP's reasoning and reliance upon the most obvious four elements missing from the proof here:

First, there can be no racketeering liability under RICO where there are no predicate acts, as defined in the statute, and no such predicate acts are found here. There is here insufficient evidence (and therefore no finding) of actionable fraud here, whether under common law or any statute prohibiting fraudulent activity through the use of wires.

Second, because RICO requires a showing of concrete financial injury stemming from one or more of the required predicate acts, the absence of qualifying predicate acts *ipso facto* eliminates the possibility of showing related concrete injury.

Third, because RICO requires proof of two or more predicate acts over a sustained period in order to show a pattern of racketeering activity, the absence of *any* qualifying predicate acts

here is again fatal to recovery under RICO.

Finally, RICO requires proof of actual damages "by reason of" a RICO violation. SCP has made no such showing here. Instead, the damages that SCP seeks to recover under RICO are entirely duplicative of the "benefit of the bargain" damages to which Mr. Legier testified. Plainly, none of those damages, even if credibly proven, were the result of a RICO violation or of any offending predicate act under RICO.

## XVI.  SCP'S THEORIES OF SINGLE BUSINESS ENTITY, ALTER EGO, JOINT ENTERPRISE, AND PERSONAL LIABILITY OF JEFF CARLSON

I have considered and here deny SCP's request for a finding of extended liability upon each of the grounds stated immediately above. I do not believe the facts of this dispute or the law support such findings, and I believe that such findings, even if permissible, would be superfluous to SCP's rights of recovery as described herein. *See* FCP Post-Hearing Brief at p. 233-36.  I specifically deny any and all claims of liability lodged against Mr. Carlson as being without legal or factual support here. I believe Mr. Carlson to be innocent of any wrongdoing whatsoever.

## XVII.  THE DOCTORS' CLAIM FOR DAMAGES (IN THEIR OWN WORDS)

The Doctors' categories of damages are quantified below:

| Claim | Amount owed |
|---|---|
| Additional taxes owed to IRS | $8,625,238 |
| Additional IRS interest | $1,864,817 |
| IRS penalties | $1,711,618 |
| Lost opportunities (includes $1,250,944 in quarterly fees paid by Doctors) | $23,224,403 |
| Forced liquidation of Bitcoin | $2,495,280.72 |
| Projected costs of IRS audit | $5,000,000[520] |

---

[520] *See* Transcript, Volume 1, August 3, 2021, at p. 350, lines 8-13 (Dr. Scott Sullivan).

| | |
|---|---|
| Doctors' share of premiums converted from 2018/2019 risk pool | $221,005.21 |
| ***Subtotal*** | ***$43,142,361.93***[521] |
| The *"Subtotal"* trebled pursuant to DTPA, Texas Insurance Code, and/or RICO | $129,427,085.79 |

1) The *"Subtotal"* in the chart above in an amount of $43,142,361.93 does not include (1) pre-judgment interest, (2) statutory multipliers for treble damages, pursuant to RICO, the DTPA, or the Texas Insurance Code, or (3) the amount of attorneys' fees and costs. This *"Subtotal"* is subject to statutory multipliers because all the damages would never have occurred but for FCP's intentional misconduct violating these statutes. In addition, the DTPA, Texas Insurance Code, and RICO authorize the recovery of attorneys' fees and expert fees incurred in these matters. The Doctors claim the right to recover attorneys' fees/ costs and expert fees *only* pursuant to these statutes (DTPA, Texas Insurance Code, and RICO).

**I.** **The Doctors are entitled to recover all amounts owed to the IRS (including back taxes, penalties, interest) for tax years dating back to 2015.**

1) The Doctors' forensic C.P.A. expert, Bill Legier, performed a detailed analysis of the Doctors' expected losses based on their exposure to penalties, back taxes, and interest.[522] The Doctors testified that they would not have entered into the Joint Engagement Letter if Feldman and Capstone had disclosed: (1) the substance of the adverse IRS audits against Reserve Mechanical and six other Capstone-administered captives, (2) that Feldman and Capstone got the Doctors to insure Feldman's and Capstone's professional malpractice and legal expense liabilities; and (3) that Feldman was under an IRS audit for promoting abusive tax shelters. Therefore, Mr.

---

[521] The fee forfeiture amount is already included in the lost opportunities amount calculated by Mr. Legier. This total does not count the fee forfeiture amount twice.
[522] *See* Exhibit DRS-2575, Legier PowerPoint/ Supplemental Expert Disclosure, July 31, 2021.

Legier, using an "actual versus but-for" methodology, compared what would have happened but-for the Doctors electing to contract with Capstone in 2015, and concluded that the Doctors have incurred $12,201,673 in damages attributable to additional taxes, penalties, and interest.[523]

2)    Mr. Legier's calculations and analysis were buttressed by the testimony of the Doctors and retired IRS trial lawyer Lyle Press.  Mr. Press concluded that it was more likely than not that: (1) the Doctors' tax positions with respect to their captive insurance would be disallowed by the IRS, and (2) the Doctors would be subject to a 20% penalty plus interest.[524]

3)    The U.S. Tax Court's opinion in *Reserve Mechanical* is probative of positions that the IRS will take regarding the Doctors' captives, which are also Capstone-administered captives. The IRS repeatedly cited and applied the Tax Court's opinion in *Reserve Mechanical* in rejecting the Capstone program and PoolRe in its recent adverse audits in the summer of 2021 concerning Mr. Feldman, the Feldman Law Firm, Capstone, A.M.Y., and RSL Funding.[525]

4)    Mr. Press gave credence to the fact that the IRS examination reports "analyze the *Reserve Mechanical* opinion and apply the holding to the facts of A.M.Y. Property & Casualty," another Capstone-administered captive that is owned by Feldman.[526]  Mr. Press noted that the IRS recently found that the risk pool that another Capstone-administered captive, A.M.Y, participated

---

[523] *See* Transcript, Volume 10, August 19, 2021, at p. 4025, lines 5-15; p. 4025, line 25 – p. 4026, line 3 (William Legier).

[524] *See* Transcript, Volume 9, August 18, 2021, at p. 3363, lines 8-15; p. 3574, line 4 – p. 3576, line 22 (Lyle Press).

[525] *See* Exhibit DRS-2464, IRS Examination Report of Feldman Law Firm, LLP, June 22, 2021, at pp. 59-60, Joint-419942 - 43; Exhibit DRS-2461, IRS Examination Report of Capstone Associated Services, Ltd., May 13, 2021, at p. 60, Joint-419722; Exhibit DRS-2463, IRS Audit Examination Report of RSL Funding, LLC, June 22, 2021, at p. 59, Joint-419865.

[526] *See* Transcript, Volume 9, August 18, 2021, at p. 3552, lines 10-22 (Lyle Press); *see also* Exhibit DRS-2462, IRS Audit Report of A.M.Y. Property & Casualty Co., at Joint-419751, 419783; Exhibit DRS-2464, IRS Examination Report of the Feldman Law Firm, LLP, June 22, 2021, at Joint-419931 ("The Reserve transaction bears many similarities to the transactions in the present case, particularly with respect to its quota share pooling arrangement."); at Joint-419949 ("[T]he Captive Program appears to be substantially similar, if not nearly identical than it was as documented in *Reserve Mechanical*, where the Court identified the captive managed in the Captive Program was determined to not have been operated as a bona fide insurance company.").

in bore "many similarities to the quota share pool arrangement that was reviewed as part of Reserve Mechanical and found to be deficient by the Tax Court."[527]

5)    The fact that the IRS was approvingly citing *Reserve Mechanical* in the IRS's adverse audit of A.M.Y., Capstone, and other Feldman-related companies supported Mr. Press's conclusions regarding the likelihood that the IRS audits would be resolved adversely to the Doctors. Mr. Press concluded:

> Given what we've seen in these documents, and specifically the A.M.Y. report and the position that the IRS has been taking on exam, I would expect that the IRS would, after examining Janus, Cerberus, and Orion, the Doctors' captives, and the Doctors' returns, if they conclude that there is no difference in the way they're operated or the factual patterns from what they've seen in other Capstone-operated entities, we reach the same conclusions that they have reached in the entities we've seen, Reserve, Treadwell, Columbia, Security, the others I forget the names, as well as A.M.Y. and reach the same conclusions.[528]

6)    Even FCP's expert, Marcus Brooks, recognized that "there's a ton of heat in here," and that "eventually, another shoe is going to drop somewhere,"[529] thereby recognizing that the Feldman / Capstone program was a high-risk venture for IRS scrutiny. Mr. Brooks' testimony further supports the likelihood that the IRS audits will be resolved adversely to the Doctors.

7)    Mr. Press also noted the crackdown by the IRS against microcaptives in recent years, including the ramped-up enforcement efforts and creation of 12 new dedicated examination teams.[530] Further, Mr. Press observed a "concerted effort" by the IRS to "examine and make adjustments" – *i.e.,* to impose back taxes, interest, and penalties – "for Capstone related entities and Capstone-operated entities" specifically.[531]

---

[527] *See* Transcript, Volume 9, August 18, 2021, at p. 3554, line 18 – p. 3555, line 7 (Lyle Press).

[528] *See* Transcript, Volume 9, August 18, 2021, at p. 3558, lines 13-21; p. 3560, line 20 – p. 3561, line 17 (Lyle Press).

[529] *See* Transcript, Volume 23, October 2, 2021, at p. 9400, lines 11-20 (Marcus Brooks).

[530] *See, e.g.,* Exhibit DRS-570, IRS Press Release, January 31, 2020; Exhibit DRS-569, IRS Press Release, October 1, 2020; Exhibit DRS-1792, IRS Press Release, April 9, 2021; *see also* Transcript, Volume 9, August 18, 2021, at p. 3579, lines 11-21; p. 3581, line 7 – p. 3581, line 14 (Lyle Press).

[531] *See* Transcript, Volume 9, August 18, 2021, at p. 3649, lines 3-7 (Lyle Press). In responding to the promoter audit, Mr. Feldman sent the IRS client lists identifying the Doctors' captives, among his other clients. *See* Exhibit DRS-2630, Letter from Val Albright to IRS, November 28, 2018. *See also* Transcript, Volume 9, August 18, 2021, at p. 3631, line 14 – p. 3632, line 18, at Joint 422719-422721 (identifying Cerberus); Joint 422935-422937 (identifying Orion); Joint 422883-422885 (identifying Janus).

8)      Mr. Press observed that the IRS recently began pursuing penalties against the owners of captive insurance companies, as demonstrated by the recent ruling in *Caylor Land & Development, Inc. v. Commissioner of Internal Revenue.*[532]  In *Caylor Land*, the Tax Court upheld the imposition of penalties "across the board."[533]

9)      Mr. Press's conclusion regarding a 20% penalty is underscored by the results of the recent adverse IRS audits of Mr. Feldman and several of his entities.[534]  There, the IRS also imposed 20% accuracy penalties.[535]  These facts further support Mr. Press's expert opinion that it is more likely than not that the IRS will impose a 20% penalty against the Doctors.[536]

10)     On October 1, 2020, the IRS issued a press release, wherein the IRS Commissioner stated, "Any future settlement terms will only get worse, not better."[537]  While certain captive owners received settlement offers from the IRS, the Doctors did not.[538]  Notably, the IRS issued an audit notice to Dr. Sullivan one day after that press release (October 2, 2020).[539]  And Dr. DellaCroce received an audit notice in July 2021.[540]

---

[532]  *Caylor Land*, T.C. Memo. 2021-30, 2021 WL 915613.  *See also*, Transcript, Volume 9, August 18, 2021, at p. 3574, line 4 – p. 3577, line 17 (Lyle Press).

[533]  *Caylor Land,* at * 49.  In *Caylor Land*, penalties were imposed against a majority of the parties. The parties who escaped without a penalty did so only because the IRS failed to comply with a technical requirement under 26 U.S.C. 6751(b), rather than any substantive reason.  *Caylor Land*, at *49.

[534]  *See* Transcript, Volume 9, August 18, 2021, at p. 3558, line 5 – p. 3561, line 17; p. 3648, line 19 – p. 3650, line 6 ("the claimed benefit from the insurance expense has been disallowed and accuracy-related penalties asserted in all of those cases"); p. 3681, line 1 – p. 3682, line 4 (Lyle Press).

[535]  *See* Exhibit DRS-2464, Audit Examination Report of the Feldman Law Firm, LLP, at Joint-419888. The imposition of these "adjustments" and the corresponding penalties "arise out of the Feldman Law Firm, LLP's [] participation in a purported captive insurance program [] which is also organized and managed by Capstone Associated Services, Inc." *See* Exhibit DRS-2464, IRS Examination Report of The Feldman Law Firm, LLP, June 22, 2021, at Joint-419889.

[536]  *See* Transcript, Volume 9, August 18, 2021, at p. 3363, lines 8-15; p. 3574, line 4 – p. 3576, line 22 (Lyle Press).

[537]  *See* Exhibit DRS-569, IRS Press Release, October 1, 2020.

[538]  *See* Transcript, Volume 9, August 18, 2021, at p. 3588, lines 15-19 (Lyle Press).

[539]  *See* Exhibit DRS-571, IRS Audit Notice, October 2, 2020.

[540]  *See* Exhibit DRS-2547, IRS Audit Notice, July 21, 2021.  The Doctors' audits concern their captive insurance companies: indeed, IDR #1 specifically asked for all documentation pertaining to Janus Insurance Corp., the captive jointly owned by the Doctors, as well as Dr. Sullivan's captive, Cerberus. *See* Exhibit J-109, IDR #1, October 26, 2020.

11)    As Mr. Press noted, "People are not encouraged to wait to see if things get better because it's not usually going to get better with the Internal Revenue Service. It's going to likely get worse."[541]

12)    Mr. Press's opinion that it is more likely than not that the IRS will disallow the Doctors' tax position with respect to the captives and impose a 20% accuracy penalty is supported by a cascade of related events that include the following:

- The IRS issued its Notice 2016-66 making microcaptive insurance "transactions of interest" and issued press releases that show an escalating level of enforcement against microcaptive insurance.[542]

- The IRS issued the adverse 2013 Examination Report of Reserve Mechanical and six other adverse pre-Engagement Letter Audits of other Capstone-administered captives, finding lack of risk distribution, determining the failure to qualify as insurance, and finding that PoolRe does not provide risk distribution.[543]

- The IRS obtained Tax Court victories in *Avrahami*, *Reserve Mechanical*, *Syzygy*, and *Caylor Land* – the last of which imposed a 20% accuracy penalty.[544]

- The IRS applied *Reserve Mechanical*, *Avrahami*, *Syzygy*, and *Caylor Land*, to Feldman's entities and Capstone-administered captives, imposing a 20% accuracy penalty against Feldman's entities for tax years well beyond those at issue in *Reserve Mechanical*.[545] Thus it is more likely than not that the IRS will also apply *Reserve Mechanical*, *Avrahami*, *Syzygy*, and *Caylor Land* to, and impose a 20% accuracy penalty against, the Doctors.[546]

- The IRS pursued audits (post-Engagement Letter) of at least seven other Capstone-administered captives – Clear Casualty, Burglass, Renn Rx, Goux, River Casualty, Printing Casualty, and Sheh Adams – for a total of at least fifteen Capstone-administered captives audited by the IRS (these seven post-Engagement Letter audits, plus Reserve and the six pre-Engagement Letter Audits, plus AMY).[547]

---

[541] *See* Transcript, Volume 9, August 18, 2021, at p. 3592, lines 21-25 (Lyle Press).

[542] *See* Transcript Volume 9, August 18, 2021, at pp. 3562-3571 (Lyle Press) (discussing transactions of interest, including IRS Notice 2016-66 (DRS 130) regarding microcaptives); *id.* at pp. 3579-93 (discussing press releases, including DRS 1792, DRS 570, and DRS 569).

[543] *See* Transcript Volume 9, August 18, 2021, at pp. 3381-3426 (Lyle Press) (discussing the IRS audit of Reserve (DRS 1873, DRS 1874, DRS 1875) and the six other pre-Engagement Letter audits and stipulations to be bound (DRS 2591-2596).

[544] *See* Transcript Volume 9, August 18, 2021, at pp. 3571-3578 (Lyle Press).

[545] *See* IRS audits of AMY (DRS 2462), Capstone (DRS 2461), RSL Funding (DRS 2463), and the Feldman Law Firm (DRS 2464).

[546] *See* Transcript Volume 9, August 18, 2021, at pp. 3548-61 & 3638-49 (Lyle Press).

[547] *See* Transcript Volume 9, August 18, 2021, at pp. 3636-38 (Lyle Press).

- The IRS promoter audits directed to Feldman and Capstone, which the IRS uses to obtain information regarding the promoters' clients and which did identify the Doctors' captives before they received the IRS audit IDR's inquiring into their captives.[548]

- The IRS audited the Doctors with an Information Document Request that identifies the Doctors' captives within the scope of the audit.[549]

13)    In addition, Mr. Press reviewed and confirmed Mr. Legier's calculations of the taxes upon the disallowance of the Doctors' tax position with respect to their captives, as well as the 20% accuracy penalty and interest.[550]

14)    Informed by Mr. Press's opinion that it is more likely than not that the IRS will disallow the Doctors' tax position with respect to their captives and impose a 20% penalty and interest, Mr. Legier calculated the Doctors' anticipated damages based on projected penalties, back taxes, and interest as follows:[551]

---

[548] *See* Transcript Volume 9, August 18, 2021, at pp. 3604-3636 (Lyle Press) (discussing promoter audits under Internal Revenue Code §§ 6112 and 6700, including DRS 2529, DRS 2629, and DRS 2630 regarding such audits directed to Feldman and Capstone for promoting abusive tax shelters and obtaining information regarding Capstone-administered captives and specifically the Doctors' captives).

[549] *See* Transcript Volume 9, August 18, 2021, at pp. 3653-64 (Lyle Press) (discussing the IRS audit IDRs of Dr. Sullivan and Dr. DellaCroce (DRS 571, J-109, & DRS 2547).

[550] *See* Transcript Volume 9, August 18, 2021, at pp. 3684-87 (Lyle Press).

[551]  *See* Exhibit DRS-2575, Legier PowerPoint/ Supplemental Expert Disclosure, July 31, 2021, at p. 6, SULLIVAN 107608.

| SUMMARY OF ADDITIONAL TAXES, PENALTIES AND INTEREST OWED BY THE DOCTORS | | | | | | |
|---|---|---|---|---|---|---|
| **Entity/Individual** | **Dr. Sullivan** | **Dr. Dellacroce** | **Janus Insurance Corp.** | **Orion Insurance Corp.** | **Cerberus Insurance Corp.** | **Total** |
| **Additional Taxes –** | | | | | | |
| Federal | $2,138,887 | $2,496,161 | $1,304,496 | $1,274,477 | $980,540 | $8,194,561 |
| State | 201,910 | 228,767 | | | | 430,677 |
| Total | 2,340,797 | 2,724,928 | 1,304,496 | 1,274,477 | 980,540 | $8,625,238 |
| **Penalties –** | | | | | | |
| Federal | 425,675 | 492,748 | 260,899 | 254,895 | 196,109 | 1,630,326 |
| State | 37,250 | 44,042 | | | | 81,292 |
| Total | 462,925 | 536,790 | 260,899 | 254,895 | 196,109 | 1,711,618 |
| **Interest –** | | | | | | |
| Federal | 450,285 | 537,968 | 270,721 | 266,601 | 210,703 | 1,736,278 |
| State | 59,304 | 69,235 | | | | 128,539 |
| Total | 509,589 | 607,203 | 270,721 | 266,601 | 210,703 | 1,864,817 |
| **Total** | $3,313,311 | $3,868,921 | $1,836,116 | $1,795,973 | $1,387,352 | **$12,201,673** |
| *Differences above due to rounding* | | | | | | |

15)    On a year-by-year basis, these totals are set forth in the supporting documentation prepared by Mr. Legier.[552] This Arbitrator [should accept] Mr. Legier's testimony and methodology as credible and award the Doctors $12,201,673 for the taxes, penalties, and interest more likely than not to be owed by the Doctors to the IRS.

## II.    The Doctors are entitled to recover for lost investment opportunities, based on the documented growth rate of 22.5% per year.

1)    The Doctors are also entitled to recover for lost profits and the opportunity to invest the profits.  Had Feldman and Capstone properly disclosed the specific adverse findings from prior IRS audits, the promoter audit of Mr. Feldman, and the presence of Feldman's primary malpractice

---

[552] *See* Exhibit FC-600, at FC-600-0016 (Dr. Scott Sullivan), FC-600-0017 (Dr. Frank DellaCroce), FC-0600-0018 (Janus), FC-0600-0019 (Orion), and FC-0200 (Cerberus).  The highlighting on these pages reflects changes from Mr. Legier's preliminary March 2021 calculations to his updated July 31, 2021 calculations.

policies in the risk pool, both Doctors would have ceased participating in captive insurance altogether, and instead, pursued alternative, tax-advantaged investments.[553]

2)      Participants in captive insurance are not free to invest as they see fit; rather, their investment options are constrained based on regulatory requirements.[554]  Thus, the Doctors were not able to pursue their usual pattern of investments.  Had the Doctors wound down their captives instead of engaging Feldman and Capstone, then, according to Mr. Legier, the Doctors would have realized an additional $23,224,403 in investment profits.[555]  Specifically, Dr. Sullivan lost $9,249,433 in lost opportunity profits, and Dr. DellaCroce lost $13,974,960 attributable to these lost opportunities.[556]  The breakdown of this calculation is as follows:[557]

| | Dr. Sullivan | Dr. Dellacroce | Total |
|---|---|---|---|
| A. Assumed 2014 Liquidation Funds Available for Investment | 2,794,338 | 2,990,400 | 5,784,738 |
| B. Total Premiums to Captives | 4,707,381 | 5,556,954 | 10,264,335 |
| C. Total Fees Paid to Capstone | 632,972 | 617,972 | 1,250,944 |
| D. Less Dividends That Would Not Have Been Received, Net | (1,647,490) | (358,150) | (2,005,640) |
| E. Return on Investment | 5,996,343 | 11,556,668 | 17,553,011 |
| But For Amount of the Doctors' Loss of Profits and Opportunity to Invest | 12,483,544 | 20,363,844 | 32,847,388 |
| F. Less Proceeds from The Assumed Liquidation in 2021 | (3,234,101) | (6,388,884) | (9,622,985) |
| Doctors' Loss of Profits and Opportunity to Invest Net of Proceeds from Assumed Liquidation in 2021 | $9,249,443 | $13,974,960 | $23,224,403 |

---

[553] *See* Transcript, Volume 1, August 3, 2021, at p. 218, lines 5-20; p. 349, lines 8-13; Volume 2, August 4, 2021, at p. 456, line 24 – p. 457, line 17; p. 554, line 22 – p. 555, line 6 (Dr. Scott Sullivan); Volume 5, August 7, 2021, at p. 1987, line 21 – p. 1989, line 13; p. 2011, line 23 – p. 2012, line 21 (Dr. Frank DellaCroce).  *See also* Volume 10, August 19, 2021, at p. 4156, line 18 – p. 4157, line 22; p. 4169, line 15 – p. 4170, line 14 (William Legier).
[554] *See* Transcript, Volume 5, August 7, 2021, at p. 1909, line 2 – p. 1910, line 6 (Dr. Frank DellaCroce).
[555] *See* Exhibit 2575, Legier PowerPoint/ Supplemental Expert Disclosure, July 31, 2021, at pp. 3, 7-10.
[556] *See* Exhibit 2575, Legier PowerPoint/ Supplemental Expert Disclosure, July 31, 2021, at p. 3.  *See also*, Transcript, Volume 10, August 18, 2021, at p. 4026, lines 4-7
[557] *See* Exhibit 2575, Legier PowerPoint/ Supplemental Expert Disclosure, July 31, 2021, at p. 10.

3)      These damages calculations are based upon the documented empirical investment performance of Dr. DellaCroce, shown in Exhibit DRS-1588. Dr. DellaCroce's brokerage statement reflects that he achieved this market-beating growth rate, both when viewed over a three-year (22.6%) and a five-year term (22.58%).[558]   The brokerage statement identifies all of Dr. DellaCroce's equity investments, including most notably, Shopify, which increased 48 times over the amount initially invested.[559] Dr. DellaCroce achieved an annualized growth rate of 22.5%, measured from January 1, 2015.[560] Dr. DellaCroce's documented investment performance reflects that these returns were consistent, whether viewed over a three-year or a five-year timeframe:[561]

| | THREE YEARS ($) | FIVE YEARS ($) |
|---|---|---|
| Beginning Value | 41,267,935 | 28,063,538 |
| Net Contribution | 8,056,094 | 7,429,900 |
| Capital Gains | -13,176 | -13,176 |
| Dividends Not Reinvested | -235,012 | -333,063 |
| Interest Not Reinvested | -29,585 | -105,134 |
| Net Cash In/Out | 9,583,557 | 9,879,423 |
| Net Transfers In/Out | -1,233,113 | -1,976,003 |
| Withholding | -16,577 | -22,147 |
| Change In Value | 37,627,435 | 51,458,025 |
| Dividend Reinvested | 2,037,924 | 3,112,955 |
| Fees | -937 | -1,222 |
| Interest Reinvested | 2,835 | 2,929 |
| Account Value Appreciation/Depreciation | 35,587,612 | 48,343,364 |
| Ending Value | 86,951,463 | 86,951,463 |
| Return | 22.60% | 22.58% |
| Moderately Aggressive Benchmark[61] | 10.38% | 13.29% |

These returns consistently outperformed all major indices.[562]

---

[558] *See* Exhibit DRS-1588, at p. SULLIVAN 019899.

[559] *See* Exhibit DRS-1588; *see also*, Transcript, Volume 5, August 7, 2021, at p. 1994, line 16 – p. 1996, line 13 (Dr. Frank DellaCroce).

[560] *See* Exhibit DRS-1588, Schwab Statement for Frank DellaCroce, at SULLIVAN 19989. At the request of Feldman/ Capstone/ PoolRe, Dr. DellaCroce also obtained an updated year-to-date calculation reflecting his portfolio's growth from February 5, 2021 (the end-date of Exhibit DRS-1588's calculations) and August 12, 2021. *See* Exhibit DRS-2649, Updated Schwab Statement for Frank DellaCroce, at SULLIVAN 107941. Mr. Legier explained that on an annualized basis, the period in question reflected a 22.71% growth rate, with a 24.74% annualized growth rate measured by the year-to-date. *See* Transcript, Volume 10, August 19, 2021, at p. 4046, line 13 – p. 4049, line 2 (William Legier).

[561] *See* Exhibit DRS-1588, Schwab Statement for Frank DellaCroce, at SULLIVAN 19989 (emphasis added).

[562] *See* Exhibit DRS-1588, Schwab Statement for Frank DellaCroce, at SULLIVAN 19989.

4)    Dr. Sullivan's investing practices differ in type making them more challenging to quantify, but have higher rates of return: instead of publicly-traded equities, he focuses primarily in sectors such as private equity, start-ups, and cryptocurrency.[563] Dr. Sullivan identified several specific examples of investments where he earned back several multiples of his initial investment, including, *inter alia*, DiscGenics (originally purchased at $3 per share, with current valuation at approximately $50 per share, with public offering anticipated this year in the $100-150 per share range), TransferWise (went public on the London Stock Exchange, with Dr. Sullivan earning 125% internal rate of return on initial investment), Green Leaf Medical (purchased at $9 per share, sold for $44 per share), and Bitcoin (originally bought at $1,000 in March 2017, traded at approximately $38,000 when he testified).[564]

5)    Dr. Sullivan testified that he was unable to invest in the seed round of Green Leaf Medical, at a rate of $1.30 per share. Green Leaf Medical subsequently was purchased at a value of $44 per share, and as of the date of Dr. Sullivan's testimony, was trading at approximately $50 per share. Although Dr. Sullivan invested in a later investment round of Green Leaf Medical, Dr. Sullivan paid approximately eight times more for his initial investment than the value of this lost opportunity. Had Dr. Sullivan been able to invest in the seed round of Green Leaf Medical, his investment would have appreciated nearly 34-fold (from $1.30 to $44).[565] Dr. Sullivan's unrebutted testimony is that his personal rate of return exceeds Dr. DellaCroce's historic rate of 22.5%.[566]

---

[563] *See* Transcript, Volume 1, August 3, 2021, at p. 342, lines 8-14 (Dr. Scott Sullivan).

[564] *See* Transcript, Volume 1, August 3, 2021, at p. 342, line 8 – p. 345, line 8; p. 347, lines 10-22 (Dr. Scott Sullivan).

[565] *See* Transcript, Volume 3, August 5, 2021, at p. 1379, line 6 – p. 1383, line 6 (Dr. Scott Sullivan).

[566] *See* Transcript, Volume 1, August 3, 2021, at p. 345, lines 5-8 (Dr. Scott Sullivan).

6)      Moreover, these specific details refute the criticism by Feldman's and Capstone's expert accountant, Jason Sharp, that the testimony regarding Dr. Sullivan's investment track record was "very general."[567]   During their exhaustive three-day cross-examination of Dr. Sullivan, counsel for Feldman/ Capstone/ PoolRe asked only a handful of questions concerning Dr. Sullivan's investment performance.   Dr. DellaCroce's testimony regarding his investment performance (*i.e.,* the 22.5% rate of return) was not challenged on cross-examination.

7)      Mr. Sharp avoided providing any contrary computation or modeling as to the Doctors' losses attributable to lost investment opportunities. Mr. Legier's testimony is the only testimony in the record that attributes a specific value to these losses. Mr. Legier's testimony and methodology supports an award in the Doctors' favor that includes $23,224,403 in lost opportunity damages.

8)      The Doctors have proven that they would have realized a 22.5% rate of return during the relevant period had they not placed their funds with Capstone, and instead invested the funds in a manner consistent with their historic practices, and with the opportunities that were available to them at the time. Therefore, the Doctors are entitled to recover the full value of their lost investment opportunities, in an amount of $23,224,403.

## III.   Dr. Sullivan is entitled to recover for losses attributable to the sale of Bitcoin to finance the costs of these arbitration proceedings.

1)      FCP is also liable to Dr. Sullivan for damages attributable to his sale of Bitcoin to fund the costs of these proceedings.  Dr. Sullivan was required to sell 91,772 shares in Grayscale Bitcoin Trust BTC ("GBTC") held in Cerberus to fund these proceedings.[568]  That sale would not have occurred but-for these arbitration proceedings.  Many of Dr. Sullivan's investments (such as

---

[567] *See* Transcript, Volume 17, September 23, 2021, at p. 6597, lines 16-24 (Jason Sharp).
[568] *See* Exhibit J-122; Transcript, Volume 1, August 3, 2021, at p. 347, line 23 – p . 348, line 9.  *See also* Exhibit DRS-2575, Legier PowerPoint/ Supplemental Expert Disclosure, July 31, 2021, at p. 11, SULLLIVAN 107615.

private equity) are illiquid in nature, and are subject to contractual restrictions upon divestment. As a result, GBTC, as a publicly-traded entity, was one of his few investments that could be quickly liquidated on an as-needed basis.[569]

These returns consistently outperformed all major indices.[570]

2)    was "very general."[571] During their exhaustive three-day cross-examination of Dr. Sullivan, counsel for Feldman/ Capstone/ PoolRe asked only a handful of questions concerning Dr. Sullivan's investment performance. Dr. DellaCroce's testimony regarding his investment performance (*i.e.,* the 22.5% rate of return) was not challenged on cross-examination.

3)    Mr. Sharp avoided providing any contrary computation or modeling as to the Doctors' losses attributable to lost investment opportunities. Mr. Legier's testimony is the only testimony in the record that attributes a specific value to these losses. Mr. Legier's testimony and methodology supports an award in the Doctors' favor that includes $23,224,403 in lost opportunity damages.

4)    The Doctors have proven that they would have realized a 22.5% rate of return during the relevant period had they not placed their funds with Capstone, and instead invested the funds in a manner consistent with their historic practices, and with the opportunities that were available to them at the time. Therefore, the Doctors are entitled to recover the full value of their lost investment opportunities, in an amount of $23,224,403.

## IV.    **Dr. Sullivan is entitled to recover for losses attributable to the sale of Bitcoin to finance the costs of these arbitration proceedings.**

1)    FCP is also liable to Dr. Sullivan for damages attributable to his sale of Bitcoin to fund the costs of these proceedings. Dr. Sullivan was required to sell 91,772 shares in Grayscale

---

[569] *See* Transcript, Volume 2, August 4, 2021, at p. 817, lines 12-15 (Dr. Scott Sullivan).
[570] *See* Exhibit DRS-1588, Schwab Statement for Frank DellaCroce, at SULLIVAN 19989.
[571] *See* Transcript, Volume 17, September 23, 2021, at p. 6597, lines 16-24 (Jason Sharp).

Bitcoin Trust BTC ("GBTC") held in Cerberus to fund these proceedings.[572] That sale would not have occurred but-for these arbitration proceedings. Many of Dr. Sullivan's investments (such as private equity) are illiquid in nature, and are subject to contractual restrictions upon divestment. As a result, GBTC, as a publicly-traded entity, was one of his few investments that could be quickly liquidated on an as-needed basis.[573]

2)    Dr. Sullivan liquidated 91,772 shares of GBTC on October 6, 2020. At the time, GBTC traded at $10.72 per share. As of July 29, 2021, shortly before Mr. Legier issued his expert report, GBTC closed at $34.15 per share. This forced liquidation prevented Dr. Sullivan from realizing $23.43 per share, or a total of $2,150,218.[574]

3)    In *Seippel v. Jenkens & Gilchrest, P.C.*, the Court determined that the plaintiffs could recover "losses caused as a result of being forced to sell assets at distressed prices to meet tax obligations," finding such injuries to be "immediate and definite."[575] The same rationale applies here and warrants an award to Dr. Sullivan of the losses attributable to the sale of the GBTC shares.

4)    Immediately prior to testifying, Mr. Legier verified that GBTC closed at $37.91 per share on August 16, 2021.[576] Using Mr. Legier's methodology, this additional increase represents an additional $345,062.72 in GBTC-related losses, bringing the net loss to $2,495,280.72.[577] This

---

[572] *See* Exhibit J-122; Transcript, Volume 1, August 3, 2021, at p. 347, line 23 – p . 348, line 9. *See also* Exhibit DRS-2575, Legier PowerPoint/ Supplemental Expert Disclosure, July 31, 2021, at p. 11, SULLLIVAN 107615.
[573] *See* Transcript, Volume 2, August 4, 2021, at p. 817, lines 12-15 (Dr. Scott Sullivan).
[574] *See* Exhibit DRS-2575, Legier PowerPoint/ Supplemental Expert Disclosure, July 31, 2021, at p. 12, SULLLIVAN 107616. *See also*, Transcript, Volume 10, August 18, 2021, at p. 4050, line 6 – p. 4052, line 23; p. 4055, lines 3-23 (William Legier).
[575] *See Seippel*, 341 F. Supp. 2d 363, 371 (S.D.N.Y. 2004).
[576] *See* Exhibit DRS-2650, Printout of GBTC closing price, August 18, 2021. *See also* Transcript, Volume 10, August 18, 2021, at p. 4053, lines 8-15 (William Legier).
[577] This amount is derived by multiplying the 91,772 shares by the additional $3.76 increase in per-share price as reflected in Exhibit DRS-2650.

Arbitrator finds that Dr. Sullivan is entitled to an award including these losses attributable to the sale of Bitcoin in an amount of $2,495,280.72.

5)    There is no basis for the assertion by FCP that Dr. Sullivan should have taken out a loan in order to pay for his legal expenses. No legal support has been offered to suggest that this argument defeats Dr. Sullivan's claim for damages.

## V.    The Doctors are entitled to recover the amount of premiums belonging to their captives that were converted by FCP.

1)    As discussed in Section XIV above, FCP is liable for the amounts of their clients' premiums converted from the 2018 and 2019 risk pools. From the 2018 pool, FCP converted $250,000.[578] From the 2019 risk pool, $3,042,427.37 was wrongfully converted to pay for FCP's legal fees and expenses in these arbitrations.[579] Capstone confirmed in a July 27, 2021 e-mail that the retention from the 2019 risk pool "has been largely expended," that no distributions are expected, and that a reinsurer funding call is contemplated.[580] Mr. Amoroso explained that this language means that "the money is gone for all intents and purposes."[581]

2)    Applying the applicable quota share percentages for 2018 and 2019, the Doctors' share of the risk pool funds improperly converted by FCP break down as follows:

| Year | Amount taken by Feldman/ Capstone/ PoolRe | Quota Share % | Doctors' share of amounts taken |
|------|-------------------------------------------|---------------|----------------------------------|
| 2018 | $250,000.00 | 3.9443%[582] | $9,860.75 |

---

[578] *See* Exhibit DRS-2543, Capstone Report on 2018 Risk Pool, July 27, 2001; *See also* Transcript, Volume 11, August 20, 2021, p. 4617, line 16 – p. 4618, line 1 (Stewart Feldman); Volume 17, September 23, 2021, p. 6857, line 5- p. 6858, line 18 (Jeff Carlson); Volume 22, 2021, p.

[579] The total amount of retained premiums belonging to all captives participating in the 2019 pool was $3,600,262.32 *See* Exhibit DRS-2004, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-401652. Claims losses and expenses for other captives' claims (as in losses from non-A.M.Y. claims), in an amount of $557,834.94 were deducted from the 2019 pool. *See* Exhibit DRS-2680, 2019 Risk Pool – Claim Losses and Third-Party Claims Evaluation Expenses, at Joint-427016. Thus, the 2019 pool had left $3,042,427.37, which FCP used to pay for their legal fees and expenses in these arbitrations.

[580] *See* Exhibit DRS-2753, E-mail from Capstone Accounting Department, July 27, 2021.

[581] *See* Transcript, Volume 7, at p. 2554, lines 6-16 (Richard Amoroso).

[582] *See* Exhibit DRS-71A, 2018 Reinsurers List. The Doctors' share of 3.9443% is derived from taking the sum of the amounts attributable to Cerberus (1.2042%), Orion (1.2042%), and Janus (1.5359%).

| 2019 | $3,042,427.37 | 6.94%[583] | $211,144.46 |
| **Total** | $3,292,427.37 | | **$221,005.21** |

FCP has converted $221,005.21 of premiums belonging to the Doctors' captives. This Arbitrator concludes that the Doctors are entitled to an award that includes $221,005.21 for FCP's conversion of that money.

## XVIII.  FCP'S RESPONSE TO THE DOCTORS' DAMAGE CLAIMS

### i.    SCP's Damages Model is Fatally Flawed

In post-hearing briefing, SCP request $43,385,088.25 in damages subject to additional statutory multipliers for treble damages under RICO, DTPA, and (even though unpled) the Texas Insurance Code. *See* Doctors' Post-Hearing Brief at 108. SCP never introduced this damages figure during the presentation of evidence. Nor do SCP distinguish in post-hearing briefing which damages are purportedly pending in which arbitrations or which damages pertain to which specific causes of action. Instead, SCP seek to recover the *same damages* based on the *same damages model* in *different arbitrations* (*i.e.,* the Kutcher and Jones arbitrations) where they purport to have *different causes of action* pending. SCP expressly state that their affirmative requests for relief are pending only before Arbitrators Kutcher and Jones. *See* Doctors' Post-Hearing Brief at 148.

Included in the $43.385 million figure are the following categories for damages:

- Fee forfeiture by Capstone;[584]
- Additional taxes owed to [the] IRS;
- Additional IRS interest;
- IRS penalties;
- Lost opportunities from funds placed with the captives by SCP (amount includes management fees paid by Doctors to Capstone) for insuring the Doctors' business entities;
- Forced liquidation of Bitcoin;

---

[583] *See* Exhibit DRS-72A, 2019 Reinsurers List.  The Doctors' share of 6.94% is derived from taking the sum of the amounts attributable to Cerberus (2.093%), Orion (2.249%), and Janus (2.598%).
[584] *See* Ex J-20 at 20 ("The overall fees, which are paid to Capstone (which in turn pays the Firm for legal workundertaken whether or not in excess of the total fees paid) for their respective services").

- Projected costs of IRS audit;
- Conversion of risk pool funds for 2018/2019, based on the quota share reinsuranceagreements executed by SCP; and
- Unpaid sanctions.

*See* Doctors' Post-Hearing Brief at 107-08. SCP's damages expert, William Legier, offered testimony in support of some but not all these categories of damages. Specifically, Mr. Legier provided figures on taxes owed to the IRS, additional IRS interest, IRS penalties, lost opportunities from funds placed with the captives, and forced liquidation of Bitcoin to fund SCP's litigation expenses. For the other categories—fee forfeiture, projected costs of IRS audit, conversion of risk pool funds,[585] and unpaid sanctions—Mr. Legier provided no testimony. Instead, SCP proffered either the lay testimony of Dr. Sullivan or no testimony in support at all.[586] Nowhere does SCP factor into its damages analysis the fact that the contractual basis of the December 2015 Engagement Letter is one where the SCP parties were advised of the risks of the planning, their liability in all cases for taxes, interest and penalties and the fact that the planning – which began years before FCP came on the scene – should only be undertaken by those who can understand, evaluate and bear the risks of loss.[587]

The IRS-related and investment-related damages model proffered by Mr. Legier **presumes** the following: (1) SCP owe taxes to the IRS for tax years 2015-2019 based on improperly-taken

---

[585] The Arbitrator [should] note that SCP have not asserted any claim for conversion in any of the live pleadings before the Arbitrator. Even if SCP could prove a conversion claim, the Arbitrator could not award any damages without validating a trial by surprise.

[586] During the final hearing, Dr. Sullivan unequivocally testified that he would not challenge any IRS determination letter. TR Vol 3 at 1187-91. Accordingly, the Arbitrator is at a loss to understand how SCP can seek the projected costs of an IRS audit when Dr. Sullivan testified that there will not be any challenge to the IRS's findings at the mere field audit level, without contesting matters in IRS Appeals, or at the next level in the federal courts (U.S. District Court, Tax Court or the U.S. Court of Claims) or thereafter in the courts of appeals. As SCP would have it, FCP becomes the Doctors' insurance company regarding some perceived guaranty of results that the Doctors have never identified and the 2015 Engagement Letter expressly disclaimed and excluded. *See* EX J-20 at 13.

[587] *See* EX J-20 at 10 ("this planning technique-as well as other types of advanced business and tax planning – involves inherent risks and should only be undertaken by those who understand and can evaluate and bear such risks").

deductions related to their captive operations; (2) the IRS will assess penalties for improper deductions for tax years 2015-2019; (3) the IRS will assess interest on the back taxes for tax years 2015-2019; (4) SCP would have profited approximately $23 million in other investment vehicles had they not participated in captive insurance for 2015-2019; (5) Dr. Sullivan lost value in future appreciation of Bitcoin investments by selling them to fund this litigation; and (6) SCP will sustain $5 million in costs and fees in defending future IRS audits. (Sher Garner, SCP's litigation counsel in this arbitration, presently serves as tax counsel for the Doctors before the IRS.)

Proving these damages constitutes an element of almost all SCP's affirmative causes of action. It would make sense to analyze SCP's damages claims vis-à-vis the elements of each of those causes of action, which this award should endeavor to do. But because competent proof of damages is so central a prerequisite to any recovery, the Arbitrator [should find] that certain aspects of SCP's damages theory warrant analysis in their own right—and will further inform the damages analyses contained in this award. Those certain aspects are the IRS-related and investment-related aspects of SCP's damages request. (Other requests for damages are addressed, as necessary, in other sections in this award.) Specific attention to these aspects is especially warranted considering FCP's argument that SCP have sustained no cognizable injury, and that throughout this litigation SCP have constantly been in search of damages about which to complain, all to re-litigate the early liquidation dispute—which SCP lost in the Dorfman arbitration.

### ii.    The Legier Model of IRS-related Damages is Wholly Speculative

Unrefuted evidence in the record makes clear that, by the close of evidence, SCP sustained no adverse IRS assessment, received no IRS penalties, and had been assessed no interest by the IRS related to SCP's captive operations. *See, e.g.*, TR Vol. 10 at 4061 (Mr. Legier testifies that SCP have not had to pay any back taxes, penalties, or interest to the IRS); TR Vol. 5 at 2158, 2191

(Dr. DellaCroce testifies that he has received no adverse tax assessment and has no measurable outstanding tax liability related to his captive operations).

SCP's IRS-related model of damages as articulated by Mr. Legier, instead, is based entirely on what the IRS **hypothetically might** do in the future. The central presumptions of Mr. Legier's calculations are exactly that: presumptions. There is no evidence of taxes owed, of interest owed, or of any penalties. As SCP's counsel cogently put it, albeit in what one presumes was a Freudian slip, guessing what the IRS might do "calls for speculation as to what is going to happen in the future." TR. Vol. 23 at 9302. Such speculative damages are "too remote, too uncertain, and [so] purely conjectural, [that] they cannot be recovered." *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997); *Murphy v. Campbell*, 964 S.W.3d 265, 269-73 (Tex. 1997) (recognizing that, even if a claim for tax liability has accrued, tax damages are too uncertain until the IRS issues a preliminary adverse determination after an audit).

On whether an IRS-related injury exists absent an actual IRS adverse assessment, Texas law is clear: no injury exists. In *Atkins v. Crosland*, for example, the Texas Supreme Court clarified that "[i]f a deficiency had never been assessed, the plaintiff would not have been harmed and therefore would have had no cause of action." 417 S.W.2d 150, 153 (Tex. 1967). The Court later clarified in *Murphy v. Campbell* that "assessment" means a notice of deficiency issued to a taxpayer by the IRS. 964 S.W.2d at 271. SCP introduced into evidence ***no notice of deficiency.*** At most, the individual Doctors introduced evidence of an *ongoing* IRS audit examining their billing company, Sigma Delta Billing, and not their captive insurance activities. See EXs FC-340, FC-597, FC-598. No SCP entity apart from the individual Doctors [is] currently under audit. TR Vol 10 at 4061; TR Vol. 20 at 8133-34, 8159-64; TR Vol. 23 at 9302-03, 9310-11, 9361.

As FCP cogently point out, multiple and necessary steps—steps that have not begun and

have no guarantee of even beginning—must occur before the IRS could even be able to issue a notice of deficiency regarding the SCP captives, itself a prerequisite to the damages calculated by Mr. Legier. Those necessary steps include, *inter alia*: the IRS opening audits for Cerberus, Orion, and Janus for the tax years 2015-2019; the IRS then determining that Cerberus, Orion, and Janus are not insurance companies for tax years 2015-2019; the IRS next reversing the tax deductions taken by SCP for tax years 2015-2019; and, finally, the IRS issuing a notice of deficiency that levies that ***maximum*** amount of tax, penalties, and interest for tax years 2015-2019. *See* Post-Hearing Brief of the Feldman Parties, Capstone Parties, and PoolRe at 65. Even Mr. Legier admitted that these steps are necessary prerequisites to SCP having IRS-related assessments. TR Vol. 10 at 4116-17.

Moreover, the Arbitrator [should find] it persuasive that the IRS's three-year statute of limitations on conducting an audit after filing a tax return renders at least the tax years 2015, 2016, and 2017 off-limits to the IRS and thus immune to the worst-case scenario that Mr. Legier was hired to present. TR Vol. 23 at 9306-11, 9347-48. Winstead partner and tax lawyer, Marcus Brooks, testified that because Cerberus, Janus, and Orion reported all income on their tax returns, albeit some of that income as tax-exempt income, those returns would be subject to a three-year statute of limitations for an audit and adverse assessment. TR Vol. 23 at 9313-19; *see* 26 U.S.C. § 6501(e)(1). Expiration of the three-year limitations period "means the IRS can't assess the tax": "If the IRS can't assess the tax, you don't owe it and they cannot ever collect it." TR Vol. 23 at 9308, 9348. No contrary expert testimony refuted Mr. Brooks. And though SCP's counsel represented that it was SCP's position that a six-year limitations period applied, SCP's counsel unambiguously retracted that representation.[588] TR Vol. 17 at 6744-6753. SCP likewise introduced

---

[588] Moreover, legal arguments made by SCP's counsel can never qualify as probative evidence. *See Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 208 (Tex. 2021).

no evidence that they would be subject to a six-year limitation period and introduced no evidence that they had waived or been pressured to waive the three-year statute of limitation.

The significance of the three-year statute of limitations is that tax years 2015, 2016, and 2017—all which Mr. Legier includes in his damages model—cannot, as a matter of law, form the basis of any IRS notice of deficiency because more than three years has run since SCP's tax returns for those years were filed with the IRS.

Under questioning, Mr. Legier demonstrated a limited knowledge of the IRS and routinely relied upon representations of Lyle Press, a former IRS lawyer and another of SCP's expert witnesses. At the direction of SCP's counsel, Mr. Press assumed the absolute "worst possible scenario." TR Vol. 9 at 3778-79. But Mr. Press's suggestion that "it is more likely than not" that the Legier damages calculations will bear out constitutes a mere *ipsit dixit*. Under Texas law, no claim can "stand or fall on the mere *ipsit dixit* of a credentialed witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999). "An *ipse dixit* is still an *ipse dixit* even if offered by the most trustworthy of sources." *Rogers v. Zanetti*, 518 S.W.3d 394, 409 (Tex. 2017). Speculation, which is what Mr. Press provided, does not constitute competent expert testimony. *Windrum v. Kareh*, 581 S.W.3d 761, 768-69 (Tex. 2019). That is especially true when, as here, that speculation ignores the reality established by the evidence—*e.g.,* that a three-year statute of limitations applies here. *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) ("When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment."). Moreover, and even though SCP spent pages relying on Mr. Press's testimony in post-hearing briefing, SCP fail to provide a single legal authority to counter the legal authority holding that the IRS must issue a notice of deficiency for there to be damages. *See* Doctors' Post-Hearing Brief at 111-17 (citing no

cases supporting an award for damages based on what the IRS might do in the future).[589]

All of this is to say: the unrefuted evidence must drive the analysis here. And that evidence is that SCP have sustained no IRS-related injury for which they have suffered damages. *See, e.g.*, TR Vol. 2 at 662; TR Vol. 3 at 1185; TR Vol. 10 at 4061; TR Vol. 20 at 8133-33, 8159-64; TR Vol. 23 at 9302-03, 9310-11, 9361. Mr. Legier's entire damages model speculates about what might happen, not what has happened. SCP's post-hearing brief implicitly concedes this point: "Mr. Legier performed a detailed analysis of the Doctors' ***expected*** tax losses based on their ***exposure*** to penalties, back taxes, and interest." Doctors' Post-hearing Brief at 111 (emphasis added). Those tax-based damages are entirely speculative and therefore not recoverable. *McKnight v. Hill & Hill Exterminators, Inc.,* 689 S.W.2d 206, 209 (Tex. 1985).

Mr. Press's testimony that the 2021 audit of A.M.Y. likewise is incompetent evidence that fails to make SCP's speculative damages more probable than not. There is no audit of an SCP entity—including Cerberus, Janus, or Orion—regarding captive issues. To sidestep this defect, SCP attempted to rely on adverse audits of entities like A.M.Y. in the year 2021. *See* DRS-2464. But these audits do not make SCP's damages more probable than not for four reasons.

First, the 2021 A.M.Y. audit results in no change in tax for A.M.Y. TR Vol. 23 at 9319:12-9321:25. Therefore, even if the IRS copies and pastes DRS-2464 into preliminary audit reports for Cerberus, Janus, and Orion, the result might be zero taxes, penalties, or interest.

Second, SCP did not connect DRS-2464 to SCP's burden to prove cause in fact. *Alvarado*, 2021 WL 1428477, at *5-9 (providing that the plaintiff must prove cause in fact and foreseeability

---

[589] The Arbitrator [should note] what appears to be an out-of-context citation to testimony by Mr. Brooks in SCP's post-hearing brief. SCP cite to Mr. Brooks's testimony to support the proposition that the IRS will likely penalize SCP by using *Reserve Mechanical*-based reasoning. SCP's Post-Hearing Brief at 113. Mr. Brooks provided the cited testimony in a different context, however. His opinions that "there's a ton of heat in here" and that "eventually, another shoe is going to drop" were directly in response to questions about whether the 2015 Engagement Letter informed SCP of the risks inherent in captive insurance planning, with Mr. Brooks opining that the Engagement Letter did disclose those risks *See* TR Vol. 23 at 9400.

to recover damages for malpractice and fiduciary duty claims). The 2021 A.M.Y. audit includes adverse findings that are unrelated to whether PoolRe is a bona fide insurance company. For instance, DRS-2464 finds that A.M.Y. fails the test for insurance for federal income tax test based on the risk shifting factor and because A.M.Y. allegedly has improper cash reserves. TR Vol. 13 at 4852:25-4869:25. If the IRS audits Cerberus, and fails Cerberus on cash reserves, SCP offers no evidence of how such a failure would result from the fact that the Feldman Law Firm and Capstone failed to disclose a (nonexistent) finding from 2013 that PoolRe is not a bona fide insurance company. TR Vol. 13 at 4852:25-4869:25. This testimony is uncontroverted.

Third, SCP does not connect DRS-2464 to SCP's "case within a case" burden for causation. *See Alvarado*, 2021 WL 1428477, at *5-9 (providing that the plaintiff must satisfy the "case within a case" standard to recover damages for malpractice and fiduciary duty claims arising from adverse litigation outcomes). SCP's alleged harm is based on pure speculation of what an adverse result **might** look like in an IRS audit or a tax-court case regarding Cerberus, Janus, and Orion.  But there is zero basis to begin the "case within a case" analysis because no one knows what the actual adverse result is—no one even knows if there will be an audit. Similarly, for whatever the hypothetical bad result would be in a hypothetical audit or tax-court case, SCP offered zero evidence that this bad result would be the result of a specific mistake that the Feldman Law Firm made as opposed to a result that would have happened for reasons unrelated to the quality of the Feldman Law Firm's representation of SCP.

Fourth, SCP does not connect DRS-2464 to SCP's burden to prove foreseeability. *Alvarado*, 2021 WL 1428477, at *5-9. As Mr. Feldman testified, the adverse audit result against A.M.Y. was **unforeseeable** when the parties entered the 2015 Engagement Letter because:

1. Feldman accurately believed that, in July 2013, the IRS did not find that PoolRe was not a bona fide insurance company through which a captive like Reserve could

distribute risk. TR Vol. 12 at 4714:6-4716:17. The IRS **did not even raise this issue**. *Id.* This finding did not exist until the June18, 2018 *Reserve* decision. TR Vol. 13 at 64835:16-4842:2. Before June 8, 2018, it was **unforeseeable** that a captive would fail an audit based on whether PoolRe is a bona fide insurancecompany through which a captive can distribute risk. *Id.* To reach such a conclusion, the IRS wouldneed to audit every captive in the pool, which the IRS has never done even to this day. *Id.*

2. In July 2013, Feldman correctly believed that the IRS made a **positive** finding for PoolRe becausethe IRS "deemed" the PoolRe reinsurance premiums to be insurance for the "gross receipts" analysis of whether Reserve was an insurance company for federal tax purposes. TR Vol. 12 at 4744:10-4767:20; FC 675.0042.

3. As distinct from any issue related to PoolRe, in July 2013, the IRS found that Reserve did not distribute risk because Reserve had only 30% outside business. TR Vol. 12 at 4744:10-4767:20; FC 675.0040. This finding was contrary to 2013 case law, contrary to thirty-nine favorable 1024 determinations from the IRS for Capstone-administered captives, and thus was not foreseeable. TRVol. 12 at 4744:10-4767:20.

4. As of December 2015, there was zero basis to believe the IRS might rely on an attack on whether PoolRe is a bona fide insurance company. The IRS "deemed" findings in favor of PoolRe's premiums. TR Vol. 12 at 4745:13-4756:5. The IRS's question regarding insurance risk for PoolRewas "shocking" and contrary to thirty-nine 1024 rulings that approved PoolRe and the specific direct policies of thirty-nine different Capstone-administered captives. TR Vol. 12 at 4715:1- 4723:17.

5. The IRS then conceded, and the Tax Court rejected, the IRS's 2013 position in three cases that the Feldman Law Firm resolved before December 2015. TR Vol. 12 at 4797:21-4801:1.

6. The Tax Court cannot review or rely upon preliminary audit reports, which are inadmissible in TaxCourt and which often differ from positions the IRS later takes in Tax Court. TR Vol. 23 at 9296:23-9298:17.

This testimony is uncontroverted.

For these reasons, adverse audits from 2021 involving A.M.Y. (such as DRS-2464) and the related adverse audits do not help SCP meet its burden to prove cause in fact, foreseeability, or damages for SCP's malpractice and fiduciary duty claims.

### iii.    The Legier Model of IRS-related Damages Incorrectly Presumes that Someone Other than SCP is Responsible for SCP's Taxes

Central to SCP's damages requests are "additional taxes owed to [the] IRS;" SCP suggests those taxes to be $8,625,238.[590] Doctors' Post-Hearing Brief at 107. This request is inherently wrong-footed. It is black letter law that a taxpayer owes a duty to the federal government to pay their taxes. *Manning v. Seeley Tube & Box Co. of N.J.*, 338 U.S. 561, 565 (1950). As Mr. Brooks explained: "The general rule is, you have to pay your own taxes. Right? You can't sue somebody else and make them pay your taxes." TR Vol. 23 at 9359. FCP's damages expert, Jason Sharp, agreed, confirming that the taxpayer always bears the ultimate responsibility for their respective tax burden. TR Vol. 17 at 6499; *see also* EX FC-388 at 8. Even Mr. Legier conceded this issue when questioned by an arbitrator. TR Vol. 10 at 4162-64.

Even if SCP had a valid claim for IRS-related damages, which they do not, those damages could not include the taxes SCP theoretically might owe due to deliberate business choices made by SCP. Mr. Sharp observed that, in 30 years as a tax professional, he has never seen a tax professional held liable to a client for additional taxes assessed against a taxpayer. TR Vol. 17 at 6498-99; *see also* EX FC-388 at 8. According to Mr. Brooks, damages may lie against tax professionals only when faulty advice causes the taxpayer to pay "<u>additional</u> taxes" as opposed to the situation where the taxpayer <u>underpays</u> taxes. TR Vol. 23 at 9359-62 (emphasis added). None

---

[590] Mr. Legier's damages model does not take into account that the largest component of these alleged tax damages would be voluntary payments made by SCP upon liquidation of the SCP captives, which are C corporations dating back to 2011. The 2015 Engagement Letter informed SCP that they would be liable for taxes upon liquidation of these C corporations. EX J-20 at 32 ("Such exempt status, of course, does not extend to the captive's liquidation or sale, which generally results in a long term capital gain tax being assessed on the gain as well as, in the case of a liquidation, an income tax internal to the captive on its appreciated assets"). EX J-20 at 8 n.11 ("Investment income is taxed as in a C corporation. Federal, state and local taxes may be due upon the captives' wind up and liquidation or upon dividends being paid."). Now SCP attempt to pivot to suggest that their voluntary actions in seeking to liquidate these C corporations should now be compensable by FCP. The Arbitrator [should] conclude that this whole line of argument is without support in the 2015 Engagement Letter, which specifically "excludes: (i) any taxes or related payments which any State government, any other country or the Internal Revenue Service (IRS) assesses of is due on or with respect to:

(a) the captives; (b) the insured companies; or (c) the parent owners." EX J-20 at 8.

of the FCP parties prepared or filed SCP's taxes, either. Mr. Kushner's firm signed the tax returns.

Given this dispositive distinction, FCP never could have caused SCP to sustain any tort damages as measured by taxes the captive insurers and insureds allegedly underpaid. "In ordinary circumstances, when a tax advisor's negligence leads to an underpayment of tax, the taxpayer cannot recover as damages the tax deficiency itself because the tax liability arose not from the negligent advice, but from the [taxpayer's] ongoing obligation to pay the tax." *O'Bryan v. Ashland*, 717 N.W.2d 632, 633 (S.D. 1997).

Though the law is dispositive on this point, the 2015 Engagement Letter also expressly excludes liability for any taxes or related payments to the IRS with respect to the SCP captives, the SCP insureds, or the parent-owners. EX J-20 at 8.

> as much certainty as possible in committing to this project. To this end, we have assembled a turnkey service package[10] and fee structure which only *excludes*:
>
> (i) any taxes or related payments which any State government, any other country or the Internal Revenue Service (IRS) assesses or is due on or with respect to: (a) the captives; (b) the insured companies; or (c) the parent-owners[11].

Thus, even if one assumes that all other premises and assumptions in SCP's damages model are correct, the $8,625,238 that SCP seek as "additional taxes owed to [the] IRS" are not recoverable.

SCP must prove the essential element of proximate cause to prevail on their professional negligence claim and collect damages. *NexBank, SSB v. Winstead PC*, No. 05-18-01345-CV, 2020 WL 1921683, at *2-3 (Tex. App. – Dallas Apr. 21, 2020, no pet.) (mem. op.). Proximate cause consists of the components of cause in fact and foreseeability. *Id.* at *3. "Cause in fact must be established by proof that (1) the negligent act or omission was a substantial factor in bringing about the harm at issue, and (2) absent the negligent act or omission ('but for' the act or omission), the

harm would not have occurred." *Id.* (quoting *Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Res. Corp.*, 299 S.W.3d 106, 122 (Tex. 2009)). Conjecture, guess, or speculation serves as no proof of causation. *Id.* (citing *Akin, Gump*, 299 S.W.3d at 122).

SCP "must supply a causal link between the attorney's alleged negligence and [their] damages." *Id.* (quoting *Rogers* 518 S.W.3d at 404). A lawyer can act negligently without causing any harm to the client. *Id.* (citing *Rogers*, 518 S.W.3d at 400). Where "the breach of a duty of care does not cause harm, no valid claim for legal-malpractice exists." *Id.* (quoting *Rogers*, 518 S.W.3d at 400). In short, SCP can recover no damages unless a causal connection exists with the alleged breach. *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 324 (Tex. App. – Houston [1st Dist.] 2011, pet. denied). Mr. Legier admitted that the element of damages requires "but-for" causation. TR Vol. 10 at 4059-60.

SCP produced no legally sufficient evidence of the "but-for" prong of the cause-in-fact component of proximate cause vis-à-vis their damages model. *See Keo v. Vu,* 76 S.W.3d 725, 731 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). The evidence proves just the opposite: SCP suffered no injury. And should SCP eventually sustain some component of their speculative damages, the proximate and but-for causation would be SCP's actions.

The evidence in the record precludes any finding of but-for causation vis-à-vis SCP's damages model. In pleadings, during the final hearing, and in post-hearing briefing, SCP exclusively relied on *Reserve Mechanical* as the theoretical basis for their tax-related damages model. In summary, SCP argued that the U.S. Tax Court's June 18, 2018 decision in *Reserve Mechanical* essentially guarantees that SCP will face an adverse IRS assessment (and thus sustain the Legier damages model) and the Feldman and Capstone Parties should be held liable (prophylactically) for that assessment because they failed to adequately disclose the risks of the

same.

*The* point here is to highlight that even if the *Reserve Mechanical* decision forewarned of likely IRS-related damages, SCP's intervening actions—and not any act or omission by the Feldman and Capstone Parties—would serve as the proximate cause of those damages. As discussed in § VII(C), *supra*, SCP must prove proximate cause to prevail on a professional negligence cause of action. Yet, the evidence presented at the final hearing demonstrates that SCP cannot prove proximate cause.

Here is why. On June 18, 2018, the U.S. Tax Court issued its memorandum opinion in *Reserve Mechanical*. Within 24 hours, the Capstone Parties emailed all their clients—including SCP and their advisors—with the just issued opinion. EX FC-189. The Capstone Parties emailed subsequent updates as well. EXs FC-207; FC-212 On June 26, 2018, a mere eight days following the opinion's issuance, Dr. Sullivan wrote in an email to Dr. DellaCroce, Mr. Kushner, and Mr. Sherman that the *Reserve Mechanical* opinion was "**not good for captives**." EX FC-189. (emphasis added).  Dr. Sullivan's email was in an email thread containing the Capstone Parties' notices of the *Reserve* opinion. *See id*. Despite Dr. Sullivan's observation, SCP did not act to exit the "captive space" or otherwise mitigate what they now allege are their tax exposures. Quite the opposite, in fact.

In October 2018, several months after *Reserve Mechanical*, SCP filed tax returns for tax year 2017 taking the same tax deductions for their captive operations that they now argue are sure to be audited and rejected by the IRS. *See, e.g*., EXs J-160, J-163, J-166; TR Vol. 23 at 9310-12. In December 2018, several months later, SCP decided to have Cerberus, Orion, and Janus issue insurance policies to the Doctors' business entities for 2019. TR Vol. 20 at 8188-93; TR Vol. 23 at 9310-13. In October 2019, SCP again filed tax returns, taking captive-related deductions. *See,*

*e.g.*, EXs J-161, J-167. And in October 2020, while the Dorfman, Duval, Baker, Kutcher, and Medley arbitrations were pending, all in which SCP alleged that the *Reserve Mechanical* decision essentially caused them damages, SCP again filed tax returns taking captive-related deductions. *See, e.g.*, EXs J-168, J-169, J-170.

This last fact is worth repeating: Despite SCP contending in these arbitrations that their captive arrangement fails to qualify as legitimate insurance for federal income tax purposes, SCP's captive insurers and insureds took the complete opposite position with the IRS under penalty of perjury when they filed their tax returns for years 2018 and 2019 after becoming aware of *Reserve Mechanical*. TR Vol. 23 at 9310-39. As of the time of the close of evidence, none of the SCP parties had amended their tax returns to retract this tax reporting position—a position that squarely contradicts the position SCP have taken in this arbitration. TR Vol. 20 at 8206; TR Vol. 23 at 9323-24; TR Vol. 3 at 1177-78. The argument that the *Reserve Mechanical* decision caused SCP to sustain damages thus fails because SCP's own actions after the *Reserve Mechanical* opinion was released, and after having been fully informed of that decision, would be the proximate cause of any theoretical tax damages to issue. *Compare, e.g.*, EX J-159 at 19-26 *with, e.g.*, EX J-160 at 20-27 (showing SCP continued to take the same tax reporting position before and after the *Reserve Mechanical* decision in June 2018). Relatedly, the three-year audit and assessment statute of limitations for all tax returns filed before June 2018 has run, rendering the only tax returns at-issue as those that SCP filed with full knowledge of the *Reserve Mechanical* decision.

As a peremptory counter argument, SCP focus in post-hearing briefing on why they did not file amended tax returns within the context of their duty to mitigate. *See* Doctors' Post-Hearing Brief at 142-44. SCP contend that a promoter audit of Mr. Feldman and/or Capstone forecloses the availability of filing amended tax returns. Doctors' Post-Hearing Brief at 143. Even if that were

true, SCP ignore—but do not dispute—that they were aware that the promotor audit had closed without any adverse result to Feldman or Capstone by the fall of 2019. EX FC-251 (email of closing letter to Mr. Kushner and Mr. Sherman). Nothing prevented SCP from filing amended returns between the fall of 2019 through the close of evidence, with those amended returns being immediately effective.  Doing so would have avoided all possible penalties and stopped additional interest from accruing, thus mitigating the damages SCP presently ask the Arbitrator to award them. TR Vol. 9 at 3614. SCP chose not to file amended returns—maybe because they determined the benefit of maintaining the tax benefits outweighed the risks of an adverse audit, or maybe because they believed the risk of an adverse audit is sufficiently remote. Whatever the reason, SCP cannot now, in the face of their affirmative election of tax deductions and affirmative decision not to file amended tax returns, recoup millions to cover *potential, speculative* back taxes, penalties and interest thereon, when they could have mitigated these damages by filing amended returns and avoiding penalties and additional interest.

This failure to mitigate [should suggest], at least to this Arbitrator, that SCP do not believe their own IRS-related damages theory.  More importantly, SCP certainly have not proven the existence of those damages nor their right to recover those damages from any of FCP.  *Reserve Mechanical* did not seem to be an issue to SCP when the opinion first issued in June 2018, or in the following 18 months when SCP continued their captive operations and continued taking captive-related tax reductions, even though Dr. Sullivan's almost immediate appraisal of the opinion  recognized potential disfavor on captive insurance companies. Reserve Mechanical did not even seem to be an issue when Dr. Sullivan requested an immediate liquidation of his captives in the fall of 2019. *Reserve Mechanical* appears only to have become an issue within the context of the SCP-FCP litigation, and only when SCP had to formulate some sort of damages model.  A

problem with such an approach, and the problem here, is that proximate cause is missing. For that reason, SCP's IRS-related damages model is fatally flawed.

**i.    SCP Cannot Recover Alleged Lost Investment Losses**

Mr. Legier's damages model also seeks damages based on the assumption that the money SCP put toward their captive operations (insurance premiums and operating capital) would have otherwise made $23.225 million in the stock market and/or other investments. *See* Doctors' Post-Hearing Brief at 117. SCP contend that had the Feldman and Capstone Parties made more robust disclosures, SCP would have ceased their captive activities and invested in other tax-advantaged investments with guaranteed great success. *Id.*

As an evidentiary matter, SCP cannot recover the alleged damages. SCP offered no evidence that showed with any degree of certainty that SCP considered exiting the "captive space" altogether in 2015 before engaging the Feldman and Capstone Parties. To the contrary, documentary evidence indicates that SCP otherwise intended to stay with their previous captive advisor and administrator, Peter Strauss, and/or ensure the continuation of their captives' operations. *See* EXs FC-37.2, FC-56, FC-57, FC-58, FC-69, FC-70, FC-73, FC-82, FC-447, FC-452, FC-456, FC-462; *see also* TR Vol. 2 at 597. Notably, SCP did not even leave the "captive space" in 2018 or 2019 after learning about the *Reserve Mechanical* decision. EX J-54. They instead doubled-down, having their captive insurers issue insurance policies—collecting millions in premiums—for the Doctors' business entities for 2019 despite being free to do otherwise.

Nor did SCP identify other, specific tax-advantaged investments in which they were guaranteed the success they now seek to recover.   For example, Dr. Sullivan failed to identify a single specific investment he considered as an alternative and offered up only abstractions about his investment strategy and the impossibility for him to calculate a rate of return. TR. Vol. 3 at

1378-79. Neither Dr. DellaCroce nor Mr. Legier were able to explain why Mr. Legier calculated a 22.5% return rate for Dr. DellaCroce when Schwab calculated a return rate for Dr. DellaCroce over the same period at 12.46%. *See* EX FC-589. The figures SCP request would amount to an unsubstantiated windfall.

As a matter of law, SCP likewise cannot recover these alleged damages. SCP can only recover their "benefit of the bargain," which is "the difference between the value as presented and the value actually received." *See W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex. 1988). With the 2015 Engagement Letter, SCP bargained for and obtained administrative services for their captive insurers. Therefore, SCP's damages model must compare the difference in value between: (1) the captive and reinsurance administrative services SCP believes it bargained for, and (2) the captive and reinsurance administrative services that SCP received. *See id.* SCP cannot build a damages model based on the hypothetical value it could have obtained from stock investments. Stock values have nothing to do with the value of the captive and reinsurance services that SCP bargained for with FCP. *See id.*

Mr. Legier failed to compute the value of what SCP bargained for when the 2015 Engagement Letter was executed. He also assigned zero value to the insurance and services SCP received from 2015 to 2019 solely because Dr. Sullivan told him to assign zero value. TR Vol. 10 at 4131. Mr. Legier **wholly ignores** that Dr. DellaCroce, at the final hearing, confirmed that the insurance that he and Dr. Sullivan obtained from the captives "was necessary." TR Vol. 5 at 2084

(Q: "Do you believe the insurance that you obtained through Janus and Orion was necessary insurance?" Dr. DellaCroce: "Yes."). Mr. Legier also ignored that SCP represented on their signed tax returns that the insurance issued by the captives was necessary. *See, e.g.*, EXs J-153, J-158, J-168, J-169; *see also* EX FC-57 at 1-2; TR Vol. 10 at 4126-30. This not only renders

the entirety of Mr. Legier's work and opinions suspect, but it precludes his model from being reliable because it assigns zero value to the captive insurance in question contrary to the parties' statements in this proceeding and tax filings (under penalty of perjury).

### ii.    SCP's Bitcoin Losses Are Not Recoverable

SCP request this Arbitrator to award Dr. Sullivan $2,495,280 "attributable to the sale of Bitcoin to fund the costs of these proceedings." SCP's Post-Hearing Brief at 120-21. SCP make no attempt to de-lineate what costs were specific to this arbitration as opposed to the other arbitrations. More fundamentally, however, such a request is contrary to Texas law. Because Bitcoin speculation is not what SCP bargained for, *see Walters*, 754 S.W.2d at 128, SCP cannot recover for the alleged Bitcoin losses. *See McKnight*, 689 S.W.2d at 209.

Further, Mr. Legier simply took Dr. Sullivan's word that he (Sullivan), with a net worth of $87 million, could not find a way to raise $900,000 to pay his lawyers other than liquidating a $3.4 million asset and losing $2.5 million of it in the process. TR Vol. 10 at 4154-55. That allegation is beyond absurd. Nor does it come close to explaining why SCP should be compensated for pursuing litigation *per se*.[591]

During the hearing, SCP made clear that Dr. Sullivan turned to his Bitcoin holdings as the source for paying his attorneys for the legal services they provided in one or more of these arbitrations:

- "Dr. Sullivan specifically seeks to recover damages for forced liquidation of Bitcoin to finance the cost of this litigation when he had to liquidate it and lost three to four times the value of Bitcoin." TR Vol. 1 at 22.

- "Dr. Sullivan wants money for liquidating Bitcoin to pay his lawyers, because if he hadn't, that investment would have increased in value. That is a decision made by

---

[591] The Arbitrator [should note] that SCP's classification of Bitcoin losses as damages incurred by them in order to pay for litigation expenses, is in reality an improper attempt to obtain an attorney's fees disguised as damages.

Dr. Sullivan." TR Vol. 1 at 130.

- Q.  All right. Have you had to divest yourself of any of your investments on account of these arbitration proceedings?

    A.      Yes.

    Q.  Can you tell the Panel what – the Arbitrators what that is?

    A.   We have used the monies within the captiveto pay for the legal expenses. The largest loss of the opportunity there was the Grayscale Bitcoin Trust, purchased 91,000 plus shares of that at a little over $10 a share. Presently trades at about 35 a share. TR Vol. 1 at 347-48.

In other words, Dr. Sullivan voluntarily liquidated a portion of his Bitcoin investment to pay his lawyers, termed this method of paying his bills a "loss," and sought to recover this liquidated amount as part of his damages model. *See* TR Vol. 1 at 347-48.

The Arbitrator [should conclude] that the Bitcoin component of Dr. Sullivan's damages model fails as "compensatory damages" under Texas law. *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 171-73 (Tex. 2013). Texas courts and the Texas Legislature "have long distinguished attorney's fees from damages" and separated the two into different categories. Id. at 172.

"While attorney's fees for the prosecution or defense of a claim may be compensatory in that they help make a claimant whole, they are not, and have never been, damages." *Id.* at 173. Applying this authority, the Arbitrator [should deny] Dr. Sullivan any damages arising from his voluntary decision to liquidate his Bitcoin investment to pay his attorneys.

The Arbitrator also [should deny] any award of such damages because SCP have insisted all during these proceedings that they are bringing claims that sound only in tort, not contract. As used by Dr. Sullivan, the Bitcoin component qualifies not as damages, but as a back-door attempt to recover attorney's fees from FCP. Dr. Sullivan is trying to shift to FCP the fees he incurred and paid to his counsel using his liquidated Bitcoin investment. Yet Texas follows the "American Rule" for recovering attorney's fees, which mandates that each party to litigation must bear their own fees in the absence of a contract or a statute that authorizes an award. *See id.* Nor can Dr. Sullivan recover any fees in a tort case in Texas, thereby nullifying any recovery for conversion, fraud, legal malpractice / negligence, breach of fiduciary duty, and negligent misrepresentation. *See Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 803-04 (Tex. 1974); *Bruce v. Cauthen*, 515 S.W.3d 495, 513-17 (Tex. App. – Houston [14th Dist.] 2017, pet. denied).

### iii.      SCP Cannot Recover Anticipated Defense Expenses for a Speculative Audit

As part of their damages request, SCP request $5 million to cover the "projected costs of IRS audit." Doctors' Post-Hearing Brief at 107. Only Dr. Sullivan testified to this amount and damages category. TR. Vol. 1 at 350. But there is no evidence of any audit related to the captives. *See supra.* Nor did Dr. Sullivan even commit to fighting an audit, should one arise. To award damages to cover the anticipated cost—not calculated by a professional with experience interfacing with the IRS, nonetheless—of a speculative audit is unambiguously without merit.

### XIX.      THIS ARBITRATOR'S ANALYSIS OF DAMAGES CLAIMED BY SCP

Because I share the view articulated by FCP that all of SCP's income tax and lost investment-related damage claims rely entirely upon speculation, supposition, and altogether unsupported allegations of loss, I deny any recovery of that nature. The fact is that the record is without *any credible proof* that SCP has suffered or is likely in the future to suffer either additional

taxes, interest, penalties, or costs of defense flowing from an Internal Revenue Service audit and assessment relating to their captive insurance operations. Even if there were hard proof that an IRS investigation into SCP's affairs had begun, there is no telling how or when it might end—whether in a decision by the IRS to stand down, a negotiated settlement, a Tax Court ruling wholly in favor of SCP, and on and on.

I am also satisfied that it is the three-year statute of limitations that would govern any future assertion of liability by the IRS here, because the facts reflect not a failure by SCP to report income, but instead the failure to pay taxes upon income that was identified but claimed to be non-taxable. *See* p. 340-41 *supra*. This renders Mr. Legier's analysis even more speculative. This limitations bar might in fact be one reason the IRS has apparently paid no attention to the SCP's captive-related affairs, notwithstanding the stunning insistence by SCP's own counsel, at hearing and in SCP's post-hearing briefing, *that SCP should in fact be subject to the more onerous six-year limitations bar*. *See* SCP Post-Hearing Brief at p. 127 *et seq.*

There is a further problem with SCP's approach to the recovery of damages here.  On one hand SCP seeks to "turn back the clock" and recover that which they say they lost for having signed-on with Feldman *et al.* This bespeaks a rescissory approach to loss. But counsel for SCP expressly disavowed any claim for recission. *See* p. 128 *supra*. Nor, under these circumstances, could an effective recission be accomplished here. SCP therefore seeks as recoverable damages what they describe as the "benefit of the bargain" struck with Feldman *et al*. But the fact is that with the exception of the relatively modest losses recoverable as damages that are described below, *SCP received and retains the benefit of their bargain*, *i.e.*, the substantial tax and other financial benefits promised as a part of the captive insurance program. What SCP actually seeks here is therefore the hallmark of an impermissible windfall recovery: keeping all the benefits of a

transaction while recovering for losses that were never incurred.  For all of these reasons, I adopt in full FCP's explication and reasoning defeating all of SCP's claims of tax-related and lost investment damages.

Conversely, I adopt here in full SCP's explication and reasoning regarding SCP's loss of their quota share premiums of the risk pool funds assessed against them for 2018 and 2019, totaling $221,005.21, and I award this amount as damages to SCP.  I also adopt in full the Doctors' reasoning in support of their claim for the disgorgement of professional fees paid to Feldman or Capstone in the amount of $1,250,944.00.  In doing so I adopt in full SCP's articulation and reliance upon *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999) for the proposition that the breach of fiduciary duties shown here merits such forfeiture. Although I have not found the conduct of Feldman, the Feldman Law Firm, and Capstone to be actionable as fraud, I find that their conduct respecting the utilization of SCP's premiums paid to PoolRe as the basis for the recovery of FCP's own legal, administrative, and other fees and expenses meets all of *Arce's* requirements for fee forfeiture.

For the same reasons, I find ample proof in the record for a declaration that Feldman/Capstone/PoolRe may not submit any as-yet-unsubmitted and undistributed legal and administrative fees and expenses from PoolRe to or for the financial benefit of Feldman, the Feldman Law Firm, Capstone, or PoolRe itself.

## XX.    THIS ARBITRATOR'S ANALYSIS OF FCP'S CLAIM FOR ATTORNEY'S FEES

Among the affirmative claims in FCP's Fourth Amended and Restated Arbitration Demand is a request for the recovery of fees associated with FCP's defense of SCP's prosecution of class action claims. This is the only one of FCP's affirmative claims that looks to have been brought forward through hearing and post-hearing briefing. But I do not find merit in this claim, as I do

not consider SCP's prosecution of class claims to be actionable as a breach of contract. As I have previously found, I do believe that SCP's prosecution of those claims in the face of my Orders denying them the right to do so warranted sanctions, but I do not believe SCP's attempt to prosecute class claims breaches any agreement not to do so. I therefore deny FCP's claim for the award of attorney's fees as damages here.

## XXI.   THE PUTATIVE CLASS ACTION

As the parties have at one time or another placed before this Arbitrator the question whether the claims asserted by the Doctors are amenable to class-wide treatment, and as this Arbitrator's answer to this has consistently been "no", this Arbitrator adopts and incorporates here the four prior Orders and the authorities under which that conclusion was reached:

IN THE ARBITRATION OF

| | | |
|---|---|---|
| Capstone Associated Services, Ltd., | § | |
| Capstone Associated Services (Wyoming), | § | |
| Limited Partnership, and Capstone | § | |
| Insurance Management, Ltd., PoolRe | § | |
| Insurance Corp., The Feldman Law Firm | § | |
| LLP, and Stewart Feldman, individually, | § | Pending Before |
|    Claimants | § | |
| | § | |
| | § | |
| v. | § | Mr. Mark Glasser, Arbitrator |
| | § | |
| St. Charles Surgical Hospital, L.L.C.; | § | |
| St. Charles Holdings, L.L.C.; | § | |
| Center for Restorative Breast | § | |
| Surgery, LLC; Sigma Delta Billing, | § | |
| LLC, Sunrise Productions, LLC, | § | |
| Cerberus Insurance Corp., | § | |
| Janus Insurance Corp., Orion | § | |
| Insurance Corp., Scott Sullivan; Frank | § | |
| DellaCroce, | § | |
|    Respondents | § | |

## MEMORANDUM OPINION

Pending before me on February 11, 2021, was the Respondents' Class Action Opening

Brief requesting, in effect, my adoption and/or enforcement of two Orders granted in a now-

dismissed arbitration. Also before me were Claimants' Response to that Brief, Respondents'

Reply Brief, and a few thousand pages of related exhibits. One of the Orders that I was asked to

adopt and/or enforce is a one-sentence Order Granting Respondents' (then Claimants') Motion

for Class Certification dated November 5, 2020, and the other a Supplemental Order on

Claimants' Motion for Class Certification dated November 16, 2020. Both Orders were entered

by former Judge Lloyd Medley, Jr. in an arbitration dismissed and closed by reason of Judge

Medley's loss of jurisdiction over the matter then pending before him. All of the claims and

defenses that were previously pending before Judge Medley were then reasserted in the filing of

Page 1 of 8

the arbitration now before me and in a parallel arbitration filed before former Judge Charles Jones.

The one-sentence Order entered by Judge Medley on November 5, 2020 states only: **"IT IS HEREBY ORDERED that Claimants' Motion for Class Certification is GRANTED"**.  The Supplemental Order entered by Judge Medley on November 16, 2020 recited his findings on the issue of Clause Construction—that is, the result of his review of the relevant arbitration agreement to determine if the agreement provided for class treatment.  Having resolved that question in the affirmative, Judge Medley proceeded, in the same Order, to make a Class Determination defining the contours of the class.

An issue that Judge Medley did not reach because of the loss of his jurisdiction was the question of what any Notice of Class Determination to be sent to putative class members should look like.  That issue fell to me for decision along with Judge Jones.  On the evening of February 11, 2021, Judge Jones issued a one-page Order, approving the Respondents' (in his case, the Claimants') Notice of Class Determination and Notice of Intent to Opt-Out Form.  Without discussion, Judge Jones wrote: "This Arbitrator finds that the previous Arbitrator, Judge Medley's [one-sentence] Order of November 5, 2020 certifying a class before that arbitrator was a partial final award as provided for in Rules 3 and 5 of the AAA Supplementary Rules for Class Actions which remains in full force and effect in this arbitration".

With great respect for Judge Jones, my view was and is that he erred in treating Judge Medley's one-sentence Order of November 5, 2020 as of the type required by the AAA in Rules 3 and 5, as Judge Medley's one-sentence Order of November 5, 2020 did not comply with the AAA requirement that it be reasoned.  And because Judge Jones' one-page Order was wholly silent with respect to Judge Medley's November 16, 2020 Supplemental Order, which was the only Order by which Judge Medley actually undertook Clause Construction and Class

Page 2 of 8

Determination, Judge Jones' Order did not purport to and could not have had the effect of ratifying or endorsing that Order. Finally, for the further reason that Judge Jones' February 11, 2021 Order, like Judge Medley's, did not offer reasoning or analysis in support of the adoption of Judge Medley's Orders—again contrary to the requirements of AAA Rules 3 and 5—my view was and is that Judge Jones' one-page Order did not constitute a proper finding of Class Construction in the matter before him, and did not constitute a proper finding of Class Determination in the matter before him, under either Rule 3 or Rule 5 of the AAA Supplemental Rules for Class Actions. Notwithstanding this, Judge Jones authorized the transmittal of the Class Notice sought by Respondents. For reasons not included in his Order, Judge Jones issued that Order without also ordering the *mandatory* 30-day stay of his Order as required by both AAA Rules described here.

As I had already concluded from my own study of the parties' filings that Judge Medley's November 5, 2020 and November 16, 2020 Orders were of no force in this or any other arbitration—for each of the reasons set out below—I was concerned to see Judge Jones' Order, not simply because it conflicted with my own analysis but because it might—especially in light of Judge Jones' failure to enter the mandatory 30-day stay of his ruling contemplated by the AAA rules—result in the premature and improper transmittal of a Notice that was and is, in my view, both defective and improper. It was for that reason that I promptly notified all interested parties of my own Order, by which I at that moment vacated Judge Medley's Order and expressly denied to Respondents the right to transmit any such Notice or any other communications to the putative class. Having timely received my Order, Respondents' counsel nevertheless proceeded to send to all putative class members their proposed Notice. As provided in my Order of February 11th, I here offer my analysis and reasoning in support of that Order.

Page 3 of 8

## JUDGE MEDLEY'S ORDERS ARE OF NO FORCE OR EFFECT

With the lapse of his jurisdiction over the parties, the two Orders entered by Judge Medley lost all force. Whether either Order actually constituted a "partial final award" under the nomenclature adopted by the AAA is irrelevant, as nothing in the AAA Rules even hints that such orders can survive the termination and dismissal of an arbitration for loss of jurisdiction. Judge Medley's Orders are today nothing more than lapsed, interim orders entered in a matter now long gone and superseded by two others, and the cases cited by the Respondents here, as Claimants point out in their Response Brief, do not lead to any different conclusion. The further fact is that Judge Medley's one-sentence November 5ᵗʰ Order did not and could not qualify as a "partial final award" under the AAA Rules because it fails to include any reasoned basis for its issuance, as plainly required by AAA Rules 3 and 5. And as this facially void and lapsed Order constituted the only articulated basis for Judge Jones' authorization for the Respondents to send their Notice to the putative class, my view is that that authorization was itself erroneous and void.[1]

## JUDGE MEDLEY'S CLAUSE CONSTRUCTION IGNORED UNITED STATES SUPREME COURT PRECEDENT

In *Lamps Plus, Inc. v. Varela*, 139 S.Ct. 1407, 1416 (2019), the United States Supreme Court held that class arbitration is impermissible unless the applicable arbitration agreement clearly and expressly provides for such, and any ambiguity on the point requires the denial of class certification. Presumably aware of this well-established rule, Respondents here struggle in their briefing, just as former Judge Medley struggled in his November 16ᵗʰ Order, to find a way around it, hoping to displace it by reference to AAA Rules (which of course cannot trump

---

[1] Judge Medley's November 16, 2020 Order was and is, in my view, the product of further serious error for having decided Clause Construction and Class Determination *in the same Order*, thereby denying Claimants the required procedural protections that are very clearly contemplated by the applicable AAA Rules. Nor did that or any other Order comply with AAA Rule 5(b), which requires that a proposed Notice of Class Determination *shall* be attached to the award.

Page 4 of 8

Supreme Court precedent), by reference to routinely-used language in virtually every arbitration agreement regarding the scope of disputes that are arbitrable, and, remarkably, by this statement in support: "The Engagement Letter does not "carve out" class proceedings" (Opening Brief at p.3). This is not the test. This is the test exactly backwards. Class arbitration is permitted only where the relevant agreement expressly permits it, not where it fails to reject it. Former Judge Medley's certification of a class in his matter is the plainest error and one that cannot be brought forward into this or any other arbitration.

### THIS ARBITRATION AND THE TEMPORAL STRICTURES THAT GOVERN IT MAKE IT PARTICULARLY UNSUITED FOR CLASS TREATMENT

At Pages 17-19 of their Response Brief, Claimants point to the PoolRe agreements (and others), as well as the allegations made against them, in support of their argument that this dispute, by its nature, is not suited for class action treatment. I have to agree with this. Highly individualized facts will characterize each putative class member's agreements, understandings, experiences, injuries (if any) and damages (if any) resulting from their dealings with the Claimants here, as articulated at page 19 of Claimants' Response Brief. Equally unsuitable is the effort to wedge class issues into this arbitration at this time. Hearing on the merits in this matter will begin in just over two weeks. Yet Respondents have proposed a 45-day timetable for opt-outs, one that would permit opt-outs just before, during, and perhaps even after conclusion of that hearing—maybe even after a final award is entered. As this is completely foreign to class action procedure, it cannot be allowed here and should not be allowed in any other arbitration.

### BECAUSE THERE IS NO CLASS TO BE CERTIFIED NO NOTICE SHOULD ISSUE AND CERTAINLY NOT THE NOTICE PROPOSED

Apart from the many legal and factual impediments to issuance of a Class Notice described above, Claimants in their Response Brief point out numerous deficiencies in the proposed Notice to the class. While some may appear inconsequential, they are nevertheless

Page 5 of 8

confused and confusing. (*See* Response Brief at pp. 20-22). Others—including some that I have independently identified—are particularly troubling.

The problems appear as early as the heading of the Notice. There, the Notice purports to pertain to and govern the arbitration that is before me when it plainly cannot. I have approved no Notice. In fact, by written Order, I expressly disapproved of the transmittal of *any* Notice to putative class members before counsel for the Respondents in my matter sent theirs.

The Notice also refers to the Medley arbitration, in the heading and elsewhere. This is both wrong and confusing. The Medley matter is terminated, and with it Judge Medley's Order on class certification. But even if the Medley Order survived, what is any putative class member to make of unexplained reference in the notice to three separate arbitrations and three separate arbitrators? As Claimants correctly point out, this is a formula for the total confusion of members of the putative class.

Nor is it proper or correct for the Notice to state that "Class Representatives have submitted the class action claims to the Honorable Judge Jones *to pick up where Judge Medley left off*." (Emphasis added). There is no provision in the applicable arbitration agreements for a later arbitration to "pick up" on a former one. On the contrary, the agreements are clear that when the jurisdiction of one arbitration ends, a *new* arbitration commences, not a continuation of the old. There is no carry-over provision in any of the pertinent agreements or under the law.

The confusing statement is also made that "Class Representatives are preparing a motion to dismiss *any attempt by Capstone and Feldman to assert the claims belonging to the class*." (Emphasis added). There is no place in a class Notice for such a statement, which is both inaccurate and confusing, and it should not have been delivered to putative class members.

There then follows an even more confusing averment, and that is in reference to the Respondents' purported Voluntary Motion for Partial Dismissal Without Prejudice. First, any

Page 6 of 8

such Motion was apparently filed only before Judge Medley, and is therefore now a nullity. Second, a much more accurate statement of affairs would result by informing the putative class members that class counsel had *already* proposed, in open court, the dismissal of the putative class members' claims, and then explaining the reason for this. The record is less than clear on what led to that request almost three months ago, and for at least that reason the putative class members are entitled to much more information on the point.

The statement that "The arbitrator(s) have certified a class in this arbitration" is also found in the Notice. [2] But the true facts are these: *only one* arbitrator (Judge Medley) certified a class, and that certification—defective as it was—lapsed with that arbitrator's jurisdiction; *another* arbitrator (Judge Jones) purported to adopt that lapsed certification, but the Order by which Judge Jones acted itself did not meet the AAA Rule 5 test for validity; and the *third* arbitrator (the writer here) *expressly vacated* the class certification, it having been erroneously entered by the first arbitrator and mistakenly relied upon by the second. If it is clarity and accuracy that Respondents seek to deliver to their putative clients in a Notice, as they are obligated to do, their Notice fails completely.

Finally, and most troubling, is the failure of class counsel to advise their prospective clients that the Notice they are receiving was sent to them contrary to the clear prohibition of one of the arbitrators in one of the three arbitrations to which the putative class has been expressly directed. What instead appears is the statement that "An arbitrator authorized this notice." That much is true, but under the circumstances present here it is highly misleading and obviously incomplete: It is true that Judge Jones authorized the transmittal of the subject Notice, but it is

---

[2] Elsewhere the Notice speaks of the class as having been ... "certified by the Court". That statement is of course not true, and it should not have been included in the Notice.

Page 7 of 8

equally true, and in my view equally important, that I clearly prohibited the transmittal of that Notice before it was sent.

## CONCLUSION

It was entirely foreseeable that the four arbitrators hearing these four arbitrations might reach contradictory conclusions on important matters, and now two of them have. Under the controlling arbitration provisions at work here, to which all parties agreed, still more conflicting rulings may be ahead. But as Respondents correctly point out, it is the duty of each arbitrator to ensure that these proceedings are characterized by due process, and this must include due process for the named participants in these arbitrations at least as much as for the members of a putative class. As it was and is my view that due process was denied to the Claimants here at too many steps along the way to Judge Medley's certification of a class and thereafter, resulting in procedural irregularities and the entry of orders that are in my view clearly erroneous in multiple ways, I vacated the certification of a class and prohibited the transmittal of any communications to the members of any putative class. Those Orders remain in effect.

February 19, 2021

_____
Mark K. Glasser, Arbitrator

Page 8 of 8

IN THE ARBITRATION OF

| | | |
|---|---|---|
| Capstone Associated Services, Ltd., | § | |
| Capstone Associated Services (Wyoming), | § | |
| Limited Partnership, and Capstone | § | |
| Insurance Management, Ltd., PoolRe | § | |
| Insurance Corp., The Feldman Law Firm | § | |
| LLP, and Stewart Feldman, individually, | § | Pending Before |
| Claimants | § | |
| | § | |
| | § | |
| v. | § | |
| | § | Mr. Mark Glasser, Arbitrator |
| St. Charles Surgical Hospital, L.L.C.; | § | |
| St. Charles Holdings, L.L.C.; | § | |
| Center for Restorative Breast | § | |
| Surgery, LLC; Sigma Delta Billing, | § | |
| LLC, Sunrise Productions, LLC, | § | |
| Cerberus Insurance Corp., | § | |
| Janus Insurance Corp., Orion | § | |
| Insurance Corp., Scott Sullivan; Frank | § | |
| DellaCroce, | § | |
| Respondents | § | |

**ORDER GRANTING PRELIMINARY RELIEF ON CLAIMANTS' MOTION FOR RELIEF RELATED TO CLASS NOTICE ISSUED IN VIOLATION OF ARBITRATOR'S ORDER**

Pending before me are Claimants' Motion for Relief Related to Class Notice Issued in Violation of Arbitrator's Order, Claimants' Supplemental Brief in support, The Doctors' Opposition to Motion for Relief, and The Doctors' Supplemental Memorandum in Opposition. Claimants' Motion seeks various forms of relief, some of them remedial, some of them compensatory, and some of them punitive. I here consider and grant only one form of relief, remedial in nature, specifically reserving the consideration of all other forms of relief for further discussion and Order.

The facts relevant to the pending Motion and to the relief that I consider and grant here are these:

Page 1 of 6

On January 8, 2021, Respondents, acting as putative class counsel, filed before me Respondnets' (sic) Motion to Approve Class Notice Program. By that Motion, Respondents invoked my jurisdiction and requested my consideration of various class-related issues, including a request that I certify a class of claimants proposed by Respondents and that I approve for delivery to that proposed class a proposed Notice of Class Determination that was attached to the Motion. While themselves invoking my jurisdiction, Respondents in their Motion purported to reserve objection to the Claimants' prior invocation of my jurisdiction on the sole ground that it offended the Texas Supreme Court decision *In Re Houston Specialty Insurance Co.* By Order dated May 2, 2021, I overruled those of Respondents' Motions that had squarely put before me Respondents' objections to my jurisdiction based upon *Houston Specialty* and upon other grounds. For the reasons stated in that Order, and because Respondents themselves specifically and purposefully invoked my jurisdiction on multiple class-related issues, without limitation or reservation, Respondents may not now complain that I am without jurisdiction to hear either the Motion that is the subject of this Order or other class-related issues. In addition to the fact that Respondents themselves conferred jurisdiction upon me respecting those issues, those issues are properly before me under the doctrine of dominant jurisdiction and in furtherance of and in the protection of my jurisdiction generally.

As required by Rule 58 of the AAA Commercial Arbitration Rules, evidentiary hearings upon the pending Motion, among others, were held by Zoom conference on March 1, 2021, on May 26, 2021 and on May 27, 2021. At those hearings, Claimants pressed their request for relief from the impact of Respondents' transmittal of a Notice of Class Determination that Respondents delivered to putative class members in the face of my February 11, 2021, Order expressly vacating Judge Medley's purported certification of a class, and expressly denying Respondents' request for my consent to issue their requested Notice. Further, and as I discuss in some detail in my Memorandum Opinion of February 19, 2021, which is incorporated by reference here, the Notice

Page 2 of 6

that was sent to the putative class was, on its face, confused, confusing, inaccurate, and misleading. Its effect was obviously to lend dignity and authority to a Notice that was in fact quite flawed, falsely stating, among other things, that four arbitrators *and a court* had approved it, and omitting entirely the fact that I had expressly prohibited its delivery.

At hearing upon the pending Motion, Respondents offered testimony and argued that the many flaws in the Notice, and the hurried manner in which it was transmitted, were all either excused or justified by Respondents' desire to faithfully discharge their fiduciary duty to the putative class, principally because there then existed a short period in which the Notice could be delivered before commencement of the hearing on the merits of Respondents' claims. I find that testimony and argument unpersuasive. First, it plainly was not in the discharge of Respondents' duty to the putative class for Respondents to deliver to that putative class a Notice as inaccurate and misleading as the one they sent, no matter what time constraints purportedly required its hurried delivery. Second, although Respondents further contended at hearing that their conduct was motivated by a concern that they might be held culpable by the putative class for any delay in the transmittal of that requested Notice, any basis for such a concern vanished the moment Respondents received my Order expressly prohibiting the transmittal of that Notice or any other. Third, Respondents offered no good explanation for their hurried delivery of the Notice within minutes after receiving conflicting Orders respecting its permissibility instead of seeking further authoritative guidance on the matter, and knowing quite well that the rushed delivery of that Notice would deny Claimants their rule-based right to appeal Judge Jones' grant of permission to send it. Finally, Respondents could have instead simply followed through on the prosecution of their proposed motion to dismiss the class and proceeded to trial on their individual claims only, just as they told all putative class members in the challenged Notice they believe themselves free to do. Having chosen none of these alternatives, Respondents' decision to rush transmittal of the Notice

Page 3 of 6

resulted in: (1) the violation of my Order prohibiting the transmittal of that Notice; (2) the denial of Claimants' right to judicial review of the Notice before its transmittal; and (3) the delivery of a flawed and confusing Notice to the putative class whose interests Respondents purported to protect.

Ultimately recognizing that their Notice suffered from each of these defects, Respondents nevertheless waited almost a month to begin to correct them, delivering to the putative class on March 5, 2021, their first Supplemental Notice Regarding Class Action. There, Respondents advised that they had in fact "sought certification of a class" from me—a position on which they more recently seem to have reversed themselves—and that I denied that request for relief. Respondents also enclosed a copy of my February 19, 2021, Memorandum Opinion. But Respondents nevertheless persisted in maintaining the prior deadline for the delivery of opt-outs from the putative class for a date then only three weeks away.

On March 22, 2021, Respondents delivered to the putative class a second Supplemental Notice, this time advising that the date for final evidentiary hearing in the matter had been reset for a date four months away. Notwithstanding this, Respondents again included in that transmittal a statement that the date for opt-out from the putative class remained March 28, 2021—then only six days away.

On April 21, 2021, a third communication to the putative class advised that Respondents' counsel were seeking to void opt-outs that they considered to be invalid—this communication having come almost a month after the original opt-out deadline.

On May 20, 2021, Respondents delivered a third Supplemental Notice, this time selectively advising the putative class members that Judge Rosenthal had "left undisturbed" Judge Jones' certification of a class, but omitting to state that Judge Rosenthal had also "left undisturbed" my denial of class certification and my Order that no Notice should issue. That Supplemental Notice

Page 4 of 6

also states, inaccurately, that Respondents' pending Motion to Bifurcate "is based on concerns regarding time constraints at the August 2021 hearing."  But no time constraints have ever been placed upon the parties respecting the August 2021 hearing or any continuation of it at a later date. And while informing the putative class that "additional discovery relating to the quantification of class-wide damages is needed", Respondents failed to inform the putative class of equally important and closely-related information regarding the procedural posture of the case, and that is that Respondents' counsel had, before the date of that transmittal, expressly agreed that the deadline for any such discovery, and the deadline for disclosure of experts related to damage issues had both expired months before.  Thus, even in their most recent communications with the putative class, Respondents continue to deliver selective, incomplete, and surely confusing information.

For having embarked upon this pattern of communications with the putative class, and by insisting upon adherence to an opt-out deadline that put putative class members to the task of deciding whether or not to participate in the putative class based upon inaccurate, incomplete, confusing, and misleading information, it is Respondents who bear responsibility for an opt-out process characterized by the delivery of late and in some instances allegedly imperfect Notices of intent to opt-out.  Even now, with considerable evidence that the vast majority of putative class members do not wish to participate in a class proceeding, Respondents make not the slightest nod in the direction of an obvious (albeit partial) cure for their prior miscommunications, to wit, the extension of the opt-out deadline to permit those members of the putative class who do not wish to be involved in it the opportunity to decide their own fate with a somewhat fuller, somewhat more comprehensible, and somewhat more accurate understanding of class-related issues than has been given them by Respondents in their hurried Notice of Class Determination and those Notices that followed.  There is no good excuse for Respondents' failure to favor the putative class that they purport to represent with an extension of the opt-out date now that the putative class has been

Page 5 of 6

given some clarification of class-related issues, and particularly now that all bases upon which Respondents purported to justify or excuse their rushed delivery of the February 4 Notice have disappeared. It therefore falls to me to attempt to remedy the situation.

For all of the above-stated reasons, it is **ORDERED:**

That Respondents' counsel shall, before 5:00 p.m. on Tuesday, June 8, 2021, deliver by e-mail transmittal to every member of the putative class a further Supplementary Notice advising the putative class that the original opt-out date of March 28, 2021, is no longer in effect and that the new opt-out date is Friday, July 9, 2021. That Supplementary Notice shall also include all of the recitals found under the heading "Your Rights and Options" in the original February 11, 2021 Notice (with the new opt-out date) and shall advise, in bolded, italicized, capital letters, (1) that any form of opt-out notice previously delivered by any putative class member to Respondents' counsel, whether transmitted directly by that putative class member or by any person purporting to act as a representative of that putative class member, is null and void and shall not substitute for the notice now required herein, and (2) that any new opt-out notice that is not timely delivered, or that does not substantially comply with the stated requirements for its content, shall be of no effect.

Any question or doubt respecting the required content of the Notice described herein shall be *immediately* brought to the undersigned's attention by e-mail communication from Respondents' counsel, absent which prompt and complete compliance with this Order is required.

Signed this 6th day of June, 2021.

Mark K. Glasser, Arbitrator

Page 6 of 6

**IN THE ARBITRATION OF**

| | | |
|---|---|---|
| Capstone Associated Services, Ltd., | § | |
| Capstone Associated Services (Wyoming), | § | |
| Limited Partnership, and Capstone | § | |
| Insurance Management, Ltd., PoolRe | § | |
| Insurance Corp., The Feldman Law Firm | § | |
| LLP, and Stewart Feldman, individually, | § | Pending Before |
|    Claimants | § | |
| | § | |
| v. | § | |
| | § | Mr. Mark Glasser, Arbitrator |
| St. Charles Surgical Hospital, L.L.C.; | § | |
| St. Charles Holdings, L.L.C.; | § | |
| Center for Restorative Breast | § | |
| Surgery, LLC; Sigma Delta Billing, | § | |
| LLC, Sunrise Productions, LLC, | § | |
| Cerberus Insurance Corp., | § | |
| Janus Insurance Corp., Orion | § | |
| Insurance Corp., Scott Sullivan; Frank | § | |
| DellaCroce, | § | |
|    Respondents | § | |

## ORDER GRANTING CLAIMANTS' MOTION TO DECERTIFY CLASS ACTION

Pending before me are Claimants' Motion to Decertify Class Action together with various Responses and Supplemental filings. For the reasons stated below, Claimants' Motion is GRANTED.

### PRELIMINARY STATEMENT

In two prior orders dealing with the issue of class certification, I identified several important substantive and procedural missteps made along the way to the certification of a class in this matter by Judge Medley and by Arbitrator Jones, not least the fact that the arbitration provisions here do not permit class-wide proceedings at all. Rather than restating each of those missteps here, however, I incorporate here in full my previous orders dated February 19, 2021, and June 6, 2021. I also reiterate here my concern with the apparent inattention to governing procedural rules and substantive law that characterizes each of those arbitrators' handling of the

Page 1 of 8

request for class certification. The matter before those arbitrators required a level of understanding and adherence to governing law that is nowhere exhibited in any of their class-related orders.

### THE FACTS

On November 5, 2020, Judge Medley issued a one sentence Order (the "Order") granting Claimant's Motion for Class Certification. *Order on Motions Heard on November 4, 2020.* That Order reads:   "6. IT IS HEREBY ORDERED THAT Claimants' Motion for Class Certification is GRANTED." *Order.*

On November 16, 2020, Judge Medley entered a second Order supplied to him by Respondents' counsel on November 8, 2020, entitled "Order on Claimants' Motion for Class Certification" (the "Supplemental Order").

The "hearing" on Respondents' Motion for Class Certification took place the night of November 4, 2020, beginning at 6:05 p.m. and ending at 7:35 p.m. *(the "Hearing Transcript")* That 90-minute hearing included Judge Medley's consideration of five unrelated motions in addition to the request for class certification. As best anyone can tell, no more than 30 minutes were devoted to consideration of the Class Certification Motion. *Hearing Transcript, pp.61-97.* No evidence was taken during that hearing and no exhibits were marked or made a part of the record. In fact, in response to a specific request by Claimants' counsel that Claimants be permitted to offer testimony and proof in opposition to class certification, Judge Medley stated: "Well, I'm not going to hear witnesses or evidence tonight. I'm just hearing the motion." *Hearing transcript, p. 80, lines, 14-17.* Moments later, however, when Respondents' counsel made a similar request, seeking to "introduce into evidence all of the documents we referenced and all of the documents attached to our papers" and to "move and offer and file and introduce

Page 2 of 8

into evidence" those materials, Judge Medley made a complete about-face, and despite his earlier refusal to grant Claimants' request to put on evidence in opposition to class certification, Judge Medley freely granted Respondents' request to offer proof in support of class certification, stating "So ordered" (*Hearing Transcript, p. 91, line 21*). Notwithstanding this, no exhibits were ever marked, made any part of the record, or otherwise put before Judge Medley by Respondents before the conclusion of that abbreviated class certification hearing. Oddly, the hearing closed with Judge Medley's assurance that he would rule upon the certification issue within 24 hours, *having at that juncture received no proof whatsoever either in support of or in opposition to the certification of a class.*

Approximately three hours later, at 10:40 p.m. on November 4, 2020, Claimants' counsel delivered to Judge Medley and Judge Medley received 24 exhibits totaling more than 700 pages in support of their Motion. It is not known whether Judge Medley actually turned his attention to that proffer before entering his one-sentence Order granting class certification (and his rulings upon the several other pending motions) the next day, but if he did, Judge Medley would have found nothing there to support the request for class certification, as that tender mostly comprised unauthenticated and irrelevant emails, discovery requests and responses thereto, hearsay affidavits, and the like, offering absolutely no basis for class certification under applicable law, as described below.

### THE GOVERNING LAW

Texas law governs this arbitration, and the requirements under Texas law for class certifications are quite clear. The Texas Supreme Court in *Southwestern Re. Co. v. Bernal*, 22 S.W. 3d 425,433 (Tex. 2000) wrote:

Rule 42 of the Texas Rules of Civil Procedure governs class certification. TEX. R. CIV. P. 42. *The rule is patterned after Federal Rule of Civil Procedure 23; consequently, federal decisions and authorities interpreting current federal class action requirements are persuasive*

*authority. See RSR Corp. v. Hayes*, 673 S.W.2d 928, 931-32 (Tex. App.–Dallas 1984, writ dism'd). All class actions must satisfy four threshold requirements: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). *See* TEX. R. CIV. P. 42(a). In addition to these prerequisites, class actions must satisfy at least one of four subdivisions of Rule 42(b). Plaintiffs assert this class action satisfies Rule 42(b)(4), which requires common questions of law or fact to predominate over questions affecting only individual members and class treatment to be "superior to other available methods for the fair and efficient adjudication of the controversy. "TEX. R. CIV. P. 42(b)(4); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 615, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997) (discussing the kinds of class actions that can be maintained under federal rule 23(b)); *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 (9th Cir. 1976) (observing that certification under federal rule 23(b)(1)(A), the federal counterpart to Texas's Rule 42(b)(1)(A), will ordinarily be inappropriate in an action for damages). *Sw. Ref. Co. v. Bernal, 22 S.W.3d 425,433 (Tex. 2000).* [1]

Courts and arbitrators charged with the task of considering class certification motions are required to perform a *rigorous analysis* before ruling on class certification to determine whether all of the aforementioned prerequisites to certification are met. *Id. at p.435.* It is manifest error to certify a class without knowing how the claims can and will be tried. A trial court's certification order *must* therefore indicate how the claims will likely be tried so that conformance with Rule 42 can be meaningfully measured. *Bernal at 435. See also Henry Schein v. Stromboe*, 102 S.W.3d 675,688 (Tex. 2002) ("Rule 42 does not require adoption of a trial plan as a mere formality; rather, according to *Bernal*, the rule requires a rigorous analysis and a specific explanation of how class claims are to proceed to trial.")

Neither Judge Medley's one-sentence Order of November 5, 2020, nor his Supplemental Order issued on November 16, 2020, come close to satisfying these elementary principles. There was no evidence at all put before Judge Medley at the November 4, 2020 hearing, and there was no *competent* evidence submitted to Judge Medley even after the conclusion of that hearing. As

---

[1] Virtually identical provisions are found in the AAA Supplementary Rules for Class Arbitrations, adopted by and routinely cited by all interested parties here.

Page 4 of 8

indicated, Claimants' counsel were in fact expressly denied their clear and repeated requests to

offer competent proof in opposition to class certification. There is thus no indication whatsoever

that Judge Medley did or could possibly have performed the rigorous evidentiary analysis

sufficient to satisfy even one of the threshold requirements of Rule 42. There is also no hint of

the mandatory trial plan required under Texas law.

These are not principles of Texas law only. In *Comcast v. Behrend*, 569 U.S. 27, 133 S.

Ct. 1426 (2013) the question presented to the Supreme Court was whether a district court may

certify a class action without resolving whether the plaintiff class has introduced **admissible**

**evidence**, including expert testimony, to show that the case is susceptible to awarding damages

on a class-wide basis. *Id. at 33, fn 4* The answer was a resounding **"no"**.

The Supreme Court stated:

The District Court held, and it is uncontested here, that to meet the predominance requirement respondents had to show (1) that the existence of individual injury resulting from the alleged antitrust violation ( referred to as " antitrust impact') was " capable of proof at trial through evidence that [was] common to the class rather than individual to its members"; and (2) that the damages resulting from the injury were measurable "on a class-wide basis" through use of a common methodology." *Id. at 30, emphasis supplied.*

The Court went on:

The Rule 'does not set forth a mere pleading standard'. Rather, a party must not only 'be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b). Repeatedly we have emphasized that it 'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis that the prerequisites of Rule 23(a) have been satisfied'. Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.' That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' *Id. at pp.33-34 (Internal citations omitted.)*

Page 5 of 8

Finding that the damage model supplied by the plaintiffs offered four different approaches to damages without attempting to isolate class damages to the single theory of liability applicable to the proposed class found by the court, the Supreme Court held:

A model that does not attempt to measure only those damages attributable to that theory cannot establish that damages are susceptible of measurement across the entire class for Rule 23(b)(3) purposes. The lower courts' contrary reasoning flatly contradicts this Court's cases, which require a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim. *Id. at 28.* (Internal citations omitted.)

The 5th Circuit is in accord. In *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408,410-1 (5th Cir. 2017) the Court held that "when plaintiffs argue that damages can be decided on a class-wide basis, plaintiffs *must* put forward a damages methodology that maps onto plaintiffs' liability theory." Or "Stated another way, the theory of damages 'must be consistent with [the] liability case, and the district court is required to conduct a rigorous analysis' [ at the class certification stage] to determine whether that is so.'" *Ludlow v. BP, P.L.C.*, 800 F.3rd 674,683 (5th Cir. 2015)

The Court in *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133 (N.D. Tex. 2014)] wrote:

The culmination of the movement by courts—away from a presumptively pro-plaintiff view to the more restrictive approach today—was most recently summed up by the Supreme Court in its 2013 opinion, *Comcast v. Behrend.* In *Comcast*, the Supreme Court, re-stated—its now firmly entrenched view—that a plaintiff seeking class certification **"must affirmatively demonstrates his compliance "** with Rule 23 (a) by showing that "there are in fact sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation." The *Comcast* court further clarified that "[t]he same analytical principles [that apply to Rule 23(a)] govern Rule 23(b)," noting in particular that "[i]f anything, Rule 23(b) (3)'s's predominance requirement is even more demanding than Rule 23(a)." Endorsing its view from *Wal-Mart* and *Falcon*, the Court in *Comcast* reiterated that the certification analysis "will frequently entail 'overlap with the merits of the plaintiff's underlying claim,'" as the class certification analysis "'generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id. at 138-139 Emphasis supplied.*

Going forward, the clear directive to plaintiffs seeking class certification—in any type of case—is that they will face a rigorous analysis by the federal courts, will not be afforded favorable presumptions from the pleadings or otherwise and must be prepared to **prove with facts—and**

by a preponderance of the evidence—their compliance with the requirements of Rule 23. *Id. at 138-139 Emphasis supplied.*

In this case, neither the original Order nor the Supplemental Order even mentions the issue of class-wide damages; no evidence of class-wide damages was offered, accepted, or is to be found in the record; and no expert modeling of or analysis of damages that may be proved class-wide was ever proffered, received, or approved.

In short, there is absolutely no evidence (and certainly not a preponderance of the evidence) in any of the certification Orders here (whether in Judge Medley's Orders or in Arbitrator Jones' single-page, non-reasoned adoption of Judge Medley's Orders) of the proof and the rigorous analysis of proof on numerosity, commonality, typicality, and adequacy-of-representation required by Rule 42(a), and none with regard to the issues of predominance required by Rule 42(b), including the existence and provability of class-wide damages.[2]

### A FURTHER REASON FOR DECERTIFICATION

I have identified in earlier orders my concern with Arbitrator Jones' handling of the class certification issue, but here, in connection with the issue of decertification, I turn to another problem.

Consistent with my earlier-described and multiple concerns with the type and content of the Class Notice that Arbitrator Jones approved some months ago, I entered on May 6, 2021, an order requiring the transmittal of a new, corrective Notice to the putative class, and the establishment of a reasonable timeline for the transmittal of opt-out notifications by putative class members. Two days later, on June 8, 2021, in what may charitably be described as a bilious

---

[2] Although offered by Respondents as proof of Judge Medley's conformity with the legal requirements for class certification, the Supplemental Order delivered by Respondents to Judge Medley, and entered by him on November 16, 2020, is nothing of the sort, as the inescapable fact is that Judge Medley had already granted class certification in his one-sentence Order eleven days before he entered that later Order, and in the complete absence of competent proof. Nor was any other form of competent proof put before Judge Medley in the intervening days between the entry of his Order on November 5, 2020, and the entry of his Supplementary Order on November 16, 2020.

Page 7 of 8

order, Arbitrator Jones purported to forbid any party's compliance with my order requiring a new Notice, pausing along the way to libel both me and Claimants' counsel with a charge of "conspiracy", and in the process openly displaying his hostility to the Claimants here. Three days later, Arbitrator Jones reversed himself, finally recognizing that a new Class Notice was in fact required here, and so, in an order dated June 11, 2021, ordered the transmittal of a new Notice of his own. In the same order, however, Arbitrator Jones required that putative class members who wished to opt-out of the class do so *within 24 hours of receipt of the corrective Notice*. This arbitrator first assumed that this inexplicably burdensome response requirement might be a typographical or calculational error by Arbitrator Jones, but when counsel for the Feldman parties reasonably requested on behalf of their clients and the class additional time in which opt-outs might be delivered, Arbitrator Jones flatly denied the request.

The truncated and onerous opt-out period imposed by Arbitrator Jones is needlessly but unavoidably prejudicial, not only to the Claimants here but also to the putative class members that Respondents here purport to represent, so much so that it surely constitutes further, reversible error in a class proceeding already fatally compromised by the proceedings described above.  Having here granted Claimants' Motion to Decertify Class Action it is therefore **ORDERED** that any and all class certifications previously granted by Judge Medley and Arbitrator Jones in any arbitration proceeding are here **DECERTIFIED** and **VACATED**, as are any orders entered in furtherance of such certifications.

Signed this 27th day of July, 2021.

_____
Mark K. Glasser, Arbitrator

Page 8 of 8

## IN THE ARBITRATION

| | | |
|---|---|---|
| Capstone Associated Services, Ltd., | § | |
| Capstone Associated Services (Wyoming), | § | |
| Limited Partnership, and Capstone | § | |
| Insurance Management, Ltd., PoolRe | § | |
| Insurance Corp., The Feldman Law Firm | § | |
| LLP, and Stewart Feldman, individually, | § | |
| | § | |
| | § | |
| | § | |
| | § | **Pending Before** |
| v. | § | Mr. Mark Glasser, Arbitrator |
| | § | |
| | § | **Required Location of** |
| | § | **Arbitral Proceeding:** |
| | § | **Houston, TX** |
| St. Charles Surgical Hospital, L.L.C.; | § | |
| St. Charles Holdings, L.L.C.; | § | |
| Center for Restorative Breast | § | |
| Surgery, LLC; Sigma Delta Billing, | § | |
| LLC, Sunrise Productions, LLC, | § | |
| Cerberus Insurance Corp., | § | |
| Janus Insurance Corp., Orion | § | |
| Insurance Corp., Scott Sullivan; Frank | § | |
| DellaCroce, and persons in privity with them, | § | |
| | § | |
| | § | |

## ORDER ADDRESSING RESPONDENTS' CONTINUING VIOLATIONS OF ARBITRATOR'S ORDERS REGARDING CLASS ARBITRATION RELIEF

Pending before this arbitrator are the following:

1. Motion for Relief Related to Class Notice Issued in Violation of Arbitrator's Order, filed on February 19, 2021;

2. Doctors' Opposition to Motion for Relief Related to Class Notice Issued on February 11, 2021, filed on February 27, 2021;

3. Notice and Motion for Further Relief Related to Class Arbitration Being Prosecuted in Violation of Arbitrator's Order, filed on April 23, 2021;

4. Motion to Compel Production of communications with Clients and to Re-Urge Request to Enjoin SCP from Further Communications, filed on May 7, 2021;

5. Doctors' Opposition to Capstone's Motion to Compel Production of Communications with Clients and to Re-Urge Request to Enjoin Doctors from

Page 1 of 11

Further Communications, filed on May 14, 2021;

6. Supplemental Brief Supporting Available Relief this Tribunal Can Permissibly Award, filed on May 21, 2021;

7. Doctors' Omnibus Supplemental Memorandum in Opposition, etc., filed on May 21, 2021;

8. Doctors' Opposition to Capstones' Motion to De-Certify Class Arbitration, filed on June 2, 2021;

9. SCP's Motion for Relief from this Tribunal's June 6, 2021 Order Considering Judge Charles Jones' June 6, 2021 Order, filed on June 8, 2021;

10. Doctors' Motion for Relief from this Tribunal's June 6, 2021 Order Considering Judge Charles Jones' June 6, 2021 Order , filed on June 8, 2021;

11. Motion for Relief Relating to the Arbitrator's Order of June 6, 2021, filed on June 9, 2021;

12. Submission of Attorneys' Fees and Costs dated July 22, 2021, including the affidavits of Joseph Greenberg and/or L. Andy Paredes;

13. Proposed Order submitted by FCP, filed on July 22, 2021;

14. Doctors' Response to Capstone and Feldman's Attorneys' Fees Submission, filed on July 27, 2021;

15. Feldman and Capstone's Reply in Support of Submission of Attorneys' Fees Related to Class Disputes, filed on August 14, 2021;

16. Claimants' Supplemental Submission of Attorneys' Fees Affidavits Related to Class Disputes, filed July 16, 2021; and

17. Doctors' Response to Capstone and Feldman's Supplemental Submission of Attorney's Fees, filed November 11, 2021.

After considering the above motions, all responses thereto, all replies, the arguments of counsel, and the applicable law, this arbitrator issues this Order.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

To explain and support the relief granted below, this arbitrator incorporates in full its prior Orders dated February 19, 2021, June 6, 2021, and July 27, 2021, including all of their legal and factual findings, and offers here this additional procedural and factual

Page 2 of 11

background.

- Respondents, or SCP,[1] initiated (as claimants) an arbitration before Judge Lloyd Medley on August 23, 2020.

- On August 24, 2020, Respondents filed an amended demand with Judge Medley asserting class arbitration disputes against Stewart A. Feldman, The Feldman Law Firm LLP, Capstone Associate Services (Wyoming), Limited Partnership, Capstone Associated Services, Ltd., Capstone Insurance Management, Ltd., and Jeff Carlson. Respondents asserted no class claims against PoolRe Insurance Corp. ("PoolRe") or its individual directors. The arbitration agreements that appear in the Feldman and Capstone parties' arbitration agreements do not expressly permit class arbitration and the PoolRe stop loss and quota share agreements expressly prohibit it.

- On October 5, 2020, Respondents filed a Motion for Class Certification with Judge Medley, invoking only "Rule 23 of the Federal Rules of Civil Procedure." Mot. for Class Certification of Oct. 5, 2020 at p. 1.

- On October 9, 2020, Claimants here (as Respondents in Judge Medley's arbitration) filed their response attacking the class-action requirements imposed by Fed. R. Civ. P. 23 and asserting that there existed no agreement that would authorize arbitrating class disputes between the parties.

- On October 17, 2021, Respondents filed a reply with Judge Medley in further support of their motion for class certification, again invoking Fed. R. Civ. P. 23. Nowhere in any of the pleadings or motions before Judge Medley did Respondents invoke, reference, or purport to comply with the Supplementary Rules for Class Arbitrations (the "AAA Class Rules") of the American Arbitration Association (the "AAA").

- On the evening of November 4, 2020, Judge Medley held a thirty-minute oral "hearing" on the Respondents' Motion for Class Certification filed on October 9, 2021. It was at this hearing that Respondents first raised the potential applicability of the AAA Class Rules. *See* Nov. 4, 2020 Hearing Transcript at 62:2-74:1. At that same Nov. 4, 2020, hearing The Feldman and Capstone Parties specifically objected that Rule 3 of the AAA Class Rules required a reasoned Clause Construction Award before Judge Medley considered a motion to certify the class. *See* Nov. 4, 2020 Transcript at 16:7-16:24;75:10-76:14. Claimants further objected that Respondents presented no evidence at the hearing in support of the motion for class certification, and sought permission to themselves put on evidence in the form of witness testimony. *Id.* at 79:10-80:17. Judge Medley flatly denied that request.

---

[1] "Respondents" or "SCP" (the St. Charles Parties) refers collectively to St. Charles Surgical Hospital, L.L.C., St. Charles Holdings, L.L.C., Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC, Sunrise Productions, LLC, Cerberus Insurance Corp., Janus Insurance Corp., Orion Insurance Corp., Scott Sullivan; and Frank DellaCroce.

Page 3 of 11

- After the hearing on the motion for class certification concluded, however, Respondents submitted and Judge Medley received 24 exhibits as evidence in support of their motion for class certification, Judge Medley having "preadmitted" those 700 pages of exhibits at the hearing the day before. *See* Nov. 4, 2020, Hearing Transcript at 91:21-93:20; 96:1-96:5 and this arbitrator's July 27, 2021, Order Granting Claimants' Motion to Decertify Class Action and authorities cited therein.

- Although Judge Medley's final hearing was then set for December 7, 2020, Judge Medley issued an order on Nov. 5, 2020, that states, in relevant part, as follows: "ITIS HEREBY ORDERED THAT Claimants' Motion for Class Certification is GRANTED." This bare-bones ruling plainly failed to qualify as a reasoned award under AAA Class Rule 3 or 5. It suffered from many other errors, equally obvious. *Id.*

- Claimants filed additional objections and an Emergency Motion to Stay Judge Medley's Arbitration on November 6, 2020, objecting that Judge Medley's November 5, 2020, order did not comply with Rules 3 and 5 of the AAA Class Rules, which provide for separate, distinct, and mandatory 30-day stays following the entry of a "Clause Construction Award" and a "Class Determination Award." AAA Class Rules 3 and 5 each require the arbitrator to issue a reasoned award, which must go beyond merely announcing the arbitrator's decision.

- On November 8, 2020, in reaction to Claimants' objections, Respondents submitted a proposed form of reasoned order to Judge Medley that impermissibly combined a Clause Construction Award and a Class Certification Award and also submitted a proposed notice of class determination to be sent to the putative class. Claimants objected via email on November 9, 2020, and also via a responsive opposition filed on November13, 2020.

- On November 16, 2020, Judge Medley entered a Supplemental Order on Claimants' Motion for Class Certification, adopting, almost verbatim, the proposed form of reasoned order submitted by Respondents on November 8, 2020.

- On November 17, 2020, Judge Medley granted a stay of his arbitration "as to class claims only," contrary to Rules 3 and 5 of the AAA Class Rules. Through this order, Judge Medley stayed the class claims and allowed the non-class claims (including those of the purported class representatives) to move forward. Because some of the non-class claims make up the substance of the class claims, the stay of the class claims ordered by Judge Medley had little or no meaningful effect on staying the class-related issues.

- At Claimants' request, the Harris County District Court issued a temporary restraining order against the Medley arbitration on November 19, 2020.

- On November 30, 2020, in order to "moot" Claimants' requests for a stay of the

Page 4 of 11

Medley Arbitration and move forward with non-class claims, Respondents agreed on the record at an emergency status conference before Judge Dollinger to dismiss the class action claims. *See* Nov. 30, 2020 Transcript at 5:9-10; 6:2-7; 30:14-17 ("[W]e are going to drop the class claims in the arbitration.") ("But that's what we're going to do. We're – we're dropping the class claims As soon as we are permitted to file it, we'll file it and proceed with the arbitration.") ("But at some point, our zeal as litigators to litigate has to give way to what's best for the [Respondents]. And what's best for the client is we go forward and protect the client.").

- On December 7, 2020, the Harris County District Court held a hearing on Claimants' application for temporary injunction. At that hearing, Respondents' counsel stated that they intended to dismiss the class and that there would be no prejudice to proposed Class Members because the "dismissal is without prejudice with the agreement that we would not bring another class action." Dec. 7, 2020 Hearing Transcript at 62:14-62:17.

- Judge Dollinger signed his order on the application for temporary injunction on December 7, 2020, granting the application with regard to the individual claims and allowing the class claims in the Medley arbitration to move forward so that absent class members could be given notice regarding the dismissal of the class claims. Judge Dollinger specifically noted Rules 6 and 8 of the AAA's Class Rules in his order, which pertain to notice(s) to class members, and voluntary compromise, settlement, or dismissal of the class claims.

- Judge Medley issued an order on December 19, 2020, that denied Respondents' motion to extend his jurisdiction beyond the four-month period fixed by the parties' arbitration agreements. That same day, Claimants submitted the disputes previously before Judge Medley, including the class-related disputes, to this arbitrator.[2]

---

[2] Claimants stated as follows in their submission:

> Judge Medley has declined to extend his four-month jurisdiction (see attached), which expires on Tuesday, December 22, 2020 at midnight. It is impossible for Judge Medley to resolve to finality the proceedings before him before December 22, 2020 given that there is no final hearing even scheduled. Thus, the matters are now before you or will be before you by operation of law at the expiration of Judge Medley's jurisdiction in 2-3 days. Thus, if it matters because of impossibility as to the existing Medley's arbitration being concluded, please consider alternatively this demand effective as of the expiration of Judge Medley's proceeding on December 22, 2020.

This arbitrator has already ruled that the class issues are properly pending in this arbitration based, in part, on the doctrine of dominant jurisdiction, *see* Order Granting Preliminary Relief of June 6, 2021 at p. 2, and on a timely filing of the demand rather than a premature one, *see* Order on Respondents' Jurisdictional Objections of May 2, 2021 at p. 3. In addition, and for the removal of doubt, the Arbitrator hereby deems that the Claimants properly submitted the disputes previously submitted to Judge Medley, including the class disputes, to this Arbitrator on December 19, 2021, or alternatively, at 12:00 a.m. on December 23, 2021, and that in either event, this arbitration was the first-filed arbitration with regard to the class disputes. Pursuant to the parties' arbitration agreements, this arbitration is the sole and exclusive forum for resolution of the class-related disputes between the parties. *See* 2015 Engagement Agreement ("Submission of the dispute to arbitration under this agreement shall be the sole and exclusive forum…").

Page 5 of 11

- Respondents filed their Class Action Opening Brief on January 27, 2021, with this arbitrator and with arbitrator Charles Jones, Claimants filed their response on February 4, 2021, and Respondents filed a reply on February 9, 2021.

## II.    DISCUSSION

With the filing of their Class Action Opening Brief before this arbitrator, Respondents willingly invoked this arbitrator's jurisdiction to hear and rule upon their request for issuance of a Notice conveying class certification. Respondents asked arbitrator Jones to do the same. In the event, both arbitrator Jones and I did as asked by Claimants, by ruling upon their requests, albeit through the issuance of conflicting orders on February 11, 2021. As is well-documented by the record and by this arbitrator's prior Orders, Arbitrator Jones adopted and treated as effective Judge Medley's non-reasoned and error-filled November 5, 2020, Order referenced above, while this arbitrator vacated both Judge Medley's and arbitrator Jones' class certification orders and denied Respondents' request to send any form of notice to members of the putative class.

Respondents violated this arbitrator's order on the evening of February 11, 2021, by hurrying a flawed, confusing, and misleading Notice to members of a putative class. As reflected in this arbitrator's Memorandum Opinion of February 19, 2021, Respondents took this action even though they had timely received my Order prohibiting it and while obviously aware of: (1) the unmistakable error in Judge Medley's conduct of the "hearing" on Class Certification; (2) the further errors resulting from Judge Medley's inattention to applicable AAA Rules; (3) the same inattention to AAA Rules in arbitrator Jones' contrary Order; and (4) the glaring flaws in the Notice itself. What was obvious then as now is that Judge Medley's one-sentence Order of November 5, 2020 did not even purport to comply with federal law, Texas law, or AAA requirements. Equally obvious was that the February 11, 2021 Order issued by Arbitrator Jones did not purport to and

Page 6 of 11

could not have legally ratified Judge Medley's Supplemental Order of November 16, 2020, because Judge Jones' Order does not even mention that Order. *Id.* at p. 2. Nor, for reasons still unexplained, did Arbitrator Jones in his Order issue the *mandatory* stay required by AAA Class Rules 3 and 5 or pay any respect to other applicable AAA Rules. All of these defects were plainly known to Respondents' counsel, who advertise specialized knowledge of class action matters, when they elected to act in defiance of this arbitrator's Order.

On February 19, 2021, Claimants filed their Motion for Relief Related to Class Notice issued in violation of Arbitrator's Order. The Doctors responded on February 27, 2021, and a hearing was held on March 1, 2021. Evidence was offered at the hearing in the form of documents and Mr. Feldman's testimony. The evidence established that Respondents had indeed acted in purposeful violation of this arbitrator's ruling on the class notice issues, a ruling that, as noted, Respondents had themselves invited.

On June 6, 2021, in an effort to ameliorate the damage done by Respondents' transmittal of a flawed and misleading Notice, this arbitrator issued an Order Granting Preliminary Relief on Claimants' Motion for Relief Related to Class Notice Issued in Violation of Arbitrator's Order and required that a new Notice to be sent to members of the purported class. Respondents refused to comply with that Order as well, claiming that a *sua sponte* Order issued by Arbitrator Jones excused them from doing so. Then, when arbitrator Jones reversed himself on June 11, 2021, there ordering Respondents to send out an additional notice to class members, *and giving them one calendar day to opt out of the class,* Respondents again elected to comply only with that Order instead of following this arbitrator's June 6 Order, yet voicing no concern at all for the obvious prejudice this short turn-around time would create for the same putative class members whose interests

Page 7 of 11

Respondents had pledged to protect. On June 9, 2021, Claimants filed their Motion for Relief Relating to the Arbitrator's Order of June 6, 2021. All matters relating to that Motion are fully briefed and are ripe for consideration of Claimants' request for injunctive relief, sanctions, attorney's fees, costs, and other equitable relief.

### III.    APPLICABLE LAW AND RELIEF GRANTED AND DENIED

As this arbitrator previously concluded in its Memorandum Opinion of February 19, 2021, Respondents purposefully disobeyed this arbitrator's February 11, 2021, Order vacating Judge Medley's Class Certification Order and Denying their Motion to Approve Notice Program, *an Order that flowed as a direct result of Respondents' specific request that this arbitrator take up and rule upon their request for class certification*. Having timely received my Order, which denied Respondents' request for relief, Respondents' counsel nevertheless proceeded to send to all putative class members their proposed Notice, arguing then and now that the entry of Judge Jones' conflicting Order permitted them to act upon his Order, which they liked, and that it also permitted them to ignore my Order, which they did not like. But the law does not work that way, and least of all upon the facts presented here.

First, for all of the reasons that litigants are justly prohibited from efforts to influence the outcome of a matter by forum shopping, Respondents' indulgence here in "favorable order shopping" surely crossed the line. Second, there is an essential distinction between the relief this arbitrator denied and the relief Judge Jones granted. Judge Jones did not order Respondents to do or not do anything; he only stated that it was, in his view, *permissible* for them to send a Notice to the putative class. But this arbitrator's Order expressly and unequivocally prohibited the dispatch of that Notice, defective and improper as it was in so many respects. In short, nothing in Judge Jones'

Page 8 of 11

Order required Respondents to rush the transmittal of a facially objectionable Order within minutes of the entry of that Order, whereas this arbitrator specifically required that Respondents refrain from doing so. By their decision to defy my Order, Respondents engaged in contemptuous and sanctionable conduct.[3]

In considering the relief requested by Claimants, this arbitrator draws on AAA Commercial Arbitration Rules R-7, R-8, R-23, R-37, R-47, and R-58. Rule R-23(d) of the AAA's Commercial Rules allows the Arbitrator to (1) exclude evidence or other submissions; and (2) make special allocations of costs or an interim award of costs arising from the noncompliance. *See* AAA Rule R-23(d). AAA Rule R-37 empowers this arbitrator to award all "interim measures" deemed "necessary" to implement its orders respecting class disputes, including granting "injunctive relief." AAA Rule R-58 ("Sanctions") empowers the arbitrator to "order appropriate sanctions where a party fails to comply with its obligations under these rules or an order of the arbitrator." In addition to specific remedies, AAA Rule R-23(e) authorizes the arbitrator to "issu[e] any other enforcement orders which the arbitrator is empowered to issue under applicable law." AAA COMMC'L ARB. R. R-23(e). Texas law entitles courts to hold parties in civil and criminal contempt. *See Ex parte Werblud*, 536 S.W.2d 542, 545-46 (Tex. 1976). Because arbitration operates just like "any other mode of trial known to law," *Forshey v. G.H. & H. R.R.*, 16 Tex. 516,539 (1856), *quoted in CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 240 (Tex. 2002), an arbitrator may hold parties in contempt under Texas law. *See Ex parte Werblud*, 536 S.W.2d at 545-46.

After considering the parties' submissions and proof regarding reasonable,

---

[3] I have of course considered, but here reject, the several arguments offered by Respondents in justification of their conduct, including the spurious claims that Respondents were "ethically bound" to deliver their Notice—flawed and misleading as it was—and that Judge Lee Rosenthal has in some fashion endorsed or approved the conduct and the positions undertaken by Respondents here.

Page 9 of 11

necessary, and segregated attorney's fees, costs, and related expenses, the arbitrator concludes that Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership, Capstone Insurance Management, Ltd., The Feldman Law Firm LLP, and Stewart Feldman, individually, should be awarded sanctions in the form of their fees, costs, and related expenses associated with Respondents' violation of the arbitrator's previous orders and rulings both that Judge Medley's previous orders are now nullities and that the parties' agreement does not provide for the arbitration of class disputes.

As the result of the above sanctionable and contemptuous conduct, St. Charles Surgical Hospital, L.L.C., St. Charles Holdings, L.L.C., Center for Restorative Breast Surgery, LLC, Sigma Delta Billing, LLC, Sunrise Productions, LLC, Cerberus Insurance Corp., Janus Insurance Corp., Orion Insurance Corp., Scott Sullivan, and Frank DellaCroce are hereby ORDERED to pay, jointly and severally, **$255,919.36** to Stewart Feldman and The Feldman Law Firm LLP. This amount represents reasonable, necessary, and segregated attorney's fees and costs, along with related expenses, all adequately supported by Claimants' verified submission, and is due to be delivered within 30 days from the date this order is signed unless otherwise agreed by the parties.

As the result of the above sanctionable and contemptuous conduct, St. Charles Surgical Hospital, L.L.C., St. Charles Holdings, L.L.C., Center for Restorative Breast Surgery, LLC, Sigma Delta Billing, LLC, Sunrise Productions, LLC, Cerberus Insurance Corp., Janus Insurance Corp., Orion Insurance Corp., Scott Sullivan, and Frank DellaCroce are hereby ORDERED to pay, jointly and severally, **$49,555.97** to Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership, and Capstone Insurance Management, Ltd. This amount represents reasonable, necessary, and

segregated attorney's fees and costs, along with related expenses, all adequately supported by Claimants' verified submission, and is due to be delivered within 30 days from the date this order is signed unless otherwise agreed by the parties. All other relief requested by Claimants is DENIED, subject to the terms of the paragraph below.

It is further ORDERED that this arbitrator shall retain jurisdiction to enforce this Order. Should Respondents fail to comply with any aspect of this Order, or should Claimants continue to incur costs associated with the defense of a prohibited and now decertified class claim, this arbitrator may, upon motion, order additional relief, including the further award of costs, attorneys' fees, and related expenses, and, if appropriate, the award of equitable relief, and compensatory and punitive monetary sanctions.

It is ORDERED that simple interest will accrue on the amounts awarded at the rate of 5% from the date of this Order.

It is so ORDERED on December 11, 2021.

Mark K. Glasser, Arbitrator

Page 11 of 11

Based upon all of the above, this Arbitrator again rules that none of: (1) the arbitration agreements; (2) Supreme Court authority; (3) Texas authority; or (4) the Rules of the American Arbitration Association permit this or any other Arbitrator to grant class certification of all or any of SCP's claims here. Any holding to the contrary would exceed this (or any other) Arbitrator's powers in clear violation of the Federal Arbitration Act. *See* 9 U.S.C. § 10(4).

## XXII.  FINAL ARBITRATION AWARD

Considering the totality of evidence in the record and the applicable law, this Arbitrator issues this Final Arbitration Award in favor of Respondents, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Claimants, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., finding Claimants liable to these Respondents for breaching fiduciary duties, committing professional malpractice, making negligent misrepresentations or omissions, and converting funds, as discussed in detail in the foregoing analysis and findings.

Respondents, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., are therefore jointly and severally liable to and must pay Claimants, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., losses in the total amount of $1,471,949.21 for the foregoing wrongful acts.

Further, this Arbitrator issues a Declaratory Judgment in favor of Respondents, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., and against Claimants, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd.,

Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd. and PoolRe Insurance Corp., declaring that Stewart Feldman and those in active concert with him, including his related entities, the Feldman Law Firm, all Capstone companies, and PoolRe, cannot tender to the risk pool or pool participants for payment or reimbursement any portion of: (1) the A.M.Y. claims, (2) the legal fees and expenses incurred in the Dorfman arbitration, this arbitration, the three other pending and related arbitrations, any future, directly-related proceedings in state or federal court, any future, directly-related state bar proceedings, or (3) the damages award issued by this Arbitrator.

In summation, considering the totality of evidence and testimony in the record and the findings of fact and conclusions of law above:

> **IT IS ORDERED, ADJUDGED, AND DECREED** that Claimants, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., are jointly and severally liable to and must pay Respondents, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., damages in the total amount of $1,471,949.21, exclusive of attorneys' fees and costs, pre-judgment interest, and post-judgment interest, for the wrongful acts identified above, comprising:
>
> 1. $1,250,944.00 in professional fees paid by the Doctors to be forfeited by Feldman and Capstone; and
>
> 2. $221,005.21 for the risk pool premiums belonging to the Doctors converted by Feldman and Capstone.
>
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Respondents, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., shall have and recover against Claimants, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and

Capstone Insurance Management, Ltd., pre-judgment interest at a rate, consistent with the post-judgment interest rate below, of 5%, beginning to accrue on December 7, 2020 and ending on the day preceding the execution of this Final Award.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Respondents, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., shall have and recover against Claimants, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; Capstone Insurance Management, Ltd., awarding the Doctors post-judgment interest consistent with Tex. Fin. Code § 304.003, at a rate of 5% beginning to apply on the date this Final Award is executed.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that there is hereby entered a Declaratory Judgment in favor of Respondents, Dr. Scott Sullivan, Dr. Frank DellaCroce; St. Charles Surgical Hospital, LLC; St. Charles Holdings, LLC; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC; Sunrise Productions, LLC; Cerberus Insurance Corp.; Janus Insurance Corp.; and Orion Insurance Corp., declaring that Stewart Feldman and those in active concert with him, including his related entities, all Capstone companies, and PoolRe, cannot tender to the risk pool or pool participants for payment or reimbursement any portion of: (1) A.M.Y. Property & Casualty Insurance Corp.'s claims, (2) the legal fees and expenses incurred in the 2020 arbitration before Hon. Grant Dorfman, this arbitrations, the three other pending and related arbitrations, any future, directly-related proceedings in state or federal court, any future, directly-related state bar proceedings, or (3) the damages award issued by this Arbitrator.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Claimants, Stewart Feldman; The Feldman Law Firm LLP; Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership; and Capstone Insurance Management, Ltd., and PoolRe Insurance Corp., take nothing and their claims, affirmative defenses, and any and all relief sought, except as described above, are rejected and dismissed with prejudice.

**ALL RELIEF NOT EXPRESSLY GRANTED HEREIN IS DENIED.**

_____
Arbitrator Mark Glasser
Signed, this 9th day of March, 2022